# EXHIBIT D

LINDELL EXHIBIT D

REFERENCE TITLE: decertifying Arizona's 2020 electors

State of Arizona
House of Representatives
Fifty-fifth Legislature
Second Regular Session
2022

# HCR 2033

Introduced by
Representatives Finchem: Barton, Biasiucci, Burges, Carter, Chaplik, Diaz, Fillmore, Martinez, Nguyen, Parker, Senators Borrelli, Rogers, Townsend

A CONCURRENT RESOLUTION

DECERTIFYING AND SETTING ASIDE THE 2020 ARIZONA ELECTORS.

(TEXT OF BILL BEGINS ON NEXT PAGE)

LINDELL EXHIBIT D

HCR 2033

1     Whereas, a declaration of the results of statewide electoral
2 contests in the 2020 general election is in dispute with probable cause to
3 believe that multiple discrepancies exist, both criminal and noncriminal
4 in nature, and that so many questionable ballots were commingled with
5 legitimate ballots across the State of Arizona that significant voter
6 disenfranchisement has occurred, making the election irredeemably
7 compromised; and
8     Whereas, the Constitution of the United States provides for
9 enumerated powers of the federal government; moreover, the Tenth Amendment
10 specifies such enumerated powers as negative rights of the federal
11 government, while protecting vast unenumerated powers for the state
12 governments, stating, "The powers not delegated to the United States by
13 the Constitution, nor prohibited by it to the States, are reserved to the
14 States respectively, or to the people"; and
15     Whereas, Article I, Section 4, Clause 1 of the United States
16 Constitution empowers state legislatures, including the Legislature of the
17 State of Arizona, to prescribe the "Times, Places, and Manner" of
18 conducting elections; and
19     Whereas, the definition of "manner" is at the sole discretion of the
20 Legislature; and
21     Whereas, Article II, Section 1, Clause 2 of the United States
22 Constitution empowers state Legislatures, including the Legislature of the
23 State of Arizona, to direct the manner of appointing electors for
24 President and Vice President of the United States; and
25     Whereas, Article IV, Section 4 of the United States Constitution,
26 known as the "Guarantee Clause," guarantees each state a republican form
27 of government, the foundation of which is self-governance through free and
28 fair elections accurately reflecting the will of the people; and
29     Whereas, the fifteen counties within the State of Arizona conducted
30 an election on November 3, 2020 for federal offices, including selecting
31 electors for President and Vice President of the United States; and
32     Whereas, the Legislature of the State of Arizona has exercised its
33 authority to establish election administration procedures for the state
34 under Arizona Revised Statutes (A.R.S.) title 16, commonly known as the
35 Arizona Election Code; and
36     Whereas, title 3, section 2 of the United States Code further
37 empowers state legislatures to appoint electors if the election failed to
38 produce a clear winner of an election due to tampering; and
39     Whereas, the A.R.S. section 16-121.01, subsection B, paragraph 2
40 specifies conditions to be a qualified elector and disqualifying factors
41 from being such, including "That the registrant has not resided in this
42 state for twenty-nine days next preceding the election or other event for
43 which the registrant's status as properly registered is in question"; and
44     Whereas, the Arizona Election Code requires that all persons voting
45 in an election must be registered to vote twenty-nine days before an
46 election by law, and voter registration was extended by the federal

