## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

SMARTMATIC USA CORP., SMARTMATIC
INTERNATIONAL HOLDING B.V. and SGO
CORPORATION LIMITED,

                Plaintiffs,

      v.

MICHAEL J. LINDELL and MY PILLOW, INC.,

                Defendants.

Case No. 22-cv-00098- WMW-JFD

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MY PILLOW, INC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**PARKER DANIELS KIBORT LLC**
Andrew D. Parker (MN Bar No. 195042)
Jesse Kibort (MN Bar No. 0328595)
Joseph A. Pull (MN Bar No. 0386968)
Ryan Malone (MN Bar No. 0395795)
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
parker@parkerdk.com
kibort@parkerdk.com
pull@parkerdk.com
malone@parkerdk.com

*Counsel for Defendant My Pillow, Inc..*

**LEWIN & LEWIN, LLP**
Nathan Lewin (D.C. Bar No. 38299)*
888 17th Street NW
Fourth Floor
Washington, DC 20006
Telephone: (202) 828-1000
nat@lewinlewin.com

*To be admitted *pro hac vice*
*Counsel for Defendant My Pillow, Inc.*

Alan Dershowitz (MA Bar No. 121200)
1575 Massachusetts Avenue
Cambridge, MA 02138

*Of Counsel for Defendant My Pillow, Inc.*

## TABLE OF CONTENTS

INTRODUCTION................................................................................................. 2

FACTUAL ALLEGATIONS................................................................................ 3

LEGAL ARGUMENT ........................................................................................ 5

I.     SMARTMATIC'S CLAIMS SUPPRESS POLITICAL SPEECH AND ARE CONSTITUTIONALLY BARRED................................................................6

     A.     THE STATEMENTS ALLEGED IN THE COMPLAINT WERE PART OF A DEBATE ON ISSUES OF PUBLIC CONCERN…......................8

     B.     SMARTMATIC IS SUBJECT TO THE ACTUAL MALICE STANDARD. ...................................................................................9

          1.     Smartmatic Is a Public Figure. ............................................... 11

          2.     Smartmatic Is a Limited Purpose Public Figure Concerning the Allegations in Its Complaint. ............................................... 11

          3.     Smartmatic Fulfilled Responsibilities of Public Officials in the 2020 Election ............................................................................ 15

     C.     SMARTMATIC DOES NOT ALLEGE FACTS TO SHOW LINDELL HAD ANY DOUBT OF THE TRUTH OF HIS STATEMENTS OR MADE THE STATEMENTS WITH RECKLESS DISREGARD, ENTERTAINING SERIOUS DOUBTS AS TO THEIR TRUTHFULNESS…………………………………………………......17

          1.     The Complaint Fails to Allege Any Statement or Conduct By Lindell Suggesting He Doubted the Truth of His Allegedly Defamatory Statements. ......................................................... 18

          2.     The Complaint Fails to Allege Lindell Entertained Serious Doubts as to the Truth of His Statements.................................. 20

          3.     The Complaint Pleads That Evidence Supported Lindell's Statements. ............................................................................. 25

          4.     Public Sources Show Lindell's Statements to Be Supportable. .......... 27

II.     MYPILLOW CANNOT BE HELD LIABLE FOR ANY STATEMENT ABOUT THE ELECTION OR SMARTMATIC BECAUSE IT HAS MADE NONE ....................................................................................................32

III.     COUNT TWO SHOULD BE DISMISSED BECAUSE IT MERELY RECASTS THE DEFAMATION CLAIM AS A DECEPTIVE TRADE PRACTICE CLAIM ...............................................................................35

IV.     THE COMPLAINT SHOULD BE DISMISSED NOW SO THAT DEFENDANTS WILL NOT BE BURDENED WITH UNJUSTIFIED ATTORNEYS' FEES AND LITIGATION COSTS......................................36

CONCLUSION .................................................................................. 38

## INTRODUCTION

Plaintiff ("Smartmatic") seeks to impose tort liability upon defendant My Pillow, Inc. ("MyPillow") for political statements made by Michael Lindell. Both fundamental constitutional principles and basic causation requirements preclude Plaintiff's claims.

The matters of which Smartmatic complains are matters of "political rhetoric best left to open and free speech." *Price v. Viking Penguin*, *Inc.*, 881 F.2d 1426, 1446 (8th Cir. 1989). The First Amendment forbids entities like Smartmatic, that discharge critical government responsibilities for collecting and counting votes, from silencing critics by suing them for defamation. Retaining an open democratic society requires vigilance against efforts to stifle speech concerning a matter of great public interest. "Debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The First Amendment "'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'" *Id.* Americans, including Lindell, have a constitutionally protected right to criticize those who perform election functions, including Smartmatic. Many may disagree with Lindell's criticisms, but the dispute must be aired in the marketplace of ideas, not in a courtroom. Lindell has an absolute right to summarize publicly the evidence of election fraud and offer conclusions regarding electronic election equipment performance. Only by specifically alleging facts to show that Lindell made statements that *he knew were false* or that he spoke with *reckless disregard because he entertained serious doubts about the truthfulness of what he said* can Smartmatic bring its claims and avoid the foundational protection of the First Amendment.

Smartmatic fails to satisfy this standard which has been described by courts as "daunting" and "almost impossible" to satisfy.

In any event, MyPillow cannot be held liable for statements it did not make. It has not said anything about Smartmatic. While Lindell is the CEO of MyPillow, imputing a company executive's personal political statements to the company is not constitutionally sustainable. It would force employers to exert ever-greater control over the speech of their employees, perverting the employment relationship to nullify the First Amendment.

The substantial risk and expense of litigation in defamation cases such as this impose a heavy chilling effect on speech. They must be weeded out and terminated on early Rule 12(b)(6) motions to avoid the enormous costs (economic and otherwise) which prospectively lead to silencing and self-censorship. *New York Times*, 376 U.S. at 279. *See also Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F. 3d 106, 109 (D.C. Cir. 2017); *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir. 1966).

## <u>FACTUAL ALLEGATIONS</u>

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires the defendant to accept as true, for purposes of the motion, all well-pleaded factual allegations in the complaint. " *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 821 (8th Cir. 2018). Smartmatic's Complaint comprises 380 numbered paragraphs filling 132 pages. Compl. (Doc. 1). However, the substance of the paragraphs is repetitive, and the central allegations can be boiled down to the following:

- Lindell knew that Joe Biden won the 2020 presidential election, but he decided to promote a preconceived false story about voting machines stealing the election as a

means to market pillows. Compl. ¶¶ 1-5, 23, 53-55, 67-74, 79, 135, 149, 181, 327-339. Lindell's acts to promote this story were also acts by My Pillow, Inc. *Id*. ¶¶ 16, 369.

- Smartmatic was founded in 2000 and provides "hyper-secure interconnection between digital devices," in the banking sector and "end-to-end election services" in the administration of secure, technology-driven elections. *Id*. ¶¶ 24-30. It has many satisfied clients. *Id*. ¶¶ 31-34.

