**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., and SGO CORPORATION LIMITED, | Case No. 22-cv-0098-WMW-JFD |
| Plaintiffs, v. | **Plaintiffs' Omnibus Brief in Opposition to Michael J. Lindell and My Pillow, Inc.'s Motions to Dismiss** |
| MICHAEL J. LINDELL and MY PILLOW, INC., | |
| Defendants. | |

# Table of Contents

Table of Contents ..................................................................................................... i

Table of Authorities ............................................................................................... iii

PRELIMINARY STATEMENT ............................................................................... 1

OVERVIEW OF ARGUMENT ................................................................................ 1

STATEMENT OF FACTS ....................................................................................... 3

I.     In the 2020 U.S. Election, Smartmatic Provided Voting Machines and
Software Only to Los Angeles County, California. ............................................. 3

II.    Lindell and MyPillow Launched a Disinformation Campaign in Which
They Represented That Smartmatic Rigged the 2020 U.S. Election. ................. 4

LEGAL STANDARD ............................................................................................... 8

ARGUMENT ............................................................................................................ 9

I.     The First Amendment Does Not Immunize Defendants from Liability for
Publishing Factually Inaccurate Statements About Smartmatic. ...................... 9

II.    Smartmatic's Complaint Sufficiently Alleges Defamation Claims Against
Defendants. ..................................................................................................... 13

        A.    A Plaintiff Must Plead Facts Establishing a Reasonable Inference
That the Defendant Defamed it with Actual Malice. ............................... 14

        B.    Smartmatic Sufficiently Pleaded That Lindell and MyPillow
Defamed It With Actual Malice. ............................................................. 17

               1.    Defendants fabricated their claims about Smartmatic. ................... 17

               2.    Defendants possessed information contradicting what they
said about Smartmatic. ................................................................. 19

               3.    Defendants either knew of or purposefully avoided dozens
of sources, articles, and reports contradicting what they said
about Smartmatic. ........................................................................ 23

               4.    Defendants had obvious reasons to doubt the veracity of
their so-called sources. ................................................................. 28

               5.    Defendants defamed Smartmatic for fame and fortune. ............... 30

6.    Defendants' persistence in defaming Smartmatic does not negate Smartmatic's factual allegations showing actual malice. ........................................................................................ 32

III.    MyPillow is Vicariously Liable for Lindell's Defamatory Statements. ......................... 36

A.    Lindell Used His Defamation Campaign Against Smartmatic to Promote MyPillow and Sell its Products. ............................... 37

B.    Lindell's Defamation Campaign Against Smartmatic was Part-and-parcel of His Job to Promote and Sell MyPillow. ................... 42

1.    MyPillow's primary spokesman, Lindell, sold MyPillow products through a disinformation campaign with full knowledge and support of MyPillow's CEO, Lindell. ........................... 42

2.    Lindell's defamatory statements occurred within "work-related time and space." .......................................................... 48

IV.    Smartmatic Sufficiently Alleged a Claim Under Minnesota's Deceptive Trade Practices Act Because Defendants Disparaged Smartmatic's Goods, Services, and Business to Promote Their Business and Sell Their Products. ................... 51

CONCLUSION ....................................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Prairie Const. Co. v. Hoich*,
  560 F.3d 780 (8th Cir. 2009) ................................................35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................9

*Britton v. Koep*,
  470 N.W.2d 518 (Minn. 1991)..............................................22

*Burger v. McGilley Mem'l Chapels, Inc.*,
  856 F.2d 1046 (8th Cir. 1988) ..............................................33

*Campbell v. Citizens for an Honest Government, Inc.*,
  255 F.3d 560 (8th Cir. 2001) ................................................31

*Chafoulias v. Peterson*,
  668 N.W.2d 642, 655 (Minn. 2003).......................................27

*Church of Scientology of Minn. v. Minn. State Medical Ass'n Found.*,
  264 N.W.2d 152 (Minn. 1978)..............................................13

*Cognex Corp. v. VCode Holdings, Inc.*,
  No. CIV. 06-1040 JNE JJG, 2008 WL 2113661, at *18 (D. Minn. May 19,
  2008) ...............................................................................36

*Connelly v. Nw. Publ'ns, Inc.*,
  448 N.W.2d 901 (Minn. Ct. App. 1989)..............................32, 33

*Cruz v. TMI Hosp., Inc.*,
  No. 14-CV-1128, 2015 WL 5996383 (D. Minn. Oct. 14, 2015) ....................................*passim*

*Curtis Publ'g Co. v. Butts*,
  388 U.S. 130 (1967).............................................................10

*Drotzmanns, Inc. v. McGraw-Hill, Inc.*,
  500 F.2d 830 (8th Cir. 1974) ................................................22

*Duffy v. Leading Edge Prods., Inc.*,
  44 F.3d 308 (5th Cir. 1995) ..................................................30

*Dunnigan v. Fed. Home Loan Mortg. Corp.*,
    184 F. Supp. 3d 726 (D. Minn. 2016) ...................................................................35

*Edgewater Motels, Inc. v. Gatzke*,
    277 N.W.2d 11 (Minn. 1979) ......................................................................49, 50

*Fahrendorff ex rel. Fahrendorff v. N. Homes, Inc.*,
    597 N.W.2d 905 (Minn. 1999) .....................................................................42, 46

*Fine v. Bernstein*,
    726 N.W.2d 137 (Minn. Ct. App. 2007) ...............................................................11

*Gerritsen v. Warner Bros. Entm't Inc.*,
    112 F. Supp. 3d 1011 (C.D. Cal. 2015) ...............................................................35

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ...............................................................................10, 11

*Glenn v. Daddy Rocks, Inc.*,
    171 F. Supp. 2d 943 (D. Minn. 2001) .................................................................13

*Golden Bear Distrib. Sys. of Tex. v. Chase Revel Inc.*,
    708 F.2d 944 (5th Cir. 1983) .........................................................................32

*Gordon v. Rosenblum*,
    393 P.3d 1122 (Or. 2017) ...........................................................................53

*Gregerson v. Vilana Fin., Inc.*,
    No. 06-1164 ADM/AJB, 2007 WL 2509718, at *6 (D. Minn. Aug. 31, 2007) ...............51, 53

*Hagen v. Burmeister & Assocs.*,
    633 N.W.2d 497 (Minn. 2001) .................................................................43, 47, 48

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ........................................................................... *passim*

*Hartford Fire Ins. Co. v. Clark*,
    727 F. Supp. 2d 765 (D. Minn. 2010) ........................................................ *passim*

*Hartigan v. Maclean Hunter Publ'g Corp.*,
    457 N.E.2d 480 (Ill. Ct. App. 1983) ..................................................................54

*Herbert v. Lando*,
    441 U.S. 153 (1979) ...........................................................................10, 12, 15

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988) ...............................................................................11, 52

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) ............................................................................27

*Johnson v. CBS*,
    10 F. Supp. 2d 1071 (D. Minn. 1998) ...............................................................14

*Jones v. Scripps Media, Inc.*,
    No. 16-cv-12647, 2017 WL 1230481 (E.D. Mich. Apr. 4, 2017) ...................30, 31

*Kasner v. Gage*,
    161 N.W.2d 40 (1968) ...................................................................................46, 47

*Maethener v. Somplace Safe, Inc.*,
    929 N.W.2d 868 (Minn. 2019) ..........................................................................22

*Mahnke v. Nw. Publ'ns, Inc.*,
    160 N.W.2d 1 (Minn. 1968) .................................................................16, 29, 32

*Mangan v. Corp. Synergies Grp., Inc.*,
    834 F. Supp. 2d 199 (D.N.J. 2011) ...................................................................36

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996) ..........................................................................27

*Miles v. Simmons Univ.*,
    514 F. Supp. 3d 1070 (D. Minn. 2021) .............................................................48

*Miller v. Keating*,
    349 So. 2d 265 (La. 1977) .............................................................................49, 50

*Moldea v. New York Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) ............................................................................52

*Molitor v. Molitor*,
    No. A16-1434, 2017 WL 1436083 (Minn. Ct. App. Apr. 24, 2017) ...................14

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .........................................................................................14

*Nunes v. Lizza*,
    12 F.4th 890 (8th Cir. 2021) ...................................................................... *passim*

*Nw. Airlines, Inc. v. Friday*,
    617 N.W.2d 590 (Minn. Ct. App. 2000) ...........................................................54

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) .............................................................................36

*Pederson v. Long*,
  No. A16-0329, 2016 WL 4723425 (Minn. Ct. App. Sept. 12, 2016) ...............................48, 49

*Pippen v. NBCUniversal Media, LLC*,
  734 F.3d 610 (7th Cir. 2013) ...................................................................22

*Prinzing v. Schwab*,
  No. A05-398, 2006 WL 538926, at *4 (Minn. Ct. App. Mar. 7, 2006)................................18

*Range Dev. Co. of Chisholm v. Star Tribune*,
  885 N.W.2d 500 (Minn. Ct. App. 2016) ........................................................22

*Rau v. Roberts*,
  640 F.3d 324 (8th Cir. 2011) ...................................................................49

*In re Resideo Techs., Inc., Sec. Litig.*,
  2021 WL 1195740 (D. Minn. Mar. 30, 2021) ...................................................35

*Schiavone Constr. Co. v. Time, Inc.*,
  847 F.2d 1069 (3d Cir. 1988)....................................................................29

*Schlieman v. Gannett Minn. Broad., Inc.*,
  637 N.W.2d 297 (Minn. Ct. App. 2001)......................................................13, 14

*Schneider v. Buckman*,
  433 N.W.2d 98 (Minn. 1988)....................................................................42

*Shoemaker v. Cardiovascular Sys.*,
  No. 16-568, 2017 WL 1180444 (D. Minn. Mar. 29, 2017) ....................................35

*Smartmatic USA Corp. v. Fox Corp.*,
  No. 151136/2021, 2022 WL 685407 (Sup. Ct. N.Y. Cty. Mar. 8, 2022) .............................19

*Speer v. Ottaway Newspapers, Inc.*,
  828 F.2d 475 (8th Cir. 1987) ...................................................................26

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)...................................................................... *passim*

*Stokes v. CBS, Inc.*,
  25 F. Supp. 2d 992 (D. Minn. 1998)...................................................... *passim*

*StopLoss Specialists, LLC v. VeriClaim, Inc.*,
  340 F. Supp. 3d 1334 (N.D. Ga. 2018) ...........................................................36

*Tah v. Glob. Witness Publ'g, Inc.*,
  991 F.3d 231, 242 (D.C. Cir. 2021) ..........................................................27, 28

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) ............................................................27

*Tholen v. Assist Am., Inc.*,
    970 F.3d 979 (8th Cir. 2020) ............................................................15

*Unker v. Joseph Markovits, Inc.*,
    643 F. Supp. 1043 (S.D.N.Y. 1986)..................................................36

*US Dominion, Inc. v. Fox News Network, LLC*,
    No. N21C-03-257 EMD, 2021 WL 5984265, at *28 (Del. Super. Ct. Dec. 16,
    2021) ............................................................................................19, 20

*US Dominion, Inc. v. Powell*,
    554 F. Supp. 3d 42 (D.D.C. 2021), *appeal dismissed sub nom. US Dominion,
    Inc. v. My Pillow, Inc*., No. 21-7103, 2022 WL 774080 (D.C. Cir. Jan. 20,
    2022) ..................................................................................... *passim*

*VECC, Inc. v. Bank of Nova Scotia*,
    296 F. Supp. 2d 617 (D.V.I. 2003) ...................................................36

*Ventura v. Kyle*,
    8 F. Supp. 3d 1115 (D. Minn. 2014)..............................................18, 34

*Wendt v. Charter Commc'ns, LLC*,
    No. 13-1308, 2013 WL 12221823 (D. Minn. Sept. 4, 2013)............43, 45

*Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*,
    437 F. Supp. 3d 693 (D. Minn. 2020) (Wright, J.) ....................8, 26, 52

**Statutes**

Minn. Stat. § 325D.44.......................................................51, 52, 53, 54

Minn. Stat. § 325D.45....................................................................52

**Other Authorities**

Rule 12 of the Federal Rules of Civil Procedure ...................................8, 34

Rule 201 of the Federal Rules of Evidence ........................................34, 35

## PRELIMINARY STATEMENT

Michael Lindell spent months defaming Smartmatic[1] for the noble purpose of self-promotion and soliciting customers for his company, My Pillow, Inc. ("MyPillow"). Lindell knew he had no credible source for his claims against Smartmatic. Lindell knew that every credible source had already refuted and debunked the conspiracy theories he advocated. Lindell knew his so-called "sources" lacked credibility, both in general and on the specific topic of whether Smartmatic rigged the 2020 U.S. election. Nonetheless, Lindell pursued and continues to pursue a defamation campaign against Smartmatic because he knows a segment of the population will reward his loyalty to former-President Trump by buying products from MyPillow. Lindell once used advertisements to secure customers. He is now using a defamation campaign. Lindell and MyPillow are liable to Smartmatic for the damage caused by that campaign.

