# Exhibit A

| | |
|---|---|
| DISTRICT COURT, CITY & COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: May 13, 2022 1:05 PM<br>CASE NUMBER: 2020CV34319 |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC., et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| | Case No:      2020cv034319<br><br>Courtroom:   409 |

## ORDER REGARDING ALL DEFENDANTS' SPECIAL MOTIONS TO DISMISS PURSUANT TO C.R.S. § 13-20-1101

> **"False statements of fact harm both the subject of the falsehood *and* the readers of the statement."** *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984).

> **"Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation."** *Kuhn v. Tribune-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981), *citing St. Amant v. Thompson*, 390 U.S 727, 732 (1968).

This matter comes before the Court on the *Special Motions to Dismiss Pursuant to C.R.S. § 13-20-1101* brought by all Defendants, namely, Defendants Joseph Oltmann ("Oltmann"), FEC United, Inc. ("FEC United"), Shuffling Madness Media, Inc. dba Conservative Daily ("SMM", and together with Oltmann and FEC United, "Oltmann et al."), James Hoft ("Hoft"), TGP Communications LLC dba The Gateway Pundit ("TGP", and together with Hoft, "Hoft-TGP"), Michelle Malkin ("Malkin"), Eric Metaxas ("Metaxas"), Chanel Rion ("Rion"), Herring Networks, Inc. dba One America News

Network ("OAN", and together with Rion, "OAN-Rion"), Sidney Powell ("Powell"), Sidney Powell, P.C. ("Powell, P.C.", and together with Sidney Powell, "Powell et al."), Rudolph Giuliani ("Giuliani"), Defending the Republic, Inc. ("Defending the Republic"), and Donald J. Trump for President, Inc. ("Trump Campaign"). This Court held a hearing on this matter on October 13 and October 14, 2021 wherein this Court heard arguments from counsel for all Defendants and counsel for Plaintiff Eric Coomer, Ph.D. ("Coomer").

## PROCEDURAL BACKGROUND

1.      On December 22, 2020, Coomer filed his Original Complaint asserting claims for defamation, intentional infliction of emotional distress, conspiracy, and injunctive relief against the Defendants.[1] On February 4, 2021, Coomer filed his First Amended Complaint.[2]

2.      Coomer's allegations against each defendant are generally the same: Defendants published false statements that 1) Coomer participated in an alleged Antifa conference call; 2) Coomer stated on that alleged call that he intended to subvert the 2020 presidential election; and 3) Coomer did subvert the results of the 2020 presidential election.  Coomer alleges that these statements caused him severe emotional and physical distress, as well as harm to his reputation, privacy, safety, earnings, and other unspecified pecuniary interests.[3]

3.      All Defendants have filed Special Motions to Dismiss Pursuant to C.R.S.

---

[1] *See generally* Orig. Compl.
[2] *See* First Am. Compl.
[3] *See* First Am. Compl. at ¶¶ 51-56 (Oltmann, et al.); ¶¶ 57, 60 (Hoft-TGP); ¶ 58 (Malkin); ¶ 59 (Metaxas); ¶ 61 (OAN-Rion); ¶¶ 64-70 (Powell et al.); ¶¶ 64-65 (Giuliani); ¶¶ 63-70 (Trump Campaign); ¶¶ 72-81 (damages).

§13-20-1101 ("Anti-SLAPP motions"). Each of the Anti-SLAPP motions raised somewhat different arguments, but which can be generalized as follows. <u>First</u>, all Defendants argue that the Anti-SLAPP statute applies to Coomer's claims.[4] Most argue that the statute applies because the statements at issue were made in connection with an issue of public interest[5] or because the statements were made in connection with an official proceeding.[6] Some generally argue that it applies because their statements were made in furtherance of their rights to petition or free speech.[7] <u>Second</u>, all Defendants argue that Coomer cannot make a *prima facie* factual showing of his claims. Defendants argue that Coomer's defamation claims fail because he cannot establish publication, falsity, or actual malice.[8] <u>Third</u>, some Defendants also raise affirmative defenses to defamation. OAN-Rion argue that their statements are protected by the fair report privilege and a "newsworthy" exception to defamation.[9] Oltmann et al., Powell et al., OAN-Rion, Metaxas and Hoft-TGP argue that their statements are not actionable as mere opinion or hyperbole.[10] The Powell et al., Giuliani, and the Trump Campaign argue their statements are protected by the

---

[4] *See* Oltmann, et al. Mot. at 1-4; Malkin Mot. at 5-7; Metaxas Mot. at 6-11; Hoft-TGP Mot. at 9-10, 12-13; OAN-Rion Mot. at 11-13; Powell Mot. at 7-11; DTR Mot. at 8-12; Giuliani Mot. at 6-9; Trump Campaign Mot. at 5-14.
[5] *See* Malkin Mot. at 5-7; Metaxas Mot. at 8-10; Hoft-TGP Mot. at 9-10, 12-13; OAN-Rion Mot. at 11-13; Powell Mot. at 8-10; DTR Mot. at 9-11; Giuliani Mot. at 7-9; Trump Campaign Mot. at 7-11.
[6] *See* Malkin Mot. at 5-6; Metaxas Mot. at 7-8; Trump Campaign Mot. at 11-14.
[7] *See* Hoft-TGP Mot. at 9*;* Powell Mot. at 10-11; DTR Mot. at 11-12; Giuliani Mot. at 9, n.4; Trump Campaign Mot. at 11-14.
[8] *See* Oltmann, et al. Mot. at 7-9 (challenging falsity and actual malice); Malkin Mot. at 7-11 (challenging actual malice); Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 8-11 (challenging actual malice); Hoft-TGP Mot. at 15-23 (challenging actual malice); OAN-Rion Mot. at 13-22 (challenging publication, falsity, and actual malice); Powell Mot. at 17-23 (challenging actual malice); DTR Mot. at 18-24 (challenging actual malice); Giuliani Mot. at 16-20 (challenging actual malice); Trump Campaign Mot. at 15-17 (challenging actual malice).
[9] *See* OAN-Rion Mot. at 12.
[10] *See* Powell Mot. at 24-25; DTR Mot. at 24-26; OAN-Rion Mot. at 17; Hoft-TGP Mot. at 16-21.

litigation privilege.[11]  The Trump Campaign argues that Donald Trump's statements are immune under the Westfall Act[12] and that Eric Trump's statement is immune under the Communications Decency Act.[13]   Hoft-TGP also argue that Coomer's pleadings were insufficient.[14]  Fourth, most Defendants argue that at least some of Coomer's remaining claims fail as they are derivative of his defamation claims.[15]  Most argue that Coomer's intentional infliction of emotional distress claims fail because he cannot establish extreme or outrageous conduct and or the requisite intent;[16] that Coomer's conspiracy claims fail because he cannot establish an unlawful overt act[17] or a meeting of the minds;[18] and that Coomer's request for injunctive relief fails because it is a prior restraint on speech, not narrowly tailored, or has not yet been adjudicated.[19]

---

[11] See Powell Mot. at 11-17; DTR Mot. at 12-18; Giuliani Mot. at 9-16; Trump Campaign Mot. at 11-12.

[12] See Trump Campaign Mot. at 18.

[13] Id. at 20.

[14] See Hoft-TGP Mot. at 13-14.

[15] See Oltmann, et al Mot. at 12 (challenging conspiracy); Malkin Mot. at 11-12 (challenging intentional infliction of emotional distress and conspiracy); Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 13-15 (challenging conspiracy and injunctive relief); Hoft-TGP Mot. at 23 (challenging intentional infliction of emotional distress, conspiracy, and injunctive relief); OAN-Rion Mot. at 22-25 (challenging intentional infliction of emotional distress, conspiracy, and injunctive relief); Powell Mot. at 7 n.5 (challenging injunctive relief); 26-27 (challenging intentional infliction of emotional distress and conspiracy); DTR Mot. at 8 n.5 (challenging injunctive relief); 26-27 (challenging intentional infliction of emotional distress and conspiracy); Giuliani Mot. 21-22 (challenging conspiracy and injunctive relief); Trump Campaign Mot. at 18-19 (challenging intentional infliction of emotional distress and conspiracy).

[16] See Oltmann, et al. Mot. at 5 (incorporating intentional infliction of emotional distress arguments in C.R.C.P. 12(b)(5) motion to dismiss by reference); Oltmann, et al. C.R.C.P. 12(b)(5) Mot. at 23-25; Malkin Mot. at 11-12; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 11-13; OAN-Rion Mot. at 22-23; Powell Mot. at 25-26; DTR Mot. at 26-27; Giuliani Mot. at 20-21.

[17] See Oltmann et al. Mot. at 12; Malkin Mot. at 12-13; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 13-14; OAN-Rion Mot. at 24; Powell Mot. at 26-27; DTR Mot. at 27; Giuliani Mot. at 21.

[18] See Oltmann et al. Mot. at 12; Malkin Mot. at 12-13; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 13; Hoft-TGP Mot. at 18-19; OAN-Rion Mot. at 24; Powell Mot. at 26-27; DTR Mot. at 27; Giuliani Mot. at 21.

[19] See Oltmann, et al. Mot. at 13-15; OAN-Rion Mot. at 25; Powell Mot. at 7 n.5; DTR Mot. at 8 n.5; Giuliani Mot. at 22.

4.     Following limited discovery, Coomer filed his *Omnibus Response* to all Defendants' arguments and affirmative defenses.[20] On reply, some Defendants expanded their original arguments by arguing additional bases for constitutional protections apply;[21] additional statements are immune under the Communications Decency Act;[22] certain statements are protected opinions and hyperbole;[23] and a "conditional" litigation privilege concerning prelitigation statements bars Coomer's causes of action.[24] Some Defendants raised entirely new arguments, arguing constitutional protections apply when other defendants created the matter of public concern;[25] the incremental harm doctrine precluded Coomer's claims;[26] vicarious liability could not be established for certain parties;[27] and asking the Court to weigh the veracity of certain statements and credibility of certain witnesses.[28] To the extent these challenges attempt to raise factual disputes, such issues are reserved for a finder of fact and equally not considered for purposes of this Order. *See Baral v. Schnitt*, 376 P.3d 604, 608 (Cal. 2016); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions. . . .").

5.     On October 13-14, 2021, the Court heard oral arguments on all of Defendants' special motions.

---

[20] Coomer filed an initial response to Metaxas's special motion to dismiss on April 7, 2021 but reserved his right to supplement or amend the evidence offered in support.  *See* Pl.'s Resp. at ¶ 23.
[21] *See* Malkin Reply at 12-13, Metaxas Reply at 6.
[22] *See* Oltmann, et al. Reply at 13, Trump Campaign Reply at 7-8.
[23] *See* Metaxas Mot. at 6-8.
[24] *See* DTR Reply at 12-15.
[25] *See* Malkin Reply at 13-14; OAN-Rion Reply at 16.
[26] *See* OAN-Rion Reply at 18-20.
[27] *See* Oltmann, et al. Reply at 13-17; DTR Reply at 2-8, 11.
[28] *See* Malkin Reply at 7-10; OAN-Rion Reply at 3-5, 20-21; Powell Reply at 1-14; Trump Campaign Reply at 8-11.

### FINDINGS OF FACT

6.      The Court conducted a two-day hearing (October 13th & 14th) wherein all parties presented summaries of the evidence they believed they would be able to present to a jury in support of their claims or defenses in this matter. This Court also undertook a review of all evidentiary objections lodged by the parties to preliminarily assess whether the evidence referenced by the parties was likely to be admissible at a trial. *See* Orders entered in this matter on December 5, 2021.

7.      Based on the admissible evidentiary submissions of the parties, this Court FINDS that Plaintiff will be able to present the following credible evidence to a jury which would be sufficient to meet the clear and convincing evidentiary standard in support of his claims of defamation, intentional infliction of emotional distress, civil conspiracy and request for injunctive relief.

**A.      *2020 Presidential Election***

8.      At the time of the 2020 presidential election, Coomer was privately employed by Dominion as the Director of Product Strategy and Security.[29] Dominion provided election equipment and services to governmental bodies in at least thirty different states during the 2020 presidential election.[30] Coomer, as an employee of Dominion, assisted with these services.[31] Neither Dominion nor Coomer were governmental employees or controlled the election or the governmental bodies they were assisting.

---

[29] *See* Ex. A, Coomer Dec. at ¶ 2.
[30] *Id*. at ¶ 9.
[31] *Id*.

9.     In the weeks leading up to the November 3, 2020 presidential election, former president Trump, his campaign, his agents, and many of his supporters began alleging widespread voter fraud and conspiracy theories to explain then President Trump's projected loss.[32] The propagation of these theories continued after the election results were announced in President Biden's favor on November 7, 2020.[33] Allegations against Coomer first appeared a few days later on November 9, 2020 and were first instigated by Oltmann.[34]

10.     In November and December 2020 alone, over 60 election related lawsuits were filed across the country by former president Trump and his supporters to challenge the legitimacy of the election results.[35] Of these lawsuits, the parties identified some that were filed on behalf of former president Trump or the Trump Campaign in federal courts in Montana, New Jersey, Nevada, Pennsylvania, and Michigan.[36] The parties identified four lawsuits filed by Powell in federal courts in Arizona, Georgia, Wisconsin, and

---

[32] *Id.* at ¶ 12.

[33] *See* Ex. A, Coomer Dec. at ¶ 13.

[34] *Id.* at ¶ 15; Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 13:2-11.

[35] *See* First Am. Compl. at ¶ 50; *see also* Malkin Mot. at 5 (identifying 60 lawsuits); Metaxas Mot. at 8 (same); OAN-Rion Mot. at 6 (same); Trump Campaign Mot. at 13 (identifying lawsuits generally); Powell Mot. at 6 (identifying lawsuits filed by Powell); Giuliani Mot. at 9 n.4 (identifying a lawsuit filed by the Trump Campaign).

[36] *See* Trump Campaign Mot. at 13, n.3 (citing *Donald J. Trump for President, Inc. v. Bullock*, 491 F. Supp. 3d 814 (D. Mont. 2020); *Donald J. Trump for President, Inc. v. Murphy*, No. 3:20-cv-10753 (D. NJ. Aug. 18, 2020); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-01445-JCM-VCF (D. Nev. Aug. 4, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-cv-02078-MWB (M.D. Penn. Nov. 9, 2020)); *see also* Giuliani Mot. at 9, n.4 (citing *Donald J. Trump for President v. Benson*, No. 1:20-cv-01083-JTN-PJG (W.D. Mich.)).

Michigan.[37] Of those numerous lawsuits, only Powell's lawsuits reference Coomer.[38] To date, these lawsuits have been dismissed or withdrawn.[39]

11.     All allegations of election fraud have been firmly rejected by credible sources. On November 12, 2020, the Cybersecurity & Infrastructure Security Agency (CISA), a standalone federal agency under the Department of Homeland Security, issued a Joint Statement from the Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees confirming that there is "no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 presidential election was the most secure in American history.[40] Then U.S. Attorney General William Barr confirmed "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."[41] Several states also conducted manual recounts without detecting any evidence of fraud.[42]

## B.     *Joseph Oltmann, FEC United, Inc., Shuffling Madness Media, Inc.*

12.     Oltmann is a business owner and political activist based in Colorado.[43] He is the founder and authorized representative of FEC United, a non-profit corporation

---

[37] *See* Trump Campaign Mot. at 13, n.4-5 (citing *Bowyer v. Ducey, et al.*, No. 2:20-cv-02321-DJF (D. Ariz. 2020); *Pearson v. Kemp*, No. 1:20-cv-04809-TCB (N.D. Ga. Nov. 25, 2020); *Feehan v. Wis. Elections Comm'n*, No. 2:20-cv-01771-PP (E.D. Wisc. Dec. 1, 2020); *King v. Whitmer*, No. 2:20-cv-13134-LVP-RSW (E.D. Mich. Nov. 25, 2020)); Powell Mot. at 6, 12 (same); DTR Mot. at 7, 13 (same).

[38] *See supra* n.37.

[39] *See supra* n.37-38.

[40] *See* Ex. M-1, PX 67.

[41] *See* Ex. O, Halderman Dec. at ¶ 19.

[42] *Id.* at ¶ 47.

[43] *See* Ex. D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. at 7:15-9:2; 23:23-24:11.

formed in Colorado.[44] He is a co-host for the Conservative Daily podcast, which broadcasts from Colorado and publishes almost daily podcasts on various online platforms.[45] He was also the founder and authorized representative for SMM, which until July 9, 2021, conducted business under the trade name Conservative Daily.[46]

13.     Oltmann, individually and as a representative of FEC, was actively involved in political events and rallies in support of former president Trump leading up the 2020 presidential election.[47] Similarly, Oltmann published podcasts on Conservative Daily in support of former president Trump both individually and as a representative of SMM.[48] In these roles, Oltmann began advancing various allegations of fraud leading up to the election, including claims that public health measures in response to the Covid-19 pandemic were intended to allow for election fraud, and various claims of ballot harvesting.[49] Prior to the election Oltmann indicated his belief that former president Trump would win reelection.[50]

14.     As the results for the election began to be reported and former president Trump's loss became clear, Oltmann again began advancing allegations of election fraud to explain the loss, including claims of ballot harvesting and late-night ballot dumps at

---

[44] *See* Ex. C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. at 7:10-13.
[45] *See* Ex. D-3, Oltmann-CD Solutions, Sept. 9, 2021 Depo. Tr. at 32:15-18.
[46] *See* Ex. D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. at 7:8-17; 14:11-23; *see also* Ex. D-1, PX 92-93.
[47] See Ex. C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. at 8:7-12:7.
[48] *See* Ex. B-10 Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020); B-11 Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 6, 2020).
[49] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 2:25-3:5, 8:25-9:10; *see also* Pl.'s Amend. Compl. at ¶¶ 4, 8, 52-53, 56-71, 85, 91-94.
[50] *See* Ex. B-8, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Sept. 9, 2020); Ex. B-9, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Aug. 5, 2020)

ballot collection centers.[51] On November 5, 2020, during a Conservative Daily podcast segment that was labeled "Democrats Just Got Caught!", Oltmann made the following statements:

> Oltmann: I think that it will actually come through. I think that it will actually end up working where President Trump becomes President, but he is going to have to fight through it. We are going to have to fight through it.
>
> . . .
>
> Max McGuire: They are throwing so much fraud at this. . .
>
> Oltmann: Pillowcases, they were bringing in pillowcases filled with stuff.
>
> McGuire: . . . So much fraud. It's like an absurd amount of fraud. And they are hoping that they can just get this thing certified before you can even count it.
>
> Oltmann: No.
>
> . . .
>
> McGuire: [Fox News cut away from a press conference in Nevada alleging voter fraud and the Fox hosts] started criticizing the Trump Campaign, for not putting forward evidence. They were saying "if you are going to allege voter fraud, you have got to show the evidence."
>
> Oltmann: There is a ton of evidence. There is a ton of evidence.
>
> . . .
>
> Oltmann: No surrender. No retreat.  That is what we have to do. . . . We have to die on this hill. . . . You don't get to take away our country.
>
> McGuire: Fraud. This is the new Democrat party logo.
>
> . . .
>
> Oltmann: Now they want to try to steal the election, and they think we are going to sit back and watch. Oh no. No. Oh no. No, no, no, no, no, no.
>
> . . .
>
> McGuire: In Pennsylvania, . . . 23,277 votes came through all in one batch and 100% were for Joe Biden. . . .
>
> Oltmann: It's not possible. It's all fraud.

---

[51] *See* Ex. A, Coomer Dec. at ¶ 15; Ex. Ex. B-10, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020); Ex. B-11, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 6, 2020).

. . .

<u>Oltmann</u>: You don't get to be the minority in this country, steal an election and expect that we are going to let Biden be president. There is no way we are going to let Biden be president. Biden will not be president. I am going to say it again. He will not be president. You are not going to destroy the democracy of the country. Not doing it.

. . .

<u>McGuire</u>: If he gets inaugurated, he is going to be an illegitimate president.

<u>Oltmann</u>: Illegitimate president? There are hundreds of millions of people in this country who literally will overrun that inauguration. You will not be able to stop the wave that comes. You won't be able to stop it. They won't even be able to have an inauguration. I promise you. I promise you, they won't be able to have one. They won't. . . . I won't stand for it. . . You don't get to cheat.

. . .

<u>Oltmann</u>: They are actually reproducing votes that don't even exist. They are not even on the rolls. They don't even have a number that correlates to that particular vote.

. . .

<u>Oltmann</u>: They have cheated this whole thing. Look, I'm going to tell you right now, we are not going to accept this election. We're not. It's not an illegitimate president. We are not going to accept it. We have a hundred million people that I promise you are going to show up on the doorsteps of these democrats. We are not going to accept it.[52]

15.     During the November 5, 2020 podcast, when one caller asked what to do if he were to discover that his deceased parents voted, Oltmann told the caller to send that information to Conservative Daily, "send it to us." Oltmann then proceeded to reiterate that Joe Biden "will not take office. I am telling you right now, he will not take office."[53]

16.     On November 6, 2020, the Conservative Daily podcast was titled "How They Stole It" and spent time analyzing their recently improving rankings on Apple's list of

---

[52] Ex. B-10, Oltmann, et al., Conservative Daily Podcast (Nov. 5, 2020).
[53] *Id.*

political podcasts. Oltmann repeatedly told viewers to "hit the share button" and Max McGuire urged the viewers to subscribe to the podcast and to give positive reviews. The November 6, 2020 podcast was devoted to ongoing allegations of election fraud, but also included an acknowledgment that one of their claims from November 5th regarding ballots in Pennsylvania had been fact-checked and was determined to have the potential of misleading people. Oltmann discussed people at a gun store buying guns in response to the purported election steal. A caller to the show referenced Venezuela. Oltmann reiterated that Biden would not be president and that he would not stand for it. McGuire predicted that the podcast was likely to be labeled "fake news" in the future.[54]

17.    On November 9, 2020, after the results of the election were called for President Joe Biden, Oltmann again co-hosted a Conservative Daily Podcast. On that podcast, Oltmann claimed to have learned at least six weeks earlier of a conspiracy to make sure former president Trump was not re-elected as president of the United States.[55] Oltmann claimed he gained this information while infiltrating an Antifa conference call with unknown and unverified participants.[56] Oltmann alleged one of the unknown participants was referred to as "Eric" and "the Dominion guy."[57] Oltmann paraphrased this "Eric" as stating on the call, "Don't worry about the election, Trump is not gonna win.

---

[54] Ex. B-11. It is impossible not to draw a straight line from Oltmann's threats of violence on his November 5th and 6th podcasts, to his statements regarding Coomer on November 9, 2020 and thereafter, to the violent attack on democracy that occurred in Washington, D.C. on January 6, 2021.

[55] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 18:19-21:11; *see also* Pl.'s Amend. Compl. at ¶¶ 5, 52-53.

[56] *Id.*; *see also* Ex. F-1, Malkin, July 27, 2021, PX 15; Ex. G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 3:15-25, 6:6-7:3; Ex. G-2, The Eric Metaxas Radio Show, YOUTUBE (Nov. 24, 2020).

[57] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 19:8-23; *see also* Pl.'s Amend. Compl. at ¶ 52.

I made f-ing sure of that."[58] Oltmann claimed to have subsequently determined the name

of the speaker by Google searching the terms "Eric," "Dominion," and "Colorado."[59]

Oltmann then identified Coomer as the alleged speaker[60] and accused him of "controlling

elections," while disclosing Coomer's name, his photograph, and his place of

employment.[61] Oltmann claimed that, although he had forgotten about this alleged

conversation for the past six weeks, he had sufficient recall of the speaker's voice to be

able to identify the speaker as Coomer. Oltmann bragged that there was "no way they can

deny" the allegations that he raised regarding Coomer. Oltmann also claimed that he was

"unable" to tell listeners how he got the information.[62] Oltmann acknowledged that,

despite the fact that he was allegedly infiltrating an Antifa conference call to identify and

reveal Antifa journalists, he did not record any of the Antifa conference call. Oltmann

went so far as to claim on the November 9, 2020 podcast that Coomer wanted to kill the

president.[63]

18.     In review of this publication, the substance of Oltmann's statements alleged

that Coomer participated in this alleged Antifa conference call; that Coomer stated on this

call his intent to subvert the presidential election; and that Coomer then created

---

[58] *See* Ex. B-3, Joseph Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 19:24-20:7; *see also* Pl.'s Amend. Compl. at ¶ 52.

[59] *See* Ex. G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Ex. G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 8:20-25; *see also* Pl.'s Amend. Compl. at ¶ 52; n.74.

[60] *See* Ex. G-2, The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020); Ex. G-1, Metaxas, Aug. 13, 2021, PX 97, Tr. 8:20-9:24; *see also* Pl.'s Amend. Compl. at ¶¶ 6, 59; n.80, 115.

[61] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 3:8-13.

[62] Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr.

[63] *Id.*

vulnerabilities in the voting machine system that allowed him to actually subvert the election. Coomer unequivocally denies these allegations.[64]

19.     The sheer implausibility of the claims made by Oltmann on the November 9, 2020 Conservative Daily podcast should have given any listener numerous serious reasons to question the veracity of his claims. Oltmann and Conservative Daily had just spent two full shows on November 5th and 6th promoting outlandish claims of election fraud, some of which Oltmann and Maguire had already acknowledged on air had been fact-checked and labeled as misleading.[65] Oltmann had pledged repeatedly that Biden would not be president and that Oltmann was "going to die on this hill" of election fraud. Then, on November 9, 2020, Oltmann claimed to have spontaneously remembered a "smoking gun" that proved Dominion had been engaged in election fraud. Oltmann claimed that he was able to positively identify a voice on a phone call that he heard at least six weeks prior. Oltmann said that there were people that had provided him with access to the information, but he refused to disclose their identity. Miraculously, in addition to Oltmann spontaneously remembering Coomer's involvement in the Antifa conference call, Oltmann also simultaneously obtained a trove of Coomer's anti-Trump Facebook posts. Oltmann acknowledged that he did not have any recording of the Antifa conference call. The entire story appears, on its face, to be manufactured around Coomer's Facebook posts, and deliberately crafted in a way to make it impossible to be verified by anyone attempting to investigate the veracity of Oltmann's outlandish claims of Coomer's involvement in the Antifa conference call.

