```
1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
2

3       ------------------------------------------------------------
                                    )
        SMARTMATIC USA CORP.,        )   File No. 22-cv-98
4       SMARTMATIC INTERNATIONAL     )          (WMW/JFD)
        HOLDING B.V. and SGO         )
5       CORPORATION LIMITED,         )
                                     )   St. Paul, Minnesota
6            Plaintiffs,             )   February 23, 2023
                                     )   2:59 p.m.
7       vs.                          )   VIDEO CONFERENCE
                                     )
8       MICHAEL J. LINDELL and MY    )
        PILLOW, INC.,                )
9
             Defendants.
10      ------------------------------------------------------------

11

12

13

14

15
                  BEFORE THE HONORABLE JOHN F. DOCHERTY
16          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                           (MOTION HEARING)
17

18

19

20

21

22

23        Proceedings reported by certified stenographer;
        transcript produced with computer.
24

25
```

1    **APPEARANCES** (Via Zoom Video Conference):

2      For the Plaintiffs:        Robins Kaplan LLP
                                   William Manske, ESQ.
3                                  800 LaSalle Avenue
                                   Suite 2800
4                                  Minneapolis, MN 55402-2015

5                                  Benesch Friedlander Coplan &
                                   Aronoff
6                                  Michael Elliot Bloom, ESQ.
                                   71 S. Wacker Drive
7                                  Suite 1600
                                   Chicago, IL 60606
8
                                   Jones Day
9                                  Jamie Ward, ESQ.
                                   77 West Wacker Drive
10                                 Suite 3500
                                   Chicago, IL 60601
11
       For the Defendants:        Parker Daniels Kibort, LLC
12                                 Matthew Eslick, ESQ.
                                   Andrew Parker, ESQ.
13                                 888 Colwell Building
                                   123 N 3rd Street
14                                 Suite 888
                                   Minneapolis MN 55401
15
       Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
16                                 Suite 146
                                   316 North Robert Street
17                                 St. Paul, Minnesota 55101

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **IN OPEN COURT** |
| 3 | **(VIA ZOOM VIDEO CONFERENCE)** |
| 4 | THE CLERK:  Good afternoon, counsel.  We're just |
| 5 | waiting to get everybody's audio connected. |
| 6 | All right.  Good afternoon, my name is Annika. |
| 7 | I'm Judge Docherty's law clerk.  I'm just going to get |
| 8 | everyone checked in. |
| 9 | To make sure that you're audio and video is |
| 10 | working, could you please say your name and who you |
| 11 | represent and just begin with counsel for plaintiffs. |
| 12 | MR. BLOOM:  Thank you.  This is Michael Bloom, |
| 13 | counsel for Smartmatic. |
| 14 | THE CLERK:  Good morning -- good afternoon, Mr. |
| 15 | Bloom. |
| 16 | MR. MANSKE:  Good afternoon, Michael anybody else |
| 17 | from your firm before I jump in? |
| 18 | MR. BLOOM:  We're expecting Jamie Ward to be on, |
| 19 | so let's see if she joins. |
| 20 | THE CLERK:  I think I see her.  One moment. |
| 21 | Good afternoon, Ms. Ward? |
| 22 | MS. WARD:  Good afternoon. |
| 23 | MR. MANSKE:  And I'm William Manske of the Robins |
| 24 | Kaplan firm also on behalf of plaintiffs. |
| 25 | THE CLERK:  And for defense counsel. |

 1          MR. ESLICK:  Your Honor [sic], Matthew Eslick on
 2    behalf of defendants.  Can you hear and see me okay?
 3          THE CLERK:  I can.  Thank you so much, Mr. Eslick.
 4    And Mr. Parker?
 5          MR. PARKER:  Yes, hello.  Andrew Parker on behalf
 6    of the defendants as well.  Mr. Eslick will be handling the
 7    motion today.
 8          THE CLERK:  Thank you very much.
 9          All right.  And counsel all -- are we expecting
10    any other counsel today?
11          MR. BLOOM:  Not for the plaintiffs.
12          MR. ESLICK:  For the defendants' either.
13          THE CLERK:  All right.  Thank you very much.
14          The hearing will begin when Judge Docherty turns
15    on his audio and video.  Thank you very much.
16          (Pause in proceedings)
17          THE COURT:  Good afternoon, everybody.
18          I'm John Docherty.  I'm the federal magistrate
19    judge assigned to this case.  We're here today for two
20    motions to compel.
21          The plaintiffs have a motion to compel at Docket
22    Number 72.
23          The defendants have a motion to compel at Docket
24    Number 73.
25          Just a couple of housekeeping items, we are

1    recording this, however that is because the court reporter

2    in preparing a transcript may need to go back and check

3    something, so this is for her and is not available to

4    others.

5            Second of all, because of the weather here in

6    Minnesota the courthouse is actually closed, so I am coming

7    to you live from my house.  Things have been fine today.

8    I'll just let you know that yesterday there was an unstable

9    internet connection.  It was not a serious problem.  It

10   caused a lag between me speaking and other people hearing

11   me.

12           If anything of the sort happens today, you have

13   not only my permission but my urging to speak up, even if

14   you have to interrupt somebody, because it's important that

15   everybody who is participating in this hearing be able to

16   hear and understand everything that is going on and not have

17   to sort of fill in the blanks.

18           And then I have organized this not so much by

19   docket number as I've got the RFPs in dispute, first,

20   whether that's because of the plaintiffs' motion or the

21   defendants' motion and then the interrogatories, whether

22   that's the plaintiffs' motion or that's the defendants'

23   motion.

24           That might mean some more going back and forth

25   between plaintiff and defendant than is customary, but I'm

1    confident that we'll get through everything.  And certainly

2    if I miss anything, counsel can let me know.

3            So the first, therefore, item of business that

4    I've got is Smartmatic's motion to have the defendants --

5    well, hold on.

6            MR. BLOOM:  Your Honor, this is Michael Bloom for

7    the plaintiffs.  If I might just make one note very quickly.

8            I'm planning to argue the Smartmatic's offensive

9    motion to compel, affirmative motion to compel, and Ms. Ward

10   who also represents Smartmatic is planning to argue our

11   opposition to defendants' motion to compel.

12           THE COURT:  Okay.

13           MR. BLOOM:  So I hope that's okay.

14           THE COURT:  Yeah, that's absolutely fine.

15           So I guess the first thing that would be coming up

16   is Smartmatic's contention that the defendants have not

17   complied with Rule 34 in the way that they have described

18   the documents they will produce and the documents they will

19   not produce.

20           And so, Mr. Bloom or Ms. Ward, I guess you would

21   have the floor at this point.

22           MR. BLOOM:  Thank you, Your Honor.

23           I think on this Rule 34 issue, what we have is

24   basically a fundamental disagreement about how parties must

25   respond to a RFP for ESI.

1          We think that Rule 34 and the committee notes

2     thereto are pretty clear that in response to a request like

3     that the proper procedure is not to wait until you have

4     reviewed every document that hits on search terms to alert

5     the other side to what you think is objectionable and what

6     you're willing to produce, but at the outset when you --

7     when you assert your objections and your responses to the

8     RFPs, that you have an obligation to state the portion of

9     the request that you think is objectionable, if any, and to

10    the extent you do find a portion of the request

11    objectionable, you state what documents you are willing to

12    produce in response to that request.

13          Defendants here have taken the position -- well,

14    I'll just backtrack, for I think it's about 12 or 13 RFPs

15    that we submitted.  Defendants submitted a series of

16    objections and then they stated, notwithstanding those

17    objections, defendants will produce responsive documents.

18          And in the meet and confer process we asked the

19    defendants, when you say you will produce responsive

20    documents, does that mean you're going to comply with the

21    request as written or you're going to produce a subset of

22    the documents or other?

23          And then the defendants informed us, we cannot

24    tell you that right now because we want to review all of the

25    documents in our possession first before we tell you which

1     portion of the request we think is discoverable.

2              Now, you know, to the extent that that's an

3     appropriate response, we'd submit that at this point, you

4     know, we're four months after we've submitted our RFPs and

5     discovery is scheduled to close end of June, and so our

6     position is that we need -- we need final responses on these

7     RFPs so we can determine whether we think that defendants

8     have proper objections to portions of our request, so we can

9     meet and confer about those objections and then we can

10    timely receive documents so that we can use them in

11    depositions.

12             And so I guess the bottom line is we don't think

13    that's a proper response as a threshold matter and certainly

14    not after four months have elapsed since we submitted our

15    responses -- or submitted our RFPs rather.

16             THE COURT:  Yeah, Mr. Bloom, one of the things

17    that you said caught my attention, which was that you said

18    that this was a problem with the way that Rule 34 treats ESI

19    or words to that effect.

20             I didn't understand this to be an ESI issue, I

21    understood it to be a just general document issue.

22             MR. BLOOM:  Sure.  We think that in the 2015

23    committee notes they addressed ESI specifically as it

24    relates to Rule 34, and the committee says that when -- when

25    a party is responding to an RFP, whether that's an ESI or

1      RFP or otherwise, the party has to submit objections and

2      state the documents that it is withholding pursuant to those

3      objections.

4              We understand that defendants cannot identify

5      every document that they're withholding when we submit an

6      ESI request.

7              It's not practical.  They do need to investigate

8      what they have.

9              The committee notes to Rule 34 contemplate this

10     exact situation.

11             They say that in lieu of identifying the actual

12     documents that you're withholding, the responding party can

13     say, you know, we object on this basis, overbroad relevance,

14     what have you, and we are going to search instead for

15     documents related to 'X' topics between 'Y' dates.

16             And then the parties can thereafter meet and

17     confer about whether that's going to be a sufficient search

18     and production of documents in response to the requests.

19             THE COURT:  Okay.  Okay.  Understood.

20             So it's got its origins in the treatment of ESI

21     but it is a methodology of responding to RFPs that's

22     generally applicable.

23             MR. BLOOM:  That's correct.

24             THE COURT:  Okay.  Okay.  Got it.  Thank you.

25             So, Mr. Eslick, over to you.

1        MR. ESLICK:  As the Court knows, the parties have

2   agreed to produce electronically stored information on a

3   rolling basis in this case.

4        As is set out in our brief, we have a database of

5   approximately 26 million e-mails that we ran Smartmatic's

6   own search terms against.  And that necessarily, as the

7   Court might imagine, resulted in a number of documents, tens

8   of thousands of them, that we needed to review for

9   privilege, and responsiveness, and because of the unique

10  character of this case for confidentiality.

11       As the Court knows from the *Cargill* --

12       THE COURT:  What's unique about this case, Mr.

13  Eslick?  I mean, we deal with sensitive issues all the time.

14       MR. ESLICK:  Because in this case, Your Honor,

15  there was a fair amount of back and forth between the

16  parties about Attorneys' Eyes Only information, what

17  qualified as that and then what qualified as confidential

18  information.

19       So in this case determining whether there was a

20  designation at all and if there had to be, whether it was an

21  AEO designation or simply a garden variety confidentiality

22  examination is a extra step.

23       I understand the Court deals with those complex

24  issues all the time and so the Court can appreciate that it

25  takes time to complete that review.

1          THE COURT:  Okay.  But here's my question:

2          You're doing a review and you are going through

3     this needs to be disclosed, this does not, this needs to be

4     disclosed, this does not, you're using some criteria to make

5     those decisions, correct?

6          MR. ESLICK:  Yes, Your Honor.

7          THE COURT:  Okay.  And what I'm used to seeing in

8     requests to RFPs where a party says that they'll produce

9     things that are responsive but objects to producing more, is

10    they say something along the lines of, We will produce the

11    operating manual and the annual updates to the operating

12    manual but we object to producing e-mails and chat messages

13    among the members of the team that wrote the manual.

