```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )  COURT FILE
SMARTMATIC USA CORP.;         )  NO. 22-CV-98 (WMW/JFD)
SMARTMATIC INTERNATIONAL      )
HOLDING B.V.; and SGO         )
CORPORATION LIMITED,          )
                              )
          Plaintiffs,         )  ** R E D A C T E D **
                              )
      vs.                     )
                              )
MICHAEL J. LINDELL and        )
MY PILLOW, INC.,              )  Courtroom 6A
                              )  Tuesday, July 25, 2023
          Defendants.         )  St. Paul, Minnesota
                              )  1:00 P.M.
------------------------------------------------------------
```

**<u>HEARING ON</u>**


**PLAINTIFFS' & DEFENDANTS' MOTIONS**


**BEFORE THE HONORABLE JOHN F. DOCHERTY**
**UNITED STATES MAGISTRATE JUDGE**


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**A P P E A R A N C E S:**


**For the Plaintiffs:**            **BENESCH FRIEDLANDER COPLAN**
                                        **& ARONOFF**
                                   By:  MICHAEL ELLIOT BLOOM, ESQUIRE
                                   71 South Wacker Drive - Suite 1600
                                   Chicago, Illinois  60606


                                   **BENESCH FRIEDLANDER COPLAN**
                                        **& ARONOFF**
                                   By:  JAMES RICHARD BEDELL, ESQUIRE
                                   200 Public Square - Suite 2300
                                   Cleveland, Ohio  44114


                                   **ROBINS KAPLAN, LLP**
                                   By:  WILLIAM E. MANSKE, ESQUIRE
                                   800 LaSalle Avenue - Suite 2800
                                   Minneapolis, Minnesota  55402-2015


**For the Defendants:**            **PARKER DANIELS KIBORT, LLC**
                                   By:  ANDREW D. PARKER, ESQUIRE
                                        ABRAHAM S. KAPLAN, ESQUIRE
                                   123 Third Street North - Suite 888
                                   Minneapolis, Minnesota  55401



                    *       *       *       *

1          (1:00 p.m.)

2                    **P R O C E E D I N G S**

3                       **IN OPEN COURT**

4          THE COURT:  Good afternoon, everyone.  Please be

5     seated.

6          All right.  We're here this afternoon for a

7     hearing on a couple of motions in Smartmatic USA and others

8     versus Michael Lindell and My Pillow.  Let's begin by

9     getting appearances beginning with counsel for the

10    plaintiffs, please.

11         MR. BLOOM:  Michael Bloom for the plaintiffs.

12         THE COURT:  Good afternoon, Mr. Bloom.

13         MR. BEDELL:  James Bedell for the plaintiffs.

14         THE COURT:  Okay.  Good afternoon.

15         MR. MANSKE:  And William Manske, also for the

16    plaintiffs.

17         THE COURT:  Okay.

18         And, counsel -- all counsel -- when you're

19    speaking, either come to the podium or speak into the

20    microphone.  I can hear you, but you won't be picked up on

21    the recording which the court reporter might need to refer

22    to unless you're speaking into the microphone, okay?

23    Thanks.

24         For the defendants.

25         MR. KAPLAN:  Abraham Kaplan representing

 1   Defendants.

 2          THE COURT:  Good afternoon, Mr. Kaplan.

 3          MR. PARKER:  Andrew Parker, Your Honor,

 4   representing the defendants.

 5          THE COURT:  Good afternoon, Mr. Parker.

 6          I suggest that we take these motions up in

 7   numerical order by docket number, which if I've copied them

 8   down properly means that Smartmatic's motion to compel,

 9   which is number 140, would go first and Mr. Lindell's motion

10   to compel, which is number 146, would go second.

11          So, Mr. Bedell, I understand that you'll be

12   presenting the argument, is that correct?

13          MR. BEDELL:  That's correct, Your Honor.

14          THE COURT:  Okay.  Why don't you come on up to the

15   podium.

16          MR. BEDELL:  Your Honor, Smartmatic seeks

17   documents related to defendant Michael Lindell's personal

18   wealth.  His financial condition is key evidence the jury

19   will need to rely upon when deciding on punitive damages.

20   Without that the jury will be unable to measure any punitive

21   damages award in accordance with one of the main purposes of

22   punitive damages, that of deterrence.

23          THE COURT:  I'd like to begin by getting some of

24   the sort of the foundational aspects of this straight.  In

25   terms of liability -- before we get to punitive damages, but

1    in terms of liability, is this a **New York Times vs. Sullivan**

2    governed case.

3              MR. BEDELL:  Yes, Your Honor.

4              THE COURT:  Okay.  Now, I notice that in one of

5    your papers you simply said Smartmatic is a public figure

6    and therefore **New York Times vs. Sullivan** controls.  I

7    didn't know that that was an issue.  Am I -- I see you

8    looking at your table.  Am I misstating something,

9    misunderstanding something?

10             MR. BLOOM:  Your Honor, Judge Wright held in her

11   ruling on defendants' motions to dismiss that Smartmatic

12   needed to prove actual malice to prevail on its claims.

13             THE COURT:  Okay, got it.  Thank you.  That's

14   helpful.

15             All right.  So now, how does that interweave with

16   the standard for punitive damages, the substantive standard?

17   We'll talk about procedure in a few minutes.

18             MR. BEDELL:  Sure.  So the substantive standard of

19   Minnesota Statute Section 549.20, you know, that outlines

20   what needs to be established in order to be entitled in

21   order to be awarded punitive damages under Minnesota law,

22   and we do believe that that is the standard that we can and

23   will be meeting at trial in this matter.

24             THE COURT:  And is that disregard for the rights

25   of others?

1          MR. BEDELL:  Correct.

2          THE COURT:  All right.  Now, having done those two

3     steps, let's go back to where you were, and you talk about

4     how it is that this motion to compel is needed in order to

5     satisfy the two standards you've just been talking about.

6          MR. BEDELL:  Sure.  So we've made a request in our

7     third set of requests for production for various items

8     related to Mr. Lindell's personal financial condition, and

9     without knowing what Lindell's financial condition actually

10    is, the jury's not going to be able to fashion an award that

11    will properly deter someone of his level of wealth from the

12    kind of conduct that Smartmatic has been forced to endure.

13          Importantly, Defendants do not argue that -- in

14    their opposition papers that Smartmatic's requested

15    discovery is irrelevant to punitive damages.  Rather, their

16    only argument is that Smartmatic failed to properly plead

17    punitive damages according to 549.191.

18          THE COURT:  Well, let's actually parse that out

19    before you move forward.

20          It seems to me that Mr. Lindell's financial

21    condition could be -- without deciding the issue, but could

22    be relevant in one of two ways and maybe in both.

23          Number one is the one that you just talked about,

24    which is the statute 549.20 and the standard for awarding

25    punitive damages.  The other -- and this is why I was asking

1    about **New York Times vs. Sullivan** -- is if there was -- it

2    seemed to me that in your written submissions you were

3    saying that there was a financial motive to make these

4    defamatory statements and that therefore information about

5    Mr. Lindell's finances would be motive evidence and that

6    wouldn't prove actual malice, but it would provide a motive

7    for doing things that are actually malicious.  Fair

8    statement?  And if so, are you going with number one, are

9    you going with number two, are you going with number one and

10   number two?

11             MR. BEDELL:  That's absolutely correct, Your

12   Honor.

13             THE COURT:  What's absolutely correct?

14             MR. BEDELL:  That it is both.  It is indeed

15   relevant to the issue of punitive damages for deterrence.

16   Also, 549.20 outlines the financial condition of a defendant

17   as one of the factors to be considered in an award of

18   punitive damages, but in addition, as you correctly point

19   out, it is also relevant to show --

20             THE COURT:  Well, I didn't say it was relevant.  I

21   was asking if that was your argument.

