1            UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2
     ------------------------------------------------------------
3                                    )
     Smartmatic USA Corp.,           )   File No. 22-cv-98
4    Smartmatic International        )            (WMW/JFD)
     Holding B.V., and SGO           )
5    Corporation Limited,            )   Courtroom 6A
                                     )   St. Paul, Minnesota
6            Plaintiffs,             )   October 11, 2023
                                     )   2:02 p.m.
7    vs.                             )
                                     )
8    Michael J. Lindell, and My      )
     Pillow, Inc.,
9
             Defendants.
10   ------------------------------------------------------------

11

12

13

14

15        BEFORE THE HONORABLE JOHN F. DOCHERTY
16    UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
17             **(CIVIL MOTIONS HEARING)**

18

19

20

21     Proceedings reported by certified stenographer;
     transcript produced with computer.
22

23

24

25

1    **<u>APPEARANCES</u>**

2    For the Plaintiffs:        Jones Day
                                 Jamie Ward, ESQ.
3                               77 West Wacker Drive
                                 Suite 3500
4                               Chicago, IL 60606

5                               Robins Kaplan LLP
                                 William Manske, ESQ.
6                               800 LaSalle Avenue
                                 Suite 2800
7                               Minneapolis, MN 55402-2015

8                               Benesch Friedlander Coplan &
                                 Aronoff
9                               J. Erik Connolly, ESQ.
                                 71 South Wacker Drive
10                              Suite 16th Floor
                                 Chicago, IL 60606

11

12   For the Defendants:        Parker Daniels Kibort, LLC
                                 Andrew Parker, ESQ.
13                              Abraham Kaplan, ESQ.
                                 888 Colwell Building
                                 123 N 3rd Street
14                              Suite 888, Minneapolis MN

15   Court Reporter:            Lynne M. Krenz, RMR, CRR, CRC
                                 Suite 146
16                              316 North Robert Street
                                 St. Paul, Minnesota 55101

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1     THE COURT:  All right.  We're here this afternoon

2  for several motions in the case of Smartmatic versus Michael

3  Lindell and My Pillow.

4        Let's begin with appearances beginning, please,

5  with counsel for the plaintiffs.

6        MR. MANSKE:  Good afternoon, Your Honor.  William

7  Manske on behalf of the plaintiffs.

8        THE COURT:  All right.

9        MS. WARD:  Good afternoon, Your Honor.  Jamie Ward

10  on behalf of the plaintiffs.

11        THE COURT:  Okay.  Could you, Ms. Ward, speak

12  again into the microphone so that we get a record.

13        MS. WARD:  Sure.  Good afternoon, Your Honor.

14  Jamie Ward on behalf of plaintiffs.

15        THE COURT:  Good afternoon.

16        MR. CONNOLLY:  And good afternoon.  Erik Connolly

17  on behalf of Smartmatic.

18        THE COURT:  And for the defense?

19        MR. Kaplan:  Your Honor, Abraham Kaplan from

20  Parker Daniels Kibort on behalf of defendants.

21        THE COURT:  Good morning, Mr. Kaplan.

22        MR. PARKER:  And Andrew Parker from Parker Daniels

23  Kibort also on behalf of the defendants.

1          THE COURT:  All right.  Good afternoon, Mr.

2     Parker.

3          All right.  We had several motions set for

4     argument this afternoon.  There's a plaintiffs' motion to

5     amend the scheduling order, that's docket number 205.

6          The defendants' motion to compel and amend the

7     scheduling order, that's docket Number 211, but our plans

8     may have, may have, may need to change because of defense

9     counsel's motion to withdrawal without substitution.  That's

10    docket number 226.

11         I want to hear from counsel at the outset as to

12    what we're going to cover today.  I don't know, Mr. Parker,

13    Mr. Kaplan, if you are going to have your motion to withdraw

14    heard first and it is granted, then I'm not sure how we

15    would go on to the other two motions.

16         Mr. Manske, I also want to hear what, you know,

17    your views are.

18         So, yes, I think the first thing is to figure out

19    what we're going to try and do today.

20         So will it be Mr. Parker or Mr. Kaplan who

21    addresses that?

22         MR. PARKER:  I will, Your Honor.

23         THE COURT:  Okay.  Please.

24         MR. PARKER:  Your Honor, from our perspective, we

25    are prepared to have the Court hear the motions that we have

1    brought as it relates to motion to compel and to extend the

2    schedule.

3              THE COURT:  Okay.

4              MR. PARKER:  We believe that those will bear, to

5    some extent, on if the Court grants our motion to withdrawal

6    what the schedule looks like going forward, whether there's

7    a stay, how long the stay will be, and what impact it might

8    have on the overall schedule.

9              And so I think it makes sense to hear our motions

10   in that regard and even plaintiffs' motion, cross motion as

11   it relates to the schedule as well.

12             And then we're happy to answer any questions or

13   discuss further our motion to withdraw.

14             THE COURT:  All right.  That's fine.

15             The motion -- your motion to compel, just if I can

16   keep you there for a moment, Mr. Parker, covers a number of

17   discrete topics, I think, and it would be -- I don't know

18   that I would be able to give a ruling on that from the bench

19   because some of them, yes, some of them will take some

20   analysis and some work, just so you know.  But we can take

21   that up at the end after we see what the final shape of this

22   hearing has been.  Okay?  All right.  Thank you.

23             MR. PARKER:  Thank you, Your Honor.

24             THE COURT:  Mr. Manske, your view?

25             MR. MANSKE:  Yes, Your Honor.

1            THE COURT:  Mr. Manske, would you come to the

2    podium, please.

3            MR. MANSKE:  Mr. Connolly.

4            THE COURT:  Oh, Mr. Connolly.  All right.  Then,

5    Mr. Manske, you stay where you are.

6            MR. CONNOLLY:  Unless you want to come with me.

7            MR. MANSKE:  I would love to come with you.

8            THE COURT:  All right.

9            MR. CONNOLLY:  I think this is a rare moment when

10   we're in agreement.

11           THE COURT:  Okay.

12           MR. CONNOLLY:  I think it makes a lot of sense to

13   deal with the discovery and the scheduling issues because

14   that helps us keep the case moving forward, then deal with

15   the withdrawal issue --

16           THE COURT:  All right.

17           MR. CONNOLLY:  -- as well.

18           THE COURT:  Okay.  That's fine.

19           All right.  Well, then let's begin.

20           I'm just going to take these up in numerical order

21   beginning with the lowest number, which is plaintiffs'

22   motion to amend the scheduling order.

23           Who's going to argue that for the plaintiffs?

24           MR. MANSKE:  Ms. Ward, Your Honor.

25           THE COURT:  All right.  Ms. Ward, you're up.

1          MR. CONNOLLY:  That one.  I'll do that.

2          MS. WARD:  Yeah.

3          MR. MANSKE:  My apologies to Mr. Connolly.

4          MR. CONNOLLY:  I think this one is fairly

5    straightforward and we've laid out our position in the

6    papers.

7          There are three witnesses for whom we've had to

8    file motions to compel to secure their deposition testimony.

9    We filed those over a month ago in each case.

10          In the context of the one out in California, that

11    one we just got a ruling yesterday from the Court ordering

12    the deposition by 10/20 or a mutually convenient date.

13          The one we have in Wisconsin with Ms. Fanning,

14    that one we have filed.  We just filed our reply brief, so

15    it is fully briefed, this week in front of that court.

16          And we have one further one with Mr. Howse that we

17    also had filed back in September and we're waiting for the

18    opposition of that.

19          So the only extension that we are looking for is

20    that we have timely motioned several motions to compel for

21    third parties.  The courts just haven't ruled on those

22    motions to compel yet and we'd like the permission to take

23    them outside of the fact discovery cutoff as it currently

24    exists, which was 10/20, as quickly as we can get it we'll

25    get it done, but I think that's the only thing we're looking

1    for.

2              THE COURT:  So if I hear you properly, this isn't

3    really a motion to extend the fact discovery deadline, this

4    is you will take these depositions as you are able, even

5    though the rest of fact discovery has closed?

6              MR. CONNOLLY:  Exactly.

7              THE COURT:  All right.  And in Wisconsin and in

8    what district is Mr. Howse?

9              MR. CONNOLLY:  Do you remember which district he's

10   in?

11             THE COURT:  Well, it doesn't --

12             MR. CONNOLLY:  Doesn't matter.

13             THE COURT:  Whichever district he's in --

14             MR. CONNOLLY:  We're not in LA --

15             THE COURT:  Do you have -- you've only got a time

16   from Los Angeles at this point?

17             MR. CONNOLLY:  Correct.  LA gave us 10/20.  In

18   Wisconsin, ED Wisconsin, we just finished our reply brief

19   there, this week, yesterday I believe it was.

20             THE COURT:  Do you have a hearing date?

21             MR. CONNOLLY:  We do not have a hearing date yet

22   from that judge.

23             THE COURT:  Okay.

24             MR. CONNOLLY:  And then with Mr. Howse, the

25   opposition is due I think in a week or two from our motion.

1     It was served 9/25.

2              THE COURT:  All right.  Over and above these

3     logistical and scheduling matters, is there anything you

4     haven't said in your papers that you would want to tell me

5     about diligence or the other standards for amending the

6     scheduling order?

7              MR. CONNOLLY:  No, sir.

8              THE COURT:  All right.  Thank you.

9              Who is speaking for the defense on the plaintiffs'

10    motion, Mr. Kaplan?

11             MR. KAPLAN:  I will, Your Honor.

12             THE COURT:  Okay.

13             MR. KAPLAN:  And, Your Honor, it's defendants'

14    position that the fact discovery in this case both from the

15    party side from plaintiffs and the third parties in this

16    case needs to be extended a full 60 days, as argued in our

17    motion.

