**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

SMARTMATIC USA CORP., SMARTMATIC
INTERNATIONAL HOLDING B.V. and SGO
CORPORATION LIMITED,

Plaintiffs,

v.                                                                          Case No. 22-cv-00098- WMW-JFD

MICHAEL J. LINDELL and MY PILLOW, INC.,

Defendants.

## DEFENDANTS' OPPOSITION TO MOTION TO COMPEL

### I.     Background

A. Plaintiffs' Motion to Compel is peppered with edgy advocacy – *see, e.g.,*

Smartmatic's Memorandum of Law in Support of its Third Motion to Compel ("Mem."),

at 2 ("Lindell … spread his lies about the legitimacy of the 2020 election.") – utterly

unrelated to the discovery issues they purport to raise, and so is unhelpful to the Court's

understanding of the discovery dispute Plaintiffs try to raise. Accordingly, while we note

our objection to the Plaintiffs' bluster, we decline to respond in kind here.

More to the point, Plaintiffs have not fairly portrayed the history or posture of the

case, culminating in their over-the-top claim that "[t]o date, Defendants have not

responded to Smartmatic's September 20, 2023 discovery requests *in any fashion*." *Id.,* at

5 (emphasis added). This is untrue. *See, e.g.,* Email Exchange Between J. Loftus

(Plaintiffs' counsel) and C. Kachouroff (Defendants' counsel) (May 8-9, 2024) (Exh. 1).

B. This case was filed on January 18, 2022. Over the last 27 months of litigation, there have been massive discovery productions and a range of different discovery disputes between Plaintiffs' counsel and Defendant's prior counsel. We understand that the documents generated in discovery now constitute well over 20 million files. We became counsel for Defendants in December 18, 2023 just before the holidays. As is evident from Plaintiffs' Memorandum, the discovery "deficiencies" of which Plaintiffs complain arose several months before we arrived on the scene. *Id.,* at 3.

When we did enter the case, our priority was to clean up the discovery mess that we confronted. Our ability to do that as quickly as we hoped was handicapped by the format of the hard drive on which over 10 million documents was conveyed to us. The hard drive was produced by an ESI vendor known as EverLaw. We no longer have access to EverLaw, and that vendor no longer has the original database in the easily searchable format in which it was holding these documents before it generated the hard drive we received.

For purposes of responding to document requests, what we have to work with is a very large hard drive where every single page of a document and its graphics are saved as an individual file. The metadata is not affixed to any actual page and that metadata does not contain a bates stamped number. What this means is that when a search is initiated using bates stamp number, our ability to search through the millions of documents remains extraordinarily time consuming. A *single* search can easily take between one to three hours, including a separate search for the metadata to verify that source and where it

came from. *Without* a bates stamp number, a search for a single document consumes many more hours, and is, practically speaking, impossible.

C. We were candid with Plaintiffs about the challenges we inherited in responding to discovery. During phone calls, the undersigned specifically reached out to find out their priorities were so we could whittle down outstanding discovery in an orderly fashion that was responsive to their concerns and to minimize the impact of any production delay. However, it appears that Plaintiffs chose to take advantage of the challenges faced by Defendants, rather than to work cooperatively so that Plaintiffs' purported discovery needs could be met as promptly as possible.

1. Plaintiffs simply did not engage with our efforts to coordinate and prioritize our responses as we worked through the discovery backlog.  The email chain in Exhibit 1 illustrates that frustrating dynamic. It shows that Plaintiffs were not only aware of how long our searches were taking, they clearly knew that we were trying to prioritize responses *for Plaintiffs* who had already stated that the September 2023 discovery was long overdue. In the email listing Plaintiffs' contentions regarding discovery deficiencies, we inserted responses in red text if a particular request was finished, and then blue text if we needed further discussion about what was available to produce. Plaintiffs' follow up was only a polite "Thank you for these responses" and then an email a few days later seeking dates for an order to show cause. At the same time, they requested five depositions which Defendants scheduled within weeks. Plaintiffs also litigated the deposition of Mary Fanning in Wisconsin because they refused to give Defendants *any* time to question Ms. Fanning until the district court gave us that time. On May 16, 2024,

Plaintiffs dumped 25,000 document files on Defendants without notifying the defense that it was coming, without identifying what the documents were or why they were being turned over. Plaintiffs knew we could not address this data dump which included documents of their dubious claim for international damages that they would drop only weeks later.

2. Given the production dilemma we confronted, it is not true, as Plaintiffs claim, Mem., at 8, that we never asked for extension in responding to discovery.  In our email response to Smartmatic's May 9, 2024 email (Exhibit 1), we reminded them of the following:

> You should know that we do not have access to the electronic materials through a vendor as did prior counsel. We literally have to search through a CTRL + F function in raw data so things are taking a lot longer to get folders restored, and etc., we were.

We made this statement to remind Plaintiffs of our discussions that we had an inability to comply with their demands concerning timing. Because of the limits on our search capabilities, we told Plaintiffs that we needed more time to respond on numerous occasions. Plaintiffs never agreed or disagreed.

