# EXHIBIT 4

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MINNESOTA
 3
 4   SMARTMATIC USA CORP.,
 5   SMARTMATIC INTERNATIONAL
 6   HOLDING B.V. and SCO
 7   CORPORATION LIMITED,
 8
 9               Plaintiffs,
10
11   vs.                 Case No. 0:22-cv-00098-WMW-JFD
12
13   MICHAEL J. LINDELL and MY
14   PILLOW, INC.,
15
16               Defendants.
17
18
19          VIDEOTAPED DEPOSITION OF BENJAMIN COTTON
20                   THURSDAY, AUGUST 8, 2024
21                        9:35 a.m. PST
22
23
24
25
```

Page 2

```
 1       BE IT REMEMBERED THAT, the videotaped deposition of
 2   BENJAMIN COTTON was reported by Mary C. Soldati,
 3   Registered Professional Reporter and Certified Shorthand
 4   Reporter, on Thursday, August 8, 2024, commencing at the
 5   hour of 9:35 a.m. PST, the proceedings being reported
 6   remotely from Portland, Oregon.
```

Page 3

```
 1                         APPEARANCES
 2
 3   Appearing on behalf of the Plaintiffs:
 4   TIMOTHY M. FREY
 5   OLIVIA SULLIVAN
 6   BENESCH FRIEDLANDER COPLAN & ARNOFF
 7   71 South Wacker Drive, Suite 1600
 8   Chicago, IL 60606
 9   tfrey@beneschlaw.com
10   osullivan@beneschlaw.com
11
12   Appearing on behalf of the Defendant:
13   MCSWEENEY CYNKAR & KACHOUROFF, PLLC
14   CHRISTOPHER KACHOUROFF
15   13649 Office Place, Suite 101
16   Woodbridge, Virginia 22192
17   chris@mck-lawyers.com
18
19   ALSO PRESENT:  Don Savoy, Videographer
```

Page 4

```
 1                      EXAMINATION INDEX
 2
 3   JOSEPH COTTON                                   PAGE NO.
 4   By Mr. Frey                                      6/196
 5   By Mr. Kachouroff                                 192
 6
 7                        EXHIBIT INDEX
 8
 9   EXHIBIT NO.        DESCRIPTION                  PAGE NO.
10
11   Exhibit No. 705    Benjamin Cotton's              28
12                      Declaration
13
14   Exhibit No. 706    ATSEC Source Code Review       77
15                      Report Voting Solutions For All
16                      People Version 2.0.
17                      Report Date 2020-1-06
18
19   Exhibit No. 707    Court Order                    93
20
21   Exhibit No. 708    County of Los Angeles          138
22                      VSAP Tally Voting System
23                      Staff Report
24
25   Exhibit No. 709    New York Times Article         188
```



Page 85

1  A. No.
2  Q. So you were examining those
3  voting systems related to other litigation in
4  which you were retained as an expert,
5  correct?
6  A. Correct.
7  Q. Did you rely upon your forensic
8  review of these voting systems in rendering
9  your opinions in this litigation?
10  A. As a corpus of knowledge, I
11  relied on that information that I obtained
12  through those examinations for paragraphs 20
13  and 21, which is the general cyber security
14  posture for voting systems.
15  Q. And do you -- let's go through
16  them one at a time.
17     So the first one is the voting
18  system in Maricopa County Arizona. What
19  company manufactured the voting system
20  information you reviewed from Maricopa
21  County?
22  A. Dominion.
23  Q. And what type of election
24  technology system did you forensically
25  examine?

Page 86

1  A. I examined all aspects of the
2  digital computing devices, which included the
3  Election Management Server, the EMS; the EMS
4  clients; the adjudication work stations; the
5  ICCs, which are the scanning controllers for
6  the canon scanners.
7     They also had four HiPro
8  scanners, which were high volume scanning
9  devices. Those were included as part of that
10  examination.
11  Q. Did you examine any ballot
12  marking devices?
13  A. They did not provide the ballot
14  marking devices as part of that subpoena.
15  But I did examine tabulators and the
16  tabulator data cards.
17  Q. So tabulators, tabulator data
18  cards, EMS, scanners.
