**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., and SGO CORPORATION LIMITED, <br><br>                Plaintiffs, <br><br>    v. <br><br> MICHAEL J. LINDELL and MY PILLOW, INC., <br><br>              Defendants. | Case No. 22-cv-0098-JMB-JFD |

**SMARTMATIC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY JUDGMENT**

**Table of Contents**

Page

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 2

I.      Smartmatic had an isolated role in the 2020 election.................................. 2

II.     Smartmatic was attacked by Fox News and others following the
        2020 election. ........................................................................................... 4

III.    Lindell began his attacks on Smartmatic after Smartmatic filed its
        lawsuit against Fox News and has continued his attack for the last
        four years. ................................................................................................. 5

IV.     Lindell stated and implied Smartmatic and its machines were
        responsible for rigging the 2020 election. ................................................. 7

V.      Lindell began and continued his disinformation campaign against
        Smartmatic even though he knew *all* evidence showed his statements
        were not true. ........................................................................................... 20

VI.     Lindell stated and implied that Smartmatic (and others) rigged the
        2020 election in order to make money for MyPillow and sell its
        products. ................................................................................................... 22

STANDARD OF REVIEW ................................................................................. 24

ARGUMENT ..................................................................................................... 25

I.      Smartmatic is entitled to summary judgment on various aspects of its
        defamation claim. ..................................................................................... 25

        A.      Smartmatic is entitled to summary judgment on the
                "publication" element............................................................... 26

        B.      Smartmatic is entitled to summary judgment on the "of and
                concerning" element................................................................... 28

        C.      Smartmatic is entitled to summary judgment on the "falsity"
                element. ................................................................................... 31

                1.      All of the Defamatory Publications *falsely* stated or
                        implied that Smartmatic and its machines rigged the
                        2020 election by switching votes. ................................... 31

i

2.  Lindell's publications stating or implying that Smartmatic machines were connected to the Internet to allow for manipulation, or were compromised or hacked by enemies of the United States to rig the 2020 election were false for additional reasons. ........................................ 36

3.  Lindell's publications stating or implying that Smartmatic designed its machines and software to rig elections and they have been used to rig elections outside of the United States were also false. .................................... 37

D.  Lindell's statements about Smartmatic were defamatory *per se*. ................................................................................................ 39

II.  Smartmatic is entitled to summary judgment on its claim for vicarious liability. .................................................................................. 41

A.  MyPillow was aware of Lindell's use of the disinformation campaign as a tool to market and promote MyPillow products. ........................................................................................ 42

B.  The disinformation campaign was carried out by MyPillow employees beyond Lindell, during regular business hours and using business resources. ............................................................ 44

III.  Smartmatic is entitled to partial summary judgment on its claim for violation of the Minnesota Deceptive Trade Practices Act. .................................... 45

CONCLUSION ............................................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Kammeier,*
262 N.W.2d 366 (Minn. 1977)....................................................................... 40

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)........................................................................................ 24

*Brill v. Minn. Mines, Inc.,*
200 Minn. 454 (1937) ..................................................................................... 28

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)........................................................................................ 24

*Cruz v. TMI Hosp., Inc.,*
2015 WL5996383 (D. Minn. Oct. 14, 2015) ......................................... 41, 43

*Edgewater Motels, Inc. v. Gatzke,*
277 N.W.2d 11 (Minn. 1979).......................................................................... 42

*Edmonds v. Minneapolis Pub. Sch. Special Sch. Dist. 1,*
368 F. Supp. 3d 1329 (D. Minn. 2018).......................................................... 25

*Fahrendorff v. North Homes, Inc.,*
597 N.W.2d 905 (Minn. 1999)........................................................................ 41

*Frieler v. Carlson Mktg. Grp., Inc.,*
751 N.W.2d 558 (Minn. 2008)........................................................................ 41

*Glenn v. Daddy Rocks, Inc.,*
171 F.Supp.2d 943 (D. Minn. 2001)........................................................ 25, 28

*Gregerson v. Vilana Fin., Inc.,*
No. 06-1164 ADM/AJB, 2007 WL 2509718 (D. Minn. Aug. 31, 2007) .................. 46

*Hagen v. Burmeister & Assocs.,*
633 N.W.2d 497 (Minn. 2001)........................................................................ 42

*Hartford Fire Ins. Co. v. Clark,*
727 F. Supp. 2d 765 (D. Minn. 2010)................................................... 41, 42, 43

*Johnson v. Columbia Broadcasting System, Inc.*,
  10 F. Supp. 2d 1071 (D. Minn. 1998) ........................................................................ 31

*Krenick v. County of Le Sueur*,
  47 F.3d 953 (8th Cir. 1995) ...................................................................................... 24

*Larson v. Gannett Co.*,
  940 N.W.2d 120 (Minn. 2020).................................................................................. 26

*Longbehn v. Schoenrock*,
  727 N.W.2d 153 (Minn. App. 2007).......................................................................... 40

*Maethner v. Someplace Safe, Inc.*,
  929 N.W.2d 868 (Minn. 2019).............................................................................. 26, 40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................................. 24

*Mgmt. Registry, Inc. v. A.W. Co.*,
  2022 WL 4706702 (D. Minn. Sep. 30, 2022) ...................................................... 25, 40

*Pederson v. Long*,
  2016 WL 4723425 (Minn. Ct. App. Sept. 12, 2016) .................................................. 42

*Petsch v. St. Paul Dispatch Printing Co.*,
  40 Minn. 291 (1889) ................................................................................................ 28

*Price v. Viking Press, Inc.*,
  625 F. Supp. 641 (D. Minn. 1985) ............................................................................ 26

*Rau v. Roberts*,
  640 F.3d 324 (8th Cir. 2011) .................................................................................... 42

*Schlieman v. Gannet Minn. Broadcasting, Inc.*,
  637 N.W.2d 297 (Minn. App. 2001)...................................................................... 28, 30

*Sherman v. Rinchem Co.*,
  2011 WL 3471057 (D. Minn. Aug. 8, 2011) ............................................................. 40

*Smartmatic USA Corp. v. Newsmax Media, Inc.*,
  C.A. No. N21C-11-028 EMD, 2024 WL 4165101 (Del. Sup. Ct. Sept.
  24, 2024) ................................................................................................................ 31

*Smartmatic v. Lindell*,
  Case No. 22-cv-0098, 2022 WL 4343299 (D. Minn. Sept. 19, 2022)....... 29, 30, 31, 46

25144383 v5

*Stock v. Heiner*,
   696 F. Supp. 1253 (D. Minn. 1988) ...................................................................... 26, 28

*Stuempges v. Parke, Davis & Co.*,
   297 N.W.2d 252, 255 (Minn. 1980) ............................................................................ 40

*US Dominion, Inc. v. Fox News Network, LLC*,
   293 A.3d 1002 (Del. Sup. Ct. 2023) ........................................................................... 31

**Statutes**

42 U.S.C. § 1983 .................................................................................................................. 6

42 U.S.C. § 1985(3) ............................................................................................................. 6

Minn. Stat. § 325D.44(8) .................................................................................................. 46

Minn. Stat. § 325D.45(3) .................................................................................................. 46

**Other Authorities**

Dan B. Dobbs, *The Law of Torts*, § 405 at 1134-35 (2000) ............................................ 28

Fed. R. Civ. P. 11 ................................................................................................................. 6

Fed. R. Civ. P. 56 ............................................................................................................... 24

# INTRODUCTION

> "If somebody asked me if Smartmatic was used – if their machines were used to rig the 2020 election, I will say yes, until – forever."

> Michael J. Lindell, June 11, 2024 (Ex.1 at 340:5–9)

In February 2021, Defendant Michael J. Lindell ("Lindell") and his company, Defendant MyPillow, Inc. ("MyPillow") began an all-out blitz against Smartmatic, accusing Smartmatic of being the "mothership" behind the "the biggest crime against United States and the world in history." Angered by the fact that Smartmatic had defended itself against defamatory statements being made by certain news organizations, and seeing the popularity for himself and his company that could result from espousing election denial theories, Lindell determined to "tie" Smartmatic into his efforts to appeal to customers supporting then-former President Trump.

Over the course of the next four years, Lindell has engaged in a disinformation campaign against Smartmatic comprising, initially, of more than 17 different publications—including four hours-long documentaries and an in-person "Cyber Symposium"—to spread his false message that Smartmatic and its machines rigged the 2020 election by switching votes from Trump to Biden. Not only that, Lindell also created his own social media platform, FrankSpeech, to sustain the campaign when other platforms refused to do so. Lindell used the publications as a running opportunity to advertise for his MyPillow products, and looped his MyPillow employees into the effort to ruin Smartmatic's business and reputation. And if that was not enough, Lindell has continued to spread his false message to this day.

1

As a result of Lindell's constant and unrelenting attacks against its integrity and its business, Smartmatic brought the instant lawsuit seeking redress for both defamation and violations of the Minnesota Deceptive Trade Practices Act ("MDTPA"). To narrow the issues for trial, Smartmatic is now seeking a ruling that, based on the undisputed evidence, Lindell's accusations were (1) published to third parties, (2) about Smartmatic, (3) false, and (4) constitute defamation *per se* as they disparage Smartmatic's business and accuse it of a crime. Smartmatic also seeks a ruling that, based on that same evidence, Lindell's tortious actions were in violation of the MDTPA. Finally, because Lindell promoted MyPillow products and used MyPillow resources to carry out his campaign, Smartmatic also seeks a ruling that MyPillow is vicariously liable for Lindell's misconduct.

## STATEMENT OF FACTS

### I.    Smartmatic had an isolated role in the 2020 election.

Antonio Mugica and Roger Piñate formed Smartmatic USA Corp. as a Delaware corporation in 2000.  (Ex.2, ¶3.) It was headquartered in Boca Raton, Florida. (*Id.*) They acquired Smartmatic International Holding B.V. as a Netherlands corporation in 2005. (*Id.* ¶4.) Smartmatic USA Corp is a wholly owned subsidiary of Smartmatic International Holdings B.V. (*Id.*) And they formed SGO Corporation Limited as a United Kingdom corporation in 2010. (*Id.* ¶5.) It was headquartered in the United Kingdom. (*Id.*) Smartmatic International Holdings B.V. is a wholly owned subsidiary of SGO Corporation Limited. (*Id.*) The companies individually and collectively operate under the brand name of "Smartmatic." (*Id.* ¶6.)

