# Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., AND DOMINION VOTING SYSTEMS CORPORATION,<br>*Plaintiffs/Counter-Defendants*,<br><br>v.<br><br>MY PILLOW, INC. AND MICHAEL J. LINDELL,<br>*Defendants/Third-Party Plaintiffs*,<br><br>v.<br><br>SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., SGO CORPORATION LIMITED, AND HAMILTON PLACE STRATEGIES, LLC,<br>*Third-Party Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 1:21-cv-00445-CJN<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT MICHAEL J. LINDELL'S ORIGINAL ANSWER, COUNTERCLAIMS, AND THIRD-PARTY COMPLAINT

Defendant Michael J. Lindell ("Defendant" or "Lindell") files this Answer to Plaintiffs U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation's (collectively, "Plaintiffs," "Dominion," or "Dominion Defendants") Complaint, together with his Counterclaims against Dominion, and Third-Party Complaint against Smartmatic USA Corp., Smartmatic International Holding B.V., SGO Corporation Limited (collectively, "Smartmatic" or "Smartmatic Defendants"), and Hamilton Place Strategies, LLC ("HPS"), and would show unto the Court as follows:

# I.
## DEFENDANT MICHAEL J. LINDELL'S ORIGINAL ANSWER

1.      Lindell admits President Donald Trump publicly praised MyPillow's famous pillow and company.  Lindell admits he is a former professional card counter.  Lindell denies the remainder of the allegations in Paragraph 1.

2.      Lindell denies the allegations made in Paragraph 2.

3.      Lindell denies the allegations made in Paragraph 3.

4.      Lindell admits that he has been censored and attacked and produced a documentary on election fraud.  Lindell denies the remainder of the allegations in Paragraph 4.

5.      Lindell denies the allegations made in Paragraph 5.

## PARTIES

6.      Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 6.

7.      Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 7.

8.      Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 8.

9.      Lindell admits the allegations made in Paragraph 9.

10.     Lindell admits he is the founder and CEO of MyPillow.  Lindell admits he is a resident of Minnesota.  Lindell denies the remainder of the allegations in Paragraph 10.

## JURISDICTION AND VENUE

11.     Lindell admits the allegations in Paragraph 11.

12.     Lindell denies the allegations made in Paragraph 12.

13.     Lindell denies the allegations made in Paragraph 13.

14.     Lindell denies the allegations made in Paragraph 14.

## FACTUAL ALLEGATIONS

### *Through Aggressive Marketing, Mike Lindell Builds a Multimillion-Dollar Company[1]*

15.     Lindell admits he founded MyPillow in 2004 which became MyPillow, Inc. Lindell admits he personally appeared in MyPillow commercials.  Plaintiffs raise a wholly irrelevant California lawsuit in Paragraph 15 that has nothing to do with this lawsuit, these Plaintiffs, defamation, or DTPA under Minnesota or D.C. law.  Plaintiffs clearly cite to this unrelated lawsuit merely as an effort to disparage Lindell and MyPillow.  Lindell admits that rather than fight the allegations against MyPillow, MyPillow made a business decision to prevent long and costly litigation, pay a fine, and move on.  Lindell denies the remainder of the allegations in Paragraph 15.

16.     Plaintiffs raise a wholly irrelevant California lawsuit in Paragraph 16 that has nothing to do with this lawsuit, these Plaintiffs, defamation, or DTPA under Minnesota or D.C. law.  Plaintiffs clearly cite to this unrelated lawsuit merely as an effort to disparage Lindell and MyPillow.  Lindell admits that rather than fight the allegations against MyPillow, MyPillow made a business decision to prevent long and costly litigation, pay a fine, and move on.  Lindell denies the remainder of the allegations in Paragraph 16.

17.     Plaintiffs raise a wholly irrelevant lawsuit in Paragraph 17 that has nothing to do with this lawsuit, these Plaintiffs, defamation, or DTPA under Minnesota or D.C. law.  Plaintiffs clearly cite to this unrelated lawsuit merely as an effort to disparage Lindell and MyPillow.  Lindell admits that rather than fight the allegations against MyPillow, MyPillow made a business decision

---

[1] Defendant denies the allegations made in this sub-heading.

to settle the litigation, and move on.  Lindell was disappointed that BBB lowered its rating of MyPillow.  Lindell denies the remainder of the allegations in Paragraph 17.

### *Lindell Scores a Valuable Product Endorsement from Donald Trump and Advertises Heavily on Conservative Media Platforms[2]*

18.     Lindell admits MyPillow's revenue exceeded $300 million in 2019.  Lindell denies the remainder of the allegations in Paragraph 18.

19.     Plaintiffs allegedly cite to the book, "Mike Lindell, *What are the Odds?* 351-54 (2019)."  Yet, Lindell's book, *What are the Odds*, only has 325 pages.  Lindell admits the second sentence.  Lindell denies the characterizations and alleged facts Plaintiffs ascribe to facts presented in Lindell's book.  Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations related to Fox News, Tucker Carlson, and Sean Hannity.  Lindell denies the remainder of the allegations in Paragraph 19.

20.     Lindell admits he has appeared on the Fox News' *Tucker Carlson Tonight*.  Lindell admits Tucker Carlson has introduced Lindell on one of his shows.  Lindell denies the remainder of the allegations in Paragraph 20.

21.     Plaintiffs pander to their liberal base by attempting to make a big deal out of where MyPillow spends its advertising dollars.  MyPillow has spent millions and millions of dollars on advertising in the Boston Globe, USA Today, the New York Times, and CNN.  Lindell denies the remainder of the allegations in Paragraph 21.

22.     Lindell admits he met President Trump at a White House event where President Trump complimented MyPillow's pillow.  Lindell admits he has been a vocal supporter of President Trump.  Plaintiffs' hack-job characterization of Lindell's interview on Fox Business's

---

[2] Defendant denies the allegations made in this sub-heading.

*After the Bell* is indicative of Plaintiffs' entire lawsuit. It's clear that the only malice demonstrated in this lawsuit is by Plaintiffs toward Lindell. Lindell denies the remainder of the allegations in Paragraph 22.

23.     Plaintiffs' smear campaign continues. The allegations in Paragraph 23 have nothing to do with Plaintiffs' defamation allegations in this case or its DTPA claim under Minnesota or D.C. law. Lindell denies the characterizations and alleged facts Plaintiffs ascribe to the experimental oleandrin-based COVID-19 vaccine produced by a third party. To the extent the alleged facts relate to Lindell, Lindell denies the allegations in Paragraph 23.

### Lindell is a Gifted "Numbers Guy"[3]

24.     Lindell admits he is "good at math," and that "numbers came easy to him," including "percentages, ratios, [and] odds." Lindell denies the remainder of the allegations in Paragraph 24.

25.     Lindell admits he was a professional card player and at times feigned being intoxicated at the card table. Lindell denies the remainder of the allegations in Paragraph 25.

26.     Lindell admits he loved game theory. Lindell denies the remainder of the allegations in Paragraph 26.

27.     Lindell admits he's a numbers guy. Lindell denies the remainder of the allegations in Paragraph 27.

---

[3] Defendant denies the allegations made in this sub-heading.

### *Lindell Understood What Really Happened on Election Night[4]*

28.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 28.

29.     Lindell no longer has access to his Twitter account.  As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 29.  To the extent Paragraph 29 includes an authentic reproduction of Lindell's Tweet, Lindell admits he retweeted President Trump's Tweets referenced in Paragraph 29.  Lindell lacks knowledge and information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 29.

30.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 30.

31.     Lindell denies the allegations made in Paragraph 31.

32.     Lindell denies the allegations made in Paragraph 32.

33.     Lindell admits Plaintiffs correctly quote from the CISA Joint Statement referred to in Paragraph 33.  Lindell denies the remainder of the allegations in Paragraph 33.

### *Mike Lindell Cons People into Buying Pillows*
### *By Telling Them the "Big Lie" About Dominion and the Election[5]*

34.     Lindell denies the allegations made in Paragraph 34.

35.     Lindell denies the allegations made in Paragraph 35.

36.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 36.

37.     Lindell denies the allegations made in Paragraph 37.

---

[4] Defendant denies the allegations made in this sub-heading.

[5] Defendant denies the allegations made in this sub-heading.

### *Lindell Sets Out to Find and Manufacture "Evidence" to Support His Defamatory Marketing Campaign and False Preconceived Narrative*[6]

38.    Lindell denies the allegations made in Paragraph 38.

39.    Lindell denies the allegations made in Paragraph 39.

40.    Lindell admits Plaintiffs correctly quote the statement attributable to then-U.S. Attorney General William Barr from an article referred to in Paragraph 40. Lindell denies the remainder of the allegations in Paragraph 40.

41.    Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 41, including the allegations in Paragraphs 41(a), 41(b), and 41(c).

42.    Lindell denies the allegations made in Paragraph 42.

43.    Lindell admits he appeared on *America First* with Sebastian Gorka. Lindell admits he was trying to get Dominion machines and open them up. Lindell admits he was trying to get the word out about election fraud. Lindell denies the remainder of the allegations in Paragraph 43.

44.    Lindell denies saying the statements and actions Plaintiffs attribute to him in Paragraph 44. Lindell denies the remainder of the allegations in Paragraph 44.

45.    Lindell denies the allegations made in Paragraph 45.

46.    Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 46.

47.    Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 47.

---

[6] Defendant denies the allegations made in this sub-heading.

48.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 48.

49.     Lindell denies the allegations made in Paragraph 49.

50.     Lindell admits he appeared on the Conservative Business Journal.  As reflected in the transcript referenced in Paragraph 50, Lindell repeated what Sydney Powell told him, that "we've got the Dominion machines and stuff, and what happened is at 11:15, our great President got so many votes that during that time, that poured in, it broke the algorithms of the machines…so instead of giving - - when you're giving 1.3 to Biden and 0.7 to the President… they had to shut down at the same time." Lindell denies the remainder of the allegations in Paragraph 50.

### Lindell Uses the Big Lie to Market MyPillow at Rallies in Washington, D.C. [7]

51.     Lindell admits he appeared at the Woman for America First rally.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's speech significantly.  Lindell admits MyPillow sponsored the Woman for America First Rally.  Lindell admits CSPAN said he was the CEO of MyPillow.  Lindell denies the remainder of the allegations in Paragraph 51.

52.     Lindell admits the allegations made in Paragraph 52.

53.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 53.

54.     Lindell denies the allegation of Paragraph 54 as worded.  In the biblical account of Jericho, YHWH destroyed the walls of the city and the children of Israel stormed the city on His orders.

55.     Lindell admits only that a MyPillow advertisement in which he appears was shown on RSBN during the broadcast of the Jericho March.  Lindell lacks knowledge and information

---

[7] Defendant denies the allegations made in this sub-heading.

sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 55.

56.     Lindell admits he appeared at the Jericho March.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's speech significantly.   Lindell denies the remainder of the allegations in Paragraph 56.

57.     Lindell admits only that a MyPillow advertisement in which he appears was shown on RSBN during the broadcast of the Jericho March.  Lindell lacks knowledge and information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 57.

58.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 58.

### *Dominion Repeatedly Demands Retraction of the Big Lie Being Spread by Lindell and His Allies but Lindell Repeatedly Doubles Down*[8]

59.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 59.  To the extent Paragraph 59 contains factual allegations directed at Lindell, Lindell denies the allegations.

60.      Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 60.

61.      Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 61.  To the extent Paragraph 61 contains factual allegations directed at Lindell, Lindell denies the allegations.

---

[8] Defendant denies the allegations made in this sub-heading.

62.     Lindell no longer has access to his Twitter account.  As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 62.  To the extent Paragraph 62 includes authentic reproductions of Lindell's Tweets, Lindell admits he tweeted the statements referenced in Paragraph 62.  Lindell denies the remainder of the allegations in Paragraph 62.

63.     Lindell admits a letter was sent by email at 10:45 p.m. two days before Christmas. To the extent Paragraph 63 contains factual allegations directed at Lindell, Lindell denies the allegations.

64.     Lindell no longer has access to his Twitter account.  As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 64.  To the extent Paragraph 64 includes an authentic reproduction of Lindell's Tweet, Lindell admits he tweeted the statements referenced in Paragraph 64.  Lindell denies the remainder of the allegations in Paragraph 64.

### *Lindell Speaks at and Sponsors Rallies in Washington, D.C. the Day Before and the Day of the Storming of the United States Capitol[9]*

65.     Lindell admits he appeared at the Save the Republic Rally.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's speech significantly.  Lindell denies the remainder of the allegations in Paragraph 65.

66.     Plaintiffs are determined to saddle Lindell with blame for the events of January 6, 2021 at the U.S. Capitol.  This is the Biggest Lie of all.  Lindell bears no connection, and denies any involvement, with those events and no authority has even suggested otherwise.  Plaintiffs distort Lindell's Facebook post.  Lindell denies the remainder of the allegations in Paragraph 66.

67.     Lindell denies the allegations made in Paragraph 67.

---

[9] Defendant denies the allegations made in this sub-heading.

68.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 68.  To the extent Paragraph 68 contains factual allegations directed at Lindell, Lindell denies the allegations.

***Following the Storming of the United States Capitol,
Dominion Again Asks Lindell to Stop Lying About Dominion[10]***

69.     Lindell admits receiving a letter by email at 12:54 a.m. on January 9, 2021.  To the extent Paragraph 69 contains factual allegations directed at Lindell, Lindell denies the allegations.

70.     Paragraph 70 includes an opening paragraph and five bullet-pointed paragraphs.  With respect to the introduction of Paragraph 70, Lindell denies the allegations.

- With respect to bullet point one, Lindell no longer has access to his Twitter account.  As a result, he cannot confirm the accuracy of the Tweet referenced in this paragraph.  To the extent this paragraph includes an authentic reproduction of Lindell's Tweet, Lindell admits he tweeted the statements in the Tweet referenced in this paragraph.  Lindell denies the remainder of the allegations and characterizations in this Paragraph.

- With respect to bullet point two, Lindell admits he appeared for an interview on RSBN.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's interview significantly.  Lindell denies the remainder of the allegations in this Paragraph.

- With respect to bullet point three, Lindell admits he appeared for an interview on RSBN.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's interview significantly.  Lindell denies the remainder of the allegations in this Paragraph.

- With respect to bullet point four, Lindell admits he appeared on The JoePags Show.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly.  Lindell denies the remainder of the allegations in this Paragraph.

- With respect to bullet point five, Lindell admits he appeared on Worldview Weekend Broadcast Network.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly.  Lindell denies the remainder of the allegations in this Paragraph.

---

[10] Defendant denies the allegations made in this sub-heading.

71.     Paragraph 71 includes an opening paragraph and eleven bullet-pointed paragraphs.

With respect to the introduction of Paragraph 71, Lindell denies the allegations.

- With respect to bullet point one, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point two, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point three, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point four, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point five, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point six, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point seven, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point eight, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point nine, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet

point.  To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point ten, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point.  To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point eleven, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point.  To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

> ### Determined to Stick to His False Preconceived Narrative, Lindell Promotes Fake "Evidence" From a Conspiracy Theory Blog After Powell, Wood, and Their Evidence Have Been Discredited[11]

72.     Paragraph 72 includes an opening paragraph and ten bullet-pointed paragraphs. With respect to the introduction of Paragraph 72, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 72.  To the extent Paragraph 72 contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point one, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point.  To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point two, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point.  To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point three, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point.  To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point four, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet

---

[11] Defendant denies the allegations made in this sub-heading.

point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

•       With respect to bullet point five, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

•       With respect to bullet point six, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

•       With respect to bullet point seven, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

•       With respect to bullet point eight, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

•       With respect to bullet point nine, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

•       With respect to bullet point ten, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

73.     Lindell denies the allegations made in Paragraph 73.

74.     Paragraph 74 includes an opening paragraph and nine bullet-pointed paragraphs.

With respect to the introduction of Paragraph 74, Lindell denies the allegations made in Paragraph

74.

•       With respect to bullet point one, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point two, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point three, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point four, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point five, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point six, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point seven, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point eight, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations

  - With respect to the first sub-bullet point under bullet-point eight, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

  - With respect to the second sub-bullet point under bullet-point eight, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations

- With respect to bullet point nine, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

75. Lindell no longer has access to his Twitter account. As a result, he cannot confirm the accuracy of the Tweets referenced in Paragraph 75. To the extent Paragraph 75 includes an authentic reproduction of Lindell's Tweets, Lindell admits he tweeted the statements in the Tweets referenced in Paragraph 75. Lindell denies the remainder of the allegations in Paragraph 75.

76. Lindell denies the allegations made in Paragraph 76.

77. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 77. To the extent Paragraph 77 contains factual allegations directed at Lindell, Lindell denies the allegations.

78. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 78. To the extent Paragraph 78 contains factual allegations directed at Lindell, Lindell denies the allegations.

79. Paragraph 79 includes an opening paragraph and six bullet-pointed paragraphs. With respect to the introduction of Paragraph 79, Lindell denies the allegations made in Paragraph 79.

- With respect to bullet point one, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point two, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point three, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point four, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point five, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

- With respect to bullet point six, Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in this bullet point. To the extent this bullet point contains factual allegations directed at Lindell, Lindell denies the allegations.

80. Lindell denies the allegations made in Paragraph 80.

81. Lindell denies the allegations made in Paragraph 81.

82. Lindell denies the allegations made in Paragraph 82.

83. Lindell denies the allegations made in Paragraph 83.

84. Lindell denies the allegations made in Paragraph 84.

85. Lindell denies the allegations made in Paragraph 85.

86. Lindell denies the allegations made in Paragraph 86.

87. Lindell denies the allegations made in Paragraph 87.

88. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 88.

89. Lindell denies the allegations made in Paragraph 89.

90. Lindell denies the allegations made in Paragraph 90.

91. Lindell admits that NBC reported the statement alleged in the third sentence. Lindell denies the remainder of the allegations made in Paragraph 91.

***News Outlets That Receive Ad Dollars From MyPillow Give Mike Lindell a Global Platform Even Though They Know His Claims About Dominion Are False[12]***

92.     Lindell denies the allegations made in Paragraph 92.

93.     Lindell admits he appeared on the Victory Channel's *FlashPoint*.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell admits the promo code was offered.  Lindell denies the remainder of the allegations in Paragraph 93.

94.     Lindell admits he appeared on Steve Bannon's *War Room: Pandemic*.  Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 94.

95.     Lindell admits Twitter participated in the Left's cancel culture and denied him access to his Twitter account.  Pressured by the Left, Twitter went even further with its cancel culture and denied MyPillow access to its Twitter account.  Lindell denies the remainder of the allegations in Paragraph 95.

96.     Lindell denies the allegations made in Paragraph 96.

97.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 97.

98.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 98.  To the extent Paragraph 98 contains factual allegations directed at Lindell, Lindell denies the allegations.

---

[12] Defendant denies the allegations made in this sub-heading.

99. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 99. To the extent Paragraph 99 contains factual allegations directed at Lindell, Lindell denies the allegations.

100. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 100.

### Lindell Produces and OAN and RSBN Broadcast a Sham "Docu-movie," Knowing Full Well That the Film is Full of Lies About Dominion[13]

101. Lindell admits the letter was sent by email at 10:34 p.m. Lindell denies the assertions made in the letter and denies the remainder of the allegations in Paragraph 101.

102. Lindell admits he appeared on *FlashPoint*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 102.

103. Lindell admits he appeared on *FlashPoint*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 103.

104. Lindell admits he is an executive producer on ABSOLUTE PROOF and it posted on his website michaeljlindell.com on February 5, 2021. Lindell admits that prior to ABSOLUTE PROOF's release it was advertised on Newsmax and *FlashPoint*. Lindell admits MyPillow accepted a discount code "Proof" on its website. Lindell denies the remainder of the allegations in Paragraph 104.

---

[13] Defendant denies the allegations made in this sub-heading.

105.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 105.  To the extent Paragraph 105 contains factual allegations directed at Lindell, Lindell denies the allegations.

106.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 106.  To the extent Paragraph 106 contains factual allegations directed at Lindell, Lindell denies the allegations.

107.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 107.  To the extent Paragraph 107 contains factual allegations directed at Lindell, Lindell denies the allegations.

108.     Lindell admits the allegations in Paragraph 108.

109.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 109.  To the extent Paragraph 109 contains factual allegations directed at Lindell, Lindell denies the allegations.

110.     Lindell admits his words were broadcast on the media alleged, are accurately though incompletely quoted, and taken out of context.  Lindell denies the remainder of the allegations in Paragraph 110.

111.     Lindell admits he and MyPillow have been boycotted and attacked relentlessly by the Left and its cancel culture.  Lindell denies the remainder of the allegations in Paragraph 111.

112.     Lindell admits ABSOLUTE PROOF includes the quoted statements cited in Paragraph 112, although Plaintiffs have edited ABSOLUTE PROOF significantly.  Lindell denies the remainder of the allegations in Paragraph 112.

113.    Lindell admits ABSOLUTE PROOF includes the quoted statements cited in Paragraph 113, although Plaintiffs have edited ABSOLUTE PROOF significantly. Lindell denies the remainder of the allegations in Paragraph 113.

114.    Lindell denies the allegations made in Paragraph 114.

115.    Lindell admits Russell Ramsland appears in ABSOLUTE PROOF and states it was a stolen election. Lindell denies the remainder of the allegations in Paragraph 115.

116.    Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 116.

117.    Lindell denies the allegations made in Paragraph 117.

118.    Lindell denies the allegations made in Paragraph 118.

119.    Lindell admits ABSOLUTE PROOF includes the quotes, taken out of context, by Russell Ramsland cited in Paragraph 119, although Plaintiffs have edited ABSOLUTE PROOF significantly. Lindell denies the remainder of the allegations in Paragraph 119.

120.    Lindell admits ABSOLUTE PROOF included the quoted statements in Paragraph 120 about Russell Ramsland, although Plaintiffs have edited ABSOLUTE PROOF significantly. Lindell denies the remainder of the allegations in Paragraph 120.

121.    Lindell admits ABSOLUTE PROOF includes the quoted statements by Russell Ramsland cited in Paragraph 120, although Plaintiffs have edited ABSOLUTE PROOF significantly. Lindell admits that "every time something pops up, it gets buried out there" and that information is getting suppressed. Lindell admits ABSOLUTE PROOF is publicly available on OAN, RSBN, WVW Broadcast Network, michaeljlindell.com, and Lindell's Facebook page. Lindell denies the remainder of the allegations in Paragraph 121.

122.     Lindell admits Dr. Shiva appears in ABSOLUTE PROOF.  Lindell denies the remainder of the allegations in Paragraph 122.

123.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 123.

124.     Lindell admits Mellissa Carone appears in ABSOLUTE PROOF.  Lindell lacks knowledge and information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 124.

125.     Lindell admits ABSOLUTE PROOF includes the quoted statements cited in Paragraph 125, although Plaintiffs have edited ABSOLUTE PROOF significantly.  Lindell denies the remainder of the allegations in Paragraph 125.

126.     Lindell admits Mary Fanning appears off-screen in ABSOLUTE PROOF.  Lindell admits Ms. Fanning is an executive producer of ABSOLUTE PROOF.  Lindell lacks knowledge and information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 126.

127.     Lindell admits ABSOLUTE PROOF includes the quoted statements cited in Paragraph 127, although Plaintiffs have edited ABSOLUTE PROOF significantly.  Lindell denies the remainder of the allegations in Paragraph 127.

128.     Lindell denies the allegations made in Paragraph 128.

129.     Lindell denies the allegations made in Paragraph 129.

130.     Lindell admits ABSOLUTE PROOF includes the quoted statements cited in Paragraph 130, although Plaintiffs have edited ABSOLUTE PROOF significantly.  Lindell denies the remainder of the allegations in Paragraph 130.

131.    Lindell admits he appeared on Rudy Giuliani's podcast referenced in Paragraph 131.  Lindell admits that as of the date of the podcast, 100 million people had seen ABSOLUTE PROOF with an average view time of an hour and 53 minutes.  Lindell admits that ABSOLUTE PROOF remains online and available.  Lindell admits he stated two new movies were coming out and he used the whack-a-mole phrase.  Lindell denies the remainder of the allegations in Paragraph 131.

### Lindell Benefits at Dominion's Expense Because People Believed Lindell's Fake "Proof" and Bought MyPillows Because of It[14]

132.    Lindell denies the allegations made in Paragraph 132.

133.    Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 133.

