# Exhibit 66

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., and SGO CORPORATION LIMITED, <br><br> *Plaintiffs*, <br><br> v. <br><br> MY PILLOW, INC. and MICHAEL J. LINDELL, <br><br> *Defendants*. | Case No. 0:22-cv-00098-WMW-JFD |

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MICHAEL J. LINDELL'S MOTION TO DISMISS

**MOHRMAN, KAARDAL & ERICKSON, P.A.**
William F. Mohrman, Atty. No. 168816
150 South 5th Street, Suite 3100
Minneapolis, MN 55402
Telephone:      (612) 341-1074
Facsimile:      (612) 341-1076
Email:      mohrman@mklaw.com

*Counsel for Defendant Michael J. Lindell*

**DANIELS & TREDENNICK, PLLC**
Douglas A. Daniels
MND Bar No. 00793579TX
Heath A. Novosad
MND Bar. No. 24037199TX
6363 Woodway Drive, Suite 700
Houston, TX 77057-1759
Telephone: 713.917.0024
doug.daniels@dtlawyers.com
heath.novosad@dtlawyers.com

*Counsel for Defendant Michael J. Lindell
Motion for pro hac vice admission will be filed*

# **TABLE OF CONTENTS**

I.  LEGAL STANDARD ........................................................................................ 2

II. ARGUMENT AND AUTHORITY ................................................................... 4

    A. Smartmatic Fails to Adequately Plead a Defamation Claim. ..................... 4

        1.  Smartmatic Is a Public Official and Public Figure. ........................... 5

            a.  Smartmatic Is a Public Official. ................................................ 5

            b.  Alternatively, Smartmatic Is an All-Purpose Public Figure. ......... 8

            c.  Alternatively, Smartmatic Is a Limited Purpose Public Figure.......... 9

        2.  Smartmatic Failed to Properly Plead Actual Malice. ......................... 13

            a.  Smartmatic Is Required to Plead and Prove That Lindell Acted With "Actual Malice."....................................................... 14

            b.  Lindell Never Had Any Doubts That His Statements Were, and Are, True. ............................................................... 15

            c.  Lindell's Statements Are Not Inherently Improbable. ................ 17

                (1) Lindell Relied on Publicly Available Information. .............. 18

                (2) Legislators Have Identified Security Flaws in Electronic Voting Machines. ............................................................... 20

                (3) Security Experts Have Detailed Security Flaws in Voting Machines. .. 23

            d.  Smartmatic's Allegations of Lindell's Ill-Will, Spite, or Profit Motive Fail to Satisfy the Actual Malice Standard................................... 27

        3.  Lindell's Statements Relate to Matters of Public Concern; Therefore, Lindell Is Immune. ........................................................ 28

        4.  Smartmatic Failed to State a Claim for Defamation by Implication. ........... 30

    B. The Court Should Also Dismiss Smartmatic's MDTPA Claim............................ 32

III. CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... 2, 3

*Bell Atlantic Corp v. Twombly,*
  550 U.S. 544 (2007) .......................................................................................... 2

*Britton v. Koep,*
  470 N.W.2d 518 (Minn. 1991) .......................................................... 4, 6, 14, 15

*Campbell v. Citizens for an Honest Gov't, Inc.,*
  255 F.3d 560 (8th Cir. 2001) ........................................................................ 4, 27

*Chafoulias v. Peterson,*
  668 N.W.2d 642 (Minn. 2003) ................................................................. *passim*

*Cohen v. Cowles Media Co.,*
  501 U.S. 663 (1991) ........................................................................................ 32

*Connelly v. Nw. Publ'ns, Inc.,*
  448 N.W.2d 901 (Minn. Ct. App. 1989) .................................................... 16, 28

*Connick v. Myers,*
  461 U.S. 138 (1983) ........................................................................................ 14

*Conroy v. Kilzer,*
  789 F. Supp. 1457 (D. Minn. 1992) ........................................................... 30, 31

*Curling v. Raffensperger,*
  2020 U.S. Dist. LEXIS 188508 (N.D. Ga. Oct. 11, 2020) ............................. 10

*Curtis Publ'g Co. v. Butts,*
  388 U.S. 130 (1967) ........................................................................................ 31

*Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.,*
  603 N.W.2d 336 (Minn. Ct. App. 1999) ........................................................ 33

*Diesen v. Hessburg,*
  455 N.W.2d 446 (Minn. 1990) ........................................................................ 31

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
  472 U.S. 749 (1985) ............................................................................. 14, 15, 29

*Fitzgerald v. Minnesota Chiropractic Ass'n, Inc.*,
  294 N.W.2d 269 (Minn. 1980) .................................................................... 4

*Foley v. WCCO Television, Inc.*,
  449 N.W.2d 497 (Minn. Ct. App. 1989) ...................................................... 32

*Fredin v. Middlecamp*,
  500 F. Supp. 3d 752 (D. Minn. 2020), *aff'd*, 855 Fed. Appx. 314 (8th Cir. 2021) ....... 17

*Gerritsen v. Warner Bros. Entm't, Inc.*,
  112 F. Supp. 3d 1011 (C.D. Cal. 2015) ...................................................... 17

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ........................................................................... 8, 10

*Harpel v. Thurn*,
  No. A14-0680, 2014 WL 6609272 (Minn. Ct. App. Nov. 24, 2014) ............................ 8

*Harte-Hanks Communications, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ........................................................................... 4, 27

*Hirman v. Rogers*,
  257 N.W.2d 564 (Minn. 1977) .................................................................. 32

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 56 (1988) ............................................................................. 32

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  No. 0- 1650, 2004 WL 7081446 (D.D.C. May 18, 2004) ........................................ 17

*Jadwin v. Minneapolis Star & Trib. Co.*,
  367 N.W.2d 476 (Minn. 1985) ............................................................ 9, 10, 31

*Janklow v. Newsweek, Inc.*,
  788 F.2d 1300 (8th Cir. 1986) ................................................................. 14

*Kahl v. Bureau of Nat'l Affs., Inc.*,
  856 F.3d 106 (D.C. Cir. 2017) .................................................................. 3

*Maethner v. Someplace Safe, Inc.*,
  929 N.W.2d 868 (Minn. 2019) ........................................................... 3, 4, 15, 29

*Manhattan Community Access Corporation v. Halleck*,
  139 S.Ct 1921 (2019) ..................................................................... 7, 8, 30

*McGuire v. Bowlin,*
  932 N.W.2d 819 (Minn. 2019) ............................................................. 5, 6

*Moldea v. New York Times Co.,*
  22 F.3d 310 (D.C. Cir. 1994) ..................................................................... 32

*Moreno v. Crookston Times Printing Co.,*
  610 N.W.2d 321 (Minn. 2000)............................................................. 4, 27

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.,*
  951 F.3d 952 (8th Cir. 2020)...........................................................*passim*

*New York Times v. Sullivan,*
  376 U.S. 254 (1964) ...................................................................... 14, 29, 30

*Nixon v. Condon,*
  286 U.S. 73 (1932) ........................................................................................ 8

*Northwest Airlines, Inc. v. Friday,*
  617 N.W.2d 590 (Minn. Ct. App. 2000) ...................................................... 33

*Price v. Viking Penguin, Inc.,*
  881 F.2d 1426 (8th Cir. 1989).................................................................... 30

*Range Dev. Co. of Chisholm v. Star Tribune,*
  885 N.W.2d 500 (Minn. Ct. App. 2016) ................................................. 5, 18

*Rochling v. Dep't of Veterans Affairs,*
  725 F.3d 927 (8th Cir. 2013)....................................................................... 3

