# Exhibit 79

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MINNESOTA
3    ----------------------------------------------
4   SMARTMATIC USA CORP.,
    SMARTMATIC INTERNATIONAL
5   HOLDING B.V., AND SGO CORPORATION
    LIMITED,              Case No.
6                22-cv-0098-JMB-JFD
          Plaintiffs,
7
    v.
8
    MICHAEL J. LINDELL and
9   MY PILLOW, INC.,
10          Defendants.
11   ----------------------------------------------
12
13        REMOTE VIDEOTAPED DEPOSITION
14              OF
15          JAMES M. FURLONG
16            JUNE 19, 2024
17
18
19
20
21
22
23
24
    Job No. J11398945
25  Stenographically Reported By:  Amy L. Larson, RPR

**Page 2**

1
2
3
4   Remote Videotaped Deposition of JAMES M. FURLONG,
5   taken before Amy L. Larson, a Registered
6   Professional Reporter, Notary Public in the State of
7   Minnesota and State of Wisconsin, Certified Court
8   Reporter in the states of Washington, Utah and
9   New Mexico, and Certified Shorthand Reporter in
10  the states of Oregon and Illinois, taken on
11  June 19, 2024, commencing at approximately
12  1:00 p.m. CST.
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1   APPEARANCES:
2     BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP
      Attorneys for Plaintiffs
3     71 South Wacker Drive
      Suite 1600
4     Chicago, IL  60606
      BY:  TIMOTHY FREY, ESQ.
5        tfrey@beneschlaw.com
         JULIE LOFTUS, ESQ.
6        jloftus@beneschlaw.com
7     MCSWEENEY, CYNKAR & KACHOUROFF, PLLC
      Attorneys for Defendants
8     13649 Office Place
      Suite 101
9     Woodbridge, Virginia  22192
      BY:  CHRISTOPHER KACHOUROFF, ESQ.
10       chris@mck-lawyers.com
11
12   ALSO PRESENT:
13     Michael Bender, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1   INDEX:
2   EXAMINATION BY:                    PAGE
3   Mr. Frey                      7, 83
4   Mr. Kachouroff                  80
5   PREVIOUSLY-MARKED EXHIBITS:
6    Exhibit No.
7    Exhibit 92                     19
     MyPillow Corporate Bylaws
8    Bates DEF030754-000001 -
     DEF030754-000019
9
     Exhibit 93                     36
10    What are the Odds?  From
     Crack Addict to CEO - Mike Lindell
11   Bates DEF043826.000001 - DEF043826.000413
12   Exhibit 659                    53
     Page Vault
13    Document Title:  Trump March Bus Tour
     No Bates
14
     Exhibit 661                    63
15    Page Vault
     Document Title:  FrankSpeech.com
16    No Bates
17   Exhibit 666                    70
     MyPillow Board Meeting 10.5.2021
18    Agenda
     Bates DEF11273862 - DEF11273864
19
     Exhibit 669                    55
20    Video Clip
     Absolute Proof Documentary
21
22
23
24
25

JAMES M. FURLONG                                    June 19, 2024
SMARTMATIC USA .V. LINDELL                                      5—8

Page 5
1  INDEX:  (Cont'd.)
2  EXHIBITS MARKED FOR IDENTIFICATION:        PAGE
3      Exhibit No.
4      Exhibit 667                46
       Star Tribune Article
5      Mike Lindell's biggest gamble:
       Giving hard sell to baseless
6      election fraud claims
       No Bates
7
       Exhibit 668                73
8      September 8, 2022 Email
       Bates DEF026575.000001 -
9      DEF026575.000003
10     Exhibit 672                56
       Video Clip
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6
1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good afternoon.
3   We are now on the record.  The current time
4   is 1:01 p.m. Central.  Today's date is
5   June 19th, 2024.
6          This begins the videotaped deposition
7   of Jim Furlong in the matter of Smartmatic
8   USA Corporation, et al. vs. Michael J.
9   Lindell, et al.  The case number is
10  22-cv-0098-JMB-JFD.
11         My name is Michael Bender.  I'm your
12  remote videographer.  And your court reporter
13  is Amy Larson.
14         Counsel, will you please introduce
15  yourselves, and the witness will be sworn.
16         MR. FREY:  Good afternoon.  This
17  is Tim Frey on behalf of Smartmatic, the
18  plaintiffs.
19         MS. LOFTUS:  Julie Loftus also on
20  behalf of Smartmatic plaintiffs.
21         MR. KACHOUROFF:  Christopher
22  Kachouroff on behalf of Mike Lindell and
23  MyPillow, Inc.
24
25

Page 7
1              JAMES M. FURLONG,
2      a witness in the above-entitled action,
3      after having been first duly sworn, was
4      deposed and says as follows:
5
6          THE COURT REPORTER:  Thank you.
7      And before we begin, I'd just ask if
8   you can sit as close as you can to the
9   microphone so we can hear you clearly.
10         THE WITNESS:  All righty.
11         THE COURT REPORTER:  Thank you.
12
13             EXAMINATION
14  BY MR. FREY:
15  Q.  Hi.  Good -- good afternoon or good morning,
16      Mr. Furlong.  I believe it's afternoon for us
17      and morning for you.
18         Before we begin, I introduced myself
19      briefly before we went on, but my name is
20      Tim Frey.  I'll be asking you some questions
21      today on behalf of Smartmatic.
22         Could you please state and spell your
23      name for the record.
24  A.  James Michael Furlong, F-U-R-L-O-N-G.
25  Q.  Thank you.

Page 8
1          And Mr. Furlong, where do you
2   currently live?
3   A.  Well, I live half the year in Minnesota and
4       half the year in Arizona.  My -- I'm
5       registered to vote in Kabetogama, Minnesota.
6   Q.  Okay.  And what is your address there in
7       Minnesota?
8   A.  10136 Timber Wolf Trail, Kabetogama,
9       Minnesota 56669.
10  Q.  Thank you.
11         And today you are present -- you're
12      actually in Arizona; is that correct?
13  A.  Yeah, I also have a home in Arizona.
14  Q.  What is your address there?
15  A.  18540 North Ibis, I-B-I-S, Way, Maricopa,
16      Arizona, 85138.
17  Q.  Thank you, Mr. Furlong.
18         Mr. Furlong, have you been deposed at
19      any time before today?
20  A.  Yes.
21  Q.  How many times have you been deposed before?
22  A.  Two or three times, I guess.
23  Q.  Do you remember the circumstances of your
24      first -- the deposition that you gave?
25  A.  Not really.  I remember the last one I gave,

JAMES M. FURLONG                                              June 19, 2024
SMARTMATIC USA .V. LINDELL                                          9–12

Page 9

1    but...
2    Q. Were you --
3    A. I --
4    Q. Were you a party to the lawsuit for the first
5       deposition that you gave?
6    A. Yes.
7    Q. And do you recall if you were a plaintiff or
8       defendant in that action?
9    A. I was the defendant, I believe. Yes.
10   Q. And where was that case? Do you remember
11      where that case, what court it was pending
12      in?
13   A. No, I don't really remember. It was quite a
14      few years ago. It -- it was MyPillow and
15      Salesforce.
16   Q. And what was the subject matter, if you
17      recall?
18   A. There was a dispute over the contract and the
19      money involved.
20   Q. Okay. And you were just providing testimony
21      as an officer of MyPillow; is that accurate?
22   A. Yes.
23   Q. Do you know if that case ever went to trial?
24   A. No, it didn't.
25   Q. Do you recall the second time you were

Page 10

1    deposed?
2    A. Jesus. No, I don't. I don't recall.
3    Q. And you said you did recall the most recent
4       time. What -- what were the circumstances --
5    A. That was the Salesforce one, yeah.
6    Q. That was the Salesforce one?
7    A. Right. That was the last deposition I gave
8       before this one.
9    Q. Okay. And there were maybe two more, but you
10      can't really remember --
11   A. One or two, I mean, from -- you know, I've
12      owned companies my entire life, and there's
13      always disputes, as you well know, and it
14      probably had to do with one of those
15      companies. It was not with MyPillow.
16   Q. Okay. And were either of those or were any
17      of those three depositions remote as we're
18      doing today?
19   A. No, they were all in office.
20   Q. Okay. So I just want to go over a few things
21      just about the logistics and kind of
22      procedures for these remote depositions,
23      okay?
24   A. Okay.
25   Q. So Mr. Kachouroff, your other counsel, might

Page 11

1    have explained some of this to you, but I'd
2    just like to get it on the record.
3        So, first, I'd ask that in the room
4    that you're in, you don't kind of be on your
5    cell phone or looking at the computer or any
6    documents around you during the deposition
7    unless you identify that to us.
8        Is that fair?
9    A. Understood.
10   Q. In terms of exhibits, we'll be going over a
11      couple of exhibits today. And what we'll do
12      is we will drop them into the chat function
13      on the Zoom.
14   A. Okay.
15   Q. And you'll be able to open up the PDF from
16      there and you'll be able to review it and
17      take as much time as you'd like with it, and
18      then we'll ask you questions on it.
19        Does that work?
20   A. Yes.
21   Q. You're already doing really well with this,
22      but I ask -- and this is for all
23      depositions -- that you allow me to finish
24      asking the question before you start to
25      respond so that the court reporter can get it

Page 12

1    down.
2        Is that fair?
3    A. Yes.
4    Q. Thank you.
5        And along the same lines, because we
6    have a court reporter here, everything needs
7    to be a verbal response, not a head nod or a
8    head shake.
9        Do you understand?
10   A. Yes.
11   Q. And if you don't understand one of my
12      questions, please just ask me to clarify. If
13      you answer a question, I'll assume that you
14      have understood it.
15        Is that fair?
16   A. Okay.
17   Q. During my questioning today, Mr. Kachouroff
18      might object to certain of them, but unless
19      he instructs you not to answer the question,
20      you're required to answer even though there's
21      an objection.
22        Do you understand that?
23   A. Okay. Yes.
24   Q. And if you need a break at any time, just let
25      us know, we're happy to go off the record and

JAMES M. FURLONG                                      June 19, 2024
SMARTMATIC USA .V. LINDELL                                  13–16

Page 13

1  take a break.  The only request I have in
2  that regard is we don't break while a
3  question is pending.  So if I ask a question,
4  you know, provide a response and then we can
5  break.
6          Is that fair?
7  A.  Yes.
8  Q.  Do you know of any reason why you could not
9     provide accurate testimony today?
10  A.  No.
11  Q.  What, if anything, did you do to prepare for
12     your deposition today?
13  A.  Nothing.
14  Q.  You didn't meet with anybody?
15  A.  No, I did not.
16  Q.  You did not review any documents?
17  A.  No, I did not.
18  Q.  So I want to start by just talking a little
19     bit about your history with MyPillow so I can
20     understand kind of your roles and
21     responsibilities, how you -- how you kind of
22     spend your time with the company over the
23     past years.
24          Do you recall when you started your
25     first association with MyPillow?

