# Exhibit C

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MINNESOTA
 3    _____
 4    SMARTMATIC USA CORP,      )Case No.
                                )22-cv-98-JMB-JFD
 5    et al.,                   )
                                )
 6       Plaintiffs             )
                                )
 7    vs.                       )
                                )
 8    LINDELL, et al.,          )
                                )
 9       Defendants.            )
      _____
10
11
12
13          Remote Videotaped Deposition of
14                  ROBERT BOWES
15                 August 6, 2024
16                 9:32 a.m. CT
17
18
19
20
21    Reported by:  Bonnie L. Russo
22    Job No. J11561326
```

**Page 2**

```
 1    Remote Videotaped Deposition of Robert Bowes
 2    held through:
 3
 4
 5
 6          Esquire Deposition Solutions
 7          1717 K Street, N.W.
 8          Washington, D.C.
 9
10
11
12
13
14
15
16
17
18    Pursuant to Notice, when were present on behalf
19    of the respective parties:
20
21
22
```

**Page 3**

```
 1    APPEARANCES:
 2    On behalf of the Plaintiffs:
 3       CHRISTOPHER LETKEWICZ, ESQUIRE
 4       JANE MOYE-ROWLEY, ESQUIRE
 5       BENESCH FRIEDLANDER COPLAN & ARONOFF
 6       71 South Wacker Drive, Suite 1600
 7       Chicago, Illinois 60606
 8       cletkewicz@beneschlaw.com
 9       jmoye-rowley@beneschlaw.com
10
11    On behalf of the Defendants:
12       CHRISTOPHER KACHOUROFF, ESQUIRE
13       McSWEENEY CYNKAR & KACHOUROFF, PLLC
14       13649 Office Pl, Suite 101
15       Woodbridge, Virginia 22192
16       chris@mck-lawyers.com
17
18    Also Present:
19    Don Savoy, Videographer
20
21
22
```

**Page 4**

```
 1                C O N T E N T S
 2    EXAMINATION OF ROBERT BOWES              PAGE
 3    BY MR. LETKEWICZ                          8
 4
 5
 6
 7                  EXHIBITS
 8
 9    Exhibit 673 Expert Report by            14
                  Donald A. Gorowsky
10                9-22-23
11    Exhibit 674 Defendants' Expert          17
                  Rebuttal Report of
12                Robert Bowes
                  7-9-24
13
14    Exhibit 675 Native Messages            20
                  DEF079498.000001-004
15    Exhibit 676 Smartmatic USA Corp        166
                  Financial Statements
16                Year Ended December 31, 2021
                  SMARTMATIC-LINDELL05358530-560
17
18    Exhibit 677 Smartmatic USA Corp        181
                  Financial Statements
                  December 31, 2020 and 2019
19                SMARTMATIC-LINDELL05062317-343
20    Exhibit 678 Smartmatic USA Corp        183
                  Financial Statements
21                Year Ended December 31, 2022
                  SMARTMATIC-LINDELL05358499-529
22
```



Page 5

1   EXHIBITS (CONTINUED):
2   Exhibit 679 Article entitled          193
              "Smartmatic to Shed
3             U.S. Unit, End Probe Into
              Venezuelan Links"
4             12-22-06
5   Exhibit 680 Article entitled          197
              "Smartmatic defeats patent
6             lawsuit from voting machine
              rival ES&S"
7             4-25-23
8   Exhibit 681 Excerpt of Judgment       197
              Election Systems & Software,
9             LLC vs. Smartmatic USA Corp.
              4-23-23
10
    Exhibit 682 News Releases            203
11            10-4-22
12  Exhibit 683 IAS 38                  216
              Intangible Assets
13
    Exhibit 684 Forensic & Valuation Services  225
14            Practice Aid
              Calculating Lost Profits
15
    Exhibit 685 Plaintiffs' Sixth       240
16            Supplemental Answers and
              Objections to Defendant
17            My Pillow, Inc.'s First
              Set of Interrogatories
18
    Exhibit 686 Expert Rebuttal Report of  276
19            Christopher James
              7-9-23
20
    Exhibit 687 First Supplemental Complaint  287
21            and Demand for Jury Trial
22

Page 6

1   EXHIBITS (CONTINUED):
2   Exhibit 688 Exhibit 106             304
              Article entitled "Scientists
3             say no credible evidence of
              computer fraud in the 2020
4             election outcome, but
              policymakers must work with
5             experts to improve confidence"
              11-16-20
6
    Exhibit 689 Article entitled        315
7             "Filipinos use election
              technology to cast 1.6B votes
8             for 18K positions"
              5-10-22
9
    Exhibit 690 Text Messages           324
10            11-1-23
11  Exhibit 691 Text Messages           327
12
13
14
15
16
17
18
19
20
21
22  (Exhibits bound separately.)

Page 7

1            P R O C E E D I N G S
2            (9:32 a.m. CT)
3
4            THE VIDEOGRAPHER:  We are now on
5   the record.  The time is 9:32 a.m. Central
6   Time.  Today is August the 6th of 2024.
7            This begins the videoconference
8   deposition of Robert Bowes.  The case is
9   Smartmatic USA Corporation, et al., versus
10  Lindell, et al.
11           My name is Don Savoy.  I am the
12  remote videographer today.  The court reporter
13  is Bonnie Russo.  We are representing Esquire
14  Deposition Solutions.
15           Counsel, please state your name and
16  whom you represent, after which the court
17  reporter will swear in the witness.
18           MR. LETKEWICZ:  Good morning.  Chris
19  Letkewicz on behalf of the Smartmatic
20  plaintiffs.
21           MS. MOYE-ROWLEY:  Jane Moye-Rowley
22  on behalf of Smartmatic plaintiffs.

Page 8

1            THE VIDEOGRAPHER:  Sir, you're
2   muted.
3            MR. KACHOUROFF:  Sorry about that.
4            Christopher Kachouroff on behalf of
5   Michael Lindell and My Pillow.  Thank you.
6
7            ROBERT BOWES,
8   being first duly sworn, to tell the truth, the
9            whole truth, and nothing but the truth,
10           testified as follows:
11           MR. LETKEWICZ:  I heard an echo.
12
13      EXAMINATION BY COUNSEL FOR PLAINTIFFS
14      BY MR. LETKEWICZ:
15      Q.  All right.  Can you please state you
16  name for the record.
17      A.  Robert Bowes.
18      Q.  Have you been deposed before?
19      A.  Yes.
20      Q.  How many times?
21      A.  Maybe ten.
22      Q.  And when was the last time you were



Page 9

1  deposed?
2      A.   I can't recall specifically.  Say
3  several years ago.
4      Q.   All right.  Because it has been a
5  few years, I will go over some quick ground
6  rules with you.
7          I'm going to be asking a number of
8  questions.  It's important for you to let me
9  finish my question before you provide an answer
10  because the court reporter cannot take down
11  what's being said by two people at the same
12  time.
13          Do you understand that?
14      A.   Yes.
15      Q.   If I ask you a question that you
16  don't understand, do you agree to ask me to
17  clarify the question?
18      A.   I will.
19      Q.   If you answer a question, will it be
20  fair to say that you understood the question?
21      A.   Generally, yes.
22      Q.   If at any point today you need a

Page 10

1  break, that's no problem.  The only thing I
2  would ask is that if a question is pending,
3  that that question be answered before you take
4  a break.  Is that fair?
5      A.   Fair enough.
6      Q.   Okay.  Do you understand that you
7  are under oath today?
8      A.   I do.
9      Q.   Do you understand that it's the same
10  oath that you would take in a court of law?
11      A.   Yes.
12      Q.   Any reason you cannot testify fully
13  and truthfully today?
14      A.   No reason.
15      Q.   Because we are doing this deposition
16  virtually, I'm going to ask you a few
17  additional questions I would not normally ask
18  if we were in the same room.
19          Where are you located?
20      A.   Arlington, Virginia.
21      Q.   Is there anyone present with you
22  there?

Page 11

1      A.   My son is in the -- in the home.
2      Q.   But in the room, you're -- in the
3  deposition, no one else is with you in the
4  room?
5      A.   Correct.
6      Q.   Do you have your expert reports with
7  you?
8      A.   Yes, I do.
9      Q.   Other than your reports, do you have
10  any notes or documents in front of you?
11      A.    Some handwritten notes from some --
12  from some work papers.
13      MR. LETKEWICZ:  Okay.  Chris, if
14  those haven't already been produced, we ask
15  that those be produced during a break.
16      MR. KACHOUROFF:  Okay.
17      BY MR. LETKEWICZ:
18      Q.   All right.  And -- okay.
19          Other than the application for this
20  deposition, do you have any programs or
21  applications open?
22      A.   No.

Page 12

1      Q.   And are you currently in any kind of
2  electronic or other contact with anybody
3  outside of the room?
4      A.   No.
5      Q.   Do you agree to not be in such
6  contact with anyone, including counsel for Mr.
7  Lindell, while we are on the record, unless you
8  first tell me that you're doing so?
9      A.   So could you please clarify that.
10  If I receive a text from -- from someone, then
11  do I tell you that I am receiving I text or --
12  because I -- if it's, like, personal or
13  something, what do I do?
14      Q.   Yeah.  I mean, basically what I am
15  saying is that you're not going to look at your
16  phone or look at your text messages while we're
17  on the record.
18          Do you agree to do that?  Other than
19  answering my questions.
20      A.   So if -- if my son's mom has to text
21  me about something urgent, then you don't want
22  me to look at that; is that right?  I



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
13–16

Page 13

1  don't know if I can agree --
2      Q.   If it's urgent -- if it's urgent --
3          MR. KACHOUROFF:  Chris, I think we
4  can solve this.  Chris, no one is going to talk
5  to him during the deposition.  No one is going
6  to feed him information or questions.  He
7  stands or rises on the questions that you ask
8  him.  So he won't be talking to me.  He won't
9  be talking to anybody, but if he has a family
10 emergency in a text, he is going to answer the
11 text.
12         MR. LETKEWICZ:  That is totally
13 fine.  Okay.
14         BY MR. LETKEWICZ:
15     Q.   All right.  There are three
16 Smartmatic companies that are plaintiffs in
17 this case.  I will refer to them collectively
18 as Smartmatic for purposes of the deposition.
19 Is that okay with you?
20     A.   No.  Break them out, please.
21     Q.   Okay.
22     A.   Yeah.  They're -- they're different

Page 14

1  legal entities, right?  So when you blend them
2  together like that, it can be very confusing.
3      Q.   Here is what I'll do is if I use the
4  term "Smartmatic," I am referring to Smartmatic
5  USA, Smartmatic International B.V. and SGO
6  Corporation collectively.  If I am -- if my
7  question calls for a specific entity, I will
8  use that specific entity name.  Okay?
9      A.   Fair enough.  That's good.
10         MR. LETKEWICZ:  All right.  Can you
11 please put in the chat Tab 1, please, and this
12 will be marked as Plaintiffs' Exhibit 673.
13         (Deposition Exhibit 673 was marked
14 for identification.)
15         BY MR. LETKEWICZ:
16     Q.   And let me know when you have it.
17     A.   Where do I see the chat?
18     Q.   There is a chat -- if you look in
19 the middle -- it should be in the middle of
20 your Zoom.  There should be a button on the
21 bottom called chat.
22     A.   Got it.

Page 15

1      Q.   This is -- I'll just tell you that
2  Plaintiffs' Exhibit 673 is the September 22,
3  2023 report of Donald Gorowsky.  And I
4  understand that is one of the reports you have
5  in front of you, correct?
6      A.   I don't have it right in front of me
7  now, but I can.  Is this the PDF you just --
8  you just sent in the chat?
9      Q.   Correct.
10     A.   If I open that, I can -- then, yes,
11 it will be right in front of me.
12     Q.   Perfect.
13         Do you have it open in front of you
14 now?
15     A.   Yes.
16     Q.   All right.  I understand that you
17 have adopted the opinions and bases thereof in
18 Mr. Gorowsky's report; is that correct?
19     A.   That's correct.
20     Q.   Is all of the information in Mr.
21 Gorowsky's September 22nd report true and
22 correct to the best of your knowledge?

Page 16

1      A.   Yes.
2      Q.   To make things -- because you've
3  adopted Mr. Gorowsky's report, I will refer to
4  this report as your September 22nd report; is
5  that okay?
6      A.   As if it's mine?
7      Q.   Yes.
8      A.   I think that -- you know, that there
9  has been some additional discovery that has
10 come in since then.  So if you're trying anchor
11 something as a temporal base, I cannot agree to
12 that because my adoption report deals not only
13 with the Gorowsky report but it deals with
14 additional discovery and information that has
15 come out since that time.
16     Q.   All right.  Well, I will -- I will
17 then just refer to it then as Mr. Gorowsky's
18 September 22nd report.
19     A.   Okay.
20         MR. LETKEWICZ:  Put Tab 2 in the
21 chat, Jane.  And this will be marked as
22 Plaintiffs' Exhibit 674.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
17—20

Page 17

1        (Deposition Exhibit 674 was marked
2    for identification.)
3        BY MR. LETKEWICZ:
4    Q.    Do you have your report open?
5    A.    No.  Not yet.  So there is no -- I
6    can't download it.  It is not letting me do it.
7    I can't open it.
8    Q.    There should be a little arrow
9    button on 674.
10    A.    To the upper right of it?  No.
11    There was on 673, but it's not -- hold on.
12    There we go.
13    Q.    Okay.
14    A.    Okay.  Do you want me to open these
15    now, or are these --
16    Q.    Yeah.  Well, keep these two open.
17    So if you can open that one.
18    A.    Which one?
19    Q.    674.
20    A.    Okay.  It's open.
21    Q.    And Plaintiffs' Exhibit 674 is your
22    July 9, 2024 expert rebuttal report, correct?

Page 18

1    A.    Yes, it is.
2    Q.    And if you could go to Page 22 of
3    your report.
4    A.    I'm there.
5    Q.    Is that your signature?
6    A.    It is.
7    Q.    And is all the information in your
8    July 9 report true and correct to the best of
9    your knowledge?
10    A.    Yes.
11    Q.    When were you first contacted about
12    potentially serving as an expert in this case?
13    A.    Wow.  I think April maybe, April
14    2024.
15    Q.    Who contacted you?
16    A.    Chris Kachouroff.
17    Q.    Have you previously worked with Mr.
18    Kachouroff prior to this case.
19    A.    Not in a -- not in a -- I'm not sure
20    actually.  I'm not sure.  I -- I -- not on this
21    matter certainly.
22    Q.    Well, I know, but I mean, in

Page 19

1    other -- has Mr. Kachouroff retained you in
2    other cases other than this one?
3    A.    No.  No.
4    Q.    When were you formally retained in
5    this matter?
6    A.    I think it was in June -- May or
7    June.  I can't remember exactly when.  I think
8    May or June.
9    Q.    And you were retained by both
10    Michael Lindell and My Pillow, correct?
11    A.    That's right.
12    Q.    Prior to being retained in this
13    matter, you knew Mr. Lindell, correct?
14    A.    Yes, I did.
15    Q.    You had communicated with Mr.
16    Lindell prior to retention in this case,
17    correct?
18    A.    Yeah.  But not on this case, though.
19    I don't think I have talked with him about this
20    case.
21    Q.    You had notified Mr. Lindell --
22    started communication about upcoming President

Page 20

1    Trump rallies, correct?
2    A.    I don't -- I don't recall.
3    Q.    You had asked Mr. Lindell for his
4    support of an Arizona congressional candidate
5    Kathy Winn, correct?
6    A.    Yes.  Yes, I did.  That's right.
7        MR. LETKEWICZ:  If you could put Tab
8    13 in the chat, and this will be marked as
9    Plaintiffs' Exhibit 675.
10        (Deposition Exhibit 675 was marked
11    for identification.)
12        BY MR. LETKEWICZ:
13    Q.    And let me know when you have it
14    open, Mr. Bowes.
15    A.    Okay.  I have it open.
16    Q.    Okay.  So this has been produced by
17    defendants and Bates-stamped DEF079498, and if
18    we start at the top here, it begins:  "Hi,
19    Mike.  Robert Bowes here from Trump admin,
20    White House Policy Advisor, and HUD/FHA.  Hope
21    to see you in Anchorage."
22        Do you see that?



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
21–24

Page 21

1    A.    I do see that, yes.

2    Q.    And that was a text -- this is a
3    text you sent to Mr. Lindell, correct?

4    A.    I -- that sounds right.  It's
5    probably a text.

6    Q.    And this text is dated July 6th of
7    '22?

8    A.    I assume that's correct.

9    Q.    Do you recall how you received Mr.
10    Lindell's phone number?

11    A.    I do not.

12    Q.    If you go a couple of paragraphs
13    down, it says:  "I highly recommend Kathleen
14    Winn for congress running in Arizona 6th."

15        Do you see that?

16    A.    I do.

17    Q.    And then in the next paragraph, it
18    says:  "Kathleen Winn is the right choice for
19    congress.  She has my full support.  She was on
20    the forefront of fighting for election
21    integrity and uncovering fraud."

22        Do you see that?

Page 22

1    A.    I do.

2    Q.    Okay.  And if you can go to the next
3    page at the top, you text Mr. Lindell on July
4    11th of '22:  "Trump Arizona rally this
5    weekend," correct?

6    A.    I -- yes.

7    Q.    Okay.  And then a couple of texts
8    down, you write:  "Not yet on official DJT site
9    but soon.  Please endorse Kathleen Winn,
10    Arizona 6th, over the Ducey hack Juan" -- I'm
11    probably going to mispronounce this guy's
12    name -- "Ciscomani.  Great to see you in
13    Anchorage."

14        Do you see that?

15    A.    Yes.

16    Q.    And you had seen Mr. Lindell in
17    Anchorage, Alaska, correct?

18    A.    That's right.  Yes.

19    Q.    And then on the next page, there is
20    a photo with the text:  "Kari Lake endorses
21    Kathleen Winn, congress," correct?

22    A.    Yes.

Page 23

1    Q.    And Mr. Lindell responds:  "I give
2    her my full endorsement," correct?

3    A.    I see that.

4    Q.    Did Ms. Winn win her election in
5    2022?

6    A.    No.

7    Q.    You can go to Page 4.  About middle
8    of the page, there is a text from you on August
9    22, 2022 where you write:  "CVR hand delivered
10    to Arlington County, Virginia today.  Thank you
11    for the great summit," correct?

12    A.    I see that.

13    Q.    What are you referring to by "CVR
14    hand delivered to Arlington County, Virginia"?

15    A.    Cast vote record.  I walked it in
16    and handed it to the clerk of the Arlington
17    County elections department.

18    Q.    What is cast vote records?

19    A.    It's the -- it's the record that is
20    produced from -- from voting.  It is -- it's
21    the electronic record of the number of votes,
22    for whom individuals voted.

Page 24

1        It's -- it's a request -- this was a
2    request to -- to receive the cast vote record
3    from Arlington County.

4    Q.    And why were you requesting the cast
5    vote records from Arlington, Virginia?

6    A.    To compare those to the reported
7    results.

8    Q.    And why did you want to do that?

9    A.    To see if there were any gaps.

10    Q.    And was this part of any type of
11    investigation you were doing into election
12    fraud?

13    A.    Yes.  Just -- just my normal
14    curiosity about Arlington County.  It wasn't a
15    main focus, but we wanted to -- I wanted to see
16    if there were any gaps between the CVR and the
17    reported results.

18    Q.    And what -- and you also refer to in
19    your text to the great summit.  Do you recall
20    what summit you are referring to?

21    A.    I don't remember what summit it was.
22    It -- there are lots of summits.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
25–28

Page 25

1    Q.    Okay.  Was this a summit put on by
2  Mr. Lindell?
3    A.    I don't know.  He was in it, I
4  think.
5    Q.    Was this a summit relating to
6  election fraud?
7    A.    Oh, yeah.  I'm sure.  Many of them
8  were.
9    Q.    You are aware that Mr. Lindell has a
10  website called FrankSpeech, correct?
11    A.    I have heard of that.
12    Q.    You have appeared on shows that are
13  on FrankSpeech, correct?
14    A.    Probably one.  I don't know -- I
15  don't know what they rebroadcast.  I think I
16  was on one show directly, but I don't know what
17  they rebroadcast from other -- other sources.
18    Q.    And which one was that?
19    A.    Oh, wow.  Probably one from two or
20  three months ago related to Wisconsin.
21    Q.    Do you recall whose show that was?
22    A.    I think it was Conrad Reynolds as

Page 26

1  the host.
2    Q.    And what were you discussing
3  concerning Wisconsin?
4    A.    I can't recall -- recall, but it was
5  probably something about recalling the speaker
6  of the house there.  Might have been on Georgia
7  election fraud.  I'm not sure exactly.  There
8  are lots of -- lots of things on this.
9    Q.    Do you know when you first met Mr.
10  Lindell?
11    A.    Probably early 2022.
12    Q.    How did you meet Mr. Lindell?
13    A.    Oh, maybe at a -- I -- I -- the one
14  I remember is I did meet him -- speak with him
15  at a -- I guess probably a Trump rally.
16    Q.    And --
17    A.    Might -- actually, it might have
18  been in 2020 because there were -- I was White
19  House advance and doing -- you know, setting up
20  events when I was in the administration.  It
21  was sort of a side thing for me, and I may have
22  met him in 2020.  I -- I just don't -- I don't

Page 27

1  remember exactly.
2    Q.    You referenced White House advance.
3  What is White House advance?
4    A.    Oh, it's a group of people who are
5  the official representatives of the president
6  in -- in setting up the -- any -- any events
7  that the president participates in.  The
8  advance team works closely with the Secret
9  Service, with the site production, local law
10  enforcement, media, the event -- people
11  attending the event.  They basically run -- run
12  the events.  So White House advance is the --
13  is the -- you know, any administration has
14  advance people that represent the president of
15  the United States in setting up these events.
16    Q.    And at the time you met Mr. Lindell
17  and prior to your retention in this case, how
18  often did you speak with Mr. Lindell?
19    A.    Oh, very infrequently.  Rarely.
20    Q.    Prior to your retention in this
21  case, did you ever socialize with Mr. Lindell?
22    A.    I don't recall.  I don't -- I don't

Page 28

1  think anything socially.
2    Q.    Why did you decide to work on this
3  matter?
4    A.    So I heard -- I heard that Gorowsky
5  was resigning or wanted to be substituted, and
6  then -- and Chris Kachouroff knew that I had
7  financial expertise, had been an expert, and he
8  contacted me.
9        So I thought this is -- this sounds
10  good, and I looked into it, and it's -- seems
11  to be a really easy case.
12    Q.    And why do you say it's an easy
13  case?
14    A.    The -- the evidence -- financial --
15  financial evidence is pretty finite, and it --
16  it tells a -- it tells a really clean picture.
17    Q.    What is that clean picture?
18    A.    Wow.  That -- I guess I refer you to
19  my -- my -- my expert report because it would
20  take a long time to go through it.
21        But the clean picture is that --
22  that Smartmatic USA was struggling and that



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
29–32

Page 29

1  they -- that entity was just having very -- a
2  lot of difficulty getting off the ground, even
3  before 2020.
4       And then it just shows clearly in
5  the -- in the financial statements, it shows
6  that in the audit report, it shows that in the
7  e-mails records later -- that I looked at later
8  that they were -- they were struggling.
9       So that part is really an easy story
10 to tell, and I know people can -- can try to
11 get it wrong and try to make it seem to be
12 something different than it is, but in my mind,
13 it's pretty -- a pretty simple story.
14    Q.   You're aware that Mr. Lindell is
15 involved in litigation against Dominion and a
16 former Dominion employee, Eric Coomer, correct?
17    A.   I am not -- I am not -- I think I
18 know that Dominion sued Mike Lindell, but I
19 don't know anything about the Coomer or -- I
20 don't know all the details of that.
21    Q.   So you have not been retained as an
22 expert in either one of those cases?

Page 30

1  A.   I have not.
2  Q.   Okay.  So going to your July 9
3  report, did anyone assist you in putting
4  together your report?
5  A.   So my lawyer sent me stuff to look
6  at.  Does that count as assistance?  I mean, I
7  was, like -- you know, navigating all the
8  discovery, I needed assistance with that, so
9  just to find -- find everything.  It was just
10 sort of blasted out in various forms.  Counsel,
11 of course -- of course they advised me where --
12 where to find things to look at.  So I guess I
13 got some assistance that way.
14      And then --
15   Q.   And by "counsel," you're --
16   A.   Go ahead.
17   Q.   And by "counsel," you're referring
18 to Mr. Kachouroff, correct?
19   A.   Yeah.
20   Q.   But other than Mr. Kachouroff
21 helping you locate documents, did anyone assist
22 you in putting together your report?

Page 31

1  A.   I had one other attorney -- I am
2  drawing a blank on his name.  He -- he sent me
3  some pointers on the -- the structure of
4  the adoption report.
5  Q.   And was that Mr. Lindell's prior
6  counsel Parker Daniels?
7  A.   No.  No.
8  Q.   And when you're referring to the
9  structure of the adoption, I assume you're
10 referring to Mr. Gorowsky's report, correct?
11   A.   Right.  Yes.  To adopt -- to adopt
12 that report and just -- just the -- the things
13 that were needed, you know, to basically
14 provide details on what -- what the -- what I
15 was adopting and -- yes.
16   Q.   And you don't recall who this
17 attorney was?
18   A.   I don't.  I would have to look it
19 up.  I can't remember his name.
20   Q.   What work have you done in
21 connection with this matter?
22   A.   Financial analysis.

Page 32

1  Q.   Okay.  What --
2  A.   Reading the discovery.
3  Q.   And what -- and so what do you
4  mean -- so what discover did you read?
5  A.   Well, I can start with those that I
6  specifically refer to in my -- my report.
7  Those were -- the Bates stamps were listed, so
8  definitely looked at all those.
9       But -- but in general, it was any of
10 the financial -- the annual reports, financial
11 statements for the three Smartmatic entities --
12 SGO, Smartmatic International, and Smartmatic
13 USA -- from the periods from maybe 2016 through
14 whenever the most recent financial statements
15 were produced.  In some cases that was 2021,
16 2022, or maybe just recently 2023 for
17 Smartmatic USA.  I just got that.  And that --
18 that 2023 financial statement in its kind of --
19 a brief -- brief form, I did not have that to
20 include in my July 9th report.
21      MR. LETKEWICZ:  I apologize.  There
22 is a siren going off.  Can we just go off the



Page 33

1  record for 30 seconds while -- so we don't have
2  to listen to that.
3       THE VIDEOGRAPHER:  We are going off
4  the record.  10 a.m.
5       (Pause.)
6       THE VIDEOGRAPHER:  We are back on
7  the record.
8       BY MR. LETKEWICZ:
9   Q.   So in addition to reviewing the
10  discovery that you just referenced in your
11  prior answer, did you review any deposition
12  transcripts from this litigation?
13   A.   Yes, I did.  Several.
14   Q.   Do you recall which deposition
15  transcripts you reviewed?
16   A.   I -- I don't at this time.
17   Q.   Okay.  Would you say -- was it more
18  than five?  More than ten?  A rough estimate of
19  how many deposition transcripts you think you
20  looked at.
21   A.   Oh, half a dozen, something like
22  that.  And then I also looked at the -- all the

Page 34

1  plaintiffs' expert reports.  That was, like, a
2  half a dozen or so of those too.
3   Q.   Okay.  And approximately how many
4  hours have you spent on this matter?
5   A.   Since -- since retention probably
6  40, maybe 50.
7   Q.   Of those 40 to 50 hours, how much of
8  that was spent on reviewing the discovery and
9  depositions and expert reports that you
10  referenced in your prior answers?
11   A.   Maybe one-third the time.
12   Q.   So that is probably --
13   A.   I don't know.  15, 20 hours.
14   Q.   -- 20 hours or so?
15   A.   Yeah.  Yep.  Sounds right.  I mean,
16  it all blends together.  You -- you have to
17  refer back to them after looking at the
18  financials.  There is no -- there is no exact,
19  crisp answer on that.  Just in ballpark terms,
20  you know, maybe a third of the time.
21   Q.   And so the rest of the time would
22  have been spent on preparing your July 9

Page 35

1  report; is that correct?
2   A.   It's -- it's really doing the --
3  conducting the financial analysis.  That was
4  probably the biggest part of it, but then yes,
5  preparing the report is the -- another big part
6  of it.
7   Q.   So let's break that down.
8       How much time do you think you spent
9  on the financial analysis?
10   A.   It all -- it all blends together, so
11  I don't think there is a -- a very real clear
12  attribution among the times.  So -- but I
13  just -- maybe one-third, one-third, one-third,
14  you know.
15   Q.   Got you.  So 15 to 20 hours
16  reviewing discovery, 15 to 20 hours of -- well,
17  15, 20 hours financial analysis, and then the
18  rest doing the expert report?
19   A.   Something like that, yes.
20   Q.   How much have you billed to date in
21  this matter in terms of the amount of money?
22   A.   To date -- well, I guess as of the

Page 36

1  last one maybe a few weeks ago, it would have
2  been almost $19,000.
3   Q.   How much have you been paid to date?
4   A.   I received a retainer for 25,000.
5   Q.   So in reviewing your July 9 report,
6  I did not see a documents considered list.
7  Have you prepared a documents considered list
8  in connection with your July 9 report?
9   A.   I have not.
10   Q.   And --
11   A.   I wrote there what I had looked at.
12  Obviously, the Gorowsky report was -- was a
13  core part of that, but then drilling into the
14  recent -- more recent financial statements,
15  those were listed as -- as being a part of my
16  consideration and report.
17   Q.   Approximately how many documents did
18  you review in connection with preparing your
19  report and your financial analysis in this
20  case?
21   A.   I -- I don't think I can put a
22  number on it.  I mean, it's dozens and dozens.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
37–40

Page 37

1  I don't know.  But the -- the -- when you think
2  of a document -- I also looked at a lot of
3  e-mails, and that was dozens and dozens just of
4  those.  So internal e-mails, internal strategic
5  reports.  I don't know.  It's -- it's hard to
6  put a number on it.
7      Q.    Over a hundred?
8      A.    There are hundreds that -- that were
9  produced, so I have not looked at every one.
10     Q.    So you received -- let me back up
11  here.  So I just want to focus in on what you
12  actually looked at.
13         So -- but you would estimate you
14  looked at at least a hundred documents,
15  correct?
16     A.    Probably less than a hundred.
17  Probably between 80 and 100.  I don't know.
18  Something like that.  But if you define
19  document as e-mail, an internal e-mail, then
20  that alone is dozens and dozens so...
21     Q.    So you indicated in your prior
22  testimony in the last few minutes that you

Page 38

1  reviewed Smartmatic internal e-mails,
2  Smartmatic USA, Smartmatic B.V. and SGO
3  financial statements, the Smartmatic expert
4  reports, and some deposition transcripts.
5         Were there any other documents that
6  you reviewed that you recall?
7      A.    I think there were some -- like, a
8  restructuring plan, a strategic plan, mark- --
9  you know, there were some documents that showed
10  what kind of markets collectively Smartmatic
11  was pursuing and what their status was.  But
12  those -- those categories you described are
13  generally the main ones.  Excuse me.
14     Q.    Did you review any of Smartmatic's
15  written discovery responses?
16     A.    As in -- I -- I did -- yes.  I
17  looked at their interrogatory responses.
18     Q.    Okay.  Did you -- was -- was -- was
19  one of the interrogatory responses you reviewed
20  Smartmatic's Six Supplemental Answers and
21  Objections to Defendant My Pillow, Inc.'s First
22  Set of Interrogatories?

Page 39

1      A.    Yes, it was.  Definitely.
2      Q.    Did you review any other
3  interrogatories or written discovery responses
4  from Smartmatic?
5      A.    I don't -- I think so, but I don't
6  recall which ones.
7      Q.    Do you recall how many Smartmatic
8  written discovery responses you would have
9  reviewed outside of the six supplemental
10  answers?
11     A.    A handful, I guess, just in general.
12     Q.    How did you determine which
13  documents to review?
14     A.    So that's a great -- a great
15  question.  So with my -- my financial analysis
16  training from Chase Manhattan Bank was really
17  just to treat this just like any other deal
18  that I've done and -- and look at it from
19  financial condition of the -- of the company --
20  companies.
21         And so I just focused in on -- on
22  their own historical financial statements and

Page 40

1  disclosure, management notes, what the auditors
2  say.  I have just been trained to do that.  You
3  just zero in on -- on -- on the financial
4  condition first, and then you kind of build in
5  around, like, what's going on to try to gain
6  information on what the root cause of these --
7  this performance is.  So it's, you know,
8  historical financial analysis and to see what
9  the drivers are.
10     Q.    You had indicated that you had
11  reviewed dozens of Smartmatic internal e-mails.
12  How did you determine which Smartmatic internal
13  e-mails to look at?
14     A.    Just -- I was just sifting through,
15  and then I found that there were some that were
16  dealing with bidding.  It was sort of a just a
17  hunt and peck.  Basically going through the
18  haystack and then finding -- finding a set that
19  were dealing with, you know, business
20  development that Smartmatic -- Smartmatic USA
21  were trying to -- trying to -- to do.
22     Q.    You had indicated earlier that Mr.



Page 41

1   Lindell, My Pillow's counsel, Mr. Kachouroff,
2   provided you with some of the documents that
3   have been produced in this case, correct?
4       A.   So they were all -- any that they
5   had were made available to me, and then just
6   getting the hierarchy -- Mr. Kachouroff
7   described to me the hierarchy where to find
8   this, as I think we had to, you know, use the
9   discovery system Egnyte.  So it was sort of
10  orienting me to -- to what -- where they
11  were -- where they were in various folders.
12          And then once I knew the folders, I
13  would sort of go read them on my own and -- and
14  just see what was pertinent.
15      Q.   Were these folders by topic, or how
16  were these folders organized?
17      A.   I guess topic is the best thing, you
18  know.  It's like who provided -- was it the
19  defendant or the plaintiff, or was there
20  responses or financial statements?  So it
21  just -- yeah.  There's a categorization that --
22  that assisted me to look.

Page 42

1          Although -- although the way these
2   things were coming in, they didn't necessarily
3   fit into that.  I guess the Smartmatic team
4   sort of just blasted them out everywhere, so
5   there was -- there was no organization to it.
6       Q.   Did you conduct any type of word
7   search for particular documents?
8       A.   I did not.
9       Q.   Sir, are you aware that Smartmatic
10  has produced approximately 1.2 million
11  documents in this case?
12      A.   I did not know the number.  I knew
13  it was a lot.
14      Q.   So how were you able to determine
15  the 80 to 100 internal documents to look at to
16  prepare your report?
17      A.   So, again, I looked at the financial
18  statements first and kind of built out from
19  there things that directly related to that.
20  And many I saw -- categories is, like -- it was
21  just -- to me, it was just noise, frankly, just
22  not relevant, not relevant to my role at least.

Page 43

1   You know, I am doing -- I am a financial
2   expert.  They weren't relevant, directly
3   relevant.  So I just sort of discarded or
4   focused in on those that were the drivers of
5   the financial performance of the company.
6       Q.   So I guess what I am getting at
7   is -- so putting aside the financial
8   statements, how did you -- you obviously did
9   not review -- based on your prior testimony, as
10  I understand it, you did not review all 1.2
11  million documents.  So my -- my question is:
12  How did you, you know, identify the documents
13  to at least take a look at to see if it would
14  be relevant for your analysis?
15      A.   I looked at those that were
16  classified -- came in related to financial
17  statements of the companies.  I started with
18  those.
19          And then I also looked at the
20  responses, the depositions, the financial
21  expert -- the plaintiffs' financial expert
22  reports, the marketing experts.  So it was just

Page 44

1   building out.  In -- in the limited time I had
2   I guess to -- to start with the core and then
3   build out from there.
4       Q.   Did you receive any guidance or
5   assistance from counsel as to which internal
6   Smartmatic documents to take a look at?
7       A.   I -- I was -- I was alerted that --
8   that new discovery came in, like this
9   interrogatory responses.  I was -- I was
10  alerted that those -- those should be looked
11  at.  And it was just basically whatever --
12  whatever new batches of what we found or you
13  guys sent over stuff.  I was told that there
14  was a new batch or this is a particular one,
15  yes.
16      Q.   And then in those new batches, did
17  you do word searches or did you look through
18  every single document that was in that new
19  batch?
20      A.   I don't believe I looked at every
21  single document in the batch -- new batches,
22  but I did find -- you know, I found the ones I



Page 45

1  needed the most, and those were the more recent
2  financial statements that -- that had not been
3  produced to Gorowsky but now were made
4  available.
5        So they were -- and some -- some
6  were the ones I remember -- you may know that I
7  put in -- or we had a supplemental discovery
8  request for items like 43, 44, 45, 46, 47, 48,
9  49, and I was relating the -- this -- this --
10  those that -- that appended or amended
11  discovery requests were those that I felt --
12  felt we needed that Gorowsky hadn't looked at.
