# EXHIBIT B

PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
1–4

## Page 1

1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MINNESOTA

3  Civil Action No. 22-cv-0098-WMW-JFD

4  SMARTMATIC USA CORP.,    )

    SMARTMATIC INTERNATIONAL   )

5  HOLDINGS B.V., and SGO     )

    CORPORATION LIMITED,     )

6                   )

           PlaintiffIs,  )

7                   )

    vs.                )

8                   )

    MICHAEL J. LINDELL and MY  )

9  PILLOW, INC.,        )

                   )

10       Defendants.   )

11  -------------------------------------------------

12

13      REMOTE DEPOSITION OF PETER KENT taken

14  Wednesday, August 7, 2024, pursuant to Rule 30 of

15  the Federal Rules of Civil Procedure beginning at

16  9:32 a.m. Central Time, via videoconference,

17  Denver, Colorado, before Patricia Vigil-Ladner, a

18  Registered Professional Reporter and Notary Public

19  for the State of Colorado.

## Page 2

1             REMOTE APPEARANCES

2

3

4  ON BEHALF OF THE PLAINTIFFS:

5      MAURA T. LEVINE-PATTON, ESQ.

      Benesch, Friedlander, Coplan & Aronoff LLP

6      71 South Wacker Drive, Suite 1600

      Chicago, Illinois  60606

7      312-624-6368

      mlevine-patton@beneschlaw.com

8

      MEGHAN GOLDEN, ESQ.

9      Benesch, Friedlander, Coplan & Aronoff LLP

      71 South Wacker Drive, Suite 1600

10     Chicago, Illinois 60606

      312-624-6378

11     mgolden@beneschlaw.com

12

  ON BEHALF OF THE DEFENDANTS:

13

      CHRISTOPHER I. KACHOUROFF, ESQ.

14     McSweeney Cynkar & Kachouroff, PLLC

      13649 Office Place, Suite 101

15     Woodbridge, Virginia  22192

      703-621-3300

16     chris@mck-lawyers.com

17

18  ALSO PRESENT:

19     Don Savoy, videographer

## Page 3

1          INDEX OF EXAMINATION

  EXAMINATION                 PAGE

2  August 7, 2024

3

4  PETER KENT

5  EXAMINATION BY MS. LEVINE-PATTON      6

## Page 4

1          INDEX OF EXHIBITS

| | | REFERENCE |
|---|---|---|
| EXHIBIT 692 | KENT REPORT | 22 |
| EXHIBIT 693 | TWITTER DOCUMENTS - 30 PGS. | 30 |
| EXHIBIT 694 | BERGER REBUTTAL REPORT | 55 |
| EXHIBIT 695 | ARTICLE 12/3/2021 | 67 |
| EXHIBIT 696 | ARTICLE 8/3/2017 | 93 |
| EXHIBIT 697 | DOCUMENT DATED 12/24/2019 | 98 |
| EXHIBIT 698 | ARTICLE 5/2/2019 | 103 |
| EXHIBIT 699 | TWITTER PROFILE | 106 |
| EXHIBIT 700 | KENT TWITTER PROFILE | 107 |
| EXHIBIT 701 | TWEET POST - 1 PG. | 113 |
| EXHIBIT 702 | JUDGE'S ORDER | 116 |
| EXHIBIT 703 | DRIPS HOLDINGS ORDER | 119 |
| EXHIBIT 704 | OPAL LABS ORDER | 120 |

Line 2 of Page 4: FOR IDENTIFICATION



Page 5

1        P R O C E E D I N G S
2            *   *   *   *
3        THE VIDEOGRAPHER:  We are now on the record.
4   The time is 9:32 a.m. Central time.  Today is
5   August the 7th, 2024.
6        This begins the videoconference deposition
7   of Peter Kent.  The case is Smartmatic USA
8   Corporation, et al versus Lindell, et al.
9        My name is Don Savoy, I am your remote
10  videographer today.  The court reporter is Patty
11  Vigil.  We are representing Esquire Deposition
12  Solutions.
13        Counsel, will you please state your name
14  and who you represent.  Afterwards, the court
15  reporter will swear in the witness.
16        MS. LEVINE-PATTON:  Maura Levine-Patton on
17  behalf of the Smartmatic, Plaintiffs.
18        MR. KACHOUROFF:  Christopher Kachouroff on
19  behalf of My Pillow and Mike Lindell.
20        THE REPORTER:  And, Mr. Kent, you can hear
21  me okay?
22        MR. KENT:  I can.
23            PETER KENT,
24  having been first duly sworn, testified on oath as
25  follows:

Page 6

1            EXAMINATION
2   BY MS. LEVINE-PATTON:
3   Q.   Good morning, Mr. Kent.
4   A.   Good morning.
5   Q.   Could you please state and spell your name
6   for the record.
7   A.   Peter Kent, P-E-T-E-R, K-E-N-T.
8   Q.   My name is Maura Levine-Patton.  And I
9   represent the Smartmatic entities, who are the
10  plaintiffs in this case.
11        Do you understand that?
12  A.   I do.
13  Q.   Mr. Kent, where do you live?
14  A.   Denver, Colorado.
15  Q.   Since we're appearing virtually today, I
16  must ask, are you in Denver, Colorado, right now?
17  A.   I am.
18  Q.   Is anyone else in the room with you?
19  A.   No.
20  Q.   Where is your cell phone currently located?
21  A.   It's on the floor down here.
22  Q.   Do you have any papers or electronic
23  documents in front of you?
24  A.   On my computer, I do have my report open.
25  I can close it if you wish.  But that's the only

Page 7

1   file manager open and my report.  I can close that
2   if you wish.
3   Q.   You can leave it for now.  We will
4   introduce your report and use it.
5        Do you have anything else in front of you?
6   Any notes or paper?
7   A.   No.
8   Q.   Do you understand that you are providing
9   testimony today under oath?
10  A.   I do.
11  Q.   And do you understand that you have to tell
12  the truth?
13  A.   I do.
14  Q.   Do you understand your testimony is being
15  recorded by our court reporter?
16  A.   Yes.
17  Q.   And do you understand your testimony is
18  also being videotaped?
19  A.   Yes.
20  Q.   Do you understand your testimony can be
21  shown to the jury in this case?
22  A.   Yes.
23  Q.   Do you have any reason today that would
24  prevent you from providing accurate testimony?
25  A.   I don't, but while we're on that point, I

Page 8

1   do want to mention, I just had COVID.  So I may be
2   coughing and spluttering.  I also have this little
3   cough drops I might need to use now and then.  So I
4   just wanted to warn you.
5   Q.   Well, I hope you're recovering well.
6   Please let me know if at any time you'd like to
7   take a break.  I'm happy to take a break when it's
8   convenient for you.  So long as there's not a
9   question pending on the record.
10  A.   Sure.  Thanks.
11  Q.   I'm going to go over a couple of ground
12  rules for a deposition.  Just -- in order for the
13  transcript to be accurate, I'm going to ask that
14  you let me finish my question before you provide
15  your answers, just so we can avoid talking over one
16  another.
17        Do you agree to try to do that?
18  A.   Yes.
19  Q.   And do you understand that all of your
20  answers must be verbal today as opposed to nodding
21  your head?
22  A.   Yes.
23  Q.   During my questions, your counsel may
24  object to a question.  Do you understand you are
25  required to answer even after counsel objects?



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
9–12

Page 9

1    A.  Yes.
2    Q.  If I ask you a question and you do not
3  understand it, just let me know; will you do that?
4    A.  Yes.
5    Q.  If I do ask a question and you answer it, I
6  will assume that you understood it and answered it
7  to the best of your ability.  Is that fair?
8    A.  Yes.
9    Q.  Now have you ever been deposed before,
10  Mr. Kent?
11    A.  I have.
12    Q.  Approximately how many times?
13    A.  75.
14    Q.  And were all of those depositions when you
15  served as an expert witness?
16    A.  Well, if we want to add in a divorce,
17  that's another one.  But primarily those 75 are
18  expert witness issues.
19    Q.  So I understand, there's approximately 75
20  expert depositions, and then also you served as a
21  fact witness in a divorce proceeding; is that
22  right?
23    A.  Yeah, and I served as a witness in a couple
24  of other cases.  As an author I was once deposed
25  about a book I had written that was relevant to

Page 10

1  some patent case.  And there was some other case, I
2  can't remember what it was now.  20 years ago, I
3  was called in.  Again, technical issue, but I was
4  deposed in that.
5        So there's probably like three or four
6  depositions which were taken when I was not an
7  expert witness.  Excuse me.
8    Q.  When was the first time that you were
9  deposed?
10    A.  I don't know.  It could be 20 years ago.
11    Q.  And when was the most recent time you were
12  deposed?
13    A.  A few months ago.
14    Q.  Have you ever testified at a trial?
15    A.  I have.
16    Q.  Approximately how many times?
17    A.  Well, at trial, court hearings and
18  mediation hearings, it's something like -- like 15
19  or 16.
20    Q.  Now, how were you initially contacted to
21  serve as an expert witness in this case?
22    A.  I -- I was called by the previous lawyer
23  working for Mr. Lindell, Parker -- I can't remember
24  the full name, Parker something or other.  An
25  attorney called me about -- actually, I don't

Page 11

1  remember when it was, eight months ago, ten months
2  ago, a year.
3    Q.  Could it be Parkers Daniel Kibort?
4    A.  Yes.
5    Q.  And had you ever met the person that had
6  contacted you from Parkers Daniel before?
7    A.  No.
8    Q.  Had you ever worked with any attorney from
9  Parkers Daniel before?
10    A.  Not that I'm aware of, no.
11    Q.  My understanding is that today you're being
12  represented by Mr. Kachouroff; is that correct?
13    A.  Yes.
14    Q.  Have you ever worked with Mr. Kachouroff on
15  a previous engagement?
16    A.  No.
17    Q.  Had you ever heard of Mr. Lindell before
18  you were contacted to serve as an expert in this
19  matter?
20    A.  Yes.
21    Q.  In what context had you heard of
22  Mr. Lindell previously?
23    A.  Well, in the context obviously of his
24  pillow ads, and in the context of his political
25  speech.

Page 12

1    Q.  And you testified that you were first
2  contacted approximately eight to ten months ago; is
3  that right?
4    A.  Well, that was -- excuse me -- that was
5  kind of a guess.  I don't recall when it was.  It
6  could be a year ago.
7    Q.  Do you recall when you were officially
8  retained by the defendants in this case?
9    A.  I don't, but if you look at the date on my
10  report, it's probably a couple of months before
11  then.
12    Q.  Who wrote your expert report in this case?
13    A.  I did.
14    Q.  Did you draft the entirety of the report by
15  yourself?
16    A.  I did.
17    Q.  Did anyone else work with you to draft your
18  report in this matter?
19    A.  Not to draft it, but as normally happens a
20  draft is sent to the attorneys, and they perhaps
21  suggest things and correct spelling mistakes, if
22  they notice them.  But I wrote that report myself.
23    Q.  And when you say "the attorneys," are you
24  referring to the Parkers Daniel attorneys in this
25  case?



Page 13

1    A.  Yes.
2    Q.  Do you know approximately how many
3  attorneys from Parkers Daniel worked on your report
4  with you?
5    A.  Probably two.  Well, not worked on the
6  report with me, but I think at least two reviewed
7  it.
8    Q.  And was there anyone else other than the
9  Parkers Daniel attorneys who reviewed your report
10  before you served it in this matter?
11    A.  No.
12    Q.  Have you communicated with any other expert
13  witnesses for the defendants in this case?
14    A.  No.
15    Q.  I'd like to talk a little bit about what
16  you did to prepare for today's deposition.  When
17  did you first begin preparing for your deposition
18  today?
19    A.  Well, I don't know about preparing.  I
20  spoke to Chris a couple of weeks ago, several weeks
21  ago, when we were trying to plan the date of the
22  deposition.  Actual preparation was really at the
23  end of the day yesterday, the day before, I guess,
24  when I was reading my report and reading the
25  rebuttal to my report.

Page 14

1    Q.  Did you attend any meetings other than the
2  one with Mr. Kachouroff a week ago in preparation
3  for your deposition today?
4    A.  It wasn't an in-person meeting, it was a
5  phone call.  No, I hadn't -- there have been no
6  other kinds of meetings with anybody else.
7    Q.  Now you mentioned reviewing your report and
8  also the rebuttal report in your -- in this case.
9  Did you review any other documents to prepare for
10  your deposition today?
11    A.  While reading my report and the rebuttal
12  report, I dipped into a couple of things.  So, for
13  instance, I definitely looked at a Web page and a
14  video that was cited in my report.
15    Q.  Do you recall the subject matter of the Web
16  page and video that you reviewed?
17    A.  Yeah.  I wish I could remember your
18  expert's name now.  But anyway, the rebuttal expert
19  who claimed I made a misleading statement, and I
20  thought that doesn't sound right.  And so I went to
21  my report and discovered that actually I hadn't
22  made a misleading statement.  But at that point I
23  dipped into the -- I went to my citation, which is
24  a Web page at -- what's the name?  I don't remember
25  the name of the site, but it's a Web page that had

Page 15

1  a video on it of someone from Smartmatic talking
2  about the Venezuelan election conspiracy.
3    Q.  And just to refresh your recollection, I
4  think you're thinking of Dr. Jonah Berger.  I know
5  there's a lot of names floating in this case, just
6  so it's at the top of your head.
7    A.  Berger?
8    Q.  Yes.
9    A.  That sounds right.
10    Q.  Did you review any other information in
11  this case or about this case online in preparation
12  for your deposition today?
13    A.  I don't -- I don't think so.  That's the
14  one I specifically recall.  I don't think there's
15  anything else, but I might have quickly clicked on
16  one or two things from the report.
17    Q.  Approximately how many hours have you spent
18  working on this case since you were hired?
19    A.  Well, that I -- that I don't know without
20  looking at my -- my records unfortunately.
21    Q.  Can you give me an estimate?  Is it less
22  than 100?
23    A.  Yes, it probably is less than 100.
24    Q.  Less than 50?
25    A.  It's probably between 50 and 100.

Page 16

1    Q.  And does that include all of the time you
2  spent drafting your expert report?
3    A.  Well, yes, that general number would
4  include all the time drafting a report and
5  preparing for this deposition.
6    Q.  Now, how much are you being compensated for
7  your work in this matter?
8    A.  $600 an hour.
9    Q.  Did you negotiate that rate at all with the
10  defendants?
11    A.  Well, I -- I discussed the rate with the
12  previous law firm.  I'm not sure how much
13  negotiation was involved, but I certainly discussed
14  it with them.
15    Q.  Is $600 per hour your standard hourly rate
16  for expert witness work in litigation matters?
17    A.  Yes.
18    Q.  Does your hourly rate ever change depending
19  on what client you are serving?
20    A.  Yes, sometimes we do negotiate it down.
21    Q.  Do you recall if you negotiated your rate
22  at all in this matter down from a standard rate?
23    A.  No, no, I wouldn't have a negotiated it
24  down to 600.
25    Q.  Have you been paid yet in this case?



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
17—20

Page 17

1    A.   I have.
2    Q.   How much have you been paid in this case?
3    A.   Well, again, I don't know without looking
4    at my records.
5    Q.   More than $10,000?
6    A.   Yes.
7    Q.   More than $20,000?
8    A.   Probably.
9    Q.   More than $30,000?
10   A.   Possibly.
11   Q.   More than $50,000?
12   A.   I don't know.  I don't think so.
13        MR. KACHOUROFF:  I'll go ahead and
14   stipulate, we paid him approximately $90,000 to
15   date.  That will make it easier for you and make
16   this go faster.
17        THE DEPONENT:  Can I jump in there?  That
18   90,000 was not just for this case.
19        MR. KACHOUROFF:  Correct, that was for both
20   cases.
21        MS. LEVINE-PATTON:  So -- I'm sorry.  Thank
22   you.  Thanks, Chris.
23   Q.   (By Ms. Levine-Patton)  It sounds like you
24   have a couple of open matters with these
25   defendants; is that correct?

