## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| SMARTMATIC USA CORP., | ) | |
| SMARTMATIC | ) | |
| INTERNATIONAL HOLDING B.V. and | ) | |
| SGO CORPORATION LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 22-cv-00098-WMW-JFD |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. LINDELL and MY PILLOW, | ) | |
| INC., | ) | |
| | | |
| Defendants. | | |

---

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MICHAEL LINDELL'S AND MY PILLOWS' MOTION FOR SUMMARY JUDGMENT

---

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC

By */s/ Christopher I. Kachouroff*
Christopher I. Kachouroff* (Bar No. 44216)
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com

Douglas G. Wardlow (MN Bar #339544)
Jeremiah D. Pilon (MN Bar #392825)
1550 Audubon Rd.
Chaska, MN 55318
Telephone: (952) 826-8658
doug@mypillow.com
jpilon@mypillow.com

ATTORNEYS FOR MY PILLOW, INC. AND
MICHAEL LINDELL
*Admitted *Pro Hac Vice*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

   A. Shareholder Plaintiffs. ...................................................................................................2

   B. Smartmatic's business presence in the United States. ....................................................2

   C. Lindell's Audience and Truth or Falsity of his Statements. ..........................................5

   D. Lindell's statements were made to the general public in specific audiences, not government officials in charge of any contract awards. ..................................................7

   E. Smartmatic's Alleged U.S. "Damages." .......................................................................8

LEGAL STANDARD ...........................................................................................................10

ARGUMENT AND AUTHORITIES ...................................................................................11

  I.   The First Amendment to the United States Constitution requires dismissal of this action entirely under summary judgment. ....................................................................11

   A. The Government cannot use defamation law to shield itself from criticism. ..................12

     1.   Smartmatic is an agent of the government and engages in work reserved for the government—namely elections administration. ...............................................13

     2.   The First Amendment bars Smartmatic, an agent of the government, from using defamation law to punish speech criticizing their election operations. ...........14

     3.   The First Amendment bars Plaintiffs' Minnesota Deceptive Trade Practices Act claim. ...........................................................................................................18

   B. *New York Times Co. v. Sullivan* requires dismissal of Smartmatic's defamation claim because Smartmatic cannot meet its burden to prove Lindell made the allegedly false statements with actual malice. ...........................................................19

     1.   No evidence suggests that Lindell harbored "serious doubts" about the truth of his statements. ..................................................................................................20

     2.   The evidence conclusively demonstrates that Lindell based his statements on multiple third-party sources and that his statements are not inherently implausible. ..................................................................................................22

   C. Lindell and My Pillow are entitled to summary judgment for Plaintiffs' permanent injunction claims because it is an unconstitutional prior restraint and has a chilling effect on protected speech. ...........................................................................................28

     1.   Plaintiffs' permanent injunction is an unconstitutional prior restraint. ...........28

2.    The Plaintiffs have not produced sufficient evidence of extraordinary circumstances that entitle them to a permanent injunction................................................30

II.    Lindell and My Pillow are entitled to summary judgment of all claims because Plaintiffs do not have, nor can they prove, any harm or damages as a result of Lindell's statements. ........................................................................................................31

III.    The Court should enter summary judgment in favor of Lindell and My Pillow on Plaintiffs' Defamation and Deceptive Trade Practices Act claims because they have failed to meet their burden of proof and Lindell's statements are opinions, true, or non-defamatory.........................................................................................................34

A. Plaintiffs have failed to establish sufficient evidence that Lindell and MyPillow violated Minnesota's Deceptive Trade Practices Act or that they were injured as a result of any alleged MDTPA violation, and therefore Plaintiffs' MDTPA claims should be dismissed with prejudice....................................................................35

B. Plaintiffs' Common Law Defamation claims fail because they also lack standing to bring a Minnesota defamation claim and, even if they had standing, all of Lindell's general statements about electronic voting systems are unactionable opinion and not factual assertions. ...................................................................................37

**CONCLUSION**...............................................................................................................**38**

## INTRODUCTION

Defendant Michael Lindell is a private American citizen and found of My Pillow Inc. Mr. Lindell voiced concerns based on multiple expert reports, news publications, and analysis about government-sanctioned election conduct and electronic voting systems. Plaintiff's contempt for the First Amendment began in their Amended Complaint seeking billions in non-existent damages following their superfluous name-calling accusing Lindell of being "crazy like a fox" and a salesman intentionally selling a lie merely because Lindell, a citizen, expressed concerns about government sanctioned election practices. *See* Supp. Compl., ECF No. 125, ¶¶1, 3.

This case should never have been brought because it is a back door to subverting the fundamental First Amendment principals the United States was founded on—namely, freedom of speech. Specifically, protected political speech on matters of public concern. Plaintiff's message that the "country will sleep better at night" if this Court punishes Lindell for exercising his First Amendment rights demands intervention. *Id.* ¶ 8.

Plaintiff Smartmatic does not make a single electronic voting machine that is legally authorized to conduct business in the United States. Despite this, they target Lindell and My Pillow Inc. for purported injuries, which they cannot prove. Indeed, Plaintiffs have established no harm, injuries, or damages that are remotely connected to any statements Lindell made. Michael Lindell and My Pillow Inc. are entitled to summary judgment and prejudicial dismissal of this matter in its entirety to send a message to Plaintiffs that the United States Constitution and laws of Minnesota triumph over the threats of Plaintiff government-sponsored corporations.

## STATEMENT OF FACTS

### A. **Shareholder Plaintiffs.**

1.     Foreign-owned Plaintiff Smartmatic International Holding B.V. owns 100% of the shares of Smartmatic USA Corp. *See* Suppl. Compl., ECF No. 125, ¶11.

2.     Foreign-owned Plaintiff SGO Corporation Limited owns 100% of the shares of Smartmatic International Holding B.V. See *Id*. ¶12.

3.     Plaintiffs Smartmatic International Holding B.V. and SGO Corporation Limited (collectively "International Plaintiffs") are no longer claiming that Mike Lindell defamed them internationally and have chosen not to pursue that theory. *See* Decl. Kachouroff, Ex. A.

4.     Rather, the foreign owned Plaintiffs are claiming they lost profits through their shares ownership pertaining to U.S. subsidiary, Plaintiff Smartmatic USA Corp. ("Smartmatic"). *Id.*

### B. **Smartmatic's business presence in the United States.**

5.     Each state has state statutes that establish voting system requirements that must be met in order for a vendor such as Smartmatic to sell its voting system products.

6.     The U.S. Election Assistance Commission (EAC) administers the Testing and Certification Program for voting systems in the United States, providing accreditation and certification of voting systems under its Voluntary Voting System Guidelines (VVSG).[1]

7.     VVSG certification by the EAC is one requirement that many states require in order to compete in the procurement process.[2] While states are not required to participate in the EAC certification program, almost all states have enacted laws or have regulations that require some level of participation in the EAC voting system standards.[3]

---

[1] U.S. Election Assistance Commission, *Testing and Certification Standards, available at* https://www.eac.gov/voting-equipment/certified-voting-systems?title=&manufacturer=56111&testing_standard=All&field_certification_date_value=&field_certification_date_value_1= (last accessed November 10, 2024); see also https://www.eac.gov/election-technology.

[2] EAC State Requirements and the U.S. Election Assistance Commission Voting System Testing and Certification Program (Aug. 3, 2023), https://www.eac.gov/sites/default/files/2023-08/State%20Requirements%20for%20Certification%202023.pdf.

[3] *Id.*

8.      In the U.S., 48 out of 50 states require voting machine manufacturers to submit their machines for testing or certification by an EAC-certified laboratory *before* selling them to any county or municipality within the state. Decl. Kachouroff, Ex. B, Smith Dep. 43:21-45:3.

9.      Between 2018 to 2020, there were only two jurisdictions, New York and California, where it "was plausible to sell uncertified equipment" but Smartmatic did not try to market to those jurisdictions. *Id.* 43:2-45:3, 65:23-66:22, 66:14-67:1-4.

10.     Minnesota has the most rigorous testing and certification requirements, requiring both federal laboratory testing and an EAC-issued certification. *Id.* 32:12-33:10; *See also* Decl. Kachouroff, Ex. 215.[4]

11.     In 2020-2023 Smartmatic was not eligible to bid on contracts in Minnesota because it did not have a product tested by a federally accredited laboratory and it did not have EAC certification.[5] *See also* Minn. Stat. § 206.57 (2019).

