**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., and SGO CORPORATION LIMITED, | |
| Plaintiffs, | Case No. 22-cv-0098-JMB-JFD |
| v. | |
| MICHAEL J. LINDELL and MYPILLOW, INC., | |
| Defendants. | |

**SMARTMATIC'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO EXCLUDE DOUG BANIA</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD ......................................................................................... 4

ARGUMENT...................................................................................................... 5

    I.    Bania's Expertise is Appropriately Applied to the Analysis of Defendants' Financial Gain from the Defamation Campaign.................................................... 5

    II.    Bania's Methodology is Reliable Because it is Based on Well-Accepted Methods and is Rigorously Applied. .................................................................. 6

    III.    Bania's Opening and Rebuttal Opinions Help the Trier of Fact Understand Evidence That Supports Defendants' Motive to Defame Smartmatic.............. 11

    IV.    Bania's Brandwatch Analysis is Methodologically Sound Because It Uses a Reliable Source of Data and Draws Reasoned Conclusions From That Data.. 13

    V.    Bania's Financial Analyses Concerning MyPillow Are Admissible Because They are Relevant, Reliable, and Assist the Trier of Fact. .............................. 16

        A.  Bania's Retail Sales Analysis is Admissible................................................. 16

        B.  Bania's Direct Sales Analysis is Admissible. ............................................. 18

        C.  Bania's Profit Analysis is Admissible.......................................................... 19

    VI.    Bania's Opinions are Relevant to Core Issues in This Case............................ 20

CONCLUSION ................................................................................................. 21

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Innovative Properties Co. v. GDC, Inc.*,
    2016 WL 3976589 (D. Minn. July 22, 2016) ............................................................ 10

*Academy Bank, N.A. v. AmGuard Ins. Co.*,
    116 F.4th 768 (8th Cir. 2024) ...................................................... 4

*Afremov v. Sulloway & Hollis, PLLC*,
    922 F. Supp. 2d 800 (D. Minn. 2013) .......................................... 11

*Am. Dairy Queen Corp. v. W.B. Mason Co.*,
    543 F. Supp. 3d 695 (D. Minn. 2021) ............................................ 7

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,
    829 F. Supp. 2d 802 (D. Minn. 2011) ..................................... 10, 20

*Babcock Power, Inc. v. Kapsalis*,
    854 F. App'x 1 (6th Cir. 2021) ................................................ 6, 7

*Bonner v. ISP Techs., Inc.*,
    259 F.3d 924 (8th Cir. 2001) ............................................... 10, 15

*Campbell v. Citizens for an Honest Government, Inc.*,
    255 F.3d 560 (8th Cir. 2001) ................................................. 9, 19

*Chong v. Parker*,
    361 F.3d 455 (8th Cir. 2004) ................................................ 11, 21

*Depp v. Heard*,
    Circuit Court of Virginia, Fairfax County, No. CL-2019-0002911 .............................. 5

*Erickson v. Sawyer*,
    650 F. Supp. 3d 758 (D. Minn 2023) ........................................... 11

*Fairstein v. Netflix, Inc.*, et al.,
    M.D. Fla., No. 2:20-cv-00180 ..................................................... 5

*Harte-Hanks Comm's, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ................................................................ 20

*Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*,
520 F. Supp. 3d 872 (E.D. Mich. 2021)................................................................17, 18

*Jayne v. City of Sioux Falls*,
2020 WL 2129599 (D.S.D. May 5, 2020) ...................................................................17

*Johannessohn v. Polaris Indus., Inc.*,
2022 WL 3585152 (D. Minn. Aug. 22, 2022) ......................................................12, 21

*Johnson v. JP Parking, Inc.*,
717 F. Supp. 3d 798 (S.D. Iowa, 2024) ......................................................................15

*Jordan v. Town of Fairmount Heights*,
2024 WL 732011 (D. Md. Feb. 21, 2024) ...................................................................17

*Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*,
2022 WL 4547022 (D. Minn. Sept. 29, 2022) .............................................................12

*Lauzon v. Senco Products*,
270 F.3d 681 (8th Cir. 2001) .......................................................................................12

*Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*,
441 F. Supp. 3d 745 (S.D. Iowa Oct. 23, 2019) ..........................................................19

*In re ResCap Liquidating Tr. Litig.*,
432 F. Supp. 3d 902 (D. Minn. Jan. 14, 2020)............................................................18

*Smartmatic USA Corp. v. Lindell*,
2023 WL 6890929 (D. Minn., Oct. 19, 2023) ...............................................................9

*Speed RMG Partners, LLC v. Arctic Cat Inc.*,
2024 WL 4543340 (D. Minn. Oct. 17, 2024) ...........................................................4, 6

*Walker v. Wanner Eng'g, Inc.*,
867 F. Supp. 2d 1050 (D. Minn. 2012).......................................................................20

