# EXHIBIT D

```
                                  Page 1
 1       IN THE UNITED STATES DISTRICT COURT FOR
 2                THE DISTRICT OF MINNESOTA
 3
 4
 5   _____
                            )
 6   SMARTMATIC USA CORP.,  )
     SMARTMATIC INTERNATIONAL)
 7   HOLDING B.V. and SGO   )
     CORPORATION LIMITED,   )
 8                          )  Case No.
                            )  22-cv-00098-WMW-JFD
 9         Plaintiffs,      )
                            )
10      vs.                 )
                            )
11   MICHAEL J. LINDELL and )
     MY PILLOW, INC.,       )
12                          )
                            )
13         Defendants.      )
     _____
14
15
16            DEPOSITION OF DOUG BANIA
17                CONDUCTED REMOTELY
18                 AUGUST 9, 2024
19
20
21
22
23   REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348
24
25
```

```
                                  Page 2
 1       IN THE UNITED STATES DISTRICT COURT FOR
 2                THE DISTRICT OF MINNESOTA
 3
 4
 5   _____
                            )
 6   SMARTMATIC USA CORP.,  )
     SMARTMATIC INTERNATIONAL)
 7   HOLDING B.V. and SGO   )
     CORPORATION LIMITED,   )
 8                          )  Case No.
                            )  22-cv-00098-WMW-JFD
 9         Plaintiffs,      )
                            )
10      vs.                 )
                            )
11   MICHAEL J. LINDELL and )
     MY PILLOW, INC.,       )
12                          )
                            )
13         Defendants.      )
     _____
14
15         VIDEO RECORDED DEPOSITION OF DOUG BANIA,
16   commencing at the hour of 10:01 a.m. PST, Friday,
17   August 9, 2024, conducted remotely, before Kaylee G.
18   Wood, Certified Shorthand Reporter, Registered
19   Professional Reporter, and Certified Realtime Reporter
20   in and for the State of California.
21
22
23
24
25
```

```
                                                Page 3
 1   APPEARANCES
 2   FOR THE PLAINTIFFS:
 3         BENESCH FRIEDLANDER COPLAN & ARONOFF LLP
           BY: MAURA LEVINE-PATTON, ESQ.
 4             WILLIAM WALSH, ESQ.
           71 SOUTH WACKER DRIVE, SUITE 1600
 5         CHICAGO, IL 60606
           (312) 212-4949
 6         MLEVINE-PATTON@BENESCHLAW.COM
           WWALSH@BENESCHLAW.COM
 7
 8   FOR THE DEFENDANTS:
 9         MCSWEENEY CYNKAR & KACHOUROFF PLLC
           BY:  CHRISTOPHER KACHOUROFF, ESQ.
10         13649 OFFICE PLACE, SUITE 101
           WOODBRIDGE, VA 22192
11         (703) 621-3300
           CHRIS@MCK-LAWYERS.COM
12
13   ALSO PRESENT:
14         DANA BACHMANN, VIDEOGRAPHER
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                Page 4
 1                   I N D E X
 2
 3   WITNESS: DOUG BANIA
 4
 5   EXAMINATION                                   PAGE
 6   BY MR. KACHOUROFF                                6
 7
 8
 9
10            E X H I B I T S
11
12   RETAINED BY COUNSEL                           PAGE
13   Exhibit 710    Mr. Bania's Report                7
14   Exhibit 711    Mr. Bania's Rebuttal Report       7
15   Exhibit 712    Article                          31
16   Exhibit 713    The Hill Article                 60
17   Exhibit 714    NBC News Article                 64
18
19
20
21
22
23
24
25
```



Page 5
1  CONDUCTED REMOTELY; AUGUST 9, 2024; 10:01 A.M. PST
2           PROCEEDINGS
3       THE VIDEOGRAPHER:  Good morning.  We're now
4  on the record, 10:01 a.m. Pacific Time on August 9,
5  2024.  This begins the videoconference deposition of
6  Doug Bania taken in the matter of Smartmatic USA
7  Corporation, et al., versus Michael J. Lindell, et al.,
8  filed in the U.S. District Court, District of
9  Minnesota, case number 22-CV-00098.  My name is Dana
10 Bachmann.  I'm your videographer today.  Our court
11 reporter is Kaylee Wood.  We're both representing
12 Esquire Deposition Solutions.  Would all present please
13 identify themselves beginning with our noticing
14 attorney?
15      MR. KACHOUROFF:  This is Christopher
16 Kachouroff on behalf of Michael Lindell and My Pillow.
17      MS. LEVINE-PATTON:  Maura Levine-Patton on
18 behalf of the Smartmatic plaintiffs and the witness.
19      MR. WALSH:  Bill Walsh also on behalf of the
20 Smartmatic plaintiffs and the witness.
21      THE VIDEOGRAPHER:  Thank you very much.
22 Madam Reporter, would you kindly swear our witness?
23 ///
24 ///
25 ///

Page 6
1           DOUG BANIA,
2  having first been duly sworn, was examined and
3  testified as follows:
4       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
5  BY MR. KACHOUROFF:
6    Q.  I guess it's good morning for you, Mr. Bania.
7  You're in California, I suppose?
8    A.  Yes, I am.  10 a.m. for me.  Thank you.
9    Q.  Okay.  My name is Chris Kachouroff.  I
10 represent Michael Lindell and My Pillow, and I know
11 that you've taken several depositions -- in fact
12 approximately 30 -- in the past.  Is that fair to say?
13   A.  Yes.  That seems correct.
14   Q.  I'm going to presume you know the ground
15 rules for the depositions, and when your attorneys
16 object, et cetera, you're required to let them make
17 their objections and otherwise you're to answer my
18 questions.  Does it sounds like the standard rules that
19 you've been told the past 30 times?
20   A.  Yes.
21   Q.  Okay.  I'd like to talk first of all the
22 scope of your opinions.  I would ask the court
23 reporter -- I don't know how we get these things back
24 up in the chat.  I can put the documents on chat if you
25 would like me to so that Mr. Bania can see them, but

Page 7
1  I'd like to put his Exhibit 1 and 2, his report and
2  rebuttal report.
3       COURT REPORTER:  Dana, are you doing that?
4       MR. KACHOUROFF:  Say again.
5       COURT REPORTER:  I was asking the
6  videographer if he's handling the exhibits.
7       THE VIDEOGRAPHER:  I'm sorry, Madam Reporter.
8  I could not understand what you were saying.
9       COURT REPORTER:  Are you doing exhibits
10 today?
11      THE VIDEOGRAPHER:  I hadn't been assigned
12 that task but I can.
13      COURT REPORTER:  However you'd like to do
14 that, Mr. Kachouroff.
15      MS. LEVINE-PATTON:  Chris, can you drop the
16 PDFs in the chat?
17      MR. KACHOUROFF:  Yeah.  I'll take care of the
18 exhibits, guys.
19      (Whereupon, Exhibit 710, Mr. Bania's Report,
20 was marked for identification.)
21      (Whereupon, Exhibit 711, Mr. Bania's Rebuttal
22 Report, was marked for identification.)
23 BY MR. KACHOUROFF:
24   Q.  Mr. Bania, would you just take a look at
25 those two and confirm for me that that's your first and

Page 8
1  rebuttal report as well?
2    A.  Okay.  I think -- okay.  I downloaded first
3  one and the second one.  Yes.
4    Q.  Page 21 of the first report and page 30 of
5  the rebuttal report contain your conclusions.  Do you
6  want to take a quick moment to make sure that I'm being
7  accurate?
8    A.  What was -- I'm sorry.  What was the page on
9  the --
10   Q.  Let's start with Exhibit 1, page 21 on
11 Exhibit 1.
12   A.  Yes.  Paragraph 55 is where I start my
13 conclusions.
14   Q.  Correct.  And that's the scope of the
15 opinions that you intend to offer at trial?
16   A.  Yes, as of right now unless something else
17 comes up.  But as of this deposition, yes.
18   Q.  Okay.  And then if we look at the rebuttal
19 report which would be Exhibit 2, I believe it's page
20 30.  Actually, I'm sorry.  I believe it's page 12 on
21 the rebuttal report, not 30, paragraph 30.
22   A.  Correct.  Yes.  I'm there.
23   Q.  And that would also be your opinions that you
24 intend to offer at trial?
25   A.  That's correct.



Page 9
1  Q. Barring any new things that come to light in
2  your mind?
3  A. That's right.
4  Q. I want to talk briefly about your background
5  and experience. You have a bachelor's degree in cinema
6  and television, is that right?
7  A. My bachelor's degree is in cinema.
8  Q. And then you have a master's in cinema,
9  television, film and new media production?
10 A. My master's is in television, film and new
11 media, yes.
12 Q. And how did that -- how does that relate to
13 your expertise in intellectual property?
14 A. My educational background is not really
15 relevant to my expertise on this case.
16 Q. Your certification and professional license,
17 I think you call it a certified licensing professional?
18 A. Yes.
19 Q. Is that relevant to the matters raised in
20 this case?
21 A. That is -- let me think about that. Not
22 necessarily. I'm not providing any licensing opinions
23 on this case.
24 Q. Do you have an engineering background?
25 A. No.

Page 10
1  Q. Marketing background?
2  A. When you say background what type of
3  background are you asking me about?
4  Q. Let me rephrase the question. Do you have
5  expertise in marketing?
6  A. I -- part of my master's degree included
7  marketing classes as my previous career I was in charge
8  of marketing and business development, and now with my
9  current company that I own and founded I do marketing
10 and business development as well.
11 Q. So you would describe your experience as
12 on-the-job training?
13 A. Including, you know, educational courses in
14 my master's degree.
15 Q. What type of marketing did you do in your
16 first company?
17 A. The first company in which I worked for I
18 really wore the marketing hat and business development
19 hat as it relates to marketing, going to events, trade
20 shows, you know, leading into internet and social media
21 marketing, building the website, optimizing each page,
22 and, you know, creating relationships and keeping
23 relationships with clients.
24 Q. What were you marketing, products or
25 services?