LINDELL EXHIBIT D

HCR 2033

1  judiciary to October 23 in direct conflict with A.R.S. section 16-101,
2  subsection A, paragraph 3, a violation of the separation of powers; and
3         Whereas, the Arizona Election Code requires election officials at
4  polling places and points where ballots are received via United States
5  Postal Service to authenticate the signatures of in-person voters; and
6         Whereas, pattern analysis of early voting ballot return envelopes
7  revealed that of 34,448 such ballot return envelope images there were
8  2-copy, 3-copy and 4-copy duplicates originating from 17,126 unique voters
9  while no duplicates were reported in Maricopa County's canvass report; and
10        Whereas, Maricopa County reported 1,455 ballot envelopes having no
11 signatures, yet they were counted contrary to A.R.S. section 16-547,
12 subsection A, which requires the following: "I declare the following under
13 penalty of perjury: I am a registered voter in [fill in the county name]
14 county Arizona, I have not voted and will not vote in this election in any
15 other county or state, I understand that knowingly voting more than once
16 in any election is a class 5 felony and I voted the enclosed ballot and
17 signed this affidavit personally unless noted below"; and
18        Whereas, the requisite audit agent signatures for sixteen Maricopa
19 County early voting ballot transport statements are missing, thus breaking
20 the requisite chain of custody; and
21        Whereas, the count of ballots contained in a transfer box for
22 nineteen Maricopa County early voting ballot transport statements are
23 missing, thus breaking the requisite chain of custody; and
24        Whereas, the requisite chain of custody for twelve Maricopa County
25 early voting ballot transport statements was broken by missing one sealed
26 signature; and
27        Whereas, the requisite chain of custody for fifteen Maricopa County
28 early voting ballot transport statements was broken by missing one
29 received signature; and
30        Whereas, the requisite chain of custody for fifteen Maricopa County
31 early voting ballot transport statements was broken by missing two sealed
32 signatures; and
33        Whereas, election day poll workers and observers testified to
34 observing discrepancies in ballot handling, that ballot chain of custody
35 was breached in case after case, that poll watchers and observers were not
36 allowed to be on site or close enough to observe whether poll workers were
37 following proper identification processes, that poll workers were made to
38 stay seated or in a particular area far away from where voting activity
39 was occurring, that poll workers were reprimanded for asking questions and
40 that poll workers observed bias in voting; and
41        Whereas, some voters were made to vote a provisional ballot while
42 others were instructed to simply retrieve proof of residence, showing
43 improper and biased voting center activity when, in certain circumstances,
44 workers were instructed to call the Elections Department for voter
45 authorization as opposed to following standardized protocols applicable to
46 all voters; and

LINDELL EXHIBIT D

HCR 2033

1	Whereas, testimony was given describing the following observations:
2	trays of mail-in ballots were brought into tabulating rooms to be properly
3	and independently checked and counted by processing teams of two different
4	parties whose envelopes had already been pre-opened in the "mailroom";
5	batches and trays of ballots by the thousands in one 4-5 hour shift were
6	carried to rooms and offsite where they were not overseen; workers in the
7	ballot processing room were allowed to retain their personal purses and
8	backpacks and were observed rummaging through them, presenting opportunity
9	for ballot tampering; ballots were moved to rooms where there were no
10	independent ballot watchers; signatures on absentee ballots did not match
11	and thousands more in a 4-5 hour period were not verified before being
12	counted or "run through" electronic signature adjudication, which alone
13	could comprise hundreds of thousands of ballots in Maricopa County, in
14	which 1.875 million out of 2 million were cast by mail; there was
15	inadequate and improper oversight in which only one independent ballot
16	observer from two different parties was assigned to observe the ballot
17	processing activities of 90 tables at one time and from a distance; and
18	Whereas, election observers witnessed the following:  computers and
19	laptops with internet connection capability in the tabulation centers;
20	over-votes for candidate Trump were not counted even when voter intent was
21	clear; some ballots were changed from candidate Trump to candidate Biden
22	but observers were never provided answers regarding how or when they were
23	to be rectified; 30 of the same signature on 30 different ballots but the
24	Attorney General's Election Fraud Unit was not notified; and
25	Whereas, an election volunteer testified to observing 100,000 votes
26	per day in the adjudication room over three days being improperly
27	processed and a Dominion employee making a copy of an entire voter file
28	and taking it off the METEC with him, thus breaking the requisite chain of
29	custody; and
30	Whereas, evidence was presented that individuals were permitted to
31	vote in violation of A.R.S. section 16-122, which states, "No person shall
32	be permitted to vote unless such person's name appears as a qualified
33	elector in both the general county register and in the precinct register
34	or list of the precinct and election districts or proposed election
35	districts in which such person resides, except as provided in sections
36	16-125, 16-135 and 16-584"; and
37	Whereas, the Arizona Election Code authorizes poll watchers,
38	selected by candidates and political parties, to observe the process of
39	canvassing absentee and mail-in ballots in certain counties in the state,
40	but the watchers were not allowed to meaningfully observe the
41	precanvassing and canvassing activities relating to absentee and mail-in
42	ballots; and
43	Whereas, the Arizona Election Code is silent on contested elections
44	in which proof of fraud sufficient to alter the outcome of an election is
45	predicted and testimony detailing the fraud is taken; and