- Los Angeles County contracted with Smartmatic in 2018 to provide a new election system. Smartmatic completed this task and its election system was used in the 2020 election. *Id*. ¶¶ 35-48. Smartmatic did not play any role in the 2020 election outside of Los Angeles County. *Id*. ¶¶ 49, 51-52, 134, 139, 148, 153-154, 261, 276.

- Smartmatic's machines "did not connect to the Internet during the election in Los Angeles County." *Id*. ¶¶ 50, 134, 164-168, 255-259.

- Many prominent people and organizations declared that the 2020 election was secure, reliable, and accurate. *Id*. ¶¶ 56-66, 224-254, 262-271.

- From December 2020 through August 2021, Lindell made many public statements, and published statements from others, alleging that algorithms in voting machines and other flaws in voting machine technology, such as vulnerability to hacking by China, had stolen the 2020 election from Donald Trump and delivered it to Biden. *Id*. ¶¶ 75-78, 80-94, 97-100, 104-106, 109-112, 115-120, 130-132.

- Lindell's statements caused hearers to wrongly believe that Smartmatic and its election products were at fault in the 2020 election, were connected to the Internet, had been hacked by China, and had helped steal the election. *Id*. ¶¶ 95-96, 100-103, 107-109, 113-114, 121-129, 133-134, 136-141, 149-152, 157-163, 169-180, 285-299. This damaged Smartmatic. *Id*. ¶¶ 346-357.

- Lindell falsely alleged Smartmatic had links to voting machine companies Dominion and ES&S during the 2020 election. *Id*. ¶ 142-147, 155-156, 173, 272-275, 277-284.

- Lindell lacked any basis for his statements about Smartmatic, had reason to doubt the veracity of the statements, and had "ill will" toward Smartmatic. *Id*. ¶¶ 181-254, 260-312, 340-345.

- Lindell failed to "exercise due care" when he published statements about Smartmatic. *Id*. ¶¶ 313-326.

The Complaint asserts two claims against Lindell and MyPillow: "Defamation for False Statements and Implications," *id*. ¶¶ 358-371, and a claim under the Minnesota Deceptive Trade Practices Act, *id*. ¶¶ 372-379.

## LEGAL ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Meiners*, 898 F.3d at 821-22 (quotation omitted). The pleaded factual content must allow "the reasonable inference that the defendant is liable for the misconduct alleged," and it is not enough to

plead facts "merely consistent with liable acts." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Smartmatic's Complaint does not allege facts sufficient to allow a reasonable inference that MyPillow is liable under either of the counts stated in the Complaint.

## I.
## SMARTMATIC'S CLAIMS SUPPRESS POLITICAL SPEECH AND ARE CONSTITUTIONALLY BARRED

In *New York Times v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court held that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id*. at 279-280. This standard "was constructed in light of three truths about public speech. First, false statements would necessarily occur in the course of a vigorous public debate. Second, absent protection for even false statements, destructive self-censorship would result. Third, the legal standards for defamation must protect defendants from the self-censorship imposed by threats of litigation." *Price*, 881 F.2d at 1430. Accordingly, "debate on matters of public concern 'should be uninhibited, robust, and wide-open, * * * [though] it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Id*. (quoting *Sullivan*, 376 U.S. at 270).

Smartmatic's Complaint defies the law established in *Sullivan*, seeking to inflict liability on MyPillow based on vehement, caustic, and unpleasantly sharp verbal attacks leveled by Lindell against Smartmatic. Lindell's statements, however, concern matters of

public concern, and the Complaint fails to plead "factual content" stating the actual malice required by *Sullivan*.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Complaint must be dismissed because the litigation it initiates and the relief it requests would suppress constitutionally protected freedom to engage in public debate.

First, the subject of the statements alleged in the Complaint is the integrity of the 2020 presidential election. That subject is unquestionably a matter of substantial public interest. The Supreme Court in *Sullivan* emphasized "[t]he maintenance of the opportunity for ***free political discussion*** to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means." 376 U.S. at 269 (quoting *Stromberg v. California*, 283 U.S. 359, 369 (1931)) (emphasis added). In the United States today controversy over election integrity attracts the interest and concern of a substantial proportion of the electorate. Free discussion of that issue is their constitutional prerogative.

Second, Smartmatic is a public figure subject to the actual malice standard, under three different measures: the general purpose public figure test, the limited purpose public figure test, and as a public official for purposes of the 2020 presidential election. Smartmatic's right to bring a defamation lawsuit related to criticism of its performance of electoral duties in the election must be measured by the same standard as would govern any individual bearing, and being compensated for bearing, that enormous public responsibility.

Third, the Complaint fails to plead facts satisfying the actual malice standard because it contains not a single non-conclusory allegation to show Lindell believed the

allegedly defamatory statements to be false or entertained serious doubts as to their truthfulness.

Smartmatic possesses the same constitutional rights as Lindell. It is entitled to disagree with his statements, but its disagreement must, under our Constitution, play out in the public square and not in a government courtroom. The Complaint must be dismissed because it fails to meet the stringent standard required by the First Amendment before a court may inflict a sanction or extended burdensome litigation for political speech.

**A.    THE STATEMENTS ALLEGED IN THE COMPLAINT WERE PART OF A DEBATE ON ISSUES OF PUBLIC CONCERN.**

The substance of Smartmatic's Complaint is that Lindell made many public statements, and published statements from others, alleging that various improprieties stole the 2020 election from Trump and delivered it to Biden, and that Smartmatic and its election products bore some responsibility for the improprieties. *Id*. ¶¶ 75-78, 80-94, 97-100, 104-106, 109-112, 115-120, 130-132 (improprieties); *id*. ¶¶ 95-96, 100-103, 107-109, 113-114, 121-129, 133-134, 136-141, 149-152, 157-163, 169-180, 285-299 (faulting Smartmatic).

The Supreme Court's decision in *New York Times v. Sullivan* implemented "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." 376 U.S. at 270. The statements alleged by Smartmatic plainly address matters of public concern, controversy, and debate. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of

legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citations omitted). The reliability of the reported results of a presidential election is a matter of the highest importance to a self-governing community of people, for "[t]he right to vote freely for the candidate of one's choice is the essence of a democratic society," *Reynolds v. Sims*, 377 U.S. 533, 555 (1964), and the right to vote encompasses not only casting a ballot but also accurate counting of the ballot, *United States v. Classic*, 313 U.S. 299, 315 (1941). Disagreement relating to the accuracy of ballot counting surely constitutes a public controversy. "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980). Public debate concerning the 2020 election was intense at the time of the statements pleaded in the Complaint, and that debate continues even today. How widely an expressed opinion is shared plays little part in determining whether it is protected. The "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

The subject of the statements alleged in the Complaint is a matter of public concern, and the statements were made in the context of a public debate about that matter of public concern.

**B.     SMARTMATIC IS SUBJECT TO THE ACTUAL MALICE STANDARD.**

In defamation actions for statements "concerning issues of public interest and concern," the First Amendment prohibits recovery of damages by "public officials or

public figures" unless the plaintiff proves the statements were made with "actual malice." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.,* 951 F.3d 952, 956 (8th Cir. 2020). Smartmatic qualifies as both a "public figure" and a "public official," so its claims must satisfy the actual malice standard.