## OVERVIEW OF ARGUMENT

Lindell and MyPillow claim that the Court should not hold them accountable for their defamation campaign against Smartmatic based on three arguments. The arguments—like the statements underlying the defamation campaign—are fallacious.

*First*, the First Amendment does not provide immunity to Lindell and MyPillow for defaming Smartmatic and disparaging its election technology and software. Defendants claim that Smartmatic is "forbid[den]" from suing them for falsely claiming that it participated in a criminal conspiracy to rig the 2020 U.S. election. The law, however,

---

[1] Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited are collectively referred to herein as "Smartmatic."

provides no such immunity. In fact, it expressly preserves the rights of plaintiffs to recover for defendants' calculated falsehoods—even when they publish falsehoods about public figures and characterize their falsehoods as "political speech." Defendants lied about Smartmatic. They cannot hide behind the First Amendment.

*Second*, the Complaint adequately alleges that Lindell and MyPillow acted with actual malice. The Complaint includes 380 paragraphs and 142 exhibits detailing evidence that Defendants: (1) knew Lindell lacked any sources for his statements about Smartmatic; (2) possessed information contradicting what Lindell said about Smartmatic; (3) acted with reckless disregard for the truth by purposefully avoiding information contradicting Lindell's statements about Smartmatic; (4) knew their so-called sources lacked credibility with respect to the claims being made about Smartmatic; and (5) defamed Smartmatic for improper purposes—namely, self-promotion and sales. Courts across the country have already found these allegations sufficient to plead actual malice, and this Court should do the same.

*Third*, the Complaint adequately alleges that MyPillow is vicariously liable for Lindell's defamatory and disparaging statements. Lindell defamed Smartmatic to boost MyPillow's profile and increase its sales. Lindell knew that, by telling lies about Smartmatic and its role in the 2020 U.S. election, he would garner public attention and media appearance invitations. In his appearances, he simultaneously published falsehoods about Smartmatic, promoted MyPillow, and solicited people to purchase MyPillow products. As such, Lindell's defamation campaign was one of the ways he fulfilled his duties to MyPillow, including brand promotion and sales.

In the end, Lindell and MyPillow's arguments break against two bedrock principles: the Court accepts the allegations in the Complaint as true when it evaluates a motion to dismiss, and the Court does not weigh evidence at this stage. Lindell and MyPillow propound a narrative throughout their briefs different than Smartmatic's allegations in the Complaint. They believe their narrative undermines Smartmatic's claims. A jury will decide who is right. At this stage, the allegations in the Complaint establish that the Defendants acted with actual malice and MyPillow is vicariously liable for the defamatory statements published by its CEO and spokesman, Lindell. Defendants' motions should be denied.

## STATEMENT OF FACTS

### I.   In the 2020 U.S. Election, Smartmatic Provided Voting Machines and Software Only to Los Angeles County, California.

Antonio Mugica and Roger Piñate founded Smartmatic in 2000 in Boca Raton, Florida. (Compl. ¶24.) After observing the "hanging chad" debacle of the 2000 U.S. election, they wanted to bring secure technology to elections and build an election technology company that could ensure accuracy, transparency, and auditability. (*Id*. ¶¶25, 30.) They dedicated the next 20 years of their lives to that endeavor and were successful. (*Id.* ¶¶26, 30-31.) Smartmatic has processed more than 5 billion votes in more than 25 countries on five continents. (*Id*. ¶¶26, 31.) Each of the elections using Smartmatic's technology included an auditable paper trail that demonstrates they were not rigged, hacked, or stolen. (*Id*. ¶31.)

The 2020 election year was the most important year in Smartmatic's history. Despite its many successes, Smartmatic had not played a major role in local, state, or federal elections in the United States. (*Id.* ¶¶35, 353.) That was about to change. In June 2018, Los Angeles County selected Smartmatic as its partner to develop Voting Solutions for All People. (*Id.* ¶¶35, 40.) Success in Los Angeles County with that initiative positioned Smartmatic to market its election technology to other counties and states in the United States (and across the world) who were inclined to follow Los Angeles County's lead. (*Id.*) And it was a success. Smartmatic provided election technology and support to Los Angeles County during the November 2020 election without incident. (*Id.* ¶¶46-47.) The results in Los Angeles County were secure, reliable, and auditable. (*Id.*) Smartmatic had no role in the general election outside of Los Angeles County. (*Id.* ¶49.)

## II.   Lindell and MyPillow Launched a Disinformation Campaign in Which They Represented That Smartmatic Rigged the 2020 U.S. Election.

In November 2020, Joe Biden and Kamala Harris won the U.S. election for President and Vice President. (*Id.* ¶56.) The security, reliability, and accuracy of the 2020 election were repeatedly confirmed from November 2020 through August 2021. (*Id.* ¶¶57-65.) Yet Lindell latched onto a false narrative that the election was "stolen" from former-President Donald Trump and Vice President Michael Pence. (*Id.* ¶69.) He decided to blame the voting machines, including Smartmatic. (*Id.*) He knew that he and his MyPillow products would garner attention in the media and stay on Donald Trump's supporters' minds if he spread a false narrative about an election stolen by electronic voting machines. (*Id.* ¶¶4-7.)

Lindell attacked Smartmatic in three ways. *First*, Lindell created and published a series of defamatory documentary videos. (*Id.* ¶80.) In the documentaries, Lindell presented several individuals as "experts" on cybersecurity and electronic voting, including blogger and self-proclaimed "national security" investigative reporter, Mary Fanning, and purported "cyber forensics" expert, Russell Ramsland. (*Id*. ¶¶300-305.) These "experts" were unqualified to discuss the security of the 2020 U.S. election and Smartmatic. (*Id.* ¶300.) For example, Ms. Fanning has no credentials in the field of national security or journalism, yet she co-publishes a conspiracy theory blog (The American Report) in which she purports to be a national security investigative journalist. (*Id.* ¶301.) Mr. Ramsland, for his part, had already been discredited by two courts for spreading false facts about the 2020 election by the time he appeared in the documentaries. (*Id.* ¶303.)

*Second*, Lindell appeared on at least 13 Internet radio and television shows promoting his documentaries, driving traffic to his website, soliciting customers for MyPillow, and defaming Smartmatic. (*Id.* ¶81.) During many of these defamatory appearances, Lindell plugged his false and defamatory documentary series at the same time he promoted MyPillow and solicited customers. (*Id*. ¶¶109-116.) Lindell's defamation of Smartmatic went hand-in-hand with his promotion of MyPillow—telegraphing that if the audience liked what he was saying about Smartmatic, they would love to buy from MyPillow. (*Id*. ¶¶7, 109.)

*Third*, Lindell held an in-person and Internet live-streamed "Cyber Symposium" from August 8-10, 2021, where he further defamed Smartmatic and promoted MyPillow. (*Id*. ¶82.) The Cyber Symposium gave Lindell and his so-called "experts" a full-time stage

to perpetuate lies about the 2020 U.S. election and defame Smartmatic. For example, Lindell claimed at the Cyber Symposium that Smartmatic machines are "built as a tool to take countries" and his "expert," Joel Oltmann, showed a graph alleging that Smartmatic was affiliated with its competitors that also provided voting machines in the 2020 U.S. election, Dominion and ES&S. (*Id*. ¶¶124, 126; Ex. 32; Ex. 36.) The MyPillow brand was, of course, prominently displayed during the Cyber Symposium. (*Id.*, Ex. 131.)

During these appearances and programs, Lindell made dozens of demonstrably false and defamatory statements about Smartmatic, its role in the 2020 U.S. election, and its election technology and software. For example, Lindell stated:

> I have, I have 100%, not 99%, 100% evidence that of everything that they did ***Smartmatic [] ES&S, all of those machines did and stole[] our country and stole[] our election***. (*Id.* ¶132(g), Ex. 16.)[2]

> \*\*\*

> ***I am going after Dominion and Smartmatic***, I'm going after them with a lawsuit if this doesn't all come out to the public and they all get exposed and then [] show what happened in our election… ***they're going to be crimes against our country that they used their [] their machines were all online***. (*Id.* ¶165(a), Ex. 11.)

> \*\*\*

> We're going after them in the biggest way possible, and we're not – we're ***including Smartmatic because now we've tied the two together. They're the mothership,*** all of that's gonna come out too, that evidence. ***They're all tied together in this corruption and this – and what went on to our country, the attack on our country***, but this is why we're doing it. (*Id.* ¶143(a), Ex. 26.)

> \*\*\*

---

[2] In all quotations, emphasis has been added unless otherwise noted.

Just like going back to Venezuela. ***They took Venezuela in two years with Smartmatic. And, and it's this is their big plan. This is a very conceived plan.*** And it's very organized, and very, you know, and they have all the marketing because they have all the evil media behind this. (*Id.* ¶170(b), Ex. 22.)

\*\*\*

I mean, this is what they do. Dominion, Smartmatic, all of them. It's just like, you talk to Matt DePerno in Michigan, and they've been going through this every day for months… ***I think everybody knows now, this is the biggest cover-up that's probably in history for a crime. It's so massive they've covered this up with the machine, or all the stuff that they did with the machines.*** (*Id.* ¶170(a), Ex. 30.)

Over the course of his disinformation campaign, which continues today, Lindell stated and published demonstrably false facts about: (1) Smartmatic's role in the 2020 U.S. election; (2) Smartmatic's relationship with Dominion and other election technology companies; (3) Smartmatic stealing the 2020 U.S. election; (4) Smartmatic's election technology and software being hacked; (5) Smartmatic's election technology being connected to the Internet; (6) Smartmatic's participation in a criminal conspiracy; and (7) Smartmatic's history of stealing elections. (*Id.* ¶128.)  Everything he said was false. (*Id.* ¶¶134-80.)

Critically, in these appearances and programs, and when making these defamatory statements, Lindell was not acting solely for his personal self-interest—though that played a part. During all relevant times, and during all relevant appearances, Lindell was acting on behalf of MyPillow. (*Id.* at p. 72 n.7; *Id.* ¶¶16, 369, 376.) Lindell is the founder and CEO of MyPillow. As the face and spokesperson of MyPillow, the company is synonymous with him and vice versa. (*Id.* ¶¶3, 19, 55, 87.) The MyPillow logo was a ubiquitous feature of the appearances and programs during which he defamed Smartmatic.

(*See, e.g., id*., Ex. 11 at 33:22-24; Ex. 16 at 25:9-14; Ex. 20 at 3:4-7.) Promo codes for ordering from MyPillow were conveniently and strategically placed during Lindell's appearances. (*Id.*) Lindell also advertised his products to viewers and listeners during the same program segments in which he defamed Smartmatic. (*Id.*) The "MyPillow guy" used his defamation campaign against Smartmatic as a tool to sell his pillows.

## LEGAL STANDARD

Lindell and MyPillow moved to dismiss Smartmatic's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Lindell Mem. at 2-3; MyPillow Mem. at 5-6.)[3] To overcome Defendants' motions, Smartmatic's Complaint must allege sufficient facts to state a facially plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When determining whether a complaint states a facially plausible claim, a district court accepts as true the factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor." *Willis Elec. Co., Ltd. v. Polygroup Macau Ltd. (BVI)*, 437 F. Supp. 3d 693, 707 (D. Minn. 2020) (Wright, J.). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

---

[3] Smartmatic refers to the Memorandum of Points and Authorities in Support of Defendant Michael J. Lindell's Motion to Dismiss, ECF Dkt. No. 20, as "Lindell Mem.," and the Memorandum of Points and Authorities in Support of Defendant My Pillow, Inc.'s Motion to Dismiss for Failure to State a Claim, ECF Dkt. No. 26, as "MyPillow Mem."

improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).