---

[64] *See* Ex. A, Coomer Dec. at ¶ 18.
[65] *See* Ex. B-11, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 6, 2020).

20.     Interestingly, when Oltmann first broadcast his claims about Coomer and the Antifa conference call, Oltmann hedged. Specifically, when he was addressing his identification of Coomer, Oltmann prefaced his remarks by stating:

> As the call carried on, a person who called himself Eric was on the call. Now, I can't tell you if it's the same Eric, but I'm going to tell you how it led me to gather the rest of this information, right?
>
> . . .
>
> And compared to what I remember hearing in his other videos, I think it's a match, but I can't be sure. So, I'm going to put that out there. But I can be sure of everything else I'm about to share with you, right?"
>
> . . .
>
> "So, I - - they identified him as Eric from Dominion, but I didn't -- I mean, I have to basically say that there could be -- maybe it's a different guy, but that led to me to all the other things that I got, which is getting access to Facebook, getting access to this information.[66]

21.     Further, the Conservative Daily, Oltmann and McGuire appeared to have defamation concerns on their mind when Oltmann made his first statements about Coomer. Specifically, Oltmann and McGuire made the following statements during the November 9, 2020 broadcast:

> I have an attorney here in Colorado that has been advising me with other attorneys to tell me to be very careful to make sure that what I have is substance, like I can prove it.
>
> . . .
>
> This guy's a *public figure* working for Dominion. (emphasis added).[67]

22.     Oltmann began repeatedly republishing these allegations against Coomer, both individually and as a representative of FEC United, across numerous media

---

[66] Ex. B-4, pp. 19-20, 60.
[67] *Id.* at 7, 30.

platforms.[68] Oltmann escalated his claims against Coomer following his initial publication on November 9, 2020. Oltmann no longer expressed any doubt that it was Coomer on the Antifa conference call. Oltmann no longer acknowledged that he could have been mistaken about who was on the alleged Antifa conference call. Moreover, the range of these numerous publications reflects the incredible breadth and speed with which malicious disinformation can be spread. Oltmann has continued to republish these allegations against Coomer on the Conservative Daily podcast, both individually and as a representative of SMM. At the present time, there are dozens of Conservative Daily podcasts in the record specifically targeting Coomer.[69]

23.     Oltmann has continued to republish these allegations against Coomer across social media platforms, including Twitter, Parler, Facebook and Telegram, at times referring to Coomer as a "liar,"[70] a "terrorist,"[71] or a "shitbag."[72]

---

[68] Ex. F-1, Malkin, July 27, 2021, PX 15, at 3:51; Ex. E-1, Hoft-TGP, Aug. 10, 2021, PX 86; Ex. A-1, pub. 11, Oltmann et. al., WAKE UP! WITH RANDY CORPORON (Nov. 14, 2020) at 43:10; Ex. A-1, pub. 13, Oltmann et. al., THE DEB FLORA SHOW (Nov. 15, 2020) at 3:40; Ex. A-1, pub. 11, Oltmann et. al., THE GATEWAY PUNDIT (Nov. 16, 2020) at 0:15; Ex. E-1, Hoft-TGP, Aug. 10, 2021, PX 87; Ex. A-1, pub. 22, Oltmann et. al., THE PETER BOYLES SHOW, (Nov. 17, 2020) at 24:29; Ex. A-1, pub. 23, Oltmann et. al., THE PETER BOYLES SHOW, (Nov. 18, 2020) at 6:14; Ex. A-1, pub. 24, Ex. A-1, pub. 33, Oltmann et. al., WAKE UP! WITH RANDY CORPORON (Nov. 21, 2020) at 30:02; Ex. I-1, Herring-OAN, July 30, 2021, PX 32 at 22:00; Ex. G-2, THE ERIC METAXAS SHOW (Nov. 24, 2020) at 4:58; Ex. F-1, Malkin, July 27, 2021, PX 17 at 11:55; Ex. A-1, pub. 61, Oltmann et. al., THE PROFESSOR'S RECORD, (Apr. 20, 2021), at 16:00; THE DEEP RIG (Zero Hour Alchemy, 2021); Ex. A-1, pub. 63, Oltmann et. al., FRANK TV (May 3, 2020) at 6:18; Ex. A-1, pub. 68, Oltmann et. al., STEEL TRUTH PODCAST (June 22, 2021); Ex. A-1, pub. 64, Oltmann et. al., THE CHUCK AND JULIE SHOW (May 5, 2020) at 28:26; Ex. A-1, pub. 72, Oltmann, Speech at Reawaken America Tour, (July 18, 2021) at 3:07; Ex. A-1, pub. 73, Oltmann et. al., INTHEMATRIXXX PODCAST (Aug. 4, 2021) at 5:09; Ex. A-1, pub. 74, Oltmann et. al., MIKE LINDELL CYBER SYMPOSIUM (Aug. 11, 2021) at 6:34; Ex. A-1, pub. 75, Oltmann et. al., STEVE BANNON'S WAR ROOM PODCAST (Aug. 11, 2021) at 1:35.

[69] See generally, Ex. A-1, pubs. 1-4, 17, 25, 29, 35, 40, 42-51, 53-54, 56, 60, 63, 66; Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-6, Oltmann et. al., CONSERVATIVE DAILY PODCAST (Dec. 28, 2020).

[70] See Ex. A-1, pub. 71.

[71] Id. at pub. 77.

[72] See Ex. I-1, PX 46.

24.     The nature and severity of Oltmann's allegations—and the means through which he allegedly obtains his information regarding Coomer—have escalated. Oltmann has denigrated Coomer by referring to him as "trash," "evil," and a "sociopath;"[73] has monitored Coomer's activities and stated, "I have people in Salida that literally are following him around and saying, 'Alright, Joe. Here's where he's at next. Here's where he's at next. I found him. He's staying in this basement, up here. Oh, he's at this house now;"[74] Oltmann has posted and shared photos of Coomer's house;[75] Oltmann has encouraged his audience to harass Coomer with statements such as "I want everybody to put on their social media account, 'Where is Eric Coomer?;'"[76] and Oltmann has repeatedly called for violence, including calling for the civil war, and repeatedly asserting that Coomer could be put to death for treason.[77] Oltmann has bragged about harassing and threatening Coomer's friends and acquaintances, demanding incriminating information and promising retribution if they did not deliver.[78] In one instance, Oltmann claimed he called Coomer's friend and threatened that he would "be the next person that [Oltmann] put[s] on Twitter" if he hung up the phone.[79]  It is unclear the full extent of the allegations Oltmann has made against Coomer given the quantity and scope of his publications, which Oltmann continues to publish. However, Coomer is the person Oltmann et al. specifically named in relation to their allegations of election fraud, making

---

[73] *Id.* at pubs. 1, 19, 52, 68, 77.
[74] *Id.* at pub. 48.
[75] *Id.* at pub. 46.
[76] *See* Ex. A-1, pub. 45.
[77] *Id.* at pubs. 2-5.
[78] *See* Ex. E-3a.
[79] *Id.*

Coomer the face of the Dominion conspiracy theory in certain media streams and across the internet.[80]

25.     Oltmann et al. have not disclosed any witness with personal knowledge that identified Coomer on the alleged Antifa conference call.[81] Oltmann et al. have no personal knowledge of any election fraud involving Coomer.[82] Oltmann et al. have not disclosed any witness with personal knowledge of any election fraud committed by Coomer.[83] Oltmann et al. have offered no evidence of election fraud committed by Coomer.[84] And Oltmann et al. have not identified any expertise in elections systems with which to identify election fraud.[85] Instead, Oltmann et al.'s allegations of fraud were based on Oltmann's speculation surrounding Coomer's Facebook posts and his employment with Dominion, neither of which include *any* evidence of election fraud.[86] The Facebook posts themselves are limited to Coomer's personal and political beliefs, which do not support the allegations made regarding election fraud.[87]

26.     Oltmann et al.'s allegations are based on anonymous sources—specifically unknown and unverified speakers on an alleged Antifa call Oltmann allegedly infiltrated.[88] Only after Coomer filed suit did Oltmann et al. claim to have personal

---

[80] *See supra* n.68.
[81] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 15:20-20:18.
[82] *See* Ex. V-5, at 52:10-53:6.
[83] *Id.*
[84] *Id.*
[85] *See* Ex. B-2, Oltmann, Sept. 8, 2021 Depo. Tr. at 140:18-22.
[86] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr.
[87] *See* Ex. A, Coomer Dec. at ¶ 48.
[88] *See* Ex. A-1, pub. 1.

knowledge of other participants on the purported call.[89] However, the witnesses Oltmann et al. directly or indirectly identified have 1) denied any knowledge of such a call, 2) denied any knowledge of the statements Oltmann alleged occurred on the call, and 3) denied any knowledge of Coomer on such a call.[90] No other participants have come forward and Oltmann has refused to disclose the name of his Antifa conduit that allegedly got Oltmann on the Antifa call and listened to portions of the call. Oltmann's claim that he only knew his conduit by the conduit's initials is completely incredible.[91]

27.    Oltmann et al.'s allegations regarding the alleged Antifa call itself have varied. Oltmann at al. initially provided no explanation for how Oltmann infiltrated the alleged Antifa call.[92] Oltmann has claimed that Heidi Beedle participated in the conference call.[93] However, Heidi Beedle has stated she has no knowledge of the alleged call or Oltmann et al.'s allegations.[94] Oltmann et al. have since acknowledged Oltmann's claim that she was on the call was a "wild guess."[95] Oltmann et al. now claims another unnamed Antifa member gave Oltmann access to the call but have refused to disclose the alleged witness's name.[96] Oltmann et al. have not identified when the purported call occurred. On November 9, 2020, Oltmann claimed that the call took place "three weeks ago," which would have been approximately October 12-19, 2020.[97] At other times,

---

[89] *See* Ex. V-5, at 29:13-17.
[90] *See* Ex. Q, Beedle Dec. at ¶¶ 14-15; Ex. T, Maulbetsch Dec. at ¶¶ 5-6; Ex. U, Anderson Dec. at ¶¶ 10-13.
[91] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 11:13-22, 56:1-62:2.
[92] *See* Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 8:5-7.
[93] *Id.* at 18:4-18.
[94] *See* Ex. Q, Beedle Dec. at ¶¶ 14-15.
[95] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 54:10-23.
[96] *See id.* at 11:13-22, 56:1-62:2.
[97] Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 72:9-13.

Oltmann placed the call in mid-to late-September[98] and at times stating it occurred on or about the week of September 27, 2020.[99] A screenshot Oltmann allegedly had the foresight to take of his Google search of the terms "Eric," "Dominion," and "Denver Colorado" is dated September 26, 2020, which would place the Google search before the call.[100] However, Oltmann et al.'s placement of the call changed again with the filing of their reply in support of their special motion to dismiss. Specifically, Oltmann at al. introduced in their reply the Declaration of John "Tig" Tiegen (Tiegen), who claims Oltmann alleged a call occurred sometime between September 17 and September 21, 2020.[101] Notably, Tiegan's description of Oltmann's allegations did not include Coomer, Dominion, or election fraud, but, instead, only theories that "journalists were trying out some propaganda."[102] Tiegen himself has no personal knowledge of an alleged call or of Oltmann et al.'s allegations against Coomer.[103] Oltmann et al. have provided no record evidence of the call itself, such as electronic records contemporaneously made that list identifying information such as the date, time, or method of the call.[104] Instead, Oltmann et al. have provided undated notes Oltmann alleges he took during the call (which differ in material ways from his summary of the notes which he provided to OAN on November 10, 2020).[105] Similarly, the method of communication has also changed with Oltmann

---

[98] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo Tr. at 71:10-72:15.
[99] *See* Ex. K-1, PX 2.
[100] *See* Ex. B-5.
[101] *See* Oltmann et. al. Reply, at Ex. G, Dec. of Johnathan Tiegen AKA "Tig," ¶¶ 11-14.
[102] *See id.* at ¶ 15.
[103] *See id.* at ¶¶ 11-15.
[104] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo Tr. at 71:10-72:15.
[105] *Compare* Ex. F-2, *with* Ex. I-1, PX 35.

first alleging it was a phone call, only to now allege it was a Zoom call.[106] Moreover, Oltmann et al. have no recording of the call despite Oltmann having allegedly accessed it for the purpose of investigating and exposing Antifa.[107]

28.     Throughout the initial Anti-SLAPP discovery period, Oltmann repeatedly refused to disclose relevant information. Specifically, at an evidentiary hearing on July 7, 2021, Oltmann refused to disclose information about how he accessed the alleged Antifa call. This Court found that his testimony was "evasive and not credible," and concluded that, for purposes of the Colorado Reporter's Privilege, C.R.S. § 13-90-119, Oltmann's "statements regarding that conference call are probably false."[108] This Court then ordered Oltmann to disclose the identity of his alleged conduit to the Antifa call.[109] Oltmann persisted in defying that order.[110] Oltmann has also refused to disclose the identity of the individual who allegedly gave him access to Coomer's Facebook profile, again in defiance of a Court order.[111] Given Oltmann et al.'s refusal to disclose evidence ordered by the Court, this Court ruled that it would not consider Oltmann et al.'s claims as to the source, timing, or manner in which Oltmann received the Facebook posts or permit Oltmann et al. to contest Coomer's evidence or claims regarding the source, timing, or manner of Oltmann's receipt of information regarding Coomer's Facebook posts.[112]

---

[106] *Id.* at 15:18-16:1.
[107] *See* Ex. B-3, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 9, 2020); Ex. B-4, Nov. 9, 2020 Conservative Daily Podcast Tr. at 19:8-20:15, 75:25-76:21.
[108] *See* Ex. V-5, July 7, 20221 Hearing Tr. at 90:22-91:7.
[109] *Id.* at 92:14-18.
[110] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 11:13-22, 56:1-62:2.
[111] *See* Ex. B-2, Oltmann, Sept. 8, 2021 Depo. Tr. at 86:5-17.
[112] *Id.*; *see also* Oct. 12, 2021 Order Re: Pl.'s Second Mot. for Sanctions Against the Oltmann Defs. Pursuant to C.R.C.P. 37.

29.     Coomer unequivocally denies Oltmann at al.'s allegations.[113]  Coomer has averred under oath that he did not participate in any alleged call; he did not state an intent to subvert the election in any alleged call; and he did not take any actions to subvert the election.[114] Coomer has put forward sworn statements of witnesses Oltmann et al. directly or indirectly identified in relation to the alleged call that deny and refute Oltmann et al.'s allegations.[115]

30.     Coomer has provided an expert declaration which confirms that Coomer will be able to present competent evidence showing that Oltmann et al.'s allegations of voter fraud against Coomer were not possible as Dominion machines are not capable of bulk adjudication and that private safeguards and multiple independent layers of security at the local, state, federal levels all either prevent such manipulation or would make any such attempted manipulation easily discoverable.[116] Dr. Halderman, a nationally-recognized election security expert, provided examples of how Coomer sought to improve transparency in the vote adjudication process to make fraud easier to detect as well as evidence that the Defendants' vote rigging allegations were "always implausible, consisting of wild speculation, readily debunked claims, and incoherent technical assertions, and months of subsequent investigations and audits have both failed to vindicate their theories and added further evidence that the election outcome was correctly decided."[117] The Court accepts Dr. Halderman's expert opinions for purposes of

---

[113] *See* Ex. A, Coomer Dec. at ¶ 18.
[114] *Id.*
[115] *See* Ex. Q, Beedle Dec.; Ex. T, Maulbetsch Dec.; Ex. U, Anderson Dec.
[116] *See* Ex. A, Coomer Dec. at ¶¶ 5-7; 40-46; *see generally* Ex. O, Halderman Dec.
[117] *See* Ex. O, Halderman Dec. at ¶¶ 7 and 40-48.

evaluating whether Coomer is able to establish a *prima facia* case and the reasonable likelihood of Coomer prevailing on his claims.

31.    Coomer has provided a declaration from an expert criticizing and challenging the media defendants' investigation and reporting of Oltmann's allegations.[118] Coomer proffered Fred Brown, Jr., as an expert on journalistic standards and practices.[119] Brown has four decades of experience both as a reporter/editor at the Denver Post and teaching journalism to students at University of Denver.[120] Brown opined that the media defendants relied on objectively unreliable information, unreliable sources such as Ron Watkins, unreliable affiants, and exhibited an unacceptable failure to even attempt to verify the facts through obvious sources.[121] Brown cited examples in his declaration of conduct that was "an affront to fundamental journalistic standards and practice" or exhibited a clear conflict of interest.[122] While Brown declined to speculate on the parties' subjective motivations, he opined that the media defendants' "failure to report on widely accepted, verifiable information that conflicts with their assumptions, may legitimately be characterized as a reckless disregard for the truth."[123] The Court accepts Brown's expert opinion for purposes of evaluating whether Coomer is able to establish a *prima facia* case and the reasonable likelihood of Coomer prevailing on his claims.

32.    Coomer provided a declaration from Mike Rothschild, an author and

---

[118] *See generally* Ex. N, Brown Dec.
[119] *See id.*
[120] *See id.* at ¶¶ 4-5.
[121] *See, e.g., id.* at ¶¶17, 48, 128-129, and 133.
[122] *See id.* at ¶¶ 38-44, 131.
[123] *See id.* at ¶ 134.

conspiracy theorist /QAnon expert, who opined that many of the defendants perpetuated and sponsored unsupported election fraud conspiracy theories which were consistent with the QAnon disinformation campaign.[124] The defendants' support of the debunked QAnon election fraud claims further supports Coomer's contention that the publication of defamatory statements about Coomer was part of defendants' overall goal of delegitimizing the 2020 election and Coomer's civil conspiracy claims. The Court accepts Rothschild's expert opinion for purposes of evaluating whether Coomer is able to establish a *prima facia* case and the reasonable likelihood of Coomer prevailing on his claims.

33.     Oltmann et al. had both political and financial motivations to delegitimize the results of the election by defaming Coomer. Oltmann is an ardent supporter of former president Trump and frequently advocates for conservative causes, often through FEC United and SMM.[125] Following Oltmann's publication of claims against Coomer, his Conservative Daily podcast gained new listeners and quickly climbed the podcast rankings.[126] Oltmann et al. have used this new exposure to promote FEC United to a wider audience.[127] Oltmann et al.'s obsession with increasing their podcast ratings through vocalizing increased outrage and increasingly provocative, inflammatory and violent

---

[124] *See* Ex. P, Rothschild Dec. at ¶¶ 81-86.

[125] *See* Ex. C-2, Oltmann-FEC United, Sept. 9, 2021 Depo. Tr. at 8:25-9:8.

[126] *See* Ex. D-4, Oltmann, et al., CONSERVATIVE DAILY PODCAST (Nov. 5, 2020) (identifying podcast as #119 most popular political podcast in America), (Nov. 6, 2020) (identifying podcast as #108 most popular political podcast in America), (Nov. 9, 2020) (identifying podcast as #81 most popular political podcast in America), (Nov. 10, 2020) (identifying podcast as #62 most popular political podcast in America), (Nov. 14, 2020) (identifying podcast as #53 most popular political podcast in America), (Nov. 19, 2020) (identifying podcast as #28 most popular political podcast in America), (Dec. 2, 2020) (identifying podcast as #8 most popular political podcast in America).

[127] *See* Ex. D-2, Oltmann-SMM, Sept. 9, 2021 Depo. Tr. at 35:23-37:14.

statements is evident throughout the Conservative Daily podcasts that this Court has reviewed.

34.    Oltmann et al. conceived of a feverish storyline regarding the results of the presidential election designed to delegitimize the election, which is reflected in their false allegations of elections fraud leading up to and after the election.[128] Oltmann et al. consciously set out to conform their implausible allegations against Coomer to their election fraud storyline and efforts to create a basis for their refusal to accept the outcome of the presidential election. In service of their goal to improve their podcast ratings, Oltmann et al. created and promoted a storyline that was based on Coomer's position at Dominion and Coomer's Facebook posts, but which involved no other investigation into Oltmann's claims regarding an Antifa conference call; failed to identify witnesses with personal knowledge of the allegations; deliberately refused to obtain corroborating evidence in support of the allegations; blindly proceeded without consulting with experts on election systems regarding the allegations; and avoided attempting to contact either Coomer or Dominion to confirm the allegations.[129] Instead, Oltmann et al. continued to publish the implausible allegations even after learning both Coomer and Dominion stated they were false.[130] Similarly, Oltmann et al. rejected reports from CISA and former Attorney General Barr regarding the legitimacy of the election.[131] Oltmann et al. advanced

---

[128] *See* Ex. B-8; B-9; B-10; B-11.
[129] *See* Ex. B-1, Oltmann, Sept. 8, 2021 Depo. Tr. at 11:13-22, 56:1-62:2; Ex. A, Coomer Dec. at ¶¶ 16, 23, 34, 36.
[130] *See generally* Ex. A-1, pubs. 47-77.
[131] *See* Ex. D-3, Oltmann-CD Solutions, Sept. 9, 2021 Depo. Tr. at 28:23-32:2.

and exploited an wholly improbable[132] story for financial gain.

35.     Oltmann et al. have not retracted any of their publications about Coomer.[133] Instead, they remain publicly available to this day.[134]

### C.     *Michelle Malkin*

36.     Malkin is a political commentator and the host of a program called #MalkinLive, which was broadcast from Colorado and published on YouTube from May 2020 until March 2021.[135] She was also the host of a program on Newsmax called "Sovereign Nation," which has since been cancelled.[136] Since November 2020, Malkin has had roughly two million Twitter followers.[137]

37.     Malkin was one of the first Defendants to interview Oltmann and publish his statements about Coomer. On November 13, 2020, Malkin first conducted an interview of Oltmann on #MalkinLive, which was posted on YouTube.[138] The substance of both Malkin's and Oltmann's statements alleged that Coomer participated in an Antifa conference call; that Coomer stated on this call his intent to subvert the presidential election; and that Coomer then did in fact subvert the election.[139] Oltmann began the first Malkin interview by repeating his previous statements regarding Coomer's alleged participation in the Antifa conference call, and Malkin stated that her interview with Oltmann provided her audience with "information vital to the systemic stealing of the

---

[132] There is evidence to support a strong inference that Oltmann fabricated his account.
[133] *See* Ex. V-1, Demand for Retraction.
[134] *See generally* Ex. A-1.
[135] *See* Ex. F-1, PX 15; PX 17.
[136] *See* Ex. F-1, Malkin, July 27, 2021 Depo. Tr. at 85:21-87:17.
[137] *Id.* at 30:20-22.
[138] *See* Ex. F-1, PX 15.
[139] *See* Ex. F-3, #MalkinLive Tr. at 5:2-23; 15:5-11; 20:12-21:7; 26:24-27:9.

election."[140] Referring to Coomer's alleged participation in the Antifa call, Malkin claimed Oltmann "got to hear the unhinged rantings of this lunatic in charge of security at Dominion Voting Systems."[141] After identifying Coomer as the anonymous "Eric," Malkin and Oltmann discussed their allegations of criminal conduct against Coomer, with Oltmann explicitly stating that Coomer committed treason and should be put to death.[142]

38.     Throughout the interview, both Malkin and Oltmann insisted they were presenting facts. Malkin presented Oltmann as an "eyewitness account of the fraud that's going on"[143] and noted that Oltmann had been censored by Twitter for "telling the truth."[144] Should anyone be confused and interpret his claims as hyperbole, Oltmann repeated that "It is truth, a hundred percent truth"[145] and that he "[was] not making any of this up."[146]

39.     Malkin began repeatedly publishing these allegations against Coomer across numerous media platforms including YouTube and Twitter. In two consecutive tweets posted on November 13, 2020, Malkin posted a link to the Oltmann interview followed by her statement, "Joe Oltmann speaks out about Dominion Systems, Antifa radical Eric Coomer & Twitter's suspension of his account!"[147] Hours later, Malkin posted another series of tweets promoting the interview and repeating Oltmann's claims:

> Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop-hatred inciting rants of #EricCoomer, VP of strategy/security of Dominion Voting

---

[140] *Id.* at 2:1-9.
[141] *Id.* at 20:12-21:7.
[142] Ex. F-3, #MalkinLive Tr. at 26:24-27:9.
[143] *Id.* at 2:23-3:9.
[144] *Id.*
[145] *Id.* at 13:10-19.
[146] *Id.* at 15:5-8.
[147] *See* Ex. A-1, pub. 6.