14    Something like that.

15         And yours doesn't give any insight into the

16    criteria you're using, it just says we'll produce responsive

17    documents.

18         From that I can't even tell, are 100 percent of

19    documents responsive going to be produced?  1 percent?  And,

20    again, What are the criteria?

21         And I think that's what I think Mr. Bloom is

22    saying he's entitled to and at least in the interest of full

23    transparency after reading all the papers, I agree with him.

24    Of course I'm keeping an open mind.  I want to hear what you

25    have to see, but that's my question.

1          MR. ESLICK:  It's evident from not only the

2     submission of the supplemental responses that we made, but

3     also the letters that memorialize the meet and confer is

4     where the answer to that question lies.

5          We have told Smartmatic's attorneys repeatedly

6     that we will produce documents that are responsive and we

7     will tell them if we have documents we are withholding on

8     the basis of an objection.

9          The exception to that is privilege.  Neither side

10    has produced a privilege log yet but I expect that's coming

11    from both sides.

12         So setting privilege aside for the moment, we have

13    told them repeatedly that we will identify documents that we

14    withhold.  As of today we don't have any, with the exception

15    of the Dominion issue that we'll get into a little bit

16    pertaining to documents only referring to Dominion.

17         So we're aware that there's a necessity to tell

18    them what we're withholding so that they know whether to

19    push the issue via the meet and confer process and

20    ultimately in a motion to compel, if necessary, if we can't

21    work it out.

22         But as I sit here today, they haven't been told

23    any documents that we're withholding on the basis of any of

24    the objections asserted, again, with the exception of the

25    attorney-client privilege, and work product, and so on.

1    They haven't been told about any of those documents because

2    there aren't any.

3          And if the Court wants us to every week reconfirm

4    that we're not withholding anything or reconfirm with every

5    production that we're not withholding anything on the basis

6    of those objections, we can certainly do that.

7          That may be more than what the rules require, but

8    that's our position and this is not new to the plaintiffs.

9          THE COURT:  Okay.  That's helpful.

10          And, yes, I think it would be helpful if when you

11    made a production you said no documents have been withheld

12    for nonprivilege or nonwork product reasons.  I think that

13    would be useful information because when I read this I

14    didn't know.  It sounded -- because it starts with, "Subject

15    to these limitations, comma, we will produce."  And I did

16    not realize and I don't know that the average reader would

17    realize that that first clause was describing, at least up

18    to now, nothing at all.  So I think that that would be

19    helpful.

20          And as I say, I mean, we'll get to a written

21    order, but I take it, correct me if I'm wrong, that you

22    don't have an objection to if you do withhold things, say

23    we're withholding these because we don't think that

24    documents of the type, fill in the blank, are relevant or

25    proportional or whatever the reason is?

1          MR. ESLICK:  That's right, Judge.  And that's --

2     an example of that the Dominion-only group of documents that

3     is coming up on next on the batting order.

4          But to respond directly to Your Honor's point,

5     this Court is aware of the *Cargill* case, which is cited at

6     page 7 of our brief on this, which is ECF Number 97, which

7     in essence said, and this is a 2012 opinion, that if we

8     don't assert any objections they're waived.

9          So without having reviewed the documents that

10    we're currently getting through, the risk is that we don't

11    raise an objection then and then find something that is

12    objectionable and then the plaintiffs come back and claim

13    waiver.

14         In that case, this Court said that the defendants

15    can serve their discovery responses and interpose objections

16    to that discovery on whatever grounds they deem prudent and

17    that's what we did.

18         So it was a -- we're cognizant of that opinion.

19    Our goal was to assert objections to the form of the request

20    and then through the meet and confer we have told the

21    plaintiffs that we would identify those documents.  If it

22    cleans it up to with every production to say, here's what

23    we're withholding, here's what we're not, we're happy to do

24    that.

25         THE COURT:  Okay.

1          Mr. Bloom, back to you.  I hear Mr. Eslick saying,

2     and he can jump in if I get this wrong, that if things are

3     withheld, the reasons for the withholding will be described

4     and that to date nothing has been withheld.  Is that

5     helpful?

6          MR. BLOOM:  It's helpful.

7          I think, as far as efficiency is concerned, I

8     think it would be better if the defendants would respond to

9     our RFPs with the portion of the request itself that they

10    believe is objectionable on a categorical basis.

11         We think that is the proper procedure and then we

12    can more quickly get through the meet and confer process and

13    if necessary be back in front of Your Honor to discuss that,

14    because under the contemplated procedure, you know, we could

15    conceivably get a note from Mr. Eslick in April that says,

16    Oh, by the way, we've actually withheld, you know, all these

17    dozens of documents, you know, because of this reason, this

18    reason and this reason, and then in the middle of

19    depositions, then we have to meet and confer on the document

20    issue and perhaps get back in front of the Court.

21         We would prefer to have those discussions upfront

22    and we think that's the basis for the rule.

23         THE COURT:  Okay.  Understood.

24         Let me go off-topic for a moment here, because

25    we're talking about document production and Mr. Eslick is

1    talking about document production or document review in the

2    millions.

3          I didn't anticipate this would come up, so I

4    haven't looked at the pretrial scheduling order but do we

5    have a deadline for substantial completion of document

6    discovery in this case and if we do not, is that something

7    we should talk about?

8          I'm not suggesting we'll decide that right here

9    today, but is that something we should put on the table?

10          MR. BLOOM:  Your Honor, from the plaintiffs' side,

11    first of all, I don't believe we have that date in the

12    scheduling order.

13          And second of all, plaintiffs would be very open

14    to having that discussion.

15          THE COURT:  All right.

16          Mr. Eslick, at the rate you're going, how long is

17    it going to be before these 26 million pages have been

18    reviewed and either turned over or withheld with a reason

19    being given for the withholding?

20          MR. ESLICK:  To be clear, Judge, the 26 million is

21    the world that we ran our search terms against --

22          THE COURT:  Okay.

23          MR. ESLICK:  -- in viewing all 26 million.  We

24    would have been here quite a while ago if that were the case

25    based on the proportionality standards.  So it's smaller

 1    than that.

 2              THE COURT:  Okay.  That's a relief.

 3              MR. ESLICK:  Yes.  As it is for us as well, Your

 4    Honor.

 5              On our side, and keep in mind that the plaintiffs

 6    are availing themselves of the rolling production idea too,

 7    on our side an additional 30 days would be substantial

 8    completion.

 9              Now of course if we find something later we'll

10    turn it over, but the search terms that they have requested

11    we run and the review of those documents I would expect to

12    be completed within 30 days from today.

13              THE COURT:  Okay.  And maybe it would be helpful

14    if I explained a little what I mean when I say substantial

15    completion, I mean that all search terms have been run or

16    they've been objected to and either you've worked out or

17    I've adjudicated that it needs to be run or it doesn't need

18    to be run, all known document repositories have been

19    searched and documents have been turned over.

20              We all know that no system is perfect.  We also

21    know that organizations continue to generate paper.  I

22    understand that there will be a few straggler documents

23    coming in after the substantial completion deadline, but it

24    should not be the case that, oh, you know, we've got these

25    servers in Ohio that we still need to look at.  That should

1     not be happening.  So with that in mind, Mr. Bloom, Mr.

2     Eslick says he'll be done in about 30 days.

3               What is the plaintiffs' best -- and I'm not

4     holding anyone to this, I just want to get an idea of the

5     situation to guide future acts.

6               MR. BLOOM:  Your Honor, I think plaintiffs would

7     be more comfortable with a date of substantial completion

8     about six weeks out from now.

9               We did send the defendants another -- a letter

10    that's, you know, about more issues that we need to meet and

11    confer about and so just given the state of document

12    production, and I believe both parties are working

13    diligently to produce documents, that's not what we're here

14    about today.

15              THE COURT:  Mm-hmm.

16              MR. BLOOM:  But I would just be more comfortable

17    if we set such a deadline about six weeks from today.

18              THE COURT:  Okay.  Okay.  I will do this.  I will

19    give the parties until a week from tomorrow to weigh in on

20    what a substantial completion deadline ought to be given the

21    definition of substantial completion that I've just given.

22    And I will -- let's make it a week from today, because then

23    I can -- I honestly think I can get this out on Friday if

24    I've got the input on Thursday.  Okay?

25              Any objection to that, Mr. Eslick?

1          MR. ESLICK:  No, Your Honor.

2          THE COURT:  Mr. Bloom?

3          MR. BLOOM:  No objections, Your Honor.

4          THE COURT:  Okay.  I know you're all busy.  I

5     don't mean to just pile on tasks, but I think that would be

6     helpful going forward in a case of this size.

7          All right.  Given that no documents have been

8     withheld yet, there's no need, I don't think, to talk about

9     defendants needing to give reasons for withholding.

10          So, Mr. Bloom, do you disagree with that?

11          MR. BLOOM:  I'm sorry, I didn't understand your --

12          THE COURT:  Yeah, no, sorry.

13          I was going to -- I thought I was perhaps going to

14     be having a longer discussion with Mr. Eslick because I

15     anticipated that at least some documents would have been

16     withheld.  Given his response, however, that no documents to

17     date have been withheld, I'm not sure that there's a need

18     for further discussion of that.

19          I think we need to, you know, whether it's 30 days

20     from now or six weeks from now, see what we've got, if

21     anything.

22          MR. BLOOM:  Yes, I think that works, Your Honor.

23     Because then as long as we have their position on whether

24     they've withheld anything by that deadline, that would still

25     give us time, I think, you know, to get in front of the

1  Court and to talk about any disputes, you know, before the

2  close of fact discovery.

3          I think, you know, like I said earlier, we would

4  still prefer that they respond now as to what portions of

5  the request they would withhold documents related to.  I

6  think that would just help us move things along a little bit

7  quicker, but understand Your Honor's position that with the

8  document production deadline, that will take care of it.

9          THE COURT:  Okay.  Mr. Eslick?

10         MR. ESLICK:  Just two brief notes, Your Honor.

11         First, we have withheld some documents and those

12  are the Dominion-only documents that --

13         THE COURT:  Okay.  And you've mentioned that.

14         MR. ESLICK:  Right.

15         THE COURT:  And that was my mistake.

16         MR. ESLICK:  I just want to make sure I've made

17  the record clear on that.

18         And then second, there are documents that we have

19  withheld on the basis of a privilege and I expect that the

20  plaintiffs have as well.

21         And neither side has produced a privilege log yet,

22  but I want to make sure that the record is clear that both

23  sides are aware that those documents are out there on behalf

24  of both sides.  And we're aware that -- I'm sure that

25  plaintiffs have some, I know we have some.

1       So with those two carveouts that -- I have no

2   objection to the procedure that the Court is proposing.  I

3   think it's a splendid idea.

4       THE COURT:  Okay.  And when are we going to be

5   getting or exchanging privilege logs?  Is there anything on

6   that?

7       MR. BLOOM:  That's not a topic that the parties

8   have discussed yet.  It's something we can easily meet and

9   confer about next week and come up with a schedule for that

10  as well.

11      THE COURT:  Okay.

12      Okay.  Anything else on this particular point

13  before we move on?

14      MR. BLOOM:  Nothing from the plaintiff, Your

15  Honor.

16      MR. ESLICK:  Not from the defendants either,

17  Judge.

18      THE COURT:  Okay.

19      Let's then, actually the next one that I've got,

20  contrary to Mr. Eslick's expectation, is not the Dominion

21  documents, it's instead Defendants' RFPs 1, 8, and 10, which

22  is seeking source code for products used in California in

23  the 2020 Election, exemplar of Smartmatic products used in

24  California in the 2020 Election, and any hardware or

25  software in Smartmatic's possession, custody or control used

1      in the 2020 Election in any jurisdiction so they can

2      determine whether Smartmatic's products were used outside of

3      Los Angeles County.

4              Mr. Eslick, the plaintiffs have represented in

5      filings with the Court that nothing, that they worked only

6      in Los Angeles County in the 2020 Election.