22             MR. BEDELL:  I believe it's relevant.  And you're

23   correct in pointing out that we believe it is irrelevant,

24   that in addition to punitive damages, it also touches upon

25   the issues of actual malice.

1          THE COURT:  Okay.  Thank you for the

2     clarification.  You can go ahead.

3          MR. BEDELL:  Yes, sure.  So, Defendants' only

4     argument in their opposition papers is that Smartmatic

5     failed to properly plead punitive damages according to

6     Section 549.191, and in the process they make no attempt to

7     distinguish Your Honor's opinion in ***Russ v. Ecklund***

8     ***Logistics***.  Thus, if the Court does decide today that

9     Smartmatic properly pleaded punitive damages, the inquiry

10    can end there.

11         THE COURT:  Just to be clear, ***Russ v. Ecklund***

12    ***Logistics***, there was no dispute.  I wrote a couple of

13    paragraphs, but both the defense and the plaintiffs agreed

14    that Rule 15 was the rule of decision.

15         MR. BEDELL:  Understood, Your Honor.

16         THE COURT:  Okay.

17         MR. BEDELL:  More focused on your analysis of the

18    issue and whether or not there was an issue of the Rules

19    Enabling Act in regards to comparing Section 549.191 with

20    Rule 15.  And Defendants' position in this matter is

21    incorrect.

22         So, first, to the extent that Defendants had an

23    issue with Smartmatic's pleading, the time to address that

24    has long since passed.  Smartmatic pleaded punitive damages

25    in its original complaint.

1      THE COURT:  But does that have to do with the Rule

2   15 versus Minnesota statute issue, or does that only kick

3   in, as I think you wrote, if I decide that the Minnesota

4   statute is the rule of decision?

5      MR. BEDELL:  So I believe in this case it's a

6   little bit adjacent of an issue.  It's more about an issue

7   of waiver as opposed to procedure in that instance, meaning

8   that Defendants have had ample opportunity to challenge the

9   sufficiency of our pleading.  They did so in their motion to

10   dismiss and did not raise this as an issue that they felt

11   was deficient, even though that was present in that initial

12   complaint.  They also had an opportunity to do so during the

13   filing of our first supplemental complaint and again chose

14   not to.

15      But putting that aside, you know, in this district

16   Section 549.191 is considered to be a procedural, not

17   substantive, statute, so as a result, pleading under the

18   requirements of Federal Rule of Procedure 8, which requires

19   a pleading to include a demand for damages for relief

20   sought, including different types of relief, is a proper

21   manner to plead punitive damages.

22      Furthermore, even if Smartmatic was required to

23   follow the procedures of Section 549.191, there's no dispute

24   that Smartmatic could beat those requirements.  Smartmatic

25   has alleged that Defendants intentionally disregarded the

1    wealth of publicly available information showing that

2    Smartmatic could not have possibly rigged the 2020 election

3    and they chose to broadcast those statements anyway.

4    Defendants have not disputed that Smartmatic's allegations,

5    if proven true, give rise to the availability of punitive

6    damages.

7            And finally, as you touched on earlier,

8    Smartmatic's request for documents related to Lindell's

9    financial condition is relevant to the actual malice element

10   of Smartmatic's defamation claim.  Defendants' argument that

11   there is no evidence Lindell personally profited from their

12   defamation campaign is without merit, because Defendants'

13   argument ignores that Lindell is the owner and CEO of My

14   Pillow, and thus he serves to personally profit from the

15   increased sales that My Pillow could have seen as a result

16   of the increased exposure during their defamation campaign.

17           And Defendants further ignore that just because an

18   improper motive cannot satisfy actual malice on its own,

19   that does not mean the evidence of an improper motive is not

20   relevant.  Courts have consistently held that evidence of an

21   improper motive is still relevant to the issue of actual

22   malice.

23           (Pause)

24           THE COURT:  I'm not sure what it signifies when

25   you stop like this.

1            MR. BEDELL:  Oh.  Your Honor, if you have other

2    questions --

3            THE COURT:  No.  Let me just make sure that the

4    universe of discovery being sought here is your request for

5    production 30, 31, 32 and 33?

6            MR. BEDELL:  That's correct.

7            THE COURT:  Nothing more?

8            MR. BEDELL:  For this particular motion, that's

9    correct.

10            THE COURT:  Okay.  All right.  I have no other

11    questions.  Thanks.

12            MR. BEDELL:  Thank you, Your Honor.

13            THE COURT:  Mr. Kaplan, you're up.

14            MR. KAPLAN:  Good afternoon, Your Honor.

15            THE COURT:  Good afternoon.

16            MR. KAPLAN:  As both parties agree on this case,

17    Minnesota Statute 549.20 applies in this case in order to

18    put an evidentiary burden on Plaintiffs to present to this

19    Court before they can plead punitive damages in this case.

20            THE COURT:  Well, is it before they can plead or

21    before they can be awarded punitive damages?  I agree with

22    you that 549.20 is the substantive component of the statute,

23    but I'm not sure that you need to satisfy that before

24    pleading punitive damages, although you can't get punitive

25    damages in the end until you've satisfied it.

1          MR. KAPLAN:  So the courts when they analyze --

2    first, state courts when they analyze a motion to amend the

3    complaint to bring punitive damages, the standard is

4    *prima facie* evidence that there is clear and convincing

5    evidence of a reckless disregard for a party's rights.  So

6    549.19 adopts the clear and convincing standard that must be

7    presented at the *prima facie* level in a motion to amend the

8    complaint.

9          THE COURT:  All right.  Now, what does that in

10   turn have to do with 549.191 and its requirement of

11   affidavits and so forth and so on and not being able to

12   plead punitive damages in your initial complaint?  How do

13   those two -- I mean, do those two work together?

14         MR. KAPLAN:  They absolutely work together, Your

15   Honor, because 549.19 references 549.20 when it's laying out

16   the standard that a party is required to present to the

17   court.  And really the question of procedural versus

18   substantive goes back really to the heart of the circuit

19   split that's currently present in the Minnesota federal

20   courts.

21         Now, Judge Wilhelmina Wright issued an opinion

22   that we cite on the very first page of our brief of

23   **Johannessohn vs. Polaris**, where Judge Wilhelmina Wright

24   stated that 549.19 and 20 are both substantive, Your Honor.

25   And she adopted her magistrate's ruling in that case that

1    when a party brings a motion to amend under Rule 15 of the

2    federal rules, they require the higher evidentiary burden to

3    be presented.

4             THE COURT:  Now, let me make sure that I'm

5    tracking this.

6             You say that there is a Judge Wright opinion which

7    is in -- on the first page of your -- is it your opposition

8    to their motion?

9             MR. KAPLAN:  Correct, Your Honor.  Not on the

10    first page.  The first argument page.

11             THE COURT:  First argument page.  All right.  Hold

12    on.  Let me get to that.

13             All right.  And which one is it that you are

14    drawing my attention to?  ***Johannessohn***?

15             MR. KAPLAN:  On the bottom of page 3, ***Johannessohn***

16    ***vs. Polaris Industries.***

17             THE COURT:  Okay.  Got it.

18             MR. KAPLAN:  A Judge Wilhelmina Wright decision

19    ruling that the substantive burdens of the Minnesota

20    punitive damages statute apply in a federal case.

21             THE COURT:  I don't know that -- I mean, I guess I

22    can hear from Mr. Bedell in a minute or two, but I don't

23    know that there's argument about that.  The question is do

24    you need to comply with 549.19's procedures, or do we go

25    under Federal Rules of Civil Procedure 8 and 15.

1          I have written at least twice that the answer is

2     that you go with the federal rules.  Most of my colleagues

3     are in agreement with that.  I think Judge Brisbois held out

4     for awhile, but I'm not sure what's happening there after

5     Judge Brasel's opinion in the *Polaris* -- I'm not remembering

6     the name of the case.