18             So we don't view as sufficient a small carveout

19    that plaintiff is proposing to the Court of limited

20    depositions to be held for Mary Fanning, Conan Hayes or

21    Brandan Howse, that's currently under motion practice.

22             We think a limited carveout of a discovery

23    extension flies in the face of other deadlines that the

24    parties have been faced with.  And the only real solution in

25    this case is to examine the scheduling order with a critical

1    eye and determine whether or not there's good cause to

2    extend it completely or not, Your Honor.

3              THE COURT:  Okay.

4              Over and above what is in your papers, what is

5    there that you want to tell me concerning, you know, I'm not

6    hearing you say that the plaintiffs have not been diligent

7    or that they have not aggressively sought to take these

8    depositions, rather what I am hearing is as a practical

9    matter this shouldn't be just these three depositions, it

10   should be a uniform 60-day extension.

11             So, what I'd like to hear now, if there is

12   anything to say, is do you agree that, practical issues

13   aside, the standards for an extension of -- or an amendment

14   of the scheduling order as to these three depositions have

15   been made by the plaintiffs?

16             MR. KAPLAN:  Your Honor, both parties in this case

17   have brought motions and sought discovery from third parties

18   since September of 2023.

19             Due to the volume of production in this case,

20   Smartmatic, I believe, have produced to defendants over six

21   million pages of documents.  And defendants have produced to

22   Smartmatic also a huge amount of documents.  We don't view

23   it as a nondiligence --

24             THE COURT:  Okay.

25             MR. KAPLAN:  -- for a party to go after

1     third-party discovery in September.

2              Plaintiffs are making that position in their

3     motion papers that going after a third party in September is

4     not diligent, but it's not defendants' position, Your Honor.

5              THE COURT:  Okay.  All right.  Thank you.  I

6     appreciate that.

7              I'm not going to rule on this at the moment.  I

8     hope that I will rule on it before the end of the afternoon,

9     but I'd like to have a more comprehensive discussion about

10    discovery and discovery extensions.

11             And actually, Mr. Kaplan, I don't know if you're

12    going to argue this or Mr. Kaplan is, but in terms of your

13    motion to compel, would this be an appropriate time to pivot

14    to that.

15             MR. KAPLAN:  It would, Your Honor.

16             THE COURT:  Okay.

17             MR. KAPLAN:  Let me just grab --

18             THE COURT:  Let me get -- yes, I also need to get

19    myself organized, so stand by.

20             All right.  So, Mr. Kaplan, before you begin and

21    also whoever for plaintiff is going to be arguing this, you

22    won't be able to read this but you'll see what it looks

23    like.

24             My hardworking law clerk has prepared a

25    spreadsheet of all the things being covered in the

1    defendants' motion.  This goes on for pages, and pages, and

2    pages.  We're not going to be able to talk about all of them

3    here this afternoon.

4            Looking through them, this looks like the kind of

5    thing that is amenable to being ruled on on the papers.  I

6    don't think that I could go through and make a ruling on

7    each -- some of them I probably could, but I don't think I

8    can go through and make a ruling on each and every one of

9    these.

10           You, Mr. Kaplan, you know, filed a 43-page memo in

11   support, and usually there were three or four things on each

12   page.  And, of course, the plaintiffs have responded

13   similarly.

14           What I would suggest is that I can simply start at

15   the top and I can see whether there is anything additional

16   to say, either from you or from plaintiffs.  And we can just

17   go back and forth that way.  And once I've got that

18   compiled, I think that would probably be it for the

19   afternoon.

20           Your views on that?

21           MR. KAPLAN:  So, Your Honor, there are a lot of

22   discovery requests at issue --

23           THE COURT:  Right.

24           MR. KAPLAN:  -- in our motion to compel.  But

25   they're broadly categorized under two categories.  Damages

1    and LA County confidential documents.

2              THE COURT:  Okay.

3              MR. KAPLAN:  Is what we've been calling it.

4         So I think I can give an overview to the Court as

5    to those two categories.

6              THE COURT:  That's fine.

7              MR. KAPLAN:  And how it relates to the

8    interrogatory.

9              THE COURT:  Okay.  Yes.  Please go ahead.

10             MR. KAPLAN:  So, Your Honor, defendants, as Your

11   Honor understands, is before the Court asking for relevant

12   responsive discovery information that has been withheld by

13   plaintiffs from the very outset of this case.  And I just --

14   as I just discussed with Your Honor, this relates to a

15   category of Los Angeles County documents, which is not a

16   single request but multiple requests, all of which

17   plaintiffs are taking the position that they're withholding

18   documents because of a confidentiality agreement with LA

19   County.  That's one category.

20             Second, is broad information related to damages.

21             THE COURT:  All right.  Let me start with LA

22   County, which is probably where you were going to start,

23   too.

24             I can't quote it from memory, but you made

25   requests for production asking for, as I recall, source code

1    that was used in the 2020 Election.  You asked for ballot --

2    exemplar of a ballot marking device that was used in the

3    2020 Election.  Smartmatic responded, We do not have what

4    was used in the 2020 Election.

5              It seemed to me then, and it honestly still seems

6    to me now, that given the fairly precise way that you had

7    written your RFP, the answer was that Smartmatic does not

8    have what you are asking for.  That they do not have what

9    was used in the 2020 Election.

10             I understand they have exemplars and source code

11   that we all think is probably close or identical, but we

12   don't know that and we can't know that unless we compare it

13   with Los Angeles County has got.

14             So you went off to Los Angeles County and you

15   sought through a Rule 45 subpoena to obtain these materials.

16   I'll just say because I think it's only fair for lawyers to

17   know where the judge is coming from at the outset, that that

18   still seems to be to the best approach.  But I am, of

19   course, open-minded and want to hear what you have to say.

20             MR. KAPLAN:  So if I can correct Your Honor on a

21   couple of points --

22             THE COURT:  Always.

23             MR. KAPLAN:  -- from the defendants' position.

24             THE COURT:  All right.

25             MR. KAPLAN:  Defendants did not just ask for a

1    machine used in the 2020 Election.  We explicitly asked for

2    an exemplar.

3               THE COURT:  Mm-hmm.

4               MR. KAPLAN:  A machine used in the 2020 Election.

5               Number two, the Court stated that we don't know

6    how similar it is or if there's any similarities.  In fact,

7    Your Honor, we do know.

8               THE COURT:  How do we know that, though?

9               MR. KAPLAN:  Because plaintiffs gave this machine

10   to their experts and their experts said it's substantially

11   similar to the one used in the 2020 Election.

12              THE COURT:  Well, actually the plaintiffs said

13   that.  They said this is substantially similar to what was

14   used in the 2020 Election.

15              But it has not been -- it's almost, I don't want

16   to say it's a chain-of-custody or an integrity of evidence

17   issue, but it has not been in their hands.

18              And if Los Angeles County did something to it, I

19   think my point was, we know that if we put the two

20   side-by-side and see if they are the same or different.  We

21   put the source code side-by-side and see if each line of

22   code is the same or different.  And that is something we

23   cannot do without obtaining material from Los Angeles

24   County.

25              Yes, as I was careful to say, all indications are

1   that it is the same but we cannot know that.  That that was

2   my only point.

3           MR. KAPLAN:  So I'd like to point out two things,

4   Your Honor.

5           Number one, the source code question is different

6   than an exemplar machine question.

7           THE COURT:  I agree.

8           MR. KAPLAN:  So for the exemplar machine, we do

9   know it is in plaintiffs' possession.  It's in their

10  possession, they gave it to their experts to examine --

11          THE COURT:  Mm-hmm.

12          MR. KAPLAN:  -- at the close of fact discovery.

13  █████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  the expert pointed to two things, Your Honor.

17  █████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  the only difference in the hardware the expert pointed to,

20  █████████████████████████████████████████████

21  That is not a difference.  That doesn't not take it out of

22  the exemplar category.

23  ██████████████████████████████████████████████████████████

24  ███████████████████████████████████████████

25  ████████████████████████████████████████████████████████

1  ███████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ███████████████████████████████

4          It's defendants' very strong position that that's

5  squarely in line what an exemplar machine is.  And their own

6  ███████████████████████████████████████████████

7  ████████

8          THE COURT:  So does this dispute then turn on the

9  definition of an exemplar?  Does an exemplar actually have

10 to be a machine that was used in the 2020 Election or is it

11 something that was substantially similar to something that

12 was used in the 2020 Election?

13         And, I guess the followup question was, it's

14 customary, of course, for discovery requests to be proceeded

15 by definitions, was exemplar a defined term?  And, if so,

16 what was the definition?

17         MR. KAPLAN:  So, Your Honor --

18         THE COURT:  And I'm sorry, I only just thought of

19 that, so I --

20         MR. KAPLAN:  Nope.

21         THE COURT:  Yep.

22         MR. KAPLAN:  Your Honor, I do not believe it was a

23 defined term.

24         THE COURT:  Okay.

25         MR. KAPLAN:  While plaintiffs are up I'll verify

```
1    that.

2              THE COURT:  Okay.

3              MR. KAPLAN:  But I will point that the Webster

4    definition of exemplar includes the word "model".

5              THE COURT:  Okay.

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████

8              THE COURT:  Understood.

9              MR. KAPLAN:  And, Your Honor, I believe had one

10   more question besides for the exemplar that I cannot recall.

11             THE COURT:  Yes.

12             The other question was:  How does your expert know

13   that these are similar?  Has your -- not your expert, has

14   their expert -- did their expert in the report that you have

15   read say that they have done a side-by-side comparison of

16   these -- this device and this source code with what is in

17   possession of the Los Angeles County?

18             MR. KAPLAN:  So on this point, Your Honor, where

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ██████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████

24             THE COURT:  All right.

25             MR. KAPLAN:  If anybody would know from Los
```

1    Angeles County and from plaintiffs, the difference and the

2    similarities between the machines, it would be James Long,

3    Your Honor.

4         And I'd like to add one more point.  I think it's

5    broader than looking at a single request of an exemplar

6    machine with plaintiffs' conduct in this case, Your Honor.