3. Plaintiffs have tried to capitalize on the change in defense counsel by effectively asking the defense to redo discovery that had already been done. A cursory review of Exhibit 1 shows Plaintiffs asking the Defense to verify things, to confirm things, and to search for documents for prior requests that later turned out to have been completed by prior counsel.

4. Plaintiffs have also ignored informal efforts of Defendants to be responsive. For example, Plaintiffs' Second Requests for Admissions consist of 559 requests to admit

documents as authentic. Plaintiffs did not attach copies of the documents they wanted to

authenticate, as provided under Rule 36(a)(2), but simply identified them by Bates

number. Plaintiffs knew that with only Bates numbers, we could not respond to these 559

requests to admit in a timely fashion. Nevertheless, we advised Plaintiffs that we would

stipulate to the authenticity of any documents we produced. Our representation was

clearly a good faith effort to be as responsive as we could while working our way through

all these documents.

D. What Plaintiffs' maneuvers ignore is the common-sense principle of

proportionality that shapes discovery under the Federal Rules of Civil Procedure.

Proportionality requires consideration of

> the importance of the issues at stake in the action, the amount in controversy,
> the parties' relative access to relevant information, the parties' resources, the
> importance of the discovery in resolving the issues, and whether the burden
> or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Rather than cooperate with Defendants to secure the discovery

they contend they need in light of the constraints on Defendants' resources, Plaintiffs

have sought to strain those resources to seek some advantage in this litigation.

Paradoxically, as we will now explain, at this point any remaining discovery deficiencies

on the part of Defendants are minimal, while Plaintiffs have stonewalled Defendants'

discovery, which will require us to move to compel responses from Defendants.

**1.      The September 2023 discovery production.**

Plaintiffs claim that we never asked for an extension to respond to their discovery

request. That is not true. The Defense has reiterated over and over that it does not have

the ability to comply within the time frames imposed by Plaintiffs because the defense

5

electronic discovery platform is non-existent. The defense is relegated to a command function search of a hard drive where millions of documents are housed in an almost unusable format—each page of every document is saved as a separate file. We simply do not have the resources to hire an ESI Vendor to mine millions of pages of data.

Technically, Plaintiffs did comply with Rule 36(a)2 in their 559 requests for admissions because they did not submit a document along with each request as required by the Rule, and they knew that identifying documents by Bates number was, in the context of this case, not a practical substitute that would allow Defendants to timely respond. Nevertheless, we have already agreed to stipulate to the authenticity of documents produced by Defendants, and it appears that all 559 documents have defense Bates numbering. Practically speaking, then, we have admitted all 559 requests for admission, and no live discovery dispute remains.   If a stipulation to this effect will further make this clear, we will gladly sign such a stipulation. We have also today responded to Plaintiffs' other set of 50 requests for admission. Those responses will not surprise Plaintiffs and they already know Mr. Lindell's position on every single request. Under these circumstances, we do not believe it is not appropriate to deem any RFA admitted in this motion to compel.

**2.     Interrogatory Nos. 20 & 23; RFP No. 26.**

*a. Interrogatory No. 20*

For Interrogatory No. 20, Defendants have stated over and over that My Pillow, Inc. cannot identify "monetary contributions to Defendants' defamatory activities." These contributions do not exist because Defendants do not, and in the context of discovery

cannot be forced to, concede that they engaged in any defamatory activities. Smartmatic *refuses* to accept any answer other than the one it wants. Its argument implies that the rule for responsiveness is not relevance but more like the old "reasonably calculated to lead to discoverable information" standard. Plaintiffs state:

> But whether MyPillow provided financing to the March for Trump Tour directly or by purchasing advertising is irrelevant—both are responsive to Interrogatory No. 20.

Mem at 11.

Providing financing for the March for Trump tour would be directly relevant but Plaintiffs go one step further and assume that *all* advertising costs are relevant and responsive to Interrogatory No. 20. Apart from the fact that Plaintiffs specifically asked for "March for Trump" tour support making that purpose a relevant consideration for responsiveness, the request specifically limits itself by seeking identification of financial resources or support *used* "for the development, production, or publication of the ACCUSED PROGRAMS, . . ." See Interrogatory 20. Whether financial support is relevant and therefore responsive, necessarily depends on whether the purpose of the loan was "for the development, production, or publication" of the programs that Plaintiffs claim are defamatory. That is their interrogatory.

The previous answers corrected an answer that $100,000 was a loan to Frank Speech. It was not a loan but an advertising credit. If the credit does not get used, it gets paid back *like a loan*. Plaintiffs do not care, they say, what the money is used for. They say it is probative. This is not the standard for Fed. R. Civ. Pro. 26(b)(1) which requires

both relevance and proportionality. There is simply no need for this level of intrusion consistent with Plaintiffs' theory of their case.

It is worth noting here that Frank Speech is not My Pillow Inc.'s only source of advertising. Under Plaintiffs theory, *every* advertisement by anyone dealing with My Pillow, Inc. is relevant for production. It is hard to see how this argument meets the definition of "relevance." Defendants stand on their answer.