19     But no BMDs, right?
20  A. Correct.
21  Q. How did you obtain the forensic
22  images of these components of the voting
23  system in Maricopa County Arizona?
24  A. So I followed standard digital
25  imaging processes, utilized a right block for

Page 87

1  all the digital media, and then used an FTK
2  imageer to create a forensics image of each
3  of those components.
4  Q. Did you yourself --
5     (Cross talk.)
6  A. I've got a UPS device that is
7  beeping and it's about to go off. So I need
8  to reset something real quick.
9  Q. Sure, no problem.
10     MR. FREY: We can go off the
11  record.
12     THE VIDEOGRAPHER: We are going
13  off the record at 11:30 a.m.
14     (Break taken.)
15     THE VIDEOGRAPHER: We are back
16  on the record at 11:33 a.m.
17  BY MR. FREY:
18  Q. Okay. Mr. Cotton, we are back
19  on the record. And my question was:
20     Based on your prior answer that
21  you followed standard digital imaging
22  processes, et cetera, you -- it sounds like
23  you yourself imaged the voting system
24  components for Maricopa County, Arizona; is
25  that true?

Page 88

1  A. You mean some of them. We had
2  a team of ten people that were performing the
3  imaging. I personally conducted the training
4  of all people to make sure they met the
5  standards. They were part of my company.
6  And we had some independent contractors
7  contacted as well for this.
8     So we baselined everybody, did
9  essentially a mini-validation that they were
10  following proper procedures, and then we
11  imaged approximately 140 terabytes of data as
12  part of that engagement.
13  Q. And I don't need the exact
14  date, but do you recall the time period in
15  which you performed this imaging?
16  A. It would have been from the
17  middle of May for the next two weeks.
18  Q. May 2021?
19  A. Yeah.
20  Q. So it wasn't imaged at the time
21  of the election, correct?
22  A. No. We were relying on the
23  Arizona Senate to provide the devices under
24  subpoena. And so it took -- the subpoena was
25  issued in December of 2020, and then there



Page 97

1   Do you see that?
2   A.   I do.
3   Q.   And the Court says that the
4   special master found, quote, "No evidence
5   that the routers, manage switches, or
6   electronic devices in Maricopa County's
7   Ballot Tabulations Center connected to the
8   public Internet," right?
9   A.   I see that.
10   Q.   And is this consistent with the
11   special master's testimony?
12   A.   That is.  However, what I would
13   like to point out here is that the special
14   master's examination of the current state of
15   the Maricopa County network was conducted
16   almost two and a half months after we imaged
17   the devices.
18        At no time did they request or
19   did they examine the forensics images that we
20   created that was the basis of my testimony.
21        So in other words, they wrote a
22   report without looking at the evidence.  They
23   wrote a report in which not all of the
24   evidence, as it existed at the time of the
25   election, existed.

Page 98

1        And they relied almost
2   exclusively on the Maricopa County officials'
3   assertion that it was an Air Gap network.
4        So this was his decision, but
5   quite frankly, I don't understand how you can
6   make this decision when they didn't look at
7   the evidence that we preserved.  And the
8   Senate had a copy of those images.
9        And that did not include all
10   the equipment that the Pro V&V audit report
11   validated was present at the time of the
12   election.
13        You know, I think we've all
14   been in cases where we believe the judge got
15   it wrong.  And in this case, he definitely
16   did.
17   Q.   As the Court then goes on to
18   state at the bottom of that page, it says:
19        "The special master's findings
20        are consistent with what the County
21        has long maintained and what previous
22        audits have likewise concluded."
23        Do you see that?
24   A.   I do.
25   Q.   And then the Court says:

Page 99

1        "Although the plaintiffs'
2        claims that Maricopa County's systems
3        can be or have been connected to the
4        Internet are in direct contradiction
5        to the County Defendant's evidence and
6        the special master's findings, the
7        Court will treat them as unpersuasive
8        arguments rather than as false
9        assertions of fact, allowing
10        plaintiffs the benefit of the doubt."