Smartmatic is a technology company that focuses on providing election-related equipment and services to countries, states, and localities around the world. (*Id.* ¶7.) Prior to the 2020 election, Smartmatic had processed more than 5 billion votes in more than 25 countries on five continents, all without an election security breach. (*Id.* ¶8.) While Smartmatic's technology varies by jurisdiction and election, all of its voting equipment includes an auditable paper record of the vote cast by the voter. (*Id.* ¶9.) Every post-election audit conducted of the votes processed using Smartmatic voting equipment has confirmed the accuracy of the vote count. (*Id.* ¶10.) No audit has ever found an instance of Smartmatic voting equipment switching or inflating votes. (*Id.*)

Smartmatic had a very limited role in the 2020 election. (*Id.* ¶11.) Smartmatic manufactured ballot marking devices ("BMDs") for Los Angeles County. (*Id.*) BMDs consist of a touchscreen that allows a voter to select their candidate and generates a paper record of their vote. (*Id.*) The voter reviews this paper record, and then, assuming the voter is satisfied with it, the voter selects to cast the paper record at which point it is deposited into a sealed case attached to the BMD. (*Id.*) The BMDs used in Los Angeles County for the 2020 election were not connected to the internet. (*Id.* ¶12.) Nor were the BMDs used to count or tabulate votes. (*Id.*) The paper records generated by the BMDs were counted in Los Angeles County by the county itself using a vote tally system provided by Digital Foundry, Inc. (*Id.*) Smartmatic played no role in the counting or tabulating of votes. (*Id.*)

Smartmatic played no role in the 2020 election outside of Los Angeles County. (*Id.* ¶13.) Smartmatic did not provide election technology or services to any other state or county. (*Id.*) Smartmatic did not license its technology or software to any other voting

company. (*Id.* ¶13.) Smartmatic did not count or tabulate votes in any state or county, including Los Angeles County. (*Id.* ¶13.) The only role Smartmatic played in the 2020 election was providing BMDs to Los Angeles County and assisting with some administrative services in Los Angeles County. (*Id.* ¶14.) Post-election audits in Los Angeles County found no instances of election fraud, switched votes, or inflated votes. (*Id.* ¶15.)

## II.    Smartmatic was attacked by Fox News and others following the 2020 election.

Almost immediately after the 2020 election results were determined, Rudolph Giuliani and Sidney Powell began a campaign to dispute the legitimacy of the election, claiming that it was rigged and stolen from Trump. (Ex.3.) Guiliani and Powell identified voting machine companies Smartmatic and Dominion as the main culprits in the conspiracy to rig the election. (*Id.*) Their message was picked up and adopted by certain media outlets, including Fox News, which spread allegations that Smartmatic had participated in rigging the election for Biden around the world. (Ex.4.)

Smartmatic sent a retraction demand to Fox News on December 10, 2020. (Ex.5.) In response, Fox News aired a statement from a leading authority, Mr. Eddie Perez, indicating that none of the allegations being made against Smartmatic were supported by any evidence. (Ex.4, at 7–8.) However, because Fox News refused to retract its prior statements, and as a result of the harm Fox News had caused to Smartmatic's reputation, Smartmatic filed a lawsuit against Fox Corporation and Fox News on February 4, 2021 in the state of New York. (Ex.6.)

**III.    Lindell began his attacks on Smartmatic after Smartmatic filed its lawsuit against Fox News and has continued his attack for the last four years.**

Prior to February 4, 2021, Lindell had expressed support for Trump and publicly voiced allegations that the election had been rigged. For instance, Lindell and MyPillow sponsored a 20-city "March for Trump" bus tour promoting the January 6, 2021 rally in Washington, D.C. (Ex.7.) On the bus tour, Mr. Lindell told audiences that "Donald Trump got so many votes that they didn't expect that it broke the algorithms in those machines[.] They went into a panic so . . . they shut everything down at the same time, from Georgia to Wisconsin to Michigan to Pennsylvania. Crazy, at the exact same time? You know what the odds of that are?" (*Id.*)

However, up until the time Smartmatic sued Fox, Lindell had not published any statements regarding Smartmatic or alleged that it had any role in the claimed conspiracy. According to Lindell, Smartmatic became the focus of his attention as a result of its lawsuit against Fox News:

> Smartmatic drew first blood. Smartmatic sued Fox News on February 4th, 2021, which changed my life forever. That's why I was very upset with Smartmatic there. Smartmatic, when they did that, I could never, ever go on FOX again to sell pillows, NewMax [sic] or anywhere. I was completely shut out of all places I advertised before. . . . After Smartmatic sued – they drew first blood in this big out lawfare, and that's where Smartmatic got tied in.

(Ex.1 at 163:3–13.) Accordingly, in response to Smartmatic's lawsuit against Fox, Lindell did two things. First, Lindell filed claims against Smartmatic in the United States District Court for the District of Columbia. (Case No. 21-cv-445-CJN.) In his claims, Lindell alleged that Smartmatic engaged in a civil conspiracy with Dominion and violated the

5

Racketeer Influenced and Corrupt Practices Act, as well as the First, Fifth, and Fourteenth Amendment under 42 U.S.C. §§ 1983, 1985(3). (Ex.8.)[1]

Second, Lindell began a campaign to tarnish Smartmatic's name and brand by publishing lies that Smartmatic played a pivotal role in stealing the election for Biden. Lindell's disinformation campaign against Smartmatic was three-pronged. In the first prong, Lindell created and published a series of defamatory documentary videos purporting to release "evidence" and "facts" corroborating that Smartmatic's voting technology stole the 2020 election. These documentaries included: (1) *Absolute Proof: Exposing Election Fraud and the Theft of America by Enemies Foreign and Domestic*, first published on February 5, 2021 (Exs.9, 29); (2) *Scientific Proof*, first published on April 3, 2021 (Exs.10, 40); (3) *Absolute Interference*, first published on April 22, 2021 (Exs.11, 43); and (4) *Absolutely 9-0*, first published on June 5, 2021 (Exs.12, 47).

For the second prong, Lindell appeared on numerous Internet radio and television shows to promote his documentaries, drive traffic to his websites, advertise MyPillow, and defame Smartmatic. These included five separate appearances on Steve Bannon's "War Room" podcast (Exs. 13–17, 32, 37, 42, 44, 46); as well as appearances on (1) OANN's *Real America with Dan Ball* (Exs.18, 34); (2) an OANN Special with Steve Bannon, *A Screening and Conversation of Absolute Proof* (Exs.19, 35); (3) *The Pete Santilli Show* (Exs.20, 36); (4) the *Eric Metaxas Radio Show* (Exs.21, 38); (5) *Indivisible with John*

---

[1] The District of Columbia dismissed all of Lindell's claims against Smartmatic (Ex.8(a)), and awarded Rule 11 sanctions against Lindell and his counsel (*id.*). To date, those sanctions have not been reduced to judgment or paid to Smartmatic. (Ex.8(b).)

*Stubbins* (Exs.22, 39); (6) *USA Watchdog* with Greg Hunter (Exs.23, 41); and (7) OANN's "Newsroom" with Pearson Sharp (Exs.24, 45). During these programs, Lindell promoted his documentaries, restated their accusations, promised that he would be forthcoming with "evidence" to support his defamatory claims about Smartmatic, and advertised MyPillow products. (*Id.*)

Finally, Lindell held an in-person and Internet live-streamed "Cyber Symposium" from August 10 to 12, 2021 during which he purported to reveal even more evidence that election voting machines, including Smartmatic's, rigged the 2020 election. (Exs.25, 48-50.) Although the Symposium did not go as planned—with an individual cybersecurity expert effectively "proving Mike Wrong" with respect to the data Lindell claimed to show election interference (Ex.26), Lindell has held a symposium about supposed election fraud every year for the past 3 years. (Exs. 27, 28.)

## IV. Lindell stated and implied Smartmatic and its machines were responsible for rigging the 2020 election.

Through each of these publications (the "Defamatory Publications"), Lindell spread four main messages about Smartmatic and its machines. *First*, Lindell stated and implied that Smartmatic and its machines rigged the 2020 election by switching votes. *Second*, Lindell stated and implied that Smartmatic's machines were compromised or hacked by enemies of the United States to rig the 2020 election. *Third*, Lindell stated and implied that Smartmatic's machines were connected to the internet to allow for manipulation of the 2020 election. *Fourth*, Lindell stated and implied that Smartmatic designed its machines

and software to rig elections and that they have been used to rig elections outside of the United States in the past.

**Defamatory Publication No. 1.** On February 5, Lindell released *Absolute Proof*. (Exs. 9, 29). The documentary was aired on OANN a total of thirteen times from February 5–8, 2021. (Ex.30, ¶5.) Lindell also had the documentary posted to other platforms including Vimeo, Rumble, YouTube, FrankSpeech.com, and MichaelJLindell.com (*id.*), and used MyPillow employees to distribute it in hard copy and digital form to partners and advertisers (Ex.31 at 140:1-142:2; Ex.32 at 69:1–70:12). In the documentary, Lindell hosts several guest speakers who claim to set forth "proof" that the 2020 election was stolen and that machines, including Smartmatic machines, were responsible. Colonel Phil Waldron first identified Smartmatic as a perpetrator at the beginning of the *Absolute Proof* documentary and established the message that Smartmatic was responsible for rigging the 2020 election through the design of its voting technology software:

> Colonel Waldron: "So a critical capability for any of this to happen are the inherent vulnerabilities that were built into ES&S and Dominion software, which is, you know, again, we've proven through, through our work that this is all related directly back to the soft, Smartmatic [] SGO Smartmatic software core. . . *the board of SGO Smartmatic,* because they own a, an air purification company. So just think about it, if you get to pick an administration that is favorable to your company, say if they [passed] the Green New Deal, and you're going to make billions and billions of dollars off of government-mandated air purification systems and public buildings… *you would spend quite a bit of money on the frontside to make sure the election was done*."