134.    Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 134.

135.    Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 135.

136.    Lindell no longer has access to his Facebook account.  As a result, he cannot confirm the accuracy of the post referenced in Paragraph 136.  To the extent Paragraph 136 includes an authentic reproduction of Lindell's Facebook account, Lindell admits that he received a comment from the individual identified.  Lindell lacks knowledge and information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 136.

137.    Lindell no longer has access to his Facebook account.  As a result, he cannot confirm the accuracy of the post referenced in Paragraph 137.  To the extent Paragraph 137

---

[14] Defendant denies the allegations made in this sub-heading.

includes an authentic reproduction of Lindell's Facebook account, Lindell admits that he received a comment from the individual identified. Lindell lacks knowledge and information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 137.

138. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 138.

139. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 139.

140. Lindell denies the allegations made in Paragraph 140.

141. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 141. To the extent Paragraph 141 contains factual allegations directed at Lindell, Lindell denies the allegations.

142. Lindell admits he said that he wanted Dominion to sue him. Lindell lacks knowledge and information sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 142. To the extent Paragraph 142 contains any other factual allegations directed at Lindell, Lindell denies the allegations.

143. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 143.

144. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 144.

145. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 145.

146. Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 146.

147.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 147.

148.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 148.  To the extent Paragraph 148 contains factual allegations directed at Lindell, Lindell denies the allegations.

149.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 149.

150.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 150.  To the extent Paragraph 150 contains factual allegations directed at Lindell, Lindell denies the allegations.

151.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 151.  To the extent Paragraph 151 contains factual allegations directed at Lindell, Lindell denies the allegations.

152.     Lindell denies the allegations made in Paragraph 152.

153.     Lindell denies the allegations made in Paragraph 153.

### *Dominion Suffers Enormous Harm*[15]

154.     Lindell denies the allegations made in Paragraph 154

155.     Lindell denies the allegations made in Paragraph 155.

156.     Lindell denies the allegations made in Paragraph 156.

157.     Lindell lacks knowledge and information sufficient to form a belief about the truth of the allegations contained in Paragraph 157.

158.     Lindell denies the allegations made in Paragraph 158.

---

[15] Defendant denies the allegations made in this sub-heading.

159. Lindell denies the allegations made in Paragraph 159.

**Lindell Has Given Dominion No Choice but to Bring This Lawsuit[16]**

160. Lindell admits he has said the two quoted sentences in Paragraph 160. Lindell denies the remainder of the allegations in Paragraph 160.

161. Lindell denies the allegations made in Paragraph 161.

162. Lindell admits that facts and truth matter. Lindell admits that everyone has had enough . . . of Dominion. Lindell denies the remainder of the allegations in Paragraph 162.

## COUNT ONE – DEFAMATION *PER SE*
### (Against All Defendants)

163. In response to Paragraph 163, Lindell incorporates by reference his responses in the forgoing paragraphs in their entirety as though fully set forth in this cause of action.

164. Lindell denies the allegations made in Paragraph 164.

165. Lindell denies the allegations found in the introductory paragraph of Paragraph 165.

- Lindell admits he appeared at the Woman for America First rally. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's speech significantly. Lindell denies the remainder of the allegations in Paragraph 165(a).

- Lindell admits he appeared at the Jericho March. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's speech significantly. Lindell denies the remainder of the allegations in Paragraph 165(b).

- Lindell admits he appeared on the Newsmax program, *Stinchfield*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(c).

- Lindell no longer has access to his Twitter account. As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 165(d). To the extent Paragraph 165(d) includes an authentic reproduction of Lindell's Tweet, Lindell admits he tweeted the statements in the Tweet referenced in Paragraph 165(d). Lindell denies the remainder of the allegations in Paragraph 165(d).

---

[16] Defendant denies the allegations made in this sub-heading.

- Lindell no longer has access to his Twitter account. As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 165(e). To the extent Paragraph 165(e) includes an authentic reproduction of Lindell's Tweet, Lindell admits he tweeted the statements in the Tweet referenced in Paragraph 165(e). Lindell denies the remainder of the allegations in Paragraph 165(e).

- Lindell no longer has access to his Twitter account. As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 165(f). To the extent Paragraph 165(f) includes an authentic reproduction of Lindell's Tweet, Lindell admits he tweeted the statements in the Tweet referenced in Paragraph 165(f). Lindell denies the remainder of the allegations in Paragraph 165(f).

- Lindell admits he appeared on the Newsmax program, *Greg Kelly Reports*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(g).

- Lindell admits he appeared on the Victory Channel's. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(h).

- Lindell admits he appeared on the ThriveTime Show. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(i).

- Lindell no longer has access to his Twitter account. As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 165(j). To the extent Paragraph 165(j) includes an authentic reproduction of Lindell's Tweet, Lindell admits he tweeted the statements in the Tweet referenced in Paragraph 165(j). Lindell denies the remainder of the allegations in Paragraph 165(j).

- Lindell admits he appeared at the Save the Republic Rally. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's speech significantly. Lindell denies the remainder of the allegations in Paragraph 165(k).

- Lindell admits he appeared for an interview with Roy Fields. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's interview significantly. Lindell denies the remainder of the allegations in Paragraph 165(l).

- Lindell admits he posted a live video to his Facebook page. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's post significantly. Lindell denies the remainder of the allegations in Paragraph 165(m).

- Lindell admits he appeared for an interview. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's interview significantly. Lindell denies the remainder of the allegations in Paragraph 165(n).

- Lindell admits he appeared for an interview on RSBN with Brian Glenn. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's interview significantly. Lindell denies the remainder of the allegations in Paragraph 165(o).

- Lindell admits he appeared for an interview on RSBN. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's interview significantly. Lindell denies the remainder of the allegations in Paragraph 165(p).

- Lindell admits he appeared on the Victory Channel's *FlashPoint*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(q).

- Lindell admits he appeared on Steve Bannon's *War Room: Pandemic*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(r).

- Lindell admits he appeared on The JoePags Show. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(s).

- Lindell no longer has access to his Twitter account. As a result, he cannot confirm the accuracy of the Tweet referenced in Paragraph 165(t). To the extent Paragraph 165(t) includes an authentic reproduction of Lindell's Tweet, Lindell admits he tweeted the statements and link in the Tweet referenced in Paragraph 165(t). Lindell denies the remainder of the allegations in Paragraph 165(t).

- Lindell admits he appeared on the Fox News' *Tucker Carlson Tonight*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(u).

- Lindell admits he appeared on Newsmax. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(v).

- Lindell admits he appeared on Worldview Weekend Broadcast Network. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(w).

- Lindell admits he appeared on *FlashPoint*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(x).

- Lindell admits ABSOLUTE PROOF includes the dialogue cited in Paragraph 165(y), although Plaintiffs have edited ABSOLUTE PROOF significantly. Lindell denies the remainder of the allegations in Paragraph 165(y).

- Lindell admits he appeared for an interview with Steve Bannon. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's interview significantly. Lindell denies the remainder of the allegations in Paragraph 165(z).

- Lindell admits he appeared on the St. George News radio show, *The Kate Dalley Show*. Lindell admits saying the words quoted, although Plaintiffs have edited Lindell's appearance significantly. Lindell denies the remainder of the allegations in Paragraph 165(aa).

166. Paragraph 166 sets out legal conclusions as to which no admission or denial is required.

167. Lindell denies the allegations made in Paragraph 167.

168. Paragraph 168 sets out legal conclusions as to which no admission or denial is required.

169. Paragraph 169 sets out legal conclusions as to which no admission or denial is required.

170. Lindell denies the allegations made in Paragraph 170.

171. Lindell denies the allegations made in Paragraph 171.

172. Lindell denies the allegations made in Paragraph 172.

## COUNT TWO – DECEPTIVE TRADE PRACTICES
### *(Against All Defendants)*

173. In response to Paragraph 173, Lindell incorporates by reference his responses in the forgoing paragraphs in their entirety as though fully set forth in this cause of action.

174. Paragraph 174 sets out legal conclusions as to which no admission or denial is required.

175. Lindell denies the allegations made in Paragraph 175.

176. Lindell denies the allegations made in Paragraph 176.

177.    Lindell denies the allegations made in Paragraph 177.

178.    Lindell denies the allegations made in Paragraph 178.

## PRAYER FOR RELIEF

Paragraphs (a) thru (e) of the Prayer for Relief of the Complaint are a request for relief, which do not require an admission or denial.  In any event, Lindell denies that Plaintiffs are entitled to recover and/or receive any of the relief sought in paragraphs (a) thru (e) against, and as it relates to, Lindell.  To the extent that paragraphs (a) thru (e) contain factual allegations, Lindell denies them.

## JURY DEMAND

Plaintiffs' request for a jury trial does not require an admission or denial.

## II.
## DEFENSES AND AFFIRMATIVE DEFENSES

Subject to the responses above, Lindell alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.  In addition to the defenses described below, subject to its responses above, Lindell specifically reserves all rights to allege additional defenses that become known through the course of discovery.

### A.
### FIRST DEFENSE: TRUTH

1.    Plaintiffs' claims are barred in whole or in part because Lindell's statements complained of are substantially true.

### B.
### SECOND DEFENSE: FIRST AMENDMENT

2.    Plaintiffs' claims are barred in whole or in part by the First Amendment to the United States Constitution.

## C.
## THIRD DEFENSE: STATUTE OF LIMITATIONS

3.      Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations (the single publication rule).

## D.
## FOURTH DEFENSE: STATE ACTOR

4.      Plaintiffs' claims are barred in whole or in part because the statements complained of concern Plaintiffs in their roles as state actors, which deprives them of standing to sue.

## E.
## FIFTH DEFENSE: ALTERNATE CAUSATION

5.      Plaintiffs' claims are barred in whole or in part because some and/or all of any alleged damages suffered by Plaintiffs were not caused by Lindell and were, in fact, caused intervening and/or supervening causes independent of Lindell's conduct.

## F.
## SIXTH DEFENSE: FAILURE TO STATE A CLAIM FOR RELIEF

6.      Plaintiffs' claims are barred in whole or in part because Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

## G.
## SEVENTH DEFENSE: ESTOPPEL

7.      Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

## H.
## EIGHTH DEFENSE: WAIVER

8.      Plaintiffs' claims are barred in whole or in part by the doctrine of waiver.

## I.
## NINTH DEFENSE: ILLEGALITY

9.      Plaintiffs' claims are barred in whole or in part by the doctrine of illegality.

**J.**
**TENTH DEFENSE: FAILURE TO MITIGATE ALLEGED DAMAGES**

10.     Plaintiffs' claims are barred in whole or in part because Plaintiffs have failed to mitigate any alleged damages.

**K.**
**ELEVENTH DEFENSE: UNCLEAN HANDS**

11.     Plaintiffs' claims are barred in whole or in part by Plaintiffs' unclean hands.

**L.**
**TWELFTH DEFENSE: ABSENCE OF MALICE**

12.     Plaintiffs' claims are barred in whole or in part because the allegedly defamatory statements were made without malice.

**M.**
**THIRTEENTH DEFENSE: FAILURE TO JOIN NECESSARY PARTIES**

13.     Plaintiffs' claims are barred in whole or in part because Plaintiffs have failed to name and join necessary parties who are responsible for any alleged damages.

**N.**
**FOURTEENTH DEFENSE: LACK OF CAUSATION**

14.     Plaintiffs' claims are barred in whole or in part due to the lack of causation.

**O.**
**FIFTEENTH DEFENSE: LACK OF PERSONAL JURISDICTION**

15.     Plaintiffs' claims are barred in whole or in part because the Court lacks personal jurisdiction over Lindell.

**P.**
**SIXTEENTH DEFENSE: IMPROPER VENUE**

16.     Plaintiffs' claims are barred in whole or in part because the District of Columbia is not the proper venue for Plaintiffs' claims.

**Q.**
**SEVENTEENTH DEFENSE: ASSUMPTION OF THE RISK**

17.     Plaintiffs' claims are barred in whole or in part because by entering the public arena of providing goods and services for, and by partnering with and/or actually running elections, Plaintiffs' assume the risk of criticism and public debate.

**R.**
**EIGHTEENTH DEFENSE: CONTRIBUTORY NEGLIGENCE**

18.     Plaintiffs' claims are barred in whole or in part by Plaintiffs' contributory negligence in failing to secure Plaintiffs' voting systems from attack after becoming aware that Plaintiffs' voting systems were vulnerable to hacking.

**S.**
**NINETEENTH DEFENSE: LACK OF STANDING**

19.     Plaintiffs' claims are barred in whole or in part because Plaintiffs lack Article III standing to assert some of the allegations Plaintiffs make and prudential standing to assert the alleged injuries of third parties, including other Plaintiffs.

**T.**
**TWENTIETH DEFENSE: FAILURE TO PLEAD SPECIAL DAMAGES**

20.     Plaintiffs' claims are barred in whole or in part because Plaintiffs failed to plead special damages such as lost profits under the heightened pleading requirements of FED. R. CIV. P. 9(g).

**U.**
**TWENTY-FIRST DEFENSE: INCREMENTAL HARM DOCTRINE**

21.     Plaintiffs' claims are barred in whole or in part by the incremental harm doctrine because Lindell's statements failed to cause incremental harm to Plaintiffs and are, therefore, nonactionable.

## V.
## TWENTY-SECOND DEFENSE: LIBEL PROOF PLAINTIFF DOCTRINE

22.     Plaintiffs' claims are barred in whole or in part by the libel proof plaintiff doctrine because Lindell's statements failed to cause Plaintiffs harm as their reputation had already been damaged beyond repair by numerous years of negative press and statements made prior to the 2020 election.

## W.
## TWENTY-THIRD DEFENSE: ABSOLUTE PRIVILEGE

23.     Plaintiffs' claims are barred in whole or in part because the landmark decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) creates an absolute privilege.

## III.
## RESERVATION OF RIGHTS

Lindell reserves the right to revise, supplement, or amend his Answer and Defenses, including reserving all defenses permitted under the Federal Rules of Civil Procedure, and/or at law or in equity, that may now exist or may in the future be available based on discovery and/or further investigation in this case.

## IV.
## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Pursuant to Federal Rules of Civil Procedure 13 and 20, Counterclaimant and Third-Party Plaintiff Lindell asserts by way of counterclaims against Plaintiffs/Counter-Defendants Dominion and/or Dominion Defendants and third-party claims against Third-Party Defendants Smartmatic and/or Smartmatic Defendants and HPS as follows:

### A.
### OVERVIEW

"We can only spread our knowledge outwards from individual to individual, generation after generation.  In the face of the Thought Police, there is no other way."

- George Orwell, *1984*

1.      Mike Lindell brings this lawsuit to stop electronic voting machine companies and their co-conspirators from weaponizing the litigation process to silence political dissent and suppress evidence showing voting machines were manipulated to affect outcomes in the November 2020 General Election.

2.      Fact:  Electronic voting machines and software can be hacked through a cyber-attack, thereby allowing data flowing through those devices to be manipulated, stolen, or altered.

3.      Fact:  It is indisputable that the electronic voting machines and software manufactured and sold by Dominion and Smartmatic are vulnerable to cyberattacks before, during, and after an election, and in a manner that could easily alter election outcomes.  Election security expert and University of Michigan science and engineering professor, J. Alex Halderman, and others have given sworn testimony of this fact:[17]

---

[17] *See* C-SPAN2, *Senate Intelligence Committee Hearing on Russian Election Interference*, YOUTUBE (Jun. 21, 2017), https://www.youtube.com/watch?v=AmivIHUAy8Q; *see also* Decls. of J. Alex Halderman, *Curling v. Raffensperger*, Case No. 1:17-cv-02989-AT, Doc. Nos. 1133 and 1177-1.



18



---

[18] *See* Mike Lindell, *Absolutely 9-0*, WVW Broadcast Network (Jun. 3, 2021), https://www.worldviewweekend.com/tv/video/mike-lindell-presents-absolutely-9-0, beginning at the 22:56 minute mark.

5.     Fact:  Direct and circumstantial evidence demonstrates that, during the 2020 General Election, electronic voting machines and software like those manufactured and sold by Dominion and Smartmatic were manipulated and hacked in a manner that caused votes for one candidate to be tallied for the opposing candidate.

6.     Fact:  Voting machine companies, including Dominion and Smartmatic, are state actors by virtue of their roles running elections in the United States—a traditionally, exclusive public function of the government and constitutional obligation reserved to the states that has been outsourced by state governments.

7.     Fact:  The First Amendment guarantees the right of citizens such as Lindell to express political dissent and espouse beliefs without fear of intimidation, suppression, or punishment from state actors like voting machine companies that provide election equipment and run elections for state governments.

8.     Fact:  Following the 2020 General Election, Lindell gathered and publicly shared information from various sources demonstrating that Dominion's voting machines and software were, in fact, the target of cyberattacks in the November 2020 General Election.  Such evidence includes Dr. Douglas Frank's conclusive analysis showing an algorithm was employed to manipulate votes in the 2020 General Election and evidence of China and other nation-state actors hacking electronic voting machines —specifically including twenty hacks primarily by actors in China that alone changed the outcomes in the presidential race in the 2020 General Election.

9.     Fact:  In response to Lindell's public statements about the evidence he gathered, Dominion, in conjunction with its public relations firm, HPS, and its lawyers at Clare Locke, LLP ("Clare Locke"), threatened Lindell with financial ruin if he did not stop publicly expressing his

political speech regarding the issues surrounding the use of electronic voting machines in the 2020 General Election.[19]

10. Fact: Dominion hired HPS after the 2020 General Election to "coordinate a public relations campaign responding to the outlandish claims by the president, his legal team, and their supporters, according to Michael Steel, a HPS partner . . . ."[20] In an interview given to CNN on or around February 7, 2021, Mr. Steel stated, "Mike Lindell is begging to be sued and some day we may oblige him."[21] HPS, at Dominion's behest and in coordination with them, devised a plan to weaponize the legal process to silence critics of Dominion's state action, including Lindell, and to intimidate witnesses to election fraud through lawsuits and/or threatening cease and desist letters and a vast media campaign. In fact, as part of the plan and media campaign to intimidate and silence Americans' first amendment rights, HPS provided copies of Dominion and Clare Locke's cease-and-desist letters and a list of those who received the letters to The Washington Post.[22]

---

[19] *See* Jacob Shamsian, *Will Dominion End Up Owning MyPillow if It Wins a $1.3 Billion Defamation Lawsuit Against Mike Lindell? Here Are 2 Ways It Could Take Control*, INSIDER (Nov. 3, 2021), https://www.businessinsider.com/will-dominion-own-mypillow-if-it-wins-defamation-lawsuit-2021-11.

[20] Lachlan Markey, *Trump-Targeted Voting Company Dominion Hires Top PR Firm to Help Against the Crazy*, DAILY BEAST, (https://www.thedailybeast.com/trump-targeted-voting-company-dominion-hires-top-pr-firm-to-help-against-the-crazy).

[21] Michael Steel, *Dominion Spokesman: Mike Lindell is Begging to be Sued. We May Oblige Him.*, CNN (Feb. 7, 2021), https://www.youtube.com/watch?v=csONmhFDW4U.

[22] *Dominion Threatens MyPillow CEO Mike Lindell with Lawsuit Over "False Conspiratorial" Claims*, THE WASHINGTON POST (Jan. 18, 2021), https://www.washingtonpost.com/politics/2021/01/18/dominion-mike-lindell-mypillow/ ("More than 150 people — including Kelli Ward, the staunchly pro-Trump chair of the Arizona GOP — were sent cease-and-desist notices and warnings to preserve documents in a recent wave of letters to those who provided affidavits in election lawsuits, according to Hamilton Place Strategies, a communications firm representing Dominion that shared copies of letters and a list of recipients Monday.")

11.     Fact:   When Lindell refused to be intimidated into surrendering his First Amendment right to political free speech, Dominion, based on the plan devised with HPS and Clare Locke, sued him for $1.3 billion in federal court in Washington, D.C.—a jurisdiction where neither Lindell nor Dominion reside, and outside the jurisdiction where Lindell made most of the statements about which Dominion complains.

12.     Fact:  Dominion weaponized the legal process and intimidated witnesses to election fraud by suing or threatening to sue over 150 private individuals or organizations, including dozens of citizen volunteer poll watchers, with baseless defamation lawsuits through "cease and desist" letters from Dominion's lawyers at Clare Locke.[23]  Dominion further publicly boasts of doing so— merely because those citizens signed affidavits regarding fraudulent or illegal activities they witnessed during the November 2020 general Ggeneral Election.[24]  Dozens of those citizens *never mentioned* Dominion or issues with any electronic voting machines, rather just those "who provided affidavits in election lawsuits."[25]  Yet, Dominion and Clare Locke, in conjunction with HPS, still threatened these witnesses—citizen volunteers performing a public service—with ruinous litigation and onerous demands to preserve even private communications.[26]

---

[23] *See* Case No. 1:21-cv-02672, *Cooper v. US Dominion, Inc.*; currently pending in the United States District Court for the District of Colorado.

[25] *Dominion Threatens MyPillow CEO Mike Lindell with Lawsuit Over "False Conspiratorial" Claims*, THE WASHINGTON POST (Jan. 18, 2021), https://www.washingtonpost.com/politics/2021/01/18/dominion-mike-lindell-mypillow/

[26] *See id*.

13.     Fact: The U.S. Government has been concerned about Smartmatic's ownership and origin as well as involvement in fraud and corruption since at least 2006.[27] According to a cable written by the political counselor of the U.S. Embassy in Caracas, Venezuela, "Smartmatic has claimed to be of U.S. origin, but its true owners—probably elite Venezuelans of several political strains—remain hidden behind a web of holding companies in the Netherlands and Barbados."[28] The cable further discussed potential rigging of the machines by and for Chavez's regime and how Smartmatic, a "virtually unknown company with no electoral experience could have landed" a contract worth at least $128,000,000 to run Venezuela's elections.[29] The cable implies Smartmatic bribed Venezuelan government officials.[30]

14.     Fact:  Based on the well-known suspicions of Smartmatic's foreign ownership, the Committee on Foreign Investment in the United States ("CFIUS") and the U.S. Department of Justice, among other state agencies, opened investigations into Smartmatic's ownership of Sequoia Voting Systems ("SVS") in 2006.  In a blatant attempt to hamper these federal investigations, Smartmatic quickly sold SVS to its own executives, who were U.S. citizens, which became SVS Holdings.

---

[27] Robert Downes, *United States Cable*, U.S. EMBASSY CARACAS, VENEZUELA (Jul. 2006) (on file with U.S. State Department); Frank Jack Daniel, et al., *U.S. Views Chavez in "Axis of Mischief,"* REUTERS (Dec. 1, 2010), https://www.reuters.com/article/us-wikileaks-venezuela-idUSTRE6B040D20101202

[28] *Id.*

[29] *Id.*

[30] *Id.*

15.     Fact:  Smartmatic owns the licensing rights to the intellectual property used by other voting machine companies, including Dominion.[31]

16.     Fact:   Smartmatic has engaged in similar weaponization of the court system to attack individuals and news outlets for publicly sharing information they gathered regarding vulnerabilities in, and attacks on, electronic voting machines in the 2020 General Election.  On February 4, 2021, Smartmatic sued Fox News, Lou Dobbs, Maria Bartiromo, Jeanine Pirro, Rudolph Giuliani, and Sidney Powell.[32]  More recently, in further perpetuation of the scheme  to silence political speech and gain media attention doing so, Smartmatic filed two new lawsuits on November 3, 2021—the one-year anniversary of the 2020 election—against One America News Network in federal court in Washington, D.C.,[33] and, in a separate action, Newsmax Media, Inc., in state court in Delaware.[34]  Smartmatic then filed a "precautionary" lawsuit against Sidney Powell in federal court in Washington, D.C. on November 12, 2021.[35]  And, the latest step in furtherance of the scheme to silence political speech?  Smartmatic has now come to this Court

---

[31] *See* September 18, 2007 Stock Purchase Agreement between Smartmatic, Sequoia Voting Systems, and SVS Holdings, Inc., at pp. 7 and 36 (§8.14) (on file with owner).

[32] *See* Index No. 151136/2021, *Smartmatic USA Corp. v. Fox Corporation*, currently pending in the Supreme Court for the State of New York, New York County.

[33] *See Smartmatic USA Corp. v. Herring Networks, Inc., d/b/a One America News Network*, currently pending in the United States District Court for the District of Columbia.