*Schlieman v. Gannett Minn. Broad., Inc.,*
  637 N.W.2d 297 (Minn. App. 2001) ........................................................... 31

*Smith v. Allwright,*
  321 U.S. 649 (1944) ...................................................................................... 8

*Snyder v. Phelps,*
  562 U.S. 443 (2011) .............................................................................. 29, 30

*St. Amant v. Thompson,*
  390 U.S. 727 (1968) .................................................................. 5, 16, 17, 18

*Standke v. B. E. Darby & Sons, Inc.,*
  291 Minn. 468, 193 N.W.2d 139 (1971)...................................................... 28

*Terry v. Adams,*
  345 U.S. 461 (1953) ......................................................................... 8

*Toney v. WCCO Television, Midwest Cable & Satellite, Inc.,*
  85 F.3d 383 (8th Cir. 1996) ............................................................ 31

*Waldbaum v. Fairchild Publications, Inc.,*
  627 F.2d 1287 (D.C. Cir. 1980) ........................................................ 9

*West v. Atkins,*
  487 U.S. 42 (1988) ............................................................................ 8

**STATUTES**

Minn. Stat. § 325D.44 ................................................................. 32, 33

**OTHER AUTHORITIES**

ANDREW W. APPEL ET AL, BALLOT-MARKING DEVICES (BMDS) CANNOT ASSURE
  THE WILL OF THE VOTERS (2020), available at
  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=3375755) ...................................... 10

**RULES**

FED. R. CIV. P. 12 ............................................................................... 3

**U.S. CONSTITUTION**

U.S. CONST. art. I, § 4 ................................................................ 7, 30

# INDEX OF EXHIBITS

EXHIBIT A:   June 12, 2018 Letter Approving Contract with Smartmatic USA Corporation, from Dean C. Logan, Registrar-Recorder/County Clerk, and William Kehoe, Chief Information Office, to the Board of Supervisors, County of Los Angeles, Adopted June 12, 2018

EXHIBIT B:   June 4, 2018 Contract Between County of Los Angeles and Smartmatic USA Corporation for Voting Solutions for All People (VSAP) Implementation and Support Services

EXHIBIT C:   Resolution to Reclaim, Office of State Representative Timothy Ramthun, 59th Assembly District

EXHIBIT D:   Arizona HCR2033, Resolution to Reclaim

"Restriction of free thought and free speech is the most dangerous of all subversions. It is the one un-American act that could most easily defeat us."[1]

Every American has a First Amendment right to speak freely about matters of public concern without fear of reprisal. Speech is most protected when it deals with matters of public concern, and nothing concerns the American republic more than secure elections. Despite their responsibility for ensuring millions of Americans' ability to vote securely and have their votes accurately tabulated, Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited (collectively "Smartmatic") have decided that they are above criticism and have embarked on a lawfare campaign against those who dare question them.

Smartmatic describes itself as a provider of "end to end election services to local, state, and national governments."[2]  From start to finish, Smartmatic runs elections, thereby running our most important democratic function in our nation's largest county—Los Angeles County, California ("LA").  Millions of Americans rely on Smartmatic's "end to end election services" as their access point to participate in America's democracy, and they pay Smartmatic more than $300,000,000 for the privilege.[3]

Michael J. Lindell ("Lindell") is a proud American, self-made entrepreneur, a devout man of principles, and a believer in the U.S. Constitution.  Lindell is concerned about the vulnerabilities of our country's electronic voting machines, and he's not alone.

---

[1] William O. Douglas, U.S. Sup. Ct. Just., Address to the Authors Guild Council (Dec. 3, 1952).

[2] Complaint ¶ 28.

[3] *See* Ex. A at 1-2.

1

Lindell was not the first to complain about electronic voting machines and he is certainly not the only person still beating the drum regarding election fraud in the 2020 U.S. Presidential Election ("2020 Election"). The very thing Lindell fights to protect—the right of Americans to securely exercise their *voice* in democracy—is the very thing at issue in this case. Americans have the right to disagree with those in power and to freely express their opinion, whether at the polls or otherwise.

Smartmatic is a public official performing a governmental duty which relates to the core functions of government. Smartmatic has not, and cannot, adequately plead that Lindell knew any of his statements were false for one simple reason: because he believes they are true. Smartmatic has not, and cannot, plead that Lindell harbored substantial doubt about his statements because he did not and does not doubt them. Smartmatic has not, and cannot, plead that Lindell made his allegedly defamatory statements with actual malice. This lawsuit should be dismissed.

## I.
## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the truth of all well-pleaded factual allegations is assumed and the reasonable inferences from those allegations are construed in the plaintiff's favor, "threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *See Rochling v. Dep't of Veterans Affairs*, 725 F.3d 927, 930 (8th Cir. 2013) (citing *Ashcroft,* 556 U.S. at 678)).

Because of Smartmatic's role in running elections, if indeed it can maintain an action for defamation at all as a state actor, Smartmatic is at least required to prove that Lindell's allegedly defamatory statements were made with actual malice. *See* Section II(A)(2) below. To avoid dismissal under Rule 12(b)(6), Smartmatic "must still lay out enough facts from which [actual] malice might be reasonably inferred." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020). "Every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Id.* Courts cannot offer recourse for defamation at the cost of chilling speech on matters of public concern, which "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. 2019) (citations omitted). "To preserve First Amendment freedoms and give [speakers] the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (citations omitted).

## II.
## ARGUMENT AND AUTHORITY

**A.    Smartmatic Fails to Adequately Plead a Defamation Claim.**

In order to avoid the chilling effect of litigation on protected speech, Constitutional jurisprudence requires a public figure who brings a defamation claim to prove by clear and convincing evidence that the speaker made the statement with actual malice.  *See Maethner*, 929 N.W.2d at 873; *see also Fitzgerald v. Minnesota Chiropractic Ass'n, Inc.*, 294 N.W.2d 269, 270 (Minn. 1980); *Britton v. Koep*, 470 N.W.2d 518, 520 (Minn. 1991) (finding that the plaintiff has the burden of proving actual malice with "convincing clarity" to establish a defamation claim).  Minnesota law considers a corporation a public figure and requires it to show that a statement was made with actual malice to establish a defamation claim.  *See Nelson Auto*, 951 F.3d at 957.

"Actual malice is a term of art; it means that the defendant acted with knowledge that [the publication] was false or with reckless disregard of whether it was false or not." *Chafoulias v. Peterson*, 668 N.W.2d 642, 654 (Minn. 2003) (cleaned up) (alteration in original).  Allegations of a defendant's ill-will, spite, or profit motive alone do not satisfy the actual malice standard. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989); *Moreno v. Crookston Times Printing Co.,* 610 N.W.2d 321, 329 (Minn. 2000); *see also Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 571 (8th Cir. 2001) (finding that a political and profit motivation behind the speech at issue was insufficient evidence to support a finding of actual recklessness).

The standard for "reckless disregard" is a subjective one; it is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Rather, "reckless disregard" requires that the defendant made the statement "while subjectively believing that the statement is probably false." *Range Dev. Co. of Chisholm v. Star Tribune*, 885 N.W.2d 500, 510 (Minn. Ct. App. 2016) (citing *Chafoulias,* 668 N.W.2d at 655). Therefore, there must be sufficient allegations pled to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. *St. Amant*, 390 U.S. at 731.