Page 14

1  A.  Yes, I believe it was winter of 2-0 -- excuse
2     me, winter of '04.
3  Q.  And what was your first position with
4     MyPillow -- MyPillow in the winter of '04?
5  A.  I was a salesperson.
6  Q.  And how did you come into the role as
7     salesperson for MyPillow?
8  A.  Well, I had met Mike, and we were talking,
9     and he was doing a log home cabin show in
10     downtown Minneapolis, and his son had crapped
11     out helping him.  So I told him, yeah, I had
12     been in sales, so I told him I'd come down
13     and help him out, and that's where it all
14     began.
15  Q.  And at the time you started with MyPillow
16     in '04, how big was the company?
17  A.  Very, very small.  It was in a garage.
18  Q.  Okay.  So can you say about how many
19     employees there were other than -- other than
20     yourself?
21  A.  Two, maybe three.
22  Q.  And then after working as a salesperson --
23     about how long were you in the role of
24     salesperson for MyPillow?
25  A.  I would say probably three or four years.

Page 15

1  Q.  And do you recall what your next position was
2     while in that time?
3  A.  Well, you know, MyPillow was never a normal
4     company, so we all decided we wanted titles,
5     and I told Mike I wanted to be a chief, so he
6     made me CFO.
7  Q.  Okay.  So you became CFO, that may be around
8     2008, 2009 time period?
9  A.  Correct.
10  Q.  And did your responsibilities change at all
11     when you became CFO?
12  A.  No.  No.
13  Q.  So what were you -- what were you doing then
14     as CFO?
15  A.  I was still doing my same job.  I mean, you
16     know, the titles were more of a joke than
17     anything else.
18  Q.  And was the company growing at that time?
19  A.  No, not really.  It was very stagnant.
20  Q.  And then how long were you in that position
21     as -- as CFO?
22  A.  Until I decided I wanted the title of
23     president.
24  Q.  Okay.  And when about was that?
25  A.  Oh, I would say probably '11, '12.

Page 16

1  Q.  And do you recall if you received the title
2     as president kind of in connection with the
3     company filing its articles of incorporation
4     and formal bylaws?
5  A.  Yes.
6  Q.  And what was the impetus for that change?
7  A.  Well, we were trying to make MyPillow more of
8     a real company instead of, you know, a
9     fly-by-night organization.  That's kind of
10     extreme to say it that way, but there wasn't
11     any structure in the company.
12          Mike had his addiction issues, all
13     that was going on.  And so we got a -- a
14     gentleman came into the company by the name
15     of Tom Clapp, and he began to argue that we
16     really had to have a corporate structure in
17     the company, you know, just for, you know,
18     the outside world, if anything else.  If we
19     wanted to get financing or leasing or things
20     of that nature, you know, we had to come
21     across as a company, a real company.
22  Q.  And you mentioned Mr. Tom Clapp.  Did he then
23     have a role with MyPillow?
24  A.  He was actually CEO at a time.  That was the
25     title he wanted.  He lost that title,

JAMES M. FURLONG                                                June 19, 2024
SMARTMATIC USA .V. LINDELL                                      17–20

Page 17

1  obviously, to Mike.  Mike had no idea what
2  all the titles meant, really, back in those
3  days.
4  Q.  How did -- are you aware of how Mr. Clapp
5     became involved with the company?
6  A.  I -- I am not.  Tom just showed up one day.
7     I think they were from the same church and
8     that's how they met.  And I would -- you
9     know, Tom must have somehow convinced Mike
10    that he could be an asset.  I was --
11 Q.  And --
12 A.  -- most of the time, so...
13 Q.  I'm sorry, what was that?
14 A.  I said I was on the road most of the time.
15 Q.  So were your responsibilities then still
16    based around sales?
17 A.  Yes.  I mean, I -- about '09 we began to hire
18    more salespeople.  And so one of my jobs was
19    not only hiring the salespeople, but then I
20    began setting up the different shows, working
21    with the show promoters, you know, making
22    sure everybody got product and just, you
23    know, the day-to-day operation of running the
24    show department.
25 Q.  And when you say, "Show department," what --

Page 18

1  what do you mean by that?
2  A.  Well, we -- we -- when MyPillow started, our
3     main revenue source was doing home shows,
4     state fairs, county fairs, you know,
5     basically any type of fair or consumer show
6     that we could get into.
7  Q.  Okay.  And so it was kind of like setting up
8     the logistics for going to the shows and then
9     what you were going to present --
10 A.  Getting the vehicle and getting everything
11    done, everything paid for, yeah.
12 Q.  And were those mainly local to the Minnesota
13    area or were you nationwide?
14 A.  We were going nationwide.  We were heavily in
15    the Midwest to begin with.
16 Q.  And at that point in time, other than the
17    shows that you just described, was MyPillow
18    doing any other kind of advertising?
19 A.  Mike started to do some television
20    advertising and he was doing some radio work.
21    Other than that, the main source of revenue
22    for the company was the shows.
23 Q.  And so then you become president around that
24    2012 time period, I think we said.  Are you
25    still president today?

Page 19

1  A.  I'm retired now.
2  Q.  And when did you retire?
3  A.  June of '22.
4  Q.  And why -- why did you retire?
5  A.  Well, I was 70 years old, and I was just
6     tired of the whole rat race.
7  Q.  And when you retired, did you have a
8     replacement, that you're aware of?
9  A.  For a while there was, yes.  Mike had decided
10    to wind down the show department and
11    eliminate it, and so there was a woman by the
12    name of Jennifer Duneman who ran it until --
13    I'm thinking -- December of '23.
14 Q.  Okay.  So I want to just talk -- go back a
15    little bit now and talk about the time you
16    were president from 2012 to June of 2022.  I
17    want to look at the bylaws that we were
18    discussing.  And we'll put it into the chat.
19    It was previously marked as Exhibit 92.
20    Julie will post it there, and let me know
21    when you have it.
22 A.  Article 1.  Okay, I see Article 1.
23 Q.  You see it there?
24 A.  Yes.
25 Q.  Okay.  So this is a previously-marked

Page 20

1  deposition exhibit.  I'll just say for the
2  record the Bates identifier is
3  DEF030754.000001.
4        And do you recognize this as the
5  bylaws of MyPillow?
6  A.  Well, I'm not -- I assume they are.
7  Q.  Have you ever seen this before?
8  A.  No.
9  Q.  I want to -- I want to -- have you seen
10    other -- I guess just to be clear, have you
11    seen any bylaws of MyPillow before?
12 A.  I don't remember ever seeing them, no.
13 Q.  So you don't have any reason to doubt that
14    these are the bylaws?  And I'll represent to
15    you this was produced to us by the defendants
16    in this case.
17 A.  I believe you.
18 Q.  Okay.  Just making sure there wasn't
19    something else you might have had in mind.
20        So if we could flip to page 8 of this
21    document.  It'll be both the .008 in the
22    lower right-hand corner and 8 in the middle
23    of the page --
24 A.  Right.  Got it.
25 Q.  Okay.  And do you see there in Article 5.03

JAMES M. FURLONG                                                    June 19, 2024
SMARTMATIC USA .V. LINDELL                                              21—24

Page 21

1    it says, "President"?
2  A.  Yes.
3  Q.  And, "Unless otherwise provided by resolution
4    of the board of directors, the president
5    shall be the chief executive officer of the
6    corporation and shall, A, have general active
7    management of the business of the
8    corporation"; do you see that?
9  A.  Uh-huh.  Yes.
10 Q.  And so do you recognize that as kind of your
11   role as the president of MyPillow, Inc.,
12   between 2012 and 2022?
13 A.  Define "business of the corporation."
14 Q.  What does that mean -- what does that mean to
15   you?
16 A.  Well, first of all, Mike was the CEO of the
17   company.  He managed the company.  I managed
18   a division of the company.  It was a very
19   profitable division of the company and -- but
20   I did not run the day-to-day operations of
21   the company.
22 Q.  Okay.  And that division of the company that
23   you oversaw, that was the show division?
24 A.  The show division, yes.
25 Q.  Did your management of the show division

Page 22

1    include any oversight regarding the marketing
2    strategy of MyPillow?
3  A.  Only as it related to the show department.
4  Q.  And in what -- in what ways -- could you give
5    me some examples of the type of marketing
6    that the show department would do?
7  A.  Well, I mean the main thing was, you know,
8    like when we began the Costco portion of the
9    show department, you know, we had to -- had
10   to present to Costco the benefits of carrying
11   MyPillow, and I was the main contact between
12   MyPillow and Costco, as well as, you know,
13   all of the different shows, including -- you
14   know, all the state fairs, everything.
15        It was a daunting task, believe me.
16 Q.  Oh, I'm sure.  I'm sure.  I'm just trying
17   to -- I just -- you know, we know your title
18   as president, and so we're just trying to
19   understand what exactly that entails, what
20   your role was.
21        So you oversaw kind of the marketing
22   to Costco.  Are there any other -- like,
23   outside of state fair shows and those types
24   of activities you mentioned, and like Costco,
25   were there other retailers that you would

Page 23

1    manage the marketing to?
2  A.  Target.  That was unsuccessful, but...
3  Q.  And how would you go about marketing to
4    those -- those types of entities?
5  A.  Pick up the phone and call them.
6  Q.  And -- and how about direct-to-consumer
7    advertising, were you involved at all in
8    the -- in the direct-to-consumer advertising
9    strategy of MyPillow?
10 A.  Not really other than, you know, I may -- you
11   know, Mike might show it, show it to me and
12   get my opinion on it.  But I had -- I did not
13   have any part in designing it.
14 Q.  Did -- did Mr. Lindell ever seek your advice
15   or input on, you know, what -- what he should
16   use for the, kind of, direct-to-consumer
17   advertising?
18 A.  Yeah, it just -- you know, it was pretty much
19   he would show you something and, you know,
20   did you like it or not, if you didn't like
21   it, why.
22 Q.  Okay.  And would he take feedback in that
23   regard?
24 A.  Excuse me?
25 Q.  Was he open to your feedback in that regard?