13  So I was looking for the ones I had already
14  asked for basically.
15     Q.   So I'm going to ask a slightly
16  different question.
17        So you cite a number of Smartmatic
18  internal e-mails in your July 9 report. So how
19  did you go about locating those? So did you
20  conduct searches? Did counsel direct you to
21  those that would be the relevant ones to look
22  at? Did you do something else? How did you go

Page 46

1  about identifying those?
2     A.   I did not do searches among them.
3  So counsel told me there were batches coming
4  in, so we just -- I looked at them, and he
5  looked at them. And he said maybe this is what
6  you're looking for, you know. So he just
7  showed me what was available, and then I would
8  do my own digging.
9     Q.   And when you say you were doing your
10  own digging, does that mean you looked through
11  each particular document?
12     A.   I may -- in some areas I looked
13  through every document, yeah. I looked through
14  note agreements, the e-mail -- lots of e-mails
15  so...
16     Q.   And --
17     A.   I -- I was not -- if it's helpful, I
18  was not restricted or -- in what I could look
19  at. I was -- whatever was available or you
20  guys made available to counsel, counsel made it
21  available to me. I was not restricted in what
22  I could look at. But I -- I ended up finding

Page 47

1  kind of the core -- the core documents that
2  were very helpful in -- in me coming up with my
3  conclusions. Excuse me.
4     Q.   Now, you referenced earlier that you
5  had -- as part of your review, you also
6  reviewed expert reports that had been disclosed
7  by Smartmatic, correct?
8     A.   Yes, that's right.
9     Q.   And one of those experts that
10  Smartmatic has retained is Kevin Keller, Ph.D.,
11  correct?
12     A.   Yes.
13     Q.   Did you review Dr. Keller's
14  September 22, '23 report?
15     A.   Yes.
16     Q.   Do you recall approximately how much
17  time you spent reviewing his report?
18     A.   Maybe an hour, half an hour, hour.
19     Q.   Did you review any of the documents
20  he listed in his documents considered list?
21     A.   I think so. I -- I can't recall
22  specifically, but you know, if it was something

Page 48

1  that was relevant to my role in this, then I
2  would -- I would tend to look at it. I can't
3  remember what -- what he had put out. I think
4  he was -- he seemed to be -- his -- his angle
5  was -- was a marketing angle, I think, if I
6  remember that right. So it wasn't directly
7  financial analysis related. It was maybe more
8  -- I don't remember which ones.
9     Q.   Did you review Dr. Keller's July 9,
10  2024 report?
11     A.   I don't think -- no, I have never
12  seen that. July 9th?
13     Q.   Yes.
14     A.   Send it to me. I would like to look
15  at it, I guess, right.
16     Q.   We provided it to Mr. Lindell's
17  counsel.
18     A.   Okay. Is it good? What's in it?
19     Q.   You'll have to read it to find out.
20     A.   Okay. Cat-and-mouse game here, huh?
21     Q.   You're also aware that Smartmatic
22  retained Tammy Patrick, correct?



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
49–52

Page 49

1    A.    Yes.  Read her report as well.
2    Q.    And that was her September 22, 2023
3  report?
4    A.    That's right.
5    Q.    And would it be similar to Dr.
6  Keller's report, that you would have sent about
7  30 minutes to 60 minutes reviewing her report?
8    A.    That's right.
9    Q.    Did you review the -- any of the
10  documents listed in her documents considered
11  list?
12    A.    I think I did in her case.  Those, I
13  think, were sort of election related maybe,
14  less marketing related more election related,
15  so yes.
16    Q.    Do you know how much time you spent
17  reviewing those documents considered list?
18    A.    I don't remember.  I just don't
19  remember.
20    Q.    And you -- you're also aware that
21  Smartmatic has retained Alan Sherman, Ph.D.,
22  correct?

Page 50

1    A.    What's the last name?
2    Q.    Alan Sherman.
3    A.    Yes.
4    Q.    Did you review his September 22,
5  2023 report?
6    A.    Yes, I did.
7    Q.    And you would have spent 30 to 60
8  minutes reviewing that report?
9    A.    That's right.
10    Q.    Are you aware that Dr. Sherman
11  issued a July 9, 2023 report?
12    A.    No.
13    Q.    So, obviously, you would not have
14  reviewed that?
15    A.    Correct.
16    Q.    You are aware that Smartmatic has
17  retained Doug Bania, correct?
18    A.    Yes.
19    Q.    And did you review his September 22,
20  2023 report?
21    A.    I did.
22    Q.    And, again, this would have bene --

Page 51

1  you would have spent 30 to 60 minutes reviewing
2  his report?
3    A.    That's about right, yes.
4    Q.    Were you -- are -- strike that.
5         Are you aware that Mr. Bania issued
6  a July 9, 2024 report?
7    A.    I'm not aware of that.  Is there
8  one?
9    Q.    There is one.
10    A.    Okay.  Why do they -- why do they
11  all update their reports?  What -- what was --
12  what's -- what's new?
13    Q.    Again, you'll have to read it to
14  find out because we're -- my question isn't
15  about the content of the report right now.
16    A.    Okay.
17    Q.    You're aware that Smartmatic has
18  retained John Berger, Ph.D., correct?
19    A.    Yes.
20    Q.    And did you review Dr. Berger's
21  September 22, 2023 report?
22    A.    I did.

Page 52

1    Q.    And, again, you would have spent 30
2  to 60 minutes reviewing that report?
3    A.    That's right.
4    Q.    Did you review the documents listed
5  in his documents considered list?
6    A.    I don't remember.
7    Q.    You're aware that Smartmatic has
8  retained Professor Christopher James, correct?
9    A.    I am.
10    Q.    Did you review Professor James's
11  July 9, 2024 report?
12    A.    I did.
13    Q.    How much time did you spend
14  reviewing his report?
15    A.    Maybe an hour, hour and a half.
16    Q.    Did you review any of the documents
17  he cited in his footnotes or listed in his
18  documents considered list?
19    A.    No, not yet.  I may.
20    Q.    And you have not prepared a report
21  responding to Professor James's July 9, 2024
22  report, correct?



Page 53

1    A.   Not yet.

2    Q.   All right.  Let's go back to your

3  July 9th report, and if you could go to Page 5

4  and Paragraph 15, and let me know when you're

5  there.

6    A.   I am there.

7    Q.   Okay.  In the very last line, about

8  halfway through it, you write:  "Being actively

9  involved in complex financial analysis" -- and

10  it continues on the next page -- "in financial

11  forecasting, mergers, and workouts since 1983,

12  I was asked by attorneys for Mr. Lindell and My

13  Pillow, Inc., to review the prior financial

14  expert report of Mr. Don Gorowsky" to -- "and

15  assess its reasonableness and accuracy.  I

16  found it reasonable and accurate in adopting

17  Mr. Gorowsky's opinions in toto," correct?

18    A.   Yes.

19    Q.   Prior to this case, have you ever

20  issued an expert report where you adopted the

21  opinions of another expert?

22    A.   No.

Page 54

1    Q.   What work did you do to assess the

2  reasonableness and accuracy of Mr. Gorowsky's

3  report?

4    A.   Well, it was sort of -- it was an

5  independent review of -- I -- I had read his

6  and then wanted to conduct my own financial

7  analysis to -- to compare against that and,

8  after doing so, found his to be reasonable and

9  accurate.

10    Q.   So you -- as part of -- so strike

11  that.

12       So you read his report.  How much

13  time did you spend reviewing Mr. Gorowsky's

14  report?

15    A.   Oh, a couple hours.

16    Q.   And you're aware that -- sorry.  I

17  didn't mean to cut you off.

18    A.   That's okay.  I completed it.

19    Q.   You're aware that Mr. Gorowsky has

20  footnotes in his report that cite to different

21  documents, correct?

22    A.   Yes.

Page 55

1    Q.   Did you review those -- any of those

2  documents?

3    A.   Some, but not all.  I don't -- I

4  just don't remember which ones.  I know I was

5  looking at a lot of the My Pillow financials.

6  I was looking at the Smartmatic financials,

7  went back -- I was, again, focused on financial

8  analysis.

9    Q.   Other than My Pillow financials and

10  Smartmatic financials, do you recall any other

11  documents that were cited in Mr. Gorowsky's

12  footnotes that you reviewed?

13    A.   He had some professional

14  certification and -- like, AICP -- you know,

15  expert standards reports I looked at.

16    Q.   Actually, if you can -- let's go to

17  Plaintiffs' Exhibit 673 for a moment, which is

18  Mr. Gorowsky's report, and if you could go to

19  Page 7.

20    A.   Okay.  I'm there.

21    Q.   And do you see at the bottom there

22  lists -- let's see here -- five bullets with

Page 56

1  different AICPA documents?  Do you see that?

2    A.   Yes.  I see those, yes.

3    Q.   Did you review each of those?

4    A.   Not -- I -- probably one or two.

5    Q.   Do you recall which ones you

6  reviewed?

7    A.   I don't at this time.  I don't -- I

8  don't remember.  I think I looked at the lost

9  -- the lost profits one and the reasonable

10  certainty of economic damages.  I think I

11  looked at those two.

12    Q.   Other than those two AICPA documents

13  you just referenced, My Pillow financials,

14  Smartmatic financials did you review any other

15  documents that Mr. Gorowsky cited in his

16  footnotes that you can recall?

17    A.   Did you list in there Smartmatic

18  financials?

19    Q.   Yes, I did.

20    A.   Okay.  Annual reports, appendices.

21  Are you referring --

22    Q.   Appendices, where are you -- are you



Page 57

1   referring to appendices?
2      A.   Well, Gorowsky's, I -- I reviewed
3   his appendices.
4      Q.   And Mr. Gorowsky, he has a documents
5   considered list?
6      A.   Uh-huh.
7      Q.   Did you review any of the documents
8   listed in his documents considered list?
9      A.   I know I did, but I'd have to look
10  at them right now, the documents -- so --
11     Q.   Yeah.  But --
12     A.   -- some -- some yes, some no.
13     Q.   Do you remember which ones you
14  reviewed?
15     A.   I don't -- I don't remember at this
16  time.  I know -- I have to go to the Bates
17  stamps.
18         Do you want to go through each one
19  or -- or what?  I mean, I --
20     Q.   Well, I mean, I was asking you:  On
21  that list do any of those look familiar to you
22  as ones you would have reviewed?

Page 58

1      A.   I can't remember the -- the Bates
2   numbers.  It's probably most of those.  When he
3   Bates labeled the documents, I probably looked
4   at most of those.
5      Q.   And do you know --
6      A.   But -- I -- I was -- I was less
7   concerned about, you know, the SGO 2013
8   financials.  I didn't go -- those were less
9   relevant to me.
10     Q.   Do you know how Mr. Gorowsky
11  selected the documents he listed in his
12  documents considered list?
13     A.   I do not.
14     Q.   Did you ever speak with -- well,
15  strike that.
16         So you reviewed Mr. Gorowsky's
17  report and looked at some of the documents he
18  cited.  Did you do any diligence to check the
19  accuracy of his -- of the statements in his
20  September 22, 2023 report?
21     A.   Yes, I did.  And that's -- that was
22  my own financial analysis to make sure the

Page 59

1   numbers matched up.  When he was referring to
2   cash flows and income statements, I just
3   proofed those out to make sure that he was --
4   he was citing those correctly, and he did.
5      Q.   So when you're saying your own
6   financial analysis, you are -- you mean your
7   review of the three Smartmatic entities'
8   financial statements, correct?
9      A.   Yes, to the extent I had them.  You
10  know, when he referred to the consolidated
11  statements of -- of -- of the -- the parent
12  company, that was, I think, the predominant
13  source of his -- of his report.  So I had
14  those.
15         But I -- again, I didn't have nor
16  did he have a lot of drill down or any drill
17  down on the Smartmatic USA financials.  So that
18  came in later after he had -- after September
19  2023 the US- -- USA financials came in later.
20  But for -- for what he had put in his report, I
21  tried to match it up and did match it up with
22  what he had written in his report when I

Page 60

1   compared it to the Smartmatic consolidated
2   financials.
3      Q.   And other than looking at the
4   Smartmatic financials statements, did you do
5   any other verification of Mr. Gorowsky's work
6   in his report?
7      A.   Yes.
8      Q.   And What was that?
9      A.   I looked at the auditor's opinions.
10  And he did -- he did not write about the
11  auditor's opinions, and I was very keen on --
12  on -- on their disclosure of what they were
13  auditing and the nature of their audit -- audit
14  findings.
15     Q.   Other than the auditor's report and
16  then the financial statements, did you review
17  anything else to -- as part of your diligence
18  in -- before adopting Mr. Gorowsky's report?
19     A.   I guess I'd have to send you back to
20  my response about all the work I conducted, and
21  I -- I guess you can't -- you can't
22  compartmentalize it into -- in what work went



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
61–64

Page 61
1  towards what review for Gorowsky's report and
2  what report came into the development of my
3  work and option.
4       One -- one category of documents
5  that I looked at that were not looked at by
6  Gorowsky -- I don't -- I don't think he looked
7  at them -- were these internal e-mails.  They
8  were very telling, and I'm not sure he even had
9  them.  He may not have had them at the time.
10  So -- but there were -- there were sets of
11  documents that came in maybe subsequent to his
12  report that did help me in -- in producing my
13  -- my adoption of his report.
14      Q.   You don't know one way or the other
15  whether or not Mr. Gorowsky had access to those
16  internal e-mails, correct?
17      A.   So all I can tell is he didn't -- he
18  didn't write about them, and I -- I think had
19  he looked at them, he would have written about
20  them.  So it leads me to believe he didn't look
21  at the internal e-mails.  They're so -- they're
22  so stunning so I think -- I think that he

Page 62
1  probably did not have the internal e-mails.
2      Q.   So you're speculating, sir, that he
3  did not have the internal e-mails, correct?
4      A.   If he was doing his job, he would
5  have written about them.
6      Q.   But, again, you -- you did not speak
7  with Mr. Gorowsky --
8      A.   No, I did not.
9      Q.   -- and he did not tell you that he
10  did not ask for Smartmatic internal e-mails,
11  correct?
12      A.   Correct.
13      Q.   So that -- you are speculating that
14  he did not have those internal e-mails,
15  correct?
16      A.   I don't want to -- speculation.  I
17  think they're so -- again, I'll stick to my
18  answer that had he looked at them, he would
19  have written about them.  They're just so --
20  they're just so in your face, bold.
21      Q.   Have you ever met Mr. Gorowsky?
22      A.   Nope.  Never met him.  Don't know

Page 63
1  him --
2      Q.   Have you ever spoken -- have you
3  ever spoken to Mr. Gorowsky?
4      A.   No.
5      Q.   All right.  You understand that Mr.
6  Lindell has retained other experts, in addition
7  to yourself, in this case, correct?
8      A.   Yes, I am aware of that.
9      Q.   Did you rely on any of those experts
10  in forming your opinions in this case?
11      A.   No, I did not.
12      Q.   Did you ever speak to Ben Cotton
13  about this case?
14      A.   No --
15      Q.   Did you ever --
16      A.   -- I have not.
17      Q.   Did you ever speak to Adam Enders
18  about this case?
19      A.   No.
20      Q.   Did you ever speak to be Peter Kent
21  about this case?
22      A.   No.

Page 64
1      Q.   Switch gears.
2       What did you do to prepare for your
3  deposition today?
4      A.   Mostly looked at the more recent
5  findings and discovery, like the Chris James
6  report, Christopher James report, and just -- I
7  just reviewed my -- my own -- my own report of
8  July 9th.
9      Q.   And did you meet with Mr. Kachouroff
10  to prepare for your deposition today?
11      A.   We had a call yesterday just to --
12  just to talk about logistics.
13      Q.   Other than talk about logistics, did
14  you talk about any other topics?
15      A.   Yes.  We -- we talked about the --
16  my -- my desire to write a rebuttal report to
17  the Chris -- Christopher James report.
18      Q.   Did you speak at all about your --
19  the deposition you would give today other than
20  logistics?
21      A.   Nothing -- nothing meaningful.
22      Q.   How much time would you estimate you



Page 65

1  spent preparing for this deposition today?

2      A.   Maybe two hours.

3          MR. LETKEWICZ:  We have been going a

4  little over an hour, and this next line of

5  questioning is going to take a little bit.  So

6  why don't we break for five, stretch our legs,

7  and give the court reporter a break.

8          THE WITNESS:  Okay.  Thank you.

9          THE VIDEOGRAPHER:  We are going off

10  the record at 10:38 a.m.

11         (A short recess was taken.)

12         THE VIDEOGRAPHER:  We are back on

13  the record at 10:46 a.m.

14         BY MR. LETKEWICZ:

15     Q.   One question that I had meant to ask

16  you during -- before we took our break was one

17  another question concerning Mr. Gorowsky.

18         Do you know why Mr. Gorowsky decided

19  to no longer be an expert in this case?

20     A.   I do not know.

21     Q.   Let's go to your background.

22         You received a bachelor's degree in

Page 66

1  finance from Indiana University in 1983,

2  correct?

3      A.   That's right, yes.

4      Q.   You do not have an accounting

5  degree, correct?

6      A.   Correct.

7      Q.   You do not have any economics

8  degree, correct?

9      A.   I was -- I also had a -- an econ

10  degree at Indiana.

11     Q.   Was that a major or a minor?

12     A.   Minor.

13     Q.   Okay.  You do not have any graduate

14  degree, correct?

15     A.   Correct.

16     Q.   So of course then, you don't have a

17  Ph.D., correct?

18     A.   Correct.

19     Q.   And after graduating in Indiana, you

20  worked at Chase Manhattan Bank, correct?

21     A.   It was a -- a regional bank, Indiana

22  National, for a year and credit training

Page 67

1  program there, and then went to Chase to their

2  credit training program as well.

3      Q.   And what work -- I'll strike that.

4          What regional bank in Indiana did

5  you work for?

6      A.   Indiana National Bank.

7      Q.   And what work did you do at Indiana

8  National Bank?

9      A.   Some mergers, like the -- the

10  Steinway Piano management buyout from CBS, the

11  Gibson Guitars, just a bunch -- bunch of little

12  deals.

13     Q.   And then after working at Indiana

14  National Bank, you then went to Chase Manhattan

15  Bank, correct?

16     A.   That's right.  Yes.

17     Q.   And you provided merger and

18  corporate finance structuring advice and

19  litigation support to Chase insurance and

20  mutual fund clients, correct?

21     A.   Correct.

22     Q.   You worked at Chase for about seven

Page 68

1  years, correct?

2      A.   Yeah.  That's about right.  That was

3  -- yes.  Yeah.

4      Q.   You then went to work for the Fund

5  Commission Services, correct?

6      A.   Right.

7      Q.   What is Fund Commission Services?

8      A.   It was a corporate finance entity

9  that financed the distribution of mutual fund

10  shares.  So it was like a -- like a specialized

11  securitization company that dealt with

12  financial institutions.

13     Q.   What did you do at Fund Commission

14  Services?

15     A.   I was the president of that company,

16  and we structured unique securitizations for

17  the sale of mutual fund shares.  We -- we

18  basically factored the commissions.  The sales

19  commissions attendant with certain mutual

20  funds, we factored them and financed them.

21     Q.   You worked at Fund Commission

22  Services for about five years, correct?



Page 69

1    A.    Yes, but it was in runoff mode where
2  we -- it was only active for, like, a couple of
3  years, and then it was, like, runoff mode for a
4  few.
5    Q.    Was this a company that you founded?
6    A.    Me and a partner, yes.
7    Q.    And who was your partner?
8    A.    John Mayo-Smith.
9    Q.    And then after working at Fund
10  Commission Services for about five years, you
11  then went to work for Hovde Capital, LLC?
12    A.    Yes.  Hovde.
13    Q.    Hovde.  What was Hovde Capital?
14    A.    It had two parts.  It would do -- it
15  did bank mergers, and it also had an investment
16  fund.  And I was a -- I was the CFO of that
17  operation, including CFO of a bank, a savings
18  and loan, and -- and the -- the Hovde capital
19  itself.
20    Q.    Was this a company that you founded?
21    A.    No.  I was an employee.  I was -- I
22  was basically doing all the internal and

Page 70

1  external financial reporting.
2    Q.    You were at Hovde Capital for about
3  a year, correct?
4    A.    That's right.
5    Q.    And then you went to work at Bowes
6  Bank and Insurance Fund, correct?
7    A.    That's right.
8    Q.    And was this your bank?
9    A.    It was a -- a registered mutual
10  fund, and we had shareholders, SEC registered,
11  regulated.  We sold no-load mutual fund shares.
12    Q.    And were those mutual fund shares in
13  financial services stocks?
14    A.    Well, they were shares of the funds
15  itself, and then the fund invested in bank and
16  insurance stocks.  So it was an equity -- it
17  was an equity mutual fund, yes.
18    Q.    Other than selling no-load mutual
19  funds shares, did Bowes Bank have any other
20  business?
21    A.    No, that was it.
22    Q.    And what did you do at Bowes Bank?

Page 71

1    A.    A -- a founder, you know, small
2  company, lots of hats, so accounting,
3  investment -- investor relations, financial
4  reporting, choosing the investments.  I was an
5  investment manager.
6    Q.    Do you recall the amount of assets
7  under Bowes Bank's management during your
8  tenure there?
9    A.    It was like two million.
10    Q.    And you were working at Bowes Bank
11  for a little over a year, correct?
12    A.    That's right.
13    Q.    And why did you stop working at
14  Bowes Bank?
15    A.    The overall market was not -- we --
16  we did not get the -- the volume of business at
17  the time.  So we -- we didn't have the scale of
18  operations to continue.  So we returned
19  everybody's share -- we returned everybody's
20  money.
21    Q.    And after that you went to work at
22  Fannie Mae, correct?

Page 72

1    A.    Yes.  2001.
2    Q.    Fannie Mae is a provider of mortgage
3  financing, correct?
4    A.    Yes, that is.
5    Q.    You worked at Fannie Mae for about
6  12 years until 2014, correct?
7    A.    Yeah.  About 13-plus years, yes.
8    Q.    Where did you go to work after
9  Fannie Mae?
10    A.    I was an employee of the Donald
11  Trump campaign.
12    Q.    And you were a field director in the
13  president -- or Donald Trump's campaign,
14  correct?
15    A.    Correct.
16    Q.    And when did you start that
17  position?
18    A.    January of 2016.
19    Q.    According to your CV, I believe you
20  indicated in your testimony a short time ago
21  you stopped working at Fannie Mae in January of
22  2014, correct?



Page 73

1    A.    Right.

2    Q.    So what were you doing in those two

3  years between leaving Fannie Mae and becoming a

4  field director for Donald Trump's campaign?

5    A.    I wasn't working.

6    Q.    What were you -- what were your

7  responsibilities as a field director for Donald

8  Trump's campaign?

9    A.    Persuading voters, putting on

10  events, organizing staff, getting volunteers.

11  That's pretty much it.

12    Q.    Let's go back to a moment ago.

13        Why did you leave Fannie Mae in

14  January of '14?

15    A.    I was a whistleblower on a

16  half-a-billion-dollar fraud, an internal fraud,

17  and it was -- it became a subject of

18  litigation, and -- and the official settlement

19  was I resigned.

20    Q.    And when was that official -- well,

21  strike that.

22        When -- when did that litigation

Page 74

1  begin?

2    A.    February of 2014.

3    Q.    And then when did the matter settle?

4    A.    Maybe two or three months after

5  that.

6    Q.    And was this litigation that was

7  filed in court?

8    A.    I think it went to arbitration, so

9  not -- no court yet.

10    Q.    Do you know which arbitration

11  organization it went to?

12    A.    I think it was JAMS.  Some federal

13  judge, I can't remember her name.  She -- she

14  heard the -- heard the case, if you will, in

15  arbitration.

16    Q.    And as a field director, were you

17  responsible for a particular region?  Was it

18  the entire country?  Kind of what was your --

19  kind of from a geographical perspective, what

20  was your scope of responsibilities?

21    A.    The entire country.  Our focus was

22  on the -- on the battle ground states, so I was

Page 75

1  on what's called the strike team, and we would

2  go in and set up operations and hire state

3  directors and run them.  And, you know, it was

4  basically prepare for each primary in the

5  early -- in the early primary states, and then

6  I was in Pennsylvania for the -- like, the last

7  three or four months of the 2016 general

8  election.

9    Q.    Were there other field directors

10  that were working on the campaign that were

11  essentially on the same level as you were?

12    A.    Several.

13    Q.    After -- strike that.

14        And you held this role through the

15  2016 election, correct?

16    A.    Correct.

17    Q.    And you were then appointed by

18  President Trump to work at the U.S. Housing and

19  Urban Development as senior advisor, correct?

20    A.    That's right.

21    Q.    How did you obtain the position of

22  field director for Donald Trump's presidential

Page 76

1  campaign in 2016?

2    A.    I sent an e-mail to the campaign

3  manager.

4    Q.    Who was the campaign manager?

5    A.    Corey Lewandowski.

6    Q.    Did you know Mr. Lewandowski

7  previously?

8    A.    I did not know him previously.

9    Q.    And this appointment to HUD, was

10  this something that was subject to senate

11  confirmation?

12    A.    No, it was not.

13    Q.    In your role as a senior advisor,

14  you advised the secretary of HUD on housing,

15  housing finance, and homelessness policy

16  matters, correct?

17    A.    That's correct.

18    Q.    And you held that role from January

19  2017 to August 2020, correct?

20    A.    Yes.

21    Q.    Who did you report to at HUD?

22    A.    Secretary Ben Carson.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
77–80

Page 77

1    Q.    Outside of reporting to Secretary
2  Ben Carson, did you meet with anyone else in
3  the Trump administration in your role as senior
4  advisor of HUD?
5    A.    Oh, yeah.  Many, many people.  There
6  were dozens of political appointees at HUD, and
7  sometimes we would interact with folks in
8  other -- other parts of the -- like, the
9  National Economic Council, from other agencies
10  like the VA, the USDA, small business.  Yeah,
11  lots of other people.
12    Q.    Did you ever meet with President
13  Trump in your role as senior advisor?
14    A.    Not -- no.
15    Q.    All right.  And then after being at
16  HUD until August 2020, you then went to work at
17  the U.S. Office of Personnel Management as a
18  senior advisor, correct?
19    A.    That's correct.
20    Q.    And that was another political
21  appointment, correct?
22    A.    That's right.

Page 78

1    Q.    And was this -- and this was an
2  appointment by President Trump, correct?
3    A.    That's right.
4    Q.    Was this an appointment that
5  required senate confirmation?
6    A.    No.
7    Q.    And in your position as a senior
8  advisor, you advised the director of the Office
9  of Personnel Management on federal employee
10  health and insurance programs, correct?
11    A.    That's right.
12    Q.    And you held that position from
13  August 2020 until January 2021, correct?
14    A.    Correct.
15    Q.    Who did you report to in the Office
16  of Personnel Management?
17    A.    It was the acting director Mike
18  Regis.
19    Q.    Was he a political appointee of
20  President Trump?
21    A.    Yes.
22    Q.    Other than Mr. Regis, did you meet

Page 79

1  with anyone else in the Trump administration in
2  your role at the Office of Personnel
3  Management?
4    A.    Yes.  You know, probably a dozen
5  people were -- were -- I met with in that time
6  that were Trump -- Trump administration
7  officials.
8    Q.    And was that in the Office of
9  Personnel Management?
10    A.    Yes.
11    Q.    And the reason why your role in the
12  Office of Personnel Management ended in January
13  of 2021 is because Joe Biden became president,
14  correct?
15    A.    Correct.
16    Q.    But you were nominated in 2020 to
17  serve as the commissioner of the Commodities
18  Future Trading Commission, correct?
19    A.    Yes, and again in 2021.
20    Q.    So you were nominated both in 2020
21  and 2021?
22    A.    Correct.

Page 80

1    Q.    You never became the commissioner of
2  the CFTC, correct?
3    A.    Correct.
4    Q.    Why did you never become the
5  commissioner of the CFTC?
6    A.    The -- I did not get senate
7  confirmation.  It was -- with a change of
8  administration, they -- folks involved in the
9  senate and the Biden administration let it
10  lapse.
11    Q.    Was your nomination voted on in any
12  senate committee?
13    A.    No.
14    Q.    And then after your role in the
15  Office of Personnel Management, you then
16  started working as a financial consultant and
17  election fraud investigator, correct?
18    A.    Correct.
19    Q.    And what work do you do as a
20  financial consultant?
21    A.    Assisting businesses on their
22  financial structure, raising capital,



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
81–84

Page 81

1  evaluating financial disputes.  Yeah, that's
2  it.
3      Q.    And what type of businesses have you
4  been assisting?
5      A.    Medical practices -- one -- one
6  medical practice, a -- a real estate company.
7  Yeah, those two and the financial consulting.
8      Q.    And what type of entities were you
9  working with in helping raise capital?
10     A.    Both of those, the medical --
11  medical practice and the real estate company.
12     Q.    And you mentioned also evaluating
13  financial dispute.  How many disputes?
14     A.    Both of those entities had financial
15  disputes as well.  So one was, like, a lease
16  renegotiation for the real estate company, and
17  then there was a breach-of-contract issue with
18  the medical practice.
19     Q.    And what work do you do as an
20  election fraud investigator?
21     A.    So I -- I was helping with the team
22  in Wisconsin.  There was the -- there was a

Page 82

1  retired justice of the Wisconsin Supreme Court,
2  Mike Gableman, who was retained by the
3  legislature to evaluate election fraud in 2020.
4  And I assisted on that team in Wisconsin for
5  part of that -- part of the time they were
6  doing their evaluation and writing their
7  report.
8      Q.    And this Mr. Gableman, was he
9  appointed by the Wisconsin legislature?
10     A.    Yes, he was.  It may -- it may have
11  been by the -- the speaker of the assembly,
12  Robin Vos, but I guess through the power -- his
13  power as the speaker of the assembly, he -- he
14  hired and paid Mike Gableman to conduct a
15  Wisconsin election investigation.
16     Q.    And you indicated that you helped
17  the team.  Who was the team?
18     A.    Okay.  So it was Mike Gableman,
19  Andrew Kloster, Clint Lancaster, myself, and
20  there was one other I can't remember.  One
21  other guy on there.
22     Q.    And these other gentlemen, other

Page 83

1  than Mr. Gableman, were these Wisconsin
2  legislative representatives?  Like, who are
3  these individuals?
4      A.    Oh, attorneys.
5      Q.    Were they attorneys in Wisconsin?
6      A.    No.  None of them were barred in
7  Wisconsin other than Gableman.
8      Q.    And how did you obtain this work
9  assisting on this election fraud investigation
10  in Wisconsin?
11     A.    I don't -- I don't recall how it
12  happened.  I probably knew one of them or two
13  of them and -- oh, yeah.  So Mike Gableman had
14  worked at the Office of Personnel Management,
15  so I knew him from OPM, and that's probably how
16  it happened.
17     Q.    Other than -- strike that.
18         And did this team put together any
19  kind of report with their findings?
20     A.    Yes, they did.
21     Q.    And at a high level, what were those
22  findings?

Page 84

1      A.    That -- that there was bribery by
2  Facebook, CTCL, to gain illegal access to the
3  voter rolls and have front-run inside
4  information on how people had requested
5  absentee ballots and whether they returned them
6  or not.  No one else had that access.  That was
7  one.  So it was -- the whole Facebook CTCL
8  bribery part was one.
9         And the second one was how all the
10  special monitors that were required by law to
11  be inside the nursing homes -- they were all
12  pulled out of the nursing homes and that many
13  residents of the nursing homes had -- had votes
14  reported for them, including people who were
15  judged to be incompetent and not able to vote.
16  So there was -- there was quite a bit of
17  election fraud inside the nursing homes.  That
18  was the second.
19         And the third was -- I'm drawing a
20  blank.  I think it was on the drop box -- well,
21  we were -- we were looking at the absentee
22  ballots and the early voting, where they were.



Page 85

1 Most likely there were folks who were ballot --
2 illegally trafficking ballots, mules, if you
3 will, ballot mules, in Milwaukee in particular,
4 and how the drop boxes were -- there were
5 exploited where no one -- no one know who was
6 -- the identities of the people dropping things
7 in drop boxes were not ascertained. So there
8 was likely ballot fraud in the drop boxes and
9 in the ballot trafficking.
10    Q.    Other than this Wisconsin
11 investigation that you were a part of, have you
12 done any other work as an election fraud
13 investigator?
14    A.    Yes.
15    Q.    What work have you done?
16    A.    I am on the Georgia RICO team.
17    Q.    What is the Georgia RICO team?
18    A.    They were the 19 people that were
19 indicted in Georgia for allegedly being
20 involved in -- in, I guess, disputing the
21 election results. I'm not sure what they were
22 charges actually were, but -- but they were

Page 86

1 alleged to have been involved in a conspiracy
2 to -- to challenge the election results.
3    Q.    And who hired you?
4    A.    I'm -- that is where I met Chris
5 Kachouroff. I wasn't -- I wasn't -- yeah,
6 that's Chris Kachouroff.
7    Q.    So Mr. Kachouroff hired you?
8    A.    I'm -- I'm not -- I'm on the -- I'm
9 on the team. I'm not -- I'm not paid.
10    Q.    Are you working for a particular
11 individual who has been indicted as part of
12 this Georgia RICO case?
13    A.    Yes. Harrison Floyd.
14    Q.    Who is Harrison Floyd?
15    A.    He was the -- he was a Trump
16 campaign employee in 2020. He is a resident of
17 Maryland.
18    Q.    And other than your work on a
19 Georgia RICO team and this Wisconsin that
20 you're handling, have you done any other work
21 as an election fraud investigator?
22    A.    Yes.

Page 87

1    Q.    What else?
2    A.    Help to advise the legislature -- or
3 rule -- rulemaking before the Georgia State
4 Election Board.
5    Q.    And who hired you to help advise the
6 Georgia Election Board?
7    A.    I was assisting the Georgia GOP on
8 that.
9    Q.    So that's the Georgia Republican
10 party?
11    A.    Yes.
12    Q.    Any other election fraud work that
13 you have done?
14    A.    Raised some money for the electors,
15 the alternate electors who have been indicted
16 around the country, Michigan, Georgia, Arizona.
17    Q.    Anything else?
18    A.    Just help -- helping on the civil
19 litigation in Georgia for Caroline Jeffords v.
20 Fulton County.
21    Q.    What is that litigation?
22    A.    It's a civil litigation that alleges

Page 88

1 election fraud. It's still open.
2    Q.    And who hired you for that work?
3    A.    Again, not hired, not paid, just
4 connecting people there. Caroline Jeffords is
5 the plaintiff.
6    Q.    What do you mean by "just connecting
7 people"?
8    A.    Making sure that the right
9 researchers are -- are helping her and lined
10 her up with counsel.
11    Q.    So we spent probably about the last
12 30 minutes going through your background --
13 well, strike that.
14        Before all of this work that you
15 described concerning election fraud, so prior
16 to January 2021, did you have any experience
17 investigating election fraud?
18    A.    Nothing -- nothing major. Certainly
19 nothing like we saw in 2020. 2020 was a very
20 aggressive multi- -- multivector types of
21 election fraud.
22    Q.    Noting just in the 30 minutes or so



Page 89

1  going through your educational background and
2  work experience, I just want to confirm a few
3  things.
4        You are not an accountant, correct?
5    A.   I do not have a C.P.A.
6    Q.   You are not an auditor, correct?
7    A.   Correct.
8    Q.   You are not an economist, correct?
9    A.   Correct.
10   Q.   You are not a certified fraud
11  examiner, correct?
12   A.   Correct.
13   Q.   Are you a member of the American
14  Institute of Certified Public Accountants, also
15  known as the AICPA?
16   A.   No, I am not.
17   Q.   Are you familiar with the AICPA Code
18  of Professional Conduct and Bylaws?
19   A.   Yes.
20   Q.   And how are you familiar with that?
21   A.   Oh, from my work at Chase, just
22  looking into their standards and -- and

Page 90

1  practices.