Page 18

1    A.   I don't know the status of the other -- the
2    other case.  I mean, this one is open, but I don't
3    know what the status is of the other case.  I
4    haven't discussed it with Chris in some time.
5    Q.   And I'm not prying into any of your
6    communications specifically with Chris, or any
7    other attorney.  But just generally speaking, is
8    the other case that you're referring to the lawsuit
9    brought by Mr. Coomer against Mr. Lindell?
10   A.   Yes, that's right.
11   Q.   And you served as an expert witness for
12   Mr. Lindell in the Coomer matter; is that right?
13   A.   I certainly did, whether I am moving
14   forward I don't know.  I don't know what's
15   happening with that case.  I suspect it's still
16   open, but I don't know the details.
17   Q.   And the $90,000 that you have been paid to
18   date by the defendants includes all of your work in
19   both this matter and the Coomer matter; is that
20   accurate?
21   A.   Correct.
22   Q.   Were you ever paid a retainer fee by anyone
23   to serve as an expert in this case, Smartmatic
24   versus Lindell?
25   A.   I don't think so.

Page 19

1    Q.   Do you recall when you were first contacted
2    to serve as an expert in the Coomer matter?
3    A.   Not really.  A year -- a year ago,
4    18 months ago.  I'm not really sure.
5    Q.   And were you also contacted by Parkers
6    Daniel to serve in the Coomer --
7    A.   Yes.
8    Q.   I'm sorry.  Did you issue an opening report
9    in that case?
10   A.   I did.
11   Q.   Do you recall approximately when that
12   report was?
13   A.   Probably two or three months before my
14   report in this case.
15   Q.   Did you ever issue a rebuttal or a reply
16   report in that case?
17   A.   No.
18   Q.   What was the nature of your work in the
19   Coomer case?
20   A.   Similar to the work in this case, an
21   analysis of social media reach of certain
22   statements.
23   Q.   Was your assignment the same in that case
24   as it was in this case?
25   A.   I would say my assignment was similar.  I

Page 20

1    don't know that it could be exactly the same, but
2    similar.
3    Q.   Have you been retained as an expert witness
4    by My Pillow or Mr. Lindell in any other cases?
5    A.   I'm not quite sure.  There was some talk
6    about another case.  I certainly never worked on
7    another case.  These are the only two cases I've
8    worked on.
9    Q.   And without revealing any privileged
10   communications, is that other case a defamation
11   matter that you discussed but have not yet served
12   in?
13   A.   Yes.
14   Q.   Do you recall who the plaintiff is in that
15   matter?
16   A.   I do.
17   Q.   And who is that?
18   A.   Well, there's no objection, so I assume I'm
19   allowed to say.  It's Dominion.
20   Q.   And you have not been retained in the
21   Dominion case; is that right?
22   A.   Well, I think there was a verbal discussion
23   of me working on that case.  However -- with
24   Parker.  However, I haven't worked on that case,
25   and don't know if I will be working on that case.



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
21–24

Page 21

1    Q.  Is your hourly rate in the Coomer case the
2    same as it is in the Smartmatic case?
3    A.  Yes.
4    Q.  Are you -- have you been deposed in the
5    Coomer case?
6    A.  Yes.
7    Q.  Do you recall when?
8    A.  Six months ago.  What month are we in?
9    Yeah, I don't know.  That's a guess.  Excuse me.
10   Q.  And are you planning or prepared to testify
11   at trial in the Coomer case?
12   A.  If it's necessary.
13   Q.  Have you performed any other work for
14   Mr. Lindell outside of the two cases, plus the
15   Dominion matter that we've discussed so far today?
16   A.  No.
17   Q.  No consulting work?
18   A.  No.
19   Q.  What about for My Pillow?  Any other work
20   for My Pillow?
21   A.  No.
22   Q.  No consulting work?
23   A.  No.
24   Q.  Okay.  We're going to enter Exhibit 692.
25   And Meghan is going to drop the document in the

Page 22

1    chat, and you should be able to open it from there,
2    but I'll let you know when it's up.
3         (Exhibit 692 marked for identification.)
4    Q.  (By Ms. Levine-Patton)  Okay.  I think it's
5    available.  Let me know when you have it in front
6    of you.
7    A.  Well, it says -- here we go.  Yes, I have
8    it open.
9    Q.  Excellent.  Will you please -- is this the
10   expert report that you submitted in this matter?
11   Feel free to scroll through it if you need to.
12   A.  Yes, it certainly appears to be.
13   Q.  I'd like to first turn to page 6 of your
14   report.  Let me know when you're there.
15        MR. KACHOUROFF:  Meghan, I'm sorry to
16   interrupt.  Can you tell me what you've marked this
17   report, what number?  692?
18        MS. LEVINE-PATTON:  Yes, sir.
19        MR. KACHOUROFF:  Thank you.
20   Q.  (By Ms. Levine-Patton)  Mr. Kent, do you
21   see Section 5 Background on page 6?
22   A.  Section 5 -- yes.
23   Q.  It says:
24        "I was asked to investigate and report on
25        the recent statements about Smartmatic

Page 23

1    between the 2020 presidential election and
2    February 24, 2021."
3    Do you see that?
4    A.  I do.
5    Q.  Is that an accurate recitation of your
6    assignment in this case?
7    A.  Yes.
8    Q.  Is there anything else you were assigned to
9    do in this case?
10   A.  Well, no, not really.  I mean, that
11   encompasses it.
12   Q.  And has your assignment ever changed during
13   the history of this case?
14   A.  No.
15   Q.  Okay.  I'd like to turn to page 43 of your
16   report.  Please let me know when you're there.
17   A.  Yes.
18   Q.  It says, "Summary of Conclusions."  Do you
19   see that?
20   A.  I do.
21   Q.  You list 12 bullet points under paragraph 115.
22   Do you see that?
23   A.  Yes.
24   Q.  Do you have any other opinions or
25   conclusions in this case outside of these 12 bullet

Page 24

1    points?
2    A.  Not currently.
3    Q.  I'd like to look at the first bullet point.
4    Is it your opinion that the statements Smartmatic
5    regards as defamatory were widely broadcast by
6    numerous parties prior to defendant's first
7    comments regarding Smartmatic?  Is that an accurate
8    summary of your opinion?
9    A.  Yes, but I'm upset that there's no
10   apostrophe, but apart from that, yes.
11   Q.  Okay.  It's a long report.
12       I'd like to go to the second to last bullet
13   point, which is on page 44.  You wrote:
14       "Controversial commentary about Smartmatic
15       was already present on the Web prior to the
16       election, including allegations of vote
17       manipulation in other elections."
18       Do you see that?
19   A.  I do.
20   Q.  Sitting here today, is that an accurate
21   statement of one of your opinions in this case?
22   A.  Yes.
23   Q.  Okay.  We're going to look at the last
24   bullet point, which is also on page 44.  You wrote:
25       "A debate had been underway in the United

Page 25

1    States since at least 2006 regarding voting
2    machine security, with many allegations
3    that the various machines were not secure."
4    Is that an opinion that you render in this
5    case?
6    A.  Yes.
7    Q.  And sitting here today, is that an accurate
8    statement of an opinion that you made in this case?
9    A.  Yes.
10   Q.  Now you mentioned here that you read the
11   rebuttal report of Professor Berger that was served
12   on July 9, 2024; is that right?
13   A.  Yes.
14   Q.  And you're aware that that report replies
15   to your expert report, which you served on
16   September 22, 2023, correct?
17   A.  Yes.
18   Q.  Did reading Professor Berger's report lead
19   you to change any of your opinions in your opening
20   report?
21   A.  No.
22   Q.  Have you formed any new opinions since
23   reading Professor Berger's rebuttal report?
24   A.  Not of substance.  I mean, I have the
25   opinion that he misinterpreted something I said at

Page 26

1    least once in the report -- in his report, but it
2    hasn't changed any of my, you know, the core
3    opinions in this case.
4    Q.  So you have no new opinions regarding the
5    effect of Mr. Lindell's statements on online
6    commentary; is that right?
7    A.  I -- I -- I -- none of my opinions refer to
8    Mr. Lindell's -- the effectiveness of Lindell's
9    statements.
10   Q.  And do you have any new opinions regarding
11   the effect of Mr. Lindell's statements on the
12   public perception of Smartmatic?
13   A.  I don't.  That was out of my purview.  I
14   wasn't asked to look at that.
15   Q.  Have you formed any other opinions
16   regarding the Lindell commentary about Smartmatic
17   and whether that was different than the commentary
18   about Smartmatic that appeared prior to
19   February 2021?
20   A.  I have not.
21   Q.  Let's look at page 46 of your report, which
22   is Exhibit B.
23   Do you see that?
24   A.  I do.
25   Q.  Is this a full and accurate list of all of

Page 27

1    the materials you considered when performing your
2    analysis in this case?
3    A.  I believe so, with the caveat that they are
4    also citations within the report that may not be in
5    here.  Citations -- well, there are.  Citations to
6    different websites, for instance.  But otherwise,
7    yes, this should be materials.
8    Q.  You don't list any depositions here.  Did
9    you review any depositions in this matter?
10   A.  I don't recall seeing any depositions.  If
11   they're not listed here, I probably didn't.
12   Q.  Did you review anything outside of this
13   list, and Mr. -- Dr. Berger's report in preparation
14   for your deposition?
15   A.  Anything outside that list.  Well, again,
16   as I mentioned earlier, I did certainly look at a
17   website that was citing my report.
18   Q.  How did you gather the list of documents
19   that appears in Exhibit B?
20   A.  So these -- these are documents I was sent,
21   and so they're, you know, they're sitting in
22   my -- on my hard drive, and I copied them and paste
23   the names into my document.
24   Q.  Were they sent to you by Parkers Daniel?
25   A.  Yes.

Page 28

1    Q.  Were they sent to you by anyone else?
2    A.  No.
3    Q.  Did anyone -- did you ask for any specific
4    documents from Parkers Daniel?
5    A.  Not that I recall.
6    Q.  Did you watch all of the videos that are
7    alleged to be defamatory in the first supplemental
8    complaint in this case?
9    A.  I -- I don't recall what those videos were.
10   Q.  Did you review all of the statements
11   Mr. Lindell made in this case that are alleged to
12   be defamatory in the first supplemental complaint?
13   A.  I'm sure I read the complaint, but I don't
14   recall what's in there, what I -- what I saw.
15   Q.  I'd like to look at the first half of
16   page 46.  You specifically note looking at
17   Exhibits 143, 144 and 145 to the first supplemental
18   complaint.
19   Do you see that?
20   A.  Yes, yes.
21   Q.  Why did you consider those exhibits
22   specifically?
23   A.  Well -- okay.  First, I want to explain
24   what materials considered means, because this is
25   ambiguous in the field of expert witnessing.  The



Page 29

1  fact that it's -- okay. So according to the
2  Federal Rules of Evidence I need to list the
3  documents -- materials considered. However, that
4  has been defined differently by different courts,
5  is my understanding. And so what I do is I list
6  all the documents that I had available to me. If a
7  document was sent to me, I included on that list
8  even if it really didn't result in any opinion, or
9  was not used to support any particular opinion.
10        I know there have been lawsuits related to
11  this very issue. So the safe thing is just to
12  include everything I was sent.
13    Q.  Do you know why those three exhibits were
14  sent to you out of the over 150 exhibits that were
15  filed with the first supplemental complaint?
16    A.  I don't know, because offhand without
17  looking at them, I don't know what they were. Most
18  of these -- well, pretty much everything in here I
19  at least dipped into.
20        So again, they're not necessary materials
21  that were used to provide an opinion or to support
22  an opinion, but I do -- if I receive a document, I
23  generally at least open it to check what's in it,
24  but I don't report what these are.
25    Q.  Okay. I'm going to show you one of them,

Page 30

1  which is Exhibit 144, of the first supplemental
2  complaint. We're going to be introducing that as
3  Exhibit 693.
4    A.  Okay.
5    Q.  It's going to show up in your chat
6        (Exhibit 693 marked for identification.)
7    Q.  (By Ms. Levine-Patton) Please let me know
8  when you have that open.
9    A.  I'm trying. Okay. I do have it open.
10   Q.  Do you see that -- do you recognize this
11  document?
12   A.  Yeah, it looks familiar.
13   Q.  Does this refresh your recollection as to
14  why Parkers Daniel would have sent this to you as
15  only one of three exhibits from the first
16  supplemental complaint, as opposed to sending you
17  all 150 or so?
18   A.  I -- I really don't know the answer to
19  that. Excuse me.
20        MR. KACHOUROFF: I do have an objection.
21  You're mischaracterizing. I think he has all the
22  exhibits. If you look above those three exhibits,
23  doesn't it say 1 through 142?
24        MS. LEVINE-PATTON: I'm sorry. Is that an
25  objection, Mr. Kachouroff?

Page 31

1        MR. KACHOUROFF: Yes, objection to form and
2  because you're mischaracterizing what his materials
3  considered list says.
4        MS. LEVINE-PATTON: Thank you. Your
5  objection is noted.
6    Q.  (By Ms. Levine-Patton) Can you please
7  answer the question, Mr. Kent?
8    A.  So thank you for drawing my attention to
9  that, but I don't know -- what was the question
10  again? Why did they send it to me?
11   Q.  Does this refresh your recollection as to
12  why Parkers Daniel would have sent this to you as
13  one of three exhibits in the first supplemental
14  complaint, as opposed to sending you the full range
15  of exhibits?
16        MR. KACHOUROFF: Once again objection to
17  form. That's not what his materials list says.
18        You can answer.
19        THE DEPONENT: So -- I mean, the simple
20  answer is no. It doesn't remind me of why they
21  sent this to me. But again, apparently I had
22  Exhibits 1 through 145, but I can't -- I can't say
23  why any particular document was sent to me.
24   Q.  (By Ms. Levine-Patton) Do you know why
25  these three exhibits were pulled out of the list of

Page 32

1  the complete exhibit number? Did they have a
2  particular significance or importance?
3    A.  I -- I don't know why they were separate.
4  I have no idea.
5    Q.  Now looking back at Exhibit 693, do you see
6  Mr. Lindell published this tweet on January 31st,
7  2023?
8    A.  Yes.
9    Q.  Now the period you examined in your expert
10  report was between the 2020 presidential election
11  and February 4, 2021; is that right?
12   A.  If that's what the report says. I don't
13  recall the specific days.
14   Q.  Well, let's -- let's look back at your
15  report just so we're all on the same page. If you
16  go to page 6, paragraph 17, please.
17   A.  Yes. Okay.
18   Q.  You said:
19        "I was asked to investigate and report on
20        the recent statements about Smartmatic
21        between the 2020 presidential election and
22        February 4, 2021."
23        Is that right?
24   A.  Yes.
25   Q.  Now this tweet that we're looking at in



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
33–36

Page 33

1  Exhibit 693 is outside of that time period,
2  correct?
3      A.   Sorry.  What -- outside that time period.
4  It's within that.  Oh, 2021.  When is this?  2023,
5  yes, it's outside.
6      Q.   How was your review of this specific
7  exhibit relevant to your analysis in this case?
8      A.   Well, it clearly wasn't.
9      Q.   You do not list any court file documents in
10  Exhibit B; is that right?
11     A.   I -- I don't know.
12     Q.   Please take a chance to look it over, and
13  let me know if you see any court file documents in
14  Exhibit B.
15     A.   What do you mean by court file?  You say
16  court file or court filed?
17     Q.   I'm sorry.  Yeah, that was a bad question.
18  I wasn't clear.  I mean, documents, motions,
19  memorandums of law filed by the attorneys in this
20  matter.
21     A.   Well, I have the complaints.  Does that
22  count as one?
23     Q.   Sure.  Outside of the complaint.
24     A.   And the exhibits to the complaint and the
25  first supplemental complaint, so.  Well, we have

Page 34

1  various complaints.  Smartmatic being news media,
2  BPAL.  We have all those.
3      Q.   Did you review defendant's memorandum of
4  law in support of its motion to dismiss the
5  complaint in this case?
6      A.   I don't know.  Is it in here?
7      Q.   I'll represent to you it's not in this
8  list.
9      A.   Then I --
10     Q.   Would you have reviewed it outside of this
11  list?
12     A.   No.  I doubt very much I would have seen
13  it.
14     Q.   Did you ask to review that?
15     A.   I wouldn't have known it existed.
16     Q.   Did you review Smartmatic's opposition to
17  defendant's memorandum of law to dismiss this case?
18     A.   If it's not in that list, then, no.
19     Q.   You also don't list any Bates-stamped
20  documents.  Do you understand what Bates-stamped
21  documents are?
22     A.   I do.
23     Q.   Do you list any in Exhibit B?
24     A.   I don't see any.
25     Q.   Did you review any documents that

Page 35

1  Smartmatic produced in this case when rendering
2  your opinions?
3      A.   I don't know.  Are any of these documents
4  on this list provided by Smartmatic?  If not, then
5  I didn't.
6      Q.   Why not?
7      A.   Why?
8      Q.   Yes, sir.
9      A.   I'm asking you why.  It's a rhetorical
10  question.  I don't understand what relevance it
11  would have been to the task I was sent.
12     Q.   Did you review any documents that the
13  defendants produced in this case when rendering
14  your opinions?
15     A.   Say again, did I review?
16     Q.   Any documents that the defendants produced
17  in this case when rendering your opinions in this
18  case?
19     A.   Well, again, I had available to me the
20  documents in this exhibit.  Exhibit B here.  If --
21  if you're after a document that's not on that list,
22  then I would say, no.
23     Q.   Now, I'm still on page 46.  The second to
24  last split before the break in the page reads
25  2023-09-21-TGP.