12.     The EAC's Voluntary Voting System Guidelines ("VVSG") provides the standards used to evaluate voting systems, VVSG 1.1 was in effect from March 31, 2015, until February 21, 2021, and on February 21, 2021, the EAC adopted VVSG 2.0 as the current standard for testing and certification. [6]

13.     Other requirements may include testing to federal standards and testing by a federal laboratory, but all voting systems must, at a minimum, meet standards for voting equipment set for the by 2002 Help America Vote Act ("HAVA").[7]

14.     No Smartmatic voting machine system has ever achieved VVSG 1.1 certification. Ex. B, Smith Dep. 147:20-22.[8]

15.     No Smartmatic voting machine system has ever achieved VVSG 2.0 certification. *Id.* 272:4-273:7. [9]

16.     Smartmatic's primary competitors in the U.S. election machine market are ES&S, Dominion, and Hart Civic. *Id.*193:1-24.

---

[4] *Id.*

[5] *Id.*

[6]     https://www.eac.gov/news/2021/02/10/us-election-assistance-commission-adopts-new-voluntary-voting-system-guidelines-20.

[7] *Id.*

[8] https://www.eac.gov/voting-equipment/certified-voting-systems

[9] *Id.*

17.     All three competitor companies sell voting machines that are federally or state certified.[10] *Id.*

18.     From 2018 through July 2021, Smartmatic USA had only one voting machine prototype, the A4-617, which it attempted to market in the U.S.[11] *Id.* 126:2-10.

19.     The A4-617 prototype never achieved federal or state certification and was ultimately never sold in the U.S. market. *Id.*

20.     As of 2020, Smartmatic's only customer was Los Angeles County, California where it received a contract award in 2018 to purchase commercial, off-the-shelf hardware, program that hardware to meet a design by another vendor and provide deployment services. Ed Smith Depo 54:9-55:8. The voting machine Smartmatic USA developed for Los Angeles County was called the VSAP BMD system. *Id.* 247:23-248:22.

21.     In 2018, at the time the contract was signed between Smartmatic USA and Los Angeles County, Smartmatic USA did not own the legal right to build an election machine system using the VSAP BMD system specifications; the entire VSAP BMD system was wholly owned by Los Angeles County. *Id*. 249:13-24.

22.     In or around August 2021, Smartmatic secured the rights from Los Angeles County to produce and market a voting machine based on the VSAP BMD specifications. *Id.* 253:10-254:18.

23.     However, Smartmatic's work for LA County's VSAP system was "100% custom" where Smartmatic did not retain any rights or license to market this system to any other local or state government. *See* Decl. Kachouroff, Ex. C.

24.     Following the acquisition of these rights, Smartmatic USA developed a new voting machine prototype called the VSR BMD. *Id*.

25.     No machines or hardware used by LA County are, or have ever been, labeled with the Smartmatic name. *See* Ex. B, Smith Dep. 63:16-18.

26.     On March 31, 2023, Smartmatic USA submitted its first application to the EAC for testing and certification of its VSR BMD voting machine but is has not yet received approval. [12] *Id.* 37:11-38:9; *see also* Decl. Kachouroff ¶ 6, Ex. 216.

---

[10] *Id.*

[11] *See* Smartmatic RFI (redacted), (March 2022), *available at* https://sos.ga.gov/sites/default/files/2022-03/smartmatic_rfi_redacted.pdf.

[12] https://www.eac.gov/voting-equipment/voting-systems-under-test

27.     Smartmatic is currently unable to sell its latest voting machine prototype in any U.S. jurisdiction. *Id.,* Smith Dep. 65:23-67:2.

28.     From 2015 to the present, Smartmatic has never sold a voting system that was federally certified, and Smartmatic has never achieved federal certification for any of its voting systems. *Id.* 37:4-8.

29.     Smartmatic has not had a federally certified voting system in the United States which significantly limited its ability to sell its products to local and state governments. *Id.* 52:6-20.

30.     Otherwise Smartmatic cannot consummate a sale until it receives certification. *Id.* 66:4-13.

31.     As of the date of this motion, Smartmatic does not have a single voting machine that is certified by the EAC for use in any jurisdiction in the United States.[13]

32.     Smartmatic is not authorized to do business in a majority of jurisdictions in the United States.[14]

### C. Lindell's Audience and Truth or Falsity of his Statements.

33.     Plaintiffs have not identified any material facts that Michael Lindell knew the statements he made were false.

34.     Mr. Lindell believes that the statements identified in the Supplemented Complaint that he made concerning Smartmatic are true.

35.     Mr. Lindell, like many others from all political sides, has criticized electronic voting machines generally, certainly not limiting his criticism only to Smartmatic.

36.     Lindell spoke with multiple experts and disclosed data obtained and expert opinions. *See e.g.* Supp. Compl., ECF No. 125 ¶¶ 70, 88 – 89, 139; see also *infra,* part I(B)(2).

37.     Lindell relied on attorney statements and data obtained regarding concerns about electronic voting machines. *Id.*

---

[13]  *U.S. EAC Certified Voting Systems*, *available at* https://www.eac.gov/voting-equipment/certified-voting-systems (Last accessed Nov. 10, 2024).

[14]  *Id.*

38.     Plaintiffs have produced no sufficient evidence that any state or local government procurement officials heard the statements of Mike Lindell, let alone were swayed by any such statements.

39.     Smartmatic received a significant investment from the Venezuelan government in 2003 when it acquired 28% of Smartmatic affiliated companies. *See* Decl. Kachouroff ¶ 7, Ex. 173.

40.     With this investment, Smartmatic automated Venezuelan elections with voting machines for dictator Hugo Chavez. *Id.*

41.     Claims in the United States that Smartmatic Machines could be used to manipulate started as far back as April 20, 2004 when the Miami Herald published an article that claimed Smartmatic machines could be used to manipulate a vote tally in Smartmatic's home country of Venezuela. *Id.*

42.     In 2005, Smartmatic purchased Sequoia Systems to enter the U.S. government contracting market. *Id.*

43.     Democratic Congresswoman Maloney urged CFIUS to review the Sequoia Systems purchase. *Id.*

44.     After CFIUS investigated the purchase, Smartmatic refused to identify its owners and voluntarily withdrew from its application to do business in the U.S. *Id.*

45.     It is a fact that Sequoia Systems used Smartmatic software IP in Sequoia's voting machines.[15]

46.     Dominion Voting Systems Corporation ("Dominion") purchased the assets of Sequoia Voting Systems, including the embedded software that was owned and licensed by Smartmatic. *Id.*

47.     Sequoia Systems CEO Jack Blaine testified under oath in the 2006 Chicago hearings that "software components from the Sequoia system, [sic] were developed in Venezuela

---

[15] *Smartmatic Corp. v. SVS Holdings, Inc.*, Delaware Chancery case no. 3685-VCL, April 4 2008 at 13-14.                          Available                          at
https://bradblog.com/Docs/SVSSequoia_v_Hart_Smartmatic_LambDecision_040408.pdf

[including the critical component of the Sequoia systems – the HAAT] and that 'the Venezuelans have access to the Sequoia code.'"[16]

48.    In 2007, Sequoia, which used Smartmatic vote counting software, was decertified for use in California elections due to election security failures.[17]

49.    On July 6, 2010, Obama lawyer John Bonifaz wrote a letter to NIST on behalf of an organization known as Voter Action with concerns that Dominion Voting Systems Corporation is a foreign company whose software is dependent on "secret source code created and owned by Smartmatic, a foreign controlled company with ties to the Venezuelan government led by Hugo Chavez."[18]

50.    Plaintiffs claimed that "Smartmatic was one of the voting machine companies at the center of" a false narrative that included the following: "voting election technology is not secure, was hacked by China, and the voting election companies stole the election." See Compl. ¶ 69.

51.    But Plaintiffs have not identified any material facts to support its contention that the statements in paragraph 69 of the complaint are false. *See* Decl. Kachouroff, Ex. D, at p. 9.

52.    The subjects of Lindell's statements were already in the public domain for many years and never once refuted by Smartmatic.[19] *See e.g.* Ex. 173.

53.    The first time Michael Lindell mentioned the name Smartmatic was February 5, 2021. Smartmatic's suit against Fox News was filed the day before. Decl. Kachouroff, Ex. E, Mugica Dep. 32:24-33:3, and Ex. 490.

### D.    Lindell's statements were made to the general public in specific audiences, not government officials in charge of any contract awards.

54.    Smartmatic does not draw customers from the general public—its primary business is that of a government contractor whose business is with State and local governments.