*Wells Fargo & Co. v. U.S.*,
2013 WL 5596287 (D. Minn. June 14, 2013).............................................................21

**Other Authorities**

Fed. R. Evid. 702 ..............................................................................................1, 4, 9

Fed. R. Evid. 703 ...................................................................................................17

# INTRODUCTION

In a futile effort to exclude the well-founded opinions of Doug Bania, Defendants throw confused arguments at the proverbial wall, misstating Bania's opinions and failing to understand their relevance and rigor. Some of Defendants' arguments are unintelligible and out of place in the context of a *Daubert* motion, such as the assertion that "Bania punishes Lindell for his First Amendment activities." (Dkt. 430, Def's. Mem. in Support of Motion to Exclude Bania at 2). And to the extent the arguments in Defendants' motion can be parsed, they provide no basis to justify the exclusion of Bania's opinions.

Bania is an expert in the relevant disciplines of intellectual property analysis, valuation, damages calculations, and internet and social media analytics. Indeed, he has been accepted as an expert in over 100 cases, including defamation matters. His opinions in this case are straightforward and focus on two issues: the reach of Defendants' defamation campaign against Smartmatic (*i.e.*, the extent to which the campaign's messages were spread), and whether the Defendants likely benefited from engaging in the campaign. Bania's analysis of Defendants' financial benefit is relevant to whether Defendants acted with actual malice—a key issue for the finder of fact—and for punitive damages. Bania uses his experience in internet and social media analytics and financial analysis to render opinions about Defendants' financial gain in this case, all of which are methodologically sound and admissible under Rule 702. Defendants' motion should be denied.

## BACKGROUND

Defendants' motion to exclude Bania consistently mischaracterizes and misunderstands Bania's report, his opinions, and his testimony. Bania examined how Defendants' defamation campaign impacted the Defendants, "including whether it generated additional online activity or benefits to the business or occupation of the Defendants as a result." (Ex. A, Expert Report of Doug Bania at ¶5). Bania provides several opinions in this case regarding that specific assignment.

*First*, Bania reviewed MyPillow's financial performance from 2018 through 2022. (*Id.* at ¶23). He determined that during the period in which the defamation campaign was promoted and published, MyPillow was able to generate sales above its historical average. (*Id.* at ¶24). "Not only did sales increase, but the average advertising-to-revenue ratio also decreased to 31.2%, meaning the Defendants generated more sales relative to any increase in advertising spend." (*Id.*)

*Second,* Bania assessed the viewership of Defendants' campaign against Smartmatic. He concluded, based on an investigation of viewership data using an online analytical tool, that "the Defamation Campaign received at least 116,536 [online] mentions by 71,872 unique authors, and at least 1,122 of the mentions showed people 1) admitted they purchased MyPillow products after watching events related to the Defamation Campaign, 2) encouraged others to purchase MyPillow products, and 3) shared promotional discount codes for MyPillow products." (*Id.* at ¶¶25, 55). Additionally, Bania used these mentions to uncover videos related to the Defamation Campaign. These videos generated 21.8 million views. (*Id.* at ¶¶49-50).

2

*Third*, Bania opines that Defendants benefited by using the defamation campaign as free advertising. Bania employed a Relief from Pay-Per-Click ("RfPPC") analysis "to determine the cost of internet advertising that would have been paid had pay-per-click ('PPC') advertising *i.e.,* Google Ads been used rather than using the Defamation Campaign to promote MyPillow products." (*Id.* at ¶32).

To render this third opinion, Bania investigated the price that Defendants have historically paid for advertising to their websites (*i.e.,* the "pay-per-click" price). (*Id.* at ¶51). Using the Google Keyword Planner, he determined that website owners using a combination of words associated with Defendants have previously paid $0.75 every time a person clicks on an associated ad. (*Id.* at ¶52). By multiplying the PPC price with the number of video views using a Relief from Pay-Per-Click ("RfPPC") calculation, Bania was able to determine that "Defendants should have paid at least $16.3 million through online advertising to achieve an amount of awareness and views equivalent to what was achieved from the Defamation Campaign." (*Id.* at ¶53).

*Fourth*, in his rebuttal report, Bania examined the opinions of Defendants' expert Donald Gorowsky (which have now been adopted by Defendants' expert Robert Bowes). (*See* Dkt. 401, Mem. in support of Mot. to Exclude Robert Bowes at 5). Specifically, Bania investigated the opinion that "MyPillow's financial performance was negatively impacted in 2021 and 2022 due to Mr. Lindell's statements on the 2020 U.S. election." (Ex. B, Rebuttal Report of Doug Bania at ¶9). Bania determined that Gorowsky/Bowes do not provide sufficient evidence to prove MyPillow was negatively impacted by Lindell's statements about the 2020 U.S. election, and in fact, "the publicity generated by Lindell's

3

statements regarding the 2020 U.S. election positively impacted MyPillow's 2021 and 2022 direct sales, which were higher than historical performance." (*Id.* at ¶30). Additionally, Bania found that MyPillow's retail sales decreased for several reasons unrelated to Mr. Lindell's comments regarding the 2020 election. (*Id.*)

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the standard of admissibility for experts. The Eighth Circuit has provided "'a three-part test' for district courts to apply in evaluating proposed expert testimony. First, evidence based on scientific, technical or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact … Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Academy Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 790 (8th Cir. 2024).