Page 11
1  A. Services.
2  Q. You are not portending to be an expert in
3  marketing, are you?
4  A. No.
5  Q. You're not an expert in psychology and
6  behavioral science?
7  A. I am not.
8  Q. Do you have a law degree?
9  A. I do not.
10 Q. Do you have an accounting degree?
11 A. I do not.
12 Q. You don't hold a CPA license, I presume?
13 A. No, I don't.
14 Q. Do you have any certifications in finance?
15 A. I do not.
16 Q. Business valuations?
17 A. The CLP designation includes having
18 experience in valuation.
19 Q. Is the experience in valuation specific to
20 intellectual property?
21 A. Yes.
22 Q. And I believe in your rebuttal report, page
23 4, 6, you said that you have not been asked to provide
24 any valuation on IP.
25 A. What page are you on?

Page 12
1  Q. If we look at page --
2  A. Or paragraph.
3  Q. I'm sorry, paragraph -- it will be page 4,
4  paragraph 6. You've not been asked to confirm the
5  accuracy of any information provided to you or provide
6  an analysis of valuation opinion of any businesses,
7  intellectual properties, or intangible assets owned by
8  plaintiffs or defendants?
9  A. That's correct.
10 Q. Your website says that you have three
11 offices, San Diego, LA, and D.C. Are these virtual
12 offices? Are they brick and mortar?
13 A. The San Diego office is brick and mortar and
14 the other two are virtual.
15 Q. For 2023 how much expert -- how much revenue
16 did you generate from being an expert witness?
17 A. I don't know.
18 Q. What about 2024?
19 A. I don't know.
20 Q. What percentage of your income comes from
21 expert witness testimony?
22 A. It varies year to year. 60 percent.
23 Q. I'd like to turn to your first report, and
24 specifically I'm looking at -- I'm beginning at page --
25 let's see.



Page 13
1    MS. LEVINE-PATTON: I'm sorry, Chris. Just
2  for the record what exhibit number is this so we have
3  it so that the court reporter can mark it as an
4  exhibit?
5    MR. KACHOUROFF: I started with 1, and you'll
6  see all the exhibits I upload will have a designation
7  of 1, 2, 3, 4, 5, or 6.
8    MS. LEVINE-PATTON: Okay. I just want to put
9  on the record that we may request later that these
10  exhibits be renumbered to continue the sequential
11  numbering that we have done through over 700 in this
12  case up to this point which -- I just want to reserve
13  that right on the record.
14    MR. KACHOUROFF: Well, let's not have to
15  worry about it. Why don't I just change that right
16  now?
17    MS. LEVINE-PATTON: That would be great.
18    MR. KACHOUROFF: One moment. The last
19  exhibit number I have is 709.
20    MS. LEVINE-PATTON: Yes. I think we're --
21  yeah. 710.
22    MR. KACHOUROFF: So we'll refer to this
23  exhibit, Mr. Bania, your report, as 710, okay?
24    MS. LEVINE-PATTON: Thank you so much.
25    THE WITNESS: Okay.

Page 14
1    MR. KACHOUROFF: You're welcome.
2  BY MR. KACHOUROFF:
3    Q.  Your report begins on -- well, I think the
4  substance of it begins really on page 10. You talk
5  about the impact of what you refer to as the defamation
6  campaign. Smartmatic filed suit against Fox News on
7  February the 5th, 2021, for alleged defamation. Are
8  you aware of that case?
9    A.  I am aware of that case, yes.
10   Q.  And why are you aware of that case?
11   A.  Because it was in the news.
12   Q.  Are you an expert in that case?
13   A.  No.
14   Q.  But you are an expert in the Kumer case?
15   A.  The Kumer v. Lindell case?
16   Q.  Yes, sir.
17   A.  Yes, I am.
18   Q.  When was the first time that Mike Lindell
19  mentioned the name Smartmatic?
20   A.  I mean, my investigation starts February 5,
21  2021 with the airing of Absolute Proof.
22   Q.  And was the name Smartmatic isolated by
23  itself or were there other names along with it?
24   A.  There are other names along with it.
25   Q.  Do you know who those other names are?

Page 15
1    A.  Not off -- no, I don't.
2    Q.  Did you consider Mr. Lindell's online
3  presence or his celebrity status prior to that date you
4  said which was February 5, 2021?
5    A.  What do you mean? Did I consider?
6    Q.  Did you consider how popular he was and how
7  much publicity he had prior to that date?
8    A.  I mean, I guess I'd have to, you know, ask
9  you to define what you mean by consider. Was I aware
10  of it or did I incorporate that into my analysis?
11  I'm -- don't understand what you're asking.
12   Q.  Fair enough. I'll rephrase. Did you
13  consider as part of your analysis Mr. Lindell's online
14  presence prior to February 5, 2021?
15   A.  I was aware of his online presence and I was
16  aware of him being online and talking, yes.
17   Q.  You did not conduct any analysis of his
18  online presence prior to February 5, 2021?
19   A.  Correct.
20   Q.  And you called Mr. Lindell's efforts a
21  defamation campaign. Those were your words, correct?
22   A.  I coined the defamation campaign that way. I
23  don't know if I pulled that from the complaint or if I
24  coined it that way. I'm not sure.
25   Q.  So you're not giving any opinion as to

Page 16
1  whether the statements were defamatory or not?
2    A.  Correct.
3    Q.  And on that note you don't have any opinion
4  on whether a trade practice was deceptive or not?
5    A.  That's correct.
6    Q.  In your report I think you've included this
7  campaign saved the defendants significant advertising
8  costs, isn't that fair to say?
9    A.  That's correct.
10   Q.  Can you detail the assumptions and
11  calculations that you used in your relief from
12  pay-per-click analysis?
13   A.  One more time, please.
14   Q.  I'm sorry. Can you detail the assumptions
15  and the calculations that you used in your relief from
16  pay-per-click, the RFPPC analysis that you did?
17    MS. LEVINE-PATTON: I'm going to object to
18  form.
19   Q.  Let's start over. Where does RFPPC even come
20  from?
21   A.  So that is based on a relief from royalty
22  approach to damages.
23   Q.  That's something you created?
24   A.  No, I did not.
25   Q.  Who created the relief from pay-per-click



Page 17

1  analysis?
2     A.  Oh, I'm sorry.  I was confused.  I thought
3  you asked me if I created the relief from royalty
4  calculation, which I did not.  But yes, I did create
5  the relief from pay-per-click approach to damages.
6     Q.  How do you account for variables in that
7  analysis such as the organic traffic growth and general
8  market trends?
9     A.  The relief from pay-per-click approach looks
10 at the amount of traffic or views -- it could be a
11 video, it could be an article, it could be statements
12 online -- how many views the articles or the videos
13 received by using a defamatory statement, by using an
14 infringed, you know, copyrighted image of a celebrity,
15 by using -- infringing trademark use.  So but for using
16 an infringing or defamatory approach the in this case
17 defendant saved on marketing spend that they should
18 have paid via a pay-per-click campaign.  So it is based
19 on the cost savings that -- using in this case the
20 defamation campaign.
21    Q.  But you didn't separate out -- well, you know
22 that Mr. Lindell's campaign against the machines wasn't
23 limited to Smartmatic.  We just talked about that,
24 right?
25    A.  Yes.  I do know that.

Page 18

1     Q.  I mean, he mentioned ES&S, Hart InterCivic,
2  and Dominion, right?
3     A.  He did.  Yes.  That's why if you look at my
4  analysis I first came up with over 28 million mentions
5  and then I sifted and sorted and, you know, that down
6  to 116,000 that were specifically -- that specifically
7  included Smartmatic.
8     Q.  The 116,000 mentions -- and we'll get to
9  that -- that was also in the context of the other
10 companies like ES&S, Hart, and Dominion, wasn't it?
11    A.  What was your question?
12    Q.  The 116,000 views you say you narrowed down
13 to Smartmatic, what statements were narrowed down to
14 that 116,000 views?
15       MS. LEVINE-PATTON:  Object to form.
16    Q.  If you understand.
17    A.  I'm not understanding.
18    Q.  Where did the 116,000 views come from?  You
19 said that you used -- you narrowed it down just to
20 Smartmatic, is that fair to say?
21    A.  I narrowed the 28 million mentions down to
22 116,000 by weeding out mentions that did not include
23 Smartmatic.
24    Q.  So if a mention included Smartmatic and other
25 companies it still got included in the 116,000, is that

Page 19

1  correct?
2     A.  Say that again, please.
3     Q.  If the mentions included not only Smartmatic
4  but Hart, Dominion, or any other machine company, those
5  were not excluded from the 116,000 mentions?
6     A.  If in the 116,000 mentions of Smartmatic, in
7  that bucket of 116,000 other companies or names might
8  have been mentioned as well if that's what you're
9  asking.
10    Q.  Correct.  And you didn't segregate those out?
11    A.  No.  I segregated the 28 million down to
12 116,000 that only include mentions of Smartmatic but
13 may include other companies or people.
14    Q.  So the benefit that you claim My Pillow
15 obtained would not necessarily include mentioning the
16 other companies as well?
17       MS. LEVINE-PATTON:  Object to form.
18    A.  Say that one more time.  I'm sorry.
19       MR. KACHOUROFF:  Madam Court Reporter, would
20 you mind reading that back?
21       (Pending question read.)
22       THE WITNESS:  I don't -- I'm sorry.  I don't
23 understand the question.
24    Q.  I'll rephrase it.
25    A.  Thank you.