LINDELL EXHIBIT D

HCR 2033

1   Whereas, on November 30, 2020, members of the Legislature of the
2   State of Arizona sitting as an *ad hoc* public fact-finding hearing on
3   election integrity ("the Panel") heard testimony and received evidence
4   that through extraordinary means the vote count in some counties was
5   electronically altered to award enough votes to a candidate that did not
6   actually receive said number of votes in such a volume so as to alter the
7   outcome of the election; and
8   Whereas, it is well settled civil rights law under the Equal
9   Protection Clause of the United States Constitution that to protect
10  individual franchise of sovereignty commonly known as suffrage, the legal
11  doctrine of "one person, one vote" shall apply to all elections; and
12  Whereas, the Arizona Legislature has the duty to ensure that no
13  citizen of this State is disenfranchised, to insist that all elections be
14  conducted according to the law and to satisfy the general public that
15  every legal vote is counted accurately; and
16  Whereas, mathematical modeling evidence was presented to the Panel
17  to explain how the slope of tabulation for the presidential candidates
18  could only be explained by a vote count of 130% of one party's registered
19  voters, revealing the violation of "one person, one vote"; and
20  Whereas, on November 30, 2020, the Panel was shown evidence that,
21  while tabulation of votes using vote tabulation equipment was intended,
22  through extraordinary means fractional vote calculation occurred, awarding
23  more than one vote to one candidate and less than one vote to another; and
24  Whereas, evidence related to the matching of signature records made
25  by voters predating the election to those found on paper ballot envelopes
26  was provided; and
27  Whereas, evidence was received by the Panel that votes for candidate
28  Trump were intermittently, and in some cases immediately, assigned to
29  candidate Biden, and votes for candidate Trump were not tabulated; and
30  Whereas, the Arizona Senate Forensic Audit revealed key
31  cybersecurity failures of the system necessary for electronic tabulation
32  of votes, including the failure to perform basic operating system patch
33  management and the failure to update antivirus definitions, despite the
34  claim that the system was not configured to access the internet nor
35  capable of accessing the internet, which represents a significant security
36  risk as reported by the Senate's qualified cyber forensics analysis
37  provider; and
38  Whereas, Election Assistance Commission (EAC) Certification Defense
39  is not valid in view of the evidence the 4 ".exe" files were created after
40  Dominion software install, that 45 ".dll" files were modified after the
41  Dominion software install, that 377 ".dll" files were created after the
42  Dominion software install, that 1053 ".dll" files were modified after the
43  Dominion software install and that there was a failure to preserve
44  security logs as reported by the Senate's qualified cyber forensics
45  analysis provider; and

LINDELL EXHIBIT D

HCR 2033

1  Whereas, 865 directories and 85,673 election-related files (scanned
2  ballots, .dvd files, slog.txt files, etc.) were deleted between October
3  28, 2020 and November 5, 2020, 9,571 directories and 1,064,746
4  election-related files were deleted between November 1, 2020 and March 16,
5  2021, 304 directories and 59,387 files containing election data were
6  deleted from the HiPro scanner 1 on March 3, 2021, 1,016 directories and
7  196,463 files containing election data were deleted from the HiPro scanner
8  3 on March 3, 2021, and 981 directories and 191,295 files containing
9  election data were deleted from the HiPro scanner 4 on March 3, 2021 as
10 reported by the Senate's qualified cyber forensics analysis provider, all
11 showing an illegal destruction of election records under 52 United States
12 Code section 20701; and
13 Whereas, there is clear evidence of intentional remote overwriting
14 of the security logs by the Elections Management System Administrator
15 (EMSADMIN) Account where on February 11, 2021, 462 log entries were
16 overwritten, on March 3, 2021, 37,686 log entries were overwritten and on
17 April 12, 2021, 330 log entries were overwritten as reported by the
18 Senate's qualified cyber forensics analysis provider, all in direct
19 violation of 52 United States Code section 20701; and
20 Whereas, Maricopa County Supervisors admitted on the Congressional
21 Record that general election results were purged from the Election
22 Management System (EMS) as evidenced by a February 1, 2021 SQL Log entry
23 that the RTRAdmin Account purged the general election results from the
24 database, with no corresponding Windows Access Log entry, as reported by
25 the Senate's qualified cyber forensics analysis provider; and
26 Whereas, Maricopa County records reveal a failure to maintain chain
27 of custody and properly document ballot retrieval and transport, which
28 makes it impossible to verify the origin of the ballots counted in the
29 election under scrutiny; and
30 Whereas, Arizona statutes set out specific requirements for secure
31 ballot retrieval and chain of custody procedures of the transfer of voted
32 ballots from drop boxes and vote centers; and
33 Whereas, Maricopa County officials violated Arizona statutes and do
34 not have the required chain of custody for at least 740,000 ballots; and
35 Whereas, the United States EAC advocates for thorough, detailed
36 chain of custody as a standard of care, stating, "keeping a proper chain
37 of custody is more than best practice…chain of custody documents provide
38 evidence that can be used to authenticate election results, corroborate
39 post-election tabulation audits, and demonstrate that election outcomes
40 can be trusted; and
41 Whereas, the Arizona Legislature understood the need for ballot
42 chain of custody and included that requirement in A.R.S. title 16;
43 moreover, the Secretary of State, Governor and Attorney General agreed on
44 the requirements for voted ballots deposited in Early Voting locations in
45 the 2019 Elections Procedure Manual (EPM); and