Allegations in the Complaint relevant to the question of Smartmatic's status as "public figure" and a "public official" include the following:

- Smartmatic provided "election technology, support, and services" to Los Angeles County during the 2020 U.S. presidential election. Compl. ¶ 10.

- Smartmatic has "processed more than 5 billion secure votes worldwide." *Id*. ¶ 26.

- Smartmatic "provides end-to-end election services to local, state, and national governments," providing a "comprehensive suite of technologies and services to make every phase of the election process more efficient and transparent." *Id*. ¶ 28.

- Beginning in 2018, Smartmatic (a) engineered and manufactured voting hardware for Los Angeles County, (b) programmed and installed the software, (c) "led" the state "certification process," (d) "provided systems integration services," (e) built the operations center, (f) conducted "logistics and setup/breakdown of the vote centers," (g) "oversaw real-time data management," and (h) "supplied Help Desk services on Election Day." *Id*. ¶¶ 40-42.

- "Smartmatic was thrilled with **its** success in the Los Angeles County election" and considered its work in the county to "highlight **its** success in facilitating secure, reliable, and auditable election results." *Id*. ¶ 47 (emphases added).

- The three Smartmatic entities are each corporations. Compl. ¶¶ 10-12.

### 1. Smartmatic Is a Public Figure.

In this diversity action, Compl. ¶ 20, Smartmatic brings its claims under Minnesota law. *Id.* ¶¶ 21, 358-379. "Minnesota law considers a corporation a public figure and requires it to show that a statement was made with actual malice to establish a defamation claim." *Nelson Auto Ctr.,* 951 F.3d at 957; *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1116 (8th Cir. 1999); *Northwest Airlines v. Astraea Aviation Servs.*, 111 F.3d 1386, 1393 (8th Cir. 1997). Accordingly, the actual malice standard applies to the defamation claims brought by the Smartmatic corporations – public figures – in this action.

### 2. Smartmatic Is a Limited Purpose Public Figure Concerning the Allegations in Its Complaint.

Smartmatic is also a "limited purpose public figure" with respect to the statements pleaded in the Complaint. A limited purpose public figure is a person who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Stepnes v. Ritschel*, 663 F.3d 952, 963-64 (8th Cir. 2011) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). Minnesota law considers three factors to determine whether a person is a limited purpose public figure: "(1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement related to the controversy." *Id.* (citing *Chafoulias v. Peterson*, 668 N.W.2d 642, 651 (Minn. 2003)).

*A public controversy exists.* A public controversy is one whose "ramifications will be felt by persons who are not direct participants." *Chafoulias*, 668 N.W.2d at 651

(quoting *Waldbaum*, 627 F.2d at 1296). The Complaint alleges defamatory statements were made "[f]rom February through June 2021." Compl. ¶ 359. A public controversy concerning the reliability, and vulnerability to fraudulent manipulation, of electronic election equipment existed long before February 2021. The exhibits to Smartmatic's Complaint include news reports from 2018 and 2019 about security vulnerabilities of electronic election equipment, including inquiries to manufacturers by U.S. Senators and a joint statement from seven different federal agencies about threats to the security of the 2020 election. Compl. Exs. 86, 87, 88, 89, 90, 91. A lawsuit has been pending since before 2017 in the federal court for the Northern District of Georgia, in which the plaintiffs allege that a Georgia election was conducted using "insecure" electronic election equipment with "fundamental flaws" that was vulnerable to "hacking," and the installation of "malicious software," and "security failures" that made it "unreliable for the determination of the result." Verified Am. Election Contest & Compl. at 28, 32-33, 54, *Curling v. Kemp*, no. 1:17-cv-02989-AT (N.D. Ga. Aug. 18, 2017). The judge in that case entered an order on October 11, 2020, finding that electronic election equipment used to mark ballots, and the associated scanner and software, "presents serious system security vulnerability and operational issues" that risked depriving voters of the right to have their votes accurately counted. *Curling v. Raffensperger*, 493 F.Supp.3d 1264, 1340 (N.D. Ga. 2020). The order reviewed extensive evidence and found "a broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data." *Id.* at 1280. Minnesota law beginning in 2005 required voting

officials to "secure ballot recording and tabulating systems physically and electronically against unauthorized access," and it prohibited connection of ballot recording and tabulating systems to "any electronic network" including "the Internet," except for "wired connections within the polling place." Minn. Stat. § 206.845 (2005).

The security of electronic election equipment has been a matter of public controversy and concern since at least 2005, certainly before the statements alleged in Smartmatic's Complaint.

**Plaintiff played a meaningful role in the controversy.** Smartmatic's "mission statement" is "to provide secure, reliable, and auditable election technology and software." Compl. ¶ 31. Smartmatic claims to have provided technology and software that has "processed over 5 billion votes without any security breaches and with an auditable paper trail demonstrating that the elections were not rigged, hacked, or stolen." *Id*. Smartmatic says its "technology has been proven in audited elections for almost 20 years." Compl. Ex. 67. Exhibit 103 to the Complaint is a copy of a page from Smartmatic's website that includes numerous statements proclaiming the security and reliability of Smartmatic's electronic election equipment and the corporation's leading role in election administration:

- August 2019: "the Smartmatic team has been working hard to manufacture, program and ship hundreds of [voting solutions] machines to L.A."

- February 2020: "The County subjected the system to independent, third-party security and penetration testing that exceeded state requirements."

- September 25, 2020: "All systems undergo extensive performance evaluations that includes . . . hardware and software security penetration testing . . . The

technology infrastructure is air-gapped, meaning that it is isolated, self-contained and never connected to the internet. This is one of the many security mechanisms used to protect the system."

- November 11, 2020: "Smartmatic provided the following: ·Engineered and manufactured the BMD hardware ·Programmed and installed the BMD software . . . ·Created the backend software to manage the devices . . . ·Handled logistics and setup/breakdown of the vote centers ·Oversaw real-time data management for deployment ·Supplied Help Desk services on Election Day  Smartmatic had, at times, as many as 200 staffers supporting the project."

Compl. Ex. 103. Smartmatic has profited handsomely from providing election equipment. The system it built for Los Angeles was a $300 million system. Compl. Ex. 102.

Smartmatic has played a meaningful role in the ongoing controversy over the security of electronic election equipment. It has profited from the manufacture, supply, and support of equipment that it markets as secure.

***The allegedly defamatory statements relate to the controversy.*** The statements alleged in Smartmatic's Complaint squarely relate to the controversy over whether electronic election equipment is secure or whether it has been compromised, hacked, or infiltrated to wrongfully manipulate the reported results of elections. Compl. ¶¶ 137, 143, 150, 158, 165, 170, 176.

Smartmatic easily meets the criteria for a limited purpose public figure with respect to controversy concerning the security of electronic election equipment. The actual malice standard applies to Smartmatic's defamation claims.

14

### 3. Smartmatic Fulfilled Responsibilities of Public Officials in the 2020 Election.

The Complaint alleges that Smartmatic carried out numerous tasks essential to the 2020 election. Because it fulfilled essential government functions in election administration, Smartmatic must satisfy the actual malice standard applicable to public officials who bring a defamation action against a critic of their conduct in administering an election.