## ARGUMENT

Under black letter law, Defendants cannot escape responsibility for the defamatory statements Lindell made to garner attention and sell MyPillow. The allegations in the Complaint are more than sufficient to state a claim. Below, Section I responds to Defendants' overarching argument that they have absolute immunity to defame and disparage Smartmatic under the First Amendment. They do not. Section II addresses Defendants' claim that Smartmatic failed to allege sufficient facts to establish actual malice. Plaintiffs did with 380 paragraphs and 142 exhibits. Finally, Section III addresses MyPillow's attempt to now distance itself from its CEO and spokesman by claiming vicarious liability does not apply. It does. MyPillow accepts the benefits of Lindell's sales tactics. MyPillow must also accept the consequences.

## I.      The First Amendment Does Not Immunize Defendants from Liability for Publishing Factually Inaccurate Statements About Smartmatic.

Defendants claim that the First Amendment "forbids" Smartmatic from suing them because their false and defamatory statements relate to "government responsibilities," including "election functions." (MyPillow Mem. at 2.) They are mistaken. The First Amendment and Minnesota law allow them to publish what they want about Smartmatic because there are few prior restraints on speech. But under the First Amendment and Minnesota law, Defendants are also liable for the falsehoods they publish if they acted with the requisite culpability.

9

The First Amendment embodies a balance between two sets of competing interests: "the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood." *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 153 (1967). One set does not trump the other. An individual's right to protect his or her good name:

> reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of a private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system[.]

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974) (citation omitted). As profound as our commitment is to the freedoms of speech and press, the Supreme Court has never wavered in "its conviction—reflected in the laws of defamation of all of the States—that the individual's interest in his reputation is also a basic concern." *Herbert v. Lando*, 441 U.S. 153, 169 (1979).

For that reason, the Supreme Court has never "embraced . . . the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation." *Gertz*, 418 U.S. at 341. "[A]bsolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation." *Id.* "The fact that dissemination of information and opinion on questions of public concern is ordinarily a legitimate, protected and indeed cherished activity does not mean, however, that one may in all respects carry on that activity exempt from sanctions designed to safeguard the legitimate interests of others." *Curtis Publ'g*, 388 U.S. at 150.

10

A related, core First Amendment principle is the worthlessness of "calculated falsehoods." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 687 n. 34 (1989). They are worthless because they debase our society. "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz*, 418 U.S. at 340. To the contrary, false statements of fact "interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988). For that reason, the First Amendment offers no shield to disseminating false information in a public forum. *See Fine v. Bernstein,* 726 N.W.2d 137, 144 (Minn. Ct. App. 2007) ("Simply because Bernstein's assertions are political statements made during an election campaign does not shield him from a state's ability to punish an abuse of the liberty of speech.").

The near-total immunity urged by Defendants runs afoul of these core principles. They claim that "[t]he First Amendment forbids entities like Smartmatic, that discharge critical government responsibilities for collecting and counting votes, from silencing critics by suing them for defamation" (MyPillow Mem. at 2), and that they are "'immun[e]' from a defamation lawsuit for 'criticism of official conduct.'" (Lindell Mem. at 29.) But while "[v]igorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty," the First Amendment does not provide individuals with "absolute immunity in . . . coverage of public figures or elections." *Harte-Hanks*, 491 U.S. at 687-88. "Spreading false

information in and of itself carries no First Amendment credentials." *Herbert*, 441 U.S. at 171.

In fact, courts have already held that these Defendants should be held liable for their false statements about the 2020 U.S. election. Smartmatic's competitor, Dominion Voting Systems, Inc. ("Dominion"), brought a defamation complaint against Defendants in the United States District Court for the District of Columbia, in which it seeks to hold them liable for the same types of false representations at issue in this case. *See US Dominion, Inc. v. My Pillow, Inc.*, No. 1:21-cv-00445-CJN (D.D.C.). In that case, Defendants claimed, as they argue here, that they are "immune" from liability. The court rejected their argument:

> [T]here is no blanket immunity for statements that are "political" in nature: as the Court of Appeals has put it, the fact that statements were made in a "political 'context' does not indiscriminately immunize every statement contained therein." . . . It is true that courts recognize the value in some level of "imaginative expression" or "rhetorical hyperbole" in our public debate. . . . . But it is simply not the law that provably false statements cannot be actionable if made in the context of an election. . . . MyPillow appears to similarly argue that the First Amendment grants some kind of blanket protection to statements about "public debate in a public forum." . . . Again, there is no such immunity . . . Instead, the First Amendment safeguards our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," . . . by limiting viable defamation claims to provably false statements made with actual malice.

*US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 57, 57 n.8 (D.D.C. 2021), *appeal dismissed sub nom. US Dominion, Inc. v. My Pillow, Inc.*, No. 21-7103, 2022 WL 774080 (D.C. Cir. Jan. 20, 2022) (citations omitted) ("*US Dominion*").

Defendants, therefore, are mistaken that the First Amendment bars Smartmatic's claims where, as discussed below, Smartmatic has sufficiently pled that they acted with

actual malice. This lawsuit is not, as Defendants contend, a "threat . . . to the exercise of First Amendment rights." (MyPillow Mem. at 36-38.) Nor is Smartmatic "chilling" their speech by prosecuting this lawsuit. (*See id.*) Defendants falsely stated that Smartmatic participated in a far-reaching criminal conspiracy to undermine a U.S. election. The law does not countenance their lies, and to the extent that Defendants must participate in "[c]ostly and time-consuming defamation litigation," they have only themselves to blame. (*See id.* at 37 (citation omitted).)

## II.  Smartmatic's Complaint Sufficiently Alleges Defamation Claims Against Defendants.

The essence of a defamation claim is an injury to reputation. *Church of Scientology of Minn. v. Minn. State Medical Ass'n Found.*, 264 N.W.2d 152, 155 (Minn. 1978) ("Words are defamatory when they tend to injure the plaintiff's reputation and expose the plaintiff to public hatred, contempt, ridicule or degradation."). To plead a claim for defamation, Smartmatic must allege that Defendants: (1) published a statement of fact; (2) of and concerning Smartmatic; (3) which was false; and (4) damaged Smartmatic's reputation and "lowered [its] estimation in the community." *Glenn v. Daddy Rocks, Inc.*, 171 F. Supp. 2d 943, 948 (D. Minn. 2001) (citation omitted). Smartmatic must also allege facts showing that Defendants acted with actual malice if the Court determines that Smartmatic is a "public figure" or "public official." *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 302 (Minn. Ct. App. 2001).

Defendants concede that Smartmatic has adequately alleged most of these elements. They do not dispute that they published false and defamatory statements of fact about

Smartmatic. They do not dispute that their false statements were "of and concerning" Smartmatic. Nor do they dispute Smartmatic's allegations that their false statements damaged its reputation. As such, the only issue that the Court must decide is whether Smartmatic has adequately alleged that Defendants defamed Smartmatic with actual malice. *See Schlieman*, 637 N.W.2d at 302.[4]

### A.   A Plaintiff Must Plead Facts Establishing a Reasonable Inference That the Defendant Defamed it with Actual Malice.

Public officials and public figures must prove that the defendant asserted his defamatory statements with "'actual malice,' meaning 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Nunes v. Lizza*, 12 F.4th 890, 899 (8th Cir. 2021) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). That is, the defendant "must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication." *Id.* (quoting *Harte-Hanks*, 491 U.S. at 667). To overcome a motion to dismiss, though, plaintiffs need only allege "facts sufficient to give rise to a reasonable inference of actual malice." *Id.* (citation omitted). Courts consider only whether the allegations of a complaint,

---

[4] Lindell argues that Smartmatic cannot assert that Defendants defamed it by *implying* false facts. (Lindell Mem. at 30-32.) Defamation by implication is a well-settled doctrine under Minnesota Law. *See, e.g., Johnson v. CBS*, 10 F. Supp. 2d 1071, 1076 (D. Minn. 1998) (denying summary judgment where broadcast "could reasonably be interpreted as implying that [plaintiff] conspired to steal"). Defamation by implication is a theory of liability as opposed to a separate cause of action. *See Molitor v. Molitor*, No. A16-1434, 2017 WL 1436083, at *3 n.1 (Minn. Ct. App. Apr. 24, 2017) ("Although Saji argues that defamation by implication is a separate cause of action, which must be particularly alleged, we agree with Molitor that defamation by implication is a theory, which need not be specifically pleaded.").

accepted as true, raise a "'*reasonable expectation* that discovery will reveal evidence' of actual malice." *Id.* at 901 (citation omitted) (emphasis added).[5]

Evidence demonstrating that a defendant *knew* his statements were false when he asserted them is hallmark evidence of actual malice. *See, e.g., Tholen v. Assist Am., Inc.,* 970 F.3d 979, 984 (8th Cir. 2020) (plaintiff established a reasonable inference of actual malice where defendant reported that plaintiff's wife made a statement, but plaintiff alleged that his wife never made the statement). Courts recognize, though, that "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant[.]" *Herbert*, 441 U.S. at 170. Accordingly, even if a plaintiff cannot establish that the defendant knew his statement was false based on direct evidence, it can rely on several forms of circumstantial evidence. *Harte-Hanks*, 491 U.S. at 668.

*First*, "[r]epublication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard." *Nunes*, 12 F.4th at 901 (citation omitted). In *Nunes*, Esquire Magazine published an article about the plaintiff on September 30, 2018, in which it claimed that he conspired with his family to "conceal[] basic facts about the family's move to Iowa." *Id.* at 894. Plaintiff denied all of defendant's accusations in a lawsuit he filed one year later. *Id.* at 900. Yet, two months after plaintiff filed his lawsuit, Esquire repeated the accusations

---

[5] Smartmatic does not concede that it is a "public figure" or "public official," or that it must plead or prove Defendants acted with actual malice. Regardless, for purposes of Defendants' motions to dismiss, the Court can apply the actual malice standard because Smartmatic has sufficiently pleaded facts establishing that Defendants acted with actual malice.

it published in its initial article. *Id.* The Eighth Circuit ruled that plaintiff sufficiently pleaded actual malice because plaintiff's allegations in his lawsuit put Esquire on notice that statements in the article it republished were false. *Id.* at 900-01.

*Second*, while allegations of an inadequate investigation are not independently sufficient, "the purposeful avoidance of the truth is in a different category." *Harte-Hanks*, 491 U.S. at 692. The reckless disregard standard can be satisfied by allegations showing that the defendant's failure to investigate "was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the information published or an "intent to avoid the truth." *Id.* at 692-93. In *Stokes v. CBS*, *Inc.*, for example, plaintiff sufficiently alleged purposeful avoidance because it claimed that the defendants chose not to ask a source "critical questions" because they did not want to learn the truth and "might well have been afraid of what the answers would be." 25 F. Supp. 2d 992, 1004 (D. Minn. 1998).

*Finally*, recognizing that Defendants uniformly claim that they believed their statements were true, "recklessness may be found where there are obvious reasons to doubt the veracity of the [defendant's source] or the accuracy of the [defendant's] reports." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see also Mahnke v. Nw. Publ'ns, Inc.,* 160 N.W.2d 1, 9 (Minn. 1968) (affirming jury verdict for plaintiff where defendant relied on source who "was in no position to have the true facts in his possession."). Similarly, a defendant cannot prevail where his statements are "fabricated," "the product of his imagination," "based wholly on an unverified anonymous telephone call," or "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390

16

U.S. at 732; *see also Stokes*, 25 F. Supp. 2d at 1004 (plaintiff sufficiently alleged actual malice where defendant knew or should have known that source's assertions lacked evidentiary foundation).

**B.      Smartmatic Sufficiently Pleaded That Lindell and MyPillow Defamed It With Actual Malice.**

Smartmatic alleged five categories of evidence establishing that Lindell and MyPillow defamed it with actual malice: (1) Defendants fabricated their claims about Smartmatic; (2) Defendants possessed information contradicting what they said about Smartmatic; (3) Defendants purposefully avoided publicly available information contradicting what they said about Smartmatic; (4) Defendants had obvious reasons to doubt their so-called sources about Smartmatic; and (5) Defendants acted with an improper motive when defaming Smartmatic.

**1.      Defendants fabricated their claims about Smartmatic.**

The actual malice inquiry starts and ends with one simple truth: Defendants fabricated their claims about Smartmatic. Each time Lindell made a defamatory statement about Smartmatic, he knew that he lacked any support or evidence for what he was saying:

- Defendants had no evidence that Smartmatic had a relationship with Dominion or ES&S during the 2020 U.S. election.

- Defendants had no evidence indicating that Smartmatic stole the 2020 U.S. election for Joe Biden and Kamala Harris.