Systems. "What if I told you he is a major shareholder" in Dominion & "owns patents associated with other voting systems?"[148]

Full interview with #joeoltmann on #ericcoomer #dominion here ==>[149]

What are they trying to hide? #DominionVotingSystems" [links to now deleted tweet from Joey Camp][150]

40.     Throughout the following week, Malkin published multiple tweets promoting the Oltmann interview and Coomer-related hashtags. On November 15, 2020, Malkin wrote, "ICYMI – Dominion, Antifa, and #EricCoomer exposed by Joe Oltmann on #MalkinLive last week."[151] On November 16, 2020, Malkin posted a link to an article from The Gateway Pundit that identified Coomer as an "unhinged sociopath" and wrote, "ICYMI: #ExposeDominion #WhoIsEricCoomer #JoeOltmann."[152] On November 19, 2020, Malkin published another series of tweets linking the Oltmann interview, and stating "In case you missed it: My interview with #joeoltmann from six days ago exposing #EricCoomer    #Antifa    #Expose    Dominion"    and    "#ExposeDominion #ExposeEricCoomer."[153]

41.     On November 28, 2020, Malkin interviewed Oltmann on her Newsmax program "Sovereign Nation."  Malkin introduced Oltmann to her audience by stating:

Who has control over our elections? Who has dominion over our votes? Is it we the people or is it the electronic voting oligarchs? Without full election transparency, there can be no election peace. Next up, Denver businessman Joe Oltmann joins me to discuss his shocking discoveries about Dominion vice president of strategy and security, Eric Coomer, plus much more. Stay

---

[148] *See* Ex. F-4.
[149] *See* Ex. F-1, PX 20.
[150] *See* Ex. F-1, PX 21.
[151] *See* Ex. F-1, PX 22.
[152] *See* Ex. F-1, PX 23.
[153] *See* Ex. F-1, PX 24.

tuned.[154]

42.     Malkin specifically invited Oltmann to discuss Coomer, stating, "I want you to tell our audience at Sovereign Nation who exactly Eric Coomer is and why it matters in these ongoing battles against election fraud across the country."[155] Upon review of these publications, the substance of Malkin's and Oltmann's statements alleged that Coomer participated in an Antifa conference call; that Coomer stated on this call his intent to subvert the presidential election; and that Coomer then did in fact subvert the election. Gone from Oltmann's retelling was any suggestion that Oltmann could not be sure that Coomer was the individual on the alleged Antifa conference call. Instead, Oltmann stated:

> So, Eric Coomer is the Director of Strategy and Security for Dominion Voting Systems. He's also affiliated with or a part of the Antifa movement, and frankly, he has the ability – he has a doctorate in nuclear physics and has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country.[156]

43.     Despite later acknowledging that she had no working theory of how Coomer could have rigged the election,[157] Malkin emphasized the seriousness of Oltmann's allegations and in so doing, again accused Coomer of committing election fraud: "And the reason why this is so alarming -- and it's obvious, but it should be spelled out -- is that this is one of the highest ranking officials at Dominion Voting Systems, which has penetrated our election system across the country and of course around the world."[158] Oltmann agreed, asserting that "[Coomer] truly is the mastermind" and that "he's a large

---

[154] *See* Ex. F-1, PX 17; Ex. A-1, pub. 41.
[155] *Id.*
[156] *Id.*
[157] *See* Ex. F-1, Malkin, July 27, 2021 Depo. Tr. at 73:18-25.
[158] *See* Ex. F-1, PX 17; Ex. A-1, pub. 41.

shareholder in Dominion Voting Systems."[159] To date, Malkin has not put forward any evidence in support of her statements about Coomer. Further, Malkin specifically named Coomer in relation to her allegations of election fraud, making Coomer the face of the Dominion conspiracy theory.[160]

44.     Given Oltmann's lack of personal knowledge, lack of expertise, and lack of evidence in support of his allegations against Coomer, Malkin had sufficient reason to know Oltmann was an unreliable source. Malkin testified that she had listened to "snippets" of Oltmann's podcast and that she was aware that he had been suspended by Twitter prior to her interview of him.[161] Oltmann's suspension from Twitter and the publicly available contents of Oltmann's podcast should have informed Malkin that Oltmann was not a credible or objective source for any first-hand report regarding election fraud.[162] Further, Oltmann had disclosed to Malkin that his allegations were based on unknown and unverified participants on an unknown and unverified call.[163] Malkin failed to ask Oltmann about how he accessed the alleged Antifa call,[164] about the notes he claims he took during the call,[165] or about the identities of the other alleged participants, even though these alleged participants would have been able to corroborate or discredit Oltmann's allegations.[166] Malkin has admitted that she had not investigated

---

[159] *Id.*
[160] *See generally* Ex. F-1, PX 15; PX 17.
[161] *See* Ex. F-1, Malkin, July 27, 2021 Depo. Tr. at 10-12.
[162] Ex. B-10, Oltmann, et al., Conservative Daily Podcast (Nov. 5, 2020) and Ex. B-11, Oltmann, et al., Conservative Daily Podcast (Nov. 6, 2020).
[163] *See* Ex. F-3, #MalkinLive Tr. at 4:24-5:23.
[164] *See generally* Ex. F-3; Ex. F-1, PX 17; Malkin Mot. at Ex. A-2.
[165] *See* Ex. F-1, Malkin, July 27, 2021 Depo. Tr. at 70:2-7.
[166] *Id.* at 71:8-22; 126:8-20.

Oltmann's allegations[167] nor attempted to contact Coomer or Dominion[168] or any other alleged call participants[169] before inviting Oltmann to appear on both of her programs.

45.     Malkin conceived of a fictious storyline regarding the results of the presidential election, which is reflected in her allegations of elections fraud leading up to and after the election. [170] Malkin consciously set out to conform her allegations against Coomer to that storyline, given her wholly unwarranted reliance on Oltmann, failure to investigate, and disregard of authoritative sources rejecting all fraud allegations.[171]

46.     Malkin had both political and financial motivations to delegitimize the results of the election. Malkin is a supporter of former president Trump[172] and gained national exposure advancing allegations of fraud in relation to the election and against Coomer.[173] Malkin's publications were relied upon by other defendants, including Hoft-TGP, Metaxas, OAN-Rion, and Powell et al., in publishing their own allegations against Coomer.[174]

47.     Malkin has not retracted any of her publications about Coomer, and they remain publicly available to this day.[175]

---

[167] *Id.* at 16:23-17:18; 29:22-30:4.
[168] *Id.* at 70:15-22; 71:8-22; 72:7-24.
[169] *Id.* at 126:8-20.
[170] *See* Ex. F-5; F-6.
[171] *See* Ex. F-1, Malkin, July 27, 2021 Depo. Tr. at 73:1-16; 109:14-110:2.
[172] *See generally* Ex. F-1, PX 15; PX 17.
[173] *Id.*
[174] *See* Ex. E-1, Hoft-TGP, Aug. 10, 2021 Depo. Tr. at 30:3-15, 33:6-34:17, 37:19-38:2, 124:10-21; Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 69:18-70:2; Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 15:21-16:1, 18:12-19:7, 73:16-20, 81:16-82:15, 115:2-7, 116:23-117:17, 150:14-19, 160:15-23; Ex. I-1, OAN, July 30, 2021 Depo. Tr. at 11:22-12:21, 14:6-14, 28:17-22, 30:17-19, 62:4-9; Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 10:14-21, 11:20-12:1, 15:10-18, 26:15-27:4, 41:13-16, 57:22-58:3, 65:22-66:8, 72:15-23, 73:8-15, 88:22-89:6, 92:11-22, 96:4-16, 98:10-15, 108:22-109:7.
[175] *See* Ex. V-1, Demand for Retraction.

### D.      James "Jim" Hoft and TGP Communications, LLC

48.     Hoft is the founder and editor of TGP, a political website and blog conducting business under the trade name The Gateway Pundit.[176] As a founder, editor, and contributing author, Hoft is an authorized representative for TGP.[177]

49.     Shortly after the presidential election, on November 13, 2020, Hoft-TGP began publishing articles and interviews based on Oltmann's allegations against Coomer.[178] Hoft personally authored most of TGP's numerous articles discussing Coomer and approved the rest before publication.[179] Upon review of these publications, the substance of Hoft-TGP's statements alleged that Coomer participated in an Antifa conference call; that Coomer stated on this call his intent to subvert the presidential election; and then did in fact subvert the election.[180] Hoft-TGP's allegations against Coomer are first found in the article titles:

> Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote[181]

> Report: Anti-Trump Dominion Voting Systems Security Chief was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online[182]

> Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile Is Being Deleted and Erased[183]

---

[176] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 7:13-18; 9:8-11.
[177] *Id.*
[178] *See* Ex. E-1, PX 86; Ex. E-1, PX 87; Ex. E-3.
[179] *Id.*; *see also* Ex. E-4-14; Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 9:8-11.
[180] *See* Ex. E-1-14.
[181] *See* Ex. E-1, PX 86.
[182] *See* Ex. E-1, PX 87.
[183] *See* Ex. E-3.

BREAKING: SECOND VIDEO REVEALED of Dominion Voting System's Eric Coomer Explaining to Elections Officials How to Switch Votes (VIDEO)[184]

BALD-FACED LIES: Dominion Says Assertions of Vote Switching Are 'Completely False' – But We Have Two Videos of Dominion Executive Eric Coomer Showing How to Switch Votes[185]

Developing: Dominion's Anti-Trump Executive Eric Coomer Owns Patents on Adjudication Process That Investigators Found Skimmed Votes from Trump in Michigan[186]

WAKE UP AMERICA! Bold Billionaire Offers $1 Million Bounty for Dominion's, Eric Coomer's Comeuppance[187]

50.     The articles themselves are replete with similar allegations.  On November 14, 2020, Hoft-TGP stated that Coomer participated in "Antifa Calls" and relied on the November 13, 2020 #MalkinLive interview in alleging that Oltmann infiltrated an Antifa call and discovered Coomer's participation.[188]  On November 16, 2020, Hoft-TGP restated Oltmann's previous allegations but went on to state that Coomer is "mentally ill and a sociopath," "an unhinged Trump hater and Antifa supporter," and a "lunatic."[189]  Hoft-TGP made similar statements again on December 27, 2020.[190]   Hoft-TGP specifically named Coomer in relation to their allegations of election fraud, making Coomer the face of the Dominion conspiracy theory.[191]

51.     Hoft-TGP repeatedly imputed criminal conduct to Coomer. On November

---

[184] *See* Ex. E-4.
[185] *See* Ex. E-8.
[186] *See* Ex. E-10.
[187] *See* Ex. E-11.
[188] *See* Ex. E-1, PX 87.
[189] *See* Ex. E-3.
[190] *See* Ex. E-10.
[191] *See generally* Ex. E-1-14.

27, 2020, Hoft-TGP published photos and videos of Coomer alongside statements like "Dominion Voting Systems is in a panic as more and more Americans learn of their role in stealing the 2020 election from President Donald Trump."[192] On December 17, 2020, Hoft-TGP published an article entitled "More on Dominion Voting Machines: They Could Easily Duplicate Votes and Security Threats Were Virtually Ignored" that included statements like "there may be a good case for perjury" against Coomer.[193]  On December 28, 2020, Hoft-TGP published an article alerting its readers to a "bounty" for Coomer's "comeuppance" and stating that Coomer "can be seen in training videos explaining to users 'adjudication' functions on the vote machine that could allegedly be used to alter votes, singularly or in bulk, if a nefarious user chose to do so."[194] This video does not support the allegations made against Coomer and, instead, appears intentionally edited to include only limited and misleading excerpts of a longer presentation.[195] Coomer has put forward evidence these excerpts are misleading and do not accurately describe the adjudication process or its purpose.[196] On January 4, 2021, Hoft-TGP published another photo of Coomer alongside statements describing the updates to Georgia's voting machines as "illegal."[197]

52.    Hoft-TGP and Oltmann have insisted they were presenting facts. On November 13, 2020, Hoft-TGP stated that "Joe Oltmann did a deep dive on Eric Coomer"

---

[192] *See* Ex. E-8.
[193] *See* Ex. E-9.
[194] *See* Ex. E-11.
[195] *Id.*
[196] *See* Ex. A, Coomer Dec. at ¶¶ 5-7; *see also* Ex. O, Halderman Dec. at ¶¶ 35-48.
[197] *See* Ex. E-1, PX 88.

and described Oltmann as the only one "investigating [Dr.] Coomer, his far left background and his role at Dominion."[198]  In an audio interview on November 16, 2020, Hoft said to Oltmann: "You have information that's truthful and should be released and is very much, there's nothing wrong with it and they're going to just shut you down because you're exposing absolute fraud."[199]

53.     Hoft-TGP's articles and interviews about Coomer were published on TGP's website, as well as republished across other media platforms.[200] To date, Hoft-TGP have not put forward any evidence in support of their statements about Coomer.[201]

54.     Given Oltmann's lack of personal knowledge, lack of expertise, obvious lack of credibility, and lack of evidence in support of his allegations against Coomer, Hoft-TGP had sufficient reason to know Oltmann was an unreliable witness. Oltmann had disclosed to Hoft-TGP that his allegations were based on unknown and unverified participants on an unknown and unverified call.[202] Oltmann admitted on his own podcast that he could not be positive that Coomer was the Eric speaking on the Antifa call. Yet Hoft-TGP relied almost exclusively on Oltmann as their only source and admitted that they have never attempted to find corroborating evidence.[203] Hoft-TGP never attempted to contact Coomer, asked to see the notes Oltmann claims he took during the call, or asked about the identities of the other alleged participants.[204]

---

[198] *See* Ex. E-1, PX 86.
[199] *See* Ex. E-3a.
[200] *See* Ex. F-1, PX 23; *see also See* Ex. I-1, PX 33.
[201] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 46:15-17; 51:6-10.
[202] *See* Ex. E-3a.
[203] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 32:17-33:6.
[204] *Id.* at 20:25-21:22, 32:13-24; 50:4-7.

55.     Hoft-TGP conceived of a storyline regarding the results of the presidential election, which is reflected in their allegations of elections fraud leading up to and after the election.[205]  Hoft-TGP consciously set out to conform their allegations against Coomer to that storyline, given their unreasonable reliance on Oltmann, failure to investigate, and disregard of authoritative sources rejecting all fraud allegations. Hoft-TGP financially benefitted from this conduct as their post-election coverage resulted in increased subscriptions, increased advertising revenue, and notoriety as a pro-Trump grassroots leader.[206] Hoft-TGP have not retracted any of their publications about Coomer, and they remain publicly available to this day.[207]

## E.     *Eric Metaxas*

56.     Metaxas is the host of the radio program and podcast called The Eric Metaxas Radio Show. He views himself as a "variety show host" type of figure and acknowledges that there are no journalistic standards for his show and neither he nor his staff does anything to research or vet the reliability or veracity of the guests or information he puts forth on his program.[208] Metaxas is employed by Salem Media, which broadcasts his program on various media networks and platforms across the United States.[209] A video version of The Eric Metaxas Radio Show is published on YouTube.[210]

57.     On November 24, 2020, Metaxas interviewed Oltmann on The Eric Metaxas

---

[205] *Id.* at 62:18-64:11; 66:19-69:21.
[206] *See* Ex. E-1, Hoft, Aug. 10, 2021 Depo. Tr. at 73:4-74:20.
[207] *See* Ex. V-1, Demand for Retraction.
[208] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 11-16.
[209] *See* Pl.'s Resp. to Metaxas 12(b)(2) Mot. at Coomer Dec., at ¶¶ 6, 9.
[210] *See* Ex. G-1, PX 97 at 15:18-23.

Show during a segment called "Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss."[211] The substance of both Metaxas's and Oltmann's statements alleged that Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did in fact subvert the election.[212] These statements started almost immediately as Metaxas introduced the segment: "Eric Coomer also seems to be so viciously, insanely anti-Trump that Eric Coomer of Dominion is also involved with Antifa. We just thought we'd get Joe Oltmann to tell the story."[213] Oltmann repeated his previous statements regarding Coomer's alleged participation in the Antifa conference call.[214] Oltmann continued, "We were dealing with a person that could put his finger firmly on the American voice and tip the scale of the election very easily, and that frankly he was doing it."[215] Not only did Metaxas endorse Oltmann's allegations, he went on to claim Coomer is "pro-Antifa, despises not just Donald Trump, but it seems to me if you're pro-Antifa, despises America."[216] Metaxas continued, comparing Coomer to the Unabomber and "Marxist shock troops" and implying he is evil, anti-American, and "flirt[s] with insanity and violence."[217] Metaxas specifically named Coomer in relation to his allegations of election fraud, making Coomer the face of the Dominion conspiracy theory.[218]

58.     Metaxas went on to state Coomer had engaged in criminal conduct:

Well, there's levels of stupidity and evil and we know that not everybody is

---

[211] *See* Ex. G-2; Ex. G-1, PX 97 at 2:8-17.
[212] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 5:7-8:6; 14:7-16; 28:22-29:23.
[213] *Id*. at 2:8-16.
[214] *Id*. at 5:7-8:6.
[215] *Id*. at 14:7-16.
[216] *Id*. at 11:6-8.
[217] *Id*. at 15:2-9.
[218] *See generally* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr.; Ex. G-2.

on the same level, that there are some people that they just hate Trump but then there are other nefarious actors like Mr. Coomer and others who, you know, they're -- it's hard to know what to say other than there is wickedness, there is evil here because nothing that they're doing, even if you hate Trump, I have many friends who hate Trump, but they would never do what we're talking about. What we're talking about is evil. In fact, let's just say this. It's extremely criminal and these folks know they're going to go to jail for the rest of their lives.[219]

. . .

Eric Coomer, has he gone into hiding? What is he thinking? Does he know he's going to go to prison for the rest of his life?[220]

59.    During the interview, Oltmann repeatedly alleged that he was presenting facts: "[T]his isn't all made up. This isn't hyperbole that we're just throwing out there. This is absolute fact."[221] Metaxas emphasized the alleged significance of Oltmann's claims to the wider narrative of election fraud surrounding the 2020 election:

The idea that anyone would dare to try to mess with our elections, many patriots have died, suffered and died so that we could have what we have, and I cannot think of anything more despicable and more worthy of our doing everything we can, including give our lives if necessary to fight for this. And so that's why I'm so glad to be speaking with you and getting this information out. People need to understand. I keep saying we need a thousand Paul Revere's to get this information out. This is utterly unacceptable. There's no way that anyone will accept the presidency of Joe Biden under this black cloud now unless they can prove that this was a fair election, there is no way the American people with all this evidence coming out are going to accept it.[222]

60.    Metaxas went on to promote the November 24, 2020 interview on Twitter, where he included a link to the interview and wrote, "Today Joe Oltmann explained how after infiltrating Antifa he bumped into someone working w/them named Eric Koomer

---

[219] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 28:22-29:10.
[220] *Id.* at 26:13-16.
[221] *Id.* at 28:14-16.
[222] *Id.* at 22:8-24.

[sic] – who was the head of Security and Safety at #Dominion – and who PROMISED the Antifa folks that "effing" Trump WOULD NOT WIN! Please RT."[223]

61.     Given Oltmann's lack of personal knowledge, partisanship and obvious lack of credibility as a first-hand fact witness, lack of expertise, and lack of evidence in support of his allegations against Coomer, Metaxas had sufficient reason to know Oltmann was an unreliable witness. Oltmann had disclosed to Metaxas that his allegations were based on unknown and unverified participants on an unknown and unverified call.[224] Metaxas failed to ask Oltmann about how he accessed the alleged Antifa call, about the notes he claims he took during the call, or about the identities of the other alleged participants, even though these participants would have been allegedly able to corroborate Oltmann's allegations.[225] Metaxas knew what Oltmann intended to discuss on his show but admitted that he had not investigated Oltmann's allegations[226] nor attempted to contact Coomer or Dominion or any other alleged call participants before inviting Oltmann to appear on his program.[227]

62.     Metaxas conceived of a storyline regarding the results of the presidential election, which is reflected in his allegations of elections fraud leading up to and after the election.[228] For example, on November 7, 2020, soon after the election was called for President Biden, Metaxas had already claimed that "If an election bears signs of fraud –

---

[223] *See* Ex. G-5.
[224] *See* Ex. G-1, PX 97 at 5:7-8:6.
[225] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 28:5-19.
[226] *Id.* at 21:10-23;11-20.
[227] *Id.* at 28:5-19; 30:3-20.
[228] *See* Ex. G-9*;* Ex. G-5.

so that the will of the people was thwarted – it is not an official election. STAY TUNED. And pray. This is absolutely not over, despite what some seem to think. The American people will not roll over."[229] Metaxas consciously set out to conform his allegations against Coomer to this storyline, given his unreasonable reliance on Oltmann, failure to investigate, and disregard of authoritative sources rejecting all fraud allegations.[230]

63.     Metaxas had both political and financial motivations to delegitimize the results of the election. Metaxas is a supporter of former president Trump[231] and sought national attention advancing allegations of fraud in relation to the election and against Coomer.[232]

64.     Metaxas has not retracted any of his publications about Coomer, and they remain publicly available to this day.[233]

### F.     OAN and Chanel Rion

65.     Herring Networks, Inc. owns and operates OAN, a national conservative news network with bureaus in San Diego and Washington D.C.[234] Charles Herring and the Herring family own OAN and exercise direct control over the content published by OAN.[235] Rion is OAN's Chief White House Correspondent.[236] Rion produces and hosts program specials that are nationally broadcast on OAN and often posted on Rion's

---

[229] *Id.*
[230] *See* Ex. G-1, Metaxas, Aug. 13, 2021 Depo. Tr. at 39:15-25; 46:19-47:1; 73:21-74:21.
[231] *See generally* Ex. G-1; G-2.
[232] *See generally* Ex. G-1; G-2; G-3; G-4; G-5; G-6; G-7; G-8; G-9.
[233] *See* Ex. V-1, Demand for Retraction.
[234] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 63:25-65:2; 66:19-67:6.
[235] *See* Ex. I-1, OAN, July 30, 2021 Depo. Tr. at 10:17-11:6; *see also* Ex. R, Golingan Dec. at ¶¶ 5, 14; Ex. C.
[236] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 30:20-25.

personal website and YouTube.[237] Rion began working for OAN in 2019[238] and has no formal journalism training.[239]

66.    OAN was one of the first entities that Oltmann reached out to with his claims about Coomer. On the morning of November 10, 2020, the day after Oltmann originally published his allegations against Coomer on the Conservative Daily, he informed OAN that he had "massive amounts of information on Eric Coomer."[240] In a follow up email that same afternoon, Oltmann wrote, "Now I want to start [sic] that I cannot verify on this call that it is the same Eric but let me tell you as I jotted down notes what I discovered."[241] In this same follow-up email, Oltmann indicates that he has notes from the alleged Antifa call, and he describes what some of his notes say.[242] Within days, Oltmann was in contact with Rion, who was preparing a story on Dominion Voting Systems.[243] Rion did not know who Coomer was at the time and had to familiarize herself with his role at Dominion.[244] On November 15, 2020, Rion told Oltmann that she was "working with Rudy [Giuliani] and Sidney [Powell]" and that she "would like to include [him] in the special."[245]

67.    On November 17, 2020, Rion tweeted #EricCoomer alongside "Trump

---

[237] *Id.*
[238] *Id.* at 30:10-19.
[239] *Id.* at 29:10-14.
[240] *See* Ex. I-1, PX 34.
[241] *See* Ex. I-1, PX 35.
[242] The notes, as described by Oltmann in this email (PX 35), do not match the handwritten notes that Oltmann has produced in this litigation (Ex. F-2).
[243] *See* Ex. I-1, PX 37.
[244] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 115:2-23.
[245] *See* Ex. I-1, PX 37.

won't win. I made F***ing sure of that."[246] The tweet attached another tweet from Ron Watkins, former administrator of the online message board 8chan, that claimed Dominion's voting software "Allows staff to adjust tally based on review of scanned ballot images."[247] On November 21, 2020, Rion tweeted again, this time promoting her program "Dominion-izing the Vote" and claiming that the FBI should have been investigating Dominion employees.[248]

68.     OAN broadcast Rion's "Dominion-izing the Vote" on November 21, 2020.[249] This program was an "H Story" required by Charles Herring to be given priority broadcasting.[250] The report included an interview with Ron Watkins, who OAN-Rion claimed was a "large systems technical analyst", misleadingly implying that he had experience with voting machine systems. Watkins stated that "your vote doesn't matter in these districts with the Dominion machines in them, because these 2-6 people trained by Dominion have ultimate control." OAN-Rion concluded the Watkins segment by wondering aloud, "to what extent was this actually designed by the top, on purpose?"[251] This segue led into an interview with Oltmann that focused on Coomer.