7              My question is, do you have that in a format that

8      is required under the rules?  So do you have a written,

9      signed under oath response saying, we don't have anything to

10     give you outside of Los Angeles County because we didn't

11     work outside of Los Angeles County?

12             MR. ESLICK:  Was that question directed to me,

13     Judge?

14             THE COURT:  Yes, it was.

15             MR. ESLICK:  I'm sorry.

16             THE COURT:  Sorry.

17             MR. ESLICK:  Well, we're requesting information --

18     maybe I misunderstand the question.

19             THE COURT:  Sure.

20             MR. ESLICK:  We're requesting the information that

21     Smartmatic has in its possession, custody and control.

22             One of their allegations is that when Mr. Lindell

23     allegedly said that Smartmatic had its technology used in

24     other jurisdictions, that that statement was false.  And so

25     if the answer that the plaintiffs can give is, We don't have

1     any other information, they should be required to say that.

2              On the other hand, if they do, then they should be

3     required to produce it because it's relevant and certainly

4     discoverable to the truth of the statement that they claim

5     is false.

6              THE COURT:  Okay.

7              So, Mr. Bloom, what form has -- I understand your

8     clients' assertion is they only worked in Los Angeles

9     County.  What form has that assertion taken?

10             Because it looks -- I mean, there have been RFPs

11    served and my understanding is if there's nothing, there

12    needs to be a statement saying there's nothing; is that

13    correct?

14             MR. BLOOM:  Your Honor, I'm going to let Ms. Ward

15    take over for this motion.

16             THE COURT:  Ms. Ward, you have the floor.

17             MS. WARD:  That statement is contained in the

18    complaint, I believe, in several places and I believe that

19    statement has also been made in interrogatory responses.

20             I can certainly follow up and ensure that that's

21    the case, but if not, we are certainly happy to provide you

22    a verified statement to that effect.

23             THE COURT:  All right.  So if you would follow up

24    on that, that would be great.

25             And then, Mr. Eslick, if, in fact, there is a

1    statement that, hey, we only worked in Los Angeles County,

2    then how do I have the authority to order that production,

3    if it's in the hands of the County of Los Angeles and not in

4    the custody of Smartmatic, as they say?

5              MR. ESLICK:  Right.  And, Judge, I think it's

6    important to recognize on this point what Smartmatic is not

7    arguing.

8              They're not arguing that they don't have exemplars

9    of the code that they created in their archives.  We know

10   there's a copy in California.  We know that it was escrowed,

11   we know it was taken out of the escrow and used in the 2020

12   Election.  And we know that Los Angeles County or the

13   Secretary of State has that.  And we have sent subpoenas to

14   obtain that information.

15             THE COURT:  Okay.

16             MR. ESLICK:  But what Smartmatic has alleged in

17   its complaint is that Mr. Lindell allegedly said that

18   Smartmatic's products were -- and I'm paraphrasing here,

19   Smartmatic's products were programmed to flip votes.  They

20   were programmed to cause a particular result in the

21   election.

22             So given that they are claiming that statement was

23   A, made, and, B, is false, Smartmatic's own code that it has

24   is discoverable because the allegation related to

25   Smartmatic, not to Los Angeles County.

1          Now Smartmatic is trying to say, if I'm

2     understanding their briefing correctly, that once we gave

3     them to L.A. County or the Secretary of State in California

4     it was no longer ours.  And that's true.  There's a license

5     agreement in the contract that was attached to Mr. Bloom's

6     declaration in support of their opposition.  And that's why

7     we sent the subpoenas.

8          But I have not heard Smartmatic say that it does

9     not have exemplars of that information.  And if they don't

10    have it, then there's nothing to produce and we're back

11    where we were before, they should be required to say that.

12         But to the extent they have their native code in

13    their archives and since their allegations relate to

14    statements about Smartmatic, that's discoverable under the

15    rules because it is embraced necessarily by the allegations

16    in the complaint.

17         So we're talking about two different things,

18    Judge.  Category A is what Smartmatic has and that's what

19    they're not turning over.

20         Category B is what L.A. County or the Secretary of

21    State in California has, and that we sent a subpoena for.

22         So bucket two is -- the response date is a few

23    dates away.  Bucket A remains to be filled.

24         THE COURT:  All right.  So, Mr. Bloom -- or Mr.

25    Ward, sorry, what does Smartmatic have that could be

1    responsive to RFPs 1, 8 and 10?

2            MS. WARD:  Yes, Your Honor.

3            So in our view the RFPs are very specific and each

4    state or request as an exemplar or the source code in

5    question that was used to administer the 2020 Election.

6            And it's reasonable that it was phrased that way

7    because the defendants' defamatory allegations at issue are

8    that Smartmatic did, in fact, rig or steal the election and

9    that that software was, in fact, utilized to flip votes in

10   the 2020 Election, but it makes sense that that RFP asks

11   specifically for the product or source code that was used to

12   administer the 2020 Election.

13           So the process of certification and testing and

14   implementation of an election technology is really complex

15   and I'm happy to summarize it here for the Court if that

16   would be helpful.

17           THE COURT:  No.  Let's -- I mean, let me ask the

18   bottom line question and then we can circle back for

19   additional deal as needed.

20           I understand your point that Smartmatic developed

21   this stuff, turned it over to Los Angeles County, Smartmatic

22   can't have it anymore.  It's in this vault and don't have a

23   key.

24           Did you keep any copies?  Do you have anything in

25   responsive to these RFPs?

1          MS. WARD:  What Smartmatic has in its possession

2    is a copy of the source code as it existed basically at the

3    end of its development.

4          We have no reason to believe that this code is

5    different than the code that was utilized by Los Angeles

6    County and installed with the actual machines.  And indeed

7    there are a number of safeguards to ensure that that doesn't

8    happen for security reasons.

9          However, because after the source code left

10   Smartmatic's hands, it went through an entire

11   chain-of-custody essentially that Smartmatic wasn't involved

12   in, you know, we can't confirm that that's the case.

13         Defendants' allegations relate to essentially a,

14   you know, a conspiracy to rig or fix an election.  And if

15   that's the basis for their claims, which it is, they need to

16   look at the actual source code that was installed into the

17   machines.

18         I think if the Court were to order production of

19   what Smartmatic did to develop copies of the software that

20   Smartmatic does have in its possession, basically we're

21   going to be going back again and again because now we're

22   going to need to review what Las Vegas County received, and

23   then what was held in the escrow account, and then what was

24   removed from the escrow accounts.

25         THE COURT:  But did you not say a couple minutes

1    ago that there's no reason to doubt that what you've got in

2    your possession is different from what is in the vault or

3    did I mishear that?

4             MS. WARD:  Smartmatic has no reason to think that

5    that is different.

6             Again, the defendants' allegations are that

7    Smartmatic or certain parties were involved in the scheme to

8    rig or fix an election, to the extent that that's their

9    claim, they need to go basically to the source of that

10   claim.  What was the code actually applied to the machines?

11            I think this is pretty clear when defendants have

12   already again gone directly to L.A. County to look at their

13   code, that that's the ultimate source of defendants'

14   defamatory statements and the proper source of this request.

15            THE COURT:  Turning to the ballot marking devices.

16   Does Smartmatic have those or are those all in the

17   possession of Los Angeles County?

18            MS. WARD:  All ballot marking devices used in Los

19   Angeles are all within the possession of Los Angeles County.

20   They're kept in an warehouse owned and operated by the

21   county.

22            THE COURT:  What about in the words of RFP Number

23   10, "Any hardware or software used in the 2020 Election."

24            MS. WARD:  So the ballot marking device and its

25   associated software are the only products that Smartmatic

 1    developed for use the in 2020 Election.

 2              To the extent that defendants are going to

 3    construe any hardware or software to include things like

 4    spare parts, I suppose, spare screws or plastic facing

 5    that's used for maintenance purposes, you know, potentially

 6    Smartmatic might have some of those, but we would argue that

 7    that is not truly, you know, a hardware or software used to

 8    administer the 2020 Election.

 9              THE COURT:  All right.

10              So, Mr. Eslick, I take it you don't want the

11    screws and the spare plastic covers?

12              MR. ESLICK:  No, Your Honor.  That there are no

13    allegations in the complaint about those things.

14              I would like to respond briefly to a couple of

15    things Ms. Ward's said when I have an opportunity, though.

16              THE COURT:  Yeah, that's fine.

17              Why don't we do that now and then we can continue

18    the discussion on this point.

19              MR. ESLICK:  Yeah, a couple times Ms. Ward

20    mentioned the defendants' allegations, the defendants'

21    claims.  That turns the normal burden of proof on its head.

22    It usually in civil cases the defendant doesn't need to

23    prove anything, it's up to the plaintiffs to prove their

24    claims.

25              And so when the plaintiffs say that Mr. Lindell's

1    statements were false, they should be put to their proof.

2    And if Ms. Ward thinks that there's -- or rather Ms. Ward's

3    client, thinks that there's no difference between the code

4    that it has and it has admitted it has and the escrowed code

5    in California, that's all the more reason to turn it over.

6         Because if, in fact, it turns out that the code is

7    different, that raises another issue as it pertains to the

8    statements that Mr. Lindell is accused of making, namely,

9    that it's easy for Smartmatic's code to be manipulated.

10        So comparing those two is directly relevant to any

11   allegations the plaintiffs have made.

12        And, again, it's the plaintiff who has to prove

13   their case.  Mr. Lindell didn't sue Smartmatic and neither

14   did My Pillow, he didn't sue himself.  He's here because the

15   plaintiffs have made the allegations that they did and we

16   should be entitled to see what backs up those allegations.

17        So like making a box or a box with not one hand

18   but two hands tied behind his back while sitting on the

19   floor with a blindfold on.

20        THE COURT:  Well, that's -- that's, you know,

21   quite a picture.

22        But Mr. Lindell and My Pillow have also put forth

23   the affirmative defense of truth, it's the second

24   affirmative defense in both of their answers, so I don't

25   know that things are quite as binary as all that as they

1      would be in, you know, in a different case.

2              Let's talk then about security.  Because if we're

3      going to talk about the source code, let's talk about that.

4      There is a protective order in place in this case.

5              On the other hand, you know, Mr. Lindell has made

6      public statements about how he relishes discovery in a

7      federal lawsuit because he'll get all sorts of things that

8      he can then publicize and then put out there, that those

9      statements are a concern to me.  And I don't want to give

10     source code to somebody who's going to put it on the

11     internet.

12             So what can you tell me about that, Mr. Eslick?

13             MR. ESLICK:  A couple of responses, Judge.

14             First, if you look at -- if the Court looks at

15     what Smartmatic is actually quoting Mr. Lindell saying, not

16     once does he say, I'm going to violate a protective order.

17             To the extent that there are items that are not

18     confidential he is, I believe, free to do within the

19     confines of the protective order what he wishes.

20             THE COURT:  Mr. Eslick, that is an awfully

21     generous reading of his statements.  His statements are

22     basically, I look forward to discovery because then they

23     have to give me all this stuff and he also says that he

24     fully intends to make things public.

25             Now, it could be that in his mind he is thinking

1    of course if there's a protective order I can't do that.

2    But I haven't seen that degree of precision in Mr. Lindell's

3    statements, to put it mildly.