7          I mean, isn't it pretty well-settled here in

8     Minnesota that a federal court sitting in diversity

9     considering punitive damages uses the Federal Rules of Civil

10    Procedure for procedure?

11         MR. KAPLAN:  I don't believe so, Your Honor.  And

12    if Your Honor reviews page 3 and 4 of our briefs, we cite to

13    over ten to 12 opinions by federal court judges in Minnesota

14    applying the substantive standard under the Minnesota

15    punitive damages statute.

16         THE COURT:  But with the exception of

17    *Johannessohn*, all of those cases are years old, and I

18    believe that the judges, the magistrate judges in this

19    district, after *Shady Grove* have been using the Federal

20    Rules of Civil Procedure only in the last couple, three

21    years.

22         MR. KAPLAN:  Your Honor, I believe *Shady Grove* was

23    a 2010 opinion.

24         THE COURT:  It was.  We're slow.

25         MR. KAPLAN:  And all these opinions are after 2010

1      where these courts apply the Minnesota standard.

2                  THE COURT:  No, I understand that, but what I am

3      saying is that those cases -- that more recent cases from

4      this district are pretty uniform on using the Federal Rules

5      of Civil Procedure in this context and I'm asking whether

6      that is correct.

7                  MR. KAPLAN:  Whether or not most recent cases --

8                  THE COURT:  Most recent cases use the Federal

9      Rules of Civil Procedure and not the Minnesota statute for

10     the procedural component of bringing a claim for punitive

11     damages.

12                 MR. KAPLAN:  And, Your Honor, I'm not trying to

13     hide the ball.  I don't know the past three years.  My

14     analysis was since *Shady Grove*.

15                 THE COURT:  Okay.

16                 MR. KAPLAN:  But importantly, Your Honor, I think

17     every case cited by the plaintiffs for the proposition that

18     the federal rules apply are always going on the Rule 15

19     standard, which means that none of the parties in those

20     cases asserted it in the complaint, because if they had,

21     they wouldn't need to bring a motion to amend.  So everybody

22     seems to recognize that punitive damages cannot just be put

23     in the complaint and the courts are grappling with

24     ultimately when a motion to amend is brought, is it the

25     higher clear-and-convincing standard requiring specific

1      evidentiary burdens, or does it go back to justice allows

2      all amendments to be put in?

3              THE COURT:  Well, you say that everyone seems to

4      recognize that punitive damages can't just go into the

5      complaint at the start.  Why not?

6              MR. KAPLAN:   Well, I think it goes back to the

7      original reason for sort of the -- under the **Shady Grove**

8      analysis, in that under the **Erie** doctrine we don't want to

9      encourage forum shopping for plaintiffs, to chose one court

10     over the other.  And if one court sort of lets the door open

11     on punitive damages to be pled originally in the complaint,

12     and the Minnesota state court says no, you have to wait

13     until a later date and higher evidentiary burdens, I think

14     that encourages forum shopping, which goes back to the

15     analysis that Judge Wilhelmina Wright analyzed in the case,

16     in that Minnesota 549.19 is substantive, because it requires

17     a party to come forward with a higher evidentiary burden

18     than they ordinarily would need to present in order to even

19     put it into the case, to engage in discovery and to litigate

20     the case.

21              Now, in this case, Plaintiffs' brief devotes 90

22     percent of its arguments that the personal financials of

23     Mike Lindell should be allowed to be discovered under

24     punitive damages, and they devote I think under a page to

25     the argument that it should be allowed because it helps

1    support actual malice.  So I think that gives an insight

2    into Plaintiffs' position in this case, that they mostly are

3    claiming that it's solely because of punitive damages that

4    they should be allowed to dig into the complete personal

5    financials of a defendant.

6              THE COURT:  You're doing an admirable job,

7    Mr. Kaplan, but I can't help but notice that every argument

8    you make invites me to disregard the plain language of these

9    recent opinions from many judges of this court in order to

10   take a somewhat more sophisticated approach and look behind

11   and look to intent and look to the consensus, apparently,

12   among the bar about the way in which things are pleaded.

13             As the person who's going to have to make this

14   decision, why should I not just look at these cases which

15   all say go with the federal rules and end it there rather

16   than continuing to look for nuance and subtlety that may not

17   even be there?

18             MR. KAPLAN:  I think three reasons, Your Honor.

19             Number one, because the district judge in this

20   case has endorsed the substantive analysis that the punitive

21   damages are substantive law and not procedural.  So I think

22   that analysis should be looked at and analyzed before

23   potentially we move down just because multiple judges since

24   2021 or 2022 are going on a specific road.

25             Number two, it's Defendants' position that it can

1    lead to improper motion practice and improper forum

2    shopping.  So I think this Court has an opportunity to sort

3    of join the right side of analyzing it under a substantive

4    analysis and not allow people just to pick a court to

5    potentially claim a massive amount of punitive damages.

6          Now, this bleeds into a little bit of our upcoming

7    motion to compel, but Plaintiffs' damages in this case are

8    extremely tenuous and it's Defendants' position that they're

9    hiding the ball on it.  And one of the arguments that they

10   present in their briefing is that we don't even need

11   economic damages in this case because we have *per se* damages

12   and we go straight to punitives.  So I think this case all

13   the more so, before it jumps into punitive damages, which

14   seems to be the bulk of their complaint and their current

15   case, a higher bar needs to be set.

16         And lastly, Your Honor, just in the recent edition

17   of the *Bench & Bar* in Minnesota, there was an entire article

18   going through the circuit split between the federal

19   procedural rules applies versus the substantive rules.  So

20   it's far from a settled issue.  It came out on the day that

21   we filed our brief, so -- the day after we filed our briefs,

22   but it's not Defendants' position that it's a settled issue.

23         THE COURT:  All right.  I mean, I understand what

24   you're saying.  I don't have any questions about the

25   argument itself.  Anything else you think it's important for

 1    me to bear in mind as I look at this?

 2              MR. KAPLAN:   No, Your Honor.

 3              THE COURT:  Thanks very much, Mr. Kaplan.

 4              Mr. Bedell, I'll give you a couple of minutes for

 5    rebuttal, but it would have to be limited to what Mr. Kaplan

 6    said.

 7              MR. BEDELL:  Understood, Your Honor.

 8              THE COURT:  And maybe you could start by giving me

 9    your take on the *Johannessohn* case by Judge Wright.

10              MR. BEDELL:  Yes, Your Honor, so I will start

11    there.

12              You know, I think it bleeds into a conversation I

13    feel you've gone over with the both of us where following

14    *Shady Grove* there has been -- this court has wrestled with

15    the idea of how to address the pleading standards from the

16    federal rules versus the Minnesota Statute 191.  And over

17    time there have been conflicting decisions.  There has not

18    necessarily been a one -- you know, the Eighth Circuit has

19    not stepped in to clarify everything for sure, but as it

20    appears you recognize, the overwhelming majority of courts

21    do seem to come out on the side that the federal rules

22    should be followed for pleading standards and that 549.20

23    should be followed for the substantive analysis.

24              THE COURT:  Well, with apparently the important

25    exception of the district judge on this case, and that's why

1    I'm asking about **Johannessohn**.

2              MR. BEDELL:  Yes.  So I believe **Johannessohn** was

3    decided in --

4              THE COURT:  I think it's a '22 case.

5              MR. BEDELL:  '22 case, yes.  And in **Johannessohn**,

6    I believe -- I think a lot of it is just -- there's been a

7    lot of different discussions.  I think important to remember

8    at the end of the day is that regardless of whether the

9    pleading standards of Section 549.191 or Rule 8 or Rule 15

10   are followed, your initial question to Mr. Kaplan I thought

11   was astute in that that does not change what you need to

12   establish in a case to be awarded punitive damages.  So the

13   substantive rights from a defendant who is potentially

14   subject to a punitive damages award or a plaintiff who is

15   pursuing a punitive damages award regardless of which

16   pleading standard you decide to use, Section 549.20 is still

17   the evidentiary burden that still needs to be carried.