7         It's defendants' position that if such a device

8    that's so clearly relevant to every aspect of the complaint

9    can be withheld and document requests can be read

10   creatively, every single one to somehow figure a way that it

11   should not have been included, it destroys discovery rules

12   as we know it.

13        THE COURT:  Well, that, Mr. Kaplan, is a fairly --

14   I'm trying to think of another word, but dramatic is the

15   only one that comes to mind, conclusion to draw.

16        I will tell you I read that RFP as being, we want

17   a machine that was used in Los Angeles County during this

18   election.  Now, to the extent my opinion matters.

19        But, and that is why I agreed with Smartmatic that

20   they did not possess that type of machine and that is why I

21   agreed that the appropriate course for you to take was a

22   subpoena to Los Angeles County.

23        MR. KAPLAN:  So, again, I understand Your Honor's

24   position, but if you go throughout the document request,

25   just looking at the one in front of me, request number 14,

1   "All documents that relate to the truth or falsity of every

2   allegation of paragraph 134 of the complaint."

3          There are multiple requests that defendants are

4   asking for all relevant documents.  And for them to take a

5   piece as important as this, which they gave their own

6   expert, so obviously they consider highly relevant, to

7   withhold it, when there's multiple requests similar to this,

8   leaves only one conclusion of them trying to creatively

9   think of ways to defend their position against -- to produce

10  it.

11         And, Your Honor, there's so many points to this

12  argument.  In the original motion to compel where we sought

13  the exemplar, one of their arguments was that it's too

14  sensitive to produce in the case, but then they produce it.

15         Another argument was, the machine's not relevant

16  because Mike Lindell and My Pillow have no evidence to back

17  up their claims, but then they produce it.

18         They consistently take positions, if the Court

19  looks at their brief, contradicts their current position,

20  Your Honor.  It's nontenable.

21         So we would strongly ask the Court to reconsider

22  the position that a party can hold a crucial piece of

23  evidence and just give it to their expert at the end and

24  somehow explain how it wasn't identified before, whether in

25  initial disclosures parties are obligated to identify the

1    documents related to the case and then our numerous

2    interrogatories and document requests, that unless you read

3    them creatively, would touch upon the issue.

4              THE COURT:  I'm not sure that they're being read

5    creatively.

6              I think that lawyers -- one of the things that

7    lawyers do is make distinctions, sometimes quite fine

8    distinctions.  That is, perhaps, what I did in this case and

9    I am neither defensive nor apologetic for doing so.

10             If it's your view that I was mistaken, as I said,

11   I will listen respectfully.  I will hear you out.  I will

12   consider what you are saying, but I certainly was not

13   engaged in any sort of creative reading when I made the

14   ruling that I did that you disagree with so strenuously, as

15   you are entitled to do.

16             MR. KAPLAN:  Absolutely, Your Honor.

17             The one fact that I would point out is that the

18   plaintiffs are 1,000 times more knowledgeable about this

19   case, the documents they have, what they consider relevant

20   and what they knew they were going to produce to their

21   expert more than Your Honor.

22             And Your Honor's position of reading discovery

23   requests in isolation, plaintiffs have a significantly

24   higher burden taking the case and the totality to not

25   litigate trial by ambush and producing something at the

1     end.

2          THE COURT:  All right.  Should we move on to

3     damages?

4          MR. KAPLAN:  So, Your Honor, the Los Angeles

5     County confidential documents that we're bringing the motion

6     to compel today don't touch upon the exemplar machine and

7     the source code.  They relate to a different category of

8     documents.

9          THE COURT:  All right.

10          MR. KAPLAN:  Which I'd like an opportunity to

11     opine on.

12          THE COURT:  Yes.

13          MR. KAPLAN:  So there are numerous category of

14     requests for production in this case that were served in

15     November of 2022, responded by plaintiff in December of

16     2022, that responsive and relevant information was requested

17     by defendants.  And in plaintiffs' responses, there was no

18     statement whatsoever that any documents were being withheld.

19          And, in fact, it wasn't true, Your Honor.  There

20     were significant documents being withheld back to this basis

21     of this confidentiality provision in the contract between

22     Smartmatic and LA County.

23          And just to give -- sort of a skip to the end of

24     the argument a little bit, two days ago plaintiffs produced

25     what we estimate to be 900,000 pages of documents under this

1    category of Los Angeles County confidential documents.

2          We haven't had an opportunity to review it yet.

3    We have no idea what's in it.  But I'm assuming plaintiff

4    has a much greater understanding of what it is and what it

5    isn't, so that colors this motion, Your Honor.

6          THE COURT:  The 900 [sic] pages, were they

7    responsive or were they represented as being responsive

8    to discovery requests that you had made in November of

9    2022?

10          MR. KAPLAN:  So if I can correct, Your Honor.

11          THE COURT:  Okay.

12          MR. KAPLAN:  900,000.

13          THE COURT:  I thought I said that, but if I

14    didn't, okay.

15          MR. KAPLAN:  Okay.  I thought I heard 900, Your

16    Honor.

17          So these are requests that plaintiffs seem to be

18    producing to defendants' discovery requests Number 14, 20

19    and 35.

20          Number 14 and 20 were made in November of 2022 and

21    35 was made probably in April.  But I don't know that for

22    certain the date of Request For Production 35 --

23          THE COURT:  But later?

24          MR. KAPLAN:  Right.

25          THE COURT:  Okay.

1          MR. KAPLAN:  So, again, this Court set an

2     April 2023, substantial completion date.

3          We have a plaintiff party that's saying October 20

4     should not be moved for any reason.  But two days ago they

5     produced 900,000 pages of discovery.  And that that's just

6     scratching the surface of this category of documents, Your

7     Honor.

8          So, plaintiffs in this case built an election

9     machine for LA County to use in the 2020 Election.  This BMD

10    machine, Ballot Marking Device.  They were also the primary

11    contractor and all the subcontractors who did related work.

12         Now, plaintiff sued the defendants in this case

13    and with a 135-page complaint.

14         In there was countless statements relating to the

15    very heart of the technology that they provided.  How the

16    BMDs were designed.  Where their known vulnerabilities where

17    in the machines.  The hackability risk.  Whether they're

18    susceptible for vote flipping.  Whether they're built from

19    an existing framework.  Whether they could be connected to

20    the internet.

21         There's countless statements in plaintiffs'

22    complaint that go directly to this issue.  So they're

23    clearly relevant documents, Your Honor.

24         Plaintiff, one of the arguments they make, we

25    shouldn't even be able to bring this motion for these

1   documents is they call it an utter lack of diligence.  They

2   say, we requested these documents from November of 2022, and

3   we're only bringing a motion to compel ten months later.

4          So if I can just briefly go through the timeline

5   of when defendants became aware of these documents and when

6   plaintiff disclosed that they were withholding them, Your

7   Honor.

8          As I said, these were requested in November of

9   2022.

10          On December 5th of 2022 plaintiff put their

11   answers to the requests for production.

12          Not a single answer said they're withholding

13   documents based on confidentiality.

14          There's boilerplate confidentiality objections

15   sprinkled in nearly every request but nothing that said

16   they're withholding.

17          We brought a motion to compel in February on the

18   exemplar and source code.  Defendants didn't know that there

19   was another million or two million pages of other discovery

20   being withheld.

21          Only in July of 2023, during a meet and confer

22   that I held with plaintiffs' counsel, Mike Bloom, did he say

23   that they're withholding substantial documents.

24          Immediately we followed up with a demand letter

25   and we demanded a supplementation to the requests for

1    production to say, Explain which requests you're withholding

2    documents to.

3              They only supplemented their responses in

4    August 21 of 2023, less than two months ago, Your Honor.  We

5    immediately brought this motion to compel.  And then two

6    days ago, there is a parallel litigation between Smartmatic

7    and *Fox News*.

8              THE COURT:  Right.

9              MR. KAPLAN:  The judge in *Fox News* required

10   Smartmatic to produce certain categories of information that

11   they're holding under confidentiality.

12             What they produced to us two days ago is the

13   documents that Smartmatic produced to the *Fox News* case.

14   Just to give Your Honor an understanding of what they're

15   producing now versus potentially what they're withholding.

16             And we think that all responsive, relevant

17   documents, whether or not there's a confidentiality

18   agreement with LA County, must be produced in this case.

19             This case has a protective order.  There's an

20   Attorney's Eyes Only provision.  And there's no rule in

21   civil procedure that says when things are sensitive they

22   aren't produced.

23             Courts deal with sensitive matters.  And this is a

24   sensitive matter.  And we're requesting all relevant and

25   responsive documents to be produced.  And plaintiffs'

1      position that LA County needs to have a chance to intervene

2      to argue what documents should not be produced or specific

3      categories, they had their chance, Your Honor.  This is a

4      public docket.

5              Los Angeles County did not intervene.  Plaintiffs

6      are not explaining what they're withholding and what they

7      have, and they lose the right to object to specific

8      categories, Your Honor.  Everything needs be produced.

9              The next category as we discussed, Your Honor, is

10     damages.

11             Again, we're at the close of discovery and

12     defendants do not have a clear understanding of their

13     damages.

14             Defendants have a right to litigate this case and

15     conduct discovery during this case while they have an

16     understanding of what plaintiff is going to present to a

17     jury to explain what their damages are.

18             The Rules of Civil Procedure recognize the

19     importance of damages are requiring a party in their initial

20     disclosures to explain what their damages are.