### b. *Interrogatory No. 23*

For Interrogatory No. 23, Plaintiffs once again refuse to accept an answer if it differs from their theory. In their memorandum, Plaintiffs concede implicitly that loans between Lindell and My Pillow, Inc. are only *relevant* if My Pillow, Inc. provided financing for Lindell's political activities. Simply because a loan exists does not automatically mean that it is for Lindell's political activities or that it is relevant and responsive. Plaintiffs realize that their claim against My Pillow, Inc. is unsupportable and so they are trying to gin up any hook or link to support their theory of employer liability. There is nothing in the previous answers that are contradictory. Defendants stand on their previous answers.

### c. *Request for Production No. 26.*

Plaintiffs claim they need a parallel update from My Pillow on financials because they say, Plaintiffs supplemented their financial records with a production of information pertaining to fiscal year 2023 on May 16, 2023, well over a year ago. This is certainly a typo because Plaintiffs dumped 25,000 documents without explaining what the documents are or why we were receiving them on May 16, 2024. Regardless, Defendants

will have turned over My Pillow Inc.'s tax returns and financials for 2022 and 2023

before the date of the hearing with the exception of Mr. Lindell's personal taxes for years

2022 and 2023. Mr. Lindell's personal returns will be completed in September of 2024.

This request will have been satisfied to the best of Defendants' ability with the only item

remaining to disclose are Lindell's personal tax returns *as soon as they are filed.*

### 3.    Interrogatory Nos. 4 & 14.

#### a. Interrogatory No. 4

Plaintiffs say that not obtaining granular contact information "[p]articularly with

respect to natural persons, . . . deprives Smartmatic of critical information in assessing the

credibility of Defendants' sources." Mem at 13. The statement makes no sense. Plaintiffs

are finally asking new counsel for the granular contact information over two years after

the request was propounded and at a time that they have refused to extend fact discovery

and have been declaring fact discovery over. What good will contact information do if

fact discovery is over? First, if this information were so important to investigate as part of

the facts of this case, why did Plaintiffs wait so long? They have no excuse. They have a

team of at least four attorneys writing all kinds of deficiency letters and motions against

one attorney. It would seem that Plaintiffs would have pursued this information earlier if

it were really important to them. They did not but instead treated it on the level of every

other request. Assuming this information exists—which it does not—Plaintiffs will have

to come up with an answer as to how they could assess matters that are no longer open to

investigation.

But this Court need not address Plaintiffs' deficiencies here because Defendants have substantively answered Interrogatory No. 4. Mr. Lindell identified numerous sources of information. Plaintiffs believe we ignored portions of the interrogatory requesting granular detail. But Mr. Lindell did not keep the granularity that Plaintiffs seem to think exists. Where he could, he provided as much detail about the source as he could remember. He did not keep notes and details in writing. He interviewed subjects organically and on video, all of which Plaintiffs have carefully catalogued and obtained transcripts for. Plaintiffs already have it all. Some of Mr. Lindell's subjects he agreed with and others he did not agree with. Plaintiffs can make of that what they will at trial but this is the answer. Defendants have fully answered Interrogatory No. 4.

        b.      *Interrogatory No. 14.*

It is simply not true that Mr. Lindell has failed to substantively respond to this request which closely aligns with Interrogatory No. 4. (Indeed, many of the interrogatories are overlapping and even Plaintiffs lump them together.) What the parties are divided about in this interrogatory is whether the statements are defamatory. We in fact did make a substantive response but we refuse to concede that these were defamatory statements. We are under no duty to embrace Plaintiffs' theory of the case or repeat Plaintiffs' messaging that it intends to make to the jury. Mr. Lindell has complied with this response because he has already given Plaintiffs everything he has relied on along with every single video he has made. In addition to the documents and videos he identified, his FrankSpeech videos are the best evidence to show what Mr. Lindell

10

investigated, who he spoke with, and why he made the claims that he did. The Court

should deny Plaintiffs this issue as well because Defendants have fully answered.

### Conclusion

The Requests for Admission have been addressed. The only thing that Defendants

owe to Plaintiffs are My Pillow, Inc.'s taxes and financial statements for 2022 and 2023

which will be forthcoming in the next few days and Mr. Lindell's personal taxes for 2022

and 2023 which are estimated for completion in September of 2024.

All of the disputes with this Court are not genuine disputes. Given the resources of

the parties, the good faith effort of Defendants to meet their obligations, and the lack of

reciprocity from Plaintiffs, we would ask this Court to deny the Motion to Compel.

DATED: July 24, 2024.                 **MCSWEENY, CYNKAR & KACHOUROFF PLLC**

By */s/ Christopher I. Kachouroff*
Christopher I. Kachouroff* (Bar No. 44216)
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
(703) 621-3300
chris@mck-lawyers.com

Douglas G. Wardlow (MN Bar #339544)
Jeremiah D. Pilon (MN Bar #392825)
1550 Audubon Rd.
Chaska, MN 55318
(952) 826-8658
doug@mypillow.com
jpilon@mypillow.com

**ATTORNEYS FOR MY PILLOW, INC. AND
MICHAEL LINDELL**

*Admitted *Pro Hac Vice*