11        Do you see that?
12   A.   I think the keyword there is
13   they allowed the plaintiffs the benefit of
14   the doubt.  If you will review my report to
15   the Senate, I itemized specific instances in
16   which multiple connections were made external
17   to the Air Gap network by the EMS.
18   Q.   And you maintain control or
19   possession of the information that you
20   forensically reviewed in this case?
21   A.   So I returned to forensics
22   images to the Arizona State Senate.
23   Q.   Did you rely upon the forensic
24   images from the Maricopa County voting
25   systems in rendering your opinions in this

Page 100

1   case?
2   A.   From a corpus of knowledge as
3   it pertained to cyber security, yes, in
4   paragraphs 20 and 21.
5        There was no dispute that they
6   did not patch the systems, they had not
7   updated the antivirus, they allowed remote
8   access to the EMS, they had used the same
9   password for all user accounts on the system.
10   There's no dispute to that.
11   Q.   And I'm just trying to
12   understand that -- the extent to which you
13   relied upon that for rendering your opinions
14   in this litigation.
15        And that's in paragraphs 20 and
16   21, you said, correct?
17   A.   Well, specifically to the Air
18   Gap network, I relied on my personal
19   knowledge and the ability to easily bypass
20   Air Gap networks through various techniques.
21   I did not rely on this particular finding by
22   the judge as part of my report.
23   Q.   Okay.  I want to talk about the
24   next system that you forensically reviewed,
25   and that's Antrim County, Michigan, correct?



Page 101

1  A.  Correct.
2  Q.  And what company manufactured
3  the voting system information you reviewed
4  from Antrim County?
5  A.  Dominion.
6  Q.  And was that the Dominion
7  5.5(a), did you testify earlier?
8  A.  B.
9  Q.  5.5(b), okay.
10  A.  5.5(b) --
11  Q.  I'm sorry?
12  A.  5.5(a) is Georgia.
13  Q.  And what components of the
14  voting system did you forensically review in
15  Antrim County?
16  A.  So with Antrim County, I had
17  access to previously imaged -- to a
18  previously-imaged forensics image of the EMS
19  server, as well as the poll books and I
20  believe an ICC.
21  Q.  So no BMD, correct?
22  A.  And a BMD, yes.
23  Q.  There was a BMD?
24  A.  Yes.
25  Q.  And you don't recall one way or

Page 102

1  the other whether BMDs were used in Antrim
2  County in the 2020 election?
3  A.  I don't recall if this was one
4  that was actually used or one that they had
5  imaged.
6     I actually had imaged that one,
7  so I don't know if that one was actually used
8  in the election or not, so...
9  Q.  And it sounds like -- you said
10  you imaged one thing and then they had imaged
11  other things.
12     So who did the -- who obtained
13  the information that you reviewed --
14  A.  I'd have to look at the custody
15  documents for the exact person, but I believe
16  it was a member of an organization called
17  ASOC.
18  Q.  Is that Colonel Waldron's
19  organization?
20  A.  I believe so, yes.
21  Q.  Do you know the manner in which
22  they collected information?
23  A.  Based on the forensic images
24  that I got, it appeared to be created with
25  FTK Imager in conjunction with the use of a

Page 103

1  write block.
2  Q.  Are you confident that it
3  was --
4  A.  And it was --
5     (Cross talk.)
6     (Reporter clarification.)
7     THE WITNESS:  It was in the
8  N-case format.
9  BY MR. FREY:
10  Q.  Are you confident that it was
11  collected in the manner that would
12  demonstrate how it would have performed on
13  election day?
14  A.  I saw no indications that
15  anything was modified on it.  And within the
16  N-case forensics image format, it has a
17  self-validation/verification function.  And
18  the images -- the image is verified.
19  Q.  And did you appear as an expert
20  witness related to your review of the
21  information obtained from Antrim County?
22  A.  Specific to Antrim County, I
23  submitted an affidavit, but it did not reach
24  court so I did not testify.
25  Q.  That litigation was dismissed

Page 104

1  by the court, correct?
2  A.  Correct.
3  Q.  Do you retain control or
4  possession of the forensic images from Antrim
5  County?
6  A.  I returned those to the
7  attorney.