(Exs. 9, 29.) Lindell then propagated the Smartmatic-specific theme himself:

> Mr. Lindell: "So why [] *would Texas*, they denied these Dominion ones, and in your opinion, so they must have looked at them and said there's something there we don't like, but then they, over here, with

8

>*Smartmatic and these other ones, they were okay with that? What would be your opinion of why, why one, they would deny one machine* that, because they're afraid of election fraud, and, and over here, they accepted that one?"
>
> Mr. Ramsland: "I think that it sometimes has more to do with politics and influence, who gets through and who doesn't [] *for the machines*."

After Smartmatic was introduced as the primary villain behind machines being used to rig the 2020 election by switching votes, other speakers claimed to provide evidence as to how the "machines" accomplished this feat including by being open to hackers from foreign countries, and being connected to the internet. For example:[2]

> Mr. Lindell: "Right they were just flipped. In order for that to be off, you do the conclusion which I would right now, 100%, how could that be off? It would be something wrong with what?"
>
> Mr. DePerno: "The machines."
>
> Mr. Lindell: "The machines, the machines. And what we're showing here right now, what you're going to see, all this what we've been talking about, *this massive machine election fraud that went on, where countries hacked into our election*. And nationwide, this is one little county in northern Michigan, and *these machines would do it right down to the precinct*… And so what I want to tell you all is this is the perfect example, just so you know, right down to the precinct level, what went on with these machine[s]…"
>
> ***
>
> Mr. Lindell: "So everybody knows what you're going to see, when you see this spike, you're going to see a forensic footprint, how this happened and *who did it. China? Yes. If you're on the Internet, the bottom line is you can get, you can cheat, you can do all kinds of*

---

[2]Additional examples of defamatory statements made against Smartmatic in each of the Defamatory Publications are included in Appendices A–D, which include the full list of defamatory statements with respect to which Smartmatic seeks summary judgment along with relevant analyses as to why those statements satisfy the elements of (1) publication (Appendix A), (2) of and concerning (Appendix B), (3) falsity (Appendix C), and (4) defamatory *per se* (Appendix D).

***things.*** And that's because otherwise you can't explain any of these numbers. Right?"

Matt DePerno: "That's correct. The machine results don't match up with the hand-tabulation."

\*\*\*

Mr. Lindell: "And [] we've just shown everybody in the world 100% evidence that this was an attack on our country and is still under attack by China and other countries through the use of these machines used in our election."

In *Absolute Proof*, Lindell conveyed that Smartmatic rigged the 2020 election and that he had "100% evidence" that this was the case.

**Defamatory Publication No. 2.** To help promote *Absolute Proof*, Lindell first appeared on Bannon's *War Room* on February 6, 2021. (Exs. 13, 33.) During his appearance, Lindell made statements conveying that Smartmatic and its machines rigged the 2020 election and that this was accomplished through foreign manipulation and connections to the internet:

Mr. Lindell "[F]oreign countries, like China, came in and attacked our country using these machines; Dominion, Smartmatic, ES&S all these machines."

\*\*\*

Mr. Lindell: "I am going after Dominion and Smartmatic, I'm going after them with a lawsuit if this doesn't all come out to the public and they all get exposed and then [] show what happened in our election… they're going to be crimes against our country that they used their [] their machines were all online."

**Defamatory Publication No. 3.** Lindell continued his promotion of *Absolute Proof* on February 8, 2021, when he appeared on *Real America with Dan Ball* on OANN to claim that Smartmatic machines rigged the election and that they accomplished the feat by being

open to manipulation from foreign actors. (Exs.18, 34.) During his statements, Lindell claimed: "We have them from November 1 all the way through the election, and [*Absolute Proof*] shows them a massive attack on our country by China and other country. China did 60% of this. It was all done through Dominion machines and [] Smartmatic machines."

**Defamatory Publication No. 4.** Three days later, Lindell again appeared on OANN with Bannon during a live screening of *Absolute Proof*. (Exs.19, 35.) Lindell and Bannon exchanged commentary during the showing of the documentary, during which Lindell made additional statements conveying not only that Smartmatic rigged the election, but that it had designed its machines to rig elections and had done so before.

> Mr. Lindell: "This was an attack on our country. ***These Dominion machines and Smartmatic, these machines that were [] the tools of this attack***, and we will never have another fair election if we [] don't stop that, so I will never back down."
>
> \*\*\*
>
> Mr. Lindell: "[B]ut the point of that, of bringing up the Texas thing is ***ESS, Smartmatic and Dominion, you can interchange the names, they all are the same.*** They cyber phonetics [sic] we showed goes through all these machines, ***they're all the same. This is [my] whole point***…"
>
> \*\*\*
>
> Mr. Lindell: "[A]s part of my due diligence, that's been all this week. I wanted to go back to where this all started. And Venezuela, ***it all started in Venezuela with Smartmatic, not Dominion or the other one, it was with Smartmatic.***"

**Defamatory Publication No. 5.** Lindell continued his disinformation campaign against Smartmatic on February 24, 2021, when he appeared on the *Pete Santilli* show. (Exs. 20, 36.) During his appearance, Lindell continued his accusations that Smartmatic

11

had designed its machines to rig elections and that all of the machines used in the 2020 election incorporated Smartmatic's designs in order to steal the election for Biden. For example:

> Mr. Lindell: "They're all split off from Smartmatic that started in 2001, or 2002. They're, every one of them is the same, they're interchangeable. And by the way, every state in the United States was I, had votes flip. It wasn't just those swing states… [A]nd everyone says, well Dallas didn't have Dominion, because they didn't want it. No, they had the other one. They had SNS or whatever they had. [] [I]t didn't matter what machines you had, there was this whole thing, the cyber-attack…"

> ***

> Mr. Lindell: "You know, what we, what everybody needs to know is that they're all, they're all cousins. They're all split off from Smartmatic that started in 2001, or 2002. They're, every one of them is the same, they're interchangeable."

> ***

> Mr. Lindell: "Smartmatic started machines in Venezuela, around 2001, 2002. When they [] brought them in there, they invented them and brought them in there and took down that country in two years. It was brought into the United States, they split with Dominion, ESS and Smartmatic. It's all, all they're built for is to steal elections. They've stolen in the United States…"

**Defamatory Publication No. 6.** Lindell next appeared on Bannon's *War Room* on March 26, 2021, where he again spread the message that Smartmatic machines rigged the election by being manipulated by foreign actors: "[f]oreign countries, like China, came in and attacked our country using these machines; Dominion, Smartmatic, ES&S all these machines." (Exs.14, 37.)

**Defamatory Publication No. 7.** Four days later, on March 30, 2021, Lindell appeared on the *Eric Metaxas Radio Show*, where he began to lay the groundwork for his

next documentary, *Scientific Proof*. During the appearance, Lindell claimed to have spent "millions of dollars" to discover the truth about Smartmatic's role in rigging the 2020 election. (Exs.21, 38.) He stated:

> Mr. Lindell: "We got whistleblowers you're gonna see. We have people that worked on the inside… maybe they'll come clean and get lesser sentences. [] ***I spent millions of dollars investigating*** [] Dominion, ***Smartmatic… the people behind these attacks***, investigators that went over and cyber people that went over, got the IPs and the IDs of people in China."

**Defamatory Publication No. 8.** Then, on April 1, Lindell again tied the conspiracy to steal the election back to Smartmatic and its machines, claiming on *Indivisible with John Stubbins* that Smartmatic's machines were designed to steal elections, and had done so for years:

> Mr. Lindell: "Just like going back to Venezuela. They took Venezuela in two years with Smartmatic. And, and it's this is their big plan. This is a very conceived plan. And it's very organized, and very, you know, and they have all the marketing because they have all the evil media behind this."

(Exs.22, 39.)

**Defamatory Publication No. 9.** On April 3, 2021, Lindell released his next documentary, *Scientific Proof*, on LindellTV and Rumble. (Ex.30 ¶5.) In *Scientific Proof*, Lindell has a one-on-one conversation with Dr. Douglas Frank, who Lindell claims identified the secret algorithm allowing voting machines, including Smartmatic voting machines, to rig elections:

> Mr. Lindell: "I just want everyone to know that why we're showing other states and not just the swing state[s]. It was every state, it happened in your state []. Texas, when they said, oh, we didn't use the

Dominion machines. ***Doesn't matter, the name of the, the name of the machine doesn't matter.***"

Dr. Frank: "No."

Mr. Lindell: "***Smartmatic, ES&S, don't matter. Just in Dallas alone***, there was 57 vote, 57,000 votes flipped on, and I don't even know if that was before noon."

***

Mr. Lindell: "100% it can only be done by machines. I can't stress that enough."

Douglas Frank: "Absolutely."

Mr. Lindell: "***And they all rhyme with Dominion, or Smartmatic, ES&S all of them*** . . . ***them***… [W]e have enough evidence that we're gonna dump for the next six weeks on the whole world and the country that by the time it gets to Supreme Court, everyone's gonna, they're all nine going to go 9-0 yes, so our country's been attacked. ***We have been attacked by foreign actors, starting with China***, and with help of domestic actors here that you know, they had to be let in…"

***

Mr. Lindell: "[W]hat you're saying there, Dr. Frank, they're saying that they've set this in the machine—"

Dr. Frank: "Yes."

Mr. Lindell: "Or set this beforehand— "

Dr. Frank: "Yes".

Mr. Lindell: "That they set to see who was gonna win and they set this algorithm?"

Dr. Frank: "Yes."

Mr. Lindell: "Okay. These are the algorithms we've been telling you about."

***

14

> Mr. Lindell: "Talking about 'Absolute Proof' that documentary we did, where **we have the spyware and these American heroes that were [] whistleblowers and stuff that were there and that worked for the government and stuff that, former and present, that were there and they were taking these footprints, these cyber footprints the night of the election, actually, from November 1st to 5th.** And we have all the IP addresses… the ID's of the computers, we have all this of the attacks…"
>
> Douglas Frank: "Yes. I was on the edge of my seat watching that…***But the thing about it is, you're showing the incursions into the machines but what do they do when they're there? They have to know what to do. That's what the algorithm is telling them what to do.***"
>
> ***
>
> Mr. Lindell: "***Let's, let's open up the machines***. Let's look at this and here's what you're gonna find, ***this was the biggest crime against United States and the world in history***. I believe it's one of the biggest ever because it affects every single person on the planet."