[34] *See Smartmatic USA Corp., v. Newsmax Media, Inc.*, currently pending in the Superior Court of the State of Delaware.

[35] *Smartmatic USA Corp. v. Powell*, currently pending in the United States District Court for the District of Columbia.

threatening to sue Lindell and seek sanctions against him for fighting back against the coordinated campaign to stifle dissenting speech.[36]

17.     Fact: Dominion and Smartmatic both manufacture, distribute, and maintain voting hardware and software.  They both also execute software updates, fixes, and patches for their voting machines and election management systems.  On the surface, Dominion and Smartmatic appear as competitors in the market for electronic voting systems.  But in reality, they share many things in common—including an intertwined corporate history and a shared "DNA" of election management system software and hardware.  Dominion has been known to license Smartmatic's intellectual property for Dominion's voting systems.  For example, Dominion bid on Colorado's voting system contract in 2013 and stated that Dominion's proposed "project" and voting "system" included Smartmatic's Proprietary Intellectual Property, specifically the "Edge 2 + . . . and the HAAT" systems.  Dominion stated that it "continues to support and improve [Smartmatic's] system today."[37]  Their intertwined corporate history also includes several high-ranking Dominion employees with Smartmatic email addresses.  Dominion and Smartmatic have both aggressively launched threats and lawsuits towards anyone who publicizes the flaws present in their voting machines and systems and the role both Defendants played in undermining the integrity of the

---

[36] *See* Smartmatic Defendants' Memorandum in Support of Their Motion to Dismiss at 2-3 n.1, n.2, *Lindell v. US Dominion, Inc., et. al*, Case No. 1:21-cv-02296-CJN, Doc. No. 81-1.

[37] *State of Colorado Uniform Voting System Request for Proposal, RFP No. CDOS-UVS-2013-01, Business Proposal*, DOMINION VOTING (Dec. 4, 2013), https://www.sos.state.co.us/pubs/elections/VotingSystems/RFI/proposals/DominionVotingSyste msColoradoUVSProposal.pdf.

2020 General Election.  And both publicly boast of their abhorrent conduct on their respective websites.[38]

18.     Fact:  The Arizona Senate ordered a full forensic audit of the votes cast in Maricopa County—the fourth most populous county in the United States in order "to restore integrity to the election process."  The audit included Dominion's voting machines used in that county during the 2020 General Election.   The Maricopa County Board of Supervisors and various Democrat-affiliated groups spent months attempting to thwart or obstruct the audit—efforts that were repeatedly rebuffed in Court.  These efforts included refusing to turn over routers connected to the Dominion machines, which showed details regarding the Dominion machines' internet connections.  The Maricopa County officials also admitted they did not possess the administrative passwords to the Dominion voting machines, meaning Dominion employees had sole access to the machines and control over the election.  As expected, Dominion joined the Democrat-led chorus to smear the audit and refused to cooperate with the auditors, including refusing to turn over the administrator passwords to the voting machines.  These facts regarding the Maricopa County audit were only recently reported. The investigation "clearly demonstrated that the Maricopa County [and Dominion] voting systems did not follow [the Cyber and Infrastructure Security Agency] or industry standard cyber security best practices."[39] "Files were [also] missing from [Dominion's] Election Management System (EMS) Server" and ballot images on the EMS were "corrupt or missing."[40]   Further, "[l]ogs appeared to be intentionally rolled over, and all the data in the

---

[38] *Legal Updates*, DOMINION VOTING, https://www.dominionvoting.com/legal-updates-learn-how-we-are-defending-dominion/; *Media*, SMARTMATIC, https://www.smartmatic.com/us/media/.

[39]  Cyber Ninjas, *Maricopa County Forensic Election Audit Volume III* at 62 (2021).

[40] *Id.*

database related to the 2020 General Election had been fully cleared."[41]  The report includes a summary table of conclusions which, more so than any "fake news" or "disinformation" Defendants have so desperately sought to silence, gives Americans good reason to question the integrity of the election results generated by electronic voting machines and Defendants'—not Lindell's—role in causing that distrust.  For instance, the report shows a high likelihood that the EMS database was purged[42] and elections files were deleted, both of which significantly impacted election results.[43] The report also shows a high likelihood that a significant number of ballots had corrupt images, which also severely impacted the election results.[44]  The Maricopa County reports clearly show significant problems related to Dominion's machines and administration of elections which could have influenced election results and support many of Lindell's statements.

19.     Fact:  Forensic audits and investigations of the November 2020 election and the role of voting machines and electronic voting systems are currently underway or were recently completed either by court order or by direction of state legislatures or attorneys general in Arizona, Georgia, Michigan, Wisconsin, New Hampshire, and Pennsylvania.  In fact, recently "[a] judge . . . asked Georgia election investigators and the [Georgia Bureau of Investigations] to provide an update about any investigations into allegations involving the casting of counterfeit ballots in last

---

[41] *Id.*

[42] *See id.*

[43] *See id.*

[44] *See id.*

year's presidential election."[45]  In August 2021, Pennsylvania Senate President Pro Tempore Jake

Corman announced that the Senate would "conduct a thorough forensic audit of recent elections,"

which would "go much further than previous reviews mandated by state law, which have focused

on whether the reported counts are 'accurate.'"[46]  "The goal of the Senate's investigation will not

be to conduct a recount, but to find any flaws in the system that could be exploited by bad actors

and take action to correct those flaws through legislative changes to our Election Code."[47]  In

conjunction with the probe, the Pennsylvania Senate Intergovernmental Operations Committee

created a webpage for voters to submit sworn testimony concerning any "voter irregularities or

other election improprieties" they witnessed.[48]  More than a few individuals in Pennsylvania

cannot participate in the Senate's effort, however, because Dominion, in coordination with HPS,

and Clare Locke, sent over 150 cease and desist letters threatening ruinous litigation if any of the

recipients spoke publicly about what they witnessed.  The cease and desist letters orchestrated by

Dominion, HPS, and Clare Locke are not only reckless, but also interfere with governmental

investigations and are tantamount to obstruction of justice.  The letters also constitute witness

---

[45] Mark Niesse, *Judge Seeks Info on Georgia Investigations of Counterfeit Ballots*, ATLANTA J. CONST. (Sept. 20, 2021),
https://www.ajc.com/politics/judge-seeks-info-on-georgia-investigations-of-counterfeit-ballots/YUQ3JQR32VHTNCXO3NUMW4YQNY/.

[46] Jake Corman, Op-Ed: Careful, Thoughtful Investigation is Necessary to Restore Faith in Our Elections (Aug. 23, 2021), https://www.senatorcorman.com/2021/08/23/op-ed-careful-thoughtful-investigation-is-necessary-to-restore-faith-in-our-elections/.

[47] *See id*.

[48] *Senate Intergovernmental Operations Committee Invites Public to Submit Sworn Testimony in Election Investigation*, PENNSYLVANIA SENATE REPUBLICANS (Sept. 2, 2021), https://www.pasenategop.com/blog/senate-intergovernmental-operations-committee-invites-public-to-submit-sworn-testimony-in-election-investigation/.

intimidation and tampering. Such actions are specifically actionable under every States' penal code because of the heinousness of the conduct.

20. Fact: Both Dominion and Smartmatic have a common interest to suppress speech and views about their respective electronic voting equipment's security issues and vulnerabilities. Dominion and Smartmatic are two of only a handful of companies currently administering and running elections in the United States. Both sit on a Cyber Infrastructure and Security Agency counsel board and both heavily lobby state and federal legislatures every year regarding election issues because states are their clients and the federal government controls election security standards. Without question, when Republicans start to examine their technologies' vulnerabilities, like the Democrats have done for years, it creates an existential threat to their businesses because now both parties are wary of using their technology. Very few issues are more political in nature than running an election, which is a traditionally exclusive public function of the state. Accordingly, Dominion and Smartmatic have taken it upon themselves to coordinate their response to such an existential threat by using the litigation process to silence their critics.

21. Conclusion: Dominion, HPS, Clare Locke, Smartmatic, and others are desperate to cover up gross security flaws in their electronic voting systems—and information showing cyber attacks and hacking in the November 2020 election—by uniting in a common purpose to use the litigation process to attempt to suppress the revelation and public discussion of these truths.

22. This new, fledgling era of "lawfare"[49] must be stopped before it is allowed to gain a toehold of acceptance in the U.S. judiciary and the courts become yet another weapon for wealthy

---

[49] Lawsuit Warfare = Lawsuit + Warfare = Lawfare. *See* https://en.wikipedia.org/wiki/Lawfare.

corporations and the powerful politicians they support to silence speech and ideas they deem unacceptable to their narrative.

## B.
## PARTIES

23.     Plaintiff Michael J. Lindell ("Plaintiff" or "Lindell") is an individual citizen of the State of Minnesota.

24.     Defendant US Dominion, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Denver, Colorado.  It may be served with process by delivering the summons and complaint to its Chief Executive Officer, John Poulos, at its principal place of business, 1201 18th Street, Suite 210, Denver, Colorado 80202.

25.     Defendant Dominion Voting Systems, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Denver, Colorado. It may be served with process through its registered agent for service of process in Minnesota, Cogency Global, Inc., 6160 Summit Drive N., Suite 205, Brooklyn Center, Minnesota 55430.

26.     Defendant Dominion Voting Systems Corporation is a corporation organized and existing under the laws of the Province of Ontario, Canada with its principal place of business in Toronto, Ontario, Canada.  It may be served with process in accordance with the terms of the Hague Convention.

27.     Dominion has generally appeared in this case.

28.     Defendant Hamilton Place Strategies, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Washington, District of Columbia.  It may be served with process by delivering the summons and complaint to its CEO, Stuart Siciliano, at its principal place of business, 805 15th St. NW, Suite 200, Washington, District of Columbia 20005.

29.     Defendant Smartmatic USA Corp. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Boca Raton, Florida.  It may be served with process by delivering the summons and complaint to its Director, James Long, at its principal place of business, 1001 Broken Sound Parkway, Suite D, Boca Raton, Florida 33487.

30.     Defendant Smartmatic International Holding B.V. is a corporation organized and existing under the laws of the Netherlands, with its principal place of business in Amsterdam, Netherlands.  It may be served with process in accordance with the terms of the Hauge Convention.

31.     Defendant SGO Corporation Limited is a corporation organized and existing under the laws of the United Kingdom with its principal place of business located in London, United Kingdom.  It may be served with process in accordance with the terms of the Hague Convention.

### C.
### JURISDICTION AND VENUE

32.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §1331, in that one or more of Lindell's causes of action arises under the Constitution or laws of the United States.  Specifically, Lindell alleges causes of action under 42 U.S.C. §1983, 42 U.S.C. §1985(3), and 18 U.S.C. §1964.

33.     This Court also has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §1332, in that the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states or citizens of a State and citizens or subjects of a foreign state.  Specifically, Lindell is a citizen of Minnesota, while Counter-Defendants and Third-Party Defendants are citizens of Delaware, Washington, D.C., Colorado, Florida, Canada, the Netherlands, and the United Kingdom.

34.     This Court has *in personam* jurisdiction over Counter-Defendants and Third-Party Defendants in that they have minimum contacts with the District of Columbia, having purposefully availed themselves of the privilege of doing business here.   Moreover, this Court's assertion of personal jurisdiction over Counter-Defendants and Third-Party Defendants comports with traditional notions of fair play and substantial justice.

35.     Venue is proper in this District under 28 U.S.C. §1391 in that Counter-Defendants and Third-Party Defendants are subject to personal jurisdiction in this District, as set out above. Further, the parties, excluding HPS, have consented to transfer of this case from the District of Minnesota to the District of Columbia.

**D.**
**FACTUAL ALLEGATIONS**

> "Power is in tearing human minds to pieces and putting them together again in new shapes of your own choosing."
>
> -   George Orwell, *1984*

36.     Lindell will prove that the Dominion Defendants, acting in concert and as part of an unlawful enterprise alongside HPS, Clare Locke, and the Smartmatic Defendants, have weaponized the court system and the litigation process in an attempt to silence Lindell's and others' political speech about election fraud and the role of electronic voting machines in it.  In the specific context of political speech about something as vital to a republican form of government as election integrity, no litigant should be permitted to use the courts and the litigation process as a bludgeon to suppress and stifle dissent.  But that is what the Dominion Defendants, HPS, and Smartmatic Defendants have done.  Many of their victims lack the resources to fight back and expose the Defendants' scheme for what it is—an authoritarian abuse of state power fueled by the virtually unlimited resources from their ideological comrades.  But Lindell has the resources and

the will to fight back, albeit at great personal and financial cost; Lindell believes the future of the American republic depends on fighting back against censorship of information concerning the fundamental aspect of our republic—fair and secure elections. So, Lindell brings this suit to bring a stop to the defendants' abuses of the legal system and protect Americans' right to speak freely on matters of the utmost public concern.

## I.
## The Rise of the Machines

"You talk as if a god had made the Machine … I believe that you pray to it when you are unhappy. Men made it, do not forget that."

- E.M. Forster, *The Machine Stops*

37. Prior to 2002, states conducted their elections overwhelmingly using relatively secure and auditable paper-based systems. However, following passage of the Help America Vote Act in 2002,[50] billions of federal dollars were spent to move from such paper-based systems to electronic, computer-based systems.

38. As a result, by 2020, most elections in the United States were conducted using one of only a small handful of available private election management systems. These systems are provided by a small number of private companies having little to no transparency to the public, producing results that are far more difficult to audit than paper-based systems, and lacking any meaningful federal standards or security requirements beyond what individual states may choose to certify.[51]

---

[50] 52 U.S.C. §20901 *et seq.*

[51] Dominion touts its certification by the United States Election Assistance Commission ("EAC"). But as of November 2020, the EAC did not test or certify electronic voting systems for security against cyberattacks.

39.     This small cadre of private companies supply the hardware and software for the election management systems and electronic voting machines, in some cases manage the voter registration rolls, maintain the voter records, partially manage the elections, program the vote counting, and report the election results to the relevant government authorities.

40.     As of November 2020, a total of five (5) companies conducted and administered elections for more than ninety percent (90%) of counties in the United States: (1) Election Systems & Software, (2) Dominion Voting Systems, (3) Smartmatic USA Corp., (4) Hart InterCivic, and (5) Tenex.[52]  All these providers' electronic voting machines and election management systems are vulnerable to hacking, as has been published and presented to various congressional committees.  All can be, and at various steps in the voting, counting, tabulation, and/or reporting process are designed to be, connected to the internet directly or indirectly.

41.     After votes are tabulated at the county level using one of the handful of available election management systems, they are then uploaded over the internet to one of a small handful of election night reporting systems.  Those systems are owned and controlled by Scytl, GCR, VR Systems, and Arikkan.  For its part, the Clarity system, used in twenty-eight states, is wholly owned by Scytl, a multi-national company headquartered in Barcelona, Spain that reportedly stored its election vote data on servers in Frankfurt, Germany.[53]

---

[52] Pam Fessler & Johnny Kauffman, *Trips to Vegas and Chocolate-Covered Pretzels: Election Vendors Come Under Scrutiny*, NPR (May 2, 2019, 5:00 AM), https://www.npr.org/2019/05/02/718270183/trips-to-vegas-and-chocolate-covered-pretzels-election-vendors-come-under-scruti.

[53] Letter from Congressmen Bill Posey, Matt Gaetz, Jody B. Hice, Jeff Duncan, Michael Cloud, Ted Budd, John Rose, Rick W. Allen, and Louie Gohmert to John Ratcliffe, Dir. of Nat'l Intel. (Nov. 13, 2020), https://posey.house.gov/uploadedfiles/barr_election_fraud_software_11132020.pdf.

42.     In short, over the last two decades, the United States has transitioned from a safe, secure, auditable paper-based system (paper voter rolls, hand-marked paper ballots, etc.) to an inherently vulnerable, internet-exposed electronic voting machine-based system.  And not surprisingly, that transition to increased reliance on electronic systems and computer technology has brought with it the very real specter of hacking, election tampering, and electronic voting fraud.

43.     As previously noted, Dominion and Smartmatic manufacture, distribute, and maintain voting hardware and software.  Dominion executes software updates, fixes, and patches for its voting machines, including as late as the night before election day, and it pushes out such software through means selected at its own discretion, including via the internet.

44.     Dominion designs public election processes with its hardware and software products at the center and provides administrative services for public elections.  While polls are open, Dominion employees stand by to provide troubleshooting and support when voting machines malfunction, among other election services.  Dominion also audits the performance of the machines and elections.  In Fulton County, Georgia alone, for six weeks of "service" beginning for the "week ending on October 25" through the "week ending November 29," 2020, Dominion billed, and the county paid $1,297,260.00.[54]  In addition to that invoice, Dominion billed, and the county paid $407,000.00 and $261,000.000 for "on-site services."[55]

45.     Increasingly, jurisdictions have chosen to outsource their constitutional obligations under Article 1, Section 4, Clause 1 to administer and run election operations and programming to private contractors.  By the time of the 2020 election, at least 3,143 counties across the United

---

[54] Fulton County, Georgia, Invoice No. DVS138565R1 (March 31, 2021).

[55] Fulton County, Georgia Invoice Nos. DVS139582 and DVS139583 (Jan. 31, 2021).

States had outsourced these constitutional obligations to private contractors. For the 2020 election, Dominion provided its voting machines and services in more than half of the United States from its U.S. base of operations in Colorado. Many of these states, such as Arizona, Nevada, Wisconsin, Michigan, Georgia, Florida, and Pennsylvania, have been referred to as battleground or swing states because their voters are equally divided (or nearly equally divided) in their degree of support for the two primary political parties. Dominion has contracts with over 1,300 governmental jurisdictions around the United States to administer elections, including a state-wide mandated contract with Georgia requiring every county use Dominion's machines and services.

46. The State of Georgia awarded the Master Solution Purchase and Service Agreement ("Agreement") to Dominion on July 29, 2019, just in time to implement the solution prior to the 2020 election.[56] Unlike other states, Georgia required that one company alone be responsible for all election administration.[57] As part of the Agreement, Georgia and Dominion agreed that the "State has relied, and will rely on, [Dominion's] experience and expertise in installing, implementing, and servicing the Solution purchased under this Agreement."[58] Dominion's core responsibilities under the Agreement were, therefore, the administration, collection, counting, recording, and auditing of ballots and election results with the help of thousands of hours of support.[59] The Agreement cost the State of Georgia roughly $90,000,000 upfront.[60] And soon,

---

[56] *See* Master Solution Purchase and Services Agreement, by and between Dominion Voting Systems, Inc., and Secretary of State of the State of Georgia (July 29, 2019), https://gaverifiedvoting.org/pdf/20190729-GA-Dominion-Contract.pdf.

[57] Georgia H.R. 316, 2019; GA. CODE § 21-2-300(2).

[58] *Id*. at § 4.1.1.

[59] *See id*.

[60] *See* Master Solution Purchase and Service Agreement, *supra*.

the "service" bills from Dominion to local counties started to roll in. In Fulton County, Georgia alone, for six weeks of service for the "week ending on October 25" through the "week ending November 29," 2020, Dominion collected $1,297,260.00.[61]

47. By its own account Dominion provides an "End-To-End Election Management System" that "[d]rives the entire election project through a single comprehensive database."[62] Its tools "build the election project," and its technology provides "solutions" for "voting & tabulation," and "tallying & reporting," and "auditing the election." The products sold by Dominion include ballot marking machines, tabulation machines, central tabulation machines, among others, and thousands of hours of support services. Dominion also provides numerous and continuous software updates to their machines. By contracting with governmental jurisdictions to take responsibility for States' constitutional obligations under Article 1, Section 4, Clause 1 to provide comprehensive voting solutions for public elections, which is a traditionally exclusive public function, and "driv[ing] the entire election,"[63] Dominion is a state actor. As a result of Dominion's contracts with government entities, it is delegated responsibility to administer public elections, including the election of individuals to serve in constitutionally prescribed offices—a core governmental function. In at least one jurisdiction in the November 2020 election, Maricopa County, Arizona, county officials did not even possess the administrator passwords to the Dominion voting machines—meaning only Dominion could program and operate the machines on behalf of the county.

_____

[61] Fulton County, Georgia, Invoice No. DVS138565R1 (March 31, 2021).

[62] DEMOCRACY SUITE® ELECTION MANAGEMENT SYSTEM,
 https://www.dominionvoting.com/democracy-suite-ems/ (last visited Apr. 18, 2021).

[63] *Id.*

48.     Such total control by Dominion over their machines is not isolated to Maricopa County, Arizona.  To the contrary, as reported as recently as November 15, 2021, it also happens in cities like San Francisco.[64]  In an article questioning how Dominion gained total control over elections within the city, it also questions why open-source voting technology is not used, as "[o]pen source is the ultimate in transparency and accountability for all."[65]  "Open-source voting technology would allow cities' tech teams to work with vendors on voting equipment software, advocates say. San Francisco and many other cities lease '**black box**' voting machines, such as the Dominion machines used in The City, **with software that city tech teams cannot access**."[66]  If places like Maricopa and San Francisco are not provided access to the machines, then how are they able to administer and run their respective elections?  The answer is they cannot.  Rather, Dominion through total control of the election infrastructure administers and runs these elections.

49.     All of these facts demonstrating that Dominion does, in fact, run elections around the country repudiate Dominion's representation to the United States Court of Appeals for the District of Columbia Circuit that "Dominion does not run any elections, period."[67]  Dominion's involvement in running elections amounts to state action because running elections are a traditionally, exclusive public function.  Dominion is granted authority by the United States Constitution and state law, and willfully participates in joint activity with the state during voting,

---

[64] Jeff Elder, *How One Company Came to Control San Francisco's Elections*, SAN FRANCISCO EXAMINER (Nov. 15, 2021), https://www.sfexaminer.com/news/how-one-company-came-to-control-san-franciscos-elections/.

[65] *Id.*

[66] *Id.* (emphasis added).

[67] Dominion's Reply in Support of its Motion to Dismiss for Lack of Jurisdiction, Doc. No. 1923455 at 1, n.1, USCA Case No. 21-7103, Consolidated with USCA Case No. 21-7104 (Nov. 22, 2021).

including by supplying its products and services coextensively with election officials to carry out the election. There is pervasive entwinement between Dominion and States.

## II.
## Strange Bedfellows

"Misery acquaints a man with strange bedfellows."

- William Shakespeare, *The Tempest*

50. Dominion and Smartmatic both manufacture, distribute, and maintain voting hardware and software. They both also execute software updates, fixes, and patches for their voting machines and election management systems. On the surface, Dominion and Smartmatic appear as competitors in the market for electronic voting systems. But in reality, they share many things in common—including an intertwined corporate history and a shared "DNA" of election management system software and hardware. They also share a common purpose of using litigation and "lawfare" to silence those who would publicly criticize the security flaws in their voting machines and systems or attempt to inform the public about the role of those flaws in undermining the integrity of the 2020 presidential election.

51. According to its website,[68] Dominion was founded in 2003, and provides electronic voting machines and systems in twenty-eight different states and Puerto Rico, including "9 of the top 20 counties" and "4 of the top 10 counties" in the United States. Its machines and systems range from the "election event designer"—software that creates the ballots voters will mark while voting, as well as programing the tabulators of those votes—to the devices on which voters mark their votes ("ballot marking devices," or "BMDs"), to the machines that tabulate the votes at the precinct level, to the machines that receive and tabulate the various precinct results ("centralized

---

[68] https://www.dominionvoting.com.

tabulation"), to the systems and options for transmitting those results from the BMD to the precinct tabulator to the central tabulator to, ultimately, the official government authority responsible for certifying the election results. Plus, Dominion provides thousands of hours of support services before, on election day at voting precincts, and after. In a very real sense, then, Dominion has taken responsibility for the constitutional obligations of States and controls the administration and conduct of the elections, a traditional exclusive public function, in those jurisdictions where its systems are deployed, and any vulnerabilities or weaknesses in Dominion's systems undermine— or at the very least, call into legitimate question—the integrity and reliability of all election results coming from those jurisdictions.