### 1. Smartmatic Is a Public Official and Public Figure.

Smartmatic is both a public official and a public figure and is thus, at minimum, subject to the heightened requirement to plead "actual malice" in defamation claims. Smartmatic is a public official because it has, and appears to the public to have, substantial responsibility over government affairs via its administration of elections for millions of voters. Smartmatic is also a public figure because its role in the election affords it special prominence in the affairs of society.

### a. Smartmatic Is a Public Official.

Minnesota law holds that any plaintiff who performs governmental duties which "relate to the core functions of government" is a "public official" subject to the *New York Times v. Sullivan* actual malice requirement. *McGuire v. Bowlin*, 932 N.W.2d 819, 825 (Minn. 2019). Minnesota recognizes three criteria governing the evaluation of a plaintiff's potential status as a public official: whether the plaintiff "perform[s] governmental duties

directly related to the public interest," whether the plaintiff "hold[s] a position to influence significantly the resolution of public issues," and whether the plaintiff has, or appears to the public to have, "substantial responsibility for or control over the conduct of government affairs." *Britton*, 470 N.W.2d at 522. Also integral to this analysis is whether the governmental duties performed by the plaintiff are "fundamental to democracy." *McGuire*, 932 N.W.2d at 825.

In 2018, the County of Los Angeles contracted with Smartmatic USA Corp. to develop and oversee the deployment of a new voting system.[4] According to Smartmatic's own website, Smartmatic "[e]ngineered and manufactured the BMD hardware; [p]rogrammed and installed the BMD software; [l]ed the California certification process; [c]reated the backend software to manage the devices; [p]rovided systems integration services; [b]uilt the VSAP operations center; [h]andled logistics and setup/breakdown of the vote centers; [o]versaw real-time data management for deployment; and [s]upplied Help Desk services on Election Day."[5] "Smartmatic had, at times, as many as 200 staffers supporting the project" and even provided "800+ [e]lection workers hired and trained by Smartmatic for the County."[6]

Per the contract, Smartmatic provided "hardware manufacturing, software, engineering, implementation (including integration, certification, training, and help desk

---

[4] *See* Ex. B.
[5] *Los Angeles County 2020–Present: VSAP Modernizes Elections*, SMARTMATIC (Nov. 11, 2020) (https://www.smartmatic.com/us/case-studies/article/los-angeles-county-2020-present-vsap-modernizes-elections/).
[6] *Id.*

services), maintenance and support" services,[7] as well as "dedicated support by [Smartmatic] for Vote Centers up to and during elections."[8] As Smartmatic proudly points out on its site, "LA is America's largest election jurisdiction with more than 5.8 million registered voters."[9] On Election Day of 2020, 4,270,129 votes were cast on the system developed and deployed by Smartmatic.[10]

On those facts, Smartmatic's administration of elections is a "governmental [duty] directly related to the public interest." The U.S. Constitution reserves authority over elections to the states, U.S. CONST. art. I, § 4 cl. 1, and the U.S. Supreme Court recognizes that "running elections" is one of "very few" traditional, exclusive public functions. *See Manhattan Community Access Corporation v. Halleck*, 139 S.Ct 1921, 1929 (2019). Beyond question, an election is an issue of public interest. Smartmatic is in a position to "influence significantly the resolution of" such elections, at least in the sense that elections are resolved via the collection and counting of ballots on systems such as those Smartmatic oversees for millions of voters in LA. By its own admission, Smartmatic has a significant hand in the development and deployment of these systems, even providing support services on Election Day.[11] This role provides Smartmatic with substantial responsibility, or at least the appearance of substantial responsibility, for the conduct of government affairs.

---

[7] Ex. A at 6.
[8] Ex. B at 278.
[9] SMARTMATIC, *supra* note 5.
[10] *Id*.
[11] *Id*.

Smartmatic is responsible for elections—government affairs "related to the core functions of government" and by logical necessity "fundamental to democracy." This is sufficient to hold Smartmatic to be a public official. *West v. Atkins*, 487 U.S. 42 (1988) (private entity deemed a state actor when carrying out a constitutional obligation outsourced by the government). Moreover, the Supreme Court recognizes that elections are an "exclusive public function." *See Manhattan Community*, 139 S.Ct. at 1929 ("running elections" is a traditionally exclusive public function); *see also Terry v. Adams*, 345 U.S. 461 (1953); *Smith v. Allwright*, 321 U.S. 649 (1944); *Nixon v. Condon*, 286 U.S. 73 (1932).

### b.    Alternatively, Smartmatic Is an All-Purpose Public Figure.

Even were Smartmatic not a public official, it is an all-purpose public figure. In certain instances, a non-public official "may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts," subjecting him to the *New York Times v. Sullivan* actual malice requirement in pleading defamation claims. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). The plaintiff must have assumed a "role of special prominence in the affairs of society," based upon a clear showing "of general fame or notoriety in the community, and pervasive involvement in the affairs of society." *Harpel v. Thurn*, No. A14-0680, 2014 WL 6609272, at *2 (Minn. Ct. App. Nov. 24, 2014); *Gertz*, 418 U.S. at 352.

To determine whether a plaintiff has achieved the requisite degree of notoriety and influence necessary to become a public figure in all contexts, federal courts may look to several factors, constantly keeping in mind the voluntariness of the plaintiff's prominence

and the availability of self-help through press coverage of its responses. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1295 (D.C. Cir. 1980). The factors include, but are not limited to, the previous press coverage of the plaintiff, plaintiff's name recognition, and whether others alter or reevaluate their conduct or ideas in light of the plaintiff's actions. *Id.* at 1295. Minnesota courts have articulated similar indicators that a plaintiff is a public figure. *See Jadwin v. Minneapolis Star & Trib. Co.*, 367 N.W.2d 476, 486 (Minn. 1985) (a plaintiff's access to the media to rebut defamatory statements is a "distinguishing feature" between private individuals and public figures.).

Smartmatic has "special prominence in the affairs of society" by way of its key role in deploying the election system upon which millions of Americans participated in the most important "affair of society" there is—national elections. The extensive mainstream press coverage of statements by Smartmatic's leadership makes the company's public figure status even clearer.[12]

    **c.    Alternatively, Smartmatic Is a Limited Purpose Public Figure.**

If Smartmatic's publicly-advertised responsibilities and access to media are not enough to confer public official and all-purpose public figure status, Smartmatic easily meets the requirements of a limited purpose public figure. A plaintiff who thrusts itself "to the forefront of a particular public controversy in order to influence the resolution of the

---

[12] *See, e.g.*, Brett Samuels, *Voting machine company Smartmatic demands conservative networks retract election claims*, THE HILL (Dec. 14, 2020, 10:19 AM), https://thehill.com/homenews/media/530080-smartmatic-files-retraction-demands-with-conservative-networks-over-election (quoting statement by Smartmatic CEO Antonio Mugica); Raphael Satter, *Trump's conspiracies pose 'existential' threat to electronic voting industry*, REUTERS (Dec. 14, 2020) (interviewing Antonio Mugica).

issues involved" becomes a public figure for a limited range of issues. *Jadwin*, 367 N.W.2d at 483-84 (quoting *Gertz*, 418 U.S. at 345). A person may be a limited purpose public figure depending upon: (1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement is related to the controversy. *Chafoulias*, 668 N.W.2d at 651. Smartmatic is a limited purpose public figure under this test.