Page 24

1  A.  Seldom.
2  Q.  So is it fair to say you reported to
3    Mike Lindell then when -- as president?
4  A.  Yes.
5  Q.  And I'm assuming that you had a number of
6    people reporting to you; is that fair?
7  A.  Correct.
8  Q.  About how many people do you recall
9    overseeing in the, you know, kind of 2019 to
10   2022 time frame?
11 A.  Oh, I'd say about a 150.
12 Q.  And are there -- so, like, there's 150 flowing
13   down, but some direct reports --
14 A.  Yeah, I had -- I probably had two or three
15   people that reported directly to me.
16 Q.  Do you recall who those -- who those people
17   were?
18 A.  Names?
19 Q.  If you recall.  Or positions.
20 A.  Jennifer Duneman, she was basically the lead
21   administrator.  God, I got Sherry Miles on my
22   mind, and that wasn't the person I was
23   thinking of.  How easily you forget.
24        But Jennifer was the main person that

Page 25

1    they would go to to get to me.  The other
2    folks were -- if I can look at my phone for a
3    second, I can give you the names.
4  Q. Oh, so you have, like, a list of contacts?
5  A. Yeah.
6  Q. Sure.  Yeah, that's fine.
7  A. Larry Howard, Timothy Schmeig.  You're going
8    to ask me how to spell that, aren't you?
9  Q. The court reporter likely will, if not now,
10   then when we go on a break.
11 A. Schmeig, it's S-C-H-M-E-I-G.
12 Q. Thank you.
13       And what types of work were the --
14   were the people underneath you engaged in?
15 A. Jennifer was -- she -- she was Madam
16   Organization.  She was very meticulous, very
17   organized.  And there were so many small
18   details that had to be addressed in all the
19   different areas, and she was just incredible
20   at it.
21       The other two basically dealt with --
22   a lot with the salespeople.  If there was a
23   problem, they'd come to them first.  And if
24   they couldn't handle it, they would go to me.
25 Q. Got it.  Got it.  Okay.

Page 26

1       So then that was your role as
2    president.  I want to talk a little bit about
3    kind of the other roles you may have had with
4    MyPillow, the first being are you a
5    shareholder in MyPillow?
6  A. Yes.
7  Q. Do you recall when you became a shareholder?
8  A. I was one of the original shareholders.
9    Probably '06, '07.
10 Q. And do you know how many shares of MyPillow
11   stock you currently own?
12 A. Around a hundred thousand.
13 Q. And as a shareholder of MyPillow, are you --
14   do you ever attend shareholder meetings?
15 A. No.
16 Q. Is that because there aren't shareholder
17   meetings or because you choose not to attend?
18 A. There aren't shareholder meetings.
19 Q. Do you recall when, if ever, the last
20   shareholder meeting was?
21 A. 2012.
22 Q. Do you ever -- are you ever requested to vote
23   as a shareholder of MyPillow?
24 A. Not that I recall.
25 Q. And in addition to being a shareholder, are

Page 27

1    you also a member of the MyPillow board of
2    directors?
3  A. Yes.
4  Q. And are you still a member of the board of
5    directors today?
6  A. Yes.
7  Q. Do you recall when you first joined the board
8    of directors?
9  A. I don't recall the year, really.  It was part
10   of the let's make this a real corporation
11   move.
12 Q. So maybe if you look at the bylaws there and
13   you flip to, I guess, page -- page 13, it
14   indicates that this is dated July 31st, 2009.
15   So maybe sometime around then?
16 A. Yes.
17 Q. And as --
18 A. Can I --
19 Q. Go ahead.
20 A. Are you sure this is the latest version?
21 Q. Well, this is what -- this is what was -- was
22   produced to us, so that's what we're basing
23   it on.  If you think there's a more recent
24   version, I'd be interested in that.
25 A. I just -- it just seems like '09 was such a

Page 28

1    long time ago.  Okay.  I'm just curious.
2  Q. And there are -- if you continue to scroll
3    through this exhibit, you'll see that there's
4    certain amendments that take place, you know,
5    over the -- on page 15 there's an amendment
6    on June 1st, 2015.
7  A. Uh-huh.
8  Q. And then if you go to page 19, there's
9    another amendment, October 5th, 2021.
10       Do you see that?
11 A. Yes.
12 Q. Okay.  And that 2021 amendment increases the
13   number of the board of directors to no more
14   than 12.
15 A. Right.  This is the most recent.  I can tell
16   by the names and the dates.
17 Q. So as a -- as a board member of MyPillow, do
18   you attend meetings, director meetings in
19   that capacity?
20 A. Yes.
21 Q. And how often does the board of directors of
22   MyPillow meet?
23 A. Well, we haven't had a meeting in a while.
24   Normally, it had been every -- about twice a
25   year.

JAMES M. FURLONG
SMARTMATIC USA .V. LINDELL

June 19, 2024
29–32

Page 29

1  Q. Has the board had any meetings thus far in
2     2024?
3  A. No.
4  Q. Do you recall if the board met at all in
5     2023?
6  A. No.
7  Q. I'm sorry, no, you don't recall or no --
8  A. No, we did not meet.  I'm sorry.
9  Q. That's okay.  It was a poor question on my
10    side.
11        Did the board meet at all in 2022?
12 A. Yes.
13 Q. And do you recall how many times the board
14    met in 2022?
15 A. I only recall once.
16 Q. Do you know when about that was?
17 A. Well, I was there in person, so it couldn't
18    have been in the winter.  So it must have
19    been in the spring sometime.
20 Q. And do you recall what was discussed at that
21    meeting in the spring, at that board of
22    directors meeting in the spring of 2022?
23 A. I'd have to see the itinerary.
24 Q. And in that regard, you know, when there is a
25    board meeting, do you receive an agenda for

Page 30

1     that meeting ahead of time?
2  A. Yes.
3  Q. And how is that agenda delivered to you?
4  A. At the meeting.  Well, sometimes we'd get an
5     advanced copy email as well.
6  Q. And is there -- are there minutes circulated
7     of that board meeting after it's complete?
8  A. Yes.
9  Q. So there was a meeting sometime in the spring
10    of 2022.
11        Do you recall any meetings, any board
12    of directors meetings in 2021?
13 A. I know that we had them, but I don't recall
14    when.
15 Q. And we'll look -- later this afternoon we'll
16    look at a couple of minutes that we do have
17    from those meetings and that might refresh
18    your recollection.
19        In terms of responsibilities, duties
20    and responsibilities as a board member, what
21    do you understand those to be?
22 A. Well, I think that, you know, we would just
23    approve various amendments, go through the
24    important business, talk about if there were
25    lawsuits, what was going on with those.

Page 31

1     Just -- we always tried to keep it as focused
2     as possible on MyPillow.
3  Q. And when you say, "As focused as possible on
4     MyPillow," what do you mean by that, as
5     opposed to --
6  A. Well, Mike was known to go down rabbit holes,
7     and it can take a two-hour meeting into a
8     six-hour meeting.  And we were always very
9     keen on let's just get it done and get out of
10    here.
11 Q. Okay.  I want to look at -- it's the same
12    document, these bylaws here.  If you look at
13    Article 3, which is on page 4 of the
14    document.
15 A. Four?
16 Q. Page 4.
17 A. Okay.  Article 3.  Okay.
18 Q. And do you see there 3.01 is, "Duties"?
19 A. Uh-huh.  Yes.
20 Q. It says, "The board of directors shall manage
21    the business and affairs of the corporation,"
22    and then it gives kind of three specific
23    things --
24 A. Yes.
25 Q. -- about what that means, right?  Do you see

Page 32

1     that?
2         So did you understand -- or do you
3     understand that as a board member of
4     MyPillow, Inc., you have the authority and
5     the duty to manage the business and affairs
6     of the corporation?
7  A. Yes.
8  Q. And then if we look at the three subsets, so
9     3.01(a) says the board has the duty and power
10    to borrow money for the corporation and to
11    make, execute and issue mortgages, bonds,
12    deeds of trusts, et cetera.
13        Do you see that?
14 A. Yes.
15 Q. And do you understand that you do have that
16    power and duty as a board member of
17    MyPillow, Inc.?
18 A. Yes.
19 Q. And then the next one there, 3.01(b), is to
20    enter into such contracts as may be necessary
21    or appropriate for the conduct of affairs of
22    the corporation.
23        Do you see that?
24 A. Yes.
25 Q. And so do you understand that as a -- as a

Page 33

1    board member of MyPillow, Inc., you have the
2    duty and the power to enter into contracts
3    necessary and appropriate for the conduct of
4    the affairs of the corporation?
5  A. If there's a vote in favor, yes.
6  Q. Not you yourself individually, but as a board
7    member.
8  A. If I vote yes, yes.
9  Q. And do you recall any instances in which
10    you -- the board has voted on entering into
11    contracts on behalf of MyPillow?
12  A. Yes.
13  Q. What's the most recent contract you recall
14    the board entering into?
15  A. You know, if I had the agendas, it would sure
16    help.
17  Q. I understand, Mr. Furlong, and I agree. To
18    be honest with you, we've requested them and
19    they haven't been -- only a couple of them
20    have been provided so --
21  A. Okay. I wish I was in Minnesota, because I
22    have them all in files.
23        I know that we voted on some computer
24    programs, some purchases of robots for
25    production.