2    Q.   Are you familiar with the AICPA
3  Statement on Standards for Forensic Services?
4    A.   No, I'm not.
5    Q.   Are you familiar with the AICPA
6  Forensic and Valuation Services Practices Aid
7  Calculating Lost Profits?
8    A.   I believe I looked at that under the
9  Gorowsky report.
10   Q.   Prior to your work in connection
11  with looking at the Gorowsky report, had you
12  ever looked at the AICPA Forensic and Valuation
13  Services Practices Aid Calculating Lost
14  Profits?
15   A.   No.  It's certainly guidance that
16  was put out.  The folks in the real world --
17  not that they are not in the real world but
18  that the actual providers of companies that are
19  in the space, not just their auditors, they --
20  they sort of drive that -- that practice, not
21  necessarily the AICPA.  They look at the AICPA
22  to assist them, but -- but the actual

Page 91

1  reporters, you know, the corporate entities
2  that have to abide by that, they -- they drive
3  that.
4        And I -- and I guess I am more
5  familiar with them because of my work at Chase
6  and Fannie Mae.
7    Q.   When you're saying "corporate
8  entities drive that," are you referring to what
9  is set forth in the AICPA Forensic and
10  Valuation Services Practice Aid Calculating
11  Lost Profits?
12   A.   No.  I know what the -- what the
13  public companies have to do when they -- when
14  they do their own forecasting.  So financial
15  institutions, you know, what they're obligated
16  to do.  And, certainly, they do rely on their
17  auditors, and the auditors rely on the AICPA,
18  but I know the standards that the financial
19  institutions have to follow.
20   Q.   Are you familiar with the AICPA
21  Forensic and Valuation Services Practices Aid
22  Attaining Reasonable Certainty in Economic

Page 92

1  Damages Calculations?
2    A.   I looked -- I did look at that under
3  the Gorowsky report.
4    Q.   And then prior to looking at that in
5  connection with the Gorowsky report, had you
6  previously looked at that?
7    A.   I -- so in -- in very similar
8  practices when I ran the Fannie Mae lost
9  forecasting committee, I was a parliamentarian
10  for that.  We actually had to do that in
11  practice in much more detail than what AICPA
12  puts out.  So -- so we knew the standards
13  for -- for valuing long-term assets, impaired
14  assets, all that.  So I'm -- I'm familiar with
15  that.
16   Q.   Are you familiar with generally
17  accepted accounting principles, also known as
18  GAAP?
19   A.   Yes.
20   Q.   How are you familiar with GAAP?
21   A.   Oh, through FASB pronouncements.  I
22  guess I kept up with them over the years with



Page 93

1  Chase and -- and with Fannie Mae because they
2  definitely impacted our business when companies
3  would put out -- you know, we -- we could tell
4  when our financial statement analysis, whether
5  companies were actually complying with GAAP or
6  not, whether they used -- they followed the
7  FASB pronouncements, the AICPA pronouncements,
8  the advisory opinions. So I just had to deal
9  with it every day in my -- in my 20-plus years,
10  you know, of -- of doing -- with work at Fannie
11  and -- and Chase.
12      Q.   In completing your July 9 report,
13  did you review any GAAP rules or guidelines?
14      A.   No.
15      Q.   Do you consider yourself an expert
16  in GAAP?
17      A.   No.  I'm -- I'm adept in it, but I
18  wouldn't consider myself an expert.
19      Q.   Are you familiar with the
20  International Accounting Standards Board, also
21  known as IFRS?
22      A.   Yes, I am.

Page 94

1      Q.   In completing your July 9 report,
2  did you review any IFRS rules or guidelines?
3      A.   No, I did not.  And -- and by your
4  question, just the way you're going with
5  this -- so you know that Smartmatic doesn't
6  use -- well, certainly, Smartmatic USA doesn't
7  use IFRS, and it actually doesn't even use
8  GAAP.  So they use -- I think they use
9  government accounting standards, so it's GAS,
10  G-A-S, so -- so Smartmatic USA doesn't use
11  GAAP, doesn't use IFRS.
12      Q.   Do you consider yourself an expert
13  in IFRS?
14      A.   No.
15      Q.   Okay.  In Appendix B to your report,
16  you list four cases that you describe as
17  significant case testimony, correct?
18      A.   Yes.
19      Q.   Were you designated as a testifying
20  expert in any of those cases?
21      A.   Yes.  Let me just see.
22      Q.   Which ones?

Page 95

1      A.   The Ambac, Keystone -- so AMTRUST --
2  so -- so Number -- Number 1 and Number 4,
3  definitely.
4          Number 2 and Number 3 are sort of
5  unique because they are specifically in the
6  FDIC world or insurance regulatory world.  I
7  was -- I was -- I guess it's a similar
8  designation in those cases.  I was the expert
9  on the AMTRUST case.  Hold on.  Yeah.  Ambac
10  was -- was -- yes.  I did an affidavit as a
11  recognized financial expert in that.
12          AMTRUST was FDIC work -- FDIC
13  workout.  The Triad Guaranty was a workout of
14  an insurance company.  So it was similar in 2
15  and 3.  And I can --
16      Q.   And --
17      A.   -- I testified in both those cases.
18      Q.   By "both those cases," you mean the
19  AMTRUST Financial case and the Triad --
20      A.   Right.
21      Q.   -- Guaranty?
22      A.   That's right.

Page 96

1      Q.   And the other two cases, the Ambac
2  case and the Keystone case, did you prepare
3  expert reports?
4      A.   Affidavits, and -- and -- I did
5  affidavits and gave testimony.
6      Q.   Was that in a court?
7      A.   For -- for use in court, yes.
8  Sworn -- sworn depositions.
9      Q.   So both of those cases, you gave
10  depositions?
11      A.   That's right.
12      Q.   And then these other two cases, the
13  AMTRUST and Triad Guaranty case, did you
14  provide any deposition testimony in those
15  cases?
16      A.   Testified -- in the Fannie Mae-Triad
17  case, I testified before the insurance
18  regulator.
19          In the AMTRUST -- that was in --
20  Ohio Savings was the underlying operating
21  company.  The AMTRUST owned Ohio Savings.  When
22  they -- when they went to receivership, I was



Page 97

1   the -- I did not provide court testimony.  I
2   was -- and just -- I was just the recognized
3   financial expert on the mortgage aspects of
4   that case, mortgage servicing rights, yeah.
5        Q.    And -- and the -- and this AMTRUST
6   case, did you give deposition testimony?
7        A.    I can't -- I can't recall.  I don't
8   know -- can't recall.
9        Q.    Have you prepared any expert reports
10  in any other cases beyond the four that you
11  list here in your Appendix B?
12       A.    No.
13       Q.    Has any court or arbitrator ever
14  determined that you were not qualified to
15  testify as an expert?
16       A.    No.
17       Q.    Has all or any part of your expert
18  opinions ever been stricken by a court or
19  arbitrator?
20       A.    No.
21       Q.    Has all or any part of your expert
22  opinions ever been criticized by any court or

Page 98

1   arbitrator?
2        A.    No.
3        Q.    These four cases that you list in
4   your Appendix B, were you asked in any of those
5   cases to render an expert opinion on a claim of
6   lost profits?
7        A.    So yes, so it's -- the Ambac case
8   very much dealt with forecasting future
9   performance of the company.  So we -- we had to
10  determine -- I had to determine the projections
11  of cash flows.  So that is -- is essentially
12  the same thing.  You know, forecasting lost
13  profits, the only way you can get there is to
14  forecast the cash flows and -- and the
15  financial performance of the company.
16            Actually, in Triad Guaranty, I had
17  to do the same thing.  So in Number 3, so when
18  we had to forecast their claims-paying ability,
19  a necessary part of that is to forecast their
20  profits.  So I was brought in in Ambac and
21  AMTRUST -- I'm sorry -- Ambac and Triad
22  particularly to do the forecasting of the

Page 99

1   financial condition of the companies.
2        Q.    For --
3        A.    The courts relied on those and
4   actually affirmed them, by the way.
5        Q.    So the two cases you just listed
6   were -- was the Ambac case and the Triad case,
7   correct?
8        A.    That's right.
9        Q.    And in the Ambac case, were you
10  asked to calculate what the company's revenue
11  would have been but for the misconduct or the
12  conduct that was being complained about?
13       A.    So there was not -- what misconduct?
14       Q.    So you talk -- so -- well, here.
15  Help you out.
16       A.    Those -- those cases -- those two
17  cases were not looking for a defendant to sue.
18  So there was no damaging statement in those
19  cases, but -- but the same core plus
20  forecasting is required in those cases.
21            So you -- you got -- in both of
22  those cases, I had to forecast the

Page 100

1   claims-paying ability and that's comprehensive.
2   You have to look at the entire financial
3   condition.  How much money are they going to
4   make?  How much money are they going to pay?
5   And -- and we -- we argued about that, and my
6   side prevailed.  My opinions prevailed.
7            But there was no -- there was no
8   damaging statement catalyst.  There were --
9   there were other factors that drove the
10  performance, but it wasn't damaging statements.
11       Q.    So in both of those cases, it did
12  not involve a party committing any type of
13  unlawful conduct or any type of other conduct
14  that was alleged to have caused financial harm?
15       A.    No.
16            MR. KACHOUROFF:  I'm going to object
17  to the form of that.
18            THE WITNESS:  No.
19            Yeah --
20            MR. KACHOUROFF:  Object to form.
21            THE WITNESS:  -- the form was
22  interesting.



Page 101

1        But no.  These are macro impacts on
2  -- on -- there was no -- there was no alleged
3  unlawful behavior in those two cases.
4        But the science is exactly the same
5  as calculating lost profits.  You have -- you
6  can't do -- you can't do one without the other.
7  Forecasting the ability to pay is the same as
8  forecasting profits.  If you don't have any
9  profits, you don't have any ability to pay.
10       BY MR. LETKEWICZ:
11       Q.   So this Ambac case, what was the
12  nature of this litigation?
13       A.   So in short, layman's terms, Ambac
14  was running out of money, had a lot of claims
15  to pay, and they basically wanted to issue IOUs
16  to -- to basically say, oh, we'll -- we'll pay
17  you later.  So we had to calculate what was an
18  acceptable form for the court to approve on a
19  deferred -- deferred-claims-payment basis.
20       So some of it was going to be
21  current pay of current claims as they came in,
22  and then the rest was just going to be put into

Page 102

1  an IOU.
2        Same -- same thing -- same thing
3  with Triad.  It was basically what -- what
4  amount could they pay, and we actually -- in
5  both -- both those cases, we built in a
6  mechanism so as -- as financial performance
7  would change, we could adjust up or down the
8  current claims-paying function.  And -- and we
9  did in both of those cases.  We later had to go
10  back and adjust the current claims-paying
11  ratio.
12       So basically everybody's --
13  everybody's claims would get stacked up, and
14  they'd pay, you know, say, 75 cents on the
15  dollar, and they'd defer the other 25.  So I
16  basically had to -- you know, I was the one
17  calculating what these companies could afford
18  to pay, and that -- that was totally based on
19  the lost -- you know, that's -- that is
20  forecasting profits.
21       Q.   So the focus of both -- sorry.  Do
22  you have something else you wanted to add to

Page 103

1  your answer?
2        A.   Go ahead.
3        Q.   So both of these cases focused on
4  the ability of a company to pay claims; is that
5  right?
6        A.   Yes, but it's -- it's everything
7  involved in that.  It's revenue, expenses,
8  business, business growth.
9        Q.   And, again, to be clear, there was
10  no claim being brought that some entity had
11  engaged in some type of misconduct and caused
12  harm to Ambac or Triad, correct?
13       MR. KACHOUROFF:  Objection to form.
14  Calls for legal conclusion.
15       THE WITNESS:  There were -- there
16  were allegations in both cases of -- of
17  mismanagement, but it's not -- it's not --
18  again, there was no -- there was no alleged
19  damaging statements, you know, that -- Ambac
20  didn't say, well, somebody hurt my feelings
21  and, therefore, I couldn't make any money.
22  Triad said somebody -- you know, somebody hurt

Page 104

1  my feeling, so I couldn't make any money.  None
2  of that happened in this case -- in these
3  cases.
4        BY MR. LETKEWICZ:
5        Q.   So let me ask my question a little
6  bit differently.
7        These allegations of mismanagement,
8  there was no claim against either the entity or
9  the person that were engaging in this
10  mismanagement.  They were not -- none of those
11  entities or persons were a party to that --
12  those litigations, correct?
13       A.   Could you repeat that again?  I'm
14  not sure what you mean.
15       MR. KACHOUROFF:  Objection.
16       THE WITNESS:  Let me -- can I offer
17  one thing?  So there -- there were disputes in
18  Ambac basically where we -- there -- there
19  were allegations of fraud on conveyance, so
20  they were basically trying to bifurcate the
21  entity into what is called a good bank and a
22  bad bank.  And maybe you've worked on these.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
105—108

1    But -- but Ambac was trying to stuff
2 certain bad business in the bad bank and good
3 business in the good bank, so there were
4 disputes about that.  Now, there were
5 allegations -- you know, it was going get to
6 fraudulent conveyance type of things where --
7 where the bifurcation was not fair to certain
8 classes of creditors.  So we got into -- got
9 into that quite a bit.
10    Now, whether that is illegal -- you
11 know, it's not -- it's not analogous to, you
12 know, somebody having their feelings hurt by
13 somebody making some statements.
14    BY MR. LETKEWICZ:
15    Q.    Were these -- and it's the -- were
16 there claims of fraudulent conveyance that were
17 being alleged in this case where they were
18 trying to recover assets from the company or
19 the person that received the fraudulent
20 conveyance?
21    A.    Some creditors disputed the -- the
22 bifurcation and what business would go into the

1 bad bank.
2    Q.    But, again, the focus was -- and in
3 both of these cases -- on the Ambac and Triad's
4 ability to pay claims, right?
5    A.    It was.  It was.  The related
6 part --
7    Q.    And --
8    A.    The related part of Ambac was the
9 bifurcation that they were proposing, and there
10 were -- there was another mortgage bond -- it
11 was a bond insurance company trying to do the
12 same thing.  One of their major competitors had
13 just bifurcated.  We didn't have any business
14 with them thankfully.
15    But -- so this -- this was kind of a
16 shake-and-bake strategy in the market that we
17 had seen, and for Chase and for Fannie Mae --
18 I'm sorry -- in this case with Ambac with
19 Fannie Mae, we wanted to make sure that we
20 weren't the victims of a shake and bake.
21    Q.    What do you mean by a shake and
22 bake?

1    A.    Conveying assets to a bad bank -- or
2 conveying -- moving good assets from a --
3 from -- from the bad bank into the good bank
4 and vice versa.  We just wanted to make sure --
5 when you split a legal entity apart, the -- the
6 way you do that bifurcation can have adverse
7 impacts on certain classes of creditors, or
8 equity holders, all that.  We just wanted to
9 make sure it was done the right way, fair and
10 square, right.
11    Q.    So in addition to -- in addition to
12 evaluating a company -- the company's ability
13 to pay a claim, it was also ensuring that there
14 were not fraudulent conveyances; is that a fair
15 assessment?
16    A.    Yes.
17    Q.    Has any court or arbitrator
18 recognized you as an expert in calculating lost
19 profits?
20    A.    No.  Is there such a designation?
21    Q.    I am asking you.
22    A.    I don't -- I don't think -- I don't

1 think there is such a designation, like a lost
2 profit expert in court, so no.
3    Q.    Prior to this case, have you been
4 asked to analyze or critique a claim of lost
5 profits?
6    A.    Yes.
7    Q.    And which cases were those?
8    A.    Those weren't -- oh, in a case or in
9 an engagement?  Did you want it in a court
10 case?
11    Q.    Let's start with the court case.
12    MR. KACHOUROFF:  I'll object because
13 he has asked and answered that one already, I
14 think.
15    THE WITNESS:  I did, yeah --
16    BY MR. LETKEWICZ:
17    Q.    Well, I can short-circuit it.
18    A.    Okay.
19    Q.    The -- other than the Ambac and
20 Triad matter, have you ever been asked to
21 analyze or critique a claim of lost profits in
22 court?



Page 109

1    A.   In court, no.
2    Q.   You raised being engaged.  Have you
3  been engaged in a matter, other than the court
4  cases we have discussed where you were asked to
5  critique a claim of lost profits, outside of
6  this specific case?
7    A.   Yes.  I just -- I'm -- over the
8  years, I just -- one may have been a medical
9  practice, not the same one I mentioned before.
10  But another was a brokerage firm and -- but
11  that was -- those were civil.  They weren't --
12  they weren't in court, and they were just
13  contractual disputes.
14      I am trying to think if I've -- if
15  I've done any others.  I think perhaps a
16  brokerage firm and a medical practice group.
17    Q.   So in those two cases, were you
18  asked --
19    A.   They weren't -- I guess they
20  weren't -- they weren't court cases, though,
21  so...
22    Q.   In those two cases, were you asked

Page 110

1  to calculate the lost profits of -- sorry.
2  Let's break this up.
3      In the medical practice, were you
4  asked to calculate the lost profits of the
5  medical practice?
6    A.   Yes.  Yes.
7    Q.   And in this brokerage case, were you
8  asked to calculate the lost profits of the
9  brokerage firm?
10    A.   Yes.
11    Q.   And was that, doing this financial
12  forecasting, inability to pay or did it involve
13  something different?
14    A.   It was -- it was not a claims --
15  those were not in the realm of claims-paying
16  ability.  They were just straight forecasts.
17  What were the business -- what is it?  What
18  expected result would come from -- from -- from
19  the medical practice, if you will, in the one
20  case had -- had the certain behavior hadn't
21  taken place.  But it was financial forecasting.
22    Q.   Do you consider yourself an expert

Page 111

1  in analyzing or calculating lost profits?
2    A.   Yes, I do.
3    Q.   And how so?
4    A.   Wow.  So I have had to do that in
5  all the deals I have done at Chase and at
6  Fannie Mae.  So I -- all the customers that --
7  the large sophisticated financial institutions
8  that I worked with at both Chase and Fannie
9  Mae, you know, had to determine whether they
10  were good for the money where we extended
11  credit to them in many types of forms.
12      And we -- I needed to
13  basically determine for -- for our own
14  shareholders what their ability to repay is,
15  and I had to do it for -- for lots of reasons,
16  for our own loss forecasting at Fannie Mae.
17      And I had to do it -- had to do it
18  at FHA as well.  Are these entities going to
19  pay us back?  So we had to do -- we conducted
20  forecasts.  I conducted forecasts, and it was
21  required for our financial reporting at Fannie
22  Mae.  We needed to know is -- are the entities

Page 112

1  that owe us money, are they going to fail or
2  are they going to -- what is a reasonable
3  certainty of -- of them repaying us and in what
4  amounts over what period of time.  So I had to
5  do that all the time.
6    Q.   So this work that you just
7  described, that was focused on an entity's
8  ability to pay back credit that had been
9  extended to them, correct?
10    A.   Yes.  Yes.
11    Q.   Yeah.
12    A.   And it's not just -- not just
13  credit.  It's exposure, legal obligations, you
14  know, like a recourse obligation to buy back
15  loans from us, to settle derivative trades.
16  All kinds of -- you know, if you -- extending
17  credit, I would just treat that broadly.  It's
18  exposure.  We had -- what? -- you know,
19  hundred -- hundreds of billions of exposure,
20  and I -- my job was to make sure that our
21  exposure was -- was -- was covered and repaid.
22    Q.   And so, again, to summarize, it was



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024

113–116

Page 113

1  focused on an entity's ability to pay claims,
2  correct, broadly?
3      A.    To -- to make money, to -- to earn
4  profits, to repay obligations, to satisfy
5  exposures, all that.
6      Q.    Has any court recognized you as an
7  expert in calculating damages?
8      A.    No.
9      Q.    Do you consider yourself an expert
10  in calculating damages?
11      A.    Yes.
12      Q.    How so?
13      A.    I'm -- I have been trained -- been
14  doing this for 20, 30 years on looking at root
15  cause analysis, and it's identical.  If you --
16  if you know how to look at root cause of -- of
17  impacts on a company's financial condition or
18  performance, it's the same as identifying what
19  damages are.  I can -- I can say those
20  decisions had a reasonable certainty of leading
21  to this type of impact on the financial
22  condition.

Page 114

1      Q.    And what do you mean by "root cause
2  analysis"?
3      A.    Okay.  So there are underlying
4  factors that -- that result in financial
5  performance or financial condition.  You have
6  to look at those underlying factors.  Some are
7  really simple to say that is a direct cause.
8  Other -- other things are indirect causes.  So
9  it's the -- the core reason why a company
10  performed or did not perform a particular way.
11      Q.    And those factors, is that based
12  on -- on a particular authoritative source,
13  guidance?  How do you determine the factors?
14      A.    So I guess it's my training and
15  experience, what I learned at Chase and the
16  training programs, what we applied day to day
17  in -- in the transactions we had -- we did with
18  companies.  I -- I don't think there is a
19  certification of root cause analysts.  You
20  know, you just have to do it.  It's like just
21  being in a -- being in a -- being in a position
22  for decades.  You kind of get it.

Page 115

1      Q.    And are you able to cite any
2  authoritative source that sets forth these are
3  the factors that you need to look at in a root
4  cause analysis?
5      A.    No.
6      Q.    And so in your report, you describe
7  your field as the field of forensic and
8  financial forecasting.  Does that sound
9  familiar?
10      A.    Yes.
11      Q.    What is forensic and financial
12  forecasting?
13      A.    Forensics is looking at the
14  historical, what actually happened, what is the
15  root cause impact on the financial condition,
16  and then is it likely or what is the
17  expectation, is that repeating or not, what are
18  the drivers of the operation of a company.
19          And the -- and the forensics is --
20  it's just like you do with, you know, legal due
21  diligence or -- or medical due diligence.  You
22  have to just see what are -- what's --

Page 116

1  what's -- what's driving the -- what's driving
2  the -- the performance.
3      Q.    Do you have any accreditation
4  recognizing you as an expert in forensic and
5  financial forecasting?
6      A.    No.
7      Q.    Are you aware of any accreditation
8  that recognizes someone as an expert in
9  forensic and financial forecasting?
10      A.    I think there is maybe a forensic
11  examiner, a CFE, but I don't know about a
12  forecasting accreditation.
13      Q.    You don't have a CFE, correct?
14          Did you hear my question?
15      A.    What's that?
16      Q.    Do you -- you don't have a C F E,
17  correct?
18      A.    Correct.
19      Q.    Do you belong to any organizations
20  relating to forensic and financial forecasting?
21      A.    No.
22      Q.    All right.  Has any court or



Page 117

1  arbitrator recognized you as an expert in
2  forensic or financial forecasting?
3      A.   The courts that we talked about with
4  Ambac and Triad definitely recognized me as the
5  expert in -- in forecasting.
6      Q.   Are you aware of any treatise,
7  textbook, or authoritative source concerning
8  forensic and financial forecasting?
9      A.   I'm sure they are out there.  I
10 don't -- but I don't know -- I don't -- don't
11 know.
12     Q.   Do you have any licenses,
13 certifications, or accreditations?
14     A.   No.
15     Q.   Have you ever worked for a voting
16 machine company?
17     A.   No.
18     Q.   Have you ever consulted for a voting
19 machine company?
20     A.   No.
21     Q.   Have you ever worked for a company
22 that sells any election products or services?

Page 118

1      A.   Election services, no.
2      Q.   Have you ever consulted for a
3  company that sells any election products or
4  services?
5      A.   No.
6      Q.   Have you ever worked for a
7  government body or agency that considered
8  procuring or procured voting machines?
9      A.   Is the U.S. -- if you count the U.S.
10 government, I worked for the U.S. government.
11 I don't -- the U.S. government procures -- what
12 did you -- what did you ask?  Election
13 machines?
14     Q.   So I'll reask my question.
15          Have you ever worked for a
16 government body or agency that considered
17 procuring or procured voting machines?
18     A.   I -- I worked for the U.S.
19 government.  I don't know if the U.S.
20 government procured -- probably did around the
21 world, so maybe the answer is yes.
22     Q.   But you were not involved in that

Page 119

1  procurement process, correct?
2      A.   Correct, I was not.
3      Q.   Have you ever worked for -- or
4  strike that.
5          Have you ever been -- strike that.
6          Have you ever worked for a
7  government body or agency that procures
8  election products or services?  And my question
9  is focused on your -- you having personal
10 involvement.
11     A.   No.
12     Q.   Have you ever consulted for a
13 government body or agency concerning the
14 procurement of election products or services?
15     A.   No.
16     Q.   Have you ever worked for a
17 government body or agency that runs an
18 election?
19     MR. KACHOUROFF:  I'm going to object
20 to form on that one.
21     MR. LETKEWICZ:  Sure.  I'll ask --
22 I'll ask it a different way.

Page 120

1     BY MR. LETKEWICZ:
2      Q.   Have you ever worked for a
3  government body or agency where one of your
4  responsibilities was to help run an election?
5      A.   No.
6      Q.   Have you ever consulted for a
7  government body or agency where one of your
8  responsibilities was to help run an election?
9      A.   No.
10     Q.   You are not an expert in defamation
11 law, correct?
12     A.   No.
13     Q.   You are not an expert in assessing
14 the reach of television, news articles, or any
15 other publication, correct?
16     A.   As -- as an expert, is that what
17 you're saying?
18     Q.   Yes.  You're not an expert?
19     A.   No.
20     Q.   You're not an expert in government
21 procurement laws, correct?
22     A.   Laws?  You said --



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
121–124

Page 121

1    Q.    Yes.
2    A.    No.
3    Q.    I said government procurement laws.
4    A.    I'm not -- I'm not an expert in it,
5    though, but I'm aware.
6    Q.    You're not -- let me just -- I'll
7    just reask to make sure we're clear.
8        You do not consider yourself an
9    expert in government procurement laws, correct?
10    A.    Correct.
11    Q.    You are not an expert in the
12    marketing of products, correct?
13    A.    Wow.  Is there such a designation?
14    I mean --
15    Q.    I'm just asking:  Do you consider
16    yourself an expert in the marketing of
17    products?
18        MR. KACHOUROFF:  Objection to form.
19    Are you asking generally, or are you talking
20    about election products?
21        MR. LETKEWICZ:  Marketing of any
22    products.

Page 122

1        THE WITNESS:  I am pretty good at
2    it.  If I -- if you put me on it, I think I can
3    do a pretty good job.  But I don't know if
4    there's an -- no.  I mean, if there is some
5    label like that, no, I -- I don't have a label,
6    like I'm an expert in marketing.
7        BY MR. LETKEWICZ:
8    Q.    Do you consider yourself an expert
9    in branding?
10    A.    Branding?
11    Q.    Yes.
12    A.    No.
13    Q.    Okay.  Do you consider yourself an expert
14    in defamation damages?
15    A.    So the financial damages, I'm an --
16    I'm an expert in that.  So defamation law, no,
17    I'm not an expert in that.
18    Q.    Okay.  Do you consider yourself an
19    expert in assessing the impact of a defamatory
20    statement on a business?
21    A.    Yes.
22    Q.    Other than this particular case,

Page 123

1    have you worked on any matter, whether it be
2    consulting in a court, where you were asked to
3    assess the impact of a defamatory statement on
4    a business?
5        MR. KACHOUROFF:  Asked and answered.
6        THE WITNESS:  Is there a next
7    question?
8        BY MR. LETKEWICZ:
9    Q.    You didn't answer my -- I'll ask my
10    question again.
11        Other than this specific case, have
12    you worked on any matter where you were asked
13    to assess the impact of a defamatory statement
14    on a business?
15        MR. KACHOUROFF:  Same objection.
16        THE WITNESS:  Yeah.  I'm -- I'm --
17    I'll stick with my previous answers on that.
18        BY MR. LETKEWICZ:
19    Q.    You actually have not answered that
20    question.
21        So my question is:  Other than this
22    specific case, have you been asked to assess

Page 124

1    the impact of a defamatory statement?
2    A.    I am just going through other
3    situations.
4        And by "this impact," you're just
5    referring to financial impact --
6    Q.    Yes.
7    A.    -- or --
8    Q.    I'll ask it -- I'll ask it a
9    different way.
10        Other than this case, have you
11    worked on a defamation case?
12    A.    Yes.
13    Q.    And which cases have you worked on?
14    A.    I was -- I was a -- I was helping my
15    dad in his liquor store, and the previous
16    manager accused me of defamation.  So that's
17    what -- I was thinking about that, and he was
18    claiming damages from defamation.  So that was
19    -- I can't remember the guy's name.  It was so
20    many years ago.  Gary somebody versus Hayden's
21    Liquors so...
22    Q.    And were you serving as an expert in



Page 125

1  that case?
2      A.   No.  I was -- I was purportedly the
3  defamatory party.
4      Q.   Do you consider yourself an expert
5  in analyzing and assessing company reputations?
6      A.   Reputation, hm.  To the extent -- to
7  the extent -- and don't go back to the
8  defamation part.  To the extent that these
9  acts, like, that they impact the financial
10  condition of the company, yes, I am an expert
11  in that.  But as far as defamatory statement
12  itself, no.
13          And what was your last question?
14  What was the question?
15      Q.   The question was:  Do you consider
16  yourself an expert in analyzing and assessing
17  company reputations?
18      A.   I -- I would say if -- I can see --
19  and I am an expert on looking at the impact of
20  changes of reputation.  If a business is --
21  they -- they engage in things that -- that hurt
22  their own reputation, I can see the results of

Page 126

1  that in the financial statements.  So I am an
2  expert on that from that aspect of it.
3          But -- but as far as just my -- no,
4  I am not an expert in just assessing
5  reputation, you know, or -- or market or
6  defamation.  I mean, there are a lot of people
7  that want to go do that, and -- and I think
8  they -- they do that at their own peril.  It --
9  to the extent it ties to the money side of it,
10  I'm an expert.
11          And a lot of the people who just
12  talk about reputation and marketing and
13  defamation, they don't know that side of it.
14  They may know the reputation side.  They may
15  know the marketing side.  They may know the
16  defamatory statement side, but they -- they
17  don't know the financial impact side, so I know
18  the financial impact side.
19      Q.   So just to -- just the short summary
20  of the answer you gave is you do not consider
21  yourself an expert in assessing the reputation
22  of a company or the market of a company,

Page 127

1  correct?
2          MR. KACHOUROFF:  Objection to form.
3  Relevance.
4          THE WITNESS:  So as a daily matter,
5  I don't assess the reputations of companies.
6  I -- I do look at how reputations may be
7  changed and -- and the impact that has on the
8  financial conditions and performance of
9  companies.  Yes, I do that all the time.
10          BY MR. LETKEWICZ:
11      Q.   Do you -- do you consider yourself
12  an expert in assessing whether or not a
13  company's reputation is good or bad or what
14  factors someone might look at in determining
15  whether or not a company has a good or bad
16  reputation?
17      A.   Is there -- is there such a
18  certification for that kind of thing?
19          MR. KACHOUROFF:  I'm going to object
20  -- I'm going to --
21          I'm sorry, Robert.
22          I'm going to -- I'm going to object

Page 128

1  to form on that one as well.  Sorry.
2          BY MR. LETKEWICZ:
3      Q.   I am asking:  Do you consider --
4      A.   Who is -- who would you consider --
5  who would you consider an expert in that area?
6  There is no accreditation for that.
7      Q.   Okay.  So you don't consider
8  yourself an expert in that?
9      A.   I think you're just trying to --
10          MR. KACHOUROFF:  Objection.  I don't
11  think he understands the question.
12          THE WITNESS:  Yeah.  I think I
13  answered that.
14          To the extent -- again, to the
15  extent it impacts -- if it impacts the
16  financial condition of the company -- my career
17  has been built on trying to find the root
18  cause, including defamatory statements,
19  reputation, yes.
20          I have to do that for -- for Chase
21  and Fannie Mae.  If somebody gets into trouble,
22  the company does some stupid stuff, I have to



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
129–132

Page 129

1  report on that. I have to tell them, well,
2  that had an adverse impact on you own
3  operations, guys. And I have to quantify that.
4      BY MR. LETKEWICZ:
5  Q.   Other than this case and the liquor
6  store case, you have not worked on any other
7  case or matter involving a defamation claim,
8  correct?
9  A.   Correct.
10  Q.   Do you consider yourself an expert
11  in analyzing the market for voting machines or
12  election products and services?
13  A.   No.
14      MR. KACHOUROFF: Objection to form.
15      BY MR. LETKEWICZ:
16  Q.   Do you consider yourself an expert
17  in EAC certification standards?
18  A.   No.
19  Q.   Do you consider yourself an expert
20  in what jurisdictions require EAC
21  certifications and which ones do not?
22  A.   I am knowledgeable in those, but I

Page 130

1  not an expert in those.
2  Q.   Do you consider yourself an expert
3  in the procurement of election products and
4  services?
5  A.   No.
6  Q.   Do you consider yourself an expert
7  in the elections products and services market?
8  A.   No.
9      MR. LETKEWICZ: All right. So we
10  have been going about an hour 20. I have -- I
11  think my next line of questions is probably
12  going to take 15, 20 minutes. So if you're
13  good to go -- keep going, we can keep going,
14  but if you want to break, that's fine too.
15      THE WITNESS: I'm okay.
16      MR. KACHOUROFF: How long do you
17  plan on going today, Chris?
18      MR. LETKEWICZ: Well, I mean, we
19  will see how long it takes me to get through
20  the questions. If it takes the full seven
21  hours, it takes the full seven hours.
22      MR. KACHOUROFF: Okay. Because I

Page 131

1  don't -- a lot of this time can be truncated.
2  You've gone over -- you've spent two hours on
3  literally not talking about the report. I
4  get -- I understand what you are trying to do,
5  but in terms of paying his bill, I am paying
6  his bill apparently. So we need to talk about
7  that offline.
8      MR. LETKEWICZ: Okay. Well, so,
9  Chris, I am entitled to seven hours under the
10  rules. How I spend my seven --
11      MR. KACHOUROFF: I didn't say you
12  weren't. I didn't say you weren't. If you
13  want to use the full seven hours, sure. You
14  can have the full seven hours. I am not
15  debating that at all.
16      Is it necessary to do the full seven
17  hours? That's really what I am asking you. So
18  I want to be able to plan my day, and if that's
19  what it's going to be, then that's what it is.
20      MR. LETKEWICZ: Right now I would
21  say it's -- yeah. I mean, again, I don't have
22  a magic ball. It could take the full seven

Page 132

1  hours.
2      MR. KACHOUROFF: Okay. Mr. Bowes,
3  do you want to keep going, or do you want to --
4      THE WITNESS: I'm okay to go another
5  15 or 20 if that's the next segment.
6      And I would think for everybody's
7  interest in time, you know, not trying to,
8  like -- I would say trying to, like, tweak and
9  reask the same questions over and over again is
10  not helpful to anybody. So if we can just get
11  right to the cheese here, that would be better,
12  frankly.
13      BY MR. LETKEWICZ:
14  Q.   Now, let's go back for a moment.
15  A.   After saying that now you want to go
16  back and ask the same questions over again.
17  Come on. These are -- these are reach
18  questions too in my opinion. But go ahead.
19  Q.   All right. Let's -- we'll go --
20  we'll go to your report here, and if you could
21  go to Paragraph 17.
22  A.   Okay. I'm there.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
133—136

Page 133

1    Q.    And in Paragraph 17, you write:
2    "The defendants asked me to prepare a rebuttal
3    report of my detailed financial analysis as
4    well as to conduct a root cause analysis of
5    what really happened inside Smartmatic in t
6    period from 2018 to 2022."
7         Do you see that?
8    A.    Oh, yeah.  So --
9    Q.    And --
10   A.    -- 17 just, you know, if you want to
11   -- everybody can see it, so do you want to read
12   everything all over again, or what?
13   Q.    Sir, this deposition is going to go
14   a lot faster if you don't have commentary for
15   all my questions.  Okay.
16   A.    It's going to go a lot faster if you
17   don't repeat stuff and read stuff that's
18   obvious.
19   Q.    What standard --
20   A.    I see it.  I wrote it.
21   Q.    Are you done with your commentary,
22   sir?

Page 134

1    A.    What's that?
2    Q.    Do you have more commentary on the
3    question?
4    A.    You asked me if I see 17.  I see it.
5    I wrote it.  It's right there.  Why read it?
6    Q.    Okay.  What standards or methodology
7    did you use to conduct a root cause analysis?
8    A.    The core financial analysis and
9    credit analysis that I was taught at two banks
10   and at a major mortgage guarantee company.
11   Q.    And what were these core credit
12   financial analyses that you did?
13   A.    So it's spreading out the numbers,
14   laying them in consistent form, looking at
15   trends, looking at changes among them, proofing
16   them to make sure they are right, applying the
17   accounting standards to see if they're right,
18   what -- what accounting standards are applied,
19   seeing if -- if management's footnotes
20   accurately depict what is going on in the
21   company or not, looking at the way entities are
22   consolidated with -- with affiliates, looking

Page 135

1    at cash source to uses, looking at changes in
2    debt and equity.  It's -- it just -- it goes on
3    and on.  I mean, it's, like -- it's -- it's --
4    I guess the simplest way is it's standard
5    credit and financial analysis.