Page 36

1          Do you see that?
2      A.   I do.
3      Q.   Do you recall what document that refers to?
4      A.   No, I don't.
5      Q.   The second half of this page lists several
6  Excel documents; is that correct?
7      A.   There are a number, yes.
8      Q.   Are these Excel documents also from Parkers
9  Daniel to you?
10     A.   No, I believe these are documents I
11  actually created.  These are documents from Infegy,
12  which is the tool I used for analysis.
13     Q.   And did you produce those documents when
14  you produced your report in this -- when you served
15  your report in this case?
16     A.   I did.  Well, I provided the documents to
17  Parker Daniels, and they, I assume, provided them
18  to you guys, but that's out of my hands.
19     Q.   Were all of these Excel documents from
20  Infegy?
21     A.   Well, not all of them.  I mean, for
22  instance, the second one is from BuzzSumo.  A lot
23  of them are from Infegy.  I don't recall where the
24  Bipar Share comes from, but it's probably defined
25  within my report somewhere.



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
37–40

Page 37

1    The rest -- apart from those two, the rest
2  are Infegy documents or Infegy reports.
3    Q.  Just to be clear, this list of Excel
4  documents is not publicly available; is that right?
5    A.  No, these are spreadsheets that I created
6  and I provided.
7    Q.  I'd like to look at page 47 of Exhibit B.
8  The heading at the top is Google Analytics Metrics.
9  Do you see that?
10    A.  I do.
11    Q.  Each of the documents listed here are PDFs,
12  or it appears that way; is that fair?
13    A.  Yes.
14    Q.  Do you recall how you went about collecting
15  these PDFs?
16    A.  I didn't collect these.  I was given these.
17    Q.  Who were you given these by?
18    A.  Well, by the attorneys.
19    Q.  Do you know if all of these are dated
20  during your assignment period from November 20
21  through February 4, 2021?
22    A.  Were they created?  I don't know the
23  question that you're asking me.  Were they created?
24  I'm sorry?
25    Q.  Dated.  Do you know if all of these

Page 38

1  documents were dated during your assignment period?
2    A.  By dated I'm not sure what you mean.  I
3  could look at a date on the file, but are you
4  asking -- do you really want to know when they were
5  created or?
6    Q.  I'm just wondering if any of these
7  documents are outside of your assignment period, if
8  you can recall?
9    A.  If -- if the data within them relates to a
10  period outside of my assignment period?
11    Q.  Yes.
12    A.  I'd have to go back and look at them, but I
13  believe these are -- well, that's -- that's a good
14  question.  I don't know.  I'd have to go look at
15  the date range shown within the reports.
16    Q.  And again, you didn't gather any of these
17  Google analytic metric documents yourself; is that
18  right?
19    A.  Correct.
20    Q.  Did you review any academic literature in
21  preparing your report in this case?
22    A.  I don't believe so unless I cite it in the
23  report.  I don't recall doing that.
24    Q.  Did you review all of the documents cited
25  in Professor Berger's rebuttal report?

Page 39

1    A.  No.
2    Q.  Why not?
3    A.  I was not given that task.
4    Q.  Have you considered any additional documents
5  since you signed your report in this case other
6  than Dr. Berger's rebuttal report?
7    A.  Yeah, I was going to say his report.  No.
8    Q.  Okay.  I'd like to turn to what's been labeled
9  as page 49 of your report.  This is your CV.  Do
10  you see that?
11    A.  I do.
12    Q.  Did you draft this?
13    A.  I did.  And, in fact, I noticed yesterday
14  this seems to be out of order.  That was supposed
15  to be Exhibit A, but evidently when I put it in I
16  dropped it in the wrong position.  But, yes, I did
17  draft it.
18    Q.  Does this contain a full and accurate
19  description of your expertise and your experience?
20    A.  I would say accurate.  I wouldn't say full.
21    Q.  What is it missing?
22    A.  Well, I mean, I've done numerous things
23  over the past 40 years, I guess.  I've been
24  involved in social media.  It's hard to cover
25  everything in a resume.

Page 40

1    Q.  How did you curate what to add and what to
2  not add to the CV?
3    A.  I don't really know.  When I sat down to
4  write it, I wrote things I thought would be
5  appropriate.
6    Q.  Appropriate for this case?
7    A.  No, this is more of a general CV.  I didn't
8  write this specifically for this case.
9    Q.  Now, this doesn't list your educational
10  background; is that right?
11    A.  No, it doesn't.
12    Q.  Did you attend a college or university?
13    A.  I did.
14    Q.  Where?
15    A.  The University of Sheffield in Northern
16  England.
17    Q.  When did you graduate?
18    A.  1978.
19    Q.  And what was your degree in?
20    A.  Geography and geology.  And I would note,
21  of course, there was no social media in 1978.
22    Q.  Did you attend any schooling after
23  undergraduate -- your undergraduate or university
24  degree?
25    A.  I did, the school of life.



Page 41

1    Q.  Did you obtain a master's or a doctoral
2  degree?
3    A.  No.
4    Q.  Do you consider yourself an expert in the
5  method of content analysis?
6    A.  I -- I don't know.  I mean, it depends on
7  the context.  In certain context, I would say, yes.
8  But if you're talking general sort of academic
9  field, then I would say, no.
10    Q.  Have you ever utilized the content analysis
11  tools?
12    A.  Sorry.  What content analysis tools are you
13  referring to?
14    Q.  I guess they're tools that are used in the
15  academic sphere to systematically analyze the
16  nature of content.  I'm curious if you've ever used
17  any of those methods or tools?
18    A.  Well, I don't know what tools you're
19  referring to.  Certainly, for instance, Infegy has
20  content analysis tools built in, which I have used.
21    Q.  Have you ever taught any classes using the
22  method of content analysis?
23    A.  No.
24    Q.  Have you written any academic papers using
25  the method of content analysis?

Page 42

1    A.  No.
2    Q.  Do you consider yourself an expert in
3  information, diffusion or the way that information
4  spreads online?
5    A.  Well, I'm certainly testifying in this case
6  as an expert in -- excuse me -- the diffusion of
7  information across social media channels.  And I
8  have a 40-year background in social media.
9    Q.  Is the basis for your expertise in
10  information diffusion your years of experience?  Is
11  there anything else you'd like to add?
12    A.  I'm not using the term information
13  diffusion, because I suspect Mr. Berger has told
14  you that's an academic field.  However, as I
15  mentioned, I certainly would be regarded under the
16  Federal Rules of Evidence as an expert in the
17  propagation of information across social media.
18    Q.  Have you ever conducted research in the
19  field of looking at information propagation over
20  social media?
21    A.  Academic research, no.
22    Q.  Have you ever taught classes in that field?
23    A.  I've taught classes about social media and
24  using social media for business purposes.
25    Q.  Where have you taught those classes?

Page 43

1    A.  Well, the last time I recall a colleague
2  and I did a local -- a local workshop that we set
3  up ourselves and rented some space and advertised
4  and brought people in.
5    Q.  Is that in Colorado?
6    A.  Yes.
7    Q.  Was it a semester course?
8    A.  It wasn't an academic course.  It was a
9  course for small businesses.
10    Q.  Do you consider yourself an expert in
11  marketing?
12    A.  I consider myself an expert, and I believe
13  the Federal Rules of Evidence would back me up that
14  I am an expert in digital marketing.
15    Q.  And what is your basis for your expertise
16  in digital marketing?
17    A.  Well, my 40 years of experience.
18    Q.  Anything else?
19    A.  Well, the Federal Rules of Evidence list
20  knowledge, skills, training or education.  I have
21  the knowledge.  I have the skills.  I have the
22  experience, 40 years.  Training, certain training,
23  but not academic.  Education, not academic, but
24  certainly I have that.
25        So under the Federal Rules of Evidence, I

Page 44

1  am an expert in that field.  And I've also been
2  accepted by a number of courts as an expert in that
3  field.
4    Q.  In the field of digital marketing?
5    A.  Correct.
6    Q.  Do you consider yourself an expert in news
7  media?
8    A.  I'm not quite sure what you're referring to
9  by that.  I have not served as an expert witness in
10  that arena.  Well, that's -- some of the cases I've
11  served as an expert witness in have touched on that
12  arena.  And I also had a couple of journalism
13  prizes.  So I'm not quite sure how to answer that.
14    Q.  I'm sorry.  Did you say journalism prizes?
15    A.  Yes.
16    Q.  Do you consider yourself an expert in
17  consumer behavior?
18    A.  Again, it depends on the context.  I don't
19  put myself out there as a -- a lot of people are
20  consumer behavior experts and in effect survey
21  experts.  I don't do consumer behavior surveys.
22        However, I have testified in relation to
23  consumer behavior in the context of the use of, for
24  instance, websites and search engines.
25    Q.  Have you ever taught any classes on



Page 45

1 consumer behavior?
2    A.  I haven't taught classes under that rubric,
3 but I've certainly taught classes and written books
4 about consumer behavior in the context of digital
5 marketing.
6    Q.  Have you ever written any academic articles
7 about consumer behavior?
8    A.  Well, I'm not sure how we define academic
9 articles.  I've written in a couple of legal
10 journals related to consumer behavior in relation
11 to paperclip advertising.
12    Q.  Do you know if those -- I'm sorry.  Go
13 ahead.
14    A.  Sorry.  I was kind of musing.  Other than
15 that -- I've written a lot of articles that one
16 probably wouldn't define as academic, but I've
17 certainly written for both.  Magazines and journals
18 over the years, and some of that writing is in the
19 area of digital marketing.
20    Q.  Were any of those peer-reviewed academic
21 publications?
22    A.  No.
23    Q.  Do you consider yourself an expert in
24 consumer perception?
25    A.  Well, again, I wouldn't call myself a

Page 46

1 consumer perception expert, but in the arena of
2 digital marketing, I've certainly testified in
3 relation to issues that touch on the perceptions of
4 consumers working on websites or search engines.
5    Q.  Have you ever held a professor position in
6 an academic institution?
7    A.  No.
8    Q.  Have you ever published on any subject in
9 an academic peer review journal?
10    A.  Well, two legal journals.  I'm not sure
11 they are called peer review.  I'm not sure.
12    Q.  What legal journals?
13    A.  I -- I don't recall the name of it.  It had
14 law in the name, but I'd have to look it up I'm
15 afraid.
16    Q.  You don't consider yourself a legal expert,
17 do you?
18    A.  No, I don't regard myself in the law, per
19 se, no.
20    Q.  Approximately how many times have you
21 served as an expert in a defamation case?
22    A.  Well, defamation -- and this is going to be
23 kind of a very rough guess -- 15 -- 12, 15.
24 Something like that.  I don't know.
25    Q.  Okay.  Does your expert report fairly

Page 47

1 summarize all of the opinions you intend to offer
2 in this case?
3    A.  It does, unless, of course, I'm asked a
4 question that requires some more thought.
5    Q.  Sitting here today are you planning to
6 offer any other opinions that are not identified in
7 your report?
8    A.  No.
9    Q.  Are you intending to perform any analysis
10 that is not set forth in your report?
11    A.  No.
12    Q.  Are you intending to rely on any data that
13 is not set forth in your report?
14    A.  No.
15    Q.  Are you intending to change any of your
16 opinions that are set forth in your report?
17    A.  No.
18    Q.  Are you offering any opinions in this case
19 about the effect of Mr. Lindell's statements about
20 Smartmatic on Smartmatic from February 4, 2021, to
21 the present?
22    A.  No.
23    Q.  Do you intend to offer an opinion at trial
24 regarding the effect of Mr. Lindell's statements
25 about Smartmatic on Smartmatic from February 4,

Page 48

1 2021, to the present?
2    A.  No.
3    Q.  Are you offering any opinions in this case
4 about Mr. Lindell's statements about voting
5 machines generally from February 4, 2021, to the
6 present?
7    A.  No.
8    Q.  Do you intend to offer an opinion at trial
9 regarding Mr. Lindell's statements about voting
10 machines from February 4, 2021, to present?
11    A.  No.
12    Q.  Are you offering any opinions in this case
13 about the online reach of defendants' statements
14 about Smartmatic?
15    A.  No.
16    Q.  Do you intend to offer an opinion at trial
17 about the online reach of defendants' statements
18 about Smartmatic?
19    A.  No.
20    Q.  Are you offering any opinions in this case
21 on the extent to which the publications by
22 defendant about Smartmatic were circulated online?
23    A.  No.
24    Q.  Do you intend to offer an opinion at trial
25 regarding the extent to which the publications by



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
49–52

Page 49

1  defendants about Smartmatic were circulated online?
2  A.  No.
3  Q.  Are you offering any opinions in this case
4  about whether a publication by the defendants
5  targeted Smartmatic?
6  A.  No.
7  Q.  Do you intend to offer an opinion at trial
8  regarding whether any publications by defendants
9  targeted Smartmatic?
10  A.  No.
11  Q.  Are you offering any opinions in this case
12  on whether any publications by defendants caused
13  Smartmatic any financial loss?
14  A.  No.
15  Q.  Do you intend to offer an opinion at trial
16  regarding whether publications by defendants about
17  Smartmatic caused Smartmatic financial loss?
18  A.  No.
19  Q.  Are you offering any opinions in this case
20  on whether any publications by defendants caused
21  Smartmatic reputational harm?
22  A.  No.
23  Q.  Do you intend to offer any opinions at
24  trial regarding whether the publications by
25  defendants caused Smartmatic reputational harm?