55.    Smartmatic USA Corp. states that is in the business of providing election technology and services.[20]

---

[16] Hearing Transcript of Joint Committee on Finance, Committee on Budget and Government Operations and Committee on Committees, Rules and Ethics ("Joint Committee"), City Council of Chicago, Apr. 7, 2006, at 105-06.
[17] https://www.sos.ca.gov/elections/ovsta/frequently-requested-information/top-bottom-review
[18] https://www.nist.gov/system/files/documents/itl/vote/SequoiaSmartmaticReport61208.pdf
[19] *See e.g.* https://youtu.be/PHSUoHPcVFs?si=VX3EEiCDZEPnevaD.
[20] https://www.smartmatic.com/us/about/.

56.    Smartmatic defines its election technology as a universal ballot marking device,[21] a precinct scanner to tabulate votes,[22] centralized ballot scanning powered by its ballot processing software,[23] an election management software system to manage elections,[24] and deployment and support services for end-to-end management of government elections.[25]

57.    Smartmatic's business model is focused on obtaining revenue from government contracts awarded through a competitive procurement process.

58.    Even though their primary business is with state and local government officials, Smartmatic is barred from marketing their products or doing business under federal standards because they have never been certified by VVSG.

59.    Smartmatic stacks its board with former federal officials from the EAC in order to persuade the government to award it a contract. *See* Ex. E, Mugica Dep. 58:1-61:3 & 82:10-22.

60.    In their 140-page Supplemented Complaint, Plaintiffs never once alleged, nor produced any information, nor can they produce information, that Lindell's statements affected their federal EAC and VVSG certifications. *See* Supp. Compl., ECF No. 125.

### E.    Smartmatic's Alleged U.S. "Damages."

61.    At the beginning of 2018, Smartmatic USA had no infrastructure established for the U.S. market, no dedicated resources for U.S. development, and a Board of Directors composed entirely of non-U.S. citizens, which was considered a disadvantage in the U.S. market. *See* Decl. Kachouroff, Ex. F, Shelly Dep. 37:8-41:10 & Ex. 255.

62.    In 2018, Ed Smith joined Smartmatic USA as a Director with expertise in voting machine certification. *See* Ex. B 20:9-21:5; 90:3-9.

63.    Ed Smith's primary role was to lead the company's election machine certification efforts. *Id*.

64.    Kevin Shelly served as President of Smartmatic U.S. from 2018 until his termination in February 2020. *See* Ex. F 13:1-10 & 326:12-18.

---

[21] https://www.smartmatic.com/us/elections/universal-ballot-marking/
[22] https://www.smartmatic.com/us/elections/precinct-tabulation/
[23] https://www.smartmatic.com/us/elections/central-scanning/
[24] https://www.smartmatic.com/us/elections/election-management-system/
[25] https://www.smartmatic.com/us/elections/effective-deployment-support-services/

65.    Since 2021, Smartmatic USA has not employed any salespeople dedicated to the U.S. election machine market. *See* Ex. B 121:23.

66.    Since February of 2020, when Kevin Shelly was fired, Smartmatic USA has not had a President leading Smartmatic USA. *Id.,* at pp. 12-14.

67.    Since entering the U.S. market, Smartmatic USA has not developed, marketed, or sold any voting machine in the U.S. that has received federal or state certification. *Id.* 126:2-10.[26]

68.    On December 10, 2021, L.A. County informed Smartmatic that the proposal evaluation committee determined that Smartmatic's proposal would not be moving forward with the next phase of evaluation. Decl. Kachouroff, Ex. G.

69.    That same day, Smartmatic's proposal representative sent an internal email to Smartmatic employees stating,

> I regret having to forward this email to you. It seems that LA did not move our proposal to the next round. *I can only assume that the cost for our proposal was so far above their budget or above that of other proposals that they chose to not advance us to the next round*. Frankly, I am shocked by this because I cannot believe that there is a team that could handle this project in a better way than the team that we assembled. And, I do not believe that any other bidder could be as qualified or as successful in putting together an EMS that requires so many features and has such complexity. Of course, I will ask for a debrief and I will let you know how what information comes from that process. *Id.*, Ex. H (emphasis added).

70.    The email does not attribute the loss of the contract award to any disinformation campaign but rather to price alone. *Id.*

71.    Smartmatic created an internal spreadsheet of its lost U.S. opportunities between 2020 and 2023. *See* Decl. Kachouroff, Ex. I.

72.    Out of nine potential award opportunities totaling $143,682,333, Smartmatic lost three to competition, one RFP was cancelled, and Smartmatic chose not to pursue five for various reasons such as "elections were not required," Smartmatic did "not have a certified solution to offer," or the customer took too long to decide. *Id.*

---

[26] https://www.eac.gov/voting-equipment/certified-voting-systems?title=&manufacturer=All&testing_standard=All&field_certification_date_value=&field_certification_date_value_1=

73.     The two largest opportunities were L.A. County at $100 million and Maryland at $28 million. Smartmatic lost L.A. County due to price, and for Maryland, it was because they did not offer a federally or state-certified system.

74.     Smartmatic was in dire financial condition as of October 2020 where an internal email states that the financial changes had not produced the expected results. *See* Ex. E 133:4-6.

75.     Smartmatic has not had any salespeople nor marketing projects directly targeting a U.S. jurisdiction since 2021. *See* Ex. B 121:1-23.

76.     In this lawsuit, Smartmatic claims damages for jurisdictions only in the U.S. in which Smartmatic alleges will not or may not do business with Smartmatic due to the defamatory statements; Smartmatic is not claiming any damages in international markets. *See* Ex. D, at pp. 30 – 42; *see also* Decl. Kachouroff, Ex. J (filed under seal).

77.     Smartmatic identifies the following U.S. jurisdictions as being damaged due to alleged defamation: Idaho, Illinois, Kansas, Louisiana, New Hampshire, New Jersey, Ohio, Oregon, Rhode Island, Tennessee, Washington, West Virgina and Wisconsin. *Id.*

78.     However, all these jurisdictions at a minimum all required EAC VVSG 1.1 or VVSG 2.0 testing requirements or required the systems to be tested and certified by a Federally authorized laboratory.  Ex. B 43:21-45:3 & 65:23-66:22.

79.     Additionally, Smartmatic cannot point to any evidence that any of these named jurisdictions had an election machine bidding process, that Smartmatic placed a bid for and lost.

80.     As a matter of law, Smartmatic was not legally certified to sell election machine systems in any of these states and could not suffer any lost profits due to any alleged defamation.

81.     Additionally, even if Smartmatic was authorized to submit for bids to any of these jurisdictions, Smartmatic was an entry level player in the US market attempting to compete against well-established competitors, it is purely speculative to claim Smartmatic would have made profits in these jurisdictions but for Defendants' alleged defamation.  *See* Ex. F 37:8-41:10; Ex. 255; Ex. B 192:7-194:4.

## LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 2552, 91 L.Ed.2d 265 (1986).  The moving party need not "negate" the Plaintiff's claims to obtain summary judgment, specifically where is no genuine need for trial. *Celotex,* 477 U.S. at 323 – 4, *see* Fed. R. Civ. P. 56(e). Indeed, the court only views the facts in a light favorable to the nonmoving party "if there is a genuine dispute about those facts." *Scott*, 550 U.S. at 378–81.

Courts have held that summary judgment is the proper vehicle for pretrial determination of defamation claims where the constitutional defense of lack of actual malice is raised. *Wasserman v. Time, Inc*., 138 U. S. App. D.C. 7, 424 F.2d 920, 922 (1970), *cert. den*. 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273; *Treutler v. Meredith Corp.* 455 F.2d 255 (8th Cir. 1972); *LaBruzzo v. Associated Press,* 353 F. Supp. 979, 982 (W.D. Mo. 1973). When considering defenses under *NY Times v. Sullivan,* the Supreme Court has held that the First Amendment guarantees the public a right to access all information about a public matter and "be fully informed about it." *United Medical Laboratories v. Columbia Broadcasting System, Inc.,* 404 F.2d 706, 710 (9th Cir. 1968), cert. den. 394 U.S. 921, 89 S. Ct. 1197, 22 L.Ed.2d 454 (1969).

## ARGUMENT AND AUTHORITIES

### I.  The First Amendment to the United States Constitution requires dismissal of this action entirely under summary judgment.