As the Eighth Circuit recently explained, the post-*Daubert* amendments to Rule 702 "'relaxed the requirements for expert witnesses, though the Supreme Court has held that courts still have a gatekeeping role to assure that evidence admitted is both relevant and reliable." *Id*. "In short, expert testimony is to be evaluated for relevance, qualifications, and reliability." *Speed RMG Partners, LLC v. Arctic Cat Inc.*, 2024 WL 4543340, at *13 (D. Minn. Oct. 17, 2024). "[C]ourts need not apply" the *Daubert* factors strictly "when evaluating non-scientific expert testimony." *Id.* "For non-scientific experts, 'experience itself can be a sufficient basis for expert testimony." *Id.* Mr. Bania's expertise and opinions readily meet the *Daubert* standard.

4

## ARGUMENT

Defendants' motion to exclude Doug Bania should be denied for the reasons explained below.

## I.    Bania's Expertise is Appropriately Applied to the Analysis of Defendants' Financial Gain from the Defamation Campaign.

Defendants challenge Bania's qualifications to assess financial impacts based on a lack of formal training or experience in "economics, human behavior, accountancy, or marketing." (Dkt. 430 at 5). Therefore, Defendants argue, he is not equipped to "reliably assess financial impacts" and his testimony is inadmissible. (*Id.*) Defendants' argument is misguided and ignores Bania's relevant expertise.

*First*, Bania is an expert not only in intellectual property analysis, but also in valuation and damages apportionment and calculations. (Ex. A at ¶4). Bania's business acumen spans across industries and types of legal claims, from copyright, to defamation, to trademark and right of publicity cases. He has calculated financial damages as an accepted expert in dozens of cases and published and presented on financial valuations tens of times. (*Id.* at 24-37). His testimonial experience includes numerous cases involving damages in defamation cases. (*See, e.g.*, *id.* at 25 (*Depp v. Heard*, Circuit Court of Virginia, Fairfax County, No. CL-2019-0002911 (Defamation, Damages, Internet, Media and Social Media Analytics); *Fairstein v. Netflix, Inc.*, et al., M.D. Fla., No. 2:20-cv-00180 (Defamation Damages))).

*Second*, even if Bania's expertise were "primarily" in the field of intellectual property—which it is not—that would not matter. He does not claim to be an expert in the

fields cherry-picked by Defendants, such as economics or human behavior—but neither of these fields is required to render opinions about MyPillow's profit-and-loss statements or analyze the financial impact of Defendants' activities. His breadth of experience in financial valuations, damages apportionment, and damages calculations, generally, render him sufficiently qualified to testify about MyPillow's financial data. *See, e.g.*, *Speed RMG Partners*, 2024 WL 4543340, at *14 (allowing expert testimony on market and sales projections despite expert's lack of economics training).

## II.    Bania's Methodology is Reliable Because it is Based on Well-Accepted Methods and is Rigorously Applied.

Defendants argue that Bania's use of the Relief from Pay-Per-Click ("RfPPC") calculation to estimate MyPillow's alleged advertising savings is "flawed and unreliable" because it is "made up," "lacks a foundation in accepted financial or advertising principles and has no empirical basis for reliably linking it to actual revenue impact." (Dkt. 430 at 3). Defendants add that Bania "assumes" that the RfPPC method "is a reliable method of marketing for MyPillow" even though "MyPillow does not use" PPC and "has never used it in advertising." (*Id.* at 3). They claim that this shows "Bania's lack of expertise in marketing generally." (*Id.*) These arguments are unfounded.

*First*, Bania's RfPPC methodology is based on the well-established relief-from-royalty ("RFR") calculation, which is used in trademark, copyright, and patent cases, and has been accepted by courts as the basis for expert testimony. *See e.g., Babcock Power, Inc. v. Kapsalis,* 854 F. App'x 1, 8 (6th Cir. 2021) (affirming denial of a motion to exclude expert who used the RFR method). The RFR damages approach "calculates the value of

intangible assets based on the royalties that the company is relieved from paying as a result of owning the assets." *See* "Methods of valuation of patents for licenses or assignments," 6 Pat. L. Fundamentals § 19:6:50 (2d ed. 2024). The RFR methodology is "often used to establish damages in litigated cases" by providing "a measure of value by determining the avoided cost." (*Id.*) The RfPPC calculation's grounding in the RFR methodology validates its reliability. *See Am. Dairy Queen Corp. v. W.B. Mason Co.*, 543 F. Supp. 3d 695, 723 (D. Minn. 2021) (rejecting argument that expert's survey design must have been "published or subject to peer review" where the survey methodology used was based on accepted methods).