Page 20

1     Q.  The benefit that you claim My Pillow
2  obtained, it would have included other companies like
3  Hart, Dominion, or ES&S, not just Smartmatic?
4        MS. LEVINE-PATTON:  Objection.  Same
5  objection.
6     A.  Yeah.  I can say that the benefit that
7  defendant achieved, you know, based on the defamation
8  campaign included other companies and names like I've
9  already said.  I want to make sure I'm -- it sounds
10 like you're asking the same question but I want to make
11 sure I'm hearing you right.
12    Q.  I think you've answered it if you're
13 satisfied with that answer.  You would agree that
14 Mr. Lindell has the right to criticize voting machines,
15 right?
16    A.  I don't have any opinions on his rights.
17    Q.  You believe in the first amendment, don't
18 you?
19    A.  Yes.
20    Q.  And people have a first amendment right to
21 speak about political matters, do they not?
22    A.  They do, but again, I'm not bringing
23 expertise on the first amendment.
24    Q.  I'm not asking for expertise on the first
25 amendment.  I want just your understanding of basic



Page 21

1  human rights and whether people have a right to speak
2  their minds on political matters.
3     A.  Yes, they do.
4     Q.  Now, on page 7 you say that Mr. Lindell
5  accused Smartmatic of being engaged in a criminal
6  enterprise?
7     A.  What paragraph are you on?
8     Q.  Page 7 of 710.  I believe it's 710.  Let me
9  just make sure.
10    A.  Let's see.  I'm on page 7.  I see paragraph
11 15.
12    Q.  Very top, the second bullet from the top.  In
13 this list you're referring to what you call the
14 defamatory statements, and one was that Smartmatic was
15 engaged in a criminal enterprise.  Do you see that?
16    A.  Yes.  These are -- these bullets are pulled
17 from the claims in the complaint which is document 1A.
18    Q.  Okay.  Did you hear that yesterday three
19 Smartmatic executives were indicted for bribery in the
20 Philippines, for their conduct in the Philippines?
21    A.  No.
22    Q.  So you're not opining on whether any of these
23 statements are true or not?
24    A.  Correct.
25    Q.  Okay.  I'd like to talk about the approach

Page 22

1  that you claim Mike Lindell had to the campaign, and I
2  think it's also on page 7 where you talk about the
3  approach.  And you start with, paragraph 15, Absolute
4  documentary series, media appearances, Cyber Symposium,
5  and the post-complaint defamation.  Do you see that?
6     A.  I do.
7     Q.  Let's start with the Absolute documentary
8  series.  Did you watch the entire video Absolute Proof?
9     A.  I watched segments of it.
10    Q.  What segments did you watch?
11    A.  I looked for a segment -- so these were --
12 these episodes in this Absolute documentary series was
13 mentioned and alleged in the complaint.  Therefore I
14 went to these episodes to see what was said, if
15 anything, about Smartmatic.  So I watched, you know, a
16 lot of the segments that didn't include mentions of
17 Smartmatic and then found the mentions of Smartmatic.
18    Q.  And you talk about 28.1 million views or
19 whatever it is, 28.3 million views.  You don't know if
20 the other 28.3 million people watched the entire video?
21    A.  Correct.
22    Q.  Someone could have watched it for five
23 minutes and turned it off?
24    A.  That is possible.
25    Q.  When does the first My Pillow ad appear in

Page 23

1  the video?
2     A.  I don't know.  I'm looking for, you know,
3  mentions of Smartmatic.
4     Q.  Well, you're claiming that My Pillow
5  benefitted so I was just wondering if you knew what
6  part of the videos contained My Pillow's ads.
7     A.  The approach with Mr. Lindell is related to
8  promo codes, not necessarily ads.
9     Q.  Did you see any promo codes in the videos?
10    A.  The research I did that revealed 1,100 of the
11 mentions talked about, you know, buying pillows, you
12 know, talking about promo codes, you know, talking
13 about, you know, Mr. Lindell lost tens of millions of
14 dollars, let's help save him, everybody go buy some
15 more pillows.  So the research and investigation I did
16 uncovered roughly 1,100 mentions of people connecting
17 the defamation campaign to My Pillow's business.
18    Q.  We'll get to that in just a moment, but as
19 regards the Absolute documentary series the answer is
20 you did not see any My Pillow ads or coupon codes in
21 those videos, is that fair to say?
22    A.  I don't recall if during the mentions or any
23 speeches or during the series if promo codes were
24 given.  I don't recall.
25    Q.  And so you say that there were 11,022 [sic]

Page 24

1  mentions out of 28.8 million views, right?
2     A.  Well, remember, my 28.5 million mentions was
3  boiled down to the 116,000, so --
4     Q.  Correct.  But there's still out of the 21.8
5  million views there are 1,122 mentions that you were
6  focused on?
7     A.  I would frame it as out of the 116,000
8  relevant mentions 1,100 or so mention My Pillow
9  products.
10    Q.  And so out of the 1,122 you don't know how
11 many people actually bought My Pillow products?
12    A.  Yes.  I did not get the analytics from the
13 defendants as it relates to purchases.
14    Q.  You -- what those 1,122 mentions represented
15 according to you was people who bought, encouraged
16 others to buy, or who passed on coupon codes, is that
17 fair to say?
18    A.  That's fair to say, and, you know, what was
19 important for me to find out or to discover is people
20 were associating this what I'm coining as the
21 defamation campaign to My Pillow products.
22    Q.  Are you aware of any time that My Pillow ever
23 promoted anything about Mr. Lindell's election
24 theories?
25    A.  I did not analyze or have access to any of My



Page 25
1  Pillow's, you know, marketing activities.
2    Q.  You did searches online for My Pillow
3  marketing activities, did you not?
4    A.  I did searches online, you know, in my query
5  as it relates to the pieces of defamation campaign.
6    Q.  On page 10 -- we'll turn to page 10.  I'm
7  going to try to do this in sequence so as we go through
8  I hope not to have to go back and forth in your report,
9  so I don't want it to be confusing.  Page 10 and 11 you
10 begin what I call the financial performance analysis.
11   A.  Yes.
12   Q.  Okay.  You say on page -- let's see.  If we
13 can go down to one more page, page 12.
14   A.  Do you have paragraph numbers?
15   Q.  Yes.  Let's start on paragraph 26, page 12.
16 You say, based on this information people associated My
17 Pillow products with the defamation campaign.  At the
18 same time defendants experienced increased revenues and
19 decreased advertising costs.
20      Do you see that?
21   A.  Yes.
22   Q.  You would agree that you're not an economist?
23   A.  I am not an economist.
24   Q.  Okay.  What products did My Pillow sell in
25 2020 and 2021?

Page 26
1    A.  They sold a variety of products ranging from
2  pillows to bedsheets to -- I have an exhibit here of
3  the products they sold.
4    Q.  Do you know what the manufacturing cost was
5  for a My Pillow product in 2020?
6    A.  The manufacturing cost -- well, I have the
7  costs of goods sold.  I don't have manufacturing costs.
8    Q.  What about manufacturing costs for 2021?
9    A.  Again, I have the COG information only.
10   Q.  So you don't have My Pillow's profit margins
11 in your revenue analysis?
12   A.  I do have profit margins, and again here I'm
13 focusing on the advertising to revenue ratio.
14   Q.  I understand that, but you don't have net
15 profits.  You don't know what their margins were on the
16 sale of a single pillow?
17   A.  I do not.
18   Q.  You know that in your report you talk about
19 the cancellation of all these box stores, and in your
20 mind it had nothing to do with his, quote, unquote,
21 campaign, is that fair to say?
22   A.  I wouldn't say in my mind.  Mr. Growsky, you
23 know, said that those cancellations were due to the
24 defamation campaign but without any evidence.  Because
25 he didn't provide any evidence I did dig in and I did

Page 27
1  some research that showed that those were canceled for
2  other reasons and the mention of the election was not
3  brought up at all.
4    Q.  Okay.  I did a search -- I did your searches,
5  by the way, and I got the opposite result where it said
6  that he was being canceled all at one time by all these
7  box stores in January of 2021.  Did you not see that?
8    A.  Did you clear your cache before your search?
9    Q.  I had never done your search before.  I was
10 asking you.
11   A.  No.  I'm asking when you did your search did
12 you clear your --
13      (Reporter clarification.)
14   A.  -- cache?  Your C-A-C-H-E.  Yes.  So what's
15 your question?
16   Q.  So you excluded news articles, a number of
17 them it seems, and really had to dig really deep to
18 find what you consider to be nonpolitical reasons for
19 the cancellation, isn't that --
20   A.  I didn't -- no.  I didn't have to dig very
21 deep.  I did a simple search and I shared with you in
22 the report the results that I saw.
23   Q.  Right.
24   A.  None of them mention being -- you know, box
25 shops or retailers canceling because of what

Page 28
1  Mr. Lindell is saying about the election.
2    Q.  Do you find it probative that all the box
3  stores seemed to cancel in January of 2021?
4    A.  That's not what I saw.
5    Q.  When did BJ's cancel him?
6    A.  I have to go to my exhibit.
7    Q.  It would be January 20, 2021.  Do you know
8  what happened on January 20, 2021?
9    A.  You said what was it?  BJ's?
10   Q.  Correct.  Are you searching on your computer
11 now?
12   A.  Oh, I'm looking at my report.  BJ's Wholesale
13 Club was not with him in 2018, was with him in 2019,
14 '20, seemed to have lost money in '21, and then is no
15 longer with them in '22.  So it appears that the -- you
16 know, the total sales of BJ's was not doing so good.
17 And yes, they're no longer with My Pillow in '22.
18      MS. LEVINE-PATTON:  And just for the record,
19 Mr. Bania, what part of your report are you looking at
20 when you're describing that?
21      THE WITNESS:  I'm looking at schedule 2D.
22 I'm sorry.  2B as in boy.
23      MS. LEVINE-PATTON:  Thank you.
24   Q.  Did you contact BJ's to find out why they
25 canceled Mr. Lindell?