LINDELL EXHIBIT D

1    Whereas, Maricopa County reported that 923,000 early voter ballots
2    were accepted at vote centers or drop box locations and that the county
3    lacks chain of custody documents for at least 740,000 of those early voter
4    ballots; and
5    Whereas, of the 1,895 Early Voting Ballot Transport Statements
6    (EVBTS), eighty percent have defects that violate Arizona statutes; and
7    Whereas, violations of Arizona statutes include documents with no
8    record of the number of ballots retrieved and documents that reveal a
9    failure to assign two couriers for each ballot retrieval; and
10   Whereas, the Maricopa County Recorder, who is responsible for
11   enforcing the chain of custody of all ballots, failed to enforce the
12   counting of ballots and record the number of ballots retrieved from each
13   ballot drop box location. Arizona law was disregarded by the Maricopa
14   County Recorder's Office, specifically the EPM requirement that when the
15   secure ballot container is opened by the County Recorder or officer in
16   charge of elections or designee, the number of ballots inside the
17   container shall be counted and noted on the retrieval form. These
18   violations of Arizona statutes are so egregious and so widespread that
19   they demand referral to the Arizona Attorney General's Office under the
20   Arizona Election Code, which states, "An officer of an election who
21   knowingly fails or refuses to perform any duty required of him under this
22   chapter is guilty of a class 2 misdemeanor unless another classification
23   is specifically prescribed"; and
24   Whereas, 1,514 EVBTS forms out of a total of 1,895 forms have no
25   ballot counts and 48 out of 1,895 unique EVBTS forms have either one
26   retriever signature where two are required or have no signatures at all;
27   and
28   Whereas, 23,344 voters voted via mail-in ballot even though they
29   show in the Melissa Commercial Database as having moved and no one with
30   the same last name living at the address of record for the voter; 2,382
31   voters voted in person even though they show in the Melissa Commercial
32   Database as having moved out of Maricopa County; 2,081 voters moved out of
33   state during the 29 days before the election and were given a full ballot
34   instead of a presidential-only ballot; and 255,326 early votes show in the
35   VM55 that do not have a corresponding EV33 entry, in total showing that
36   the margin of error far exceeds the margin of victory by candidate Biden;
37   and
38   Whereas, there is additional evidence of similar crimes of
39   compliance and manipulation of votes in Pima County and of "ballot
40   harvesting" in violation of A.R.S. section 16-1005 in Yuma County; and
41   Whereas, the State of Arizona's general election results were
42   certified on November 30, 2020 when the Arizona Secretary of State, the
43   Governor of the State and the Attorney General of the State prematurely
44   certified results of the November 3, 2020 election even while a hearing
45   was underway revealing election discrepancies and fraud, herein