*New York Times v. Sullivan* held that the Constitution bars "damages for libel in actions brought by public officials against critics of their official conduct." 376 U.S. at 283. Under Minnesota law, any plaintiff who "perform[s] governmental duties, directly related to the public interest" is a "public official" for purposes of the *Sullivan* standard. *Hirman v. Rogers*, 257 N.W.2d 563, 566 (Minn. 1977). Minnesota courts consider three criteria as relevant to a determination of public official status: (1) whether the plaintiff "perform[s] governmental duties directly related to the public interest," (2) "hold[s] a position to influence significantly the resolution of public issues," and (3) has "or appear[s] to the public to have, substantial responsibility for or control over the conduct of government affairs." *Britton v. Koep*, 470 N.W.2d 518, 522 (Minn. 1991).

Administration of an election is plainly a governmental duty directly related to the public interest. Persons who process ballots have the ability to influence significantly the outcome of the election, a public issue. Their ability to influence outcomes imposes on election workers the responsibility for ensuring that ballots are distributed, voted, collected, and counted in a fair, accurate, and accountable manner.

Smartmatic pleads that it provided "election technology, support, and services" to Los Angeles County "during the 2020 U.S. election." Compl. ¶ 10. These services were part of its proclaimed "mission" to "increase integrity in the democratic process," which it pursues by "harness[ing] the full power of technology to deliver reliable, accurate and auditable election results." *Id*. ¶ 27. Smartmatic "provides end-to-end election services to local, state, and national governments," and offers a "comprehensive suite of technologies and services to make every phase of the election process more efficient and transparent." *Id*. ¶ 28. In Los Angeles for the 2020 election specifically, Smartmatic hired and trained more than 800 "election workers." Compl. ¶ 45. It created the election software, hardware, and operations center, handled logistics and setup of vote centers, oversaw "real-time data management," and supplied 200 staffers to support the election. Compl. ¶ 42; Compl. Ex. 103.

By Smartmatic's own account it provided critical election administration services. These services had to be performed for the election to be held. If not contracted out to Smartmatic, they would have been performed by Los Angeles employees. By fulfilling these essential services on behalf of Los Angeles, Smartmatic acted as a public official and became subject to constitutional limitations on its ability to bring defamation claims against anyone who criticized its performance of the services. Criticism of Smartmatic's electronic election equipment is legally entitled to the same constitutional protection as criticism of a secretary of state responsible for certification of election results or criticism of an election commissioner responsible for distributing and collecting ballots, hiring and training election workers, or setting up voting centers. *Cf. Price*, 881 F.2d at 1431 (applying actual

malice standard to criticism that "reflect[ed] on the imperatives and conduct of the F.B.I. and the government generally, implicating the type of public debate at the core of the first amendment"). "Criticism *of those responsible for government operations* must be free, lest criticism of government itself be penalized."  *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) (emphasis added).

Smartmatic is subject, in this defamation action brought against a critic of its election administration conduct, to the actual malice standard applicable to those responsible for government operations.

**C.**    **SMARTMATIC DOES NOT ALLEGE FACTS TO SHOW LINDELL HAD ANY DOUBT OF THE TRUTH OF HIS STATEMENTS OR MADE THE STATEMENTS WITH RECKLESS DISREGARD, ENTERTAINING SERIOUS DOUBTS AS TO THEIR TRUTHFULNESS.**

The "actual malice" that Smartmatic must plead in order to avoid dismissal of its claims presents a "daunting" standard. *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001). It requires the Complaint to "allege enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" that Lindell published his statements "knowing they were false or with reckless disregard for whether they were false or not," *Nelson Auto Ctr.*, 951 F.3d at 958 (quotation omitted).

The Complaint does not, and cannot, allege facts that satisfy either prong of this standard.

1. **The Complaint Fails to Allege Any Statement or Conduct By Lindell Suggesting He Doubted the Truth of His Allegedly Defamatory Statements.**

The Complaint makes conclusory assertions regarding Lindell's purported nefarious mental processes, accusing him of "know[ing] the election was not rigged, fixed, or stolen," Compl. ¶ 2. But the Complaint does not allege any word or conduct by Lindell indicating any such belief. Accordingly, the Complaint's attempt to plead that Lindell published his statements "knowing they were false," *Nelson Auto Ctr.*, 951 F.3d at 958, amounts to nothing more than a bare recitation of the elements of Smartmatic's claim. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The Complaint does not satisfy the pleading standard of *Iqbal* and *Twombley*, and fails to state a claim upon which relief may be granted.

The Complaint imputes to Lindell a calculated scheme to "sell conspiracy theory" built on false claims in order to "sell pillows to keep and increase his fortune." Compl. ¶ 3. This narrative – in and of itself a conspiracy theory – is repeated, riffed upon, and regurgitated throughout the Complaint. *See id.* ¶¶ 5, 7, 17-18, 23, 69-74, 149, 327-329, 337. But the Complaint alleges *no factual event* – no statement by Lindell, no behavior by Lindell, no act undertaken by someone else at Lindell's direction – which would even tend to show that Lindell doubted the truth of anything he said. The Complaint merely pleads that Smartmatic disagrees with Lindell's statements, cites evidence that Smartmatic claims supports its views, and then infers that Lindell must secretly agree with Smartmatic.

Smartmatic's pleading strategy does not clear the hurdle to allege actual malice under Minnesota law. "Because the actual malice standard is the cornerstone of protection

for free exchange of ideas about public officials, it may never be presumed or inferred by innuendo." *Foley v. WCCO Television, Inc.*, 449 N.W.2d 497, 502 (Minn. Ct. App. 1989) (citing *Hirman*, 257 N.W.2d at 566). Smartmatic's pleading does not rise to the level of innuendo. The pleading merely expresses incredulity that anyone could disagree with Smartmatic's views.

The allegations in the Complaint that "Mr. Lindell knew" his statements were "false" (Compl. ¶ 181) do not show knowledge at all. They merely list information that Lindell purportedly did *not* know, *id.* ¶¶ 185-193, and information that was purportedly "available" to Lindell in the public record, *id.* ¶¶ 195-96, 209-210, 211, 216, 218, 219, 220, 222, 255, 260, 272, 285, 292, 300.

Whether factual claims exist or are available in the public record does not prove knowledge by an individual that his statements contradicting these factual claims are false. An individual may be unaware of publicly available information, and the First Amendment does not oblige him to search out contrary claims before speaking on matter of public concern. "[T]he mere failure to investigate is not dispositive of actual malice; rather, to meet the actual malice standard, [t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 879 n.7 (Minn. 2019) (quotations omitted); *Britton*, 470 N.W.2d at 524 ("Although Koep did not seek to corroborate the information from the two informants, failure to investigate does not establish bad faith."); *Drotzmanns, Inc. v. McGraw-Hill, Inc.*, 500 F.2d 830, 834 (8th Cir. 1974) ("But failure to investigate does not in itself establish malice."); *Pippen v.*

*NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013) ("failure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth.").