- Defendants had no evidence that Smartmatic's election technology and software were compromised or hacked by China or other foreign countries during the 2020 U.S. election.

- Defendants had no evidence that Smartmatic's election technology was connected to the Internet during the 2020 U.S. election.

- Defendants had no evidence that Smartmatic was involved in a widespread criminal conspiracy to alter the results of the 2020 U.S. election.

- Defendants had no evidence that Smartmatic's election technology and software was designed to steal elections.

(Compl. ¶¶185-193.) In short, Defendants had no evidence to support their statements about: (1) Smartmatic's role in the 2020 U.S. election; (2) Smartmatic's relationship with Dominion or ES&S; (3) Smartmatic stealing the 2020 U.S. election; (4) Smartmatic's election technology and software being hacked; (5) Smartmatic's election technology being connected to the Internet; (6) Smartmatic's participation in a criminal conspiracy; or (7) Smartmatic's history of stealing elections. Defendants' statements were fiction, and they knew it. (*Id.*)

These allegations, alone, establish actual malice. *St. Amant,* 390 U.S. at 732 (actual malice can exist where a story is fabricated or is the product of defendant's imagination); *Ventura v. Kyle*, 8 F. Supp. 3d 1115, 1122 (D. Minn. 2014) (finding the jury should resolve a claim of actual malice where it is possible defendant fabricated his story about plaintiff); *Prinzing v. Schwab*, No. A05-398, 2006 WL 538926, at *4 (Minn. Ct. App. Mar. 7, 2006) (in determining whether a defendant acted with actual malice, a fact-finder may assess whether a statement was fabricated, a product of defendant's imagination, or it was "so inherently improbable only a reckless person would publish it") (Wright, J.).

Smartmatic's allegations that Lindell lacked support for his defamatory statements are not conclusory or speculative. Smartmatic's election technology and software were used only in Los Angeles County during the 2020 U.S. election. (*Id.* ¶¶35-52.) And Smartmatic's election technology and software create an auditable paper trail to ensure

elections cannot be rigged, fixed or stolen. (*Id.* ¶31.) These two facts mean that Defendants' statements were not only factually inaccurate but inherently improbable. *St. Amant*, 390 U.S. at 732 (actual malice can be established where defendant's statement was "so inherently improbable that only a reckless man would have been them in circulation"). To this day, Lindell has never offered any evidence rebutting these two indisputable facts; and, even if he claims he has such evidence, that only creates an issue of fact for the jury. *US Dominion, Inc. v. Fox News Network, LLC*, No. N21C-03-257 EMD, 2021 WL 5984265, at \*28 (Del. Super. Ct. Dec. 16, 2021) (complaint was not conclusory and adequately alleged actual malice where plaintiff alleged that there were signs defendant "possessed countervailing evidence of election fraud" but still broadcast claims of fraud in the 2020 U.S. election).

### 2.    Defendants possessed information contradicting what they said about Smartmatic.

Smartmatic also pleaded that Defendants acted with actual malice by alleging that they made defamatory statements after receiving information contradicting what they said. *See Nunes*, 12 F.4th at 900-01 (plaintiff sufficiently alleged actual malice based on defendant's republication of falsehoods after receiving accurate information). When a defendant publishes a statement after receiving accurate information to the contrary, there is an issue of fact regarding whether he acted with reckless disregard for the truth, and the jury must decide that question. *See Smartmatic USA Corp. v. Fox Corp.*, No. 151136/2021, 2022 WL 685407, at \*24 (Sup. Ct. N.Y. Cty. Mar. 8, 2022) ("since [defendant] continued to disseminate allegedly false information about [Smartmatic] *after* he told his viewing

audience about the emails, there is a substantial basis for [Smartmatic's] allegation that he acted with reckless disregard for the truth.") (emphasis supplied by the court). Smartmatic has alleged that Defendants possessed information contradicting what Lindell said, which is sufficient to plead actual malice. *See Nunes*, 12 F.4th at 900-01; *US Dominion, Inc*, 2021 WL 5984265, at *28.

*First*, Defendants made defamatory statements about Smartmatic after receiving accurate information from Dominion. On December 23, 2020, January 8, 2021, and February 4, 2021, Dominion sent retraction letters to Lindell. (*See id.* ¶¶251, 269, 286, 304, 318; Ex. 38.) These letters, and the materials attached to them, informed Lindell that: (1) his claims that the 2020 U.S. election had been stolen were categorically false; (2) officials found no evidence of fraud in Arizona's vote computation; (3) officials found no evidence of fraud in Georgia's vote computation; and (4) the "sources" that Lindell relied upon had no credibility. (*Id.*, Ex. 38.) Lindell defamed Smartmatic *after* receiving these letters. He asserted, for example, that Smartmatic engaged in "the biggest cover-up that's probably in history for a crime," including frauds it committed "in Arizona." (*Id.*, Ex. 30; *see also id.*, Ex. 22 ("[O]ver the next five weeks, we're gonna dump all the evidence that came from these machines, Smartmatic and Dominion. And right now as of today, you've got Maricopa County in Arizona . . . .").) Lindell possessed information contradicting what he said when he said it. Thus, Smartmatic sufficiently alleged actual malice. *See Nunes*, 12 F.4th at 900-01.

*Second,* Defendants made defamatory statements about Smartmatic after it filed a lawsuit, which Lindell reviewed, in which Smartmatic disclosed accurate information

regarding its limited role in the 2020 U.S. election. On February 4, 2021, Smartmatic filed a lawsuit against Fox News and other defendants in New York state court. The suit detailed, in 754 paragraphs and 152 exhibits that: (1) Smartmatic's technology and software were not widely used in the 2020 election, and they were only used in Los Angeles County; (2) Smartmatic did not have a relationship with Dominion during the 2020 election; (3) Smartmatic did not fix, rig, or steal the 2020 election for Joe Biden and Kamala Harris; (4) Smartmatic did not send votes to foreign countries for manipulation during the 2020 election; (5) Smartmatic's election technology and software was not compromised or hacked during the 2020 election; (6) Smartmatic has never been banned from providing election technology and software in the U.S.; (7) Smartmatic was neither founded nor funded by corrupt dictators; and (8) Smartmatic's election technology and software was not designed to fix, rig, and steal elections. (*See* Compl., Ex. 138.)

One day later, on February 5, 2021, Lindell admitted that he was familiar with Smartmatic's lawsuit. He appeared on Bannon's *War Room* podcast and he stated, "don't forget Smartmatic, they're right in there, I think that they're the ones that went after Fox." (*Id.,* Ex. 9.) Then, on February 6, 2021, Lindell appeared again on Bannon's *War Room* Podcast and said, "it's not funny that they have perfect timing, that Smartmatic comes in and sues Fox yesterday and gets rid of Lou Dobbs." (*Id.*, Ex. 11.) Lindell made all of his defamatory statements about Smartmatic after reviewing Smartmatic's New York complaint that contained facts and evidence contradicting what he said. At the very least, Defendants acted with reckless disregard by asserting that Smartmatic rigged and stole the

2020 U.S. election after reviewing a complaint explaining that their statements were inaccurate and implausible.

The cases that MyPillow cites regarding a defendant's "failure to investigate" are inapposite. (MyPillow Mem. at 19-20.) Three of MyPillow's cases are irrelevant because they were not even decided at the pleadings stage, and they are otherwise factually distinguishable. *See Maethener v. Somplace Safe, Inc*., 929 N.W.2d 868, 879 n.7, 884 (Minn. 2019) (determining on summary judgment that plaintiff failed to establish actual malice because he "rest[ed] on his assertions that there was a duty to investigate" and he provided "no substantive evidence of actual malice"); *Britton v. Koep*, 470 N.W.2d 518, 524 (Minn. 1991) (affirming summary judgment where defendant had "no reason to disbelieve" a "very reliable" informant); *Drotzmanns, Inc. v. McGraw-Hill, Inc*., 500 F.2d 830, 834 (8th Cir. 1974) (ruling that plaintiff failed to establish actual malice at trial where trade journal article's author "was furnished background information by a reliable source."). Moreover, in *Pippen v. NBCUniversal Media, LLC*, the court ruled that former NBA basketball player, Scottie Pippen, failed to sufficiently allege actual malice because he merely asserted that defendants could have discovered the truth that he did not declare bankruptcy if they had examined the PACER docket. 734 F.3d 610, 614 (7th Cir. 2013). Here, by contrast, Smartmatic has alleged facts showing that Defendants knew their statements were fabricated and possessed information contradicting what they said.[6]

---

[6] MyPillow also cites *Range Dev. Co. of Chisholm v. Star Tribune*, but that case addressed only whether plaintiff could take discovery protected by Minnesota's media shield privilege. 885 N.W.2d 500, 510 (Minn. Ct. App. 2016).

3.     **Defendants either knew of or purposefully avoided dozens of sources, articles, and reports contradicting what they said about Smartmatic.**

Smartmatic set forth in its Complaint dozens of publicly available sources, articles, and reports contradicting Defendants' claims. The truth about the 2020 U.S. election and Smartmatic's limited role in the election was readily available to Defendants. (Compl. ¶¶195-299.) This fact puts Defendants in a Catch-22. If Defendants reviewed this publicly available information, then they knew their statements were false. *Nunes*, 12 F.4th at 900-01. If Defendants purposefully avoided this publicly available information, then they acted with reckless disregard. *See Stokes*, 25 F. Supp. 2d at 1004 (denying summary judgment where plaintiff showed that defendant avoided certain sources because it may have been "afraid of what the answers would be."). Either way, Smartmatic's detailed recitation of publicly available information contradicting Defendants' statements is sufficient to satisfy its burden to plead actual malice.

*First*, Smartmatic identified eight publicly available sources of information that showed Smartmatic's election technology and software were not widely used in the 2020 U.S. election (and were not used in contested states). (Compl. ¶¶195-221.) This included information showing which companies' election technology was used in each state, which election technology companies were widely used in the 2020 election, each election technology company's description of the states in which its technology was used, and information showing that Smartmatic's election technology was used only in Los Angeles County. (*Id*.) The Complaint attaches 37 exhibits with examples of this information. Defendants made statements contradicted by this information. (*Id.* ¶¶136-41.)

*Second*, Smartmatic identified eight publicly available sources of information that showed Smartmatic's election technology, hardware, and software were not used to steal the 2020 U.S. election. (*Id.* ¶¶222-54.) This information showed that Smartmatic's election technology and software were not widely used, which would make rigging the election impossible. (*Id.*) It also included information on the steps taken to secure the election, and public statements by key federal and state officials and agencies confirming the absence of any vote manipulation. (*Id.*) The Complaint attaches 27 exhibits with examples of this information. Defendants made statements contradicted by this information. (*Id.* ¶¶149-56.)

*Third*, Smartmatic identified three publicly available sources of information that showed Smartmatic's election technology and software were not connected to the Internet during the 2020 U.S. election. (*Id.* ¶¶255-259.) This included information available, for example, on Smartmatic's website and information discussed in Smartmatic's lawsuit against Fox News, which Lindell was aware of and commented upon in the War Room podcast. (*Id.*) The Complaint attaches 6 exhibits with examples of this information. Defendants made statements contradicted by this information. (*Id.* ¶¶164-68.)

*Fourth*, Smartmatic identified eight publicly available sources of information that showed Smartmatic's election technology and software were not compromised or hacked by China or other foreign countries during the 2020 U.S. election. (*Id.* ¶¶260-271.) This included information showing Smartmatic was only involved in Los Angeles County and there were no security issues there. It also included information from state and federal officials on the security of the election and information published by Smartmatic showing its technology and software had been used to count over 5 billion votes without any security

24

issues. (*Id.*) The Complaint attaches 16 exhibits with examples of this information. Defendants made statements contradicted by this information. (*Id.* ¶¶157-63.)

*Fifth*, Smartmatic identified seven publicly available sources of information that showed Smartmatic's election technology, hardware, and software were not used by Dominion or ES&S during the 2020 U.S. election. (*Id.* ¶¶272-284.) This included public filings for the companies, the companies' website information, and websites that identify the voting equipment used in each state. (*Id.*) The Complaint attaches 19 exhibits with examples of this information. Defendants made statements contradicted by this information. (*Id.* ¶¶142-48.)

*Sixth*, Smartmatic identified five publicly available sources of information that showed Smartmatic was not engaged in a widespread criminal conspiracy to steal the 2020 U.S. election. (*Id*. ¶¶285-291.) This included multiple federal district court orders rejecting allegations that the 2020 U.S. election was rigged before Defendants even began to falsely assert that Smartmatic was involved in a conspiracy to rig the election. (*Id.*) The Complaint attaches 4 exhibits with examples of this information. Defendants made statements contradicted by this information. (*Id.* ¶¶169-74.)