69.     In the pre-recorded interview, OAN-Rion introduced Oltmann by stating, "Joe, you infiltrated an antifa conference call this past September and accidentally came upon a top Dominion Voting Systems executive named Eric Coomer. Describe your call and what it led you to find." Oltmann then proceeded to repeat his claims about Coomer,

---

[246] *See* Ex. I-1, PX 33.
[247] *Id.*
[248] *See* Ex. A-1, pub. 32.
[249] *See* Ex. I-1, PX 32.
[250] *See* Ex. R, Golingan Dec. at ¶ 14; Exs. A-E.
[251] *See* Ex. I-1, PX 32.

specifically that Coomer was on an Antifa conference call, that Coomer stated on that call that he had rigged the election, and that Coomer did in fact rig the election. Rather than challenge Oltmann's allegation that Coomer "tipped the scales of the election," Rion stated, "In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters. What does he mean when he says 'Trump won't win. I made f-ing sure of that? Nothing?"[252] Referencing Coomer, Rion went on to state that Dominion's "antifa drenched engineers are hell bent on deleting half of America's voice."[253] OAN-Rion named Coomer in relation to their allegations of election fraud, making him the face of the Dominion conspiracy theory.[254]

70.    On November 24, 2020, OAN again used its official Twitter account to promote the Rion interview with Oltmann: "Dominion executive: Trump is not going to win. I made f***ing sure of that. [YouTube link] via @YouTube @ChanelRion #OANN."[255]

71.    Given Oltmann's lack of personal knowledge, partisanship and obvious lack of credibility as a first-hand fact witness, the contradictions between Oltmann's own November 10th description of his notes of the Antifa call and handwritten notes ultimately produced by Oltmann, Oltmann's lack of expertise in election security matters, and his lack of evidence in support of his allegations against Coomer, OAN-Rion had sufficient reason to know Oltmann was an unreliable witness. Oltmann had disclosed to OAN-Rion that his allegations were based on unknown and unverified participants on an unknown

---

[252] *Id.*
[253] *Id.*
[254] *See id.*
[255] *See* Ex. A-1, pub. 38.

and unverified call,[256] and he had explicitly stated that he could not confirm whether or not the "Eric" on the alleged call was actually Coomer.[257] OAN-Rion failed to ask Oltmann about how he accessed the alleged Antifa call,[258] about the notes he claims he took during the call, or about the identities of the other alleged participants, even though these participants would have been allegedly able to corroborate Oltmann's allegations.[259] OAN was aware that there was no video or audio recording of the call[260] and that Oltmann claimed to have accessed the Antifa call through Heidi Beedle, yet ignored her as a potential source to corroborate Oltmann's allegations.[261] Rion failed to verify the credibility of her sources for "Dominion-izing the Vote," including Ron Watkins.[262] Rion has admitted that she had not investigated Oltmann's allegations nor attempted to contact Coomer or Dominion[263] or any other alleged call participants[264] before inviting Oltmann to appear on OAN. OAN published the "Dominion-izing the Vote" segment, knowing it was false.[265]

72.     OAN-Rion conceived of a storyline regarding the results of the presidential election, which is reflected in their allegations of elections fraud leading up to and after the election.[266] To this end, OAN reporters worked closely with Giuliani and the Trump

---

[256] *See* Ex. I-1, PX 35.
[257] *Id.*
[258] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 78:21-79:5.
[259] *Id.* at 79:22-80:17; 80:23-81:15; 84:1-13.
[260] *See* Ex. I-1, OAN, July 30, 2021 Depo. Tr. at 21:20-22:9.
[261] *Id.* at 27:17-23; 32:24-34:5.
[262] *See* Ex. R, Golingan Dec. at ¶ 11; *see generally* Exhibit P, Rothschild Dec.
[263] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 89:13-90:20.
[264] *Id.* at 80:8-81:15.
[265] *See* Ex. R, Golingan Dec. at ¶¶ 5, 12-15, 17.
[266] *See* Ex. I-2; I-3; I-4; Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 40:11-41:21.

Campaign, with any reporting by OAN reporter, Christina Bobb, being subject to the Trump Campaign's express approval.[267] OAN-Rion maliciously and consciously set out to conform their allegations against Coomer to that storyline, concealing their wholly unreasonable reliance on Oltmann, failure to investigate, and disregard of authoritative sources rejecting fraud allegations.

73.     OAN-Rion had political and financial motivations to delegitimize the results of the election. OAN-Rion sought national exposure promoting support for former president Trump and in advancing allegations of fraud in relation to the election and against Coomer.[268]

74.     OAN-Rion has not retracted any of their publications about Coomer, and they remain publicly available to this day.[269]

### G.    *Sidney Powell, Powell, P.C., and Defending the Republic*

75.     Powell is an attorney practicing out of Dallas, Texas.[270] Powell, P.C. is Powell's law firm.[271] Defending the Republic is a Texas-based 501(c)(4) corporation directed and represented by Powell and Powell, P.C.[272] Powell formed Defending the Republic as a fundraising organization and website in order to solicit donations to fund her election-related litigation.[273]

---

[267] *See* Ex. H-1, Rion, Aug. 9, 2021 Depo. Tr. at 30:4-20.
[268] *See generally* Ex. A-1, pub. 32, 38; Ex. I-1, PX 32-33.
[269] *See* Ex. V-1, Demand for Retraction.
[270] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 25:1-3, 115:17.
[271] *Id*. at 8:9-12.
[272] *See* Ex. L-1, DTR, Aug. 4, 2021 Depo. Tr. at 13:10-17, 14:11-13.
[273] In a November 10, 2020 appearance on Lou Dobbs' show, Powell directed viewers to DTR's website stating, "I'm starting a website called DefendingtheRepublic.org where people can donate to the fund because I want this fraud fully prosecuted on behalf of the voters and the American people."

76.     Throughout the relevant time period, Powell interchangeably acted individually and on behalf of the Trump Campaign, Defending the Republic, and Powell, P.C.[274] Former president Trump tweeted on November 14, 2020 that Powell was on the legal team, and Giuliani introduced her as a part of the team at the November 19, 2020 press conference.[275] When asked whether she was working with Giuliani at that time, Powell's response was "Yes and no."[276]

77.     A Defending the Republic website appears to have been established as early as November 10, 2020, and was promoted on Fox News' Lou Dobbs Tonight on November 10, 2020.[277] The site was used to solicit funds for Powell's litigation, which included generating Oltmann's affidavit regarding Coomer.[278] While Powell testified that she was representing Powell, P.C. in her legal efforts to overturn the election, she hoped to be paid from Defending the Republic donations at some point.[279]

78.     On November 19, 2020, the Trump Campaign provided an update on its legal challenges to the election from the Republican National Committee in Washington, D.C.[280]  Among those who spoke at the press conference were personal attorneys for former president Trump and then attorneys for the Trump Campaign, Powell, Giuliani, and Jenna Ellis.

79.     Upon review of this publication, the substance of Powell's statements

---

[274] *Id*.; *see also* Ex. M-3; Ex. K-1, PX 5 (identifying Powell as "Attorney for President Trump").
[275] *See* Ex. K-1, PX 6, PX 3.
[276] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 21:10-19.
[277] *See* Ex. L-2.
[278] *See, e.g.*, Ex. K-5 (promoting the "Kraken" suits in Georgia and Michigan, referring to Powell as the "KRAKEN RELEASER", and seeking donations to Defending the Republic as a 501(c)(4) organization).
[279] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 98:21-99:4; 101:16-102:1.
[280] *See generally* Ex. K-1, PX 3.

alleged that Coomer participated in an Antifa conference call, that the call was recorded, that Coomer stated he had rigged the election for Joe Biden and was "going to f- Trump," and that Coomer had in fact rigged the election.[281] Powell also alleged incorrectly that Coomer was a member of Smartmatic.[282]

80.    As the press conference continued, Powell continued making other allegations about Dominion and Smartmatic, saying that "people can [ ] go in and change whatever they want," and that the ratio of votes could be weighted by the use of an alleged algorithm.[283] Powell declared that votes were "injected into the machine."[284] Powell made numerous allegations about hacking, mentioning another algorithm for "vote-flipping."[285] Powell also appeared to refer to the video of Coomer explaining the adjudication process, falsely stating there was video of "him" admitting that they changed a million votes with no problem.[286] Coomer is the only person Powell specifically named during her speech, making him the face of the Dominion and Smartmatic conspiracy theory.[287]

81.    On November 20, 2020, Newsmax host Howie Carr interviewed Powell on "The Howie Carr Show."[288] During that interview, Carr asked Powell whether Coomer had actually stated: "Don't worry about President Trump, I already made sure that he's going to lose the election." Powell responded by asserting the alleged facts were true: "Yes, it's

---

[281] *See* Ex. K-1, PX 3 at 35.
[282] *Id.*
[283] *See* Ex. K-1, PX 3 at 32:4-33:3.
[284] *Id.* at 33:9-13.
[285] *Id.* at 33:1-34:22; *see also* Ex. E-1, PX 86.
[286] *See* Ex. K-1, PX 3 at 34:23-35:1.
[287] *See generally* Ex. K-1, PX 3.
[288] *See* Ex. K-4.

true. We have an affidavit to that effect, and I think we have a copy of the call."[289] Powell also closed her appearance by implying that Coomer had committed a crime: "It's called a confession in a courtroom, it's called a confession."[290]

82.     The same day, Powell appeared on Fox News' Mornings with Maria Bartiromo where she alleged she had "Eric Coomer admitting on tape that he rigged the election for Biden and hated Trump."[291] Powell also alleged she had pictures of Coomer "in other countries helping people rig elections," that Coomer had a long history of doing so, and that "I'm sure that it's for money."[292]

83.     Powell had sufficient reason to know Oltmann was an unreliable witness. During her deposition, Powell stated that she learned of the accusations against Coomer from the #MalkinLive interview with Oltmann and Oltmann's affidavit.[293] Oltmann disclosed in that interview his lack of personal knowledge, experience, and evidence as well as his personal motivations. Further, to this day, Powell cannot articulate what role Coomer would have played in any election fraud.[294] Instead, she referred to Coomer as a "gnat in the tsunami of information that was being thrown at me."[295]

84.     Powell believed she was provided Oltmann's affidavit by Jenna Ellis, who was working with Giuliani.[296] Powell claimed she was unaware that Joe Oltmann hosted a podcast or had advanced election fraud disinformation in favor of former president

---

[289] *Id.*
[290] *Id.*
[291] *See* Ex. K-1, PX 5.
[292] *See Id.*
[293] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 10:14-22, 15:10-16:10.
[294] *Id.* at 12:2-9; 13:2-8; 97:10-17.
[295] *Id.* at 13:16-17.
[296] *Id.* at 30:2-4.

Trump.[297] Powell did not ask Oltmann how Coomer would have influenced the outcome of the election.[298] Powell did not vet Oltmann's affidavit or its contents other than watching his interview with Malkin.[299] The only thing Powell claims to have known about Oltmann was what was in that interview and his affidavit.[300] Powell never reached out to Coomer to verify any information regarding her allegations.[301]

85.     Instead, Powell et al. conceived of a storyline regarding the results of the presidential election, which is reflected in their allegations of the elections fraud leading up to and after the election. Powell et al.'s allegations regarding Coomer and Dominion were very similar to allegations Powell had made prior to the election regarding a program called "Hammer and Scorecard" that would have allegedly been able to switch 3% of the national presidential election vote total.[302] Further, Powell et al.'s allegations of fraud immediately after the election continued to advance similar allegations of fraud before focusing on Coomer and Dominion.[303]

86.     When discussing her unfounded claims of election fraud, Powell neglected to read any of the sources rebutting accusations of election fraud, such as the CISA report, the Michigan report, or the statements of Attorney General Barr.[304]

87.     Powell et al. had both political and financial motivations to delegitimize the

---

[297] *Id.* at 125:22-126:20.
[298] *Id.* at 14:21-15:2.
[299] *See id.* at 27:15-28:18.
[300] *Id.* at 32:3–34:4.
[301] *Id.* at 58:4–19.
[302] *See id.* at 104:21-107:10.
[303] *See* Ex. K-6.
[304] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 94:12-96:3.

results of the election. Powell is a supporter of former president Trump.[305] Powell et al. gained national exposure advancing allegations of fraud in relation to the election and against Coomer.[306] Powell et al.'s allegations accompanied and furthered her efforts to raise funds for Defending the Republic.[307]

88.     Powell et al. have not retracted any of their publications about Coomer, and they remain publicly available to this day.[308]

## H.     *Rudolph Giuliani*

89.     Giuliani is an attorney that was licensed in the state of New York with his practice based in New York City.[309] He served as the U.S. Attorney for the Southern District of New York, the mayor of New York City, and as an authorized representative for Donald Trump as well as the Trump Campaign.[310]

90.     On November 19, 2020, Giuliani appeared with Sidney Powell at the Republican National Convention, where Powell published statements (described above) against Coomer and Dominion.[311] Giuliani introduced himself and Powell, stating "This is representative of our legal team. We are representing President Trump and we're representing the Trump Campaign."[312] Giuliani explained that Powell's statements would follow his, indicating a collective message by the legal team.[313] Giuliani added his

---

[305] *See generally* Ex. K-1, PX 3.
[306] *See* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 102:7-16.
[307] *See, e.g.*, Ex. K-5 (promoting the "Kraken" suits and seeking donations on behalf of Defending the Republic as a 501(c)(4) organization).
[308] *See* Ex. V-1, Demand for Retraction.
[309] *See* Ex. V-2, New York Bar Association Opinion re Giuliani.
[310] *See* Giuliani Mot. at 2; *see also* Ex. K-1, PX 3 at 3:12-14.
[311] *See generally* Ex. K-1, PX 3; *see also* Ex. K-1, Powell, July 20, 2021 Depo. Tr. at 64:1-16.
[312] *See* Ex. K-1, PX 3 at 3:12-14.
[313] *Id.* at 3:14-21.

statements to Powell's, including allegations that Coomer was a "vicious man" that was "close to Antifa," "biased" against former president Trump, and who had not only indicated an intent to "fix the election" but committed a crime in relation to it.[314] Giuliani emphasized, "I've tried a hundred cases. I prosecuted some of the most dangerous criminals in the world. I know crimes. I can smell them. You don't have to smell this one. I can prove it to you 18 different ways."[315]  Upon review of this publication, the substance of the statements alleged that Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did in fact subvert the election. Giuliani specifically named Coomer in relation to his allegations of election fraud, making Coomer the face of the Dominion conspiracy theory.[316]

91.      Giuliani had ample reason to know his information regarding Coomer was unreliable and false. Prior to making statements regarding Coomer at the November 19, 2020 press conference, Giuliani spent virtually no time investigating Coomer or the Antifa call.[317] When asked what his theoretical attorney bill would be on "Coomer time" before the November 19th press conference, Giuliani stated, "Before the press conference, gosh almighty, I bet it's not an hour."[318]

92.      Giuliani testified that he relied on Col. Phil Waldron (Waldron) of Allied Security Operations Group (ASOG) for his information on Coomer.[319] ASOG had

---

[314] *Id.* at 49:14-50:7.
[315] *Id.* at 50:1-4.
[316] *See generally* Ex. K-1, PX 3.
[317] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 47:3-18.
[318] *Id.* at 45:19-20.
[319] *Id.* at 41:7-43:9, 46:14-50:17.

performed a forensic audit of voting tabulators in Antrim County, Michigan, which was debunked by the Michigan Senate Oversight Committee.[320] The information Giuliani acquired from Waldron appears to be derived from Oltmann's allegations against Coomer, as the substance of the statements is substantially the same.[321] Giuliani testified he had a four-minute conversation with Waldron regarding Coomer.[322] Giuliani was told that there was a recording of the Antifa call and there were "a couple of witnesses" who could corroborate the story. From there, Giuliani alleges to have read some media reports about Coomer and some of his social media posts.[323]

93.     This was the extent of Giuliani's investigation regarding the accusations he made about Coomer. Giuliani never spoke to Oltmann (who he referred to as Olzheimer in his deposition);[324] did not have any information as to whether Oltmann was credible (or not);[325] never tried to listen to the (non-existent) recording he thought actually existed;[326] did not try to talk to the other "Antifa people" on the call;[327] does not recall reviewing Oltmann's notes of the alleged call;.[328] did not reach out to Coomer or Dominion;[329] and had access to research by the Trump Campaign's communications department but did not receive a copy of the research on Coomer or Dominion.[330]

---

[320] *See* Ex. B-2, Oltmann, Sept. 8, 2021, PX 107 at 15.
[321] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 40:10-44:5, 44:23-45:9.
[322] *Id.*; *see also* Ex. A-1 at pub. 75.
[323] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 47:19-55:12.
[324] *Id.* at 60:18-61:18.
[325] *Id.* at 120:8-20.
[326] *Id.* at 133:6-11.
[327] *Id.* at 133:12-19.
[328] *Id.* at 133:20-134:8.
[329] *Id.* at 134:9-15.
[330] *Id.* at 134:16-136:20.

Instead, Giuliani has stated on multiple occasions that he was allegedly constrained by time and was unable to conduct his own investigation of Coomer.[331]

94.     Giuliani discounted any official sources that found there was no evidence of widespread election fraud. He discounted CISA even though he was on the cybersecurity advisory committee when CISA was created; he called CISA's election security report a "totally phony report"; and he said the Department of Homeland Security was afraid to investigate the fraud claims.[332]

95.     Likewise, Giuliani discounted the Trump Campaign's internal memo which found no basis for any of the allegations regarding Coomer, calling it a "corporate document" and explaining that there were members of the Trump Campaign who were trying to undermine his efforts because "they wanted Trump to lose because they could raise more money."[333] Giuliani further stated that the Trump Campaign was trying to keep things from him and undermine the litigation, citing to alleged Republication National Convention memos and internal Trump Campaign memos telling campaign officials not to cooperate with Giuliani and Jenna Ellis.[334]

96.     In his deposition, Giuliani stated that if Coomer had rigged the election it would have been a crime and likely would have been in concert with Dominion.[335] Generally, throughout his deposition, Giuliani continued to maintain the validity of his various election fraud theories involving Dominion, Smartmatic, and Sequoia; the

---

[331] *See, e.g.*, Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 120:8-122:13.
[332] *Id.* at 160:11-161:15, 164:21-165:24.
[333] *Id.* at 159:9-160:7.
[334] *Id.* at 139:14-144:20.
[335] *Id.* at 58:10-22.

existence of "fugazi" voting machines; fraud in various battleground states; and the same theories that lead to the suspension of his law license in New York.[336] But, when asked for his theory on Coomer's participation in this fraud, Giuliani stated, "I mean I could guess but it would <u>not</u> be an educated guess."[337] Ultimately, Giuliani filed no litigation involving Coomer.[338]

97.     Giuliani had political motivations to delegitimize the results of the election. Giuliani is a supporter of former president Trump.[339] Giuliani sought national attention by advancing allegations of fraud in relation to the election and against Coomer.[340] When Giuliani was asked why he felt he needed to speak about Coomer at the press conference (as opposed to saying nothing), Giuliani replied:

> It was my obligation at that time to give the public all the facts that I had because we had had an unprecedented three weeks of censorship unheard of in the United States which had followed three months of censorship on the Hunter Biden hard drive, which the American people elected a president without knowing the complete evidence of how he was engaged for 30 years of taking bribes through his son, which his son spells out in great deal in the hard drive and the American people have never seen it. . . .[341]

In other words, Giuliani's decision to spread Oltmann's story regarding Coomer was not based on any sort of legitimate purpose, but rather was in response to his grievances regarding the lack of media coverage regarding Hunter Biden.

98.     Further, Giuliani conceived of a storyline regarding the results of the

---

[336] *Id.* at 71:19-83:20, 104:9-108:4.
[337] *Id.* at 83:21-84:3 (emphasis added).
[338] *Id.* at 108:16-109:7.
[339] *See generally* Ex. K-1, PX 3.
[340] *Id.*
[341] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 124:8-125:22.

presidential election, which is reflected in his allegations after the election. Giuliani collaborated with other parties in early efforts to contest election results even before his allegations against Coomer. Giuliani was at the White House on election night on November 3, 2020.[342] After an Oval Office meeting with former president Trump on November 4, 2020, Giuliani took over the Trump Campaign's legal team.[343]

99.     Immediately after Joe Biden was declared the winner of the presidential election on November 7, 2020, Giuliani appeared at a press conference in front of Four Seasons Total Landscaping to make multiple accusations of voter fraud.[344] Giuliani alleged that votes for Trump had "disappeared," and that Philadelphia had a "history of voter fraud," even including alleged dead voters.[345] Giuliani then consciously set out to conform his allegations against Coomer to this manufactured storyline of election fraud.

100.     Giuliani cooperated with OAN reporter, Christina Bobb (Bobb), in his efforts to contest the election results. Prior to the November 19th press conference, Bobb was approved as part of the Trump Campaign's legal team through Giuliani's connections.[346] Giuliani had gotten to know OAN's president, Charles Herring, "very well" when Rion and OAN did a documentary with Giuliani on "Ukrainian collusion."[347] Giuliani agreed with Charles Herring about the terms of Bobb's placement on the Trump Campaign's legal team, which included Giuliani approving when Bobb could report on

---

[342] *Id.* at 168:21-24.
[343] *Id.* at 27:6-28:3.
[344] *See* Ex. M-1, PX 65.
[345] *Id.*
[346] *See* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 30:4-20.
[347] *Id.* at 88:3-13.

information obtained while working for Giuliani. [348]

101.   Giuliani has not retracted his publications regarding Coomer, and they remain publicly available to this day.[349]

## I.   *Trump Campaign*

102.   The Trump Campaign is a corporation organized for the purpose of electing Donald Trump president.  Following the 2020 presidential election, the Trump Campaign allowed Giuliani to assume control over much of its public messaging and legal efforts to subvert the campaign results.[350] In the beginning, that control included cooperation with Powell.[351] Former president Trump tweeted on November 14, 2020 that Powell was on his legal team.[352]

103.   On November 17, 2020, Eric Trump, who the Trump Campaign refers to as its "surrogate speaker," retweeted a story from Hoft-TGP stating that Coomer said "Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!"[353]  By November 12, 2020, former president Trump himself tweeted the allegation that Dominion had "deleted 2.7 million Trump votes Nationwide."[354] These allegations continued despite CISA's joint statement with other governmental entities issued on November 12, 2020 that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."[355] Former president Trump

---

[348] *Id.* at 89:23-91:22, 93:23-94:3.
[349] *See* Ex. V-1, Demand for Retraction.
[350] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 44:8-10; 47:8-15.
[351] *See* Ex. K-1, PX 6; PX 3.
[352] *See* Ex. M-3.
[353] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 58:12-15; PX 69.
[354] *See* Ex. M-1, PX 66.
[355] *See* Ex. M-1, PX 67.

retweeted Rion's story "Dominion-izing the Vote" on November 21, 2020.[356]

104.    On November 19, 2020, Giuliani appeared with Powell at the Republican National Convention for a press conference as authorized representatives on behalf of the Trump Campaign.[357] The substance and gist of Giuliani and Powell's statements at the press conference alleged that Coomer participated in an Antifa conference call; that he stated on this call his intent to subvert the presidential election; and that he then did subvert the election.

105.    Powell went on multiple nationally televised news programs before and after the November 19, 2020 press conference to repeat the allegations regarding Coomer.[358] During these programs Powell was identified as a representative of the Trump Campaign.[359]

106.    Shortly after the election, Giuliani and his legal team set up their offices in Trump Campaign headquarters, where he would coordinate efforts to contest the election results and promote election fraud narratives.[360] During this time, the Trump Campaign itself had done research debunking many of the allegations by Giuliani and Powell, but the Trump Campaign did not widely share this information. After Giuliani moved into the Campaign headquarters, the Trump Campaign neglected its prior internal processes for distribution of information. According to Trump Campaign representative Sean Dollman:

> So when Mr. Giuliani came in as legal – or as a lawyer, he – he and his team took over a conference room.   And we spent, I mean, years setting up an

---

[356] *See* Ex. M-1, PX 70; Ex. M-1, PX 71.
[357] *See generally* Ex. K-1, PX 3.
[358] *See, e.g.*, Ex. K-1, PX 5.
[359] *Id.*
[360] *Id.* at 44; *see also* Ex. J-1, Giuliani, Aug. 14, 2021, Depo. Tr. at 29:22-30:25.

internal process of where documents would go, who sees them, and then making sure that people review them, and approvals.