4         MR. ESLICK:  Then I'll turn -- direct the Court's

5    attention to the protective order in this case and that is

6    Document Number 70 on the Court's docket.

7         There are two levels of confidentiality that I

8    alluded to earlier.  Confidential information and Attorneys'

9    Eyes Only or AEO information.

10        And the categories of people that get to see

11   information as marked as AEO are identified in paragraph 9

12   of that order, and that's on page 7.

13        And if the Court compares the categories in

14   paragraph 8, which is the people that get to see

15   confidential information with the categories in paragraph 9,

16   which is the AEO information, the Court will note that it

17   excludes the parties' current employees who are assisting

18   with this litigation and it does not say that Mr. Lindell,

19   himself would receive this information.

20        There are carveouts, you know, the lawyers get to

21   see it, experts get to see it, witnesses or deponents can

22   see it under certain circumstances, but we're reading the

23   Court's order that was entered in November as excluding Mr.

24   Lindell from the category of people who would, you know,

25   much less have custody but not even get to see that

1    information.

2              And this isn't before the Court today, but

3    plaintiffs have been not been shy about designating

4    documents as AEO and they didn't complain about that.

5              So it is odd that this particular issue, this one

6    narrow issue, is somehow being treated differently than the

7    other documents that they have designated under the

8    protective order.  That's my response, Judge.

9              THE COURT:  You know, and I'll just say I don't

10   think it's odd, because the public facing statements are

11   coming from one particular direction, but I take your point

12   about the protective order and I'll certainly consider it.

13   Okay.

14             Is there anything else that we need to talk about

15   today regarding defendants' requests for production 1, 8 and

16   10, Mr. Eslick?

17             MR. ESLICK:  Judge, the only issue we didn't

18   address is the -- I believe that the plaintiffs called the

19   source code "highly confidential" and simply because it has

20   that characterization it should be shielded from discovery.

21             So setting aside Mr. Lindell's alleged statements

22   but just simply the characteristics of that information make

23   it outside the bounds of discovery.

24             And I just want to make sure the Court considers

25   the cases cited by plaintiffs when reasoning through that

1    argument.

2              All the cases that they cite, the plaintiffs,

3    involve information that the plaintiff is seeking from the

4    defendant.  So in the cases that they're talking, the *Viacom*

5    case, for example, which is discussed in their brief,

6    involved a lawsuit brought by a plaintiff who then sought to

7    discover information from the defendant.

8              Here it's the other way around.  The plaintiff

9    brought these claims claiming certain things about their

10   products and so just because it's highly confidential

11   information, that characterization alone should be

12   insufficient to put the documents requested and the

13   information requested outside of bounds of discovery.

14             I just wanted to make sure to address that point,

15   Your Honor, because we haven't discussed it at this point.

16             THE COURT:  Okay.  Noted.

17             Okay.  Ms. Ward, is there anything else we need to

18   talk about concerning defendants' RFPs 1, 8 and 10?

19             MS. WARD:  Sure, Your Honor, just a couple quick

20   points I want to make.

21             With regard to the ability of a protective or

22   confidentiality order to essentially remove the concern for

23   security, you know, I think Your Honor, you know, pointed

24   out statements that have been made written made by Mr.

25   Lindell, which are obviously are of the utmost concern, in

1     addition, you know, Mr. Lindell is currently under

2     investigation by the FBI for crimes relating to proper

3     access of voting machine technology, including specifically,

4     you know, any alleged misappropriation or exfiltration of

5     proprietary software or data, you know that's something

6     that's exactly on point here and that is truly one of our

7     greatest concerns here.

8            In addition --

9            THE COURT:  But the AEO designation, I mean, this

10    would go to Mr. Eslick and his colleagues, it would not go

11    to his client.  He would never have the chance -- I mean,

12    under Mr. Eslick's view of the situation he wouldn't have

13    the chance to exfiltrate or do any of these other things

14    that you're apprehensive about.

15           MS. WARD:  And I want to make sure that we

16    certainly are not alleging or saying that Mr. Eslick or his

17    colleague have any, you know, improprieties or ill motive

18    here.

19           I believe [indescernible] that that also would

20    extend to inhouse counsel, including inhouse counsel of My

21    Pillow, which is a larger group there.  And I think we do

22    have concern that once those documents are in the hands of

23    My Pillow, that Mr. Lindell, as the CEO and owner of the

24    company is going to have some assess to those documents.

25           THE COURT:  Okay.

 1          MS. WARD:  Just one other brief point I wanted to

 2     make is, you know, as several of the cases cited in our

 3     brief note, the courts will often look as to whether, you

 4     know, the discovery sought particularly for something as

 5     highly sensitive as a source code is actually necessary not

 6     just relevant here.  And we've highlighted in our brief that

 7     there are innumerous public sources here that show not only

 8     are any claims regarding Smartmatic's software source code

 9     untrue but to some extent simply impossible.

10          The software and product at issue did not count

11     votes, did not tally votes.  Doesn't store or tablet votes,

12     it simply prints ballots.  So I think there is a plentiful

13     amount of public information out there that make clear that

14     the factual claims that defendants are trying to test here

15     are simply untrue.

16          And because of that fact, the necessity element

17     simply can't be met.

18          THE COURT:  Mr. Eslick, is the standard, in fact,

19     necessary rather than merely relevant when we're talking

20     about highly confidential information such as source code?

21          MR. ESLICK:  Under my reading of the rules, Judge,

22     the rules apply to everything equally and there isn't -- my

23     reading of the information provided by Smartmatic, any

24     indication that there is a legal requirement that documents

25     or information having a certain characteristic be necessary.

1    That's certainly not in the rules.

2              But, you know, even if that it is the rule, even

3    if it is necessary to get that, look at the documents that

4    Ms. Ward cited are.  They don't say anything about source

5    code.  They don't provide an expert analysis of the source

6    code to prove their claims.  They discuss election results.

7    There are some public reports that were cited that talk

8    about election security.  And that's fine.  But that's

9    different than being able to see the actual code that

10   Smartmatic developed to test their claims.

11             And with all due respect to the public agencies

12   that issued those, just because they issued those statements

13   does not make Smartmatic prevail.  That's for the jury to

14   decide.  And discovery is broad.  The documents are clearly

15   relevant.  And we would assert they are necessary to prove

16   or disprove the claim that Smartmatic's products can be

17   manipulated in an election.

18             So the standard is not necessary, Your Honor, but

19   even if it is, it's certainly necessary here.

20             THE COURT:  All right.  All right.

21             Now, let's turn to what Mr. Eslick's been

22   anticipating, the Dominion-only documents.

23             So will it be you, Mr. Bloom, or Ms. Ward?

24             MR. BLOOM:  It will be me, Your Honor.

25             THE COURT:  So why is it, and I know you wrote

1       about this, but help me understand why it is that you need

2       or are entitled to under the rules, documents that don't

3       even talk about your client that are just about Dominion.

4              MR. BLOOM:  No problem, Your Honor.

5              So we've alleged that the defendants made many

6       false statements about us and our relationship with

7       Dominion.  These statements are in a few different

8       categories.

9              They say that we had a corrupt relationship with

10      Dominion to rig the 2020 Election and they also say that

11      Dominion was using our source code, our software, in their

12      own machines that were hacked or manipulated.

13             And so in order to show that there are actual

14      malice, defendants' actual malice, that is that they knew

15      what they were saying was false or were reckless as to the

16      truth, we need to show what they knew about Dominion and not

17      just documents that are going to say, Dominion had no

18      relationship with Smartmatic.

19             We think that documents that relate specifically

20      to Dominion and only Dominion are also going to be probative

21      of the knowledge that defendants had related to their --

22      related to Smartmatic's relationship with Dominion.  And so

23      we've cited an example here.

24             If you have a, we'll call it a dossier on Dominion

25      that does not mention Smartmatic, it might still have

1     information that by inference relates to the false

2     statements at issue in this case, that was kind of

3     confusingly put.

4          So in this dossier, if the information provided to

5     Mr. Lindell says that Dominion, who had its origins in

6     Canada, Dominion, they use this equipment and this software,

7     even if there's no comparison to Smartmatic in there, that's

8     still going to put defendants on notice that Dominion has no

9     ties to Venezuela and Smartmatic.  Dominion was not using

10    Smartmatic's source code.

11         And so that's all evidence that we would like to

12    be able to show it the jury to further establish that what

13    they knew what they were saying about Dominion as it related

14    to Smartmatic was false.

15         THE COURT:  All right.  Now a couple of things.

16         There were some quotes in the papers that were

17    submitted to the Court and it wasn't clear to me whether

18    these were direct quotes from Mr. Lindell or not.  And the

19    one that I'm particularly zeroing in is the use of the word

20    "conspired," as in, Dominion and Smartmatic conspired or

21    were coconspirators or were in a conspiracy.

22         Is that -- and if you can't answer it, you know,

23    here today, is that a quote from Mr. Lindell?  Are those

24    words that he used?

25         MR. BLOOM:  Yeah, Your Honor.

1          I can't quickly find the quote in the brief.  But

2   what I can tell you is that we have asserted in our

3   complaint statements, several statements I believe, where

4   Mr. Lindell stated as a quote, "Smartmatic was the

5   Mothership of this conspiracy," you know, to rig the

6   election.  So that's clearly at issue in our case.

7          THE COURT:  All right.

8          So, Mr. Eslick, go over to you.  If, in fact, Mr.

9   Lindell has made statements like "Smartmatic is the

10  Mothership of this conspiracy," then my understanding of

11  conspiracy law is that all conspirators are all agents of

12  other conspirators and if he has made statements like that,

13  it does seem to me that he is putting at issue the

14  relationship or his state of knowledge between Smartmatic

15  and Dominion.

16         And so if there is a document in Mr. Lindell's

17  possession or My Pillow's possession that would show, for

18  example, that Dominion got booted out of Venezuela in 1935

19  and has never been allowed back in, to take an example that

20  strikes me as something that needs to be disclosed.  Is that

21  correct or not correct?

22         MR. ESLICK:  Judge, I have two responses to your

23  question.

24         THE COURT:  Okay.

25         MR. ESLICK:  The first response is in the examples

1    that Mr. Bloom referenced, he kept saying Smartmatic over

2    and over.  That Smartmatic was the Mothership, for example,

3    as one of the examples that he provided.

4           The Court will note from looking at our briefing

5    that there are three broad categories of documents that we

6    have agreed to produce, documents that relate to Smartmatic

7    of course are discoverable.  If they relate to Smartmatic

8    and another machine company or voting technology company

9    that would be produced and that would include Dominion as

10   well.

11          And then if there's a document that references

12   voting technology companies generally without naming names,

13   those are being produced as well.

14          So you can't have a conspiracy of one, it requires

15   two.  And I would agree with the Court's interpretation of

16   conspiracy law, at least in the civil context, but the

17   documents where that if there are documents that say

18   Smartmatic and Dominion have nothing to do with each other,

19   that would be in the group that we have agreed to produce.

20          THE COURT:  It would, but I'm talking about a

21   different example.  A document that speaks only of Dominion,

22   does not speak about Smartmatic, but nevertheless contains

23   information that makes it clear that Dominion is more likely

24   or less likely to be able to conspire with Smartmatic,

25   because that goes to, I think, the state of mind of Mr.

1     Lindell or the state of knowledge of Mr. Lindell when he

2     made the allegedly defamatory statements that Smartmatic and

3     Dominion were coconspirators.

4          MR. ESLICK:  If that is the interpretation that

5     the plaintiffs are advancing of their document request, that

6     is news to me.

7          THE COURT:  It's not -- it's what I'm taking away

8     from the briefing.

9          MR. ESLICK:  Then that interpretation -- if the

10    interpretation is that if a document relates to Dominion

11    only as it pertains to the allegations in the complaint,

12    then I would concede that that is probably discoverable.