18             THE COURT:  Okay.  Do you have **Johannessohn** in

19   that impressively thick binder of yours?

20             MR. BEDELL:  Yes, I do.

21             THE COURT:  Okay.  Why don't you just take a

22   minute.  You're not hurting yourself by taking your time.

23             MR. BEDELL:   I appreciate that.

24             THE COURT:  Find it, give it a quick scan, refresh

25   your memory of what it says, and then tell me what your

1    position is with regard to that case.  Take the time you

2    need.

3         (Pause)

4         MR. BEDELL:  So, Your Honor, I believe there is

5    one key distinction that distinguishes this particular

6    matter from *Johannessohn.*  Well, maybe two to be honest.

7         First and foremost, *Johannessohn* involved a motion

8    to amend, which this is not.  This is a motion to compel.

9    It happens to butt up against the issue of deciding these

10   rules and which pleading rules to follow, but that was a

11   motion to amend, which this is not.

12        Furthermore, the court in *Johannessohn* decided

13   that the evidence that was presented did not meet that

14   standard, which is not quite in front of us.

15        THE COURT:  Which standard?

16        MR. BEDELL:  The standard of 191 in that the

17   evidence that they did consider and they did present as

18   their basis for a motion to amend did not rise to the

19   evidentiary *prima facie* case that they needed to display at

20   that point.  Now, those issues --

21        THE COURT:  Well, wait.  Are you talking about .19

22   or .20, because --

23        MR. BEDELL:  .191, the *prima facie* showing of

24   clear and convincing evidence that in this case Polaris

25   acted with deliberate disregard of the plaintiff's rights

1    and safety.

2             THE COURT:  Okay.  So it sounds like Judge Wright,

3    because she analyzed the problem in .191 terms, is going

4    with the idea that .191 is the rule of decision in a

5    situation where someone wants to amend a complaint and add

6    punitive damages in a diversity case in federal court.

7             MR. BEDELL:  Yes.  And I believe that ties into

8    your opinion in *Ecklund Logistics* where you identified that,

9    you know, one place, regardless of which procedural rules

10   you use, the substantive rules still come into play showing

11   futility of a potential amendment.  If your evidence cannot

12   meet that standard anyway, then there's no point in allowing

13   it to be amended under Rule 15 if it cannot satisfy the

14   substantive burden that you'll need to carry at the end of

15   the day through 549.20 anyway.

16            THE COURT:  All right.  Well, I mean, here's the

17   thing.

18            Mr. Kaplan has pointed out rather compellingly

19   that there is a split that judges might be moving towards

20   following the federal rules, but that there are still some

21   judges who are not convinced, and he made the point that

22   Judge Wright might be one of them, and that's why it's

23   important that I hear from you what your view is.  I mean, I

24   can read the case myself, but I want to know what your take

25   on the case is.  And it sounds to me like Judge Wright was

1    going down a state-law path, not a Federal Rule of Civil

2    Procedure path, when she analyzed this motion to amend.

3              MR. BEDELL:  I think in the case of Judge Wright's

4    opinion, what's important to note there is that regardless

5    of which path would have been chosen --

6              THE COURT:  I know that.

7              MR. BEDELL:   Sure.

8              THE COURT:  Really.  You know, you've said it.  I

9    get it.  But was Judge Wright taking the view that the state

10   procedural statute was the appropriate rule of decision in

11   *Johannessohn*?

12       (Pause)

13             MR. BEDELL:  With the caveat that I've --

14             THE COURT:  Understood.

15             MR. BEDELL:   -- probably not reviewed this

16   opinion as much as I wish I would have at this point, that

17   does appear to be correct.

18             THE COURT:  Okay.  Thanks very much.

19             MR. BEDELL:  Your Honor, I did want to point out

20   one inaccuracy in Mr. Kaplan's representation of our motion.

21   He mentioned that there was no cases that we cited that

22   applied this to a situation involving Rule 8.  That is not

23   the case.

24             As you can see in our papers, we cite *American

25   Achievement Corp. vs. Jostens*, and additionally *BCBSM vs. GS*

1     ***Labs.***   Both of those cases are -- involved situations about

2     Rule 8 as opposed to Rule 15.  A similar analysis was

3     conducted and both of those courts concluded that there's no

4     reason not to follow Rule 8, which does expressly require

5     that if a plaintiff is going to be pleading damages, that

6     they need to plead them and they need to plead which types

7     of damages they are seeking.  So I wanted to clarify that,

8     Your Honor.

9              THE COURT:  Okay.  All right.  Thanks very much.

10             MR. BEDELL:  Thank you.

11             THE COURT:  All right.  We'll take that one under

12     advisement.

13             Let's move on then to Mr. Lindell's motion to

14     compel, which as I understand, Mr. Kaplan, is you again.

15             MR. KAPLAN:   Yes.

16             THE COURT:  Okay.  As I understand, it is damages

17     and contention interrogatories.  Does that sum up the

18     waterfront?

19             MR. KAPLAN:  Correct, Your Honor.

20             THE COURT:  Okay.

21             MR. KAPLAN:  Rule 26 initial disclosures, damages

22     interrogatories and contention interrogatories.

23             THE COURT:  Okay.  You have the floor.

24             MR. KAPLAN:  Thank you, Your Honor.

25             THE COURT:  And for the record, this is docket

1    146.

2            MR. KAPLAN:  Your Honor, Defendants are seeking

3    one of the foundational components of discovery in this

4    motion, basic damage information that under Rule 26 initial

5    disclosures, without request or demand from another party, a

6    plaintiff must provide their theory of damages in the case.

7            Now, what does "theory of damages" mean?  It means

8    that they must provide a computation of damages, they must

9    provide the methodology or analysis and how it was computed,

10   and all documents and evidentiary support to support the

11   computation and methodology.

12           Now, Plaintiffs have not told us a lot about their

13   damages in this case, but what we do know about Plaintiffs'

14   damages is what they write in the complaint.  In a complaint

15   first filed in January of '22 and amended in April of 2023,

16   the plaintiffs alleged that they have suffered over a

17   billion dollars in damages in this case.  They put in

18   language in the complaint that based on modest multipliers

19   their valuation has gone down from three billion to one

20   billion or perhaps even under one billion.

21           So just taking a step back, before they even filed

22   this case, Plaintiffs must have done some type of damages

23   analysis.  Rule 11 requires that a reasonable inquiry be

24   done before a statement like that can be put in the

25   complaint.  The complaint grabbed headlines in large part

1    because of the over a billion dollar defamation complaint,

2    but since then the plaintiffs have refused to even provide

3    how that analysis in the complaint was provided.

4              THE COURT:  So this is different from other cases

5    with this sort of dispute in that the plaintiffs are

6    responding, as I understand it, that we have provided in

7    response to your entreaties some information, some guidance,

8    that this hasn't been just a "We're not telling you anything

9    until the end of discovery" situation.

10             Is that correct?

11             MR. KAPLAN:  So, Your Honor, it's correct and

12   wrong at the same time.

13             THE COURT:  Okay.  Well, what have they done?

14   Give me -- from where you sit on the receiving end, what has

15   been the response when you say, "We need to know more about

16   damages"?

17             MR. KAPLAN:  So to date the plaintiffs have

18   provided Rule 26 disclosures that are extremely conclusory.

19   The disclosures don't identify contracts.  They generally

20   describe economic damages consisting of contracts, valuation

21   and reputational harm, and they assert that they're going

22   after punitive damages, but they do not identify specific

23   computation and methodologies of how they come to that

24   damage.