21             THE COURT:  And after the initial disclosures, Mr.

22     Kaplan, is there any authority for the proposition that

23     damages discovery -- that singles out damages discovery as a

24     category and talks about when, and in what format, and so

25     forth it must be produced?

1          MR. KAPLAN:  It goes back to Rule 26, Your Honor,

2     that all relevant documents in a case that's proportionate

3     to a case and that's responsive in a case have to be

4     produced and disclosed, whether it's an interrogatory or

5     request for production.

6          There's no reason why plaintiffs are allowed to

7     shirk their obligation on an entire category of damages.

8     They need to produce what they have.

9          And my point with initial disclosures is just to

10    show that we should have gotten this information without

11    even asking for it.  And we're forced to bring multiple

12    interrogatories and document requests to try to get this

13    information.

14         Now, plaintiffs' position in this case in their

15    damages literally changes by the week.

16         On the one hand, plaintiffs are currently taking a

17    position and one of their main arguments against our motion

18    to compel is that this is a per se case and damages are

19    presumed.  That's not what their discovery says.

20         If Your Honor looks at -- if Your Honor looks at

21    Exhibit 3 attached to my declaration.  And this is in

22    response to interrogatory number 20 that defendants sent to

23    plaintiffs November of 2022.  There were three answers given

24    to this interrogatory, the latest one in July of 2023.

25         And in their answer Smartmatic says they're going

1    to seek damages for historical and future loss sales.  That

2    doesn't sound like a per se argument.  They're seeking

3    damages for revenues, profits, business value, reputation,

4    costs for cybersecurity, employee retention, legal expenses.

5            Plaintiffs list every damage under the book,

6    whether it's special, consequential, or general damages.

7    That's the current response to the interrogatory.  And then

8    plaintiffs in their brief say, We're only going after per

9    se.

10           They need to supplement the formal discovery in

11   this case and not say their position in a brief.  They need

12   to say it in response to an interrogatory.

13           Additionally, the interrogatory response says that

14   based on defendants' statements they went from three billion

15   to 400 million in valuation.  That's not a per se argument.

16   That's not a presumed argument.  That's a specific argument

17   of damages.  And plaintiffs are not explaining how that

18   valuation, or a method, or computation came to be.  They're

19   just putting it out there expecting defendants to hunt

20   through six million pages of document discovery to figure

21   out what their argument is.

22           These are basic interrogatories, Your Honor.  And,

23   we're at this point in the case ten days before the close of

24   discovery and they've given us nothing substantial for us to

25   understand what they're going to present to the jury.

1          Additionally, attached to interrogatory number 20

2     is this famous appendix A, Your Honor.

3          This came up at our prior motion.

4          THE COURT:  I remember it.

5          MR. KAPLAN:  Where a list of jurisdictions are

6     listed, "With an initial probability calculation,

7     probability as of February 2, 2021 calculation."  And a lost

8     profit.

9          And if you add all these together, they come to

10    around a half a billion in lost profits that they're

11    claiming defamation caused their sales.

12         They produced it in this case.  And when we try to

13    seek discovery on appendix A, they take the position that

14    per se we're presumed damages, we don't have to say

15    anything.

16         If they produce something in this case, we're

17    allowed to drill 1,000 feet deep to understand what this

18    document is.

19         THE COURT:  Do you know who prepared appendix A?

20    Do you know who the authors are?

21         MR. KAPLAN:  So their authors that they list are

22    Antonio Mugica and I believe Pedro Mugica, or Mr. Piñate.

23         THE COURT:  All right.

24         MR. KAPLAN:  And two primary authors.

25         THE COURT:  Okay.  Have you noticed their

1    depositions?

2              MR. KAPLAN:  We did notice their depositions, Your

3    Honor.

4              So what I believe Your Honor is alluding to is,

5    why not ask all these questions in a deposition.

6              Two reasons, Your Honor.

7              Number one, a party has a right to ask discovery

8    in a way that they think strategically benefits the case.

9              We think an interrogatory is the correct vehicle

10   for this response.

11             Having a deponent come to a deposition, trying to

12   memorize complex probability numbers for 400 jurisdictions

13   is ridiculous.  They're not going to be able to think off

14   the top of their read for multiple jurisdictions about who

15   they spoke with, the documents they viewed, who outside of

16   Smartmatic they spoke with.  All things that plaintiff are

17   admitting in general terms were used to calculate these

18   probabilities.

19             A party has a right to ask, you produced this

20   document, obviously a deep analysis was done in each

21   jurisdiction, we have a right to know what that analysis

22   was.

23             And these probabilities are highly specific, Your

24   Honor.  They go from 78 percent to 22 percent.  How do you

25   go from 78 percent to 22 percent without a real explanation

1      of how that was done?

2              If this was a case where a single line of this

3      appendix A was at issue and the whole case revolved around

4      that lost profit, of course we would have an opportunity to

5      make it an interrogatory request explaining the basis.

6              Because plaintiff produced a document with 400

7      lines doesn't absolve their need to explain what this

8      document is and how it came to be.

9              THE COURT:  All right.  All right.  Thank you.

10             All right.  For the plaintiffs, Ms. Ward.

11             MS. WARD:  Good afternoon, Your Honor.

12             THE COURT:  Good afternoon.

13             MS. WARD:  As a very initial point Your Honor had

14      stated, as we started this hearing that you believed that

15      these issues, given how granular they are, how many there

16      are, it may be appropriate to decide on the papers.

17             We think that makes a lot of sense here.  So, of

18      course, I want to answer any questions the Court has, but

19      I'm going to keep my points relatively brief because we

20      believe our position has been well laid out in the papers.

21             THE COURT:  Well, let's start with the 900,000

22      pages that Mr. Kaplan tells me was produced the day before

23      yesterday.

24             MS. WARD:  Certainly, Your Honor.

25             So, to provide a little bit of context to the

1    timeline, which Mr. Kaplan stated in part but made a couple

2    of pretty important exclusions.

3         In, I believe it was November of last year,

4    defendants filed their RFPs, interrogatories.  We answered

5    December 5th of 2022.

6         Mr. Kaplan is incorrect in stating that our

7    responses made no reference to documents being withheld.

8         The responses explicitly stated that Smartmatic

9    would not agree to produce any documents that were subject

10   to confidentiality obligations under contracts with its

11   clients.

12        Now, following that up in March of 2023,

13   March 20th, 2023, to be precise, and Mr. Kaplan kept this

14   out of his timeline entirely, Smartmatic produced to

15   defendants a detailed letter.

16        This letter stated that Smartmatic had a

17   confidentiality obligation under its contract with Los

18   Angeles County that required Smartmatic to either get the

19   consent of the County to produce documents or they could

20   produce it via court order.

21        Smartmatic laid out in this letter that it had

22   gone to LA County to request the County's consent to produce

23   its confidential information.  And that the County had, in

24   fact, agreed to the production of 26 different categories of

25   information.

1          Smartmatic stated in this March 20 letter that

2     these -- these categories of information are what Smartmatic

3     would be producing, that it would not be producing any

4     categories of documents outside of that letter.  And that

5     letter has been provided to the Court at docket 224-11.

6          Now, after that March letter, we heard not a peep

7     from defendants.  Nothing until late July, many months

8     later, when defendants seemed to realize for the first time,

9     I'm not sure, you know, if it slipped through the cracks,

10    I'm not sure what happened, but that Smartmatic had only

11    produced a -- the enumerated categories of documents from

12    our March letter.

13         We, again, expressed that it was our position that

14    we could not produce any additional documentation except by

15    the County's consent or by court order.

16         Now, sometime later in the *Fox* litigation that Mr.

17    Kaplan referenced Smartmatic by court order, produced a

18    number of additional documents relating to LA County.

19         We reached out to defendants in the interests of

20    providing fulsome discovery and stated that we had

21    proactively reached out to the County and asked the County,

22    would the County consent for us to produce all of those

23    documents that have been produced in the *Fox* litigation by

24    court order to defendants.

25         The County did consent to do so just, I believe,

1   nine or ten days ago.  And we turned around and produced

2   those documents, as Mr. Kaplan said, several days ago.

3            So Smartmatic was able to produce those documents

4   by the County's consent only and because those documents had

5   previously been ordered for production by court order.

6            THE COURT:  Is Mr. Kaplan correct that this

7   amounted to approximately 900,000 pages?

8            MS. WARD:  I don't have the page number on me,

9   Your Honor.

10           THE COURT:  Does it sound right?

11           MS. WARD:  I know it's about 50,000 documents.  So

12  I would not be surprised if 900,000 pages was accurate.

13           THE COURT:  All right.

14           So, tell me more about what happened in the *Fox

15  News* litigation that caused the judge to order these

16  documents produced.

17           What was -- I mean, I can go on Pacer and read the

18  order, but what was the rationale and why did it come up?

19           MS. WARD:  So in the *Fox* litigation, *Fox* similarly

20  had a number of RFPs broadly requesting LA County documents.

21  Smartmatic took the same position it did in this litigation,

22  that it could do so only via consent or court order.

23           *Fox* moved to require Smartmatic to produce any LA

24  County-related documents within the parties' otherwise

25  agreed search terms.  We've provided that list of search

1    terms to the Court attached to my affidavit.  There's about

2    400 different pretty complex search strings.  So that was

3    the basis for their motion.

4          LA County intervened in that proceeding and the

5    Court kind of facilitated a process by which *Fox*, LA County

6    and Smartmatic worked together to determine -- LA County

7    reviewed some of those documents to determine that it did

8    not believe that they posed a security risk to the County

9    and those documents were then produced.

10         THE COURT:  All right.  All right.  Let's talk

11   about damages.