8  Q.  Did you review the forensic
9  images from Antrim County in the course of
10  drafting your declaration in this case?
11  A.  I reviewed the report at some
12  point prior to writing this, but once again,
13  that formed the -- kind of the corpus of
14  knowledge for paragraphs 20 and 21.
15  Q.  And in paragraphs 20 and 21,
16  you don't cite to any specific, you know,
17  findings or Antrim County specifically in
18  there, correct?
19  A.  No, but what I did find was
20  consistent among all of the Dominion systems,
21  was an -- I would call it a complete and
22  utter lack of cyber security practices.
23     The systems weren't patched,
24  the antivirus wasn't updated, there was no
25  mechanism to validate that only certified



Page 105

1  processes were being run, that only
2  authorized MAC addresses were communicating.
3         The user passwords had never
4  been changed since the date of the
5  installation of the software, and there was
6  repeated usage of the same password within
7  each jurisdiction for all user accounts.  And
8  that had been across all Dominion.
9       Q.   And we just -- we don't -- to
10 your knowledge, defendants have not produced
11 any of the information you're relying on here
12 to plaintiffs in this case, right?
13      A.   No one has asked for it.
14      Q.   And if the request were made,
15 would you be able to provide the images you
16 reviewed from Antrim County?
17      A.   I would, but I would assume
18 that that would take a court order, because
19 one company is looking at another company's
20 proprietary data.  But, yes, we would produce
21 that.
22      Q.   Moving on to Mesa County,
23 Colorado.
24          What voting system information
25 did you review from Mesa County, Colorado?

Page 106

1       A.   I reviewed an image of the
2  Dominion EMS.
3       Q.   So not a ballot-marking device,
4  correct?
5       A.   Correct.
6       Q.   And how did you obtain the
7  information or the image of the Dominion EMS
8  from Mesa County, Colorado?
9       A.   I was provided that by the
10 legal team that was defending -- I'm sorry, I
11 don't remember her name right now -- but the
12 County clerk and the election official for
13 Mesa County.
14      Q.   Is it Tina Peters?
15      A.   It is.  Thank you.
16      Q.   Are you aware, then, that Ms.
17 Peters was indicted for copying this election
18 software from Mesa County Colorado without
19 authorization?
20          MR. KACHOUROFF:  Objection.
21      (Inaudible) hypothetical.
22          Go ahead, you can answer the
23      question.
24          THE WITNESS:  I knew she had
25      legal problems.  I wasn't aware of

Page 107

1  exactly what she was charged with.
2  BY MR. FREY:
3       Q.   And you said you got the image
4  that you reviewed from her attorneys; is that
5  right?
6       A.   Yes.
7       Q.   And was that in connection with
8  the defense of her criminal case?
9       A.   That was my understanding, yes.
10      Q.   And what work did you do with
11 that image?
12      A.   I was asked to be a
13 non-testifying expert and review the findings
14 of another team's report.
15      Q.   Do you maintain control or
16 possession of the image of the Dominion EMS
17 from Mesa County, Colorado?
18      A.   I do not.
19      Q.   Are you relying upon your
20 review of the Dominion EMS from Mesa County,
21 Colorado in rendering your opinions in this
22 case?
23      A.   Only to the effect of the cyber
24 security implications for the election
25 systems as a whole.

Page 108

1       Q.   Okay.  What voting system
2  information did you review from Coffee
3  County, Georgia?
4       A.   I was retained by Misty
5  Hampton's attorney to examine the EMS and one
6  ICC notebook as part of her defense for Misty
7  Hampton.
8       Q.   And was that -- excuse me.
9          (Discussion off the record.)
10 BY MR. FREY:
11      Q.   So you reviewed the EMS and an
12 ICC notebook.
13          Was that a Dominion system?
14      A.   That was, yes.
15      Q.   And again, that's -- you did
16 not review an image of a ballot-marking
17 device, correct?
18      A.   No.
19      Q.   And do you know how the image
20 that you reviewed of the EMS and ICC notebook
21 was obtained?
22      A.   Yes.  I was provided that by --
23 or provided access to it by Stephanie
24 Lambert, who was the attorney for Misty
25 Hampton.