(Exs.10, 40.) In *Scientific Proof*, Lindell first establishes that all machines – including Smartmatic machines – were used to rig the 2020 election by switching votes, and then purports to have evidence as to how this was accomplished.

**Defamatory Publication Nos. 10 and 11.** Over the next several weeks, Lindell appeared on *USA Watchdog* with Greg Hunter (Exs.23, 41) and again on Bannon's *War Room* (Exs.15, 42), where he hammered the message that Smartmatic was the primary villain in the theft of the 2020 election because it was the "mothership" that perpetrated the "biggest crime against our country . . . in history." (Ex.41 ("Not only that, they're, you know what they did to our country them and Smartmatic, let's not forget Smartmatic, they're like the mothership of this. And for not only being involved in the biggest crime against our country, probably in history…"); Ex.42 ("We're going after them in the biggest way possible, and we're not – we're including Smartmatic because now we've tied the two

15

together. They're the mothership, all of that's gonna come out too, that evidence. They're

all tied together in this corruption and this – and what went on to our country, the attack on

our country, but this is why we're doing it.").)

**Defamatory Publication No. 12.** On April 22, 2021, Lindell released his third

documentary, *Absolute Interference*—this time on his own recently launched website,

FrankSpeech.com as well as on Rumble. (Ex.30 ¶7.) Similar to *Absolute Proof*, *Absolute*

*Interference* is a two-hour documentary featuring several speakers discussing "evidence"

that voting machines, including Smartmatic voting machines, were responsible for rigging

the 2020 election:

> Mr. Lindell: "100% impossible, had to be machines."
>
> Dr. Frank: "Yes." Mr. Lindell: "And they had to be online."
>
> Dr. Frank: "Constantly online."
>
> Mr. Lindell: "Constantly online, everybody. No way you could ever do
> that humanly…"
>
> Dr. Frank: "When I've shown this other people they've said, well, gee,
> how could people do that? And I say—"
>
> Mr. Lindell: "They can't, it has to be machines—"
>
> Dr. Frank: "Has to be."
>
> Mr. Lindell: "***And it rhymes with Dominion, and it rhymes with***
> ***Smartmatic*** and ES&S, all these machines that were used out there
> cannot be done by humans and you have to have access before, during
> and after."
>
>                           \*\*\*
>
> Mr. Lindell: "I have proof, 100% proof that ***our country was attacked***
> ***by China***, by communism coming in, ***this foreign interference to our***
> ***elections, through the machines, Dominion, Smartmatic, ES&S, all***
> ***of them***."

16

*** 

> Mr. Flynn: "**China is clearly, I mean everything that we've learned about the ownership of some of these machines, some of these companies to, to how they're actually operating inside of this country**… Now you take it to the elections [] and you look at the machinery that we are using in our election process, which, you know, I don't know how we are going to go forward as a nation and continue to use these machines knowing that what we just went through was really a false election. It was a false election." (Exs. 11, 43)

In addition to discussing the alleged mechanism by which the machines rigged the election—including being on the internet and subject to hacking by foreign countries, Lindell and his guests also discussed Smartmatic's alleged corrupt history and intentional design of its machines to steal elections:

> Mr. Lindell: "Absolutely. And it's, you know, in Venezuela, when we went back, **when it started in Venezuela, didn't they flip that country in two years, right?**"

> Michael Flynn: "Right so that [] what I learned, almost right after the election, when we started to really go, okay, wait a second, what happened and we started to talk about how the machines really were impacting… really from the fourth through the seventh of November. We this, this issue of Venezuela came up and **we had the opportunity to [] get some feedback from one of the individuals who was in Venezuela at the time, who was working with [] the Chavez government**. And it actually caused, **they were able to take the, these machines that they had in Venezuela at the time to basically ensure that Chavez won the election and then subsequently down the road Maduro**. So [] **it was almost like the machinery was being tested, if you will, in another country to kind of get a sense of can you actually do this and to work for them**."

**Defamatory Publication Nos. 13–15.** After the release of *Absolute Interference*, Lindell continued to appear on television shows and podcasts to spread the defamatory message that machines, including Smartmatic machines, were responsible for rigging the 2020 election. These included May 3, 2021 appearances on Bannon's *War Room* (Exs.16,

44 ("Texas still had machines, all the machines are the same. They're all – you've got your ES&S, your Hart, your Diebold, your Dominion and your mothership, Smartmatic."), and *OANN Newsroom with Pearson Sharp* (Exs.24, 45 ("Dominion, Smartmatic, Hart all of them are the same, ES&S. You just say Dominion, but it's all machines. China hacked into our election and flipped millions upon millions of votes.")), as well as another May 8, 2021 appearance on *War Room* where Lindell underscored his message that Smartmatic had designed its machines to rig elections:

> Mr. Lindell: "I mean, this is what they do. Dominion, Smartmatic, all of them. It's just like, you talk to Matt DePerno in Michigan, and they've been going through this every day for months. And in Arizona, you know, it's just like right now, when they find those [] all the stuff that's missing, it doesn't surprise anyone. I think everybody knows now, this is the biggest cover-up that's probably in history for a crime. It's so massive that they've covered this up with the machine, or all the stuff that they did with the machines."

(Exs.17, 46.)

**Defamatory Publication No. 16.** On June 5, 2021, Lindell released his fourth and final documentary, this one titled *Absolutely 9-0*. (Exs.12, 47.) *Absolutely 9-0* was first published on FrankSpeech.com and broadcast on OANN. (Ex.30 ¶8.) *Absolutely 9-0* further alleged that Smartmatic and Smartmatic machines were responsible for rigging the 2020 election, and that the Supreme Court would overturn the election once it had reviewed Lindell's evidence. The documentary again contains numerous defamatory statements regarding Smartmatic, its machines, and its history:

> Mr. Lindell: "Hello everyone I'm Mike Lindell and as you all know on January 9th I received evidence of a cyber attack orchestrated by China on our 2020 election. I took that one piece of evidence, and I just went all in. This was something different, nobody had seen. ***This was***

18

*something that came through the machines, the Dominion machines, the Smartmatic and other machines*. This was a cyber attack. I didn't know anything about cyber attacks. And boy, I learned, I had to learn real fast... *this was 100% an attack by China on our country through these machines*."

\*\*\*

Mr. Lindell: "But I wanted to get on here and explain to everyone, *this was an attack by China, on our country through these Dominion and these other machines,* where, and they just hacked in, *a cyber attack hacked into our election* and flipped it to everyone, anyone that they wanted to win."

\*\*\*

Mr. Lindell: "This is why, when we say that Donald Trump really won this election by like almost 80 million to 68 million for Biden, how can you switch tens of millions of votes? *It had to be done with computers, it had to be done with the machines, through these Dominion and through all these machines, and China, China did it*. It's a cyber attack of historical proportions."

**Defamatory Publication No. 17.** Following the release of his documentaries, Lindell decided to host a Cyber Symposium event on August 10–12, 2021 at which he purportedly would share further evidence that Smartmatic and Smartmatic machines were responsible for rigging the 2020 election. (Exs.25, 48–50.) At the event, numerous speakers appeared who broadcast this message to the people in attendance, as well as those watching the livestream on a social media platform recently created by Lindell to share his defamatory messages, FrankSpeech.com. (Ex.30 ¶9; Ex.51.)  Examples of defamatory statements published by Lindell at the Cyber Symposium event include:

Mr. Lindell: "Venezuela is where the machine started. *Smartmatic started in Venezuela*. I got a whole big I've spent millions of dollars investigating this. *They're built to take they're built as a tool to take countries*."

*** 

Colonel Waldron: "Some of the anomalies that we noticed in the 2020 general elections that *five key states all stopped counting at a certain time in these key battleground states*. *These were all where the software Dominion machines, ES&S machines were used, the the Smartmatic, the Gems software, so when the vote stopped counting…*"

***

Mr. Oltmann: This particular piece is actually talking about *the… similarities in testing of the equipment, the hardware, between Smartmatic and Dominion voting systems. So they're using the same hardware, they just have a new badge on it, one says Dominion Voting and one says Smartmatic… Yes, yeah. Made by the same supplier. Right.*

**Defamatory Publication No. 18.** Despite the filing of the instant lawsuit, and the information provided to Lindell in discovery, Lindell has never stopped defaming Smartmatic. Indeed, on January 4, 2023, Lindell hosted a program on his website FrankSpeech.com, where he discussed the lawsuit and continued to insist Smartmatic played a prominent role in rigging the 2020 election. (Ex.52 ("Let me tell you about Smartmatic . . . in the 2020 election, do you think L.A. County was computer-manipulated or not? . . . Of course it was!").) According to Lindell, he will never stop making these statements. (Ex.1 at 340:5–9.)

## V.    Lindell began and continued his disinformation campaign against Smartmatic even though he knew *all* evidence showed his statements were not true.

Lindell began his disinformation campaign against Smartmatic on February 5, 2021. By the time Lindell did so, he had access to a plethora of evidence—all of which showed that his allegations about Smartmatic were false. Not only did he possess that information at the time he began publishing his false and defamatory statements, but the evidence

20

disputing his claims continued to grow throughout the life of his disinformation campaign. Nevertheless, Lindell has refused to stop. (*Id.*)

Information available to Lindell-of which Lindell was aware, included information from state governments, information from the federal government, information from Smartmatic, and information from Dominion. *First*, at the time Lindell began publishing statements accusing Smartmatic of rigging the 2020 election, nearly every state—including states in which election results has been particularly questioned—had completed post-election audits confirming the integrity of the polling results. (Ex.53¶6, Ex.54¶12.) *Second*, in addition to state post-election audits, numerous federal investigations had occurred, and announcements had been made confirming the integrity of the election. For example, on November 29, 2020, Chris Krebs, former Director of CISA, was quoted as saying that "there was no indication or evidence that there was any evidence of hacking or compromise of election systems on, before, or after November 3 . . ." (Ex.55.) Lindell was aware of this statement. (Ex.1 at 301:20-302:23). Likewise, on December 1, 2020, Attorney General William Barr stated that "To date, [DOJ investigators] have not seen fraud on a scale that could have effected a different outcome in the election." (Ex.56.) Lindell was also aware of this statement at the time he began his Defamatory Publications. (Ex.1 at 310:3–311:11.)