52. According to its website,[69] Smartmatic was founded in 2000 in Palm Beach County, Florida, and developed its first electronic voting machine in 2003. This is a fiction. In reality, Smartmatic's true beginnings are in Venezuela back in 1997, when three Venezuelan engineers— Antonio Mugica, Alfredo Jose Anzola, and Roger Piñate founded Tecnologia Smartmatic de Venezuela, C.A. It was not until April 2000 that the founders created Smartmatic Voting Systems in Delaware, with headquarters in Boca Raton, Florida. But Smartmatic's ties to Venezuela remained strong. In early 2004, a fund controlled by the Venezuelan Finance Ministry invested more than US $200,000 in a virtually dormant technology company, Bitza, owned by the same owners as Smartmatic.[70] Also in 2004, Smartmatic was contracted by the Venezuelan National Electoral Council to provide e-voting technology for the 2004 Venezuelan national elections. That same year, Smartmatic moved its headquarters to Amsterdam, the Netherlands.

---

[69] *Our history*, SMARTMATIC, https://www.smartmatic.com/us/about/our-history/ (last visited Nov. 4, 2021).

[70] Tim Golden, *U.S. Investigates Voting Machines' Venezuela Ties*, N.Y. TIMES (Oct. 29, 2006), https://www.nytimes.com/2006/10/29/washington/29ballot.html.

53.     The U.S. Government has been concerned about Smartmatic's ownership and origin, along with fraud and corruption since at least 2006.[71] According to a cable written by the political counselor of the U.S. Embassy in Caracas, Venezuela, "Smartmatic has claimed to be of U.S. origin, but its true owners – probably elite Venezuelans of several political strains — remain hidden behind a web of holding companies in the Netherlands and Barbados."[72]  The cable went on to discuss potential rigging of the machines by and for Hugo Chavez, although not proven, leading to unforeseen landslide victories.[73]  In addition, a technician working for the opposition party was able to defeat a Smartmatic machine's alleged random storage protocols.[74]  The random storage protocols were designed to keep the vote secret, because as one may expect, opposition to Chavez was not well tolerated within the regime.[75]  The cable also detailed that it was unclear how Smartmatic, a "virtually unknown company with no electoral experience could have landed" a contract worth at least $128,000,000 to run Venezuela's elections.[76]   The cable implies that Smartmatic bribed Venezuelan officials.[77] The cable concluded that:

> Smartmatic is a riddle.  The company came out of nowhere to snatch a multi-million dollar contract in an electoral process that ultimately reaffirmed Chavez' mandate and all-but destroyed his political

---

[71] Robert Downes, *Caracas 00002063 001.2 of 004*, U.S. EMBASSY CARACAS, VENEZUELA (Jul. 2006) (on file with U.S. State Department); Frank Jack Daniel, et al., *U.S. Views Chavez in "Axis of Mischief,"* REUTERS (Dec. 1, 2010), https://www.reuters.com/article/us-wikileaks-venezuela-idUSTRE6B040D20101202.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

> opposition. The perspective we have here, after several discussion with Smartmatic, is that the company is de facto Venezuelan and operated by Venezuelans. The identity of Smartmatic's true owners remains a mystery. Our best guess is that there are probably several well-known Venezuelan businessmen backing the company who prefer anonymity either because of their political affiliation or, perhaps, because they manage the interests of senior Venezuelan government officials.[78]

Smartmatic cannot plausibly allege that its ties to Venezuela or the Chavez regime do not exist. Nor can Smartmatic allege their machines have never been subject to fraud concerns. To the contrary, the opposition to Chavez was very concerned before the 2004 election because the machines were connected to the internet and the votes were stored electronically, making them subject to tampering.[79] Because of Chavez's total control over the country, however, not much could be done. Matthew 7:17 proclaims "[e]ven so every good tree bringeth forth good fruit; but a corrupt tree bringeth forth evil fruit." The Smartmatic tree has been corrupt from the very beginning; their subsequent administration, collection, counting, and auditing of ballot results for elections must be viewed in light on their original corruption.

54. In 2005, Smartmatic opened its research and development center in Taipei, Taiwan, and also began to offer its electronic voting services in the United States.[80] Between 2007 and 2008, Smartmatic expanded its offerings to numerous foreign jurisdictions, including Curaçao, the Philippines, Argentina, and Brazil,[81] while continuing its close relationship as a contractor for the Hugo Chavez-controlled government of Venezuela. By 2011, Smartmatic had expanded its

---

[78] *Id*.

[79] Mark Wells, *Caracas 00002063 001.2 of 004*, U.S. EMBASSY CARACAS, VENEZUELA (Jun. 28, 2004) (on file with U.S. State Department).

[80] SMARTMATIC, *supra* n.39.

[81] *See id*.

operations to Mexico, Haiti, Panama, and India.  In 2012, Smartmatic moved its headquarters to London.  In 2014, Smartmatic created the Centre for Excellence in Estonia with the goal of advancing internet voting.  By 2015 and 2016, Smartmatic was offering its electronic voting services in such far-away jurisdictions as Sierra Leone, Kyrgyzstan, Uganda, and Oman.  In 2018, Smartmatic became a member of the United States Department of Homeland Security's fledgling Sector Coordinating Council for the Election Infrastructure Sector[82]—a prime example of "the fox guarding the henhouse."  For the 2020 election, Smartmatic administered, collected, counted, recorded, and audited the ballot results for Los Angeles County, California,[83] which is the largest county by population in the United States with over an estimated five million registered voters, and a GDP of roughly one trillion dollars, larger than all but a handful of countries.  By running the election in Los Angeles County, which is a traditionally exclusive public function, Smartmatic took responsibility for the State of California's constitutional obligations in that county under Article 1, Section 4, Clause 1 and state law, making them a state actor.

55.     The histories of Dominion and Smartmatic are inextricably intertwined, which helps to explain their coordinated actions at issue in this lawsuit.  Some background is important to understand this point.

56.     From roughly 2002 to 2009, two voting machine vendors dominated electronic voting in United States elections:  Diebold Election Systems (re-branded to Premier Election

---

[82] *See Smartmatic, Founding Member of the DHS Council to Protect Election Integrity and Security*, SMARTMATIC (Jun. 6, 2018), https://www.smartmatic.com/us/media/article/smartmatic-founding-member-of-the-dhs-council-to-protect-election-integrity-and-security/.

[83] Saul Gonzalez, *The Company Behind LA's New Election Infrastructure*, KRCW (Oct. 05, 2018), https://www.kcrw.com/news/articles/the-company-behind-las-new-election-infrastructure  (Last Visited on Nov. 9, 2021); *Voting Solution of All People*, SMARTMATIC, https://www.smartmatic.com/en/elections/e-voting/los-angeles-vsap-solution/ (Last Visited Nov. 9, 2021).

Solutions, Inc. in 2007) and Election Systems & Software ("ES&S"). ES&S was acquired by American Information Systems ("AIS"), a company formed in Nebraska by the Urosevich brothers, descendants of Serbian immigrants.[84] Following that acquisition, AIS changed its name and began doing business as ES&S. From 2002 to 2009, ES&S served approximately 45% of precincts in the United States, while Diebold (operating under the Premier name) served approximately 23% of U.S. precincts. The remaining precincts were served by Sequoia Voting Systems (18%), Hart InterCivic (9%), and Dominion (founded in 2003) (5%).

57.    In 2005, Smartmatic (flush with cash from its 2004 efforts on behalf of the Hugo Chavez government in Venezuela) acquired Sequoia Voting Systems ("SVS") for $16 million and, with it, its 18% U.S. electronic voting market share. Smartmatic worked quickly to replace SVS's inferior technology with Smartmatic's own systems and personnel, which was followed by two years of rapid growth and solid revenue. Then, concerns arose about the ties between Smartmatic/SVS and the government of Venezuela.[85] Specifically, in or around May 2006, Congresswoman Carolyn Maloney (D. NY) asked the U.S. Treasury Department to investigate

---

[84] Dominion's ties to Serbia run far deeper than the ancestry of AIS's founders. In May 2016, Dominion's then Vice President, Goran Obradovic, gave an interview in which he stated that Dominion's office in Belgrade was opened in 2005 and had grown by 2016 into a team of fifty engineers. "The products such as Democracy Suite Election Management System, ImageCast Evolution and ImageCase X **are completely developed in Belgrade."** https://ekonomijaibiznis.mk/ControlPanel/Upload/Free_Editions/wZ0X5bz60KCgpcvFcEBvA/ maj%202016%20ENG/mobile/index.html#p=33 (emphasis added).

[85] Michael Alvarez, *US Government Investigating Ownership Structure of Sequoia Voting Systems?*, ELECTION UPDATES BLOG (Oct. 28, 2006), https://electionupdates.caltech.edu/2006/10/28/us-government-investigating-ownership-structure-of-sequoia-voting-systems/.

Smartmatic's acquisition of SVS.[86] Around the same time, concerns arose in connection with Smartmatic's efforts to implement its systems for the City of Chicago, when observers noticed that Smartmatic was flying in developers from Venezuela to resolve issues and assist with the implementation. By the time those concerns emerged publicly in the U.S. media, SVS/Smartmatic had voting equipment located in 17 U.S. states and the District of Columbia.

58. Concerned for the integrity of their elections and voting system, the Committee on Foreign Investment in the United States ("CFIUS") ordered an audit to determine if any Foreign Investment Act rules had been broken. However, rather than undergoing that audit, Smartmatic developed a plan to divest (sell) SVS to its U.S.-based management and establish a U.S.-based provider of global election systems. To that end, in late 2007 or early 2008, Smartmatic and SVS management formed a new company, SVS Holdings. To complete the purchase, Smartmatic's U.S. based management team, who were now the owners of SVS Holdings, signed a promissory note in the amount of $2 million payable to Smartmatic, secured by $2 million worth of shares, along with a percentage "earn-out" from future SVS Holdings' revenues. Moreover, Smartmatic's technology continued to be used in SVS machines.

59. In 2009, ES&S acquired Premier, creating a market behemoth with nearly 70% of the market share for electronic voting systems in the United States. Not long after the acquisition, anti-trust concerns led to ES&S being forced to divest itself of Premier. In May 2010, ES&S sold Premier to Dominion, then a Canadian company with only 5% of the United States market for electronic voting systems. According to Dominion's press release at the time, the acquisition

---

[86] Letter from Congresswoman Carolyn Maloney to Henry M. Paulson, Jr., Sec'y of the Treasury 1 (Nov. 30, 2006) ("As you recall, I brought concerns regarding this acquisition to the attention of the Department by letter of May 4, 2006 . . .") (on file with author).

included "the primary assets of Premier, including all intellectual property, software, firmware and hardware for Premier's current and legacy optical scan, central scan, and touch screen voting systems, and all versions of the GEMS election management system."[87]

60.     In June 2010, under continued pressure from authorities due to the ongoing financial and technological control by Smartmatic, SVS Holdings was forced to sell SVS and its Smartmatic-heavy technology.  The buyer?  None other than the upstart Canadian company, Dominion.  Dominion thereby acquired SVS, but Smartmatic continued to own its software, which, upon information and belief, it eventually licensed to Dominion.  After the acquisition of SVS, Dominion held roughly 50% of the private electoral market for electronic voting in the U.S., with only two remaining competitors—ES&S, with 40%, and Hart InterCivic, with 10%.[88]  At the time, Dominion spokesman Chris Rigall claimed that "Smartmatic's intellectual property was not included in the Sequoia transaction because Sequoia did not own it."[89]  But according to a 2017 report published by the *Huffington Post*, "The 'intellectual property' of the voting systems (of Sequoia, acquired by Dominion) remains the property of the company linked to the Venezuelan president (Smartmatic and Hugo Chavez), despite the rather misleading statement" issued by

---

[87] *Dominion Voting Systems, Inc. Acquires Premier Election Solutions Assets from ES&S*, BENZINGA (May 20, 2010), https://www.benzinga.com/press-releases/10/05/b292647/dominion-voting-systems-inc-acquires-premier-election-solutions-assets-.

[88] *See EXCLUSIVE: On Heels of Diebold/Premier Purchase, Canadian eVoting Firm Dominion Also Acquires Sequoia, Lies About Chavez Ties in Announcement*, HUFFPOST (Jun. 22, 2010), updated December 6, 2017,
https://www.huffpost.com/entry/exclusive-on-heels-of-die_b_620084?guccounter=1.

[89] *Id.*

Dominion in 2010.[90]  In fact, the *Huffington Post* investigation revealed that "the IP for the vast-majority/near-entirety of Sequoia's  voting systems was actually secretly owned by the Hugo Chavez-tied, Venezuelan-based firm, Smartmatic."[91]  It was later discovered that Smartmatic still held interests in SVS, even controlling the company's intellectual property through rights it had reserved to negotiate by means of non-compete agreements abroad.[92]

61.    The historically intertwined relationship between Dominion and Smartmatic extends beyond the mere acquisition of legacy hardware and software technologies.  For example, in 2009, Dominion and Smartmatic entered into a license agreement whereby Smartmatic leased from Dominion certain precinct count optical scan technology, including "the right to market, make, use and sell PCOS voting systems using the Dominion technology," as well as "the applicable hardware, software and firmware loaded on the hardware and election management system ('EMS') software designed to be used with such version of the PCOS system."

62.    Even more telling is the cross-pollination of former Smartmatic employees and inventors who found their way to Dominion in the SVS acquisition.  With Dominion's acquisition of SVS in June 2010, came Eric Coomer, Vice President for Engineering at Smartmatic, and Frederico Arnao, Venezuelan-born "Usability Architect" for Smartmatic and Senior Software

---

[90] *See* Press Release, Dominion Voting Systems, *Dominion Voting Systems Corporation Acquires Assets of Sequoia Voting Systems* (Jun. 4, 2010), https://www.bradblog.com/Docs/DominionAcquiresPremierReleaseFinal4_051910.pdf.

[91] Brad Friedman, *EXCLUSIVE: On Heels of Diebold/Premier Purchase, Canadian eVoting Firm Dominion Also Acquires Sequoia, Lies About Chavez Ties in Announcement*, HUFFPOST (Dec. 6, 2017), https://www.huffpost.com/entry/exclusive-on-heels-of-die_b_620084.

[92] *Id.*

Developer for Smartmatic-affiliated Bizta Voting Systems.[93]  Importantly, Arnao and Coomer are named as inventors on a pair of patent applications filed on April 22, 2011, dealing with electronic voting systems, claiming priority to patents filed in 2009, while they were still employed by Smartmatic.[94]  (For his part, Coomer is listed as an inventor on an additional four such patents, one of which traces back to a patent filing in 2008.) By way of further example, public internet searches identify at least four additional employees who are shown as employees of Dominion Voting Systems at Smartmatic's Boca Raton, Florida business address, with @smartmatic email addresses:

| Name | Title | Company | E-mail | Address | Web Domain |
|---|---|---|---|---|---|
| Babic, Paul | Vice President Marketing | Dominion Voting Systems Corp, Boca Raton, Florida | Paul.babic@smartmatic.com | 1001 Broken Sound Pkwy NW, Boca Raton, FL 33487 | Dominionvoting.com |
| Cook, Jason | U.S. Sales | Dominion Voting Systems Corp, Boca Raton, Florida | Jason.cook@smartmatic.com | 1001 Broken Sound Pkwy NW, Boca Raton, FL 33487 | Dominionvoting.com |

---

[93] *Federico Arnao*, LINKEDIN, https://www.linkedin.com/in/farnao/?originalSubdomain=ca (last visited Nov. 8, 2021).

[94] *Patents by Inventor Federico Arnao*, JUSTIA, https://patents.justia.com/inventor/federico-arnao (last visited Nov. 8, 2021).

| Scott, Jeffrey | Senior Technical Sales Engineer | Dominion Voting Systems Corp, Boca Raton, Florida | Jeff.scott@smartmatic.com | 1001 Broken Sound Pkwy NW, Boca Raton, FL 33487 | Dominionvoting.com |
|---|---|---|---|---|---|
| Vasquez, Jorge M. | Vice President Operations | Dominion Voting Systems Corp, Boca Raton, Florida | jvasquez@smartmatic.com | 1001 Broken Sound Pkwy NW, Boca Raton, FL 33487 | Dominionvoting.com |

The facts set out above belie any assertion that these two companies have no ties. In fact, they share a common technological DNA, a common role in our constitutional electoral system, a common motive to suppress criticism of electronic voting machines, and a common scheme for doing so.

63. Both Dominion and Smartmatic also have a common interest to suppress speech and views about their respective electronic voting equipment's security issues and vulnerabilities. Dominion and Smartmatic are two of only a handful of companies currently administering and running elections in the United States. Both sit on a Cyber Infrastructure and Security Agency counsel board and both heavily lobby state and federal legislatures every year regarding election issues because states are their clients and the federal government controls election security standards. Without question, when Republicans start to examine their technologies' vulnerabilities, like the Democrats have done for years, it creates an existential threat to their businesses because now both parties are wary of using their technology. Very few issues are more political in nature than running an election, which is a traditionally exclusive public function of

the state. As such, Dominion and Smartmatic have taken it upon themselves to coordinate their response to such an existential threat by using Lawfare to silence their critics.

64.     Legislators have long raised questions about the murky picture of who exactly owns and controls electronic voting machine companies like Dominion. In December 2019, United States Senators Elizabeth Warren (D-Mass.), Amy Klobuchar (D-Minn.), Ron Wyden (D-Or.), and Congressman Mark Pocan (D-Wis.) wrote to Stephen D. Owens and Hootan Yaghoobzadeh, Managing Directors of Staple Street Capital, LLC, a private equity firm, which acquired Dominion in 2018.[95] After recognizing that Dominion was "one of three election technology vendors responsible for developing, manufacturing and maintaining the vast majority of voting machines and software in the United States, the four Democratic congressional leaders raised a number of serious concerns regarding "the spread and effect of private equity investment in many sectors of the economy, including the election technology industry—an integral part of our nation's democratic process."[96] Those concerns included:

a.      "[T]hat secretive and 'trouble-plagued companies,' owned by private equity firms and responsible for manufacturing and maintaining voting machines and other election administration equipment, 'have long skimped on security in favor of convenience,' leaving voting systems across the country 'prone to security problems.'"

b.      "[T]hree large vendors—Election Systems & Software, Dominion, and Hart InterCivic—collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States."

c.      "Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat."

---

[95] Letter from United States Senators Elizabeth Warren, Amy Klobuchar and Ron Wyden and Member of Congress Mark Pocan to Stephen D. Owens Hootan Yaghoobzadeh, Managing Directors of Staple Street Capital, LLC (Dec. 6, 2019), https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf

[96] Id.

d. "[V]oting machines are reportedly falling apart across the country, as vendors neglect to innovate and improve important voting systems, putting our elections at avoidable and increased risk."

e. "[R]esearchers recently uncovered previously undisclosed vulnerabilities in 'nearly three dozen backend election systems in 10 states.'"

f. "These problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack."[97]

The congressional leaders' letter followed these concerns with a request for seven specific categories of information "[i]n order to help us understand your firm's role in this sector."[98]

65. The congressional leaders' concerns were not unfounded. In 2018, Dominion was acquired by a private equity firm, Staple Street Capital,[99] whose largest shareholder, David Mark Rubenstein, is a co-founder of The Carlyle Group.[100] The Carlyle Group is a global investment firm with longstanding and enormous investments in China.[101] In 2020, mere months before the election, Staple Street Capital (owner of Dominion) received a $400 million investment from UBS

---

[97] *Id.*

[98] *Id.*

[99] *Dominion Voting Systems Acquired by its Management Team and Staple Street Capital*, PR NEWSWIRE, https://www.prnewswire.com/news-releases/dominion-voting-systems-acquired-by-its-management-team-and-staple-street-capital-300681752.html (last visited Nov. 8, 2021).

[100] *David M. Rubenstein*, CARLYLE GROUP, https://www.carlyle.com/about-carlyle/team/david-m-rubenstein (last visited Nov. 8, 2021).

[101] *See Carlyle Invests US $ 140 Million in Four Growth Companies Across Asia*, CARLYLE GROUP,
https://www.carlyle.com/zh-hans/business-segment/%E4%BC%81%E4%B8%9A%E7%A7%81%E5%8B%9F%E8%82%A1%E6%9D%83?page=6 (last visited Nov. 8, 2021).

Securities, LLC.[102]  UBS Securities LLC owns 24.99% of UBS Securities Co. LTD, a Chinese investment bank.[103]  The remaining 75% of UBS Securities Co. LTD is owned by the Chinese government or various arms of it.  At the time of the November 2020 election, the two UBS Securities affiliates shared three common directors: (1) Ye Xiang (Board Chairman of UBS Beijing until his resignation in December 2020, also Secretary of Peoples Bank of China and ex-director of Bank of China International); (2) Mu Lina (Director of Fund Management and Head of Fund Operations for UBS Beijing); and (3) Luo Qiang.[104]

66.    Nor do the connections between Dominion, Smartmatic, and China end with the $400 million investment in Dominion's parent.  Five years earlier, beginning in 2015, Smartmatic began using the Chinese company Shenzhen Zhongjian Nanfang Testing Co., Ltd. to conduct in-depth testing, studies, and certifications of its voting machine hardware and software.  This relationship continued until at least 2020, just prior to the election.  In that role, the Chinese company had complete access to all facets of Smartmatic's devices and software—which shared the same "DNA" as the Dominion systems going back to the Diebold-Premier-Sequoia acquisitions.  Worse still, in or around September 2019, Dominion pledged as many as eighteen

---

[102] Staple St. Cap. III, L.P., Notice of Exempt Offering of Securities (Form D) (Oct. 8, 2020).

[103] *UBS becomes first foreign bank approved for majority stake in China JV*, Reuters (Nov. 30, 2018, 9:29 AM), https://www.reuters.com/article/uk-china-regulator/ubs-becomes-first-foreign-bank-approved-for-majority-stake-in-china-jv-idUSKCN1NZ1YK.

[104] Emel Akan, *Ownership of Dominion Draws Scrutiny After Unusual Fundraising*, THE EPOCH TIMES (Dec. 22, 2020), https://www.theepochtimes.com/mkt_app/ownership-of-dominion-draws-scrutiny-after-unusual-fundraising_3618603.html.

of its patents as collateral with Hong Kong Shanghai Banking Corporation (HSBC), a large Chinese bank.[105]

67.     In other words, by the time of the 2020 election, Chinese government-related entities, Chinese technology companies, and powerful Chinese financial interests had direct or indirect ownership of and near-total access to Dominion's and Smartmatic's voting machine technology.  Small wonder that by then congressional leaders had serious concerns regarding "the spread and effect of private equity investment in many sectors of the economy, including the election technology industry."[106]

### III.
### Ghosts in the Machines

> "But you can't make people listen.  They have to come round in their own time, wondering what happened and why the world blew up around them.  It can't last."
>
> -   Ray Bradbury, *Fahrenheit 451*

68.     As a result of systemic and well-documented vulnerabilities in Dominion's software and hardware, widespread claims have been lodged that during the 2020 election significant numbers of votes across the country were altered.

---

[105] *Patent Assignment 050500/236*, U.S. PAT. AND TRADEMARK OFF., https://assignment.uspto.gov/patent/index.html#/patent/search/resultAssignment?id=50500-236 (last visited Nov. 8, 2021).

[106] Letter from United States Senators Elizabeth Warren, Amy Klobuchar and Ron Wyden and Member of Congress Mark Pocan to Stephen D. Owens Hootan Yaghoobzadeh, Managing Directors of Staple Street Capital, LLC (Dec. 6, 2019), https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf

69.     Lindell was not the first to sound the alarm that electronic voting machines posed grave threats to U.S. election integrity.[107]  Indeed, voices from the political left had been protesting the use and vulnerability of electronic voting machines for years prior to the 2020 Presidential election.

70.     Evidence of problems with electronic voting systems, including Dominion's system, has been accumulating for over a decade, and the 2020 election cycle only accelerated this trend.  Prior to 2020, it was well-established that these systems were wide-open to hacking.  Evidence that Dominion's voting systems actually were hacked in the 2020 election continues to accumulate.

71.     Some states, like Texas, rejected Dominion voting systems after examining their vulnerability to hacking.  Others, like Arizona, have found cause to order post-election forensic audits of electronic voting systems—including Dominion's voting machines—to attempt to "restore integrity to the election process."[108]  Recently, the New Hampshire Senate voted 24-0 to conduct a complete examination of Dominion-owned voting machines after suspicious shorting of votes was discovered.[109]  Litigation involving Dominion's voting machines in Antrim County, Michigan, initiated after approximately 6,000 votes were discovered to have been wrongly

---

[107] Andrew Mark Miller, *Democratic Senators Warned of Potential 'Vote Switching' by Dominion Voting Machines Prior to 2020 Election*, WASHINGTON EXAMINER (Nov. 13, 2020), https://www.washingtonexaminer.com/news/democratic-senators-warned-of-potential-vote-switching-by-dominion-voting-machines-prior-to-2020-election.