First, Smartmatic is engaged in a public controversy. A public controversy inquiry has two components: (1) there must be some real dispute that is being publicly debated; and (2) it must be reasonably foreseeable that the dispute could have substantial ramifications for persons beyond the immediate participants. *Id.* at 652. Dispute in public forums surrounding the ability of voting machines to provide a secure and verifiable election outcome long preceded Lindell's alleged statements. *See Curling v. Raffensperger*, 2020 U.S. Dist. LEXIS 188508, *26 (N.D. Ga. Oct. 11, 2020) (public interest group plaintiffs alleged voting machines were vulnerable to access, hacking, unauthorized intrusion, and manipulation); ANDREW W. APPEL ET AL, BALLOT-MARKING DEVICES (BMDS) CANNOT ASSURE THE WILL OF THE VOTERS (2020), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=3375755).

Since at least 2006, the U.S. government has been concerned about electronic voting machines, including Smartmatic's. In 2006, the political counselor for the U.S. Embassy in Caracas, Venezuela, wrote a diplomatic cable detailing Smartmatic's mysterious

ownership and suspected involvement in fraudulent Venezuelan elections.[13]  The cable stated that while "Smartmatic has claimed to be of U.S. origin," its true owners, who remained anonymous via the use of overseas holding companies, were likely Venezuelan business elites with ties to the government of then-President Hugo Chavez.[14]  Further, Smartmatic's machines were "widely suspected of" susceptibility to fraud, with the Venezuelan political opposition "convinced that the Smartmatic machines robbed them of victory" in an August 2004 election won by Chavez.[15]  The cable described a study showing irregularities in the machines' reporting of election results.[16]  Finally, the cable forecasted that Smartmatic would turn its attention away from managing Venezuelan elections towards those elsewhere in the world, including the United States.[17]

In October 2006, the U.S. government's Committee on Foreign Investment in the United States investigated Smartmatic's 2005 takeover of Sequoia Voting Systems, a California company whose voting machines were used in 17 states and the District of Columbia.[18]  Congresswoman Carolyn B. Maloney (D-N.Y.) said, "[t]here seems to have been an obvious effort to obscure the ownership of the company."[19]  She further remarked,

---

[13] Robert Downes, *Caracas 00002063 001.2 of 004*, U.S. Embassy Caracas, Venezuela, (Jul. 2006) (on file with U.S. State Department).
[14] *Id.*
[15] *Id*.
[16] *Id*.
[17] *Id*.
[18] Tim Golden, *U.S. Investigates Voting Machines' Venezuela Ties*, N.Y. TIMES (Oct. 29, 2006), https://www.nytimes.com/2006/10/29/washington/29ballot.html.
[19] *Id*.

"[t]he government should know who owns our voting machines; that is a national security concern."[20]

The resolution of this lawsuit undoubtedly reaches beyond just Smartmatic and Lindell; every U.S. citizen has an interest in knowing that their votes are reliably counted. Thus, a public controversy involving Smartmatic's role in guaranteeing the security and integrity of electronic voting clearly exists.

Second, Smartmatic is playing a meaningful role in the public controversy by either (a) purposely trying to influence the outcome, or (b) by realistic expectation, because of its position in the controversy, to have an impact on its resolution. *Chafoulias*, 668 N.W.2d at 653. The truth underlying the claims against Smartmatic, whether voiced by a U.S. government diplomat or by Lindell after the election, directly implicates the issue of election integrity. Similarly, Smartmatic's public statements after the 2020 Election show that it is actively engaged in persuading the public to believe that its machines and voting software are safe.[21] Smartmatic's "lawfare" campaign, which includes lawsuits against Lindell, Fox News, Lou Dobbs, Maria Bartiromo, Jeanine Pirro, Rudolph Giuliani, Sidney Powell, Newsmax, and OANN,[22] as well as the fact that Smartmatic argues its position

---

[20] *Id.*

[21] *See, e.g. Smartmatic's response to misinformation*, SMARTMATIC, https://www.smartmatic.com/us/media/article/smartmatic-s-response-to-misinformation/; *Lawsuit Updates & Fact* Checks, SMARTMATIC, https://www.smartmatic.com/us/lawsuit-updates-fact-checks/ (last visited Feb. 20, 2022) (attempting to persuade readers that "Smartmatic's software was developed. . . to do three things; accurately process votes, keep them secure, and facilitate audits.")

[22] *See US Dominion Inc. v. Lindell*, No. 1:21-cv-00445-CJN, currently pending in the United States District Court for the District of Columbia, Dkt. No. 87.

online and in statements to the media, shows that it is purposely trying to influence the outcome of this controversy. *See Chafoulias*, 668 N.W.2d at 653-54 (plaintiff who used media to "promote his position in the dispute" had a role in the controversy).

Third, Lindell's statements on their face are germane to Smartmatic's participation in the election integrity controversy. Lindell's statements directly relate to the ongoing public controversy surrounding whether electronic voting machines, including Smartmatic's, have vulnerabilities which render them unreliable in accurately and securely recording votes and reporting the results of elections. Therefore, they are related to the public controversy. Having satisfied the three prongs of the *Chafoulias* test, Smartmatic is, at a minimum, a limited purpose public figure and must meet the heightened burden of proof to plead actual malice.

### 2. Smartmatic Failed to Properly Plead Actual Malice.

Smartmatic's 133-page Complaint is replete with conclusory statements that Lindell knew statements and implications that he and/or his guest speakers made about Smartmatic were false and/or he acted with reckless disregard.[23]  Lindell and the public had a litany of sources of information questioning the vulnerabilities of electronic voting machines—this is not a new topic of public debate.  Smartmatic's bald assertions do not satisfy Smartmatic's burden to plausibly plead facts sufficient to establish that Lindell acted with actual malice.  This Court should not infer actual malice based on nothing more than Smartmatic's *ipse dixit.*  The Complaint, which amounts to nothing more than "Mike

---

[23] *See* Complaint ¶¶ 181-299.

Lindell said things we disagree with," is, therefore, insufficient to maintain a defamation cause of action.

### a. Smartmatic Is Required to Plead and Prove That Lindell Acted With "Actual Malice."

The Supreme Court requires public officials and public figures suing for defamation to prove actual malice by clear and convincing evidence. *Chafoulias*, 668 N.W.2d at 648-49 (citing *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)); *Britton*, 470 N.W.2d at 520. In setting this standard, the Court "imposed a constitutionally protected privilege in order to encourage open debate" on the understanding that "public policy supports a 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Britton*, 470 N.W.2d at 520 (quoting *Sullivan*, 376 U.S. at 270).

Speech about the government and its officers and about how well or how badly they perform their duties lies at the very heart of the First Amendment. *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985) ("It is speech on matters of public concern that is at the heart of the First Amendment's protection.") (internal quotation marks omitted). Such speech is more than self-expression; "it is the essence of self-government." *Dun & Bradstreet, Inc.*, 472 U.S. at 758-59 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). It is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials. *Janklow*, 788 F.2d at 1305. It is the

private or public concern of the statements at issue—not the identity of the speaker—that provides the heightened protection of the First Amendment.[24]  *See Maethner*, 929 N.W.2d at 878 (holding that regardless of the speaker's identity, statements involving a matter of public concern require plaintiff to establish actual malice); *see also Dunn & Bradstreet*, 472 U.S. at 758-60 (finding that speech on matters of public concern is of more First Amendment importance than speech on matters of purely private concern).  Recognizing that speech relating to public officials and public figures enjoys a greater protection than speech directed at private persons, public officials and public figures may not recover damages for defamation without a showing of actual malice. *See Nelson Auto*, 951 F.3d at 956.