Page 34

1        But if I had the -- if I had the
2    agenda, it would sure help. I mean, this --
3    it was a long time ago.
4  Q. I understand.
5        Do you -- do you recall entering into
6    any advertising contracts on behalf of
7    MyPillow?
8  A. They were discussed at the meetings and voted
9    on in the meetings.
10  Q. They were?
11  A. They were approved at the meetings, yes.
12  Q. Okay. And what -- do you recall entering
13    into any advertising contracts on behalf of
14    MyPillow in 2020 or 2021?
15  A. No, I don't.
16  Q. What's the most recent, I guess, advertising
17    contract you recall voting on?
18  A. We had a company that was run by a guy by the
19    name of Mark Jones that set up all of the ads
20    for, you know, Fox and all of the different
21    television and radio, and we voted on if we
22    wanted to continue with him or not. I guess
23    that's the most recent.
24        I think they're still using him. I
25    forget the company name that he had, but he

Page 35

1    worked with MyPillow directly for quite a
2    while.
3  Q. Could that be Telebrands?
4  A. Telebrands, there you go.
5  Q. Okay.
6  A. You know the answers before you ask them,
7    don't you?
8  Q. My colleague does.
9        Okay. Do you -- do you recall ever
10    entering into an advertising contract with an
11    entity called FrankSpeech?
12  A. With FrankSpeech?
13  Q. Correct.
14  A. I do not recall that. I mean, I know what
15    FrankSpeech is, but I don't remember the --
16    the contract.
17  Q. We'll look at some -- some board minutes on
18    that topic later and we'll talk about it.
19  A. I have a feeling you have the answer, yeah.
20  Q. Just going back generally, I guess, who
21    typically kind of leads or MCs the board of
22    directors meetings of MyPillow?
23  A. Mike.
24  Q. And does -- does Mr. Lindell also put
25    proposals up for votes? Is it his role to do

Page 36

1    that?
2  A. Yes.
3  Q. And what's the process then for the board
4    making decisions after Mr. Lindell puts a
5    proposal up for vote?
6  A. Well, many times you vote on it and, you
7    know, Mike makes most of the decisions
8    himself.
9  Q. Is that like without -- without board vote,
10    or is it he kind of tells the board how to
11    vote?
12  A. He does a lot of things without the board's
13    approval, yes.
14  Q. I want to look at maybe one potential example
15    of this. And we're going to put into the
16    chat what was previously marked as
17    Exhibit 93. It might take a second. I'll
18    represent to you --
19  A. Wrong button. Which one am I opening?
20  Q. It's -- it says number 12, book Exhibit 93.
21  A. I did it again, I hit the wrong one. All
22    right. It's a slow process, but it's coming.
23    It's downloading.
24  Q. No problem.
25  A. Click to open. That's a scary picture.

JAMES M. FURLONG                                    June 19, 2024
SMARTMATIC USA .V. LINDELL                          37—40

Page 37

1        All right.  Go ahead.
2  Q.  Okay.  So I'll represent to you that this is
3     Mr. Lindell's book that was published.
4        Do you recognize the cover page --
5  A.  Yes.
6  Q.  -- of the book?
7        Okay.  And I don't want to talk about
8     too much of this book other than I'd like to
9     go to page 367.
10  A.  367.
11  Q.  It's Chapter 43.
12  A.  367.  Okay.
13  Q.  Okay.  And I'll give you a minute, if you
14     just want to kind of review that page and the
15     top of the next page, and I just want to ask
16     you a couple of questions about what
17     Mr. Lindell is describing here.
18  A.  (Reviews document.)
19        How far do you want me to read the
20     next page?
21  Q.  Oh, just the top --
22  A.  Okay.
23  Q.  -- top three paragraphs.
24        Do you recall -- so in this
25     Chapter 43 here of his book, Mr. Lindell

Page 38

1     writes about meeting Donald Trump in the
2     summer of 2016 and deciding to support his
3     candidacy, right?
4  A.  I'm sorry, was there a question?
5  Q.  Do you agree that that's kind of what
6     Mr. Lindell is writing about here in this
7     Chapter 43?
8  A.  Yes.
9  Q.  And he also discusses in the third paragraph
10     on the first page that he told the MyPillow
11     board about his meeting with then-candidate
12     Trump and that he decided he was going to go
13     all in to get -- help get him elected.
14        Do you see that?
15  A.  Yes.
16  Q.  Do you recall that board meeting?
17  A.  Yes.
18  Q.  What do you -- what do you recall about the
19     meeting?
20  A.  That I wanted to throw up.
21  Q.  And why is that?
22  A.  Because I have a very strong dislike for
23     Mr. Trump.
24  Q.  Did you have any -- any views on the CEO of
25     the company you're a board of kind of

Page 39

1     publicly supporting Mr. Trump?
2  A.  Oh, yeah.  Major trouble.  Major trouble.
3  Q.  Major trouble, did you say?  I'm sorry?
4  A.  No, I was extremely upset by it.  I thought
5     it was a terrible mistake.  And it was the
6     beginning of the downfall of MyPillow.
7  Q.  Did you -- did you share those views with
8     Mr. Lindell?
9  A.  I -- I did inform that I thought it was a
10     serious mistake, yes.  And I didn't give a
11     shit what he thought about God coming to save
12     MyPillow.  It was a bunch of bullshit.
13  Q.  And did any other -- any other board members
14     share their opinions with Mr. Lindell?
15  A.  Well, Joe did, the attorney.  He was the only
16     other smart one in the room.
17  Q.  I'm sorry, you said Joe --
18  A.  Joe Springer was our corporate attorney at
19     the time.
20  Q.  Okay.  And do you recall whether the board
21     took any kind of vote or action in response
22     to Mr. Lindell's intentions?
23  A.  No.  Mike said he was going to do it, and if
24     we didn't like it, that was just too bad.
25  Q.  And was -- strike that.

Page 40

1        So did -- following that, I believe,
2     if you look at the second page of the
3     document, then, or page 368, Mr. Lindell
4     writes, "The next day I did the press
5     release," and so he's indicating there,
6     right, that he went ahead with issuing a
7     press release stating he was in support of
8     then-candidate Trump?
9        Do you recall that?
10  A.  I recall it, yes.
11  Q.  And you said yourself and Mr. Springer kind
12     of spoke out against it, but none of the
13     other board members did?
14  A.  No.  That's the advantage when you -- you
15     know, when you have a board member that -- a
16     board where the chairman signs your paycheck,
17     it's difficult to disagree.
18  Q.  So in your opinion, then, does Mr. Lindell
19     effectively control the board --
20  A.  Yes.
21  Q.  -- of MyPillow?
22  A.  Yes.
23        MR. KACHOUROFF:  We'll stipulate
24     to that.
25  BY MR. FREY:

Page 41

1  Q. And in the -- in the short-term -- or not in
2     the short-term, but following Mr. Lindell's
3     decision and the board's going along with,
4     I'll say, the support of then-candidate Trump
5     and then President Trump, in some respects,
6     that was actually helpful to MyPillow's
7     business, right?
8  A. I would disagree with that.
9  Q. And this is, I'm talking about, in between
10    2016 and 2020.
11 A. I would still disagree with that.
12 Q. And why is that?
13 A. Things began to change when Mike began to
14    support Trump.  And, you know, one of the
15    major rules of business is never support a
16    political candidate, because immediately you
17    lose a large percentage of your potential
18    customers.  And that was the case here.
19        Mr. Trump creates so many emotions,
20    so much discontent and hatred that would come
21    across in our shows.  We would have stuff
22    thrown at us, we'd be spit at.  I mean, it --
23    people would buy our pillows and rip them up
24    and return them.
25        I mean, it was -- it just continued

Page 42

1     and got worse and worse and worse.  And we
2     were losing employees.  We were losing sales
3     because of it.  Ultimately, we lost Costco
4     because of it, simply because -- Costco is a
5     great company, and they really care what
6     their customers say and how they feel, and
7     they were getting a huge pushback from their
8     clients about MyPillow being in their stores.
9     And you saw it in the numbers.  The numbers
10    began to drop, and eventually Costco said,
11    Bye.  And that was millions of dollars a
12    year.
13 Q. And in your recollection, this began in and
14    around 2016?
15 A. Yes.  Virtually, when Mike publicly came out
16    supporting Donald Trump, you know, the
17    problems really began.
18 Q. And it sounds like, in your experience then,
19    that's because people associated if
20    Mike Lindell supported something, that it was
21    MyPillow supporting that as well; is that
22    fair?
23 A. They were taking their frustration out on our
24    people.
25 Q. Okay.  I want to change gears just a little

Page 43

1     bit for a second and talk about what you know
2     about the company -- or the corporation
3     Lindell Management.
4        Are you familiar with an entity
5     called Lindell Management?
6  A. The name only.
7  Q. So you've never been employed by
8     Lindell Management?
9  A. No, I was not.
10 Q. Have you ever received any compensation from
11    Lindell Management?
12 A. I did not.
13 Q. That makes that one quick.
14        Okay.  So moving forward then, so in
15    2016 Mr. Lindell says he's going to support
16    then-candidate Trump for president, raises
17    the issue to the board, you disagree,
18    Mr. Springer disagrees, but Mr. Lindell goes
19    ahead with it and kind of ties himself and
20    the brand to President Trump, correct?
21 A. Correct.
22        MR. KACHOUROFF:  Objection to
23    form.
24        You can answer.
25 BY MR. FREY:

Page 44

1  Q. And then moving forward to the -- the 2020
2     election, November 2020 election, are you
3     familiar with the election between
4     President Joe Biden and former
5     President Trump in November 2020?
6  A. Yes.
7  Q. And is it your understanding that Joe Biden
8     was certified as the winner of that
9     November 2020 election?
10 A. Yes.
11 Q. And do you believe that Joe Biden was the
12    legitimate winner of the November 2020
13    election?
14 A. Yes.
15 Q. At that time immediately following the
16    November 2020 election, did you discuss with
17    Mr. Lindell whether Joe Biden had
18    legitimately won the 2020 election?
19 A. I would say I listened more than discussed.
20 Q. And what do you mean by that?
21 A. Well, I didn't agree with his position.  I
22    didn't agree that the election was stolen.  I
23    voted for Biden.  But with Mike, sometimes
24    you just kind of, you know, just let him go.
25    Because especially -- you know, him and I

Page 45

1   have a lot of history together, and it -- you
2   know, something I felt this passionate about,
3   you know, could ruin our friendship.  And I
4   do treasure Mike as a friend, and it just
5   wasn't worth ruining that friendship over a
6   piece of shit like Trump.
7   Q.  Okay.  Did Mr. Lindell tell you why he
8       believed that Donald Trump had won the
9       election?
10  A.  You know, he had all kinds of crazy theories,
11      you know.  And, obviously, the machines were
12      a big part of that.  And, you know, my theory
13      was, okay, prove it, show me the proof.  And
14      there is none, there was none, there never
15      will be any.
16  Q.  So you challenged Mr. Lindell to show you the
17      proof and he did not?
18  A.  Right.  You know, because he lost case after
19      case after case after case, every recount
20      came out the same.
21          MR. KACHOUROFF:  I have a quick
22      objection to the form of the question.  I'm
23      sorry.
24  BY MR. FREY:
25  Q.  You can go on, Mr. Furlong.

Page 46

1   A.  No, I just -- that's all I'm saying, okay,
2       show me the proof.  And there really hasn't
3       been any.  And that's the end of my
4       discussion with him about it.  And he still
5       goes on about this and that, but I just go,
6       Yeah, Mike.
7   Q.  And did Mr. Lindell tell you, around that
8       time, that he was intending to make public
9       appearances and statements regarding his
10      theories of election fraud?
11  A.  Well, I obviously saw it on television and on
12      the internet.  I would search it every couple
13      of days to see what, you know, crazy stuff
14      was going on.
15  Q.  But he didn't discuss it with you ahead of
16      time?
17  A.  No, he did not.
18  Q.  I want to look briefly at an article that was
19      published in the Star Tribune kind of related
20      to Mr. Lindell's public statements and
21      appearances that has some quotes for you --
22      from you.
23          So we're going to post in the chat
24      here what will be marked as Exhibit 667, I
25      believe.

Page 47

1          THE COURT REPORTER:  That's
2   correct.
3   BY MR. FREY:
4   Q.  Okay.  This will be marked as Exhibit 667.
5       Just let me know when you have that pulled
6       up.
7          (Exhibit 667 marked.)
8          THE WITNESS:  It must be this one
9   here.  There it is again.  Yep.  Okay, I got
10  it.
11  BY MR. FREY:
12  Q.  Okay.  And you see that this is an archived
13      version of an article that appeared in the
14      Star Tribune titled, Mike Lindell's biggest
15      gamble:  Giving hard sell to baseless
16      election fraud claims?
17  A.  Yes.
18  Q.  And I'll represent to you that in archiving
19      this, sometimes there's text repeated at the
20      top or bottom of the pages because of
21      advertisements, so it can be a little tricky
22      to look at.  But just letting you know that's
23      what it is.
24          And on page 3 of this article, right
25      above the advertisement that says, "Save

Page 48

1   Energy with Lighting," the article quotes,
2   "He talks in his book about how he was always
3   striving for acceptance, said Jim Furlong, a
4   longtime friend who is president of MyPillow.
5   He was accepted by the most powerful man in
6   the world.  What greater validation is there
7   than that?"
8          Do you see that?
9   A.  Yes.
10  Q.  And do you recognize this paragraph as
11      quoting you?
12  A.  Yes.
13  Q.  And do you recall being interviewed for this
14      article?
15  A.  I must have been.  I don't recall it.
16  Q.  Do you have any reason to doubt that you were
17      or that this article is quoting you
18      accurately?
19  A.  I have no reason to doubt it, no.
20  Q.  So I want to look at page 9.  And at the
21      bottom there under the picture of Mr. Lindell
22      there's a heading, "Doubts and conviction."
23  A.  I think I'm on page 10, sorry.  Okay.
24  Q.  It says, "Around the election, Lindell spent
25      a couple of hours during a flight on his

JAMES M. FURLONG                                          June 19, 2024
SMARTMATIC USA .V. LINDELL                                      49—52

Page 49

1    private plane arguing about election fraud
2    with Furlong, a democrat. The more you say
3    no to him, Furlong said, the stronger his
4    commitment becomes."
5        Do you see that?
6  A. Right.
7  Q. Do you recall the incident that's described
8    here in this article?
9  A. Flying in a small airplane with Lindell,
10   you'd never forget it. Yes, I do remember it
11   distinctly.
12 Q. Okay. And do you recall arguing about
13   election fraud with Mr. Lindell at this time?
14 A. Yeah. Yes.
15 Q. And was this along the lines of what you
16   discussed before where he would tell you his
17   theories and you would say, Show me the
18   proof?
19 A. Yes.
20 Q. Do you recall anything else, you know,
21   anything additional about that conversation?
22 A. I'm sorry, what was the date of this
23   publication?
24 Q. Oh, this is March 12th, 2021. It's on the
25   first page there --

Page 50

1  A. Okay.
2  Q. -- right above the photo.
3  A. Okay. I was just thinking of a number of
4    things, so I forgot the original question.
5  Q. Oh, I was just going to say is there
6    anything, you know, additional you remember
7    about this conversation other than what
8    you've kind of previously described as your
9    general conversations with Mr. Lindell about
10   his theories of election fraud?
11 A. Well, yeah, I mean, we talked about the
12   election fraud. But we talked about other
13   things too, you know, disagreements about
14   other things that Mr. Trump had done and not
15   done and just my, you know, general distrust
16   of the man.
17       As far as the election fraud thing, I
18   was very strongly against it, and I let Mike
19   just run on and on and, you know, it wasn't
20   going to change my opinion at all.
21 Q. And this quotes you here as saying, "The more
22   you say," quote, "no to him, the stronger his
23   commitment becomes."
24       Do you see that?
25 A. Yes. Mike doesn't like the word "no."

Page 51

1  Q. What do you mean by that?
2  A. If you say no to Mike, it will usually
3    empower him to keep on going. He gets
4    something locked in and good luck trying to
5    change his mind.
6  Q. And in your personal experience with
7    Mr. Lindell, if you said no to him and he's
8    locked in, would he be willing to change his
9    mind?
10 A. The thing with Mike is you have to get him to
11   listen to reason or listen to the other side
12   of the story. And the only way to do that is
13   to let him run on and on about whatever the
14   issue is until he would run out of his gas,
15   and then you would have the opportunity to
16   come in and say, Okay, you know, this and
17   this and this is what happened and/or is
18   going to happen.
19       And but with this particular issue,
20   the election being stolen and the machines,
21   he -- you know, there is -- he's not going to
22   listen to reason. It's a firm commitment.
23       MR. FREY: Mr. Furlong, we've been
24   going just over an hour, so let's take a
25   quick, maybe, five-minute break and then come

Page 52

1    back.
2        Does that work for you?
3        THE WITNESS: That would be great.
4        THE VIDEOGRAPHER: We are now off
5    the record. The time is 2:10 p.m.
6        (Recess.)
7        THE VIDEOGRAPHER: We are back on
8    the record. The time is 2:19 p.m.
9  BY MR. FREY:
10 Q. Okay, Mr. Furlong, we're back on the record.
11   And before the break we were -- we were
12   talking about Mr. Lindell's views on the
13   election and the kind of statements you made
14   in this Star Tribune article.
15       I just wanted to keep going on that a
16   little bit to say that -- or to ask whether
17   you were aware, following kind of those
18   initial conversations you had with
19   Mr. Lindell after the election, that
20   Mr. Lindell did go out and make public
21   appearances in which he stated the 2020
22   election was rigged and that Donald Trump was
23   the rightful winner?
24 A. Did I know that?
25 Q. Were you aware of that, yeah, when he was --

JAMES M. FURLONG                                          June 19, 2024
SMARTMATIC USA .V. LINDELL                                      53—56

Page 53

1  A.  I was aware of that, yes.
2  Q.  And were you aware that he attended the
3      March for Trump bus tour?
4  A.  Could you repeat that?
5  Q.  Were you aware that he attended the
6      March for Trump bus tour?
7  A.  No.
8  Q.  Did you ever see the March for Trump bus?
9  A.  No.
10 Q.  We'll post in the -- in the chat box here
11     what was previously marked as Exhibit 659.
12     Let me know when you have it.
13 A.  Yeah, I got it.
14 Q.  And do you see on that -- and I'll represent
15     to you that this is a Page Vault capture of a
16     website that has a photo of the March for
17     Trump bus.
18         Do you see there on the -- on the bus
19     under the driver's side window there's a
20     MyPillow logo?
21 A.  I see that.
22 Q.  As the -- as the president of MyPillow at the
23     time, did you approve of having the MyPillow
24     logo displayed on the March for Trump bus?
25 A.  No.