6    Q.    And can those factors that you just
7    delineated, be found in any textbook, treatise,
8    or authoritative source?
9         MR. KACHOUROFF:  Objection.
10        THE WITNESS:  So there are textbooks
11   written about credit analysis and financial
12   statement analysis.  I don't remember their
13   names.  I have read them.  I just don't
14   remember.  It is been decades.  I have been
15   applying them.
16        BY MR. LETKEWICZ:
17   Q.    In forming your opinions, did you
18   speak with anyone at Smartmatic's competitors?
19   A.    No.
20   Q.    Did you speak with anyone who
21   currently works at or previously worked at a
22   government body that considered procuring or

Page 136

1    procured voting machines in forming your
2    opinions in this case?
3    A.    No.
4    Q.    Did you speak with anyone who
5    currently works at or previously worked at a
6    government body that procures election products
7    or services or manages elections in forming
8    your opinions in this case?
9    A.    No.
10   Q.    Did you speak with anyone who is
11   currently or previously an election government
12   official in forming any of your opinions in
13   this case?
14   A.    Not -- not related to this case, no.
15   Q.    Did you speak with Mr. Lindell in
16   forming any of your opinions in this case?
17   A.    No, not at all.
18   Q.    And other than counsel, have -- did
19   you speak with anyone in forming your opinions
20   in this case?
21   A.    No.
22   Q.    Were you provided any assumptions by



Page 137
1  Mr. Lindell's counsel to take into account when
2  performing your work on your report?
3      A.   No.  I was not --
4      Q.   Were you --
5      A.   -- boxed in, not constrained.  It
6  was just applied science.
7      Q.   So you were not then assuming
8  liability for any of your opinions in this
9  case?
10     A.   Am I assuming liability --
11     Q.   Yes.
12     A.   -- is that your -- why would -- why
13  would there be any liability?  What is that --
14  what is that supposed to mean?
15     Q.   So do you understand that in a civil
16  case that if the defendant is found liable,
17  then you look at whether or not the defendant
18  has to pay damages to the claimant?
19        Do you understand that?
20     A.   Oh, I thought you were talking about
21  my being liable.
22     Q.   No.

Page 138
1      A.   Okay.  Can you reclarify your
2  question then.
3      Q.   Sure.  Are you assuming that Mr.
4  Lindell and/or My Pillow will be found liable
5  in this case?
6      A.   No, I am not assuming that.
7      Q.   Are you offering an opinion on the
8  liability of Mr. Lindell and/or My Pillow?
9      A.   Yes.
10     Q.   And where in your report can I find
11  your opinion on liability?
12        MR. KACHOUROFF:  I'm going to object
13  to the question as to form.  You are asking him
14  to -- I don't think he understands the
15  question, but I can tell you we're not -- we're
16  not offering him as a witness on liability.
17        MR. LETKEWICZ:  Okay.
18        BY MR. LETKEWICZ:
19     Q.   So you're -- so you're not intending
20  to offer an opinion on liability then; is that
21  correct?
22     A.   I have -- I have developed my own

Page 139
1  opinions about it based on the financial
2  analysis, but I -- I have not been -- I guess
3  not been asked to provide those so...
4      Q.   Are you assuming that Smartmatic USA
5  is the only Smartmatic entity claiming damages?
6      A.   I -- I have been informed that that
7  was agreed to as such.
8        MR. KACHOUROFF:  Let me get on the
9  record -- I'm sorry, Chris, to interrupt.  But
10  this is perhaps where you-all can elucidate --
11  my last understanding -- and I told my
12  expert -- was that you-all had jettisoned the
13  Attachment A, which was a damage -- the
14  international damages chart for the foreign
15  plaintiffs in this case.
16        Without that, I have asked what were
17  the damages then that remain for the foreign
18  plaintiffs.  I haven't heard any, and I was
19  hoping that you could put on the record now
20  what those damages are so that we could address
21  those -- those issues.
22        MR. LETKEWICZ:  Well, the focus of

Page 140
1  the deposition is Mr. Bowes' deposition, so
2  that's what we're going to focus on right now.
3        MR. KACHOUROFF:  Correct.  We can't
4  answer your questions in this deposition
5  without knowing what are the damages being
6  claimed.  I have asked several times.  The only
7  response that I have gotten from you-all is
8  lost profits through their ownership of
9  Smartmatic USA.  If that's what it is, that's
10  what we're going to proceed on.
11        MR. LETKEWICZ:  Let's go to the next
12  question.
13        BY MR. LETKEWICZ:
14     Q.   Do you offer an opinion in either
15  your September 22nd or July 9th reports whether
16  Mr. Lindell's statements caused financial harm
17  to Smartmatic?
18     A.   The Gorowsky report, I believe, did
19  not address that, and my July 9th report, I
20  have -- I have my own view about that.  I --
21  I -- my opinions did not list that
22  specifically.



Page 141

1    Q.   Can you go to Page 21 of your
2  report.
3    A.   Okay.  I'm there.
4    Q.   And toward the bottom, about halfway
5  down that last paragraph:  "One is left only to
6  opine."
7         Do you see that?
8    A.   I see that.
9    Q.   And toward the end of that line, it
10  says:  "Smartmatic's allegations that it could
11  have been great if only this or that had
12  happened or only if someone had not said mean
13  things about voting machines is absolutely
14  unfounded as there is no link between Mr.
15  Lindell's statements and Smartmatic's
16  systematic business failure."
17        That's your opinion in this case,
18  correct?
19    A.   (No response.)
20    Q.   Do you need me to repeat my
21  question, sir?
22    A.   I think I answered yes in the

Page 142

1  affirmative.  I'm sorry if you didn't hear me.
2  Did you get that, or is my -- my sound on?
3    Q.   Yes.  I got it.  I got it.
4    A.   Okay.
5    Q.   And in what section do you discuss
6  that there is no link between Mike Lindell's
7  statements and Smartmatic's business failures?
8    A.   Section of what?
9    Q.   What section in your report?
10    A.   So the -- the other causes were --
11  were self-inflicted.  I refer in -- with Bates
12  stamps on it as well about how the company's
13  own admissions were that it was struggling to
14  get acceptance of its products.  So that's a
15  direct -- a direct challenge to the assertion
16  that -- that Lindell's statements were
17  defamatory and caused harm.
18        My view is -- and it's written in
19  this report -- is that the company had its own
20  problems well before even the 2020 election.
21  Those cannot be dismissed as a root cause to
22  their -- to Smartmatic financial difficulties.

Page 143

1    Q.   So the base of your opinion --
2    A.   I can go -- I can go further.
3  The -- the company was -- was essentially -- it
4  had no equity.  It had negative equity.  And
5  its own auditors, I wrote, gave it an
6  opinion -- BDO gave the opinion that this
7  company is not likely to survive 12 months.  It
8  had a going concern opinion by its own
9  auditors, and that happened even before -- it
10  had nothing to do with statements by Lindell.
11        So, of course, it's -- it's embedded
12  in my report.  They had -- they had product
13  failures on -- on unrelated stuff.  $16 million
14  right off on -- on PPE.  I mean, come on.  They
15  were under investigation by the DOJ.  Mike
16  Lindell didn't cause that.  Mike Lindell didn't
17  cause them to go into the PPE business.
18        They were -- they were -- and now I
19  look at the 2023 numbers that are not in this
20  record.  It's $20 million borrowed just to fund
21  you guys, fund the litigation.  This is not --
22  this is not a serious operating company.  In

Page 144

1  fact, they're really not operating in the
2  election -- election business anymore.  They're
3  in the lawsuit business.  It's great for you
4  guys and Reid Hoffman funding you.  That's
5  perfect.  Nice gig if you can get it.
6    Q.   So is your opinion then that
7  Smartmatic's damages are zero in this case,
8  correct?
9    A.   I guess if you had to put a number
10  on it.  I don't want to put a precise number on
11  it because, frankly, it's -- it's a negative
12  number.  It's a negative number.  They had
13  negative equity.  They had massive losses.
14  They could still continue to have massive
15  losses.  There is -- there is nothing
16  substantive left of the company, and that
17  condition was happening even before January of
18  2021.
19    Q.   So are you saying then that
20  Smartmatic should be paying Mr. Lindell and My
21  Pillow?  Is that what you're trying to say by
22  negative damages?



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
145–148

Page 145

1    A.    I am not saying that, but -- but to
2    -- you know, to avoid losses, maybe they should
3    just do as their auditors suggested and just
4    wrap up business, and that may save themselves
5    some money.
6        Q.    So you agree that -- it's your
7    opinion that Smartmatic has not suffered any
8    damage.  That's -- that's your ultimate opinion
9    in this case, correct?
10       A.    Well, my ultimate point is they
11   have -- they have self-inflicted damages.
12       Q.    That is not --
13       A.    The financial condition is obvious.
14   They had -- they -- the operating losses -- and
15   Gorowsky was absolutely right on this.  They
16   had massive operating losses.  Their cash flows
17   were negative.  They had to rely on bailouts.
18           They had their own auditors
19   basically saying, you know, I'm not sure, you
20   know, that Smartmatic's top of the house is
21   going to continue to fund these large operating
22   losses in the United States and we're not sure

Page 146

1    it's going to be a going concern after 12
2    months.  That happened way before Mike Lindell
3    was ever involved in this thing.  So these are
4    structural, core fundamentals.
5        Q.    Let's -- very simply, it's your
6    opinion that Mike Lindell and My Pillow did not
7    cause any financial harm to Smartmatic.  That
8    is your opinion, correct?
9        A.    That's my opinion.
10       Q.    And one of the reasons for your
11   opinion is from your review of Smartmatic USA's
12   2020 to 2022 financials, correct?
13       A.    Well, it's all of them.  It's -- I
14   just even looked through --
15       Q.    Sir, can we -- I'm just going to
16   break this down.  Okay?
17       A.    All right.
18       Q.    So one of the reasons is the -- that
19   you rely on is Smartmatic USA's 2020 through
20   2022 financials, correct?
21       A.    Oh, I -- okay.  Yes.  In looking at
22   2020 through 2022, yes.  And now I just

Page 147

1    received some, like, abbreviated version of
2    2023, which is even worse.  So, yes, I did rely
3    on those.
4        Q.    And -- but the -- you do not -- you
5    do not discuss Smartmatic's 2023 financials in
6    your report, correct?
7        A.    I just got them.
8        Q.    And another one of your reasons that
9    Mike Lindell and My Pillow did not cause any
10   damages to Smartmatic is your view that
11   Smartmatic was outperformed by its competitors
12   which, in your view, had superior products and
13   were better at capturing government contracts?
14       A.    Among other reasons, yes.
15       Q.    And another reason you cite in your
16   report are the internal Smartmatic
17   communications that you cite and discuss in
18   your report, correct?
19       A.    Correct.  Yes.
20       Q.    And another reason you cite is
21   Smartmatic -- Smartmatic's USA's 2020, 2021,
22   and 2022 financials do not show any impairment

Page 148

1    of Smartmatic's intangible assets?
2        A.    Could you repeat that question.
3        Q.    Sure.
4        A.    I mean, I got a bit, but yes, they
5    do not show impairment.  But what was the full
6    question?
7        Q.    Sure.  The question is:  Another
8    reason for your opinion that the defendants did
9    not cause Smartmatic any damages is that
10   Smartmatic USA's 2020, 2021, and 2022
11   financials do not show any impairment of
12   Smartmatic's intangible assets, correct?
13       A.    So just to parse that out, the fact
14   that no impairment was taken is not -- had
15   there -- had there been a legitimate damage to
16   the company, they would have taken impairment
17   to their -- to their intellectual property, but
18   they did not.
19           What I am saying is that they -- if
20   this were a legitimate claim -- and I believe
21   it's not a legitimate claim of damages for
22   defamation.  I don't believe it is legitimate.



Page 149

1  If it were legitimate, they at least would have
2  told their own auditors about it, and the
3  auditors had no -- nothing -- the auditors
4  didn't do any impairment on their business.
5        So I'm not -- the way you asked that
6  question, there is not the causation that you
7  inferred in your question.  I am just saying
8  that the accounting standards do not reflect
9  damages.  They -- they would have and should
10  have if that were the case.  They should have
11  maybe just talked to BDO.  Like, hey, we have
12  damages.  But they didn't.
13        They didn't even have a footnote in
14  the USA statements about it.  The USA
15  statements had no footnotes disclosing a
16  disinformation campaign.  They -- they put this
17  at the -- at the parent company.  Crazy.
18     Q.   So, again, if there was, in fact,
19  damages, in your view, it would have shown up
20  as an impairment on Smartmatic's intangible
21  assets for Smartmatic USA, correct?
22     A.   The proper accounting would have

Page 150

1  been to show an impairment, and they did not
2  use proper accounting.  They were using -- they
3  certainly weren't using GAAP.  They aren't
4  using PCAOB U.S. GAAP.  They aren't, and that's
5  a problem.
6        Who knows what's going on in those
7  financial statements.  Had they done it
8  right -- what I am alleging is that -- that
9  there is an inconsistency.  The company
10  should -- if they really thought they were, you
11  know, damaged, they would impaired their
12  assets, and they did not impair their assets.
13     Q.   And another reason --
14     A.   Before -- and that gets right to the
15  principles of -- of looking at long-lifed
16  assets.  Are they continuing -- are they
17  useful?  Are they going to be persistent?  Are
18  they going to produce revenues?  And -- and
19  there was no -- there was no change in
20  impairment, you know.
21     Q.   All right.  Another reason you cite
22  in your report that the defendants did not

Page 151

1  cause damages to Smartmatic is that Smartmatic
2  had little deferred revenue after 2020,
3  correct?
4     A.   Again, that's a -- that's a similar
5  accounting tell.  That indication, that
6  actually --
7     Q.   It's a simple yes or no, sir.
8     A.   Well, could you ask that -- could
9  you ask that again because --
10     Q.   Absolutely.
11     A.   -- it's not the --
12     Q.   I said:  Another reason cited in
13  your report as to why the defendants did not
14  cause Smartmatic any damages is that Smartmatic
15  had little deferred revenue after 2020,
16  correct?
17     A.   That's not the way I characterized
18  it.  So, no, that's not correct.  I -- I was
19  focusing on the deferred revenues to look at
20  what -- what -- what revenues were in the
21  pipeline.  And I used that to basically
22  refute -- I -- I totally refuted these -- the

Page 152

1  plaintiffs' purported experts, you know, these
2  marketing people trying to tell me about
3  financial forecasting.  They don't know
4  anything about financial forecasting.
5        They're trying -- and -- and the
6  reason they don't, they would have -- they
7  would have looked at what is in the pipeline
8  for deferred -- that deferred revenue was
9  tailing off.  It was -- they were -- they lost
10  their L.A. contract, and there were just fumes
11  in the tank.  So they were in a depletion
12  runoff mode because of their -- because of
13  their own doing.
14        So it's not statements by Mike
15  Lindell that did it.  Their own contracting was
16  drying up, and you could see it in the deferred
17  revenues.
18     Q.   Another reason that you cite that
19  defendants did not cause Smartmatic any damages
20  was the DOJ investigation, correct?
21     A.   Yes.
22     Q.   And another reason you cite that



Page 153

1  defendants did not cause Smartmatic USA's --
2  strike that.
3        Another reason you cite that
4  defendants did not cause Smartmatic's --
5  Smartmatic any damages is -- was Smartmatic
6  USA's efforts to try to sell personal
7  protective equipment, correct?
8     A.   That is a massive impact on the
9  company.  The $16 million write-down in their
10  failed product line.  That had nothing to do
11  with --
12     Q.   And -- I'm sorry.  I cut you off.
13  You said nothing to do with...?
14     A.   That decision and the big write-off
15  that SGO took had nothing to do with Mike
16  Lindell.
17     Q.   And another reason you cite that
18  defendants did not cause Smartmatic any damages
19  is that Smartmatic lacks a EAC-certified
20  product, correct?
21     A.   Yes.
22     Q.   And another reason you cite that

Page 154

1  defendants did not cause Smartmatic any damages
2  is that Smartmatic is focused on lawsuits and
3  not its business, correct?
4     A.   It seems that way to me right now,
5  and 2023 just confirmed that.
6     Q.   All right.  We're going to go in a
7  little more detail in each of these bases after
8  our break but --
9     A.   Okay.
10     Q.   -- are there any other bases in
11  terms of topics for your opinion that
12  defendants did not cause Smartmatic any
13  damages?
14     A.   So I think there are -- there may be
15  one or two.  The political risk that Smartmatic
16  was involved in sort of bit them in the behind,
17  particularly in the Philippines.  So that --
18  that did impact their reputation.  It is not
19  listed in this, but if I had to be thorough, I
20  would say the Philippines stuff -- it's related
21  to DOJ obviously, but I think the product
22  problems and whatever -- whatever reasons they

Page 155

1  got kicked out of Philippines probably had an
2  impact on them.
3     Q.   Anything else?
4     A.   That's it.  Those are the major
5  ones.
6        MR. LETKEWICZ:  All right.  Why
7  don't we break for lunch.  You want to come
8  back -- it's in about -- it would be 1:00 my
9  time, 2:00 your time.  Does that work for you
10  guys?
11        THE WITNESS:  That sounds good.
12        THE VIDEOGRAPHER:  We are going off
13  the record.  12:32 p.m.
14        (A short recess was taken.)
15        THE VIDEOGRAPHER:  We are back on
16  the record.  1:02 p.m.
17        BY MR. LETKEWICZ:
18     Q.   Good afternoon, Mr. Bowes.
19        Prior to breaking for lunch, we were
20  talking about your ultimate opinion in this
21  case that defendants did not cause any harm to
22  Smartmatic.  Do you recall that?

Page 156

1     A.   Yes.
2     Q.   Did you do any analysis as to what
3  Smartmatic's damages would be if Smartmatic can
4  prove that defendants did not harm Smartmatic?
5     A.   So that hypothetical doesn't appear
6  reasonable to me.  You cannot ignore the -- the
7  large self-inflicted damage to Smartmatic from
8  its own doing.  So it's -- it's -- it's sort of
9  an academic exercise that's really futile in my
10  view.
11     Q.   So the short answer is you did not
12  do any analysis as to what Smartmatic's damages
13  could be if Smartmatic could prove defendants
14  harmed Smartmatic, correct?
15     A.   In my view, there aren't any.
16     Q.   Is the crux of your opinion that
17  defendants did not cause harm to Smartmatic?
18     A.   That's a -- that's a secondary view
19  of mine.  My primary view is that -- as I
20  outlined in the report, that there are all
21  these, you know, good half a dozen major
22  dysfunctional adverse impacts to Smartmatic



Page 157

1  that they had experienced, caused themselves
2  that dwarf anything that -- anybody making a
3  statement. Any statements couldn't have,
4  wouldn't have any impact on the damage that had
5  already been inflicted to Smartmatic.
6      Q.   So you did not do any type of -- so
7  it sounds like, though, you did not do a
8  hypothetical exercise of what Smartmatic's
9  damages would be if Smartmatic can prove at
10  trial that Smartmatic -- that the defendants
11  harmed Smartmatic. Is that fair to say?
12          MR. KACHOUROFF:  I'm going to object
13  to form.
14          But go ahead.
15          THE WITNESS:  So this is -- this is
16  an easy one because the company was already --
17  the resources had already been depleted. The
18  revenues were drying up even before early 2021.
19          And now the business is totally
20  different than what it was. It is not
21  operating as an election company anymore. It's
22  operating as a lawsuit company.

Page 158

1          And, frankly, we all have -- with
2  the benefit of the passage of time here, now we
3  have -- the hindsight is really crisp to us
4  that in -- in 2021, 2022, 2023, and even seeing
5  some of the stuff with Smartmatic right now in
6  2024, it just confirms what I am saying that
7  the -- that the damage was self-inflicted
8  before January 2021. It's not salvageable, and
9  you can -- you can -- sure, you can create all
10  these hypothetical, theoretical things, but
11  they are not reasonable. They are not likely.
12  There is no -- there is no expectation of them.
13  So it's a futile -- it's a futile exercise.
14     BY MR. LETKEWICZ:
15     Q.   I understand, sir, it's your opinion
16  it's a futile exercise.
17          My question was a very simple
18  question. My question was:  Did you do any
19  analysis as to what Smartmatic's damages would
20  be if -- if Smartmatic can prove that
21  defendants harmed Smartmatic? It sounds like
22  based on your prior testimony the answer is no,

Page 159

1  but can you confirm your answer is no?
2          MR. KACHOUROFF:  I'm going to object
3  because he has already answered this question.
4  He already said he can't determine damages even
5  if Smartmatic could -- I will let him answer
6  that, but I am objecting to that question to
7  form, and also he's asked and answered it
8  already.
9          MR. LETKEWICZ:  All right. Yeah. I
10  don't need the speaking --
11          THE WITNESS:  So let me just say
12  that had -- had none of those prior, what I
13  call, self-inflicted damages occurred for --
14  for product, for pricing, you know, for
15  integrity issues, you know, drifting in the
16  unrelated businesses that were a total failure,
17  not having the capital, I -- I can see -- they
18  didn't even have the capital to support growth.
19  They didn't -- their bondholders were bailing
20  out. Their shareholders were -- were bailing
21  out. Their board meetings were bailing out
22  even before January 2021.

Page 160

1          So none of the ingredients were
2  conducive to even having these wildly
3  fantastical ideas of actually having a real
4  business. They don't have a real business.
5  It's gone. So -- okay.
6          But -- but let's just -- just play
7  the game here. Suppose none of those things
8  had happened and it was a -- it was an
9  operational persistency driven business. Then
10  I would have looked at any impact from
11  defamatory statements, but because those things
12  were so disqualifying, there is no -- there is
13  no reasonable, logical way to move forward
14  because the impacts of the self-inflicted
15  damages are just so -- so finite and terminal.
16     BY MR. LETKEWICZ:
17     Q.   Right. So the focus of your
18  analysis was whether or not the defendants
19  caused harm to Smartmatic. Is that fair to
20  say?
21     A.   No, that's not fair to say.
22     Q.   Okay. But your -- your ultimate



Page 161

1  opinion, though, is that the defendants did not
2  cause harm to Smartmatic, correct?
3      A.   Yes.  Because the harm was
4  self-inflicted and it was terminal.  This was a
5  runoff operation that was struggling, failing.
6  Nothing in the tank even before January 2021.
7  We have the passage of time.  We can see it.
8  It's clear.
9      Q.   You've used -- you said it was a
10  runoff operation.  Is that a finance term of
11  art?
12      A.   It is.  It is.
13      Q.   When --
14      A.   Particular for insurance --
15  insurance companies when they -- when they
16  cease or slow down or -- or exit a line of
17  business.  They consider that to be in a runoff
18  mode, meaning they sort of just work through
19  the pipeline of any prior contracts, and then
20  they sort of shut that line down or shut the
21  whole company down.
22           Smartmatic was in runoff, runoff

Page 162

1  mode definitely.
2      Q.   Where -- can you tell me where I can
3  find a definition of runoff?
4      A.   Sure.  Try -- let's see.  The NAIC,
5  like, the National Association of Insurance
6  Commissioners, they probably have a whole book
7  on runoff, so NAIC.
8      Q.   And you understand, sir, this is not
9  an insurance case, correct?
10      A.   I -- I -- I totally get that, yes.
11      Q.   And you also said that it was
12  terminal.  Is -- is terminal a term of art in
13  finance?
14      A.   No.  That's more like in medicine.
15  The company was dying.
16      Q.   Okay.  And is that -- is there any
17  type of -- can you tell me any type of source
18  I -- I can go to to what factors I would look
19  at in terms of whether or not a company is
20  "dying"?
21      A.   Sure.  It's right -- it's right in
22  front of you on the Smartmatic USA financial

Page 163

1  statements.  BDO wrote it clearly in their
2  opinion that this -- they issued a going
3  concern opinion, and they can look at that in
4  the AICPA as well.  When they -- the reason
5  they put a going concern opinion on is because
6  they believed that this company wasn't going to
7  make it past 12 months.
8      Q.   Okay.  Now, isn't it in fact true
9  that Smartmatic -- strike that.
10          Before I get to -- if I can direct
11  your attention to Page 17 of your report.
12      A.   Okay.  Hold on.
13          Okay.  I'm there.
14      Q.   And in G the title of that section
15  is:  "Auditor BDO Unable to Issue a Clean
16  Opinion Citing Risk of SUSA Failure."
17          Do you see that?
18      A.   Yes.
19      Q.   And what do you mean by "clean
20  opinion"?
21      A.   Okay.  So a clean opinion would not
22  have any -- any material adverse comments, like

Page 164

1  a going concern opinion.  If -- if BDO had
2  issued a clean opinion, then they would not
3  have included the view that the company was --
4  had a risk of failure within 12 months.
5          So it's basically -- that's a -- I
6  guess it's a colloquial -- in the accounting
7  world, a clean opinion is everything is
8  hunky-dory, all is fine, and there's no issues.
9  But a nonclean opinion includes things like
10  material adverse changes or going concern
11  caveats that -- that the auditors are required
12  to put -- put on -- on the financial
13  statements.
14      Q.   Isn't it true that BDO issued a
15  clean audit opinion for Smartmatic USA's 2021
16  financials?
17      A.   They did not.
18      Q.   Isn't it true that BDO, in
19  connection with Smartmatic USA's 2021
20  financials, concluded that Smartmatic USA would
21  continue as a going concern?
22      A.   They -- they did not.  They had the



Page 165

1 risk of failure.
2     Q.    And isn't it true that BDO issued a
3 clean audit opinion for Smartmatic USA's 2022
4 financials?
5     A.    Not true.  Where do you see that?
6 Show -- show them to me.  It's -- it's clear
7 there is a -- they cite the risk of failure in
8 all those years.  Did they -- did they go back
9 and revise their statements and I don't know
10 about it?
11    Q.    Isn't it true that BDO concluded, in
12 connection with Smartmatic USA's 2022
13 financials, that Smartmatic USA management has
14 continued to take actions to ensure that
15 Smartmatic USA would continue as a going
16 concern?
17    A.    They -- they said -- they said that
18 the company still faced a risk of large -- they
19 had a negative net worth.  Large and continuing
20 operating cash losses as well as uncertainty
21 about the risks of the parent company and
22 creditors funding the operation.

Page 166

1         So no.  You might be citing a
2 sentence, but that directly conflicts with
3 the -- the obvious, glaring opinion that BDO
4 said there is a going -- there is a concern
5 about this -- the company's ability to operate.
6         MR. LETKEWICZ:  Put Tab 15 in the
7 chat, and this will be marked as Plaintiff's
8 Exhibit 676.
9         (Deposition Exhibit 676 was marked
10 for identification.)
11        BY MR. LETKEWICZ:
12    Q.    And then let me know when you have
13 that open.
14    A.    Okay.  Opening now.  Okay.  Go
15 ahead.
16    Q.    And Plaintiffs' Exhibit 676 is
17 Smartmatic USA's financial statements for the
18 year ending December 31, 2021, correct?
19    A.    Yes.
20    Q.    And if you could please go to at
21 least Page 4 of the PDF but it's listed as Page
22 3.  You should see a section that's entitled:

Page 167

1 "Opinion."
2     A.    Uh-huh.  I see that.
3     Q.    Before I get to that, you had
4 indicated earlier that Smartmatic doesn't use
5 GAAP or IFRS.  Do you recall that?
6     A.    Yes, I recall that.
7     Q.    And you stand by that testimony?
8     A.    I do.
9     Q.    All right.  And if -- so let's go
10 to page -- so Page 3.  In the second paragraph,
11 it states:  "In our opinion, the accompanying
12 financial statements present fairly, in all
13 material respects, the financial position of
14 the company as of December 31, 2021, and the
15 results of its operations and its cash flows
16 for the year then ended, including the required
17 comparative information, in accordance" with --
18 "accordance International Financial Reporting
19 Standards as issued by the International
20 Accounting Standards Board and interpretations,
21 collectively IFRS."
22        Do you see that?

Page 168

1     A.    I do see that.
2     Q.    And that is a clean audit opinion,
3 correct?
4     A.    No, it's not.  Go to --
5     Q.    Why not?
6     A.    Go to the next page.  Top -- top --
7 right below that, going concern.  This is not
8 clean.  As discussed --
9     Q.    And -- go ahead.  Finish your
10 answer.
11    A.    That -- read -- read the paragraph
12 at the top of what is marked as Page 4.
13 They -- they talk about going concern opinion,
14 and -- and -- and then they also say that the
15 basis of their opinion is -- is used -- using
16 GAAS, not IFRS.
17    Q.    It is talking about GAAS.  It's
18 talking about the audit BDO has conducted,
19 right?
20    A.    Correct.
21    Q.    It's not talking about how
22 Smartmatic kept its financials, correct?



Page 169

1    A.   So the -- the required comparative
2  information was produced under IFRS, but they
3  took management's preparation, and that is
4  using GAAS.
5    Q.   Right.  I understand they did it as
6  part of the audit, but Smartmatic did their
7  financials in accordance with IFRS, correct?
8    A.   Well, if you just -- the sentence --
9  I'll just take the sentence as it's written.
10  They used it for comparative information.
11    Q.   So based on that sentence, it's your
12  opinion then that Smartmatic did not maintain
13  its financials in accordance with IFRS.  Is
14  that what you're saying?
15    A.   They say they certainly did not use
16  GAAP.  Okay.  There is nothing about GAAP in
17  there.  They -- they have a reference to IFRS.
18  It's only with respect to the comparative
19  information.  There is nothing directly stating
20  that they used IFRS in the presentation in --
21  of their financials.
22        So this is -- this is a very tricky

Page 170

1  opinion.  It's not clean.  And -- and, further,
2  it's not clean because of the going concern
3  issues and the significant customer issue
4  they -- they cite on the next page.
5        But no.  I understand your point.
6  Thank you for pointing out that IFRS reference,
7  but that does not directly answer the question
8  about what type of audit -- what standards they
9  applied to the preparation of their financial
10  settlements.
11        And they're -- this is not -- the
12  biggest thing is they're not -- this is not
13  GAAP at all.  This is nonGAAP.  So it is
14  missing out on a lot of important things
15  that -- that, you know, capital markets and --
16  and regulars want in the United States.
17  They -- these are -- these are -- this is a --
18  a weak secondary auditing standard and weak
19  secondary financial statements.
20    Q.   Are you aware, sir, that
21  international finance reporting standards are
22  required in over 140 countries?

Page 171

1    A.   Of course.  That doesn't make them
2  better than U.S. GAAP.  U.S. GAAP is the best.
3  Okay.
4    Q.   And -- and what is your basis for
5  U.S. GAAP being better than IFRS?
6    A.   Because it -- there are a whole -- a
7  whole array of weaknesses in IFRS.  Again,
8  U.S. -- U.S. Public Company Accounting
9  Oversight Board, GAAP is the best measure of
10  financial statement presentation in the world.
11  IFRS is a weak -- is a weak second.
12    Q.   Are you -- are you aware, though,
13  sir, that more than 500 foreign SEC registrants
14  use IFRS standards in their U.S. filings?
15    A.   I'm not -- I'm not aware of that.
16  I'm sure there are those that use them.  I know
17  that the -- the -- the registration rules have
18  gotten -- they're not -- they're not as strong
19  as they once were.  So it's actually a systemic
20  risk of the capital markets in our country that
21  we allow that to happen.
22    Q.   And are you aware of any statute,

Page 172

1  regulation, or rule that bars a company from
2  using IFRS standards for accounting instead of
3  GAAP?
4    A.   Now, again, this -- this opinion
5  does not say that they used IFRS --
6    Q.   Sir, focus on my question.  My
7  question was --
8    A.   I am.  I am.
9    Q.   Okay.  So my question was:  Are you
10  aware of a rule, regulation, or statute that
11  bars a company from using IFRS accounting
12  instead of GAAP accounting?
13    A.   We had -- yes.  Yes, I am.  We had
14  that in --
15    Q.   Okay.
16    A.   -- in financial -- financial
17  standards and eligibility all throughout the
18  United States through our mortgage markets,
19  through our financial markets.  U.S. --
20  U.S.-regulated institutions cannot use IFRS.
21  It's deficient.
22        So yes.  FDIC, OCC, all -- all the



Page 173
1  mortgage market -- Dodd-Frank.  It has got U.S.
2  PCAOB, GAAP.  IFRS is a weak -- is a weak view,
3  and they're not even applying it to their --
4  the preparation of financial statements.
5  They're just using it for comparative
6  information, so this -- this is secondary.
7      Q.   Okay.
8      A.   And on top of that, we've got a
9  going concern.  You told me that this was a
10  clean opinion.  Sir, you are wrong.  This is
11  not a clean opinion.  They had clearly
12  distinguished a going concern problem in -- in
13  the Smartmatic USA financials.
14     Q.   And so what textbook or treatise or
15  authoritative source can I go to that would
16  tell me that if there is a going concern, it's
17  not a clean opinion?
18     A.   I'll have to look it up and send it
19  to you.
20     Q.   Okay.  All right.  Let's -- as you
21  talk about that going concern issue, can you
22  please go to -- I believe it's Page 12 of the

Page 174
1  PDF, Page 11, and it says in Number 1:  "Nature
2  of operations."
3      A.   Is this a financial statement you
4  just sent me, the 2021?
5      Q.   Yes.  Correct.
6      A.   Page 12.
7      Q.   It's Page 12 of the PDF.  It will be
8  Page 11 as indicated on the document.
9      A.   Okay.  I'm there.  Yeah, I'm there.
10     Q.   And in the second paragraph, it says
11  that as reflected in the financial statements,
12  the company had approximately $4,462,980 and
13  $4,651,858 of net cash used in operating
14  activities for the years ended December 31,
15  2021 and 2020, respectively.  Management has
16  continued to take actions to ensure that the
17  company will continue as a going concern,
18  including procuring new contracts in the U.S.
19  SGO Corporation Limited (the ultimate parent)
20  has agreed, if necessary, to fund the company's
21  operations for the foreseeable future, and at
22  least one year from June 23, 2023.  Management

Page 175
1  believes that these actions, along with the
2  support from the ultimate parent, will enable
3  the company to continue as a going concern.
4      So they are saying they are going to
5  continue as a going concern, correct?
6      A.   Management is -- did write that, but
7  their auditors did not believe that.
8      If this were so convincing -- and it
9  wasn't -- then BDO wouldn't have put the going
10  concern caveat on here.
11     Q.   Okay.  So let's go to that.  Let's
12  go to -- go to Page 5, going concern.
13     A.   Yep.
14     Q.   Where does it say that the company
15  is not going to continue as a going concern?
16     A.   So this is a red flag warning to
17  creditors, anybody trying to invest in this
18  company, whatever, that there is a risk that
19  this company will not exist in 12 months,
20  within 12 months.
21     Q.   But you -- it -- nowhere in this
22  paragraph does it say the company -- there is a

Page 176
1  risk the company will not continue as a going
2  concern.  That language cannot be found in that
3  paragraph.  You would agree with that?
4      A.   You know, I -- I'm going to leave it
5  just like they wrote it.  You better ask BDO
6  why they did this.  Why don't you ask them?
7      They are required to put it in there
8  if they've got risks of a going concern, and
9  they write it clearly, going concern.  So you
10  can try to characterize it all you want, but
11  I'll just leave it to what BDO wrote.
12     Q.   But, again, they -- did they not use
13  the term "there is a risk that Smartmatic would
14  not continue as a going concern in the next 12
15  months."  That -- that specific language cannot
16  be found in that paragraph?
17     A.   So in substance, you're -- you're
18  barking up the wrong tree.
19     So they have to disclose this, and
20  this is such a significant risk they had to
21  disclose it.  You know, if you want to quibble
22  over the exact order of the words, technically,



Page 177

1 you're right, but substantively, you are wrong.
2     Q.   Have you ever conducted -- you --
3 have you ever conducted an audit of a company,
4 sir?
5     A.   I actually have.
6     Q.   Okay.  And are you a -- you
7 indicated earlier you were not a licensed
8 C.P.A., correct?
9     A.   Correct.  That doesn't mean I can't
10 be an auditor when I'm putting my -- on a
11 financial report.  I do audit them, yes.
12     Q.   Okay.  And what entities did you do
13 audit work for?
14     A.   So Sunwest Savings Bank and -- I'm
15 sorry -- Sunwest Bank and Hancock Savings Bank
16 were the two that I was responsible of
17 reporting and -- for when I worked as CFO of
18 Hovde Capital.
19         We were -- we were majority owners
20 of those two.  Our -- our investment bank owned
21 the majority of those banks, so I was -- I was
22 the CFO of those two.

Page 178

1     Q.   And then did you issue audited
2 financials for those two banks?
3     A.   We had outside auditors issue the
4 opinions on them, and I did the internal audits
5 to be able to -- be able to present them to our
6 outside auditors that they were in compliance
7 with U.S. GAAP.