Page 50

1  A.  No.
2  Q.  Are you offering any opinion on the value
3  of Smartmatic's brand prior to Mr. Lindell's
4  statements about Smartmatic?
5  A.  Not -- not directly the value of the brand.
6  But, obviously, a lot of my report relates to
7  Smartmatic's reputation prior to that date.
8  Q.  But you did not review any documents
9  produced by Smartmatic regarding its brand prior to
10  Mr. Lindell's statements about Smartmatic; is that
11  right?
12  A.  Correct.
13  Q.  Is it your opinion that the statements
14  Mr. Lindell made about Smartmatic did not cause any
15  harm to Smartmatic at all whatsoever?
16  A.  I -- I have no opinion on that subject.
17  Q.  And do you intend to offer an opinion at
18  trial on the subject of whether the statements
19  Mr. Lindell made about Smartmatic caused Smartmatic
20  any harm whatsoever?
21  A.  No.
22  Q.  Is it your opinion that Smartmatic cannot
23  still be suffering harm as a result of Mr. Lindell's
24  statements about Smartmatic?
25  A.  Again, I don't have an opinion on that

Page 51

1  subject.  It's not something I studied.
2  Q.  Do you intend to offer an opinion at trial
3  regarding whether Smartmatic can still be suffering
4  harm as a result of Mr. Lindell's statements about
5  Smartmatic?
6  A.  No.
7  Q.  Do you have any opinions in this case about
8  whether the statements Mr. Lindell has been making
9  about Smartmatic are true or false?
10  A.  No.
11  Q.  Do you intend to offer any opinion at trial
12  regarding whether the statements Mr. Lindell is
13  making about Smartmatic are true or false?
14  A.  No.
15  Q.  Okay.
16  MS. LEVINE-PATTON:  Let's go off the record
17  briefly.
18  THE VIDEOGRAPHER:  We are going off the
19  record.  10:33 a.m.
20  (Whereupon, a recess was taken at
21  10:33 a.m.)
22  (Whereupon, the proceedings resumed at
23  10:41 a.m.)
24  THE VIDEOGRAPHER:  We are back on the
25  record.  10:41 a.m.

Page 52

1  Q.  (By Ms. Levine-Patton)  Mr. Kent, I'd like
2  to go to page 11 of your report.  I'm looking at
3  paragraph 29.  Please let me know when you're
4  there.
5  A.  Yep, I'm there.
6  Q.  In this paragraph, you explained you
7  searched for Smartmatic using a date range of
8  January 1, 2020, through February 4, 2021; is that
9  right?
10  A.  Yes.
11  Q.  And you did this using Google Trends, which
12  is a service that allows one to ask Google to
13  provide a chart showing the use of a specified
14  search term over time; is that right?
15  A.  Yes.
16  Q.  Did you ever look for the term Smartmatic
17  on Google Trends after February 4, 2021?
18  A.  I don't believe I did.
19  Q.  Why not?
20  A.  Well, it wasn't within the area I was asked
21  to -- you know, the time range I was asked to look
22  at.
23  Q.  You are aware that Smartmatic claims that
24  the defendants began their campaign of statements
25  against Smartmatic on February 5th, 2021; is that



Page 53

1  right?
2    A.  Yes, I'm aware of that.
3    Q.  Did you perform any analysis using Google
4  Trends to determine the relative levels of the
5  search term Smartmatic from February 5, 2021, until
6  September 22 in 2023 when you served your report in
7  this case?
8    A.  No, I didn't.
9    Q.  Why not?
10   A.  Again, it wasn't what I was asked to -- to
11  analyze.
12   Q.  You also used the service Infegy in your
13  analysis for this case, is that right?
14   A.  I did.
15   Q.  I'd like to look at page 13 of your report,
16  paragraph 33.  Let me know when you're there.
17   A.  I'm there.
18   Q.  Now using Infegy, you found that there was
19  a low of 40 posts containing the word Smartmatic on
20  November 1st, 2020, right?
21   A.  Was that 2020?  That's a bad -- this is a
22  bad -- this is a fuzzy version of my report.  It's
23  hard to read these diagrams.  Is it okay with you
24  if I open my report directly?
25   Q.  Yes.  That's okay.

Page 54

1    A.  Because it's much sharper, much more
2  differences.  Sorry.  So we're looking at
3  30 -- here we go.  That's a lot cleaner.  We were
4  looking at paragraph 34, yes.  Okay.  So could you
5  repeat your question please.
6    Q.  Yeah, I'm actually in paragraph 33.
7    A.  Okay.
8    Q.  And my question was -- yeah, using Infegy
9  you found there was a low of 40 posts containing
10  the word Smartmatic on November 1st; is that right?
11   A.  40 posts, that's what it says, yes.
12   Q.  And then there was a high of 95,644 posts
13  on November 15; is that right?
14   A.  Yes.
15   Q.  And the year is 2020 for both of those
16  November dates, right?
17   A.  Yes.
18   Q.  Did you use Infegy to search for posts
19  containing the word Smartmatic from February 4,
20  2021, through the time you served your expert
21  report in this case, which was September 22, 2023?
22   A.  No.
23   Q.  Why not?
24   A.  Same answer, because it was out -- outside
25  of the task I was given.

Page 55

1    Q.  I'm now entering what will be marked as
2  Exhibit 694.  It's the Berger rebuttal report.
3  Please let me know when you have that open.
4      (Exhibit 694 marked for identification.)
5      THE DEPONENT:  Yes.
6    Q.  (By Ms. Levine-Patton)  I'm on page 6 of
7  his report, paragraph 18.  Do you see that?
8    A.  Paragraph 18.  Hold on a second.  Yes.
9    Q.  Now on the last sentence of that paragraph,
10  Dr. Berger wrote:
11      "Utilizing the same Infegy Atlas search
12      tool as Mr. Kent, I find a substantial
13      level of online commentary after the start
14      of the Lindell campaign against Smartmatic
15      that discusses voting machines or their
16      manufacturers together with Lindell or his
17      company, My Pillow, which demonstrates that
18      Mr. Lindell and My Pillow are associated
19      with voting machine commentary."
20      Do you see that?
21   A.  Yes.
22   Q.  Now in the next paragraph Dr. Berger
23  writes:
24      Specifically, if I used Infegy Atlas to
25      determine whether posts from February 5,

Page 56

1  2021, to October 5, 2023, mentioned voting
2  machines or their manufacturers and
3  Mr. Lindell or My Pillow.  Infegy Atlas
4  returned 48,274 posts, with an estimated
5  total number of impressions at
6  1,628,702,216, and an estimated reach of
7  22,220,494,866 according to the Infegy
8  Atlas metrics reported by Mr. Kent."
9      Do you see that?
10   A.  According to the metrics reported by me --
11   Q.  Do you see the section I just read?
12   A.  I see that, but I don't understand.  He
13  used Infegy Atlas, but then he's saying reported by
14  me.
15   Q.  With the metrics reported by you using the
16  same metrics.  Do you understand that?
17   A.  The same actual data is he saying?
18   Q.  Total number of impressions he made a reach
19  of metrics?  Do you understand that?
20   A.  According to the Infegy metrics.  I didn't
21  report those numbers though.  I just want to be
22  clear that this is his analysis.  It's not my
23  analysis.
24   Q.  Correct.  It's his analysis using the
25  metrics of impression and reach.  Do you understand



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
57—60

Page 57

1  that?
2   A.  I don't think that's what it says, but if
3  that's how we want to read it I'm fine with that.
4   Q.  Now, did you perform any research or
5  analysis to confirm or deny the numbers that
6  Dr. Berger presents in paragraph 19?
7   A.  I did not.
8   Q.  Do you have any reason to dispute the
9  numbers that Dr. Berger -- that Dr. Berger gives in
10  paragraph 19?
11   A.  No.
12   Q.  Did you perform any analysis using Infegy
13  or BuzzSumo to show that Mr. Lindell and My Pillow
14  are frequently discussed alongside Smartmatic after
15  February 5th, 2021?
16   A.  No.
17   Q.  Do you dispute that Infegy and BuzzSumo
18  show that Mr. Lindell and My Pillow are frequently
19  discussed online alongside Smartmatic after
20  February 5th, 2021?
21   A.  No.
22   Q.  Do you dispute that Mr. Lindell made
23  hundreds, if not thousands of negative statements
24  about Smartmatic and voting machines after
25  February 4, 2021?

Page 58

1   A.  I -- I don't dispute it.  I have no idea if
2  those numbers are correct or not.  It's not
3  something I looked at.
4   Q.  Do you dispute that Mr. Lindell's
5  statements about Smartmatic could have influenced
6  public perception of Smartmatic after February 4,
7  2021?
8       MR. KACHOUROFF:  I'm going to object to the
9  form of all these questions.  And plus they are
10  outside the scope of his expert testimony.
11       So go ahead and answer the question, if you
12  can.
13       THE DEPONENT:  I don't dispute it, but
14  again, I don't know what the facts are.
15   Q.  (By Ms. Levine-Patton)  I'd like to go back
16  to your report.  I'm on page 14, paragraph 35.
17  Please let me know when you're there?
18   A.  14.  Paragraph 35, you said?
19   Q.  Yes, sir.
20   A.  Yes, I'm there.
21   Q.  You write in the second sentence:
22       "There was already a low volume of
23       derogatory posts about Smartmatic prior to
24       the rise, as President Trump and those
25       around him began to talk in a general way

Page 59

1       about what they claimed was a stolen
2       election, and about the role of electronic
3       voting machines, attention would naturally
4       shine on Smartmatic, one of a mere handful
5       of companies providing electronic-voting
6       devices in the United States."
7       Do you see that?
8   A.  I do.
9   Q.  Are you aware that the three largest voting
10  manufacturers in the United States in 2020 were
11  ES&S, Dominion and Hart InterCivic?
12   A.  I don't know the relative sizes of these
13  companies.  I've certainly heard of these companies,
14  along with Smartmatic, but I don't know the
15  relative sizes.
16   Q.  So you were not aware that those are the
17  three largest voting manufacturers in 2020,
18  correct?
19   A.  Well, again, I'm not -- I was not aware of
20  the specific numbers.  I was aware of the
21  companies.
22   Q.  Are you aware that Smartmatic only provided
23  election technology and services to one county in
24  the 2020 US election?
25   A.  I believe I have heard that before, yes.

Page 60

1   Q.  Were you aware that Smartmatic only
2  provided election technology and services to Los
3  Angeles County in the 2020 US election?
4   A.  That certainly sounds familiar.
5   Q.  What basis do you have for opining that
6  attention would naturally shine on Smartmatic in
7  2020?
8   A.  Well, the fact that Smartmatic was being
9  talked about previously.  It's one of the -- well,
10  I guess you said the top three.  Well, I suspect
11  that means Smartmatic's Number 4.  So it's one of
12  the handful, and it wasn't only Smartmatic
13  obviously that was getting attention.
14   Q.  Did you do any analysis or research to
15  confirm your opinion that attention would naturally
16  shine on Smartmatic in 2020?
17   A.  No, not research based on what naturally.
18  In a sense this is a segue.  I mean, I think one
19  reason attention focused on Smartmatic was its
20  connection to Venezuela probably.
21   Q.  Did you perform any analysis on whether the
22  statements Mr. Lindell made about Smartmatic
23  contributed to anger towards voting machine
24  manufacturers?
25   A.  No.  Again, that was outside of my task.



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
61—64

Page 61

1    Q.  Do you dispute that the statements
2    Mr. Lindell made about Smartmatic contributed to
3    anger towards voting machine manufacturers?
4         MR. KACHOUROFF:  Objection to form.
5         THE DEPONENT:  I don't dispute it, but
6    again it's not something I've looked at.
7    Q.  (By Ms. Levine-Patton)  Did you perform any
8    analysis on whether the statements Mr. Lindell made
9    about Smartmatic contributed to fear towards voting
10   machine manufacturers?
11        MR. KACHOUROFF:  Objection to form.
12        THE DEPONENT:  No.
13   Q.  (By Ms. Levine-Patton)  Do you dispute that
14   the statements Mr. Lindell made about Smartmatic
15   contributed to fear towards voting machine
16   manufacturers?
17        MR. KACHOUROFF:  Objection to form.
18        THE DEPONENT:  No.  Sorry.  The question
19   was do I dispute?  That one?
20   Q.  (By Ms. Levine-Patton)  Yes, sir.
21   A.  No, I don't dispute, but again it's not
22   something I really looked at.
23   Q.  Did you perform any analysis on whether
24   election officials indicated that Mr. Lindell
25   influenced the public skepticism of the legitimacy

Page 62

1    of the 2020 election?
2    A.  No, I didn't.
3    Q.  Do you dispute that election officials
4    indicated that Mr. Lindell influenced the public's
5    skepticism of the legitimacy of the 2020 US
6    election?
7         MR. KACHOUROFF:  Objection to form.
8         THE DEPONENT:  No, I don't dispute that,
9    but again it's outside my -- my task.
10   Q.  (By Ms. Levine-Patton)  Did you analyze
11   whether public speakers other than Mr. Lindell
12   continued to make statements about Smartmatic
13   stealing the election in April of 2021?
14   A.  No.
15   Q.  Did you analyze whether public speakers
16   other than Mr. Lindell continued to make statements
17   that Smartmatic stole the election in May 2021?
18   A.  No.
19   Q.  Did you analyze whether public speakers
20   other than Mr. Lindell continued to make statements
21   that Smartmatic stole the election in June of 2021?
22   A.  No.
23   Q.  Did you analyze whether public speakers
24   other than Mr. Lindell continued to make statements
25   that Smartmatic stole the election in July of 2021?

Page 63

1    A.  No.
2    Q.  Did you analyze whether public speakers
3    other than Mr. Lindell continued to make statements
4    that Smartmatic stole the election in August
5    of 2021?
6    A.  No.
7         MR. KACHOUROFF:  I'm going to object.  Let
8    me get my objection out.
9         He's already stated that he has not done
10   anything, analysis or has any opinions beyond what
11   he was tasked to do.  So you can ask all the
12   questions the way you want.  I'm going to object to
13   form on all of them.  I'm trying not to interrupt
14   you because I want to get done with this, so.
15        THE DEPONENT:  Can we add some months
16   together?
17        MS. LEVINE-PATTON:  Thanks, Chris.
18   Q.  (By Ms. Levine-Patton)  Did you analyze
19   whether public speakers other than Mr. Lindell
20   continued to make statements that Smartmatic stole
21   the election in August of 2021?
22   A.  No.
23   Q.  Did you analyze whether public speakers
24   other than Mr. Lindell continued to make statements
25   throughout the rest of 2021?

Page 64

1    A.  No.
2    Q.  Did you analyze whether public speakers
3    other than Mr. Lindell continued to make statements
4    that Smartmatic stole the election in 2022?
5    A.  No.
6    Q.  Did you analyze whether public speakers
7    other than Mr. Lindell continued to make statements
8    that Smartmatic stole the election in 2023?
9    A.  No.
10   Q.  Are you aware that Mr. Lindell has
11   continued to make public statements about Smartmatic
12   from February 5th, 2021, to the present?
13   A.  I -- I -- I guess I'm aware of some of
14   those statements.  I don't know if he continues to.
15   Q.  Your analysis does not take any of those
16   statements during that entire time period into
17   account; is that correct?
18   A.  Correct.
19   Q.  I'd like to go to page 17 of your report,
20   please.  The heading in the middle of the page is
21   "Example:  The Gateway Pundit."
22        Do you see that?
23   A.  I do.
24   Q.  You wrote in paragraph 46.
25        "As I show later in this report, the



Page 65

1      allegations about Smartmatic before
2      February 5, 2021, were being broadly
3      disseminated to millions of Americans."
4      Do you see that?
5    A.  Yes.
6    Q.  You then use an example of The Gateway
7  Pundit, which you claim published at least 39
8  articles that mentioned Smartmatic before
9  February 5th, 2021; is that correct?
10   A.  Yes.
11   Q.  Why did you choose the Gateway Pundit as
12  your example here?
13   A.  It's a very popular, major, one might say,
14  conservative website, conservative opinion website.
15   Q.  Did you use any methodology when choosing
16  the Gateway Pundit as your exemplar here?
17   A.  I didn't use any particular methodology
18  beyond what I just stated.  I mean, it's -- I could
19  have picked others.  This is just an example of how
20  things spread, and I -- I picked this one again
21  because it's a very popular, well-known,
22  conservative opinion site.
23   Q.  Under paragraph 47, you list 39 articles
24  and their links, correct?
25   A.  Yes.