The First Amendment protects speech on matters of public concern in order to ensure that the government and its agents are not able to set a public orthodoxy or steer the public narrative in a way that protects their own power. "The First Amendment is not only about protecting the rights of individual speakers, but also about 'constraining the collective authority of temporary political majorities to exercise their power by determining for everyone what is true and false, as

well as what is right and wrong.'" *281 Care Comm. v. Arneson*, 638 F.3d 621, 635-36 (8th Cir. 2011) (quoting Stephen G. Gey, *The First Amendment and the Dissemination of Socially Worthless Untruths,* 36 Fla. St. U. L. Rev. 1, 3 (2008)). As Justice Jackson famously stated in *West Virginia State Board of Education v. Barnette*: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. 624, 642 (1943). Defendants are entitled to summary judgment because this entire case violates the First Amendment because it involves a government agent's attempts to subvert speech, has a chilling effect, and imposes prior restraint, and Plaintiffs' have failed to establish that Lindell's statements were made with any malice.

### A.  **The Government cannot use defamation law to shield itself from criticism.**

Where speech criticizing the government is concerned, the First Amendment provides blanket protection, regardless of whether the speech is true, false, or defamatory. *See Arneson*, 638 F.3d at 633-34 (reversing dismissal of complaint alleging that advocacy organizations' free-speech rights were violated by provisions of Minnesota Fair Campaign Practices Act that made it a crime to knowingly or with reckless disregard for the truth make a false statement about a ballot initiative). Accordingly, "[a] government entity cannot bring a libel or defamation action." Id. at 634 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 291 (1964) (observing that no court "of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence.") (internal quotations

omitted)).[27] Were it otherwise, the government would be able to use defamation law to suppress speech, shield itself from criticism, and evade constitutional limits on government by keeping constitutional violations out of public discourse and view.

1. *Smartmatic is an agent of the government and engages in work reserved for the government—namely elections administration.*

Smartmatic is an agent of the government, operating elections for government customers. *See* Am. Compl., ECF No. 125, ¶¶ 35, 40 – 42 (Smartmatic was retained by government in Los Angeles County to help election authorities administer elections). As discussed below, Smartmatic is thus a state actor for purposes of the First and Fourteenth Amendments.  Accordingly, Smartmatic, like the government itself, cannot maintain a defamation action to shield itself from criticism about its administration of elections.

Lindell's allegedly defamatory statements mainly criticize voting-machine companies, including Smartmatic, for their operation of a function traditionally reserved for the government itself: the administration of elections and, more specifically, balloting and the tabulation of ballots. The First Amendment guarantees protections even to misstatements of fact about businesses

---

[27] The justifications for punishing defamation do not exist with respect to speech critical of the government. The common-law tort of defamation is justified not merely by the falsity of the speech, but by the fact that the interests of private individuals are implicated. That is, defamatory falsehoods are punishable because they damage an individual's reputation. The government, by contrast, has no reputational interest, and thus the First Amendment bars punishment for speech critical of the government, regardless whether the speech is truthful or false. *See 281 Arneson Care Comm.*, 638 F.3d at 633-34 (8th Cir. 2011) (quoting Charles Fried, *The New First Amendment Jurisprudence: A Threat to Liberty,* 59 U.Chi.L.Rev. 225, 238 (1992) (noting defamation is an actionable wrong because it "vindicate[s] private rights invoked by, or at least on behalf of, private individuals," but that "the First Amendment precludes punishment for generalized 'public' frauds, deceptions, and defamation"); *Hustler Magazine v. Falwell,* 485 U.S. 46, 52 (1988) (noting defamatory falsehoods are punishable because they can "cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective").

"involved in matters of important public concern." *Time, Inc. v. McLaney*, 406 F.2d 565, 571-572 (5th Cir. 1969), cert. den. 395 U.S. 922, 89 S. Ct. 1776, 23 L.Ed.2d 239. Lindell's statements are thus political speech on matters of public concern entitled to the highest level of First Amendment protection. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339-40 (2010); see also *Snyder v. Phelps*, 562 U.S. 443, 452, (2011) (speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."). As the Supreme Court stated in *Rosenblatt v. Baer*, "[c]riticism of government is at the very center of the constitutionally protected area of free discussion." 383 U.S. 75, 85 (1966).

> 2. *The First Amendment bars Smartmatic, an agent of the government, from using defamation law to punish speech criticizing their election operations.*

The First Amendment's special concern for protection of speech critical of the government extends to criticism of private parties who, like Smartmatic, administer the functions of government. "Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." *Rosenblatt*, 319 U.S. at 642. The justifications for barring the government from utilizing defamation law to punish speech thus extend with equal force to private agents of the government. Indeed, First Amendment jurisprudence and the doctrine of state action demonstrate that speech criticizing the operation of government functions must be absolutely privileged as against a defamation claim brought by an agent of the government performing those functions.

While the "Free Speech Clause of the First Amendment constrains governmental actors and protects private actors," *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804, (2019),

private entities may, in some cases, qualify as government actors subject to constitutional restrictions, *see*, *e.g.*, *Evans v. Newton*, 382 U.S. 296, 301-302 (1966) (holding that privatized municipal park remained subject to the constraints of the Fourteenth Amendment). To "draw the line between governmental and private" in the context of the Free Speech Clause and its application via the Fourteenth Amendment, the Supreme Court "applies . . . the state-action doctrine." *Halleck*, 687 U.S. at 804.

The Supreme Court has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974). A "nominally private entity" is treated "as a state actor" "when it has been delegated a public function by the State." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). A public function is one "which is traditionally associated with sovereignty." *Jackson*, 419 U.S. at 353. To qualify, "the government must have traditionally *and* exclusively performed the function." *Halleck*, 587 U.S. at 809. Very few government functions qualify as traditional, exclusive public functions for purposes of the state-action doctrine. The operation of elections is one of those few qualifying functions. *Id.* at 810.

For purposes of state-action analysis under the First and Fourteenth Amendments in this matter, Smartmatic qualifies as a state actor. Smartmatic carries out functions that are traditionally and exclusively reserved for the state – namely, the marking and counting of ballots using Smartmatic machines, with support from Smartmatic personnel, in addition to host of other election-related services. Smartmatic describes itself as "provid[ing] end-to-end election services to local, state, and national governments," and boasts that its "comprehensive suite of technologies and services" makes "every phase of the election process more efficient and transparent." Am.

Compl. ¶ 28. In addition to providing voting machines, electronic counting machines, and ballot marking devices, Smartmatic also provides voter-database management, poll-worker support, and election management platforms. *Id.*, ¶ 29.

In addition, Smartmatic election machines are often custom designed for the operation of a particular government customer's elections, as was the case with Los Angeles County in the 2020 election. *Id.*, ¶¶ 35, 40-42. Moreover, Smartmatic provides a high level of support and other services related to the operation of the machines designed by Smartmatic to conduct elections for the government. In Los Angeles County, Smartmatic not only engineered, manufactured, programmed, and installed ballot-marking-device hardware and software, but also provided systems integration services, setup and broke down vote centers, handled logistics, oversaw real-time data management, and supplied help-desk services on election day. *Id.*, ¶ 42. The undisputed facts thus demonstrate that Smartmatic doesn't merely sell voting and election-administration machines to the government. Smartmatic essentially operates elections for the government.

Because Smartmatic operates the traditional, exclusive public function of elections on behalf of government customers, it is a state actor. Consequently, Smartmatic, in its election-related conduct, is bound by the limitations of the constitution to the same extent as the government itself. *See Terry v. Adams*, 345 U.S. 461, 468-70 (1953) (holding that private political association, which conducted pre-primary election of candidates that were perfunctorily ratified in primary and general elections, deprived certain citizens of their right to vote on account of their race); *Smith v. Allwright*, 321 U.S. 649, 662-66 (1944) (holding that, where primary elections were conducted by political party, statutory system to select party nominees made the political party an agency of the state with respect to the determination of participants in a primary election, and thus

the constitutional safeguards for candidate selection applied to the political party). Smartmatic would thus be subject to Section 1983 liability were it to operate elections in a manner that violates the constitutional rights of citizens. As the Supreme Court observed in *West v. Atkins*, if "[c]ontracting out" public functions to a private entity were a "basis for delimiting [Section] 1983 liability, 'the state w[ould] be free to contract out all services which it is constitutionally obligated to provide and leave its citizens with no means for vindication of those rights, whose protection has been delegated to 'private' actors, when they have been denied.'" 487 U.S. 42, 56 & n. 14 (1988).