The RfPPC calculation applies the same principle as RFR but is specifically tailored to cases in the digital era. (Ex. A at ¶32). Bania discusses RfPPC in a book chapter published in *The Comprehensive Guide to Economic Damages* ("Using Internet Analytic Tools for Valuation and Damages Calculations in Internet IP Infringement and Defamation Cases"). In that publication, Bania describes a matter where the RfPPC method was employed in litigation involving a false celebrity endorsement used to generate views and impressions. In that case, the RfPPC methodology was used to "indicate[] the cost of search-based advertising that the company would have needed to obtain the same number of views and impressions." (Ex. C, *The Comprehensive Guide to Economic Damages: Vol. II*, Ch. 38, Business Valuation Resources (BVR) (2021) at 333). Bania also presented on this method at a conference for the National Association of Valuation Professionals ("NACVA"). (Ex. A at 35).

7

Here, Bania employed the RfPPC in a similar manner as the case he described above. As explained in his expert report, "[i]n a RfPPC calculation, advertising costs are calculated assuming the defendant would have paid a PPC [pay-per-click] fee for search traffic and click-throughs rather than use the Defamation Campaign to drive organic traffic and clicks." (*Id.* at ¶33). "[T]he RfPPC method" as used here "calculate[d] the amount Defendants should have paid to achieve an amount of awareness and views equivalent to what was gained from the Defamation Campaign." (*Id.* at ¶34). Specifically, Bania first performed a detailed video views investigation where he determined the "awareness, mentions and views achieved by the Defamation Campaign." (*Id.* at ¶35). Next, he investigated the pay-per-click price. (*Id.* at ¶¶51-52). Finally, he was able to calculate the RfPPC to reach his opinions in this case. (*Id.* at ¶¶53-54; *see also* Ex. D, Deposition of D. Bania at 17:9-20, 18:3-7). In short, Bania carefully applied his RfPPC methodology, explaining the calculation in detail—and Defendants have not (and cannot) point to any flaw in his application of the methodology which would undermine its reliability.

*Second*, it is incorrect—and irrelevant—that MyPillow itself has "never used" PPC in advertising. Defendants have used PPC before. (*See* "Mike Lindell is not allowed to buy his own name," Bannon's War Room, Rumble, *available at* https://rumble.com/vdqac1-mike-lindell-is-not-allowed-to-buy-his-own-name.html). "According to an interview on Bannon's War Room, Lindell paid for Google Ads to have his website appear at the top of the Google search engine results page when *Absolute Proof* was released." (Ex. A at ¶29). This alone proves that MyPillow used PPC advertising, and that Defendant Lindell

understands that there is a pay-per-click price for keywords that will trigger online advertising.

Even if Defendants had never used PPC in advertising, it would have no impact on the admissibility of Bania's RfPPC analysis—because his calculation helps the fact finder understand *the value of the publicity gained* by Defendants through their conduct, and thus their potential motive to maintain in the defamation campaign. *See Campbell v. Citizens for an Honest Government, Inc.*, 255 F.3d 560, 571 (8th Cir. 2001) ("the ultimate conclusion" of whether a defendant acted with actual malice "may be supported by evidence of a defendant's motive.") Per Bania's report, Defendants would have otherwise paid "at least $16.3 million to achieve an amount of awareness and views equivalent to what was achieved from the Defamation Campaign." (*Id.* at ¶53).

Expert testimony must follow the "helpfulness" standard and "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Here, Bania's testimony meets this standard, as it will assist the jury in discerning the financial impact that Defendants' defamation campaign had on Defendants, thereby revealing possible motive. *Campbell*, 255 F.3d at 571; *Smartmatic USA Corp. v. Lindell*, 2023 WL 6890929, at *5 (D. Minn., Oct. 19, 2023) ("Mr. Lindell's financial status is relevant to Smartmatic's claim of actual malice.").

Defendants also argue that "Bania's RfPPC calculation does not establish comparable market rates or control for variables, such as seasonal advertising changes or shifts in consumer behavior." (Dkt. 430 at 3). As a threshold matter, Bania used Google Keyword Planner to determine the price-per-click. Google Keyword Planner allows a user

9

to determine the keyword traffic and prices for a selected date range. For Bania's analysis, he selected a timeframe of February 2021 to August 2023 (*see* Ex. E, BANIA_00001-00007). This timeframe accounts for the start of Lindell's Defamation Campaign through Bania's Report. As a result, any variability or seasonality in pay-per-click prices during the Damages Period is accounted for in his analysis.