Page 29

1  A. No.
2  Q. You relied on Google?
3  A. The internet research I did in my report, you
4  know, states the process I took and, you know, I saw
5  other reasons why retailers were canceling. I didn't
6  see any evidence that it's because of what Mr. Lindell
7  is saying about the election campaign.
8  Q. There were articles that were equating the
9  cancellation to his election campaign, were there not?
10 A. Again, my articles did not show anything
11 related to the election campaign.
12 Q. Okay. Do you know when Bed Bath & Beyond
13 canceled Mr. Lindell?
14 A. I see revenue from 2018 through 2022, so I
15 don't know.
16 Q. Do you know whether CNN canceled Mr. Lindell?
17 A. Whether who did?
18 Q. CNN.
19 A. I don't know.
20 Q. What about CVS?
21 A. I see that based on schedule 2B as in boy I
22 see no revenue or sales in 2022.
23 Q. What about MSNBC?
24 A. I don't have information about MSNBC.
25 Q. Were you aware that My Pillow cut its prices

Page 30

1  in 2021?
2  A. No.
3  Q. But you are aware that the sales went up in
4  2021?
5  A. Yes.
6  Q. If My Pillow's margins were lower that means
7  that they'd have to sell more in order to make the same
8  amount of money, isn't that fair to say?
9  A. Say that one more time.
10 Q. If My Pillow's margins, its profit margins
11 were lower in 2021 they would have to sell more in
12 order to make the same amount of profit?
13 A. Yes.
14 Q. You did not consider that in your analysis,
15 did you?
16 A. No. I did not have -- I did not have
17 detailed financial information as it related to, you
18 know, specific products.
19 Q. Did you consider that retail sales were
20 stagnant at brick-and-mortar locations in 2020 and
21 2021?
22 A. Yeah. It's -- yeah. 2021, you said?
23 Q. Correct, in 2020 and 2021.
24 A. Yes, yes. That is the time of COVID.
25 Q. And e-commerce was booming during that time,

Page 31

1  was it not?
2  MS. LEVINE-PATTON: Objection to form.
3  A. I did not -- well, I'm not sure what you mean
4  by booming, but I did not do any analysis as it relates
5  to retail sales compared to online sales in this
6  report.
7  MR. KACHOUROFF: I'm going to drop in the
8  chat -- we'll call this Exhibit 712. Madam Court
9  Reporter, I apologize. 710 is his report. 711 would
10 be the rebuttal. 712 is the latest document.
11 (Whereupon, Exhibit 712, Article, was marked
12 for identification.)
13 A. Okay. I have this up.
14 Q. This talks about e-commerce increasing as a
15 result of COVID in the 2020 to 2021 time frame.
16 MS. LEVINE-PATTON: I'm sorry. Before he
17 answers any question I want to make sure Mr. Bania has
18 had a chance to review the full document before
19 answering any questions about it.
20 MR. KACHOUROFF: Sure, sure.
21 THE WITNESS: Yeah. Let me quickly take a
22 look.
23 MS. LEVINE-PATTON: Thank you.
24 THE WITNESS: Yes. I've reviewed it.
25 Q. This talks about consumer behavior, there

Page 32

1  being an e-commerce boom during that time frame. Do
2  you see that?
3  A. Yes.
4  Q. That boom in online sales, that could have
5  accounted for the increase in sales revenues as well,
6  correct?
7  A. More people buying online, it would replace
8  going to the store. So it makes sense retail sales
9  would go down and e-commerce sales would go up.
10 Q. Now, your methodology, let's pull up your
11 search terms?
12 A. Can I close this document?
13 Q. Yes, sir. I'm sorry. Yes. You can close
14 that. I think you've already answered this at the
15 outset but just -- I want to make sure. You did not
16 include the other voting machine companies in your
17 searches; just the name Smartmatic?
18 A. Yes. I did not include them, no.
19 Q. You know that he did bash all of them in the
20 same sentence at times, correct?
21 A. I know that he was bringing Dominion into
22 this alleged election fraud. I know he called
23 Smartmatic the mother ship.
24 Q. And you estimated that -- what you call the
25 reach of this campaign using video views and social



Page 33

1  media mentions.  Do you recall that?
2     A.  Yes.
3     Q.  How did you address potential inaccuracies in
4  the view counts such as repeated views by the same
5  users or bots?  And what I mean by bots are those
6  computer-generated inflating number programs.
7     A.  Yes.  Again, as I've explained, I went from
8  28 million mentions down to the 116,000 mentions, you
9  know, by manually weeding out nonrelevant information.
10  And then that, you know, led to the video views, the
11  21.8 million video views, and there could be some bots.
12  There might not be bots.  I don't know.  You know, a
13  bot analysis was not -- I was not able to do that.
14     Q.  When you conducted your analysis you're
15  equating -- help me understand this.  You're equating
16  the views on his videos with a pay-per-click?
17     A.  So the 21.8 million views, my opinion is he
18  used the defamation campaign to generate those views as
19  opposed to paying per click.  As we know, Mr. Lindell
20  has used Google Ads in the past as I mention in
21  paragraph 31 of my report.  He got in trouble by Google
22  because of his election claims, therefore could not use
23  Google Ads anymore.  And then my opinion is he went on
24  using this defamation campaign to generate those video
25  views.  So yes, so each of those video views he should

Page 34

1  have paid per click like he used to do.
2     Q.  So My Pillow -- would it surprise you that My
3  Pillow spends the same amount on Google Ads both before
4  and after January 1, 2020?
5     A.  I don't have any Google Ads financial
6  information.
7     Q.  You understand that My Pillow is an entity
8  separate from Mr. Lindell, correct?
9     A.  Yes.
10     Q.  But you're equating the views of his videos
11  to pay-per-click advertising.  That's what I want to
12  focus on right now.
13     A.  That's correct.
14     Q.  What is the purpose of pay-per-click?
15     A.  It is to drive traffic to your website.
16     Q.  For who?
17     A.  For the advertiser.
18     Q.  And you can't just click on the video,
19  Mr. Lindell's video, and get to My Pillow, can you?
20     A.  That's correct.
21     Q.  There were no links to My Pillow on his video
22  sites, were there?
23     A.  He used promo codes.
24     Q.  On which sites?
25     A.  The sites that I focused on, you know, the

Page 35

1  videos were mostly on the Rumble and Bitchute.  But
2  Mr. Lindell promoted and promotes My Pillow with
3  basically everything he does, you know, the Cyber
4  Symposium, which was about, you know, election was
5  stolen, in which he, you know, promoted this defamation
6  campaign.  Along with that he promotes My Pillow.
7     Q.  Okay.  So I don't want to confuse the issue.
8  When you keep saying defamation campaign, those are
9  your words to describe it.  You're not saying there was
10  actual defamation, right?
11     A.  Correct.
12     Q.  Okay.  The Cyber Symposium was three days,
13  was it not?
14     A.  It was.
15     Q.  Do you know which day any My Pillow ad
16  appeared?
17     A.  Again, what is your definition of a My Pillow
18  ad?
19     Q.  Is -- I know you know -- I'm not trying to
20  play games with you, but you know what the word ad
21  means.  Do you have any indication of any day during
22  this Cyber Symposium that My Pillow produced any
23  advertisement, promo code, or other means to sell
24  pillows or his products at that Cyber Symposium?
25     A.  Mr. Lindell is an ad for My Pillow.  That's

Page 36

1  what he does.  He promotes --
2     Q.  Okay.
3     A.  -- My Pillow.  He uses promo codes.  He
4  always talks about My Pillow.  So in my opinion he is a
5  walking, talking advertisement for My Pillow.
6     Q.  So he doesn't have to mention My Pillow in
7  order to be advertising My Pillow?  Is that what you're
8  saying?
9     A.  The opposite.  I am not saying that.
10     Q.  You can't name a single day in the convention
11  where a My Pillow promo code was produced, can you?
12     A.  I -- like I said, you asked about when is a
13  My Pillow ad being displayed at the Cyber Symposium.  I
14  asked you, what is your definition of an ad, okay?  And
15  then I'm clarifying that Mr. Lindell talking about My
16  Pillow, buy My Pillow, go get my products, here's a
17  promo code.  That is an advertisement.  He is
18  advertising.  He is marketing and promoting My Pillow
19  during the Cyber Symposium and these other media tours.
20     Q.  Did you see at any time in the Cyber
21  Symposium any time that Mr. Lindell offered a My Pillow
22  coupon code?
23     A.  I believe that when he mentioned My Pillow
24  there was a promo code at the bottom of the screen.
25     Q.  Okay.



Page 37
1    A.  Verbally or visually, I did not -- I don't
2  know exactly how many of each.  But yes, there are
3  promo codes being used verbally and visually.
4    Q.  Now, you have estimated valuation of IP in
5  the past, correct?
6    A.  Have I -- say that again, please.
7    Q.  It was a bad question.  Let me rephrase it.
8  In the past you have valued intellectual property such
9  as a company name?
10   A.  Yes.
11   Q.  If a company name is worth zero is there
12  still an infringement on that property?
13   A.  That is a legal -- well, it's a legal
14  opinion.
15   Q.  It is.  You're right.  Bad question.  Let
16  me -- I'll withdraw the question and let me rephrase
17  it.  When you valued a company's name, if the company's
18  name is worth zero can they still suffer damages
19  because somebody uses that name, monetary damages?
20   A.  So if I am hired to value a company's name
21  and I come up with a value of zero, is that the
22  hypothetical?
23   Q.  Yes, sir.
24   A.  Okay.  And then somebody infringes on that
25  name.  Can there be damages?  Is that your question?