LINDELL EXHIBIT D

1  enumerated, knowing that such action would deprive one or both candidates
2  due process in the ongoing litigation regarding presidential electors.
3  Therefore
4  Be it resolved by the House of Representatives of the State of Arizona,
5      the Senate concurring:
6      1.  That the Members of the Legislature recognize that lawful voters
7  expect that election officials and state legislators will do their duty to
8  ensure that lawful votes of the people as cast are honored and not diluted
9  or debased by acts classified by the Arizona Legislature as criminal acts.
10     2.  That, in the words of constitutional expert Alexander Hamilton
11 in Federalist 68, "Nothing was more to be desired than that every
12 practicable obstacle should be opposed to cabal, intrigue, and corruption.
13 These most deadly adversaries of republican government might naturally
14 have been expected to make their approaches from more than one quarter,
15 but chiefly from the desire in foreign powers to gain an improper
16 ascendant in our councils. How could they better gratify this, than by
17 raising a creature of their own to the chief magistracy of the Union? But
18 the convention have guarded against all danger of this sort, with the most
19 provident and judicious attention."
20     3.  That when a state legislature exercises this plenary power to
21 determine the manner in which electors are chosen, that power is governed
22 solely by the federal Constitution, the jurisprudence memorialized in
23 Leser v. Garnett, 258 U.S. 130, 137 (1922) (function of state legislature
24 in carrying out a federal function derived from the United States
25 Constitution "transcends any limitations sought to be imposed by the
26 people of a State") and that no state constitution, state law or state
27 court can alter or constrain that grant of power.
28     4.  That the appointment of these electors is thus placed absolutely
29 and wholly with the legislatures of the several states, that this power is
30 conferred on the legislatures of the states by the Constitution of the
31 United States and cannot be taken from them or modified by their state
32 constitutions; and that whatever provisions may be made by statute, or by
33 the state constitution, to choose electors by the people, there is no
34 doubt of the right of the legislature to resume the power at any time, for
35 it can neither be taken away nor abdicated, the jurisprudence memorialized
36 in McPherson v. Blacker, 146 U.S. 1, 34-35 (1892).
37     5.  That the legal doctrine E*x Dolo Malo Non Oritur Actio,* a right
38 of action cannot arise out of fraud and that "No court will lend its aid
39 to a man who founds his cause of action upon an immoral or an illegal act.
40 The maxim lies at the foundation of a general rule of public policy, the
41 rule that the courts will not sustain an action which arises out of the
42 moral turpitude of the plaintiff or out of his violation of a general law
43 enacted to carry into effect the public policy of the state or nation."
44 Marshall v. Lovell, 19 F.2d 751, 755 (8th Cir. Minn. 1927).
45     6.  That substantial irregularities and violations of A.R.S. title
46 16 elections law are specifically classified as criminal behaviors.

LINDELL EXHIBIT D

7. That significant irregularities associated with the illegal practice commonly known as "ballot harvesting," a class 6 felony criminal offense under Arizona law, affected mail-in balloting, precanvassing and canvassing and occurred during the November 3, 2020 election.

8. That there was infringement on the Legislature of the State of Arizona's authority pursuant to the United States Constitution under legislative plenary power and the "Supremacy Clause" to regulate elections.

9. That the selection of presidential electors and other statewide electoral contest results in this State involving federal offices is in dispute.

10. That, based on the clear and convincing nature of the evidence cited in this Resolution, there remains an irreconcilable controversy that cannot be resolved with the declaration of a clear winner, and as such is irredeemably compromised.

11. That the Office of the President of the United States is in fact the Chief Magistrate of these United States, charged with the duty of care under the Guarantee Clause of the Constitution as such to maintain impartial and fair elections.

12. That Article II, Section 1, Clause 2 of the United States Constitution provides, in relevant part, that "Each State shall appoint, *in such Manner as the Legislature thereof may direct,* a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." (Emphasis added.) The Supreme Court has described the constitutional authority of the state legislatures to determine the manner of choosing electors as "plenary." *See* McPherson v. Blacker, 146 U.S. 1, 35 (1892); *see also* Bush v. Gore, 531 U.S. 98, 104 (2000).

13. That the Supreme Court of the United States has even noted that, "whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power *at any time*." McPherson, 146 U.S. at 35 (emphasis added, quoting with approval Sen. R., 1st Sess. 43rd Cong. No. 395); *see also* Bush v. Gore, 531 U.S. at 104 ("The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors").

14. That the Members of the Legislature hereby notify the President of the United States Senate, the Speaker of the United States House of Representatives and the Members of Congress from the State of Arizona that it is the justifiable position of the Arizona State Legislature that we set aside the results of the Maricopa, Pima and Yuma County elections as irredeemably compromised and reclaim the 2020 Presidential Electors due to the irredeemably flawed nature of these elections that prevent the declaration of a clear winner of said presidential electors.

LINDELL EXHIBIT D