Even if an individual is aware of publicly available assertions, he may choose to disbelieve them, judge them incomplete or unreliable, or disagree with them. Freedom of speech must encompass freedom to disagree with others. To prove that Lindell acted with "actual malice" because he had knowledge of the falsity of his statements, Smartmatic would have to present "clear and convincing evidence" that Lindell *knew or believed* his statements were false. *Campbell*, 255 F.3d at 569. "[T]he record must clearly and convincingly demonstrate" Lindell's "knowledge of falsity." *Id.* A complaint that does not allege *any word or act* by the defendant even suggesting a belief or knowledge of falsity fails to plausibly allege knowledge of falsity. It is not enough to plead "the mere possibility of misconduct" or facts "consistent with" unlawful activity. *Iqbal*, 556 U.S. at 679, 680. A defamation plaintiff may not subject a defendant to the burdens of discovery by simply reciting unsupported conclusions about the defendant's mental state. If such a tactic is countenanced, the actual malice element becomes a dead letter.

The Complaint's allegations that Lindell has actual knowledge of falsity fail to satisfy the requirements of *Iqbal* and *Twombly*.

### 2. The Complaint Fails to Allege Lindell Entertained Serious Doubts as to the Truth of His Statements.

*New York Times v. Sullivan* and subsequent cases elucidating its meaning allow a defamation plaintiff to show "actual malice" by only one avenue other than actual

knowledge of falsity – by showing that the defendant spoke with "reckless disregard for whether they were false or not." *Nelson Auto Ctr.*, 951 F.3d at 958; *Stepnes*, 663 F.3d at 963. Recklessness "is not measured by whether a reasonably prudent man would have published," but rather whether the defendant published "with a high degree of awareness of probable falsity" or "entertained serious doubts as to the truth of his publication." *Nunes v. Lizza*, 12 F.4th 890, 899 (8th Cir. 2021) (quotation omitted). Smartmatic embarks on six inadequate sallies to plead recklessness.

***Absence of Evidence***. Smartmatic first alleges that Lindell "did not have sources to prove something that did not happen." Compl. at 73. This sally is doubly flawed. First, it directly contradicts the allegations in the rest of the Complaint, which reference a multitude of sources relied on by Lindell. *E.g.* Compl. ¶¶ 87-89, 100, 107, 114-115, 118, 130-132, 150(h), (i), (l), (m), (o), (q). Smartmatic unsurprisingly disputes Lindell's sources, but Smartmatic's disagreement does make the sources disappear. The Complaint acknowledges that Lindell did have sources supporting his statements. Second, absence of evidence is not evidence of absence. The actual malice standard is not satisfied by an absence of evidence to support a speaker's statements; actual malice demands *a high degree of awareness of probable falsity*. Smartmatic's reliance on a purported lack of evidence is a disguised attempt to impose upon the defamation defendant a duty to find published support or to investigate. Such an obligation is squarely foreclosed by the *Maethner*, *Britton*, and *Drotzmanns* decisions cited above (among many others).

***Publicly Available Information***. Smartmatic alleges Lindell "ignored" publicly available and accessible information "that showed his statements and implications about

Smartmatic . . . were false." Compl. ¶ 195. But Lindell may disagree with these sources,
just as Smartmatic disagrees with Lindell's sources. The existence of contrary information
– which a defendant may or may not have seen – does not show that a defendant knew or
believed the information. "A publisher's failure accurately to guess which of two
conflicting accounts a jury might later believe does not demonstrate actual malice. . . To
find liability in these circumstances would undermine the purpose for which the Supreme
Court in *New York Times* adopted the actual malice requirement – to prevent the self-
censorship that may arise if a critic of official conduct were compelled to guarantee the
actual truth of all factual assertions on pain of a libel judgment." *Speer v. Ottaway
Newspapers, Inc.*, 828 F.2d 475, 478 (8th Cir. 1987). "[I]t is not enough to show that
defendant should have known better; instead, the plaintiff must offer evidence that the
defendant in fact harbored subjective doubt." *Jankovic v. International Crisis Grp.*, 822
F.3d 576, 589 (D.C. Cir. 2016); *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304-05
(D.C. Cir. 1996); *Tavoulareas v. Piro*, 817 F.2d 762, 775-76 (D.C. Cir. 1987). *Cf. Tah v.
Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021) (publisher "need not accept
denials, however vehement; such denials are so commonplace in the world of polemical
charge and countercharges that, in themselves they hardly alert the conscientious reporter
to the likelihood of error") (internal quotations omitted).

*Veracity of Individuals*. Smartmatic alleges that Lindell relied on and publicized
the views of individuals who "were not credible nor legitimate 'experts.'" Compl. ¶ 300.
The First Amendment does not, however, dictate that Lindell had to agree with
Smartmatic's assessments of expertise or credibility. Furthermore, the Complaint

acknowledges that Lindell relied upon multiple individuals who did possess credentials that buttressed their analyses. *E.g.* Compl. ¶¶ 131(c) (Colonel Waldron has "background in the military" with "influence operations, information operations, information warfare," and as "information warfare officer" he "looked for vulnerabilities and ways to attack systems"); 131(d) (Ramsland was founder of cyber forensics and security organization); 131(e) (Dr. Ayyadurai has four degrees from MIT, expertise in system science and pattern analysis, and builds large-scale computer systems for Fortune 1000 companies); 131(a) (Douglas Frank is a Ph.D. with 60 scientific publications). Allegations that some experts are better sources than others do not plead actual malice, particularly where the First Amendment imposes no obligation that there be any expert at all to support an expressed opinion on a matter of public concern.

***Exercise of Due Care***. Smartmatic alleges Lindell "did not exercise due care" when speaking about Smartmatic. Compl. ¶ 313. This allegation is an attempt to replace the "actual malice" standard established by the Supreme Court with a different standard of Smartmatic's own construction. The fiat of Smartmatic does not overrule *New York Times v. Sullivan*. "Due care" is not the applicable standard. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("[T]he standard of ordinary care" does not "adequately implement First Amendment policies" because it does not "protect against self-censorship.") The First Amendment protects a person who speaks about a public actor's performance of matters of public concern unless the speech is made "with a high degree of awareness of probable falsity" or with "serious doubts as to the truth of his publication." *Nunes*, 12 F.4th at 899.

Because the allegations in the Complaint fail to meet this legal bar, Smartmatic tries to lower the bar by substituting a "due care" standard. It may not do so.

**Financial and Other Motives**.  Smartmatic alleges that Lindell acted "with ill will and improper motives for self-promotion" and "for personal financial gain." Compl. ¶ 327. "Evidence of a defendant's . . . political or profit motive does not suffice." *Campbell*, 255 F.3d at 569 (citing *Garrison v. Louisiana*, 379 U.S. 64, 78-79 (1964)). Even allegations that a defamation defendant was "politically motivated," "wanted to increase his profits," and departed "from professional standards" do not support a finding of "actual recklessness." *Id.* at 571. "[T]he record must clearly and convincingly demonstrate either the defendant's knowledge of falsity or his reckless disregard for the truth or falsity of the allegations." *Id*. at 569 (citing *Harte-Hanks Comms. v. Connaughton*, 491 U.S. 657, 665 (1989)).