*Finally*, Smartmatic identified five publicly available sources of information that showed Smartmatic's election technology and software were not designed or used to steal elections. (*Id.* ¶¶292-299.) This included information showing that Smartmatic's election technology and software were used in audited elections, and publicly available information about those audited elections that refutes any assertion of election rigging. (*Id.*) It also included information from Smartmatic's website showing that its election technology and

software had received recognition from various third-party validators. (*Id*.) The Complaint attaches 4 exhibits with examples of this information. Defendants made statements contradicted by this information. (*Id.* ¶¶175-80.)

In response, Defendants argue that the publicly available sources are irrelevant because they (Defendants) are permitted to "disagree with these sources" and they are not required to "guess which of two conflicting accounts" is accurate. (MyPillow Mem. at 21-22.) Defendants' argument is misplaced for three reasons. *First*, as discussed below, Defendants were not presented with two reasonable points of view and forced to choose a side—they had obvious reasons to doubt any "source" that said Smartmatic stole the 2020 U.S. election. *Infra* at II.B.4. *Second*, Defendants knew that every credible source of information, including state election officials and federal judges, had rejected the conspiracy theories that they were reporting. (Compl. ¶¶194-299.) *Third*, Defendants' argument raises a disputed issue of fact that the Court cannot resolve on a motion to dismiss. Defendants claim they had credible sources contradicting the mountain of publicly available information identified in the Complaint. A jury will ultimately decide whether that is true or not. For now, Smartmatic's allegations are assumed to be true. *Willis Elec. Co.*, 437 F. Supp. 3d at 707.

The cases cited by Defendants (MyPillow Mem. at 22) are all inapposite. None of the cases involve a motion to dismiss, where the plaintiff's allegations are accepted as true. And all of them involved determinations that defendants reasonably relied on their sources, whereas Smartmatic alleged that Defendants had obvious reasons to doubt their sources. *See Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 478 (8th Cir. 1987) (affirming

26

judgment notwithstanding the verdict where the defendant "had no reason to doubt its source, because it knew [him] as a trusted employee and believed him to be reliable, honest, and good with details," and his story was not "inherently improbable."); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 594-95 (D.C. Cir. 2016) (affirming summary judgment where defendant was not obligated to pursue additional leads because it had no reason to doubt the credibility of its sources); *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304-05 (D.C. Cir. 1996) (affirming summary judgment where defendant disclosed potential reasons why its source might not be credible and it reasonably relied upon his statements); *Tavoulareas v. Piro*, 817 F.2d 762, 775-90 (D.C. Cir. 1987) (affirming judgment notwithstanding the verdict where source was credible because his statements were "independently verified by other sources whose credibility even the plaintiff does not now challenge."); *see also Chafoulias v. Peterson*, 668 N.W.2d 642, 655 (Minn. 2003) (Lindell Mem. at 28) (affirming summary judgment where defendant did not act with actual malice because the "undisputed facts" showed that it "undertook an independent investigation to substantiate [source's] statement.").

Defendants cite only one case decided at the motion to dismiss stage, *Tah v. Glob. Witness Publ'g, Inc.,* 991 F.3d 231, 242 (D.C. Cir. 2021). (*See* MyPillow Mem. at 22.) In *Tah* the court granted the defendant's motion to dismiss, finding that plaintiff's "denials" were not evidence of defendant's actual malice because they could not be verified. In this case, though, Smartmatic has alleged that (1) Defendants fabricated their claims and had no support for what they said, (2) Defendants possessed information contradicting what they said, (3) Defendants had access to a mountain of publicly available information

contradicting what they said, (4) Defendants had obvious reasons to doubt the veracity of their sources, and (5) Defendants acted with improper purposes. This case is nothing like the limited fact pattern of *Tah*.

### 4. Defendants had obvious reasons to doubt the veracity of their so-called sources.

This case is a textbook example of why courts find actual malice when a defendant had obvious reasons to doubt his sources. Smartmatic alleged in its Complaint that Defendants brought a myriad of guests on their four-part "Absolute" documentaries and their Cyber Symposium, including Mary Fanning, Phil Waldron, Matthew DePerno, Russell Ramsland, Dr. Shiva Ayyudurai, Patrick Colbeck, Michael Flynn, Dr. Frank Douglas, and Joel Oltmann. (Compl. ¶300.) Smartmatic pleaded in detail, including citations to exhibits and judicial opinions, that Defendants' sources were not "experts," had been publicly discredited, and/or the statements they were making lacked credibility because they had been summarily debunked. (*Id.* ¶¶300-312.) As the *US Dominion* court explained, "Lindell recklessly disregarded the truth by relying on obviously problematic sources to support a preconceived narrative he had crafted for his own profit." 554 F. Supp. 3d at 63.

Two of the so-called sources stand out as examples of why Defendants had obvious reasons to doubt their veracity. Lindell touted Mr. Ramsland as an expert in cyber forensics and security even though *two* judges had already rejected his conspiracy theories regarding the 2020 U.S. election. (Compl. ¶¶303-305.) Similarly, Ms. Fanning, an internet conspiracy blogger, has no credentials in national security or journalism, and she has a well-

28

documented history of perpetuating debunked theories. (*Id.* ¶301.) Yet, Lindell portrayed both as "experts" and used their statements to construct his narrative that Smartmatic somehow rigged the 2020 U.S. election. These "experts" were "in no position to have the true facts" and their statements had been summarily debunked time and time again. *See Mahnke*, 160 N.W.2d at 9.

MyPillow argues that Lindell was entitled to rely on those individuals because of the positions and degrees that he attributed to them in his documentaries. (MyPillow Mem. at 22-23.) But "reliance on the reports of others does not automatically shield one from liability." *Stokes,* 25 F. Supp. 2d at 1004 (citation omitted). Defendants were not permitted to rely upon a source providing information that "far outpace[s] his evidentiary foundation." *Id.*; *Mahnke*, 160 N.W.2d at 9; *see also Harte-Hanks*, 491 U.S. at 681-82 (affirming jury award where the source used was contradicted by numerous other witnesses and defendant did not take further steps to investigate the veracity of the source despite clear reasons to do so). Thus, even if Mr. Ramsland founded a cyber forensics organization, or Dr. Ayyadurai graduated from MIT, Lindell was not permitted to accept their baseless claims regarding Smartmatic as fact. *See id.*

Once again, Defendants' arguments are ill-suited for a motion to dismiss. Defendants take issue with Smartmatic's allegations—arguing that they have different "facts" they want the Court to take into consideration and weigh in their favor. But, in ruling on Defendants' motions to dismiss, the Court accepts Smartmatic's allegations as true. Lindell's argument raises an issue of fact as to whether he believed his discredited sources in "good faith," which is a question for the jury. *See Schiavone Constr. Co. v. Time,*

29

*Inc.*, 847 F.2d 1069, 1092 (3d Cir. 1988) (affirming denial of summary judgment even where a jury could ultimately determine that defendant published defamatory article in "good faith"); *see also St. Amant,* 390 U.S. at 732 ("[t]he finder of fact must determine whether the publication was indeed made in good faith.").

### 5.   Defendants defamed Smartmatic for fame and fortune.

Plaintiffs are not required to plead evidence of ill will to establish a defendant's actual malice. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995). However, "a showing of ill will 'is nevertheless relevant and admissible as evidence in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity.'" *Stokes*, 25 F. Supp. 2d at 1003 (citation omitted); *see also Duffy*, 44 F.3d at 315 n.10 ("evidence of ulterior motive can often bolster an inference of actual malice"); *Jones v. Scripps Media, Inc.*, No. 16-cv-12647, 2017 WL 1230481, at *12 (E.D. Mich. Apr. 4, 2017) (allegations of animus and motive to harm supported inference of actual malice). Here, Smartmatic alleged that Defendants acted with ill will and an improper motive.

Defendants knew President Trump lost the 2020 U.S. election. (Compl. ¶¶222-254.) That was reported and confirmed by state and federal authorities in November and December 2020 and for months afterwards. (*Id.*) In President Trump's defeat, however, Lindell saw an opportunity. (*Id.* ¶4.) Lindell decided to promote a conspiracy theory involving Smartmatic stealing the 2020 U.S. election. Lindell decided to promote that theory because: (1) it would bring him further fame as one of President Trump's staunchest supporters; and (2) it would help him sell MyPillow products. *Infra* at III.A. There was a

reason that the MyPillow brand decorated the sets on which Lindell spoke and promo codes for MyPillow products were ubiquitous during Lindell's defamatory publications. *Id.* Lindell was not furthering a noble purpose. Lindell was using defamation for self-promotion and to solicit customers for MyPillow.

Defendants argue that Smartmatic's allegations regarding their improper purposes are irrelevant, but they are mistaken. (Lindell Mem. at 27; MyPillow Mem. at 24.) The case they principally rely upon is *Harte-Hanks*, 491 U.S. at 667. In that case, the Court merely held that evidence of ill will or improper purpose, alone, is not sufficient to establish actual malice. *Id.* Smartmatic agrees with that proposition: evidence of ill will or improper purpose, alone, does not establish actual malice. Nonetheless, evidence of ill will or improper purpose is relevant to establish the defendant's state of mind. *See Stokes*, 25 F. Supp. 2d at 1003; *Jones*, 2017 WL 1230481, at *12. It is not sufficient standing alone, but it is relevant.

The court's decision in *Campbell v. Citizens for an Honest Government, Inc*., 255 F.3d 560 (8th Cir. 2001), cited by MyPillow, confirms that evidence of ill will is relevant. In *Campbell*, the plaintiff submitted evidence that the publisher was "politically motivated" and defamed plaintiffs in order to "increase his profits." *Id.* at 571. The court did not determine that plaintiff's evidence of ill will and improper purpose was irrelevant. *Id.* Rather, consistent with *Harte-Hanks*, it did not find actual malice based on that evidence alone. *See id.* In fact, the court expressly stated that "the ultimate conclusion" of whether a defendant acted with actual malice "may be supported by evidence of a defendant's motive." *Id.* at 569.

### 6.   Defendants' persistence in defaming Smartmatic does not negate Smartmatic's factual allegations showing actual malice.

Lindell's primary argument against actual malice is ironic. He claims that he could not have known that his statements were false because he has refused to retract his statements and has continued to defame Smartmatic. (Lindell Mem. at 16.) His refusal to retract his false statements, however, is evidence of his actual malice. *See Mahnke,* 160 N.W.2d at 11 ("the failure to retract the defamatory statements underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration"); *see also Nunes*, 12 F.4th at 900-01 (plaintiff sufficiently alleged actual malice where defendant republished falsehoods after learning they were false); *Golden Bear Distrib. Sys. of Tex. v. Chase Revel Inc.*, 708 F.2d 944, 950 (5th Cir. 1983) (jury finding of actual malice supported by evidence that defendant refused to retract its false statements after being informed of their falsity).

The case relied upon by Lindell—*Connelly v. Nw. Publ'ns, Inc.*, 448 N.W.2d 901 (Minn. Ct. App. 1989)—is inapposite. (Lindell Mem. at 16.) In *Connelly*, the court ruled that defendants did not act with actual malice because they "conducted an extended investigation" after they were informed of an FBI investigation in which they "reviewed hundreds of Department of Transportation files on condemned property, spoke to county and state officials, and interviewed [plaintiff] and other condemnation commissioners." 448 N.W.2d at 904. In that regard, they "neither fabricated [the] article nor imagined [plaintiff's] alleged conflict [of interest]." *Id*. Moreover, based on the information they obtained, their report that plaintiff had a conflict of interest was not "inherently

32

improbable." *Id.* at 905. Lindell, by contrast, lacked any source for his statements, possessed information contradicting his statements, and conveyed the fabricated tale that Smartmatic rigged the election despite not being involved outside of Los Angeles County.