But when Mr. Giuliani came in with his team, the – that whole approval chain, that whole – everything pretty much went out the window.[361]

107.    The Trump Campaign had reason to know the allegations against Coomer were false and unreliable. Prior to the press conference on November 19, 2020, the Trump Campaign performed its own research into the accusations regarding Coomer and Dominion. In the only email chain produced by the Trump Campaign, Zach Parkinson requested researchers look into the accusations regarding Dominion, stating: "Let's cut this off at 10:30.  Have more dead voters we'll need to get to in the morning."[362]

108.    The memo produced by the Trump Campaign shows that the Trump Campaign found there was no evidence to support the conspiracy theories regarding Dominion and Coomer. That memo found in part: "Dominion and Smartmatic Are Independent Companies that Split from Each Other in 2012"; "Dominion Has Not [Sic] Direct Ties to Venezuela"; "There Is No Evidence That Dominion's CEO Or Any Other Leader Of The Group Has Ties to Antifa"; and "There is no evidence Coomer is a member or has any ties to Antifa."[363]

109.    The memo itself purportedly never made it to Giuliani, even though Giuliani continued to make public statements regarding Coomer and allegations of election fraud.[364] Giuliani, Powell, and Eric Trump continued to allege Coomer and Dominion

---

[361] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 44:8-10, 47:8-15.
[362] *See* Ex. M-1, PX 68 at TC-01.
[363] *See* Ex. M-1, PX 68 at TC-03-04.
[364] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 62:19-63:24; *see also* Ex. J-1, Giuliani, Aug. 14, 2021 Depo. Tr. at 162:13-163:24.

were to blame for election fraud without acknowledging the Campaign's own research debunking those theories.[365]

110.    The Trump Campaign made no effort to correct statements made by Giuliani and Powell, and as late as August 2021, the Trump Campaign stated that "at this point in time, . . . [they] were still investigating and trying to get facts together."[366] The Trump Campaign also claimed to be unaware that Oltmann, the source of Giuliani's and Powell's allegations regarding Coomer, was the host of a conservative podcast who had held rallies in support of President Trump and made allegations of election fraud even before the election.[367] Giuliani and Powell performed virtually none of their own research into Oltmann or verifying the statements they made at the November 19th press conference.[368]

111.    The Trump Campaign conceived of a false storyline regarding the results of the presidential election, as reflected in its allegations leading up to and immediately following the election, in an effort to spread political disinformation aimed at undermining faith in democracy. As early as July 2020, former president Trump stated in an interview with Fox News: "I think mail-in voting is going to rig the election. I really do."[369] The Trump Campaign's efforts to contest the election results as fraudulent began immediately after election day, even before Coomer became a subject of those efforts. In the early morning hours of November 4, 2020, before the total votes were ever counted,

---

[365] *Id.*
[366] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 38:10-16.
[367] *Id.* at 38:6-39:19.
[368] *See supra* at ¶¶ 85-88, 93-98.
[369] Ex. M-1, Trump Campaign, Aug. 9, 2021; PX 62, at 24.

former president Trump announced "This is a fraud on the American public. This is an embarrassment to our country. We were getting ready to win this election. Frankly, we did win this election."[370] Former president Trump also tweeted in part: "We are up BIG, but they are trying to STEAL the Election. We will never let them do it."[371]

112.    As late as August 9, 2021, the Trump Campaign representative, Sean Dollman, could only explain that immediately after the election, the Trump Campaign "felt like" there was "some type of fraud," but still could not give detail on why they believed there was fraud, and admitted they were still "looking into the facts" at the time.[372]

113.    Despite still reportedly "looking into the facts," on November 7, 2020, Giuliani appeared at a press conference in front of Four Seasons Total Landscaping to make his first accusations of voter fraud.[373] Giuliani alleged that votes for former president Trump had "disappeared," and that Philadelphia had a "history of voter fraud," even including alleged dead voters.[374] The Trump Campaign never made any effort to correct statements made by Giuliani, and stated in August 2021 that "at this point in time, . . . [they] were still investigating and trying to get facts together."[375]

114.    The Trump Campaign had political and financial motivations to delegitimize the results of the election. The Trump Campaign maintained national

---

[370] *See* Ex. M-1, PX 65.
[371] Ex. M-1, PX 64.
[372] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 25:6-20; 29:19-24.
[373] Ex. M-1, PX 65.
[374] *Id.* This same reference to dead voters was made in Zach Parkinson's email to the research team requesting information on the Dominion and Coomer allegations.
[375] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 38:10-16.

exposure by advancing allegations of fraud against Coomer while garnering political

support.[376] The Trump Campaign continues to raise funds to support its efforts to contest

the election results and to pay Trump Campaign debt.[377] Regarding these fundraising

efforts, Trump Campaign representative Sean Dollman testified:

> I think there was a lot of people within the United States that were –
> wanted answers and wanted to entrust their funds and their money to
> the campaign, to look into it, right?
>
> They had nowhere – not nowhere else to turn, but the President and the
> campaign was an entity they put their donations and money behind
> before.[378]

115.    While the Trump Campaign filed a number of lawsuits challenging the

election results, none alleged Coomer had any role in changing the election results.[379]

Nevertheless, the Trump Campaign never made any retraction or clarification regarding

defamatory statements by its agents or representatives.[380]

116.    Even as late as August 9, 2021, the Trump Campaign maintained that there

was some kind of election fraud but could not state why.[381]  The Campaign representative

stated the Campaign believed the election was the result of fraud because they "have no

underlying definite facts that it wasn't."[382]  The Campaign has not articulated in any

---

[376] *See generally* Ex. K-1, PX 3.
[377] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 30:11-13; 32:19-24; *see also* Ex. M-2, Trump Campaign, Aug. 13, 2021 Depo. Tr. at 46:20-47:5 (admitting fundraising efforts likely involved challenging election results).
[378] *See* Ex. M-1, Trump Campaign, Aug. 9, 2021 Depo. Tr. at 73:1-7.
[379] *Id.* at 25:10-18.
[380] *Id.* at 32:21-33:3. When asked whether anyone at the Trump Campaign asked Giuliani to stop making allegations regarding Dominion or Coomer, the Trump Campaign's representative said he could not answer due to privilege.  *Id.* at 17:15-18:17.
[381] *Id.* at 27:5-11.
[382] *Id.* at 74:19-75:6.

manner how Coomer had anything to do with the alleged election fraud. The Trump Campaign continues to take the position that the election was the result of fraud but has presented absolutely no facts in support of that claim, and no idea how Coomer could have aided in alleged election fraud.[383] The Trump Campaign has not retracted its publications regarding Coomer, and they remain publicly available.[384]

## J.    *Coomer's injuries and damages*

117.    As a direct consequence of Defendants' false statements, Coomer faced an onslaught of harassment, threats of violence, and credible death threats against himself and his family.[385] The conduct of Defendants, separately and collectively, has caused Coomer severe emotional distress, including anxiety and depression requiring medical treatment.[386] Defendants' conduct has destroyed Coomer's ability to continue working in elections, resulting in lost wages and other negative harm.[387]

## **LEGAL FRAMEWORK**

## A.    *The Anti-SLAPP Statute*

118.    In 2019 the Colorado General Assembly enacted C.R.S. § 13-20-1101 (the "Anti-SLAPP Statute"). Because the statute is relatively new and untested, Colorado courts look to the more well-established body of authority interpreting the California law for guidance since the Anti-SLAPP Statute "tracks California's statute almost exactly." *See Stevens v. Mulay*, No. 19-cv-01675-REB-KLM, 2021 WL 1153059, at *2 n. 7 (D. Colo.

---

[383] *Id.*
[384] *See* Ex. V-1, Demand for Retraction.
[385] *See* Ex. A, Coomer Dec. at ¶¶ 19-20, 53; *see generally* Ex. W, Bania Dec.
[386] *See* Ex. A, Coomer Dec. at ¶ 53.
[387] *Id.*

2021); *compare* C.R.S. § 13-20-1101 (2019), *with* CALIF. CODE OF CIV. PROC. § 425.16.

119.    Anti-SLAPP laws serve a limited purpose—to dismiss frivolous claims targeting constitutional rights. These laws were enacted specifically to combat strategic lawsuits against public participation ("SLAPP"). They are intended to enable courts to dismiss frivolous cases brought with the intent to chill a person's constitutional rights. *FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156, 1160 (Cal. 2019). They provide a procedural mechanism invoked in limited circumstances early in a case for the purpose of dismissing meritless claims. *See Baral*, 376 P.3d at 608 (Cal. 2016) ("The Anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech.  It only provides a procedure for weeding out, at an early state, *meritless* claims arising from protected activity") (emphasis in original). However, they do not bar meritorious claims.

120.    Colorado enacted its Anti-SLAPP statute to prevent the "abuse of the judicial process." C.R.S. § 13-20-1101(1)(a) (2019).

121.    An additional purpose of the Anti-SLAPP Statute is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law." C.R.S. § 13-20-1101(1)(b). However, the statute expressly requires courts to simultaneously "protect the rights of persons to file meritorious lawsuits for demonstrable injury." *Id.*

122.    Under the statute, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the

United States constitution or the state constitution in connection with a <u>public issue</u> is subject to a special motion to dismiss . . ."  C.R.S. § 13-20-1101(3)(a) (2019) (emphasis added).

123.    An "act of [a] person in furtherance of [a] person's right of petition or free speech under the United States constitution or the state constitution in connection with a public issue" as that phrase is used in the statute shall be referred to herein as a "protected act." That statute states that protected acts include:

(a) Any written or oral statement or writing made before a legislative, executive, or judicial proceeding or any other official proceeding authorized by law;

(b) Any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body or any other official proceeding authorized by law;

(c) Any written or oral statement or writing made in a place open to the public or <u>a public forum in connection with an issue of public interest</u>; or

(d) Any other conduct or communication in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech <u>in connection with a public issue or an issue of public interest</u>.

C.R.S. § 13-20-1101(2)(a) (2019) (emphasis added).

124.    A protected act is any statement, conduct or communication in furtherance of a person's exercise of their constitutional rights of petition or free speech in connection with a public issue or an issue of public interest.

**B.    *Burdens of Proof***

125.    When a defendant has engaged in protected activity, the burden shifts to the plaintiff to establish "that there is a reasonable likelihood that the plaintiff will prevail on the claim." C.R.S. § 13-20-1101(3)(a) (2019).

126. The California Court of Appeals has described this two-step analysis under the Anti-SLAPP Statute as follows:

> When a party moves to strike a cause of action under the anti-SLAPP law, a trial court evaluates the special motion to strike by implementing a two-prong test: (1) has the moving party made a threshold showing that the challenged cause of action arises from protected activity, and, if it has, (2) has the non-moving party demonstrated that the challenged cause of action has minimal merit by making a *prima facie* factual showing sufficient to sustain a judgment in its favor?

*Trinity Risk Mgmt., LLC v. Simplified Lab. Staffing Sols., Inc.*, 59 Cal. App. 5th 995, 1003-1004, 273 Cal. Rptr. 3d 831, 837-838 (Cal. Ct. App. 2021), *review denied* (Apr. 21, 2021).

127. The term "*prima facie*" evidence means evidence that is sufficient to establish a fact unless disproved or rebutted. *See Application for Water Rts. of Well Augmentation Subdistrict of Cent. Colo. Water Conservancy Dist.*, 435 P.3d 469, 475 (Colo. 2019), *quoting Black's Law Dictionary* (10th ed. 2014). To meet this burden, a plaintiff must adduce admissible evidence – not merely allegations in the complaint or conclusory statements by counsel. *See Finton Constr., Inc. v. Bidna & Keys, APLC*, 238 Cal. App. 4th 200, 213, 190 Cal. Rptr. 3d 1, 12 (Cal. Ct. App. 2015).

128. A plaintiff can prevail against an Anti-SLAPP motion only if he demonstrates "that there is a reasonable likelihood that [he] will prevail on the claim." C.R.S. § 13-20-1101(3)(a) (2019). The statute provides that in making its determination of a special motion to dismiss, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." C.R.S. § 13–20–1101(3)(b) (2019). Thus, to "defeat an anti-SLAPP motion, [the party

65

asserting the claim] must overcome any substantive defenses that exist." *Trinity Risk Mgmt., LLC*, 273 Cal. Rptr. 3d at 840.

### C.   *Plaintiff's Burden to Prevail Against Anti-SLAPP Motion*

129.   As a division of this Court has noted, "section 1101(3)(a) clearly establishes a burden on a plaintiff at the outset of a case – which is higher than a Rule 12(b)(5) plausibility test." *Salazar v. Public Trust Institute*, Case No. 2021CV33689, Denver, Colorado District Court (March 10, 2021 Order, p. 4).

130.   This Court concurs with Judge Myers's analysis in *Salazar*, *supra*, that a plaintiff's burden under the Anti-SLAPP Statute is higher than the Rule 12(b)(5) plausibility test. Thus, the plausibility test set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Warne v. Hall*, 373 P.3d 588 (Colo. 2016) is not applicable at this stage of the proceedings. To prevail against an Anti-SLAPP motion, a plaintiff need demonstrate more than mere plausibility of his claims. He must demonstrate that he has a reasonable likelihood of prevailing on those claims. The applicable standard is summarized in *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590 (9th Cir. 2010):

> Reasonable probability in the anti-SLAPP statute has a specialized meaning. The statute requires only a minimum level of legal sufficiency and triability. Indeed, the second step of the anti-SLAPP inquiry is often called the "minimal merit" prong.  To establish minimal merit, the plaintiff need only "state and substantiate a legally sufficient claim." Put another way, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.  . . .  The applicable burden is much like that used in determining a motion for nonsuit or directed verdict, which mandates dismissal when no reasonable jury could find for the plaintiff.  The court does not weigh the credibility or comparative probative strength of competing evidence, but should grant the motion if, as a matter of law, the defendant's evidence supporting the

motion defeats the plaintiff's attempt to establish evidentiary support for the claim.

*Id.*, 611 F.3d at 598–99 (9th Cir. 2010) (internal citations and quotations omitted).

131.    When a plaintiff bears a heightened burden of proof, a court must take that heightened burden into account when determining whether the plaintiff has a reasonable likelihood of prevailing. As Judge Myers concluded, "[t]he precise question the court must ask [in determining an Anti-SLAPP motion] is whether a jury properly instructed on the law, including any applicable heightened fault and proof requirements, could reasonably find for the claimant on the evidence presented." *Salazar*, *supra*, at p. 9, *quoting Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1236 (D.C. 2016), *as amended* (Dec. 13, 2018); *see also Ampex Corp. v. Cargle*, 27 Cal. Rptr. 3d 863, 871 (Cal. App. 2005) (courts must consider the pertinent burden of proof in ascertaining whether the plaintiff has shown a probability of prevailing on anti-SLAPP motion).

132.    As discussed below, in defamation cases involving public issues Anti-SLAPP statutes require plaintiffs to prove actual malice by clear and convincing evidence. In *Christian Research Inst. v. Alnor*, 148 Cal. App. 4th 71 (2007), the court described the burden placed on plaintiffs as follows:

> Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' Accordingly, a reviewing court is not bound to consider the evidence of actual malice in the light most favorable to respondents or to draw all permissible inferences in favor of respondents. To do so would compromise the independence of our inquiry. The constitutional responsibility of independent review encompasses far more than an exercise in ritualistic inference granting. Independent review is applied with equal force in considering whether a plaintiff has established a

probability of demonstrating malice by clear and convincing evidence in opposing an anti-SLAPP motion.

*Id.*, at 86 (internal citations omitted).

### D.   *The Anti-SLAPP Statute Applies Because Defendants' Statements About Coomer Involved Matters of Public Concern*

133.   For the Anti-SLAPP Statute to apply, the allegedly harmful statements must have been made in furtherance of a person's right of free speech "in connection with a public issue." C.R.S. § 13-20-1101(3)(a) (2019). Where a statement relates to a matter of public concern, the defamed party is subject to heightened burdens of proof. These are: (1) the defamed party must prove the falsity of the statement by clear and convincing evidence, rather than by a mere preponderance; (2) the defamed party must prove that the speaker published the statement with actual malice—that is, with actual knowledge that the statement was false or with reckless disregard for whether the statement was true; and (3) the defamed party must establish actual damages to maintain the action, even if the statement is defamatory *per se*. *McIntyre v. Jones*, 194 P.3d 519, 523-24 (Colo. App. 2008); *see Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1106–09 (Colo. 1982); *see also Keohane v. Stewart*, 882 P.2d 1293, 1304 (Colo. 1994).

134.   The boundaries of public concern cannot be readily defined but must be determined on a case-by-case basis. *Lawson v. Stow*, 327 P.3d 340, 346 (Colo. App. 2014). Generally, a matter is of public concern whenever "it embraces an issue about which information is needed or is appropriate," or when "the public may reasonably be expected to have a legitimate interest in what is being published." *Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996) (*quoting in part Lewis v. McGraw–Hill Broad. Co.*, 832 P.2d 1118, 1121 (Colo. App. 1992)); *see also City of San Diego v. Roe*, 543

U.S. 77, 83–84 (2004) ("public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication").

135.    Generally, a matter is of public concern whenever "it embraces an issue about which information is needed or is appropriate," or when "the public may reasonably be expected to have a legitimate interest in what is being published." *Shoen v. Shoen*, 292 P.3d 1224, 1229 (Colo. App. 2012); *Smiley's Too, Inc. v. Denver Post Corp.*, 935 P.2d 39, 42 (Colo. App. 1996).

136.    Conversely, the mere fact that the press is attracted to a particular person or activity does not make that person a public figure or that activity a matter of public concern. *See Diversified Mgmt., Inc.*, 653 P.2d at 1106–09; *Saro Corp. v. Waterman Broad. Corp.*, 595 So.2d 87, 89 (Fla. Dist. Ct. App. 1992) (where media defendant created controversy, transmission repair shop accused of recommending unnecessary repairs held to be a "private claimant"); *Smiley's Too, Inc.*, 935 P.2d at 41.

137.    Broadly speaking, courts have recognized that safeguarding elections is a matter of public concern.  *See Mauff v. People*, 123 P. 101, 103 (Colo. 1912) ("It is a matter of general public concern that, at all elections, such safeguards be afforded."); *see Johnson v. Bradley*, 4 Cal. 4th 389, 409 (Cal. 1992) (the integrity of the electoral process, at both the state and local level, is undoubtedly a statewide concern.); *Burroughs v. United States*, 290 U.S. 534, 545 (1934) (the importance of a presidential election "cannot be too strongly stated").

138.    More recently, in *Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020), the court specifically held that the issues of voting machine security in the 2020 election were matters of public interest. Specifically, the court stated: "Amidst the many other serious concerns facing the public in this challenging era, issues surrounding election system security, reliability, fairness, and the correct counting of votes continue on the forefront of citizen concerns." *Id.* at 1268.

139.    As relevant to defamation standards, it is the matter or issue being discussed, not the specific individual referenced, that must be a matter of public interest.

> If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved.  The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety.

*Rosenbloom v. Metromedia*, Inc., 403 U.S. 29, 43 (1971).

Colorado courts have expressly adopted *Rosenbloom. See Diversified Mgmt., Inc.*, 653 P.2d at 1110 and *Walker v. Colorado Springs Sun, Inc.*, 538 P.2d 450 (1975).

140.    Citing *Quigley v. Rosenthal*, 327 F.3d 1044 (10th Cir. 2003), Plaintiff argues that because his employer is a private company and he is privately employed, his purported actions in his role as Director of Product Strategy and Security is not a matter of public concern. The Court is not persuaded.  Instead, this case is more akin to *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028 (10th Cir. 2013). In *Spacecon* the defendant made a documentary in which he alleged the plaintiff had engaged in ethnically discriminatory labor practices.  The plaintiff argued that the film did not involve a matter of public concern because its statements were made in a private context against a private

company. The *Spacecon* court noted that Colorado courts have held a statement involves a matter of public concern "if its message has the potential to impact many members of the public or the public as a whole." *Id*. at 1036, *citing Diversified Mgmt., Inc.*, 653 P.2d at 1108 (Colo. 1982) (public contained a number of potential buyers who had interest in alleged land fraud); and *Lewis*, 832 P.2d 1118 (Colo. App. 1992) (public had interest in racially discriminatory policies of private retailer). The court then held that the defendant's statements did involve a matter of public concern because "[l]ike in *Diversified Management*, the public includes current and potential employees, business owners, and government officials who have an abiding interest in matters discussed in the film." *Id*. at 1037. The court also noted that the form of the statements (screening of film in context of discussion regarding significant social issues) indicated the film was not published in a purely private context.  *Id.*  The *Spacecon* court distinguished *Quigley*, noting that in *Quigley* the allegations were not made against a company with which the general public had contact and thus exposure to discrimination and abuse. Here, Coomer worked for a company which supplied and serviced voting machines utilized by members of the public.

141.    On March 26, 2020, the HBO documentary *Kill Chain* premiered. (Ex. 911). The parties stipulated to the Court's review of this documentary and the Court has done so. The Court has considered the statements in *Kill Chain* not for the truth of the matters asserted, but for the purpose of ascertaining whether a concern regarding security of voting machines was a "public issue" or "an issue of public importance" prior to the Defendants' publication of their allegedly defamatory statements in November 2020. *Kill*

*Chain* addressed potential election security vulnerabilities and contained interviews regarding this issue with Senators James Lankford (R-OK), Mark Warner (D-VA), Ron Wyden (D-OR) and Amy Klobuchar (D-MN), all of whom expressed reservations about certain voting machine vulnerabilities.

142.   In this case, the Defendants' statements concerning Coomer's alleged involvement in election fraud fall within the holding of *Spacecon* because those statements related to existing public concerns about security of voting machines and thus, their statements have "the potential to impact many members of the public or the public as a whole." Accordingly, the Court concludes that Defendants' statements regarding Coomer's alleged participation in election fraud relate to a matter of public concern.

### E.   *Public Person*

143.   Following the reasoning in *Diversified Management, Inc.*, *supra* at 1107, the Court concludes that Coomer was not a public figure. While Coomer participated in activities that were in the public view, such as demonstrating voting machine capabilities to various governmental bodies or being called to testify in judicial proceedings, there is no indication that Coomer ever sought media attention or thrust himself into a particular controversy. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) (fact that press was attracted to appellants' activities does not make them public figures); *cf. DiLeo v. Koltnow*, 613 P.2d 318 (Colo. 1980) (police officer was limited public figure because he actively sought press coverage of the controversy surrounding his termination).

### F.   *Elements of Defamation Claim*

144.   The elements of a cause of action for defamation are: (1) a defamatory

statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication. *McIntyre v. Jones,* 194 P.3d 519, 523–24 (Colo. App. 2008).

145.    If the alleged defamatory statement involves a matter of public concern or a public figure, the  plaintiff must also prove the statement was made with "actual malice." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29 (1971).  Colorado courts have expressly adopted *Rosenbloom. See Walker v. Colorado Springs Sun, Inc.*, 538 P.2d 450 (1975); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1110 (Colo. 1982).

## G.    *The First Amendment Implements a Profound Commitment to Robust Debate*

146.    The First Amendment implements a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).  The protection offered by the First Amendment is at its strongest for speech on matters of public concern. *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.*, 562 U.S. at 452 (*quoting Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted)).

## H.    *The Actual Malice Standard Applies*

147.    The actual malice standard applies in this case because, as discussed above, the Defendants' statements about Plaintiff, if they were to be believed, related to a matter

of public concern, namely voting machine vulnerabilities. Where statements involve "a matter of public concern," the plaintiff cannot prevail absent proof, by clear and convincing evidence, "that the defendant published the defamatory statement with actual malice." *See Lewis v. McGraw-Hill Broad. Co.*, 832 P. 2d 1118, 1122-23 (Colo. App. 1992).

## I.      The "Actual Malice" Standard Requires Reckless Disregard for the Truth

148.    At common law, actual malice was shown by ill will, evil or corrupt motive, intention to injure, hatred, enmity, hostility, or spite. *Carson v. Allied News Co.*, 529 F.2d 206 (7th Cir. 1976). However, in the post-*New York Times v. Sullivan* world of defamation, the term has taken on a new meaning and has become a term of art to provide a convenient shorthand for the *New York Times* standard of liability. *Id.*

149.    Except for requiring that it be shown with convincing clarity, *New York Times v. Sullivan* did not define "actual malice" beyond saying that it was "with knowledge that . . . (the defamatory falsehood) was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280(1964). Later opinions of the U.S. Supreme Court have defined it as making statements with a high degree of awareness of their probable falsity, *Garrison v. State of Louisiana*, 379 U.S. 64, 74 (1964), or where the defendant entertained serious doubts as to the truth of the statements. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

150.    Thus, the term of art, "actual malice", is quite different from the common law standard of "malice" which focused on the defendant's attitude toward the plaintiff. *Carson*, 529 F.2d at 209.

151.     Under Colorado law, for a statement to be made with actual malice, a defendant must have made the statement with knowledge of its falsity or with reckless disregard as to its truthfulness.  *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1122-23 (Colo. App. 1992); *Fry v. Lee*, 408 P.3d 843, 848 (Colo. App. 2013).[388]  To prove actual malice, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement . . . or acted with a high degree of awareness of its probable falsity." *Lewis*, 832 P.2d at 1122-23. Reckless disregard "cannot be fully encompassed in one infallible definition." *See St. Amant*, 390 U.S. at 730. Instead, actual malice can be inferred from objective circumstantial evidence, which can override a defendant's protestations of good faith. *See Brown v. Petrolite Corp.*, 965 F.2d 38, 46-47 (5th Cir. 1992).

152.     It is helpful to review what types of evidence other courts have determined is or is not sufficient to establish actual malice.

153.     "Failure to investigate obvious sources of refutation or corroboration of statements, especially when there is no time-pressure on their publication, may indicate not only negligence, but the higher standard of actual malice." *Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1180 (D. Colo. 1999) *citing Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1362 (Colo. 1983). Circumstantial evidence of actual malice can include instances when a story is fabricated by a defendant or is the product of his imagination; when a defendant relies on anonymous sources; when a defendant has

---

[388] To prove actual malice, a public figure plaintiff bringing a defamation suit must present some evidence that the defendant purposefully published mistaken facts or that the circumstances were so improbable that only a reckless publisher would have made the mistake. *Fox Entm't Group, Inc. v. Abdel-Hafiz*, 240 S.W.3d 524 (Tex. App. Fort Worth 2007), review denied, (Sept. 26, 2008).

reason to know that a source is unreliable; when the allegations made are inherently improbable that only a reckless person would publish them; when a defendant intentionally avoids the truth; when a defendant's allegations conform to a preconceived storyline; and when a defendant has an incentive or motive to make the defamatory statements. *See, e.g.*, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967); *St. Amant*, 390 U.S. at 732. Actual malice may be inferred by the finder of fact if an investigation is grossly inadequate. *Kuhn v. Tribune-Republican Pub. Co.*, 637 P.2d 315, 319 (Colo. 1981). A reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth. *Id.*, *citing Alioto v. Cowles Communications, Inc.*, 623 F.2d 616 (9th Cir. 1980). Once the publisher has obvious reasons to doubt the accuracy of a story, the publisher must act reasonably in dispelling those doubts. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003). "Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted." *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969), *cert. denied*, 396 U.S. 1049, (1970) (stating that repetition is one factor that may be probative of actual malice). While actual malice cannot be inferred from ill will or intent to injure alone, "[i]t cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989); *see also Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995) (evidence of ill will can often bolster an inference of actual malice). Evidence that a defendant conceived a story line in advance of an investigation

and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice and may often prove to be quite powerful evidence. *Harris v. City of Seattle*, 152 Fed.Appx. 565, 568 (9th Cir. 2005).

154.    "The actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term." *Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 666.  Although "actual malice" is not synonymous with ill will, spite, or evil motive, evidence that the defendant harbored ill will towards the plaintiff is probative on the issue of whether the defendant was reckless with the truth in publishing the allegedly defamatory statements about a public figure. *Texas Disposal Systems Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563 (Tex. App. 2007). Although the failure to investigate does not, on its own, demonstrate actual malice, a purposeful avoidance of the truth does. *Id.* at 578–79.