13         The two categories they have asked for, though,

14    are all the documents that were produced in any way in the

15    companion -- in what we have called the D.C. case, the case

16    involving Dominion out in D.C.

17         And setting aside the point that proposing those

18    documents would violate the protective order issued by Judge

19    Nichols, it's hard to see how every document referring to

20    Dominion in our world of 26 million e-mails is relevant to

21    any of the claims.

22         But if the Court orders that that request be

23    narrowed to fit the allegations in complaint, I would

24    concede those documents are discoverable.

25         THE COURT:  Okay.

1          Mr. Bloom, if the documents cannot be made to be

2     relevant to the allegation in his your complaint, then how

3     could Dominion -- other than showing state of mind, because

4     here's a Dominion document that says, the code on these, you

5     know, doesn't talk with other machines or things like that,

6     can you give me an example of something outside that

7     definition that would be relevant and discoverable?

8          MR. BLOOM:  I'm sorry, Your Honor, I didn't mean

9     to interrupt.

10          THE COURT:  No, no.

11          MR. BLOOM:  Your Honor, we are the position that

12     any information relating Dominion here is reasonably

13     calculated to lead to relevant evidence.

14          I struggle to think of a example of a document

15     that's in Mr. Lindell's possession about Dominion that would

16     not bear on anything at issue in this case.  You know, I

17     suppose you could have a document that mentions the country

18     club memberships of a Dominion employee.  I mean, that would

19     be the type of thing that would be fully irrelevant.

20          But any information about Dominion, its origins,

21     its technology, its equipment, we think that's all going to

22     be relevant to our claims in this case.

23          And so we think the more workable solution is just

24     to require defendants to produce all their documents related

25     to Dominion.

1          And we haven't talked about burden here.  You

2      know, they haven't said that that's going to be too

3      burdensome, they are running our search term that just

4      relates all to Dominion and we just don't understand what

5      the problem is.

6          THE COURT:  Okay.  Now you just gave the standard

7      as reasonably calculated to lead to discoverable

8      information, is that -- is that correct?

9          MR. BLOOM:  No -- it was the standard, I think,

10     you know, we're talking about relevant information.

11         We think that anything outside of, you know, sort

12     of the example that I just gave about, you know, something

13     that's wholly unrelated to the technology, to contracts, you

14     know, that that would not be relevant.  But anything we

15     think that relates to Dominion's business, its equipment, we

16     think that's all going to be inclusive, it's going to be

17     relevant.

18         And just for the record, as long as I'm chatting

19     right now, the defendants mentioned in their brief they

20     think this is a scheme to get information about our

21     competitor.  I just want to say for the record that that is

22     not the case and we're just trying to prove up our claims

23     here.

24         THE COURT:  All right.

25         So, Mr. Eslick, I am, you know, again what I say

1      today is what I say today, there will be something in

2      writing coming, but listening to the conversation you must

3      realize that it's probable that you're going to be told that

4      some Dominion-only documents are discoverable if they go to

5      informing Mr. Lindell's state of mind about Dominion and,

6      therefore, its capacity to or not to be a coconspirator of

7      Dominion -- or of Smartmatic, I'm sorry.

8                  Mr. Bloom raised this, you did not, and that's

9      burden.

10                 MR. ESLICK:  Judge, I think that the -- and I'm

11     speculating a little, so give me a lit of leeway, I believe

12     that the world of those documents, the Dominion-only ones,

13     that are relevant to any parties' claim or defense, which I

14     think is what the standard is, is going to be fairly small.

15     I don't anticipate burden being an issue there, particularly

16     with respect to the other productions that we're already

17     doing.

18                 THE COURT:  Okay.  All right.

19                 Let's see where we are next.

20                 Anything further on this particular point, Mr.

21     Bloom?

22                 MR. BLOOM:  No, Your Honor.

23                 THE COURT:  Mr. Eslick?

24                 MR. ESLICK:  No, Judge.

25                 THE COURT:  Okay.

1           Let me just get to the next -- I lost my cursor.

2       Here we are.  All right.

3           So I think with that, next we've got Smartmatic's

4       interrogatory number 9, "All communications defendants had

5       with Mr. Trump, his administration, his campaign, and the

6       republican national committee."

7           My understanding is that there's not really a

8       dispute about documents but there is about oral statements.

9       Is that accurate, Mr. Bloom?

10          MR. BLOOM:  That is my understanding based on

11      their briefing.

12          THE COURT:  Okay.

13          And, Mr. Eslick, what is the concern with

14      disclosing oral conversations that have not been captured in

15      a written document?

16          MR. ESLICK:  And I'm confident that the

17      plaintiffs' attorney will point out if I'm reading this

18      incorrectly, but interrogatory 9 asks for all communications

19      or interactions, regardless of what the subject is.

20          And it's difficult to see how a conversation about

21      something completely unrelated to the claims and defenses

22      would be discoverable.

23          The other piece of this, Your Honor, is it's

24      difficult for anyone, much less a busy CEO, to remember

25      everyone -- to recount every conversation, where it

1    happened, when it happened, what was said, and who was there

2    years after the fact.

3            Now, we are aware of one oral communication that

4    occurred -- and this is a supplement that we can make, we

5    are aware of one oral communication that occurred sometime

6    in October or November of 2020 between Mr. Trump and Mr.

7    Lindell that related to the election in Minnesota.  It was

8    something along the lines of, Do you think I'm going to win

9    Minnesota?  That's not relevant to L.A. County.  It doesn't

10   mention -- the conversation didn't mention Smartmatic, it

11   didn't mention voting technology at all.

12           And they will have the opportunity to depose Mr.

13   Lindell and ask him, As you sit here today, what do you

14   remember speaking with Mr. Trump about as it pertained to

15   the claims and defenses that are in the case?

16           So that is the response that I have, Judge.

17           THE COURT:  Okay.  But with respect to memory, I

18   mean, I understand that Mr. Lindell moves in probably faster

19   circles than I do, but I should think I would remember a

20   conversation with the President of the United States.  Just,

21   you know, I understand if there's a conversation with the

22   campaign field director in Arkansas, maybe that's less

23   memorable.

24           But I don't know that a blanket assertion that we

25   can't answer because there are some that can't be remembered

1    is going to hold up.

2              MR. ESLICK:  Judge, I have given the response that

3    I have on that point.

4              THE COURT:  Okay.

5              MR. ESLICK:  And as I said, we have at least one

6    supplement to make on that point.

7              If the Court is inclined to grant this portion of

8    the motion, though, I would -- I would urge the Court to

9    tailer any sort of compelled response to the claims and

10   defenses.

11             THE COURT:  Well, sure, yeah.

12             Mr. Bloom, what about -- I mean, Mr. Eslick's

13   point is you're going to take a deposition.

14             Isn't a deposition the place for this rather than

15   an interrogatory, particularly, I mean I'm just sort of

16   asking it out there, I think you mentioned in your papers a

17   January 15th visit to the White House, that's a matter of

18   public record, it was covered in the news, you can ask Mr.

19   Lindell about it.

20             What is -- what is behind this interrogatory and

21   why is it a righteous interrogatory?

22             MR. BLOOM:  Sure, Your Honor.

23             We think that the approach that the Court used in

24   the *Marco Techs* case which we cited is very workable and

25   appropriate here, where all the Court said was for oral

1    communications you need to identify when it took place, who

2    the parties were, and what were the topics discussed.

3           And as to your more general question as to why we

4    need that now as opposed to when we depose Mr. Lindell,

5    we're not sure when we're going to depose Mr. Lindell yet,

6    and we need the identities of the individuals whom he was

7    speaking with from the Trump campaign, the Trump

8    administration and from Trump himself so that we can serve

9    proper discovery before the close of discovery.  Whether

10   we're going to serve documents subpoenas only or documents

11   subpoenas with a deposition subpoena, that's -- this is all

12   information that we'd like to have on the front end rather

13   than waiting for our deposition of Mr. Lindell.

14           THE COURT:  All right.  I that was -- that was all

15   well-briefed, but in this particular one I don't really have

16   a lot of questions but, Mr. Eslick, if either of you has

17   anything further on this point we can talk about it,

18   otherwise we will move on.

19           MR. ESLICK:  I don't have anything further, Judge.

20           MR. BLOOM:  Nothing further from the plaintiffs.

21           THE COURT:  Okay.

22           Smartmatic's interrogatory 15 asks the defense to

23   identify the metrics they use to estimate how many people

24   viewed the statements at issue in this case.

25           It looks to me as though the defendants have said

1    that they will respond to this and I am wondering, Mr.

2    Bloom, whether that makes this moot.

3           It says, at least my notes indicate, "Defendants

4    now clarify they have metrics data from a third-party and

5    that all metrics data has been or will be disclosed."  And

6    that's defendants' memo in opposition to your motion to

7    compel at page 18.

8           MR. BLOOM:  Your Honor, we appreciate that they've

9    agreed to produce responsive documents.

10           We would still prefer that they answer the

11    interrogatory in writing to identify the sources themselves.

12    In particular we're interested in the source they were

13    referring to in the podcast that we cited with Rudy Giuliani

14    where Mr. Lindell clearly referenced the cite that we track,

15    and then there's a quote from him, you know, "We're not sure

16    whether there's going to be responsive documents to that.

17    It may just be something that they monitor using the

18    internet or another tool for all we know."

19           And so for that reason, we would prefer that they

20    -- that they actually identify the sources in writing.

21           THE COURT:  All right.

22           So, Mr. Eslick, then going to Mr. Lindell's

23    appearance on Mr. Giuliani's podcast, I think it was on the

24    15th of February where he said, allegedly, "That 100 million

25    people had viewed absolute proof and that that on average

1    they had spent an hour and 53 minutes doing so."

2           The 100 million, you know, sounds like the sort of

3    thing people say.  The hour and 53 minutes, that's awful

4    precise.

5           So I think that, and again I'm keeping an open

6    mind and I want to hear what you have to say about this, but

7    I do think that Mr. Bloom is probably correct in that you've

8    got to say, he got those numbers from 'X' or he didn't have

9    a source.

10          MR. ESLICK:  And that's a fair point, Judge.  And

11   I think you identified perhaps correctly that hyperbole is a

12   feature, a potential feature of some of the rounder numbers.

13          As it pertains to the specific one that Your Honor

14   mentioned, if the Court is inclined to require us to,

15   require our clients rather, to say, Here's where I received

16   that figure or I don't have a source for that, it's me

17   speaking that that's the source, that is something we can

18   certainly clean up.

19          THE COURT:  Well here's my question:

20          I mean, this is an interrogatory that has been

21   served.  There's -- you haven't identified anything that's

22   facially wrong with the interrogatory or that would excuse

23   performance.

24          Why I do need to come in and say you need to

25   answer the interrogatory?

1          MR. ESLICK:  The way this came up in the meet and

2     confer, Your Honor, is the Smartmatic gave us -- I don't

3     know if it was part of the record or not, a document that

4     was produced in the Dominion case, this is one with that

5     protective order out in D.C.

6          THE COURT:  Mm-hmm.

7          MR. ESLICK:  And said, Look, here is an example of

8     metric data and we went back to our client and said, This

9     looks like metric data.

10          The response, and this is at page 18 of our

11     opposition, is that this information wasn't used by our

12     clients to monitor internet usage because it wasn't reliable

13     and we provided that information back to plaintiffs.

14          If the position all along was, here is a statement

15     that was made about viewership and time, where did you get

16     it or did you make it up?  That is -- that is certainly not

17     what the interrogatory says, it just asks for all metric

18     data.

19          THE COURT:  Okay.  Mr. Bloom, is this a problem

20     with the drafting of the interrogatory or is there more to

21     it than that?

22          MR. BLOOM:  No, Your Honor.  I don't think it's a

23     drafting issue.