25             THE COURT:  Well, one of the things that ran

1     through your written materials was:  They haven't provided

2     us with a contract that has been broken or not fulfilled or

3     something like that.  I mean, how did that become the gold

4     standard for measuring damages other than the fact that they

5     don't have any and therefore, you know, for obvious

6     strategic reasons.  But I mean, if a political subdivision

7     is unwilling to do business with Smartmatic, they might not

8     enter into a contract in the first place, and I'm honestly

9     not sure what metric one could possibly have to measure

10    reputational harm.

11            Can you help me out with that?

12            MR. KAPLAN:  Absolutely, Your Honor.

13            So regarding the first point, the few disclosures

14    that the plaintiffs have provided to Interrogatory Number 20

15    are identifying specific jurisdictions that they're claiming

16    have -- will not do business with them because of

17    Defendants' defamation.  So the plaintiffs are the ones that

18    are presenting the case showing all indications that when

19    they are in front of a jury they're going to go through

20    jurisdiction by jurisdiction, present their ability to get

21    the contract beforehand, what happened in the middle, and

22    the reason why they think they cannot get the contract in

23    the end.  So to the extent that that's going to be their

24    case, Defendants have a right to prepare for that case.

25    That's number one.

1          THE COURT:  Have you got any of that sort of

2     thing -- and I'm thinking of Shasta County, California,

3     specifically, because there was reference to public source

4     materials concerning that.

5          So, for example, do you know who it was at Shasta

6     County who said:  I'm reluctant to do business with

7     Smartmatic.  There's something of an odor about them, or

8     words to that effect, when it was said, who it was said to,

9     anything like that?

10         MR. KAPLAN:  So, Your Honor, off the top of my

11    head I cannot recall the specific Shasta County, California

12    example, but I think we need to take a little bit of a step

13    back.

14         THE COURT:  Well, I was setting the stage for

15    another question, which is there is that long list of

16    every -- ███████████████████████████████████████

17    ███████████ down to whoever is last.

18         Anything of that sort been produced with respect

19    to any of those jurisdictions?

20         MR. KAPLAN:  So in this case over five million

21    pages have been produced by Plaintiffs to Defendants.  Now,

22    what Plaintiffs are saying, one of the defenses to our

23    motion, is, hey, go dig through the documents and identify

24    it yourself, but it's not the standard under Rule 26.

25         Under Rule 26, they need to provide to us with

1    bifurcated documents that they allege provide the basis for

2    their damages.  They can't send Defendants to go search

3    through five million pages to try to creatively think this

4    might be a document that they use to support this, or this

5    might be to support this.  They need to amend the Rule 26

6    initial disclosures and tell us where they are at currently.

7            THE COURT:  All right.  Can I ask why I'm hearing

8    about this now?  This case was filed in January of 2022.

9    I'm sure -- I don't have the initial scheduling order in

10   front of me, but I'm sure that 26(a)(1) materials were due

11   sometime in January-February of last year, and here we are

12   it's almost August of the following year, fact discovery is

13   a few weeks from ending, and now there's a complaint about

14   the 26(a)(1)?

15           MR. KAPLAN:  Your Honor, to directly address that

16   point, this case, there was a substantial completion date of

17   fact discovery in early April.

18           THE COURT:  Right.

19           MR. KAPLAN:  And both parties, the defendants,

20   were -- in the months preceding it were massively focused on

21   meeting that fact discovery deadline, and we expected that

22   the plaintiffs, once fact discovery substantial completion

23   was completed, they would supplement their damages

24   disclosures.  And as soon as that didn't happen, a week

25   within the substantial completion deadline, the defendants

1     sent a deficiency letter in early April to Plaintiffs, and

2     since then they have provided next to nothing.  And the

3     reason why we know it's next to nothing, Your Honor, is

4     because of a supplementation that the plaintiffs provided

5     two days ago after 5:00 p.m. on Friday.  Could I approach

6     Your Honor to --

7              THE COURT:  Sure.  I take it that Plaintiffs have

8     seen what you're about to show me?

9              MR. KAPLAN:  Yes.  It's a supplemental

10    interrogatory, Interrogatory Number 20.

11             THE COURT:  Do the plaintiffs have any objection

12    to me getting this?

13       (Copy provided to Plaintiffs and the Court)

14             MR. BLOOM:  No objection, Your Honor.

15             THE COURT:  All right.  So what I'm going to do,

16    Mr. Kaplan, is I'm going to put this into the hearing

17    record.  Is any of this under seal or confidential?

18             MR. KAPLAN:  Yes, Your Honor.

19             THE COURT:  Okay.

20             MR. KAPLAN:  There is -- in the appendix at the

21    end it says "Attorneys' Eyes Only."

22             THE COURT:  Okay.

23             MR. KAPLAN:  So I'm guessing that it is

24    confidential, which is one of the reasons why we did not

25    file it as a supplementation prior to this hearing.

 1              THE COURT:  All right.  We'll handle it

 2      appropriately.

 3              All right.  This is a fairly big document,

 4      Mr. Kaplan.  What is it that you'd like to direct my

 5      attention to?

 6              MR. KAPLAN:  So primarily on page 23 of the

 7      document --

 8              THE COURT:  All right.

 9              MR. KAPLAN:  -- is where Interrogatory Number 20

10      was laid out.  And this new filing, this new discovery

11      response, starts on page 24.

12              MR. KAPLAN:  Mm-hm.  I got it.

13              THE COURT:  And a couple of interesting things are

14      added to this supplementation, but most importantly on the

15      last sentence, the last page, on page 27, Plaintiffs state:

16      "Responding further, Smartmatic refers to Appendix A

17      attached hereto which provides specific customer information

18      from Smartmatic's customer relationship management

19      database," which is the appendix, Your Honor, that follows.

20              THE COURT:  Mm-hm.  Okay.

21              MR. KAPLAN:  Now, this appendix, it's a little bit

22      small, Your Honor.

23              THE COURT:  I can't read it, but --

24              MR. KAPLAN:  Okay.  So it's ██████████████████

25      of entries of specific jurisdictions, the year they think

1    the contract would have been awarded, and an initial

2    probability column for the probability of getting the

3    contracts before the defamation, and then a statement of

4    probability as of ██████████████. And it shows ███

5    ████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████

7    █████████████████████████████████████████████████

8    ██████████████████████████████████

9          Now, this document is mind-blowing, Your Honor,

10   but one of the main reasons why it's mind-blowing is because

11   this document was produced in the **Smartmatic vs. Fox News**

12   case in March of 2023, four months ago.  An almost identical

13   document was provided to the Fox News defendant.  And this

14   document was provided to the defendants in this case two

15   days ago.

16          So the plaintiffs are clearly hiding the ball and

17   trying to run out discovery, and the reason why that is so

18   is because this identifies hundreds of jurisdictions when

19   all of their disclosures until now were a couple of dozen

20   jurisdictions.  Your Honor can look at the supplemental

21   answer, Interrogatory Number 20, and then at this appendix.

22   They're completely different cases.

23          So at the close of discovery the plaintiffs by

24   giving us this document seem to be telling us that this is

25   going to be their case to the jury.  It's going to be on

1    specific jurisdiction, specific contracts.  But this

2    document alone provides us nothing, because it's just

3    conclusory probability reductions and it doesn't say the

4    methodology of how these reductions were done.  We know they

5    exist.  ████████████████████████████████████████

6    ████████████     So Plaintiffs have been taking the position

7    in their brief that they have nothing in computation and

8    methodology, and this document shows ████████████████████

9    ███████████████████████████████████████

10   ██████████████████

11        But the reason why it's -- also attacks the

12   plaintiffs' position in this motion is that ███████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   █████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ███████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ██████████████████████████████████

22        So we know that the plaintiffs could create this

23   document and now we're asking this document be updated to

24   the current date.  █████████████████████████████

25   ███████████████████████████████████     If they can

1      make the analysis then, they have the methodology to make

2      that same analysis now.