12         MS. WARD:  Certainly.

13         THE COURT:  I believe that you have taken the

14   position at different times that under Minnesota law this is

15   defamation per se because it -- the allegedly defamatory

16   statements go to Smartmatic's business, trade, or

17   profession; is that correct?

18         MS. WARD:  That's correct, Your Honor.

19         THE COURT:  All right.  Would you also agree

20   though that although damages are presumed, a jury in a per

21   se case could come in with a damages award of $1 and it

22   followed the law?

23         MS. WARD:  That's correct, Your Honor.

24         THE COURT:  All right.  Or a million dollars and

25   it followed the law?

1            MS. WARD:  Certainly.

2            THE COURT:  Okay.  So to say that it is a per se

3    case doesn't seem to me to get us very far in terms of

4    quantifying the damages that you're actually going to be

5    seeking.

6            Mr. Kaplan has indicated that at different times

7    you have also spoken about lost profits, about legal

8    expenses, you know, lost business, lost sales.  There were

9    more but those are the ones that I remember.

10           Are you seeking specific categories of damages,

11   whether you put them under the per se or -- whether these

12   are given as the -- to the jury as guidance for the exercise

13   of their discretion in awarding per se damages or whether

14   these are damages pure and simple, you know, what discovery

15   has there been, you know, big picture on the question of

16   damages?

17           MS. WARD:  Your Honor, so to date, and it has

18   never been our position that we do not need to provide any

19   discovery on damages whatsoever, because we certainly have.

20           As Mr. Kaplan has stated several times in his

21   presentation, we've produced six million pages of documents

22   to date.  The vast majority of those documents relate to

23   Smartmatic's financial condition, its value, its business

24   relationships, its both current and potential future

25   customers, all of those documents relate to the damages --

1    to Smartmatic's damages allegations.

2          Now, beyond just this incredible volume of

3    documentation, Your Honor referenced, you know, is -- do

4    defendants intend to seek the depositions of these

5    individuals?  And they certainly have.

6          Antonio Mugica, who Mr. Kaplan references as being

7    one of the authors of the appendix at issue, recently sat

8    for deposition and provided over 13 hours of testimony over

9    two days, the majority of which was on this exact issue.

10         Mr. Mugica provided incredibly in-depth, detailed

11   testimony, walking line-by-line through that appendix.

12   Providing additional detail on Smartmatic's view of its

13   potential lost business opportunities.  Smartmatic's view of

14   its enterprise value, and other aspects of its damages case.

15         So defendants, on top of receiving this incredible

16   volume of documents, have the opportunity to and have

17   received very detailed testimony on these topics, which we

18   believe is the appropriate avenue for the quote, "The

19   specific interrogatories at issue in this motion."

20         THE COURT:  And was this deposition taken in this

21   case or in one of the other cases like in Denver or

22   somewhere else?

23         MS. WARD:  No.  It was in this case, Your Honor.

24         THE COURT:  All right.

25         MS. WARD:  Mr. Mugica sat both in his individual

1    capacity and as a corporate representative.

2              THE COURT:  All right.  All right.

3              Anything else that you think it important for me

4    to know about these issues on a non-detailed level?

5              MS. WARD:  Your Honor, I think our position is

6    well laid out in our papers.

7              One point that I would like to make for the Court

8    though, defendants have spoken about the different requests

9    made in this motion to compel in very broad terms.

10             I would encourage the Court and ask the Court in

11   making its decision to look very specifically at the request

12   for production at issue, because a number of them beyond

13   issues of confidentiality, are just incredibly, incredibly

14   broad and burdensome.

15             I give as an example one such request, request 35

16   which would require that Smartmatic produce any document

17   even referencing Los Angeles County back to 2016.  And

18   Smartmatic has had an ongoing day-to-day project for Los

19   Angeles County since 2018.  And Smartmatic -- defendants

20   appear to believe that the appropriate scope of discovery is

21   any document even referencing that, you know, six-year

22   relationship.

23             I think that is pretty emblematic of the requests

24   that defendants are currently seeking.  So beyond even the

25   issues of confidentiality that we've discussed today, the

1    requests themselves are incredibly broad and defendants have

2    shown no need for the any additional information beyond the

3    six million pages that Smartmatic has already produced.

4              THE COURT:  All right.  Thank you.

5              MS. WARD:  Thank you.

6              THE COURT:  Mr. Kaplan, do you want to be heard

7    briefly in rebuttal?

8              MR. KAPLAN:  I do, Your Honor.

9              THE COURT:  All right.

10             MR. KAPLAN:  So a couple of items, Your Honor.

11             Relating to the Los Angeles County confidential

12   documents.  Plaintiffs' counsel just represented that in

13   their request -- their answers to requests for production

14   filed December of 2022 they said they're withholding Los

15   Angeles documents.

16             Your Honor, it's open and front to me.  It's not

17   there.

18             And, in fact --

19             THE COURT:  Well, I think what we better do is

20   somebody better make this an exhibit and hand it in.

21             MR. KAPLAN:  Your Honor, it is.

22             THE COURT:  Okay.

23             MR. KAPLAN:  Exhibit K.

24             THE COURT:  Exhibit K.  All right.

25             MR. KAPLAN:  Exhibit K, page 14 is for request

1    number 14.

2          We ask, and there's no statement that they're

3    withholding anything, and, in fact, it says, "We'll produce

4    responsive documents sufficient to show the truth and

5    falsity of the allegations."

6          Now, this --

7          THE COURT:  Go ahead.

8          MR. KAPLAN:  And this specific request, number 14

9    and number 20, the plaintiffs supplemented a response in

10   August of 2023 specifically to state that they are

11   withholding documents.

12         So I don't know how they can take the position

13   that they already disclosed it, but they felt they needed to

14   disclose it again in August of 2023.

15         I'll cite Your Honor to the exhibit of the

16   supplementation.

17         THE COURT:  I've got Kaplan declaration Exhibit J,

18   docket number 215-2.  Sound right?

19         MR. KAPLAN:  For the supplementation, Your Honor?

20         THE COURT:  No.  For the original response were

21   you say that there's no reference to withheld documents.

22         MR. KAPLAN:  I have it as Exhibit K of the Kaplan

23   declaration.

24         The Exhibit J is just a request, Your Honor,

25   Exhibit K is the responses --

1          THE COURT:  Okay.

2          MR. KAPLAN:  -- to the requests.

3          And if Your Honor can give me one second, Exhibit

4    L is plaintiffs' supplementation in August of 2023 with

5    responses to say that they're withholding documents from LA

6    County.

7          It's completely laid out there.  They did not say

8    in their requests for production answers until August of

9    2023 they're withholding these documents.

10          And, Your Honor, plaintiffs' counsel referenced a

11    letter sent in March of 2023.  Again, I viewed the letter

12    when it came in.  I was the attorney that viewed it.  We

13    just came off the hearing for the exemplar machine and

14    source code.  I didn't understand what was being withheld.

15    They don't say categories of documents being withheld.  They

16    only say specific documents that they're going to produce.

17          We don't know the documents that exist.  How are

18    we expected to surmise from the letter what documents are

19    being withheld if we don't know what they exist?

20          And, Your Honor, just practically, in a

21    six-million-page document case, we don't view all the

22    documents that were withheld.  We have AI algorithms that

23    attempt to bring up the relevant documents, we have search

24    terms.

25          For plaintiff to take the position, well, they got

1    the documents, they should have known what was in there, to

2    this date we haven't completely reviewed everything.  We

3    rely on technology and search terms to try to generate

4    things up.

5              And plaintiffs were not open and forthright on

6    this issue.  And that is why we're in October bringing it to

7    the Court's attention.

8              Your Honor, plaintiffs' counsel referenced

9    requests for production that were broad, presumably claiming

10   that it's too burdensome for this case.

11             This is a $2.4 billion case.  I don't think a

12   request for production going back to 2018 or 2017 is too

13   burdensome for this case, Your Honor.  And if it is, they

14   should explain the specific reasons why it's too burdensome

15   in their papers.

16             THE COURT:  I think there -- I mean, they can

17   spoke for themselves, but I think it was the fact that it

18   was for all documents that even referenced Los Angeles

19   County.

20             MR. KAPLAN:  Correct, Your Honor.

21             And, again, I was the attorney that drafted that

22   request for production and it came off of the heels, I

23   believe, of us understanding the documents were being

24   withheld from Los Angeles County.  And we wanted to put a

25   request out there that asked for everything and then we can

1    meet and confer with the party that knows what documents

2    exist.

3              We don't know what documents exist.  So we want to

4    have a discussion.  You explain to us, plaintiffs, what

5    document exists.  What is burdensome to collect.  A standard

6    meet and confer process.  And plaintiffs to this date have

7    refused to explain what types of documents they're

8    withholding.  They refuse to provide categories of documents

9    that they are withholding consistently.

10             So we're left in a position to ask the Court to

11   force them to explain it.  Explain the burden.  Explain what

12   they're withholding.  And then we can have a substantive

13   discussion.

14             But at this rate, we brought a motion to compel

15   seeking these documents of Los Angeles County.  And to be

16   clear, Your Honor, they're not Los Angeles County documents,

17   they're plaintiffs' documents that they're saying is covered

18   by a confidentiality order.

19             So we bring a motion to compel and they make the

20   last-minute production, which in all likelihood will force

21   us before this Court again once we understand what's in the

22   production and potentially what's deficient.  And this

23   delay's all due to plaintiffs' positioning in the case.

24             We are not able to have a substantive discussion

25   on what's being withheld because they refuse to produce

1    categories and LA County has not intervened on this motion.

2              It's defendants' position multiple motion practice

3    on single issues is not helpful for case scheduling, Your

4    Honor.

5              THE COURT:  Well, nobody thinks that it is.

6              MR. KAPLAN:  But it's one of the reasons why this

7    case has to be amended, it has to be pushed out.