*Third*, at the time Lindell began making his Defamatory Publications, Lindell knew Smartmatic had filed a lawsuit against Fox News and others based upon similar lies regarding Smartmatic's alleged role in rigging the 2020 election. As Lindell testified during his deposition, he did not begin attacking Smartmatic until after that lawsuit was filed. (Ex.1 at 163:3–13.) The Smartmatic lawsuit against Fox News contains hundreds of pages

21

of statements and exhibits debunking each and every statement made by Mr. Lindell, including statements showing that Smartmatic only operated in LA County during the 2020 election and, even in LA County, only operated BMDs that did not count or tabulate votes. (Ex.6.) Mr. Lindell knew these facts at the time he began his disinformation campaign against Smartmatic.

*Fourth*, at the time he began making his Defamatory Publications, Lindell had been sent a retraction demand letter by Dominion, providing Mr. Lindell with knowledge that not only did Dominion not have any relationship whatsoever with Smartmatic, but also that the 2020 election was not rigged by voting machines. (Ex.1 at 349:1–51:19; Ex.57.) Not only did Mr. Lindell have all of this information as of the date he began his disinformation campaign against Smartmatic, but the body of evidence proving the integrity of the 2020 election only continued (and continues) to grow. (Ex.54¶13; Ex.86.)

## VI.    Lindell stated and implied that Smartmatic (and others) rigged the 2020 election in order to make money for MyPillow and sell its products.

Despite the abundance of information in Lindell's possession proving that his statements regarding Smartmatic in particular, and the 2020 election in general, were false, Lindell nevertheless engaged in an all-out defamation blitz against Smartmatic, at least in part, to generate popularity and revenue for MyPillow. Lindell discovered that associating with Trump could be profitable at least as of March 30, 2020 when MyPillow experienced a spike in sales following Lindell's appearance with Trump during a white house press briefing. (Ex.58, at 67:5–69:23.)

Indeed, during 2021—the height of Lindell's disinformation campaign—MyPillow achieved its highest gross profit in four years (Ex.60 at 150:2–151:15) and in February 2021, the month in which Lindell released *Absolute Proof*—the first documentary accusing Smartmatic of rigging the election by changing votes—MyPillow achieved its best revenue in more than four years. (*Id.* at 158:5-13; *see also* Ex.61, (Lindell tells his son that they shipped "4.6 million," orders and comments: "Who said being crazy in the news isn't good :)".) This was despite the fact that MyPillow lost accounts with big box retailers such as Costco and Bed Bath and Beyond during the same time period. (Ex. 60 at 262:6–10; 272:3– 30.)

Lindell's disinformation campaign was an integral part of My Pillow's business. *First*, in nearly all of the Defamatory Publications, Lindell identified himself (or was identified by others) as the CEO of MyPillow, founder of MyPillow, or the "MyPillow guy." (*See, e.g.*, Defamatory Publication Nos. 1, 2, 3, 4, 5, 7, 8, 10, 11, 12, 14, 15, 17.) This is consistent with Lindell's role as the primary spokesman for MyPillow. (Ex.1 at 463:6– 8; Ex.31 at 57:16–58:1; Ex.62 at 235:18–237:4.) *Second*, many of the Defamatory Publications ran MyPillow advertisements, or shared MyPillow promotional codes— intended to provide discounts on MyPillow products—either immediately before or immediately after the defamatory statements. (*See, e.g.*, Defamatory Publication Nos. 2, 5, 7, 8, 10.) *Third*, MyPillow employees helped to promote the Defamatory Publications, both by sending out links of documentaries such as *Absolute Proof* to MyPillow advertisers (Ex.31 at 140:1–142:2), by storing and shipping DVDs of *Absolute Proof* from the MyPillow warehouse (Ex.32 at 69:1–70:12), and by posting the Defamatory Publications

to various social media websites (Ex.62 at 45:14–23, 211:7–10, 212:5–8, 212:25–213:2.) *Fourth*, MyPillow employees actively participated in creating and publishing content on Lindell's social media site, FrankSpeech, (*see, e.g., id.* at 29:3–33:1) a platform on which many of the Defamatory Publications are posted, and with which MyPillow had a revenue sharing agreement. (Ex.31 at 282:11–290:15; Ex. 63.)

## STANDARD OF REVIEW

The Court should grant summary judgment where the record demonstrates "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A party may move for partial summary judgment, identifying the part of each claim or defense on which summary judgment is sought. *Id.* A fact is "material" only if its resolution will affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party presents a supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Krenick v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). The nonmoving party cannot rest on mere denials or allegations, and must do more than "simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Additionally, a party cannot create a genuine issue of material fact through unproduced documents, as "[a] party who fails to disclose or supplement required discovery 'is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless.'" *Edmonds v. Minneapolis Pub. Sch. Special Sch. Dist. 1*, 368 F. Supp. 3d 1329, 1338 (D. Minn. 2018).

## ARGUMENT

By this Motion, Smartmatic is moving for partial summary judgment on certain elements of its defamation claim against Lindell and MyPillow, as well as its claim for violation of the MDTPA. This will narrow the issues the jury will need to address at trial. Smartmatic will prove at trial that (1) Lindell acted with actual malice in making the Defamatory Publications, (2) Lindell and MyPillow's violation of the MDTPA was willful; and (3) Smartmatic's resulting damages, including its costs and attorneys' fees recoverable under the MDTPA.

## I.    Smartmatic is entitled to summary judgment on various aspects of its defamation claim.

To prevail under Minnesota law on a claim for defamation, a plaintiff must prove that defendant (1) published a statement of fact; (2) of and concerning him; (3) which was false; and (4) damaged his reputation in the community. *Glenn v. Daddy Rocks, Inc.*, 171 F.Supp.2d 943, 948 (D. Minn. 2001). Moreover, statements which are defamatory *per se* are "actionable without proof of actual damages . . . because statements that are defamatory *per se* are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove." *Mgmt. Registry, Inc. v. A.W. Co.*, 2022 WL 4706702, at

*13 (D. Minn. Sep. 30, 2022) (quoting *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. 2019)).[3]

### A. Smartmatic is entitled to summary judgment on the "publication" element.

The first element of a defamation claim under Minnesota law is publication of the challenged statements without privilege or authorization to a third party. A defendant is liable for publishing a defamatory falsehood about a plaintiff if he publicly makes the statement himself to third parties or publishes or espouses the defamatory statement of another in a communication to third parties. *See Larson v. Gannett Co.*, 940 N.W.2d 120, 131 (Minn. 2020) ("Under the republication doctrine, a speaker may be liable for repeating the defamatory statements of another."); *see also Price v. Viking Press, Inc.*, 625 F. Supp. 641, 645 (D. Minn. 1985) ("Unless protected by a privilege, defendants are as liable for republication of a defamatory statement as if they had made the statement themselves."); *Stock v. Heiner*, 696 F. Supp. 1253, 1260 (D. Minn. 1988) (holding that if a defendant espouses or concurs with statements voiced by others, defendant likewise assumes responsibility for those statements).

Smartmatic is entitled to summary judgment on this aspect of its defamation claim as there is no genuine dispute as to whether Lindell published the challenged statements

---

[3] In cases such as this involving statements of public concern, damages may only be presumed when there are sufficient allegations of actual malice. *See Maethner*, 929 N.W.2d at 878–79. Although Smartmatic is not moving for summary judgment with respect to actual malice, Smartmatic has alleged—and will prove at trial—that Lindell acted with actual malice in publishing the Defamatory Publications accusing Smartmatic as having perpetrated the "biggest crime in American history." (*See* First. Supp. Compl. ¶¶ 189–353.)

regarding Smartmatic. The evidentiary record demonstrates that all of the challenged statements were either:

(1) statements made by Lindell himself in Defamatory Publications that he himself published (*see, e.g.,* Defamatory Publication Nos. 1, 9, 12, 16, 17, 18; Ex.64 at Responses 1, 7, 12, 18, 23, 28, 34; Ex.30);

(2) statements made by Lindell himself on Defamatory Publications published by third parties (*see, e.g.*, Defamatory Publication Nos. 2–8, 10-11, 13–15), or;

(3) statements made by third parties on Defamatory Publications published and endorsed by Lindell (*see e.g.*, Defamatory Publication Nos. 1, 9, 12, 16, 17, 18; Ex.64 at Responses 1, 7, 12, 18, 23, 28, 34; Ex.30).

Indeed, as the Court previously held, Lindell does not dispute that he published these statements. *See* Ex.65, at 8 ("Although the parties dispute the falsity of Lindell's statements, the parties do not dispute that the challenged statements were communicated to members of the public and entities other than Smartmatic.").

Appendix A to this Memorandum sets forth each of the challenged statements within the Defamatory Publications and indicates by which method Lindell is responsible for their publication, either because he himself spoke and published them, he spoke them on a platform published by another, or a third party spoke them and he published and espoused them. Lindell (and My Pillow) are responsible for the publication of each of the challenged statements for one or more of these reasons.

**B.    Smartmatic is entitled to summary judgment on the "of and concerning" element.**

In order for a statement to be defamatory, it must concern the plaintiff (as opposed to another) and cannot be part of vague language that "cannot be said to refer to a particular person." *Stock v. Heiner*, 696 F. Supp. 1253, 1259 (D. Minn. 1988) (citing *Brill v. Minn. Mines, Inc.*, 200 Minn. 454 (1937) & *Petsch v. St. Paul Dispatch Printing Co.*, 40 Minn. 291 (1889)). In determining whether a statement is "of and concerning" the plaintiff, the entire context of the publication is to be taken into account. *Schlieman v. Gannet Minn. Broadcasting, Inc.*, 637 N.W.2d 297, 306 (Minn. App. 2001). Accordingly, a defamatory publication is actionable by the person or persons "to whom recipients reasonably or correctly believe it refers." *Id.* (citing Dan B. Dobbs, *The Law of Torts*, § 405 at 1134–35 (2000)); *see also Daddy Rocks, Inc.*, 171 F.Supp.2d at 948 ("A plaintiff does not have to be specifically named in the defamatory publication so long as a reader by fair implication would understand the statement to be directed at the plaintiff.").