[108] Press Release, Ariz. Senate Republicans, Senate chooses qualified auditing firm to conduct forensic audit of Maricopa County election results (Jan. 29, 2021) https://www.azsenaterepublicans.com/post/senate-chooses-qualified-auditing-firm-to-conduct-forensic-audit-of-maricopa-county-election-results.

[109] Chad Groenig, *Dominion gets caught shorting GOP candidates*, One News Now, Mar. 5, 2021, https://onenewsnow.com/politics-govt/2021/03/05/dominion-gets-caught-shorting-gop-candidates.

switched between Presidential candidates—ostensibly due to a so-called "glitch"[110]—proved Dominion's machines could be manipulated and hacked to generate this "glitch."

72.     During a December 30, 2020 live-streamed hearing held by the Georgia Senate Judiciary Subcommittee on Elections, a testifying expert hacked into a Dominion polling pad during a live broadcast to the world.[111]  And, at the same hearing, legislators were shown replays of real-time news reports showing that tens of thousands of votes were switched from President Trump to former Vice President Biden in several counties in Georgia.  For example, in Bibb County, Trump was reported to have 29,391 votes at 9:11 pm EST while simultaneously former Biden was reported to have 17,218 votes.  A minute later at the next update, these vote numbers switched, with Trump now having 17,218 votes and Biden having 29,391—a 12,173-vote switch in Biden's favor.  YouTube—owned by Google, Inc.—removed this news video after this switch was revealed.[112]  No rational explanation has ever been offered showing a legitimate reason for this switch in the vote tally.

73.     For many years serious security and technology problems have dogged Dominion's election machines and systems.

---

[110] Tom Pappert, *VIDEO: Michigan County Discovers 'Glitch' That Gave 6,000 Trump Votes to Biden*, National File, Nov. 6, 2020, https://nationalfile.com/video-michigan-county-discovers-glitch-that-gave-6000-trump-votes-to-biden/; Jack Windsor, *Votes for Trump Went to Biden in Antrim County, Michigan*, The Michigan Star, Nov. 7, 2020, https://themichiganstar.com/2020/11/07/votes-for-trump-went-to-biden-in-antrim-county-michigan/.

[111] *NTD News*, *LIVE: Georgia Senate Subcommittee Holds Hearing on Election Issues*, YOUTUBE (Dec. 30, 2020), https://www.youtube.com/watch?v=EjbAFuoQOvo.

[112] *See Georgia Data Show Over 30,000 of Trump's Votes Removed, Another 12,173 Switched to Biden: Data Scientists*, THE EPOCH TIMES (Jan. 2, 2021), https://www.theepochtimes.com/georgia-election-data-shows-17650-votes-switched-from-trump-to-biden-data-scientists_3640670.html.

74. As noted, Dominion purchased Premier (formerly Diebold) from ES&S in 2010, thereby acquiring all intellectual property, software, and firmware and hardware for Premier's voting systems and all versions of Premier's Global Election Management System (GEMS). [113]

75. Premier had been owned by Diebold, but Diebold changed its name to Premier in 2007 after a series of studies publicized its unreliable security and accuracy, and technical problems sullied its reputation. The name change was motivated by the desire to create a fresh public image.[114] Diebold sold Premier to ES&S for $5 million in September 2009, reporting a $45 million loss,[115] and nine months later, in May 2010, ES&S sold Premier to Dominion.

76. The Diebold technology Dominion obtained when it acquired Premier has a long and troubled track record.

    a.    In 2003, it was discovered that Diebold had left approximately 40,000 files that made up its foundational e-voting security software code, GEMS, entirely unprotected on a publicly accessible website.[116]

---

[113] "Dominion Voting Systems, Inc. Acquires Premier Election Solutions Assets from ES&S" (May 20, 2010),
https://www.benzinga.com/press-releases/10/05/b292647/dominion-voting-systems-inc-acquires-premier-election-solutions-assets-.

[114] Allison St. John, *Diebold Voting Machine Company Changes Name to Improve Image*, KPBS (Aug. 21, 2007),
https://www.kpbs.org/news/2007/aug/21/diebold-voting-machine-company-changes-name-to/.

[115] Ryan Paul, *Diebold impeaches e-voting unit, sells it off for $5 million*, ARS TECHNICA (Sept. 4, 2009),
https://arstechnica.com/tech-policy/2009/09/diebold-elects-to-get-out-of-the-voting-machine-business/.

[116] Victoria Collier, *How to Rig an Election*, HARPER'S MAGAZINE (Nov. 2012),
https://harpers.org/archive/2012/11/how-to-rig-an-election/.

b. Following the discovery that the GEMS code was publicly available, computer programmers around the world began probing and testing it. In 2012, a Harper's Magazine article titled "How to Rig an Election" summarized, "GEMS turned out to be a vote rigger's dream.  According to [one investigator's] analysis, it could be hacked, remotely or on-site, using any off-the-shelf version of Microsoft Access, and password protection was missing for supervisor functions.  Not only could multiple users gain access to the system after only one had logged in, but unencrypted audit logs allowed any trace of vote rigging to be wiped from the record."[117]

c. In 2004, a team of computer scientists from Johns Hopkins University and Rice University concluded about the GEMS code: "this voting system is far below even the most minimal security standards applicable in other contexts . . . [It] is unsuitable for use in a general election." [118] More broadly, the team wrote, "The model where individual vendors write proprietary code to run our elections appears to be unreliable, and if we do not change the process of designing our voting systems, we will have no confidence that our election results will reflect the will of the electorate.  We owe it to ourselves and to our future to have robust, well-designed election systems to preserve the bedrock of our democracy."

d. In 2006, a team of computer scientists at Princeton University analyzed the security of the Diebold AccuVote-TS voting machine, then one of the most widely deployed

---

[117] *Id.*

[118] Takayoshi Kohno, Adam Stubblefield, Aviel D. Rubin, and Dan S. Wallach, *Analysis of an Electronic Voting System, IEEE Symposium on Security and Privacy and Privacy 2004*, IEEE COMPUTER SOCIETY PRESS, May 2004, https://avirubin.com/vote.pdf (Ex. 1).

electronic voting platforms in the United States. They found, "Malicious software running on a single voting machine can steal votes with little risk of detection. The malicious software can modify all of the records, audit logs, and counters kept by the voting machine, so that even careful forensic examination of these records will find nothing amiss . . . Anyone who has physical access to a voting machine, or to a memory card that will later be inserted into a machine, can install said malicious software using a simple method that takes as little as one minute. . . . AccuVote-TS machines are susceptible to voting machine viruses – computer viruses that can spread malicious software automatically and invisibly from machine to machine during normal pre- and post-election activity."[119]

e.  The Princeton team prepared a video demonstration showing how malware could shift votes cast for one candidate to another.[120] In the video, mock election votes were cast in favor of George Washington by a 4 to 1 margin, but the paper print-out that reported the results showed Benedict Arnold prevailing by a margin of 3 to 2. Malicious vote-stealing malware was the sole reason for reallocation of votes from Washington to Arnold, and the malware deleted itself after the election, leaving no evidence that the voting machine was ever hijacked or any votes stolen.[121]

---

[119] Ariel J. Feldman, J. Alex Halderman, and Edward W. Felten, *Security Analysis of the Diebold AccuVote-TS Voting Machine*, USENIX (Sep. 13, 2006), https://www.usenix.org/legacy/event/evt07/tech/full_papers/feldman/feldman_html/index.html (Ex. 2).

[120] *See Security Demonstration of Diebold AccuVote-TS Electronic Voting Machine*, YOUTUBE (Nov. 30, 2016), https://www.youtube.com/watch?v=B8TXuRA4IQM&t=20s.

[121] *See id.*

77.     Despite these security weaknesses, Dominion incorporated GEMS into its voting machines after acquiring the technology in 2010.  By 2011, Dominion Voting Systems was selling voting systems that had updated GEMS software at the core of their DNA.[122]

78.     Vote integrity issues with Dominion's voting systems predated its acquisition and incorporation of GEMS, both in the U.S. and abroad.  In 2009, during a New York congressional election, Dominion's software allowed voters to vote for more than one candidate, and its faulty machines froze during operation due to insufficient memory.[123] In the 2010 general election in the Philippines, allegations of technical problems and offers of vote manipulation were rampant.[124]  In that election, where Dominion's products were in more than 2,200 local municipalities, a Dominion "glitch" caused voting machines to incorrectly read ballots, while poll machines supplied by Smartmatic had wrongly configured flash cards affecting the automated count.[125]  A Product Manager of Dominion indicated that more than 76,000 compact flash cards had to be configured just days before the election.

---

[122] Ken Detzner, *Voting System Qualification Test Report Dominion Voting Systems, Inc. GEMS Release 1.21.6, Version 1*, FLA. DEP'T OF STATE (Mar. 2012), https://files.floridados.gov/media/697908/dominion-gems-release-1216-version-1-test-report.pdf (Ex. 3).

[123] *Dominion also handled 2009 NY congressional poll*, ABS-CBN NEWS (May 7, 2010), https://news.abs-cbn.com/nation/05/07/10/dominion-also-handled-2009-ny-congressional-poll.

[124] *See, e.g., Aquino Unfazed by Philippine Poll Fraud Allegations*, REUTERS (May 27, 2010), https://www.reuters.com/article/idINIndia-48840420100527.

[125] Ina Reformina, *Source code firm Dominion sheds light on voting glitch*, ABS-CBN NEWS (May 7, 2010), https://news.abs-cbn.com/nation/05/07/10/source-code-firm-dominion-sheds-light-voting-glitch.

79.     Dominion continued selling and leasing the troubled AccuVote voting machine as recently as 2017.[126]

80.     Dominion voting systems reliant on GEMS were used in the 2020 general election.[127]

81.     Following the 2016 general election, a left-leaning advocacy organization and individual voters filed an action in the United States District Court for the Northern District of Georgia, seeking to set aside the results of a 2016 Congressional race in which the Republican candidate had prevailed.  The *Curling v. Raffensperger* plaintiffs alleged "sophisticated hackers – whether Russian or otherwise – had the capability and intent to manipulate elections in the United States."[128] They later asked the court to enter a preliminary injunction barring Georgia in the 2020 general election from using Dominion's ballot marking devices from its Democracy Suite 5.5-A voting system.  *See Curling v. Raffensperger*, 493 F.Supp.2d 1264, 1267 (N.D. Ga. 2020).

82.     On October 11, 2020, just three weeks before the 2020 general election, Judge Amy Totenberg[129] issued an order regarding the Dominion voting system's security risks and the potential for fraud or irregularities.[130] Judge Totenberg found substantial evidence that the

---

[126] *See, e.g., Notice of Contract: Contract No. 071B7700117*, State of Michigan Enterprise Procurement: Department of Technology, Management, and Budget, 48 (2017), https://www.michigan.gov/documents/sos/071B7700117_Dominion_555356_7.pdf.

[127] *See Qualified Voting Systems*, MO. SEC. OF STATE, https://www.sos.mo.gov/elections/qualsystems.asp, (last visited Nov. 8, 2021).

[128] Amended Complaint, Doc. 15, N.D. Ga. No. 2017CV292233 (Ex. 4).

[129] Given the hyper-partisan nature of the allegations and assertions set forth in Dominion's Complaints against Lindell and others, it is worth noting that Judge Totenberg was nominated to the federal bench by President Obama in January of 2011.

[130] *Curling v. Raffensperger*, No. 493 F.Supp.3d 1264, 1267 (N.D. Ga. 2020) (Ex. 5).

Dominion system was plagued by security risks and the potential for votes to be improperly rejected or misallocated. She wrote, "The Plaintiffs' national security experts convincingly present evidence that this is not a question of 'might this actually ever happen?' – but 'when it will happen,' especially if further protective measures are not taken."[131]

83.     Judge Totenberg's findings reflected many of the same issues which had existed more than ten years earlier with the predicate Diebold GEMS system, ultimately purchased by Dominion:

- "[H]uge volume of significant evidence regarding the security risks and deficits in the [Dominion] system as implemented . . ."

- "Evidence presented in this case overall indicates the possibility generally of hacking or malware attacks occurring in voting systems and this particular system through a variety of routes – whether through physical access and use of a USB flash drive or another form of mini-computer, or connection with the internet."

- "[E]vidence credibly explaining how malware can mask itself when inserted in voting software systems or QR codes, erase the malware's tracks, alter data, or create system disruption."

- "Defendants [including Dominion] do not appear to actually dispute that cybersecurity risks are significant in the electoral sphere."

- Dominion's Director of Product Strategy and Security "acknowledged the potential for compromise of the [Dominion] operating system, by exploiting a vulnerability, that could allow a hacker to take over the Voting machine and compromise the security of the voting system software."

- "[F]ormidable amount of evidence that casts serious doubt on the validity of the use of the [risk-limiting audit statistical method for auditing election outcomes] with the current [Dominion] system."[132]

---

[131] *Id*. at 1342.

[132] *Id*. at 1278, 1280, 1281, 1283, 1287, 1306.

84.     Although Judge Totenberg declined the *Curling* plaintiffs' request for injunctive relief requiring paper ballots—because she felt bound by Eleventh Circuit precedent and because there was insufficient time to implement the requested relief prior to the election—she nevertheless expressed profound concern regarding the Dominion voting system and Dominion's less than transparent actions:

> The Court's Order has delved deep into the true risks posed by the new [Dominion] voting system as well as its manner of implementation.  These risks are neither hypothetical nor remote under the current circumstances.  The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise.  The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted.

> The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' — but 'when it will happen,' especially if further protective measures are not taken.  Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well. [133]

85.     The *Curling* litigation continues to this day.  Recently, J. Alex Halderman filed a declaration in the suit detailing the serious security vulnerabilities of Dominion's voting technology.  Mr. Halderman stated:

> My July 1, 2021, expert report describes numerous security vulnerabilities in Georgia's Dominion ICX BMDs.  These include flaws that would allow attackers to install malicious software on the ICX, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems.  They are not general weaknesses or theoretical problems, but rather specific flaws in the ICX software, and I am prepared to demonstrate

---

[133] *Id*. at 1341-42.

proof-of-concept malware that can exploit them to steal votes cast on ICX devices.

. . .

My analysis also concludes that the ICX is very likely to contain other, equally critical flaws that are yet to be discovered. Jurisdictions can mitigate this serious risk through procedural changes, such as reserving BMDs for voters who need or request them. Election officials cannot make an informed decision about such urgent policy changes or any other mitigations until they have assessed the technical findings in my report.

. . .

Nor do these problems affect Georgia alone. In 2022, the ICX will be used in parts of 16 states. Nevada will use it as the primary method of in-person voting in certain areas of the state. Louisiana is slated to use it for early voting in a DRE configuration where there is not even a paper trail. It will be used for accessible voting in Alaska and large parts of Arizona, California, Colorado, and Michigan. It will also see some use in parts of Illinois, Kansas, Ohio, Missouri, New Jersey, Pennsylvania, Tennessee, and Washington State. Officials in these jurisdictions too must act to update the software and their procedures, but they cannot do so without information about the problems. Continuing to conceal those problems from those who can-and are authorized to-address them, to the extent possible, serves no one and only hurts voters (and heightens the risk of compromise in future elections).[134]

86.     According to Dr. Halderman, he has been attempting to reach Dominion regarding the security vulnerabilities since January 2021, yet Dominion has ignored his requests.[135] Dominion's refusal to accept Dr. Halderman's offer reflects the same hubris with which Dominion treats any person who dares to label their machines as less than 100% secure. But unlike Mr.

---

[134] Decl. of J. Alex Halderman, Doc. No. 1177-1, *Curling v. Raffensperger*, Case No. 1:17-cv-02989-AT, currently pending in the United States District Court of the Northern District of Georgia Atlanta Division.

[135] Decl. of J. Alex Halderman, Doc. No. 1133, *Curling v. Raffensperger*, Case No. 1:17-cv-02989-AT, currently pending in the United States District Court of the Northern District of Georgia Atlanta Division.

Lindell, Dr. Halderman, upon information and belief, has not been sued by Dominion for more than $1 billion, nor threatened with suit and sanctions by Smartmatic.

87.     In 2019, Politico ran an article entitled "Georgia Likely to Plow Ahead with Buying Insecure Voting Machines."[136]  The first line of the article paints a clear picture of the nation's thinking regarding Dominion and voting machines in the United States, and specifically Georgia, at during 2019: "Georgia Gov. Brian Kemp is poised to sign a bill to overhaul the state's voting systems with [Dominion] machines that are widely considered vulnerable to hacking."[137] The article continues: "Security experts warn that an intruder can corrupt the machines and alter the barcode-based ballots without voters or election officials realizing it."[138]  Upon information and belief, Politico nor Mr. Geller, the article's author, have been threatened or sued by Dominion and/or Smartmatic.

88.     In June 2020, The New York Times published an article detailing the troubles with Dominion's voting system in Georgia.  "Much of the trouble that plunged Georgia's voting system into chaos Tuesday was specific to the state, stemming from the rollout of new [Dominion] voting machines and an electronic voter check-in system, which some election experts had been sounding the alarm bells about for months."[139] Upon information and belief, The New York Times was not threatened or sued by Dominion and/or Smartmatic.

---

[136] Eric Geller, *Georgia Likely to Plow Ahead with Buying Insecure Voting Machines*, Politico (Mar. 28, 2019),
https://www.politico.com/story/2019/03/28/georgia-voting-machines-safe-1241033.

[137] *Id*.

[138] *Id*.

[139] Richard Fausset and Reid J. Epstein, *Georgia's Election Mess: Many Problems, Plenty of Blame, Few Solutions for November*, The New York Times (Jun. 10, 2020),
https://www.nytimes.com/2020/06/10/us/politics/georgia-primary-election-voting.html

89.     In addition to her December 2019 letter to Dominion's parent company, Staple Street Capital, Senator Warren noted how Dominion kept their operations under a cloak of secrecy: "These vendors make little to no information publicly available on how much money they dedicate to research and development, or to maintenance of their voting systems and technology.  They also share little or no information regarding annual profits or executive compensation for their owners."[140]  Upon information and belief, Senator Warren has not been threatened or sued by Dominion and/or Smartmatic.

90.     In August 2018, Senator Klobuchar stated on nationally broadcast television, Meet the Press, "I'm very concerned you could have a hack that finally went through.  You have 21 states that were hacked into, they didn't find out about it for a year."[141] Upon information and belief, Senator Klobuchar has not been threatened or sued by Dominion and/or Smartmatic.

91.     Senator Wyden, also in the lead up to the 2020 election, explained during an interview, "[T]oday, you can have a voting machine with an open connection to the internet, which is the equivalent of stashing American ballots in the Kremlin. . . . [As] of today, what we see in terms of foreign interference in 2020 is going to make 2016 look like small potatoes.  This is a national security issue! . . . The total lack of cybersecurity standards is especially troubling . . . But the lack of cybersecurity standards leads local officials to unwittingly buy overpriced, insecure

---

[140] Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity, Elizabeth Warren: United States Senator for MA (Dec. 10, 2019), https://www.warren.senate.gov/oversight/letters/warren-klobuchar-wyden-and-pocan-investigate-vulnerabilities-and-shortcomings-of-election-technology-industry-with-ties-to-private-equity.

[141] NBC News, Amy Klobuchar: Concerned That A 2018 Election Hack Could Succeed (Full) | Meet The Press | NBC News, YouTube (Aug. 5, 2018), https://www.youtube.com/watch?v=9wtUxqqLh6U.

junk. Insecure junk guarantees three things: a big payday for the election-tech companies, long lines on Election Day, and other hostile foreign governments can influence the outcome of elections through hacks."[142]  Upon information and belief, Senator Wyden has not been threatened or sued by Dominion and belief, Senator Wyden has not been threatened or sued by Dominion and/or Smartmatic.

92.     After failing certification in Texas in January 2019, on October 2 and 3, 2019, Dominion again presented its Democracy Suite 5.5-A voting system in Texas for examination and certification.[143] It failed the second time as well.

93.     "The examiner reports identified multiple hardware and software issues . . . Specifically, the examiner reports raise concerns about whether the Democracy Suite 5.5-A system is suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation.[144]

94.     On January 24, 2020, the Texas Secretary of State denied certification of the system for use in Texas elections.  Texas's designated experts who evaluated Democracy Suite 5.5-A flagged risk from the system's connectivity to the internet despite "vendor claims" that the system

---

[142] Mark Sullivan, *Senator Ron Wyden: The GOP is 'making a mockery' of election security*, FAST COMPANY (Feb. 19, 2020),
 https://www.fastcompany.com/90465001/senator-ron-wyden-the-gop-is-making-a-mockery-of-election-security.

[143] Jose A. Esparza, *Report of Review of Dominion Voting Systems Democracy Suite 5.5A*, Tex. Sec'y of State (Jan. 24, 2020),
 https://www.sos.texas.gov/elections/forms/sysexam/dominion-d-suite-5.5-a.pdf (Ex. 6).

[144] *Id.*

is "protected by hardening of data and IP address features."[145, 146] "[T]he machines could be vulnerable to a rogue operator on a machine if the election LAN is not confined to just the machines used for the election . . . The ethernet port is active on the ICX BMD during an election. . . . This is an unnecessary open port during the voting period and could be used as an attack vector."[147] Other security vulnerabilities found by Texas include use of a "rack mounted server" which "would typically be in a room other than a room used for the central count" and would present a security risk "since it is out of sight."[148]

95.     Texas Attorney General Ken Paxton later explained, "We have not approved these voting systems based on repeated software and hardware issues.  It was determined they were not accurate and that they failed — they had a vulnerability to fraud and unauthorized manipulation."[149]

96.     Election officials and voting system manufacturers, including Dominion's CEO, have publicly denied that voting machines are connected to the internet and, therefore, not

---

[145] Letter from Brandon Hurley to Keith Ingram (Nov. 4, 2019) (Ex. 7).

[146] James Sneeringer, Ph.D., *Voting System Examination: Dominion Voting Systems Democracy Suite 5.5-A* 2, 5 (TX Sec. of State Elections Div.), https://www.sos.texas.gov/elections/forms/sysexam/oct2019-sneeringer.pdf.

[147] Tom Watson, *Democracy Suite 5.5A* 4-5, TX SEC. OF STATE ELECTIONS DIV., https://www.sos.texas.gov/elections/forms/sysexam/oct2019-watson.pdf.

[148] *Id*.

[149] Brad Johnson, *Texas Rejected Use of Dominion Voting System Software Due to Efficiency Issues*, THE TEXAN (Nov. 19, 2020), https://thetexan.news/texas-rejected-use-of-dominion-voting-system-software-due-to-efficiency-issues/.

susceptible to attack via the internet.[150] Dominion's CEO, John Poulos, testified in December 2020 that Dominion's voting systems are "closed systems that are not networked meaning they **are not connected to the internet**."[151]  This is false.

97.    For example, in his May 2016 interview, Dominion Vice President Obradovic stated, "All devices of the ImageCast series have additional options such as modems for wireless and wired transfer of results from the very polling place…."[152]

98.    Dominion has even tried to hide its systems' internet connectivity from the election officials who are ostensibly in charge of running the elections where Dominion's systems are used. *Vice* reported in 2019, "[A] group of election security experts have found what they believe to be nearly three dozen backend election systems in 10 states connected to the internet over the last year, including some in critical swing states.  These include systems in nine Wisconsin counties, in four Michigan counties, and in seven Florida counties. . . . [A]t least some jurisdictions were not aware that their systems were online[.] . . . **Election officials were publicly saying that their systems were never connected to the internet because they didn't know differently**."[153]  In

---

[150] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, Vice (Aug. 8, 2019), https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials.

[151] *See* https://danfromsquirrelhill.wordpress.com/2020/12/31/oomf/ (emphasis added).   Again, Google's YouTube deleted this video shortly after it began to gain circulation.

[152] https://ekonomijaibiznis.mk/ControlPanel/Upload/Free_Editions/wZ0X5bz60KCgpcvFcEBvA /maj%202016%20ENG/mobile/index.html#p=33.

[153] *Id*. (emphasis added).

2020, a team of election security experts found more than thirty-five voting systems were online.[154] Upon information and belief, Vice nor the author of the report have been threatened or sued by Dominion and/or Smartmatic.