### b.     Lindell Never Had Any Doubts That His Statements Were, and Are, True.

Lindell has not sued anyone to overturn an election, but Lindell is absolutely positive that the 2020 Election was stolen from Donald Trump and that electronic voting machines played an integral role in that outcome.  Because Lindell would not be bullied or intimidated by lawsuits seeking damages multiple times the value of the companies who brought them, he became a target of Smartmatic's lawfare.  Lindell has not wavered in his position, despite Smartmatic moving for sanctions against him and against his counsel in the United States District Court for the District of Columbia.[25]

---

[24] "Minnesota affords to nonmedia defendants the same first amendment protection for criticism of public officials that it grants to the mass media." *Britton*, 470 N.W.2d at 521.
[25] *See US Dominion Inc. v. Lindell*, No. 1:21-cv-00445-CJN, currently pending in the United States District Court for the District of Columbia.

Lindell has continued to post content regarding the vulnerabilities of electronic voting machines on frankspeech.com and lindelltv.com because he believes the machines played a role in the hacking and changing of votes in the 2020 Election. Smartmatic avers that "because Smartmatic says so," Lindell must believe Smartmatic and consider them a credible source. However, Lindell has the right not to take Smartmatic at its word.

Smartmatic's allegations regarding Lindell's refusal to retract his statements do not establish a reasonable inference of actual malice. Lindell's refusal to retract and his continued publication in the face of Smartmatic's threats and legal attacks undercut Smartmatic's allegation that Lindell has "subjective doubt" about any of the things he has said that Smartmatic claims are defamatory. *See Connelly v. Nw. Publ'ns, Inc.*, 448 N.W.2d 901, 905 (Minn. Ct. App. 1989) (citing *St. Amant*, 390 U.S. at 732).

Despite being repeatedly threatened with litigation by Dominion and subsequently sued by Dominion for $1.3 billion in another case,[26] and despite being sued by Smartmatic in the present case, Lindell has continued to make media appearances about the role election voting machines played in the 2020 Election. For example, Lindell has produced a series of documentaries (including *Absolute Proof*, *Scientific Proof*, and *Absolute Interference*)[27] which detail foreign hacking of electronic voting machines, including Smartmatic's machines, and its impact on the outcome of the 2020 Election. The sheer volume of content that Lindell produces—and the evidence he discusses regarding the role

---

[26] *See US Dominion Inc. v. Lindell*, No. 1:21-cv-00445-CJN, currently pending in the United States District Court for the District of Columbia.

[27] Mike Lindell's Absolute Series, FRANK SPEECH, https://frankspeech.com/content/mike-lindells-absolute-series (last visited Mar. 15, 2022).

that electronic voting machines, including Smartmatic's, played in the hacking and changing votes in the 2020 election—is fatal to Smartmatic's claim. There is simply no way for Smartmatic to meet its burden to plausibly plead that Lindell has a shred of doubt about the statements he has made, because he has no doubt whatsoever.

### c. Lindell's Statements Are Not Inherently Improbable.

The voluminous amount of information and the corresponding evidence[28] indicate that Lindell did not fabricate the story behind his statements, that the fraud in the 2020 Election is not the product of his imagination, that the story is not based wholly on an unverified anonymous source, or that it is inherently improbable. This is fatal to Smartmatic's claim. *See St. Amant*, 390 U.S. at 732 (finding that a statement may have been made with actual malice if it is fabricated by the defendant, is the product of his imagination, is based wholly on an unverified anonymous telephone call, or is so inherently

---

[28] This evidence includes news articles, court filings, legislative documents and other publicly available documents. These sources of evidence, along with specifically referenced or attached evidence to this motion, are not offered to prove the truth of the matters asserted therein, but rather to provide the Court a more complete picture of the public debate regarding election security dating back to 2006. The Court may take judicial notice of these documents to show what existed and exists in the public realm regarding the issues of voting security that underlie this matter. *See Fredin v. Middlecamp*, 500 F. Supp. 3d 752, 761 (D. Minn. 2020), *aff'd*, 855 Fed. Appx. 314 (8th Cir. 2021); *Gerritsen v. Warner Bros. Entm't, Inc*., 112 F. Supp. 3d 1011, 1028 (C.D. Cal. 2015) (stating that judicial notice of press releases and news articles can be used to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." (internal quotation marks omitted) (citation omitted)). And the Court's judicial notice of such documents does not turn a motion to dismiss into a motion for summary judgment. *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 0- 1650, 2004 WL 7081446, at *1 n.1 (D.D.C. May 18, 2004). All of the evidence identified in this list are incorporated by reference as if fully set forth herein.

improbable that only a reckless man would have put them in circulation); *see also*

*Chafoulias*, 668 N.W.2d at 654 (citing *St. Amant*, 390 U.S. at 732 and finding same).

### (1)   Lindell Relied on Publicly Available Information.

Substantiated complaints about electronic voting security vulnerabilities date back

many years.   Publicly known facts which Lindell espouses make it impossible for

Smartmatic to plausibly allege facts showing that Lindell "knew or recklessly disregarded"

the truth or "knowingly participated in publishing false information" as Smartmatic

claims.[29]  Smartmatic's conclusory allegations are not plausible facts which could support

an inference of subjective knowledge and thus are insufficient to maintain this suit.  *See*

*Range Dev. Co.*, 885 N.W.2d at 510.

A 2012 article in Harper's Magazine entitled *How to Rig an Election* wrote that

"[t]he spread of computerized voting has carried with it an enormous potential for

electronic skullduggery."[30]   The article detailed how, in 2011, a team at the U.S.

Department of Energy's Argonne National Laboratory successfully breached a Sequoia

voting system using a hack which required "no knowledge of the actual voting software."[31]

After the 2016 election, the U.S. government confirmed that Russian agents had

attempted to hack (and in some cases successfully breached) voter registration systems and

election systems throughout the country.  According to the Congressional Task Force on

Election Security's Final Report, Russia targeted voting systems in 21 states, breaching at

---

[29] *See* Complaint ¶¶ 327, 366.
[30] Victoria Collier, *How to Rig an Election*, HARPER'S MAG. (Nov. 2012), https://harpers.org/archive/2012/11/how-to-rig-an-election/.
[31] *Id.*

least two states' voter registration databases.[32]   The same report found that "many jurisdictions are using voting machines that are highly vulnerable to outside attack."[33] Special Counsel Robert Mueller's report on Russian interference in the election confirmed that Russian hackers had specifically targeted companies that supplied software and technology used to administer U.S. elections.[34]

Regarding the prospects for future interference by Russia, then-FBI Director James Comey testified before Congress that: "[T]hey'll be back.  They'll be back in 2020.  They may be back in 2018."[35]   On or about March 11, 2022, White House press secretary Jen Psaki publicly claimed to TikTok users that the Russian government "of course, hacked" the 2016 election.[36]   Psaki further noted that "every step we predicted the Russians were going to take, they have taken."[37]   Notably, one of those predictions for the past several years has been the future interference in the U.S. elections by Russian hackers.

These are but a drop in the bucket of publicly-available discourse regarding electronic voting machines and their ability to be used to create fraud in American

---

[32] Cong. Task Force on Election Sec., Final Report 3 (2018).

[33] *Id*. at 23.

[34] 1 Robert S. Mueller III, Report on the Investigation into Russian Interference in the 2016 Presidential Election 37 (2019).

[35] Cong. Task Force on Election Sec., *supra* note 32.

[36] Jerry Dunleavy, *Psaki says Russia 'hacked' 2016 election during briefing on combating disinformation*, WASHINGTON EXAMINER (Mar. 12, 2022, 4:45 PM), https://www.washingtonexaminer.com/news/psaki-says-russia-hacked-2016-election-during-briefing-on-combating-disinformation; *see also* Taylor Lorenz, *White House Press Briefing TikTokers Ukraine*, SOUNDCLOUD (Mar. 10-11, 2022), https://soundcloud.com/taylorlorenz/white-house-press-briefing-tiktokers-ukraine (*see* 19:45-21:10).