Page 54

1  Q.  Do you know whether the board approved the my
2      logo -- or the MyPillow logo being placed on
3      the March for Trump bus?
4  A.  No.
5  Q.  Do you know whether -- or do you recall
6      whether the board ever discussed whether the
7      MyPillow logo would be placed there?
8  A.  I don't recall that ever being discussed.
9  Q.  Are you aware that Mr. Lindell also published
10     a series of documentaries in 2021 related to
11     voting machines and the outcome of the 2020
12     presidential election?
13 A.  Yes.
14 Q.  And the first documentary was called
15     Absolute Proof; is that correct?
16 A.  Yes.
17 Q.  And have you watched Absolute Proof before?
18 A.  No.
19 Q.  I'm going to play just a short clip here of
20     the beginning of the documentary called
21     Absolute Proof.
22         Oh, and my colleague is asking if we
23     can go off just very quickly so she can
24     upload the video and then we'll play it.
25         THE VIDEOGRAPHER:  We are now off

Page 55

1      the record.  The time is 2:23 p.m.
2          (Recess.)
3          THE VIDEOGRAPHER:  We are back on
4      the record.  The time is 2:24 p.m.
5  BY MR. FREY:
6  Q.  Okay, Mr. Furlong, my colleague has shared
7      her screen and is going to play a clip from
8      the Absolute Proof documentary.  This was
9      previously marked as an exhibit in this case.
10         (Exhibit 669 introduced.)
11         (Video playing.)
12         MIKE LINDELL:  "Hello everyone.
13     This is Mike Lindell, the CEO of MyPillow.
14     As you all know, I have been attacked the
15     last month relentlessly on social media, by
16     newspapers, by TV shows, by you name it, I've
17     been attacked."
18         (Video stopped.)
19 BY MR. FREY:
20 Q.  Mr. Furlong, do you recognize Mr. Lindell
21     there?
22 A.  Yes.
23 Q.  And Mr. Lindell identifies himself as the CEO
24     of MyPillow at the start of that clip,
25     correct?

Page 56

1  A.  Yes.
2  Q.  Then I want to play for you one more clip
3      from -- from the documentary itself which was
4      previously marked as an exhibit in this case.
5          (Exhibit 672 marked.)
6          (Video playing.)
7          MIKE LINDELL:  -- "opinion this is
8      an attack by other countries, a foreign -- of
9      foreign countries; is what you're saying
10     then?"
11         UNIDENTIFIED SPEAKER:  "I believe
12     from what I've seen and the witnesses that
13     I've talked to that this is a -- a coup that
14     definitely involved elements inside our own
15     country and inside our own federal
16     government, definitely -- definitely part of
17     the coup that was aided and abetted by a
18     foreign threat nation state, a peer enemy
19     nation state, China."
20         MIKE LINDELL:  "Do you believe
21     that this attack from other countries could
22     not have happened without people here,
23     domestic people, domestic traders basically?"
24         UNIDENTIFIED SPEAKER:  "Yeah, I
25     believe that.  Again, we have affidavits of

JAMES M. FURLONG                                           June 19, 2024
SMARTMATIC USA .V. LINDELL                                      57—60

Page 57

1    CIA and state department personnel out of the
2    Italian embassy participating in this coup.
3    We have a name, email and phone number of a
4    senior DOJ official from a -- from a U.S.
5    attorney that said that this individual was
6    shutting down any DOJ or FBI investigation
7    into any election -- any election-related
8    investigation and trying to shut down
9    judicial cases, court cases.  So from inside
10   our own DOJ, people were shutting down active
11   investigations.
12        "You wonder why, you know, Mr. Barr
13   didn't find or see any evidence of widespread
14   election fraud, is because the FBI never did
15   anything other than to impede investigations
16   into election fraud.
17        "The FBI went to question truck
18   drivers who delivered ballots and created
19   affidavits.  They were harassing, you know,
20   the Americans, you know, the patriotic
21   Americans who were -- who were whistleblowers
22   and prosecuting them.
23        "Mike, you mentioned something
24   earlier is the machines, the ES&S and
25   Dominion machines.  If you look at, you know,

Page 58

1    military planning factors, there are critical
2    capabilities.  Capability is what you have to
3    have to execute your mission or the enemy has
4    to have to execute its mission successfully.
5        "So critical capability for any of
6    this to happen are the inherent
7    vulnerabilities that were built into ES&S and
8    Dominion software, which is, you know, again
9    we've proven through our work that this is
10   all related directly back to the soft --
11   Smartmatic -- Smartmatic -- SGO Smartmatic
12   software Core, and they definitely had
13   financial gains to -- financial reasons,
14   based on some of the other investments that
15   they've made, especially the -- you know,
16   looking down the road, if they make billions
17   and billions of dollars, the board of SGO
18   Smartmatic, because they own an air
19   purification company.
20        "So just think about it.  If you get
21   to pick an administration that is favorable
22   to your company, say, and they pass a green
23   new deal and you're going to make billions
24   and billions of dollars off of
25   government-mandated air purification systems

Page 59

1    in public buildings and apartment buildings
2    and industrial complexes, you know, you would
3    spend quite a bit of money on the front side
4    to make sure the election was" --
5        (Video stopped.)
6    BY MR. FREY:
7    Q.  Okay, Mr. Furlong, that was a clip from the
8        Absolute Proof documentary.
9            As president of MyPillow at the time
10       that this documentary was published, were you
11       aware that Mr. Lindell and his guests would
12       tie Smartmatic to the alleged rigging of the
13       2020 U.S. election?
14           MR. KACHOUROFF:  Objection to
15       form.
16           You can answer it, if you know.
17           THE WITNESS:  Would you repeat
18       that?  I'm sorry.
19   BY MR. FREY:
20   Q.  Sure.  As president of MyPillow at the time
21       this documentary was published, were you
22       aware that Mr. Lindell and his guests would
23       be tying Smartmatic to the rigging or the
24       alleged rigging of the 2020 U.S. election?
25   A.  No.

Page 60

1            MR. KACHOUROFF:  Same objection.
2    BY MR. FREY:
3    Q.  Do you agree with Mr. Lindell and his guests
4        making these accusations against Smartmatic
5        in connection with the alleged rigging of the
6        2020 U.S. election?
7    A.  No.
8            MR. KACHOUROFF:  Objection to
9        form, also relevance.
10   BY MR. FREY:
11   Q.  And as president of MyPillow at the time this
12       documentary was published, did you take any
13       actions to stop Mr. Lindell from publishing
14       documentaries tying -- or allegedly tying
15       Smartmatic to the rigging of the 2020 U.S.
16       election?
17   A.  No.
18   Q.  And are you aware of the board of MyPillow --
19       as a member of the board of directors of
20       MyPillow, are you aware of whether the board
21       took any actions to stop Mr. Lindell --
22   A.  No.
23   Q.  -- in these activities?
24   A.  No.
25           THE COURT REPORTER:  I'm sorry,

JAMES M. FURLONG                                                    June 19, 2024
SMARTMATIC USA .V. LINDELL                                         61-64

Page 61

1    Tim, the end of that question cut out.
2            MR. FREY:  Engaging in any of
3    these activities.
4            THE COURT REPORTER:  Thank you.
5    BY MR. FREY:
6    Q.  Mr. Furlong, were you aware that in addition
7        to publishing Absolute Proof, Mr. Lindell
8        also appeared on a number of podcasts to
9        promote the documentary?
10   A.  Am I aware that he did that?
11   Q.  Yes.
12   A.  No, I was not.
13   Q.  So I'm assuming, then, you were also not
14       aware that during these appearances,
15       Mr. Lindell would also promote MyPillow
16       products and offer promo codes to purchase
17       MyPillow products?
18   A.  No.
19   Q.  And do you agree with Mr. Lindell's actions
20       to simultaneously broadcast MyPillow promo
21       codes and promote MyPillow products while
22       promoting documentaries claiming that the
23       2020 election was rigged?
24   A.  No.
25   Q.  And did you do anything, as president of

Page 62

1    MyPillow, to stop Mr. Lindell from
2    simultaneously broadcasting MyPillow promo
3    codes promoting MyPillow products at the same
4    time he was promoting the documentaries
5    claiming that the 2020 U.S. election was
6    rigged?
7    A.  No.
8    Q.  As a member of the board of directors of
9        MyPillow, Inc., at the time these broadcasts
10       were aired, are you aware of any board action
11       to stop Mr. Lindell from simultaneously
12       promoting MyPillow products and promoting
13       documentaries claiming that the 2020 U.S.
14       election was rigged?
15   A.  No.
16   Q.  Are you familiar with the cyber symposium
17       that Mr. Lindell hosted in Sioux Falls,
18       South Dakota in August of 2021?
19   A.  Yes.
20   Q.  Did you assist at all with any planning or
21       preparation for the cyber symposium?
22   A.  No.
23   Q.  Do you know of any MyPillow employees who
24       assisted with the planning or preparation for
25       the cyber symposium?

Page 63

1    A.  No.
2    Q.  Do you know of any MyPillow employees who
3        helped promote the cyber symposium?
4    A.  No.
5    Q.  Did you yourself attend the cyber symposium?
6    A.  No.
7    Q.  Were you aware that Mr. Lindell promoted
8        MyPillow products and promo codes during and
9        in advance of the cyber symposium?
10   A.  No.
11   Q.  Do you agree with the promotion of MyPillow
12       products and promo codes during and in
13       advance of the cyber symposium in connection
14       with the cyber symposium?
15   A.  No.
16   Q.  As you're not aware of it, I'm going to just
17       show you one document that demonstrates the
18       linking by Mr. Lindell of the cyber symposium
19       to MyPillow products.  My colleague will
20       place into the chat for you what was
21       previously marked as Exhibit 661.
22   A.  Okay, I got it.
23   Q.  And do you see here this is -- this is a
24       Page Vault, so this is an online tool that
25       captures web pages.  And so this is a

Page 64

1    Page Vault of the mypillow.com/frankspeech
2    website introducing a flash sale.
3            Do you see that?
4    A.  Yes.
5            MR. KACHOUROFF:  Objection.
6    Objection to form.
7            MR. FREY:  What's your objection,
8    Chris?
9            Oh, Chris, I think you might be
10   muted.
11           MR. KACHOUROFF:  Actually, I am.
12   Sorry about that.  I was objecting to form.
13   And I just need a second to pull up the right
14   page.
15           MR. FREY:  Yep.
16           MR. KACHOUROFF:  I'll start my
17   video so you can see me.
18   BY MR. FREY:
19   Q.  Mr. Furlong, do you see in the upper
20       left-hand corner there's a MyPillow logo?
21   A.  Yes.
22   Q.  And then do you see down at the bottom of the
23       page it says, "Capture URL
24       https://www.mypillow.com/frankspeech"?
25   A.  Yes.