8     Q.   Okay.  And so -- so the nature of
9 your work was that you were assisting the
10 outside auditors of these two banks, correct?
11     A.   So not exactly.  When you read
12 through the opinions, a lot of the auditors
13 will say, well, we relied on management and
14 what management reported.
15         So the first obligation is for
16 the -- for the financial execs at the company
17 to prepare the financials, and so they're --
18 they're on the hook, and they sign it.  They --
19 when they sign their names, they are now liable
20 for any mistake.  So the auditing
21 responsibility is primarily with the company
22 management.  Secondarily, it's with their

Page 179

1 outside auditors.
2         So it's -- it's not exactly as you
3 say, but -- so, you know, we -- when we send
4 out audit letters on our accounts, it came from
5 me.  It came from -- you know, we -- we go
6 verify our statements, verify our bank
7 accounts.  We would conduct the auditing
8 standards to do that, and then we would turn
9 that over and show the auditing file to the
10 outside auditors.
11     Q.   But, again, to be clear, in
12 connection with those two banks, you did not
13 issue an independent auditor's report, correct?
14     A.   That's correct.  I did not.  Right.
15     Q.   If you can go to page -- one moment.
16     A.   Same document.
17     Q.   No.  We're going to go back to your
18 report.
19     A.   Okay.
20     Q.   All right.  And I want to go to Page
21 21 of your report.
22     A.   Okay.  I'm there.

Page 180

1     Q.   And in the first full paragraph, you
2 write:  "In my professional opinion rendered to
3 a reasonable of professional certainty for
4 someone in my field, Smartmatic was not a going
5 concern in 2020, and it was on the verge of
6 going bankrupt."
7         Do you see that?
8     A.   Yes.
9     Q.   And isn't it true that Smartmatic
10 was, in fact, profitable in 2020?
11     A.   Let's see.  2020?
12     Q.   Yes.
13     A.   I am just looking at my -- my --
14 they had net losses in 2020.
15     Q.   So -- so just to make sure we have a
16 clear record, are you looking at Table 1 in
17 your report?
18     A.   Table 3.
19     Q.   Table 3.
20     A.   Yeah.
21     Q.   In Table 3 you indicate that
22 Smartmatic USA had net losses of approximately



Page 181

1  2.7 million, correct?
2     A.   That's correct.
3          MR. LETKEWICZ:  All right.  Can you
4  put Tab 24 in the chat, and that will be marked
5  as Plaintiffs' Exhibit 677.
6          (Deposition Exhibit 677 was marked
7  for identification.)
8          THE WITNESS:  Okay.
9          BY MR. LETKEWICZ:
10    Q.   All right.  You should have in front
11 of you Smartmatic USA Corp. financial
12 statements December 31, 2020 and 2019.
13         Do you see that?
14    A.   I see that, yes.
15    Q.   Okay.  Let's go -- all right.  Can
16 you please go to -- let's see here.  It -- I
17 don't know what page of the PDF, but it's Page
18 5 of the financial statements.  You should see
19 at the top it says:  "Statement of operations
20 for the years ending December 31."
21    A.   I see that.
22    Q.   Okay.  And if you look, there's a --

Page 182

1  there's a column for 2020.  Do you see that?
2     A.   I do.
3     Q.   And it shows a gross margin of
4  approximately 8.5 million.  Do you see that?
5     A.   Yes.
6     Q.   And it shows a positive 3.5 million
7  of income from operations, correct?
8     A.   I see that.
9     Q.   And if you look a little further
10 down, it, again, shows a positive 3.5 million
11 income before income tax expense, correct?
12    A.   Yes.
13    Q.   And then at the bottom, net income
14 and total other comprehensive income, it's
15 approximately 2.7 million, correct, positive?
16    A.   That's right.  Yes, I do see that.
17    Q.   So Smartmatic, under any metric,
18 Smartmatic USA was profitable in 2020, correct?
19    A.   Yes.  I -- I have to correct that.
20 I must have missed a sign on my table, so yes.
21    Q.   All right.  Can we go back to your
22 report for a moment, and I actually want to go

Page 183

1  back to your Table 1 on Page 8.
2     A.   Table 1.  Yes.
3     Q.   And you see that there is a row, net
4  cash for operations, and you say in 2022 it was
5  approximately a negative 7.8 million, correct?
6     A.   Yes, I see that.
7     Q.   Okay.  Isn't it true that
8  Smartmatic's net cash for operations in 2022
9  was actually positive 13.6 million?
10    A.   I'm not sure.
11    Q.   Okay.
12    A.   I believe it was 7.8 -- minus 7.8,
13 but --
14    Q.   Okay.
15    A.   -- after making that sign -- I have
16 to check the cash flow statements for each of
17 those years, 2020 and 2022.
18         MR. LETKEWICZ:  So can you please
19 put -- can you put Tab 14 in the chat, please.
20         (Deposition Exhibit 678 was marked
21 for identification.)
22         MR. LETKEWICZ:  And for the record,

Page 184

1  this will be marked as Plaintiffs' Exhibit 678.
2          BY MR. LETKEWICZ:
3     Q.   Let me know when you have it open.
4     A.   So are these the same Bates stamp
5  numbers that I refer to in my report?
6     Q.   I am not sure.  This is
7  SMARTMATIC-LINDELL05358499.
8     A.   So -- okay.  I'm just -- we need to
9  just make sure.  You want me to open 678?
10    Q.   Yes.
11    A.   Okay.  I have opened it.
12    Q.   Okay.  And this is Smartmatic USA
13 Corp. financial statements year ended December
14 31, 2022.
15         Do you see that?
16    A.   Yeah.  There is no Bates stamp on
17 there, is there?
18    Q.   If you look -- you should look in
19 the lower right-hand corner.  You should see
20 SMARTMATIC-LINDELL05358499.
21    A.   8499.  Just to make sure that those
22 are -- those are the exact same ones I looked



Page 185

1    at before.
2        Go ahead.
3        Q.    All right.  And if you could go to
4    Page 10, and if you look at -- it should say:
5    "Statement of cash flows."
6        A.    Uh-huh.  I see that.
7        Q.    Okay.  And in the middle of that
8    page, it says:  "Net cash provided by (used in)
9    operating activities," and it's a positive 13.6
10   million.
11       Do you see that?
12       A.    I see that, yes.
13       Q.    And it's not a negative 7.8 million,
14   correct?
15       A.    So this is -- the -- the cash flow
16   from operating activities is -- is net 6
17   million, and so I have to -- I have to check
18   this after our call.
19       But cash from operating
20   activities -- so what you're -- what you're
21   pulling out is provided by operations --
22       Q.    Okay.

Page 186

1        A.    -- it's not the same -- what I am
2    referring to.  I am referring to the -- the
3    cash flow from operations so --
4        Q.    And so what I am pointing to is
5    something different?
6        A.    Yes, it is different.  The 13.6
7    includes -- so what -- so what it includes is a
8    bunch of money that came in from affiliates.
9    Like $20 million came in from affiliates.  So
10   that's the difference between the -- between
11   the negative 6 or 7 million from the organic
12   operations of the company.  Your -- your $13
13   million dollar figure includes $20 million that
14   came in from affiliates.
15       So -- so in 2022 somebody -- some
16   affiliate of Smartmatic USA basically funded
17   $20 million and then made -- made the number
18   look good, made it look positive.  But I'll
19   stand by my negative cash flow from operations
20   of 6 or 7 million.
21       Q.    Yeah.  So, actually, can you go back
22   to your Table 1.

Page 187

1        A.    Yep.
2        Q.    And if you look at 2021.
3        A.    Uh-huh.
4        Q.    And it says:  "Net cash from
5    operations, negative 4.463 million."  Do you
6    see that?
7        A.    Yes.
8        Q.    And if you go back to exhibit --
9        A.    What year?
10       Q.    For 2021.
11       A.    2021?
12       Q.    Yes.
13       A.    Okay.
14       Q.    So do you see that there's -- you
15   have negative 4.463 million?
16       A.    I do.  I do.
17       Q.    All right.  And if we go back to --
18   to Plaintiffs' Exhibit 678 and we look at --
19       A.    I see it.  It matches -- it does
20   match.  Right.  But it's --
21       Q.    Right.
22       A.    So here is -- here is where the

Page 188

1    Chase Manhattan Bank credit training kicks in.
2    So when you're goosing the numbers by borrowing
3    $20 million from affiliates, you don't count
4    that in operating activities.  That's -- that
5    is -- what I am saying is that $20 million -- I
6    remember seeing this now.
7        The 20 million that came in as due
8    from related parties and due to related --
9    this -- this bolus of money from -- from
10   affiliates, you do not count that in operating
11   activities.  That -- that should have been more
12   properly attributed to the next section, cash
13   flows from financing activities.
14       So I properly adjusted that in 2022
15   to say you can't count those.  GAAP -- GAAP
16   would never let you count that, that money from
17   affiliates in cash flow from operations.  So
18   they -- they didn't get the bolus of money in
19   2021.  They got a big bolus of money in 2022,
20   and that is financing.  That is clearly
21   financing.  Okay.  It's not operations.
22       So I made that adjustment to come up



Page 189

1  with that, so they're -- they -- they -- in
2  reality according to GAAP, Smartmatic had the
3  cash flow figures that I said.
4        I'm going to check that 2021, by the
5  way, because I may have had my signs wrong on
6  the 2021 -- 2020 cash flow figure.  But for
7  2021 and 2022, I stand by them.
8     Q.   So what GAAP standard requires you
9  not to include these due from related parties?
10    A.   These were loans.  They're loans.
11  They are not --
12    Q.   I understand, sir.  I am asking you:
13  What -- what GAAP standard requires that?
14    A.   It's not properly attributed to cash
15  flow from -- it should have been -- GAAP would
16  say it's properly attributed to cash flow
17  provided by financing, not by operations.  They
18  borrowed this money from affiliates.
19    Q.   Sir, that's not my question.  Focus
20  on my question, sir.
21        My question is:  Name me the
22  specific GAAP standard that requires you to not

Page 190

1  include these amounts due for related parties
2  as part of your calculation of net cash.  What
3  standards should I look at?
4     A.   I will get it for you.  It's --
5  it's -- what is the GAAP standard that says
6  don't count -- don't count financing in
7  operations.  I will find it for you.
8     Q.   But you don't -- you don't know
9  right now, though?
10    A.   I do not know right now.
11    Q.   Okay.  But now let's go back to
12  2021, sir.
13    A.   Yep.
14    Q.   You see how in due from related
15  parties for 2021 --
16    A.   Uh-huh.
17    Q.   -- you have a $618,011, correct?
18    A.   Yes.
19    Q.   And you have then -- and then a
20  little bit down there $247,598, correct?
21    A.   To -- to related parties, right.  I
22  didn't say it was material.  The -- the others

Page 191

1  are material.
2     Q.   Oh.  And -- and what -- what
3  constitutes material?
4     A.   Just -- I mean, if it's just a
5  couple 100,000, it doesn't have a -- it's not a
6  big percentage of the overall numbers, but when
7  you -- when you drop in a $10 million loan from
8  affiliates and you try to pass that off as
9  operating activities, no.  That's not -- that's
10  legit.
11    Q.   And, sir, you said that it's loans
12  from related parties.  Did you see the
13  underlying loan documents for that?
14    A.   No.  I would like to see them
15  because they may have tax implications on that.
16    Q.   All right.  Can we go to -- back to
17  your report, and if you could please go to
18  Paragraph 88, so on Page 20.
19    A.   88.  On my report?
20    Q.   Your report.  Page 20, Paragraph 88.
21    A.   Okay.  Yes.
22    Q.   Okay.  And in Paragraph 88, you

Page 192

1  state that Smartmatic experts failed to
2  consider, and you list 1, 2, 3, 4, 5.
3        Do you see that?
4     A.   Yes, I see that.
5     Q.   Okay.  In Number 1 one of the things
6  you say that they did -- failed to take into
7  account is its past history of having been
8  kicked out of the U.S. market by the federal
9  government sometime in 2005 to 2006 time frame.
10        Do you see that?
11    A.   Yes.
12    Q.   And what do you mean by "kicked
13  out"?
14    A.   So CFIUS rejected -- I think it was
15  foreign ownership, and CFIUS said they're not
16  eligible.  They got kicked out.
17    Q.   So meaning that CFIUS barred them
18  from operating in the U.S.; is that what you
19  are saying?
20    A.   I think that's right.
21    Q.   Isn't it true that Smartmatic
22  voluntarily decided to divest itself of its



Page 193

1  U.S. subsidiary rather than CFIUS banning them
2  from operating in the U.S.?
3      A.  So the CFIUS concern just didn't --
4  didn't magically appear.  As far -- as far as
5  who did what, the bottom line is that CFIUS had
6  problems with Smartmatic in the U.S.
7      Q.  Sir, you just said that CFIUS barred
8  them from operating.  And my question is:
9  Isn't it, in fact, true that CFIUS did no such
10  thing?
11      A.  I -- I still believe they got kicked
12  out of the U.S. market.
13      MR. LETKEWICZ:  Okay.  Can you
14  please put Tab 23 in the chat.
15      THE WITNESS:  They just sort of
16  voluntarily left on their own?
17      (Deposition Exhibit 679 was marked
18  for identification.)
19      THE WITNESS:  Which one is it?
20      BY MR. LETKEWICZ:
21      Q.  So this is going to be 679.
22      A.  Okay.

Page 194

1      Q.  Let me know when you have it open.
2      A.  It's open.
3      Q.  Okay.  And this is a December 22,
4  2006 article from The Wall Street Journal.
5      Do you see that?
6      A.  I see it.
7      Q.  Okay.  And the headline is:
8  "Smartmatic to Shed U.S. Unit, End Probe Into
9  Venezuelan Links."
10      Do you see that headline?
11      A.  I see that headline.
12      Q.  Okay.  And in the first paragraph,
13  it says: "Voting machine Smartmatic said it
14  would sell its U.S. subsidiary to end a review
15  by the Committee on Foreign Investment in the
16  U.S." -- "into the U.S. into whether Smartmatic
17  is partially owned by the Venezuelan
18  government."
19      Do you see that?
20      A.  I see it.
21      Q.  Okay.  And please go to the second
22  page.

Page 195

1      And at the very bottom, it says:  "A
2  spokesman for the treasury, which takes the
3  lead on matters regarding CFIUS, said the
4  committee agreed to end the Smartmatic review
5  but added that CFIUS will closely monitor the
6  sales process," correct?
7      A.  I see that.
8      Q.  Okay.  So CFIUS decided to end the
9  review after Smartmatic said it was going to
10  divest itself of its U.S. operations, correct?
11      MR. KACHOUROFF:  I'm going to object
12  to form.  This is --
13      THE WITNESS:  Right.  So, you know,
14  you know in regulatory worlds that -- that this
15  news report may not actually describe what
16  actually happened.  I mean, the press -- so,
17  you know, when you have regulatory settlements
18  like this, that's -- that's what drives it, not
19  a -- not a newspaper report about it.
20      BY MR. LETKEWICZ:
21      Q.  Okay.  Have you seen the -- the
22  regulatory report concerning --

Page 196

1      A.  No.  No.
2      Q.  -- this investigation?
3      A.  No.
4      Q.  So --
5      A.  -- but I have read enough of these
6  to know that it wasn't just a voluntary thing
7  by Smartmatic.
8      Q.  But, sir, you are speculating that
9  CFIUS is the one that, in fact, kicked out
10  Smartmatic, correct?
11      A.  I don't think it's speculation.
12      Q.  Oh, so did you speak to someone at
13  CFIUS about this investigation?
14      A.  No, I did not.
15      Q.  All right.  Can you go back to page
16  -- back to Paragraph 88 and Number 2.  Let me
17  know when you are there.
18      A.  Okay.  I'm there.
19      Q.  And at Number 2, you said that they
20  failed to consider Smartmatic's own poor
21  integrity, its infringement, and misuse of
22  election technology owned by the leading United



Page 197

1　States election technology company, ES&S.
2　　A.　Yes, I see that.
3　　Q.　All right.  Isn't it true that
4　Smartmatic won its lawsuit brought by ES&S
5　alleged patent infringement?
6　　A.　I don't know that.
7　　Q.　I will help you out with that.
8　　　　MR. LETKEWICZ:  Can you put Tab 12
9　and Tab 21 in the chat.
10　　　　(Deposition Exhibit 680 was marked
11　for identification.)
12　　　　(Deposition Exhibit 681 was marked
13　for identification.)
14　　　　MR. KACHOUROFF:  If it will make it
15　go faster, we stipulate to that fact.
16　　　　THE WITNESS:  Okay.
17　　　　BY MR. LETKEWICZ:
18　　Q.　So you would agree then, sir, that
19　Smartmatic won the patent lawsuit brought by
20　ES&S.  Is that -- is that -- do I understand
21　that correctly from your attorney?
22　　A.　From me?

Page 198

1　　Q.　Yeah, I am asking you.
2　　A.　I'm not -- I'm not aware that there
3　was any win or loss on that.
4　　Q.　Okay.  Well, let's look at this
5　really quick then.
6　　　　All right.  If you look at -- first,
7　let's look at -- okay.  Can you look at
8　Plaintiffs' Exhibit 680 first, please.
9　　A.　680.
10　　Q.　Yep.
11　　A.　The Reuters Report?
12　　Q.　Yep.  And the headline is:
13　"Smartmatic Defeats Patent Lawsuit From Voting
14　Machine Rival ES&S."
15　　　　Do you see that?
16　　A.　I see that statement -- headline.
17　　Q.　Okay.  And then if you go to the
18　second page at the top, it says:  "Voting
19　technology company Smartmatic USA Corp. on
20　Tuesday fended off a patent infringement
21　lawsuit brought by competitor Electronic [sic]
22　Systems & Software, LLC, persuading a federal

Page 199

1　judge that the last patent remaining in the
2　case is invalid."
3　　　　Do you see that?
4　　A.　I see that.
5　　Q.　Okay.  Open up 681.  And 681 should
6　have a document entitled:  "Electronic [sic]
7　Systems & Software v.  Smartmatic USA Corp.
8　Judgment."
9　　　　Do you see that?
10　　A.　Yes, I see that.
11　　Q.　And it says:  "For the reasons set
12　forth in the Court's memorandum opinion and
13　order dated April 25, 2023, it is ordered and
14　adjudicated that the judgement be and is hereby
15　entered in favor of defendant and against
16　plaintiff," correct?
17　　A.　I see that.
18　　Q.　And the defendant is Smartmatic USA
19　Corp., correct?
20　　A.　Yes.
21　　Q.　And the plaintiff is ES&S, correct?
22　　　　MR. KACHOUROFF:  Can we move along?

Page 200

1　We already stipulated to this.
2　　　　MR. LETKEWICZ:  Well, he didn't, so
3　I had to ask the questions.
4　　　　So let's move --
5　　　　THE WITNESS:  The pendency -- the
6　pendency of this dispute had -- you can't
7　ignore the dispute with -- with their only
8　contractor during the time of the pendency of
9　this dispute.  You don't think L.A. doesn't --
10　L.A. doesn't know about this?
11　　　　BY MR. LETKEWICZ:
12　　Q.　Well, you say in Number 2 that
13　Smartmatic's own poor integrity and its
14　infringement and misuse.  So you are saying
15　they did, in fact, commit patent infringement
16　in Number 2, correct?  You are not saying an
17　allegation?
18　　A.　The allegation -- the allegation was
19　that they misused.
20　　Q.　Where does it say in Number 2
21　allegation?
22　　A.　In what?  In Number 2?



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
201–204

Page 201

1    Q.    Where does it say allegation?
2    A.    Oh, it doesn't have the word
3    "allegation."
4    Q.    Okay --
5    A.    Considering its poor integrity --
6    okay.
7    Q.    -- to Number 5, we have that
8    Smartmatic experts failed to consider that
9    Smartmatic's one customer, Los Angeles County,
10    had significant problems with the vulnerability
11    of the election equipment use in Los Angeles
12    which resulted in the county district attorney
13    seizing the polling equipment of Konnech and
14    arresting its Chinese CEO, Eugene Yu, for a
15    serious data breach of poll workers and voter
16    data that flowed into the Smartmatic touch
17    pads.
18        Do you see that?
19    A.    I see that.
20    Q.    Do you know what election equipment
21    Smartmatic provided L.A. County?
22    A.    Touch pads.

Page 202

1    Q.    Anything else?
2    A.    Software on the tabulators.
3    Q.    Anything else?
4    A.    I -- I'm not sure.
5    Q.    Do you know if Smartmatic provided
6    e-poll books to L.A. County?
7    A.    I don't believe so.
8    Q.    And do you know what election
9    services Smartmatic provided, if any, to L.A.
10    County?
11    A.    I mentioned it was touch pads, you
12    know, the voting systems for all people,
13    accessible touch pads.  They -- it provided
14    software on the tabulators.
15    Q.    And nothing else to your knowledge?
16    A.    I'm not sure.  I don't know.
17    Q.    Isn't it true that the alleged data
18    breach you discuss in Paragraph 88 was limited
19    to the personal identifying information of poll
20    workers and that it had no impact on the
21    tabulation of votes and did not alter election
22    results?

Page 203

1    A.    So PII of poll workers, yes.  Voter
2    registration files, yes.  It -- it.  It remains
3    to be seen what -- whether it had further
4    impact on other things.
5        MR. LETKEWICZ:  All right.  Can you
6    put Tab 22 in the chat, and this will be marked
7    as Plaintiffs' Exhibit 682.
8        (Deposition Exhibit 682 was marked
9    for identification.)
10        THE WITNESS:  One second.  I have to
11    plug in my phone.
12        Okay.  Go -- go ahead.  I am just
13    making sure I get some power in my phone before
14    I lose it.
15        BY MR. LETKEWICZ:
16    Q.    Okay.  So are you able to open 682?
17    A.    No.  My -- my battery pack I had by
18    my computer is not working, so let me see how
19    much -- how much juice I have.  Okay.  It's
20    charging.
21        Can you refer to it while I get to
22    my charge here where I can jump back to it?

Page 204

1    Q.    Sure.  Why don't we just put it on
2    the screen.
3    A.    Yeah.
4    Q.    All right.  So Plaintiffs' Exhibit
5    682, this is an October 4, 2022 press release
6    from L.A. County.
7        Do you see that?
8    A.    Yes.
9    Q.    All right.  And the headline is:
10    "Head of Election Worker Management Company
11    Arrested in Connection With Theft of Personal
12    Data."
13        And in the third full paragraph, it
14    says:  "This investigation is concerned solely
15    with the personal identifying information of
16    election workers.  In this case, alleged
17    conduct had no impact on the tabulation of
18    votes and did not alter election results."
19        Do you see that?
20    A.    I -- I did -- I did -- I do see
21    that, and I remember hearing that, but I'm not
22    sure that's true.



Page 205

1        MR. KACHOUROFF:  Object to form.
2   Also to hearsay.  This is inadmissible.
3        BY MR. LETKEWICZ:
4        Q.    Okay.  And if we go down a couple
5   paragraphs, it's describing Konnech, and it
6   says:  "Describes [sic] and sells its
7   proprietary PollChief software, which is an
8   election worker management system that was
9   utilized by the county in the last California
10  election.  The software assists with poll
11  worker assignments, communications and payroll.
12  PollChief requires that workers submit personal
13  identifying information, which is retained by
14  Konnech."
15       Do you see that?
16       A.    Yes.
17       Q.    So that has nothing to do with voter
18  registration information, correct?
19       A.    Well, the -- the words don't include
20  those, but in function, the -- the -- the
21  e-poll books, PollChief in particular, are
22  populated with voter rolls.

Page 206

1        Q.    And -- and have you, in fact, seen
2   that, sir?
3        A.    I have not seen that directly.
4        Q.    Okay.  So that's speculation then on
5   your part then?
6        A.    It's -- it's a -- it's an allegation
7   in -- it's an -- it's an -- it's an expert
8   finding -- let's put it that way -- that voter
9   data was included in this Konnech problem.
10       Q.    Was that an expert finding of -- by
11  you?
12       A.    No.
13       Q.    Let's go book to your report.  And
14  if you go down to Page 21 -- are you able to
15  see -- are you able to see your report?  Right?
16       A.    No.  You have to share it again.
17  Just -- just give me some --
18       Q.    Okay.
19       A.    -- yeah, share it if you could.
20       What was the page?
21       Q.    Page 21.  So we're going to go to
22  Page 21.

Page 207

1        A.    Uh-huh.  Back on Konnech, number 5?
2        Q.    No.  We are on Page 21.
3        A.    I know.  Is it that Number 5 item?
4        Q.    No.  That's on Page 20.
5        A.    Okay.
6        Q.    And so in the middle of the --
7        MR. LETKEWICZ:  Can you scroll down
8   a little bit, Jane.
9        BY MR. LETKEWICZ:
10       Q.    And in the middle of that last
11  paragraph --
12       MR. LETKEWICZ:  You can highlight
13  it.
14       BY MR. LETKEWICZ:
15       Q.    -- it says:  "Smartmatic with no
16  cap" --
17       MR. LETKEWICZ:  Sorry.  Scroll down.
18       BY MR. LETKEWICZ:
19       Q.    "Smartmatic with no capital and no
20  prospects has lost out on every contract
21  proposal it has made in history (with the
22  exception" to -- "with the exception of Los

Page 208

1   Angeles)."
2        Do you see that?
3        A.    Yes.
4        Q.    Isn't it true that Smartmatic has
5   done business outside of Los Angeles County?
6        A.    In the United States?
7        Q.    Yes.
8        A.    No.  Where?  Show me.
9        Q.    All right.
10       A.    Why would BDO -- BDO says they have
11  one customer.  They have one customer, Los
12  Angeles County.
13       Q.    Right.  But -- but you understand,
14  sir, that they have operated in the United
15  States before 2020, correct?
16       A.    Oh, so you're talking about a
17  different time period?
18       Q.    Well, you -- you said -- you say in
19  your report here they only have one contract --
20  they have only won one contract.  So I am
21  trying to understand what you're referring to,
22  sir.



Page 209

1    A.    Well, I'm referring to whatever BDO
2    said.  They have one customer.  Their own
3    auditor said they have one customer.
4        Q.    And so what you're referring to then
5    is simply to Smartmatic USA during the 2020 to
6    2022 time frame, correct?
7        A.    Yes.  That's all the -- I don't
8    believe I had 2019 -- maybe I did.  I think --
9    I think just from -- maybe 2018 to 2022, it
10   seemed like it was one customer, and BDO
11   confirmed that.
12       Q.    No.
13       A.    No?  There was some other customer
14   in that -- that time period?
15           MR. LETKEWICZ:  All right.  We have
16   been going a little over an hour.  Why don't we
17   take a break.  You can get a little more juice
18   on your phone.
19           THE WITNESS:  Okay.  That's good.
20           MR. LETKEWICZ:  Why don't we come
21   back in, like, ten minutes.  Does that work?
22           MR. KACHOUROFF:  Why are we

Page 210

1    taking -- why are we taking a break?
2            MR. LETKEWICZ:  So, I mean, we've
3    been going a little over an hour.  I mean -- I
4    mean, I don't know how workable this is he
5    having -- him holding his phone while we're
6    showing documents so --
7            THE WITNESS:  Ten minutes to get
8    charged.  Ten, that will help.  That will help,
9    yes.
10           THE VIDEOGRAPHER:  We are going off
11   the record.  2:05 p.m.
12           (A short recess was taken.)
13           THE VIDEOGRAPHER:  Back on the
14   record.  2:15 p.m.
15           BY MR. LETKEWICZ:
16       Q.    Earlier we had talked about -- that
17   in your view if Smartmatic had suffered
18   reputational harm, it would have shown up as an
19   impairment to Smartmatic USA's intangible
20   assets, correct?
21       A.    Not necessarily reputational harm,
22   but if they thought that -- if they felt they

Page 211

1    were damaged so much, not just reputation, but
2    they would have -- they would have basically
3    truncated the useful life of their -- of their
4    intellectual property assets, and they didn't.
5    So there was no meaningful change.
6            I mean, they -- they -- earlier
7    transferred a lot of IP somewhere to somebody,
8    but there was no impairment of whatever they
9    owned.  Usually reputational harm or -- or
10   damages to the -- to the prospects of a
11   business, customer lists, you know.  That --
12   that would -- and if the right accounting is
13   done, you've got to impair the assets, and they
14   did not.
15       Q.    Now, earlier in our -- some of our
16   more recent questioning, Smartmatic's auditor
17   indicated that Smartmatic USA's financials were
18   presented fairly and included the required
19   comparative information in accordance with
20   IFRS.  Do you remember that?
21       A.    Yes.
22       Q.    Are you aware, sir, that under IFRS

Page 212

1    a company's intangible assets would not include
2    a company's reputation?
3        A.    I don't know that.
4        Q.    Okay.  Do you know -- are you aware,
5    sir, that under IFRS standards a company's
6    intangible assets would not include a company's
7    goodwill?
8        A.    I don't know that.  You can classify
9    -- I don't -- I don't know their exact
10   classifications.  It could be customer lists,
11   value of business, business prospects.  My --
12   my comments about the impairment would have
13   affected any and all those.
14           If what you are suggesting -- if you
15   suggest there is some damage from statements,
16   they need to impair their -- their -- their
17   assets for future business, business prospects,
18   customer lists, things like that.  You can't --
19   if you're -- if you're going to have damage,
20   it's going to truncate your useful life and you
21   have to shorten your cash flow forecasting
22   period and -- and take an impairment.



Page 213

1    They didn't take any impairment.  So
2 you can -- you can -- I'll take you at your
3 word for IFRS, but -- but it -- from U.S. GAAP
4 perspective, they needed to take an impairment,
5 if -- if it were true, but they did not take an
6 impairment, so that leads one to believe that
7 the accountants didn't think there was any
8 damage.
9    Q.   You are aware, sir, that the audit
10 was done in accordance with IFRS standards,
11 correct?
12    A.   With respect to -- as -- as we
13 discussed before with the comparatives.
14    Q.   Right.  That's what I want to stay
15 focused on for the moment.
16        Are you aware under IFRS customer
17 lists should not be recognized as intangible
18 assets?
19    A.   I'm not aware of that.  It could be
20 just they classify them somewhere else.  That's
21 all.  It could be just geography on the -- on
22 the balance sheet, and I -- I -- you know, my

Page 214

1 comments are globally.  You know, if you get --
2 you've got impact on the business, you need to
3 impair that particular asset however it's
4 classified.  If IFRS says put it in something
5 else, you impair it.  They didn't.
6        They did -- they did take an
7 impairment on PPE, $16 million.  So it's not
8 like impairments were just not done.
9 Smartmatic took an impairment on PPE.
10    Q.   All right.  So let's go to --
11        MR. LETKEWICZ:  Jane put the --
12 since it looks like he does not have his
13 computer in front of him --
14        THE WITNESS:  I will now.  I will.
15        BY MR. LETKEWICZ:
16    Q.   Okay.
17    A.   Go ahead.
18    Q.   All right.  Well, when you get
19 there --
20    A.   Yep.
21    Q.   -- I would direct your attention to
22 Page 11 and Paragraph 43.

Page 215

1    A.   Of which -- of which one?
2    Q.   Of your July 9 report, sir.
3    A.   Oh, okay.  Page 11, 43?
4    Q.   Yep?
5    A.   Okay.  I'm there.
6    Q.   All right.  And you say:
7 "Plaintiffs' use" -- goes on, and you say:
8 "Either did not know, failed to realize, or
9 intentionally ignored that a required
10 impairment to intangible assets would be
11 necessary."
12    A.   Yes.  Yeah.
13    Q.   So in your report, you're talking
14 about an impairment to intangible assets,
15 correct?
16    A.   Yes, and I'm broadly using
17 intangibles to include business prospects,
18 customer lists, goodwill, all of it.  All the
19 things they had put into intangibles.
20    Q.   And are you familiar, sir, with
21 International Accounting Standard 38?
22    A.   No.

Page 216

1        MR. LETKEWICZ:  Can you put that --
2 can you put Tab 20 in the chat, and this will
3 be marked as Plaintiffs' Exhibit 683.
4        (Deposition Exhibit 683 was marked
5 for identification.)
6        THE WITNESS:  Okay.
7        BY MR. LETKEWICZ:
8    Q.   All right.  And you should see on
9 the first page IAS38, intangible assets.  Do
10 you see that?
11    A.   I do.
12    Q.   Okay.  And if you could go to Page
13 5, which in the bottom right-hand corner is
14 A1519.
15    A.   Okay.  I'm there.
16    Q.   Okay.  And it says:  "The objective
17 of the standard is to prescribe the accounting
18 treatment for intangible assets that are not
19 dealt with specifically in any other standard."
20        Do you see that?
21    A.   Yes.
22    Q.   Okay.  If you can go to the Page 15,



Page 217

1  which in the lower right-hand corner is A1529.
2      A.   Okay.
3      Q.   And do you see how there's numbering
4  on the left-hand side?
5      A.   I do.
6      Q.   And in 48 it says --
7      MR. KACHOUROFF:  Sorry -- I'm sorry
8  to interrupt.  Where are we?  We're on -- we're
9  on Exhibit 683 of what page?
10     MR. LETKEWICZ:  We're at Page 15,
11 which in the lower right-hand corner is A1529.
12     MR. KACHOUROFF:  Give me one second
13 to follow you.  Okay.
14     BY MR. LETKEWICZ:
15     Q.   All right.  And at 48 it says:
16 "Internally generated goodwill shall not be
17 recognized as an asset," correct?
18     A.   I see that.
19     Q.   Okay.  And if you go to -- let's
20 see.  Two pages later, which is A1531.
21     A.   Okay.
22     Q.   And it says:  "Internally generated

Page 218

1  brands, mastheads, publishing titles, customer
2  lists, and items similar in substance shall not
3  be recognized as intangible assets."
4          Do you see that?
5      A.   I do, yes.
6      Q.   Okay.  All right.  And so what IAS
7  38 is saying here is that brands are not an
8  intangible asset, correct?
9      MR. KACHOUROFF:  I'm going to object
10 to that because I think that's a misstatement
11 of the IAS Rule 38 which talks about
12 identifiable assets, and I'm also going to
13 object to form.
14     MR. LETKEWICZ:  Okay.
15     THE WITNESS:  Was -- is there a
16 question?
17     BY MR. LETKEWICZ:
18     Q.   Sure.  So IAS38 is saying here at 63
19 is that internally generated brands, mastheads,
20 publishing titles, customer lists, and items
21 similar in substance shall not be recognized as
22 intangible assets.

Page 219

1      A.   Okay.  I see that.
2      Q.   And we looked at earlier that in
3  internally generated goodwill shall not be
4  recognized as an asset.  We saw that also in
5  IAS38, correct?
6      A.   Yes.
7      Q.   Have you looked at BDO's work papers
8  concerning Smartmatic USA's intangible assets
9  for 2020?
10     A.   No.
11     MR. KACHOUROFF:  No.  The defendants
12 have -- the plaintiffs have refused to turn
13 them over, so just letting you know.  I haven't
14 gotten them.
15     MR. LETKEWICZ:  I don't believe that
16 is true, but your -- your statement is noted.
17     MR. KACHOUROFF:  As my colleagues --
18 I told my colleagues, we don't have the same
19 federal law system that you-all have.  I
20 literally have to search through a hard drive
21 page by page.  So if you have them -- and I
22 have asked for all the documents.  I was given

Page 220

1  this four set of Bates-stamped numbers.  I
2  found them, and that was not among them.
3      MR. LETKEWICZ:  Okay.
4      BY MR. LETKEWICZ:
5      Q.   You have not looked at BDO's work
6  papers concerning Smartmatic USA's intangible
7  assets for 2021, correct?
8      A.   True.
9      Q.   You have not looked at Smartmatic --
10 I'm sorry.  Strike that.
11         You have not looked at BDO's work
12 papers concerning Smartmatic USA's intangible
13 assets for 2022, correct?
14     A.   Correct.
15     Q.   So you would not know why Smartmatic
16 USA did not recognize an intangible asset
17 impairment for 2020, correct?
18     MR. KACHOUROFF:  Again, I object to
19 the form of the question and the notion that we
20 have received these.  If you've got these
21 documents and you have the Bates stamp numbers
22 for them, I would love to have them here on the



Page 221

1  record.
2      BY MR. LETKEWICZ:
3      Q.   Sir, I am just asking if you know or
4  not.
5      A.   So I know that there was no
6  impairment --
7      Q.   Okay.
8      A.   -- in those periods.
9      Q.   But --
10     A.   No impairment to any assets,
11  regardless of intangibles or anything.  There
12  was no -- and there should -- if -- if you
13  believe that there was damage to the company,
14  something ought to -- ought to have been
15  impaired, and nothing was impaired so --
16     Q.   Sir, sir, we just looked at --
17     A.   -- the element -- the embedded
18  costs, nothing was impaired.  So --
19     Q.   But, again, you don't -- okay.  I'm
20  sorry.