Page 66

1    Q.  What methodology did you use to find these
2  39 articles?
3    A.  Well, I -- I think -- we talked about these
4  documents earlier on.  I believe I was given some
5  links to some of these articles already.  I can't
6  remember in what form.  But also I went to Gateway
7  Pundit and actually searched the site looking
8  for -- well, the word Smartmatic.
9    Q.  And then you performed a manual review of
10  the website; is that fair?
11   A.  Yes, as I found articles that related, what
12  pages that related to Smartmatic, I copied the URL
13  and gathered information about -- about the page.
14   Q.  Sorry.  To interrupt.
15      I'd like to go to page 20 of your report,
16  paragraph 49.
17   A.  Yes.
18   Q.  You write:
19      "Indeed, as two of The Gateway Pundit links
20      above show, Smartmatic had been linked to
21      George Soros in 2016 and again in 2018."
22      Do you see that?
23   A.  I do.
24   Q.  Are you aware that The Gateway Pundit is
25  considered an unreliable website?

Page 67

1      MR. KACHOUROFF:  Objection to form.
2      THE DEPONENT:  Well, I could have a
3  personal view one way or another about that.  But
4  I'm not sure that I know what unreliable means in
5  this context.
6    Q.  (By Ms. Levine-Patton)  Sure.  I'm going to
7  introduce an exhibit to help with that.  We're at
8  Exhibit 695.  Please let me know when you have it
9  in your chat.
10      (Exhibit 695 marked for identification.)
11      THE DEPONENT:  I'm downloading it now.
12  Yes, it's open.
13   Q.  (By Ms. Levine-Patton)  Now this is a
14  Reuters article.  Have you ever seen this before?
15   A.  I don't -- I don't think so.
16   Q.  This was published on December 3, 2021.  Do
17  you see that?
18   A.  Yes.  Yes.
19   Q.  Let's look at the first paragraph.  It
20  says:
21      "The Gateway Pundit, a far-right news site,
22      has used its Facebook page, with more than
23      630,000 followers, to post bogus stories
24      alleging the 2020 election was stolen from
25      former President Donald Trump.  Some

Page 68

1      commenters responded with threats of
2      violence."
3      Do you see that?
4    A.  I do.
5    Q.  Are you aware that the Gateway Pundit was
6  considered a far-right news site?
7      MR. KACHOUROFF:  Objection to form.
8      THE DEPONENT:  I think I was aware that
9  some people regard this site as far-right.
10   Q.  (By Ms. Levine-Patton)  Were you aware that
11  the Gateway Pundit has been accused of posting
12  bogus stories about the 2020 US election?
13      MR. KACHOUROFF:  Same objection.  Objection
14  to form.
15      THE DEPONENT:  So what was -- how did you
16  phrase that again?  Was I aware?
17   Q.  (By Ms. Levine-Patton)  That the Gateway
18  Pundit has been accused of posting bogus stories
19  about the 2020 US election?
20   A.  I'm not sure if I've seen such accusations
21  myself, but certainly I wouldn't be surprised if
22  they had been accused of such things.
23   Q.  Let's look at the third paragraph of this
24  Reuters article.  It says:
25      "For years, Facebook has imposed sanctions



PETER KENT                                    August 07, 2024
Smartmatic USA Corp vs Michael J. Lindell          69–72

Page 69

1    on Gateway Pundit's account to limit the
2    spread of its misinformation.  But Gateway
3    Pundit still uses its Facebook page to
4    amplify its reporting and raise money.  The
5    page features a prominent appeal asking
6    readers to buy subscriptions to support its
7    battle for survival."
8        Do you see that?
9    A.  I do.
10   Q.  Were you aware when you drafted your expert
11   report in this case that The Gateway Pundit had
12   been spreading misinformation for years?
13       MR. KACHOUROFF:  Objection to form.
14       THE DEPONENT:  I was not actually aware of
15   Gateway Pundit for years before.  I may have run
16   across Gateway Pundit once or twice before doing
17   this report, but I certainly wasn't particularly
18   familiar with the site.
19   Q.  (By Ms. Levine-Patton)  So you were not
20   aware that The Gateway Pundit had been spreading
21   misinformation when you chose to use it as an
22   exemplar in your expert report; is that right?
23       MR. KACHOUROFF:  Objection to form again.
24       THE DEPONENT:  No, I don't think that's
25   quite correct.  I think some of what I

Page 70

1    reported -- some of these articles that I listed,
2    for instance, I suspect were misinformation.
3    Q.  (By Ms. Levine-Patton)  I'd like to look at
4    the third paragraph from the bottom of the article
5    in front of you.
6    A.  Sorry.  Third from the bottom.  The last
7    page?
8    Q.  Yes.
9    A.  "Facebook has long recognized..."?
10   Q.  Yes, sir.
11   A.  Okay.
12   Q.  It says:
13       "Facebook has long recognized Gateway
14       Pundit as a source of false and divisive
15       content.  A July 2019 internal report on
16       potential misinformation and polarization
17       risks listed the site as one of Facebook's
18       common misinfo offenders.  The report was
19       among a cache of documents provided to the
20       U.S. Securities and Exchange Commission and
21       Congress by Frances Haugen, a former
22       Facebook product manager who left the
23       company in May and has been leading a
24       public critic of its practices."
25       Do you see that?

Page 71

1    A.  I do.
2    Q.  Did you do any analysis to determine how
3    the public reacted to Gateway Pundit publications?
4    A.  I didn't.
5    Q.  Did you do any analysis to determine
6    whether the public was persuaded by the Gateway
7    Pundit, if at all?
8    A.  No, but I don't see how either of these
9    issues are related to the task I was given.
10   Q.  Did you do anything to evaluate features of
11   the Gateway Pundit publication to determine whether
12   or not they may have been persuasive?
13   A.  I didn't do such an analysis, no.
14   Q.  Do you know anything about the impact that
15   Gateway Pundit publications would have on public
16   sentiment about Smartmatic prior to the 2020
17   election?
18   A.  Sorry.  Could you repeat that?  Do I have
19   -- do I --
20   Q.  Know anything about the impact that the
21   Gateway Pundit publications had on public sentiment
22   about Smartmatic prior to the 2020 election?
23   A.  Well, I didn't do any analysis into that
24   issue.  I can certainly guess what the reaction
25   would be.

Page 72

1    Q.  Sitting here today, do you think that
2    Gateway Pundit was a reliable exemplar for you to
3    use in your expert report?
4    A.  I'm not sure what you mean by reliable
5    exemplar.  I think it was a good exemplar for
6    purposes of my report.  I think by reliable I
7    suspect you mean, was the information truthful, but
8    maybe I'm miscorrecting you.  I'm not sure what you
9    mean by reliable.
10   Q.  I'd like -- sorry.  I'd like to go to
11   page 38 of your report.  Please let me know when
12   you're there.
13   A.  Did you say page 38?
14   Q.  Yes, sir, Section D.
15   A.  I'm there.
16   Q.  In this section you opine that there was
17   controversial content about Smartmatic before the
18   2020 US election; is that right?
19   A.  Yes.
20   Q.  Now, I'd like to look at paragraph 100.  Do
21   you see that?
22   A.  I do.
23   Q.  You write:
24       "While this case revolves around
25       allegations that Smartmatic was involved in

PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
73–76

Page 73

1       voter fraud during the 2020 Presidential
2       Election, one might consider these
3       allegations as a continuation of a much
4       broader public debate that started years
5       earlier, involving not just Smartmatic but
6       all the companies that provide electronic
7       voting machines for use in elections in the
8       United States, also including Dominion
9       Voting Systems Corporation and Election
10      Systems Software, LLC; ES&S."
11      Do you see that?
12  A.  I do.
13  Q.  When you say in that paragraph, "one might
14  consider," who are you talking about?
15  A.  I'm talking about anybody who's looking at
16  the data.  This is a simple little segue.  I'm not
17  sure why -- is it Dr. Berger or Mr. Berger, why he
18  focused on this word "continuation," but one is
19  somebody who looks at the evidence and considers
20  it.
21  Q.  Is it your opinion that it was such a
22  continuation?
23  A.  I believe it was.
24  Q.  And what is your basis for that belief?
25  A.  Well, I mean, stories don't come out of

Page 74

1  nowhere.  There's all this vitriol directed at
2  these companies.  It didn't just occur someday.
3  It's something that builds over time.  And if you
4  look at the historical record, certain things were
5  being said in the past.  It's like -- I can't
6  remember what phrase.  I think I used the phrase
7  kindling in my report.  It's burning away slowly
8  and suddenly ignite.
9  Q.  And what expert methodology did you use to
10  come to the opinion that you just espoused?
11  A.  Well, it's a methodology from examining
12  statements that are being made.  I mean, one might
13  ask -- is it Dr. Berger, by the way?  I don't want
14  to be rude to him.
15  Q.  Yes.
16  A.  One might ask what analysis Dr. Berger used
17  to show that there was no continuation.  Well, I
18  used the same analysis, the same form of analysis
19  that he did, which is a sort of puristic analysis.
20  You can look at the evidence and you can see what
21  happened.
22  Q.  Did you use any automated content analysis
23  tools when you looked at the evidence to see what
24  happened?
25  A.  Related content analysis tools.  I

Page 75

1  obviously used the search tools.  So they were
2  analyzing content.
3      So I'm not quite sure what you're referring
4  to.  Dr. Berger didn't use any particular tools to
5  show -- to prove there was no continuation.  So I'd
6  be interested to know what those tools should have
7  been, and I think he was using the same analysis.
8  Same methodology.
9  Q.  Is it your opinion that commentary about
10  the risk of using electronic voting machines is the
11  same as commentary stating that Smartmatic fixed,
12  rigged and stole the 2020 election?
13  A.  Of course it's not the same, but it's the
14  preparation for that commentary.  You're
15  saying that -- a lot of people were saying, it was
16  both Democrats and Republicans saying that we had
17  issues with these voting machines and they can be
18  used in a corrupt manner.
19      And so if you have that name out there
20  floating around, it's not hard to take it and
21  ignite the next phase, which is to actually accuse
22  somebody of doing something.
23  Q.  And what methodology or basis are you using
24  to opine that that was preparation for the same --
25  for the commentary specifically about Smartmatic?

Page 76

1  A.  Well, I'm not saying -- and I don't know if
2  you intended this.  By the word preparation, I'm
3  not suggesting there was some plan by people
4  preparing the ground.  I'm simply saying it's like
5  a forest fire.  Nobody is planning for the forest
6  fire, but the forest dries out and becomes
7  ignitable.
8      And so we had a story going on for several
9  years with a lot of prominent people worrying and
10  making comments about the dangers of electronic
11  voting, and that just provides the dry -- the dry
12  underbrush that can be ignited.
13  Q.  Is that just your common sense that you're
14  using to determine that that created an underbrush
15  that could be ignited?
16  A.  Well, I know you're not supposed to use the
17  word common sense.  At the end of the day, to a
18  great degree it is common sense.  You can look at
19  the discussion over time.
20      You've got the discussion of dangers of
21  electronic voting.  You've got a discussion of
22  Smartmatic specifically being accused of voter
23  fraud in Venezuela and perhaps the Philippines.
24  You've got -- and then you have an extension.  Over
25  time something grows.  We have the election here,



Page 77

1 and people start pointing at the electronic voting
2 machines.
3     The pointing did not begin with the
4 election. That's the point. The pointing began
5 several years earlier.
6   Q.  Are you aware that Smartmatic did not enter
7 the US market between 2006 and 2019?
8   A.  I have no idea the chronology of their
9 operations.
10   Q.  I'd like to draw your attention to page 39
11 of your report, Section E.
12   A.  Yes.
13   Q.  Here you explain that your tool Infegy
14 Atlas found that in August of 2019, 84 percent of
15 the posts mentioning Smartmatic were from
16 Argentina; is that correct?
17   A.  Yes.
18   Q.  Do you know whether perceptions differ
19 regarding elections in the United States versus in
20 Argentina?
21   A.  That's such a broad question. I wouldn't
22 know how to answer it. Obviously, there are local
23 differences. I think some perceptions related to
24 voting the same world over. People want to have
25 their votes counted and they want the vote counting

Page 78

1 to be fair. So in that sense perceptions are very
2 similar. Obviously, you have individual
3 differences, different candidates and different
4 ways to handle the votes. So I'm not exactly sure
5 how to answer that question.
6   Q.  Well, what is your basis for claiming that
7 discussion about Smartmatic in Argentina in 2019
8 has any relevance to discussions about Smartmatic
9 in the United States in 2020?
10   A.  Well, again, I'm reporting what was going
11 on. I'm not drawing a straight line from a
12 particular post in Argentina to any particular
13 statement in the United States. But the -- social
14 media is obviously international. These posts do
15 spread.
16     People in the United States do see posts
17 from other countries. This was -- probably had
18 very minor impact at the time in the United States,
19 but the -- the information -- certainly the
20 information appeared later in the conservative
21 press. So somehow that information did flow from
22 Argentina to the United States.
23   Q.  Did you do any research, academic or
24 otherwise, to determine how public perception in
25 Argentina in 2019 would have any relevance to the

Page 79

1 discussions about Smartmatic in the United States
2 in 2020?
3   A.  Well, I think I just answered that. Those
4 -- those events in Argentina did find their way
5 through social media to the United States and to
6 conservative websites in the United States. So
7 obviously there was some kind of connection.
8     There's no -- there's no firewall between
9 these Argentinian posts and the United States --
10 conservative websites in the United States.
11   Q.  Which conservative websites are you
12 referring to that Argentinian posts flowed to in
13 the United States?
14   A.  Well, I suspect that -- I don't have it in
15 front of me right now. I'm pretty sure you can
16 find information about what happened in Argentina,
17 certainly what happened in Venezuela, on Gateway
18 Pundit, for instance. I know for a fact Gateway
19 Pundit was talking about Venezuela.
20   Q.  Any other websites that you can recall?
21   A.  Not that I can recall right now. I'm sure
22 if you gave me time I could find them.
23   Q.  Do those appear in your expert report?
24   A.  Well, certainly with the Venezuela
25 connection they do, yes.

Page 80

1   Q.  I'm talking about the Argentina 2019
2 commentary specifically. Do those appear in your
3 expert report and how they flowed to other
4 conservative websites in 2020?
5   A.  I don't recall if they do. I suspect
6 because you're asking that question they don't.
7   Q.  I'd like to go to paragraph 105 on page 40
8 of your report, please.
9   A.  105. Yes, I'm there.
10   Q.  The paragraph says:
11     "There was, at the time in Argentina,
12     accusations that the Smartmatic system
13     could be used for electoral fraud. The
14     Frente de Todos political group claimed
15     that the Smartmatic system could be used to
16     interfere with election data, and that we
17     fear the government will try to interfere
18     with the count using the system."
19     Do you see that?
20   A.  I do.
21   Q.  Do you believe that Argentinian comments
22 about the government interfering in an election
23 through Smartmatic software are the same or similar
24 to Mr. Lindell's claims that Smartmatic fixed,
25 rigged and stole the 2020 US election?



Page 81

1    A.  Well, obviously -- I guess I don't
2    understand the question, because obviously there's
3    a similarity.  In both cases there's an accusation
4    that Smartmatic machines were used for electoral
5    fraud.
6    Q.  And what is your basis or methodology for
7    that opinion?
8    A.  I can read.
9    Q.  So essentially common sense?
10   A.  I don't know that it's common sense.  If
11   you read two different statements and they both
12   refer to electoral fraud using Smartmatic machines,
13   one can quite clearly see they are related, or at
14   least they cover the same ground.
15   Q.  How do you define electoral fraud?
16   A.  Well, I think in the context we're talking
17   about, electoral fraud would be the use of these
18   electronic voting machines in some way to change
19   the votes of enough people to change the outcome of
20   an election.
21   Q.  Would you agree with me that there's a
22   difference between allegations on one hand of a
23   government interfering with a vote count, and on
24   the other hand of an entire election being rigged
25   by an election technology company?