In short, Smartmatic, as a state actor administering elections for the government, is duty-bound not to violate the constitutional rights of citizens, including their First Amendment rights. It logically follows that Smartmatic, like the government itself, likewise may not use defamation law to punish speech critical of its administration of elections. To hold otherwise would allow Smartmatic to wield the law as a weapon to suppress public discourse about whether Smartmatic and its voting machines are operating elections on behalf of the government within constitutional limits. The First Amendment, applied through the Fourteenth Amendment, thus extends an absolute privilege to Defendants' statements criticizing Smartmatic's design and operation of voting machines to conduct the traditional, exclusive government function of collecting and tabulating votes. Defendants are therefore entitled to summary judgment, and Smartmatic's claims should be dismissed in their entirety.

17

3. *The First Amendment bars Plaintiffs' Minnesota Deceptive Trade Practices Act claim.*

Smartmatic has also sued Defendants under the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44 (the "MDTPA"). Under the MDTPA, "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: . . . (8) disparages the goods, services, or business of another by false or misleading representation of fact[.]" Minn. Stat. § 325D.44, subd. 1(8). Smartmatic's MDTPA claim is based on precisely the same conduct that underlies Smartmatic's defamation claim – namely, that Lindell made allegedly false statements.

It is well established that "[a] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994) (citing *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)). The First Amendment's "daunting" actual-malice requirement under *New York Times Co. v. Sullivan* and the other First Amendment defenses discussed above apply with equal force to any tort claim that seeks redress as a result of Lindell's speech. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 56 (1988) ("actual malice" standard applies even though public figure sues under tort of "intentional infliction of emotional distress" rather than tort of defamation). Smartmatic cannot escape the requirements of the First Amendment by virtue of asserting an MDTPA claim on the same conduct. Because, as discussed above, Lindell's statements criticizing Smartmatic's administration of elections are absolutely privileged by virtue of the First Amendment, and because Smartmatic cannot establish actual malice, Smartmatic's MDTPA claim fails as a matter of law and should be dismissed.

18

**B.** ***New York Times Co. v. Sullivan* requires dismissal of Smartmatic's defamation claim because Smartmatic cannot meet its burden to prove Lindell made the allegedly false statements with actual malice.**

Smartmatic cannot establish that Lindell acted with actual malice. Lindell believed and still believes his statements to be true. This Court has already ruled that Plaintiff is a public figure for purposes of defamation. *See* Order on Defendants' Motions to Dismiss, ECF No. 52, at p. 6 ("Smartmatic is a public figure under Minnesota law."); *see also Nelson Auto Center, Inc. v. Multimedia Holdings Corporation*, 951 F.3d 952 (2020). As a public figure, Smartmatic must prove that Lindell made each alleged defamatory statement with actual malice. *Nunes v. Lizza*, 12 F.4th 890 (2021) (stating that a public figure alleging defamation must prove (1) the falsity of the statement, and (2) that it was made with actual malice). To establish actual malice, Smartmatic must prove that Lindell made each statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80; *accord Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342 (1974).

The actual-malice standard is a "daunting" one that must be established by "clear and convincing evidence." *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001). For purposes of establishing actual malice, reckless disregard "is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be *sufficient evidence* to permit the conclusion that the defendant *in fact entertained serious doubts* as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968) (emphasis added); *see also Nunes*, 12 F.4th at 899 (stating that recklessness "is not measured by whether a reasonably prudent man would have published," but rather whether the defendant published "with a high degree of awareness of probable falsity" or "entertained serious doubts as

to the truth of his publication") (quotation omitted). A defamation plaintiff must "offer evidence that the defendant in fact harbored subjective doubt" as to the falsity of their statements rather than merely arguing a "defendant should have known better." *Jankovic v. International Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016); *see also Klayman v. Judicial Watch, Inc.*, 6 F.4th 1301 (D.C. Cir. 2021) (holding that there was no evidence that statement made allegedly defaming employee, who was public figure, was made with actual malice, because employee offered no evidence that employer harbored doubt about the truth of the statement).

> 1. *No evidence suggests that Lindell harbored "serious doubts" about the truth of his statements.*

Smartmatic has marshalled no evidence to suggest that Lindell "in fact entertained serious doubts" about the truth of his statements. *St. Amant,* 390 U.S. at 731. Because the record contains no such evidence, Smartmatic cannot establish actual malice, and Smartmatic's defamation claim must be summarily dismissed.

Far from indicating that Lindell entertained any doubts, the evidence demonstrates that Lindell believed that the statements were truthful, and that Lindell continues to believe the statements were truthful. Plaintiffs admitted in their amended complaint that Lindell has not made any statements retracting or expressing concern as to the falsity of any statements, even acknowledging Lindell's statements continued after the filing of this case. *See* Am. Compl., ECF No. 125, ¶ 130. Plaintiffs also alleged facts showing that Lindell not only believed (and still believes) his statements are true, but repeatedly published and relied on experts, reports, and other data he saw and believed substantiated his claims. *See, e.g.*, *id.*, ¶¶ 70, 88 – 89, 139. Record evidence also shows that Lindell's belief in the truth of the statements at issue has never wavered.

*See* Decl. Kachouroff, Ex. O, Lindell Dep. 467-472 (June 11, 2024) (testifying to his continuing belief that the use of Smartmatic and other voting machines in elections has led to errors and potential manipulation, and that the machines are vulnerable to hacking and errors); *id.* at 473-75 (stating that the cast vote records from Los Angeles County demonstrate that the 2020 election was computer manipulated).

Moreover, Smartmatic cannot rely on Lindell's refusal to retract his statements in the face of Smartmatic's denials to establish actual malice. *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021) (publisher "need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharges that, in themselves they hardly alert the conscientious reporter to the likelihood of error"). On the contrary, Lindell's refusal to retract and his continued publication and reiteration of the alleged statements demonstrate that Lindell harbors no "subjective doubt" about any of the things he has said that Smartmatic claims are defamatory. *See Connelly v. Nw. Publ'ns, Inc.*, 448 N.W.2d 901, 905 (Minn. Ct. App. 1989) (citing *St. Amant*, 390 U.S. at 732).  The existence of information that Smartmatic claims rebuts Lindell's statements – information that Lindell may or may not have seen – does not change the analysis. This Court has granted summary judgment to defendants that argued they believed their statements were true despite receiving contrary information from third parties. *See McClure v. American Family Mut. Ins. Co.*, 29 F. Supp. 2d 1046 (D. Minn. 1998), *aff'd*, 223 F.3d 845 (8th Cir. 2000). "A publisher's failure accurately to guess which of two conflicting accounts a jury might later believe does not demonstrate actual malice…To find liability in these circumstances would undermine the purpose for which the Supreme Court in *New York Times* adopted the actual malice requirement – to prevent the self-censorship that may arise if a critic of official conduct

21

were compelled to guarantee the actual truth of all factual assertions on pain of a libel judgment." *Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 478 (8th Cir. 1987).

Given the complete lack of evidence suggesting that Lindell harbored serious doubt and the ample evidence showing that Lindell in fact believed the truth of his statements, no jury could conclude that Lindell published his statements with knowledge of their falsity or while entertaining the serious doubt necessary to establish reckless disregard. Consequently, Smartmatic cannot establish actual malice, and Smartmatic's claims should be dismissed.

> 2. *The evidence conclusively demonstrates that Lindell based his statements on multiple third-party sources and that his statements are not inherently implausible.*

The record evidence conclusively demonstrates that Lindell did not fabricate the basis for his statements, that the basis for his statements was not the product of his imagination, that the statements were not based entirely on an anonymous source, and that the statements are not inherently improbable. This is fatal to Smartmatic's claim. *See St. Amant*, 390 U.S. at 732 (finding that a statement may have been made with actual malice if it is fabricated by the defendant, is the product of his imagination, is based wholly on an unverified anonymous telephone call, or is so inherently improbable that only a reckless man would have put them in circulation); *see also Chafoulias v. Peterson*, 668 N.W.2d 642, 654 (Minn. 2003) (citing *St. Amant*, 390 U.S. at 732 and finding same). Indeed, the evidence shows that Lindell believed his statements to be true based on multiple experts and third-party analyses. In particular, Lindell relied on information from three, independent sources: Dennis Montgomery, Gen. Michael Flynn, and Dr. Douglas Frank.

**<u>Dennis Montgomery</u>**

Dennis Montgomery is a computer scientist who invented software technologies covered by multiple patents, including technology used for securing streaming data and for managing memory in surveillance systems. *See* Decl. Kachouroff, Ex. K, Montgomery Dep. 7:2-3, 9:11-12:12 (Oct. 9, 2023); Montgomery Dep. Exs. 504 and 505.  Montgomery met Lindell around January 9, 2021. *See* Decl. Kachouroff, Ex. L, Montgomery Dep. 143:6-11 (Oct. 10, 2023). During their conversation that day, Montgomery told Lindell that a government order precluded Montgomery from sharing everything he knew, but if the President of the United States lifted that order, Montgomery would be unrestricted in what he could say. *Id.* 145:10-146:1.