Regardless, Defendants' argument about alternative factors that Bania "should have accounted for" is not grounds to exclude Bania or his opinion. Rather, challenges concerning an expert's control for particular variables go to the persuasiveness or credibility of the testimony, not its reliability for *Daubert* purposes. *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 823 (D. Minn. 2011) (allowing expert testimony where the alleged effect of certain un-controlled variables went "to the factual basis of the opinion," not its admissibility). The appropriate time for Defendants to raise these challenges is on cross-examination at trial. *See id.*; *see also Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) ("the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."); *3M Innovative Properties Co. v. GDC, Inc.*, 2016 WL 3976589, at *6 (D. Minn. July 22, 2016) ("[t]he Court concludes that the *competing testimony regarding the introduction of variables* will be a topic for cross-examination and is not an appropriate basis for exclusion.") (emphasis added).

### III. Bania's Opening and Rebuttal Opinions Help the Trier of Fact Understand Evidence That Supports Defendants' Motive to Defame Smartmatic.

Defendants claim that Bania "fails to demonstrate any direct causal link between Lindell's political statements and MyPillow's financial performance," concluding, without citation to a single case, that "[c]ourts have consistently excluded expert opinions lacking adequate causation analysis." (Dkt. 430 at 4). Defendants' argument surrounding this "causal link" concept misconstrues and conflates several of Bania's opinions.

As a threshold matter, Bania does not render a pure causation analysis. This is not a malpractice case; Bania does not need to, nor does he purport to, offer an opinion concerning causation as a necessary element of Plaintiff's claims. *See e.g., Afremov v. Sulloway & Hollis, PLLC*, 922 F. Supp. 2d 800, 816 (D. Minn. 2013) (expert testimony is required to establish the elements—including proximate cause—in malpractice cases unless it is a "rare" or "exceptional" case). Rather, Bania provides various analyses to show the large audience reached by the defamation campaign, and the related financial benefit Defendants realized through their conduct. *See supra* at 3-4.

Bania's analyses provide the jury with evidence of the extent that the defamation campaign was circulated to others. *See Erickson v. Sawyer*, 650 F. Supp. 3d 758, 769 (D. Minn 2023) (considering the defendant's intent to reach a large audience with defamatory statements, and the actual audience reached, in approving damages award). His analyses also help the jury understand Defendants' motive to defame Smartmatic by the prospect of financial gain, which goes to the actual malice element of defamation, and assist the jury in a determination of punitive damages. *Chong v. Parker,* 361 F.3d 455, 458 (8th Cir. 2004)

11

("Only outrageous conduct stemming from an 'evil motive or reckless indifference' can give rise to an award of punitive damages."); *Johannessohn v. Polaris Indus., Inc.*, 2022 WL 3585152, at *5 (D. Minn. Aug. 22, 2022) ("To obtain punitive damages, a party must show by clear-and-convincing evidence 'a culpable mental state on the part of the defendant, either by wanton, willful or outrageous act… (from which evil motive is inferred)"). Bania's analysis is helpful to the jury, as he will "testify about observable underlying facts that could be relevant to determining the mental state of an individual or entity." *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, 2022 WL 4547022, at *6 (D. Minn. Sept. 29, 2022) (allowing banking expert to testify about his interpretation of internal bank documents and their relevance to employees' potential knowledge of fraud, provided the expert did not "directly speculate about the knowledge or mental state of the employees.").

Furthermore, Bania provides specific examples showing that online users admitted they purchased MyPillow products after watching events related to the defamation campaign online; encouraged others to purchase MyPillow products; and shared promotional discount codes online for MyPillow products. (Ex. A at ¶25; *id.* at 98). This is evidence of a direct link between Defendants' statements about Smartmatic and MyPillow's financial gain.

Defendants also claim that Bania fails "to account for alternative explanations" that led to the increased sales and financial outcomes for MyPillow. But the Eighth Circuit has held that an expert need not rule out all alternative possibilities when rendering a causation opinion. *Lauzon v. Senco Products*, 270 F.3d 681, 693 (8th Cir. 2001) (reversing exclusion

of expert's testimony on potential causes of nail gun misfire, holding that an expert's "causation conclusion should not be excluded because he or she has failed to rule out *every* possible alternative cause."). To the extent Defendants contend Bania should have considered certain alternative explanations, they may challenge the basis for his opinion on cross-examination. *Id.* at 694 ("[defendant] may attack [expert's] explanations of causation on cross examination, thereby requiring [him] to offer valid explanations as to why his conclusion remains reliable.")

It is unclear which of Bania's opinions Defendants attack as missing a causal link—but regardless, none of Bania's opinions should be excluded on this basis. Bania's opinions are logical, rigorous, and within his expertise.