Page 38
1    Q.  Sure.
2    A.  First of all, there could be.  I mean,
3  obviously every valuation is different.  Every piece of
4  litigation is very unique.
5    Q.  Sure.
6    A.  So there could be damages.  It depends --
7  yeah, how is the defendant using the name and did using
8  that name produce an economic benefit for them?
9    Q.  Obviously if the intellectual property in the
10  name is worth zero one would not expect damages to be
11  too high, would you?
12       MS. LEVINE-PATTON:  Object to form.
13   A.  I -- yeah.  I don't have an opinion on that.
14  You know, intellectual property's value to one company
15  could be a different value to another company.
16   Q.  Did you consider Smartmatic's reputation in
17  its name before 2021?
18   A.  I did not do any valuation as it relates to
19  Smartmatic.
20   Q.  Did you value the Smartmatic name at all in
21  your consideration of whether there were damages in
22  this case?
23   A.  Well, remember at the beginning of my depo
24  one of my first paragraphs mentioned that I didn't
25  value anything.

Page 39
1    Q.  I want to get back to the pay-per-click in
2  the video analogy that you've drawn.  When you watch a
3  video if you see a My Pillow on the video you would
4  have to move your mouse curser to the address bar or
5  open a new tab in order to get to My Pillow, is that
6  fair to say?
7    A.  Say that again, please.
8    Q.  While you're watching a video if you
9  wanted to -- you saw My Pillow on one of these -- would
10  you -- what we call the Absolute Proof videos and you
11  see -- let's assume that there was a My Pillow display
12  on the documentary somewhere.  Unlike a pay-per-click
13  you'd have to move your mouse curser to the address bar
14  to get to My Pillow, right?
15       MS. LEVINE-PATTON:  Object to form.
16   A.  Well, I mean, not necessarily.  I mean, like
17  I said, the promo codes are used.  That's a visual.
18  Somebody could then, you know, go to MyPillow.com and
19  use that promo code and not necessarily have to move
20  their mouse on that video.
21   Q.  So as opposed to a click which sends you
22  right to the site, you're agreeing with me that you'd
23  have to move the mouse cursor to a new page or the
24  address bar to get to the My Pillow site?
25       MS. LEVINE-PATTON:  Objection.

Page 40
1  Mischaracterizes the testimony.
2    A.  Yeah.  I think maybe you're missing what the
3  definition from the relief from pay-per-click
4  methodology is, and I'm happy to discuss that if you'd
5  like to.  But to answer your question, you're asking me
6  about moving a mouse?
7    Q.  Yeah, a computer mouse.  In other words,
8  you're the one who equated pay-per-click with a video
9  and I want to see how similar the pay-per-click method
10  is as opposed to watching a video and having to
11  manually move your mouse to a new tab or the address
12  bar.
13   A.  Yeah.  I see the disconnect here.  So what
14  I'm saying is Mr. Lindell used the defamation campaign
15  to generate the 21.8 million views.  And -- you know,
16  and if, you know, it's a legal opinion whether or not
17  that is defamation.  And setting all the legal stuff
18  aside, he shouldn't have been, you know, talking about
19  Smartmatic in this way, you know, if legally it is
20  determined that there's defamation.  Therefore he
21  should have paid per click to get those 21 million
22  views.  So it's used as proxy.  You know, he's used
23  Google pay-per-click in the past.  He's no longer using
24  it now because he's using the defamation campaign to
25  generate his views.  So he should have paid per click



Page 41

1  to get those views is what I'm saying.
2      Q.   What evidence do you have that he used Google
3  pay-per-click in the past?
4      A.   Well, I believe on my paragraph 31 I
5  mentioned here Lindell is aware of Google Ads and is
6  experienced in online advertising to draw traffic to
7  his -- the Lindell websites to increase sales.
8      Q.   What sales did he increase on the Lindell
9  websites?
10     A.   Well, the goal is to get somebody to your
11 website.  I don't have -- I did not receive any
12 information on, you know, per person purchases.  So --
13 but the whole goal of pay-per-click advertising or the
14 defamation campaign is to drive people to the website.
15 That's the first step.  And then a certain percent of
16 them will make a purchase.  Now, I'm not talking about
17 unjust enrichment here.  I'm talking about the
18 marketing cost avoided via pay-per-click by using the
19 defamation campaign.
20     Q.   Are you aware that My Pillow has never used
21 pay-per-click since 2010?
22     A.   I did not know that.
23     Q.   Did you know that they exclusively used promo
24 codes in his marketing techniques --
25         (Reporter clarification.)

Page 42

1          MR. KACHOUROFF:  Did you want me to restate
2  the question?
3          COURT REPORTER:  Yes, please.
4      Q.   Were you aware that since 2010 he used promo
5  codes exclusively?
6      A.   Based on my paragraph 30 he has a video
7  talking about using Google Ads.  He has a video talking
8  about how because of this defamation campaign he's no
9  longer to use Google Ads.  He tried to use his name in
10 Google Ads.  Google no longer allows him to do that
11 because of this defamation campaign.  So my
12 understanding is he has used Google Ads and can no
13 longer use them because of what he's saying about the
14 election.  So those are the facts that I have.
15     Q.   That has nothing to do with My Pillow using
16 coupon codes, does it?
17     A.   Well, again, Google Ads, which he's used in
18 the past, is used to drive traffic to a website and
19 hopefully somebody buys something.
20         (Reporter clarification.)
21     Q.   Mr. Bania, I have a tendency to talk fast.  I
22 hope you don't take it as being disrespectful.  I'm
23 not -- I don't intend that.  So I'll try to slow down.
24 You being from California have plenty of people who
25 talk the way I do.  But go ahead.  Let's get back to

Page 43

1  what we were talking about.
2          MS. LEVINE-PATTON:  I'm sorry.  What was the
3  question so the record is clear?
4      Q.   All right.  There's a difference between My
5  Pillow and Mr. Lindell buying Google Ads, is there not?
6      A.   So your question, is there a difference
7  between My Pillow the company buying Google Ads --
8      Q.   Right.
9      A.   -- and Mr. Lindell as a person buying Google
10 Ads?
11     Q.   Correct.
12     A.   I would think that Mr. Lindell would be --
13 the person would be buying Google Ads for My Pillow.
14     Q.   The -- when Google canceled him did they
15 cancel My Pillow or did they cancel him for trying to
16 get his political views across?
17         MS. LEVINE-PATTON:  Object to form.
18     A.   Say that one more time.
19     Q.   When Google canceled as you mentioned in your
20 complaint -- your report did they do so because he was
21 trying to advertise My Pillow or because he was trying
22 to advertise his documentary series?
23     A.   My understanding is they no longer allowed
24 him to use his name in Google Ads because of his
25 opinions on the election.

Page 44

1      Q.   Would it surprise you that he was using
2  Google Ads to drive people to his documentary site?
3      A.   No.
4      Q.   Would it surprise you that that went on for
5  exactly two hours?
6      A.   What went on?
7      Q.   His Google Ads for two hours before he was
8  shut down.
9      A.   And what's the question?
10     Q.   Would it surprise you that Google shut him
11 down just after two hours of using his ads to drive
12 traffic to his documentary series?
13     A.   I don't have any opinion about being
14 surprised or what Google is doing here.  I just know
15 that Google, you know, didn't allow him to use his name
16 in Google Ads anymore.
17     Q.   You read what he wrote about it online or
18 what he said about it online, didn't you?
19     A.   Yeah.  I watched a video talking about how
20 Google's not allowing him to use his name anymore
21 because Google put efforts together to remove election
22 fraud conspiracy theories.
23     Q.   I understand that's what you think Google
24 did, but you would agree with me that has nothing to do
25 with My Pillow buying Google AdWords?



Page 45

1  A.  Based on my investigation Mr. Lindell,
2  whether he is playing a role in the defamation
3  campaign, whether he's playing a role in Absolute Proof
4  or any of the other, you know, talk shows he's been
5  involved with, he's always promoting My Pillow.
6  Q.  We talked about that.
7  A.  Okay.  Is that what you're asking?
8  Q.  No.  But we can move on because I want to go
9  back again.  The pay-per-click that we were talking
10 about is different than driving traffic to a website
11 where a documentary is housed, is that fair to say?
12 A.  One more time, please.
13 Q.  A pay-per-click ad is functionally different
14 than watching a video, correct?
15 A.  Yes.
16 Q.  Watching a video and compelling the viewer to
17 go online to look for another website would be wholly
18 inefficient, would it not?
19 A.  No.
20 Q.  You think it's as easy as clicking on a
21 pay-per-click button?
22 A.  When you have the owner of a company touting,
23 you know, election theories and how he's been harmed in
24 this defamation campaign I think is more powerful
25 and -- more powerful than a pay-per-click campaign.