**Personal Animosity**. Smartmatic's sixth sally alleges that Lindell "exhibited personal animosity, hate, spite, and ill will towards Smartmatic." Compl. ¶ 340. The statements Smartmatic quotes to support this assertion show no such thing. *Id.* ¶¶ 341-345. Rather, they are quintessentially political statements, showing a citizen devoted to his country and concerned about its future, articulating an ideological view of what arrangements of public affairs are beneficial and what arrangements are harmful. In any event, allegations of animosity or ill will do not plead First Amendment reckless disregard for the truth or falsity of published statements. "Evidence of a defendant's ill will, desire to injure, or political or profit motive does not suffice." *Campbell*, 255 F.3d at 569 (citing *Garrison*, 379 U.S. at 78-79). "It is not enough for a public official to show that the

defendant has acted from personal ill-will but rather he must prove that the publication was made with a high degree of awareness that it was probably false." *Hirman*, 257 N.W.2d at 566. *Maethner*, 929 N.W.2d at 879 n.7 ("[E]ven if Maethner can produce evidence of Jorud's 'ill will,' that would not be sufficient to establish actual malice.").

Smartmatic's Complaint attempts in six different ways to plead that Lindell spoke with reckless disregard for the truthfulness of his statements. Every one of those six sallies fails under the well-established law of actual malice.

### 3. The Complaint Pleads That Evidence Supported Lindell's Statements.

Rather than pleading actual malice, Smartmatic's Complaint pleads the opposite. It acknowledges a wealth of information supporting Lindell's criticisms, and Smartmatic admits that this information was public knowledge before the 2020 election. The existence of this public information refutes Smartmatic's attempt to plead actual malice.

The Complaint alleges statements by Lindell that concern whether vulnerabilities in electronic election equipment compromised the reported vote tallies in the 2020 presidential election, and whether malicious actors overseas, such as in China, exploited vulnerabilities to manipulate the equipment. Yet the Complaint acknowledges that before the election mainstream sources published news reports that were strongly supportive of Lindell's statements. This information (similar to the test of Fed. R. Evid. 401) has a tendency to make Lindell's statements more probable than not.

- Foreign actors in Russia did, in fact, "meddl[e]" in the 2016 U.S. presidential election," and US authorities have indicted Russian military intelligence

operatives for "infiltrating state and local election systems." Compl. Ex. 86 at 3, 5 (2018 Chicago Tribune news report). Election experts have characterized the manufacturers of U.S. electronic election equipment as "security-challenged" and "long skimp[ing] on security in favor of convenience, making it more difficult to detect intrusions" like the Russian attacks. *Id*. at 3; Compl. Ex. 87 at 1 (2018 Associated Press news report). There is "abundant evidence of sloppy software development, a major source of vulnerabilities" in election systems, and in 2018 an electronic election equipment manufacturer suffered "the kind of security lapse that gives election officials nightmares" when it left an "exposed data cache" that included "encrypted passwords" which "a sophisticated attacker" could have used to cause a "complete compromise" of its election systems. Compl. Ex. 86 at 2, 4, 7 (emphasis added). "Many voting systems in use today across the more than 10,000 US election jurisdictions are prone to security problems," "computer scientists began hacking them with ease more than a decade ago, and not much has changed," "Hackers could theoretically wreak havoc at multiple stages of the election process," including by "secretly introduce[ing] software to flip votes," and "election mischief or malware booby traps may have gone unnoticed." *Id*. at 4-5.

- In 2019, U.S. Senators Amy Klobuchar, Mark Warner, Jack Reed, and Gary Peters sent a letter to election equipment manufacturers stating, "The integrity of our elections remains under serious threat," and that U.S. intelligence agencies "continue to raise the alarm that foreign adversaries are actively trying

to undermine our system of democracy, and will target the 2020 elections as they did the 2016 and 2018 elections." Compl. Ex. 88 at 3.

- In November 2019, the Department of Justice, Department of Defense, FBI, and CISA, among other federal agencies, issued a joint statement which announced, "Our adversaries want to undermine our democratic institutions, influence public sentiment, and affect government policies. Russia, China, Iran, and other foreign malicious actors all will seek to interfere in the voting process or influence voter perceptions." Compl. Ex. 91. The methods of foreign interference identified in the joint statement included "destructive cyberattacks." *Id*.

This widely circulated information alleged in the Complaint itself contradicts any allegation that Lindell *knew he spoke falsely* or *spoke with reckless disregard for falsity because he entertained serious doubts as to truthfulness* when he made statements similar to the information that had been reported by others. A statement is not "reckless" when it is supported by reported facts. The "daunting standard" of pleading actual malice cannot be met when a speaker like Lindell makes statements on matters of public concern that reflect and summarize facts and information that has been publicly disseminated.

### 4. Public Sources Show Lindell's Statements to Be Supportable.

The body of publicly available information about election equipment vulnerability, hacking, and foreign election interference goes far beyond the narrow selection of articles attached by Smartmatic to its Complaint. This body supports the substance of Lindell's allegedly defamatory statements and further puts to rest any notion that Smartmatic could

plead that Lindell spoke with knowledge of falsity or entertained serious doubts as to truthfulness.

The Court addressing a Rule 12(b)(6) motion is limited in the information it may consider. It may consider "the pleadings" and "materials that are part of the public record or do not contradict the complaint, and materials that are 'necessarily embraced by the pleadings.'" *Nelson Auto Ctr.*, 951 F.3d at 955 (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). The Court may also take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" under Fed. R. Evid. 201 at any stage of a proceeding. Sources of judicial notice information include news articles for the purpose of showing that particular information was in the public realm, *Gerritsen v. Warner Bros. Entm't, Inc.,* 112 F.Supp. 3d 1011, 1028 (C.D. Cal. 2015); records of federal courts, *Akers v. Watts*, 589 F. Supp. 2d 12, 15 (D.D.C. 2008); and government websites, *Dark Storm Indus., LLC v Cuomo,* 471 F. Supp. 3d 482, 490, n. 2 (N.D. N.Y. 2020).

Smartmatic's Complaint fails to plead that Lindell spoke with actual malice because the Complaint fails to plead facts showing that Lindell disbelieved information supporting his statements that was publicly available from these three types of judicial-notice sources. Statements about an issue of public concern that are consistent with publicly available information cannot, as a matter of law, be characterized as made with "actual malice" or "reckless disregard" of their truth.

28

*News Articles.* Long leading up to the 2020 election, many diverse publications reported that electronic election equipment is vulnerable to unauthorized access that could change vote totals. For example:

- Kim Zetter, *The Myth of the Hacker-Proof Voting Machine,* THE NEW YORK TIMES MAGAZINE, Feb. 21, 2018, https://www.nytimes.com/2018/02/21/magazine/the-myth-of-the-hacker-proof-voting-machine.html ("In the 15 years since electronic voting machines were first adopted by many states, numerous reports by computer scientists have shown nearly every make and model to be vulnerable to hacking. The systems were not initially designed with robust security in mind . . .")

- Eric Geller, *State Election Officials Opt for 2020 Voting Machines Vulnerable to Hacking*, POLITICO, Mar. 1, 2019, https://www.politico.com/story/2019/03/01/election-vulnerable-voting-machines-1198780 ("these new machines still pose unacceptable risks in an election that U.S. intelligence officials expect to be a prime target for disruption by countries such as Russia and China.")