***Lindell's Belief.*** Lindell also argues that he could not have acted with actual malice because he believes Smartmatic conspired to steal the election for Joe Biden. (Lindell Mem. at 15-17.) It is well settled, though, that a defendant cannot immunize himself from liability by claiming that he believed (and still believes) the truth of his statements. *St. Amant*, 390 U.S. at 732 (A "defendant in a defamation action . . . cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."); *Burger v. McGilley Mem'l Chapels, Inc*., 856 F.2d 1046, 1052-53 (8th Cir. 1988) (fact issue existed as to a defendant's actual malice where he "simply assert[s] that he believed that what he said was true") (citation omitted). Based on the information Lindell knew, and the universe of publicly available information that he either knew or purposefully avoided, *supra* at II.B.3, the only reasonable inference is that he knew his statements regarding Smartmatic were false or he acted with reckless disregard. (*See* Compl. ¶¶181-345); *see also US Dominion*, 554 F. Supp. 3d at 63 ("a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it.").

***Defendants' So-Called Evidence.*** Defendants also attempt to prove through extraneous evidence that they did not act with actual malice because information "in the public realm" shows that their falsehoods regarding Smartmatic are not "inherently

improbable." (Lindell Mem. at 17-26; MyPillow Mem. at 27-31.) The *US Dominion* court already rejected this argument. *US Dominion*, 554 F. Supp. 3d at 63. This Court should also reject Defendants' argument for multiple reasons.

*First*, state and federal agencies and courts have confirmed the results of the 2020 election. Defendants' fabricated conspiracy involving Smartmatic is "inherently improbable." Defendants stated, and maintain, that Smartmatic engaged in a far-reaching criminal conspiracy to rig the 2020 U.S. Presidential Election in favor of Joe Biden even though, for example, Smartmatic was not involved in a single jurisdiction other than Los Angeles County, and security specialists, Attorney General Barr, numerous government agencies, and elected officials have all rejected Defendants' claims. (Compl. ¶¶57, 64, 139-141, 145-148, 152-156, 160-163, 167-168, 172-174, 178-180, 185-299.) Based on these allegations and evidence, Defendants' claims regarding Smartmatic are the epitome of "inherently improbable." *See St. Amant*, 390 U.S. at 732; *see also Ventura*, 8 F. Supp. 3d at 1121-22 (D. Minn. 2014) (determining that the jury should resolve a claim of actual malice where it was possible defendant fabricated his story about plaintiff).

*Second*, the Court must accept Smartmatic's allegations as true for purposes of Defendants' motions and it may not consider matters outside the pleadings. Fed. R. Civ. P. 12(b). Defendants argue that the Court should take judicial notice of extraneous information under Federal Rule of Evidence 201 for the purpose of showing information in "the public realm" that supported their false statements. (Lindell Mem. at 17 n.28; MyPillow Mem. at 28.) Whether or not such evidence would have any probative value, the Court should reject it because the Court can only take judicial notice of facts "generally

34

known" within the jurisdiction or "whose accuracy cannot reasonably be questioned." *Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780, 796-97 (8th Cir. 2009). Here, there is no record through which the Court can ascertain the accuracy of any of this information—all cited via hyperlinks—including, for example, an article allegedly published by "Harper's Magazine" in 2012 and a TikTok video that White House Press Secretary Jen Psaki allegedly distributed in 2022. (Lindell Mem. at 18-19.) In fact, case law cited by Defendants counsels the Court to not consider these materials. *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1029-30 (C.D. Cal. 2015) (declining to take judicial notice of press releases and news reports from third party websites).

Moreover, the statements in the referenced materials, and the extent to which they represented prevailing views in the "public realm," are not beyond controversy. *See Shoemaker v. Cardiovascular Sys.*, No. 16-568 (DWF/KMM), 2017 WL 1180444, at *7 (D. Minn. Mar. 29, 2017) ("Courts cannot resolve fact disputes on a motion to dismiss. Similarly, Rule 201 allows a court to take judicial notice of only those facts that are not in dispute"). Thus, the Court should not permit Defendants to use this information for any purpose, let alone to negate Smartmatic's allegations of actual malice. *See, e.g., Dunnigan v. Fed. Home Loan Mortg. Corp.,* 184 F. Supp. 3d 726, 734 (D. Minn. 2016) ("Materials outside the pleadings offered for such contradictory or supplementary purposes may not be considered"); *In re Resideo Techs., Inc., Sec. Litig.*, No. 19-CV-2863 (WMW/KMM), 2021 WL 1195740, at *3 (D. Minn. Mar. 30, 2021) (declining to take judicial notice of motion to dismiss exhibits because the parties disputed the relevance and accuracy of the exhibits, and they were not needed to decide the motion to dismiss). Put simply: "the majority of the

35

evidence to which Lindell points is outside of the Complaint, and the Court cannot rely on this information at this time." *US Dominion*, 554 F. Supp. 3d at 63.

### III.   MyPillow is Vicariously Liable for Lindell's Defamatory Statements.

MyPillow claims that it cannot be held liable for Lindell's defamatory statements because "[e]ach of the specified statements was allegedly made or published by Lindell, not by MyPillow." (MyPillow Mem. at 32-35.) As MyPillow acknowledges, though, corporations can be held liable for their employees' defamatory statements. (*Id.* at 33.) *See Cognex Corp. v. VCode Holdings, Inc.*, No. CIV. 06-1040 JNE JJG, 2008 WL 2113661, at *18 (D. Minn. May 19, 2008) (denying summary judgment on business defamation claim against corporation based on employee statements); *see also, e.g., Palin v. New York Times Co.,* 940 F.3d 804, 814 (2d Cir. 2019) (plaintiff stated a claim for defamation against *The New York Times* where she alleged facts giving rise to a plausible inference that the paper's agents recklessly disregarded the truth).[7] Smartmatic has sufficiently pleaded that MyPillow should be held vicariously liable for Lindell's defamatory statements because he was acting pursuant to his duties as a MyPillow executive and to promote MyPillow's

---

[7] Other examples include *Mangan v. Corp. Synergies Grp., Inc*., 834 F. Supp. 2d 199, 202-04 (D.N.J. 2011) (plaintiff stated a claim for defamation against a corporation where CEO made allegedly defamatory statements); *StopLoss Specialists, LLC v. VeriClaim, Inc*., 340 F. Supp. 3d 1334, 1356 (N.D. Ga. 2018) (corporation could be liable for defamatory email sent by its agent); *Unker v. Joseph Markovits, Inc*., 643 F. Supp. 1043, 1049 (S.D.N.Y. 1986) ("A corporation may be held liable for defamatory utterances made by its officer or agent, acting within the scope of his authority."); *VECC, Inc. v. Bank of Nova Scotia*, 296 F. Supp. 2d 617, 622 (D.V.I. 2003) (plaintiff stated a claim for defamation against a corporation where its agent made defamatory remarks).

products when he defamed Smartmatic. MyPillow cannot receive the benefits of Lindell's defamatory statements—more sales—without accepting the consequences.

**A.      Lindell Used His Defamation Campaign Against Smartmatic to Promote MyPillow and Sell its Products.**

Lindell was acting on behalf of his company, MyPillow, when he defamed Smartmatic. (Compl. at p. 72 n.7; *Id.* ¶¶16, 369, 376.) He is the founder and CEO of MyPillow. He is MyPillow's spokesman—the "MyPillow Guy," in fact. And the MyPillow logo and name was a ubiquitous feature of his media appearances each time he defamed Smartmatic. (*See, e.g., id.*, Ex. 11 at 33:22-24; Ex. 16 at 25:9-14; Ex. 20 at 3:4-7.) As discussed below, Lindell used his media appearances as sales and product placement opportunities for MyPillow. His defamation campaign against Smartmatic was an advertising campaign for MyPillow. Lindell drew an audience by hyping his false narrative, worked that audience up with his defamatory statements about Smartmatic, and then encouraged them to buy MyPillow products. (*See, e.g., id.*, Ex. 16 at 25:9-14.) Lindell all but said: "if you like what I am saying about Smartmatic, you will love MyPillow."

Lindell began his first documentary, "Absolute Proof," by highlighting that he was appearing on behalf of his company:

> Hello everyone, ***this is Mike Lindell the CEO of MyPillow***. As you all know, I have been attacked the last month, relentlessly on social media, by newspapers, by TV shows, by you name it, ***I've been attacked, in myself, not just myself, but my company.*** The boycotts that are going on, box stores are dropping me. Social media, they cancel my Twitter. ***Today, they cancel MyPillow's Twitter account, my company's Twitter account***. Well, before I was going to get erase completely, we put together this show.

(*Id.*, Ex. 1 at 2:1-9.) He then went on to defame Smartmatic eleven times in that documentary. (*Id.* ¶¶ 137, 143, 150.) This was a clever tactic. His defamatory statements about Smartmatic would persuade the audience that it was wrong for MyPillow to be "attacked" and, thereby, garner sympathy and supporters for MyPillow.

Lindell also appeared as the "CEO of MyPillow" on nearly all the media appearances where he defamed Smartmatic. For example, during *The Pete Santilli Show*, Lindell was billed continuously as "Mike Lindell, CEO & Inventor of MyPillow":



(*Id.*, Ex. 17, Screenshot A.) The *Pete Santilli Show* segment also played a pre-recorded video of Lindell advertising MyPillow's "new Giza Dreams bed sheets" and suggesting that listeners "go to mypillow.com or call the number on your screen right now to get your very own MyPillow Giza Dream Sheet." (*Id.* ¶336; Ex. 16 at 25:9-14.) Lindell defamed Smartmatic during that media appearance, claiming he had evidence that Smartmatic stole the election. (*Id.* ¶¶137, 143, 150, 158, 170.) The advertisement placement was clever. If

the audience liked what Lindell was saying about Smartmatic, they were more inclined to order their "very own MyPillow Giza Dream Sheet." (*Id.*, Ex. 16 at 25:9-14.)

On February 6, 2021, Lindell was on Bannon's *War Room* show. Bannon introduced Lindell, twice, as the "CEO of My Pillow." (*Id.*, Ex. 11 at 31:20-21; 32:7-8.) During the show, Lindell defamed Smartmatic, claiming it was involved in a criminal conspiracy and that its machines were online. (*Id.* ¶165.) Lindell also used this appearance as an advertising sales opportunity for MyPillow, by telling listeners they could use "promo code proof" to get "66% off of my stuff on mypillow.com." (*Id.*, Ex. 11, 33:22-24.) "Proof" was one of the catchphrases that Lindell used as part of his defamation campaign. He said he had "absolute proof" that Smartmatic stole the election. (*Id.* ¶83-92.) He then used that same catchphrase to incentivize people to buy "my stuff on mypillow.com." (*Id.*, Ex. 11 at 33:22-24.)

Lindell also used his appearance on *The Eric Metaxas Radio Show* on March 30, 2021, as a sales and advertising opportunity. Lindell was introduced as "Mike Lindell of MyPillow.com fame." (*Id.*, Ex. 20 at 2:1-3.) During the program, Lindell defamed Smartmatic, claiming that Smartmatic stole the election for President Biden. (*Id.* ¶150.) And, of course, he also plugged sales for MyPillow: "Now do people need to use the code Eric to get a big discount? Well, you know they could use that at MyPillow.com." (*Id.*, Ex. 20 at 3:4-7.) And here is what people saw:



(*Id.*, Ex. 21, Screenshot E.) "MyPillow.com" and the promo code "Eric" were mentioned no fewer than six times during the program. (*Id.*) Lindell effectively used his defamation campaign to get free advertising for MyPillow. People like Eric Metaxas invited him onto their shows to defame Smartmatic—a win for them—and Lindell got to use the free airtime to solicit customers.

Two days later, on April 1, 2021, Lindell joined John Stubbins on *Indivisible with John Stubbins*. He was introduced as "CEO of MyPillow, Mike Lindell." (*Id*., Ex. 22 at 4:14.) As expected—there was no other reason for him to appear on the show—Lindell made false claims about the 2020 U.S. election. Then, as expected, Lindell advertised for MyPillow. He said, "Right . . . best place to get is mypillow.com. Use promo code ML66, and you'll get them for $9.97, free shipping." (*Id*., Ex. 22 at 6:2-4.) Lindell also plugged his book during that appearance, telling the audience, "there's not a better time . . . to launch this book than now." (*Id.* at 6:6.) And, of course, "Mike's Book" is available for purchase through mypillow.com.  (*Id*., Ex. 21, Screenshot E.)

40

Finally, on April 8, 2021, Lindell appeared on Greg Hunter's *USA Watchdog* program. He was introduced as "Mike Lindell, the creator and CEO of MyPillow." (*Id.*, Ex. 24 at 2:12.) Hunter was transparent about the symbiotic relationship between selling MyPillow products and Lindell's defamation campaign. Hunter started the segment as follows: "Of course he has the Giza Sheets under that moniker, the famous My Pillow, and also the Mattress topper and all that there, Michael Lindell, thank you for joining us today on USAWatchdog.com." (*Id.*, at 2:13-16.) Lindell then defamed Smartmatic, claiming that Smartmatic had a corrupt relationship with Dominion and ES&S during the 2020 U.S. election to attack the election. (*Id.* ¶143.) Lindell gave Hunter clickbait by defaming Smartmatic. Hunter gave Lindell and MyPillow a free endorsement.