155.    Although the serious doubt inquiry "is too fact-bound to be resolved on the basis of any single factor or mechanical test," *Tavoulareas v. Piro*, 817 F.2d 762, 788 (D.C. Cir. 1987), several principles guide the analysis. For example, "actual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith." *Id.* at 789. Nor is it enough for the plaintiff to offer evidence of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Harte-Hanks Commc'ns*, 491 U.S. at 664–65. Nor, does it suffice for a plaintiff merely to proffer "purportedly credible evidence that contradicts a publisher's story." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir.

2003). Rather, it is only when a plaintiff offers evidence that "a defendant has reason to doubt the veracity of its source" does "its utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story" demonstrate reckless disregard. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509 (D.C. Cir. 1996). Absent such concerns, the defendant has no duty to corroborate the defamatory allegation. *Id.* Even "ill will toward the plaintiff or bad motives are not elements of actual malice," and "such evidence is insufficient by itself to support a finding of actual malice." *Tavoulareas*, 817 F.2d at 795. That is, "a newspaper's motive in publishing a story— whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Commc'ns*, 491 U.S. at 665. Only when the evidence of ill will or bad motive is also probative of a "willingness to publish unsupported allegations" is it suggestive of actual malice. *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590–91 (D.C. Cir. 2016).

156.    The United States Supreme Court analyzed evidence sufficient to establish actual malice in *Curtis Publishing Company*. There, the court analyzed a case involving allegations that the athletic director for the University of Georgia conspired to rig the football game with the University of Alabama. *See* 388 U.S. at 135-36. These allegations were based on a witness to an alleged telephone conversation between the athletic director for Georgia and the coach for Alabama that outlined Georgia's offensive plays and how Georgia planned to defend in advance of the game. *See id.* at 136. While the allegations necessitated an investigation given the seriousness of the charges and injury that would result, the publisher relied solely on an affidavit from the witness to the alleged

call and conducted no additional investigation. *See id.* at 157-58. The publisher did not review the witness's alleged notes of the call; interview other witnesses allegedly present when the call occurred; review the game itself to see if the allegations were accurate; or determine whether Alabama adjusted its plans based on the alleged call. *See id.* It neither assigned nor consulted a football expert to assess the allegations. *See id.* There was evidence the publisher was motivated to publish the allegations as part of a policy intended to change its image, and it assigned writers to assist on the story that were separately involved in another libel action involving the Alabama football coach. *See id.* Further, no subsequent investigation was made after the athletic coach informed the publisher that the allegations were untrue. *See id.* at 169-170. The United States Supreme Court found this evidence sufficient to establish actual malice as the publisher recklessly disregarded the truth. *See id.* Subsequent decisions have upheld the court's analysis. *See St. Amant*, 390 U.S. at 732; *see also Harte-Hanks Comm'ns Inc.*, 491 U.S. at 692-93.

157.    Finally, actual malice is a subjective standard. *Makaeff v. Trump Univ., LLC*, 26 F. Supp. 3d 1002, 1008 (S.D. Cal. 2014). Thus, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731.

## CONCLUSIONS OF LAW

### A.  *Reasonable Likelihood of Success on Coomer's Claims*

158.    As described above, in the second step of the anti-SLAPP analysis, courts must assess whether a plaintiff has sufficient evidence to establish a "reasonable likelihood that the plaintiff will prevail on the claim[s]" to which the statute applies. C.R.S. § 13-20-1101(3)(a) (2019).

159.    In making this assessment, the Court looks to whether the plaintiff "has stated a legally sufficient claim and made a *prima facie* factual showing." *Baral v. Schnitt*, 376 P.3d 604, 608 (Cal. 2016). The Court does not weigh the evidence and must accept all admissible evidence in the plaintiff's favor as true. *Id.* at 608–609.  As the California Supreme Court noted in *Baral*:

> The anti-SLAPP statute does not insulate defendants from any liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity.

*Id.* at 608. Once a plaintiff provides the minimum quantum of evidence to show a legally cognizable claim, the plaintiff has satisfied its burden under the second prong.  *See id.*

160.    Defendants argue that the anti-SLAPP statute applies to all claims that Coomer has brought against them for (1) defamation, (2) intentional infliction of emotional distress, (3) civil conspiracy, and (4) request for permanent injunction. Although Defendants advance different bases, they collectively argue that Coomer cannot establish a likelihood of success on his claims.  However, Coomer has made a *prima facie* showing that his claims are do have a reasonable likelihood of success on the merits and thus are viable under Colorado law.

### i.    Coomer has established a prima facie showing of defamation by clear and convincing evidence.

161.    Under Colorado law, the elements for defamation are: (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication." *Williams v. Dist. Court, Second Judicial Dist., City & Cnty. of Denver*, 866 P.2d 908, 911 n.4 (Colo. 1993).

162.    If a defamatory statement does not involve a public official, public figure, or a matter of public concern, at trial the plaintiff must only prove defamation by a preponderance of the evidence. *McIntyre v. Jones*, 194 P.3d 519, 524 (Colo. App. 2008). However, if, as here, the statement pertains to a matter of public concern, there are two additional burdens the plaintiff must prove at trial: (1) the statement's falsity by clear and convincing evidence and (2) that the defendant published the statement with actual malice. *Id.*; *see also Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1110 (10th Cir. 2017).  At this stage of the proceeding, a plaintiff need only establish a reasonable probability that he would be able to produce at trial clear and convincing evidence of falsity and actual malice.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Young v. CBS Broad., Inc.*, 212 Cal. App. 4th 551, 562 (2012); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576 (2005).  Here, Coomer has established *prima facie* evidence of Defendants' defamation, including falsity and actual malice.

### a.    Oltmann, FEC United, and Shuffling Madness Media

163.    As to the first element, Coomer has put forward overwhelming *prima facie* evidence that Oltmann made defamatory, false statements of fact concerning Coomer. These statements include allegations that "Eric" the "the Dominion guy" participated in an Antifa call; said he made "f-ing sure" that "Trump is not gonna win;" and that he was in fact "controlling the elections."   There is no dispute that Oltmann made these statements about Coomer, both individually and as a representative of FEC United, which Oltmann identified when publishing his statements.[389] In its reply, SMM argues for the first time that it is not the proper party as to the claims asserted.[390] This argument is refuted by evidence showing SMM operated under the trade name Conservative Daily at the time of Oltmann's statements, which is the primary media platform and podcast through which Oltmann published his statements concerning Coomer.

164.    Oltmann et al. argue their statements are opinions and hyperbolic rhetoric that cannot be proven true or false.[391] For a statement to be actionable as defamatory, it must express or imply a verifiably false fact about the plaintiff. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Burns v. McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983). Statements of opinion can be actionable if they imply provably false facts or rely upon stated facts that are provably false. *See Milkovich*, 497 U.S. at 20. In deciding whether a statement expressed or implied a false statement of fact, courts consider the entire statement, the context in which it was made, and whether a reasonable

---

[389] *See generally* Oltmann, et al. Mot.; Oltmann, et al. Reply.
[390] *See* Oltmann, et al. Reply at 15-16.
[391] *See* Oltmann, et al. Mot. at 9-12.

person would conclude that the statements at issue expressed or implied a false fact. *See Burns*, 659 P.2d at 1360. The reasonable person standard does not require that a majority of the community consider the statement defamatory, but, instead, a substantial and respectable minority of the community. *See Keohane*, 882 P.2d 1293, 1299, n.9 (Colo. 1994).

165.    In reviewing the entire statements and the context in which they were made, Oltmann et al. allege that Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then that he did in fact subvert the presidential election. These are verifiable facts. Coomer either participated in the call or he did not; he either made the statement or he did not; and he either committed election fraud or he did not. Coomer has unequivocally declared that these statements are false. For purposes of the anti-SLAPP statute, Coomer's evidence is accepted as true. *See Baral v. Schnitt*, 376 P.3d 604, 608-09 (Cal. 2016). Further, Coomer's evidence is uncontroverted by credible evidence. Absent Oltmann's testimony, Oltmann et al. have put forward no evidence in support of their allegations against Coomer. Oltmann proffered himself as a witness to the allegations made but had no personal knowledge of Coomer so as to identify him on the alleged Antifa call; no personal knowledge of any election fraud committed by Coomer; and no expertise with which to form the allegations made.  Instead, Oltmann et al. seemingly relied on Coomer's Facebook posts. However, the posts were limited to Coomer's personal and political beliefs, neither of which prove Oltmann's allegations.  Oltmann has acknowledged that the anonymous "Eric" on the call was only identified by another anonymous source that he cannot identify or verify. As

such, Oltmann et al.'s allegations were, at best, speculation, which is not credible evidence.

166.    Accusations of criminal activity, even if in the form of opinion, are not constitutionally protected and are actionable.  *See Keohane*, 882 P.2d at 1304 (*citing Burns*, 659 P.2d at 1359).  Oltmann et al.'s statements about Coomer impute a criminal offense—here, election fraud—and, therefore, are actionable regardless of whether they are in the form of an opinion.

167.    As to the second element of defamation, there is *prima facie* evidence that Oltmann et al. published the defamatory statements against Coomer to third parties. These publications were made across numerous media platforms including podcasts, radio broadcasts, online articles, social media posts, and television broadcasts. In its reply brief, FEC United argues that it is immune from liability for its publication of statements under Section 230 of the Communications Decency Act (CDA).[392]  Again, this argument is untimely and unsupported given the CDA creates a federal immunity from state law causes of action that protects providers and users of interactive computer services from being treated as publishers or speakers of information originating from third parties. *See* 47 U.S.C. §§ 230(c)(1), (e)(3) (2018); *see also Silver v. Quora, Inc.*, 666 F. App'x 727, 729 (10th Cir. 2016). FEC United's liability stems from its own publication of statements through Oltmann and not from interactive, user-generated content.  *Cf. Zeran v. America Online Inc.*, 129 F.3d 327, 329 (4th Cir. 1997) (involving posts on AOL online bulletin

---

[392] *See* Oltmann, et al. Reply at 13.

board), *and Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) (involving posts on defendant's online message board).

168.    As to the third defamation element, there is *prima facie* evidence that, at a minimum, Oltmann et al. negligently published their defamatory statements.[393] Evidence that Oltmann et al. failed to investigate the allegations against Coomer, lacked corroborating evidence in support of their allegations, and based their allegations on speculation and conjecture are sufficient to support a finding of negligence.  *See Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1180 (D. Colo. 1999) ("Failure to investigate obvious sources of refutation or corroboration of statements, especially when there is no time-pressure on their publication, may indicate not only negligence, but the higher standard of actual malice.").

169.    There is *prima facie* evidence that Oltmann et al. acted with actual malice in publishing their statements. Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1110-11.  Circumstantial evidence of actual malice can include when a story is fabricated by a defendant or is the product of his imagination; when a defendant relies on anonymous sources; when a defendant has reason to know that a source is unreliable; when the allegations made are inherently improbable that only a reckless person would publish them; when a defendant intentionally avoids the truth; when a defendant's allegations conform to a preconceived storyline; and when a defendant has an incentive

---

[393] There is also evidence to support a finding that Oltmann et al. published their defamatory statements knowing of their falsity.

or motive to make the defamatory statements. *See, e.g.*, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). All of these bases are present here with respect to Oltmann et al.

170.    The facts at issue in *Curtis* (detailed in paragraph 156 above) are analogous to the facts at issue here. As in *Curtis*, the allegations of fraud in this case are premised on a purported witness to a call. Similarly, here there is reason to question the reliability of the witness, Joe Oltmann. Oltmann did not know Coomer and could not identify Coomer during the Antifa call. Instead, Oltmann premised his allegations against Coomer on unknown and unverified speakers on an alleged phone call. Oltmann identified no expertise or reliable means with which he subsequently identified any of the speakers on the alleged call. Oltmann possessed no expertise in election systems or evidence to support his allegations against Coomer. There is *prima facie* evidence that Oltmann fabricated his allegations based on his determination to "die on this hill" that Joe Biden did not win the 2020 presidential election and Oltmann refused to identify any individuals that could corroborate his account. Further, like *Curtis*, the allegations here necessitated an investigation and corroborating evidence given the seriousness of the charges. Yet Oltmann et al. did not obtain witnesses or evidence in support of their allegations or consult with experts on election systems to confirm their allegations. Instead, they disregarded credible sources of information that refuted their allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is *prima facie* evidence that Oltmann et al.'s allegations against Coomer were inherently improbable considering the lack of evidence

supporting Oltmann's claims and the extensive evidence disproving all claims of election fraud. Oltmann et al.'s allegations against Coomer conformed to a preconceived storyline of fraud they adopted and advanced leading up to and after the election aimed at undermining Biden's election. Further, there is evidence that Oltmann et al. had political and financial incentive to defame Coomer, both to support former president Trump and to gain national exposure, thereby improving the ratings of the Conservative Daily podcast. This evidence is sufficient to support a finding of actual malice. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967); *see also Kuhn v. Trib.-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns v. McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1361-62 (Colo. 1983).

171.    As to the fourth element of defamation, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by Oltmann et al.'s defamatory statements.

172.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Oltmann et al.

### b.    *Malkin*

173.    As to the first and second elements, Coomer has put forward *prima facie* evidence that Malkin made defamatory, false statements of fact concerning Coomer. These statements include allegations that Coomer was the anonymous "Eric" on the Antifa call, that he stated on the Antifa call that he intended to subvert the presidential election, and that he did in fact "penetrate[ ] our election system across the county and of course around the world." Malkin is the host of the program #MalkinLive, which she

publishes on YouTube. There is *prima facie* evidence that in this role, Malkin both invited Oltmann to be interviewed and published Oltmann's statements regarding Coomer. Malkin then actively promoted her interviews with Oltmann, republishing them on Twitter. Similarly, Malkin was the host of the program Sovereign Nation on Newsmax. There is *prima facie* evidence that in this role Malkin again invited Oltmann to be interviewed so as to publish his allegations on Newsmax's Sovereign Nation program. To the extent that Malkin republished Oltmann's allegations, Malkin is equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also* Colo. Jury Instr., Civil 22:7 (citing Restatement (Second of Torts § 578 (1977)) ("Each time that libelous matter is communicated by a new person, a new publication has occurred, which is a separate basis of tort liability . . . It is no defense that the second publisher names the author or original publisher of the libel.").

174. As to the third element, there is *prima facie* evidence that Malkin acted with actual malice in publishing her statements. Here, Malkin's allegations against Coomer were based on Oltmann's allegations without substantial independent support. Malkin had reason to question the reliability of Oltmann as a witness given Oltmann's prior statements regarding the election, the wildly improbably nature of his allegations and the lack of evidence in support of his claims. Yet, there is *prima facie* evidence Malkin did not investigate the allegations against Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; and did not consult with experts on election systems to confirm the allegations made. Instead,

there is evidence that Malkin disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud.  There is evidence the allegations against Coomer were inherently improbable and that Oltmann was not a neutral observer.  Yet, Malkin republished these allegations.  There is evidence that Malkin's allegations against Coomer conformed to a preconceived storyline of fraud given her allegations of fraud leading up to and after the election.  Further, there is evidence that Malkin had incentive to defame Coomer both in support of former president Trump and to gain national exposure.  This evidence is sufficient to support a finding of actual malice.  *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967); *see also Kuhn v. Trib.-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns v. McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1361-62 (Colo. 1983).

175.    As to the fourth element, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by Malkin's defamatory statements.

176.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Malkin.

### c.   *Hoft and TGP*

177.    As to the first element, Coomer has put forward *prima facie* evidence that Hoft-TGP made defamatory, false statements of fact concerning Coomer.   These statements include allegations that Coomer "was participating in Antifa calls," that he intended to subvert the presidential election, and then that he did "manipulate," "skim,"

and "steal" votes.  There is no dispute that Hoft-TGP made the statements at issue.[394]

Hoft is the owner of TGP as well as an editor and writer for TGP.[395] In that role, Hoft

authorized the publication of articles regarding Coomer on TGP's website.[396]  These

articles were either drafted by Hoft or subject to his editorial control.[397] Although

Hoft-TGP have challenged whether Coomer sufficiently pleaded the defamatory

statements at issue, this Court has previously determined that Coomer's pleading was

sufficient.[398]

178.    Hoft-TGP also argue that their statements are protected as opinion and

hyperbolic rhetoric.[399] In reviewing Hoft-TGP's entire statements and the context in

which they were made, their arguments fail. While there are certainly many instances

where Holt-TGP did employ hyperbole and dangerous rhetoric, those statements are

distinct from Hoft-TGP's additional statements of fact which alleged that Coomer

participated in an Antifa conference call, stated on that call that he intended to subvert

the presidential election, and then did in fact subvert the presidential election. These

statements express or imply verifiably false facts about Coomer and, therefore, are

actionable. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Burns v.

McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983). Coomer has

unequivocally declared that these statements are false. Not only is this evidence accepted

as true at this stage of the proceeding, but it is uncontroverted. *See Baral v. Schnitt*, 376

---

[394] *See generally* Hoft-TGP Mot.; Hoft-TGP Reply.
[395] *See* Ex. E-1, Hoft-TGP, Aug. 10, 2021 Depo. Tr. at 9:10-11; 11:8-10.
[396] *See Id.* at 11:19-22; 18:12-22:7; 46:12-48:10; 101:9-22; 120:6-10; and 133:4-134:8.
[397] *See Id.* at 23:20-21; 42:19-20; 100:6-101:2; 106:8-22; 107:5-9; and 122:17-24.
[398] *See* Sept. 15, 2021 Order Denying Hoft-TGP C.R.C.P. 12(e) Mot.; *see also* Order Regarding Pl.'s Resp. to All Defendants' Objections, Dec. 5, 2021 at 10.
[399] *See* Hoft-TGP Mot. at 16-21; Hoft-TGP Reply at 4.

P.3d 604, 608-09 (Cal. 2016). Absent Oltmann's wholly incredible testimony, Hoft-TGP similarly have not put forward evidence in support of their allegations against Coomer.

179.    Hoft-TGP also contend they are not liable for their opinions because they fully disclosed the facts upon which they relied.[400]   Statements of opinion may not be actionable when the facts underlying them are nondefamatory and fully disclosed. *See* Restatement (Second) of Torts § 566, cmt. c. However, the publication of false statements of fact is itself actionable regardless of whether an opinion was formed.  *See id.* To the extent that Hoft-TGP formed opinions, including that Coomer is "mentally ill and a sociopath," "an unhinged Trump hater and Antifa supporter," and a "lunatic," those opinions are premised on false statements of fact and, therefore, are actionable. *See id.*; *see also Milkovich*, 497 U.S. at 18-19; *see also NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 11 (Colo. 1994). Further, there is evidence that Hoft-TGP did not fully disclose the facts upon which they formed their opinions.  *See Burns*, 659 P.2d at 1360; *Keohane v. Stewart*, 882 P.2d 1293, 1302-04 (Colo. 1994). For example, Hoft-TGP published statements alleging there were notes, recordings, and witnesses of the purported call that were not disclosed. Hoft-TGP published deliberately misleading statements alleging to have video evidence that Coomer showed how votes could be altered. Hoft-TGP also presented Oltmann as a witness, despite Oltmann having no personal knowledge of the election fraud/vote changing allegations made against Coomer. As such, there is *prima facie* evidence that Hoft-TGP both withheld information and positioned themselves to be perceived as having additional knowledge.  *See Burns*,

---

[400] *See* Hoft-TGP Mot. at 16-21.

659 P.2d at 1360; *Keohane*, 882 P.2d at 1302-04. Regardless, Hoft-TGP's statements impute a criminal offense, which is actionable even if in the form of an opinion. *See Keohane*, 882 P.2d at 1304.

180. As to the second element, it is undisputed that Hoft-TGP published their defamatory statements against Coomer to third parties as these statements were published on TGP's website. To the extent that Hoft-TGP republished Oltmann's allegations, Hoft-TGP are equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also* Colo. Jury Instr., Civil 22:7.

181. As to the third element, there is *prima facie* evidence that Hoft-TGP acted with actual malice in publishing their statements. Here, Hoft-TGP's allegations against Coomer were based on Oltmann's wholly incredible allegations without substantial independent support. Hoft-TGP also had reason to question the reliability of Oltmann as a witness given Oltmann's prior statements regarding the election, the wildly improbably nature of his allegations and the lack of evidence in support of his claims. Yet there is *prima facie* evidence Hoft-TGP did not investigate the allegations against Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; did not consult with experts on election systems to confirm the allegations made. Instead, there is evidence that Hoft-TGP disregarded credible sources of information that refuted their allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is evidence the allegations against Coomer were inherently improbable. Yet Hoft-TGP

republished and embellished these allegations. There is evidence that Hoft-TGP allegations against Coomer conformed to a preconceived storyline of fraud given their allegations of fraud leading up and after the election. Further, there is evidence that Hoft-TGP had political and financial incentive to defame Coomer, as their statements resulted in increased subscriptions, increased advertising revenue, and notoriety as a supporter of former president Trump. This evidence is sufficient to support a finding of actual malice as well as overcome Hoft-TGP's professions of good faith. *See, e.g.*, *Curtis Publ'g Co.*, 388 U.S. at 157-58; *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

182.    As to the fourth element, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by Hoft-TGP's defamatory statements.

183.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Hoft-TGP.

### d.    *Metaxas*

184.    As to the first element, Coomer has put forward *prima facie* evidence that Metaxas made defamatory, false statements of fact concerning Coomer. These statements include allegations that Coomer participated in an Antifa call, "promised Antifa members a Trump loss," and then subverted the presidential election. There is no dispute that Metaxas made the statements at issue. Metaxas is the host of the radio program and podcast, The Eric Metaxas Radio Show, which Metaxas publishes through national radio broadcasts as well as on his website and YouTube. There is *prima facie* evidence that in that role, Metaxas both invited Oltmann to be interviewed and published Oltmann's

statements regarding Coomer. Metaxas then actively promoted his interviews with Oltmann, republishing them on Twitter.

185.   For the first time in his supplemental reply, Metaxas argues, like the defendants above, that his statements are protected opinion and hyperbolic rhetoric.[401] While this argument is untimely, it also fails for the same reasons outlined above.  While there are certainly many instances where Metaxas did employ hyperbole and dangerous rhetoric, those statements are distinct from Metaxas's additional statements of fact wherein Metaxas alleged that Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then did in fact subvert the presidential election. These statements are actionable because they express or imply verifiably false facts about Coomer. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Burns v. McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983). Coomer has unequivocally declared that these statements are false. This evidence is accepted as true.  *See Baral v. Schnitt*, 376 P.3d 604, 608-09 (Cal. 2016). This evidence is also uncontroverted because, absent Oltmann's wholly incredible testimony, Metaxas has not put forward any evidence in support of his allegations against Coomer. Regardless, Metaxas's statements impute a criminal offense, which is actionable even if in the form of an opinion.  *See , Keohane v. Stewart*, 882 P.2d 1293, 1304 (Colo. 1994).

186.   As to the second element, it is undisputed that Metaxas published his defamatory statements against Coomer to third parties as these statements were published on his website, on YouTube, and through national radio broadcasts.[402]  To the

---

[401] *See* Metaxas Supp. Reply at 6-8.
[402] *See generally* Metaxas Mot.

extent that Metaxas republished Oltmann's allegations, Metaxas is equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also* Colo. Jury Instr., Civil 22:7.

187.    As to the third element, there is *prima facie* evidence that Metaxas acted with actual malice in publishing his statements. Here, Metaxas's allegations against Coomer were based on Oltmann's incredible allegations without substantial independent support. Metaxas also had reason to question the reliability of Oltmann as a witness given Oltmann's prior statements regarding refusing to accept the results of the election, the wildly improbably nature of his allegations and the lack of evidence in support of his claims. Yet, there is *prima facie* evidence Metaxas did not investigate the allegations against Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; and did not consult with experts on election systems to confirm the allegations made. Instead, there is evidence that Metaxas purposefully refuses to investigate the claims of his guests and was determined to willfully disregard credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is evidence the allegations against Coomer were inherently improbable. Yet Metaxas republished these allegations as facts. There is evidence that Metaxas's allegations against Coomer conformed to a preconceived storyline of fraud given his allegations of fraud after the election. Further, there is evidence that Metaxas had incentive to defame Coomer both in support of former president Trump and to gain

national exposure.  This evidence is sufficient to support a finding of actual malice.  *See, e.g.*, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967).

188.    As to the fourth element, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by Metaxas' defamatory statements.

189.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Metaxas.

### e.    OAN and Rion

190.    As to the first element, Coomer has put forward *prima facie* evidence that OAN-Rion made defamatory, false statements of fact concerning Coomer. These statements include allegations that Coomer participated in an Antifa conference call, that he was "hell bent on deleting half of America's voice," and that he subverted the presidential election. There is no dispute that OAN-Rion made the statements at issue. Rion is the Chief White House Correspondent for OAN, a national news network. OAN authorized the publication of Rion's news segments regarding Coomer. In their reply, OAN-Rion argue for the first time that they cannot be held to Coomer for statements made about Dominion.[403] Not only is this argument untimely, there is *prima facie* evidence that OAN-Rion inextricably linked Coomer to Dominion such that no discernable distinction between references to Coomer and Dominion existed in their statements. *See Gordon v. Boyles*, 99 P.3d 75, 88-89 (Colo. App. 2004)(finding identity can be inferred from prior statements).