24          I think it's pretty clear from Mr. Lindell's

25     statements when he's talking about the millions of people

1     viewing, you know, programs that he's -- that he's getting

2     it from somewhere, that the documents that we've cited are

3     consistent with that, and we think that they need to be

4     identifying where that information came from.

5              THE COURT:  All right.  Under advisement.

6              Smartmatic interrogatory 18A asks for the identity

7     of the My Pillow's employees who input codes into the

8     system.  And there was something else, I believe.  Okay.  It

9     looks -- it looks that -- it looks like that's all it calls

10    for.

11             Mr. Eslick, it looks to me your response is a My

12    Pillow put it in.  That could means there's a guy who was --

13    that's their job.  That could be mean that in the morning

14    somebody is sent to unload trucks and somebody else is sent

15    to input codes and that changes from day-to-day.  That could

16    cover all sorts of things.

17             And I think Mr. Bloom has asked, and I think again

18    my first impression, is probably entitled to identities.

19             Now, I also anticipate that's just going to tee up

20    a further motion, which is to quash the deposition notices,

21    but we'll cross that bridge when we get to it.

22             But why would plaintiffs not be entitled to

23    identifying information for the employees who input the

24    codes?

25             MR. ESLICK:  A couple of responses, Judge.

1      And I'll start at page 14 of our opposition and

2   this is Document 97.

3      If it is not clear in the interrogatory answers,

4   the brief states that three are employees who perform that

5   function.

6      THE COURT:  Okay.

7      MR. ESLICK:  That's the first part.

8      So there's more than one person that we would need

9   to track down, assuming that we even can do that now.

10      The My Pillow employees aren't like lawyers where

11   we have to write down what we do all the time.  So it might

12   be a person in the morning that did it different from a

13   person in the afternoon that provided that information.

14   That's the first response.

15      But the second response is what good is it?  The

16   only task that this person has is to take a promotional code

17   that they don't develop that they have no input in creating

18   that they are simply told and tie that to a promotional

19   discount.

20      For example, promotional code ABC might mean a

21   10 percent discount on a product.  All that person does is

22   go into the computer system and say, Code A, B, C equals ten

23   percent discount.  And the relevance from that testimony

24   from that individual is minimal at best.  They don't do

25   anything other than in essence flip a switch to activate the

1    code.

2              We've identified the individuals that --

3    individual rather, that creates and develops the code.  And

4    only through a very liberal interpretation of the word

5    "use", would that person's identity or existence even be

6    known.

7              THE COURT:  Well, that's -- why though, isn't the

8    plaintiff entitled to ask these employees themselves rather

9    than taking counsel's representation as to their job duties?

10             MR. ESLICK:  My understanding, Judge, is that this

11   was an interrogatory answer executed under oath.

12             So it isn't just my representation, they have

13   something that they can talk to Mr. Lindell about if they

14   decide to.

15             Again, if the -- if the -- I have yet to get a

16   meaningful response at any of the meet and confers that I

17   have had with the plaintiffs' lawyers about how the identity

18   of a person who inputs a piece of code to flip a switch to

19   activate a promotional discount, how the identity of that

20   person is relevant to any of the parties' claims and

21   defenses.

22             THE COURT:  All right.

23             MR. ESLICK:  Certainly --

24             THE COURT:  Mr. Bloom, it sounds like Mr. Eslick

25   has -- I couldn't put the challenge -- I couldn't possibly

1    put it any more clearly.

2              If all this person does is say, ABC code equals

3    10 percent off and flips a switch, what's the relevance of

4    the person's identity?

5              MR. BLOOM:  Well, first of all, Your Honor, I'd

6    just like to point out the idea that Mr. Lindell -- the

7    interrogatory itself requests the identities of all My

8    Pillow employees who had anything to do with the creation,

9    development or implementation of these promo codes that were

10   used in the programs in which defendants defamed us.

11             It seems totally implausible that Mike Lindell

12   creates the code and just hands it off to one low-level

13   employee who puts it into this, you know, whatever program

14   we're talking about here.

15             And so we want to get -- we want to know exactly

16   what's going in on this operation, whether there's a

17   director of marketing involved, whether there are other

18   people involved too, because this all goes to the vicarious

19   liability.  This all goes to their involvement in the -- in

20   promos -- in the promo codes that are use, to gain revenue

21   based on defaming us and so that's all going to be relevant

22   to our claims.

23             Now, as to the more micropoint about the identity

24   of that individual, I think Your Honor put it best when you

25   said why should Smartmatic have to take it at their word

1    that that's all the employee does and I think we're entitled

2    to their identities so that we can find out for ourselves

3    whether it is really that simple.

4           THE COURT:  All right.  Mr. Eslick, I'll give you

5    the last word on this and then we'll move to interrogatory

6    22, which I think is the last one.

7           MR. ESLICK:  I think so, too, Judge.  I really

8    don't have anything else to add.

9           THE COURT:  Okay.

10          MR. ESLICK:  The interrogatory answer says what it

11   says.

12          THE COURT:  All right.  Fair enough.

13          Let's move to number 22.  And, again, I

14   congratulate the parties because this has been narrowed down

15   it is, I think, a nice, well-defined issue.

16          As I understand it, Mr. Bloom or Ms. Ward, correct

17   me if I'm overstating things, it looks like the objection at

18   this point is that the defendants have said that because the

19   duties and responsibilities of a chief executive officer and

20   chairman of the board are well-known we don't need to go any

21   further than that.  Is that correct?

22          MR. BLOOM:  That's my understanding of the

23   defendants' position, Your Honor.

24          THE COURT:  Okay.  And then one just clarifying

25   question, I think I know the answer but I guess I'm looking

1    for confirmation, was this interrogatory objected to by the

2    defendants as to the portion that's before us here this

3    afternoon, the duties and responsibilities part?

4              MR. BLOOM:  My understanding, Your Honor, is

5    that -- I'm sorry, I'm just trying to quickly find it so I

6    can give you an accurate answer.

7              MR. ESLICK:  If it helps move things along, it's

8    Document 81-9.

9              THE COURT:  Thank you.

10             MR. ESLICK:  Page 4.

11             MR. BLOOM:  Right.  So defendants in response they

12   just say, "At all relevant device times Mr. Lindell was My

13   Pillow's CEO and Chairman of the Board."  Right.  So there's

14   no objections, Your Honor.

15             THE COURT:  All right.

16             So, Mr. Eslick, what is the problem with

17   explaining what -- I mean, I get chairman of the board is a

18   well-known term, CEO is a well-known term.  But there is a

19   difference between being the CEO and chairman of the board

20   of an airline, a publishing house, a Silicon Valley startup,

21   and a pillow company in Minnesota, and companies can assign

22   all sorts of different duties and responsibilities to their

23   CEO and chairman and it's got a lot of flexibility there.

24             MR. ESLICK:  Your Honor, this is set forth in our

25   -- in our briefing on this point.

1        Our position is that this is -- this is a

2    sufficient answer to the interrogatory because the general

3    tasks that a CEO or a chairman of the Board of Directors

4    does is not a unique item and I think Your Honor may have --

5    may have identified that issue already.

6        If the interrogatory is to be interpreted to

7    require Mr. Lindell to list every single thing he did from

8    January 2018 to the present, every single task he did,

9    again, it's difficult to see the relevance of that response

10   to the claims and defenses.

11       So there isn't an objection because we think the

12   answer is sufficient.  Clearly the plaintiffs think

13   otherwise and the Court may order otherwise, but because

14   these are not unique positions that are well-known, our

15   position is that the answer is sufficient as it reads now.

16       THE COURT:  Okay.  And I'm not thinking of having

17   him catalog everything he did every day from, you know, 2017

18   forward, but, I mean, we've all read job vacancy

19   announcements when they say, you know, the incumbent is

20   expected to do A, and B, and C, and they have

21   responsibilities for X, and Y, and Z I think that's what the

22   plaintiffs are looking for but let's found out.

23       Mr. Bloom?

24       MR. BLOOM:  That's correct, Your Honor.  This,

25   like the other request we discussed, links to the vicarious

1    liability.

2           As the Court's well aware, our burden to prove up

3    vicarious liability is to show that Mr. Lindell defamed

4    Smartmatic within the course and scope of his employment and

5    we're just looking for basic information here about what

6    that scope of employment is and so we think that his duties

7    as CEO and chairman of the board are clearly relevant to

8    that topic.

9           THE COURT:  All right.  All right.

10          Is there anything else?  With interrogatory number

11   22, we've gotten to the end of my list.  Did I miss any?

12          MR. BLOOM:  Your Honor, I don't think we discussed

13   interrogatory numbers 19 or 1.  And I don't know if that's

14   because you don't need to hear argument about it or

15   otherwise.

16          THE COURT:  Let me just refresh myself as to what

17   those are about.

18          Oh, yes, oh, yes.  19 we should talk about.  That

19   talks about advertisements, product deals or promotional

20   codes related to various things generally associated with

21   the 2020 Election and then discloses associated revenue.

22          So, Mr. Bloom, I did read what you wrote about

23   relevancy on number 19.  I'm struggling a little bit with

24   it.  In that I'm -- it appears to me that you're using

25   revenue derived as a proxy for importance or a degree of

1    defamation or I don't know what.

2              But what are you measuring when you measure --

3    when you know the revenue, what does that tell you that's

4    important?

5              MR. BLOOM:  Your Honor, that gives context to our

6    allegations and our claim that one of the reasons that Mr.

7    Lindell has defamed us and has continued to defame us for

8    several years now or multiple years I should say, he was

9    motivated by a profit, not only to curry favor with

10   President Trump himself but to sell additional products to

11   followers of Mr. Trump, supporters of Mr. Trump.

12             And so we think the promo codes are an essential

13   part of that story.  That Mr. Lindell was using these promo

14   codes, creating them, and then using him in his defamatory

15   broadcasts in order to generate more revenue.

16             And we believe that that's relevant evidence not

17   of vicarious -- My Pillow's vicarious liability but also Mr.

18   Lindell's actual malice because it shows his ill will and

19   improper motive, which we believe in the cases show is

20   relevant to the actual malice inquiry.

21             THE COURT:  All right.

22             So, Mr. Eslick, it sounds to me like Mr. Bloom is

23   looking for motive evidence.  Is that your understanding or

24   is your understanding different?

25             MR. ESLICK:  I think that's -- that's one way to

1    understand this interrogatory.

2              THE COURT:  Mm-hmm.

3              MR. ESLICK:  But the issue we have with this

4    interrogatory isn't so much about the content, in fact, we

5    did produce recently promo code revenue data for the codes

6    that they did list.  And those are the ones that are in

7    interrogatory -- we're calling it 18A, but it's

8    interrogatory 18, there's footnote that explains that.

9              THE COURT:  Yeah.

10             MR. ESLICK:  We did produce that.

11             But if the Court looks at the scope of what this

12   interrogatory requests, it is exceptionally broad.  And this

13   is one that we would claim burden on.

14             All of those capitalized words in interrogatory

15   19, all 1, 2, 3, 4, 5, 6, 7, 8, 9 -- you know, almost 10 of

16   them are defined terms.

17             And if you go to the definitions that accompanied

18   the interrogatories, those defined terms incorporate other

19   defined terms.  And one of the defined terms contains a

20   reference to approximately 30 or 25 paragraphs of the

21   complaint.

22             So if the plaintiffs want to know revenue data for

23   specific promo codes, they should ask for it.  It's improper

24   and unduly burdensome for us to imagine what they think are

25   the defamatory broadcasts, watch them all, mine them for

1      promotional code data, and then produce responsive

2      documents.  They clearly know how to ask for information

3      about specific promo codes because they did it in

4      interrogatory 18.