3              THE COURT:  Did this document when it was produced

4      to you, did it come in hard copy or did it come in

5      electronic form?

6              MR. KAPLAN:  Electronic, Your Honor.

7              THE COURT:  Was there metadata associated with it?

8              MR. KAPLAN:  I don't believe so.

9              THE COURT:  Okay.  I was going to ask when the

10     document was generated.

11             MR. KAPLAN:  And importantly, Your Honor, it

12     doesn't have a Bates number, so there's no possibility that

13     this document was previously produced in the five million

14     pages that the plaintiffs have previously given us.  This is

15     a new document for this case that completely changes the

16     case.

17             And I think another important point is that

18     another -- another of Plaintiffs' arguments in their motion

19     is that they cannot determine the division between the harms

20     caused by the various defendants, that Fox News said

21     defamation, or Sidney Powell said alleged defamation, or

22     Giuliani, Defendants.  And right now in their mind it's all

23     together and they can't separate them.  ████████████████

24     ███████████████████████████████████████████████████████

25     ██████████████

 1          THE COURT:  █████████████

 2          MR. KAPLAN:  ████████████████████████████

 3    ████████████████████████████  It shows the defendants

 4    could separate it, because they have some type of

 5    methodology to say potentially on a quarterly basis or a

 6    month-by-month basis what's their chance of getting a

 7    specific contract.  So we're asking for all of that

 8    information to be produced immediately by the plaintiffs.

 9          So again, just going through this document, they

10    have a computation because there are numbers in this

11    document, they have the methodology because there's the

12    percent reduction, and they can divide the damages between

13    the numerous defendants because this is limited by ███████

14    ████████████████

15          THE COURT:  Isn't the rejoinder from the other

16    side regarding separating things out by defendant that this

17    is a joint-and-several liability case?

18          And so, for example, if I say lawyer Jones

19    embezzles money from clients and that's not true, I've got a

20    problem, and if you repeat it, you've got a problem, and

21    lawyer Jones doesn't really need to differentiate what harm

22    came from my statement and what from yours because we're

23    both on the hook for the full amount.

24          MR. KAPLAN:  Interestingly, Your Honor, I don't

25    think they make that argument.

1          THE COURT:  Okay.

2          MR. KAPLAN:  They cite to Your Honor's opinion in

3    the *In Re EpiPen Litigation.*

4          THE COURT:  But that was an antitrust case.

5          MR. KAPLAN:  I agree it was an antitrust case, but

6    the principal stand related to when a tort, when it could be

7    divided among the actions of the defendant, you do divide

8    it.  But if substantively you cannot separate and tear apart

9    each defendant's actions resulting in the harm, that's when

10   you say joint and several apply.  The plaintiffs do not make

11   the argument joint and several apply.  And we would argue

12   the fact that they can put ███████ as a marker shows

13   they can separate, because all that activity happened before

14   the defendants made any allegations in this case.  So number

15   one, they don't argue it.  Number two, this document would

16   defeat it even if they do attempt to argue it, Your Honor.

17         THE COURT:  All right.

18         MR. KAPLAN:  Finally, Your Honor, relating to the

19   contention interrogatories, contention interrogatories, some

20   judges say to wait till the end of the case, to wait till

21   the end of fact discovery.  We are at the end of fact

22   discovery.  We're four weeks away.  If there's any time to

23   answer a contention interrogatory, it's right now.  And the

24   contention interrogatories are not difficult.  They're

25   asking for specific statements that support specific

1    allegations in the complaint.

2            Now, Plaintiffs' complaint is 132 pages.  They

3    have a massive amount of information relating to their

4    support against Defendants.  So instead of a contention

5    interrogatory, them citing to paragraphs in a complaint, I

6    don't think it's too high of a burden to repeat the specific

7    allegations they're saying, and to the extent that's all

8    that they're relying on, they say such in their answer.  But

9    citing to multiple -- dozens and dozens of paragraphs in a

10   complaint which Defendant then has to review and not knowing

11   if it's complete is improper.  So we're simply asking that

12   now that discovery is closing they give a final answer on

13   specific allegations that are made in the complaint.

14           Thank you, Your Honor.

15           THE COURT:  Thank you.

16           MR. BLOOM:  Good afternoon, Your Honor.

17           THE COURT:  Good afternoon.

18           MR. BLOOM:  Smartmatic is not contending that it

19   has produced all of the damages information to which

20   Defendants are entitled.  It intends to provide computation.

21   It intends to provide additional information concerning the

22   lost opportunities that were caused by Defendants.  It can

23   just not provide that information at this moment.  It still

24   needs additional information in fact discovery and it still

25   needs its experts to opine on that information and other

1    information in order to give the defendants the information

2    that they're looking for.

3              THE COURT:  So what have you given the defendants?

4    I mean, I know that you've given them a great deal of

5    discovery, but in response to their protests that they need

6    more information about damages, what have you done?  Have

7    you given them any guidance, index, anything like that?

8              MR. BLOOM:  Your Honor, we've been doing all we

9    can to give them the identities of jurisdictions that we

10   think are in play here.  And what I mean by that is, in

11   April 2023 we identified the jurisdictions where we believe

12   we may have lost business because of their defamatory

13   statements.

14             THE COURT:  All right.  Now, is that more than the

15   list that is in the supplemental response?

16             MR. BLOOM:  I would characterize it as a subset of

17   that list, and I can talk more about that list right now if

18   you'd like.

19             THE COURT:  I would like to, because here's what

20   I'm -- I mean, here's where I'm -- you've got the list.

21   Political subdivisions get put on the list for a reason.

22   That suggests to me that somebody at Smartmatic had a

23   conversation, got a text, got a letter.  There's

24   something -- I mean, ████████████  I don't know why I picked

25   that example, but ████████████ on the list.  Why is ███

1    ████████ on the list?  What's the evidence that supports

2    putting ████████████ on the list?  Have the defendants

3    received it?

4              MR. BLOOM:  Your Honor --

5              THE COURT:  And I don't mean to give you a memory

6    test if you don't know about ██████████ off the top of your

7    head, but that was an illustrative example.

8              MR. BLOOM:  Your Honor, I can't speak to the exact

9    analysis that our client performed to determine which of the

10   jurisdictions it thought it may have lost.  These are all

11   projects that it was pursuing.  And so -- you know, I'll

12   give you more color to this list.

13             This is a list that was prepared for the *Fox*

14   litigation as the Defendants mentioned, and they requested

15   that we produce it here.  They were aware of its existence

16   and so we've produced it now.

17             The reason that we did not produce it until now is

18   because we wanted to give the defendants a list of the

19   precise projects that Smartmatic lost because of their

20   defamatory statements.  This list -- we are not contending

21   that this is a list of everything that they have cost us.

22   This is a list that was prepared for the *Fox* litigation.

23   They asked us for us to produce it.  We said okay.

24             What we're trying to do is whittle down the

25   universe of jurisdictions for which we believe they are

1     responsible.

2              THE COURT:  Is this anything more than a list of

3     contracts Smartmatic tried to get but didn't get?  Because

4     that could be for reasons like cost, equipment

5     compatibility, all sorts of things beyond allegedly

6     defamatory statements.

7              MR. BLOOM:  Right.  This list, as I understand

8     it -- and I did not put this list together -- is of the

9     projects that we believe we may have lost because of

10    defamatory statements.  Not just from Defendants' defamatory

11    statements.  It could be defamatory statements by Fox,

12    Newsmax, Sidney Powell, et cetera.

13             And so what we've done here is, we initially

14    provided them in April a list of the jurisdictions.  We

15    wanted to help them focus their discovery efforts.  We said

16    we think these are the jurisdictions we may claim that you,

17    defendants in this case, have responsibility for.

18             And then last week what we did is in addition to

19    providing this particular list, we identified the

20    jurisdictions that we are now saying will not do business

21    with us because of defamation.