8              THE COURT:  All right.

9              MR. KAPLAN:  And, Your Honor, just to highlight

10   the damages issue.

11             That is when Your Honor questioned plaintiffs is

12   completely the defendants' position.  Per se damages only

13   gets them to tell the jury to give them a dollar.  They're

14   not going to tell the jury to give them an dollar, Your

15   Honor.  They're going to ask likelihood for tens of

16   millions, maybe hundreds of millions of damages, but they

17   refuse to explain their case strategy of what they're going

18   to present.

19             And we are at the end of the case and we have no

20   understanding besides for a general three billion to 400

21   million.  And, Your Honor, depositions are not helpful in

22   this regard.

23             In the CEO Smartmatic's deposition he claimed the

24   company was worth zero.  He was pressed on this issue and he

25   repeated his claim it's worth absolutely zero due to the

1    defamation.

2         Emotional deposition responses do not replace

3    interrogatory responses that are reviewed by a corporation,

4    signed, and submitted to the other side.

5         THE COURT:  Well, it sounds from Ms. Ward's

6    description of the deposition concerning Exhibit A, that

7    that was not emotional.  She described a process that lasted

8    13 hours, took two days, and went line-by-line and was very

9    detailed.

10        MR. KAPLAN:  Your Honor, it is not defendants'

11   position that it was a full answer on every line in the

12   appendix that he was responding to.  He's limited to human

13   memory.  There is absolutely no way he's able to recall 70

14   or 80 jurisdictions for all the reasons why he calculated a

15   reduced probability in the case.

16        THE COURT:  All right.  Understood.

17        Ms. Ward, I am looking at the response to request

18   for production 14 that was sent in, it looks like back in

19   December, and I am also struggling to find where it is that

20   there is a clear statement the documents are being withheld

21   from production.

22        If you've got something, could I ask you to submit

23   it?

24        MS. WARD:  Certainly, Your Honor.

25        I don't have, I believe it's Exhibit K in front of

 1     me, so I can't refer you to a page number now, but there is

 2     both an objection upfront.

 3            And within the text, I believe, of the objections

 4     that Smartmatic will not agree to produce documents that are

 5     subject to its confidentiality obligations with a third

 6     party.

 7            THE COURT:  All right.  Well, all I can tell you

 8     is that in preparing for this hearing we took that language

 9     and put it, as I said, into a spreadsheet and I have been

10     going through this and I'm just not seeing it.

11            MS. WARD:  I'm happy to go back and look and

12     provide Your Honor with that number.

13            THE COURT:  Please.

14            MS. WARD:  Certainly.

15            THE COURT:  I think it's important.  All right.

16     Thank you.

17            All right.  I'll take these two discovery-related

18     orders/motions under advisement.

19            Let's turn now, though, to the motion to withdraw

20     as counsel.

21            Mr. Parker, is that one that you're going to take?

22            MR. PARKER:  Yes, it is, Your Honor.

23            Does Your Honor want to discuss our motion to

24     amend for extension which is part of the motion to compel?

25            THE COURT:  That's what we were just talking about

1     I thought --

2              MR. PARKER:  Okay.  In terms of the dates and --

3              THE COURT:  You want 60 days and this is why you

4     want it?

5              MR. PARKER:  (Nods head).

6              THE COURT:  Right.  Okay.  Got it.

7              MR. PARKER:  Your Honor, I think that our papers

8     outline the unfortunate position that we are in having to

9     bring this motion before the Court.

10             I can say that in all the years that I've appeared

11    before this court, nearly 35, I have never had to bring a

12    motion like this.

13             THE COURT:  Mm-hmm.

14             MR. PARKER:  And it is difficult for myself and

15    our firm to have to assert the motion to withdraw.

16             The facts are laid out, the chronology is laid

17    out.  The basis for the request and the monetary impact that

18    this ultimately has our firm and the magnitude of it is

19    significant.

20             I think it clearly meets the legal standard of

21    being presumptively appropriate to allow our withdrawal.

22             I have indicated clearly that other counsel should

23    be sought immediately by My Pillow and Mr. Lindell, the

24    defendants.  They have been working on that already and

25    believe that they are close to retaining other counsel,

1   which may be helpful.  I can report that to the Court.

2          If the Court has any other questions regarding our

3   motion, I stand to answer them.

4          THE COURT:  I'm not -- without hearing from the

5   plaintiffs, but just having read the papers, I am not too

6   much in doubt about the motion to withdraw itself.

7          The question really is as to the consequences of

8   the motion to withdraw.

9          If you withdraw and there is a gap in

10  representation, it's going to have collateral knock-on

11  consequences on the scheduling in this case.

12         And I take it that Mr. Lindell and My Pillow will

13  be seeking adjustments to the scheduling order as a result.

14  They haven't yet, but I think it's reasonable to predict

15  that they will.

16         I mean, as you know, the standard for amending a

17  scheduling order is good cause and good cause in turn is

18  usually reduced to diligence.  It means other things as

19  well, but 90 percent of the time we're talking about

20  diligence.

21         It's, therefore, of some concern to me when I

22  receive from plaintiffs in Ms. Loftus's declaration an

23  indication that Mr. Lindell is continuing to fundraise but

24  that the funds being raised would not be devoted to paying

25  you, and Mr. Kaplan, and your colleagues, but would be used

1      for other purposes such as purchasing electronic devices

2      that are purported to allow county election clerks to tell

3      whether a voting machine has connected itself to the

4      internet.

5              I have zero doubt that you are accurately

6      conveying that Mr. Lindell and My Pillow are not paying you.

7              I guess my question is, and this will feed into

8      whether I can find diligence to find good cause to allow the

9      scheduling order to be adjusted, are they compelled not to

10     pay you, or do they have money, or are they raising money

11     that they are choosing to spend on other things?

12             MR. PARKER:  I can tell you that they have -- the

13     company first has lost millions, upon millions of dollars

14     since this case has been brought.  In large part due to

15     response from businesses, from vendors, from banks, et

16     cetera.  Mr. Lindell, same.  And the numbers are staggering

17     in terms of the losses I now have learned.

18             And in terms of raising money, you know, I saw

19     what was submitted as well, it may well be that Mr. Lindell

20     is able to raise money for the purpose of these devices, but

21     for the purpose of paying his lawyers might well be a far

22     different story as some might imagine in terms of trying to

23     raise money for that purpose.

24             I can't speak to it much more than that other than

25     to say that, you know, I know that the losses have been

1    significant and that Mr. Lindell has been diligent, open,

2    and honest with us as things have shifted over 2023.

3            I did not want to bring this motion, as I have

4    indicated.

5            THE COURT:  No lawyer does.

6            MR. PARKER:  No lawyer does.  Well, that's true,

7    hopefully.

8            But the point is, I look back at it, you know,

9    should I have brought it earlier?  Should I have waited to

10   bring it later?  And, frankly, I think the timing could not

11   have been earlier and I didn't want to wait any later.

12           THE COURT:  All right.  All right.  Thank you.

13           MR. PARKER:  Thank you, Your Honor.

14           THE COURT:  Mr. Connolly, it looks like you were

15   getting up.

16           MR. CONNOLLY:  I was getting up.  Was that okay?

17           We're obviously not opposing the withdrawal

18   itself, I'm sympathetic to that situation.

19           I think our concern is where the Court was at

20   two-fold.

21           One, what impact does this have on our schedule,

22   and I'll explain why that's so important to us.

23           Also, I will need to flag in terms of good cause.

24   There's actually no evidence that the Court could possibly

25   rely upon to find good cause in this situation.

1          THE COURT:  I disagree.  I believe that I can rely

2     on the representations of Mr. Parker.

3          MR. CONNOLLY:  I agree that Mr. Parker's

4     representations speak to whether he has been paid.  And I

5     agree, and I believe him, and I take him at his word about

6     that.

7          What the Court does not have any evidence of is

8     Mr. Lindell's inability to pay or My Pillow's inability to

9     pay.

10          There are no bank statements.  There's no

11     affidavit even, from Mr. Lindell or any representative of My

12     Pillow, indicative of any inability to make the payments.

13          A month ago, Mr. Lindell put on another

14     cybersymposium, where he, again, defamed Smartmatic.  So he

15     had the money to put on another cybersymposium a month ago

16     to do more disinformation.  But in front of this Court what

17     we do know and what has been established is that he has not

18     paid his counsel.  We all know that.  And I absolutely trust

19     Mr. Parker at his word on that issue.  But there's nothing

20     here indicating that Mr. Lindell and My Pillow is unable to

21     make that.

22          If that was the good cause argument that they were

23     going to present, there would have to be an affidavit from

24     Mr. Lindell and from a representative of My Pillow --

25          THE COURT:  Well, wait a minute --

1          MR. CONNOLLY:  I'm sorry.

2          THE COURT:  Mr. Parker had just stood at that

3     podium and said that he had spoken to his client, and that

4     his client told him what the financial situation was, and

5     that there was no money in order to pay.

6          Where is the authority for the proposition that

7     that information cannot be conveyed to me through counsel

8     but must come through in the form of an affidavit?

9          MR. CONNOLLY:  Right.

10         THE COURT:  I mean, certainly at a trial that

11    would probably be hearsay, I'm not sure what exception it

12    would fall within, if any, but why can I not say Mr. Parker

13    got information from Mr. Lindell and then as an officer of

14    the Court passed that on to me.

15         MR. CONNOLLY:  I think I was going exactly where

16    you were headed with that in terms of a hearsay problem with

17    that.

18         I don't think there's any credibility behind an

19    assertion like that.  It is certainly an accurate

20    representation of what Mr. Lindell said to Mr. Parker at

21    some point in time.  I'm not disputing that at all.