Smartmatic is entitled to summary judgment on the "of and concerning" element of its defamation claim for three reasons. First, Defendants themselves do not dispute that the challenged statements were "of and concerning" Smartmatic. *See, e.g.* Ex.66, Memorandum of Points and Authorities in Support of Defendant Michael J. Lindell's Motion to Dismiss, ECF No. 20, at 16 ("Lindell has continued to make media appearances about the role election voting machines played in the 2020 Election. For example, Lindell has produced a series of documentaries (including *Absolute Proof, Scientific Proof*, and *Absolute Interference*) which detail foreign hacking of electronic voting machines,

28

including ***Smartmatic's machines***, and its impact on the outcome of the 2020 Election.")
(emphasis added).

Second, the Defamatory Publications all refer to Smartmatic by name. Although each defamatory statement itself may not use the word "Smartmatic," that name is used elsewhere in each Defamatory Publication, shortly before or after the defamatory statement, such that the defamatory statement is in clear reference to Smartmatic. For example, in Defamatory Publication No. 1, Colonel Waldron began by stating that the "inherent vulnerabilities that were built into the ES&S and Dominion software . . . is all related directly back to the soft, *Smartmatic [] SGO Smartmatic software core.*" (Ex.29.) Accordingly, every future statement regarding Dominion, ES&S, Smartmatic, or voting machines generally would be reasonably understood by the recipient to refer to Smartmatic itself. The same is true of every other Defamatory Publication, in which each defamatory statement either directly refers to Smartmatic, or the context provided by previous or later statements would reasonably lead the listener to understand that Smartmatic is the entity being referred to. *See, e.g.,* Defamatory Publication Nos. 4 ("ESS, Smartmatic and Dominion, you can interchange the names, they are all the same. . ."); 5 ("They're all split off from Smartmatic . . . everyone one of them is the same, they're interchangeable . . . ."); 9 ("Doesn't matter, the name of the, the name of the machine doesn't matter . . . Smartmatic, ES&S, doesn't matter."); 12 ("And it rhymes with Dominion, and it rhymes with Smartmatic and ES&S, all these machines that were used out there . . . ."); 16 ("This was something that came through the machines, the Dominion machines, the Smartmatic

machines and other machines . . . ."); 17 ("So they're using the same hardware, they just have a new badge on it, one says Dominion Voting and one says Smartmatic . . .").

Third, the "of and concerning requirement is also satisfied because the name Lindell used in the Defamatory Publications—"Smartmatic"—is the brand name used by all three Plaintiffs. (Ex.2¶6.). Smartmatic USA, Smartmatic International, and SGO all operate under the "Smartmatic" brand to sell "Smartmatic products. (*Id.*) Thus, when Lindell alleged that "Smartmatic" rigged the 2020 election by switching votes, "Smartmatic" machines were hacked by foreign countries, "Smartmatic" machines were connected to the internet, or "Smartmatic" machines had been designed to rig elections overseas, those who know Plaintiffs, including SGO, understood that they were being defamed through the "Smartmatic" brand. *See Schlieman*, 637 N.W.2d at 306. This is especially true here where, in his very first Defamatory Publication, Lindell referred to SGO directly. (Ex.29 ("So a critical capability for any of this to happen are the inherent vulnerabilities that were built into ES&S and Dominion software, which is, you know, again, we've proven through, through our work that this is all related directly back to the soft**, *Smartmatic [] SGO Smartmatic* software core. . . the *board of SGO Smartmatic* . . .")

Appendix B to this Brief sets forth each of the challenged statements and indicates the reason why those statements were "of and concerning" the Plaintiffs, including that (1) the statement itself refers to Smartmatic, or (2) the Defamatory Publication had already connected Smartmatic with "voting machines" generally, or Dominion and/or ESS specifically, such that the context of the publication would be understood by the listener to be a reference to Smartmatic.

C.      **Smartmatic is entitled to summary judgment on the "falsity" element.**

"A statement or communication is false if it is not substantially accurate, and a statement or communication is not substantially accurate if its essence is not true." *Smartmatic v. Lindell*, Case No. 22-cv-0098, 2022 WL 4343299, at *3 (D. Minn. Sept. 19, 2022) (internal quotation and citations omitted). Whether the factual assertions at issue are capable of being proven true or false "is a question of law for the Court." *Johnson v. Columbia Broadcasting System, Inc.*, 10 F. Supp. 2d 1071, 1074 (D. Minn. 1998). The essence of Lindell's statements and implications was that Smartmatic, and/or Smartmatic voting machines, rigged the 2020 election in order for Biden to prevail over Trump. There is no genuine dispute as to whether those statements were false. *See e.g., US Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1039 (Del. Sup. Ct. 2023); *Smartmatic USA Corp. v. Newsmax Media, Inc.*, C.A. No. N21C-11-028 EMD, 2024 WL 4165101, at *21 (Del. Sup. Ct. Sept. 24, 2024) ("[S]tatements regarding Smartmatic software or voting machines altering the results of the [2020 election] are factually false. . . . [T]he Court will instruct the jury that any allegations regarding whether the [2020 election] and its results were somehow altered or manipulated by Smartmatic are factually false/untrue.").

1.      **All of the Defamatory Publications *falsely* stated or implied that Smartmatic and its machines rigged the 2020 election by switching votes.**

As discussed above, each of the Defamatory Publications stated or implied that Smartmatic participated in rigging the 2020 election or Smartmatic's software was used to rig the 2020 election. *Supra* at 8–22. This is the singular, overarching message conveyed by each of the Defamatory Publications made throughout Lindell's disinformation

31

campaign.[4] Because there is no genuine dispute that Smartmatic and its machines did not rig the 2020 election by switching votes, Smartmatic is entitled to summary judgment on the falsity element of its defamation claim.

***First,*** Smartmatic only provided BMDs used in Los Angeles County during the 2020 election. (Ex.2¶11.) The reported vote count in Los Angeles County for the 2020 election was 71.04% for Biden and 26.87% for Trump. (Ex.67.) The reported vote count for California for the 2020 election was 63.5% for Biden and 34.3% for Trump (Ex.68.) Neither Smartmatic nor Smartmatic's technology could have even theoretically rigged the 2020 national election given its isolated role in the 2020 election in a county and state that voted overwhelmingly for Biden.

***Second***, Smartmatic's BMDs were touchscreen machines that allowed voters to select a candidate and generated a paper record of the vote, *i.e.*, a paper ballot. (Ex.2¶11.) Once the ballot is printed, it cannot be altered by any adversary attacking the election electronically. (*Id.*¶17; Ex.54¶4.) The paper ballots in Los Angeles County were then tabulated and counted, with the paper ballots remaining as a source to check the results. (Ex.2¶26; Ex.54¶4.) Smartmatic and its technology were not involved in counting or tabulating votes. (Ex.2¶12; Ex.54¶7.) Neither Smartmatic nor Smartmatic's technology could have even theoretically rigged the 2020 election given the limited function of the BMDs.

---

[4] Mr. Lindell himself testified that this is the meaning he intended to convey through his Defamatory Publications. (*See, e.g.*, Ex.1 at 250:20-24 ("Q: And you had indicated Smartmatic was involved in a crime or attack against this country? A: They were – they were – yes. And Smartmatic, all the machine companies, yes.")

*Third*, neither Smartmatic nor any Smartmatic technology switched, altered, or changed any votes cast during the 2020 election. Smartmatic's BMDs did not have any functionality that allowed for the switching, altering, or changing of the votes cast by the voter. (Ex.2¶17.) Smartmatic did not receive any notice or comments by anyone with Los Angeles County that a voter claimed or commented that his or her vote had been switched, altered, or changed by Smartmatic's BMD. (*Id.*¶19.) And the paper record created by Smartmatic's BMD prevented a vote from being switched, altered, or changed by a third party. (*Id.*¶17; Ex.54¶4-5.)

*Fourth*, the post-election audits verified the 2020 results. Los Angeles County conducts a 1% manual audit to verify the results of the election. (Ex.54¶11.) In this audit, election officials manually tally all the ballots in 1 percent of the precincts, selected at random by election officials. For each race that is not included in the initial group of precincts, the election officials count one additional precinct to include all races in the manual tally. (*Id.*) The post-election audit conducted by Los Angeles County validated the reported results. (Ex.2¶15; Ex.54¶11.)

*Fifth*, Smartmatic's voting technology and software were not used in any jurisdiction other than Los Angeles County during the 2020 election. (Ex.2¶13; Ex.57.) Smartmatic did not license its software or technology for use by any other voting company for the 2020 election. (Ex.2¶13) States and counties publicly reported the technology being used during the 2020 election. (Ex.53¶4.) That information is also publicly available at websites such as the Election Assistance Commission, Verified Voting, and the websites

of states and counties. (*Id.*) Smartmatic technology and software was not listed or identified as being used by any jurisdiction other than Los Angeles County. (Ex.2¶13; Ex.53¶4.)

The Court does not need to address whether the 2020 election was rigged to find that the main message conveyed by the Defamatory Publications—Smartmatic and its machines participated in rigging the 2020 election—was false. The Court need only address the fact that Smartmatic and Smartmatic's technology did not participate in rigging the 2020 election and could not have even theoretically done so given that Smartmatic only provided BMDs for Los Angeles County during the 2020 election. Smartmatic has established falsity for the main message conveyed by each Defamatory Publication with that simple fact.

However, further proving that it was false for Lindell to publish that Smartmatic and its machines participated in rigging the 2020 election is the evidence that the 2020 election was not in fact rigged.

***First***, jurisdictions across the country conducted post-election audits. (Ex.53¶5.) These included Reconciliation Audits, Hand-Count Audits, and Risk-Limiting Audits. (*Id.*) None of the audits conducted after the 2020 election identified any vote manipulation, vote switching, or vote flipping attributable to voting machines, including Smartmatic machines and software. (Ex.2¶27; Ex.53¶6; Ex.54¶12.)