99.     In 2020, NBC reported that voting machines were in fact connected to the internet, making them susceptible to hacking, and "The three largest voting manufacturing companies — Election Systems & Software, Dominion Voting Systems and Hart InterCivic — have acknowledged they all put modems in some of their tabulators and scanners. . . . Those modems connect to cell phone networks, which, in turn, are connected to the internet . . . 'Once a hacker starts talking to the voting machine through the modem . . . they can hack the software in the voting machine and make it cheat in future elections,' [a Princeton computer science professor and expert on elections] said."[155]



---

[154] *Kevin Monahan, Cynthia McFadden, and Didi Martinez, 'Online and Vulnerable': Experts find nearly three dozen U.S. voting systems connected to internet*, NBC NEWS, Jan. 10, 2020, available at https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436.

[155] *Id.*

100. In a 2019 story about the DEF CON hacking conference, NBC News reported that Dominion avoided participation in the conference; that hackers can target voting systems with ease; and that Dominion's voting machines are connected to the internet.[156] Upon information and belief, NBC News has not been threatened or sued by Dominion and/or Smartmatic.



101. In 2017, Dominion refused to respond to CNNTech's request for comment about its hackable voting machines.[157] CNNTech also asked Jake Braun, a former security advisor for the Obama administration and organizer of the DEF CON hacking conference, "Do you believe that right now, we are in a position where the 2020 election will be hacked?" He answered, "Oh, without question. I mean the 2020 election will be hacked no matter what we do. . . ."[158] Upon

---

[156] NBC News, *How Hackers Can Target Voting Machines | NBC News Now*, YOUTUBE (Aug. 12, 2019), https://www.youtube.com/watch?v=QtWP0KDx2hA.

[157] CNN Business, *We watched hackers break into voting machines*, YOUTUBE (Aug. 11, 2017), https://www.youtube.com/watch?v=HA2DWMHgLnc.

[158] *Id*.

information and belief, CNNTech nor Mr. Braun have been threatened or sued by Dominion and/or Smartmatic.



102.    The Congressional Task Force on Election Security's Final Report in January 2018 identified the vulnerability of U.S. elections to foreign interference:[159] "According to DHS, Russian agents targeted election systems in at least 21 states, stealing personal voter records and positioning themselves to carry out future attacks. . . media also reported that the Russians accessed at least one U.S. voting software supplier . . . in most of the targeted states officials saw only preparations for hacking . . . [but] in Arizona and Illinois, voter registration databases were reportedly breached. . . If 2016 was all about preparation, what more can they do and when will they strike? . . . [W]hen asked in March about the prospects for future interference by Russia, then-FBI Director James Comey testified before Congress that: '[T]hey'll be back.  They'll be back in 2020.  They may be back in 2018.'"[160]

_____

[159] Congressional Task Force on Election Security, Final Report (2018) (Ex. 8).

[160] _Id_. at 6-7.

103.    The Congressional Task Force on Election Security report also stated that "many jurisdictions are using voting machines that are highly vulnerable to an outside attack," in part because "many machines have foreign-made internal parts." Therefore, "[A] hacker's point-of-entry into an entire make or model of voting machine could happen well before that voting machine rolls off the production line."[161]

104.    In 2016, "Russian agents probed voting systems in all 50 states, and successfully breached the voter registration systems of Arizona and Illinois."[162] The Robert Mueller report and a previous indictment of twelve Russian agents confirmed that Russian hackers had targeted vendors that provide election software, and Russian intelligence officers "targeted employees of [REDACTED], a voting technology company that developed software used by numerous U.S. counties to manage voter rolls, and installed malware on the company network."[163]

105.    A 2015 report issued by the Brennan Center for Justice listed two and a half-pages of instances of issues with voting machines, including a 2014 post-election investigation into machine crashes in Virginia which found "voters in Virginia Beach observed that when they

---

[161] *Id*. at 25 (citing Matt Blaze, et al., DEFCON 25 Voting Machine Hacking Village: Rep. on Cyber Vulnerabilities in U.S. Election Equipment, Databases, and Infrastructure, 16 (2017), https://www.defcon.org/images/defcon-25/DEF%20CON%2025%20voting%20village%20report.pdf).

[162] Jordan Wilkie, *'They think they are above the law': the firms that own America's voting system*, THE GUARDIAN (Apr. 23, 2019), https://www.theguardian.com/us-news/2019/apr/22/us-voting-machine-private-companies-voter-registration.

[163] Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* at p. 50, U.S. DEPARTMENT OF JUSTICE (Mar. 2019), https://www.justice.gov/archives/sco/file/1373816/download.

selected one candidate, the machine would register their selection for a different candidate."[164] The investigation also found that the Advanced Voting Solutions WINVote machine, which is Wi-Fi-enabled, "had serious security vulnerabilities" because wireless cards on the system could allow "an external party to access the [machine] and modify the data [on the machine] without notice from a nearby location," and "an attacker could join the wireless ad-hoc network, record voting data or inject malicious [data.]"[165] Upon information and belief, The Brennan Center for Justice has not been threatened or sued by Dominion and/or Smartmatic.

106.    HBO's documentary *Kill Chain: The Cyber War on America's Elections*,[166] details the vulnerability of election voting machines, including Dominion's.  Harri Hursti, a world-renowned data security expert, showed that he hacked digital voting machines to *change votes* in 2005.  According to Hursti, the same Dominion machine that he hacked in 2005 was slated for use in twenty states for the 2020 election.

107.    In the documentary, Marilyn Marks, Executive Director of Coalition of Good Governance (one of the Plaintiffs in *Curling*), stated, "In Georgia, we ended up seeing the strangest thing.  In a heavily Democratic precinct, there was one machine out of a seven-machine precinct that showed heavy Republican wins, while the precinct itself and all of the other machines were showing heavy Democratic wins." Dr. Kellie Ottoboni, Department of Statistics, UC Berkeley,

---

[164] Lawrence Norden and Christopher Famighetti, *AMERICA'S VOTING MACHINES AT RISK*, BRENNAN CTR. FOR JUST., 13 (Sep. 15, 2014), https://www.brennancenter.org/sites/default/files/2019-08/Report_Americas_Voting_Machines_At_Risk.pdf (Ex. 9).

[165] *Id*.

[166] Simon Ardizzone, Russell Michaels, and Sarah Teale, *Kill Chain: The Cyber War on America's Elections*, HBO (Mar. 26, 2020), https://play.hbomax.com/feature/urn:hbo:feature:GXk7d3QAJHI7CZgEAACa0?reentered=true &userProfileType=liteUserProfile.

stated the likelihood of this happening is "an astronomically small chance." It was less than one in

a million.[167]  Upon information and belief, HBO, Harri Hursti, Marilyn Marks, nor the Coalition

of Good Governance have been threatened or sued by Dominion and/or Smartmatic.



108.    In December 2020, the Department of Homeland Security's Cybersecurity &

Infrastructure Agency ("CISA") revealed that hackers infiltrated SolarWinds software.[168] Despite

CEO Poulos's claim that Dominion had never used SolarWinds, an archival screenshot of

Dominion's website shows a now-deleted SolarWinds logo (screenshot below).  Dominion in fact

did use SolarWinds:

---

[167] Screenshot from https://www.facebook.com/KillChainDoc/videos/2715244992032273/.

[168] Zachary Stieber, *Dominion Voting Systems Uses Firm That Was Hacked*, THE EPOCH TIMES, Dec. 14, 2020, https://www.theepochtimes.com/mkt_app/dominion-voting-systems-uses-firm-that-was-hacked_3617507.html.



109. Dominion refuses to provide access to experts to forensically investigate its "proprietary" software, machines, and systems, to further establish that its machines have been hacked. This is telling in and of itself. Dominion denies the public access to the evidence to substantiate that it has been hacked. It silences anyone who makes this claim while simultaneously denying access to the key information one way or the other.

### IV.
### Gaslighting: The REAL Big Lie

> "And if all others accepted the lie which the Party imposed—if all records told the same tale—then the lie passed into history and became truth. 'Who controls the past,' ran the Party slogan, 'controls the future: who controls the present controls the past.'"
>
> - George Orwell, *1984*

110. In the wake of the 2020 presidential election and amidst a growing wave of public concern that the election results had been interfered with, tampered with, or manipulated to such a degree as to impact the outcome against Donald Trump and in favor of Joe Biden, Department of Homeland Security's Cybersecurity and Infrastructure Security Agency ("CISA") publicly claimed the 2020 election was the "most secure in American history." Dominion proudly touted

that claim as vindication of its role in an election many claimed was stolen, and even continues to cite CISA's claim in support of its allegation that Mike Lindell's cries of election fraud are a "Big Lie." The real Big Lie is, in fact, CISA's claim that the 2020 election was the "most secure in American history."

111. For example, hand recounts occurred in several jurisdictions after the 2020 election. The hand recounts did not confirm, however, that the election was the "most secure in American history." Rather, while the Georgia hand recount did confirm the original tabulation, the court in *Curling*, as discussed above, found that BMD machines are inherently unverifiable by their very nature, leading to inaccurate recounts because there are no actual printed ballots with the voters chosen representatives listed. Re-running ballots only bearing a QR code back through the machine does not dispel concerns that the QR code itself may not accurately reflect the vote cast. In other words, the so-called "hand recount" of Dominion's ballots is only as good as the software recording the vote and the (unreadable) QR code it prints. Hand recounts of the type described are no evidence that the 2020 election was the "most secure in American history."

112. In addition, what neither CISA nor Dominion nor Smartmatic bothered to tell the American people is that Dominion and Smartmatic are members of CISA's Election Infrastructure Sector Coordinating Council, and so wielded self-serving influence over CISA's proclamations that the 2020 election was historically unprecedented in its security.[169] And, there is ample evidence that the 2020 presidential election was the furthest thing from secure—let alone "the most

---

[169] *See Government Facilities Sector – Election Infrastructure Subsector: Charters and Membership*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/government-facilities-election-infrastructure-charters-and-membership (last visited Nov. 5, 2021).

secure in American history." For instance, see above J. Alex Halderman declaration detailing numerous security issues with the same voting technologies used in the 2020 election.

113.   On Monday, November 2, 2020, the night before the 2020 general election, Dominion forced unplanned and unannounced software uploads into its machines.[170] In some counties in Georgia, Dominion's irregular software update caused voting machines to crash the next day during the election.[171] The supervisor of one County Board of Elections stated that Dominion "uploaded something last night, which is not normal, and it caused a glitch," and "[t]hat is something that they don't ever do. I've never seen them update anything the day before the election."[172]  Notably, Dominion had earlier *publicly denied* that any such updates just prior to election day were made and that its machines were connected to the internet—both of which were false statements.[173]

114.   During the 2020 general election Dominion machines across the country were connected to the internet when they should not have been.[174] A Dominion representative assigned to Wayne County, Michigan reported numerous irregularities with the election process and Dominion's machines, including that the voting machines were connected to the internet and that the machines had scanning issues.

---

[170] Kim Zetter, *Cause of Election Day Glitch in Georgia counties Still Unexplained*, POLITICO (Nov. 12, 2020, 10:28 PM), https://www.politico.com/news/2020/11/04/94eorgia-election-machine-glitch-434065.

[171] *See id*.

[172] *See id.*

[173] *Dominion Voting Machines Were Updated Before Election, Georgia Official Confirms*, THE EPOCH TIMES (Dec. 4, 2020), https://www.theepochtimes.com/dominion-voting-machines-were-updated-before-election-georgia-official-confirms_3604668.html.

[174] Aff. of Patrick J. Colbeck, *Costantino v. City of Detroit*, 950 N.W.2d 707 (Mich. 2020).

115.    In Wisconsin, Dominion machines that were not supposed to be connected to the internet were in fact connected to a "hidden" Wi-Fi network during voting.[175] Michael Spitzer-Rubenstein, a democrat political operative, was given internet access to a hidden Wi-Fi network at the Wisconsin election center where votes were being counted.[176] Spitzer-Rubenstein received an email from Trent James, director of event technology at Green Bay's Central Count location, which stated, "One SSID [for a Wi-Fi network] will be hidden and it's: 2020vote. There will be no passwords or splash page for this one and it should only be used for the sensitive machines that need to be connected to the internet."[177] Four other individuals were copied on the email.

116.    Dominion also provides numerous and continuous updates to their machines. During one such update in May 2021, Dominion has been reported to have deleted 2020 election related data.[178] Such blatant deletion of data would be in clear violation of Dominion's duty to preserve all evidence of their malfeasance in the 2020 election for their claims against Lindell and Lindell's affirmative defenses and his own claims against Dominion. Dominion's actions would amount to spoliation. While it should be unnecessary considering these duties are tantamount to common knowledge, Lindell nevertheless sent a letter to Dominion on August 11, 2021 reminding

---

[175] M.D. Kittle, *EMAILS: GREEN BAY'S 'HIDDEN' ELECTION NETWORKS*, WISCONSIN SPOTLIGHT, Mar. 21, 2021, https://wisconsinspotlight.com/emails-green-bays-hidden-election-networks/.

[176] M.D. Kittle, *Democrats' Operative Got Secret Internet Connection at Wisconsin Election Center, Emails Show*, DAILY SIGNAL, Mar. 23, 2021, available at https://www.dailysignal.com/2021/03/23/democrats-operative-got-secret-internet-connection-at-wisconsin-election-center-emails-show/.

[177] Email from Michael Spitzer-Rubenstein to Celestine Jeffreys, Mike Hronek, Amaad Rivera, and Shelby Edlebeck (Oct. 30, 2020, 4:36 PM) (on file with author).

[178] *Mesa County Colorado Voting Systems, Report No. 1 with Forensic Examination and Analysis* (Sep. 15, 2021).

it of its obligation to preserve all evidence prior to conducting any software updates. Upon information and belief, based on reports of additional updates after the August 11 letter, Dominion ignored the request and continues to provide updates to their software, which are deleting and/or destroying 2020 election related data.

117. Attorneys representing a Democratic candidate who lost in 2020 filed a brief raising Dominion machine errors and election issues, arguing, "discrepancies between the number of votes cast and the number of votes tabulated have been pervasive in the counting of ballots for this race . . . In addition to the table-to-machine count discrepancies of which the parties are aware, there have also been procedural inconsistencies that question the integrity of the process . . . [T]he audit results revealed 'unexplained discrepancies' but failed to provide any explanation . . . what caused those discrepancies or if they were ever resolved . . . In this case, there is reason to believe that voting tabulation machines misread *hundreds* if not *thousands* of valid votes as undervotes . . ."[179]

118. Following the 2020 election, state lawmakers initiated investigations and audits of the results, often directing particular attention to Dominion's voting systems.

    a.    Congressman Paul Gosar called for a special session of the Arizona legislature to investigate the accuracy and reliability of the Dominion ballot software.[180] On January 27, 2021, the Maricopa County, Arizona Board of Supervisors voted unanimously to approve an audit of the 2020 election results and a forensic audit

---

[179] Oswego County, Index No. ECF 2020-1376, dated February 1, 2021 at 2.

[180] Hannah Bleau, *Rep. Paul Gosar Calls on Arizona Officials to 'Investigate the Accuracy' of the Dominion Ballot Software After Reports of 'Glitches,'* BREITBART, Nov. 7, 2020, https://www.breitbart.com/politics/2020/11/07/rep-gosar-calls-on-az-officials-investigate-the-accuracy-of-the-dominion-ballot-software-after-reports-of-glitches/.

of Dominion's voting machines.[181] The Arizona senate hired a team of forensic auditors consisting of four companies to review Maricopa's election process.[182] A week later, attorneys sent each of those four companies a threatening cease-and-desist letter, improperly attempting to influence the reviews.[183] The audit began in April 2021 and, despite nearly-continuous efforts by left-minded litigants and certain Maricopa County officials to thwart it. The Cyber Ninjas issued their audit report on September 24, 2021, with portions yet to be completed because they were denied access to information.[184] In spite of that, the report contained many significant findings, including those detailed above.[185]

---

[181] *Auditing Elections Equipment in Maricopa County*, MARICOPA COUNTY, https://www.maricopa.gov/5681/Elections-Equipment-Audit (last visited Apr. 18, 2021).

[182] Press Release, Arizona State Senate, Arizona Senate hires auditor to review 2020 election in Maricopa County (Mar. 31, 2021) (on file with author) (Ex. 10).

[183] Letter from Sara Chimene-Weiss, James E. Barton II, Roopali H. Desai, and Sarah R. Gonski to Cyber Ninjas, CyFir, Digital Discovery, and Wake Technology Services (Apr. 6, 2021) (Ex. 11).

[184] Cyber Ninjas, *Maricopa County Forensic Election Audit, Volume III* at 60 (2021).

[185] *Maricopa County Forensic Election Audit, Volume I,* at 1-2 (2021) (Some of these significant findings include, but are not limited to: (1) "None of the various systems related to elections had numbers that would balance and agree with each other. In some cases, these differences were significant." (2) "Files were missing from the Election Management System (EMS) Server." (3) "Logs appeared to be intentionally rolled over, and all the data in the database related to the 2020 General Election had been fully cleared." (4) "Software and patch protocols were not followed." (5) "There were a significant number of ballots cast by individuals that had moved prior to the election." (6) Maricopa County and Dominion failed to follow basic cyber security best practices and guidelines from the CISA. (7) The audit further stated that "Legislation should be considered that would prohibit connecting tabulators, or the Election Management System Servers or other similar equipment from being connected to the internet or any other mechanism that could allow remote access to these systems.")

b. In the Michigan case of *Bailey v. Antrim County*, Cyber Ninjas and CyFir have found Dominion voting machines are connected to the internet, either by Wi-Fi or a LAN wire; there are multiple ways election results could be modified and leave no trace; and the same problems have been around for 10 years or more.[186]

c. In that same case, forensic analysts gained access to the Dominion voting machines used in the November 2020 election and determined the following:

   i. "The system intentionally generates an enormously high number of ballot errors … The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail."

   ii. "[T]he computer system shows vote adjudication logs for prior years; but all adjudication log entries for the 2020 election cycle are missing … Removal of these files violates state law."

   iii. "[A]ll'' server security logs prior to 11:03 pm on November 4, 2020 are missing. This means that all security logs for the day after the election, on election day, and prior to election day are gone … Other server logs before November 4, 2020 are present; therefore, there is no reasonable explanation for the security logs to be missing." [187]

---

[186] Pl.'s Collective Resp. to Defs.' and Non-Party Counties' Mots. to Quash and for Protective Orders at Exs. 7-8 (April 9, 2021), *Bailey v. Antrim County* (No. 20-9238).

[187] Allied Security Operations Group Revised Preliminary Summary v.2, Antrim Michigan Forensics Report, 12/13/2020, https://www.depernolaw.com/uploads/2/7/0/2/27029178/ex_8-9.pdf.

        iv.      An expert in the case "examined the forensic image of a Dominion ICX system utilized in the November 2020 election and discovered evidence of internet communications to a number of public and private IP addresses."[188]

    d.     On April 12, 2021, New Hampshire Governor Christopher Sununu announced he had signed legislation appointing an audit of a Rockingham County race that relied upon Dominion voting machines after suspicious uniform shorting of vote tallies for four candidates was uncovered. The resulting report found issues with the Dominion machines used to count absentee ballots.

    e.     On March 23, 2021 the Wisconsin Assembly ordered an investigation into the 2020 election. Wisconsin uses Dominion voting machines.[189] The Wisconsin Legislative Audit Bureau is currently conducting its investigation with results coming soon.

    f.     Investigations into election irregularities are also ongoing in Pennsylvania and Georgia, states which also use Dominion voting machines.

Even the Biden administration has recently sanctioned Russia for election interference and hacking.[190]

---

[188] Aff. Of Benjamin R. Cotton 8 April 2021 at 3, Case No. 20-9238-CZ, *Bailey v. Antrim County*.

[189] Scott Bauer, *Wisconsin Assembly OKs investigation into 2020 election*, FOX6 NEWS MILWAUKEE, Mar. 23, 2020, https://www.fox6now.com/news/wisconsin-assembly-approves-election-investigation.

[190] *See, e.g.*, Truak, Natasha and Amanda Macias, "Biden administration slaps new sanctions on Russia for cyberattacks, election interference," Apr. 14, 2021, https://www.cnbc.com/2021/04/15/biden-administration-sanctions-russia-for-cyber-attacks-election-interference.html.

119.    In early 2021, a data scientist, Douglas G. Frank, PhD, uncovered an algorithm or "key"—a sixth degree polynomial—that operates in the electronic voting machines in a number of states to determine the ballots cast.[191]  These algorithms are unique to each particular state.  In other words, the algorithm used in Minnesota does not work next door in Wisconsin.  Likewise, the algorithm in Ohio does not work in Michigan or in Pennsylvania.  That fact further demonstrates an algorithm is at work and the voter results are not random.  Each algorithm is determined at the state level to shift votes based on the particular and peculiar demographics of each state.  The examples below are from counties in Minnesota, but Dr. Frank has done the same analysis in a number of other states, including Michigan, Ohio, Pennsylvania, North Carolina, Washington, Colorado, and Florida, and reached the same results and conclusions.

120.    Specifically, the algorithm is a mathematical computation of the actual registrations compared to the actual ballots cast.  When applied to the 2019 census data and the registration data, that algorithm enables the prediction of the number of ballots cast *for each voter age group* in any given county in a state with near 100% certainty—without seeing the actual results.  The key for each state applies with 100% certainty or near 100% certainty for every county within that state.  And, as stated above, each state has a unique key.  That does not happen in a random world.

121.    Specifically, with respect to the charts for the respective Minnesota counties below:

a.     The data is shown in graphs and compiled from three different databases:

BLUE CURVE.  Population data extracted from the 2019 U.S. census at census.gov.  This is the blue curve on each chart for the counties examined, which shows the census data per age group.

BLACK LINE.  The state registration database for used in the November 3, 2020 election. This is the black line on each chart.

---

[191] Plaintiff's Collective Response to Defendants' and Non-Party Counties' Motion to Quash and for Protective Orders, Ex. 4, *Bailey v. Antrim Cty.*, No. 20-9238-CZ (Mich. Cir. Ct. May 18, 2021).

**RED LINE**.  The state voter database with recorded results after the election.  This is the red line on each chart.



b.  The blue, black, and red lines on the graphs are data.  They are not speculative or calculated.  They are comprised of 100% data.  The algorithm itself, a sixth-degree polynomial, is a mathematical computation of the actual registrations on each graph (black line) compared to the actual ballots cast (red line).  The polynomial can be described as a "key" because it works in every county in a state e.g., Minnesota. The algorithm is regulating voter turnout by age as shown by the fact that voter turnout by age is in the exact same relative proportion to registered voters in each county in any given state.  What happens in one county happens in all counties in a given state.  The almost-perfect correlation also means that by taking the census data and the registration data and then applying the algorithm, the number of ballots cast in a county can be predicted with virtually perfect certainty without even seeing the results.

c. To discover the key, Dr. Frank first charted the total voting population that could be registered (dark blue line). Dr. Frank then layered in the registered voters (black line). Next, Dr. Frank included the actual ballots cast (red line). When all of the bumps in the black line (registrations) are compared to those in the red line (ballots), they look very familiar. The red line is almost a direct image of the black line, but just lower on the graph. Simply graphing the ratio between the black and the red creates the polynomial. The polynomial becomes the key. The key is then used and works in every county in a given state. When the key is applied, it generates the light blue line (predicted ballots).

d. Dr. Frank applied the algorithm (a sixth-degree polynomial) and predicted the number of ballots cast per age group in each county. This is represented by the light blue line (predicted ballots). The red line (actual ballots cast) tracks almost identically with the ballots predicted by the key. The light blue line (predicted ballots, using the "key") also tracks with the black line (registrations). Those curves also follow the shape of the census (*i.e.,* the population).

e. As found for several other states, in Minnesota, Dr. Frank's algorithm consistently predicted voter participation demographics to remarkably unnatural precision, with nearly every correlation coefficient equal or greater than 0.990. In Minnesota alone, he predicted 13 counties with R = 1.000, 33 counties with R = 0.999, 22 counties with R = 0.998, and all the rest greater than 0.994 except for three, the

worst of which was R = 0.976—still impossibly high to be a random event.[192] Three

such counties are depicted in the charts below:





[192] All of the county charts can be viewed at
https://www.youtube.com/watch?v=xkY2LRA1ijQ



f.      The analysis of the data shows an ability to predict ballot demographics with a degree of precision approaching 100%—a level of accuracy that would be impossible without the activity of a regulating algorithm.   And, the degree of precision observed confirms that algorithms had real-time access to voting databases and voting activity before, during, and following the November 3, 2020 election.

electronic voting machines are computers—computers highly vulnerable to hacking, tampering, and cyberattacks.[193]

123.    In addition, Exhibit 12 shows a subset of twenty documented successful hacks through the election management system in the states of Michigan, Pennsylvania, Georgia, Wisconsin, and Arizona resulting in a total 555,864 votes switched from President Trump to candidate Vice President Biden in the 2020 general election.  These hacks came primarily from within China and are identified by the date, location, and the network from which the hack originated and the location and network that was the target of the hack.  The network packets of information flowing from these hacks was captured and recorded in real time as discussed in the documentary, "Absolute 9-0."[194]

124.    In short, every mainstream media "reporter" and social media pundit continues to label the fact of tampering and interference in the 2020 election as "baseless," "false," "debunked," or some similarly approved newspeak.  Dominion, HPS, and Smartmatic have likewise taken up this mantle through aggressive Lawfare.  Smartmatic also even released a "Crisis Handbook for Election Commissioners" designed to combat what they categorize as "fake news."[195]  Smartmatic "created this handbook as a planning tool and guide to aid election officials in countering false information and protecting the integrity of the elections process in jurisdictions across the United

---

[193] Dr. Frank's analysis for these states (and others) is viewable at
 https://www.youtube.com/channel/UC57eE4MaR0oIwTinM__WQSg.