[37] *Id.*

elections. Between his Original Third-Party Complaint against Smartmatic ("Lindell's Complaint")[38] and his Response to Smartmatic's Motion to Dismiss ("Response")[39], Lindell cited more than 130 pieces of publicly-available evidence—including expert testimony—in support of his so-called "defamatory" statements.

Smartmatic points to "publicly available" information, including Smartmatic's own website (which Smartmatic implicitly suggests Lindell must simply believe despite his own contrary evidence), but there is equally weighty, publicly available information to contradict—or at least raise questions about—Smartmatic's claims. Lindell's independent investigation into the vulnerabilities of electronic voting machines led him to be sure these statements were true. *See Chafoulias*, 668 N.W.2d at 655 (defendant television network undertook an independent investigation to substantiate alleged defamatory statements of third party which defendant broadcasted, and there was no evidence defendant was aware of the statement's "probable falsity."). Indeed, Smartmatic has not pled sufficient facts to infer that Lindell subjectively believed that either his statements, or those of any of his guest speakers, were probably false.

### (2) Legislators Have Identified Security Flaws in Electronic Voting Machines.

Contrary to Smartmatic's assertion that this was the "most secure election" in U.S. history, legislators from both the Democratic and Republican parties have confirmed

---

[38] *See US Dominion Inc. v. Lindell*, No. 1:21-cv-00445-CJN, currently pending in the United States District Court for the District of Columbia, Dkt. No. 87.
[39] *Id.*, Dkt. No. 104.

serious security flaws in electronic voting machines. In 2018, Senator James Lankford, R-OK, co-sponsor of the Secure Elections Act, stated:

> There are vulnerabilities in our system that we should pay attention to, some are dramatic like actually changing votes. Some are subtle like just trying to alter a formula in a website and making that vulnerable so people can't trust the results that they got.[40]

At a June 2018 hearing before the Senate Committee on Intelligence, then-Senator Kamala Harris said, "I actually held a demonstration for my colleagues here at the Capitol where we brought folks who, before our eyes, hacked election machines."[41] Vice President Harris continued to express her concern over electronic voting machines in 2019 when she said, "As it turns out, for all that technology has brought us, good and bad, the best way to conduct secure elections? Paper ballots. Cause, the way I kind of like to say it, half joking, is 'Russia can't hack a piece of paper.'"[42]

In 2019, Senator Amy Klobuchar, (D-MN), along with Senator Elizabeth Warren (D-MA), Senator Ron Wyden (D-OR), and Congressman Mark Pocan (D-WI), wrote a letter addressing the threat electronic voting machines pose to our elections:

> Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat… researchers recently uncovered previously undisclosed vulnerabilities… these problems threaten the integrity of our elections

---

[40] *Senate Briefing on Election Security*, 115th Cong. (2018) (statement of Sen. James Lankford, (R-OK)).

[41] *Election Security*, *Hearing Before S. Judiciary Comm.*, 115th Cong. (2018) (statement of Sen. Kamala Harris (D-CA)).

[42] John Bowden, *Harris on election security: 'Russia can't hack a piece of paper'*, THE HILL (Feb. 19, 2019, 11:07 AM), https://thehill.com/policy/cybersecurity/430565-harris-calls-for-paper-ballots-in-elections-russia-cant-hack-a-piece-of.

> and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack.[43]

Senator Klobuchar reiterated her concern about electronic voting machines in 2019, stating: "It's not just about hardware. It's the hardware of our democracy."[44]

Recent developments in Wisconsin and Arizona, where state legislators have called for their states' 2020 Election results to be decertified and/or their presidential electors recalled, lend further credence to Lindell's statements that the 2020 Election was rife with fraud.

In late 2021, Wisconsin Representative Timothy Ramthun announced a resolution to reclaim Wisconsin's 10 electors from the 2020 Election.[45] One of the specific reasons given for Rep. Ramthun's resolution was that the multiple post-election "upgrades" had been performed on voting machines without any reassurance that data from the 2020 Election was protected from erasure.[46]

More recently, 11 state representatives and 3 state senators in Arizona introduced HCR2033 to decertify and set aside the 2020 Arizona presidential electors.[47] As in Wisconsin, basis for the resolution included irregularities with the Dominion machines used in the 2020 Election in Arizona.[48]

---

[43] Letter from Sens. Amy Klobuchar (D-MN), Elizabeth Warren (D-MA), Ron Wyden (D-OR) and Rep. Mark Pocan (D-WI) to Michael McCarthy, Chairman, McCarthy Grp. (Dec. 6, 2019) (on file with authors).
[44] KILL CHAIN: THE CYBER WAR ON AMERICA'S ELECTIONS (HBO 2019) (at 2:15).
[45] *See* Ex. C.
[46] *See id*. at 19.
[47] *See* Ex. D.
[48] *Id*. at 3:25-29; 4:38-45.

As state legislators and others continue to raise questions regarding the electronic voting machines' role in the 2020 Election, Lindell continues to genuinely believe that electronic voting machines, like Smartmatic's, played an influential role in election fraud in the 2020 Election.

While Smartmatic was not used in Arizona or Wisconsin in the 2020 Election, its shared DNA with other electronic voting companies, including Dominion, supports Lindell's statements. Specifically, Smartmatic and Dominion not only share an intertwined corporate history, but they have also used Smartmatic's election management system software and hardware. As a result of prior business transactions, Dominion licenses, or at the very least uses, Smartmatic's intellectual property in its voting systems. Moreover, Smartmatic and Dominion appear to share employees, as some Dominion executive employees had or have Smartmatic email addresses.[49]

### (3) Security Experts Have Detailed Security Flaws in Voting Machines.

Concerns about the use of electronic voting machines in elections—including Smartmatic's—were commonplace in American political discourse long before Lindell entered the conversation. In an article published mere days before the 2020 Election, the New York Times reported on fears that voting machines could be hacked to "silently change election outcomes."[50] The Times highlighted the concerns of Finnish hacker and

---

[49] *See US Dominion Inc. v. Lindell*, No. 1:21-cv-00445-CJN, currently pending in the United States District Court for the District of Columbia, Dkt. No. 87.

[50] David E. Sanger and Nicole Perlroth, *'Perception Hacks' and Other Potential Threats to the Election*, NEW YORK TIMES (Oct. 28, 2020),

cybersecurity expert Harri Hursti ("Hursti"), writing, "Mr. Hursti worries about a scenario in which ballot scanners could be reprogrammed to read a vote for Joseph R. Biden Jr. as a vote for Mr. Trump or vice versa."[51]

Hursti has demonstrated his ability to hack into voting machines in Florida using a tampered-with memory card.[52] Hursti opined on the role of electronic voting machines in our democracy:

> In order for us to find a way forward, we have to understand how broken the system is and what are the fundamental problems we are facing. This shouldn't be a partisan issue. This is our common problem owned by everyone living in the United States and we have to solve it in order to preserve our way of life, our society, the rule of law and our right to self-govern.[53]

Hursti reinforced his concerns about vulnerabilities: "I keep hearing that the system is un-hackable. Wrong. Always."[54]

In a live demonstration at Massachusetts Institute of Technology in 2018, J. Alex Halderman, professor of computer science and engineering at the University of Michigan, used an electronic voting machine programmed with "malicious vote-stealing software" to alter the results of a mock election.[55]

---

https://www.nytimes.com/2020/10/28/us/politics/2020-election-hacking.html (quoting J. Alex Halderman).