JAMES M. FURLONG                                      June 19, 2024
SMARTMATIC USA .V. LINDELL                            65—68

Page 65

1  Q.  Do you recognize this as a landing page from
2      the MyPillow website?
3  A.  No.
4  Q.  Do you visit the MyPillow website?
5  A.  No.  Well, I do sometimes.  I used to just
6      because of prices and things of that nature.
7      But other than that, I didn't visit it much.
8  Q.  Do you have any reason to doubt that this is
9      a capture of the landing page from the
10     MyPillow website?
11 A.  No.
12 Q.  So you see there under the picture of
13     Mr. Lindell it reads, "Hello, I'm
14     Mike Lindell.  I'm coming to you with the
15     most important commercial that I have ever
16     done.  All of you know what MyPillow and
17     myself have gone through in the last five
18     months for my efforts to bring the truth
19     forward."
20         Do you see that?
21 A.  Yes.
22 Q.  He then says, "I'm having a cyber symposium
23     on August 10th, 11th and 12th.  This
24     historical event will be livestreamed 72
25     hours straight on my new platform

Page 66

1      frankspeech.com.  You can help by getting
2      everybody you know to go to frankspeech.com
3      now."
4          Do you see that?
5  A.  Yes.
6  Q.  And then he says, "To help support the cyber
7      symposium event, I am offering some of the
8      best prices ever on MyPillow products, but
9      they're only offered on frankspeech.com.  Go
10     to frankspeech.com now to receive these
11     exclusive MyPillow offers."
12         Do you see that?
13 A.  Yes.
14 Q.  Okay.  So, essentially, here Mr. Lindell is
15     telling viewers to support the cyber
16     symposium by buying MyPillow products, right?
17 A.  Yes.
18 Q.  And do you agree with Mr. Lindell's decision
19     to promote MyPillow products and promo codes
20     in connection with the hosting of the cyber
21     symposium?
22 A.  Yes.
23             MR. KACHOUROFF:  I don't
24     understand.  Objection to form.  I didn't
25     understand the question.  Can you repeat it?

Page 67

1             MR. FREY:  Sure.  Yes.
2  BY MR. FREY:
3  Q.  I said as the former president of MyPillow
4      and a board member of MyPillow, do you agree
5      with Mr. Lindell's decision to promote
6      MyPillow products in connection with the
7      hosting of the cyber symposium?
8             THE WITNESS:  Thank you, Chris.
9          I -- I did not understand your
10     question.  No, I do not approve.
11         Thanks.
12 BY MR. FREY:
13 Q.  And did you -- did you take any action, as
14     president of MyPillow, to stop Mr. Lindell
15     from promoting MyPillow products in
16     connection with the hosting of the cyber
17     symposium?
18 A.  I took no action.
19 Q.  And as a director of the board of directors
20     of MyPillow, are you aware of any MyPillow
21     board members taking any actions to stop
22     Mr. Lindell from promoting MyPillow products
23     in connection with the cyber symposium?
24 A.  No.
25 Q.  And on this document you see that the landing

Page 68

1      page is frankspeech.com.  I think you said
2      earlier you're aware of the website called
3      FrankSpeech?
4  A.  Yes.
5  Q.  What is FrankSpeech?
6  A.  I believe it's Mike's network for promoting
7      his views.
8  Q.  Do you yourself subscribe to FrankSpeech?
9  A.  No.
10 Q.  Do you know whether you've ever received any
11     emails from FrankSpeech?
12 A.  I blocked them.
13 Q.  So you were signed up for it, but you blocked
14     the emails?
15 A.  I'm not sure that I was signed up for it.  I
16     may have just been -- you know, because of my
17     email address being MyPillow, it may have
18     just been, you know, added.
19 Q.  So were MyPillow email accounts just added to
20     the server -- or the mail server for
21     FrankSpeech?
22 A.  Yeah, I do not recall signing up for it.  I'm
23     just assuming that.
24 Q.  If I represent to you that we have emails
25     that were produced by MyPillow where your

JAMES M. FURLONG                                    June 19, 2024
SMARTMATIC USA .V. LINDELL                          69–72

Page 69

1    email address receives FrankSpeech email
2    blasts, would you have any reason to dispute
3    that?
4    A. No, I do not.
5    Q. But you're telling me that but you don't read
6    them, because you block them?
7    A. I block FrankSpeech, yes.
8    Q. Did you yourself participate in any capacity
9    in the planning or development of
10   FrankSpeech?
11   A. No.
12   Q. Have you discussed FrankSpeech with
13   Mr. Lindell?
14   A. No.
15   Q. Are you aware of the kinds of videos that are
16   published on FrankSpeech?
17   A. No.
18   Q. Are you aware -- strike that.
19       Do you have any reason to doubt that
20   the videos published on FrankSpeech include
21   the documentaries published by Mr. Lindell
22   regarding alleged voting machine fraud in the
23   2020 U.S. election?
24   A. I have no doubt that they do.
25   Q. And do you have any reason to doubt that

Page 70

1    MyPillow products are often also promoted in
2    the videos posted to FrankSpeech?
3    A. You're asking me to assume that. You know, I
4    mean, I don't watch FrankSpeech, I don't
5    watch any of it, so I don't know what goes on
6    on it, so I can't really give you a truthful
7    yes or no.
8    Q. And that's partially because you've chosen to
9    block the FrankSpeech emails from coming into
10   your email account, correct?
11   A. Correct.
12   Q. In 2020 and 2021 -- or, I guess, strike that.
13       In 2021 as president of MyPillow and
14   a member of the board of directors, did you
15   participate in any discussions regarding
16   FrankSpeech?
17   A. No.
18   Q. I want to look at one set of boards minutes
19   that I mentioned earlier. My colleague will
20   drop these in the chat. This was previously
21   marked as Exhibit 666. For the record, the
22   Bates label is DEF11273862.
23       Let me know when you have that,
24   Mr. Furlong.
25   A. I got it.

Page 71

1    Q. Do you see that this is titled, MyPillow
2    Board Meeting, 10/5/2021?
3    A. Yes.
4    Q. Do you recognize this document as minutes of
5    a MyPillow board meeting?
6    A. Yes.
7    Q. Have you seen these minutes before?
8    A. Yes.
9    Q. And were you present at this meeting on
10   October 5th, 2021?
11   A. Yes.
12   Q. I want to look at the second page here of
13   this -- of these minutes under, Chairman's
14   Report.
15   A. Okay.
16   Q. About four lines down under the chairman's
17   report -- and the chairman is Mr. Lindell,
18   correct?
19   A. Yes.
20   Q. And so would it be typical at a board meeting
21   for him to kind of give an update to the
22   board on what was going on with the business?
23   A. Yes.
24   Q. And do you see four lines down it says,
25   "Discussed FrankSpeech and how revenue will

Page 72

1    be coming from there as having them advertise
2    MyPillow products"?
3    A. Yes.
4    Q. Does that refresh your recollection at all as
5    to whether the board of directors of MyPillow
6    discussed promoting MyPillow products on
7    FrankSpeech?
8    A. Yes.
9    Q. What, if anything, now do you recall about
10   that discussion?
11   A. Well, obviously it's there. I don't recall
12   it happening, but it's in the minutes.
13   Q. Do you know whether any board members
14   objected to having FrankSpeech advertise
15   MyPillow products?
16   A. I don't recall.
17   Q. Are you aware of any board members taking any
18   actions or raising any objections to having
19   FrankSpeech advertise MyPillow products?
20   A. I don't recall.
21   Q. Do you have any reason to believe that any
22   objections were raised?
23   A. I doubt it.
24   Q. And why is that?
25   A. Again, I think the important thing is that,

Page 73

1    you know, Mike owns 51 percent of the
2    company, and what he decides to do is going
3    to happen unless there is some serious
4    objection to it.
5              And there are times -- you know, I
6    think I stated before, the board members all
7    depend on Mike for their checks.  And so if
8    somebody disapproved, they have to take that
9    into account.  Most of them just shut up and
10   let it go.
11   Q.  And does this refresh your recollection at
12   all regarding whether there were any
13   contracts entered into that were approved by
14   the board between FrankSpeech and MyPillow?
15   A.  There were none.  Between the board.  There
16   were no contracts presented to the board.
17   Q.  I want to just look at one -- one document
18   that FrankSpeech published.  And this was
19   previously marked.
20            MR. FREY:  It was not previously
21   marked?  Oh, that's right.  I'm sorry.
22            This will be a new exhibit.  This
23   will be Exhibit 668.
24            (Exhibit 668 marked.)
25   BY MR. FREY:

Page 74

1    Q.  It should be coming up shortly.
2    A.  Oh, it's not there yet.
3    Q.  Do you have that?
4    A.  There it is.  Got it.
5    Q.  Okay.  And for the record, this is
6    Bates-stamped DEF026575.00001.
7              Do you see at the top there this is
8    an email from FrankSpeech to
9    jim@mypillow.com?
10   A.  Yes.
11   Q.  And is jim@mypillow.com your email address?
12   A.  Yes.
13   Q.  And the document says, "Hello from
14   Mike Lindell.  I have exciting news.  Do you
15   know who Dennis Montgomery is?"
16            Do you see that?
17   A.  Yeah.
18   Q.  And, Mr. Furlong, do you know who
19   Dennis Montgomery is?
20   A.  Yes.
21   Q.  Who is Dennis Montgomery?
22   A.  -- I've not met him.
23   Q.  I'm sorry, I couldn't hear you there for a
24   second.
25   A.  Sorry.  I know of him.  I have never met him.