21     A.   Okay.
22     Q.   But you don't know why there was an

Page 222

1  impairment or there wasn't an impairment,
2  correct?
3      A.   I didn't know that there wasn't an
4  impairment.  And it's -- it's not consistent
5  with your -- your allegations in this lawsuit
6  do not match with that at all.  It's totally
7  inconsistent.
8      Q.   So, sir, we -- we just looked at,
9  though, IAS38.  That's --
10     A.   No.  You looked at particular
11  defined categories.  You didn't look at the
12  entirety of what's on the balance sheet.  There
13  were no impairments to anything on the balance
14  sheet related to impact.
15     Q.   So, sir, we just looked at in your
16  report where you -- you didn't say --
17     A.   Doesn't matter.  Doesn't matter.
18     Q.   Sir, just listen to my question.
19  Okay.  Focus on my question, sir.  It is --
20     MR. KACHOUROFF:  Just ask your
21  questions.  Don't tell him to focus.  That's
22  deprecating.  Just ask the question.

Page 223

1      BY MR. LETKEWICZ:
2      Q.   You -- when you were talking about
3  impairment, you said an impairment to
4  intangible assets.  That was -- those were your
5  words.
6      A.   I'm going to go back to what I used
7  in my report.  What -- impairment --
8      Q.   Sure.  It's in Paragraph 43 --
9      A.   -- required impairment to intangible
10  assets would be necessary.  Right.
11     Q.   And --
12     A.   Go ahead.
13     Q.   -- sir, sir, are you aware of -- you
14  mentioned multiple times about GAAP.  Are you
15  able to tell me the specific -- sitting here
16  today, the specific GAAP standard that would --
17  that if there was -- that -- I'm sorry.  Strike
18  that.
19     Are you able -- sitting here today,
20  are you able to cite to the specific GAAP
21  standard that intangible assets would include
22  reputation, good -- or goodwill?

Page 224

1      A.   I cannot cite that here.  I know
2  that many companies do it -- you take it -- one
3  company, they will do it differently from other
4  companies.  Some will it have it included.
5  Some will break it out as a separate line item.
6  You know, customer list, software development,
7  future business might be classified separately.
8  Sometimes some companies will put it into
9  intangible assets.  So it's -- it's not
10  consistent.
11     Even the -- even the -- and, you
12  know, in -- in Smartmatic's case, they don't
13  even use GAAP so...
14     Q.   And then are you aware of a specific
15  rule or statute that requires Smartmatic USA to
16  use GAAP as opposed to IFRS?
17     A.   No.  No, they're -- they're --
18  they're not required to use GAAP in my view.
19  It would be better, be more -- higher
20  integrity, transparent, but they don't.
21     Q.   One of the reasons that you cite in
22  your report that defendants did not cause any



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
225–228

Page 225

1  harm to Smartmatic is because Smartmatic was
2  losing money in 2021 and 2022, correct?
3      A.    Yes.
4      Q.    And you understand that Smartmatic
5  is claiming lost profits as a result of Mr.
6  Lindell's defamatory statement.  You're aware
7  that is what Smartmatic's allegation is?
8      A.    What profits?  There weren't any.
9      Q.    Sir, I -- I understand that it's
10  your opinion that there were no profits.
11      A.    There weren't any.
12      Q.    My question is:  Smartmatic is
13  claiming lost profits as a result of the
14  defendants' conduct?
15      A.    Yeah.  I heard that, yes.
16      MR. LETKEWICZ:  Let's put Tab 18 in
17  the chat.
18      (Deposition Exhibit 684 was marked
19  for identification.)
20      MR. LETKEWICZ:  And for the record,
21  this will be marked as Plaintiffs' Exhibit 684.
22      BY MR. LETKEWICZ:

Page 226

1      Q.    Let me know when you have it open.
2      A.    It's 684, right?
3      Q.    Yes.  So you should see in front of
4  you:  "Forensic and Valuation Services Practice
5  Aid Calculating Lost Profits."
6      Do you see that?
7      A.    I do, yep.
8      Q.    All right.  It's a long document, so
9  I'm just going to ask you about a couple small
10  portions of this document.
11      If you could -- and you -- I'm
12  sorry.  Before I go to the specific page, you
13  had indicated earlier that you had reviewed
14  this, at least a portion of this, as part of
15  your work in this case, correct?
16      A.    Yes.
17      Q.    And you can go to Page 19, and it
18  should be Chapter 3, "Lost Profits As a Measure
19  of Damages."
20      A.    All righty.  Yes.  I'm there.
21      Q.    All right.  And the second
22  paragraph, it says:  "As a measure of

Page 227

1  compensatory damages, damages based on lost
2  profits redress the defendants' unlawful act or
3  acts by compensating the plaintiff for the
4  profits that would have been obtained but for
5  the unlawful act or acts."
6      Do you see that?
7      A.    I do.
8      Q.    Okay.  And then if you can go to the
9  next page, and right underneath the graph, it
10  says:  "Typically the first step in this
11  calculation is to estimate profits that would
12  have been obtained by the harmed party
13  simplified to plaintiff but for the unlawful
14  act during the damages period."
15      Do you see that?
16      A.    I heard what you said.
17      Q.    Okay.  And did you undertake any
18  analysis as to what Smartmatic's revenues would
19  have been but for Mr. Lindell defamatory
20  statements?
21      A.    In the chart right above what you
22  just read, it assumes that there is this --

Page 228

1  this line above the -- above the X axis that
2  reflects profits, but in -- because of
3  Smartmatic's USA's situation, they are below
4  the X axis.  They don't have profits.
5      So it's -- it's basically, you know,
6  less of a loss, more of a loss.  It's -- it's
7  a -- we're not even in the realm of this
8  theoretical -- this guidance that AICPA is
9  putting out.  It's -- and it's ignoring -- it's
10  untethered to the reality of the -- the stark
11  business operations and performance of
12  Smartmatic.  And I can't just suspend my
13  disbelief for you because you want to pretend
14  that some profits are emerging from this
15  company or revenues are emerging from this
16  company.  Revenues were depleting and -- and
17  running off so --
18      Q.    My -- my -- again, my question -- so
19  this is a simple yes-or-no question.
20      Yes or no; did you conduct an
21  analysis into what Smartmatic's revenues would
22  have been but for Mr. Lindell's defamatory



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
229–232

Page 229

1  statements?
2       MR. KACHOUROFF:  Objection.  That's
3  been asked and answered.
4       THE WITNESS:  What is the but for?
5  Because if you're doing the but-for
6  hypothetical, I must insist that my -- my
7  assertions are reality.  They're not
8  hypothetical.  You -- you can't -- you cannot
9  make up revenues from a company who doesn't
10  have the resources to produce those revenues.
11  If -- you know.
12       And this is another glaring massive
13  deficiency of the -- of the plaintiffs'
14  experts.  They can just -- they're trying to
15  just pretend that things emerge out of the
16  blue.  They don't emerge out of the blue.  You
17  actually have to have the resources and the
18  people and the money and the capital to make it
19  happen.  You have to have product to make it
20  happen.  You have to have demand to make it
21  happen.  Smartmatic had none of it.  They had
22  no capital.  They had a product that was not --

Page 230

1  not received so --
2       BY MR. LETKEWICZ:
3  Q.   Again --
4  A.   -- my answer to the question --
5  my --
6  Q.   -- all I am asking for is -- all I'm
7  asking for is -- all I'm asking for is:  Have
8  you conducted an analysis; yes or no?
9  A.   I did -- I did analyze it, yes.
10  Q.   Okay.  And what did you determine
11  Smartmatic's but-for revenues would be but for
12  Mr. Lindell's defamatory statements?
13  A.   What's a but for?
14  Q.   Meaning if Mr. Lindell did not make
15  these defamatory statements, did you do an
16  analysis as to what Smartmatic's revenues would
17  have been?
18  A.   So, yes, I did, and -- and if
19  you're -- if you're defining the but for to be
20  in that particular way, you -- you fail to --
21  you fail to recognize that there are larger
22  more important but fors that are the big

Page 231

1  drivers here.
2       This is -- what you are asserting is
3  just total fantasy.  There -- there -- there
4  weren't any meaningful revenues, and there were
5  meaningful losses.  There's still massive
6  losses for this company.  They caught -- the
7  auditor is right.  It's got -- it's got a risk
8  that it's not going to be in business.  When
9  you have that risk, you don't assign any value
10  to expected persistency.  There is no
11  persistency.  Nothing is -- nothing is there to
12  persist.
13       So, yes, I did the analysis, and
14  yes, I believe there -- there is no -- there is
15  no damage from -- from this, so you know --
16  Q.   So if I'm -- if I'm understanding
17  your answer here, is it your opinion but for
18  Smartmatic -- but for Mr. Lindell's defamatory
19  statements, that Smartmatic USA revenues would
20  be zero?  Is that what you're saying?
21  A.   Very tiny, tiny amounts.  It was --
22  what? -- a few million dollars in revenues.

Page 232

1  Q.   Okay.  Where -- where in your report
2  can I find what Smartmatic's revenue would have
3  been but for the defendants' conduct in this
4  case.
5  A.   There is no -- there is no specific
6  listing in my report of the exact dollar amount
7  of what would have happened with or without
8  statements by Lindell.  The more meaningful
9  and -- the more meaningful analysis is that
10  there was very little revenue to begin with,
11  that the company was in a -- effectively in a
12  runoff mode, and that is the larger driver of
13  this -- of this situation.  You know --
14  Q.   You understand --
15  A.   Go ahead.
16  Q.   You understand the AICPA is saying
17  here is that in calculating lost profits, the
18  first thing you do is to determine what
19  Smartmatic -- or what the plaintiffs' revenues
20  would have been but for the defendants'
21  conduct.  You understand that is the first step
22  that is being described here in this AICPA



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
233–236

Page 233

1  guidance?
2      A.   Sure, but that's -- that's in an
3  academic world.  I am operating in the real
4  world here.  Okay.
5      Q.   So -- well, are you saying then,
6  sir, that the -- that this AICPA guidance is
7  not an authoritative source that an expert can
8  rely on in calculating lost profits?
9          MR. KACHOUROFF:  Object to the form.
10         THE WITNESS:  It's an authoritative
11  source that people can rely on, but they have
12  to do it in -- in a -- and apply it reasonably
13  to the actual circumstances that are happening
14  in the real world.
15         And that's the -- that's the
16  fundamental disconnect here.  Smartmatic is
17  basically trying to pretend that -- that there
18  is -- you know, the sky is blue, and it's not
19  blue.  It's, like, dark and dreary.  So it's
20  pretend.
21      BY MR. LETKEWICZ:
22      Q.   You understood -- so if we go to

Page 234

1  your table here, this Table 5, and you have
2  table of forecast revenue and then actual
3  revenue.
4      A.   Based on it, yes.
5      Q.   And so -- and you believe, as I
6  understand it from your testimony today, that
7  this is one of the reasons why the defendants
8  did not cause Smartmatic any harm; is that
9  correct?
10         MR. KACHOUROFF:  Objection to form.
11         THE WITNESS:  No, I don't agree with
12  that statement.  What -- so it's not --
13      BY MR. LETKEWICZ:
14      Q.   Well, I am trying to understand then
15  what the purpose of that Table 5 is then.
16      A.   Oh, it's showing -- it's showing --
17  I guess it was maybe Tammy -- Tammy Patrick or
18  something that was putting together this, like,
19  projected revenues, and they -- they just show
20  how disconnected they were to reality --
21      Q.   And so --
22      A.   -- and you see the variances I put

Page 235

1  in there.
2      Q.   Yeah.  And so you would say this
3  supports your ultimate opinion that we've
4  talked about today that the defendants did not
5  cause damage to Smartmatic, correct?
6      A.   I -- it's not directly.  Not
7  directly.  I mean --
8      Q.   Now, sir -- well, you understand,
9  sir, that these different forecasted -- you
10  characterize what you say is forecast revenue.
11      A.   Uh-huh.
12      Q.   That was based on a presumption of
13  there being no defamatory statements by the
14  defendants.  Do you understand that?
15      A.   It had a lot of presumptions in it.
16  I do know that was one of them, but it -- it
17  just was fundamentally flawed in many respects,
18  on market share, on growth.  You know, this --
19      Q.   And --
20      A.   -- it's just -- it's -- it's a
21  fantasy, a total fantasy.
22      Q.   And -- well, okay.  I understand you

Page 236

1  think it's a fantasy.
2          But, again, you understand that one
3  of the factors that went into this forecast
4  revenue is that there would not have been any
5  defamatory statements by the defendants, right?
6      A.   That there would not have been?
7      Q.   Yes.
8      A.   Sure.  Maybe that's a possible --
9  possible thing, right.
10      Q.   And these XO -- and you understand,
11  sir, that Smartmatic alleges that Mr. Lindell
12  began making defamatory statements about
13  Smartmatic in 2021, correct?
14      A.   I've heard that allegation.  Don't
15  agree with it.
16      Q.   Okay.  And the -- these actual
17  revenue figures, you know, take into account
18  what has actually occurred from a financial
19  perspective after Mr. Lindell's statement,
20  correct?
21      A.   I don't think that is correct.  So
22  what -- what you're talking about is actual.



Page 237

1  My actual --
2     Q.  So --
3     A.  -- is those that actually happened.
4     Q.  Right.  So you have actual revenues.
5  So you have 25 million actual revenue in 2021,
6  so that was Smartmatic's actual revenue in the
7  real world --
8     A.  Yes.  Yes.
9     Q.  -- in 2021, correct?
10    A.  Yes.  Yes.
11    Q.  And their revenue of 38.5 million in
12  2022 was their revenue in -- was their actual
13  revenue, correct?
14    A.  Perhaps.  Maybe.
15    Q.  Maybe.  So -- so -- well, what was
16  Smartmatic's actual revenue in 2022 if it
17  wasn't 38.5 million, as you state here?
18    A.  So we didn't get the attribution of
19  the components of the revenue, and it appeared
20  to be maybe some transfer pricing from
21  affiliates that might have juiced that number
22  So I don't know what is truly organic revenue

Page 238

1  and what's manipulated revenue.
2        But let's put that aside.  I see
3  that it was 38 million put on their financial
4  statements.
5     Q.  Right.  And then -- and then the
6  forecasted revenue was not based on the
7  defendants' conduct but a hypothetical scenario
8  in which the defendants did not make defamatory
9  statements about Smartmatic.  You understand
10  that, correct?
11    A.  I -- I don't understand that, and I
12  don't -- I don't agree with the numbers.  I
13  think they're a fantasy.
14    Q.  I understand --
15    A.  There is no -- there's nothing that
16  supports it.
17    Q.  I understand, sir, you don't agree
18  with the numbers.
19        But my question is that one of the
20  assumptions into these numbers was that there
21  would have been no defamatory statements by Mr.
22  Lindell, correct?

Page 239

1     A.  So let's just agree to disagree on
2  this.  How about that?  Because if you want me
3  to pretend that all these other assumptions
4  aren't in play but only one assumption is in
5  play, I can't play that game.
6        The bigger drivers are that the
7  revenue -- it was deteriorating, that you could
8  see it in the deferred revenues being cleared
9  out of the pipeline, they had no persistency,
10  they were on fumes.  And there is no reasonable
11  basis for that forecast that I have referred to
12  in my report.  Nothing reasonable about it
13  whatsoever.
14        So you can -- just playing the --
15  playing these hypothetical games isolating just
16  one assumption at the expense of all the other
17  assumptions is -- is -- is a lie to -- to a
18  jury.  You guys want to go in and pretend to
19  lie to a jury.  I -- I can't do that.  I have
20  to tell the truth.  Okay.
21        So the truth is their revenues were
22  depleting.  They were in runoff mode.  I can't

Page 240

1  ignore that.  You guys can try to do that all
2  you want, but I -- I can't.
3        MR. LETKEWICZ:  All right.  Can
4  you -- it looks he's -- can you share your
5  screen and put Tab 19 on the screen, and we
6  will mark that as Plaintiffs' Exhibit 685.
7        (Deposition Exhibit 685 was marked
8  for identification.)
9        THE WITNESS:  Thank you.
10        BY MR. LETKEWICZ:
11    Q.  All right.  So Plaintiffs' Exhibit
12  --
13    A.  Is it up?
14    Q.  It's up.  Do you see it?
15    A.  No.  Where -- how do I get it on my
16  --
17    Q.  We're sharing the screen.  I see it
18  in front of my screen right now.
19    A.  Okay.  Here we go.  Yep.
20    Q.  Okay.  And so Plaintiffs' Exhibit
21  685, this is Plaintiffs' six supplemental
22  answers and objections to defendant My Pillow,



Page 241

1  Inc.'s first set of interrogatories.
2         Do you see that?
3    A.   I do.
4    Q.   And this is something that you have
5  reviewed as part of your work in this case,
6  correct?
7    A.   Yes.
8         MR. LETKEWICZ:  All right.  Jane,
9  please go to Page 26.
10        BY MR. LETKEWICZ:
11   Q.   All right.  Interrogatory 20 asked:
12  "Provide an itemized list of all damages that
13  you allege the defendants have caused you."
14        Do you see that?
15   A.   Yes.
16   Q.   All right.  So it's a rather lengthy
17  document, so I will just direct your attention
18  to -- let's see here.
19        MR. LETKEWICZ:  So let's just start
20  at -- go to Page 31.
21        BY MR. LETKEWICZ:
22   Q.   Page 31 is the fourth supplemental

Page 242

1  answer.  Do you see that?
2    A.   Yes.  Yes.
3    Q.   Okay.  Let's go to Page 33, and it
4  says at about four, five -- well, actually, six
5  lines from the bottom here:  "Assuming
6  Smartmatic maintained a 21.3 percent market
7  share in 2021 through 2025, Smartmatic would
8  have earned but for the disinformation campaign
9  that defendants participated in approximately
10  652.1 million from 2021 to 2025."  And it
11  breaks out that $652.1 million figure by year.
12        Do you see that?
13   A.   Yes --
14   Q.   And --
15   A.   -- and those are the numbers I
16  put --
17   Q.   Yeah.
18   A.   I put those into my -- my Table 5.
19   Q.   Correct.  So these figures were what
20  Smartmatic estimates its damages -- or I'm
21  sorry.  Not damages -- its revenue would have
22  been but for the campaign -- I understand you

Page 243

1  don't agree with the numbers, but that's where
2  the numbers are coming from.  That's all that I
3  am asking for right now.
4    A.   It's just like anybody can write
5  stuff on paper.  Exactly.
6    Q.   And you then compare that to the
7  actual revenue Smartmatic earned in '21 and
8  '22, correct?
9    A.   Right.
10   Q.   And you understand --
11   A.   USA -- I thought it was USA, right?
12   Q.   Correct.
13   A.   Yeah.
14   Q.   And you understand, sir, that -- as
15  we've talked about, that Smartmatic alleges
16  that Mr. Lindell made defamatory statements
17  about Smartmatic in January 2021?  I understand
18  you don't agree with the allegation.  I
19  understand.  But you understand that is an
20  allegation made by Smartmatic, correct?
21   A.   Yes.
22   Q.   So by comparing the -- these

Page 244

1  projected revenues but for the disinformation
2  campaign that the defendants participated in
3  versus the actual revenues that Smartmatic
4  actually earned is not an apples-to-apples
5  comparison, correct?
6    A.   What -- what is not apples to
7  apples?
8    Q.   The fact that you are comparing that
9  what you call the forecasted revenues to what
10  were Smartmatic's actually revenue in '21 and
11  '22?
12   A.   They are not apples to apples.
13  That's correct.
14   Q.   All right.
15   A.   One -- one is forecasted revenues,
16  and one is actual revenues.  They are, by
17  design, different.
18   Q.   All right.  Let's go --
19        MR. LETKEWICZ:  You can take that
20  down, Jane.
21        BY MR. LETKEWICZ:
22   Q.   Let's go back to your report.  And,



Page 245

1   now, one of the other bases that we have talked
2   about today for your opinion that defendants
3   did not cause any harm to Smartmatic are the
4   internal -- are internal communications that
5   you cite in your report, correct?
6       A.   Yes.
7           MR. LETKEWICZ:  And, Jane, can we
8   put the report on the screen, and if you can
9   scroll down to Paragraph 29.
10          BY MR. LETKEWICZ:
11      Q.   All right.  And you cite these
12  communications, I believe, in paragraphs 29 to
13  34 --
14          MR. LETKEWICZ:  You can scroll
15  through that, Jane, to show him that.
16          BY MR. LETKEWICZ:
17      Q.   -- correct?
18      A.   Yes.
19          MR. LETKEWICZ:  And then scroll down
20  to Paragraph 51.
21          BY MR. LETKEWICZ:
22      Q.   And in Paragraph 51 through, I

Page 246

1   believe, 68, yes, you cite additional internal
2   Smartmatic communications.
3           MR. LETKEWICZ:  And, Jane, just
4   scroll through so he can see them.
5           THE WITNESS:  Okay.
6           BY MR. LETKEWICZ:
7       Q.   So from my count, I think I saw
8   about 20 or so communications that you cite in
9   your report.  Does that sound about right?
10      A.   Maybe -- maybe a little -- that's
11  about right.  Maybe fewer.  A little bit fewer.
12          MR. LETKEWICZ:  And, Jane, can you
13  scroll up to Paragraph 28, please.
14          BY MR. LETKEWICZ:
15      Q.   And in Paragraph 28, you state:
16  "Smartmatic executive internal communications
17  show chaos and panic between 2018 and 2020
18  concerning the company's future existence."
19          Do you see that?
20      A.   Yes.
21      Q.   That was based on your
22  interpretation of the Smartmatic internal

Page 247

1   communications that you looked at, correct?
2       A.   Really, really driven by their
3   direct -- the direct words in the e-mails, but
4   I just sort of summarized it right there.
5       Q.   Sure.  So you drew this conclusion
6   about chaos and panic based on your
7   interpretation of the Smartmatic internal
8   communications you cited in your report,
9   correct?
10      A.   I did write that in my report.
11      Q.   And that was based on your
12  interpretation of the documents you reviewed in
13  this case, correct?
14      A.   Yeah, but it was -- it was -- there
15  wasn't much interpreting.  The words -- the
16  words in those e-mails sort of speak for
17  themselves, but -- but I just did it to
18  summarize it.
19      Q.   Well, sir, you say that the words --
20  sir, you say that the words speak for
21  themselves.  I don't believe in any of those
22  documents the word chaos or panic is used.

Page 248

1   Correct me if I am wrong.
2       A.   Okay.  All right.  I'll take your
3   word for it.
4       Q.   Okay.  So your characterization of
5   chaos and panic is your interpretation of the
6   documents you reviewed in this case, correct?
7           MR. KACHOUROFF:  Objection to form.
8           THE WITNESS:  Okay.
9           BY MR. LETKEWICZ:
10      Q.   Is the answer okay?
11      A.   Yes, it's okay.
12      Q.   So yes?
13          MR. KACHOUROFF:  Same objection.
14          THE WITNESS:  Yeah.  I just -- I'll
15  just -- I did --
16          MR. KACHOUROFF:  He's -- he's
17  already admitted that's his conclusion based on
18  the e-mails.  That's what you want him to say.
19          THE WITNESS:  It's a summation --
20  it's a summation of the dozens of e-mails or
21  whatever.  And there's more in there.  I just
22  picked out, like, some highlights so -- but go



Page 249

1  ahead.
2       BY MR. LETKEWICZ:
3    Q.   And, now -- now, again, we talked
4  about earlier that Smartmatic has produced over
5  1.2 million documents, and I believe earlier
6  you indicated that of those documents you
7  reviewed approximately 80 to 100 of those; is
8  that correct?
9    A.   That's -- that sounds about right.
10      MR. LETKEWICZ:  You can take that
11  document down for the moment, Jane.
12      BY MR. LETKEWICZ:
13   Q.   One of the other bases for your
14  opinion that Smartmatic -- strike that.
15      One of the other bases that you
16  mentioned today about why the defendants did
17  not cause Smartmatic any damages is the ongoing
18  DOJ investigation in Smartmatic, correct?
19      MR. KACHOUROFF:  Objection to form.
20      THE WITNESS:  The -- The DOJ
21  investigation did happen during -- during the
22  time period we're looking at for the financial

Page 250

1  analysis.
2       BY MR. LETKEWICZ:
3    Q.   Sure.  And -- and -- and as I
4  understood your -- some of your prior
5  testimony, that is one of the reasons why you
6  have concluded that defendants did not cause
7  Smartmatic any damages; is that correct?
8    A.   Yes.  Correct.
9    Q.   And are you aware of a single
10  potential customer of Smartmatic who refused to
11  or was reluctant to do business with Smartmatic
12  because of the DOJ investigation?
13   A.   No.
14   Q.   Are you aware of any contract
15  Smartmatic lost because of the DOJ
16  investigation?
17   A.   There was nothing reported about
18  that in -- in -- in the e-mails that I saw.
19   Q.   So no, you're -- you're not aware of
20  one?
21   A.   Not aware, so you know, if you -- if
22  you go down -- Smartmatic cannot have it both

Page 251

1  ways.  They can't -- they can't on the one hand
2  say that selected bad news, bad reputational
3  news doesn't affect them but, on the other
4  hand, you know, having their feelings hurt does
5  affect them.
6       I think -- I think the materiality
7  of a DOJ investigation related to bribery or
8  whatever was alleged in -- in Philippines is
9  going to have a much bigger impact than
10  whatever statements, bland, innocuous
11  statements were made by Mike Lindell.
12   Q.   So my question was:  Are you aware
13  of a single contract Smartmatic lost because of
14  this DOJ investigation?
15   A.   So I'll just stick with my answer
16  that I gave already.
17   Q.   Which is no?
18   A.   That the news of DOJ investigating
19  this -- Smartmatic likely had an adverse impact
20  on their contracting.
21   Q.   I understand that that is an opinion
22  you have, but my question is a little

Page 252

1  different.  I am asking you:  Can you identify
2  a single contract, any contract, that
3  Smartmatic lost that you know of because of the
4  DOJ investigation?
5    A.   I can't identify any particular
6  contract that was lost because of the DOJ
7  investigation.
8    Q.   All right.  One of the other bases
9  that we talked about sort of for a brief moment
10  this morning as to why the defendants did not
11  cause Smartmatic any damages is that Smartmatic
12  is focused on lawsuits and not its business,
13  correct?
14   A.   That seems like they -- they've
15  changed their business model to be lawsuit --
16  lawsuits only.
17   Q.   Yeah.  I think you had indicated
18  that their business now is lawsuits; is that
19  correct?
20   A.   By and large, yes.
21      MR. LETKEWICZ:  Can you put his
22  report back on the screen, please.  All right.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
253–256

Page 253

1  And go to Paragraph 42, please.
2      BY MR. LETKEWICZ:
3      Q.   All right.  And the last sentence of
4  Paragraph 42, it says:  "At present it appears
5  that Smartmatic is banking on lawsuits as a
6  source of revenue," correct?
7      A.   Yes.
8      Q.   And, now, in that particular
9  statement, you do not cite a Smartmatic
10  document, correct?
11     A.   I think I refer to -- one of the
12  things that impacted me was a Smartmatic press
13  release about getting money from Reid Hoffman.
14     Q.   Okay.  So is it your opinion then --
15  so strike that.
16         Is it your basis that Smartmatic is
17  banking on lawsuits as a source of revenue
18  based -- based solely on a press release from
19  Reid Hoffman that he was financing Smartmatic
20  lawsuits?
21     A.   No.  I -- I just -- I recalled
22  there's other -- there were other documents at

Page 254

1  Smartmatic that showed me how the business
2  has -- has sort of morphed into a lawsuit
3  business.
4      Q.   What --
5      A.   Okay.  So a set of those are
6  these -- these lawsuit financing contracts
7  where there is -- you know, I don't know --
8  half a dozen, dozen borrowings by people hoping
9  to profit from the lawsuit, and they have,
10  like, a kicker.  It's not -- it's not just an
11  interest rate.  There is, like, a bonus that's
12  built into the contracts.
13         So all -- all of -- all of
14  Smartmatic's, like, recent financing activity
15  maybe in the last two or three years has been
16  just funding lawsuits, and they're -- they're
17  doing -- doing -- raising money based on that.
18  So those are -- those are really big tells
19  that -- that Smartmatic is spending all its
20  time on -- on -- on litigation, not on trying
21  to solve the fundamental product -- problems in
22  their products.

Page 255

1      They basically just -- yeah.  So
2  that's another -- another area.  The financial
3  statements -- the Smartmatic documents that
4  I -- that showed it really simply are the
5  financial statements themselves.  They just
6  show revenues tailing off from, you know,
7  their -- what used to be their business in
8  election systems or whatever contract they had
9  with L.A.  There is not much of that left.
10  They're just -- it's all, like I said, in
11  runoff.  And all the financial information
12  shows -- it's Smartmatic documents again
13  showing that they've -- they've morphed into a
14  lawsuit company.
15     Q.   So your basis that Smartmatic has
16  morphed into a lawsuit company is a press
17  release from Reid Hoffman, lawsuit financing
18  contracts, and Smartmatic's financial
19  statements; is that it?
20     A.   I would add -- yes, that's correct.
21  That's correct.
22         But there's more.  I would look at

Page 256

1  the internal e-mails that are referred to in my
2  report.  Those -- those show the struggling.
3  They show the products not being received well,
4  that the -- that the competition is just eating
5  Smartmatic's lunch.  They -- they don't have
6  certain EACs -- nobody is buying their product
7  anymore because it's not certified, doesn't fit
8  the market, it's not comprehensive, their
9  competitors are better capitalized.  Smartmatic
10  is not capitalized, has negative equity.
11         You know, you can't just -- you
12  can't just assume -- assume it's a Ferrari when
13  you've got, like, an AMC Gremlin in your
14  garage.
15     Q.   Which internal e-mail did you cite
16  in your report, because I think I missed this,
17  where someone at Smartmatic said we are no
18  longer in the election, equipment and services
19  business; we are in the lawsuit business?  Did
20  you see such internal communications because I
21  don't recall seeing such communications cited
22  in your report.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
257–260

Page 257

1    A.   Come on.  Read what I referred to in
2  the report.  They are basically admitting to
3  being third place in their bidding.  They can't
4  bid in so many states because they're not
5  certified.  That's what I am referring to.
6    Q.   So you're saying -- you're saying
7  that --
8    A.   That's -- you can try -- you can try
9  to summarize it all you want, but -- but
10  that's -- that's their own words, in your own
11  Smartmatic exec's words telling us that
12  they're in runoff mode.
13    Q.   Well, let me ask you this:  I mean,
14  are you aware -- did you cite a single
15  Smartmatic internal communication where a
16  Smartmatic person said we are in runoff mode?
17    A.   This is a stupid question.  It's a
18  stupid question.  Just look at the substance of
19  what I wrote.  You want to --
20    Q.   Okay.  Well, you keep saying it's in
21  runoff mode.  Well, sir --
22    A.   Don't -- don't try to tell me what

Page 258

1  I'm saying.  Okay.  Just read my report.  You
2  want to try to box me into saying, oh, he
3  didn't say runoff or he didn't say -- doesn't
4  matter.  It doesn't matter.
5    Q.   Okay.  Well, it doesn't matter.
6       So, sir, I mean, you say that the
7  documents speak for themselves and you keep
8  saying it's in runoff mode.  So then there must
9  be an internal communication in your report,
10  and I must have missed it, where they said, you
11  know what?  We are in runoff mode.
12       MR. KACHOUROFF:  Objection to form.
13  You are being argumentive with him.  Just be
14  respectful.  Ask the question and move on?
15       THE WITNESS:  I answered it.
16  Really.
17       BY MR. LETKEWICZ:
18    Q.   So there is not a specific
19  communication -- you agree there is not a
20  specific communication where someone at
21  Smartmatic said we are in runoff mode?
22    A.   No.  There were words to similar

Page 259

1  effect in their e-mails.
2    Q.   Okay.  And what were those words?
3    A.   I just referred in my report.  Read
4  the internal e-mails about how they were losing
5  business.  The competitors were cleaning their
6  clocks and they were -- they didn't get renewed
7  in L.A.  Couldn't get certified in EAC.  Had
8  basically said we can't -- we can't be devoted
9  to developing new products.  We have to try to
10  sell whatever we have got now.  So bail out --
11  bail out of any new development.  Just try to
12  sell existing stuff, which nobody wanted.
13       I'd be -- I'd be happy to get into a
14  lot of detail on that and read each one, but I
15  just don't want to take the time.  You can just
16  read them, you know.  You -- you know what's in
17  those e-mails.  It's just quibbling about the
18  word "runoff" is sort of stupid.
19    Q.   Are you aware of any Smartmatic
20  deposition testimony in which a Smartmatic
21  witness indicated that Smartmatic's strategy
22  was to close up normal operations?

Page 260

1    A.   So they -- they did talk about --
2  there was an internal strategic reorganization
3  document that said they were going to lay off a
4  bunch of people, and there was a reorganization
5  plan that the board considered.
6       Some of the board bailed out.  Like,
7  I think your U.K. board people said we're just
8  getting off this sinking ship, so yeah.
9    Q.   And, sir, my question was not about
10  Smartmatic internal documents.  I was asking
11  about Smartmatic deposition testimony.
12       So you indicated, I believe toward
13  the beginning of your deposition today, that
14  you reviewed about a half a dozen deposition
15  transcripts.  And in any of those deposition
16  transcripts, did any witness state that they --
17  it was Smartmatic's strategy to close up normal
18  business operations?
19    A.   I did not see those in the
20  depositions that I saw, and I'm not sure that
21  the depositions taken at that time would have
22  had the benefit of the internal e-mail



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024

Page 261

1  disclosures for anybody to even ask Smartmatic
2  people about that at the time.
3      Had -- had -- if they were to go
4  back -- and maybe we should -- if we were to go
5  back and say, okay, by the way, we're still
6  deposing you, and why is this e-mail saying
7  you're about to do a massive strategic
8  reorganization, shut down operations, you're
9  not going to do any new product development,
10  you're just going to try to sell what you have,
11  maybe we'd get a different response.
12     Q.   Sure.  Well, sir, are you aware of a
13  single document that was shown at any of the
14  six depositions that you reviewed?
15     A.   Yes.  That deal -- that deal with
16  what we're talking about right now?
17     Q.   Yeah.
18     MR. KACHOUROFF:  This -- this is
19  outside the scope of his opinion.
20     MR. LETKEWICZ:  Yeah.
21     MR. KACHOUROFF:  You know, we can
22  play the green-eyeshade, gotcha games all day

Page 262

1  long by asking him --
2      THE WITNESS:  Right.
3      MR. KACHOUROFF:  -- if he remembers
4  documents from depositions.  We're going to --
5      MR. LETKEWICZ:  Chris, I don't need
6  the speaking objections.  Just say --
7      MR. KACHOUROFF:  No.  No.  You're
8  going to get my objection, and this is -- I'm
9  asking you -- we can go off the record if you
10  want.  I don't care.
11     At the end of the day, you're
12  wasting time with all this stuff.  I mean, get
13  to your question.  You can ask him the question
14  and move on.
15     THE WITNESS:  And I would just --
16  you're trying to put words in my mouth here,
17  and I -- and I don't like that.  And I'm just
18  trying to -- I've tried -- I've answered these
19  things a couple of times, and I'm trying to be,
20  you know, thoughtful about your questions.  You
21  don't like the answers.  Just say you don't
22  like them and move on, I think.

Page 263

1      BY MR. LETKEWICZ:
2      Q.   Sir, have you done any analysis as
3  to how much time Smartmatic employees are
4  spending on the Smartmatic lawsuits and how
5  much time they are spending on Smartmatic's
6  business?
7      A.   You know, I thought of that.
8  That's -- that's a great question, and I -- I
9  just -- I look at all the time in the document
10  production and the depositions and the courts,
11  and it has to have a toll on -- I don't know.
12  It seems like a lot of time on litigation to me
13  for the -- for the folks.  I don't know if it's
14  a majority of their time.  Just -- from --
15  from -- again, I look at it from the kind of
16  bottom up from the financial perspective.
17     And I don't see any new revenues.  I
18  see runoff revenues, and by that -- I'm sorry
19  to be using that term.  You know, I know you
20  don't like it term.  But residual trailing
21  revenues from the Los Angeles County contract.
22  That's all they have, and those weren't --

Page 264

1  those weren't even persistent revenues.  They
2  were sort of just one-time add-ons.  That's all
3  that has been -- that's all that has flowed
4  through the financial statements.
5      So from my view of the financial
6  statements is this is a -- it's a dying entity.
7  The basic operations are dying, and it seems
8  like from the financial statements of all the
9  capital raised that it's totally now morphed
10  into predominantly a lawsuit operation.
11     Q.   But you did not look at any
12  Smartmatic time records as to how Smartmatic
13  employees were spending their time?  That would
14  be correct?
15     A.   No.  If you got them, send them to
16  me.  But, no, I did not.