Page 82

1        MR. KACHOUROFF:  Objection to form.
2        THE DEPONENT:  Well, obviously in the way
3    you put it there, yes, there's a difference.  But
4    at the heart, at the end of it, is the use of
5    electronic voting machines to change the results of
6    an election.
7    Q.  (By Ms. Levine-Patton)  I'd like to look at
8    Section F.  We're still on page 40 of your report.
9    In this section you explain that from September 22,
10   2018, through October 31st, 2020, Smartmatic was
11   mentioned online in conjunction with Hugo Chavez;
12   is that right?
13   A.  Yes.
14   Q.  And you made that determination using your
15   Infegy tool, right?
16   A.  Correct.
17   Q.  Now if we go to page 41, paragraph 110, you
18   write:
19       "Thus, there was clearly commentary
20       regarding Smartmatic's relationship with
21       Hugo Chavez predating the 2020 election in
22       the US.  It was at a relatively low level,
23       but it served as a kindling of a sort."
24       Do you see that?
25   A.  I do.

Page 83

1    Q.  What analysis did you perform to determine
2    that the low level of comments from 2018 to 2020
3    connecting Chavez with Smartmatic were a quote,
4    unquote, kindling for the 2020 US election
5    statements Mr. Lindell made about Smartmatic?
6    A.  I used the same analysis, methodology that
7    Dr. Berger did.  Reading a post and coming to a
8    conclusion.  The post discussed Hugo Chavez.  They
9    discuss the Venezuelan relationship to Smartmatic
10   to Venezuela and in particular -- a particular
11   Venezuelan election, and those stories turn up in
12   conservative media a couple years later.
13       There is no firewall between these social
14   media systems.
15   Q.  Did you isolate the geographic regions
16   where Hugo Chavez was being discussed in
17   conjunction with Smartmatic?
18   A.  I don't believe I did.
19   Q.  In the next section, on page 41, Section G,
20   you explain that Smartmatic is often conflated with
21   Dominion voting systems; is that right?
22   A.  Yes.
23   Q.  And that claim is based on 49 posts that
24   Infegy found, correct?
25   A.  No.

Page 84

1    Q.  Well, let's look at paragraph 112.  You say
2    in the second sentence:
3        "Infegy found 49 such posts and estimated
4        that the full number would be around
5        1,094."
6        Do you see that?
7    A.  That was before the 2020 election.  Let's
8    go back to paragraph 111.  I'm saying Smartmatic is
9    often conflated with Dominion voting system, and it
10   is.  Again, in the conservative media -- I mean, in
11   social media you see this commentary a lot, that
12   these two companies are related.
13   Q.  And you make that opinion that it is
14   conflated based on data you gathered from
15   September 22, 2018, to October 31st, 2020, correct?
16   A.  No, that's not what my report says.
17   Q.  What other data and time period do you use
18   to come to that conclusion?
19   A.  Well, I didn't provide citations for this.
20   I probably should have, but it's so obvious and so
21   common that I didn't.  Perhaps I should have done
22   that.
23       But what I'm saying is there is this
24   conflation, then, based on this conflation, I went
25   back -- to examine earlier conflation, I went back



Page 85

1  to the previous years to see if people -- if this
2  commentary existed back then.  But I'm not saying
3  that those 49 posts are what I base the conflation
4  on.  It's I'm sure you're aware it's a very common
5  statement.
6      Q.  What else did you base that conflation on
7  other than the data that you list in your report?
8      A.  Which data in my report are you referring
9  to?  Because I don't cite to any particular data
10  when I made that statement.
11      Q.  Well, what I asked you -- I'm looking at
12  the realtime.  What other data and time period do
13  you use to come to that conclusion, the conclusion
14  being that Smartmatic and Dominion are currently
15  conflated.
16      The data that you said in your report was
17  from 2018 through October 31, 2020, and you said,
18  well, and you say I didn't provide citations; I
19  probably should have.  I'm asking you what data
20  should you have provided citations for?
21      A.  The data -- well, I could have linked to
22  various social media posts.  I could have linked to
23  Gateway Pundit.  I could have linked to any number
24  of different sites where people are conflating
25  Dominion with Smartmatic.

Page 86

1      But just to be clear again, paragraph 112
2  is not what I was using as support for the first
3  sentence of paragraph 111.
4      Q.  Okay.  There's a lot there I want to break
5  down.
6      First of all, if paragraph 112 is not the
7  support that you're using for the first sentence of
8  paragraph 111, what is the basis for the first
9  sentence of paragraph 111?
10      A.  I think I just answered that question.  One
11  can find numerous -- I see my mistake here.  It's
12  such a common conflation, such a common statement
13  that I assumed everybody would understand it, and I
14  didn't need to support it.  But evidently I should
15  have supported it.
16      I've answered that question.  I can -- you
17  can find many, many, many examples of people in
18  social media and people on conservative blogs and
19  so on making this link between the two companies.
20      Q.  Okay.  So you've mentioned now three
21  sources that you used as support for paragraph 111
22  outside of what is in your report.  Those three
23  sources are social media, blogs and Gateway Pundit.
24  Is there anything else you'd like to add?
25      A.  Well, you're going to like this one.

Page 87

1  Paragraph 112 does actually support it to some
2  degree, but in the narrative here I'm not using
3  paragraph 112.  I'm not saying because of
4  paragraph 112 we can see this conflation.
5      I'm saying we can see this conflation, and
6  if you go back in time you can see there it's still
7  at a low level of conflation back there -- back
8  then.
9      Q.  Did you do any systematic analysis using
10  the Infegy tool or any other tool of the social
11  media Gateway Pundit and conservative blogs you
12  just mentioned after October 31st, 2020, to
13  determine that Dominion and Smartmatic were
14  conflated?
15      A.  I -- I did not.  I made the mistake of
16  basing it on quite clear -- basing it on the fact
17  that it's quite clear this was going on.  My
18  mistake, I should have supported it.
19      Q.  Now, have you considered that of the 49
20  posts you cite in paragraph 112 -- well, first of
21  all, did you perform a manual review of those 49
22  posts?
23      A.  I did.
24      Q.  And how many of the 49 posts were referring
25  to Dominion and Smartmatic simultaneously because

Page 88

1  they are competitors?
2      A.  That I don't know.  I just want to make one
3  point though.  Yes, Infegy found 49 posts, but
4  remember Infegy extrapolates and estimates the full
5  number.  It believed there's probably somewhere
6  around 1100 such posts.
7      Q.  But you were unable to review the 1,094
8  posts because those were just an estimate, right?
9      A.  Yeah, those are an extrapolation based on
10  what Infegy knows about the web.
11      Q.  Thank you.  Yeah, I want to focus on the 49
12  you were able to manually review right now.
13      Do you know how many of those 49 were
14  referring to Dominion and Smartmatic simultaneously
15  because they're in the same industry?
16      A.  I don't know offhand without going back to
17  check.  And I know you have a theme of questions
18  right now.  Unfortunately, I've been drinking too
19  much water, and would love to have a break fairly
20  soon.
21      Q.  Sure.  Yeah, let's take a break.  That's
22  fine.
23      THE VIDEOGRAPHER:  We are going off the
24  record.  11:29 a.m.
25      (Whereupon, a recess was taken at



PETER KENT                                            August 07, 2024
Smartmatic USA Corp vs Michael J. Lindell                      89–92

Page 89

1   11:29 a.m.)
2        (Whereupon, the proceedings resumed at
3   11:35 a.m.)
4        THE VIDEOGRAPHER:  We are back on the
5   record.  11:35 a.m.
6    Q.   (By Ms. Levine-Patton)  Mr. Kent, before we
7   went off the record, we were looking at
8   paragraph 111 and 112 of your report.  And you were
9   talking about 49 Infegy posts that you found from
10  September 22, 2018, through October 31, 2020,
11  conflating Dominion and Smartmatic.
12       Do you recall that conversation?
13   A.   I do.
14   Q.   And one more question about that.
15       Do you know how many of those 49 posts
16  referring -- were referring to Dominion and
17  Smartmatic simultaneously because they were being
18  conflated or intertwined in a negative or
19  defamatory way?
20   A.   I don't know without going back to look at
21  that data.
22   Q.   And did you provide each of those 49 posts
23  in the -- in your supplemental materials for your
24  expert report?
25   A.   Well, I believe so.  The citation is to --

Page 90

1   well, it's footnote 92, Infegy, Dominion post text
2   dot XLSX.  So it is presumably in that file.
3    Q.   So it's your testimony that you provided
4   that file to counsel; is that right?
5    A.   I did.
6    Q.   Okay.  I'd like to go to page 42, Section H
7   of your report, the voting machine debate.  Do you
8   see that?
9    A.   I do.
10   Q.   In this section you explain that prior to
11  the 2020 US election, there was a debate for
12  several years in the US concerning the use of
13  electronic voting machines; is that right?
14   A.   Yes.
15   Q.   Now on paragraph 114, in the second
16  sentence, you write:
17       "This debate was not focused solely on
18       Smartmatic; it involved all and any
19       voting-machine companies, though certainly
20       Smartmatic was frequently named."
21       Do you see that?
22   A.   I do.
23   Q.   What is your definition of "frequently
24  named"?
25   A.   Well, named means the name appeared in the

Page 91

1   articles and the videos or whatever.  Frequently, I
2   don't have a specific definition right now
3   unfortunately.
4    Q.   So then you list bullet points of articles,
5   which you say are a few examples of National Press
6   discussing this issue and disseminating information
7   about it online; is that right?
8    A.   Yes.
9    Q.   How did you find the articles for this
10  list?
11   A.   I'm pretty sure I used a Google search.
12   Q.   Did you --
13   A.   Probably --
14   Q.   I'm sorry.  Go ahead.
15   A.   Probably a Google search and then, you
16  know, following threads, following links from
17  article to article and so on.
18   Q.   Did you randomly select these articles from
19  a Google search?
20   A.   I don't believe I randomly selected them.
21  I think as I found them I added them to the list
22  and eventually stopped looking.
23   Q.   Do you know approximately how many articles
24  you read to come to this list?
25   A.   Well, about 16.

Page 92

1    Q.   Did you read any more than the 16 when
2   putting this list together?
3    A.   I think if I read more I would have added
4   them to the list.
5    Q.   What basis did you use when you chose to
6   add an article to the list?
7    A.   I found it.
8    Q.   Did you use Smartmatic as a search term
9   when looking for these articles?
10   A.   I don't -- I don't believe so.  I think I
11  was just looking for -- well, electronic voting
12  machines probably is what I was searching on.  I
13  don't recall exactly.
14   Q.   Do you know how many of these articles
15  mentioned Smartmatic?
16   A.   No, not offhand without checking.
17   Q.   Would it surprise you to learn that only
18  four of them mention Smartmatic?
19       MR. KACHOUROFF:  Objection to form.
20       THE DEPONENT:  Well, it wouldn't surprise
21  me, but again I don't believe I did a specific
22  Smartmatic search.
23   Q.   (By Ms. Levine-Patton)  What methodology
24  did you use to arrive at the conclusion that
25  Smartmatic was frequently named in the debate about



Page 93

1  voting machines in the US prior to the 2020
2  election?
3     A.  It was probably as I noticed it being
4  mentioned.  There was no particular methodology
5  beyond that.
6     Q.  I'd like to look at the third bullet point
7  that you cite here.  We're going to introduce
8  Exhibit 696.  Please let me know when you have it
9  up.
10     (Exhibit 696 marked for identification.)
11     THE DEPONENT:  Yes.
12     Q.  (By Ms. Levine-Patton)  This article is
13  entitled "Voting machines and election systems, a
14  quick look."
15     Do you recall locating this article?
16     A.  It certainly looks familiar and it's in my
17  list so I obviously found it.
18     Q.  Do you remember how you found this one and
19  added it to your bullet point list?
20     A.  Well, it would have been a Google search or
21  following from -- so if I had opened one of the
22  other articles and it linked over to here, I may
23  have found it that way.
24     Q.  Now this was published on August 3, 2017,
25  correct?

Page 94

1     A.  Yes.
2     Q.  I'd like to look at the first paragraph.
3  It says:
4     "Digital voting machines are in the
5     spotlight in Venezuela, where the head of
6     Smartmatic, a maker of election systems
7     used in the country's tumultuous-assembly
8     election, said Wednesday that the official
9     turnout figure had been tampered with.  The
10     company's CEO said the count was off by at
11     least one million votes, possibly in either
12     direction."
13     Do you see that?
14     A.  I do.
15     Q.  The article then goes on to talk about the
16  biggest US player, ES&S.  Do you see that?
17     A.  Lower down, yes.
18     Q.  The articles also mentioned the company
19  Diebold or Dibold?
20     A.  Yeah.
21     Q.  Now, I'd like to go to the last paragraph
22  on the first page.  It says:
23     "Although paperless machines that are
24     essentially impossible to audit are still
25     used in 14 U.S. states, the trend is toward

Page 95

1     optical-scan machines that record votes
2     electronically but leave a paper record.
3     The machines used in Venezuela, supplied by
4     Smartmatic, produce a paper record for each
5     voter."
6     Do you see that?
7     A.  I do.
8     Q.  Now, I'd like to skip down to the second
9  page of the article under the heading "How could
10  tampering take place?"
11     Are you there?
12     A.  Yes.
13     Q.  It says:
14     "Tampering is easiest when a voting system
15     leaves no paper trail.  That's one reason
16     researchers want the U.S. to move entirely
17     to paper ballots.  Paper can't be remotely
18     hacked, and makes it possible to audit
19     election results after the fact."
20     Do you see that?
21     A.  I do.
22     Q.  Now I'd like to go to the last section of
23  the article under the heading, "Why would a voting
24  machine company publicly acknowledge tampering?"
25     Do you see that?

Page 96

1     A.  I do.
2     Q.  It says:
3     "Blowing the whistle on a client might not
4     seem very good for business.  But an
5     election-systems company might see no other
6     option if it believes a government is
7     making unrealistic claims about election
8     turnout, as appears to be the case with
9     Smartmatic in Venezuela."
10     Do you see that?
11     A.  Yes.
12     Q.  Now other than the places we've already
13  talked about, and I read aloud, does this article
14  mention Smartmatic at all?
15     A.  Well, it mentions it several times.
16     Q.  Other than the places we've already
17  discussed?
18     A.  I don't know.  I'd have to read the rest of
19  the article to -- I'm not sure your point.  You
20  mentioned Smartmatic.  We've seen it in here.  I
21  haven't read certain pieces.  I don't know if they
22  mention Smartmatic in those pieces.
23     Q.  Well, please go ahead and look it over.
24  I'm trying to get a sense of whether there's any
25  negative mentions of Smartmatic in the article.

PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
97–100

Page 97

1    A.   Well, I'll just do a search of Smartmatic.
2   Okay.  So it appears four times.
3    Q.   Are any of the four times it appears
4   separate from the times we just read aloud
5   together?
6    A.   I don't think so.  I think these are the
7   ones we looked at together.
8    Q.   Does this article suggest that Smartmatic
9   fixed, rigged, or stole the 2017 election in
10   Venezuela?
11    A.   No, it doesn't.
12    Q.   Does it suggest that Smartmatic was
13   involved in or supporting fraud or election
14   tampering?
15    A.   No.
16    Q.   Does it otherwise support allegations that
17   Mr. Lindell has made about Smartmatic since
18   February of 2021?
19       MR. KACHOUROFF:  Objection to form.
20       THE DEPONENT:  Well, it depends what you
21   mean by support.  I think -- well, clearly some of
22   these conservative let's say websites believe what
23   happened in Venezuela does support their
24   accusations.
25    Q.   (By Ms. Levine-Patton)  Are you aware that

Page 98

1   Smartmatic fled Venezuela in 2017 because it blew
2   the whistle on the Venezuelan government for
3   attempting to cheat?
4    A.   I'm not sure of the specifics of when it
5   left, but certainly that wouldn't surprise me.
6    Q.   I'd like to go back to your report.  In
7   paragraph 114 you say:
8       "These are a few examples of National Press
9       discussing this issue and disseminating
10       information about it online."
11       Is that correct?
12    A.   I beg your pardon.  Where were we?  114?
13    Q.   Yes, sir, it's the last paragraph, sentence
14   of 114.
15    A.   Yes, okay.
16    Q.   I'm going to introduce Exhibit 697, which
17   is one of the documents that you bullet point on
18   page 43 under paragraph 114.  Please let me know
19   when you have it up.
20       (Exhibit 697 marked for identification.)
21       THE DEPONENT:  Yes, I have it.
22    Q.   (By Ms. Levine-Patton)  Do you recognize
23   this document?
24    A.   Yes, it looks familiar.
25    Q.   Is this an example of the National Press

Page 99

1   talking about the voting machine debate?
2    A.   Well, I wouldn't call it National Press,
3   but it's certainly part of the debate.
4    Q.   Well, your descriptor in the last sentence
5   of paragraph 114 for each of these bullet points is
6   a few examples of National Press discussing this
7   issue and disseminating information about it
8   online.
9       My question is how does Exhibit 697 fit
10   that description?
11    A.   Well, I guess it doesn't directly fit that
12   description.  Certainly it would have ended up in
13   the press, as I said I know there's a lot more out
14   there that I could have found if I continued
15   searching.
16    Q.   Does this report suggest that Smartmatic
17   fixed, rigged or stole an election?
18    A.   No, but I don't describe it as such.
19    Q.   Does this report suggest that Smartmatic
20   was involved in or supporting fraud or election
21   tampering?
22    A.   No.  Again, I don't describe -- this
23   section of my report is not related to that.
24    Q.   Feel free to control or search in this
25   document.  But does this report name the company

Page 100

1   Smartmatic at all?
2    A.   I don't believe it does.  No, I don't think
3   it does.
4    Q.   Does it otherwise support the allegations
5   that Mr. Lindell has made about Smartmatic since
6   February of 2021?
7    A.   Well, I -- I don't know what support means.
8   Mr. Lindell points to all sorts of different
9   information and evidence to support his beliefs.
10   So I don't know if he would point to something in
11   here or not.
12    Q.   Have you reviewed the statements that
13   Mr. Lindell makes about Smartmatic?
14    A.   No, I haven't reviewed them.  Again,
15   remember this is -- this document is discussing
16   potential fraud being carried out through
17   electronic voting machines.  So it's not
18   particularly about Smartmatic, it's about
19   electronic voting systems in general.  And
20   Mr. Lindell might well use something like this to
21   support his beliefs.
22    Q.   Well, it's a third-party consultant public
23   report on security testing of a voting system; is
24   that right?
25    A.   I believe so.



Page 101

1    Q.  Are you aware that third-party consultants
2  and other companies frequently test voting machines
3  for vulnerabilities to make sure that they are safe
4  in advance of an election?
5    A.  I do understand there's testing.  Some of
6  these companies pointed out vulnerabilities, but I
7  do understand there's testing.
8    Q.  And this report is a public version of a
9  report that was done to show that the systems are
10  secure in advance of an election; is that right?
11    A.  I suppose in a general sense we could say
12  that.  I don't know if it was done close to a
13  particular election, what was it December 2019.
14  So I mean any such testing could be described
15  as -- how did you put it, in advance of an
16  election?
17    Q.  But you use this as an example, quote,
18  National Press discussing and disseminating
19  information about it online, unquote; is that
20  right?
21    A.  Well, obviously, we have an issue with the
22  term National Press.  But it is part of the debate
23  related to the vulnerabilities of voting machines.
24  I mean, I assume you are not suggesting there are
25  no vulnerabilities.  I'm simply pointing out there

Page 102

1  was a debate about these vulnerabilities.
2    Q.  And why is your point that there were
3  vulnerabilities prior to the 2020 election relevant
4  to your analysis in this case?
5    A.  So my analysis is about the discussion
6  going on in social media and on the Web prior to
7  the date, whatever it was, February -- was it
8  February 4, whatever it was, related to these
9  issues related directly to Smartmatic, related to
10  Smartmatic's history before the election and
11  related to the voting machine debate.
12        Again, none of these discussions are
13  unrelated.  I know, obviously, you want to paint it
14  was unrelated.  But the voting machine debate has
15  been used by the conservative press to suggest that
16  the election was stolen.
17        I mean, the election can't be stolen if
18  there's no vulnerabilities in the voting machines,
19  and it's my understanding that the conservative
20  position is or the vote -- whatever you call the
21  position.  I'm not sure what was appropriate to
22  call it.  But the position of people who's saying
23  that the election was stolen, the position is that
24  electronic voting machines were used to do that.
25  And so they -- they point back to these

Page 103

1  vulnerabilities.  So I believe it is related to
2  this issue.
3    Q.  Is it your opinion that this list of
4  articles was support for Mr. Lindell's statements
5  that he made starting in February 2021 about
6  Smartmatic?
7    A.  I don't know if Mr. Lindell has seen any of
8  these particular citations.
9    Q.  I'm going to look at one more of your
10  bullet point articles.  This one appears on page 43
11  of your report.  It's the first bullet on that
12  page.  We're introducing that as 698.  Please let
13  me know when you have it open.
14        (Exhibit 698 marked for identification.)
15        THE DEPONENT:  Yes.
16    Q.  (By Ms. Levine-Patton)  Do you recognize
17  this article?
18    A.  I do.
19    Q.  Are you aware that Smartmatic included this
20  article as its first supplemental complaint against
21  Mr. Lindell?
22    A.  I recall.  Maybe that's where I found it,
23  but I don't recall.
24    Q.  Does this article mention Smartmatic?
25    A.  I don't know.  Let's have a look.  I don't

Page 104

1  think it does.
2    Q.  I'd like to go to the bottom of page 3 of
3  the article.  The heading is "Three Companies."  Do
4  you see that?
5    A.  I do.
6    Q.  It reads:
7        "Part of the concern is that only three
8        Companies dominate the market:  Election
9        Systems and Software, ES&S, it's the
10        largest, followed by Dominion Voting
11        Systems and Hart InterCivic.  All three
12        companies have worked extremely closely
13        with election officials for years, with
14        vendors often spending thousands of dollars
15        to sponsor conferences and receptions
16        attended by the officials.  The industry
17        often hires former election officials to
18        represent them."
19        Do you see that?
20    A.  Yes.
21    Q.  Now, this paragraph does not include
22  Smartmatic, does it?
23    A.  It doesn't.
24    Q.  Smartmatic was not one of the top three
25  voting machine technology providers in the US when



Page 105

1  this article was published, correct?
2     A.  If that's a correct statement, yeah.
3     Q.  And this article was published before
4  Mr. Lindell began making statements about
5  Smartmatic; is that right?
6        MR. KACHOUROFF:  Objection to form to both
7  of these questions.  I'm sorry.
8        THE DEPONENT:  Yes.
9     Q.  (By Ms. Levine-Patton)  Now based on this
10  article, would you agree it was publicly available
11  for Mr. Lindell to discover that Smartmatic did not
12  and does not dominate the market before he made
13  statements about Smartmatic's alleged widespread
14  use?
15     A.  Yes, it would have been available.  I
16  suspect Mr. Lindell wouldn't take NPR at its word,
17  but it would have been available.
18     Q.  Are you aware that despite this publicly
19  available information, Mr. Lindell has continued to
20  claim that Smartmatic was widely used in the 2020
21  US election?
22     A.  I mean, I think that's correct, but I just
23  want to be clear that I haven't spent a lot of time
24  reading Mr. Lindell's statements.
25        MS. LEVINE-PATTON:  Okay.  I'm now

Page 106

1  introducing Exhibit 699.  Please let me know when
2  you have it open.
3        (Exhibit 699 marked for identification.)
4        THE DEPONENT:  Yes.
5     Q.  (By Ms. Levine-Patton)  Is this your
6  Twitter profile?
7     A.  It is.
8     Q.  Do you manage your posts from your own
9  Twitter or does someone help you with that?
10     A.  I do not recall -- I don't think this is
11  real.  I do not recall ever -- I'm sorry, I'll
12  answer your question first.  No, nobody else has
13  access to this account.  I do not recall ever
14  replacing this.
15     Q.  So I'm looking --
16     A.  My personal belief is this is faked because
17  I do not believe I would have ever reposted
18  anything from Rudy Giuliani.
19     Q.  So do you see the first tweet that is on
20  your Twitter profile here?
21     A.  The Rudy Giuliani repost?
22     Q.  Yes, sir.
23     A.  Yes, that's what I'm talking about.  I
24  don't believe this is real, because I can't
25  imagine, unless I was blind drunk, I would forward

Page 107

1  that.
2     Q.  So I do have -- I do have another version
3  of this that I pulled directly from your Twitter
4  that may be easier to view.
5        MS. LEVINE-PATTON:  Let's go off the record
6  for one minute please.
7        THE VIDEOGRAPHER:  We are going off the
8  record at 11:57 a.m.
9        (Whereupon, there was a pause in the
10  proceedings.)
11        THE VIDEOGRAPHER:  We are back on the
12  record.  11:57 a.m.
13        (Exhibit 700 marked for identification.)
14     Q.  (By Ms. Levine-Patton)  We've now put in
15  the chat Exhibit 700.  If you can please open that.
16     A.  There's -- okay.
17     Q.  Now, I'll represent to you that we use a
18  forensic software called Page Vault to save pages
19  online, and you can see in the bottom left-hand
20  corner the exact date and time, the URL and the
21  document title when this document was Page Vaulted.
22  It's a forensic software.
23        Do you recognize this as the first page of
24  your Twitter profile?
25     A.  Well, I recognize it.  I certainly don't

Page 108

1  recognize these two reposts at the top.  I do
2  recognize the subsequent posts.  I -- let me have a
3  look at this.
4     Q.  Is @ clickmench, M-E-N-C-H, your Twitter
5  handle, sir?
6     A.  It is.
7     Q.  And is that your photo on this page?
8     A.  It is.  Those are -- I didn't -- I do not
9  know how -- why they're there.  I do not believe I
10  reposted Giuliani and Elon Musk, both of whom I
11  have a very low opinion of.  I just -- I don't
12  think this is real.
13     Q.  Is it your opinion that the last tweet that
14  you put on your Twitter profile was on June 7,
15  2020?
16     A.  Probably.  What is this, November 2020 and
17  September '23.  So this is suggesting that
18  11 months ago -- where are in August.  11 months
19  ago I reposed Elon Musk.  That is complete
20  nonsense.  I don't know what's going on here.
21     Q.  You did not -- so it's your testimony today
22  that this is your Twitter profile.  No one else has
23  access to your credentials, but you did not repost
24  the Rudy Giuliani tweet that appears at the top.
25  Is that all accurate?



Page 109

1    A.  It's my testimony that it appears to be my
2   profile -- excuse me -- profile, but the top piece
3   on there is from my profile.  And nobody else has
4   access to my profile that I am aware of.  Now I'm
5   starting to wondering.  But I did not repost those
6   two posts there.  I just can't imagine a
7   circumstance in which I would have done that.
8    Q.  So I just would like to read the first
9   post, which is from Rudy Giuliani.  Have you ever
10  met Rudy Giuliani?
11   A.  I have not.
12   Q.  The tweet says:
13      "Did you know a foreign company, Dominion,
14      was counting our vote in Michigan, Arizona,
15      and Georgia and other states, but it was a
16      front for Smartmatic, who was really doing
17      the computing.  Look up Smartmatic and
18      tweet me what you think.  It will all come
19      out."
20      Is that the -- do you see that tweet?
21   A.  I do.
22   Q.  Now, I'd like to look at your report where
23  you screenshot this tweet and put it on your
24  report.  It's on page 15.  If you can go to your
25  report, page 15, please.

Page 110

1    A.  Report.  Page 15, yes.  Yes, I'm aware of
2   this being in my -- now when --
3    Q.  Now just so my record is clear, is this a
4   screenshot of the same tweet in your expert report
5   on page 15?
6    A.  Hang on a second.  I'm clearing up some
7   tabs because I've got so much open now.  Yeah, I
8   mean it's the same tweet.  The same Giuliani tweet.
9    Q.  Let's go to page 8 of your report, please.
10   A.  Yes.
11   Q.  Now here you're defining some terms that
12  you consider technical terms; is that right?
13   A.  Yes.
14   Q.  I'd like to look at your definition of
15  retweet, which is in a clear bullet on the middle
16  of the page.  You write:
17      "A retweet on Twitter occurs when the
18      viewer of a tweet from someone they follow
19      sends that tweet out to their own
20      followers, in effect passing the content on
21      to others."
22      Do you see that?
23   A.  I do.
24   Q.  Is it your testimony that you did not
25  retweet Giuliani's tweet on your own personal

Page 111

1   Twitter?
2    A.  I do not recall doing that.  And, you know,
3   if potentially I'm thinking well, perhaps while I
4   was working on this -- on this report, I forwarded
5   something just to experiment.  Maybe -- maybe
6   that's what happened with -- I don't recall posting
7   either of these.  I mean, because the Elon Musk
8   thing is also questionable.
9      However, Elon Musk is a more recent one,
10  and I may have been experimenting to see -- if you
11  look at the Icon underneath Elon Musk, one, two,
12  three, four across, 73M, 73 million, that's a new
13  feature in Twitter or X, whatever they want to call
14  themselves these days.  That's a new feature, which
15  I actually discuss in my report.
16      So I guess there's a possibility that I
17  retweeted these as an experiment to see -- to see
18  this new feature, because I was aware of a new view
19  feature was in there.  I guess it's possible.  I
20  dread to think I left them off.  But that's the
21  only conclusion I can think of.
22      I was playing -- because that's
23  September 2023.  When I was doing the report -- what
24  was the date on the report?  The date on the report
25  was September the 22nd.  So maybe -- maybe I did

Page 112

1   tweet them and forgot to delete them.  I don't
2   know.  It's dreadful.
3    Q.  Now you have 2,399 followers based on this
4   Exhibit 700; is that right?
5    A.  Yeah, probably less now.  Probably less the
6   number before I tweeted those things, reposted
7   those things, if that's what happened.
8    Q.  Your Twitter profile is public, sir?
9    A.  Yes.
10   Q.  So anyone who comes to your Twitter profile
11  can see this?
12   A.  Yeah, yeah, exactly.  Horrible.
13   Q.  I'd like to look at page 14 of your report.
14  In paragraph 37 --
15   A.  Paragraph 37.  I'm just trying to find my
16  way there.  Paragraph 37.
17   Q.  Yeah.  Actually, strike that.  Is it --
18  you've also written books about COVID; is that
19  right?
20   A.  No, I wrote a book.  The beginning when,
21  you know, I had a little free time on my hands, I
22  was experimenting with Kindle publishing, and at
23  that point I wrote a book about COVID, yes.
24   Q.  I'm going to introduce Exhibit 701 in the
25  chat.  Please let me know when you have it up.