Lindell asked Montgomery to prove Montgomery's computer skills, and Montgomery was able to control Lindell's sprinklers and lights at Lindell's house, from Montgomery's location in Florida. *Id.* 150:17-151:11. Montgomery worked with Lindell to show that the 2020 election had been stolen, and Montgomery said he had already proved that. *Id.* 169:8-170:3, 216:24-217:6. Lindell sent other people to talk to Montgomery to validate his work. *Id.* 175:4-176:15, 178:14-180:10.

Montgomery provided Lindell with a $3 million contract between BLXWARE LLC and the United States, administered through Hill Air Force Base in Utah. *See* Decl. Kachouroff, Ex. 516. Montgomery testified that he worked for BLXWARE and later purchased the company. *See* Ex. K 57:16-59:4, 68:1-69:14. Montgomery later sold to Lindell assets related to Montgomery's work at eTreppid and BLXWARE, telling Lindell that the assets showed election fraud and the vulnerability of election machines to hacking. *Id.* 84:10-86:23.

**<u>General Michael Flynn</u>**

23

Gen. Michael Flynn was appointed as a Lieutenant General by President Barack Obama. *See* Decl. Kachouroff, Ex. M, Flynn Dep. 183:11-25. He has professionally spoken on national security, cyber, and foreign policy since leaving the military. *Id.* 20:3-20. He has a master's degree in telecommunications and spent about sixteen years in the military on signals intelligence and electronic warfare. *Id.* 20:21-21:4.

On December 24, 2020, Gen. Flynn sent Lindell an email stating, "Mike, please read as your time permits and share this with others." *See* Ex. 173. Attached to the email were several documents. These attached documents stated, "There was foreign interference in the November 3, 2020 election. Foreign interference was observed and documented by experts and data analysts, including the Federal Bureau of Investigation (FBI) and Cybersecurity and Infrastructure Security Agency (CISA)." *Id.* at DEF026772.000003. The attachments also stated, "Election machines and software used by most voters across the country are compromised. The five companies which provide systems that control voting in the United States are Dominion, ES & S, Hart InterCivic, Sequioa, and Smartmatic." *Id.* at DEF026772.000004. The attachments further stated, "The numerous similarities between these voting systems are related to shared origin of the software code, and all of the systems have similar security and functional flaws." *Id.* Additionally, "These election systems appear to have been intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results." *Id.* The attachments cited a bipartisan Senate Intelligence Committee report. *Id.* at DEF026772.000005.

The documents attached to Gen. Flynn's email also included information alleging a relationship between Smartmatic and Dominion. The attachments stated:

> Dominion's purchase of Sequoia Voting Systems from Smartmatic has resulted in the same "Source Code" being used today. Due to this and various other mergers, acquisitions, licensing agreements and partnerships, the entire election ecosystem in the United States is convoluted, murky and hidden. This began with the Venezuelan investment into Smartmatic specifically to rig elections. It should also be noted that Smartmatic still runs elections in the US and licenses its software to other Election Management System Companies.

*Id*. at DEF026772.000011. Additionally, the attachments stated, "Dominion and Smartmatic share a physical address in Barbados despite their insistence that there is no relationship between the companies. They also have a mutual non-compete agreement detailing shared resources and code." *Id*. at DEF026772.000012.

On January 5, 2021, Gen. Flynn sent Lindell another email with attachments including information about Smartmatic. The attachments stated, "China has leveraged financial, non-governmental and foreign allies including Venezuela to acquire INFLUENCE and CONTROL US Voting Infrastructure in at least 28 States." *See* Decl. Kachouroff, Ex. 177 at p. DEF026403.000003. The attachment showed a timeline of events related to Smartmatic, stating Smartmatic was "used in Venezuela election fraud to avoid recall vote on Chavez," Smartmatic "later buys Dominion and ESS", Smartmatic "involved in Philippines election interference." *Id*. at 5. It further stated, "CCP CONTROL OF TESTING for Smartmatic Software Operating Dominion Voting Machines". *Id*. at 6. And it stated that the Chinese Communist Party gained access to "Smartmatic Software Operation on Dominion Voting Machines" just "a few months BEFORE the November 3, 2020 elections." *Id*. at 11.

### Dr. Douglas Frank

Lindell frequently asked Dr. Douglas Frank to provide him with analysis of state election data. *See* Decl. Kachouroff, Ex. N 148:25-149:20. Dr. Frank has a Ph.D. in surface electro

analytical chemistry from the University of Cincinnati and approximately 60 peer-reviewed scientific publications. *Id.* 33:8-34:9, 41:15-42:2. Dr. Frank told Lindell that Dr. Frank's analysis of voting data showed a pattern that was not natural, and the pattern allowed Dr. Frank to predict voting results based on census data in almost every U.S. county. *Id.* 106:11-111:16, 168:13-170:7. Dr. Frank's conclusion was that the 2020 election was manipulated through an algorithm. *Id.* 113:3-18, 171:4-173:19.

The evidence thus clearly shows that, far from inventing or imagining the basis for his statements, Lindell based his statements on multiple, independent sources. Consequently, no reasonable juror could conclude that Lindell knew his statements were false or made his statements with reckless disregard of whether they were true or false.

Publicly known facts which Lindell espouses buttress this conclusion and further demonstrate that Lindell's statements are not inherently implausible. The concern about the risk of computerized voting has been expressed by multiple responsible experts for decades. The General Accountability Office published a report in September 2005 which concluded that all electronic voting systems had inherent security problems and that "access control flaws could allow unauthorized personnel to disrupt elections or modify data and programs that are critical to the accuracy of the voting process." *Federal Efforts to Improve Security and Reliability of Electronic Voting Systems are Under Way, but Key Activities Need to Be Completed,* at 26.

In 2018, The National Academies Press published *Securing the Vote: Protecting American Democracy*, in which it stated:

Election tallies and reporting may also be affected by malicious actors.
***

26

> Malware---malicious software that includes worms, spyware, viruses, Trojan horses, and    ransomware---is perhaps the greatest threat to electronic voting.
>
> ***
>
> Malware can be introduced at any point in the electronic path of a vote---casting interface    to the software tabulating votes---to prevent a voter's vote from being recorded as    intended.
>
> ***
>
> Malware can also be used to disrupt auditing software.
>
> ***
>
> [C]ybersecurity is a concern with all computer systems.
>
> ***
>
> There is no realistic mechanism to fully secure vote casting and tabulation computer systems from cyber threats.
>
> ***
>
> Complicated and technology-dependent voting systems increase the risk of (and opportunity for) malicious manipulation.

National Academies of Sciences, Engineering, and Medicine, *Securing the Vote: Protecting American Democracy* 85-88, 91, 100 (2018).

Perhaps the most definitive support for Lindell's statements can be found in the opinions of United States District Judge Amy Totenberg in *Curling v. Raffensperger,* No. 17-cv-2989 (N.D. Ga.), who received testimony from several leading cyber experts. In her October 11, 2020, opinion, Judge Totenberg stated:

> A broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data.

493 F.Supp.3d 1264, 1280. Her opinion went on to conclude that "[t]he Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually happen?'---but 'when it will happen.'" *Id.,* at 1342.

Lindell's statements are thus not inherently implausible. Moreover, because ample evidence demonstrates that Lindell based his statements on multiple, independent sources,

Smartmatic cannot meet its burden to show that Lindell had the requisite knowledge of falsity or recklessness necessary to establish actual malice. *See St. Amant,* 390 U.S. at 731-32. Smartmatic's claims should be dismissed.

C. **Lindell and My Pillow are entitled to summary judgment for Plaintiffs' permanent injunction claims because it is an unconstitutional prior restraint and has a chilling effect on protected speech.**

Here, the severity of any injunction combined with Plaintiffs' failures to provide any evidence of circumstances necessitating such restraint require dismissal of Plaintiffs' permanent injunction claim.

*1. Plaintiffs' permanent injunction is an unconstitutional prior restraint.*

Plaintiffs' claims for a permanent injunction should be dismissed as a matter of law because it is a prior restraint on future speech. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S. Ct. 2791, 2803, 49 L. Ed. 2d 683 (1976). Such restrictions, like the permanent injunction Plaintiffs seek here, are subject to very high level of scrutiny and generally presumed to be unconstitutional. *Id.* A plaintiff "seeking a prior restraint bears a 'heavy burden'" and courts "should tread cautiously when considering injunctive relief against future publication" specifically on matters of public concern. *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 778 (8th Cir. 1994), quoting *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S. Ct. 2140, 29 L.Ed.2d 822 (1971).