**IV.    Bania's Brandwatch Analysis is Methodologically Sound Because It Uses a Reliable Source of Data and Draws Reasoned Conclusions From That Data.**

Defendants attack Bania's use of Brandwatch data as unreliable because they claim he does not prove that social media interactions led to consumer purchases, and that his analysis is speculative. (Dkt. 430 at 4). But Defendants miscomprehend how Bania is using the Brandwatch data to support his opinion.

Bania uses the Brandwatch online analytics tool in his opening expert report as the first step in his RfPPC calculation "to determine how many mentions the Defamation Campaign received on third-party websites, blogs, and social media platforms." (Ex. A at ¶39). Brandwatch is a widely-used tool that is appropriate to this task: "Brandwatch is a social media monitoring and analytics platform that provides insights and data analysis for businesses to understand their online presence and consumer perception. Brandwatch

provides data on 100 million online sources and 1.4 trillion posts," including websites, blogs, and social media posts available on the internet. (*Id.*) The Brandwatch tool utilizes an automated software program "known as a crawler, to download web pages into its database. The web pages are then analyzed and indexed[.]" (Exhibit A at 38, ¶2 ("Brandwatch Analysis Description")). The utility of Brandwatch to conduct brand research has been studied and affirmed in an academic setting. *See e.g.,* Sussman, Kristen *et al*., "Examining Implications of Search Query Construction on Sentiment Analysis: The Case of Brandwatch," *Journal of Current issues & Research in Advertising,* 45(3), 339-356. In sum, Brandwatch is a reliable tool used by businesses that provides quantitative data about online activity concerning companies and brands.

Bania used a carefully developed query within Brandwatch to capture mentions of the defamation campaign. (Ex. A at ¶40; *see also id.* at ¶41, n.46, citing how to appropriately develop a Brandwatch query, and *id.* at 37 (VI) ¶4, explaining the specific query developed in this case). Bania then further refined the Brandwatch search results with a category filter before extracting it to an Excel spreadsheet and manually analyzing to ensure all mentions were related to the defamation campaign. (*Id.* at ¶¶41-42). Bania used this systematically-procured Brandwatch data to determine that the defamation campaign and related comments were broadly discussed across these sources: they were mentioned at least 116,536 times by 71,872 unique authors. (*Id.* at ¶44). This investigation provided Bania with insight into how far the Defendants' defamation campaign was disseminated. (*Id.* at ¶36).

The Brandwatch investigation further informed Bania that the RfPPC was an appropriate calculation to use in this case, as it could quantify the savings Defendants' generated on advertising. For example, if Defendants' defamation campaign had resulted in minimal mentions, unique authors or views, Bania would have understood that a RfPPC calculation would not be appropriate in this case because the benefit gained from free publicity would be minimal. This was a reasonable way for Bania to determine to apply the RfPPC calculation. See *Johnson v. JP Parking, Inc.*, 717 F. Supp. 3d 798, 812 (S.D. Iowa, 2024) (marketing expert's specific choices in employing a survey were reasonable and reliable, and defendant' argument against the reliability of the survey was "more of a 'gotcha' argument than an effort to point out significant methodological flaws in the survey.").

Finally, Defendants complain about another conclusion Bania reached through his social media analysis—that video content from the defamation campaign was viewed at least 21.8 million times—saying that Bania "has absolutely no way to know whether '21.8 million views' of Lindell's videos were watched all the way through or for the first few minutes," and that this cannot be translated to "any perceptible financial impact" (Dkt. 430 at 5). This critique misses the point, as the time spent watching this content is immaterial; rather, Bania's analysis aims to measure the audience exposed to the content rather than quantify the precise amount time any viewer spent watching it. (Ex. A at ¶53). And in any event, this criticism is comparable to Defendants' attack on Bania's control for certain variables: at most, it is relevant to the factual basis for Bania's opinions, not its admissibility. *See Bonner*, 259 F.3d at 929-30.

15

**V.    Bania's Financial Analyses Concerning MyPillow Are Admissible Because They are Relevant, Reliable, and Assist the Trier of Fact.**

Defendants argue that Bania's rebuttal opinion regarding the financial impact of Defendants' statements on MyPillow is not reliable, asserting that he just conducted "a google search and then pick[ed] a news article to confirm his conclusions." (Dkt. 430 at 6). This is a gross and false oversimplification of Bania's financial analysis. In his rebuttal report Bania performed three analyses: a "retail sales analysis," a "direct sales analysis," and a "profit analysis." Each of these analyses are admissible for the reasons explained in detail below.