Page 46

1  When you have, you know, the owner of the company in
2  these videos promoting My Pillow I think that's a
3  pretty powerful marketing campaign, very powerful
4  business development strategy.
5  Q.  So out of 21.8 million video views you came
6  up with 1,122 mentions about buying My Pillows or
7  encouraging others to buy the pillows or passing on a
8  coupon?
9  A.  Yes.
10 Q.  Isn't it true that pay-per-click targets
11 people that are ready to buy?
12 A.  No.
13 Q.  In other words, if somebody visits a web page
14 and they see a pay-per-click they make a decision about
15 whether to buy or not when they see that button, isn't
16 that fair to say?
17 A.  No.  You know, they don't see a web page and
18 then see a pay-per-click.  They do a Google search, an
19 organic search, and up pops up [sic] the ad.  And then
20 they click on that and go to the website.
21 Q.  So what are they doing in the organic search?
22 What are they searching for?
23 A.  Well, as I mentioned in my report, the
24 various keywords I chose ranging from My Pillow or
25 Mike Lindell.

Page 47

1  Q.  So they're ready to buy is what we're saying,
2  right?
3  A.  No.
4  Q.  So they're just going to go to My Pillow's
5  website without any intention of buying?
6  A.  Google does not guarantee -- after somebody
7  clicks on your ad and you pay 75 cents or $5 they don't
8  guarantee that anybody's going to buy.  Half the battle
9  for a business is getting people to your website, and
10 that's what, you know, pay-per-click advertisement is
11 about.
12 Q.  Right.
13 A.  You know, using a promo code is luring people
14 to go to the website, but you can't -- you know,
15 there's no guarantee they're going to buy anything.
16 Q.  Right.  And even with a pay-per-click they're
17 not necessarily going to buy anything, but they're --
18 at least you're honing in on the person that wants
19 something, is that fair to say?
20 A.  You're hoping that somebody's going to buy
21 something.  That's the goal of pay-per-click
22 advertisement.  Or maybe somebody wants you to download
23 something or maybe, you know, another company wants you
24 to read something.  The goal with pay-per-click
25 advertising is get somebody to your website to do

Page 48

1  whatever your goal is.
2  Q.  Okay.  And Mr. Lindell's goal could have been
3  to propagate his video so people could learn what he
4  believed was the truth, isn't that fair to say?
5      MS. LEVINE-PATTON:  Objection.  Speculation.
6  A.  Yeah.  I mean, my opinion is, you know,
7  Mr. Lindell's goal is to sell more products.
8  Q.  I got that's what your goal -- well, you
9  think that's what it is.
10 A.  Yeah.  He promoted his website with promo
11 codes, I mean, during, you know, these -- during the
12 defamation campaign.
13 Q.  Which websites did he promote -- did he offer
14 promo codes on?
15 A.  On MyPillow.com.
16 Q.  MyPillow.com has always had promo codes even
17 before 2020.  Would you agree with that?
18 A.  Yes.
19 Q.  So when did My Pillow ever offer a promo code
20 that said Smartmatic?
21 A.  There were no promo codes that said
22 Smartmatic.
23 Q.  What was the cost for him creating the video
24 Absolute Proof?  Do you know?
25 A.  No.



Page 49
1  Q. What was the cost for his Cyber Symposium?
2  Do you know that?
3  A. No.
4  Q. What was the cost for his FrankSpeech
5  platform?
6  A. I don't know.
7  Q. You never included the costs for those things
8  in your advertising cost, did you?
9  A. No. I did not -- I have not received any of
10 those costs.
11 Q. It's fair to say that you don't know the
12 intricate details of how the company My Pillow
13 advertises its products, do you?
14 A. Again, my assignment was to determine the
15 cost avoided by leveraging off the defamation campaign,
16 so I don't have the detailed costs as it relates to
17 running his business.
18 Q. Okay. I would like to switch briefly to your
19 rebuttal report.
20 A. Okay. Should I keep my main report open?
21 Q. I don't think you need to.
22 A. Okay.
23 Q. Isn't the -- when you go ahead and value My
24 Pillow's benefit isn't that a business valuation you're
25 conducting?

Page 50
1  A. No.
2  Q. What about a partial business valuation?
3  A. No.
4  Q. How do you define business valuation?
5  A. I define -- you know, it's valuing the entire
6  business as it relates to revenues and profits.
7  Q. And talking about the benefit to My Pillow on
8  this campaign would be a valuation, would it not?
9  A. We would look at the marketing spend, you
10 know, so again, my assignment was looking at the costs
11 of -- marketing cost avoided by using the defamation
12 campaign.
13 Q. Can you turn to page 8 of your rebuttal
14 report, paragraph 19?
15 A. Paragraph 19?
16 Q. Correct.
17 A. Yes.
18 Q. You are disputing what Mr. Growsky claims
19 here, are you not?
20 A. Let me read 19 real quick. Yes.
21 Q. Mr. Growsky has a CPA, a juris doctor, and an
22 accounting degree. Do you know that?
23 A. Yes. Are we talking about Growsky? We --
24 has he stepped out of this role as an expert?
25 Q. His opinions are still there. They were

Page 51
1  formed by somebody with those credentials.
2  A. Whose opinions are these now?
3  Q. Dr. Growsky. Sorry. Mr. Growsky. I'm
4  sorry.
5  A. Mr. Growsky's opinions. Okay. And your
6  question again?
7  Q. You know that he has his CPA license, do you
8  not?
9  A. I do.
10 Q. He's got a juris doctor?
11 A. He does.
12 Q. Are you aware of that? An accounting degree?
13 A. Yes.
14 Q. A certified valuation expert?
15 A. Okay.
16 Q. You're not qualified to tell somebody with
17 those credentials what information they should or
18 should not include in their reports, are you?
19    MS. LEVINE-PATTON: Object to form.
20 A. I do that all the time.
21 Q. And what's your basis for determining that
22 somebody with those credentials has failed to properly
23 conduct the analysis?
24 A. Well, my basis is based on experience, so I
25 am qualified based on my experience, but he says a lot

Page 52
1  of stuff but doesn't show any of his analysis. He
2  talks about, you know, sales increased because of new
3  products that were introduced in 2020 but provides no
4  evidence.
5  Q. Well, let's take a look at figure one on that
6  page 8. Do you see that?
7  A. Yes.
8  Q. Look at the percentage of the cost of goods
9  sold as a percentage of total sales.
10 A. Yes.
11 Q. It goes from 39 percent to 49 percent in 2020
12 to 2021. You see that?
13 A. Yes, yes.
14 Q. It's a 10 percent increase?
15 A. Correct.
16 Q. Advertising did not stay flat, the
17 advertising cost rather?
18 A. That's true.
19 Q. This supports Mr. Lindell's and My Pillow's
20 statements that they had to generate more revenue
21 because the cost of goods sold cost them more money,
22 isn't that fair to say?
23 A. No. What I'm saying here is Mr. Growsky says
24 that the revenues went up in '21 because of these new
25 products but without any evidence, but if you dig into



Page 53
1  those details these new products only were about 2 to 3
2  percent of total sales.
3      Q.  Okay.  Well, we'll start here with the new
4  products.  As a percent of total sales the cost -- this
5  is your chart, right?
6      A.  Yes.
7      Q.  It goes up 10 percent.  That means it's 10
8  percent more expensive to sell those goods, isn't that
9  right?
10     A.  Well, if you look at the total sales in 2020
11 it's 355 million, and then the total sales in '21 are
12 531 million.
13     Q.  I'm just talking about this one little sliver
14 with his new products.
15     A.  Okay.
16     Q.  The costs of goods sold increased -- the
17 numbers are right there.  The cost of goods sold
18 increased from 2020 to 2021 by 10 percent, right?
19     A.  Yes.  I mean -- yes, yes.
20     Q.  I understand that you believe they're minimal
21 compared to My Pillow's total cost of goods sold, but
22 as we established, you don't have any idea of what his
23 margins were in 2020 versus 2021, correct?
24     A.  Well, you're missing a point.  What I'm
25 rebutting here with Mr. Growsky is he said that sales

Page 54
1  have gone up in '21 because of new products without
2  providing any evidence, okay?
3      Q.  He didn't say just new products.  Didn't he
4  also say shipping costs, manufacturing costs, and
5  inflation?  Didn't he add those in?
6      A.  Well, in this portion of his report he's
7  talking about these new products, yeah, combined with
8  other things.  So what figure one is doing is just
9  looking at, well, what percent of new sales are in '21?
10 And as I said, it's only, you know, 2 to 3 percent.
11     Q.  Right.
12     A.  And the main point is, you know, Mr. Growsky
13 is stating that because of what Mr. Lindell said about
14 the election that sales have gone down and -- without
15 any evidence.
16     Q.  Well, any evidence that you've seen?
17     A.  I have not seen any evidence, but he didn't
18 provide any.  He's the expert here, so I would expect
19 an expert of any caliber to provide evidence, you know,
20 to support opinions.  Everything we're talking about
21 has nothing to do with what Mr. Lindell said.
22     Q.  Okay.  Let's go back to the section of your
23 report where you talk about why Mr. Lindell was
24 canceled.  Give me one moment and I'll direct you
25 there.