- Gopal Ratnam, *Mueller Report: Russia Hacked State Databases and Voting Machine Companies,* ROLL CALL, Apr. 22, 2019, https://www.rollcall.com/2019/04/22/mueller-report-russia-hacked-state-databases-and-voting-machine-companies/.

- Taylor Telford, *Hackers Were Told to Break Into U.S. Voting Machines. They Didn't Have Much Trouble.*, THE WASHINGTON POST, Aug. 12, 2019, https://www.washingtonpost.com/business/2019/08/12/def-con-hackers-lawmakers-came-together-tackle-holes-election-security/.

Many more could also be listed. MyPillow does not cite these articles as proof of the truth of any information reported in them, but merely to show that the reported information was *circulating in the public realm* prior to Lindell's statements. This refutes any inference that Lindell's statements to similar effect were knowingly false or reckless.

*Federal Court Records*. In the *Curling* litigation discussed above, the court received extensive evidence about security vulnerabilities in an electronic election system. It issued

a lengthy opinion on October 11, 2020 finding that the electronic election equipment used in Georgia could be tampered with to create ballots with "information regarding their voter choices that does not match what they enter . . . or could cause a precinct scanner to improperly tabulate their votes." *Curling,* 493 F.Supp.3d at 1309.

The court concluded,

The Court's Order has delved deep into the true risks posed by the new [electronic] voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. . . The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted. . . The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' — but 'when it will happen,' especially if further protective measures are not taken.

*Id*. at 1341-42**.**

MyPillow does not cite these filings to rely on the truth of any information reported in them, but merely to show that the reported information was *circulating in the public realm* prior to Lindell's statements. Filings like these conclusively refute Smartmatic's attempt to plead that Lindell spoke with actual malice in describing manipulation of electronic election equipment to change votes.

*Government Sources.* Official government sources also provided information that supported Lindell's statements. A congressional task force in 2018 concluded, "research and interviews unequivocally show that many jurisdictions are using voting machines that are highly vulnerable to an outside attack." CONGRESSIONAL TASK FORCE ON ELECTION

SECURITY, FINAL REPORT, 23 (January 2018).[1] In October 2020, the Department of Homeland Security published a report which stated that Russian hackers had interfered with the 2016 United States election, and "foreign adversaries continue to aim to influence our election process." U.S. DEP'T OF HOMELAND SEC., OFFICE OF INSPECTOR GEN., OIG-21-01, DHS HAS SECURED THE NATION'S ELECTION SYSTEMS, BUT WORK REMAINS TO PROTECT THE INFRASTRUCTURE, 1 (2020).[2] MyPillow does not cite these sources to rely on the truth of any information reported in them, but merely to show that the reported information was *circulating in the public realm* prior to Lindell's statements. Consequently, Lindell's statements were not knowingly false or reckless.

Public information from news reports, federal court proceedings, and government authorities all supported and lent credence to the statements made by Lindell. Whether or not this stew of information and ideas was correct, Smartmatic cannot plead that Lindell spoke with actual malice when he affirmed information and ideas circulating within the country contemporaneous with his speech. The First Amendment protects an individual who enters into such a cultural debate.

Because Smartmatic has failed to plead actual malice by Lindell, its defamation claims arising out of statements made by Lindell are barred by *New York Times v. Sullivan* and should be dismissed.

---

[1] *Available at* https://homeland.house.gov/imo/media/doc/TFESReport.pdf.

[2] *Available at* https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-01-Oct20.pdf.

## II.
## MYPILLOW CANNOT BE HELD LIABLE FOR ANY STATEMENT ABOUT THE ELECTION OR SMARTMATIC BECAUSE IT HAS MADE NONE

Paragraph 359 of the Complaint identifies the statements that Smartmatic alleges to be defamatory as those specified in paragraphs 137, 143, 150, 158, 165, 170, and 176. "Minnesota law has generally required that in defamation suits, the defamatory matter be set out verbatim." *Moreno v. Crookston Times Printing Co.*, 610 N.W.2d 321, 326 (Minn. 2000). Hence Smartmatic's claims are limited to the quotations enumerated in the Complaint. Each of the specified statements was allegedly made or published by Lindell, not by MyPillow. Compl. ¶¶ 137, 143, 150, 158, 165, 170, 176. The Complaint imputes liability to MyPillow for statements made by Lindell, but it does not plead any facts that make MyPillow responsible for political commentary by Lindell. The claims against MyPillow must, therefore, be dismissed.

The Complaint does not plead that any of the allegedly defamatory statements were published on a MyPillow website or social media account. It does not plead that the MyPillow board of directors authorized, approved, or directed any of the statements. It does not plead that any of the statements were communicated from MyPillow's headquarters or any other company location. It does not plead that political activities are among Lindell's responsibilities as a representative of MyPillow. It does not plead that Lindell was authorized by the corporation to engage in political commentary on its behalf. It does not plead that the MyPillow board of directors ever passed a resolution or otherwise acted to make political commentary part of Lindell's duties.

Online communications have made it easier than ever to publish and preserve political commentary, opening to the common person a privilege formerly limited to a narrow club of elected officials and the few fortunate enough to gain access to mass media. But this rich tapestry of public participation in political debate is threatened by another new trend, in which individuals find themselves involuntarily unemployed as a result of pressure on their employers to terminate them for political statements unrelated to their job responsibilities. Invoking an agency theory to hold companies liable for personal political views expressed by executives would be a grave error and accelerate this harmful trend. It would force corporations to exert ever-greater levels of control over their employees' personal lives to avoid possible liability. It would limit political expression to the fortunate few who need no employer. That is not the political order envisioned by and enshrined in our Constitution. Companies and employers should be empowered to stand apart from their employees' political expression. They should not monitor or control employees' personal political views.

Minnesota law already points to that result. A principal is liable for the act of its agent only if the act giving rise to alleged liability was committed within the scope of the agency and was not for a purpose personal to the agent. *Semrad v. Edina Realty, Inc.,* 493 N.W.2d 528, 535 (Minn. 1992). A corporation cannot be held liable for executives' allegedly defamatory statements unless the executives were acting within the scope of their employment and in furtherance of the company's business. Liability is not imposed "unless there is some connection between the tort and the business such that the employer in essence assumed the risk when it chose to engage in the business." *Hagen v. Burmeister &*

*Assocs., Inc.*, 633 N.W.2d 497, 504 (Minn. 2001). Foreseeability is an element for showing such a connection, and foreseeability turns on whether "the type of tortious conduct involved is a well-known industry hazard." *Id*. at 505. In *Hagen*, the plaintiff failed to show that the risk of employees misappropriating trade secrets was a well-known hazard in the insurance industry. *Id*. Similarly, in *Pederson v. Long*, the plaintiff failed to show that defamatory comments made by one professional against another professional was a well-known hazard in the mental-health industry. No. A16-0329, 2016 Minn. App. Unpub. LEXIS 908, at *11 (Minn. Ct. App. Sep. 12, 2016). This Court has previously dismissed on a Rule 12(b)(6) motion tort claims seeking to hold a university liable for acts of its employee, a professor who posted online web camera footage of the plaintiff, on the basis that the complaint did not plausibly allege these acts were foreseeable. *Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1076-77 (D. Minn. 2021).