After he defamed Smartmatic, Lindell ended his appearance on *USA Watchdog* with an explicit sales pitch for MyPillow:

> Hunter: Okay. Mike Lindell, ***the inventor and the CEO of My Pillow***.
> ***Mike Lindell I'll put up the links to your site, your your sales page***…
>
> Lindell: Yeah, yeah, thanks. ***If you put it up, you can use ml 33. And
> everybody can save a lot on the website up to up to 66%.***
>
> Hunter: Oh, ***ML33 is the code you want to buy your sheets, your
> pillows.***
>
> Lindell: Everything. ***Yep, you get discounts***
>
> Hunter: Okay.
>
> Lindell: ***Great discounts***. It'll help my employees and God bless you.
>
> Hunter: Oh, hey, thanks a lot, Mike. Mike Lindell, the CEO of My
> Pillow. Thanks for joining us today on USAWatchdog.com. I really
> appreciate it.

(*Id*., Ex. 24 at 38:8-39:3.) Lindell used the defamation campaign to get himself invited onto shows like *USA Watchdog*. Once on the shows, he delivered for them by defaming Smartmatic and spreading a conspiracy theory. They, in turn, gave him a platform to sell MyPillow products to their viewers and listeners. It was a win-win for Lindell, MyPillow and the hosts.

**B.    Lindell's Defamation Campaign Against Smartmatic was Part-and-parcel of His Job to Promote and Sell MyPillow.**

Under the "well-established principle" of *respondeat superior*, "an employer is vicariously liable for the torts of an employee committed within the course and scope of employment." *Schneider v. Buckman*, 433 N.W.2d 98, 101 (Minn. 1988). "Such liability stems not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business." *Fahrendorff ex rel. Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999) (citation omitted). An employer may be held liable for the intentional torts of its employees when the tort: (1) is related to the employee's duties; and (2) occurs within work-related limits of time and space. *Id.* MyPillow principally argues that Smartmatic failed to allege that Lindell asserted his defamatory remarks in the scope of his duties, but its arguments are misplaced.

**1.    MyPillow's primary spokesman, Lindell, sold MyPillow products through a disinformation campaign with full knowledge and support of MyPillow's CEO, Lindell.**

In determining whether tortious conduct was related to the employee's duties, courts look to whether the employee's acts were foreseeable. *Hartford Fire Ins. Co. v. Clark,* 727

42

F. Supp. 2d 765, 770-72 (D. Minn. 2010) (interpreting Minnesota law). "A plaintiff need not prove that [the] employer actually foresaw that the particular employee would commit the particular tortious act." *Id.* at 772. "Rather, it is sufficient for a plaintiff to show that 'an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.'" *Id.* (quoting *Hagen v. Burmeister & Assocs.*, 633 N.W.2d 497, 505 (Minn. 2001)). In short, a plaintiff must plead only "that the employer knew or had reason to know of the employee's misconduct." *See Cruz v. TMI Hosp., Inc.*, No. 14-cv-1128 (SRN/FLN), 2015 WL 5996383, at *18 (D. Minn. Oct. 14, 2015) (material issue of fact precluded hotel's motion for summary judgment because its general manager was aware of the alleged misconduct). Whether an act was foreseeable is a question of fact that cannot be resolved on a motion to dismiss. *Hartford Fire Ins. Co.*, 727 F. Supp. 2d at 772; *Wendt v. Charter Commc'ns, LLC*, No. 13-1308 (RHK/TNL), 2013 WL 12221823, at *1 (D. Minn. Sept. 4, 2013) (collecting cases).

The Complaint adequately alleges that Lindell's misconduct was foreseeable by MyPillow. Lindell launched a defamation campaign against Smartmatic. (Compl. ¶¶53-133.) He used that defamation campaign to get invited for TV appearances and draw an audience. (*Id.* ¶¶4-7, 109-16.) Then he tried to sell MyPillow products to the audience he created through the defamation campaign. (*Id.*) This is a straight-forward case of vicarious liability. The CEO of MyPillow knew that someone who was responsible for selling MyPillow products was using a disinformation campaign to sell MyPillow products. It so happens that, in this case, the CEO and the "someone" are the same person. (*Id.* ¶14.) That

does not change the fact that MyPillow—through its CEO—knew that the company's spokesman—Lindell—was using a defamation campaign to sell the company's products. (*See id.* ¶¶80-128, 338.) MyPillow is responsible for the actions authorized by its CEO and carried out by its spokesman to sell its products. (*Id.* ¶369.)

Moreover, it is implausible that MyPillow—beyond the CEO—did not know of, and acquiesce to, Lindell's use of a disinformation campaign to create a platform to sell MyPillow products. The defamation campaign was not a onetime event. (*Id.* ¶¶53-133.) The defamation campaign consisted of pre-planned "documentaries," multiple TV appearances, and a multi-day symposium. (*Id.*) It started in February 2021 and continues through the present. (*Id.* ¶¶83-85; Lindell Mem. at 15-17.) If MyPillow did not know on Day 1 what Lindell was doing, MyPillow certainly knew by the second, third, and fourth TV appearance. (*See id.* ¶¶109-16.) If MyPillow did not want to be affiliated with Lindell's defamation campaign, MyPillow should have told Lindell to stop selling MyPillow products during his TV appearances, stop using the MyPillow brand when he is promoting the conspiracy theory, and stop having himself introduced as the "MyPillow Guy" and "CEO of MyPillow" before launching into defamatory statements about Smartmatic. MyPillow obviously did not do so. (*See id.* ¶¶83-128.)

MyPillow did not stop Lindell from using his defamation campaign to sell MyPillow products because it was good for business and Lindell was doing what he was supposed to do—sell MyPillow products. (*Id.* ¶¶338, 375.) MyPillow reached new audiences through the defamation campaign. Indeed, the defamation campaign endeared the "MyPillow Guy" to supporters of former President Trump. (*Id.* ¶¶71, 183.) President Trump's supporters, all

potential MyPillow customers, were fed disinformation and MyPillow product placements at the same time. (*Id.* ¶¶327-39.) Moreover, the defamation campaign landed the "MyPillow Guy" on TV shows through which the company obtained free advertising. (*Id.* ¶¶53-133.) Lindell was invited to shows based on the defamation campaign and, while on the shows, sold the MyPillow products to the show's audience. (*Id.* ¶¶328-39.)

MyPillow claims that Lindell's misconduct was not "foreseeable" because he asserted his defamatory statements "for purpose personal to [himself]." (MyPillow Mem. at 33.) Its argument is misplaced, though, for several reasons. *First*, whether Lindell acted exclusively pursuant to his "personal" interest is a fact issue that cannot be decided on a motion to dismiss at the pleading stage. *See Wendt*, 2013 WL 12221823, at *1. *Second*, in this situation, there is no demarcation between Lindell's personal motivation and MyPillow's business. Lindell may have wanted to spread the disinformation because it raised his personal profile, but he also used the disinformation campaign to promote MyPillow, which is what he was supposed to do as the company's CEO and spokesman. *Third*, Smartmatic has sufficiently pleaded that MyPillow "knew or had reason to know" that Lindell was using the disinformation campaign to boost MyPillow's business. *See Cruz*, 2015 WL 5996383, at *18.

As discussed above, in addition to alleging that Lindell was acting as MyPillow's CEO and spokesman at all relevant times, Smartmatic alleges that Lindell, who is universally known as "the MyPillow guy," used the controversy following the 2020 Presidential Election as a platform to sell pillows. *Supra* at III.A. Throughout his appearances over the course of several months, he held himself out in his defamatory

programs as MyPillow's CEO. (*Id.*) He used the MyPillow logo during his appearances. (*Id.*) He advertised MyPillow's products while he was defaming Smartmatic. (*Id.*) And he even offered promo codes for MyPillow's products. (*Id.*) In other words, Smartmatic has alleged that Lindell capitalized on the vast audience he has gotten by spreading false information about Smartmatic for MyPillow's financial gain and to garner popularity and purchasers for MyPillow products. (*Id.*) Based on these allegations, Smartmatic sufficiently pleaded that Lindell's actions were related to his duties, MyPillow was aware of his actions, and his actions were foreseeable to MyPillow. See *Hartford Fire Ins. Co.*, 727 F. Supp. 2d at 772; *Cruz*, 2015 WL 5996383, at *18.

MyPillow also asserts several other meritless arguments. *First*, it argues that it cannot be held vicariously liable because MyPillow's board of directors or other MyPillow officers did not "authorize" his conduct. (MyPillow Mem. at 32, 34.) Smartmatic is not required, though, to allege that MyPillow "authorized" Lindell's defamatory statements. Smartmatic must show only that he defamed Smartmatic in the scope of his employment. *See Fahrendorff*, 597 N.W.2d at 910-11. Indeed, courts have held employers vicariously liable for all sorts of misconduct that they did not "authorize." *See id.* (denying group home operator's motion for summary judgment where employee sexually assaulted minor in the scope of his employment); *see also, e.g., Hartford Fire Ins. Co.*, 727 F. Supp. 2d at 773 (reasonable jury could hold defendant vicariously liable for its agent's fraudulent billing practice merely because it was on notice of large "markups").[8]

---

[8] MyPillow cites *Kasner v. Gage*, 161 N.W.2d 40, 42 (1968), in support of its argument that it is only liable for torts related to "how [it] compete[s]" in the marketplace, (MyPillow

*Second*, citing no authority, MyPillow argues that the Court would create a "grave" danger by holding it vicariously liable because it would set a precedent that corporations must "exert ever-greater levels of control over their employees' personal lives to avoid possible liability." (MyPillow Mem. at 33.) No such threat exists here because Lindell asserted his "political expression" regarding Smartmatic in his capacity as MyPillow's CEO and spokesman and to achieve MyPillow's corporate objectives. *See supra,* at III.A. The Court would not, in any way, force MyPillow or any other corporate employer to monitor its employees' personal lives, including their "political expression," if it ruled that MyPillow can be held vicariously liable for Lindell's misconduct connected to his employment at MyPillow.

*Finally*, MyPillow argues that it cannot be held vicariously liable because Lindell's defamatory statements regarding Smartmatic were not a "well-known industry hazard" in the pillow and bedding industry. (MyPillow Mem. at 34.) While plaintiffs "commonly" prove foreseeability through evidence of a "well-known industry hazard," courts do not require such evidence. *See Hartford Fire Ins. Co.,* 727 F. Supp. 2d at 772 (denying summary judgment on vicarious liability where plaintiff "offered no evidence" that the relevant fraud was a "well-known" type of collusion in the industry); *Cruz,* 2015 WL 5996383, at *18 (denying summary judgment on vicarious liability because hotel was aware that head housekeeper was stealing other housekeepers' tips); *see also Hagen,* 633

---

Mem. at 34), but that test has been superseded. *Hagen,* 633 N.W.2d at 504 ("the district court and court of appeals applied the scope-of-employment test as enunciated in *Kasner v. Gage* . . . More recently, however, we have followed the scope-of-employment test as clarified in *Lange*.").

N.W.2d at 505 (describing evidence of a "well-known hazard" as an "example" of proof sufficient to establish foreseeability).

MyPillow cites *Hagen* for the notion that Smartmatic must allege that Lindell's actions were a "well-known hazard" in its industry, but *Hagen* does not impose any such requirement. In that case, the employer "did not know or have reason to know" of its employee's misconduct. 633 N.W.2d at 505. Thus, the employee's actions could not have been foreseeable to the employer unless they were a "well-known hazard" in the industry. *Id.* Where, as here, the employer is aware of the employee's misconduct, the plaintiff does not need to allege that the misconduct was a "well-known hazard" to state a claim. *Hartford Fire Ins. Co.*, 727 F. Supp. 2d at 773; *Cruz*, 2015 WL 5996383, at *17. MyPillow's citation to *Pederson v. Long*, No. A16-0329, 2016 WL 4723425, at *2 (Minn. Ct. App. Sept. 12, 2016), is inapposite for the same reason. There is a difference between the employer being aware of the misconduct, as MyPillow was aware of Lindell's misconduct, and an employer being unaware of the misconduct, as was the case in *Hagen* and *Pederson*. Moreover, in *Miles v. Simmons Univ.*, the plaintiff did not even address this element in her complaint, and the university could not have foreseen the professor's misconduct because he had not "demonstrate[d] a tendency towards this kind of behavior." 514 F. Supp. 3d 1070, 1076-77 (D. Minn. 2021).