---

[403] *See* OAN-Rion Reply at 9-11.

191.    Further, OAN-Rion also argue, that their statements are protected opinion and hyperbolic rhetoric.[404] While there are certainly many instances where OAN-Rion did employ hyperbole and dangerous rhetoric, those statements are distinct from OAN-Rion's additional statements of fact wherein OAN-Rion alleged that Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, and then did in fact subvert the presidential election. These statements are actionable because they express or imply verifiably false facts about Coomer. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983). Coomer has unequivocally declared that these statements are false. This evidence is accepted as true.  *See Baral v. Schnitt*, 376 P.3d 604, 608-09 (Cal. 2016). This evidence is uncontroverted because, absent Oltmann's wholly incredible testimony, OAN-Rion has failed to put forward any evidence in support of their allegations against Coomer.  OAN-Rion's attacks on Coomer's credibility and speculation surrounding whether an Antifa call actually occurred do not overcome Coomer's *prima facie* evidence for purposes of the anti-SLAPP statute. Regardless, OAN-Rion's statements impute a criminal offense, which is actionable even if in the form of an opinion.  *See Keohane v. Stewart*, 882 P.2d 1293, 1304 (Colo. 1994).

192.    As to the second element, it is undisputed that OAN-Rion published their defamatory statements against Coomer to third parties as these statements were published on the OAN network, YouTube, Twitter, and Rion's personal website.  To the extent that OAN-Rion republished Oltmann's allegations, OAN-Rion are equally liable for

---

[404] *See* OAN-Rion Mot. at 17-18.

such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also* Colo. Jury Instr., Civil 22:7.

193.   As to the third element, there is *prima facie* evidence that OAN-Rion acted with actual malice in publishing their statements. Here, OAN-Rion's allegations against Coomer were based on Oltmann's facially incredible allegations without substantial independent support. OAN-Rion had reason to question the reliability of Oltmann as a witness given Oltmann's prior statements regarding the election, the wildly improbably nature of his allegations, the internal inconsistencies between Oltmann's prior statements regarding his identification of Coomer, and the lack of evidence in support of his claims. Yet, there is *prima facie* evidence OAN-Rion did not investigate the allegations against Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; and did not consult with experts on election systems to confirm the allegations made. Instead, there is evidence that OAN-Rion disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is evidence the allegations against Coomer were inherently improbable. Yet OAN-Rion republished and embellished these allegations. There is evidence that OAN-Rion's allegations against Coomer conformed to a preconceived storyline of fraud given their allegations of fraud leading up to and after the election. Further, there is evidence that OAN-Rion had incentive to defame Coomer both in support of former president Trump and as a conservative news network seeking national

attention. This evidence is sufficient to support a finding of actual malice. *See, e.g.*, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967).

194.   As to the fourth element, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by OAN-Rion's defamatory statements.

195.   OAN-Rion initially raised a "newsworthy" exception to avoid liability for defamation.[405] However, OAN-Rion appear to have abandoned this claim and did not address it in their Reply to Special Motion to Dismiss, during the hearing on October 13th and 14th, or in their proposed Findings of Fact and Conclusions of Law. Colorado courts have rejected protecting speech based solely on what a news organization deems of interest or newsworthy. *See Diversified Mgmt. Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1107 (mere fact that press was attracted to a person's activities does not make that person a public figure). Additionally, there is nothing about OAN-Rion's reporting that could be considered "accurate or dispassionate." Therefore, the Court will not grant OAN-Rion's Special Motion to Dismiss on the basis of this newsworthy argument.[406]

196.   OAN-Rion additionally argue that the filing of an affidavit by Oltmann in subsequent judicial proceedings immunizes them from liability for defamation under the fair report privilege.[407] OAN-Rion's reliance on this privilege is misplaced. The fair report

---

[405] *See* OAN-Rion Mot. at 12.
[406] The Superior Court in Delaware recently rejected a similar argument made by Fox News, finding that Dominion's claims that Fox ignored contrary evidence and promoted a narrative that "Dominion committed election fraud" negated any argument that Fox's reporting was accurate and dispassionate. *See US Dominion, Inc., et al v. Fox News Network, LLC*, C.A. No. N21C-03-257, at 42-44 (Del. Super. Ct. Dec. 16, 2021) (Order Denying Defendant's Motion to Dismiss). Available at: https://courts.delaware.gov/Opinions/Download.aspx?id=327750. The evidence regarding OAN-Rion's reporting similarly does not support application of a neutral reporting privilege, even if it were available.
[407] *See* OAN-Rion Mot. at 15-16.

privilege protects reports of judicial proceedings that are fair and substantially correct. *See Quigley v. Rosenthal*, 327 F.3d 1062 (10th Cir. 2003). It does not apply to reporting before any judicial action has been taken, does not extend to reporting on preliminary pleadings, and cannot extend beyond accurate reporting of the judicial proceedings. *See id.* The privilege does not apply merely because Oltmann memorialized some of his allegations against Coomer in an affidavit. Indeed, a review of "Dominion-izing the Vote" reveals that this segment was not a report of active judicial proceedings.

197.    OAN-Rion also argue, for the first time on reply, that the incremental harm doctrine bars Coomer's recovery as a matter of law because any harm that accrued to Coomer was the result of his own Facebook posts.[408] This argument is untimely but will be addressed by this Court. Under the incremental harm doctrine, malicious or false statements may not be actionable where there are nonactionable parts of a particular publication that are damaging, and the malicious and false statements fail to cause any incremental harm above what is caused by the remainder of the publication. *See Tonnessen v. Denver Pub. Co.*, 5 P.3d 959, 965 (Colo. App. 2000) (referencing the incremental harm doctrine in court's analysis of a second statement which was identical to a statement which was protected by the fair report doctrine). While it is questionable whether the incremental harm doctrine applies in Colorado, that doctrine would not serve to immunize OAN-Rion from liability here because the harm associated with Coomer's Facebook posts being made public was dwarfed by the Oltmann allegations that Coomer had stated he had "fixed" the election and the statements that Coomer had actually acted

---

[408] *See* OAN-Rion Reply at 18-20.

engaged in election fraud.  It is one thing to hold strong political beliefs.  It is another thing entirely to engage in criminal conduct to change the results of an election.

198.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against OAN-Rion.

### f.    Powell, Powell P.C., and Defending the Republic

199.    As to the first and second elements, Coomer has put forward *prima facie* evidence that Powell et al. made defamatory, false statements of fact concerning Coomer. These statements include allegations that Coomer participated in an Antifa conference call, that Coomer made statements on that call that he was "going to f- Trump," a claim that there was a recording of Coomer making these statements, and then a claim that Coomer subverted the presidential election. There is no dispute that Powell made the statements at issue. There is *prima facie* evidence that Powell published the statements regarding Coomer on her own behalf, as a representative of her entities, Powell, P.C. and Defending the Republic, and as a representative of the Trump Campaign. These statements were first made on November 19, 2020 during a televised press conference at the Republican National Convention. Powell then actively promoted her statements, republishing them on a national media tour. To the extent that Powell et al. republished Oltmann's allegations, Powell et al. are equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also* Colo. Jury Instr., Civil 22:7.

200.    Powell et al. continue to claim that the statements were substantially true. However, Powell et al. have produced no evidence that would support a finding that any of these statements were true. Powell et al. presented no evidence that 1) Coomer was on an Antifa call; 2) that Coomer stated he would make sure Trump did not win the election; or 3) that Coomer interfered with the election in any manner whatsoever.

201.    In its reply, Defending the Republic argues for the first time that it is not the proper party as to the claims asserted because it was not formed with the Texas Secretary of State until after the statements were made.[409]  Not only is this argument untimely but it is refuted by *prima facie* evidence showing Defending the Republic was actively soliciting donations at the time of Powell's statements.

202.    Further, Powell et al. argue, like the defendants above, that their statements are protected opinion and hyperbolic rhetoric.[410]  This argument fails for the same reasons outlined above. While there are certainly many instances where Powell et al. did employ hyperbole and dangerous rhetoric, those statements are distinct from Powell et al.'s additional statements of fact which alleged that Coomer participated in an Antifa conference call, stated on that call that he intended to subvert the presidential election, then did in fact subvert the presidential election and that there was a recording of Coomer's statements. These statements of Powell et al. are actionable because they express or imply verifiably false facts about Coomer and the existence of a recording.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Burns v. McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1360 (Colo. 1983). Coomer has unequivocally declared that these

---

[409] *See* DTR Reply at 1-7.
[410] *See* Powell Mot. at 24-25; DTR Mot. at 24-26.

statements are false. This evidence is accepted as true. *See Baral v. Schnitt*, 376 P.3d 604, 608-09 (Cal. 2016). This evidence is also uncontroverted because, absent Oltmann's wholly incredible testimony, Powell et al. have not put forward any evidence in support of their allegations against Coomer. Regardless, Powell et al.'s statements impute a criminal offense, which is actionable even if in the form of an opinion. *See Keohane v. Stewart*, 882 P.2d 1293, 1304 (Colo. 1994).

203.   As to the third element, there is *prima facie* evidence that Powell et al. acted with actual malice in publishing their statements. Here, Powell et al.'s allegations against Coomer were based on Oltmann's allegations without substantial independent support. Powell et al. also had reason to question the reliability of Oltmann as a witness given Oltmann's prior statements regarding the election, the wildly improbably nature of his allegations and the lack of evidence in support of his claims. Yet, there is *prima facie* evidence Powell et al. did not investigate the allegations against Coomer; did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support; did not consult with experts on election systems to confirm the allegations made. Instead, there is evidence that Powell et al. disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is evidence the allegations against Coomer were inherently improbable. Yet Powell et al. republished and embellished these allegations to a national audience. There is evidence that Powell et al.'s allegations against Coomer conformed to a preconceived false storyline of fraud given their allegations of fraud leading up to and after the election. Further, there is evidence

that Powell et al. had incentive to defame Coomer both in support of former president Trump and to gain national exposure and financial contributions. This evidence is sufficient to support a finding of actual malice. *See, e.g.*, *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967).

204.   As to the fourth element, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by Powell et al.'s defamatory statements.

205.   To avoid liability for their statements, Powell et al. argue that the various election-related lawsuits immunize their statements about Coomer under the litigation privilege.[411] Broadly speaking, an attorney's statements, even if defamatory, when made in the course of, or in preparation for, judicial proceedings in a filed case cannot be the basis of a tort claim if the statements are related to the litigation. *Patterson v. James*, 454 P.3d 345, 350 (Colo. App. 2018), *citing Begley v. Ireson*, 399 P.3d 777 (Colo. App. 2017).

206.   The best summary of Colorado's treatment of the litigation privilege in defamation suits is found in *Miller v. Inst. for Def. Analyses*, No. 17-CV-02411-NYW, 2018 WL 10563049, at *5 (D. Colo. May 29, 2018) wherein Magistrate Judge Nina Y. Wang stated:

> In certain instances, Colorado law shields an attorney's communications from liability for defamation, even if the statements are in fact defamatory. Derived from the Restatement (Second) of Torts § 586, an attorney is "absolutely privileged to publish defamatory matter concerning another in communications *preliminary* to a proposed judicial proceeding, or in the *institution of*, or *during* the course" of judicial proceedings in which the attorney participates as counsel, "*if it has some relation to the proceeding*." *Club Valencia Homeowners Ass'n, Inc. v. Valencia Assocs.*, 712 P.2d 1024, 1027 (Colo. App. 1985) (emphasis added) ("[T]he alleged defamatory matter

---

[411] *See* Powell Mot. at 5, 11-17; DTR Mot. at 5-6, 12-18.

must have been made in reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue involved in it."); *Buckhannon v. U.S. West Commc'ns, Inc.*, 928 P.2d 1331, 1335 (Colo. App. 1996) (extending this privilege to "bar[] other non-defamation claims that stem from the same conduct."). *see also Partminer Worldwide Inc. v. Siliconexpert Techs. Inc.*, No. 09-cv-00586-MSK-MJW, 2010 WL 502718, at *5 (D. Colo. Feb. 10, 2010) (dismissing defamation claim, because the litigation privilege shielded communications from the plaintiff's general counsel that Mr. Williams was the "leak" of proprietary information alleged in a state court case and noting communications were an attorney's concerning a judicial proceeding). A division of the Colorado Court of Appeals has since qualified that defamatory communications made preliminary to actual litigation must not only relate to the proposed litigation but that the proposed litigation must be contemplated in good faith. *See Begley v. Ireson*, 399 P.3d 777, 781 (Colo. App. 2017). Several Colorado courts have also inquired as to whom the communication was disclosed, as the "maker of the statement and the recipient must be involved in and closely connected with the proceeding." *Club Valencia Homeowners Ass'n, Inc.*, 712 P.2d at 1027 (holding the privilege applied to an attorney's letter apprising individual homeowners of a lawsuit initiated by the homeowner's association); *see also Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1315 (D. Colo. 1998) (holding the privilege did not apply to an attorney's statements about a pending lawsuit made to the press or posted on the internet); *Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 438 F. Supp. 2d 1288, 1294–95 (D. Colo. 2006) (holding the privilege did not apply to attorney statements made in a press release and brochures distributed to the public despite being published in the course of a judicial proceeding).

207.   In asserting the litigation privilege, Powell et al. rely on various lawsuits filed to challenge the election results, including those wherein Powell included the Oltmann affidavit. However, Coomer's claims against Powell et al. are based on statements made to national media—not on statements made in those lawsuits. Here, Powell's statements made in the course of the national press conference and her statements regarding Coomer which were made to the national media bore no relation to judicial proceedings and were directed to individuals with no relationship to any potential litigation. Thus, Colorado's litigation privilege does not apply to protect Powell et al. from

Coomer's defamation claims, and any election-related litigation filed before or after the alleged defamation is irrelevant. *See Kleier Advert., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1043-44 (10th Cir. 1990) (citations omitted) ("unnecessary publication to the news media may result in loss of the privilege as well as publication to those wholly unconnected with the judicial process").

208.   Additionally, the litigation privilege applies only to statements made prior to a judicial proceeding when those statements have "some relation to a proceeding that is contemplated in *good faith* and under serious consideration." *See Begley*, 399 P.3d at 782 (Colo. App. 2017) (emphasis added). Powell et al. have not presented any evidence that they ever considered pursuing litigation against Coomer, much less that any of their litigation decisions or strategies involving Coomer were made in good faith. Therefore, their statements may still be actionable, even if made by means other than press conference or media appearance. There is significant evidence in the record that Powell et al.'s assertions of good faith regarding her reference to Coomer are baseless and thus, the litigation privilege will not protect her pre-litigation statements concerning Coomer.

209.   Defending the Republic attempts, for the first time on reply, to create a distinction between an "absolute" and a "conditional" litigation privilege.[412] But when analyzing an attorney's prelitigation statements, the distinction between an absolute and a conditional, or qualified, privilege is ultimately irrelevant. *See Begley*, 399 P.3d at 791 ("Whether this privilege is characterized as absolute or qualified is beside the point."). The inquiry remains whether the prelitigation statements were made in connection with

---

[412] *See* DTR Reply at 12-15.

prospective litigation and whether the litigation was contemplated in good faith. *Id.* It is unclear how Powell et al.'s statements were made in connection with prospective litigation or contemplated in good faith given their statements against Coomer were likely made with knowledge or reckless disregard for the falsity of those statements. Moreover, applying Defending the Republic's interpretation of the litigation privilege here would reward Powell's post-defamation filing of bad faith and meritless lawsuits, realizing the fear articulated in *Begley*, *supra*, that extending the litigation privilege to prelitigation statements could "encourage or protect attorneys who file bad faith litigation in order to immunize otherwise tortious conduct." *Id.*

210.    In summary, even where privilege applies in a defamation suit, it can be lost by a finding of actual malice, *see Burke v. Greene*, 963 P.2d 1119, 1122 (Colo. App. 1998), or by unnecessary publication of privileged statements to news media or "those wholly unconnected with the judicial process." *See Seidl*, 30 F. Supp. 2d at 1314; *see also Club Valencia Homeowners Ass'n, Inc. v. Valencia Assocs.*, 712 P.2d 1024, 1027 (Colo. App. 1985) ("the maker of the statement and the recipient must be involved in and closely connected with the proceeding"). When analyzing statements made to the press, the attorney's intent is relevant. Statements made solely for the purpose of publicity are not privileged. *See Seidl*, 30 F. Supp at 1315. Here, as addressed above, there is sufficient evidence to support a finding of actual malice. There is also sufficient evidence that Powell et al.'s purpose in publishing their statements to the press was pure publicity. Thus, even if the privilege did apply, Powell et al. would not be entitled to its protections.

211.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Powell et al.

### g.    *Giuliani*

212.    As to the first and second elements, Coomer has put forward *prima facie* evidence that Giuliani made defamatory, false statements of fact concerning Coomer. These statements include allegations that Coomer was "close to Antifa" and participated in an Antifa call, that he intended to "fix the election," and that he did in fact subvert the presidential election. There is no dispute that Giuliani published the statements at issue.[413] There is *prima facie* evidence that Giuliani published the statements regarding Coomer, both individually and as a representative of the Trump Campaign, on November 19, 2020 during a televised press conference at the Republican National Convention. To the extent Giuliani republished Oltmann's allegations, Giuliani is equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson v. Newsweek, Inc.*, 562 F.2d 626, 631 (10th Cir. 1977); *see also* Colo. Jury Instr., Civil 22:7.

213.    As to the third element, there is *prima facie* evidence that Giuliani acted with actual malice in publishing his statements. Here, Giuliani's allegations against Coomer were based on Oltmann's wholly incredible allegations without substantial independent support and which were contradicted by the Trump Campaign's own internal research and memo. Giuliani also had reason to question the reliability of his sources given the wildly improbable nature of the allegations and lack of evidence in

---

[413] *See generally* Giuliani Mot.; Giuliani Reply.

support of those allegations. Yet there is *prima facie* evidence Giuliani did not investigate the allegations against Coomer; did not speak with witnesses or review any evidence in support of the allegations despite his purported understanding that there was a video and witnesses; did not review research prepared by the Trump Campaign, including the internal memo rejection the claims; and did not consult with experts on election systems to determine whether the allegations against Coomer were accurate. Instead, there is evidence that Giuliani disregarded credible sources of information that refuted the allegations, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is evidence the allegations against Coomer were inherently improbable. Yet Giuliani republished and embellished these allegations. There is evidence that Giuliani's allegations against Coomer conformed to a preconceived storyline of fraud given his allegations of fraud after the election. Further, there is evidence that Giuliani had incentive to defame Coomer both in support of former president Trump and to maintain national attention. This evidence is sufficient to support a finding of actual malice. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967); *see also Kuhn v. Trib.-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981); *Burns v. McGraw Hill Broad. Co., Inc.*, 659 P.2d 1351, 1361-62 (Colo. 1983).

214.   As to the fourth element, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by Giuliani's defamatory statements.

215.    Like Powell et al., Giuliani relies on the various election-related lawsuits to argue that his statements about Coomer are immunized under the litigation privilege.[414] However, Giuliani was not involved in any election-related lawsuits referencing Coomer. Further, as addressed above in relation to Powell et al.'s claims of litigation privilege, the litigation privilege does not apply because Coomer's claims against Giuliani are based on statements made to the national media, not on statements made in those lawsuits.  *See Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1314-15 (D. Colo. 1998); and *Cache la Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 438 F. Supp. 2d 1288, 1294–95 (D. Colo. 2006). Nor can Giuliani establish that his pre-litigation statements were made in good faith contemplation of litigation against Coomer given the lack of evidence in support of the allegations. *See Begley v. Ireson*, 399 P.3d 777, 782 (Colo. App. 2017). Moreover, even if the privilege did apply, Giuliani would not be entitled to its protections because there is sufficient evidence to support a finding of actual malice and the purpose of publishing their statements to the press was publicity.

216.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against Giuliani.

### h.    *Trump Campaign*

217.    As to the first and second elements, Coomer has put forward *prima facie* evidence that the Trump Campaign, through its agents made defamatory, false statements of fact concerning Coomer. These statements include allegations that Coomer participated in an Antifa conference call, made statements on that call that he intended

---

[414] *See* Giuliani Mot. at 9-16; Giuliani Reply at 7.

to subvert the presidential election, and that votes for Trump had in fact "disappeared." There is *prima facie* evidence that the Trump Campaign, through its agents Powell and Giuliani, Eric Trump and former president Trump, published the statements regarding Coomer. The Trump Campaign then actively promoted the statements about Coomer through a national media tour and on Twitter. To the extent the Trump Campaign republished Oltmann's allegations, the Trump Campaign is equally liable for such republication as "the republication of false defamatory statements is as much a tort as the original publication." *See Dixson*, 562 F.2d at 631; *see also* Colo. Jury Instr., Civil 22:7.

218.   As to the third element, there is *prima facie* evidence that the Trump Campaign acted with actual malice in publishing its statements. In publishing its statements, the Trump Campaign ignored its own research expressly rejecting any connection between Coomer and claims of election fraud. The Trump Campaign's allegations against Coomer were based on Oltmann's wholly incredible and discredited allegations without substantial independent support. The Trump Campaign had reason to question the reliability of Oltmann as a witness given Oltmann's prior statements regarding his determination to reject the results of the election, the wildly improbably nature of his allegations, the lack of evidence in support of Oltmann's claims, and the Trump Campaign's own internal research and memo which discredited the allegations. Further, there is *prima facie* evidence the Trump Campaign did not review the notes Oltmann allegedly took during the call; did not seek other witnesses or evidence in support of the allegations; and did not consult with experts on election systems to determine whether the allegations against Coomer were accurate. Instead, there is

evidence that the Trump Campaign disregarded its own research debunking the allegations against Coomer and disregarded outside credible sources of information that refuted the allegations at the time they were made, including statements by CISA and former U.S. Attorney General Barr that there was no evidence of widespread fraud. There is evidence the allegations against Coomer were inherently improbable. Yet the Trump Campaign republished and promoted these allegations. There is evidence that the Trump Campaign's allegations against Coomer conformed to a preconceived false storyline of fraud given its allegations leading up to and after the election. Further, there is evidence that the Trump Campaign had incentive to defame Coomer both in support of former president Trump and to continue to solicit campaign contributions under the guise of challenging the election results. This evidence is sufficient to support a finding of actual malice. *See Curtis Publ'g Co.*, 388 U.S. at 157-58 (1967); *see also Kuhn*, 637 P.2d at 319; *Burns*, 659 P.2d at 1361-62.

219.   As to the fourth element, there is *prima facie* evidence that Coomer has suffered special damages in the form of serious emotional distress, pecuniary loss, and other damages that were caused by the Trump Campaign's defamatory statements.

220.   The Trump Campaign relies on the various election-related lawsuits to argue that its statements about Coomer were immunized under the litigation privilege.[415] However, the Trump Campaign was not involved in any election-related lawsuits referencing Coomer. Further, as addressed above in relation to Powell et al.'s claims of litigation privilege, the litigation privilege does not apply because Coomer's claims against

---

[415] *See* Trump Campaign Mot. at 11-14; Trump Campaign Reply at 3-7.

the Trump Campaign are based on statements made to the national media, not on statements made in those lawsuits. *See also Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1314-15 (D. Colo. 1998). Nor can the Trump Campaign establish that its pre-litigation statements were made in good faith contemplation of litigation against Coomer or related to Coomer given the lack of evidence in support of its allegations. *See Begley v. Ireson*, 399 P.3d 777, 782 (Colo. App. 2017). Moreover, even if the privilege did apply, the Trump Campaign would not be entitled to its protections because there is sufficient evidence to support a finding of actual malice and the purpose of publishing its statements to the press was publicity, false propaganda, and fundraising.

221. The Trump Campaign next argues that it is immune from liability under the Westfall Act for former president Trump's Twitter posts about Coomer because President Trump was acting within the scope of his federal employment at the time of his posts.[416] While the Westfall Act provides immunity for federal employees acting within the scope of their office or employment, it does not grant absolute immunity for that employee's conduct. 28 U.S.C. §§ 2679(b)(1), (d) (1988). Rather, if the Attorney General or the court certifies that an employee was acting within the scope of their employment at the time the tortious conduct occurred, the United States will be substituted as the defendant in the litigation. *Id.* at §§ 2679(d)(1), (3). The Trump Campaign offers no certification from the Attorney General that President Trump was acting within the scope of his employment when the statement was made, nor does it seek such certification from the Court. The Trump Campaign fails altogether to identify the President's scope of employment or

---

[416] *See* Trump Campaign Mot. at 18.

explain how defaming Coomer with actual malice might fall within it. The Trump Campaign further fails to explain how the Westfall Act precludes the Trump Campaign's own liability, especially because former president Trump has not been sued in his individual capacity.

222.   The Trump Campaign also argues that it is immune from liability under Section 230 of the CDA because Eric Trump was a "mere distributor/re-publisher" when he posted Oltmann's alleged defamatory statements about Coomer on Twitter.[417]  For the first time on reply, the Trump Campaign attempts to expand this argument to include former president Trump and his tweets.[418] While the Trump Campaign's attempt to expand this argument is untimely, the application of Section 230 to Eric Trump's and former president Trump's tweets strains the reach of CDA immunity. The United States Supreme Court has recently cautioned against the "sweeping immunity" some courts have read into the CDA, noting that "[e]xtending [this] immunity beyond the natural reading of the text can have serious consequences." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 18 (2020). Here, on November 17, 2020, Eric Trump did not merely republish the statements of Holt-TGP. Rather, Eric Trump's tweet included his own statement "Eric Coomer - Dominions [sic] Vice President of U.S. Engineering—'Don't worry about the election, Trump's not gonna win. I made f*cking sure of that.'"[419] Eric Trump published his own defamatory statements to his Twitter followers. Thus,

---

[417] *Id.* at 20.
[418] *See* Trump Campaign Reply at 7-8.
[419] Ex. M-1, PX 69.

the Trump Campaign's reliance on *Barrett v. Rosenthal*, 146 P.3d 510 (Cal. 2006) is misplaced.