5              So it's more of a scope issue at this point,

6      Judge, as opposed to a content issue.

7              THE COURT:  All right.

8              So, Mr. Bloom, if I'm hearing Mr. Eslick

9      correctly, content is not a problem but burden is.  And if

10     you want to know about a specific promo code, ask and you

11     shall receive.

12             And so can we do it that way or are we going to

13     need to have a knock-down, drag-out about burden and

14     proportionality?

15             MR. BLOOM:  Well, Your Honor, I think our response

16     to that is that we've -- we don't understand the burden

17     argument.

18             We've clearly defined which programs where we're

19     talking about in our complaint the ones that contain the

20     defamatory statements.  I think all we're asking them to

21     find themselves is to identify promo codes that relate to

22     Donald Trump.  And I can't say what My Pillow's systems are,

23     but we don't understand why that information should be so

24     difficult to ascertain.  It's certainly in their possession,

25     custody or control.  We just don't understand the burden

1    issue here, I guess.

2            THE COURT:  Well, I'll tell you what, let's do

3    this, let's segue into interrogatory number 1, because I

4    think that's relative to what we're talking about here,

5    which is your request that Mr. Lindell and My Pillow recount

6    all the statements Mr. Lindell said about Smartmatic,

7    including when he made them, where he made them, and all

8    republications which is a term you have since narrowed.

9            But is this, perhaps, not illustrative of what Mr.

10   Eslick is talking about in that a subset of statements about

11   Smartmatic are allegedly defamatory statements about

12   Smartmatic and then you need to look at those and find out

13   what promo codes were mentioned and then go get the revenue?

14           MR. BLOOM:  Well, with respect to the promo codes,

15   again, we think it's a very narrow universe.  We've

16   identified very specific programs.  And I'll get to how that

17   relates to interrogatory number 1 in a second, but this

18   isn't, you know, dozens of hours of footage.  Mr. Lindell

19   himself should know what promo codes are in these very --

20   there's four documentaries, there's some podcast appearances

21   and some other appearances, this isn't an endless universe

22   of moments when he was, you know, this isn't an endless

23   universe of moments in our complaint, it's very defined.

24   We've --

25           THE COURT:  In interrogatory number 19, have you

1    specified, you know, at a rally in Phoenix on such and such

2    a date, this promo code, you know, and then you can go watch

3    that and see what promo codes are used or is it more

4    generally as to allegedly defamatory statements?

5         MR. BLOOM:  It falls into both buckets, Your

6    Honor.  We defined in interrogatory number 19, we request

7    the promo codes related to, for example, the defamatory

8    broadcasts, and that's a term that's defined and includes

9    citations to our complaint to specific statements, to

10   specific publications.

11        The promo codes related to Donald Trump and the

12   Trump administration, that's not something we have defined,

13   that would be more generally what promo codes do you have

14   that relate to Donald Trump.

15        THE COURT:  So there would need to be research to

16   be done on that.

17        MR. BLOOM:  That's correct.

18        THE COURT:  All right.

19        Mr. Eslick, if there -- if the plaintiffs have

20   identified specific publications or if the accused

21   statements are defined with precision, does that help with

22   your burden argument as to number 19?

23        MR. ESLICK:  Two points on that, Judge, and then

24   I've got a response to something Mr. Bloom said.

25        First, if it is not that hard to do, then the

1    plaintiffs would have done it.

2          They would have said like they did in

3    interrogatory 18A, here are a list of codes, let us know the

4    revenue.  That's the first point.

5          Second point I'll make really has two parts.  The

6    burden argument is going to come up again if the plaintiffs

7    go and mine these programs for promotional codes and come

8    back with a list of 300.  And so the -- the Court's

9    characterization that will, I think the Courts had asked if

10   you receive as true, to the extent that we don't get a long

11   list of promotional codes, the substantiative response is

12   this:

13         Let's just take one of the defined terms in

14   interrogatory 19 and that is the term "accused programs",

15   and I want to just walk the Court through our thought

16   process on this.

17         So any advertisement, and that is something other

18   than promo codes, but any advertisement, product deals or

19   promotional codes using the disjunctive, related to the

20   defamatory broadcast and why don't we just -- or, excuse me,

21   the accused programs, first of all, it's very difficult if

22   not impossible to track revenue from an advertisement.

23         If you publish an ad in the newspapers and you

24   buys a product they're not going necessarily going to say,

25   Hey, I saw your ad.  It's easier with promo codes because

1     they have to type that in.

2          The accused programs are all of the internet

3     programs, radio programs, television programs, and

4     documentaries identified in paragraphs 81 through 108, 110

5     through 116, and 117 through 126 of the complaint, including

6     a few that are specifically identified.

7          So the notion that they're, you know, it's just a

8     couple of hours of listening to a video and when you hear

9     promo code, type it in, is not necessarily what the

10    interrogatory says.

11         And it gets worse because defamatory broadcasts

12    also has a definition and it's any -- any broadcast and a

13    complete program in which any of the defamatory statements

14    appeared and defamatory statements is defined to be

15    including without limitation the statements identified in a

16    whole serious of paragraphs.  And that's in document 81-4 at

17    page 3.

18         So the responsive is two-fold.

19         If it's really that easy, the plaintiffs can just

20    do it.  If it's not that easy, then they should narrow

21    interrogatory 19 to satisfy the burdens -- the burden

22    argument that we raised earlier.

23         THE COURT:  Okay.  And then you also had something

24    you wanted to respond to Mr. Bloom on?

25         MR. ESLICK:  I did that with --

1          THE COURT:  You did that.

2          MR. ESLICK:  Sorry, Judge.

3          THE COURT:  Nope.  That's fine.

4          MR. ESLICK:  Trying to move things along.

5          THE COURT:  I appreciated that.  This is turning

6     into a long afternoon.

7          This is one I'm going to have to dig in on a

8     little bit.  I still want to get this written as soon as I

9     can, but I think that I'll just -- I'll need to go through

10    this interrogatory and go through its various component

11    parts and look at the definitions.

12         MR. BLOOM:  Your Honor, could I also quickly go

13    back to interrogatory number 1?

14         THE COURT:  I was just about to turn to

15    interrogatory number 1.

16         So interrogatory number 1 is, "All statements Mr.

17    Lindell made about Smartmatic.  When he made them.  Where he

18    made them.  All republications."

19         And it looks like you've subsequently limited that

20    had to the accused programs and that are you are only

21    looking for republications that came from the defendants and

22    it wouldn't be like if I saw it and sent it to my

23    brother-in-law or something like that.

24         MR. BLOOM:  That's correct, Your Honor.

25         Through the meet and confer process or during the

1    meet and confer process I should say, we acknowledged the

2    defendants' concerns about interrogatory number 1 and we

3    substantially narrowed it.

4         All we're looking for is for them to identify

5    instances in which they caused these programs that we've

6    identified in our complaint to be published.  As we

7    mentioned in our brief, we know that they -- they worked

8    with the network OEN to publish absolute proof.  Those were

9    the responsive instances.  And any other similar instances

10   in which they caused any programs that we've identified in

11   our complaint, that's what we want to know.

12            THE COURT:  Okay.

13         Mr. Eslick, with that narrowing, is the burden

14   argument entirely gone, largely gone, not gone at all?

15            MR. ESLICK:  The burden is different than the

16   interrogatory -- different than as the interrogatory is

17   worded.  And there might be some incongruence in between

18   what Mr. Bloom's understanding of the narrowing is and what

19   mine is.

20         The way that we're interpreting interrogatory

21   number 1 as narrowed is if there is a statement by Mr.

22   Lindell in the allegedly defamatory broadcast, identify it.

23         And our position there is you have, the

24   plaintiffs, the allegedly defamatory broadcast.  They're

25   cited numerous times in the complaint and it's just as easy

1    for plaintiffs to listen to the defamatory broadcast and

2    identify the statements.  And, in fact, they already have,

3    because many of them appear in the complaint.

4         So the response, Judge, is that we appreciate the

5    narrowing and appreciate the lifting of a significant burden

6    that otherwise existed, but at this point it's just as

7    convenient for the plaintiffs to listen to the programs,

8    identify the statements that they think are defamatory, that

9    they clearly know where they were published, because they

10   would be in the allegedly defamatory programs and they know

11   when, because they've already reviewed those.

12        THE COURT:  That's --

13        MR. ESLICK:  That's my understanding of what

14   interrogatory number 1 is as narrowed.

15        THE COURT:  You know, you've several times this

16   afternoon said you have two responses to that and I've got

17   two responses to what you just said --

18        MR. ESLICK:  Okay.

19        THE COURT:  -- or two questions to what you've

20   said.

21        Number one, is the standard if it's as easy for

22   the other side to get the material or is it -- is it not

23   something more like easier or substantially easier or, I

24   mean, again, you've been served with an interrogatory,

25   you've not identified a facial problem with the

1    interrogatory, you know, you're resisting answering the

2    interrogatory, as is your prerogative, but my understanding

3    is that saying it's just as easy for them to do it as for us

4    to do it will not ring the bell in terms of you not having

5    to turn it over.  I have a little problem with the

6    standards.

7              MR. ESLICK:  Yeah.  The other piece of that,

8    Judge, is this information is already in their custody and

9    control, you know, brevity is not a future of the complaint.

10   It's 136 pages long and the exhibits are several thousand

11   more.

12             They have identified what they think the

13   defamatory statements are.  And there is, if the information

14   is in their custody and control, then the interrogatory is

15   simply duplicitous.  Now --

16             THE COURT:  That's the second thing I wanted to

17   speak with you about.

18             Is interrogatory number 1 not asking, in effect,

19   what else is out there, not just what's in the complaint,

20   but what else did he say that defamed us?

21             MR. ESLICK:  I think that was the -- I'm sorry,

22   Judge.

23             THE COURT:  I'm done.

24             MR. ESLICK:  Okay.  I think that was the original

25   intent of interrogatory 1, but as narrowed it is about the

1    -- what they have termed the defamatory broadcast only.  And

2    the defamatory broadcast, and we again go to their

3    definition, are the broadcasts where the allegedly

4    defamatory statements were made and that definition refers

5    to the complaint.

6            And so if there's a statement made in one of the

7    allegedly defamatory broadcasts identified as such because

8    it contained an allegedly defamatory statement, and that

9    definition refers to the complaint, which refers to

10   documents the plaintiff already has, then the information is

11   already in their custody and control.

12           And this relates to something, Judge, that you

13   said earlier about the last interrogatory we were talking

14   about, number 19.  This information is in their custody and

15   control and it's -- it would be, again, unduly burdensome to

16   sit and listen to the numerous hours of broadcasts that

17   would be required and type out everything that Mr. Lindell

18   said.

19           MR. BLOOM:  Your Honor, if I may?

20           THE COURT:  Yes.

21           MR. BLOOM:  I just think, we don't understand the

22   burden issue here.  All we're asking for is for them to

23   identify instances in which these programs were published.

24   We're not asking them to watch the programs at all actually.

25           I gave the example or I gave the example of them

 1      publishing material on OEN.  What we're asking for and I

 2      think what Your Honor understands we're asking for is

 3      similar instances.  If they -- if they published these

 4      materials in Algeria, you know, that's something that we

 5      want to know and that we're asking about.

 6              We're not asking them to identify any specific

 7      statements in the programs themselves, we're just looking

 8      for instances in which they were published.

 9              THE COURT:  All right.  Mr. Eslick, anything

10      further on this point?