22             Now, what the defendants said was that list

23    reflected the jurisdictions that we're saying are

24    specifically responsible to them.  That's actually not the

25    case.  We are still not in a position to say which specific

1    jurisdictions they were a substantial factor in our losses,

2    so I just wanted to clarify that.

3              THE COURT:  Yeah.  And I mean, I don't mean to

4    beat a dead horse, but I keep coming back to you've got to

5    have a reason for asserting that ████████████████████████

6    ████████████████████ decided not to go with Smartmatic.  When

7    you say this is a list of jurisdictions that won't do

8    business with us, that's fine.  I mean, so far.

9              Then there's the second part, though, because of

10   allegedly defamatory statements, and it's that causation

11   component that there has simply got to be some evidence of

12   somewhere, because I hope Smartmatic is not just saying,

13   well, there's another contract we lost.  We don't know why

14   we lost it, but it must have been because Mike Lindell ran

15   his mouth on the *Jimmy Fallon Show*.  I mean, there's got to

16   be more to it than that.  And I think -- I mean, I'll

17   carefully consider this, but I think they're probably

18   entitled to whatever it was that made you or your client

19   conclude that the cause of the lost business was the alleged

20   defamatory statement.

21             MR. BLOOM:  And, Your Honor, I just want to

22   clarify again we are not saying that they are definitely

23   responsible for these jurisdictions.  We are saying these

24   are jurisdictions that we know will not deal with us because

25   of defamation.  Not necessarily their defamation.  We cannot

1    perform that causal analysis yet.  We are still waiting on

2    data from them related to the reach of their publications,

3    where they were republishing and similar data.  And until we

4    have that and we can have an expert look at it, we cannot

5    say that we lost ███████████████ because of these

6    defendants.  Right now we can say ███████ won't deal with

7    us because of defamation.

8               THE COURT:  But -- okay.  How do you know that?

9    How do you know ███████ won't deal with you because of

10   defamation and not because Smartmatic's machines aren't

11   compatible with ██████████████████████████

12   █████████?

13              MR. BLOOM:  Your Honor, I cannot tell you of a

14   specific statement made by ████████████████████████

15   You know, I'd be going beyond my knowledge if I went there.

16   But all I can tell you is that my client has determined that

17   ███████████ is a nonstarter because of the defamation.

18              THE COURT:  Okay.  But why is My Pillow and

19   Mr. Lindell not entitled to know why it is that ██████████

20   has made that determination or why your client has concluded

21   that ███████████ has made that determination, to be more

22   precise?

23              MR. BLOOM:  Your Honor, we have not argued that

24   issue.  We haven't met and conferred on that.  They haven't

25   asked for the type of information that you're contemplating

1    right now, and that's something that we're happy to meet and

2    confer with them about.

3            THE COURT:  All right.  What have they asked for

4    and what have -- I mean, in summary, what have they asked

5    for and what has your response been?

6            MR. BLOOM:  Your Honor, we have produced our

7    entire pipeline database which reflects all of the

8    opportunities we've had ███████████  It has all the details

9    related to the amount with the project, the contacts in the

10   project, type of technology involved.  We've produced our

11   contracts, we've produced our audited financial statements,

12   RFPs.  And then in conjunction with our identification of

13   the jurisdictions that we think are in play, we think that

14   is sufficient guidance for them to perform any third-party

15   discovery that they need, any follow-up document requests,

16   interrogatories that they want to make.  We've been doing

17   the best we can and we've been just waiting till we are able

18   to identify the specific jurisdictions, and then we will in

19   compliance with our duties update our interrogatory

20   response.

21           THE COURT:  Rule 26(a)(1) requires a computation

22   of damages by category.

23           So, for example, you've said we've got lost

24   economic opportunity damages.  We're a few weeks from the

25   end of fact discovery in a case that's been going on for

1      awhile.  I mean, when can the defendants expect to know how

2      much you're looking for in lost economic opportunity damages

3      and how they were computed?

4            MR. BLOOM:  Your Honor, we've said to them in our

5      discovery responses, in our Rule 26 disclosures, we're going

6      to make that -- we're going to provide that information in

7      conjunction with our expert disclosures, because we need

8      experts to opine on this.  As in the *EpiPen* case, there was

9      a situation where Your Honor stated that in the interest of

10     efficiency it wouldn't make sense for the plaintiffs in fact

11     discovery to try to, you know, essentially guess what the

12     numbers would be here.  Those were on sales figures, not

13     damages like here.  But I think the principle holds true in

14     this case as well.  When it comes to reputational damages,

15     Smartmatic needs an expert who can review our goodwill, for

16     example, or whatever methodology that we ultimately use to

17     make that determination.  Smartmatic cannot perform that

18     calculation.  An expert will have to do it.

19           And then with respect to economic damages, we

20     would have experts opine based on the data that we would get

21     which jurisdictions they were a substantial factor for, and

22     based on those losses, perhaps a different expert would then

23     say based on those losses attributable to these defendants,

24     these defendants are also responsible for this decline in

25     Smartmatic's enterprise value.  Again, it's a calculation

1    that we just cannot make and therefore we cannot provide the

2    sort of computation that they're asking for.

3              THE COURT:  Well, you can't provide -- I mean, I'm

4    not going to order you to turn over expert reports that

5    haven't been written yet.  But at the same time, what I

6    actually did in the *EpiPen* case was I said do the best you

7    can now and supplement later.  Why would I not do that in

8    this situation as well?

9              MR. BLOOM:  Your Honor, I think we are doing the

10   best we can in the circumstances.  The issue is that until

11   we can identify the precise jurisdictions for which we've

12   alleged these defendants are responsible for, we cannot --

13   we just can't even make a calculation that would be worth

14   the time in doing in the interest of efficiency.

15             THE COURT:  But this case, I mean, you brought

16   this case in January of '22.  It's been going on for a long

17   time.  I will confess I am a little surprised that at this

18   point a few weeks before the end of fact discovery you

19   cannot allocate economic loss.  I mean, I understand that

20   reputational damage can be fuzzy.  We'll just set that aside

21   for purposes of this question:

22             While are you still saying four weeks or so before

23   the end of the fact discovery period:  We can't say for sure

24   that we didn't get a new contract with ███████ because

25   of their defamation?

1    MR. BLOOM:  Your Honor, based on their discovery

2    production and their resistance to some of our requests,

3    requests which are at issue in a motion to compel that is

4    currently pending, we cannot -- we don't have the tools we

5    need to determine, you know, was there a sufficient

6    footprint on their defamatory publications in █████████

7    ████████ wherever it may be.  We don't have the data we need

8    to make that assessment at this point.

9    THE COURT:  All right.  I mean, I understand your

10   argument.  Anything else you want me to know?

11   MR. BLOOM:  Your Honor, you had asked about Shasta

12   County earlier and I just wanted to clarify the record on

13   that.

14   We have not said that we lost an opportunity in

15   Shasta County.  What we were describing in our papers was

16   the fact that Mr. Lindell has done a bit of a tour to state

17   governments and counties in this country to persuade them,

18   we understand, to get rid of their voting machines in favor

19   of hand counting.

20   We have not said that Shasta County in particular

21   is a lost opportunity where Mr. Lindell said, "Don't use

22   Smartmatic."  We haven't taken that discovery yet.  And so

23   this is more information that we're going to need to help

24   identify jurisdictions.

25   We're going to be deposing Mr. Lindell.  We

1    deposed one of his colleagues last week about this issue, is

2    about these meetings that are going on and the reception

3    that he was getting in his efforts to persuade state

4    government officials that they shouldn't be working with us

5    or other voting machine companies, so I just wanted to

6    clarify that for the record.