22         But the existence of a hearsay rule is because you

23    don't have the credibility of that out-of-court statement by

24    Mr. Lindell.

25         If Mr. Lindell was here and making those

1    representations to you where you could judge his credibility

2    and we could ask him some questions to probe the credibility

3    of that, such as, How can you afford to put on a

4    cybersymposium a month ago but not pay your attorneys?

5    Great question.  I think it's a good question.  But it's a

6    question that could be asked to determine whether or not he

7    has the ability to pay, Your Honor could then gauge his

8    reaction.  But right now because it's an empty chair there's

9    no way for you to do that.

10           So I appreciate and accept Mr. Parker's

11   representations of what he's being told by Mr. Lindell, but

12   I have a great degree of skepticism regarding the

13   credibility of any representation Mr. Lindell may have made

14   to Mr. Parker.

15           I'm not getting into privileged conversations,

16   obviously, but that's why something more than the bare bones

17   records you have in front of you right now, particularly in

18   light of a symposium being put on a month ago, would be

19   relevant to gauging whether or not good cause exists from a

20   financial impairment perspective in order to excuse this.

21           THE COURT:  You know, there are numbers of

22   proceedings which are exempted from the rule against

23   hearsay, and they are enumerated towards the end of the

24   Rules of Evidence, sentencing hearings, preliminary matters

25   in criminal cases.

1          Where is the authority for the idea that the rule

2     against hearsay applies to lawyer's arguments at motions

3     hearings?  I will tell you if that is the rule, motions

4     hearings are going to get much, much, much longer than they

5     already are.

6          MR. CONNOLLY:  I do not have a rule that that

7     would not be considered in connection with a motions

8     hearing.

9          I am making my position on this because good cause

10    needs to be established.  I do not think a hearsay statement

11    regarding financial condition has the type of credibility

12    that the Court should rely upon for a finding of diligence

13    for good cause.

14          THE COURT:  All right.

15          MR. CONNOLLY:  I absolutely cannot point to any.

16          THE COURT:  Are you objecting to my granting the

17    motion to withdraw?

18          MR. CONNOLLY:  Withdraw, no.  It's all about the

19    impact.

20          THE COURT:  All right.

21          MR. CONNOLLY:  And I think that's where the only

22    reason I am bringing in the diligence issue, because I think

23    it informs directly on the effect that this would have, a

24    couple of things that bear on our position that we put forth

25    to you in terms of what we think would be a reasonable

1    resolution to this.

2            One of them is at a high level and there's a

3    couple very specific details/issues too for us.

4            Number one, Smartmatic is in a very unfortunate

5    position with respect to Mr. Lindell.

6            Mr. Lindell has continued to defame Smartmatic on

7    a very regular basis ever since the complaint was filed.

8            There are e-mail blasts that he sends to anybody

9    who signs up for his websites that have advertisements for

10   My Pillows, coupled with defamation on Smartmatic.

11           So there's a barrage that we keep getting hit

12   with.  The only way we can cut this off in our minds is to

13   have a trial date.  And so the further we are pushing off

14   our trial date is compounding an injury to us, which is why

15   we would only think a very short extension to accommodate

16   the new counsel would be appropriate.

17           There are some very nitty gritty issues that also

18   has to come into play.

19           THE COURT:  Well, let's hear about them.

20           MR. CONNOLLY:  Yep.  The first is we have a

21   deposition of Dennis Montgomery.

22           Mr. Montgomery was one of the alleged sources for

23   Mr. Lindell.  That deposition was proceeding this week

24   through a motion to compel.  Defendants completed their

25   examination of Mr. Montgomery.  However, due to medical

1    issues for Mr. Montgomery, that deposition could not be

2    completed.

3           Mr. Montgomery has told the parties that he's

4    available at 10/26 for Smartmatic to do their examination.

5    Because it is a motion to compel situation, because he has

6    medical issues, we need to have that deposition completed on

7    10/26.

8           He could not continue to complete it this week.

9    We were there.  We were ready.  I wasn't there.  My

10   cocounsel was there to complete it.  They could not continue

11   it based upon his medical conditions.  And so I need the

12   Montgomery deposition completed.

13          We also have some -- a motion to amend the

14   complaint that we'll likely be filing.  This was referenced

15   in our papers to you.  This is us doing a

16   belt-and-suspenders approach with respect to whether or not

17   we have to include any information to comply with a

18   Minnesota procedural statute on punitive damages.

19          We want to get that on file soon.  I think we'll

20   be filing that with Judge Wright, but we want to have that

21   still to be able for us to file that so that we are showing

22   our proper diligence in prosecuting our claims with Judge

23   Wright.

24          THE COURT:  A motion to amend the complaint would

25   come to me.

1          MR. CONNOLLY:  Okay.  Then we'll be sending it to

2     you then.  Sorry.

3          And then the last thing, as we're thinking through

4     the schedule, is I have some concern about the Court setting

5     a schedule that is too far out on an accommodation for new

6     counsel if we actually don't end up in a situation where we

7     have new counsel.

8          If Mr. Lindell is able to raise the funds to

9     continue with Parker Daniels, that, in terms of a learning

10    curve for new counsel, is a very different fact pattern --

11    I'm sorry, for retaining counsel is a very different fact

12    pattern than new counsel.

13         THE COURT:  Wait.  You just said continue with

14    Parker Daniels.

15         MR. CONNOLLY:  Let me flip it and do it again.

16         THE COURT:  Well, start over and let's --

17         MR. CONNOLLY:  Let me start over.

18         I see two scenarios and they are -- they could

19    very different in how the Court views a reasonable

20    extension.

21         Scenario one is Parker Daniels withdraws.  They're

22    out of the case.  Mr. Lindell brings in brand new counsel

23    and the Court is attempting to figure out whether or not and

24    how long the schedule should be adjusted to accommodate

25    brand new counsel that may have a learning curve to deal

1      with, scenario one.

2              Scenario two, is Mr. Lindell is able to retain

3      funds as a result of getting more money, is able then to

4      retain Parker Daniels again, and then Parker Daniels comes

5      back in as counsel.  That is not a learning curve situation.

6              So as we're looking at the situation here -- and

7      maybe scenario two is so implausible it's never going to

8      happen, it's a pink elephant, but I don't want to see, I'm

9      hoping the Court wouldn't set a schedule that if Parker

10     Daniels gets back into the case I'm stuck with this longer

11     schedule that the Court set because they were trying to

12     accommodate brand new counsel.

13             So that's just a concern I have in the back of my

14     mind.

15             We see all that happening with Mayor Giuliani and

16     in some of our other litigation as well, so that's why it's

17     kind of front and center for Smartmatic.

18             THE COURT:  All right.  Any other nitty gritty

19     details that you want to talk about?

20             MR. CONNOLLY:  That's it.  And then obviously

21     these discovery issues.

22             THE COURT:  All right.  Mr. Parker, with respect

23     to the Montgomery deposition set for October the 26th, I

24     don't think that I could grant a motion to withdraw today

25     and have that covered on 10/26, but I also am very, very

1   reluctant to start the whole motion to compel process all

2   over again.

3           I don't -- a solution not coming readily to mind.

4           MR. PARKER:  There's about three hours left in

5   that deposition, as I understand it.  I suppose the

6   plaintiffs could go longer.  They did -- the plaintiffs did

7   depose Mr. Montgomery today.  Due to his medical condition,

8   it didn't go all day.

9           THE COURT:  It didn't finish, right.

10          MR. PARKER:  So they want to finish the second

11  half of their part of his deposition.

12          I have -- I guess I have not fully thought through

13  but our firm to solve this problem would agree to represent

14  the defendants for the sole purpose of completing the Dennis

15  Montgomery deposition on October 26th if that is needed.

16          And, again, I haven't thought through that,

17  whether that even is a viable alternative under the rules.

18          THE COURT:  Nor have I.

19          MR. PARKER:  So we'd be willing to do it.

20          THE COURT:  I appreciate that.  All right.

21          MR. PARKER:  Can I respond to that?

22          THE COURT:  Yes, of course.

23          MR. PARKER:  First, as it relates to the idea that

24  a defendant whose counsel is withdrawing has to come forward

25  with financial data showing that they couldn't pay, has not

1    been accepted by this Court on a number of cases.  And I can

2    cite them.  They don't have any cases to support that

3    because there aren't any.

4             Several cases don't support that, in fact.

5             THE COURT:  All right.

6             MR. PARKER:  But I can provide --

7             THE COURT:  Why don't you give me a few of them,

8    not all, but.

9             MR. PARKER:  I'll give you three of them.

10            THE COURT:  Sure.

11            MR. PARKER:  *Stemilt*, S-T-E-M-I-L-T, *Growers*, *LLC*

12   *versus J & J Distribution*, D. Minn. November 24, 2021.  That

13   is found at U.S. District Lexis 255395, Magistrate Judge

14   Thorson.

15            THE COURT:  Okay.

16            MR. PARKER:  A client was in arrears, the Court

17   did not require client showing the client could not to pay.

18            *Miracle Ear, Inc., versus South Georgia Hearing*,

19   *Inc.*, 2011, U.S. District Lexis 51234, D. Minn. May 12,

20   2011, Magistrate Judge Erickson decision.

21            Client in that case claimed to be defunct without

22   assets.  It was being challenged.  No proof was required.

23            The next case *AB Tours, LLC, versus ABC Bus*

24   *Leasing*, 2021 U.S. District Lexis 264318.

25            THE COURT:  264318?

1          MR. PARKER:  Yes.  D. Minn. December 13, 2021.

2          THE COURT:  Okay.  Thank you.

3          MR. PARKER:  I want to speak to the schedule for a

4     moment.