***Second***, federal and state agencies confirmed the integrity of the 2020 election. This confirmation began shortly after the election was completed and continued through Congressional investigation completed in December 2022.

- November 12, 2020: In a Joint Statement from Elections Infrastructure Government Coordinating Council and Election Infrastructure Sector Coordinating Executive Committees, those agencies announced that: "The November 3rd election was the most secure in American history . . . There is no evidence that any voting system deleted or lost votes, changed votes or was in any way compromised." (Ex.55.)

- November 13, 2020: Benjamin Hovland, Commissioner for the U.S. Election Assistance Commission, announced that there was "no widespread fraud or malfunction that would change the result of the election." (Ex.69.)

- November 16, 2020: Fifty-nine election security and computer science experts jointly announced: "We are aware of alarming assertions being made that the 2020 election was 'rigged' by exploiting technical vulnerabilities. However, in every case of which we are aware, these claims either have been unsubstantiated or are technically incoherent. To our collective knowledge, no credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise." (Ex.70.)

- December 1, 2020: William Barr, U.S. Attorney General, announced that the Department of Justice had investigated claims of election fraud and concluded that "to date, we have not seen fraud on a scale that could have effected a different outcome in the election." Attorney General Barr continued: "There's been one assertion that would be systematic fraud and

35

that would be the claim that machines were programmed essentially to skew the election results. And the DHS and DOJ have looked into that, and so far, we haven't seen anything to substantiate that." (Ex.56.)

- December 22, 2022: The Select Committee to Investigate the January 6th Attack on the United States conducted and 18-month investigation, which included nine public hearings and testimony from seventy witnesses.  The Select Committee concluded: "Not a single witness—nor any combination of witnesses—provided the Select Committee with evidence demonstrating that fraud occurred on a scale even remotely close to changing the outcome in any State." (Ex.71.)

To date, no state or federal investigation—and there have been many—has concluded that the 2020 election was rigged or that votes were manipulated by voting machines, including Smartmatic's BMDs used in Lost Angeles County. (Ex.54 ¶¶12–13.)

> **2.    Lindell's publications stating or implying that Smartmatic machines were connected to the Internet to allow for manipulation, or were compromised or hacked by enemies of the United States to rig the 2020 election were false for additional reasons.**

Several statements in certain of the Defamatory Publications also accused Smartmatic's voting machines of being connected to the Internet in order to allow for vote manipulation (*see, e.g.,* Defamatory Publication Nos. 1, 2, 12), or of being compromised or hacked by enemies of the United States to rig the 2020 election (*see, e.g.*, Defamatory Publication Nos. 1–3, 6, 7, 9, 12, 14, 16). Those statements were also false.

*First*, Smartmatic's BMDs were not connected to the internet during the 2020 election (Ex.2¶12; Ex.54¶8.) Per the LA County VSAP Use Procedures, the BMDs were not capable of connecting to the Internet as they were "air-gapped" from (not physically connected to) any other systems. (Ex.54¶8.) The BMD has no wireless capability and although there is an Ethernet port present for machine set up, that port was protected by both physical barriers (i.e., it is blocked by the ballot box, covered with tamper-evident tape, and locked with a tamper-evident seal) and software barriers (*i.e*, the BMD source code disables the functionality of the Ethernet interface during voting) to prevent any Internet connections. (*Id.*) There is no evidence that either these physical or software barriers were breached. (*Id.*)

*Second*, given that the BMD machines were not connected to the internet, Smartmatic's BMDs were not hacked by a foreign entity during the 2020 election (Ex.2¶18; Ex.54¶9.)  Indeed, the BMDs could not be hacked (by a foreign entity or otherwise) because they were not connected to the internet.  (*Id.*) There is no evidence that Smartmatic's BMDs were hacked during the 2020 election (by a foreign entity or otherwise); and, to the contrary, the post-election audit confirmed the absence of manipulation (by hacking or otherwise). (Ex.54 ¶9.)

3.  **Lindell's publications stating or implying that Smartmatic designed its machines and software to rig elections and they have been used to rig elections outside of the United States were also false.**

Finally, several of the statements in the Defamatory Publications stated or implied that Smartmatic designed its software to rig elections and rigged elections in Venezuela

and other countries outside the United States. (*See, e.g.*, Defamatory Publication Nos. 1, 4, 5, 8, 10, 11, 12, 16.) Those statements were also false. ***First***, Smartmatic has not designed any of its election technology to rig elections. (Ex.2¶28.) Smartmatic has designed its election technology to enable all election stakeholders to audit the entire process. (*Id.*; Ex.72.) Smartmatic's election technology keeps or generates paper records (*e.g.*, paper ballots or voter verified paper audit trail) that are used by election officials to confirm the accuracy of the vote count. (Ex 2¶29.) When a voting system involves paper ballots that are audited, it is not possible for software alone to rig elections without detection. (Ex.54¶5.) If an electronic voting machine were designed to rig elections, it would not incorporate verifiable paper ballots and an audit trail. (*Id.*) Prior to the 2020 election, Smartmatic had processed more than 5 billion votes in more than 25 countries and 5 continents, all without any election security breach. (Ex.2¶29.)

***Second***, Smartmatic has never rigged an election and its technology has not been used to manipulate votes. (*Id.*¶31.) Smartmatic technology has been open to audits in all countries where it operates, and it has been audited in accordance with the laws and regulations of each country. (*Id.*) All audits of elections that have used Smartmatic technology have validated the results, confirming the integrity of the election. (*Id.*) Elections conducted with Smartmatic technology have been validated by world-renowned institutes such as the Carter Center, the United Nations, the Organization of American States, and the European Union. (*Id.*¶34.) All claims about the integrity of the system or the accuracy of the results have been dismissed. (*Id.*)

*Third*, in the 2020 election, Smartmatic manufactured BMDs based on design instructions provided by Los Angeles County. (*Id.*¶32.) The technology Smartmatic provided Los Angeles County for the 2020 election was subject to testing by five different independent agencies, none of which identified any software designed to manipulate, rig, or fix an election. (Ex.54; Exs.73–77.) In addition, Smartmatic freely shared its source code for the BMDs with LA Count. (Ex.54¶6.) If Smartmatic designed its technology to steal elections, it would not freely share its source code with third party entities.

*\*\*\**

Appendix C to this Brief details the manner in which each of the challenged statements was false regarding Smartmatic and its role in the 2020 election, including because (1) Smartmatic did not rig the 2020 election, (2) voting machines did not rig the 2020 election, (3) Smartmatic's machines were not connected to the internet and or hacked by enemies of the United States during the 2020 election; and (4) Smartmatic's voting machines have not rigged elections in the past, nor are they designed to rig elections. As demonstrated in Appendix C, all of the challenged statements are false for at least one of these reasons—which is enough to find falsity as a matter of law—but many are false for multiple of these reasons.

### D.    Lindell's statements about Smartmatic were defamatory *per se.*

Smartmatic is also entitled to a summary judgment ruling that Lindell's statements are defamatory *per se*. Although proof of reputational harm is a required element on a claim for defamation, that is not the case when the defendants' statements are defamatory *per se*. As a general matter, a statement is defamatory if it "disgraces and degrades the plaintiff,

holds him up to public hatred, contempt or ridicule" or "harm[s] the plaintiff's reputation and lower[s] the plaintiff in the estimation of the community." *Sherman v. Rinchem Co.*, 2011 WL 3471057, at *6 (D. Minn. Aug. 8, 2011) (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980)). A statement goes beyond mere defamation and rises to the level of defamatory *per se,* however if it contains false accusations of criminal behavior, false statements regarding the plaintiff's conduct of business, and imputations of a loathsome disease or unchastity. *Anderson v. Kammeier,* 262 N.W.2d 366, 372 (Minn. 1977). Defamation *per se* is "actionable without proof of actual damages . . . because statements that are defamatory per se are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove." *Mgmt. Registry, Inc. v. A.W. Co.*, 2022 WL 4706702, at *13 (D. Minn. Sep. 30, 2022) (quoting *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. 2019)).

Lindell's statements are a prime example of defamation *per se*. While a statement need not directly accuse a defendant of a crime in order to constitute defamation *per se*, *see Longbehn v. Schoenrock*, 727 N.W.2d 153, 158 (Minn. App. 2007), Lindell often did just that, unabashedly and repeatedly accusing Smartmatic of engaging in one of the biggest crimes in United States history. (*See, e.g.*, Defamatory Publication Nos. 1, 2, 9, 10, 14, 15.) And, when not accusing Smartmatic directly of committing a crime, Lindell implied that Smartmatic's machines were used to commit a crime by being vulnerable to foreign hacking. Appendix D sets forth each of the challenged statements, and whether those statements accused Smartmatic of a crime and/or attacked its business reputation. The Court should rule that Lindell's statements were defamatory *per se* as a matter of law.

**II.    Smartmatic is entitled to summary judgment on its claim for vicarious liability.**

Smartmatic is also entitled to a summary judgment ruling that MyPillow is vicariously liable for the Defamatory Publications published by Lindell. An employer is vicariously liable for the intentional torts of an employee who is acting in the course and scope of his or employment. *See, e.g., Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905, 912 (Minn. 1999). "Such liability stems not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business." *Id.* at 910. The Minnesota Supreme Court has found that "an employer is liable for an employee's intentional misconduct if (1) the source of the tort is related to the duties of the employee and (2) the tort occurs within work-related limits of time and space." *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 583 (Minn. 2008) (cleaned up). Plaintiffs must also prove that (3) "the employer knew or had reason to know of the employee's misconduct." *Cruz v. TMI Hosp., Inc.*, 2015 WL5996383 (D. Minn. Oct. 14, 2015) (material issue of fact precluded defendant hotel's motion for summary judgment because its general manager was aware of alleged misconduct).