[194] *See* Mike Lindell, A*bsolutely 9-0*, WVW BROADCAST NETWORK (Jun. 3, 2021),
https://www.worldviewweekend.com/tv/video/mike-lindell-presents-absolutely-9-0, beginning of
the documentary through the 16 minute mark.
[195] *Communications in the Age of Fake News: A Crisis Handbook for Election Commissions*,
SMARTMATIC, https://electionfactcheck.news/.

States."[196]  But "baseless," "false," "debunked," and similar adjectives are not synonyms for "disputed."  The media, big-tech orthodoxy, Democrats, Dominion, HPS, and Smartmatic may *dispute* the sources, methodologies, or conclusions that lead many to question the 2020 election, but they are beyond disingenuous to claim such questions have no basis or have been conclusively or objectively answered in favor of their view.  They are ignoring the cacophony of complaints from the political left prior to November 3, 2020.  And they are literally asking Americans to ignore open and obvious evidence—evidence of events *they themselves predicted would occur*—and instead yield meekly to their campaign of enforced doublethink.

## V.
## Shut Up or Else

"Being in a minority, even a minority of one, did not make you mad.
There was truth and there was untruth, and if you clung to the truth
even against the whole world, you were not mad."

- George Orwell, *1984*

125.  Lindell has spoken out personally about Dominion, about electronic voting machines more generally, and the importance of election integrity.  And, Lindell has spoken accurately about these issues of great public concern.  He has presented evidence backed by expert analysis to raise public awareness of election integrity issues—particularly relating to the hacking of electronic voting machines like Dominion's machines.  For those actions Dominion sued him, baselessly alleging defamation, and seeking a headline grabbing, fictitious $1.3 billion in damages.[197]

---

[196] *Id*.

[197] *See* Case No. 1:21-cv-00445-CJN; *US Dominion, Inc., et al. v. My Pillow, Inc. and Michael J. Lindell*; in the United States District Court for the District of Columbia ("the D.C. Lawsuit").

126.     However, Dominion's true purpose is not simply to silence Lindell, but to silence anyone else who might speak out on election fraud.  Thus, Dominion also sued the company Mike Lindell founded and owns.  MyPillow made no statements about Dominion.  Instead, by suing MyPillow, Dominion seeks to punish Lindell for *his* statements by damaging his reputation, his finances, and his business.  More fundamentally, Dominion, the controlling person of the enterprise, with the assistance and participation HPS, Smartmatic, and Clare Locke, and those unknown individuals working with them also seek to send a message to others: "Shut up or else."

127.     After the election, Dominion hired HPS to design a media campaign seeking to broadcast as far as possible the message of "Shut up or else."  Mr. Steel, a partner with HPS, told media at the time that it was hired to "coordinate a public relations campaign responding to the outlandish claims by the president, his legal team, and their supporters. . ."[198]  In an interview given to CNN on or around February 7, 2021, Mr. Steel stated "Mike Lindell is begging to be sued and some day we may oblige him."[199]

128.     That is why Dominion's campaign also included bragging publicly with the assistance of HPS about having its lawyers at Clare Locke send threatening letters to over 150 individuals demanding they cease and desist from commenting on the election or Dominion.[200]  Among the recipients of these shotgun-style attack letters are dozens of everyday citizens—not

---

[198] Lachlan Markey, *Trump-Targeted Voting Company Dominion Hires Top PR Firm to Help Against the Crazy*, DAILY BEAST (https://www.thedailybeast.com/trump-targeted-voting-company-dominion-hires-top-pr-firm-to-help-against-the-crazy).

[199] Michael Steel, *Dominion Spokesman: Mike Lindell is Begging to be Sued. We May Oblige Him.*, CNN (Feb. 7, 2021), https://www.youtube.com/watch?v=csONmhFDW4U.

[200] Hannah Knowles and Emma Brown, *Dominion threatens MyPillow CEO Mike Lindell with lawsuit over 'false and conspiratorial' claims*, Washington Post, Jan. 18, 2021, https://www.washingtonpost.com/politics/2021/01/18/dominion-mike-lindell-mypillow/.

public figures—who volunteered as poll watchers in the 2020 election and signed sworn statements about election irregularities they witnessed.[201] Dominion found out who they were and dispatched its lawyers to send them threatening cease-and-desist letters, falsely claiming they had defamed Dominion when these private citizens never mentioned Dominion. Dominion then illegally demanded these private citizens preserve all communications, emails, texts—private or otherwise—and a host of other materials. Dominion's and Clare Locke's threats constitute witness intimidation.

129.    Dominion and Smartmatic, however, did not stop there. To give the letters further intimidating weight, their public campaign extended to suing news networks, like Fox News, One America News, Newsmax, and individuals for billions of dollars. These lawsuits were amplified by HPS' high-powered, well-orchestrated publicity campaign designed to spread their allegations to as many people as possible. Dominion and HPS intend for their media blitz to inflict a crippling fear of becoming the next target for destruction if one dares to raise any question about the use and integrity of voting machines during elections.

130.    Through aggressive litigation, threats of litigation, and publicization of these activities, Dominion seeks to intimidate those who might dare to come forward with evidence of election fraud, stop criticism of election voting machines, and suppress information about how its machines have been hacked in American elections. This campaign of lawfare is intended to stifle *any* and *all* public debate about the reliability of the election results, whether such speech is related to Dominion or not.

---

[201] *See* Case No. 1:21-cv-02672-STV, *Cooper v. US Dominion, Inc.,* currently pending before the United States District Court for the District of Colorado.

131.    Dominion has filed a $1.3 billion lawsuit against Sidney Powell.  Dominion has filed a $1.3 billion lawsuit against Rudy Giuliani.  Dominion has filed a $1.3 billion lawsuit against Patrick Byrne.  Dominion has filed a $1.6 billion lawsuit against Fox News.  Dominion has filed a $1.3 billion lawsuit against MyPillow and its CEO.  Dominion has filed a $1.73 billion lawsuit against One America News Network.  And Dominion has filed a $1.73 billion lawsuit against Newsmax Media, Inc.    Yet Dominion's annual revenues are only about $90 million.[202] Dominion's exaggerated lawsuits are not about any damages it has suffered; they are designed to intimidate those who exercise their right to free speech about the election.

132.    Dominion amplifies the effect of its exaggerated lawsuits with threatening letters and a publicity campaign.

a.    Dominion has sent at least 150 attorney letters, threatening the recipients with legal action.  Some of these letters include copies of Dominion's legal papers in its lawsuits.  The clear message of these letters is that anyone who comments publicly about Dominion will be ruined.[203]

b.    Dominion sent threatening letters to numerous individuals who signed sworn affidavits that were used in litigation about the election process.  In many cases, the poll watchers' affidavits did not include any statement about Dominion or the election.  But Dominion's campaign is total; it seeks to deter *any public expression*

---

[202] "The entire sector generates only about $300 million in revenue annually, according to Harvard professor Stephen Ansolabehere, who studies elections and formerly directed the Caltech/MIT Voting Technology Project," and "Dominion, [] has about 30% of the market." https://www.propublica.org/article/the-market-for-voting-machines-is-broken-this-company-has-thrived-in-it.

[203] *See* Case No. 1:21-cv-02672-STV, *Cooper v. US Dominion, Inc.*, currently pending before the United States District Court for the District of Colorado.

questioning the election. Dominion's clear threats that it will sue witnesses who testify about election irregularities or fraud does not threaten just the individual witnesses; it threatens the integrity of the justice system as a whole. Exhibits 13 and 14 are representative of the threatening letters Dominion and Clare Locke sent to dozens of these citizen volunteers performing a public service.[204]

c.  In another instance, Dominion sent an intimidating letter to *the uncle* of an attorney involved in litigation about the 2020 election. The uncle himself had no involvement, but for the circumstance of being related to someone investigating Dominion and the election, Dominion accused him of disseminating misinformation and making false accusations. Its letter threatened, "Litigation regarding these issues is imminent."

---

[204] *See id.*



THOMAS A. CLARE, P.C.  **C L A R E  L O C K E**  MEGAN L. MEIER
                                    L L P

December 23, 2020

*Via Federal Express*



Re:  *Notice of Obligation to Preserve Documents Related to Dominion*

Dear ▮▮▮

Our firm is defamation counsel to US Dominion Inc.[1]  We write to you regarding the ongoing misinformation campaigns falsely accusing Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election.  In recent days we sent letters to Sidney Powell and various media entities demanding retraction of their myriad defamatory and conspiratorial claims about Dominion.

Dominion is prepared to defend its good name and set the record straight.  Litigation regarding these issues is imminent.  This letter is your formal notice to cease and desist taking part in defaming Dominion[2] and to preserve all documents and communications that may be relevant to Dominion's pending legal claims.

Accordingly, you must ensure that you and your principals, your agents, your subcontractors, any agents or employees under your supervision, and all sources of information upon which you relied are preserving and retaining all emails, text messages (including messages sent over messaging platforms such as WhatsApp), audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relate in any way to these matters.  Without any limitation, this requires you to preserve all drafts, redline edits, versions, comments, and any other modifications to all affidavits or declarations that you prepared or were prepared for you (regardless of whether they were ultimately used); all research and any and all other work relating to statements you have made (whether made in affidavits or declarations, in other writings, or verbally) about alleged voting improprieties or Dominion; all research you conducted or instructed others to conduct relating to Dominion or allegations of alleged voting improprieties; and all prepared remarks that you drafted or that were drafted for you related to Dominion or alleged voting improprieties.

---

[1] We also represent and write on behalf of its subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion").

[2] For the avoidance of doubt, this is a retraction demand pursuant to relevant state statutes and applicable rules of court.



In addition, you must preserve, without limitation, all communications with:

- Any member, volunteer, staff, or employee of the Trump campaign;

- Sidney Powell, Rudy Giuliani, Jenna Ellis, L. Lin Wood, and each of their partners, associates, and paralegals;

- Every individual who assisted you in drafting, or drafted for you, any and all affidavits or declarations you submitted in litigation related to Dominion or the November 2020 presidential election;

- Every individual who assisted you in drafting, or drafted for you, any and all prepared remarks related to Dominion or alleged voting improprieties;

- Every reporter, editor, blogger, host, or other member of the media with whom you communicated about Dominion or the November 2020 presidential election, regardless of whether they published any of your claims; and

- Every individual who has compensated you or any related entity in any manner for making public statements about, submitting affidavits or declarations in litigation related to, or undertaking any other related actions related to Dominion or the November 2020 presidential election.

The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. As a result, you must take every reasonable step to preserve this information until this matter is resolved. This may include, but would not be limited to, an obligation to discontinue all data destruction and data backup recycling policies and procedures on any and all devices within your possession, custody, or control. Your obligation to preserve documents applies both to you individually, and to any entities that you control.

2



Confirm receipt of this letter and that you intend to adhere to our request to retain documents as set forth above. This is not a complete recitation of Dominion's rights and remedies, all of which are expressly reserved.

We look forward to your prompt response.

Regards,

*Thomas A. Clare, P.C.*

Thomas. A. Clare, P.C.

*Megan L. Meier*

Megan L. Meier

3

d.     Another individual, an actuary, performed statistical analyses, inquiring whether the presence of Dominion voting machines affected election outcomes. He found non-random differences in counties that used Dominion machines. Dominion mailed him a box, pictured below, full of legal papers, which included lawsuits filed against other citizens along with a threatening cease and desist letter. As a result of speaking out, the actuary lost business.



133.    To further amplify the impact of its legal letters and exaggerated lawsuits, Dominion has bragged about and widely publicized them with the help of their public relations firm, HPS, seeking to ensure that everyone – not just the recipients of its attorney letters – knows they will be punished if they speak against Dominion, and anyone could be the next victim of a Dominion billion-dollar lawsuit.  For example:

a.    In a nationally televised interview, Dominion CEO John Poulos announced, **"Our legal team is looking at frankly everyone, and we're not ruling anybody out."** He said Dominion's previous lawsuit was "definitely not the last lawsuit" it would be filing.



b.     Dominion's website prominently displays its lawsuits, even ahead of its own products, and statements from its attorneys.  The website boasts, "Dominion has sent preservation request letters to Powell, Giuliani, Fox, OAN, and Newsmax, as well as more than 150 other individuals and news organizations.  Stay tuned to this page for updates."[205]

c.     As promised, Dominion's website was recently updated with lawsuits against One America News, Newsmax, and Patrick Byrne, as described above.

134.    The substantial expense of litigation in defamation lawsuits brought by governmental actors (like Dominion) against their critics has an enormous chilling effect on speech.  Dominion has issued a general threat to all ("Our legal team is looking at frankly everyone, and we're not ruling anybody out") and sharpened that threat by delivering it to specific individuals

---

[205] *Legal Updates*, DOMINION VOTING, https://www.dominionvoting.com/legal-updates-learn-how-we-are-defending-dominion/ (last visited Nov. 8, 2021).

("litigation regarding these issues is imminent") – sometimes accompanied by copies of lawsuits Dominion had already filed against others.

135.    Dominion's use of lawfare tears at the fabric of our constitutional order.   If successful, the scheme will cripple our system's ability to ferret out and stop electoral manipulation, as well as cut a wide hole in the First Amendment.

136.    Dominion aggressively pushed a narrative that there should be no concern regarding the integrity of the election.   Dominion and HPS took equally aggressive action to demand no criticism.   In response to Lindell's exercise of his First Amendment free speech rights, Dominion launched its lawfare campaign against both Lindell and his company.   Exhibits 15 through 17 are the increasingly aggressive "cease and desist" letters sent by Dominion, orchestrated with HPS, and Clare Locke to Lindell, seeking to silence Lindell's criticism and cherry-pick support for Dominion's self-interested denial of any wrongdoing.   Dominion, HPS, Clare Locke, and Smartmatic's scheme is wrongful because their purpose is to punish and deter important constitutionally-protected activity–free expression about a matter of public concern.

137.    Among Dominion and HPS' co-conspirators in this campaign to suppress free speech and extort silence from dissenters is another election-runner and state actor, Smartmatic. On or about February 4, 2021, Smartmatic filed a *$2.7 billion* lawsuit in federal court in New York City against Fox News; journalists Lou Dobbs, Maria Bartiromo, and Jeanine Pirro; and former Trump attorneys Rudy Giuliani and Sydney Powell.   Only recently, Smartmatic also sued One America News and Newsmax for billions of dollars.   The defendants' alleged wrongdoing? Speaking their mind publicly, attempting to report on growing questions about the role of voting machines in 2020 election irregularities, and utilizing the legal process to expose such irregularities and prevent certification of any election results that may have resulted from a tainted process.   But

Smartmatic's true motive is as obvious as Dominion's: to enforce the orthodoxy of Democrats, the mainstream media, and Big Tech and quash any and all suggestions that President Joe Biden might not have been the victor in an election conducted fairly and untainted by fraud. And Smartmatic's weapon of choice? The litigation process—an expensive, slow, notoriously inefficient arena in which only a very few can afford to wage battle on the scale Smartmatic, Dominion, HPS, and Clare Locke attempt to impose on those who question the integrity of their systems. Under the auspices of "defending election integrity"—a lofty goal far better served by fixing their notoriously and demonstrably insecure voting machines than by waging lawsuit warfare on private citizens—Smartmatic and Dominion have embarked on a concerted, collective enterprise to extort silence from their dissenters or bring financial ruin on any and all who persist in speaking their minds.[206]

138. Lindell is a victim of this conspiracy[207] and enterprise by Dominion, Smartmatic, HPS, and Clare Locke to attempt to silence him by abusing the litigation process and, as state actors, punish him for his support and advocacy of certain political views or candidates. Specifically, he has suffered reputational harm from being called the perpetrator of the "Big Lie"—

---

[206] Grace Dean and Jacob Shamsian, *From Mike Lindell to OAN, Here's Everyone Dominion and Smartmatic are Suing Over Election Conspiracy Theories So Far*, BUSINESS INSIDER (Aug. 14, 2021),
https://www.businessinsider.com/everyone-dominion-smartmatic-suing-defamation-election-conspiracy-theories-2021-2.

[207] Even Time Magazine, a storied and notoriously left-leaning publication, admitted there was a vast conspiracy amongst many in the private sector and government to stifle dissent regarding the outcome of the 2020 General Election. *See* Molly Ball, *The Secret History of the Shadow Campaign That Saved the 2020 Election*, TIME (Feb. 4, 2021), https://time.com/5936036/secret-2020-election-campaign/.

a Hitler-coined term[208]—and publicly vilified as a liar, conspiracy theorist, and purveyor of "baseless" or "false" information regarding the 2020 election.  Moreover, Lindell has received numerous threats against his person and even his life since speaking out about evidence of election fraud.  Obviously, he has suffered individually as a result of the damage done to his business, MyPillow, as a result of the Dominion- and Smartmatic-led "cancel culture" aimed at Lindell.  And the Dominion lawfare campaign against Lindell has interfered with plans to take Lindell's on-line store, MyStore, public in an initial public offering.  Moreover, he has incurred and is incurring millions of dollars to defend himself against Dominion's $1.3 billion lawsuit simply because Dominion, HPS, and Clare Locke want to use the litigation process to silence him—even as it tolerated a decade or more of criticism of its machines' security from those on the political left.  Lindell is entitled to recover his actual and special damages from Dominion and Smartmatic for their collective role in their conspiracy and enterprise to harm him—damages which presently are estimated to exceed $2 billion.

139.    In the context of election integrity—so crucial to the functioning and survival of a republican form of government—no litigant should be able to weaponize the courts and the litigation process while hiding behind legal doctrines originally intended and developed to *protect* constitutional rights, such as the right to petition the government, and the right to a full and fair opportunity to be heard in a court of law.  No doubt, the Dominion Defendants, HPS, and the Smartmatic Defendants will attempt to hide behind such doctrines (like the *Noerr-Pennnington* doctrine or the "absolute privilege" protecting statements made in the course of judicial proceedings) to *deprive* Lindell and other litigants of their sacrosanct right of freedom of speech.

---

[208] Adolf Hitler, *Mein Kampf vol. I, ch. X, James Murphy trans.*, HURST AND BLACKETT LTD. (1939), http://gutenberg.net.au/ebooks02/0200601.txt.

Through their joint enterprise to suppress political dissent, the Dominion Defendants and the Smartmatic Defendants have placed in tension the right to petition the government against the right to free speech. In doing so, one set of litigants (the Dominion and Smartmatic Defendants) have abused the right to petition the government in an effort to suppress Mike Lindell's and others' lawful and proper exercise of their freedom of speech. Plaintiff Lindell has been harmed as a result and brings this suit to recover for that harm and bring an end once and for all to the defendants' reign of litigation terror and conspiracy to deprive Lindell and others of their constitutionally protected freedom of political expression.

140. In short, Plaintiff Lindell brings this lawsuit to put an end to Dominion's and Smartmatic's campaign of "Lawfare" against those who criticize their electronic voting machines, or who question their role in the indisputably suspect conduct of the 2020 Presidential Election. Lindell's claims rise above any protections the defendants may assert to wage their lawfare campaign, because those protections do not and should not immunize state actors from weaponizing the judicial system and the litigation process to silence dissent, unpopular beliefs, or facts inconveniently out-of-line with mainstream groupthink.

## E.
## CAUSES OF ACTION

> "Freedom is the freedom to say that two plus two make four. If that is granted, all else follows."
>
> - George Orwell, *1984*

141. The facts alleged above and to be proven at trial demonstrate that Plaintiff is entitled to recover damages and other relief against the various defendants in this case on one or more theories and causes of action as set out below.

# I.
## COUNT ONE:  ABUSE OF PROCESS
### (As to the Dominion Defendants)

142.    Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

143.    The facts set forth herein and to be proven at trial demonstrate that Plaintiff is entitled to recovery against the Dominion Defendants, jointly and severally, for the common law tort of abuse of process.

144.    Under Minnesota law, the elements of a tort cause of action for abuse of process are (a) the existence of an ulterior purpose, and (b) the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued, whether such result might otherwise be lawfully obtained or not.  *See Young v. Klass*, 776 F.Supp.2d 916, 924 (D. Minn. 2011), *quoting Hoppe v. Klapperich*, 224 Minn. 224, 28 N.W.2d 780, 786 (1947).  Abuse of process does not require the plaintiff to prove either favorable termination of the underlying litigation or malice on the part of the defendant.

145.    The facts alleged above and to be proven at trial will establish each of these elements.  As detailed above, the Dominion Defendants brought suit against Lindell as part of a widespread "lawfare" campaign designed by Dominion, HPS, and Clare Locke not to compensate for any harm to Dominion caused by the public statements by Lindell and others, but to weaponize the judicial system in order to quash political dissent and silence those who would have the citizens of the United States (and the world, for that matter) know the truth about the grave flaws in Dominion's voting machines (as well as the voting machines of others).  To that end, the Dominion Defendants have willfully plead gross mischaracterizations and outright lies about their voting machines, about the public statements Lindell has made about them, and about Lindell personally. In addition, the Dominion Defendants have alleged a quantum of damages—$1.3 *billion*—that not

only bears no conceivable connection to any possible harm suffered from the public exposé of their flawed machines, but also is many multiples of the Dominion Defendants' revenues from their voting machines that were the subject of Lindell's public statements.  Such allegations, having no basis in fact, are instead meant only to intimidate and silence.  For these and other reasons, the Dominion Defendants' judicial claims against Lindell are devoid of factual support and were instead made for the primary purpose of intimidating Lindell into silence and a public retraction of his previous public statements.  Upon information and belief, Dominion recently directed HPS to place a story with the Business Insider detailing potential ways that Dominion will own MyPillow after litigation has ended.[209] The story was even picked up by late night television host Seth Meyers.

146.    As a result of the Dominion Defendants' abuse of the judicial process, Plaintiff has suffered damages to his business interests and his reputation, has suffered threats to his personal safety and life, and has incurred and continues to incur costs to defend the abusive litigation those defendants have brought against him, for which he is entitled to recovery against those defendants, jointly and severally, and for which he now brings this suit.

---

[209] Jacob Shamsian, *Will Dominion End Up Owning MyPillow if It Wins a $1.3 Billion Defamation Lawsuit Against Mike Lindell?  Here Are 2 Ways It Could Take Control*, INSIDER (Nov. 3, 2021), https://www.businessinsider.com/will-dominion-own-mypillow-if-it-wins-defamation-lawsuit-2021-11.

## II.
## COUNT TWO: DEFAMATION
### (As to the Dominion Defendants)

147.   Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

148.   Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiff is entitled to recovery against the Dominion Defendants, jointly and severally, for the common law tort of defamation.