[51] *Id.*

[52] Adrian Horton, *Hack the vote: terrifying film shows how vulnerable US elections are*, THE GUARDIAN (Mar. 26, 2020), https://www.theguardian.com/tv-and-radio/2020/mar/26/kill-chain-hbo-election-hacking-documentary.

[53] KILL CHAIN: THE CYBER WAR ON AMERICA'S ELECTIONS, *supra* note 44 (at 3:00).

[54] *Id.* (at 1:55).

[55] Charlotte Jee, *How to hack an election-and what states should do to prevent fake votes*, MIT TECHNOLOGY REVIEW (Sept. 13, 2018),

Mainstream media outlets publicized the concerns about security problems with electronic voting machines in the run-up to the 2020 Election, again long before Lindell entered the conversation. In August 2018, *The New Yorker's* Sue Halpern reported on instances in which improperly calibrated electronic voting machines "flipped" votes from one candidate to another.[56] Halpern further described Halderman's demonstration before Congress that the direct-recording electronic voting machines used in the state of Georgia could be easily and "surreptitiously manipulated."[57] Revisiting this subject in July of 2020, Halpern wrote about "the problems with electronic voting machines that continue to dog elections today," including "tallies that can't be audited because the voting machines do not provide a paper trail, software and hardware glitches, security vulnerabilities."[58] The same article criticized the private ownership of electronic voting machines by "for-profit election venders [sic]," each of whom has no obligation to reveal critical information about its machines and software to the voting public.[59] Halpern affirmed what many already knew, "This is not a partisan issue. Everyone should care about this—whoever they vote for."[60]

---

https://www.technologyreview.com/2018/09/13/66529/how-to-hack-an-election-and-defensive-measures-states-should-take-to-prevent-fake-votes/.

[56] Sue Halpern, *How Voting-Machine Errors Reflect a Wider Crisis for American Democracy*, THE NEW YORKER (Aug. 26, 2018), https://www.newyorker.com/news/news-desk/how-voting-machine-errors-reflect-a-wider-crisis-for-american-democracy.

[57] *Id.*

[58] Sue Halpern, *Can Our Ballots Be Both Secret and Secure?* THE NEW YORKER: THE FUTURE OF DEMOCRACY (Jul. 7, 2020), https://www.newyorker.com/news/the-future-of-democracy/can-our-ballots-be-both-secret-and-secure.

[59] *Id.*

[60] KILL CHAIN: THE CYBER WAR ON AMERICA'S ELECTIONS, *supra* note 44 (at 1:15:15).

Other media outlets simultaneously publicized the issue, both in print as well as film and television.  Television network HBO released *Kill Chain: The Cyber War on America's Elections*, a documentary entirely focused on the security vulnerabilities of electronic voting machines.  *Kill Chain* featured a multitude of experts who warned of the machines' susceptibility to hacking.   Sandy Clark, a security researcher at the University of Pennsylvania, said:

> We call them voting machines but they are nothing more than obsolete computers...[61]  I feel like we are in terrible danger of losing what it means to be a democracy.  If elections can be altered subtly—they can be altered in a way that is undetectable—how does one trust the results of their election? And a democracy functions on trust.  Without that trust, things descend into chaos and anarchy.  Those of us who know how vulnerable the voting systems are in these elections are terribly afraid right now.[62]

In March 2020, CBS News interviewed Hursti, who opined that the 2020 Election was "too close" to make the changes necessary to make America's voting technology less vulnerable and advised readers to ask for a paper ballot.[63]  In April 2020, the Wall Street Journal gave a platform to Hursti's fears about specific voting machines which would subsequently be used in the 2020 Election.[64]

---

[61] *Id*. (at 2:10).
[62] *Id*. (at 56:16).
[63] *'Software I Hacked In 2005 Is Still In Use': Cyber Security Expert Harri Hursti On 2020 Presidential Election*, CBS NEW YORK (Mar. 23, 2020, 4:36 PM), https://www.cbsnews.com/newyork/news/software-i-hacked-in-2005-is-still-in-use-cyber-security-expert-hari-hursti-on-2020-presidential-election/.
[64] Alexandra Wolfe, *Why a Data-Security Expert Fears U.S.  Voting Will Be Hacked*, THE WALL ST. J. (Apr. 24, 2020, 12:52 PM).

There is a long list of popular media outlets who published similar information about the vulnerability of electronic voting machines. These publications sowed a widespread narrative casting doubt on the reliability of the results in the 2020 Election and placed the blame specifically on electronic voting machines.

> **d.    Smartmatic's Allegations of Lindell's Ill-Will, Spite, or Profit Motive Fail to Satisfy the Actual Malice Standard.**

Smartmatic alleges that Lindell was motivated by potential financial gain or benefit and to win the favor of Donald Trump and his supporters. As examples, Smartmatic alleges that Lindell "needs to sell pillows to keep and increase his fortune";[65] that Lindell acts with the "noble purpose of selling his pillows";[66] and that "this was about currying favor with President Trump, continuing to endear himself to the millions of Americans who supported President Trump, and making money."[67] Smartmatic also vaguely alleges that Lindell was motivated by personal animosity and ill-will.

Smartmatic's false allegations as to Lindell's motive would fail to demonstrate actual malice *even if they were true*, as courts have consistently held that allegations of a defendant's ill-will, spite, or profit motive do not satisfy the actual malice standard in a defamation claim. *Harte-Hanks*, 491 U.S. at 667; *Moreno,* 610 N.W.2d at 329 (noting that actual malice has "nothing to do with motive or ill will in the publishing of otherwise defamatory statements"); *see also Campbell*, 255 F.3d at 571 (finding that a political and

---

[65] Complaint ¶ 3.
[66] *Id*. at ¶ 7
[67] *Id*. at ¶ 183.

profit motivation behind the speech at issue was insufficient evidence to support a finding of actual recklessness).

Moreover, Smartmatic's allegations that Lindell failed to exercise due care,[68] by, for example, failing to gather "accurate" information related to the 2020 Election, to verify information before releasing it, or to seek out opposing views, are also insufficient to establish "actual malice," as ignorance or even negligence does not constitute actual malice. *See Standke v. B. E. Darby & Sons, Inc.*, 291 Minn. 468, 482, 193 N.W.2d 139, 148 (1971). Courts have also held that the mere failure to investigate or a "highly slanted perspective" are also insufficient to satisfy the actual malice standard. *See Connelly v. Nw. Publications, Inc.*, 448 N.W.2d 901, 904 (Minn. Ct. App. 1989) ("Failure to investigate may provide evidence of negligence. It does not establish knowledge of falsity or serious doubt about the truth of the story."); *see also Chafoulias*, 668 N.W.2d at 655.

As such, Smartmatic's vague allegations of Lindell's ill-will, spite, or motive for profit fail to establish "actual malice" under Minnesota law. And none of Smartmatic's allegations give rise to a reasonable inference that Lindell published his statements with knowledge of falsity or reckless disregard for the truth or falsity of the allegations. *Chafoulias*, 668 N.W.2d at 654; *Nelson Auto*, 951 F.3d at 958.