Page 75

1    Q.  Okay.  What do you know of him?
2    A.  He's a well-known fraudster.
3    Q.  Have you discussed Dennis Montgomery with
4    Mr. Lindell at any point in time?
5    A.  No.
6    Q.  If you see the fourth paragraph, it says,
7    "Montgomery's information will be the final
8    nail in the coffin for the proof that
9    electronic voting machines are stealing your
10   voice."
11            Do you see that?
12   A.  Yes.
13   Q.  Have you ever seen this Dennis Montgomery
14   information?
15   A.  No.
16   Q.  Are you aware of the board of MyPillow ever
17   reviewing the Dennis Montgomery information?
18   A.  They did not.
19   Q.  If you turn to -- or go to page 2 with the --
20   in the second paragraph, it says, "Every
21   dollar you donate is spent on our legal
22   team's efforts to uncover the truth behind
23   electronic voting machines and the corrupt
24   outcome of the 2020 presidential election and
25   all subsequent elections since."

Page 76

1            Do you see that?
2    A.  Yes.
3    Q.  It goes on to say, "We are funding lawsuits
4    and strategic legal injunctions, as well as
5    going on the offensive for everyday Americans
6    who have been targeted by Dominion and
7    Smartmatic."
8            Do you see that?
9    A.  Yes.
10   Q.  And this was published by frankspeech.com,
11   Mr. Lindell's website, correct?
12   A.  Correct.
13   Q.  And this FrankSpeech is what we looked at in
14   the last exhibit as having sharing revenue
15   and advertising MyPillow products, correct?
16   A.  That's what it said.
17   Q.  And you were present at this board meeting,
18   right?
19   A.  I do not recall that happening, but I was in
20   the board meeting.
21   Q.  And do you have any reason to doubt that the
22   minutes of the board meeting would be
23   inaccurate?
24   A.  No.
25   Q.  Mr. Furlong, during your tenure on the board

JAMES M. FURLONG                                    June 19, 2024
SMARTMATIC USA .V. LINDELL                          77—80

Page 77
1  of directors of MyPillow since the 2020
2  election, do you recall any board discussions
3  regarding Mr. Lindell's public statements
4  about alleged election fraud or Smartmatic's
5  role in that election?
6  A. No.
7  Q. Is it true, then, that at no point in time
8  the MyPillow board made any attempt to
9  distance MyPillow from Mr. Lindell's
10  allegations of election fraud and
11  Smartmatic's involvement in alleged election
12  fraud?
13  A. No.
14        MR. KACHOUROFF: Objection to
15  form.
16  BY MR. FREY:
17  Q. I'm sorry, my question was maybe a little too
18  long, so I'll re -- I'll rephrase it.
19        My question was: At any point in
20  time, has the MyPillow board made any attempt
21  to distance MyPillow from Mr. Lindell's
22  allegations of election fraud and/or
23  Smartmatic's alleged involvement in election
24  fraud?
25  A. No.

Page 78
1        MR. KACHOUROFF: Objection to
2  form. Same objection.
3        MR. FREY: Mr. Furlong, give me
4  five minutes to look over my notes and then
5  we might be -- at least I might be done for
6  today.
7        THE WITNESS: Okay.
8        THE VIDEOGRAPHER: Do you want to
9  go off the record, Mr. Frey?
10        MR. FREY: Yes, please.
11        THE VIDEOGRAPHER: We are now off
12  the record. The time is 2:54 p.m.
13        (Recess.)
14        THE VIDEOGRAPHER: We are back on
15  the record. The time is 2:59 p.m.
16  BY MR. FREY:
17  Q. Good afternoon, Mr. Furlong. I just have a
18  handful more questions for you, okay?
19  A. Okay.
20  Q. And as a predicate to my questions, I'll
21  represent to you that February 5th, 2021, is
22  the date Mr. Lindell published the
23  Absolute Proof documentary, okay?
24  A. Okay.
25        MR. KACHOUROFF: We'll stipulate

Page 79
1  to that.
2  BY MR. FREY:
3  Q. As of February 5th, 2021, you understood that
4  Smartmatic voting machines did not change
5  votes cast for Donald Trump to votes for
6  Joe Biden, correct?
7  A. Correct.
8  Q. As of February 5th --
9        THE COURT REPORTER: I'm sorry,
10  Chris, I saw your lips moving, but we
11  couldn't hear you.
12        MR. KACHOUROFF: I pushed the mute
13  button. I muted myself when I said it. I
14  was objecting to form of the last question.
15  BY MR. FREY:
16  Q. As of February 5th, 2021, you understood that
17  Smartmatic voting machines did not inflate
18  the number of votes cast for Joe Biden,
19  correct?
20        MR. KACHOUROFF: Same -- same
21  objection.
22        THE WITNESS: Yes.
23  BY MR. FREY:
24  Q. As of February 5th, 2021, you understood that
25  Smartmatic voting machines did not deflate

Page 80
1  the number of votes cast for Donald Trump,
2  correct?
3        MR. KACHOUROFF: Same objection.
4        THE WITNESS: Correct, yes.
5  BY MR. FREY:
6  Q. As of February 5th, 2021, you understood that
7  Smartmatic's software did not change votes
8  cast for Donald Trump to votes for Joe Biden,
9  correct?
10  A. Yes.
11  Q. Are you aware of any evidence that Smartmatic
12  or Smartmatic software rigged the
13  November 2020 U.S. election?
14  A. No.
15  Q. Are you aware of any evidence that Smartmatic
16  or its software has or had any relationship
17  with Dominion?
18  A. No.
19        MR. FREY: I have no further
20  questions, Mr. Furlong. Thank you.
21        MR. KACHOUROFF: I have just a few
22  brief follow-up questions.
23
24        EXAMINATION
25  BY MR. KACHOUROFF:

Page 81

1  Q.  Mr. Furlong, did you know who Smartmatic was
2      prior to coming to this deposition?
3  A.  Yes.
4  Q.  And how did you know who they were?
5  A.  The name has been in the news.
6  Q.  Did you look them up on the web?
7  A.  No.
8  Q.  Do you know what products they create?
9  A.  No, other than voting machines.
10 Q.  Do you know who their customers are?
11 A.  Various government agencies.
12 Q.  And you know Mike's campaign is to get rid of
13     the machines, correct?
14 A.  Yes.
15 Q.  He does not like election machines counting
16     votes?
17 A.  Correct.
18 Q.  Are you aware that Smartmatic was only in one
19     county in the entire United States, that's
20     L.A. County --
21 A.  No.
22 Q.  -- during the 2020 election?
23 A.  No.
24 Q.  Are you aware that the L.A. County, the
25     county that Smartmatic created its election

Page 82

1      software and platforms for, are you aware
2      that voter information, sensitive voter
3      information was stored on Chinese communist
4      servers?
5          MR. FREY:  Object to form, object
6      to foundation.
7          THE WITNESS:  No.
8  BY MR. KACHOUROFF:
9  Q.  Do you know -- you've known Mike for all
10     these years.  We've heard all this discussion
11     about Mike this, Mike that.  Do you know Mike
12     to be a liar?
13 A.  No.
14 Q.  Do you believe that Mike believes that the
15     statements that he is making are true?
16         MR. FREY:  Object to form.
17         THE WITNESS:  Yes.
18 BY MR. KACHOUROFF:
19 Q.  You disagree with him on politics, though,
20     correct?
21 A.  Yes.
22         MR. KACHOUROFF:  Nothing further.
23         MR. FREY:  Just one second,
24     Mr. Furlong.
25         Just one question, Mr. Furlong.

Page 83

1          FURTHER EXAMINATION
2  BY MR. FREY:
3  Q.  Are you aware of any evidence that
4      L.A. County voter information is stored on
5      Chinese communist servers?
6  A.  No.
7          MR. FREY:  No further questions.
8          MR. KACHOUROFF:  Great.  Thanks
9      guys.
10         THE VIDEOGRAPHER:  Before we go
11     off the record, Mr. Kachouroff, would you
12     like a copy of the video today?
13         THE WITNESS:  No.  As much as I'd
14     like to see Mr. Furlong's face, and maybe
15     even in person, no, I don't need to see the
16     video.
17         THE VIDEOGRAPHER:  And the
18     transcript?
19         MR. KACHOUROFF:  Miniscript,
20     please.
21         THE VIDEOGRAPHER:  Okay.  Thank
22     you.
23         Ms. Larson, do you have anything else
24     before I take us off?
25         THE COURT REPORTER:  No, I don't.

Page 84

1  Thank you.
2          THE VIDEOGRAPHER:  We are now off
3  the record.  The time is 3:04 p.m.
4          (Deposition concluded 3:04 p.m.)

Page 85

1        REPORTER'S CERTIFICATE

2        Be it known that I took the foregoing

3    videotaped deposition of James M. Furlong,

4    on June 19, 2024;

5        That I was then and there a Registered

6    Professional Reporter and a Notary Public,

7    and that by virtue thereof, I was duly authorized

8    to administer an oath;

9        That the witness was by me first duly

10   sworn to testify to the truth, the whole truth and

11   nothing but the truth relative to said cause;

12       That the foregoing transcript is a true

13   and correct transcript of my stenographic notes in

14   said matter;

15       That I am not related to any of the

16   parties hereto, nor interested in the outcome of

17   the action;

18       WITNESS MY HAND AND SEAL the 21st day of June,

19   2024.

20       _____

         Amy L. Larson, RPR

21       My Commission Expires 01/31/25

22

23

24

25