17     Q.   And did you do any analysis as to
18  how much Smartmatic has spent in any year since
19  filing its lawsuits against Fox News, Newsmax,
20  and Mr. Lindell and on its -- in comparison to
21  how much it spent on its business?
22     A.   I saw indications of it in -- in --



Page 265

1  in the cash flow statements that show it's the
2  majority of their -- the majority of their
3  financing is coming directly related to and for
4  litigation expenses.
5       If they didn't -- if they didn't
6  have the litigation expenses, they might have
7  actually shown a profit in one of those years.
8       But, no, as far as, like, time, I
9  don't have that visibility at this point on the
10  relative time spent.  It has got to be a lot.
11  You know, hey, it's a competitive marketplace
12  out there.  If you -- if you -- if they're
13  thinking they've got a shot, you're thinking
14  you've got a shot trying to do this -- this --
15  this shakedown, whatever.  It's not illegal for
16  you to do it.
17     Q.   So it's your opinion then that this
18  Smartmatic lawsuit is a shakedown?
19     A.   Yes.
20       MR. LETKEWICZ:  All right.  Can you
21  put his report back on the screen.
22       BY MR. LETKEWICZ:

Page 266

1     Q.   All right.  Can you go to Paragraph
2  79.
3     A.   Okay.
4     Q.   All right.  And then in 79 and then
5  80, you say:  "Smartmatic settled a lawsuit
6  with One America News Network for an
7  undisclosed sum.  Smartmatic has spent that
8  money on dividends to stockholders, transfers
9  to affiliates, or to pay for ongoing litigation
10  expenses."
11       Do you see that?
12     A.   I do, yes.
13     Q.   And that's speculation on your -- on
14  your part that Smartmatic spent the OAN
15  settlement on dividends to stockholders,
16  transfers to affiliates, or to pay for ongoing
17  litigation expenses?
18     A.   Those are the only -- those are the
19  likely uses of that money.  Where else would it
20  go?  Is it sitting on the balance sheet?  It
21  doesn't look like it's sitting on the balance
22  sheet.  I don't have 2024 financials, so we can

Page 267

1  prove this out if you send me 2024 financials.
2     Q.   Right.  So you -- but you don't know
3  how Smartmatic used or didn't use the OAN
4  settlement, correct?
5     A.   My statement was a true statement.
6  It's -- it's got to be these -- one of these
7  three things or a combination of all of them.
8     Q.   And, again, you have not seen a
9  specific document indicating that?
10     A.   No.  Send me -- send me 2024
11  financials, and then we can prove it.  Can we
12  get them?
13     Q.   One of the things that you've been
14  talking about over the last hour is the fact of
15  Smartmatic not having much deferred revenue
16  after 2020.  Do you recall that?
17     A.   Yes.  I made a couple of references
18  to that in the past hour, yes.
19     Q.   And you're aware, sir, that in order
20  for Smartmatic to have deferred revenue it has
21  to obtain contracts from customers, correct?
22     A.   Or in this case --

Page 268

1       MR. KACHOUROFF:  Hold on.  Wait.
2  Wait, Robert.  Let me make my objection.
3       Objection to form, and objection to
4  the question assuming that they don't have
5  customers.  They have government contracts.
6       BY MR. LETKEWICZ:
7     Q.   Okay.  Answer the question.
8     A.   So I'm aware of one government
9  contract.  That's it, and it appears to be in a
10  residual wind-down trailing mode, and that's
11  reflected in the accounting for deferred
12  revenues.
13     Q.   But you would agree, sir, that
14  Smartmatic cannot defer revenues for contracts
15  it has not yet obtained, correct?
16     A.   Yes, that's true.  You -- so it's a
17  good thing that you bring that up.  Yes.  You
18  cannot count your chickens before they're
19  hatched.  Yet Smartmatic is doing exactly that
20  in this lawsuit, counting chickens that are --
21  are ill and dying.
22       So, yes, you're right.  But let's



Page 269

1  apply it across this whole thing.  This whole
2  thing is a charade of pretend.
3      Q.    So one of the other bases that
4  you've also referred to in the past hour and
5  earlier today as to why the defendants did not
6  cause any of Smartmatic's damages is that
7  Smartmatic's -- Smartmatic was outperformed by
8  its competitors which, in your view, had
9  superior products or were better at capturing
10 government contracts, correct?
11     A.    That was not my view.  That was
12 Smartmatic's employees' view.
13     Q.    Have -- have you -- let's --
14 actually, I'll anchor my next question.
15        MR. LETKEWICZ:  Can you put his
16 report back up on the screen.
17     BY MR. LETKEWICZ:
18     Q.    Or -- or if you're able to refer to
19 it, I won't have to put it back on the screen.
20     A.    Go ahead.  Yeah, I've got it up.
21     Q.    Sure.
22     A.    What is it.

Page 270

1      Q.    Yeah.  If you can go to Paragraph
2  23.
3      A.    Okay.  I'm there.
4      Q.    All right.  And you say: "Starting
5  in 2018 and getting worse in 2019, Smartmatic
6  USA has been outperformed by its competitors
7  ES&S, Dominion, and Hart InterCivic, which
8  apparently had superior products or were better
9  at capturing government contracts."
10        Do you see that?
11     A.    I do.
12     Q.    Okay.  And which products are you
13 referring to here?
14     A.    So election systems broadly.  So the
15 other -- the other aspect of that is that my
16 understanding of the ES&S, Dominion, and Hart
17 InterCivic is that they had -- EAC approved,
18 and they had the comprehensive package of them.
19        And many, many -- according to the
20 e-mails I read from Smartmatic's own people,
21 that they -- their -- those -- it said
22 Smartmatic had, like, a piece of this or a

Page 271

1  piece of that, but they didn't have a
2  comprehensive solution that the government's --
3  the state election people wanted.  They wanted,
4  you know, a bigger scale product that covered a
5  lot of things and -- and then that Smartmatic
6  was sort of relegated to, like, this little
7  niche thing here, like, the -- the Voting
8  Systems For All People thing in L.A.
9      Q.    What do you mean by a "comprehensive
10 batch"?
11     A.    Okay.  From -- I guess what I meant
12 is that they have the tabulators, the election
13 management systems, the e-poll books.  If there
14 were a requirement to have a ballot marking
15 device, they would also have a ballot marking
16 device.
17        So they -- they had the full array
18 -- these other larger competitors,
19 well-capitalized competitors, had and have all
20 those components.  And my understanding is that
21 Smartmatic did not have all those components.
22     Q.    And during what time frame did

Page 272

1  Smartmatic's competitors, ES&S, Dominion,
2  and/or Hart InterCivic, have superior products
3  to Smartmatic?
4      A.    From the e-mails, again, I could
5  tell that it was from 2018 all the way through
6  2022.
7      Q.    And by "the e-mails," you're
8  referring to the Smartmatic internal e-mails,
9  correct?
10     A.    Smartmatic internal e-mails, yes.
11     Q.    You did not, as part of your
12 analysis, review any documents from ES&S,
13 correct?
14     A.    Correct.
15     Q.    You did not review any documents
16 from Dominion, correct?
17     A.    Not for this case.
18     Q.    And you did not review any documents
19 from Hart InterCivic, correct?
20     A.    No.  No.
21     Q.    And you did not speak with anyone at
22 ES&S, correct?



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
273–276

Page 273

1    A.    Correct.

2    Q.    You did not speak with anyone at

3  Dominion, correct?

4    A.    Correct.

5    Q.    You did not speak with anyone at

6  Hart InterCivic, correct?

7    A.    Correct.

8    Q.    And did you do any analysis as to

9  how many contracts Smartmatic's competitors won

10  in a particular year?

11    A.    No, not -- not -- no.  I just

12  anecdotally heard they were -- they were

13  getting awarded ones that -- that -- again,

14  from the eternal e-mails, that Smartmatic was

15  bidding on, but then it was awarded to -- you

16  know, Georgia got awarded to Dominion.  ES&S

17  got awarded, you know, somewhere else,

18  whatever.  So just anecdotal.

19    Q.    By "anecdotally," you're referring

20  to your review of the Smartmatic internal

21  communications, correct?

22    A.    Yes, and also my knowledge of where

Page 274

1  Dominion operates.  I just happen to know that

2  they were getting large contracts in other

3  markets across the country.

4    Q.    Did you, for your work in this --

5  strike that.

6        For your work in this case, did you

7  look at any financials for ES&S?

8    A.    No.

9    Q.    Did you look at any financials from

10  Dominion?

11    A.    No.

12    Q.    Did you look at any financials from

13  Hart InterCivic?

14    A.    No.

15    Q.    Did you -- so then did you do any

16  analysis to the total value of contracts that

17  any Smartmatic's competitors won for a

18  particular year?

19    A.    No, I have not.

20    Q.    Now, one of things you talked

21  about -- you've talked about a few times today

22  is that Smartmatic -- I'm sorry -- the

Page 275

1  defendants -- one of the other reasons the

2  defendants did not harm Smartmatic is that

3  Smartmatic does not have a voting machine that

4  is EAC certified, correct?

5    A.    Correct.

6    Q.    But you're aware, sir, that

7  Smartmatic won a contract worth hundreds of

8  millions of dollars with L.A. County even

9  though it did not have EAC certification,

10  correct?

11    A.    Correct.

12        MR. KACHOUROFF:  Objection to form.

13    BY MR. LETKEWICZ:

14    Q.    And are you aware how many states

15  require EAC certification?

16    A.    I don't know the exact ones, but I

17  think it's -- it's a supermajority.  I'm

18  thinking 30s, 30 of the 50, something like

19  that.

20        MR. LETKEWICZ:  Can you put Tab 3 in

21  the chat.

22        THE WITNESS:  And then, of course,

Page 276

1  you know, it depends on the type of equipment

2  that is certified.  If -- if you're talking

3  about EMS, then many -- I think all of them

4  need to be EAC certified, but if it's -- if

5  it's BMDs or -- or peripherals then -- like,

6  printers, scanners, not necessarily.

7        (Deposition Exhibit 686 was marked

8  for identification.)

9        THE WITNESS:  Okay.  What am I

10  looking at?

11        BY MR. LETKEWICZ:

12    Q.    All right.  And this is 686.  This

13  will be marked as 686.  And so this -- you

14  should see it should state:  "The Expert

15  Rebuttal Report of Christopher James."

16    A.    All right.  Okay.  I see it.

17    Q.    All right.  And you've -- you've

18  reviewed this report, correct?

19    A.    Yes, I have.

20    Q.    Okay.  All right.  If you can go --

21        MR. KACHOUROFF:  Before you go --

22  before you go -- before you go further, I just



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
277–280

Page 277

1  want to state for the record, as I told your
2  colleague yesterday, we're going to be doing a
3  rebuttal to it so...
4      MR. LETKEWICZ:  Okay.  And we
5  reserve all rights to -- you're saving me some
6  time at the end of the deposition.  Thank you,
7  Chris.
8      We reserve all rights, including
9  striking such rebuttal report as untimely and
10  being able to depose Mr. Bowes about any such
11  rebuttal report.
12      MR. KACHOUROFF:  You are the ones
13  who didn't give me the -- the information until
14  the day the rebuttal reports are due, so you
15  know, I understood we talked to Tim Frye about
16  this, and I understand you reserve all your
17  rights.
18      So you can continue.
19      BY MR. LETKEWICZ:
20  Q.  All right.  If you can go to
21  Paragraph 50.
22  A.  Okay.

Page 278

1  Q.  And in Paragraph 50, do you see that
2  Professor James is describing various products
3  and services Smartmatic offers.  He says:  "In
4  addition to voting machines and associate
5  software, Smartmatic offers:  Project
6  management and oversight; 2, system readiness
7  testing; 3, voter registration and management
8  services; 4, poll worker recruitment, training,
9  and support; 5, election management platforms;
10  and, 6, online voting platforms (also referred
11  to as e-voting or Internet voting)."
12      Do you see all that?
13  A.  I -- I did read that.  Yes, I see
14  it.
15  Q.  Okay.  And do you have any reason to
16  believe that Smartmatic does not offer any of
17  these products or services?
18  A.  I don't know if they offer these,
19  but these are -- these are -- seem like they
20  are trying to sell whatever they can possibly
21  sell it looks like maybe.  I'm not sure when --
22  when -- what date.  This is not dated.

Page 279

1      And -- and, more importantly,
2  these -- what's not listed in there is the most
3  important part.  They don't talk about
4  tabulators, EMS.  They don't talk about e-poll
5  books.  So the three key things that -- that
6  the election state -- the election management
7  bodies want, Smartmatic doesn't even offer.
8      You can do project management and --
9  and throw in screen door repair in there, and
10  you're good.  You know, it's all -- it's
11  all not an important part.
12  Q.  So my question was simply:  Do you
13  have any reason to believe that Smartmatic does
14  not offer any of these products or services,
15  and based on the initial part of your answer,
16  the answer to that is no, you're not aware of
17  any of --
18  A.  I -- I just -- I don't know.  I
19  don't know what they're doing or what they're
20  -- you know, they can -- they can say they've
21  got things for sale, but I know that they
22  haven't actually sold stuff.  So, I mean, L.A.

Page 280

1  is the last contract I know of.
2      So this -- this is -- this list I --
3  there's -- there's a low degree of certainty
4  that this is true -- these are true statements.
5  Q.  Okay.  And why do you say there is a
6  low degree of certainty that these are true
7  statements?
8  A.  Because I don't see it in the
9  numbers.  Show me a -- show me a contract that
10  they have gotten for any of the list of items
11  here.  Have that got any contracts for 1
12  through 6 in the last -- since L.A.?  Have they
13  received any contract, 1, 2, 3, 4 or 5 or 6,
14  since L.A.?
15  Q.  So --
16  A.  It seems to me to be totally
17  speculative.
18  Q.  Well, sir, aren't you speculating
19  that Smartmatic has not sold these?
20  A.  No.  No.  I know that Los Angeles is
21  the last contracts they've had.
22  Q.  Well, sir, you know that they --



Page 281

1  they are -- they do business outside the United
2  States, though, right?  Correct?
3      A.   All right.  So we're getting back to
4  the interrogatories.  We are talking about USA,
5  right?
6      Q.   All right.  But you -- you are
7  speculating that Smartmatic USA has not or has
8  not sold any of these products and services
9  listed 1 through 6, correct?
10          MR. KACHOUROFF:  Objection.  Asked
11  and answered.
12          THE WITNESS:  Yeah.  Yeah, I have
13  answered.  It's like I don't think they've sold
14  it to anybody in the U.S. other than L.A.
15      Q.   And that's based on your review of
16  the financial statements; is that correct?
17      A.   And e-mails.
18      Q.   And e-mails?
19      A.   Uh-huh.
20      Q.   Are you aware --
21      A.   Wait.  BDO writes they had one
22  customer.  One customer.  That's it.  And that

Page 282

1  was VSAP and maybe related software.
2      Q.   Sir, have you reviewed the contract
3  between L.A. County and Smartmatic?
4      A.   I -- I did see some aspects of it,
5  but I -- but I haven't dug into it in detail.
6  I know they had, like, an extra add-on piece
7  just, like, in the 2022, maybe 2021, 2022, but
8  I don't -- I wouldn't say I know it in detail.
9      Q.   And going back to this list of items
10  in Number 50 do you know if project management
11  and oversight requires EAC certification?
12      A.   I don't believe it does.
13      Q.   Okay.  And do you know if system
14  readiness testing requires EAC certification?
15      A.   If it's -- if it's EMS or logic and
16  accuracy, yes, but I don't know what system
17  they're talking about here.  Maybe otherwise,
18  no.
19      Q.   All right.  And voter registration
20  and management services, does that require EAC
21  certification?
22      A.   No.

Page 283

1      Q.   Poll worker recruitment training and
2  support, does that require EAC certification?
3      A.   No.  No.
4      Q.   Election management platforms, does
5  that require EAC certification?
6      A.   Maybe.  Depends on what platforms
7  that this guy is talking about.
8      Q.   Online voting platforms, does that
9  require EAC certification?
10      A.   I don't know.  Maybe.
11          MR. LETKEWICZ:  All right.  We've
12  been going about an hour and 20 minutes.  I
13  want to give the court reporter a break.  Why
14  don't we break for eight minutes and come back
15  at quarter till?
16          THE VIDEOGRAPHER:  We are going off
17  the record at 3:37 p.m.
18          (A short recess was taken.)
19          THE VIDEOGRAPHER:  We are back on
20  the record.  3:46 p.m.
21          BY MR. LETKEWICZ:
22      Q.   Okay.  Now, Mr. Bowes, it's your

Page 284

1  opinion that not only did defendants not cause
2  Smartmatic any damages, that Mr. Lindell's
3  statements actually helped Smartmatic, correct?
4      A.   I -- I don't know about that.  I
5  think that there were all kinds of statements
6  going out by various actors all across the
7  spectrum that were saying -- I think -- I think
8  the bigger impact is -- is when the U.S.
9  government comes out and -- and various parties
10  within inside the U.S. government come out and
11  say it's the safest, most secure election ever.
12  You know, Chris Krebs, various people, so that
13  those certainly -- that certainly helped that
14  business, the election system business.  I
15  don't know -- I don't know whether --
16      Q.   Let me --
17      A.   I don't think Lindell's statements
18  had any -- had any impact either way.
19      Q.   I'll -- I'll help you by directing a
20  portion of your report here.  If you can go to
21  Page 11 and Paragraph 42, and let me know when
22  you're there.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
285–288

Page 285

1    A.    42?
2    Q.    Yes.
3    A.    Yes.  Yes.
4    Q.    And you state in the middle of this
5    paragraph:  "If anything, statements by Lindell
6    gave Smartmatic new life."
7        Do you see that?
8    A.    I do see that.
9    Q.    And do you still stand by that
10   sentence?
11   A.    Yes.  It -- it brought attention to
12   them.  The government -- the U.S. government
13   was backing them up basically saying, oh,
14   safest, most secure election.
15       And it -- frankly, before 2020 they
16   were -- they were having -- what I was trying
17   to get at in that statement is that you could
18   see that the L.A. contract was -- was sort of
19   drying up, running down, you know, just stubs
20   -- you know, stubs of it coming in.
21       This -- this dispute has created a
22   new life for Smartmatic.  They, you know, got

Page 286

1    them tens of millions of new capital to come
2    into Smartmatic because of this litigation.
3    They -- they got a settlement from OAN.  They
4    are trying to shake money out of other
5    entities.  So this is, I guess, the new life I
6    was referring to in that statement, the
7    litigation life.
8    Q.    And if you can go to Page 18 --
9    A.    Yes.
10   Q.    -- and Paragraph 82.
11   A.    Okay.
12   Q.    And in the last sentence, you write:
13   "Ironically, had media and individuals not
14   mention Smartmatic, the company would not be in
15   business today and would have folded shortly
16   after the 2020 election."
17       Do you see that?
18   A.    Yes.  That's what I believe, yes.
19   Q.    Yeah.  And are you including Mr.
20   Lindell in that particular statement?
21   A.    Well, yes.  He is the target of a
22   shakedown, so yes.  I think -- I think this is

Page 287

1    still a true -- still a true statement.
2        MR. LETKEWICZ:  All right.  Can you
3    put Tab 5 in the chat.  This will be marked as
4    Plaintiff's Exhibit 686.
5        MS. MOYE-ROWLEY:  87.
6        MR. LETKEWICZ:  687.  Thank you.
7        (Deposition Exhibit 687 was marked
8    for identification.)
9        THE WITNESS:  87?
10       MR. LETKEWICZ:  Or 86?
11       THE WITNESS:  86.  Oh, wait.
12   It's --
13       BY MR. LETKEWICZ:
14   Q.    Open 687, Mr. Bowes.
15   A.    Okay.  It just populated.  I see it
16   now.
17       Okay.  It's open.
18   Q.    Okay.  And this -- I will represent
19   to you this is the first supplemental complaint
20   that Smartmatic filed in this case.
21       I believe you indicated earlier that
22   you had reviewed this as part of your work in

Page 288

1    this case, correct?
2    A.    I reviewed parts of it, not all of
3    it.
4    Q.    Okay.  All right.  Well, I'm only
5    going to ask you about a couple small parts of
6    this.
7        If you could go to Page 63 of the
8    PDF.  It's Page 60 in the document, and let me
9    know when you're there.  You should see a
10   Paragraph 158.
11   A.    It's Page 60 in the document?
12   Q.    It will be 63 of the PDF.
13   A.    Okay.  It's --
14   Q.    If you look at the page number on
15   the bottom center, it says 60.
16   A.    Okay.  I have that.
17   Q.    And in 158 it says:  "Below are some
18   of the statements that Lindell made and/or
19   broadcast to create the impression that
20   Smartmatic had stolen the 2020 U.S. election
21   for Joe Biden and Kamala Harris."
22       Do you see that?



Page 289

1    A.   So -- okay.  It is part of 158 that
2  starts above?  Okay.
3    Q.   Yeah.  Do you see that -- that
4  sentence?  And then it's -- on that particular
5  page, it's A through F.
6    A.   A through F.  So A through F are not
7  -- oh, on -- is it 60?  I'm sorry.
8    Q.   Page -- Page 60.  It's Page 63 of
9  the PDF.
10    A.   Okay.  Right.  I see those.
11    Q.   And in Subsection B, it says -- it
12  alleges Mr. Lindell said:  "I have" -- "I have
13  100 percent, not 99 percent, 100 percent
14  evidence" of -- "that of everything they did,
15  Smartmatic, ES&S, all of those machines did and
16  stole our country and stole our election."
17       Do you see that?
18    A.   I see that.
19    Q.   So how did this particular statement
20  not only not harm Smartmatic but give it new
21  life?
22       MR. KACHOUROFF:  Objection.  This

Page 290

1  goes beyond his opinion.
2       But you can answer it again.
3       THE WITNESS:  Yeah.  I think I
4  answered it before.  I'll just summarize it
5  quickly.
6       The -- this dispute has given
7  Smartmatic a life that they would not have
8  otherwise had.  They -- they appeared to me to
9  be failing in their contract bidding and that
10  now they are in a new life of litigation.
11       BY MR. LETKEWICZ:
12    Q.   So do you believe --
13    A.   That's what I meant.
14    Q.   So do you believe then that being
15  accused of stealing a U.S. presidential
16  election actually helps a company?  Is that
17  what you're saying?
18       MR. KACHOUROFF:  Objection to form.
19       THE WITNESS:  I'm not saying that.
20       BY MR. LETKEWICZ:
21    Q.   Okay.  But that -- but you are
22  saying that this -- statements, such as that

Page 291

1  one, did not financially harm Smartmatic and
2  gave Smartmatic new life, correct?
3    A.   So you've got to get into the harm.
4  I think that it's relative to -- to what the
5  condition of Smartmatic was at the time.  And
6  they had -- this USA was very tenuous, had no
7  capital.  They were -- you know, had a going
8  concern opinion.  So --
9    Q.   So a statement -- go ahead.  I'm
10  sorry.
11    A.   Go ahead.
12    Q.   So a statement that Smartmatic stole
13  the 2020 U.S. presidential election did not
14  cause any financial harm to Smartmatic.  That's
15  what your testimony is?
16       MR. KACHOUROFF:  Objection.  That
17  mischaracterizes the paragraph.  The whole
18  paragraph doesn't say just Smartmatic.
19       BY MR. LETKEWICZ:
20    Q.   You can answer the question.
21    A.   So this statement listed in B, I --
22  I don't believe that it harmed the financial

Page 292

1  condition of Smartmatic.
2    Q.   And why is that?
3    A.   So it's -- it's not -- the main
4  thing is that Smartmatic had already harmed
5  themselves, and was that -- that they were at
6  the losing end of incumbency bias, as Chris
7  James says.  He says it's incumbency bias.
8  They -- they were on the losing end of that
9  because the -- the two other -- two or three
10  other competitors were the incumbents, and
11  Smartmatic was trying to wedge themselves in
12  and unsuccessfully.  Could not wedge themselves
13  into getting any contracts other than L.A.
14       So they -- they -- they just didn't
15  have the resources.  Their -- their business
16  practices showed poor integrity.  They had
17  political risk.  They had -- just -- their
18  operations just were inferior.  So they had
19  already harmed themselves.  So you can't
20  really -- can't really harm them any further
21  when they have already, you know, been in a --
22  in a -- it was a sinking ship to begin with



Page 293

1   so --
2       Q.    So it's your -- your opinion then,
3   if I am understanding that answer, that as of
4   -- as of the -- January 1, 2021 Smartmatic was
5   worth zero.  Is that essentially what you're
6   saying?
7       A.    So the worth of the company would --
8   I -- I look at it as the simplest measure is
9   the equity value in the company, and it was
10  near zero.  I think -- I think in 2021 they had
11  negative equity, if I am not mistaken, or very,
12  very little, if any, capital.  So that's --
13  that's a pure accounting measure of value.
14  They essentially had no value.
15      Q.    And if you could go to Page 74 of
16  the PDF.  It's Page 71 of the complaint.
17      A.    Oh, okay.  71.  I'm there.
18      Q.    Yep.  And at Paragraph 178, it says:
19  "Below are some of the statements Mr. Lindell
20  made and published to create the false
21  narrative that Smartmatic was engaged in a
22  widespread criminal conspiracy."

Page 294

1         Do you see that?
2       A.    I see those words written, yes.
3       Q.    And it has subsections A through F,
4   but I can direct your attention to Subsection E
5   on the next page.
6         Do you see that?
7       A.    Yes.
8       Q.    And it alleges Mr. Lindell said:
9   "Not only that they're -- you know, what they
10  did to our country, them and Smartmatic --
11  let's not forget Smartmatic.  They're like the
12  mothership of this and for not only being
13  involved in the biggest crime against our
14  country, probably in history."
15        Do you see that statement?
16      A.    I do see that statement.
17      Q.    Okay.  And it's your opinion that
18  being accused of being involved in the biggest
19  crime against the country probably in history
20  had no negative financial impact on Smartmatic?
21  That's your opinion, correct?
22      A.    That's my opinion, yes.

Page 295

1       Q.    Let's put that document away.
2         All right.  Can we go -- let's go to
3   Mr. Gorowsky's September 22nd report, and if
4   you could go to Page 12.  Let me know when you
5   are there.
6       A.    Okay.  Hang on.
7         Okay.  Page 12.
8       Q.    And the title of Subsection A there
9   is:  "Smartmatic's Election Business Was
10  Reporting Declining Revenues, Operating in Net
11  Losses and Negative Operating Cash Flows Prior
12  to January 2021," and then there is Footnote
13  10.
14        Do you see that?
15      A.    Yes, I do.
16      Q.    And pages then 12 through 18
17  describes Smartmatic's financial performance
18  from 2012 to 2021, correct?
19      A.    Right.
20      Q.    And going to Footnote 10, it says:
21  "Much of the information contained in this
22  section was obtained but independently verified

Page 296

1   from the updated expert report of Daniel R.
2   Fischel dated April 17, 2023 in the Smartmatic
3   USA Corp., et al., v. Fox Corp., et al., case
4   in the New York -- Supreme Court of the State
5   of New York, County of New York."
6         Do you see that?
7       A.    I do see that, yes.
8       Q.    Prior to adopting Mr. Gorowsky's
9   opinions in toto, did you speak with Mr.
10  Fischel?
11      A.    I did not.
12      Q.    And prior to your deposition today,
13  did you speak with Mr. Fischel?
14      A.    No.
15      Q.    What work did you do to assess the
16  accuracy and reliability of the information in
17  the updated expert report of Daniel R. Fischel?
18      A.    I -- I relied on Gorowsky to -- to
19  do that.  I -- I did -- I did read parts of
20  that and -- but -- but relied on Gorowsky.
21      Q.    All right.  If you can go to Page
22  18, and right above Subsection B, it says:



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
297–300

Page 297

1  "Smartmatic's financial performance leading up
2  to the alleged disinformation campaign shows a
3  business in decline facing declining revenues,
4  consistent losses, and negative cash flows from
5  operations."
6      Do you see that?
7  A.  Yes.
8  Q.  Okay.  And is it your opinion that a
9  company that is losing money can never suffer
10  any damages?
11  A.  That's not my opinion.  You have to
12  look at all the facts and circumstances of the
13  situation to -- drill into exactly what's
14  going on.
15  Q.  And, sir, you're aware that simply
16  because a company is losing money in the past
17  does not mean it is going to continue to lose
18  money in the future, correct?
19  A.  It depends on the company.
20  Q.  Right.  So there are certain
21  companies -- you would agree there are certain
22  companies that simply because they lost money

Page 298

1  previously, that they would not necessarily
2  continue to lose money in the future?
3  A.  That there -- there are those
4  situations, yes.
5  Q.  And, for example, Amazon would be an
6  example of that, correct?
7  A.  I don't know.
8  Q.  All right.  If you can go to Page 20
9  of Mr. Gorowsky's report.  And in the first
10  full paragraph, it says:  "As of the date of
11  this report, there are numerous known factors
12  other than defendants' alleged defamation that
13  may contribute in whole or in part to any
14  alleged damages."
15      Do you see that?
16  A.  I see it, yes.
17  Q.  And then it lists -- let's see here.
18  It goes over multiple pages, but A through H on
19  different factors that Mr. Gorowsky said may
20  contribute in whole or in part to any alleged
21  damages, correct?
22  A.  Yes.

Page 299

1  Q.  And the first factor that he lists
2  is Smartmatic's lawsuits against Fox, Newsmax,
3  and OAN, correct?
4  A.  Yes.
5  Q.  And you're aware -- I understand,
6  sir, that you disagree with Smartmatic -- what
7  Smartmatic is alleging as its damages.
8      But you understand, sir, that
9  Smartmatic is alleging damages in this case,
10  correct?
11  A.  Yes.
12  Q.  And have you done any analysis
13  trying to apportion those claimed damages
14  amongst Fox, Newsmax, and/or OAN?
15  A.  Analysis?
16  Q.  Yes.
17  A.  I don't have discovery to be able to
18  do that, and I -- I look at this as sort of
19  like a -- it's a subrogation issue where --
20  Q.  And --
21  A.  What's that?
22  Q.  All right.  So let's go to B here.

Page 300

1      And it references:  "In addition to
2  those identified in these three specific
3  lawsuits, other individuals who made the same
4  or similar statements as Mr. Lindell that may
5  have contributed in whole or in part to
6  Smartmatic's alleged damages include, but is
7  not limited to, Donald J. Trump, Michael Flynn,
8  Steven Bannon, the 2020 Trump campaign, Tucker
9  Carlson, and Patrick Byrne."
10      Do you see all that?
11  A.  I do.
12  Q.  And similar to Fox, Newsmax, and
13  OAN, you have not done any analysis to trying
14  to apportion Smartmatic's claimed damages to
15  any of these individuals listed in Subsection
16  B, correct?
17  A.  So that -- that would -- I just have
18  to reiterate that the last question you're
19  asking about A and the last question about B
20  forget -- they totally ignore the elephant in
21  the room, and that is that Smartmatic had its
22  own major financial issues before all this



Page 301

1  happened. So, again, I -- I challenge the
2  assertion that there were damages at all by
3  these people so...
4      Q.   Okay. So, sir -- so, sir, I
5  understand you understand there were not any
6  damages.
7          But my question is simply -- I am
8  focused on the work that you did in this case.
9      A.   Sure. Sure.
10     Q.   You did not do any type of
11  apportionment of Smartmatic's claimed damages
12  to any of the -- any of the individuals listed
13  in Subsection B here on Page 20, correct?
14         MR. KACHOUROFF: Objection. Asked
15  and answered. He told you he can't do it.
16         THE WITNESS: So let me just -- I'll
17  give you a mathematical. So if I were to apply
18  some apportionment to zero losses, you know,
19  rules of multiplication of zeros is it still
20  results in zero. So if somebody had 10 percent
21  of the -- of the attribution of a loss of
22  damages, then it's still zero. So it's an

Page 302

1  academic exercise.
2          BY MR. LETKEWICZ:
3      Q.   Well, sir, you indicated that you
4  adopted Mr. Gorowsky's report in toto, and he
5  is saying here are other factors that may
6  contribute in whole or in part to any alleged
7  damages.
8          And I am just focused on -- if you
9  didn't do any analysis, that's fine, just say
10  you didn't do any analysis. My question is:
11  Did you do any analysis as to any kind of
12  apportionment?
13     A.   If you -- yes. The simple analysis
14  is that I don't believe damages occurred that
15  -- so, therefore, the apportionment study was
16  very quick. When you have zero damages and you
17  have other alleged statements, there is no --
18  there is no apportionment of losses to other
19  people. No -- no apportionment of damages to
20  other people. My assertion still is that --
21  that Smartmatic had self-inflicted damages.
22     Q.   And in -- so in C a factor that was

Page 303

1  listed is -- that may contribute in whole or in
2  part to any alleged damages is -- cybersecurity
3  experts who have raised concerns about the
4  vulnerabilities of electronic voting machines
5  may have also contributed to Smartmatic's
6  alleged damages. Vocal critics of the
7  electronic voting machine industry include
8  Professor Alex Halderman, Professor Andrew
9  Appel, and Henri Hursti.
10         Do you see all that?
11     A.   I do.
12     Q.   Are you aware that Professor
13  Halderman, Professor Appel, and Mr. Hursti all
14  signed a letter stating that there was no
15  credible evidence to support the conclusion
16  that the 2020 election outcome at any state had
17  been altered through technical compromise?
18     A.   So I'm not aware of that. In fact,
19  the opposite is I have -- know that those three
20  individuals have testified in federal court
21  that there are these cybersecurity
22  vulnerabilities.

Page 304

1      Q.   Well, my question was not whether
2  there are cybersecurity vulnerabilities but
3  that they signed a letter that stated that
4  there was no credible evidence to support the
5  conclusion that the 2020 election outcome in
6  any state had been altered through technical
7  compromise.
8          MR. KACHOUROFF: Object to form and
9  objection. Hearsay.
10         THE WITNESS: Yes. That's -- I
11  think they have written contrary statements and
12  they have testified contrary to what you just
13  described, every one of them. Harri -- Harri
14  Hursti, in particular. Alex Halderman in
15  particular.
16         MR. LETKEWICZ: Can you please put
17  Tab 25 in the chat, please. And this will be
18  marked as 688. Thank you.
19         (Deposition Exhibit 688 was marked
20  for identification.)
21         BY MR. LETKEWICZ:
22     Q.   All right. And exhibit --



Page 305

1  Plaintiff's Exhibit 688 is Exhibit 106 to
2  Smartmatic's first amended complaint, which we
3  looked at briefly a short time ago.
4        And if you go to the second page,
5  there is a headline: "Scientists Say No
6  Credible Evidence of Computer Fraud in the 2020
7  Election Outcome, But Policymakers Must Work
8  With Experts to Improve Confidence."
9        Do you see that headline?
10  A.   Yeah.  What is this?  What is the
11  source of this?
12  Q.   It's a letter that was put together
13  by various individuals that signed that we're
14  getting to in a moment.  So --
15  A.   Words on paper.
16  Q.   Okay.
17       MR. KACHOUROFF:  I'm objecting to
18  this exhibit as hearsay.
19       MR. LETKEWICZ:  Okay.
20       BY MR. LETKEWICZ:
21  Q.   And it says, if you look in the --
22  let's see.  One, two, three, four -- Paragraph

Page 306

1  5, it says:  "To our collective knowledge, no
2  credible evidence has been put forth that
3  supports a conclusion that the 2020 election
4  outcome in any state has been altered through
5  technical compromise."
6        Do you see that?
7  A.   I -- I lost you on that.  So which
8  paragraph?
9  Q.   Do you see there's -- it's three
10  paragraphs from the bottom.  We are -- it
11  starts with:  "We are aware."
12  A.   We are aware.  Okay.
13  Q.   Yeah.  And in the last sentence, it
14  says:  "To our collective knowledge, no
15  credible evidence has been put forth that
16  supports a conclusion that the 2020 election
17  outcome in any state has been altered through
18  technical compromise."
19       Do you see that statement?
20  A.   I see that statement.
21  Q.   Okay.  And then on the next page, it
22  says:  "Signed."

Page 307

1        And then -- do you see that?
2  A.   Yes.
3  Q.   And Number 2 is listed Andrew W.
4  Appel, Professor of computer science, Princeton
5  University, correct?
6  A.   See that.
7  Q.   And then it says at Number 22, J.
8  Alex Halderman, professor of computer science
9  and engineering, University of Michigan,
10  correct?
11  A.   Yes.
12  Q.   And if you look at Number 24, it
13  says Harri Hursti, cofounder of Nordic
14  Innovation Labs and Election Integrity
15  Foundation, correct?
16  A.   I see that.
17  Q.   All right.  We can put that away.
18  A.   That -- that -- that -- I have
19  questions about that, the validity --
20       MR. KACHOUROFF:  There is no
21  question on the table, Robert.