PETER KENT                                                August 07, 2024
Smartmatic USA Corp vs Michael J. Lindell                          113—116

Page 113

1      (Exhibit 701 marked for identification.)
2      THE DEPONENT:  Yes, this is certainly one
3  of my posts.
4    Q.   (By Ms. Levine-Patton)  And we saw this
5  post on Exhibit 700 as well, but this just blows it
6  up a little bit so it's easier to read.
7      You wrote here that Amazon blocked your
8  COVID ebook; is that right?
9    A.   Yeah, along with many other people.
10   Q.   And you say:  "Amazon blocked my pandemic
11  book so I give it away, FreePandemicBook.com"; is
12  that right?
13   A.   I did at the time.
14   Q.   Are you aware that that link, FreePandemicBook
15  is no longer live?
16   A.   Yes.
17   Q.   Did you remove it from the internet?
18   A.   I removed -- well, eventually Amazon let me
19  back in, and that book was published through
20  Amazon.  It's still up through Amazon.  And so I
21  took the site down.
22   Q.   You also write in this tweet:
23      "It raises an important question re: who
24      has right to block speech."
25      Do you see that?

Page 114

1    A.   I do.
2    Q.   Do you know why Amazon blocked your book
3  about COVID?
4    A.   They -- they never -- well, they did say
5  they would send out boilerplate saying you
6  contravened some policy without ever telling me
7  what you did wrong.  But what was happening at the
8  time was before I published my book, Amazon had so
9  many really junk books published about COVID.  So
10  this was early in the pandemic.  People, for
11  instance, were just downloading the CDC website or
12  downloading a national health website from the UK
13  or whatever.  Downloading all the COVID information
14  and putting it into a Kindle book and selling it as
15  a book.
16      So Amazon apparently was getting flooded,
17  and they essentially banned all books about COVID.
18   Q.   Did Amazon ever tell you why they blocked
19  your book about COVID specifically?
20   A.   No, they wouldn't -- they wouldn't say.
21  However, the morning after I e-mailed certain
22  senior executives at Amazon, my book was -- went
23  through the process, continued through the process.
24  The block was removed the morning after I e-mailed
25  these people.

Page 115

1      So I don't know.  Nobody ever told me --
2  nobody ever told me specifically why my book was
3  blocked, but then a lot of other books were
4  blocked, and nobody ever told me why it was
5  released.
6    Q.   Okay.  Has your expert testimony ever been
7  excluded by a court in whole or in part?
8    A.   Sure.
9    Q.   Do you know how many times?
10   A.   Three or four.  Never -- never with any
11  black marks.  But, you know, there's always cases
12  where the other side objects, and you're told all
13  right you can't testify about paragraph 53.  You
14  can't testify about this particular document or
15  whatever.
16   Q.   Does seven times excluded sound about
17  right?
18   A.   I don't know.  It's possible.  I'm assuming
19  you're not just plucking a number out of the air,
20  so maybe it's true.
21   Q.   And were you excluded in several of those
22  cases for improperly giving a legal opinion?
23   A.   Yes, I have been excluded for when
24  something I said was interpreted as giving a legal
25  opinion.  I -- I do recall one case, it was judged

Page 116

1  that I had given a legal opinion related to
2  paperclip advertising and whether it was legal or
3  not.  The same -- exact same evidence had been
4  accepted by a different court.  So a lot of it's
5  interpretation.
6    Q.   Do you recall the case Bal Seal Engineering
7  versus Nelson Products Incorporated?
8    A.   I do.
9    Q.   You served as an expert for Bal Seal?
10   A.   That sounds right.  It was a small case a
11  few years ago.  I don't recall a lot about it.
12   Q.   Are you aware your testimony was excluded
13  in total in that case?
14   A.   I don't think I am.  I think this is the
15  first I've heard of that.
16   Q.   Okay.
17      MS. LEVINE-PATTON:  We're going to
18  introduce Exhibit 702.  Please let me know when you
19  have it up.
20      (Exhibit 702 marked for identification.)
21      THE DEPONENT:  Yeah, I've got it -- I have
22  it open.
23   Q.   (By Ms. Levine-Patton)  So this is the
24  judge's order on a number of matters in that case,
25  including your exclusion.  I'd like to turn to



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
117–120

Page 117

1  page 8 of this document.
2      A.  I'm there.
3      Q.  Heading 10.
4      A.  Yes.
5      Q.  It says:
6          "Defendant's Daubert motion No. 1 to
7          exclude Peter Kent and the ruling is
8          granted."
9          Do you see that?
10     A.  I do.
11     Q.  This is a trade secret case, correct?
12     A.  Yeah.
13     Q.  And in this case you opine --
14     A.  I think, I didn't mean to speak over you.
15     Q.  I'm sorry.  Hard over zoom.
16         You opine that defendants employed Black
17  Hatting techniques, wherein they embedded code on
18  their website to intentionally steer customers
19  looking for Bal Seal parts to their website.
20         Was that your opinion in this case?
21     A.  I assume so.  That's what it says here.  I
22  don't recall the details.
23     Q.  Now a black hatting technique is when
24  someone using improper methods to steer internet
25  traffic to a particular website, correct?

Page 118

1      A.  Yeah, in a general sense that description
2  could work.
3      Q.  And the defendants moved to exclude your
4  opinion, correct?
5      A.  Apparently.
6      Q.  And you were not allowed to testify in that
7  case?
8      A.  I don't know.  I haven't read all this.
9      MR. KACHOUROFF:  Object to your
10  characterization of the record.  I think it speaks
11  for itself, Maura.
12     Q.  (By Ms. Levine-Patton)  Did you testify at
13  trial in that matter?
14     A.  I did not.
15     Q.  Do you recall a case Drips Holdings versus
16  Teledrip, LLC?
17     A.  I do, and I know one or two sentences or
18  perhaps even paragraphs were excluded.  And I
19  don't -- quite the fact I don't see how these
20  things help you.  This first case there's no
21  strike.  There's no black mark against me.  I was
22  asked to do a job, I did the job, and then they
23  determined it wasn't relevant.
24         In the Drips case you're mentioning, it was
25  a patent case, and I think the judge denied the

Page 119

1  motion in part and granted it in part related to, I
2  think, a single sentence or a single paragraph.
3  You probably have it in front of you.
4      Q.  Yeah, it might be easier, or go quicker if
5  I introduce it.  So we're introducing 703.  Please
6  let me know when you have it open?
7          (Exhibit 703 marked for identification.)
8      THE DEPONENT:  I have it open.  Sorry.
9      Q.  (By Ms. Levine-Patton)  I'd like to look at
10  page 10 please.  Do you see page 10?
11     A.  Okay.  I'm on 10.
12     Q.  The court found that it was improper for
13  you to opine on the legal significance of the Drips
14  access agreement.  Do you see that?
15     A.  I do.
16     Q.  And on page 11, the court specifically
17  found it was improper for you to opine as to the
18  legal ramifications or make legal interpretations
19  of the agreements, correct?
20     A.  Yeah.  This wasn't a patent case, is it?
21  Okay.
22     Q.  I believe it was a trade secrets case, but
23  that's okay.
24     A.  Yeah, no, I think you're right.
25     Q.  And based on this ruling, the court limited

Page 120

1  your testimony at trial.  Do you recall that?
2      A.  I don't remember now.  I think I knew about
3  it.
4      Q.  Okay.  We're going to look at one more
5  case.  Opal Labs versus sprinkler.  Do you remember
6  that case.
7      A.  I do.
8      Q.  You were an expert for plaintiff Opal Labs?
9      A.  Correct.
10     Q.  That was also a trade secrets case?
11     A.  Yes.
12     MS. LEVINE-PATTON:  We're now introducing
13  Exhibit 704.
14     Q.  (By Ms. Levine-Patton)  Please let me know
15  when you have it open.
16         (Exhibit 704 marked for identification.)
17     THE DEPONENT:  I wasn't excluded -- I
18  wasn't excluded for testifying in Opal Labs,
19  because I actually sat on the stand and testified.
20     Q.  (By Ms. Levine-Patton)  I'd like to direct
21  your attention to page 4 once you have the document
22  open.
23     A.  I've got it open.
24     Q.  The second paragraph on page 4 starts
25  "however"; do you see that?



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
121–124

Page 121

1    A.  Yes.
2    Q.  Now on this case you opine on the relevant
3  industry standards for assessing whether plaintiff
4  took reasonable measures to maintain the secrecy of
5  its trade secrets, correct?
6    A.  Yes.
7    Q.  And the court held that you did not provide
8  adequate foundation for this testimony, correct?
9    A.  Yes, I guess so.
10    Q.  The court found your opinion unreliable
11  because you could not identify with any certainty a
12  comparator business; is that correct?
13    A.  Yes, the court was unable --
14        MR. KACHOUROFF:  Hold on.
15        You're asking him to give a legal
16  interpretation of a court order?
17        MS. LEVINE-PATTON:  I'm sorry.  Is that an
18  objection?
19        MR. KACHOUROFF:  It is.  I don't understand
20  the question.  Maybe you want to repeat it.
21        MS. LEVINE-PATTON:  I'm sorry.  What's your
22  objection for the record?
23        MR. KACHOUROFF:  The objection is you're
24  asking him to give a legal interpretation of a
25  legal opinion when you just got through asking

Page 122

1  him -- telling him he's been excluded for doing
2  that.  I don't understand what your question is.
3  Repeat it.
4        MS. LEVINE-PATTON:  Is that an objection to
5  form?  Sorry, Chris, I'm just trying to follow the
6  federal rules.
7        MR. KACHOUROFF:  I'm objecting to form,
8  yeah.  Form of the question.
9        MS. LEVINE-PATTON:  Thank you.
10    Q.  (By Ms. Levine-Patton)  Do you recall the
11  court finding your opinion unreliable because you
12  could not identify with any certainty a comparator
13  business, Mr. Kent?
14    A.  I don't remember this.  I don't remember
15  seeing this.  I mean, obviously the attorneys I was
16  working for didn't care that much because I
17  testified at trial.
18    Q.  Did you testify to the relevant industry
19  standards for assessing whether plaintiff took
20  reasonable measures to maintain secrecy of its
21  trade secrets at trial?
22    A.  Well, I don't remember.  I assume not
23  because of this document.
24    Q.  Mr. Kent, do you believe that Joseph Biden
25  was legitimately elected the president of the

Page 123

1  United States in 2020?
2    A.  I actually do.
3    Q.  Do you believe that the 2020 election was
4  free and fair?
5    A.  Yes, I do believe it was, yeah.
6    Q.  Do you believe voting machines were used to
7  rig the 2020 presidential election in favor of
8  Biden over Trump?
9    A.  I don't.
10    Q.  Do you believe that Dominion rigged the
11  2020 presidential election for Biden over Trump?
12    A.  I don't.
13    Q.  Do you believe that Smartmatic owns
14  Dominion?
15    A.  No.
16    Q.  Do you believe that Dominion is a front for
17  Smartmatic?
18    A.  Well -- well, I should say -- well, no, I
19  don't think so, but again these are not really -- I
20  don't have any particular knowledge about this,
21  just things I've read online.
22    Q.  Is it your belief that Dominion is a front
23  for Smartmatic?
24    A.  Same -- same answer, but in general, no.
25    Q.  Do you believe that Smartmatic used

Page 124

1  Dominion to fix the 2020 presidential election for
2  Biden over Trump?
3    A.  No.
4    Q.  Do you believe that Smartmatic rigged the
5  2020 election at all for Biden over Trump?
6    A.  No.
7    Q.  Do you believe that anyone from Venezuela
8  rigged the 2020 presidential election for Biden
9  over Trump?
10    A.  No.
11    Q.  Do you believe that anyone connected to
12  Huga Chavez or Nicolas Maduro rigged the 2020 US
13  election for Biden over Trump?
14    A.  No.
15    Q.  Do you believe that Smartmatic software and
16  algorithms manipulated vote counts in the 2020
17  presidential election?
18    A.  No.
19    Q.  Do you believe that Dominion used
20  Smartmatic software to manipulate the vote count in
21  the 2020 presidential election?
22    A.  No.
23    Q.  Do you believe that the voting machines
24  were used in the 2020 presidential election to
25  alter and change millions of votes across multiple



PETER KENT
Smartmatic USA Corp vs Michael J. Lindell

August 07, 2024
125—128

Page 125

1  states?

2    A.  No.

3      MS. LEVINE-PATTON:  I have no further

4  questions and I pass the witness.

5      MR. KACHOUROFF:  I have nothing further for

6  Mr. Kent.  Thank you very much, Maura.  I

7  appreciate the brevity.

8      THE VIDEOGRAPHER:  Real quick.  Ms. Patton,

9  I know your firm has a standing order.

10     But, Mr. Kachouroff, would you like to

11 order a copy of the transcript and/or the video at

12 this time.

13     MR. KACHOUROFF:  Yes, sir, both of them.

14 Thanks.

15     THE VIDEOGRAPHER:  This concludes the

16 deposition of Peter Kent.  We're going off the

17 record at 12:20 p.m. Central Time.

18     THE REPORTER:  Chris, did you want a copy

19 of this?

20     MR. KACHOUROFF:  Yes, please.

21     THE REPORTER:  You'll handle signature?

22     MR. KACHOUROFF:  Yes.

23     (The deposition concluded at 12:20 p.m.,

24 this 7th day of August 2024.)

25

Page 126

1            REPORTER'S CERTIFICATE

2      I, PATRICIA VIGIL-LADNER, Registered

3  Professional Reporter and Notary Public in and for

4  the State of Colorado, duly commissioned to

5  administer oaths, do hereby certify that, previous

6  to the commencement of the examination, the witness

7  was duly sworn by me to testify to the truth in

8  relation to the matters in controversy between the

9  said parties; that the said deposition was taken in

10 stenotype by me at the time and place aforesaid and

11 was thereafter reduced to printed form by use of

12 computer-assisted transcription under my

13 supervision; that the foregoing pages is a true and

14 correct transcript of my stenotype notes thereof;

15     That I am not attorney nor counsel, nor in

16 any way connected with any of the parties to said

17 action, nor otherwise interested in the outcome of

18 this action.

19     IN WITNESS WHEREOF:  I have affixed my

20 signature and seal this 8th day of August 2024.

21

22 My commission expires December 7, 2025.

23

24

      PATRICIA VIGIL-LADNER, RPR

25     (303) 949-4442

Page 127

1            DEPOSITION ERRATA SHEET

2

3

4  Our Assignment No. J11561327

5  Case Caption: SMARTMATIC USA CORP., et al.

6  vs. MICHAEL J. LINDELL, et al.

7

8      DECLARATION UNDER PENALTY OF PERJURY

9      I declare under penalty of perjury

10 that I have read the entire transcript of

11 my Deposition taken in the captioned matter

12 or the same has been read to me, and

13 the same is true and accurate, save and

14 except for changes and/or corrections, if

15 any, as indicated by me on the DEPOSITION

16 ERRATA SHEET hereof, with the understanding

17 that I offer these changes as if still under

18 oath.

19     Signed on the _____ day of

20 _____, 2024.

21

22 _____

23      PETER KENT

24

25

Page 128

1            DEPOSITION ERRATA SHEET

2  Page No._____Line No._____Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____Line No._____Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____Line No._____Change to:_____

9  _____

10 Reason for change:_____

11 Page No._____Line No._____Change to:_____

12 _____

13 Reason for change:_____

14 Page No._____Line No._____Change to:_____

15 _____

16 Reason for change:_____

17 Page No._____Line No._____Change to:_____

18 _____

19 Reason for change:_____

20 Page No._____Line No._____Change to:_____

21 _____

22 Reason for change:_____

23

24 SIGNATURE:_____DATE:_____

25      PETER KENT



PETER KENT                                      August 07, 2024
Smartmatic USA Corp vs Michael J. Lindell                129

Page 129

```
1              DEPOSITION ERRATA SHEET
2     Page No._____Line No._____Change to:_____
3     _____
4     Reason for change:_____
5     Page No._____Line No._____Change to:_____
6     _____
7     Reason for change:_____
8     Page No._____Line No._____Change to:_____
9     _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23
24    SIGNATURE:_____DATE:_____
25              PETER KENT
```