Here, Plaintiffs request a permanent injunction seeking (1) removal of all of Mr. Lindell's defamatory statements, (2) enjoining Mr. Lindell and My Pillow from repeating such statements; and (3) enjoining Mr. Lindell and My Pillow from engaging in further deceptive trade practices

relating to Smartmatic. Am. Supp. Compl., ECF No. 125, ¶ 386. With this, Plaintiffs lump in *all statements* by Lindell, even those raising concerns about general electronic voting equipment in United States elections—clear opinions regarding a serious matter of public concern that have been raised equally by all political sides for several decades.[28]

Finally, damage from a restraint such as the injunction Plaintiffs seek here is "particularly great when the prior restraint falls upon the communication of news and commentary on current events." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S. Ct. 2791, 2803, 49 L. Ed. 2d 683 (1976). News media throughout the United States has repeatedly published stories (over several decades) of opinions, concerns, and statements questioning United States election integrity from all sides of the political aisle. Permitting Plaintiffs' permanent injunction claim (and certainly granting it) will essentially stop an entire side of a nationwide debate as to election security only on one side of the debate, specifically given the reach that Lindell has only with certain political factions. Those citizens who share Lindell's concerns and opinions will certainly have their speech chilled while those on the "other side" (such as Plaintiffs' purported "expert" Tammy Patrick) will have free reign to stifle the marketplace of ideas relating to the 2020 presidential election. Accordingly, the Court should dismiss Plaintiffs' claim for a permanent injunction with prejudice because it is an unconstitutional prior restraint.

---

[28] See e,g, *Stein ends recount bid, but says it revealed flaws in voting system,* (NY Times, Dec. 13, 2016), available at https://www.nytimes.com/2016/12/13/us/stein-ends-recount-bid-but-says-it-revealed-flaws-in-voting-system.html; see also *Russian Hacks on US Voting System Wider than Previously Known,* (Bloomberg, June 13, 2017), available at https://www.bloomberg.com/politics/articles/2017-06-13/russian-breach-of-39-states-threatens-future-u-s-elections.

2. *The Plaintiffs have not produced sufficient evidence of extraordinary circumstances that entitle them to a permanent injunction.*

Plaintiffs have not proved (nor can they) that they will suffer irreparable harm if a permanent injunction on Lindell is not granted. See *United States v. Green Acres Enters., Inc.*, 86 F.3d 130, 132–33 (8th Cir. 1996). Exceptions to the general rule against unconstitutional prior restraints are permitted only in extraordinary circumstances. *A.M.P. v. Hubbard Broad., Inc.*, 216 F. Supp. 2d 933, 934 (D. Minn. 2001). Not only have Plaintiffs failed to produce evidence of the harm or damages they purport to have suffered, but they have produced no evidence of any extraordinary circumstances that necessitate their permanent prior restraint.

Here, the only piece of "evidence" Plaintiff's offer are the general statements of election officials or their political colleagues that the 2020 presidential election was the "most secure election in history" as well as the "expert" opinions of Ms. Patrick, a woman who has never conducted, nor had experience in, any electronic voting system audit or investigation on which Lindell based some of his generalized opinions. The "evidence" Plaintiffs present are no more than "other sides" of the same coin Lindell commented on – namely, the security of the 2020 U.S. presidential election.

Additionally, the Plaintiffs have never been authorized by United States authorities to conduct business in this nation. *See supra sec.* "Uncontested Facts." This prohibition on Smartmatic's enterprise nationwide existed long before Lindell made any statement about elections or Smartmatic. A permanent injunction would do nothing to facilitate marketing Smartmatic's machines in the United States, because they are not authorized to do that, and were not, long before Lindell made any statement. *Id.* Plaintiffs essentially ask this Court to violate

Lindell's First Amendment rights as to future speech or publications where there would be no effect, whatsoever, to their revenue stream although they have produced no evidence of actual damages or harm in this matter. Plaintiffs' astronomical and unsubstantiated punitive and compensatory damages claims should be dismissed because their imposition could have a chilling effect both on the protected speech of citizen business owners and their respective companies who have not ratified any such alleged statement at issue.

The Court should dismiss Plaintiffs' claims for permanent injunctions because Plaintiffs offer no evidence showing any extraordinary circumstances that demand such an extreme measure on Lindell's potential future speech nor removing all past speech. Indeed, forcing Lindell to remove all documentaries and statements violates the First Amendment because it will effectively remove a public debate opinion from the public sphere thus silencing the marketplace of ideas regarding the use of electronic voting systems in the United States.

## II. Lindell and My Pillow are entitled to summary judgment of all claims because Plaintiffs do not have, nor can they prove, any harm or damages as a result of Lindell's statements.

Plaintiffs failed to produce any evidence that their alleged injuries resulted from any statements by Lindell. The Eighth Circuit grants summary judgment against plaintiffs who fail to provide sufficient evidence of actual harm. See e.g. *McClure v. Am. Fam. Mut. Ins. Co.,* 29 F. Supp. 2d 1046 (D. Minn. 1998), *aff'd,* 223 F.3d 845 (8th Cir. 2000). Not once in their 140-page Supplemented Complaint did Plaintiffs allege a single fact that Lindell's statements kept them from obtaining EAC and VVSG certifications required to do business in United States elections. *See* Supp. Compl. ECF No. 125.

31

Any claim by Smartmatic that it has been damaged is pure speculation. In its response to Interrogatory No. 20, Plaintiff identified state jurisdictions in which they allege they were damaged. Minnesota is not one of them. *See* Ex. D, at pp. 30 – 42.

Smartmatic has not produced any evidence that it submitted a bid or made any attempt by Smartmatic to win business in any of the states it identified. Decl. Kachouroff ¶ 24. Nor is there any evidence that the jurisdictions Smartmatic identified in Interrogatory No. 20 refused to award a government contract to Plaintiff business of the alleged defamation. *Id.* ¶ 25. After all, Smartmatic had no system that could have legitimately been sold in those jurisdictions. As the facts show, Smartmatic was completely absent from the US market for decades after Smartmatic sold Sequoia Systems in 2010 following CFIUS questioning them on their connection to Venezuela. *See supra,* sec. "Statement of Facts."

In 2018 they start to build a presence. Smartmatic's Certification employee Ed Smith and its President of U.S. operations, Kevin Shelly, admitted they were a complete underdog in the market against established players. *See* Exs. B & F. They knew it was a difficult task because Dominion, ES&S, and Hart Intercivic were large and established voting machine companies in the government contracting marketplace. Both Smith and Shelly stated that without a certified system, they could not sell in the government contracting market in the U.S. Smartmatic had no system to sell in the United States and that continues as of the date of this motion. *Id.*

Thus, Smartmatic could not produce a winning bid because 48 states require some level of certification of an election system. For example, Smartmatic cannot do business in Minnesota because it requires rigorous standards. Additionally, as Smith and Shelly testified, Smartmatic

32

failed to allocate resources to getting a certified election product because the company devoted resources to the intentional markets. *Id.*

In 2018, Smartmatic was awarded a custom build contract from L.A. County. L.A. County produced the design plans for the ballot marking hardware that was built by Smartmatic's contracts with other vendors. Smartmatic also wrote customer software that is wholly owned by L.A. County.  (California is one of the few states that creates its own certifications, but they track the federal system.)   However, LA county owned all the intellectual property. Without LA County's approval, Smartmatic could not and did not market this system.

As of November 2020, Smartmatic did not have a product it could effectively sell in the U.S. market because the single product they did have was not federally certified. In August 2021 Smartmatic negotiated with LA County to obtain a license so that they could develop a similar system. However, that new system still needed to go through federal certification. Delay after delay occurred and Smartmatic still was not investing in U.S. market. Smartmatic's salespeople were frustrated because they literally had nothing to sell.

Finally, Smartmatic's new machine was submitted in  March of 2023. Certification of that machine has yet to occur. During all this time, and up through the present, Smartmatic's competitors have multiple certified election products and systems that were marketed to different states. Smartmatic has nothing. It could make zero profit because it wasn't certified.