**A.    Bania's Retail Sales Analysis is Admissible.**

The first portion of Bania's three-part rebuttal analysis was a "retail sales analysis" where he searched for literature that explained why retail customers stopped doing business with MyPillow following the 2020 U.S. Election, in an effort to test the unsupported assertion by Defendants' experts (Gorowsky/Bowes) that retailers dropped MyPillow "due to Defendant Lindell's statements about the 2020 U.S. election." (Ex. B at ¶15). Bania performed an investigation of publicly available information and provided in his report (1) the specific search terms used, and (2) the information that he uncovered during his search. After developing and implementing an appropriate search query, Bania found news articles about more than five retailers who stopped doing business with MyPillow for stated reasons other than Mr. Lindell's political statements regarding the 2020 U.S. election. (*Id.* at ¶¶16-17). For example, Bania's investigation revealed that "Bed Bath & Beyond ceased business with MyPillow due to underperforming sales and because they wanted to focus on growth

in its key category products." (*Id*. at ¶16). Bania relied on direct quotes from retailers as published in these articles.

This research *directly rebuts* Gorowsky/Bowes's unsupported claim that MyPillow retail sales decreased *because of* Mr. Lindell's statements regarding the 2020 election. (*Id.* at ¶15) (Ex. D at 55:12-20). The research Bania conducted provided him with sufficient facts to rebut Gorowsky/Bowes's opinion that Mr. Lindell's statements were the cause of MyPillow's lower retail sales. This type of background investigation, based upon personal observation of relevant data, is admissible under *Daubert* where its probative value is helpful to the jury. *See Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 520 F. Supp. 3d 872, 892 (E.D. Mich. 2021) (finding an expert in the field of economics and business valuation could reasonably base their opinion on news articles in evaluating whether there were confounding variables affecting product sales); *Jayne v. City of Sioux Falls,* 2020 WL 2129599, at *6 (D.S.D. May 5, 2020) (expert's reliance on news articles, among other sources, was permissible and relevant); *Jordan v. Town of Fairmount Heights,* 2024 WL 732011, at *6 (D. Md. Feb. 21, 2024) (finding that it was reasonable for expert on police hiring practices to consult public news sources for information about subject officers' backgrounds, and to the extent those sources were unreliable, it went to weight not admissibility of the opinion). Because Bania's investigation directly rebuts the unsupported assertion of Gorowsky/Bowes, it is helpful to the jury and should be admitted.

Defendants assert that Bania's retail sales analysis is inadmissible under Fed. R. Evid. 703 because it is based upon hearsay. (Dkt. 430 at 6). This argument is unpersuasive. "[E]ven assuming the underlying testimony relied upon by the expert is hearsay, the

17

appropriate test is whether an expert in the field 'would reasonably rely on those kinds of facts or data' in forming their opinion. If so, the underlying facts 'need not be admissible for the opinion to be admitted.'" *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 924 (D. Minn. Jan. 14, 2020) (finding expert's reliance on hearsay did not render his opinion inadmissible under *Daubert* and noting that to the extent the opposing party wished to criticize his reliance on the hearsay, it could do so through cross-examination). Because experts in damages calculations and valuation would rely upon the type of news article investigation that Bania performed, he may rely on this evidence here. *See, e.g.*, *Innovation Ventures*, 520 F. Supp. 3d at 892 (an expert in the field of economics and business valuation could reasonably base their opinion on news articles).

**B.    Bania's Direct Sales Analysis is Admissible.**

In addition to the retail sales analysis, Bania also performed a "direct sales analysis," rebutting Gorowsky/Bowes's opinion that MyPillow's direct (*i.e.*, non-retail) sales increased in 2020 and 2021 due to new products, but then decreased in 2022 due in part to "customer alienation" because of "Mr. Lindell's statements related to the 2020 U.S. Election." (Ex. B at ¶18). Bania reviewed and analyzed MyPillow's direct sales in their financial documents. (*Id.* at ¶¶18-24). He looked at the details on cost of goods sold ("COGS") for each product category sold by MyPillow. He then calculated the COGS for new products introduced by MyPillow and calculated that "2020 and 2021 COGS for these new products are minimal compared to MyPillow's total COGS." (*Id.* at ¶21). This financial analysis showed that Gorowsky/Bowes "incorrectly assumed that the new products introduced in 2020 were the main reason for MyPillow's improved financial

performance in 2020 or 2021." (*Id.*) Another potential cause of MyPillow's improved financial performance—that Gorowsky/Bowes did not even consider—was the defamation campaign. (*Id.* at ¶22). "Mr. Lindell disseminated the Defamation Statements on the radio, podcasts, television, and live streams to gain publicity and encourage people to buy products directly from the MyPillow website," in 2021. (*Id.*) This generated a "record $531.8 million in total sales while decreasing advertising-to-revenue ratio from an average of 33.1% to 31.4%." (*Id.*)

Bania's direct sales analysis therefore shows that Defendants' defamation campaign drove sales directly to the MyPillow website. (*Id.*) This expert analysis is admissible because it assists the trier of fact in understanding the Defendants' financial motive to defame Smartmatic. *Campbell*, 255 F.3d at 571; *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 754 (S.D. Iowa Oct. 23, 2019) (damages calculation expert's testimony about voluminous financial data was admissible because the "jury would benefit from receiving [expert's] testimony analyzing" the data, which could be confusing without such testimony).