Page 55
1      A.  On the rebuttal report or the main report?
2      Q.  I think it was the main report.
3      A.  Okay.  Let me know.
4      Q.  Actually, look at your rebuttal report and
5  let me just clarify that this is what --
6          (Reporter clarification.)
7      Q.  No worries.  Let's look at schedule three,
8  page 73 of the rebuttal report.
9      A.  Okay.  I am here.
10     Q.  Are these -- is this your evidence of why
11 Mr. Lindell's contracts or why he was canceled?
12     A.  So Mr. Growsky provided no evidence that what
13 Mr. Lindell said caused retailers to cancel, okay?  So
14 I've been up against experts in the past that have
15 opinions that are not based on any evidence, so that's
16 where we're at today.  So because he provided no
17 evidence that retailers canceled because of what
18 Mr. Lindell said I did my own investigation and I found
19 these six retailers canceled with My Pillow for other
20 reasons other than what Mr. Lindell said.
21     Q.  You just picked articles off of the web that
22 said these things, isn't that correct?
23     A.  I wouldn't say I just picked them.  I did the
24 research.  I looked to see why Walmart stores canceled.
25 Again, since I received no evidence, no facts

Page 56
1  supporting Mr. Growsky's opinion, yes, I went online.
2  I did this research, and this is what I found out.
3      Q.  Why didn't you call Walmart and ask them
4  directly?
5      A.  Obviously that's not appropriate in a case
6  like this.
7      Q.  Why not?
8      A.  Walmart isn't going to just start talking to
9  me about this.  This is litigation.  I mean, even if I
10 was valuing something outside of the context of
11 litigation somebody at Walmart isn't going to disclose
12 that information.
13     Q.  You could have asked the attorneys to get
14 that information, couldn't you?
15     A.  I found it right here, you know, just as
16 Mr. Growsky didn't call.  He has no evidence.  He has
17 no internet research.  He didn't make any telephone
18 calls.  He didn't ask counsel to get information for
19 him.  So I took it a step further and I provide this
20 evidence.
21     Q.  You understand it's not his burden to produce
22 evidence in this case?
23         MS. LEVINE-PATTON:  Objection.  Requests or
24 requires a legal opinion.
25     A.  I mean, replace burden with another word and



Page 57
1  maybe I can answer.
2  Q. Smartmatic is the entity that's going forward
3  against him, are they not?
4  A. Yes, but as an expert witness if you're going
5  to have an opinion that because of what Mr. Lindell
6  said about the elections the retailers canceled, you
7  need to support that with some facts. And that is an
8  expert's responsibility to base their opinions on
9  facts.
10  Q. Well, don't you find it kind of odd that all
11  these retailers are canceling him in the beginning of
12  January 2021 when he makes his statements about the
13  voting machines?
14  A. These retailers canceled for other reasons
15  other than what Mr. Lindell said, and if you look at
16  the schedule at the end of my report you have retailers
17  that canceled way before what Mr. Lindell has said.
18  Q. How many canceled way before?
19  A. I'm scrolling to page 72, schedule 2B as in
20  boy like I referred to earlier. You have Ollie's that
21  actually started brand new with My Pillow in 2022. You
22  have Albertsons that stopped in 2020. You have Rural
23  King that started in 2022. Telebrands stopped in 2018,
24  and Telebrands was 10 percent of their total sales.
25  So --

Page 58
1  Q. And why do you suppose they stopped in 2018
2  and 2020?
3  A. I don't have the details as to why they
4  stopped.
5  Q. And you didn't feel that that was important
6  to learn possibly why they stopped back then?
7  A. Again, I'm a rebuttal expert. Mr. Growsky
8  didn't thoroughly analyze and back up his opinions.
9  Listen. I pulled my internet research. I found
10  reasons why retailers dropped My Pillow, and it has
11  nothing to do with what Mr. Lindell said.
12  Q. So if I go into my Google and I type in My
13  Pillow canceled by retailers the first one that comes
14  up is Walmart pulls My Pillow products from stores.
15  A. I mean, again, I could give you a lesson. I
16  asked you earlier if you cleared your cache. Obviously
17  you have not.
18  Q. Oh, I have.
19  A. It's not you have. You have to do it the
20  second --
21  Q. Every time. That's right.
22  A. You didn't do it right now.
23  Q. How do you know?
24  A. Because you were just typing this in, weren't
25  you?

Page 59
1  Q. How many browsers do I have on my computer?
2  A. I don't know, but listen. There's a process
3  you have to go through so you don't have biased search
4  results. If you don't clear your cache, if you don't
5  log out of your accounts, log out of Google, you're
6  going to have biased search results that are based on
7  your previous searches.
8  Q. Right. So if I used a browser that was fresh
9  and had everything cleared you would expect me not to
10  get the same results, is that fair to say?
11  A. It's quite possible. But the quotes that I'm
12  telling you here are -- have nothing to do with
13  Lindell's election comments.
14  Q. Well, I'm reading these quotes and in all of
15  these articles, like The Hill for instance, it says
16  that Walmart said it pulled My Pillow products from its
17  stores as Mr. Lindell continues to falsely claim the
18  election was stolen.
19  MS. LEVINE-PATTON: I'm sorry. I'm going to
20  object. If you're reading from a document it should be
21  introduced into evidence so that we can all see it and
22  read the document together.
23  MR. KACHOUROFF: Yeah. I'll go ahead and do
24  that. I was hoping I wouldn't have to but I'll do it.
25  I'm going to drop this article in the chat. Do you see

Page 60
1  that?
2  THE WITNESS: One second, please.
3  MS. LEVINE-PATTON: Is this Exhibit 713?
4  MR. KACHOUROFF: Yes, ma'am.
5  MS. LEVINE-PATTON: Thank you.
6  (Whereupon, Exhibit 713, The Hill Article,
7  was marked for identification.)
8  A. Okay. I have it open.
9  Q. And look down below where it's -- let's go
10  down as you read it. Why don't you take a moment and
11  go ahead and read it?
12  A. Now, I have to admit that -- now, is this
13  Growsky that I'm rebutting or is this Bowes that I'm
14  rebutting or is this, you know, Christopher I'm
15  rebutting? I mean, I've never had an attorney on the
16  fly do this kind of analysis.
17  (Reporter clarification.)
18  A. Yeah. I'm just quite surprised that, you
19  know, your own expert didn't take the time to provide
20  facts to, you know, form their opinions, and now we're
21  doing this on the fly, but I'm fine. Let me read this.
22  These are Lindell's opinions. These are not factual.
23  Q. Lindell says -- it says in the article here,
24  you guys are canceling us just like other box stores,
25  Lindell said he had told a Walmart executive. Shame on



Page 61
1  you, Walmart.  You're disgusting.
2       Do you think he was lying when he said that?
3    A.  You guys are canceling us just like other box
4  stores, Lindell said he told the Walmart executive.
5  Shame on you, Walmart.  You're disgusting.
6       If you need factual evidence to support an
7  opinion that Mr. Lindell was canceled at retail because
8  of his statements you need to rely on a statement from
9  Walmart.
10    Q.  Where is your statement from Walmart?
11    A.  I provide evidence that it's not the case.
12  That's not my opinion that Lindell was canceled by
13  these retailers because of what he said about the
14  election.  That's Growsky's opinion.  That's Bowes's
15  opinion, and it appears to be your opinion.  It's not
16  mine.
17    Q.  I just want to know what you consider to
18  be --
19       (Reporter clarification.)
20    Q.  I just want to know what you consider to be
21  evidence, and it appears that Business Insider is a
22  piece of evidence for you.  You'll accept that as
23  evidence?
24       MS. LEVINE-PATTON:  I'm sorry.  I'm going to
25  object.  This is argumentative.  Is there a question?

Page 62
1  And I also think we should take a break soon.  So you
2  can answer this question and then we're going to take a
3  break.
4       MR. KACHOUROFF:  If you'll permit me, I'm
5  basically done.  I just want to get an answer to the
6  question.
7       THE WITNESS:  What is your question?
8       MR. KACHOUROFF:  Madam Reporter, would you
9  please read it back?
10       (Pending question read.)
11       MS. LEVINE-PATTON:  I'm going to object to
12  form.
13       MR. KACHOUROFF:  I'll rephase it.
14    Q.  You keep saying you want evidence, correct?
15    A.  I keep saying that Growsky provided no
16  evidence, and I did provide evidence.
17    Q.  Your evidence are newspaper articles
18  essentially?
19    A.  Okay.  Yes.
20    Q.  And you selected those newspaper articles
21  online?
22    A.  I -- yes.  I did my investigation and this is
23  what came up.
24    Q.  You excluded Mr. Lindell's statements about
25  why he was canceled?

Page 63
1    A.  Well, I cannot rely on what the defendant
2  says.  You have to find out something, you know, other
3  than him.  That's why -- you know, that's why an expert
4  relies on other pieces of media like I did.  So you're
5  bringing up the Business Insider.  If you go back to my
6  schedule three on page 73, Bed Bath & Beyond, according
7  to Business Insider Bed Bath & Beyond said it's getting
8  rid of the pillow brand because it's not selling well.
9    Q.  You're quoting an article, a newspaper
10  article essentially about why something was canceled
11  and you consider that to be evidence?
12    A.  Well, you just brought up a Business Insider
13  article and then you were telling me that I don't trust
14  Business Insider.
15    Q.  No, no.  I'm sorry.  You're mistaken.  You're
16  the one who brought up Business Insider.  It's right
17  here in your schedule --
18    A.  Yes.
19    Q.  -- both times.  You're the one who relies on
20  Business Insider for evidence.
21       MS. LEVINE-PATTON:  I'm sorry.  Is there a
22  question?  Again I'm going to object to argumentative.
23       MR. KACHOUROFF:  Yes.
24       MS. LEVINE-PATTON:  And I will cut this off
25  with one more question and answer to take a break.

Page 64
1       MR. KACHOUROFF:  Okay.
2    Q.  You rely on Business Insider, do you not, as
3  evidence?
4    A.  Because Mr. Growsky provided no evidence I
5  did an internet search, and yes, I relied on Business
6  Insider here.  I want independent evidence, and that's
7  what these articles are providing.
8       MR. KACHOUROFF:  We can take a break and
9  I'll -- I may be done.
10       THE VIDEOGRAPHER:  Off the record at 11:34
11  a.m. Pacific Time.
12       (Whereupon, a recess was taken.)
13       THE VIDEOGRAPHER:  On the record at 11:40
14  a.m. Pacific Time.
15  BY MR. KACHOUROFF:
16    Q.  Okay.  I'm going to upload one more document
17  to the chat, and we'll call this -- I forget the
18  exhibit.  Are we up to 713?
19       MS. LEVINE-PATTON:  714.
20       MR. KACHOUROFF:  714.  Okay.
21       (Whereupon, Exhibit 714, NBC News Article,
22  was marked for identification.)
23       MR. KACHOUROFF:  I just want you to take a
24  moment -- this is another article off of NBC News.
25       (Reporter clarification.)