Even assuming, for purposes of this motion, that Smartmatic's factual allegations are true, none of those allegations plausibly suggest that Lindell acted within the scope of his employment and in the furtherance of MyPillow's business when he made personal political statements about the 2020 election. Smartmatic does not allege that defamation through political activity is a "well-known industry hazard" in the pillow and bedding industry. Nor has it pleaded that making political statements was within the scope of Lindell's agency for MyPillow, or any facts to suggest Lindell's political statements about the 2020 election were authorized, endorsed, or approved by MyPillow. In *Kasner v. Gage*, the Minnesota Supreme Court held that a corporation was not liable for an employee's intentional tort because the tort was not how the corporation competed and was accordingly

34

not within the scope of employment. 161 N.W.2d 40, 42-43 (Minn. 1968). A party alleging agency bears the burden of proving that agency, *White v. Boucher*, 322 N.W.2d 560, 566 (Minn. 1982), and Smartmatic does not plead facts that would bring political advocacy within MyPillow's agency delegation to Lindell.

Michael Lindell commented on politics and the 2020 election, as is his constitutional right. Smartmatic has not pleaded any facts to warrant a finding that MyPillow assumed the risk of defamation liability arising out of its employees' political commentary when MyPillow chose to engage in the business of marketing pillows and bedding. Smartmatic has failed to plead any basis to hold MyPillow liable for the statements by Lindell alleged in the Complaint, and its defamation claim against MyPillow should be dismissed.

### III.
### COUNT TWO SHOULD BE DISMISSED BECAUSE IT MERELY RECASTS THE DEFAMATION CLAIM AS A DECEPTIVE TRADE PRACTICE CLAIM

Because Smartmatic's defamation claim fails, so also does its other claim, under Minnesota's Deceptive Trade Practices Statute, Minn. Stat. § 325D.44 ("MDTP"). The MDTP claim is just a repackaged defamation claim. Specifically, Smartmatic alleges in paragraph 373 of the Complaint that "false and defamatory statements, as described in detail above, constitute deceptive trade practices" because they "disparage Smartmatic's goods, services, and business by false and misleading representations of fact." Thus the allegations that support the MDTP claim are identical to the allegations supporting the Plaintiffs' defamation claim.

It is well established that "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co.*, 22

F.3d 310, 319-20 (D.C. Cir. 1994). *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988). Any cause of action that seeks to hold a defendant liable for the content of words spoken by him or her is subject to the constitutional requirement of pleading and proving actual malice by the defendant. Because the Complaint fails to plead actual malice, for the reasons set forth above, the MDTP claim should also be dismissed. Smartmatic cannot do an end run around the First Amendment by simply recasting an unconstitutional defamation claim as an MDTP claim.

### IV.
### THE COMPLAINT SHOULD BE DISMISSED NOW SO THAT DEFENDANTS WILL NOT BE BURDENED WITH UNJUSTIFIED ATTORNEYS' FEES AND LITIGATION COSTS

Two contrasting Eighth Circuit decisions aptly illustrate the threat that defamation actions present to free exercise of First Amendment rights. In *Nelson Auto Ctr.,* the Eighth Circuit affirmed a Rule 12(b)(6) dismissal of defamation claims brought by a corporation for failure to plausibly allege actual malice. 951 F.3d at 958-59. Thirty-one years earlier, the same court affirmed an order of summary judgment entered in favor of a defamation defendant "after extensive discovery but before trial," explaining "the Constitution requires more speech rather than less," and "[w]e favor letting the debate continue" concerning the contested expressions of the defendant. *Price*, 881 F.2d at 1434, 1446-47. However, in the earlier case the defendant was not released from the threat of a $25 million judgment – which caused it to withdraw the challenged book from circulation – until "[n]early four years" had passed and it had expended "over one million dollars" in legal costs. *Id*. at 1429.

"[L]ong and expensive litigation" threatens speech by discouraging "full and free exercise of . . . First Amendment rights." *Keogh*, 365 F.2d at 968. "The threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Id.* If not "assured freedom from the harassment of lawsuits," those who exercise First Amendment freedoms "will tend to become self-censors." *Id.* Decisive prompt judicial relief is needed at this early stage of litigation to protect meaningfully the constitutional right to free expression. The burdens borne by the defendant in *Price* will chill free speech on matters of public concern unless speakers can be confident that the early dismissal granted in *Nelson Auto Ctr.* is available to them also.

The Supreme Court in *New York Times v. Sullivan* sought to prevent a world in which "would-be critics of official conduct may be deterred from voicing their criticism, even though it is [. . .]in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." 376 U.S. at 279. Justice Brett Kavanaugh, while a Circuit Judge, reiterated that concern: "The First Amendment guarantees freedom of speech and freedom of the press. Costly and time-consuming defamation litigation can threaten those essential freedoms. To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl*, 856 F.3d at 109. Kavanaugh built upon the earlier foundation in *Farah v. Esquire Magazine*, which noted that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive

litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." 736 F.3d 528, 534 (D.C. Cir. 2013).

"[P]olitical rhetoric best left to open and free speech" does not substitute for a legal showing of actual malice. *Price*, 881 F.2d at 1446. Smartmatic's claims against MyPillow should be dismissed now because Michael Lindell's statements about the 2020 presidential election were statements about a matter of the utmost public concern, and Smartmatic has not pleaded with particularity facts to show that Lindell doubted the truth of his statements, spoke with a high degree of awareness of probable falsity, or entertained serious doubts as to the truth of his statements.

## CONCLUSION

For the foregoing reasons, the complaint against My Pillow, Inc. should be dismissed.

DATED: March 21, 2022          **PARKER DANIELS KIBORT LLC**

By */s/ Andrew D. Parker*
  Andrew D. Parker (MN Bar No. 195042)
  Jesse Kibort (MN Bar No. 0328595)
  Joseph A. Pull (MN Bar No. 0386968)
  Ryan Malone (MN Bar No. 0395795)
  888 Colwell Building
  123 N. Third Street
  Minneapolis, MN 55401
  Telephone: (612) 355-4100
  Facsimile: (612) 355-4101
  parker@parkerdk.com
  kibort@parkerdk.com
  pull@parkerdk.com
  malone@parkerdk.com

**LEWIN & LEWIN, LLP**

By */s/ Nathan Lewin*
    Nathan Lewin (D.C. Bar No. 38299)*
    888 17th Street NW
    Fourth Floor
    Washington, DC 20006
    Telephone: (202) 828-1000
    nat@lewinlewin.com

*Counsel for Defendant My Pillow, Inc.*
 * To be admitted *pro hac vice*

    *Counsel for Defendant My Pillow, Inc.*

By */s/ Alan Dershowitz*
    Alan Dershowitz (MA Bar No. 121200)
    1575 Massachusetts Avenue
    Cambridge, MA 02138

*Of Counsel for Defendant My Pillow, Inc.*