### 2. Lindell's defamatory statements occurred within "work-related time and space."

"Few Minnesota courts have discussed [the work-related time and space] element at great length, as many of the reported cases involve employees who are indisputably 'at

48

work' at the time they allegedly committed the tort in question." *Rau v. Roberts*, 640 F.3d 324, 328 (8th Cir. 2011) (citation omitted). Moreover, the "at work" element continues to become less relevant because many boundaries that formerly separated the workplace from personal life no longer exist. "[I]n an age when electronic communication can occur [] at any time and in any location, the physical constraints of work-related time and space are less evident." *See Pederson*, 2016 WL 4723425, at *4). A spokesman who defames a competitor's product while on the Home Shopping Network during a late-night appearance is surely acting as much within the scope of his responsibilities as when he makes the same comments live-streaming from corporate headquarters.

Yet, even before the physical boundaries of an office complex became irrelevant, courts recognized that company executives are "at work" wherever they act in furtherance of their responsibilities and their employers' objectives. *See Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 17 (Minn. 1979); *Miller v. Keating,* 349 So. 2d 265, 269 (La. 1977). In *Edgewater Motels*, a Walgreen's executive negligently started a fire in his hotel room while he filled out expense reports. 277 N.W.2d at 17. Even though he was not on Walgreen's property, Walgreen's was vicariously liable for the fire he started because he was performing work related to his corporate responsibilities. *Id.* As an executive, he had no set working hours and the motel was his "office away from home" because he was performing work in that location. *Id.*; *see also Miller*, 349 So. 2d at 269 ("While considerations such as whether the tort occurred on employee premises and during working hours are relevant when assessing the conduct of a relatively subordinate employee . . . they are largely irrelevant in assessing conduct of a corporation's chief executive officer.").

49

The same is true of Lindell. Smartmatic has alleged that Lindell, acting in his capacity as MyPillow's founder, CEO, and spokesman, defamed Smartmatic through various mediums to increase MyPillow's business. *Supra* at III.A. At the same time he defamed Smartmatic, he also promoted MyPillow's products and offered MyPillow promocodes to his audience. (*Id.*) As such, he was "at work" wherever he created and distributed this content for MyPillow's benefit. *See Edgewater Motels*, 277 N.W.2d at 17. MyPillow's argument that it cannot be held liable for Lindell's actions because the defamation campaign was not "communicated from MyPillow's headquarters or any other company location" (MyPillow Mem. at 32) is legally unprecedented and factually inaccurate. Lindell does not cease being MyPillow's CEO and spokesman when he physically steps away from the office.

At bottom, Lindell presented himself as a MyPillow executive and spokesman, he acted to benefit MyPillow during the disinformation campaign, and MyPillow was aware of his actions. Based on the same factual predicate, the *US Dominion* court denied MyPillow's motion to dismiss:

> MyPillow argues that Lindell's statements cannot be imputed to it. But a corporation may be liable for an executive's conduct when the executive was acting within the scope of his employment and in furtherance of the company's business. . . Here, Dominion alleges that Lindell repeatedly made his statements while being identified as the CEO of MyPillow, and at MyPillow-sponsored rallies at which he furthered those claims, and that MyPillow accepted promotional codes distributed during Lindell's appearances that alluded to those claims (e.g., "FightforTrump").

*US Dominion, Inc.*, 554 F. Supp. 3d at 64 n.13. This Court should reach the same conclusion. MyPillow chose Lindell as its spokesman. The MyPillow brand reached new

audiences through the disinformation campaign. And Lindell used the disinformation campaign to do his job—sell pillows. MyPillow reaped the benefits and must accept the consequences of its CEO's disinformation campaign.

**IV.    Smartmatic Sufficiently Alleged a Claim Under Minnesota's Deceptive Trade Practices Act Because Defendants Disparaged Smartmatic's Goods, Services, and Business to Promote Their Business and Sell Their Products.**

Minnesota's Deceptive Trade Practices Act, Minn. Stat. § 325D.44 ("MDTPA") provides, in pertinent part: "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . disparages the goods, services, or business of another by false or misleading representation of fact." Minn. Stat. § 325D.44(8). To support its claim under the MDTPA, Smartmatic alleged that: (1) Defendants disparaged Smartmatic's goods, services, and business through their false representations of fact (Compl. ¶373); (2) Lindell was acting in his capacity as CEO and spokesman of MyPillow when he asserted his disparaging statements (*id.* ¶¶16, 369, 376); and (3) Smartmatic has suffered irreparable harm and will continue to suffer harm because of Defendants' disparagement (*id.* ¶¶368, 370, 377). These allegations sufficiently state a claim under the MDTPA. *See Gregerson v. Vilana Fin., Inc.,* No. 06-1164 ADM/AJB, 2007 WL 2509718, at *6 (D. Minn. Aug. 31, 2007) (denying summary judgment where counter-plaintiffs "submitted evidence that [counter-defendant] has posted, or allowed others to post, comments on his commercial photography website that, if untrue or misleading, make damaging comments about Defendants' business").

Defendants argue that Smartmatic's MDTPA claim nevertheless fails for three reasons, but their arguments are misplaced. *First,* Defendants argue that Smartmatic's

MDTPA claim "is just a repackaged defamation claim" and it "cannot do an end run around the First Amendment by simply recasting an unconstitutional defamation claim as an MDTP claim." (MyPillow Mem. at 35-36; Lindell Mem. at 32-33.) But they do not cite a single authority holding that Smartmatic cannot prevail on both its common law defamation and MDTPA claims. (*Id.*) To the contrary, the MDTPA expressly provides that its remedies are "in addition to remedies otherwise available against the same conduct under the common law . . . ." Minn. Stat. § 325D.45 (emphasis added). This Court has even recognized that defamatory conduct can also support a claim under the MDTPA. *See Willis Elec. Co.*, 437 F. Supp. 3d at 705, 713-14 (denying motion to dismiss defamation claim and MDTPA claim based on the same defamatory conduct); *see also US Dominion*, 554 F. Supp. 3d at 65 (holding that Dominion stated a claim under the MDTPA for Lindell's defamatory statements related to the 2020 Presidential Election).

The cases cited by Defendants merely stand for the proposition that a plaintiff who asserts an MDTPA claim must establish the same constitutional requirements, *e.g.,* actual malice, that it would need to establish to prevail on its defamation claim. *See Hustler Magazine*, 485 U.S. at 56 ("public figures and public officials may not recover for the tort of intentional infliction of emotional distress . . . without showing . . . actual malice"); *Moldea v. New York Times Co.,* 22 F.3d 310, 319-20 (D.C. Cir. 1994) (false light invasion of privacy claim necessarily failed because defamation claim failed). Smartmatic does not dispute that, if it is required to establish actual malice to prevail on its defamation claim, it must also establish actual malice to prevail on its MDTPA claim. As discussed above,

Smartmatic has adequately alleged that Defendants acted with actual malice. Thus, this argument is a red herring.

*Second*, Lindell asserts that "Smartmatic's purpose in bringing an MDTPA claim" is "to obtain its attorneys' fees, which are not allowed for defamation." (Lindell Mem. at 33.) This is irrelevant, even if it were true. Smartmatic has either sufficiently pleaded the claim, or it has not. The recovery Smartmatic will receive post-trial is irrelevant to whether it has met its pleading obligations. Moreover, Lindell is simply wrong. Smartmatic also seeks an order under the MDTPA that would enjoin Defendants from continuing to falsely disparage it. (Compl. ¶378.) Such an order is necessary because Lindell continues to falsely disparage Smartmatic, and may continue to disparage it through other mediums, unless the Court awards it injunctive relief. (*See* Lindell Mem. at 15-17.)

*Third*, Lindell argues that the MDTPA is inapplicable because he did not disparage Smartmatic "in the course of business, vocation, or occupation." (Lindell Mem. at 33.) But that is a disputed issue of fact. Lindell claims that he sought to advance only his "personal interest in national politics." (Lindell Mem. at 33.) Smartmatic has alleged, though, that Lindell disparaged Smartmatic in his capacity as MyPillow's CEO and spokesman to promote the MyPillow brand and sell MyPillow's product. *Supra* at III.A.  Based on those allegations, Smartmatic has sufficiently alleged that Lindell disparaged it pursuant to his "business, vocation, or occupation." *See Gregerson*, 2007 WL 2509718, at *6 (counter-plaintiffs stated MDTPA claim against photographer who disparaged them on his commercial website); *see also Gordon v. Rosenblum,* 393 P.3d 1122, 1131 (Or. 2017) (a defendant commits a deceptive trade practice in his "business, vocation, or occupation"

53

even if the practice is "*indirectly connected* with the ordinary and usual course of defendant's business, vocation or occupation") (emphasis supplied by the court) (citation omitted); *Hartigan v. Maclean Hunter Publ'g Corp.*, 457 N.E.2d 480, 484-85 (Ill. Ct. App. 1983) ("Where the dissemination of ideas is so invested with a financial interest, the promulgation of those ideas may constitute an unfair or deceptive trade practice.").

Lindell also cites *Nw. Airlines, Inc. v. Friday*, 617 N.W.2d 590 (Minn. Ct. App. 2000), but that case is distinguishable. In *Nw. Airlines, Inc.,* the plaintiff airliner asserted an MDTPA claim against the wife of one its pilots, claiming that she falsely disparaged it in a press release she distributed. *Id.* at 592. It was undisputed that her press release had no relation to her trade, business, or occupation. *Id.* at 595. Nevertheless, the airliner argued that her "vocation" was a "crusade" to disparage it. *Id.* The court rejected the airliner's argument because the alleged "crusade" had no connection to commerce. *Id.* at 591, 595.

Other than the existence of a "crusade," *Nw. Airlines* bears no relationship to this case. Here, MyPillow's primary spokesman embarked on a "crusade" to defame Smartmatic. (Compl. ¶¶53-69, 369.) One of the immediate benefits of that crusade was the spokesman reached a new audience (President Trump's supporters) and was invited to new venues (TV appearances). (*Id.* ¶¶109-16.) To this new audience and at the new venues, the spokesman continued the crusade and repeatedly promoted his employer's brand and product. (*Id.* ¶¶327-39.) He even provided promotional codes tied to the crusade to push sales. (*Id.* ¶¶7,19, 338.) Moreover, the company's CEO endorsed the crusade. Lindell used the defamation campaign as a vehicle to further his and MyPillow's "business, vocation, or occupation." (*Id.* ¶¶327-39.)

## CONCLUSION

The Court should deny Lindell and MyPillow's motions to dismiss. The parties clearly disagree regarding the facts. In adjudicating Defendants' motions to dismiss, however, the Court accepts Smartmatic's allegations as true. Those allegations set forth facts supporting every element of Smartmatic's claims. Discovery and the jury will determine who is correct.

Dated: April 11, 2022                                    Respectfully submitted,

                                    _____/s/ *J. Erik Connolly*_____
                                         *J. Erik Connolly*

                                    Christopher K. Larus
                                         Minnesota Bar No. 0226828
                                         CLarus@robinskaplan.com
                                    William E. Manske
                                         Minnesota Bar No. 0392348
                                         WManske@robinskaplan.com
                                    Emily J. Tremblay
                                         Minnesota Bar No. 0395003
                                         ETremblay@robinskaplan.com
                                    **ROBINS KAPLAN LLP**
                                    800 LaSalle Avenue, Suite 2800
                                    Minneapolis, MN 55402
                                    Telephone: (612) 349-8500
                                    Facsimile: (612) 339-4181

                                    J. Erik Connolly (admitted *pro hac vice*)
                                         EConnolly@beneschlaw.com
                                    Illinois ARDC No. 6269558
                                    Nicole E. Wrigley (admitted *pro hac vice*)
                                         NWrigley@beneschlaw.com
                                    Illinois ARDC No. 6278749
                                    Maura T. Levine-Patton (admitted *pro hac vice*)
                                         MLevine-patton@beneschlaw.com
                                    Illinois ARDC No. 6330026

**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949

*Attorneys for the Plaintiffs Smartmatic
USA Corp., Smartmatic International
Holding B.V., and SGO Corporation
Limited*