223.   Further, even if Eric Trump or the former president were properly considered "mere" distributors or re-publishers, this immunity does not extend to a provider's or user's distribution of information it knew or had reason to know was defamatory. *See Malwarebytes, Inc.*, 141 S. Ct. at 15-16. As addressed above, there is sufficient evidence that Eric Trump, former president Trump, and the Trump Campaign had reason to know Oltmann's statements about Coomer were false, precluding Section 230 immunity.

224.   For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for defamation against the Trump Campaign.

### ii.   *Coomer has established a prima facie showing of intentional inflicition of emotional distress by clear and convincing evidence.*

225.   Coomer has made a *prima facie* showing for intentional inflicition of emotional distress by clear and convincing evidence.  A claim for intentional inflicition of emotional distress requires proof that "(1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress." *Mackall v. JPMorgan Chase Bank, N.A.*, 356 P.3d 946, 955 (Colo. App. 2014) (citing *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004)). Claims for intentional inflicition of emotional distress that are premised on defamatory publications are subject to the same constitutional protections for public speech as applied to claims for defamation. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-

52 (1988). If a statement involves a public official, public figure, or matter of public concern, the plaintiff must also prove falsity and actual malice. *See id.* For purposes of this review, a plaintiff need only establish a reasonable probability that he would be able to prove falsity and actual malice at trial. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Young v. CBS Broad., Inc., 212 Cal. App. 4th 551, 562 (2012); Ampex Corp. v. Cargle, 128 Cal. App. 4th 1569, 1576 (2005).* Coomer has established *prima facie* evidence of falsity and actual malice.

### a. *Oltmann, FEC United, and Shuffling Madness Media*

226.    As to the first element, Coomer has put forward *prima facie* evidence that Oltmann et al. engaged in extreme and outrageous conduct. Extreme and outrageous conduct exists when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Han Ye Lee v. Colorado Times, Inc.*, 222 P.3d 957, 963 (Colo. App. 2009). Courts have found allegations of extreme and outrageous conduct sufficient when the statements at issue defame, denigrate, harass, or threaten the plaintiff. *See, e.g.*, *Han Ye Lee*, 222 P.3d at 963 65 (finding a newspaper's unverified statements that a wife failed to testify in her husband's murder trial outrageous); *Meiter v. Cavanaugh*, 580 P.2d 399, 401 (Colo. App. 1978) (finding a tenant's statements suggesting a special influence in judicial proceedings and mocking a landlord's serious physical condition outrageous); *Montoya v. Bebensee*, 761 P.2d 285, 286-90 (Colo App. 1988) (finding alleged bad faith reports of child abuse by an unlicensed mental health provider outrageous); *Ellis v. Buckley*, 790 P.2d 875, 877 (Colo. App. 1990) (finding accusations of theft against an employee with no evidence

outrageous); *Rugg v. McCarty*, 476 P.2d 753, 754 56 (Colo. 1970) (finding requests for payment and threats to garnish wages without a judgment outrageous); *Donaldson v. Am. Banco Corp. Inc.*, 945 F. Supp. 1456, 1465 66 (D. Colo. 1996) (finding derogatory comments by a supervisor to pregnant employees outrageous); *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530, 1543 44 (D. Colo. 1992) (finding racial slurs in an employment setting outrageous). Such a finding is not necessarily predicated on a pattern of conduct.

227.    In *Han Ye Lee*, *supra*, a plaintiff sued a newspaper for causing her severe emotional distress with a defamatory newspaper article that falsely reported that she declined to testify in her husband's murder trial. *Han Ye Lee*, 222 P.3d at 964. The article implied that the plaintiff was disloyal to her husband and impugned her integrity. *Id.* Further, the evidence established that the defendants published the article recklessly and without verifying the information. *Id.* The court in *Han Ye Lee* explained that a reasonable jury could find such defamatory statements by a newspaper article were extreme and outrageous. *Id.*

228.    Like *Han Ye Lee*, Oltmann et al. have impugned Coomer's integrity and reputation by alleging Coomer conspired to defraud the American public from democratically electing their next president. It is difficult to comprehend statements more extreme and more damaging than the ones Oltmann et al. have made regarding Coomer, especially given the fact that Coomer's professional career was in election services. There is evidence Oltmann et al. repeatedly, maliciously and without legitimate evidence, falsely accused Coomer of overturning the presidential election. These allegations imputed criminal conduct, accused Coomer of being mentally ill, a sociopath, and claimed that

"not one person has said that this person is a decent human being." Further, there is evidence Oltmann et al.'s allegations incited threats of real violence against Coomer by disclosing his home address, encouraging the public to find him, and calling him a traitor, and calling for him to be put to death. This is sufficient to establish a *prima facie* showing that Oltmann et al.'s defamatory statements were extreme and outrageous.

229.   As to the second element, there is *prima facie* evidence that Oltmann et al. acted recklessly and with the intent to cause Coomer severe emotional distress. Intent exists when a defendant engages in conduct with the purpose of causing severe emotional distress to another person or knows that his conduct is certain or substantially certain to have that result. *Culpepper v. Pearl St. Bldg. Inc.*, 877 P.2d 877, 882-83 (Colo. 1994). Recklessness exists when, at the time of the conduct, a defendant knew or reasonably should have known that there was a substantial probability that his conduct would cause another severe emotional distress. *Id.* Given the nature and scope of Oltmann et al.'s defamation, there is *prima facie* evidence they knew or should have known there was a substantial probability that their conduct would cause Coomer severe emotional distress. Coomer has put forward *prima facie* evidence establishing both falsity and Oltmann et al.'s actual malice.

230.   As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Oltmann et al.'s statements. *See Paulson v. State Farm Mut. Auto. Ins. Co.*, 867 F. Supp. 911, 919 (C.D. Cal. 1994) (noting that, in

order to establish severe emotional distress, the plaintiff must "prove that he suffered objective symptoms of distress."). Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

231.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Oltmann et al.

###    b.    *Malkin*

232.    As to the first element, Coomer has put forward *prima facie* evidence that Malkin engaged in extreme and outrageous conduct. Like the defendants above, there is evidence that Malkin repeatedly and without evidence, falsely accused Coomer of overturning the presidential election. These allegations imputed criminal conduct as well as professional misconduct. Further, there is evidence Malkin's allegations incited threats of real violence against Coomer. This is sufficient to establish a *prima facie* showing that Malkin's defamatory statements were extreme and outrageous.

233.    As to the second element, there is *prima facie* evidence that Malkin acted recklessly and with the intent to cause Coomer severe emotional distress. Given the nature, scope and reach of Malkin's defamation, there is *prima facie* evidence she knew or should have known there was a substantial probability that her conduct would cause Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Coomer has put forward *prima facie* evidence establishing both falsity and Malkin's actual malice.

234.    As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has

sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Malkin's statements. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

235.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Malkin.

### c.    *Hoft and TGP Communications*

236.    As to the first element, Coomer has put forward *prima facie* evidence that Hoft-TGP engaged in extreme and outrageous conduct.  Like the defendants above, there is evidence that Hoft-TGP repeatedly, without evidence, falsely accused Coomer of overturning the presidential election.  These allegations imputed criminal conduct as well as professional misconduct. There is evidence Hoft-TGP labeled Coomer an "unhinged sociopath" in an article that was shared with millions of people. Further, there is evidence Hoft-TGP's allegations incited threats of real violence against Coomer, including posting an article advertising a million-dollar bounty on Coomer. This is sufficient to establish a *prima facie* showing that Hoft-TGP's defamatory statements were extreme and outrageous.

237.    As to the second element, there is *prima facie* evidence that Hoft-TGP acted recklessly and with the intent to cause Coomer severe emotional distress. Given the nature, scope and reach of Hoft-TGP's defamation, there is *prima facie* evidence they knew or should have known there was a substantial probability that their conduct would

cause Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Indeed, it appears that they intended this result. Coomer has put forward *prima facie* evidence establishing both falsity and Hoft-TGP's actual malice.

238.   As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Hoft-TGP's statements. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

239.   For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Hoft-TGP.

### d.   *Metaxas*

240.   As to the first element, Coomer has put forward *prima facie* evidence that Metaxas engaged in extreme and outrageous conduct. Like the Defendants above, there is evidence that Metaxas without evidence, falsely accused Coomer of overturning the presidential election. These allegations imputed criminal conduct as well as professional misconduct. Further, there is evidence Metaxas's allegations incited threats of real violence against Coomer. This is sufficient to establish a *prima facie* showing that Metaxas's defamatory statements were extreme and outrageous.

241.   As to the second element, there is *prima facie* evidence that Metaxas acted recklessly and with the intent to cause Coomer severe emotional distress. Given the

nature, scope and reach of Metaxas's defamation, there is *prima facie* evidence he knew or should have known there was a substantial probability that his conduct would cause Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Coomer has put forward *prima facie* evidence establishing both falsity and Metaxas's actual malice.

242.   As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Metaxas's statements. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

243.   For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Metaxas.

### e.   *OAN and Rion*

244.   As to the first element, Coomer has put forward *prima facie* evidence that OAN-Rion engaged in extreme and outrageous conduct. Like the defendants above, there is evidence that OAN and Rion without evidence and in the face of compelling evidence to the contrary, falsely accused Coomer of overturning the presidential election. These allegations imputed criminal conduct as well as professional misconduct. Further, there is evidence OAN-Rion's allegations incited threats of real violence against Coomer. This is sufficient to establish a *prima facie* showing that OAN-Rion's defamatory statements were extreme and outrageous.

245.   As to the second element, there is *prima facie* evidence that OAN-Rion acted recklessly and with the intent to cause Coomer severe emotional distress. Given the nature, scope and reach of OAN-Rion's defamation, there is *prima facie* evidence they knew or should have known there was a substantial probability that their conduct would cause Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Coomer has put forward *prima facie* evidence establishing both falsity and OAN-Rion's actual malice.

246.   As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by OAN-Rion's statements. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

247.   For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against OAN-Rion.

### f.   *Powell, Powell P.C., and Defending the Republic*

248.   As to the first element, Coomer has put forward *prima facie* evidence that Powell et al. engaged in extreme and outrageous conduct. Like the Defendants above, there is evidence that Powell et al. without evidence, falsely accused Coomer of overturning the presidential election. These allegations imputed criminal conduct as well as professional misconduct. Further, there is evidence Powell et al.'s allegations incited

threats of real violence against Coomer. This is sufficient to establish a *prima facie* showing that Powell et al.'s defamatory statements were extreme and outrageous.

249.   As to the second element, there is *prima facie* evidence that Powell et al. acted recklessly and with the intent to cause Coomer severe emotional distress. Given the nature, scope and reach of Powell et al.'s defamation, there is *prima facie* evidence they knew or should have known there was a substantial probability that their conduct would cause Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Coomer has put forward *prima facie* evidence establishing both falsity and Powell et al.'s actual malice.

250.   As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Powell et al.'s statements. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

251.   For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Powell et al.

### g.   *Giuliani*

252.   As to the first element, Coomer has put forward *prima facie* evidence that Giuliani engaged in extreme and outrageous conduct. Like the defendants above, there is evidence that Giuliani without evidence, falsely accused Coomer of overturning the

presidential election. These allegations imputed criminal conduct as well as professional misconduct. Further, there is evidence Giuliani's allegations incited threats of real violence against Coomer. This is sufficient to establish a *prima facie* showing that Giuliani's defamatory statements were extreme and outrageous.

253.    As to the second element, there is *prima facie* evidence that Giuliani acted recklessly and with the intent to cause Coomer severe emotional distress. Given the nature, scope and reach of Giuliani's defamation, there is *prima facie* evidence he knew or should have known there was a substantial probability that his conduct would cause Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Coomer has put forward *prima facie* evidence establishing both falsity and Giuliani's actual malice.

254.    As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by Giuliani's statements. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

255.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against Giuliani.

### h.    *Trump Campaign*

256.    As to the first element, Coomer has put forward *prima facie* evidence the Trump Campaign engaged in extreme and outrageous conduct. Like the defendants

above, there is evidence that Trump Campaign without evidence, falsely accused Coomer of overturning the presidential election. These allegations imputed criminal conduct as well as professional misconduct. Further, there is evidence the Trump Campaign's allegations incited threats of real violence against Coomer. This is sufficient to establish a *prima facie* showing the Trump Campaign's defamatory statements were extreme and outrageous.

257.    As to the second element, there is *prima facie* evidence the Trump Campaign acted recklessly and with the intent to cause Coomer severe emotional distress. Given the nature, scope and reach of the Trump Campaign's defamation, there is *prima facie* evidence it knew or should have known there was a substantial probability that its conduct would cause Coomer severe emotional distress. *See Culpepper*, 877 P.2d at 882-83. Coomer has put forward *prima facie* evidence establishing both falsity and the Trump Campaign's actual malice.

258.    As to the third element, there is *prima facie* evidence that Coomer has suffered severe emotional distress, including anxiety and depression, for which he has sought medical treatment, and he has experienced lost wages and other negative harm from the severe emotional distress caused by the Trump Campaign's statements. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

259.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for intentional infliction of emotional distress against the Trump Campaign.

### iii.   *Coomer has established a prima facie showing of conspiracy by clear and convincing evidence.*

260.   Coomer has made a *prima facie* showing of civil conspiracy by clear and convincing evidence. To prevail on a claim for civil conspiracy, a plaintiff must prove five elements: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006). Conspiracy is a derivative claim based on underlying unlawful conduct. *See Colo. Cmty. Bank v. Hoffman*, 338 P.3d 390, 397 (Colo. 2013). Here, Coomer has premised his conspiracy claims on his claims for defamation and intentional infliction of emotional distress.

### a.   *Oltmann, FEC United, and Shuffling Madness Media*

261.   As to the first three elements, Coomer has put forward *prima facie* evidence that Oltmann, FEC United, and SMM, by words and conduct, agreed to invent a fictional story to defame Coomer as part of Oltmann's pledge to "die on this hill" that Joe Biden would never be president. This was an agreement between two or more persons. The object to be accomplished was to spread dangerous and inflammatory political disinformation designed to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Coomer. There is *prima facie* evidence of a meeting of the minds on this object and the respective course of action.  This agreement to spread dangerous and inflammatory political disinformation designed to undermine the legitimacy of the 2020 presidential election by defaming and intentionally

inflicting emotional distress on Coomer extended to all of the other defendants in this case.

262.   Coomer does not need to prove express agreement to establish conspiracy. *See Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1326-27 (Colo. App. 1992). Rather, conspiracy may be implied by course of conduct or other circumstantial evidence providing some indicia of agreement. *Id.* at 1327; *Ferraro v. Convercent, Inc.*, No. 17-CV-00781-RBJ, 2017 WL 4697499, at *5 (D. Colo. Oct. 19, 2017). Indeed, because few, if any, "smoking guns" are ever discovered, most conspiracy claims are established by circumstantial evidence. *Lee v. State Farm Mut. Auto. Ins. Co.*, 249 F.R.D. 662, 669 (D. Colo. 2008) ("Circumstantial evidence is not only permissible in determining whether there is illicit conduct or agreement, it is indeed the usual and customary basis for doing so. Direct evidence is seldom available and few so called 'smoking guns' are ever discovered. What individuals actually do—and perhaps more significantly what they do not do—is more probative."). As such, an agreement to conspire may "be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Wyatt v. Union Mortgage Co.*, 598 P.2d 45, 52 (Cal. 1979). "Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator." *Id.*

263.   The appellate court in *Schneider* recognized that conspiracy may be implied by a course of conduct and other circumstantial evidence providing "some indicia of agreement in an unlawful means or end." *Schneider*, 854 P.2d at 1326-27. There the court found that a car dealership's sales to an unlicensed motorist at discount prices to

encourage repeat purchases while knowing of the motorist's reckless driving was sufficient evidence for a jury to find a tacit agreement between the dealership and motorist to commit a tortious act. *Id.*  Similarly, the appellate court in *Saint John Church in Wilderness v. Scott*, 194 P.3d 475, 480 (Colo. App. 2008) found that protestors' promotion, preparation, and participation in a protest were sufficient evidence to establish a conspiracy to commit a private nuisance.

264.    Here, there is *prima facie* evidence that Oltmann conspired with the other defendants in this case to spread political disinformation at Coomer's expense. There is evidence Oltmann, as an authorized representative of FEC United and SMM, defamed and intentionally inflicted emotional distress on Coomer. Further, there is evidence Oltmann directly coordinated with and served as the source for the other defendants' defamation and intentional infliction of emotional distress, which includes directly providing false information to the defendants, agreeing to interviews with the defendants with the purpose of spreading disinformation, and publishing the actionable statements in concert with the other defendants.  Indirectly, Oltmann also served as the source of the defamation, which the other defendants relied upon with actual malice by republishing his allegations against Coomer.

265.    As to the fourth element, there is *prima facie* evidence that Oltmann et al. did defame and intentionally inflict emotional distress on Coomer, which are unlawful tortious acts. *See Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1054–55 (Colo. 1995).

266.   As to the fifth element, there is *prima facie* evidence that Coomer has suffered severe emotional distress caused by Oltmann et al.'s defamation and intentional infliction of emotional distress. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

267.   For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against Oltmann et al..

### *b.   Malkin*

268.   As to the first three elements, Coomer has put forward *prima facie* evidence that Malkin agreed with Oltmann, by words and conduct, to defame Coomer. This was an agreement between two or more persons. The object to be accomplished was to spread dangerous and inflammatory political disinformation with the goal of undermining the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Coomer. There is *prima facie* evidence of a meeting of the minds on this object and the respective course of action given Malkin's publication of Oltmann's allegations.

269.   There is also *prima facie* evidence that this agreement to spread dangerous and inflammatory political disinformation designed to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Coomer extended to all of the other defendants in this case. This conspiracy is unique among conspiracies in that the agreement to delegitimize the results of the election in the event former president Trump lost were overtly public. Allegations questioning the

legitimacy of the 2020 presidential election and efforts to undermine trust in elections and democracy occurred both prior to and after the election and were led by former president Trump, his campaign, and his supporters. There is evidence that Malkin was not only aware of but participated in these efforts, advancing various allegations of fraud, which included allegations that Coomer subverted the presidential election which she knew, or should have known were false. As part of those efforts, there is evidence that Malkin directly coordinated with and relied upon Oltmann as the sole unreliable source of her allegations against Coomer. Malkin acquired information from Oltmann, agreed to interview Oltmann, and published and promoted the actionable statements in concert with Oltmann. This course of conduct can be found with respect to all defendants. As such, there is evidence that each of the defendants agreed to defame Coomer for purposes of spreading dangerous and inflammatory disinformation with the goal of delegitimizing the election and directly or indirectly relied on Oltmann as the sole unreliable source of their allegations. *See Schneider*, 854 P.2d at 1326-27; *Saint John Church in Wilderness*, 194 P.3d at 480.

270.    As to the fourth element, there is *prima facie* evidence that Malkin did defame and intentionally inflict emotional distress on Coomer, which are unlawful tortious acts. *See Resolution Trust Corp.*, 898 P.2d at 1054–55. Malkin argues (without legal support) for some form of special immunity for news media defendants from conspiracy claims when a news media outlet reports on the reporting of other media outlets.[420] There is no special immunity for news media defendants from liability for

---

[420] *See* Malkin Reply at 14-15.

defamation committed with actual malice in the scope of their reporting. *Curtis Publ'g Co.*, 388 U.S. at 150 (finding news media defendants have "no special immunity from the application of general laws" and "no special privilege to invade the rights and liberties of others").

271.    As to the fifth element, there is *prima facie* evidence that Coomer has suffered severe emotional distress caused by Malkin's defamation and intentional infliction of emotional distress. *See Paulson*, 867 F. Supp. at 919. Because Coomer has suffered objective and verifiable symptoms of distress, he has made a *prima facie* showing for this element.

272.    For the foregoing reasons, Coomer has established a reasonable likelihood that he will prevail on his claims for conspiracy against Malkin.

### c.    *All Other Defendants*

273.    The Court incorporates the above findings and conclusions of law with respect to Coomer's *prima facie* showing of all elements necessary to establish by clear and convincing evidence his claims of civil conspiracy against defendants Hoft, TGP Communications, Metaxas, OAN, Rion, Powell, Powell P.C., Defending the Republic, Giuliani, and the Trump Campaign. All defendants cooperated and fed off one another to spread dangerous and inflammatory political disinformation designed to undermine the legitimacy of the 2020 presidential election by defaming and intentionally inflicting emotional distress on Coomer.

### iv.    *Coomer has established a prima facie showing for injunctive relief.*

274.    Coomer requests a permanent injunction against all Defendants in the event he prevails on his claims for defamation and intentional infliction of emotional distress. Only some of the Defendants raised challenges to Coomer's request for injunctive relief.[421] To prevail on a request for permanent injunction, a party must prove: "(1) he or she has achieved actual success on the merits; (2) irreparable harm will result unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause to the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Langlois v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 78 P.3d 1154, 1158 (Colo. App. 2003). Injunctive relief is appropriate when a defendant continues to publish defamatory statements about an individual. *Sunward Corp. v. Dun & Bradstreet, Inc.*, 568 F. Supp. 602, 609 (D. Colo. 1983), *rev'd on other grounds*, 811 F.2d 511 (10th Cir. 1987) ("First Amendment rights are not absolute, and if the First Amendment right is not deemed paramount, injunctive relief is appropriate if there is no adequate remedy at law."); *see also Beauharnais v. People of State of Ill.*, 343 U.S. 250, 256, (1952) (noting that defamatory statements are not entitled to First Amendment protection).

275.    As addressed above, Coomer has established a reasonable probability of prevailing on each of his claims against Defendants and, therefore, has established a likelihood of succeeding on the merits of his case.

---

[421] *See* Oltmann, et al. Mot. at 13-15; Hoft-TGP Mot. at 23; Metaxas Mot. at 11 (incorporating C.R.C.P. 12(b)(5) motion to dismiss by reference); Metaxas C.R.C.P. 12(b)(2) and 12(b)(5) Mot. at 14-15; OAN-Rion Mot. at 25; Powell Mot. at 7, n.5; DTR Mot. at 8, n.5; Giuliani Mot. at 22.

276.    Coomer has established that he will continue to suffer irreparable harm unless the injunction is issued. There is *prima facie* evidence rising to the standard of clear and convincing evidence that all Defendants published false and defamatory statements about Coomer with actual malice. There is also evidence that Defendants have not retracted or removed these statements. "[D]efamatory statements are so egregious and intolerable because the statement destroys an individual's reputation: a characteristic which cannot be bought, and one that, once lost, is extremely difficult to restore." *See Keohane v. Stewart*, 882 P.2d 1293, 1298 (Colo. 1994) (*citing Curtis Publ'g Co.*, 388 U.S. at 152). Courts have long recognized the irreparable, incalculable injuries people suffer from defamatory statements. *See id.*; *see also Hayes v. Todd*, 15 So. 752, 755 (Fla. 1894) (discussing why there is such a compelling interest in preventing and redressing attacks upon an individual's reputation). The evidence of damages Coomer has suffered to his reputation, privacy, and safety is sufficient to establish that irreparable harm would result if an injunction against all Defendants was not issued.

277.    Coomer has further put forward evidence sufficient to show the threatened injury to him would outweigh the harm that injunctive relief may cause to Defendants. Defamation has no constitutional value or protection, whereas a person's reputation is a protected liberty interest. *Gertz*, 418 U.S. at 341. The harm to Coomer's reputation, privacy, and safety outweighs the injunctive relief sought to compel the removal of published statements that have been adjudicated as defamatory.

278.    There is overwhelming evidence that an injunction would serve the public interest because the public is harmed by the spread of defamatory information. *See*

*Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 776 (1984). "False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 52 (1988).

279.    There is no constitutional value in false statements of fact or the deliberate spread of dangerous and inflammatory political disinformation designed to sow distrust in democratic institutions. *See Gertz*, 418 U.S. at 340. The public has an active interest in ensuring that there are remedies for defamatory statements. *See Keohane*, 882 P.2d at 1298. Here, there will be no adverse public interest if Defendants cannot publish statements determined to be defamatory.

280.    Subject to the adjudication of his claims, Coomer has established a *prima facie* basis for injunctive relief.

### B.    Defendants' requests for attorney's fees are not warranted under the anti-SLAPP statute and are denied.

281.    The purpose of the Colorado anti-SLAPP statute is to ensure that "participation in matters of public significance" is not "chilled through abuse of the judicial process." C.R.S. § 13-20-1101(1)(a). At the same time, the Colorado Legislature sought to "protect the rights of persons to file meritorious lawsuits for demonstrable injury." C.R.S. § 13-20-1101(b).

282.    In line with that purpose, section (4)(a) of the statute provides in part that "a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney's fees and costs." C.R.S. § 13-20-1101(4)(a). Because none of the Defendants have prevailed on their special motions to dismiss, none of the Defendants are entitled to costs or reasonable attorneys' fees.

## **CONCLUSION**

283.   The special motions to dismiss brought by all Defendants pursuant to C.R.S.

§13-20-1101 are hereby DENIED in their entirety.

Dated this 13th day of May, 2022.

BY THE COURT:

MARIE AVERY MOSES
District Court Judge