11              MR. ESLICK:  The only thing I'd add, Judge, is

12      then the narrowing to include only the allegedly defamatory

13      broadcasts is a bit hallow then, because we're sort of back

14      where we were in that I know that republication has been

15      taken off the table, but if I'm understanding this --

16              THE COURT:  Well, I'm not sure that republication

17      has been entirely taken off the table.  I think that

18      republication by people who are not -- you know, have

19      nothing to do with this case.  The example me saying, here's

20      something cool and sending it to my brother-in-law, that's

21      off the table, but if Mr. Lindell or My Pillow caused this

22      to be broadcast in a market other than the one that's

23      identified in the complaint, that type of republication is

24      still in play.  That's my understanding.

25              Mr. Bloom, am I right or am I wrong?

1              MR. BLOOM:  You are correct, Your Honor.

2              THE COURT:  So, Mr. Eslick, with that

3      understanding?

4              MR. ESLICK:  In that case, Judge, I guess I would

5      ask for more clarification about the narrowing of

6      interrogatory 1 to refer only to the allegedly defamatory

7      broadcast, because if we're now talking about a publication

8      in Algeria, that's not one of the allegedly defamatory

9      broadcasts.

10             THE COURT:  Well, okay.  I understand your point.

11     I think there's a way of crafting it and I think I can do

12     it.  Okay.

13             All right.  Now have I missed anything?

14             MR. BLOOM:  I don't believe so, Your Honor.

15             THE COURT:  It would be hard to believe, but it's

16     been a long day.

17             Mr. Eslick?

18             MR. ESLICK:  No, I don't have anything else, Your

19     Honor.  Thanks for your time.

20             THE COURT:  Well, hold on.  We're not quite done.

21             I'm going to take a short break.  I'm going to

22     create a breakout room.  I'm going to huddle up with the law

23     clerk and the two externs, and I think the court reporter

24     will be glad for a break as well.

25             And so I'll be back in five minutes or so and just

1    please stand tight.  And let me see if I can do this, okay.

2    This will just take a moment.

3              (Recess taken at 4:45 p.m.)

4                    *    *    *    *    *

5         (4:47 p.m.)

6                        **IN OPEN COURT**

7

8              THE COURT:  All right.  One thing that I think we

9    still need to discuss is just briefly a return to

10   defendants' request for production number 8, that's the one

11   seeking source code.

12             After reading the briefing, I was of the

13   impression that Smartmatic's position was, we do not have

14   possession, custody, or control of any of this material.

15             And I think that for the RFP as written, that is

16   true because it seeks the source code that was used in the

17   election and that is the stuff in the vault in Los Angeles.

18             However, counsel also represented that there's no

19   reason to believe that the version in the possession,

20   custody, and control of Smartmatic differs from the version

21   that's in the vault.

22             So I was not anticipating having a conversation

23   this afternoon about relevance, and burden, and security,

24   but given where we are at, I think we need to.

25             So the source code for products used in California

1    in the 2020 Election, and as I say, Mr. Eslick, I did not

2    think I needed to prepare on this so forgive me, but what is

3    the theory of relevance on that?

4              MR. ESLICK:  Of the source code that Smartmatic

5    has, Your Honor?

6              THE COURT:  The source code that Smartmatic has,

7    because that's the source code that I have got authority

8    over.  The stuff involved in Los Angeles would be whether

9    you draw out on that subpoena motion out in L.A.

10             MR. ESLICK:  So some initial thoughts on that,

11   Judge.

12             First, we don't know if the source code still

13   exists in the vault.  My understanding is that Smartmatic

14   has access to that and can confirm or deny that.

15             I do know that there is limit in months after an

16   election that a governmental entity must keep records about

17   an election.  So there is a possibility we may hear from

18   the, I'll call them the vault custodian, but I don't really

19   know what to call them --

20             THE COURT:  I know what you mean.

21             MR. ESLICK:  -- in the event that information is

22   not there.

23             Second, we do not know whether we will receive

24   objections or motion practice with respect to those

25   subpoenas.

1          So there isn't necessarily a guarantee that that

2     information will be provided to us in response to the

3     subpoenas.

4          And keep in mind, they are nonparties.  So the

5     burden to them is more of a -- more of a consideration than

6     it would be as it pertains to Smartmatic.

7          And then, third, Smartmatic has claimed in the

8     complaint that statements attributed to Mr. Lindell that

9     Smartmatic's products are programmed to rig elections are

10    false and that the information in Smartmatic's machines

11    cannot be easily manipulated.

12         If there are differences between the source code

13    that Smartmatic has and source code that is in the vault

14    that change is relevant because it shows that the source

15    code can be altered.  And that's one of the claims.

16         So, you know, the standard is is it relevant to a

17    claim or defense?  It is for those reasons.

18         So to sum up, we may not get it from the vault

19    custodian and if we do, then we should be allowed to compare

20    what was used by L.A. County in the 2020 Election and what

21    Smartmatic has in its possession to see if the code can be

22    changed.

23         THE COURT:  Ms. Ward, Mr. Eslick has some good

24    points.

25         Is this source code relevant and if it's not, why

1    is it not?

2         MS. WARD:  Your Honor, first I want to clarify a

3    little bit what Smartmatic has access to and how it has

4    access to that information, because I think that's prevalent

5    to the possession point.

6         So the copy of the code that Smartmatic has access

7    to is code that is kept in a database owned and maintained

8    by Los Angeles County.  Smartmatic, again, does have access

9    to it because it needs ongoing access for things like

10   maintenance and continued software development and things

11   like that, but it is not, you know, sitting within a -- you

12   know, a Smartmatic server or anything like that.  This is a

13   database owned and maintained by Los Angeles County.

14        THE COURT:  Okay.  And so let me make sure I have

15   understood this.  Because my impression when you and I

16   talked earlier was, I asked, Did Smartmatic keep any copies

17   of this?  And I understood your respond in the affirmative.

18        But now you are saying no, we don't actually have

19   possession of it.  If I understand what you're saying, it's

20   in the possession of Los Angeles County but it's not the

21   county that's in the vault?

22        MS. WARD:  Yeah, and I very much apologize if I

23   was unclear earlier.

24        So Smartmatic has possession in the sense that it

25   could go into this database and pull that file down.  That

1    is possible.

2          It is not a database that is owned by Smartmatic

3    and indeed they contract between the parties.  L.A. County

4    and Smartmatic, is clear that all of those materials are

5    indeed -- you know, L.A. County maintains full intellectual

6    property rights and ownership over all of those materials.

7          And I would, again, I apologize if I misphrased

8    kind of possessive versus access, but we do have access to

9    those materials.

10          THE COURT:  So to get to the bottom line, if I was

11    to enter an order on defendants' motion to compel saying,

12    Pull that thing down and turn it over, your response would

13    be, yes, we'll do that or your response would be, we're not

14    allowed to do it because we don't own it?

15          MS. WARD:  So, pursuant to the contract between

16    the parties, Smartmatic is required to keep that information

17    confidential.  We are not allowed to disclose it.

18          I believe there is a standard carveout for if we

19    are required to disclose information pursuant to legal

20    authority.  So I think should the Court order it, it is, you

21    know, likely permissible under the contract as it's been,

22    you know, ordered by the Court, but it in general that that

23    is not something that we have the right to disclose.

24          THE COURT:  Is this something that the District of

25    Minnesota can enter that order or is this an order that

1    would have to come from the Central District of California?

2              MS. WARD:  Given the interests at play here, you

3    know, it's our stance that the orders would be more properly

4    -- the issue would be dealt with and the order would be

5    entered more properly in the District of California.

6              THE COURT:  All right.

7              MS. WARD:  But --

8              THE COURT:  You do have access, you could produce

9    it in response to a court order, and you think that this

10   would be better litigated in Los Angeles than here in the

11   Twin Cities.

12             If that's all correct, then why is this source

13   code not relevant?

14             Mr. Eslick has given his reasons why it is.  What

15   are your reasons why it's not?

16             MS. WARD:  So, and I think this goes back more

17   generally to the exact nature of the statements made by Mr.

18   Lindell, I think at times the defendants in their briefing

19   has phrased things a little more broadly to say things like,

20   you know, Smartmatic's products in general were susceptible

21   to security issues or things like that.

22             That's not quite the statements at issue here.

23   Mr. Lindell's statements are that Smartmatic's products, the

24   software that you heard, was in fact utilized to rig or

25   steal the elections, did in fact flip votes from Trump to

1    Biden.  And with those being the key statements at issue,

2    again, they need to look at the software that was actually

3    utilized.

4              THE COURT:  All right.

5              Mr. Eslick, back to you for the last word.

6              MR. ESLICK:  With respect to my friend on the

7    other side, I disagree that this is an issue that should be

8    litigated in California.

9              This case is here.  The document request was

10   served in this litigation on the plaintiff.  And under the

11   interpretation of the contract that Ms. Ward has just

12   advanced, if a court orders them to do it they can.  There's

13   an exception to the contract.

14             It doesn't say a California court has to do it, it

15   just says a judicial authority.  And I don't have a page for

16   you, I imagine Ms. Ward might.

17             THE COURT:  That's okay.

18             MR. ESLICK:  And so this Court as a judicial

19   authority can order that, which would trigger the

20   requirement that the plaintiffs produce it.

21             It's unclear to me how it's necessary for a judge

22   in California to order Smartmatic to do anything because

23   there's no litigation there.

24             The case is here.  This Court has jurisdiction to

25   issue orders governing the discovery process.  And it seems

1    to me that if that order issues, Smartmatic has the

2    capability to do that without running afoul of the contract.

3              THE COURT:  All right.

4              MS. WARD:  Your Honor, may I make one brief point?

5              THE COURT:  Briefly, yes.

6              MS. WARD:  Yeah, so one just very quick point.

7              So we've been talking in our discussion here in

8    the briefing about production.  I just want to make the

9    point that to the extent that the Court is inclined to agree

10   that these materials are discoverable, that inspection and

11   not wholesale production is the appropriate mechanism to do

12   so, given the significant security concerns and the highly

13   confidentiality nature of this material.

14             And I think that's something the parties could

15   potentially work out a protocol for inspection if the Court

16   is so inclined, but I just want to make that point clear.

17             THE COURT:  All right.  Point taken.

18             All right, everyone.  I will take that under

19   advisement, but Ms. Ward, just FYI, on the ultimate issue, I

20   don't know, but I agree with Mr. Eslick, the case is here,

21   it's in Minnesota.

22             There is no litigation with Mr. Lindell and

23   Smartmatic and My Pillow in Los Angeles.  And I don't know

24   what procedural vehicle you would use to get it before a

25   judge out there or why that judge would not say, why am I

1    hearing this, send it back to Minnesota.

2              So I will make a decision but I agree with Mr.

3    Eslick, it is my decision to make and not the decision of a

4    judge in California.

5              All right.  Is there anything else about anything

6    else before we wrap up?

7              Mr. Eslick, let's start with you.

8              MR. ESLICK:  No, Your Honor.

9              THE COURT:  Mr. Bloom?

10             MR. BLOOM:  No, Your Honor.

11             THE COURT:  Ms. Ward?

12             MS. WARD:  No, Your Honor.  Thank you.

13             THE COURT:  All right.

14             Thank you all for hanging in here through a long

15   hearing.

16             Have a good evening.  Court is adjourned.

17             And I will see law clerk and externs in just a

18   moment.  I'll send a zoom invitation.  Thank you.

19             MR. MANSKE:  Thank you, Your Honor.

20             MR. BLOOM:  Thank you, Your Honor.

21             MR. ESLICK:  Thank you.

22             **(Court adjourned at 4:58 p.m.)**

23             *                *                *

24

25

1                          **REPORTER'S CERTIFICATE**

2              I certify the foregoing pages of typewritten
   material constitute a full, true and correct transcript of
3  my original stenograph notes, as they purport to contain, of
   the proceedings reported by me at the time and place
4  hereinbefore mentioned.

5
                         /s/Lynne M. Krenz
6                        Lynne M. Krenz, RMR, CRR, CRC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25