7              THE COURT:  All right.  Thank you.

8              MR. BLOOM:  Thank you, Your Honor.

9              THE COURT:  Mr. Kaplan?

10             MR. KAPLAN:  Thank you, Your Honor.

11             In January of '22 the plaintiffs allege in the

12   complaint that defendants Mike Lindell and My Pillow caused

13   them over a billion dollars in damage.  I don't know how

14   over a year and a half later they're saying there's complete

15   ignorance on any damages caused by Defendants.  The burdens

16   of discovery is not to wait until someone has a crystal

17   clear picture of their case that they can present in a neat

18   bow that we're going to present to the jury.

19             To the extent they have any information now

20   leading to any analysis or conclusion that Defendants have

21   caused any harm, they need to provide that basis under Rule

22   26 initial disclosures.

23             They're completely hiding the ball in this case.

24   And for them to claim that they need expert damage analysis

25   to make any connection of the allegations against Defendants

1    is belied by the Appendix A that they're attaching to the

2    interrogatory.  ████████████████████████████████████████

3    ████████████████████████████████████████████████

4    ██████████████████  Where does that probability reduction come

5    from?  It must be done in house unless the plaintiffs'

6    position is that an expert prepared this analysis that they

7    attached to an interrogatory response without disclosing

8    that it's an expert.  So we want the methodology, all the

9    documentation to support every single one of these

10   reductions in probability.

11          Because there's two things at stake.  There is

12   evidence that they have connecting Defendants to a specific

13   jurisdiction and there's evidence that they have connecting

14   one of the other defendants, *Fox News*, Sidney Powell, to the

15   potential jurisdiction.  And the fact that the Appendix A

16   stops in ██████████████  shows they have a deep

17   understanding about this case even before Mike Lindell and

18   My Pillow first uttered the name Smartmatic.  That's number

19   one.

20          THE COURT:  When you say that you want the

21   evidence that undergirds Appendix A, do you have a pending

22   discovery request out that would sweep that in?

23          MR. KAPLAN:  Well, Your Honor, again, this

24   document was provided --

25          THE COURT:  No, I understand that, but it's a

1    different question.  Is there a pending discovery request

2    whose language is expansive enough to cover the material

3    that you're asking for?

4          MR. KAPLAN:  First, I'm going to get back to that

5    question, but I think under Rule 26 initial disclosures they

6    are required to provide computation, methodology and

7    documentation to support damages.  They're saying it doesn't

8    exist, but we know from this document it does, so without

9    our request they need to provide it.  That's number one.

10         Number two, under Interrogatory Number 20 we ask

11   them to identify all persons and jurisdictions with whom

12   they allege would have purchased Smartmatic products but did

13   not do so because of the defendants' statements, the dates

14   that they would have purchased it and the specific acts that

15   Defendants stated that caused them not to purchase it.

16   That's number one.

17         The plaintiffs also are taking the position that

18   this motion to compel is not related to these topics.  It is

19   completely related to these topics.  Every single thing that

20   we're requesting in our motion to compel papers they were

21   required to provide in Rule 26, Interrogatory Number 20, or

22   requests for production.

23         Number two, the plaintiffs stated that we asked

24   for this document.  We asked for Appendix A and they

25   provided it.  I have no knowledge of where that comes from,

1    Your Honor.  We were not expecting this document to be

2    produced, and in fact, the only hint we got that Plaintiff

3    was going to be supplementing was in their motion papers.

4    The meet-and-confer letters state time after time that

5    they're not going to be producing things.  To my knowledge,

6    we didn't know about this disclosure made in *Fox News*.  And

7    even if we did, we wouldn't have supposed that they would

8    try to enter it into this case.

9         I think another important distinction here is the

10   defendants' understanding of what the plaintiffs are even

11   claiming in this case.  If one of the defendants, if

12   defendant Mike Lindell goes to Shasta County, California and

13   convinces them not to use electronic machines and to go

14   paper ballot without mentioning the name Smartmatic and just

15   going on the weakness of the machines, which is almost

16   entirely legitimate, is that a damage allegation in their

17   complaint?  We don't know, because we don't have a clear

18   understanding of the jurisdictions that they're claiming are

19   going to be at issue.

20        Another example:  They identify Maryland in

21   Interrogatory Number 20 as a jurisdiction that will not do

22   business because of Defendants' statements.  Maryland has a

23   law since 2007 that does not allow them to use

24   ballot- marking device machines and that is the machine that

25   Smartmatic is primarily selling.

1            So again, we need this information jurisdiction by

2      jurisdiction, to the extent they have it now, to give us an

3      understanding of how to defend this case.  And they bring up

4      the example that they're waiting on documents from Defendant

5      in order to provide this information.

6            Your Honor, again, this is completely out of left

7      field.  It did not come up in the parties' meet-and-confers

8      and the plaintiffs first raised this in their brief.  And

9      the information they're looking for is where the

10     documentaries aired.  The complaint has all the information

11     of where the documentaries aired.

12           Even if theoretically they're missing one

13     publication, they have to provide disclosures of damages

14     from what they understand of their current understanding of

15     the reach of the defendants' statements.  Rule 26

16     disclosures are done at the beginning, not once they can

17     completely have an understanding of the case, and we do not

18     think they have any reach discovery still outstanding.

19           And, Your Honor, one point on reputational damages

20     because you had bought it up previously.

21           I think the case law is pretty clear that the

22     specific reputational damage might be hard to come by, but

23     to the extent they're going to give the jury a range, they

24     need to provide Defendants with a range to prepare for the

25     case.

1          And the same thing applies to punitive damages.

2     To the extent Your Honor rules that punitive damages are

3     part of this case, which is not Defendants' position, but to

4     the extent they are, they need to provide a range of

5     punitive damages immediately.

6          That's all I have, Your Honor, unless you have

7     other questions.

8          THE COURT:  I do not have any other questions.

9     All right.

10          MR. BLOOM:  I'm sorry, Your Honor.  May I very

11     briefly respond to what I perceive is a bit of a personal

12     attack on my credibility here?

13          THE COURT:  I did not hear any such attack on your

14     credibility, so if you're worried about that, you don't need

15     to be, and I'm inclined to follow the rules and end the

16     argument at this point.

17          MR. BLOOM:  Understood, Your Honor.

18          THE COURT:  All right.  Thank you all very much.

19     These motions are under advisement.  Thank you.

20          MR. PARKER:  Your Honor, can I raise a

21     housekeeping matter?

22          THE COURT:  Yes.

23          MR. PARKER:  Last week we received an email from

24     Plaintiffs' counsel seeking our agreement to extend the

25     discovery deadline because they didn't feel they were ready

1   to complete discovery by August 25th.  And I'm

2   wondering whether -- we had missed each other in terms of

3   talking about that issue, but I'm wondering whether the

4   Court would like to hear discussion on that or have a formal

5   motion as it relates to it to the extent that Plaintiffs'

6   counsel still wants to discuss that.

7           THE COURT:  I think it would be important to be

8   precise and very accurate in that, and so if the two parties

9   are in agreement on that extension, put together a

10  stipulation.  Make sure the stipulation sets forth good

11  cause as the rule requires and not just this is what we

12  agree to, so please sign this.  If it needs to go to a

13  motion, then it needs to go to a motion.  If it's

14  straightforward enough, we can do it with informal dispute

15  resolution.

16          But this is a large case.  It's an important case.

17  I don't want there to be a question about when I said "X" I

18  meant something a little bit different than what you heard,

19  so I really do have a pretty strong preference for the

20  written word in this situation.

21          MR. PARKER:  Very good.

22          THE COURT:  Work for you?

23          MR. BLOOM:  Yeah, that makes sense, Your Honor.

24          THE COURT:  All right.  Now we're adjourned.

25  Thanks very much.

(Proceedings concluded at 2:22 p.m.)

\*      \*      \*      \*

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE,** Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate copy of the transcript originally filed

on **AUGUST 2, 2023,** incorporating redactions

requested by **Attorney Michael Bloom.**  Redactions

appear as " ████ " in the transcript.

*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224