5          From our perspective the schedule is shot in this

6     case right now as we sit here irrespective of our

7     withdrawal.  And I know we've brought a motion that speaks

8     to it, but since we filed our papers it's more shot.

9          And not because of what defendants have done, we

10    just received 900,000 pages.  We're to go forward with the

11    key depositions in this case without having an opportunity

12    to review them when the substantial completion date set by

13    this Court was back in April?

14         As it relates to the machine, we need our experts

15    to be able to review the machine.  We haven't even got the

16    machine yet.  Their expert got to review it.  What, we're

17    going to have a discovery deadline around the corner here

18    where our expert's not able to review the machine?  Key

19    relevant information in the case.

20         Depositions.  They canceled depositions left and

21    right.  Now they're all pushed to the October 20.  Mike

22    Lindell's deposition twice has been canceled.  And I told

23    them you need to take his deposition and not move it because

24    Mr. Lindell has very few days in September that he's

25    available.  I'm telling you that in advance.  You're able to

1      continue forthwith his deposition so you should do it.  This

2      is after the Court moved the date from August 15th or 20th

3      to October 20th.

4              They decided, no, we're going to move the date.

5      Okay.  So we gave them more dates.  And now they have

6      canceled Mike Lindell's deposition on the dates that we were

7      all set and ready to go.

8              They want to take Mike Lindell's deposition and

9      they have stated that they want to amend their complaint for

10     punitive damages but they were waiting, talk about lack of

11     diligence, they could have done this long ago, they were

12     waiting for Mike Lindell's deposition.  Meanwhile, they're

13     kicking his deposition out, until the very end so that what

14     is happening here is that we're not able to do our discovery

15     and they want to make sure that the Court orders that they

16     can do all their discovery.  It's just not fair.

17             Finally, you have a motion to amend.  Do we get to

18     respond to it?  What about the discovery we may want to do

19     as it relates to that?  All that's going to be done by

20     October 20?

21             Our request for 60-day extension is -- I would be

22     surprised if we're going to be able to get all the discovery

23     done in 60 days even if we were not withdrawing.

24             So I would recommend that the Court accept the

25     60-day extension.  Yes, it may move the trial date by

1    60 days as well.  Is that a huge prejudice to the plaintiffs

2    in a case of this magnitude?

3              And this argument that Mr. Lindell is out there

4    defaming them everyday left and right, one of the issues

5    that's going to come up in this case is who is Smartmatic.

6    And that's going to be a big issue.  They've been

7    investigated for bribery more than one occasion.  This is a

8    corrupt company and whoever takes this case forward will be

9    pushing on that.  It has nothing to do with what Mike

10   Lindell says on a matter of quintessential public certain

11   that he has every right to speak about and every citizen in

12   this country should have the right to speak about under the

13   First Amendment.

14             And so the claim that, oh, these 60 days is

15   prejudicial to us and it's improper, that's a specious

16   argument in the end.

17             As far as the last, you raised the Dennis

18   Montgomery deposition, a couple of other issues were also

19   raised.  Motion to amend, I've spoken to.  If there's going

20   to be brand new counsel and the Court regardless of that

21   resets the schedule for 60 days, it's possible that that

22   counsel can work within that.  It may be necessary,

23   depending on when they're found and how much work they have

24   to do to be caught up, that it may be shifted a little bit

25   more, but not much.

1          So the ultimate impact of this withdrawal can be

2    relatively insignificant.

3          And as far as our firm coming back in, frankly, as

4    I've said, I'm disappointed that we're not able to continue

5    in the case.  And if there is miraculously some way of

6    getting caught up and be able to fund the litigation going

7    forward, we would look at that.

8          Thank you, Your Honor.

9          THE COURT:  All right.  Thank you.

10          All right.  Let's take a recess.  I'll come back

11    out in about ten minutes and we'll see where we're going

12    from here.  Okay?  Stand by.

13      (Recess taken at 3:30 p.m.)

14                     *    *    *    *    *

15      (3:42 p.m.)

16                      **IN OPEN COURT**

17

18          THE COURT:  All right.  With respect to the motion

19    of defense counsel to withdraw pursuant to District of

20    Minnesota local Rule 83.7(c), which is withdrawal without

21    substitute counsel, the motion is granted.

22          I find that the defense counsel without objection

23    from plaintiffs' counsel have shown substantial cause for

24    the withdraw and, therefore, that motion is granted and that

25    is effective immediately.

1          The scheduling of the case going forward is

2      contingent and is going to take a little bit more work.

3      It's not something I'm to say here from the bench today.

4          I think that the parties should, however, count on

5      continuing the Montgomery deposition on October 26th.  I

6      understand that there is a question about finding a way to

7      do that within the law, but I'm going to be working hard on

8      that and I think that we will -- that we will find it.

9          I also want to say that with respect to showing

10     substantial cause it -- while I will look at the question of

11     the sort of evidence that needs to come in regarding whether

12     Mr. Lindell is able to pay for lawyers, is able to pay

13     something for lawyers, is able to pay nothing for lawyers,

14     the fact is that even if Mr. Lindell was sitting on a

15     mountain of cash, if he's refusing to pay his lawyers, then

16     his lawyers are entitled to withdraw from representation

17     and, therefore, from what I'm doing this afternoon, the

18     question of Mr. Lindell's means is not really all that -- is

19     not relevant at all.

20          That does become relevant, as I mentioned, with

21     respect to the schedule of the case going forward and

22     whether there's been justification or good cause in the form

23     of diligence for amendments to the scheduling order and what

24     the magnitude of those adjustments needs to be.

25          I also want to say something but I want to keep it

1    general concerning the question of punitive damages that is

2    a question where there's, again, I want to keep this

3    general, but there's a question of whether discovery into

4    punitive damages is relevant, given that in the view of the

5    defense punitive damages have not been properly pleaded

6    under Minnesota law.

7              For the purposes of the parties' planning, that is

8    an order that has a number of components to it, I will tell

9    you, though, that the component concerning punitive damages

10   is almost all written and that I am going to recommend -- or

11   I am going to order, rather, that punitive damages in

12   Federal District Court in Minnesota follow federal

13   procedural law, and that the Minnesota procedural statute

14   and its affidavits, and its requirement that there be a

15   delay after the filing of the complaint before there's an

16   idea of amending the complaint to add a claim for punitive

17   damages is not something that I am going to find applies in

18   federal court under the Erie doctrine.

19             So I want, as I said, to keep this fairly general.

20   I don't want to say something that would create a

21   contradiction with what is going to be written and, in fact,

22   what has been written.

23             But I also thought that since it came up it would

24   be fair to mention that to the parties.

25             So, going forward it's the question of scheduling,

1    and it's these motions that are in front of me, and I will

2    get orders out on those as quickly as I possibly can.

3            Mr. Connolly, did you have something you wanted to

4    say?

5            MR. CONNOLLY:  I was wondering if the Court could

6    set a short status for us to come back in front of you to

7    get an update from the defendants on counsel hunt, maybe

8    something in the next two weeks or so just so we keep the

9    ball moving forward.

10           I understand that Parker Daniels Kibort will not

11   have to be here, but perhaps a representative of Mr. Lindell

12   or a representative of My Pillow can update the Court on

13   where they stand in getting counsel.

14           THE COURT:  That request -- that request is

15   respectfully declined.

16           I think that Mr. Lindell and My Pillow need to

17   find new counsel promptly.  I think they know that.

18           If they do not -- I am going to set a schedule.

19   And if Mr. Lindell does not have counsel, that will still be

20   the schedule.

21           MR. CONNOLLY:  Thank you.

22           THE COURT:  Mr. Parker.

23           MR. PARKER:  Your Honor, just wondering if there

24   is a stay period of time that goes along with the granting

25   of our motion to withdraw so I can communicate that?

1      THE COURT:  Yes.  The plaintiffs have sought a

2  stay, I will call it, of approximately 30 days.  And that

3  will be granted.

4      So, in other words, fact discovery closes on

5  November 20th.  Rebuttal expert reports due, it says here

6  November 3rd, and close of expert discovery December 20th,

7  so there's been about a 30-day pushback of the relevant

8  deadlines.

9      MR. PARKER:  Your Honor, does that -- that could

10  change when you rule on the schedule going forward?

11      THE COURT:  I think that you can tell your client

12  that they can bank on those dates and that it might be more

13  depending upon what I find as I dig in on this.

14      However, I understand your point, Mr. Parker, that

15  as you so elegantly put it, the schedule is shot.  I'm not

16  quite so quick to give up on the schedule and I am

17  absolutely committed to keeping this case moving.  And I

18  think I cannot say more than that.  All right.

19      MR. PARKER:  Thank you.

20      THE COURT:  Anything further from the plaintiffs?

21      MR. CONNOLLY:  No, sir.

22      THE COURT:  All right.  Mr. Parker and Mr. Kaplan,

23  it has been a pleasure having you in this case.  You have

24  always shown up prepared.  You've been very professional.

25  You have upheld the various standards of the profession in

1   providing representation to a client who is the subject of

2   public opprobrium.  I appreciate that and I'm sorry to see

3   you go, but I understand.  Thank you.

4             MR. PARKER:  Thank you, Your Honor.

5             THE COURT:  Court's adjourned.

6             (Court adjourned at 3:49 p.m.)

7                     *           *           *

8

9                     REPORTER'S CERTIFICATE

10

11

12             I certify the foregoing pages of typewritten
    material constitute a full, true and correct transcript of
    my original stenograph notes, as they purport to contain, of
13   the proceedings reported by me at the time and place
    hereinbefore mentioned.

14

15             /s/Lynne M. Krenz
             Lynne M. Krenz, RMR, CRR, CRC
16

17

18

19

20

21

22

23

24

25