In determining whether a defendant has established the first and third elements, i.e., whether the tortious conduct was related to the employee's duties or known or knowable to the employer, courts look to whether the employee's acts were foreseeable or actually known. *Hartford Fire Ins. Co. v. Clark*, 727 F. Supp. 2d 765, 770-72 (D. Minn. 2010) (interpreting Minnesota law); *Cruz*, 2015 WL 5996383. "A plaintiff need not prove that [the] employer actually foresaw that the particular employee would commit the particular

tortious act." *Id.* at 772. "Rather, it is sufficient for a plaintiff to show that 'an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.'" *Id*. (quoting *Hagen v. Burmeister & Assocs*., 633 N.W.2d 497, 505 (Minn. 2001)).

Few Minnesota courts have discussed the "time and space" element. *Rau v. Roberts*, 640 F.3d 324, 328 (8th Cir. 2011) (citation omitted). Although this element may be less relevant due to technical innovation, *see Pederson v. Long*, 2016 WL 4723425, at *4 (Minn. Ct. App. Sept. 12, 2016), at least one court has held that a company executive is "at work" wherever he or she acts in furtherance of their responsibilities and their employers' objectives. *See Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 17 (Minn. 1979).

Here, Smartmatic is entitled to summary judgment because the undisputed facts demonstrate that: (1) MyPillow knew of, and acquiesced to, Lindell's misconduct; and (2) Lindell carried out the disinformation campaign as part of his duties as CEO and used MyPillow employees to do so.

**A.    MyPillow was aware of Lindell's use of the disinformation campaign as a tool to market and promote MyPillow products.**

Under the first and third elements of the vicarious liability determination, MyPillow is liable for Lindell's defamatory statements if it was reasonably foreseeable to MyPillow that Lindell would engage in such activities to promote MyPillow products. Lindell's misconduct was reasonably foreseeable to MyPillow for several reasons. *First,* Lindell, as CEO of MyPillow, was not only aware of the tortious acts, he perpetrated most of them himself. Accordingly, there is no disputed issue of fact as to whether MyPillow "foresaw"

42

that "[Lindell] would commit the particular tortious act." *Cruz v. TMI Hosp., Inc.*, 2015 WL5996383 (D. Minn. Oct. 14, 2015); *Hartford Fire Ins. Co.*, 727 F. Supp. 2d at 772.

*Second*, Lindell is, and has always been, the primary spokesman for MyPillow, making it foreseeable that his public commentary regarding Smartmatic and the 2020 election would be connected with the MyPillow brand. (Ex.78 at 7, Supplemental Answer to Interrogatory No. 22; Ex.1 at 463:6–8; Ex.31 at 57:16–58:1; Ex 62 at 235:18–237:4.) Indeed, in nearly all of the Defamatory Publications, Lindell is introduced (or introduces himself) as the CEO or founder of MyPillow. (*See, e.g.*, Defamatory Publication Nos. 1 (Ex.113); 2 (Ex.114); 3 (Ex.115); 4 (Ex.116); 5 (Ex.117); 7 (Ex.118); 8 (Ex.119); 10 (Ex.120); 11 (Ex.42); 12 (Ex.121); 14 (Ex.122); 15 (Ex.123); 17 (Ex.124).) Many of the Defamatory Publications also expressly include MyPillow advertisements, or MyPillow promotional codes—which could be used to get discounts on MyPillow products. (*See, e.g.*, Defamatory Publication Nos. 2 (Ex.114); 5 (Ex.117); 7 (Ex.125); 8 (Ex.126); 10 (Ex.127); 18 (Ex.128).) The use of promotional codes in this manner was standard business practice for MyPillow (*see, e.g.* Ex.60 at 20:13–21:23), making it foreseeable to MyPillow that Lindell's appearances to spread his disinformation campaign would be tied to the promotion of MyPillow products.

*Third*, members of the Board of Directors of MyPillow admitted that they were aware of Lindell's defamatory statements and activities disparaging Smartmatic and disputing the legitimacy of the 2020 election while simultaneously promoting the MyPillow brand and MyPillow products. (Ex.32 at 59:21–60:15 (board member Darren Lindell); Ex.62 at 209:5–219:6 (board member Todd Carter); Ex.58 at 46:11-47:13 (board

43

member Jessica Maskovich); *see also* Ex.82 (board member Brad Carlson).) Board minutes from several meetings further demonstrate discussion of the disinformation campaign, including revenue splits with FrankSpeech—the primary medium by which the Defamatory Publications were and remain published. (Ex.32 at 124:4–125:12; Ex.83; Ex.31 at 290:6–15.) Despite this awareness, and the fact that many of the Directors disagreed with Lindell's actions, they took no steps to stop it. (*See* Ex.32 at 60:16–20, 68:4–16; Ex.79 at 62:8–15; Ex.62 at 237:6–17; *see also* Ex.88 (former board member resignation).)

**B.    The disinformation campaign was carried out by MyPillow employees beyond Lindell, during regular business hours and using business resources.**

Under the second element of the vicarious liability analysis, MyPillow is vicariously liable for Lindell's defamatory statements because Lindell used MyPillow employees and MyPillow resources to accomplish the publication of his messages. MyPillow employees were involved with the disinformation campaign in several ways.

*First,* Lindell used MyPillow employees to assist with technical aspects of producing, posting, and tracking defamatory content. For example, MyPillow's Chief Technology Officer and Board Member, Todd Carter, was an active participant in the publication and dissemination of the Defamatory Publications. Lindell asked Mr. Carter to assist him not only with general activities related to seeking reports of election fraud, but also to publish his defamatory content on websites such as FrankSpeech and to organize and run the Cyber Symposium at which further defamatory statements were published. (Ex.62 at 209:5–219:6; Exs. 85, 87.)

*Second*, MyPillow employees actively sent Defamatory Publications to MyPillow partners and advertisers. For example, MyPillow Marketing Director Dawn Curtis was directed by Lindell to disseminate links of *Absolute Proof* to media outlets and MyPillow advertisers from her MyPillow.com email address (Ex.31 at 140:1-142:2; Exs. 89–106.) Curtis also shared a press release regarding *Scientific Proof* with media companies from her MyPillow email account (Exs. 107–08) and assisted with promotional codes to be shared on Defamatory Publications (Exs. 110–11.)

*Third*, MyPillow employees physically stored and disseminated not only Defamatory Publications such as *Absolute* Proof, but also promotional materials for the disinformation campaign along with MyPillow products. For instance, Darren Lindell, MyPillow's Chief Operating Officer and Board Member testified that he helped distribute *Absolute Proof* DVDs from the MyPillow warehouse (Ex.32 at 69:1–70:12; *see also* Ex.129) and coordinated with MyPillow employees to print off and include FrankSpeech flyers in all MyPillow orders being sent out. Those flyers encouraged MyPillow customers to watch the Lindell Report on FrankSpeech "[f]or all the latest information on the election fraud.") (Ex.112.)

## III. Smartmatic is entitled to partial summary judgment on its claim for violation of the Minnesota Deceptive Trade Practices Act.

In Count II of its First Supplemental Complaint, Smartmatic asserted a claim against Lindell and MyPillow for breaches of the MDTPA. Smartmatic is also entitled to partial summary judgment with respect to this claim.

The MDTPA provides, in pertinent part: "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . disparages the goods, services, or business of another by false or misleading representation of fact." Minn. Stat. § 325D.44(8). *See Gregerson v. Vilana Fin., Inc.,* No. 06-1164 ADM/AJB, 2007 WL 2509718, at *6 (D. Minn. Aug. 31, 2007) (denying summary judgment where counter-plaintiffs "submitted evidence that [counter-defendant] has posted, or allowed others to post, comments on his commercial photography website that, if untrue or misleading, make damaging comments about Defendants' business"). Accordingly, to prevail on its MDTPA claim, Smartmatic must prove that: (1) Defendants disparaged Smartmatic's goods, services, and business through false representations of fact; (2) Lindell was acting his capacity as CEO and spokesman of MyPillow when he asserted his disparaging statements. *Id*. To obtain attorney's fees and costs, Smartmatic must additionally show that, (3) Lindell acted willfully in making these disparaging statements of fact. Minn. Stat. § 325D.45(3).

Smartmatic is entitled to summary judgment with respect to the first and second elements of its MDTPA claim and Lindell and MyPillow should be enjoined from making further statements disparaging Smartmatic and its products. For the reasons set forth in Section II, *supra*, Defendants disparaged Smartmatic's goods, services, and business through the Defamatory Publications and, as set forth in Section III, Lindell made the Defamatory Publications as part of, and to further the business of, MyPillow. *See, e.g.*, *Smartmatic v. Lindell* Case No. 22-cv-0098, 2022 WL 4343299, at *3 (D. Minn. Sept. 19, 2022) (holding that Smartmatic may pursue both its MDTPA claims and defamation

claims, despite the substantial overlap in theories and proof required). As with Lindell's actual malice in carrying out his disinformation campaign, Smartmatic will prove at trial that Lindell and MyPillow acted in willful violation of the MDTPA, entitling Plaintiffs to costs and attorneys' fees for prosecuting this action.

## CONCLUSION

For these reasons, Smartmatic respectfully requests that the Court grant partial summary judgment in its favor and narrow the issues for jury trial to (1) Lindell's actual malice and willful violation of the MDTPA and (2) Smartmatic's damages.

Dated: November 13, 2024                    Respectfully submitted,

/s/ *J. Erik Connolly*

Christopher K. Larus
   Minnesota Bar No. 0226828
   CLarus@robinskaplan.com
William E. Manske
   Minnesota Bar No. 0392348
   WManske@robinskaplan.com
Emily J. Tremblay
   Minnesota Bar No. 0395003
   ETremblay@robinskaplan.com
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500

J. Erik Connolly (admitted *pro hac vice)*
   EConnolly@beneschlaw.com
Illinois ARDC No. 6269558
Nicole E. Wrigley (admitted *pro hac vice)*
   NWrigley@beneschlaw.com
Illinois ARDC No. 6278749
Timothy M. Frey (admitted *pro hac vice*)
   TFrey@beneschlaw.com
Illinois ARDC No. 6303335

47

Julie M. Loftus (admitted *pro hac vice*)
    JLoftus@beneschlaw.com
Illinois ARDC No. 6332174
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949

James R. Bedell (admitted *pro hac vice*)
    JBedell@beneschlaw.com
Ohio Bar No. 97921
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: (216) 363-4500

*Attorneys for the Plaintiffs*