149.   Under Minnesota law, a statement is actionable in defamation if it is: (1) false; (2) was communicated to a third party; and (3) tended to harm the plaintiff's reputation or to lower that person in the estimation of the community.  *Church v. City of St. Michael*, 205 F.Supp.3d 1014, 1043 (D. Minn. 2016).  Defamation that affects a plaintiff in its "business, trade, profession, office or calling" is defamation per se and is "actionable without any proof of actual damages." *Id.*, 1045 n.19.

150.   The Dominion Defendants have defamed Plaintiff Lindell *per se* by calling him a "liar" and a purveyor of "the Big Lie" in the D.C. Lawsuit.  In fact, everything Lindell has publicly stated about the vulnerability of voting machines to cyberattacks and hacking (including the Dominion Defendants' voting machines) is substantively true, and the Dominion Defendants know it.

151.   Labeling a private citizen a "liar" or purveyor of lies is defamation *per se*, and therefore Lindell is entitled to monetary relief even in the absence of proof of economic loss or special damages.  To the extent such proof is required, Plaintiff will show that the Dominion Defendants published lies about him have caused him economic losses and special damages, for which he is entitled to recovery against those defendants, jointly and severally, and for which he now brings this suit.

## III.
## COUNT THREE:  VIOLATIONS OF THE
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 U.S.C. § 1962
### (As to Dominion Defendants, Smartmatic Defendants, and HPS)

152.    Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

153.    Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiff is entitled to recovery under 18 U.S.C. § 1964 against the Dominion Defendants, the Smartmatic Defendants, and HPS, jointly and severally, for violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962.

154.    To establish a civil RICO claim, the plaintiff must show that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, and that he (5) sustained an injury to business or property (6) that was caused by the RICO violation.

155.    An "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  An "association-in-fact" enterprise does not require a formal structure such as a hierarchical chain-of-command, fixed roles for members, a name, regular meetings, or established rules and regulations.   To establish an enterprise, the plaintiff must show (1) a common purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

156.    The facts alleged above and to be proven at trial demonstrate that Dominion was the controlling person of the enterprise, with the assistance and participation of the Smartmatic Defendants, Clare Locke, and HPS, and those unknown individuals working with them, constituted an association–in–fact enterprise ("the Dominion/Smartmatic Enterprise") having the common purpose of suppressing speech and dissent to the use of electronic voting machines and suppressing demands for investigations into the possible use of electronic voting machines to artificially

manipulate voting, vote tabulations, and election results reporting in the 2020 Presidential Election. A relationship exists between the Dominion Defendants and the Smartmatic Defendants in that the Dominion Defendants' voting machines utilize Smartmatic software (or software previously designed, created, modified, and sold by Smartmatic), and the Dominion Defendants and Smartmatic Defendants share common employees or contractors, co-working space, and historical and functional connections to Sequoia and other legacy voting systems. They also share a common purpose of suppressing dissent to protect their commercial and financial interests shown by their coordinated attack on dissenting speech, which is akin to a price fixing scheme, but instead of illicitly conspiring to set the price of goods, they have instead agreed to work together to punish any political speech with which they disagree and that may harm their pecuniary interests. This relationship has existed for over ten years and continues to this day. At the direction of Dominion, HPS carried out a vast and never-ending public relations campaign designed to discredit and stifle dissenting speech related to the 2020 General Election. Also at the direction of Dominion, Clare Locke sent hundreds of cease and desist letters designed to aid in HPS' public relations campaign by making clear Dominion would sue anyone for billions of dollars if their dissenting speech did not stop. In carrying out their conduct described in this Complaint, Clare Locke, Smartmatic, and HPS have not acted merely as agents or instruments of Dominion, but have instead acted as independent entities whose conduct, under the circumstances, rises to the level of active participation in Dominion's wrongdoing.

157. The facts alleged above and to be proven at trial demonstrate that the Dominion/Smartmatic Enterprise was at all relevant times engaged in the production, distribution, or acquisition of goods or services in interstate commerce. Specifically, the Dominion Defendants' principal place of business is in Colorado, but Dominion provides voting machines to twenty-eight

different states, and has issued written threats to those speaking out against electronic voting machines and their vulnerability to vote manipulation in numerous states beyond the borders of the State of Colorado, and has filed suit against Plaintiff Lindell in the District of Columbia as part of the "lawfare" campaign of the Dominion/Smartmatic Enterprise. Likewise, Smartmatic has its principal place of business in Florida, but has likewise sold its goods and services—which it too seeks to protect through the joint "lawfare" campaign as part of the Dominion/Smartmatic Enterprise—to jurisdictions outside of Florida and the United States.

158.    The facts alleged above and to be proven at trial further demonstrate that the Dominion/Smartmatic Enterprise has engaged in numerous related acts of racketeering activity that amount to or pose a threat of continued criminal activity.    Specifically, the Dominion/Smartmatic Enterprise has issued—according to Dominion's own boasting on its website—over 150 "cease and desist" letters threatening companies and individuals (including family members of those who have spoken publicly against the voting machines, who have not themselves spoken publicly about them).   Those letters threaten the recipients with ruinous litigation unless the recipients recant their previous statements and cease further public expression regarding questions or evidence of fraudulent manipulation of voting machines or their use in tampering with and altering the outcome of the 2020 Presidential Election in certain jurisdictions. These threats constitute extortion, witness tampering, witness intimidation, and mail fraud for purposes of establishing the requisite "predicate acts" for a civil RICO claim.

159.    Under 18 U.S.C. § 1512(b), a person who:

> Knowingly uses intimidation, threatens, or corruptly persuades
> another person, or attempts to do so, or engages in misleading
> conduct toward another person, with intent to—
>
> (1) influence, delay, or prevent the testimony of any person in an
> official proceeding;

(2) cause or induce any person to--

    (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

    (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

    (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

    (D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation supervised release, parole, or release pending judicial proceedings;

shall be fined under this title or imprisoned not more than 20 years, or both.

Under 18 U.S.C. § 1512(d):

(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from--

    (1) attending or testifying in an official proceeding;

    (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation1 supervised release, parole, or release pending judicial proceedings;

    (3) arresting or seeking the arrest of another person in connection with a Federal offense; or

    (4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding;

or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

Here, the Dominion Enterprise has violated 18 U.S.C. § 1512.  *See also* 18 U.S.C.A. § 1961.  The

Dominion Enterprise has also violated Chapter 609 of the Minnesota Criminal Code.  *See, e.g.*,

MINN. STAT. § 609.498.  The Dominion Enterprise likewise has violated Title 18, Article 8, Part 7

of the Colorado Criminal Code.  *See, e.g.*, § 18-8-707, C.R.S.

     160.    These threats constitute a "pattern" for purposes of a civil RICO claim because the

Dominion/Smartmatic Enterprise has made them continuously since shortly after the 2020

Presidential Election, and it continues to issue new extortionate threats to additional recipients to

this day, with no apparent end in sight to the pattern of racketeering activity.  In fact, Dominion's

attorneys stated as recently as August 10, 2021 that they have not ruled out bringing additional

lawsuits.  Dominion has also stated in court filings that it believes a pleading amendment deadline

of February 2022 is appropriate to bring additional claims and parties.  On the other hand,

Smartmatic brought lawsuits against One America News and Newsmax on November 3, 2021.

The Dominion/Smartmatic Enterprise is not finished.

     161.    Plaintiff has suffered actual injury as a result of the Dominion/Smartmatic

Enterprise's actions in furtherance of its racketeering conspiracy and activities, for which he is

entitled to recovery against those defendants, jointly and severally, together with treble damages

as allowed by law, as well as attorney's fees, and for which he now brings this suit.

## IV.
## COUNT FOUR:  VIOLATIONS OF THE
## "SUPPORT AND ADVOCACY" CLAUSE OF 42 U.S.C. §1985(3)
### (As to Dominion Defendants, Smartmatic Defendants, and HPS)

     162.    Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

     163.    Pleading further and in the alternative, the facts set forth herein and to be proven at

trial demonstrate that Plaintiff is entitled to recovery under 42 U.S.C. §1985(3) against the

Dominion Defendants, Smartmatic Defendants, and HPS, jointly and severally, for violation of Plaintiff's rights under the Support and Advocacy clause of that statute.

164.    The "Support and Advocacy" clause of 42 U.S.C. §1985(3) provides as follows:

> [I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor or the election of any lawfully qualified person as an elector for President or Vice President …; or to injure any citizen in person or property on account of such support or advocacy; … if any one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived shall have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. §1985(3).

165.    A cause of action under the Support and Advocacy clause therefore requires a showing of the following elements:  (1) two or more persons; (2) who conspire to either (a) prevent by force, intimidation, or threat a citizen lawfully entitled to vote from giving support or advocacy in a legal manner toward or in favor of the election of a lawfully qualified elector for President or Vice President, or (b) injure any citizen in person or property on account of her support or advocacy toward or in favor of the election of a lawfully qualified elector for President or Vice President; (3) one or more acts in furtherance of the object of such conspiracy; (4) whereby plaintiff suffers either (a) injury in her person or property, or (b) deprivation of having and exercising any right or privilege of a citizen of the United States.  *Id.*; *see also*, Note, "The Support and Advocacy Clause of §1985(3), HARVARD LAW REVIEW 133:1382, 1384-86 (2020).

166.    The facts set out above and to be proven at trial demonstrate that the Dominion Defendants, the Smartmatic Defendants, and HPS, with the assistance and participation of non-

party co-conspirator Clare Locke, had a meeting of the minds to agree on the common purpose of silencing speech, dissent, and opposition to the use of electronic voting machines in the 2020 Presidential Election and the exposure of such machines' vulnerability to cyber-attacks and election tampering. At the direction of Dominion, HPS and Clare Locke created a plan to stifle speech and dissent related to the 2020 Presidential Election by sending hundreds of cease and desist letters and enacting a public relations campaign designed to intimidate those who supported President Donald J. Trump in the 2020 Presidential Election. As part of the conspiracy, Smartmatic followed Dominion's playbook by sending cease and desist letters and filing lawsuits against anyone who dared support President Donald J. Trump in the 2020 Presidential Election. The real purpose of the conspiracy was to silence those like Lindell who supported President Donald J. Trump and advocated for investigations into voting machine fraud (and other types of election fraud) in an effort to determine the legitimate votes cast for each Presidential candidate in each of the key swing states, in light of the numerically improbable overnight lead change from Trump to Biden in those states in the wee hours of November 4, 2020. Importantly, as noted above, upon information and belief, not one democrat or left-leaning media organization has been threatened or sued by Dominion or Smartmatic based on their years of reporting vulnerabilities in election machines and software. The Dominion Defendants, the Smartmatic Defendants, and HPS determined to carry out this conspiracy through a coordinated campaign of lawfare—weaponizing the court system and litigation process to threaten, intimidate, and force private citizens like Lindell into silence and retract their public statements regarding opposition to the use of electronic voting machines and their vulnerabilities, and the significant potential that such vulnerabilities were exploited in certain jurisdictions to artificially cost President Trump the election in key swing states. To that end, the Dominion Defendants and HPS first threatened Lindell with ruinous

litigation, then filed an abusive, sham defamation lawsuit against Lindell seeking a $1.3 *billion* recovery with no basis in fact or law. HPS and Smartmatic's actions and the Dominion Defendants' lawsuit has injured Lindell in his person (reputationally and physically due to threats on his life) and his property (through business losses and the cost of defending against the sham litigation) and has further deprived Lindell of having and exercising his rights as a United States citizen to freedoms of speech and of expression.

167. Dominion, HPS, and Smartmatic Defendants' violation of the Support and Advocacy clause of 42 U.S.C. §1985(3) has caused Plaintiff Lindell actual damages, for which he is entitled to recovery against those defendants, jointly and severally, and for which he now brings this suit.

168. Separately, a conspiracy for purposes of this claim is shown by the actions of the Dominion Defendants, their lawyers at Clare Locke, LLP, and HPS who together conspired to send out over 150 baseless cease and desist letters—including to Lindell—with the express purpose of threatening and intimidating Lindell and others who brought forth evidence of election fraud in the November 2020 general election as part of their support and advocacy for President Trump.

## V.
### COUNT FIVE: VIOLATIONS OF THE
### EQUAL PROTECTION CLAUSE UNDER 42 U.S.C. § 1983
### BECAUSE OF DOMINION AND SMARTMATIC'S STATE-ACTION
#### (As to Dominion Defendants and Smartmatic Defendants)

169. Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

170. Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiff is entitled to recovery under 42 U.S.C. §1983 against the Dominion Defendants and Smartmatic Defendants, jointly and severally, for violation of Plaintiff's rights

under the Equal Protection Clause of the United States Constitution and under the Due Process

Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

171.    At all relevant times, Dominion and Smartmatic committed state action in

connection with the 2020 Presidential Election.  Specifically, a private party is committing state

action when the State has delegated to that private entity a function traditionally, exclusively

reserved to the State or when the State has outsourced one of its Constitutional obligations to the

private entity.  Administering elections of public officials is one such function and a Constitutional

duty required of States, and the facts alleged above and to be proven at trial will demonstrate that

Dominion and Smartmatic were administering elections in jurisdictions across the United States,

the results of which significantly and materially impacted the outcome of the 2020 Presidential

Election nationally.

172.    To establish a § 1983 claim, a plaintiff must show that (1) he has Article III standing

to bring the claim, (2) a right secured by the Constitution or laws of the United States was violated,

and (3) the alleged violation was committed by a person acting under the color of state law.  *Parratt*

*v. Taylor,* 451 U.S. 527, 535 (1981), overruled in part on other grounds by *Daniels v. Williams,* 474

U.S. 327, 330–31 (1986).  Said another way, a plaintiff must show that the private entity was a

state actor because it was exercising a function traditionally, exclusively reserved to the State,

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019) (citing *Jackson v.*

*Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974)), or because the State outsourced its

constitutional obligations to a private entity, *West v. Atkins*, 487 U.S. 42 (1988).

173.    To establish a violation of the Equal Protection Clause under 42 U.S.C. §1983, the

plaintiff must show state action that inherently favors or disfavors a particular group of voters.

The facts alleged above and to be proven at trial will demonstrate that the Dominion Defendants

and Smartmatic Defendants acted under color of state law to engage in invidious discrimination or intentional misconduct to the detriment of Lindell and others of his same class of voter. Specifically, the Dominion Defendants and Smartmatic Defendants, acting under color of state law as a private corporation authorized and employed by various states under their Constitutional obligations to perform the essential state function of administering and conducting the 2020 Presidential Election, have attempted through the use of the courts and the litigation process to suppress Lindell's freedom of speech and his right to disseminate information and data regarding the role of Dominion voting machines in election fraud and election tampering. In doing so, Dominion and Smartmatic disfavored the conservative political viewpoint of Plaintiff Lindell over those of left-leaning or Democrat-supporting individuals *who also publicized the role of Dominion voting machines in election fraud and election tampering*, yet, upon information and belief, have never been threatened or sued by Dominion and/or Smartmatic. A state actor like the Dominion Defendants and Smartmatic Defendants cannot engage in viewpoint-based discrimination in attempting to suppress a private citizen's exercise of its First Amendment right to free speech, and in doing so, the Dominion Defendants and Smartmatic Defendants unlawfully deprived Plaintiff Lindell of a legally protected interest in violation of 42 U.S.C. §1983.

174. To establish a substantive due process violation under 42 U.S.C. §1983, the plaintiff must demonstrate that a fundamental right was violated and that the conduct shocks the conscience. Freedom of speech—and in particular, freedom of political speech—is, indisputably, a right of the most fundamental significance under our constitutional structure. The facts alleged above and to be proven at trial will demonstrate that the Dominion Defendants and Smartmatic Defendants acted under color of state law to engage in conduct that shocks the conscious because it was so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely

careless or unwise excess of zeal, that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience. Specifically, the Dominion Defendants and Smartmatic Defendants, acting under color of state law, misused the courts and the litigation process to suppress Lindell's freedom of speech and to deprive him of a substantive right under the First Amendment. Such wrongdoing violates 42 U.S.C. §1983 and has caused Plaintiff Lindell harm, for which he now brings this suit.

## VI.
## COUNT SIX: VIOLATION OF THE
## FIRST AMENDMENT UNDER 42 U.S.C. § 1983
## BECAUSE OF DOMINION AND SMARTMATIC'S STATE-ACTION
### (As to Dominion Defendants and Smartmatic Defendants)

175. Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

176. Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiff is entitled to recovery under 42 U.S.C. §1983 against the Dominion Defendants and Smartmatic Defendants, jointly and severally, for violation of Plaintiff's rights under the First and Fourteenth Amendments of the United States Constitution.

177. At all relevant times, Dominion and Smartmatic committed state action in connection with the 2020 Presidential Election. Specifically, a private party is committing state action when the State has delegated to that private entity a function traditionally, exclusively reserved to the State or when the State has outsourced one of its Constitutional obligations to the private entity. Administering elections of public officials is one such function and a Constitutional duty required of States, and the facts alleged above and to be proven at trial will demonstrate that Dominion and Smartmatic were administering elections in jurisdictions across the United States, the results of which significantly and materially impacted the outcome of the 2020 Presidential Election nationally.

178. To establish a § 1983 claim, a plaintiff must show that (1) he has Article III standing to bring the claim, (2) a right secured by the Constitution or laws of the United States was violated, and (3) the alleged violation was committed by a person acting under the color of state law. *Parratt v. Taylor,* 451 U.S. 527, 535 (1981), overruled in part on other grounds by *Daniels v. Williams,* 474 U.S. 327, 330–31 (1986). Said another way, a plaintiff must show that the private entity was a state actor because it was exercising a function traditionally, exclusively reserved to the State, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019) (citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974)), or because the State outsourced its constitutional obligations to a private entity, *West v. Atkins*, 487 U.S. 42 (1988).

179. It is well settled that the First Amendment prohibits the government from subjecting an individual to retaliatory actions for their speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). As the Supreme Court has noted, "[o]fficial reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Id*. (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588, n. 10 (1998)). The facts alleged above and to be proven at trial will demonstrate that Dominion and Smartmatic committed state-action as authorized by the Constitution and state law by administering, collecting, counting, recording, and auditing ballot results on behalf of state governments, which is a traditionally exclusive public function, and engaged in First Amendment retaliation by sending hundreds of cease and desist letters, filing lawsuits, threatening to sue, and/or waging Lawfare against Lindell for his constitutionally protected speech concerning election integrity and security and Dominion and Smartmatic's role in the November 2020 Presidential Election.

# VII.
## COUNT SEVEN:  CIVIL CONSPIRACY
### (As to All Defendants)

180.    Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

181.    Pleading further and in the alternative, the facts set forth herein and to be proven at trial demonstrate that Plaintiff is entitled to recovery for common law civil conspiracy against all Defendants, jointly and severally, for their collusion and agreement to the common objective or course of action, acting under color of state law, to deprive Plaintiff Lindell of his constitutional rights under the First Amendment, and their overt acts in connection with that common purpose.

182.    To establish a civil conspiracy, plaintiffs must show five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy.  *See ECTG Ltd., Trustwater, Ltd. v. O'Shaughnessy*, No. CIV. 14-960 DSD/JJK, 2014 WL 6684982, at *4 (D. Minn. Nov. 25, 2014), *citing In re TMJ Implants Prods. Liab. Litig.,* 113 F.3d 1484, 1498 (8th Cir.1997).

183.    The facts set out above and to be proven at trial will establish that Defendants collectively, with the assistance and participation of non-party co-conspirator Clare Locke, LLP, had a meeting of the minds on the object or course of action of depriving Plaintiff of his constitutional rights under the First Amendment, while acting under color of state law and as a state actor.    A relationship exists between the Dominion Defendants and the Smartmatic Defendants in that the Dominion Defendants' voting machines utilize Smartmatic software (or software previously designed, created, modified, and sold by Smartmatic), and the Dominion Defendants and Smartmatic Defendants share common employees or contractors, co-working space, and historical and functional connections to Sequoia and other legacy voting systems.  They

135

also share a common purpose of suppressing dissent to protect their commercial and financial interests shown by their coordinated attack on dissenting speech, which is akin to a price fixing scheme, but instead of illicitly conspiring to set the price of goods, they have instead agreed to work together to punish any political speech with which they disagree and that may harm their pecuniary interests. This relationship has existed for over ten years and continues to this day. At the direction of Dominion, HPS carried out a vast and never-ending public relations campaign designed to discredit and stifle dissenting speech related to the 2020 General Election. Also at the direction of Dominion, Clare Locke sent hundreds of cease and desist letters designed to aid in HPS' public relations campaign by making clear Dominion would sue anyone for billions of dollars if their dissenting speech did not stop. The facts will further establish that Defendants committed one or more wrongful overt acts, including but not limited to the following, in furtherance of this common objective or course of action:

a.   Engaging in a campaign of abuse of process to bring suit against Plaintiff not for the purpose of vindicating any legitimate right or grievance but for the sole purposes of intimidating Lindell into silencing his political speech and opposition to Defendants' point of view.

b.   Defaming Plaintiff by publishing false and defamatory statements, including but not limited to calling him a "liar" and the purveyor of "the Big Lie," when Defendants were aware that Plaintiff's statements were substantively true.

c.   Attempting to extort Plaintiff by first threatening him with ruinous litigation, then actually bringing such litigation in a sham or frivolous manner, if he refused to silence his views on the reliability of voting machines and their use to alter election outcomes in certain jurisdictions, or to retract his prior statements to that effect.

d.  Violating Plaintiff's rights under the "Support and Advocacy" clause of 42 U.S.C. §1985(3) by attempting first to intimidate him into silencing his political speech, then punishing him for continuing to exercise his right to speak, regarding the vulnerability of voting machines to, and their use in, election fraud in the 2020 Presidential Election.

e.  As a state actor, and acting under color of state law, depriving Plaintiff of his rights of equal protection and due process and violating the First Amendment by bringing and threatening sham and potentially ruinous litigation against Plaintiff purely out of discrimination against his political viewpoint and/or because of his speech, in violation of 42 U.S.C. §1983.

f.  The Dominion/Smartmatic Enterprise violated 18 U.S.C. § 1512 and related Minnesota and Colorado law through its illegal Lawfare campaign.  *See also* 18 U.S.C.A. § 1961.

The facts will further establish that Plaintiff has suffered actual damages as a proximate cause of Defendants' agreement and wrongful overt acts.

## F.
## DAMAGES AND OTHER RELIEF

184.  Plaintiff incorporates the foregoing paragraphs as if fully set forth verbatim below.

185.  The facts set out above and to be proven at trial will demonstrate that Plaintiff is entitled to recover against Defendants, jointly and severally, the following:

a.  Actual and special damages as allowed by law, in an amount to be proven at trial, including but not limited to the following:

  i.  Special damages in the form of attorneys' fees and expenses incurred in defending against Dominion's lawsuit;

137

ii.     Damages for defamation *per se* for Dominion's public attacks on his honesty and integrity;

iii.    Damages to be determined by the trier of fact suffered as a result of the deprivation of his rights under the First Amendment to the U.S. Constitution and under the "support and advocacy" clause of 42 U.S.C. §1985(3); and

iv.     Damages to be determined by the trier of fact suffered because of the deprivation of his rights under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution and under the 42 U.S.C. §1983; together with

b.      Three times actual damages for violations of 18 U.S.C. §1962;

c.      Punitive damages as allowed by law, in an amount to be determined by the trier of fact;

d.      Reasonable and necessary attorney's fees, as allowed by law; and

e.      Costs of suit.

## G.
## CONDITIONS PRECEDENT

186.    All conditions precedent to Plaintiff bringing and maintaining this action have been satisfied or waived.

## H.
## JURY DEMAND

187.    Plaintiff respectfully requests trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks that Counter-Defendants and Third-Party be cited to answer and appear herein and that, after trial or other hearing on the merits, Plaintiff have and recover against Defendants, jointly and severally, the relief requested herein, together with all writs and

processes necessary to the enforcement of same, and all other relief to which he may show himself

justly entitled.

Respectfully submitted,

DANIELS & TREDENNICK, PLLC

*/s/ Douglas A. Daniels*
Douglas A. Daniels
Texas State Bar No. 00793579
doug.daniels@dtlawyers.com (E-mail)
Heath A. Novosad
Texas State Bar No. 24037199
heath@dtlawyers.com (E-mail)

6363 Woodway Drive, Suite 700
Houston, Texas 77057
(713) 917-0024 (Telephone)
(713) 917-0026 (Facsimile)

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon all parties of record through the Court's CM ECF system on December 1, 2021.

*/s/ Douglas A. Daniels*
Douglas A. Daniels