### 3. Lindell's Statements Relate to Matters of Public Concern; Therefore, Lindell Is Immune.

Because Lindell's speech relates to matters of public concern, it is protected by the heightened standards of the First Amendment. Whether speech is of public or private

---

[68] Complaint ¶¶ 315-26.

concern requires an examination of the "content, form, and context" of the speech based on "a totality of circumstances." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (citing *Dun & Bradstreet*, 472 U.S. at 761); *Maethner*, 929 N.W.2d at 881. No single factor is dispositive, and in consideration of content, form, and context, courts should "evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454; *Maethner*, 929 N.W.2d at 881.

Moreover, the Supreme Court has recognized qualified constitutional First Amendment "immunity" from a defamation lawsuit for "criticism of official conduct." *Sullivan*, 376 U.S. at 281-82. A speaker who engages in criticism of matters of public concern must, unless he subjectively knows he is lying, be as immune from a defamation lawsuit as a public official is immune from a tort claim. *See Sullivan*, 376 U.S. at 281-83; *see also Nelson Auto*, 951 F.3d at 956 ("The First Amendment prohibits public officials or public figures from recovering damages for defamatory falsehoods concerning issues of public interest and concern unless they prove that the statement was made with 'actual malice.'").

Lindell's statements regarding Smartmatic's machines directly relate to concerns about election integrity and the very means of self-government. Lindell's statements were made in public speeches and broadcast nationally through various news outlets, social media, and in documentaries he produced. Lindell's speech can fairly be considered as relating to matters of political and social concerns to the community. *See Snyder*, 562 U.S. at 453. The broad reporting and dissemination of Lindell's speech further suggests that it "is a subject of legitimate news interest [and] a subject of general interest and of value and

concern to the public." *See id.* Based on the totality of these circumstances, Lindell's speech clearly relates to matters of public concern, and as such, it is protected by the heightened standards of the First Amendment.

Smartmatic seeks to impose liability for Lindell's communications criticizing "official conduct" in the administration of "matters of public concern." In its Complaint, Smartmatic admits that it ran the 2020 Election in LA.[69] As discussed above, administering elections is a traditional, exclusive public function for which responsibility is reserved to public officials. U.S. CONST. art. I, § 4 cl. 1; *Halleck*, 139 S.Ct. at 1929 (2019). In questioning the integrity and accuracy of Smartmatic's "technology services" vis-a-vis the result of the 2020 Election, Lindell expressed precisely the criticism of public functions and public concern that is at the heart of the constitutional immunity conferred by the Supreme Court's opinion in *New York Times v. Sullivan*. Such matters represent "political rhetoric best left to open and free speech," not to "legal argument." *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1446 (8th Cir. 1989).

### 4. Smartmatic Failed to State a Claim for Defamation by Implication.

To the extent Smartmatic attempts to allege a claim of "defamation by implication," Smartmatic fails to state a claim under this theory because it does not allege that any statements made by Lindell were true. This particular type of defamation only occurs "where false implications arise from true statements of fact." *Conroy v. Kilzer*, 789 F. Supp. 1457, 1461 (D. Minn. 1992) (holding plaintiff did not plead cause of action for libel

---

[69] *See* Complaint ¶ 49.

by implication).  Defamation by implication "occurs when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts . . . even though the particular facts are correct." *Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 387 (8th Cir. 1996).  None of Smartmatic's defamation allegations against Lindell concern allegedly true statements resulting in a false implication.  Smartmatic's Complaint may only be construed through the lens of a straight defamation theory.  *Id.* at 1462 ("the [defamation by implication] theory has been used in cases involving allegations that true statements gave rise to false implications or allegations that facts were omitted that, if included, would have changed the implication of the statement").

Even if Smartmatic's allegations had sufficiently pled a cause of action for defamation by implication, that theory would be barred because it is not available to public figures.  *See Diesen v. Hessburg*, 455 N.W.2d 446, 451–52 (Minn. 1990) (plurality op.); *see, e.g.*, *Toney*, 85 F.3d at 390 (assuming plurality opinion represented views of a majority of the court); *Schlieman v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 303 (Minn. App. 2001) ("Despite the splintered nature of the opinion, *Diesen* has been interpreted as foreclosing a defamation-by-implication cause of action for public officials."); *see Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 482–83 (Minn. 1985) (recognizing *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967) as bringing "'public figures' who were not government officials within the *New York Times v. Sullivan* rule" because "the freedom of the press to engage in uninhibited debate about [public figures'] involvement in public issues and events is crucial as it is in the case of public officials . . . .")).  And Minnesota

law holds that "[b]ecause the actual malice standard is the cornerstone of protection for free exchange of ideas about public officials, it may never be presumed or inferred by innuendo." *Foley v. WCCO Television, Inc.*, 449 N.W.2d 497, 502 (Minn. Ct. App. 1989) (upholding trial court's holding that "there can be no defamation of a public official by innuendo) (citing *Hirman v. Rogers*, 257 N.W.2d 564, 566 (Minn. 1977)).

## B.    The Court Should Also Dismiss Smartmatic's MDTPA Claim.

Attempting to avoid the stringent First Amendment impediments to its defamation claim, Smartmatic has also sued Lindell under the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44 (the "MDTPA"), for the same conduct underlying its defamation claims.  Under the MDTPA, "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:  .  .  .  (8) disparages the goods, services, or business of another by false or misleading representation of fact[.]" Minn. Stat. § 325D.44, subd. 1(8).  The conduct that Smartmatic complains of under its MDTPA claim mirrors that of its defamation claim—that Lindell made allegedly false statements.

It is well established that "[a] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994) (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)); *see also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 56 (1988) ("actual malice" standard applies even though public figure sues under tort of "intentional infliction of emotional distress" rather than tort of defamation).  Smartmatic cannot avoid the "daunting" First

Amendment defamation requirements simply by pleading an MDTPA claim on the exact same conduct.

Presumably, Smartmatic's purpose in bringing an MDTPA claim as a mirror image of its defamation claim is to obtain its attorneys' fees, which are not allowed for defamation. The MDTPA, however, "was not intended to afford the 'back-door' attorney-fee relief" to tort claimants, and "[a] party may not assert a [M]DTPA claim for the sole purpose of receiving attorney fees." *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 340 (Minn. Ct. App. 1999). Smartmatic's MDTPA claim should be dismissed for this reason alone if for no other.

Regardless, a violation of the MDTPA must occur "in the course of business, vocation, or occupation." Minn. Stat. § 325D.44(1). "The statutory term 'vocation' will be construed in a limited fashion to mean 'business or occupation;' 'vocation' does **not** mean a moral or ethical calling—that is, 'a summons or strong inclination to a particular … call to action.'" *Northwest Airlines, Inc. v. Friday,* 617 N.W.2d 590, 595 (Minn. Ct. App. 2000) (emphasis added). Thus, the MTDPA is inapplicable when a defendant makes allegedly defamatory statements about a company as part of personal activities. *See id*. Smartmatic failed to plead a set of facts plausibly showing that Lindell's statements were made in the course of business or occupation, rather than as a personal activity.

Like many other citizens—Lindell has a personal interest in national politics. Lindell's statements about the 2020 Election proceed from this personal interest and are thus personal activities to which the MDTPA is inapplicable.

## III.
## CONCLUSION

For the foregoing reasons, the Court should dismiss this lawsuit. Lindell prays for all other such relief to which he is justly entitled.

Dated: March 21, 2022.

**MOHRMAN, KAARDAL & ERICKSON, P.A.**

/s/ *William F. Mohrman*
William F. Mohrman, Atty. No. 168816
150 South 5th Street, Suite 3100
Minneapolis, MN 55402
Telephone:    (612) 341-1074
Email:          mohrman@mklaw.com

*Counsel for Defendant Michael J. Lindell*