22       THE WITNESS:  Okay.

Page 308

1       BY MR. LETKEWICZ:
2  Q.   All right.  Let's go back to the
3  September 22, 2023, Gorowsky report, and going
4  back to the different factors that Mr. Gorowsky
5  is listing.  And on Page 21, he states:
6  "Competition and successes from other companies
7  also competing in the voting machine market in
8  the U.S. and worldwide."
9        Do you see that?
10  A.   Yes.
11  Q.   Are you aware of any potential
12  customer that formed a negative opinion about
13  Smartmatic because of the success of
14  Smartmatic's competitors?
15  A.   No.
16  Q.   In E it references:  "Smartmatic's
17  other known reputational concerns outside the
18  United States, including issues with contracts
19  in the Philippines and Venezuela."
20       Do you see that?
21  A.   Yes.
22  Q.   So Smartmatic's reputation concerns



Page 309

1  outside of the United States may have affected
2  Smartmatic's business in the U.S., correct?
3      A.   They may have.
4      Q.   And you would agree that the inverse
5  would be true as well, that reputation concerns
6  in the United States could affect Smartmatic's
7  business outside the United States, correct?
8          MR. KACHOUROFF: Objection. You
9  guys have already jettisoned Attachment A, the
10  "international damages," so I'm not sure what
11  the basis is for the question.
12          MR. LETKEWICZ: All right. Well,
13  unless you're instructing him not to answer,
14  I'll need -- I'll need an answer to the
15  question.
16          MR. KACHOUROFF: Okay. Don't -- we
17  can't answer the question, and so I will
18  instruct him not to answer that question.
19          MR. LETKEWICZ: Are -- are you
20  asserting a privilege on that? Because,
21  otherwise -- if you are not asserting a
22  privilege, I don't see a basis for you to

Page 310

1  instruct him not to answer.
2          MR. KACHOUROFF: Yes. I am
3  asserting the fact that you guys jettisoned
4  your international damages, so what's the -- A,
5  there is no relevance to asking the question
6  now at this point, and B, you're asking him to
7  speculate on losses outside the United States
8  that you have now jettisoned that you say don't
9  exist. I mean, come on.
10          MR. LETKEWICZ: Okay. So your view
11  of relevance is not a basis to -- I mean,
12  you -- look, you can instruct him not to
13  answer. It's not a proper basis, and you know,
14  we'll keep the question open and the deposition
15  open, and if we have to bring him back to have
16  him answer that question, that's fine. But if
17  you're going to instruct him, that's fine. It
18  is not a proper instruction, but if that's what
19  you want to do, that's certainly your choice
20  right now.
21          MR. KACHOUROFF: State your -- state
22  your question succinctly again, please, and

Page 311

1  I'll make another decision.
2          BY MR. LETKEWICZ:
3      Q.   Have you undertaken -- I'm sorry.
4          You would agree that the inverse is
5  true as well, that reputation concerns in the
6  United States could affect Smartmatic's
7  business outside of the United States, correct?
8          MR. KACHOUROFF: Object to form.
9          THE WITNESS: I -- it's -- it's not
10  in the scope of what I looked at, so it's --
11  it's a hypothetical I can't answer.
12          BY MR. LETKEWICZ:
13      Q.   So you don't know one way or the
14  other whether or not --
15      A.   Well, I -- so I know the Philippines
16  happened, and I know that Venezuela happened,
17  but I don't know if -- I don't think there was
18  an inverse that actually happened for me to
19  evaluate.
20      Q.   So are you saying that Smartmatic
21  had no reputation concerns in the United
22  States?

Page 312

1          MR. KACHOUROFF: Objection. That
2  misstates his answer. You're talking about
3  international, not the United States.
4          THE WITNESS: Right. Between --
5          BY MR. LETKEWICZ:
6      Q.   Well, I'm -- so I'm asking you would
7  reputation concerns about Smartmatic in the
8  United States affect Smartmatic's business
9  outside the United States?
10      A.   I -- I don't know because I don't
11  know the circumstances but I do know that there
12  were troubles that Smartmatic was having in the
13  Philippines and Venezuela that you know the
14  facts, we have seen the facts, and it's --
15  it's -- the facts are there to draw a
16  reasonable conclusion, inference that that
17  could have had an impact on -- on the
18  Smartmatic USA business. I don't have an -- I
19  don't have an inverse to compare.
20      Q.   Are you aware of any contracts
21  Smartmatic lost because of Smartmatic's
22  reputational concerns outside the United



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024

313–316

Page 313

1  States?

2      A.   I am not -- I am not sure.

3      Q.   All right.  In F it states:

4  "Reports of the data security breach involving

5  Smartmatic and the Philippines resulting in

6  public officials referring to the company as

7  'Smartmagic' may be a factor."

8          Do you see that?

9      A.   I see that.

10      Q.   Do you know what the nature of the

11  data breach issue that's being referenced here

12  in F?

13      A.   Just -- just from the reports.  I

14  don't know in detail.

15      Q.   So just what's stated here in F is

16  what you know?

17      A.   Essentially.

18      Q.   So would you know how -- so you

19  wouldn't know then how the data breach issue

20  was resolved then, correct?

21      A.   How it was resolved?  No.  I know

22  how the contract got resolved, and it was

Page 314

1  terminated -- or it just seemed like it

2  truncated any business with Smartmatic.

3      Q.   And are you referencing then what is

4  in Footnote 51 where it says:  "In the 2016

5  Philippines elections, questions were raised

6  about Smartmatic making changes to the machines

7  shortly before the election.  Ultimately, the

8  Philippines Department of Justice indicted

9  several Smartmatic personnel for tampering with

10  the election server.  The Philippines did not"

11  review -- "renew Smartmatic's contract or use

12  Smartmatic for future elections."

13      A.   That's what --

14      Q.   Is that what you're referencing?

15      A.   Yes, that's what I am referring to.

16      Q.   Isn't it, in fact, true that

17  Smartmatic did business in the Philippines

18  after 2016, such as the 2022 election in the

19  Philippines?

20      A.   I don't know.

21      Q.   Wouldn't the answer be no, based on

22  just what you state here, the Philippines did

Page 315

1  not renew Smartmatic's contract or use

2  Smartmatic for future elections?

3      A.   The answer would be no in that case,

4  but I don't know if they came back and did

5  something else.  But no is what my assumption

6  is based on this -- what I read.

7          MR. LETKEWICZ:  Okay.  Can you put

8  Tab 26 in the chat, and this will be marked as

9  Plaintiff's Exhibit 689.

10          (Deposition Exhibit 689 was marked

11   for identification.)

12          THE WITNESS:  Okay.

13          BY MR. LETKEWICZ:

14      Q.   Okay.  And the first page is -- it's

15  from Smartmatic's website, as you can see in

16  the bottom left-hand corner.  It has the

17  headline:  "Filipinos use election technology

18  to cast 1.6 billion votes for 18,000

19  positions."

20          Do you see that headline?

21      A.   Yeah.  What -- what's this?  Okay.

22  I see what's on this piece -- piece of paper.

Page 316

1      Q.   Yep.  And then -- and on the next

2  page, it says:  "Philippines, Manila, May 10,

3  2022.  An estimated 53 million Filipino voters

4  flocked precincts across the country to cast

5  1.6 billion votes and elect candidates to

6  18,000 political positions in a landmark

7  election.  This was the fifth consecutive

8  automated vote since the Philippine Commission

9  on Elections (Comelec) began using Smartmatic

10  technology in 2010."

11          Do you see all that?

12      A.   I see that.

13      Q.   All right.  Let's go back to the

14  Gorowsky report, and I'm going to go to

15  Subsection C on Page 23.  Let me know when

16  you're there.

17      A.   I am there.

18      Q.   Okay.  And the title of this

19  subsection is:  "My Pillow has been negatively

20  impacted financially as a result of Mr.

21  Lindell's statements regarding the 2020

22  election."



Page 317

1         Do you see that?
2    A.   I do see that.
3    Q.   Do you know if Mr. Gorowsky showed
4  Mr. Lindell or anyone at My Pillow a draft of
5  this particular Section C before it was
6  provided to Smartmatic on September 22, 2023?
7    A.   I do not know.
8    Q.   Do you know if Mr. Gorowsky spoke
9  with Mr. Lindell, whether his statements
10 negatively impacted My Pillow?
11   A.   Whose statements?
12   Q.   Mr. Lindell's statements.
13        MR. KACHOUROFF:  Objection to form.
14 Can you reask the question.  It's a little
15 confusing.
16        MR. LETKEWICZ:  Sure.  Absolutely.
17        BY MR. LETKEWICZ:
18   Q.   Are you aware if Mr. Gorowsky had a
19 conversation with Mr. Lindell regarding whether
20 his statements regarding the 2020 election
21 negatively impacted My Pillow financially?
22   A.   I'm not aware.

Page 318

1    Q.   And have you had any conversations
2  with Mr. Lindell regarding whether his
3  statements regarding the 2020 election
4  negatively impacted My Pillow financially?
5    A.   No.
6    Q.   Beyond reviewing the text that is
7  set forth in this Subsection C, did you do any
8  work to assess the accuracy or the reliability
9  of the information as set forth in this Section
10 C?
11   A.   I did.
12   Q.   What did you do?
13   A.   I -- I compared this section to
14 the -- to the My Pillow financial statements.
15   Q.   And did you review the exhibits to
16 Mr. Gorowsky's report and, in particular,
17 Exhibit 5 and Exhibit 5A to his report?
18   A.   Yes, I did.
19   Q.   Okay.  And was any of his
20 information in Exhibit 5 or Exhibit 5A
21 inaccurate from your review?
22   A.   It was not inaccurate.

Page 319

1    Q.   I'm going to switch gears here for a
2  moment.  In connection -- now, you indicated --
3  you indicated earlier that you were a field
4  director for the 2016 Trump campaign.  Were you
5  also a delegate for the Republican National
6  Convention?
7    A.   Yes, I was.
8    Q.   And you cast a vote for Donald
9  Trump's Republican nomination, correct?
10   A.   I did.
11   Q.   And do you currently have any
12 position or role in Donald Trump's current 2024
13 campaign for president?
14   A.   No.
15   Q.   You're aware that President Trump
16 made a number of different claims of election
17 fraud in connection with the 2020 election,
18 correct?
19   A.   Yes.
20   Q.   Did you have any role in
21 investigating and -- or advocating such claims
22 on behalf of President Trump or his campaign?

Page 320

1    A.   Yes.
2    Q.   And what was your role?
3    A.   I was a contributory writer to the
4  135-page election fraud report.
5    Q.   Was that the report we were
6  discussing earlier in Wisconsin, or is that
7  something different?
8    A.   Something different.  It was a
9  national report of a variety of election fraud
10 that occurred around the country.
11   Q.   You said you were a contributor.
12 What was your contribution?
13   A.   Let's see.  In general, it was
14 dealing with the aspects of -- of Georgia
15 election fraud, and in particular, it -- I
16 focused on some of the aspects of -- about
17 illegal ballot trafficking.
18   Q.   And you are aware too that President
19 Trump was indicted down in Georgia on RICO
20 charges, correct?
21   A.   Yes.
22        MR. KACHOUROFF:  Objection to form.



Page 321

1    BY MR. LETKEWICZ:
2    Q.   And you traveled down to Georgia
3    when President Trump went to Fulton County to
4    be booked, correct?
5    A.   I did.
6    Q.   And that was to support President
7    Trump, correct?
8    A.   No, not necessarily.
9    Q.   I think you had mentioned this
10   earlier, but you -- I think as part of your
11   work on this Georgia RICO task force, you
12   compiled evidence that you believe rebutted the
13   charges in Georgia, correct?
14   A.   Yes.
15       MR. KACHOUROFF:  Objection.  What
16   does this have to do with his opinion?  We are
17   going way outside the scope of his opinion at
18   this point.
19       THE WITNESS:  Right.
20       BY MR. LETKEWICZ:
21   Q.   Did you do so on behalf of President
22   Trump or his campaign?

Page 322

1    A.   No.
2    Q.   Do you believe that Joe Biden was
3    legitimately elected president of the United
4    States?
5    A.   No.
6    Q.   Do you believe that the 2020
7    election was stolen from President Trump?
8    A.   Yes.
9    Q.   And you believe that in Georgia the
10   2020 election results were rigged to steal it
11   for Joe Biden, correct?
12       MR. KACHOUROFF:  Objection.  Form.
13       THE WITNESS:  What do you mean by
14   "rigged to steal it"?
15       BY MR. LETKEWICZ:
16   Q.   Sure.  I'll help you out here.
17       MR. LETKEWICZ:  Can you put Tab 6 in
18   the chat.  Do you have a --
19       MR. KACHOUROFF:  We're not -- we're
20   not answering -- we're not answering these
21   questions.  These have nothing to do with the
22   financial opinion and analysis that he is

Page 323

1    doing.
2        So I'm just going to instruct you
3    not to answer any other questions about going
4    down to Georgia --
5        MR. LETKEWICZ:  So --
6        MR. KACHOUROFF:  -- what your
7    personal opinions are.
8        MR. LETKEWICZ:  So --
9        MR. KACHOUROFF:  This has nothing to
10   do with your report.
11       MR. LETKEWICZ:  So, Chris, it all
12   goes to bias.  It's relevant to bias.
13       Now, again, you are certainly
14   welcome to instructed him not to answer.  That
15   is certainly your decision, and you know, if we
16   have to seek assistance from the Court to be
17   able to ask questions about his potential
18   biases, so be it.  And we have to bring him
19   back, so be it.  I don't think this is going to
20   take terribly long to go through, but if you
21   want to instruct him not to answer those
22   questions, certainly do so.  It doesn't call

Page 324

1    for privilege and --
2        MR. KACHOUROFF:  I'll -- I'll let
3    you know I'm not worried about privilege.  It
4    is outside the scope of his opinions.  He is
5    not being offered for any of this.  If you want
6    to claim that it's bias, you know, go ahead and
7    ask your questions.  I'll let it go on a little
8    bit, but I'm not going to sit here and we're
9    going to go over every lurid detail in Georgia.
10       MR. LETKEWICZ:  Well, actually, I'm
11   not going to be going over every lurid detail
12   in Georgia, but we will continue.
13       (Deposition Exhibit 690 was marked
14   for identification.)
15       BY MR. LETKEWICZ:
16   Q.   All right.  You have a Twitter
17   handle at Robert_B_Bowes, correct?
18   A.   Yes, I do.
19   Q.   All right.  And so you should have
20   in front of you Plaintiffs' Exhibit 690.  And
21   at the top, it should be -- you should have a
22   Tweet from you that's:  "Why are Brad



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
325–328

Page 325

1  Raffensperger and Fani Willis trying to hide
2  relevant evidence?"
3      Do you see that?
4      A.  I do see that.
5      Q.   Then there is a response from a
6  Tutter (Alpha Mouse):  "There is not evidence.
7  There is only copium and hopium."
8      Do you see that?
9      A.  Yes.
10     Q.   Then you respond:  "The system logs
11  show the fraud.  Tens of thousands of ballots
12  should not have been county just in that one
13  county.  It rigged the result to steal it for
14  creepy Joe."
15         And I assume you mean should not
16  have been counted and not "should not have been
17  county," correct?
18     A.   Correct.
19     Q.   And "creepy Joe," you are referring
20  to Joe Biden, correct?
21     A.   Yes.
22     Q.   Do you believe that Smartmatic's

Page 326

1  election technology or software was used
2  outside of Los Angeles County in the 2020
3  election?
4      A.   No.
5      Q.   Do you believe that Smartmatic
6  helped steal the 2020 election for Joe Biden?
7      A.   No.
8      Q.   Do you believe that Smartmatic's
9  election technology or software is designed to
10  rig elections?
11     A.   Not designed to.
12     Q.   Do you believe that Smartmatic's
13  election technology or software was compromised
14  or hacked by China or any other foreign country
15  during the 2020 election?
16     A.   I do not know.
17     Q.   Do you believe that Smartmatic's
18  voting machines were connected to the Internet
19  during the 2020 U.S. election?
20     A.   Don't know.
21     Q.   Do you believe that Smartmatic's
22  election technology software were designed to

Page 327

1  steal elections?
2      A.   I think you asked that already.
3      Q.   So no, you don't know?
4      A.   I said not designed to.
5      Q.   Do you believe that Smartmatic's
6  election technology software was used to steal
7  elections before the 2020 election?
8      A.   No.  I think you asked that one --
9  you asked that one too.
10         MR. LETKEWICZ:  Can you put Tab 9 in
11  the chat.  This will be marked as Plaintiff's
12  Exhibit 691.
13         THE WITNESS:  Can you share that?
14         BY MR. LETKEWICZ:
15     Q.   Oh, sure.  Absolutely.
16         (Deposition Exhibit 691 was marked
17  for identification.)
18         BY MR. LETKEWICZ:
19     Q.   All right.  So if we start here,
20  there is a Tweet from a Serenity, and it's --
21  appears to be quoting from a Lieutenant Colonel
22  Anthony Shaffer, and it says:  "We have

Page 328

1  evidence of a massive transfer of competed,
2  curated ballots ready to be injected into the
3  counting centers."
4      Do you see that?
5      A.   Yes.
6      Q.   Then there is a response from
7  Patrick Byrne, and he responds:  "He is
8  absolutely correct."
9      Do you see that?
10     A.   Yes.
11     Q.   And Mr. Byrne was the former CEO of
12  Overstock.com, correct?
13     A.   Yes.
14         MR. LETKEWICZ:  And if you -- if you
15  just scroll down a little bit.
16         BY MR. LETKEWICZ:
17     Q.   There is a response from a Wag the
18  Dog that states:  "Do you know when this took
19  place?  I've never seen it before.  Thanks."
20         And you respond:  "November 2020,"
21  correct?
22     A.   Yes.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
329–332

Page 329

1    Q.    So you agreed with Lieutenant
2  Colonel Shaffer and Mr. Byrne that there is
3  evidence of a massive transfer of completed,
4  curated ballots ready to be injected into the
5  counting centers in connection with the 2020
6  election?
7    A.    That was undisputed by the postal
8  inspector.
9    Q.    It's fair to say that you're a
10 critic of electronic voting machines, correct?
11   A.    No, that's not fair to say.
12   Q.    Okay.  Well, do you believe that --
13 do you believe that electronic voting machines
14 should not be used in elections?
15   A.    They should be used if they're
16 secure.  If they're not, you know, manipulated.
17 With the right controls, they could be a
18 benefit, but right now I don't see that.
19       MR. LETKEWICZ:  All right.  I
20 probably -- I'm just going to look over my
21 notes.  I probably have five minutes or less of
22 remaining questions, but I just need to go

Page 330

1  through my notes and consult with my colleague.
2  So we're just about done, so why don't we just
3  break for five minutes.
4        MR. KACHOUROFF:  Okay.
5        THE VIDEOGRAPHER:  We are going off
6  the record at 4:40 p.m.
7        (A short recess was taken.)
8        THE VIDEOGRAPHER:  We are back on
9  the record.  4:46 p.m.
10       MR. KACHOUROFF:  Oh, wait a minute.
11 I don't know if we have Chris Letkewicz.
12       THE VIDEOGRAPHER:  Yeah, he's here.
13       MR. LETKEWICZ:  Oh, sorry.  I think
14 I -- I was on mute.  Can you hear me?
15       THE VIDEOGRAPHER:  Yeah.
16       MR. LETKEWICZ:  All right.  Sorry.
17       BY MR. LETKEWICZ:
18   Q.    All right.  Can -- if we can go back
19 to Mr. Gorowsky September 22nd report and
20 specifically going back to Subsection C
21 concerning:  "My Pillow has been negatively
22 impacted financially as a result of

Page 331

1  Mr. Lindell's statements."
2        Did you speak with Mr. Lindell
3  regarding whether or not his statements had a
4  negative impact on My Pillow?
5    A.    No.  I think you asked that, and my
6  response then was no too.
7    Q.    And did you speak with anyone at My
8  Pillow as to whether or not Mr. Lindell's
9  statements had a negative impact on My Pillow?
10   A.    No.
11   Q.    Did you have any conversations with
12 Mr. Gorowsky regarding -- strike that.
13       Going to Page 23 here, Mr. Gorowsky
14 writes in the middle of the first paragraph
15 under C:  "I understand that My Pillow's retail
16 sales were highly profitable and critical to
17 its success because retailers primarily sold
18 the My Pillow product, which was My Pillow's
19 highest margin product."
20       Do you see that?
21   A.    Yes.
22   Q.    Do you know what the My Pillow's

Page 332

1  profit margin was on its My Pillow product in
2  2020?
3    A.    For -- for the retail in-store
4  sales?
5    Q.    Yes.
6    A.    I think it was something like 40, 50
7  percent.  It was pretty -- pretty -- pretty
8  nice.
9    Q.    And where can I -- and what's the
10 base of that --
11   A.    Well, I -- I don't -- don't remember
12 where I saw that.  I -- I just remember in
13 the -- in the -- in their My Pillow financial
14 statements I saw it was pretty good.  But
15 then -- then the -- you know, the big-box
16 stores are canceling them.  So I guess that's
17 the point that Gorowsky was making.
18   Q.    And -- well, he says here that the
19 reason why this hurt Smartmatic -- not
20 Smartmatic.  The other reasons it hurt My
21 Pillow, the loss of the retail sales is that
22 retail sales do not require the significant



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
333—336

Page 333

1   advertising and cost and revenue-sharing
2   agreements/affiliate marketing costs needed to
3   generate direct-to-consumer sales.
4       Do you see that?
5   A.   Yes.
6   Q.   And do -- and -- but isn't it, in
7   fact, true that in the 2021 and 2022 time frame
8   that My Pillow's advertising cost as a
9   percentage of income went down even though its
10  direct-to-consumer sales were going up?
11      MR. KACHOUROFF:  Objection to form.
12      THE WITNESS:  I don't know.  I
13  thought that they -- maybe the higher
14  advertising costs occurred into 2022 -- maybe
15  it was just a lagging effect that you see in
16  2021 because mostly cancelations may have been
17  late in the -- late in the year.  So 2021 is
18  not a real good full-run-rate measure.
19      BY MR. LETKEWICZ:
20  Q.   Okay.  If you could go to Exhibit 5
21  of Mr. Gorowsky's report, and this is on Page
22  40 of his report.

Page 334

1   A.   Okay.
2   Q.   Let me know when you are there.
3   A.   Yes, I'm there.
4   Q.   Okay.  So if we look at 2019 --
5   let's see -- direct-to-consumer sales were 68.9
6   percent of My Pillow's sales.
7       Do you see that?
8   A.   Yes.  165 million.
9   Q.   No.  I am looking at Exhibit 5.
10  A.   Yeah.  Yeah.
11  Q.   Okay.
12  A.   Under 2019, down at the bottom of
13  Column 2019, direct-to-consumer sales.
14  Q.   I gotcha.  I see what you're looking
15  at, yes.
16  A.   165 million.  Uh-huh.
17  Q.   Yes.  And that was 68.9 percent of
18  My Pillow's sales, correct?
19  A.   Right.
20  Q.   And My Pillow's
21  advertising/promotional costs as a percent of
22  total income in 2019 was 34.4 percent, correct?

Page 335

1   A.   Yes.
2   Q.   And then if we go to 2020.
3   A.   It went up to 112 million, yeah.
4   Q.   No.  Hold on.  Not my question.
5   A.   Okay.
6   Q.   I didn't ask my question.
7       In 2020 the direct-to-consumer sales
8   went up to 86.3 percent of income, correct?
9   A.   Yes.
10  Q.   And it went up to 96.5 percent of
11  sales in 2021, correct?
12  A.   Right.
13  Q.   And in 2022 direct-to-consumer sales
14  was 96.9 percent, correct?
15  A.   Yeah.  Yeah.  Big-box cancelations,
16  right.
17  Q.   And if we then look at
18  advertising/promotional, we look at those costs
19  as a percentage of income, it's 31.6 percent in
20  2020, correct?
21  A.   112 of 355, that's about right.
22  Yeah.

Page 336

1   Q.   And in 2021 it was 31.4 percent,
2   correct?
3   A.   Yes.
4   Q.   And in 2022 it was 33 percent,
5   correct?
6   A.   Right.
7   Q.   And those were -- and those numbers
8   are all lower than the 34.4 percent of what the
9   advertising/promotional cost as a percentage of
10  income were in 2019, correct?
11  A.   Which numbers?  Because the absolute
12  numbers have kept going north.  So he is right
13  that -- Gorowsky is right that the advertising
14  expenditures doubled from 2019 to 2021.  It
15  went from 82 million --
16  Q.   So --
17  A.   -- to 166 million, but from a
18  percentage basis, you -- you are correct.
19  Q.   Thank you.  All right.
20      And go to Page 25 of Mr. Gorowsky's
21  report, and in the first -- in the middle of
22  the first full paragraph, it says:  "In



Page 337

1    addition, product and freight costs increased
2    in 2021, which also negatively impacted My
3    Pillow's margins and profits."
4         Do you see that?
5    A.   Yes.
6    Q.   Are you aware of any My Pillow
7    supplier charging My Pillow higher amounts
8    because of what Mr. Lindell said regarding the
9    2020 election?
10   A.   On an individual basis?
11   Q.   Yes.
12   A.   Suppliers?
13   Q.   Yes.
14   A.   I thought I heard -- not
15   specifically, no, but I think I heard that
16   there were -- no.  Let's just leave it at that.
17   No, the answer is no.
18   Q.   Are you aware of a My Pillow freight
19   provider charging higher rates because of what
20   Mr. Lindell said regarding the 2020 election?
21   A.   I am not.
22   Q.   All right.  I'm just going to ask

Page 338

1    you a couple final things about your July 9th
2    report.  All right.  And if you could go to
3    Page 8.
4    A.   Of what?
5    Q.   Of your July 9 report.
6    A.   Mine?
7    Q.   Yes.
8    A.   Okay.
9    Q.   Paragraph 23.
10   A.   Yep.
11   Q.   And in the middle of 23 or so, it
12   says: "Smartmatic is in runoff mode, and its
13   parent company starved SUSA of capital by
14   choosing to distribute 100 million (more than
15   half of the parent company, SGO International
16   Corporation's 2017, 180 million of capital
17   equity) to its investors during 2018 through
18   2020."
19        Do you see that?
20   A.   Yes.
21   Q.   How did you -- now, you don't cite
22   any documents in this particular sentence.

Page 339

1         My question is:  How did you
2    determine that SGO distributed $100 million to
3    its investors during 2018 to 2020?
4    A.   So from the -- from the cash flow
5    statements and from the balance sheets.
6    Q.   And how did the cash -- which cash
7    flow statements indicated to you --
8    A.   Cash flow -- it's a statement of
9    changes in stockholders' equity in those three
10   years.  Look at the statement of changes to
11   stockholders' equity, and you will see the
12   ending balances are reduced, and just from --
13   from point -- like from 2018 to 2020, there was
14   about 100 million capital that -- that left the
15   company.
16   Q.   Can you -- which specific financial
17   statements did you look at to reach this
18   conclusion that there was a $100 million
19   distribution?
20   A.   From the -- the consolidated
21   statements of SGO.
22   Q.   So this was based on your review of

Page 340

1    --
2    A.   Well, let me -- hold on.  Let me
3    just clarify that.  This was referring to
4    SGO -- my -- that's based on my recollection.
5    Q.   Okay.  So this was based on your
6    review of SGO's financial statements for 2018,
7    2019, 2020, correct?
8    A.   Yes.
9    Q.   And where did this $100 million
10   distribution come from?  Was this Smartmatic
11   profits, Smartmatic revenues?
12   A.   From the assets of the company.
13   They -- they liquidated assets of the company
14   to -- to distribute to -- to equity holders and
15   to repay debt.
16        But on the debt side, on the 46 or
17   48 million that was paid off, that was -- that
18   was borrowed a couple years earlier and then
19   just paid back.  So they had -- they had assets
20   of the company that had to pay -- pay for this
21   massive capital out-flight.
22        And, again, when you -- when you're



ROBERT BOWES                                            August 06, 2024
SMARTMATIC USA vs LINDELL                                      341–344

Page 341
1  distributing that much capital more than the
2  majority of capital, that is not conducive for
3  growth.  And -- and if you -- if you bring your
4  equity down 100 million to under 80 million,
5  you have less ability to finance and fund
6  operations, so that's another reason I
7  concluded that they were in -- in a runoff
8  mode.
9      Q.    So this -- was this 46 million on
10  top of the $100 million distribution?
11     A.    Yes.  The debt payoff was
12  independent of the equity depletion.
13     Q.    And in which financial statement did
14  you find that Smartmatic or SGO had repaid $46
15  million of debt in 2019 and 2020?
16     A.    The balance sheet listed ending --
17  ending -- yearend amounts of debt owed, and it
18  also was reflected on the -- the cash flow
19  statement of changes based on borrowings and
20  financings.  It was cash flow from financing
21  activity.  You could see the outflow and the
22  cash flows from financing activity.

Page 342
1      Q.    And when you're talking about the
2  yearend amounts of debt in the cash flow
3  statements, you're referring to SGO's cash
4  flows, correct?
5      A.    Right.
6      Q.    And so this would have been based on
7  your review of SGO's 2019 and 2020 financial
8  statements, correct?
9      A.    That's right.
10     Q.    Okay.  And --
11     A.    Smartmatic USA did not have any
12  equity so -- or very little.  It had negative
13  equity of $117,000, so they -- they -- they --
14  this was -- this was SGO, you know, major
15  changes in their -- in their capital structure.
16     Q.    If you go to Paragraph 60 of your
17  July 9 report.
18     A.    Did you say 6-0?
19     Q.    6-0 on Page 15.
20     A.    Okay.
21     Q.    And in the last sentence, it
22  states -- you're referring to Smartmatic --

Page 343
1  "its overseas workforce locations and foreign
2  components could not meet the FIPS, VVSG, and
3  EAC requirements."
4          Do you see that?
5      A.    Yes.
6      Q.    And what is your basis that
7  Smartmatic could not obtain FIPS, VVSG, and EAC
8  standards because it had workers overseas and
9  uses foreign components?
10     A.    There was -- there were internal
11  e-mails that -- that talked about how they
12  couldn't -- it could not -- Smartmatic couldn't
13  win contracts, particularly the one in --
14  listed in Paragraph 61 that -- you know, they
15  had -- I guess there is an indication that they
16  had a bunch of people working in Panama and
17  that would not have given them the -- the
18  ability to get certified by EAC.
19         The components didn't meet FIPS.
20  They didn't meet Voluntary Voter System
21  Guidelines, and they didn't meet EAC
22  requirements.  Those were in the -- in the --

Page 344
1      Q.    Let's --
2      A.    I picked that up from the internal
3  e-mails.
4      Q.    Okay.  So let's -- let's break
5  that's down a little bit.
6      A.    Okay.
7      Q.    So this -- your statement about the
8  overseas workforce locations --
9      A.    Look at 62 for -- for that too.
10     Q.    Hold on.  Let me ask my -- let me
11  ask my question, sir.
12         Your reference to the overseas
13  workforce locations could not meet the FIPS,
14  VVSG, and EAC requirements, the basis for that
15  is this internal communication that you are
16  citing here in Paragraph 61, correct?
17     A.    And in 62, correct.
18     Q.    And any other paragraphs?
19     A.    Let's see.  Just those two from --
20  from what I am looking at right now.  I just --
21  I think those are the only two.
22     Q.    And the foreign components could not



Page 345

1  meet the FIPS, VVSG, and EAC requirements, the
2  bases of that is what is set forth in Paragraph
3  62, correct?
4      A.   I believe I said and 61.
5      Q.   So that one -- 61 also talks about
6  foreign components?
7      A.   Foreign workforce locations is 61,
8  and foreign components, I believe, is 62.
9      Q.   Okay.  And is there any other
10  communication that you discussed in your report
11  in which foreign components could not meet the
12  FIPS, VVSG, and EAC requirements?
13     A.   Let's see.  I can't recall off the
14  top of my head.  I -- I think those are the --
15  the main cites for this.
16     Q.   And if we look at Paragraph 62, you
17  state that the e-mail chain on March 19, 2021
18  from Edwin Smith to Jake Perry, James Long,
19  Robert Cook, Antonio Mugica, Pedro Mugica,
20  Samira Saba, and Richard Ades discussing S1,
21  which was introduced in the senate and includes
22  various election security issues.

Page 346

1      Do you see that?
2      A.   I do.
3      Q.   You're aware that S1 did not become
4  law.  Are you aware of that?
5      A.   I'm not sure.
6      Q.   And if it did not become law, then
7  there would not be a prohibition of foreign
8  component -- components to meet the FIPS, VVSG,
9  and EAC requirements, correct?
10     A.   I don't know that that's the case.
11  It's -- they -- in fact, they were still --
12  they still may have been locked out because of
13  that.
14     Q.   If S1 --
15     A.   The FIPS -- the FIPS standard was
16  there before S1, so I think -- I -- I don't
17  think your question is correct.
18     Q.   Okay.  So which FIPS standard bars
19  the use of foreign components?
20     A.   I don't know.  I really don't know.
21  That's not my area.  I refer to the -- the
22  cyber experts on that one.

Page 347

1      Q.   Okay.  And which VVSG standard rule
2  bars the use of foreign components?
3      A.   I don't know.
4      Q.   And which EAC requirements bars the
5  use of foreign components?
6      A.   Don't know.  I just -- we found
7  these internal e-mails that described the
8  concern.
9         MR. LETKEWICZ:  All right.  Well,
10  Mr. Bowes, I appreciate your time.  At this
11  time I have no further questions.
12         I will -- just to reiterate my prior
13  statement, we will need to leave the deposition
14  open based on Mr. Kachouroff's representation
15  that you may issue a rebuttal report to
16  Professor James.  We, of course, again, reserve
17  all rights, including moving to strike the
18  report as untimely and to redepose you about
19  any such rebuttal report.
20         MR. KACHOUROFF:  Bonnie, we'll read.
21         Can I get a time check, please.
22         THE VIDEOGRAPHER:  One moment, sir.

Page 348

1  6 -- 6 hours and 34 minutes.
2         MR. KACHOUROFF:  Okay.  Thank you
3  very much.  Thank you, guys.
4         THE VIDEOGRAPHER:  Real quick,
5  Mr. Kachouroff, would you like to order a copy
6  of the transcript and/or video at this time?
7         MR. KACHOUROFF:  Just the transcript
8  will be fine.  I already sent that to -- to
9  Bonnie.
10         THE VIDEOGRAPHER:  All right.
11  Mr. --
12         MR. LETKEWICZ:  And can you --
13         THE VIDEOGRAPHER:  I have -- I have
14  a standing order for you, sir.
15         MR. LETKEWICZ:  Yeah.  So just make
16  sure to send -- to send the rough tonight.
17         MR. KACHOUROFF:  Are we concluding
18  this video right now?
19         MR. LETKEWICZ:  Yes.
20         THE VIDEOGRAPHER:  This concludes
21  the deposition of Robert Bowes.  We are going
22  off the record at 5:10 p.m. Central time.



ROBERT BOWES
SMARTMATIC USA vs LINDELL

August 06, 2024
349—351

Page 349

1        (Whereupon, the proceeding was
2   concluded at 5:10 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 350

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Bonnie L. Russo, the officer before
3   whom the foregoing deposition was taken, do
4   hereby certify that the witness whose testimony
5   appears in the foregoing deposition was duly
6   sworn by me; that the testimony of said witness
7   was taken by me in shorthand and thereafter
8   reduced to computerized transcription under my
9   direction; that said deposition is a true
10  record of the testimony given by said witness;
11  that I am neither counsel for, related to, nor
12  employed by any of the parties to the action in
13  which this deposition was taken; and further,
14  that I am not a relative or employee of any
15  attorney or counsel employed by the parties
16  hereto, nor financially or otherwise interested
17  in the outcome of the action.
18
19        _____
20        Notary Public in and for
21              the District of Columbia
22  My Commission expires:  August 14, 2025

Page 351

1        ACKNOWLEDGMENT OF DEPONENT
2        I, ROBERT BOWES, do hereby certify that I
3   have read the foregoing transcript of my
4   testimony taken on 8/6/24, and further certify
5   that it is a true and accurate record of my
6   testimony (with the exception of the
7   corrections listed below):
8   Page    Line         Correction
9   _____   _____    _____
10  _____   _____    _____
11  _____   _____    _____
12  _____   _____    _____
13  _____   _____    _____
14  _____   _____    _____
15  _____   _____    _____
16  _____   _____    _____
17  _____   _____    _____
18                   _____
                     ROBERT BOWES
19
20
21
22