Thus, any claim that Smartmatic lost opportunity or profits is pure speculation and cannot be recovered. *See Leoni v. Bemis Co.*, 255 N.W.2d 824 (Minn. 1977) ("damages which are speculative, remote, or conjectural are not recoverable.")  If Smartmatic cannot even compete in the marketplace, how is the claim of damaged reputation even relevant? Likewise, Smartmatic's

President Kevin Shelly remarked that competitors were always using the company's foreign Venezuelan status against them.

Other troubling positions Smartmatic stakes out are its claims that costs were increased by Lindell's statements. The problem with this position is that Smartmatic sued Fox News on February 4, 2021, and Mr. Lindell made his first statement about Smartmatic on February 5, 2021. How to separate what costs were increased? Was there really an appreciable impact between Fox News and Lindell given the former's viewership share? Smartmatic cannot answer that question and has no evidence to make that distinction.

This Court should rule as a matter of law that Smartmatic has failed to prove any damage whatsoever.

For the same reasons, International Plaintiff Shareholders claims must be dismissed, specifically because they have no damages as "owners" of Smartmatic USA as a matter of law. Here, they claim lost profits by virtue of their share ownership, but Minnesota law does not allow shareholders to assert any cause of action that belongs solely to the corporation. *In re Medtronic, Inc. Shareholder Litigation*, 900 N.W.2d 401, 406 (Minn., 2017) (citations omitted) (holding shareholders can only sue if they can show an injury to themselves personally as "distinct from any injury suffered by the corporation").

### III. The Court should enter summary judgment in favor of Lindell and My Pillow on Plaintiffs' Defamation and Deceptive Trade Practices Act claims because they have failed to meet their burden of proof and Lindell's statements are opinions, true, or non-defamatory.

Even if the Court did not dismiss this matter entirely under the First Amendment or pursuant to Plaintiffs suffering no injuries, Lindell and My Pillow are entitled to Summary

Judgment because all Plaintiffs' lack standing. None of the Plaintiffs reside in Minnesota. None of the Plaintiffs are registered to do business in Minnesota. None of the Plaintiffs have conducted any business in Minnesota. None of the Plaintiffs allege, nor can they allege, any injury in Minnesota. Plaintiffs' own discovery responses *exclude* Minnesota as a state in which they were allegedly damaged. *See* Ex. D. Standing requires (1) an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) that the injury "be fairly traceable to the challenged action of the defendant," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Republican Party of* Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 791–92 (8th Cir.2004) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992)).

Standing "is not dispensed in gross," and "plaintiffs must demonstrate standing for each claim that they press and for each form of relief they seek," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021). Thus, without a concrete, and particularized injury *in Minnesota*, Plaintiffs do not have standing to avail themselves of Minnesota's laws. Here, Plaintiffs cannot prove they have suffered any harm because of Lindell's statements, nor are they entitled to damages under Minnesota law. Smartmatic has no lost profits, nor have they sustained any reputational injuries resulting from any conduct by Defendants.

A. **Plaintiffs have failed to establish sufficient evidence that Lindell and MyPillow violated Minnesota's Deceptive Trade Practices Act or that they were injured as a result of any alleged MDTPA violation, and therefore Plaintiffs' MDTPA claims should be dismissed with prejudice.**

To prove claims under Minnesota's Deceptive Trade Practices Act (MDTPA), Plaintiffs must establish sufficient evidence that Defendants  which provides that "A person engages in a

deceptive trade practice when, in the course of business, vocation, or occupation, the person ... (8)

disparages the goods, services, or business of another by false or misleading representations of

fact [or] (13) engages in any other conduct which similarly creates a likelihood **855 of confusion

or of misunderstanding." Minn. Stat. § 325D.44, subd. 1 (1998). The burden is upon the plaintiff

to prove the falsity of the allegedly deceptive statements. *See United Wild Rice, Inc., v. Nelson,*

313 N.W.2d 628, 635 (Minn.1982).

As a matter of law, Minnesota's Deceptive Trade Practices Act does not apply

extraterritorially. *Rouse v. H.B. Fuller Company, et al*., 694 F.Supp.3d 1149 (2023). Holding that

the *Rouse* plaintiffs lacked standing to bring a claim under the MDTPA, this Court explained,

> "[N]amed plaintiffs lack standing to assert claims under the laws of the states
> in which they do not reside or in which they suffered no injury." *Ferrari v. Best Buy
> Co*., 14-cv-2956 MJD/FLN, 2015 WL 2242128 at *9 (D. Minn. May 12, 2015)
> (*quoting Insulate SB, Inc. v. Advanced Finishing Sys., Inc*., 13-cv-2644
> (ADM/SER), 2014 WL 943224, *11 (D. Minn. Mar. 11, 2014)). "In general, there
> is a presumption against the extraterritorial application of a state's statutes."
> *Johannessohn v. Polaris Indus., Inc*., 450 F. Supp. 3d 931, 961-62 (D. Minn. 2020).
> For these Minnesota statutes [i.e., MDTPA] to apply extraterritorially, the
> Minnesota legislature must have intended for them to do so. *See id*.
> *Id.* at 1156-57.

Plaintiffs lack any legal support to show that the Minnesota legislature intended for these

statutes to apply extraterritorially. Here, none of the Plaintiffs reside, do business in, nor can they

conduct their business in Minnesota. Thus, they have suffered no damages and cannot suffer

damages as a result of any purported statements by Minnesota residents.

Further, pursuant to Minn. Stat. § 325D.45, Defendants are entitled both to summary

judgment of the DTPA claim and attorneys' fees and costs because Plaintiffs' claim is baseless

given that they have no nexus nor injuries in Minnesota.

36

**B. Plaintiffs' Common Law Defamation claims fail because they also lack standing to bring a Minnesota defamation claim and, even if they had standing, all of Lindell's general statements about electronic voting systems are unactionable opinion and not factual assertions.**

Plaintiffs lack standing to bring a Minnesota Common Law Defamation. They have alleged no damage in Minnesota, no business in Minnesota, and no cognizable violation of Minnesota's laws. Moreover, Plaintiff has not proven (let alone alleged in any Complaint) that its intended audience—a Minnesota government board that awards government contracts in Minnesota—even heard Mr. Lindell's statements or that his statements were in fact published in Minnesota. Plaintiffs' common law defamation claims must therefore be dismissed.

Next, Lindell's statements expressing general concerns about electronic voting systems are non-actionable opinions. Lindell is entitled to summary judgment even if statements included information claiming to have "evidence" or scientific proof of electronic voting machine vulnerabilities because they cannot be reasonably interpreted as stating actual facts about the Plaintiffs. So, Lindell's statements about "corruption" or collusion with other electronic machines is hyperbolic. *Ayyadurai v. Floor64, Inc.,* 270 F.Supp.3d 343 (2017) (statements suggesting that plaintiff's claim that he invented email was "fraudulent" were hyperbolic and protected because no reasonable reader would interpret them as stating actual facts); see also *Herring Networks, Inc. v. Maddow,* 445 F.Supp.3d 1042 (2020) (hyperbolic language tends to negate the impression that a statement contains an assertion of verifiable fact).

Courts have consistently held that statements are protected as not reasonably containing actual facts because this ensures public debate will "not suffer for lack of imaginative expression or rhetorical hyperbole." See *McGlothlin v. Hennelly*, 370 F.Supp.3d 603 (2019); *Blair v. Inside*

37

*Ed. Productions*, 7 F.Supp.3d 348 (2014). and, therefore, all statements alleged by Plaintiffs regarding general grievances about all or many electronic voting systems should be dismissed at summary judgment because they are opinion and non-defamatory. Even if the court did not believe some statements to be opinion, Lindell is entitled to summary judgment because the statements he made are true. *See e.g. supra* parts "Statement of Facts" and sec. I(B)(2); *see also* Decl. Kachouroff, Exs. G, H I, 173, 177, 215, 216, 255, and 490.

## CONCLUSION

For the foregoing reasons, Defendants Michael Lindell and My Pillow, Inc. respectfully request this Court enter summary judgment dismissing all claims with prejudice because Plaintiff's claims are barred by the First Amendment and the Plaintiffs have failed to establish a genuine issue of any material fact.

Dated: November 13, 2024.

Respectfully Submitted,

**MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**

By */s/ Christopher I. Kachouroff*
Christopher I. Kachouroff* (Bar No. 44216)
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com

Douglas G. Wardlow (MN Bar #339544)
Jeremiah D. Pilon (MN Bar #392825)
1550 Audubon Rd.
Chaska, MN 55318
Telephone: (952) 826-8658
doug@mypillow.com
jpilon@mypillow.com

ATTORNEY FOR MY PILLOW, INC. AND MICHAEL LINDELL

*Admitted *Pro Hac Vice*