### C.    Bania's Profit Analysis is Admissible.

Bania's "profit analysis" similarly used MyPillow's consolidated financial statement to rebut Gorowsky/Bowes' opinion regarding MyPillow's profits decreased "due to Mr. Lindell's statements regarding the 2020 US election." (Ex. B at ¶25). To rebut this claim, Bania calculated the increased expenses that MyPillow incurred following the 2020 U.S. Election and determined that Gorowsky/Bowes's expert analysis did not take into account various items in the financial statements. (*Id.* at ¶28).

For example, Bania pointed out that payroll expenses, insurance expenses, occupancy expenses, aircraft operating expenses, bank charges, vendor late fees, interest expenses, and depreciation were all increased in 2021 and/or 2022 according to MyPillow's financial statements. (*Id.*) Bania determined that these increased expenses could have continued to lower profits for MyPillow during this time period, rather than Mr. Lindell's comments on the 2020 US election. (*Id.* at ¶29). Bania's "profit analysis" is admissible because it critiques Defendants' expert's methodologies and appropriately "point[s] out potential flaws" in the Gorowsky/Bowes report. *Aviva Sports,* 829 F.Supp.2d at 835 (rebuttal experts can critique opposing expert's methodology when they "sufficiently appl[y] their expertise to the facts and methodologies" used by the opposing experts "in forming their conclusions.").

## VI.    Bania's Opinions are Relevant to Core Issues in This Case.

Finally, Defendants seek to exclude Bania's testimony, arguing that it "risks confusing" to the jury because he does not "analyz[e] economic harm to Smartmatic." (Dkt. 430 at 5). But his testimony goes directly to two key issues in the case—Defendants' motive to defame Smartmatic, and the audience reached by the defamation campaign. If Defendants profited through advertising revenue by defaming Smartmatic, this is evidence of actual malice and further evidence relevant to punitive damages. *See Harte-Hanks Comm's, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) (though motive alone does not support a finding of actual malice it can bear relation to the actual malice inquiry); *Walker v. Wanner Eng'g, Inc.*, 867 F. Supp. 2d 1050, 1055 (D. Minn. 2012) ("[a]ctual malice exists when the statements were made out of 'ill will and improper motives, or causelessly and

20

wantonly for the purpose of injuring the plaintiff.'") (citation omitted); *Chong,* 361 F.3d at 458; *Johannessohn,* 2022 WL 3585152, at *5 (*supra* at 12-13).

Jurors will not be confused by Bania's opinions because he explains the basis for them clearly. *See Wells Fargo & Co. v. U.S.*, 2013 WL 5596287, at *10-11 (D. Minn. June 14, 2013) (allowing testimony of accounting expert, observing that cash flow analysis "may be complex," but "does not require deep scientific knowledge to understand" and "should be within the power of jurors to comprehend without undue confusion.") Defendants' suggestion that confusion will result from his focus on *Defendants' benefit* rather than *Smartmatic's loss* is strange and unfounded—indeed, because the purpose of Bania's testimony is to help the jury to understand Defendants' motives and the reach of the defamation campaign, the scope of Bania's analysis and his opinions are appropriate, understandable, and helpful to the jury.

## CONCLUSION

For all of the reasons stated herein, Defendants' request to exclude the testimony of Doug Bania should be denied.

Dated: December 13, 2024                    Respectfully submitted,

                                            /s/ *Timothy M. Frey*

Christopher K. Larus
    Minnesota Bar No. 0226828
    CLarus@robinskaplan.com
William E. Manske
    Minnesota Bar No. 0392348
    WManske@robinskaplan.com
Emily J. Tremblay
    Minnesota Bar No. 0395003
    ETremblay@robinskaplan.com

**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500

J. Erik Connolly (admitted *pro hac vice)*
    EConnolly@beneschlaw.com
Illinois ARDC No. 6269558
Nicole E. Wrigley (admitted *pro hac vice)*
    NWrigley@beneschlaw.com
Illinois ARDC No. 6278749
Timothy M. Frey (admitted *pro hac vice*)
    TFrey@beneschlaw.com
Illinois ARDC No. 6303335
Julie M. Loftus (admitted *pro hac vice*)
    JLoftus@beneschlaw.com
Illinois ARDC No. 6332174

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949

James R. Bedell (admitted *pro hac vice*)
    JBedell@beneschlaw.com
Ohio Bar No. 97921

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: (216) 363-4500

*Attorneys for the Plaintiffs*