Page 65
1  THE WITNESS: One second, please. I was just
2  going to look at this. Okay. I read it.
3  Q. Is it fair to say that the timing of the
4  cancellation coincides with his campaign against the
5  machines?
6  A. I'm going to have to say that this again --
7  this is the retailers telling us why they canceled, and
8  the reason has nothing to do with what Lindell is
9  saying.
10  Q. Help me out. Retailers are in business to do
11  what?
12  A. Sell.
13  Q. And make money, correct?
14  A. Correct.
15  Q. And they don't want contentions or
16  contentious atmospheres around their products, is that
17  fair to say?
18  A. I -- that is possible.
19  Q. You don't expect retailers to take political
20  sides?
21  A. Well, listen. I have not -- I don't know
22  what retail -- I know retailers want to sell products.
23  I know they want to make money.
24  Q. They don't want to alienate Republicans or
25  Democrats, is that fair to say?

Page 66
1  A. I don't know.
2  Q. You can't even take a reasonable guess as to
3  whether they want to alienate Democrats or Republicans?
4  A. I don't want to guess, but I know there are
5  some companies that lean one way more than the other,
6  so I think it's quite possible that there could be a
7  company out there that doesn't want Democrats to buy
8  anything and another company that doesn't want
9  Republicans to buy anything. But I don't have any
10  opinions on that.
11  Q. It's fair to say that a retailer that is
12  looking at the global economic picture and not taking
13  political sides would not necessarily want to alienate
14  Democrats or Republicans when it cancels a product?
15  MS. LEVINE-PATTON: Object to form.
16  Speculation.
17  A. Listen. All I'm looking for and what I was
18  looking for from Growsky was some facts that supported
19  his opinion that retailers dropped him because of what
20  he's saying about politics, and he didn't provide any.
21  So I brought up some articles that clearly stated what
22  each retailer said, and now you're bringing up an
23  article here that supports my opinion that these
24  retailers are clearly stating they're not dropping My
25  Pillow products because of what Mr. Lindell said.

Page 67
1  Q. That's what is stated to the public because
2  they don't want to alienate Republicans, isn't that
3  fair to say?
4  A. I'm not reading any minds here. I'm reading
5  what this article is saying.
6  Q. Correct. I understand that. But it's
7  possible that the retailer is not telling you -- not
8  giving you the actual answer. They're looking for an
9  excuse to cancel, isn't that true?
10  A. I'm looking at -- a Bed Bath & Beyond
11  spokesperson said, we stopped selling, you know -- it
12  was in the company's economic interest. It says
13  nothing about what Lindell is saying.
14  Q. Sure. But if I'm a company that -- where I
15  feel that Democrat dollars and Republican dollars are
16  worth the exact same amount and I don't want to
17  alienate either side I'm going to look for a neutral
18  excuse, isn't that fair to say?
19  MS. LEVINE-PATTON: Objection. Speculation.
20  Object to form.
21  A. Yeah. I'm not basing my opinions on
22  speculation. I'll base my opinions on this article
23  that you just brought up where it clearly says why the
24  retailers are dropping.
25  Q. You're speculating that that's the real

Page 68
1  answer?
2  MS. LEVINE-PATTON: Objection.
3  Argumentative. Asked and answered. Can we move on,
4  Chris?
5  Q. Yeah. You can answer the question.
6  A. I am taking this article like I took my
7  articles in my report on schedule three, page 73 as
8  evidence that retailers are dropping My Pillow for
9  other reasons than what Lindell is saying about the
10  election.
11  Q. Your last topic we'll talk about is the
12  relief from pay-per-click. When did you create that?
13  A. I first used that -- I don't know the exact
14  date. 10 years ago.
15  Q. And have you ever used it in a lawsuit?
16  A. Yes.
17  Q. Which lawsuits?
18  A. That I cannot tell you because of protective
19  orders.
20  Q. Have you ever testified in front of a jury
21  using the request for pay-per-click analysis?
22  A. No.
23  Q. But you can't tell me -- you don't know the
24  cases that you used it in?
25  A. I could look them up but I'm under a

Page 69

1  protective order.  I cannot share that with you.
2     Q.  Not even the case name?
3     A.  No.
4     Q.  Was it a state case or a federal case?
5     A.  I don't know.
6     Q.  How many cases?
7     A.  I don't recall.
8     Q.  Who has reviewed this methodology of the
9  relief from pay-per-click?
10    A.  This is in a peer-reviewed book as a book
11 chapter published by Business Valuation Resources.  The
12 title is Guide to Economic Damages.  So it is
13 peer-reviewed and published in a book chapter and used
14 in many valuation assignments as well as litigation
15 assignments.
16    Q.  Who is the, quote, peer for this method?
17    A.  Business Valuation Resources has a peer
18 review team.  I don't know the individuals' names.
19    Q.  Who is Business Valuation Resources?
20    A.  BVR.  It is an organization that supports the
21 business of valuation and calculating economic damages.
22    Q.  Did you have to pay to get your method peer
23 reviewed?
24    A.  No.
25    Q.  Did you submit an article to them to have it

Page 70

1  peer reviewed?
2     A.  I believe if my memory serves me that I was
3  invited to speak at one of their conferences, and based
4  on that presentation I was asked to write a book
5  chapter.
6     Q.  And so that -- your chapter is -- what's the
7  name of the chapter you wrote, if you don't mind me
8  asking?
9     A.  I would have to look at my CV.  It should be
10 on there.
11    Q.  Okay.  I'll look for it.  Well, that's all I
12 have.  I appreciate the time, Mr. Bania.  I know it's a
13 little contentious at times but it's my nature.
14    A.  Not a problem.  Thank you.
15       MR. KACHOUROFF:  Thank you, Maura, as well,
16 and thank you, Kaylee.
17       COURT REPORTER:  All right.  No problem.  We
18 can go off the record.
19       THE VIDEOGRAPHER:  Counsel, before I conclude
20 the video deposition I do need to ask if anyone needs a
21 copy of the video.
22       MR. KACHOUROFF:  Yes, please.
23       MS. LEVINE-PATTON:  Yes.  I believe we have a
24 standing order.
25       THE VIDEOGRAPHER:  Thank you, ma'am.

Page 71

1  Mr. Walsh, sir?
2        MR. WALSH:  Maura can speak for me.  Thank
3  you.
4        MS. LEVINE-PATTON:  Yeah.
5        THE VIDEOGRAPHER:  This concludes today's
6  deposition of Doug Bania.  We're off the video record
7  at 11:50 a.m. Pacific Time on August 9, 2024.
8        (Off the record at 11:50 a.m.)

Page 72

1           Declaration Under Penalty of Perjury
2
3        I, DOUG BANIA, declare under penalty of
4  perjury under the laws of the State of California that
5  the foregoing is true and correct; that I have read my
6  deposition and have made the necessary corrections,
7  additions, or changes to my answers that I deem
8  necessary.
9        Executed on this _____day of
10 _____, 2024.
11
12
13
                                  _____
14
                                       DOUG BANIA



```
                                                        Page 73
 1              : : :  CERTIFICATE OF REPORTER  : : :
 2
 3           I, Kaylee G. Wood, a Certified Shorthand
     Reporter, holding a valid and current license issued by
 4   the State of California, No. 14348, duly authorized to
     administer oaths, do hereby certify:
 5           That the witness in the foregoing deposition
     was administered an oath to testify to the whole truth
 6   in the within-entitled cause;
             That said deposition was taking down by me in
 7   shorthand at the time and place therein stated and
     thereafter transcribed into typewriting, by computer,
 8   under my direction and supervision.
 9           ( X )  Reading and signing was requested.
10           (   )  Reading and signing was waived.
11           (   )  Reading and signing was not requested.
12           Should the signature of the witness not be
     affixed to the deposition, the witness shall not have
13   availed himself/herself of the opportunity to sign or
     the signature has been waived.
14           I further certify that I am neither counsel
     for nor related to any party in the foregoing
15   depositions and caption named nor in any way interested
     in the outcome thereof.
16
17
18   Dated:   This 12th day of August, 2024
19            at San Diego, California.
20
21                    _____
                           Kayleeahn
22
23                    KAYLEE G. WOOD
24                    CSR NO. 14348
25
```

```
                                                        Page 74
 1                    CORRECTION CERTIFICATE
 2   To add testimony, indicate "Add" and print the exact
     words you wish to add. To delete testimony, indicate
 3   "Delete" and print the exact words you wish to delete.
 4
 5   Deposition of:    DOUG BANIA
     Proceedings Date: August 9, 2024
 6
 7   I, DOUG BANIA,
     have the following changes to my proceedings
 8   transcript:
 9   PAGE    LINE    CHANGE TESTIMONY TO READ AS FOLLOWS:
10   ____    ____    _____
11   ____    ____    _____
12   ____    ____    _____
13   ____    ____    _____
14   ____    ____    _____
15   ____    ____    _____
16   ____    ____    _____
17   ____    ____    _____
18   ____    ____    _____
19   ____    ____    _____
20   ____    ____    _____
21   ____    ____    _____
22   ____    ____    _____
23
24   _____ Date_____
25   DOUG BANIA
```

