# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., and SGO CORPORATION LIMITED, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-0098-JMB-JFD |
| MICHAEL J. LINDELL and MY PILLOW, INC., | |
| Defendants. | |

## SMARTMATIC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

I. The First Amendment does not bar Smartmatic's claims. ............................ 2

    A. The First Amendment does not immunize Defendants. ............................. 2

    B. Smartmatic's claims are not precluded by the "state action" doctrine nor does application of the doctrine even make sense. ...................................................................................................... 4

    C. Smartmatic's MDTPA claim is not barred by the First Amendment. ......................................................................................... 5

II. Defendants' arguments on Smartmatic's defamation claim relate to disputed issues of fact, not grounds for summary judgment. ................... 6

    A. Disputed issues of fact exist regarding actual malice. ................. 6

        1. Defendants had no credible support for their accusations. ...................................................................... 8

        2. Defendants were aware of numerous sources contradicting their accusations. ............................... 10

            a) Smartmatic's lawsuit against Fox News put Defendants on notice of the truth. ........................... 11

            b) Smartmatic's website put Defendants on notice of the truth. .............................................................. 14

            c) Dominion's letters put Defendants on notice of the truth. .................................................................... 15

            d) Dominion's lawsuit against Powell put Defendants on notice of the truth. ........................... 16

            e) Dominion's lawsuit against Defendants put Defendants on notice of the truth. ........................... 17

            f) Investigations by federal agencies and officials put Defendants on notice of the truth. ..................... 18

**TABLE OF CONTENTS (continued)**

**Page(s)**

g)    Audits conducted by state governments and
officials put Defendants on notice of the truth. ...................... 20

3.    Defendants had obvious reasons to doubt the veracity
of the conspiracy theories they embraced. ........................ 22

4.    Defendants acted for an improper purpose. .................................... 26

5.    Defendants refused to retract the defamatory
statements. ........................................................................... 28

6.    Lindell's (wild) proclamation of innocence, at most,
raises a disputed issue of fact. ............................................ 29

B.    Defendants cannot obtain summary judgment on damages. ....................... 32

1.    Reputational harm to Smartmatic is presumed because
Defendants' accusations constitute defamation *per se*. ................. 32

2.    Smartmatic has presented evidence of reputational
harm. .................................................................................... 34

3.    Smartmatic has presented evidence of economic loss. .................. 37

4.    Defendants' remaining arguments on damages are red
herrings. ............................................................................... 38

C.    Defendants' remaining attacks lack legal and evidentiary
support. ............................................................................................. 39

III.    Defendants present no legal or factual basis to grant summary
judgment on Smartmatic's MDTPA claim. ............................................... 42

A.    Smartmatic has standing to pursue a MDTPA claim. ................................. 42

B.    Smartmatic's requested relief of a permanent injunction
would not be an unconstitutional prior restraint on speech. ...................... 44

CONCLUSION ............................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................6

*Becker v. Alloy Hardfacing & Eng'g Co.*,
401 N.W.2d 655 (Minn. 1987).................................................................33

*Burger v. McGilly Mem'l Chapels, Inc.*,
856 F.2d 1046 (8th Cir. 1988) .................................................................29

*Burt v. Advertiser Newspaper Co.*,
28 N.E. 1 (Mass. 1891)............................................................................38

*Celle v. Filipino Reporter Enterprises, Inc.*,
209 F.3d 163, 186 (2d Cir. 2000).............................................................26

*Curtis Publ'g Co. v. Butts*,
388 U.S. 130 (1967)....................................................................................2

*Duffy v. Leading Edge Prods., Inc.*,
44 F.3d 308 (5th Cir. 1995) ......................................................................26

*Ferrari v. Best Buy Co.*,
14-cv-2956 MJD/FLN, 2015 WL 2242128
(D. Minn. May 12, 2015)..........................................................................43

*Fine v. Bernstein*,
726 N.W.2d 137 (Minn. Ct. App. 2007)....................................................3

*Finlay v. MyLife.com Inc.*,
525 F.Supp.3d 969 (D. Minn. 2021).........................................................40

*Frisk v. News Co.*,
523 A.D. 347 (Pa. 1986) ..........................................................................38

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)..............................................................................3, 40

*Golden Bear Distrib. Sys. of Tex. v. Chase Revel Inc.*,
708 F.2d 944 (5th Cir. 1983) ....................................................................28

*Hagener v. Pulitzer Publishing Co.*,
158 S.W. 54 (Mo.App. 1912) ...................................................................38

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
    491 U.S. 657 (1989)................................................................................3, 6, 7, 22

*Herbert v. Lando,*
    441 U.S. 153 (1979)...........................................................................................3, 7

*Hunt v. Liberty,*
    720 F.2d 631 (11th Cir. 1983) ...............................................................................31

*Hunt v. University of Minn.,*
    465 N.W.2d 88 (Minn.Ct.App.1991)......................................................................41

*Hustler Magazine, Inc. v. Falwell,*
    485 U.S. 46 (1988).................................................................................................3

*Hutchinson v. Proxmire,*
    443 U.S. 111 (1979)...............................................................................................6

*Insulate SB, Inc. v. Advanced Finishing Sy., Inc.,*
    13-cv-2655, 2014 WL 943224 (D. Minn. Mar. 11, 2014)......................................43

*Jadwin v. Minneapolis Star & Trib. Co.,*
    367 N.W.2d 476 (Minn. 1985)...............................................................................34

*Janklow v. Newsweek, Inc.,*
    788 F.2d 1300 (8th Cir.1986) ................................................................................41

*Johnson v. Phillips,*
    664 F.3d 232 (8th Cir. 2011) ..................................................................................5

*Jones v. Scripps Media, Inc.,*
    No. 16-cv-12647, 2017 WL 1230481 (E.D. Mich. Apr. 4, 2017) ..........................26

*Larson v. Gannet Co., Inc.,*
    940 N.W.2d 120 (Minn. 2020)...............................................................................34

*Maethner v. Someplace Safe, Inc.,*
    929 N.W.2d 868 (Minn. 2019)...............................................................................34

*Mahnke v. Nw. Publ'ns, Inc.,*
    160 N.W.2d 1 (Minn. 1968).............................................................................22, 28

*Manhattan Comm. Access Corp. v. Halleck,*
    587 U.S. 802 (2019)...............................................................................................4

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*In re Medtronic, Inc. Shareholder Litigation*,
    900 N.W.2d 401 (Minn. 2017)............................................................................................39

*Mgmt. Registry, Inc. v. A.W. Co.*,
    2022 WL 4706702 (D. Minn. Sep. 30, 2022) .......................................................................32

*Minnesota Voters Alliance v. Ellison*,
    Case No 23-CV-2774(NEB/TNL), 2024 WL 4222829
    (D. Minn. Sep. 17, 2024) .....................................................................................................44

*Nat'l Recruiters, Inc. v. Cashman*,
    323 N.W.2d 736 (Minn. 1982)..............................................................................................33

*Nunes v. Lizza*,
    12 F.4th 890 (8th Cir. 2021) ................................................................................................28

*Ollila v. Astrue*,
    No. CIV 09-3394 JNE/AJB, 2011 WL 589037
    (D. Minn. Jan. 13, 2011) ......................................................................................................41

*Palmer v. New York News Publishing Co.*,
    31 A.D. 210 (N.Y. App. Div. 1898) .....................................................................................38

*Peoples Bank and Trust Co. of Mountain Home v. Globe*,
    978 F.2d 1065 (8th Cir. 1992) ..............................................................................................10

*Prinzing v. Schwab*,
    No. A05-398, 2006 WL 538926 (Minn. Ct. App. Mar. 7, 2006)...........................................30

*Rockwood Bank v. Gaia*,
    170 F.3d 833 (8th Cir. 1999) ................................................................................................10

*Rouse v. H.B. Fuller Co., et. al.*,
    694 F.Supp.3d 1149 (D. Minn. 2023)...................................................................................43

*S. Air Transp., Inc. v. Post-Newsweek Stations Fla., Inc.*,
    568 So.2d 927 (Fla. Dist. Ct. App. 1990) ............................................................................10

*Schattler v. Daily Herald Co.*,
    127 N.W. 42 (Mich. 1910).....................................................................................................38

*Sindi v. El-Moslimany*,
    896 F.3d 1 (1st Cir. 2018)......................................................................................................10

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*St. Amant v. Thompson,*
390 U.S. 727, 732 (U.S. 1968)......................................................................22, 29, 30

*Stern v. Cosby,*
645 F. Supp. 2d 258 (S.D.N.Y. 2009).......................................................................30

*Stokes v. CBS, Inc.,*
25 F. Supp. 2d 992 (D. Minn. 1998)......................................................22, 26, 35

*Sun Printing & Publishing Ass'n v. Schenck,*
98F. 925 (2d Cir. 1900)............................................................................................38

*Tholen v. Assist America, Inc.,*
528 F.Supp.3d 1017....................................................................................32, 34

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021)..................................................................................................40

*US Dominion, Inc. v. Powell,*
554 F. Supp. 3d 42 (D.D.C. 2021), *appeal dismissed sub nom.*
*US Dominion, Inc. v. MyPillow, Inc.*, No. 21-7103, 2022 WL 774080
(D.C. Cir. Jan. 20, 2022)...........................................................................................31

*US Dominion v. Byrne,*
600 F. Supp. 3d 24....................................................................................................31

*Ventura v. Kyle,*
8 F.Supp.3d 1115 (D. Minn. 2014)..........................................................................30

*Zarling v. Abbott Laboratories,*
2023 WL 2652575 (D. Minn. March 27, 2013)......................................................33

**Statutes**

Minnesota Deceptive Trade Practices Act..............................................................42

**Other Authorities**

4 Minn. Prac. Jury Inst. Guide, CIVJIG 50.50 ......................................................33, 34

Minnesota Rule of Civil Procedure 23.09................................................................39

Restatement Second of Torts (1977) §622A............................................................38

# INTRODUCTION[1]

> Smartmatic drew first blood. Smartmatic sued Fox News on February 4th, 2021, which changed my life forever. That's why I was very upset with Smartmatic there. Smartmatic, when they did that, I could never, ever go on Fox again to sell pillows, NewMax [sic] or anywhere. I was completely shut out of all places I advertised before . . . . After Smartmatic sued – they drew first blood in this big out lawfare, and that's where Smartmatic got tied in.

Michael J. Lindell (Ex.1 at 163:3–13.)[2]

Defendants did not begin their campaign against Smartmatic because they had uncovered evidence that its voting machines had rigged the election. No such evidence has ever existed because it did not happen. Instead, Defendants roped Smartmatic into their disinformation campaign because Lindell was angry that Smartmatic had sued Fox News. Defendants have spent the last *46 months* lying about Smartmatic for no valid reason. Their motion for summary judgment is frivolous; and, this case needs to be set for an immediate trial.

---

[1] Smartmatic USA Corp, Smartmatic International Holding B.V., and SGO Corporation Limited are collectively referred to as "Smartmatic." Michael Lindell and MyPillow, Inc. are collectively referred to as "Defendants."

[2] This Memorandum cites to exhibits referenced in Smartmatic's Memorandum of Law in Support of Its Motion for Partial Summary Judgement ("Pls.' Mem.") by the exhibit numbers assigned therein.

## ARGUMENT[3]

Defendants identify no undisputed facts that would entitle them to summary judgment and their discussion of legal principles is just wrong.

## I.    The First Amendment does not bar Smartmatic's claims.

Defendants' primary argument—that Smartmatic's claims are precluded by the First Amendment—has already been rejected by this Court. (ECF No. 20 at 28–30; ECF No. 26 at 6–8; ECF No. 52.) Defendants have repackaged arguments they submitted in their motion to dismiss into a summary judgment argument, claiming that because Smartmatic "operat[es] elections for government customers" it is a government agent pursuant to the state action doctrine and therefore precluded from recovery by the First Amendment. (Defendants' Memorandum of Law in Support of Summary Judgment ("Defs.' Mem.") at 12–17.) Defendants are wrong.

### A.    The First Amendment does not immunize Defendants.

The First Amendment embodies a balance between two sets of competing interests: "the interests of the community in free circulation of information and those of individuals in seeking recompense for harm done by the circulation of defamatory falsehood." *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 153 (1967). One set does not trump the other. An individual's right to protect his or her good name:

> reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of a private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that

---

[3] Internal citations omitted and emphasis added throughout.

2

> the right is entitled to any less recognition by this Court as a basic of
> our constitutional system[.]

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). As profound as our commitment is to freedom of speech, the Supreme Court has never wavered in "its conviction—reflected in the laws of defamation of all the States—that the individual's interest in his reputation is also a basic concern." *Herbert v. Lando*, 441 U.S. 153, 169 (1979).

A related, core First Amendment principle is the worthlessness of "calculated falsehoods." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 687 n.34 (1989). They are worthless because they debase our society. "[T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz*, 418 U.S. at 340. False statements of fact "interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988).

For these reasons, the First Amendment offers no immunity to those who disseminate false information in a public forum. *See Fine v. Bernstein*, 726 N.W.2d 137, 144 (Minn. Ct. App. 2007) ("Simply because Bernstein's assertions are political statements made during an election campaign does not shield him from a state's ability to punish an abuse of the liberty of speech.").

**B.      Smartmatic's claims are not precluded by the "state action" doctrine nor does application of the doctrine even make sense.**

Defendants contend the First Amendment precludes Smartmatic's claims because the government cannot bring a claim for defamation and Smartmatic is an "agent of the government." (Defs.' Mem. at 14.) That too is wrong.

The Supreme Court has held that a private entity may qualify as a "state actor" when it exercises "powers traditionally and exclusively reserved to the State." *Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019). However, "as the Court has long held, the fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor—unless the private entity is performing a traditional, exclusive public function." *Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 814–15 (2019). "Numerous private entities in America obtain . . . government contracts . . . [i]f those facts sufficed to transform a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors . . . ." *Id.*

Smartmatic was a government contractor providing equipment and services to a government entity. (Ex.130 ¶¶ 3-7.) It was not a state actor. Smartmatic did not "operate[] the traditional, exclusive public function" of operating the election in Los Angeles County. Los Angeles County—not Smartmatic—was in full control not only of the election equipment, but also of the operation of the vote centers, the security of the election, the transportation of ballots, the tabulation of ballots, and the auditing of the election results.

(*Id.* ¶ 7.) Smartmatic played no role whatsoever in tallying, tabulating, counting, or auditing the votes. (*Id*. ¶¶ 6-7.)

What's more, even if Smartmatic could be deemed a limited "state actor," that would not preclude Smartmatic's clams. The "state action" doctrine is used to hold a private company responsible for violations of constitutional rights under legislation such as 42 U.S.C. § 1983, when the company is acting in the traditional role of a government entity. S*ee, e.g. Johnson v. Phillips*, 664 F.3d 232, 239–40 (8th Cir. 2011) (purported state actor "exercises power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law"). The "state action" doctrine is used as a basis for potentially ***bringing*** a lawsuit against a private company, not ***precluding*** a lawsuit. Defendants cite no case in support of their effort to extend the "state action" doctrine to prevent a private company, such as Smartmatic, from bringing a lawsuit.

## C.    Smartmatic's MDTPA claim is not barred by the First Amendment.

Defendants argue that they are entitled to summary judgment on Smartmatic's MDTPA claim pursuant to the First Amendment for the same reasons they are entitled to summary judgment on the defamation claim. (Defs.' Mem. at 18.) But, this Court previously held: "the MDTPA expressly contemplates that a plaintiff may pursue claims under both the MDTPA and the common law." ECF No. 52 at 16. Because Smartmatic's common law defamation claim is not barred by the First Amendment, neither is its claim for violation of the MDTPA.

**II.    Defendants' arguments on Smartmatic's defamation claim relate to disputed issues of fact, not grounds for summary judgment.**

Defendants' arguments for summary judgment on Smartmatic's defamation claim are premised on inaccurate views of the law and a myopic view of the evidentiary record.

**A.    Disputed issues of fact exist regarding actual malice.**

The actual malice standard requires a showing that Defendants acted "with knowledge that [their statements] were false or with reckless disregard of whether [they] were false or not." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986). Reckless disregard means Defendants "made the false publication[s] with a high degree of awareness of . . . probable falsity . . . or must have entertained serious doubts as to the truth of [their] publication[s]." *Harte-Hanks*, 491 U.S. at 667. "The proof of actual malice calls a defendant's state of mind into question" and "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979).

As part of the actual malice inquiry, a defendant's "purposeful avoidance of the truth" is treated differently than a failure to investigate. *Harte-Hanks*, 491 U.S. at 692. The actual malice standard – *i.e.*, reckless disregard for the truth – can be satisfied by showing that the defendant's failure to investigate "was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the information published. *Id.* Evidence "of an intent to avoid the truth" can meet "the more demanding *New York Times* standard." *Id.* at 693.

Courts also recognize that "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant." *Herbert*, 441 U.S. at 170. That means plaintiffs must rely on "circumstantial evidence." *Harte-Hanks*, 491 U.S. at 668.

> The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of a rivalry, ill will, or hostility between the parties, [and] facts tending to show a reckless disregard for the plaintiff's rights . . .

*Herbert*, 441 U.S. at 164 n.12. Plaintiffs can use both "direct [and] indirect evidence relevant to the state of mind of the defendant" to establish actual malice. *Id.* at 165.

Smartmatic has accumulated an extensive record showing Defendants acted, at least, with reckless disregard for the truth. The evidentiary record shows:

- Defendants had no credible source to support their accusations about Smartmatic;

- Defendants were aware of numerous sources contradicting their accusations about Smartmatic;

- Defendants had obvious reasons to doubt the credibility of the conspiracy theorist they embraced;

- Defendants pursued their disinformation campaign against Smartmatic for improper purposes; and,

- Defendants refused to retract their defamatory statements about Smartmatic even after being repeatedly informed they were false.

This is not a case where the plaintiff is stretching to find evidence that Defendants acted with, at least, reckless disregard for the truth. Here, the defamation began ***after*** the

accusations had been widely and publicly debunked by Smartmatic, other voting machine companies, federal agencies and officials, and state election officials.

### 1.  Defendants had no credible support for their accusations.

Defendants published their accusations about Smartmatic without any *credible* source (person or document) in support of the accusations.

*Category One.* Defendants stated and implied that Smartmatic and its machines rigged the 2020 election by switching votes. (Pls. Mem. at 7-20, 31-36.) The accusation is implausible given that Smartmatic only provided machines for Los Angeles County. (*Id.* at 31–36.) This fact was widely publicized before the disinformation began. (*Infra* at II.A.2.) Given the limited role of Smartmatic in the election, it is not surprising that the Defendants do not identify in their opening brief any credible document or reliable person proving Smartmatic machines switched votes or were used outside of Los Angeles County. Defendants made the accusation without valid support.

*Category Two.* Defendants stated and implied that Smartmatic and its machines were compromised or hacked by enemies of the United States to rig the 2020 election. (Pls. Mem. at 7-20, 36-37.) Again, the accusation is implausible given that Smartmatic only provided machines for Los Angeles County. (*Id.* at 36–37.) And, again, it is not surprising that Defendants do not identify in their opening brief any credible document or reliable person with evidence that Smartmatic machines were compromised or hacked during the 2020 election. Defendants made the accusation without valid support.

*Category Three.* Defendants stated and implied that Smartmatic and its machines were connected to the internet to allow for manipulation of the 2020 election. (Pls. Mem.

at 7-20, 36-37.) This is yet another implausible accusation given that Smartmatic's machines were ballot marking devices that were not connected to the internet and did not count or tally votes. (*Id.* at 36–37.) And, once again, it is not surprising that Defendants do not identify in their opening brief any credible document or reliable person proving Smartmatic machines were connected to the internet during the 2020 election. This is another accusation that Defendants made knowing they had no firsthand (or even secondhand) support.

*Category Four.* Defendants stated and implied that Smartmatic designed machines and software to rig elections and had rigged elections outside the United States. (Pls. Mem. at 7-20, 37-39.) This too was inherently improbable given the extensive pre-election inspections conducted on Smartmatic machines and post-election audits. (*Id.* at 37–39.) This was also widely publicized. (*Infra* at II.A.2.) Therefore, it is again not surprising that Defendants in their opening brief do not identify any credible document or reliable person showing Smartmatic designed its machines in that manner. It is yet another accusation the Defendants made about Smartmatic without any source.

Moreover, Lindell admitted that he was repeatedly told that there was no evidence to support his accusations about voting machines, including Smartmatic. He testified:

> There are people who have been constantly saying to me, there's no evidence, in court, there's no evidence, there's no evidence. Mike, did you see this guy said there's no evidence.

Ex.1 at 396:3–6. This is consistent with Lindell's contemporaneous communications where he was repeatedly told that there was no support for his accusations. (Ex.1 at 396:3–6; Ex.244; Ex.245; Ex.246 at DEF034862.000131; Ex.247; Ex. 1 at 408:8–409:4, 412:3–18,

413:10–414:17;  Ex. 79 at 45:7–45:6, 47:4–51:22; Ex.248; Ex.249; Ex.250 at DEF029266.000001; Ex.251 at DEF035985185 at DEF034985.000185; Ex.252; Ex. 267 at DEF082635.000002.)

Defendants lack of credible support – before or during the defamation – for the accusations made about Smartmatic show they acted with a reckless disregard for the truth. *See Sindi v. El-Moslimany*, 896 F.3d 1, 16 (1st Cir. 2018) (actual malice where defendant had "no confirmed facts" to support her claims); *Rockwood Bank v. Gaia*, 170 F.3d 833, 841 (8th Cir. 1999) (actual malice where there was no evidence to support defamatory accusations); *S. Air Transp., Inc. v. Post-Newsweek Stations Fla., Inc.*, 568 So.2d 927, 928–29 (Fla. Dist. Ct. App. 1990) (actual malice could be found where "defendants admit they have no evidence that the [plaintiffs] were involved in [the misconduct]").

### 2. Defendants were aware of numerous sources contradicting their accusations.

This is the quintessential case of purposeful avoidance of the truth. Before February 5, 2021, Defendants were provided with dozens of documents (spanning thousands of pages) debunking the accusations they subsequently made and repeated about Smartmatic. The truth was well-known to Lindell *before* he began defaming Smartmatic; and, for the most part, Lindell refused to consider the wide range of sources contradicting his preconceived narrative about the 2020 election. (*See, e.g.* Ex. 1 at 401:8-404:18, 427:12-428:9.) This pattern of behavior, blatantly disregarding credible sources, is further evidence of a reckless disregard for the truth. *See Peoples Bank and Trust Co. of Mountain Home v.*

10

*Globe*, 978 F.2d 1065, 1070 (8th Cir. 1992) (affirming jury verdict based on evidence that defendant purposefully avoided the truth).

> **a)    Smartmatic's lawsuit against Fox News put Defendants on notice of the truth.**

The Court need only consider Smartmatic's lawsuit against Fox News to conclude that a disputed issue of material fact exists regarding actual malice. Smartmatic filed its lawsuit against the Fox Defendants on February 4, 2021 (the "Fox Complaint"). (Ex.6.) Lindell was aware of the Fox Complaint because (A) the lawsuit is what led him to include Smartmatic in his disinformation campaign (Ex.1 at 163:3–13), (B) he sued Smartmatic because Smartmatic had filed the Fox Complaint (Ex.8), and (C) he knew about the lawsuit when publishing the defamatory "documentaries" (Ex. 1 at 152:20-155:6; 162:14-163:18; 252:22-253:14; 253:15-24). By itself, Lindell's familiarity with the Fox Complaint *before* and *during* the disinformation campaign shows a reckless disregard for the truth (purposeful avoidance) because it put Defendants on notice that everything they published about Smartmatic was false.

*First*, the Fox Complaint showed that Defendants' accusations about Smartmatic were false. The Fox Complaint explained that: (A) Smartmatic and its machines did not rig the 2020 election or switch votes (Ex.6 ¶¶169–73, 289–316; Ex.209); (B) Smartmatic and its machines were not hacked or compromised during the 2020 election (Ex.6 ¶¶186–89, 324–330; Ex.198–99; Ex.215); (C) Smartmatic and its machines were not connected to the internet during the 2020 election (*id.* ¶¶178–81, 186–89, 318–322); and (D) Smartmatic did not design its machines to rig elections and had never been used to rig an election (*id.*

¶¶211–16, 353–57). The detailed discussion in the Fox Complaint debunking each of these accusations put Defendants on notice that all their accusations – Categories One, Two, Three, and Four – were false.

*Second*, the Fox Complaint showed that Smartmatic only provided election technology to Los Angeles County. (*Id.* ¶¶ 79–80, 259–280; Ex. 182–89.) It also explained that several sources were available to confirm that Smartmatic's technology was only used in Los Angeles County, including (A) websites maintained by state governments and agencies; (B) websites maintained by voting companies; (C) Smartmatic's website; and (D) public websites listing the technology used in each state. (*Id.* ¶¶ 259–87; Exs.166, 191–97.) Defendants being on notice that Smartmatic was only used in Los Angeles County means they acted with reckless disregard in making their accusations about Smartmatic rigging the 2020 election (Categories One, Two, and Three) because Smartmatic could not have rigged a national election from Los Angeles County.

*Third*, the Fox Complaint showed that Smartmatic only provided ballot marking devices during the 2020 election. (*Id.* ¶289; Exs.131–32; Ex.211.) It further explained that ballot marking devices: (A) only allow a voter to print out a paper copy of their vote; (B) do not count or tabulate votes; (C) are not connected to the internet; and, (D) do not send votes anywhere. (Ex.6 ¶¶186–89, 318–22; Ex.210.) Defendants being on notice that the only technology that Smartmatic provided were ballot marking devices means they acted with reckless disregard when claiming the machines switched votes (Category One), was hacked or compromised (Category Two), was connected to the internet (Category Three), or were designed to rig elections (Category Four).

**Fourth**, the Fox Complaint explained the rigorous testing that Smartmatic's technology underwent before being used in the 2020 election. For example:

> There was also information publicly available before the disinformation campaign about the work of Los Angeles County to certify Smartmatic's voting system for use, including descriptions of the state testing and certification process that exceeds the guidelines recommended by the U.S. Elections Assistance Commission (EAC) (and California's standards are also considered the most rigorous in the country). That information showed that every system goes through functional testing, source code review, accessibility and volume testing, and red team security testing that involved experts trying to "break into" the voting system. Smartmatic's system for Los Angeles County passed.

(*Id.* ¶326; Exs.212–13, Ex. 216.) Defendants being on notice that Smartmatic's technology underwent extensive testing means they acted with reckless disregard when claiming it was used to manipulate the 2020 election (Categories One, Two, and Three) and was designed to manipulate elections (Category Four). Smartmatic could not have passed testing if it did any of these things.

**Fifth**, the Fox Complaint explained the extensive pre-election certification and post-election audits that Smartmatic technology has undergone around the world. (*Id.* ¶¶43–64, 353–57.) It also explained that (A) Smartmatic's technology was designed to ensure auditable elections by generating paper audit trails (*id.* ¶¶61–62, 401; Ex.217); (B) paper audit trails protect against elections from being manipulated (*id.* ¶¶84–87, 401); and, (C) every post-election audit of Smartmatic's technology confirmed no manipulation or vote switching (*id.* ¶¶61–64, 329, 353–57). Defendants being on notice of Smartmatic's design philosophy (paper audit trails) and historical track record (perfect record) means they acted

13

with reckless disregard when claiming it designed technology to rig elections and had

rigged elections (Category Four).

> **b)**    **Smartmatic's website put Defendants on notice of the truth.**

Through the Fox Complaint, Defendants knew of Smartmatic's publicly available

website where it debunked false accusations made about its technology (the "Smartmatic

Fact Check"). (Exs.133–34, 131, 135.) The Smartmatic Fact Check stated:

- Smartmatic's technology was only used in Los Angeles County during the 2020 election. (Exs.133–34, 131.)

- Smartmatic's technology was not used by any other voting company during the 2020 election. (*Id.*)

- Smartmatic only provided ballot marking devices for the 2020 election. (Ex.133.)

- Smartmatic's technology was developed to accurately process votes, keep them secure, and facilitate audits. (Ex. 131.)

- Smartmatic's technology had been validated by independent third parties. (*Id.*)

- Smartmatic's technology had handled more than 3.7 billion votes over the last 14 years without a single discrepancy. (Ex.135)

- Smartmatic's technology had never been compromised. (*Id.*)

The Smartmatic Fact Check also included hyperlinks to source material and further

information about Smartmatic. (Exs.133–34, 131, 135.)

The information available to Defendants through the Smartmatic Fact Check

contradicted all their accusations. Smartmatic's technology could not have been used to rig

or manipulate the 2020 election (Categories One, Two, and Three) when it was only used

in Los Angeles County and was limited to ballot marking devices. Likewise, Smartmatic

14

technology could not have been designed to rig elections and successfully used to rig elections (Category Four) when it had been independently verified, never compromised, and there had not been a "single discrepancy" in vote counts. Unsurprisingly, Lindell purposefully avoided visiting Smartmatic's website because he did want to learn these facts. (Ex. 1 at 322:14-16; 330:15-331:4.)

<strong>c)      Dominion's letters put Defendants on notice of the truth.</strong>

Defendants were put notice of the truth about the 2020 election and voting machines *even before* the Fox Complaint. By the end of 2020, Defendants had already started accusing Dominion Voting Systems, another voting company, of rigging the 2020 election with its machines. (Ex.7.) In response, Dominion sent Defendants a series of letters informing them of the truth about the 2020 election and voting machines (the "Dominion Letters"). Dominion sent these letters on December 23, 2020 (Ex. 136), January 8, 2021 (Ex.137), and February 4, 2021 (Ex.57.)  Lindell read the Dominion Letters *before* starting his campaign against Smartmatic. (Ex. 1 at 180:10-181:6; 331:22-335:9; 336:15-20; 340:15-342:15.)

The Dominion Letters not only included facts contradicting Defendants' subsequent accusations about voting machines (including Smartmatic) but also provided supporting records.  (*See, e.g.* Exs.218–226 (citations in Ex.57); Exs.227–28 (citations in Ex.137).) For example**,** the Dominion Letters told Lindell:

> Independent audits, hand recounts of paper ballots, bipartisan governmental officials, Trump's Department of Justice, local election officials, election security experts, and high-profile Trump loyalists have repeatedly, forcefully, and publicly disproven and rebutted the false claim that Dominion machines were hacked or that Dominion

15

flipped, weighed, or otherwise manipulated vote counts to steal the
2020 election.

(Ex.57 at DEF04728.00002; s*ee also* Ex.136 at DEF001069.00001; Ex.137 at
DEF000719.00003.)

By debunking Defendants' primary assertion that voting machines rigged the
election, the Dominion Letters, while focused on Dominion, put Defendants on notice that
their accusations about Smartmatic rigging the election (Categories One, Two, and Three)
were likewise false for two reasons. One, Defendants typically treated Smartmatic and
Dominion as one in the same. (*See, e.g.,* Defamatory Statements 1, 10, 17, 18, 19, 21, 23,
28.) Two, the evidence Dominion identified showing that voting machines had not been
used to rig the 2020 election applied equally to Smartmatic. If voting machines did not rig
the 2020 election, that means Smartmatic's machines did not rig the election.

### d)    Dominion's lawsuit against Powell put Defendants on notice of the truth.

Defendants were also put on notice of the truth by receiving a copy of Dominion's
lawsuit against Sidney Powell (the "Powell Complaint"). The Powell Complaint was filed
on January 8, 2021. (Ex.138.) Dominion provided Lindell with a copy of the Powell
Complaint, including exhibits, on January 8, 2021. (Ex.137 at DEF000719.000004; *see,
e.g.* Exs.228–39 (select Powell Complaint Exhibits).) The Powell Complaint informed
Lindell of facts and provided sources that contradicted his accusations about Smartmatic.[4]

---

[4] The Powell Complaint was included with one of the Dominion Letters that Lindell
acknowledged reading. (Ex. 1 at 331:22-335:9; 336:15-20.)

For example, the Powell Complaint explained how voting machines use paper ballots which makes vote manipulation easily detectable.

> The voter verified paper ballots are hard evidence that can easily be used to verify the accuracy of the Dominion machine counts. If Dominion or anyone else had rigged the election by manipulating the vote counts in the Dominion machines – whether by "weighting" votes, trashing votes, adding votes, or otherwise – the number of paper ballots that were verified and cast by voters would not match the machine count. In fact, independent 100% hand audits and recounts of paper ballots have repeatedly verified the accuracy of the vote counts from Dominion machines.

(*Id.*¶41.) This information put Defendants on notice that accusations about voting machines being used to manipulate votes (Categories One, Two, and Three) or designed to rig elections (Category Four) were inherently implausible based on the use of "verified paper ballots." This was true for Dominion and Smartmatic machines.

### e)    Dominion's lawsuit against Defendants put Defendants on notice of the truth.

Defendants were also on notice of the truth based on the lawsuit filed by Dominion against them (the "Dominion Complaint"). (Ex. 1 at 252:22-253:14.) Dominion filed its lawsuit on February 21, 2021. (Ex.139; *see also* Exs.240–43 (select exhibits to the Dominion Complaint).)

The Dominion Complaint repeated much of the information Defendants had already received when Dominion provided them the Powell Complaint, including (A) the federal investigations that had debunked claims about vote manipulation (Ex.139 ¶¶ 2, 33, 40, 71, 74, 114; *see also* Ex.204–08); (B) state audits confirmed the integrity of the vote count and absence of manipulation (*id*. ¶¶45, 71, 167), and (C) the implausibility of voting machines

rigging elections without detection due to verified paper ballots (*id.* ¶¶1, 3, 45, 51, 71, 78, 129, 167). In short, the Dominion Complaint explained to the Defendants, with citations to a voluminous record, that their core messages – voting machines rigged the 2020 election (Categories One, Two, Three) and were designed to rig elections (Category Four) – were simply not true.

**f)    Investigations by federal agencies and officials put Defendants on notice of the truth.**

Defendants were also on notice about the measures taken by federal agencies – before and after the election – to confirm that there was no widespread manipulation of the votes by Smartmatic or any voting machine system. Defendants were put on notice of statements by federal agencies and officials from the Fox Complaint (Ex.6 ¶¶285–86, 291–98, 301–302; Exs.140–48), the Dominion Complaint (Ex.139 ¶¶2, 33, 40, 71, 74, 114), the Powell Complaint (Ex.138 ¶¶51, 61, 97, 77, 100, 108, 110, 115), and were widely publicized by the same federal officials and agencies.

Through these sources, Defendants were notified of the extensive security protocols implemented around voting technology before the 2020 election. For example, Defendants were informed that:

- On November 5, 2019, a joint statement was issued by national security agencies confirming the security of the election infrastructure and process in place for the 2020 U.S. election and that any threats to the election would be vigilantly monitored. (Ex.142.)

- On September 24, 2020, Christopher Wray, Director of the FBI, stated during a hearing before the U.S. Senate Committee on Homeland Security and Government Affairs that "we have not seen, historically, any kind of coordinated national voter fraud effort in a major election, whether it's by mail or otherwise." (Ex.143.)

18

- On October 30, 2020, the NASS and NASED issued a joint statement to "express their confidence in [the] nation's elections systems, processes, safety and security." (Ex.145.)

Defendants being made aware of these statements put them on notice that it was inherently improbable that Smartmatic technology could switch votes (Category One), be hacked or compromised (Category Two), be connected to the internet for manipulation (Category Three), or be designed to rig elections (Category Four). Smartmatic technology would have been flagged and not allowed to be used if it had any of these characteristics.

These sources also put Defendants on notice that federal agencies had conducted extensive investigations *after the 2020 election* and confirmed no election interference or vote manipulation. For example, Defendants were informed:

- On November 12, 2020, the U.S. Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees issued a definitive statement that "[t]he November 3rd election was the most secure in American history." It further stated, "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." (Ex.146.)

- On November 19, 2020, a spokeswoman for the National Association of Secretaries of State (NASS) stated: "[e]lections in the United States of America are administered, run, counted and certified by state and local election officials.  We have never heard of votes being tabulated in a foreign country." (Ex.199.)

- On November 29, 2020, a piece was published in which Chris Krebs, Former Director of the CISA, stated that election day "was quiet. And there was no indication or evidence that there was any evidence of hacking or compromise of election systems on, before, or after November 3." (Ex.147.)[5]

---

[5] Lindell admitted that he was familiar with this statement *before* he started his campaign (Ex.1 at 301:20–302:23) but disregarded it (*id.* at 303:22-304:15; 396:24-397:17).

- On December 1, 2020, Attorney General William Barr stated that "To date, [DOJ investigators] have not seen fraud on a scale that could have effected a different outcome in the election." (Ex.148.)[6]

Defendants thus knew (or recklessly disregarded) that Smartmatic machines could not have rigged the election (Category One), could not have been hacked or compromised (Category Two), could not have been connected to the internet for manipulation (Category Three), and could not have been designed to rig elections (Category Four). Any such actions would have been detected by the post-election investigations.

> g) **Audits conducted by state governments and officials put Defendants on notice of the truth.**

Finally, Defendants were on notice before and during their defamation that states, including the contested states, had conducted post-election audits that debunked the idea of vote manipulation. This was highlighted in the Fox Complaint (Ex.6 ¶¶ 83, 146, 189, 303–14; Exs.150–57), the Dominion Letters (Ex.137 at DEF000719.000003–04), the Dominion Complaint (Ex.139 ¶¶45, 71, 167), and the Powell Complaint (Ex.138 ¶¶3, 41–51, 110, 113, 183). The post-election state audits were discussed in each of these sources, hyperlinks were provided to statements about the post-election audits, and hard copies of statements were included as exhibits. (*Id.*)

Defendants being on notice of the post-election audits meant they were on notice that *all* theories of vote manipulation (including their own) had been refuted.[7] For example:

---

[6] Lindell admitted that he was familiar with this statement *before* he started his campaign (Ex.1 at 310:3–311:11) but disregard it (*id*. 309:25-311:23).

[7] Lindell was familiar with but disregarded public releases made by the various secretaries of state. (Ex. 1 at 401:8-404:18.)

- Arizona: "We have some of the strongest election laws in the country, laws that prioritize accountability and clearly lay out procedures for conducting, canvassing, and even contesting the results of an election." (Ex.70.) "ALL 15 counties in Arizona—counties run by both parties—certified their results." (*Id.*)

- Georgia: "The audit confirmed the original result of the election, namely that Joe Biden won the Presidential Contest in the State of Georgia." (Ex.150.) "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results." (Ex.151.)

- Michigan: "There is no evidence of widespread election misconduct . . . Additionally, state and local officials have conducted more than 100 post-election audits, all of which have demonstrated the integrity of Michigan's election." (Ex.154; *see also* Ex.203.)

- Nevada: "All voting machines undergo extensive pre-election and post-election examination to ensure they function as expected. The NV Gaming Control Board tests and certifies our systems. The post-election audits and recounts conducted in Nevada confirmed that the machines accurately tabulated the votes cast." (Ex.6 ¶83; *see also* Exs.182, 200)

- Pennsylvania: "To say there was voter fraud is a lie. To say the election was unconstitutional is a lie. To say our voting systems weren't secure is a lie." (Ex.6 ¶83; Ex.160.) "All Pennsylvanians can have confidence in our election system and the accuracy of the vote. . . Allegations of fraud and unfounded rumors of illegal activity have been repeatedly debunked." (Ex.155.)

- Wisconsin: "At this time, no evidence has been provided that supports allegations of systematic or widespread election issues." (Ex.6 ¶83.) Voting machines "absolutely [did] not" flip votes from Trump to Biden. (Ex.161.)

The post-election audits and statements by state officials confirming integrity of the voting put Defendants on notice that voting machines did not rig the election by switching votes (Category One), voting machines were not compromised or hacked to switch votes (Category Two), voting machines were not connected to the internet to manipulate votes (Category Three), and voting machines were not designed to rig elections (Category Four).

### 3. Defendants had obvious reasons to doubt the veracity of the conspiracy theories they embraced.

While Defendants attempt to immunize themselves from liability by pointing to their so-called "sources" for information (Defs.' Mem.at 22–28), the credibility of their sources – or lack thereof to be precise – is evidence of a reckless disregard for the truth.

"[R]eliance on the reports of others does not automatically shield one from liability." *Stokes v. CBS, Inc.,* 25 F. Supp. 2d 992, 1004 (D. Minn. 1998). Defendants are not permitted to rely upon a source providing information that "far outpace[s] his evidentiary foundation." *Id.*; *see also Mahnke v. Nw. Publ'ns, Inc.*, 160 N.W.2d 1, 9 (Minn. 1968); *Harte-Hanks*, 491 U.S. at 681–82 (affirming jury award where the source used was contradicted by numerous other witnesses and defendant did not take steps to investigate the veracity of the source); *St. Amant v. Thompson,* 390 U.S. 727, 732 (U.S. 1968) (defendant cannot show good faith when statements are made in reliance on the reports of others and "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."). Here, there were obvious reasons to doubt the credibility of Defendants' so-called sources.

**Dennis Montgomery**. Defendants had obvious reasons to doubt the credibility of Dennis Montgomery before and during the campaign. One, at the time Dennis Montgomery was introduced to Lindell, many of Lindell's close associates and confidants warned him that Montgomery was not credible. (Exs.162–64; Ex.165 at DEF034985.000185.) Indeed, Defendants' expert in this litigation, Benjamin Cotton, testified that he considers

22

Montgomery to be "a fraud" and shared his concerns regarding Montgomery with Lindell. (Ex.167 at 23:1–24:16, 25:3–26:9.)

Two, Defendants were put on notice by Dominion that Montgomery was not credible. (Ex. 1 at 351:23-352:20; 360:24-361:3.) On February 4, Dominion sent Lindell a letter warning him against his plan to "amplify perjurers, con artists, non-experts, and other factually unreliable sources in support of [his] false and defamatory marketing campaign." (Ex.57 at DEF004728.000004). With respect to Montgomery, Dominion advised:

> Dennis Montgomery is a fraudster known for pulling off "one of the most elaborate and dangerous hoaxes in American history" after he tricked the federal government into paying millions of dollars for bogus terrorist-detection software."
>
> ***
>
> Authorities have descried his "fantastic-sounding computer technology" as nothing more than a hoax after an intelligence commission concluded Montogomery's "technology was a fabrication."

(*Id.* at DEF004728.000009–10.) Dominion provided Lindell with hyperlinks to the articles and source material confirming Montogomery's lack of credibility.[8]

Three, Defendants knew that the "evidence" Montgomery promised to deliver regarding proof of manipulation in the 2020 election never arrived. In the days leading up to the first Cyber Symposium, Lindell was to deliver the long-promised "proof" of election fraud based on data from Montgomery. (Ex.168 at 2–3.) But that evidence did not arrive. (Ex.169 at DEF035558.94–96; *see also* Ex.170 at 84:14–24.)

---

[8] Lindell testified that he did not care about Montgomery's background even though he was informed of his lack of credibility by multiple people. (Ex. 1 at 429:8-430:1.)

Four, Montgomery admits he never had any evidence implicating Smartmatic in rigging the 2020 election. *See* Ex.171 at 285:9–25 (understanding that Smartmatic was limited to Los Angeles County); 287:19–23 (32 terabytes of data may not have had any evidence of vote tampering on ballot marking devices); 287:24–288:7 (cannot recall if the data he allegedly harvested contained any evidence related to Smartmatic), 89:21–90:7 (does not know if Smartmatic devices were interfered with in the 2020 election), 143:2–5 (does not recall whether votes were changed on equipment manufactured by Smartmatic in the 2020 election). Defendants cannot credibly claim reliance on Montgomery for their accusations against Smartmatic when Montgomery admits he cannot support the accusations against Smartmatic.

**Douglas Frank.** Defendants had obvious reasons to doubt the credibility of Douglas Frank. One, Frank was unqualified. Frank has no credentials in computer science, election administration, or national security. (Ex.172 at 34:10‑35:2; 53:12–53:19; see also Ex.173.) Nothing in Frank's background qualifies him as a credible source about voting machines, voting security, or voting data. Nor did Defendants introduce any evidence in their opening brief showing that they vetted Frank and confirmed he was a credible source.

Two, Frank's theory on election fraud was inherently improbable. Frank claims to have miraculously discovered the algorithm by which "all Presidential elections" over the past 20 years had been manipulated by some unknown actors with an unknown and unlimited set of resources. (Ex. 172 at 52:7–9; 106:12–21; 110:8–11; 141:3–23.) The theory was, unsurprisingly, repeatedly and publicly debunked by actual experts. (*See, e.g.*,

Ex.174; Ex. 175; Ex.176.) Defendants did not introduce any evidence in their opening brief showing that Frank's theory had even theoretical merit.

Three, Defendants never vetted Frank. Lindell met Frank for the first time while filming *Scientific Proof* and *Absolute Interference* (Ex.1 at 239:4–10), and Frank did not tell Lindell what he was going to say prior to filming *Scientific Proof*.  (Ex.172 at 101:15–102:2; Ex.1 at 25:5–15 ("you've got to realize when we filmed that [] we didn't practice. That was all live. It was just like I'm hearing it the first time you did.") Defendants did not identify in their opening brief any actions taken by Lindell or others to evaluate the credibility of Frank's theory or documentation provided by Frank to support his theory.

Four, Frank acknowledges he is not a credible source about Smartmatic. During his deposition, Frank admitted to knowing nothing about Smartmatic other than it only operated in Los Angeles County. (Ex. 172 at 20:21–22:6 (did not know anything about Smartmatic until he watched Lindell's documentaries; understands that they only operated in Los Angeles County). He also admitted that he did not provide Lindell with any information about Smartmatic. (*Id*. at 26:13–15.) Accordingly, Defendants cannot claim reliance on Frank for their accusations about Smartmatic.

**Michael Flynn.**  Defendants had obvious reasons to doubt the credibility of Michael Flynn. One, Flynn did not have any background with voting security or voting systems. (Ex.177 at 31:1–22.) Two, Flynn had been convicted for lying to Congress by the time he appeared in Defendants' publications to spread conspiracy theories about Smartmatic and rigging the election. (Ex.178.) Three, Flynn had been banned from Twitter for promoting conspiracy theories in accordance with a policy on "coordinated harmful activity" before

becoming a so-called "source" for Defendants. (Ex.179.) Four, Defendants do not identify in their opening brief any evidence that they received from Flynn supporting anything he said about Smartmatic, specifically, or voting machines, generally.

Defendants attempt to claim reliance on Flynn is further hampered by Flynn's deposition testimony. Flynn repeatedly invoked his Fifth Amendment right against self-incrimination when questioned about whether he provided any "evidence" to Lindell to support his accusations about voting machines and Smartmatic. (Ex.177 at 58:4–60:1, 68:25–73:23.) Flynn's refusal to answer questions on the subject, combined with Defendants failure to identify any evidence provided by Flynn during the relevant period, means a jury could reasonably conclude that both Lindell and Flynn knew he had no support for any of the accusations he was making about Smartmatic because he provided none.

### 4. Defendants acted for an improper purpose.

Although Smartmatic is not required to prove improper motive to establish a defendant's actual malice, *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 315 n.10 (5th Cir. 1995), "a showing of ill will is nevertheless relevant and admissible as evidence in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity." *Stokes*, 25 F. Supp. 2d at 1003. That is why evidence of improper motive, though not dispositive, supports the finding of actual malice. *Celle v. Filipino Reporter Enterprises, Inc.,* 209 F.3d 163, 186 (2d Cir. 2000) (upholding jury verdict where plaintiff presented evidence of actual malice that included "evidence indicating ill will and personal animosity" at the time of publication); *Jones v. Scripps Media, Inc.*, No. 16-cv-

26

12647, 2017 WL 1230481, at *12 (E.D. Mich. Apr. 4, 2017) (find that allegations of animus and motive to harm plaintiff supported inference of actual malice).

Here, Smartmatic has accumulated evidence showing Defendants acted with a variety of improper purposes. First, Lindell admitted he brought Smartmatic into his campaign because he was angry with Smartmatic for bringing a lawsuit against Fox News. (Ex.1 at 163:3–13.) Smartmatic, according to Lindell, "drew first blood in this big out lawfare, and that's where Smartmatic got tied in" *Id.* Lindell directed his accusations towards Smartmatic for having the audacity to sue the Fox Defendants.

Second, Defendants used the campaign to help promote and advertise for MyPillow. (Pls.' Mem. at 42–45.) Defendants' contemporaneous records show that they believed his campaign was good for business and helped to drive sales. (Ex.60 at 150:2–151:15; Ex.61.) Moreover, MyPillow was able to save millions of dollars in advertising costs by using the campaign as an alternative marketing tool. (Ex.180 at 41:10–19.) Defendants' motive, therefore, was to make money by selling lies about Smartmatic.

Third, Lindell used the campaign to increase his personal, professional, and even political profile. For example, right before the 2020 election, Lindell considered a future run for governor of Minnesota. (Ex. 1 at 14:23-15:13; 63:18-64:13; 66:18-67:21; Ex. 149 at 70.) After the election, in March 2021, Lindell and Steve Bannon discussed over text Defendants' publicity in connection with Frank Speech and building Lindell's political apparatus. (Ex. 1 at 70:11-80:12; 81:22-85:4; Ex. 202 at 28, 36.)

27

### 5.    Defendants refused to retract the defamatory statements.

A defendant's refusal to correct or retract defamatory statements after being alerted to their falsity is evidence of actual malice; the rationale being that the subsequent refusal shows an original intent to publish the statement regardless of its truth or falsity. *See Mahnke*, 160 N.W.2d at 11 ("the failure to retract the defamatory statements underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration"); *see also Nunes v. Lizza*, 12 F.4th 890, 900–01 (8th Cir. 2021) (plaintiff sufficiently alleged actual malice where defendant republished falsehoods after learning they were false); *Golden Bear Distrib. Sys. of Tex. v. Chase Revel Inc.*, 708 F.2d 944, 950 (5th Cir. 1983) (jury finding of actual malice supported by evidence that defendant refused to retract its false statements after being informed of their falsity).

Here, Defendants' subsequent actions confirm their reckless disregard for the truth when making the original accusations against Smartmatic. For example, in January 2022, Smartmatic filed the present defamation lawsuit against Defendants for publications from February 2021 to August 2021. (ECF No. 1.) Defendants have never retracted nor corrected any of their prior statements but, instead, have published additional defamatory statements (Exs. 52, 181) and Lindell has confirmed that he will not stop publishing false accusations about Smartmatic (Ex.1 at 340:5–9). This persistence in the face of the truth—revealed to

them once again in the Complaint—indicates they were acting with a reckless disregard for the truth on Day 1 of their disinformation campaign.[9]

### 6.    Lindell's (wild) proclamation of innocence, at most, raises a disputed issue of fact.

Defendants' primary argument is that "Lindell believed and still believes his statements to be true." (Defs.' Mem. at 19.) But, a "defendant in a defamation action . . . cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 732. "Professions of good faith will be unlikely to prove persuasive" where, *e.g.*: (1) the story is fabricated by defendant or the product of his imagination; (2) is "so inherently improbable that only a reckless man would have put [it] in circulation;" or (3) when made in reliance on the reports of others and "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.*

Thus, when a defendant professes to have believed what they said was true, one of the tasks left to the jury is to "determine whether the publication was indeed made in good faith." *Id.*; *see also Burger v. McGilly Mem'l Chapels, Inc.*, 856 F.2d 1046, 1052–53 (8th Cir. 1988) (fact issue existed as to defendant's actual malice where he "simply assert[s]

---

[9] The January 2022 Complaint was not, of course, the only time Lindell was on notice that his accusations were without merit. By way of a further example, beyond those discussed above, Lindell filed a lawsuit against Smartmatic on December 1, 2021 for allegedly engaging in "lawfare" by suing the Fox Defendants. (Ex.8.)  On December 8, 2021, Smartmatic moved to dismiss his claims as legally and factually frivolous.  (Ex.241.)  On May 22, 2022, the court granted the motion to dismiss and awarded sanctions.  (Ex.8(a).) Lindell was aware of this decision but continued with his defamatory "documentaries" nonetheless. (Ex. 1 at 181:13-182:14.)

that he believed that what he said was true"); *Ventura v. Kyle*, 8 F.Supp.3d 1115, 1122 (D. Minn. 2014) (finding the jury should resolve a claim of actual malice where it is possible defendant fabricated his story about plaintiff); *Prinzing v. Schwab*, No. A05-398, 2006 WL 538926, at *4 (Minn. Ct. App. Mar. 7, 2006) (a fact-finder may assess whether a statement was fabricated, a product of defendant's imagination, or it was "so inherently improbable only a reckless person would publish it.")

Here, the jury must decide whether Defendants made their statements about Smartmatic in good faith or with reckless disregard given, as discussed above, they (A) had no support from a credible source for the accusations about Smartmatic, (B) were on notice of the truth about Smartmatic, voting machines, and the integrity of the 2020 election from multiple sources *before* they began their campaign, (C) had obvious reasons to doubt the conspiracy theorists in their camp, and (D) were acting out of anger and avarice when they decided to begin attacking Smartmatic following the Fox Complaint. Regardless of whether any one of these facts, standing alone, would be sufficient to rebut Lindell's self-professed belief, they undoubtedly do so in combination and demonstrate a reckless disregard for the truth.

Moreover, the jury could easily decide that Defendants acted with actual malice because the accusations about Smartmatic were "so inherently improbable that only a reckless man would have put [it] in circulation." *St. Amant*, 390 U.S. at 732; *see also Stern v. Cosby*, 645 F. Supp. 2d 258, 279, 281 (S.D.N.Y. 2009) (reasonable jury could find it was "inherently improbable" that Anna Nicole Smith's attorney and the father of her child had a romantic relationship, filmed their sexual activity, and Anna Nicole Smith watched the

films in front of her nannies); *Hunt v. Liberty*, 720 F.2d 631, 645–46 (11th Cir. 1983) ("We firmly believe that even if [Defendant] thought the CIA might engage in such conduct, a jury could constitutionally view the story as inherently improbable.")

The 2020 election has been one of the most publicly investigated, studied, and analyzed in history—and no credible evidence of outcome determinative manipulation has been found. (Ex.54¶¶12–13; Ex.201.) For that reason, several courts have already held that a jury could find that accusations about voting machines manipulating the election were inherently improbable. *See, e.g., US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021), *appeal dismissed sub nom. US Dominion, Inc. v. MyPillow, Inc.*, No. 21-7103, 2022 WL 774080 (D.C. Cir. Jan. 20, 2022) ("a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it."); *US Dominion v. Byrne*, 600 F. Supp. 3d 24, 34 (internal quotation omitted) (finding Patrick Byrne's statements that that Dominions systems were developed in Venezuela to "strategically and aggressively [] rig" the election was inherently improbable under a reasonable juror standard).

And, here, the implausibility of Smartmatic machines being used to rig a national election is even more self-evident. The undisputed evidence demonstrates that (A) Smartmatic's election technology were used only in Los Angeles County during the 2020 U.S. election (Ex.130 ¶4) and (B) Smartmatic's election technology created an auditable paper trail (Ex.54 ¶¶4–5). These undisputed facts make it inherently improbable that Smartmatic played a role in manipulating the national election.

Indeed, the "evidence" Defendants identify for their accusations only serve to confirm they have no evidence. (Def.'s Mem. at 26–28.) The three documents are public reports on potential vulnerabilities in electronic voting systems. (Defs.' Mem. at 27.) None of these public reports present any evidence that *potential* vulnerabilities in electronic voting systems were *actually* exploited in the 2020 U.S. election or *could* be exploited without detection. More importantly, none of the reports have anything to do with Smartmatic rigging the 2020 election (Categories One, Two, and Three) or being designed to rig elections (Category Four).

### B.    Defendants cannot obtain summary judgment on damages.

Defendants' argument that Smartmatic failed to provide "sufficient evidence of actual harm" (Def. Mem. at 31) is legally and factually wrong.

### 1.    Reputational harm to Smartmatic is presumed because Defendants' accusations constitute defamation *per se.*

In its opening brief, Smartmatic established that Defendants' statements about Smartmatic were defamatory *per se* because they accused Smartmatic of committing a crime and its machines being used to rig and steal elections. (Pls' Mem. at 39–40.) Defamation *per se* is "actionable without proof of actual damages . . . because statements that are defamatory *per se* are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove." *Mgmt. Registry, Inc. v. A.W. Co.*, 2022 WL 4706702, at *13 (D. Minn. Sep. 30, 2022) (quoting *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. 2019)); *see also Tholen v. Assist America, Inc.*, 528 F.Supp.3d 1017, 1024 ("[i]n cases of defamation *per se* . . . harm to reputation may be

presumed"); *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987) ("We reaffirm the rule that here a defendant's statements are defamatory *per se*, general damages are presumed."); *Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982) (revising trial court that required proof of actual damages rather than determining the language was defamatory *per se*).

Minnesota's Pattern Jury Instructions confirm that Smartmatic is entitled to presumed damages because Defendants' statements are defamatory *per se* and Smartmatic will introduce evidence that Defendants acted with actual malice. *See* 4 Minn. Prac. Jury Inst. Guide, CIVJIG 50.50. The jury will be instructed that damages are presumed, and it must only decide the amount to award for "harm to [Smartmatic's] reputation and standing in the community," because Smartmatic's "defamation claim[] [is] based on speech that is a matter of public concern [and Smartmatic will] meet the constitutional standard in *New York Times Co. v. Sullivan*." *Id.* While presumed damages may not be available where the plaintiff does not prove actual malice, they are available when the plaintiff satisfies that heightened burden of proof.

Accordingly, Defendants' argument that Smartmatic allegedly has insufficient evidence of "actual harm" is irrelevant. Reputational harm is presumed from statements that are defamatory *per se* when a plaintiff proves actual malice, so summary judgment is not proper. *See Zarling v. Abbott Laboratories*, 2023 WL 2652575, at *14 (D. Minn. March 27, 2013) (denying summary judgment where alleged defamatory statements constituted

defamation *per se*, such that plaintiff "may proceed to trial without consideration at this procedural stage of whether he has presented proof of damages").[10]

### 2.    Smartmatic has presented evidence of reputational harm.

Defendants do not dispute that the Defamatory Publications harmed Smartmatic's reputation, they simply question the relevance of Smartmatic's reputation. *See* Def.'s Mem. at 33 ("If Smartmatic cannot even compete in the marketplace, how is the claim of damaged reputation even relevant?"). But, the entire point of defamation law is to protect plaintiffs' reputation. *See, e.g., Jadwin v. Minneapolis Star & Trib. Co.*, 367 N.W.2d 476, 491 (Minn. 1985) ("personal reputation has been cherished as important and highly worthy of protection"). "The common law, developed over hundreds of years, has long recognized a remedy for damage to reputation from defamation." *Larson v. Gannet Co., Inc.*, 940 N.W.2d 120, 150 (Minn. 2020) (Anderson, J. concurring in part). Thus, even when

---

[10] In *dicta*, Judge Wright cited to *Maethner* for the principle that Smartmatic must prove both actual malice *and* actual harm to reputation because the Defamatory Publications are a matter of public concern. ECF No. 52 at 5. However, *Maethner* only required that a plaintiff show actual malice to receive presumed damages. 929 N.W.2d at 878–89 ("Consistent with these principles, we hold that a private plaintiff may not recover presumed damages for defamatory statements involving a matter of public concern *unless the plaintiff can establish actual malice*." (emphasis added)). *Maethner* does not stand for the proposition that presumed damages are no longer available to plaintiffs who prove actual malice. *See, e.g., Tholen v. Assist America, Inc*., 528 F.Supp.3d 1017, 1030 n.15 (D. Minn. 2021) (holding that because plaintiffs had raised an issue of fact as to actual malice, "the Court need not address whether the [plaintiffs] are public figures, or the matter is one of public concern" to "defeat summary judgment on a theory of presumed damages."); 4 Minn. Prac., Jury Intr. Guides – Civil CIVJIG 50.40 (6th ed.) ("under Minnesota law, public figures are generally entitled to presumed damages based on a showing of actual malice.").

damages are not presumed, the only evidence a plaintiff must submit is proof of *reputational* harm. *See Stokes*, 25 F.Supp.2d at 1001–02 (denying summary judgment where plaintiff identified evidence of reputational harm but no economic losses).

Here, Smartmatic has significant evidence that the Defamatory Publications caused reputational harm. ***First,*** Smartmatic retained Professor Jonah Berger to (1) analyze the size and nature of the audience reached by the Defamatory Publications; (2) analyze the impact of Defendants' statements on public sentiment towards voting machine manufacturers and voting machines; and (3) evaluate the likely effect of changed public sentiment on Smartmatic. (Ex.253 ¶¶1–9; *id.* Ex.A ¶¶12–14.) Professor Berger concluded that Defendants' statements (1) included several key features which would be harmful to Smartmatic, (2) had a wide reach, including dissemination across a wide variety of platforms, and (3) very likely contributed to negative associations with voting machines, in general, and Smartmatic, in particular. (*Id.* ¶¶5–9.; *see also id.* Ex.A ¶¶15–16)

***Second***, Smartmatic retained Professor Kevin Keller to identify the characteristics of the Smartmatic brand and to analyze how the Defamatory Publications would affect it. (Ex. 254 ¶9) Professor Keller concluded that the Defamatory Publications had messages geared at undermining Smartmatic's brand values and public opinions towards voting machines. (*Id.* ¶¶19–27; *id.* Ex.A ¶¶16–25.) He further concluded that the Defendants' statements would be expected to and did harm Smartmatic's brand and business. (*Id.*)

***Third,*** Smartmatic retained Tammy Patrick, a former election administrator and member of the Presidential Commission on Election Administration. Ms. Patrick was retained to evaluate how the Defamatory Publications would impact Smartmatic's

reputation and credibility with election officials. (Ex.255 ¶¶1, 3.) She concluded that the Defendants' statements were the type that would undermine Smartmatic's credibility and reputation with election officials because they called into question the security and functionality of Smartmatic's machines. (*Id.* ¶7; *id.* Ex.A at 90–98.)

**Fourth,** Smartmatic's executives have testified (and will testify) about how the messages conveyed by the Defamatory Publications adversely impact Smartmatic's reputation. For example, Smartmatic's CEO, Antonio Mugica, testified:

> Well, I mean, Lindell has cultivated a very big audience in the United States, and that has spilled over to some other countries around the world, and it is, I think, pretty clear from his following and his multiple kind of media appearances and his own media that he has and promotes and from his, you know kind of combination of My Pillow, you know infomercials and his personal like—you know, his whole speech, you know, has a very, very large and significant audience, especially, of course, in Republican side, in the case of the United States, and I think all of his people believe what he say or a very significant amount of his people believe what he says and that includes government officials, and that includes people that work in elections, and many of these things, by the way, are in the public domain and extensively reported.

(Ex.257 at 160:24-162:1.) He further testified that: "Mike Lindell has been front and center up to yesterday, actually, was the last time, broadcasting in every way he can and to everyone he can reach that we were used to rig the 2020 election or other our company's products were used to rig the 2020 election." (*Id.* at 162:2-21.)

**Fifth,** Smartmatic has produced contemporaneous documents showing how the public reacted to the messages conveyed in the Defamatory Publications. For example, Smartmatic received the following email:

> You and your company, SmartASSmatic are SO crooked! You are a horrible, corrupt, lefty, liberal, lying company. You are so crooked and

> scared of the truth that you chose to sue Mike Lindell and MyPillow.
> It's laughable! He'll win and win BIG! You don't have a chance. ***Mike
> has all the facts and evidence of voter fraud*** in each state! And YOU .
> . . know it! You are an EVIL company.

(Ex.261 at SMARTMATIC-LINDELL04510063). This is just one example. The reaction
to people hearing Defendants publish accusations about Smartmatic rigging the election
was predictable – they did not like what Defendants were saying. It is not hard to imagine
why a company's reputation would be hurt by accusations of rigging an election.

### 3.    Smartmatic has presented evidence of economic loss.

Smartmatic has also introduced evidence quantifying Smartmatic's economic losses
due to the post-election disinformation campaigns. Smartmatic's damages expert, Dr. Chris
James, concluded that Smartmatic sustained economic damages of approximately $125.9
million between 2021 and 2025 in the United States as a result of the disinformation
campaigns. (Ex.264 at 10:25–11:3; *see also* Ex.265 at 93:116–118.) Defendants have not
challenged Dr. James' conclusions regarding economic loss; and, therefore, that is an issue
the jury will need to decide.

In response, Defendants take issue with whether Smartmatic could have grown its
market share without a federally certified voting machine. (Def. Mem. at 31–34.)
Defendants' argument misses the point. One, federal certification is not required in every
jurisdiction at the time of selection, nor for every product and service provided by
Smartmatic. The lack of certification does not bar Smartmatic from obtaining business.
(Ex.266 at 130:11–134:7.) Two, Smartmatic's certification was delayed due to the

disinformation campaigns. (*See e.g.*, Ex.256 at 332:9–13, 454:24–456:25; Ex.266 at 136:18–137:15.)

### 4.    Defendants' remaining arguments on damages are red herrings.

Defendants offer two final arguments on damages – neither of which are grounds for summary judgment.

*Apportionment*. Defendants argue that Smartmatic cannot recover damages because Smartmatic also sued the Fox Defendants and has not introduced evidence to parse who caused which damages. (Def. Mem. at 34.) There are three problems with that argument.

One, reputational damages are presumed because the Defamatory Publications qualify as defamatory *per se. Supra* at II.B.1. Smartmatic does not have the burden of proving causation for Defendants' defamatory statements.

Two, there can be more than one cause of an economic loss. *See* Restatement Second of Torts (1977) §622A cmt.b ("It is not necessary, however, that the defamation be the sole cause of special harm, so long as it has played a substantial part in bringing it about."). Both Defendants and the Fox Defendants may be liable for the same economic loss. *Id.*

Three, Defendants, not Smartmatic, have the burden to apportion damages between multiple defamers if they believe apportionment is appropriate. *See, e.g., Palmer v. New York News Publishing Co.*, 31 A.D. 210, 211–12 (N.Y. App. Div. 1898); *Sun Printing & Publishing Ass'n v. Schenck*, 98F. 925, 927 (2d Cir. 1900); *Burt v. Advertiser Newspaper Co.*, 28 N.E. 1, 5 (Mass. 1891); *Schattler v. Daily Herald Co.*, 127 N.W. 42, 47 (Mich. 1910); *Hagener v. Pulitzer Publishing Co.*, 158 S.W. 54, 60 (Mo.App. 1912); *Frisk v. News Co.*, 523 A.D. 347, 351–52 (Pa. 1986).

38

***Shareholders.*** Defendants argue that SGO Corporation ("SGO") and Smartmatic International B.V. ("Smartmatic International") are not allowed to recover damages. In support, Defendants cite *In re Medtronic, Inc. Shareholder Litigation*, 900 N.W.2d 401, 406 (Minn. 2017) for the proposition that "Minnesota law does not allow shareholders to assert any cause of action that belongs solely to the corporation." (Def. Mem. at 34.) There are two problems with that argument.

One, the line of cases cited by Defendants deals with whether a claim by an aggrieved shareholder against a corporation is direct or derivative for purposes of satisfying Minnesota Rule of Civil Procedure 23.09's demand requirements. *Id.* at 401. That is irrelevant here. The Defamatory Publications were "of and concerning" SGO and Smartmatic International as well as Smartmatic U.S.A. (Pls' Mem. at 28–30.) SGO and Smartmatic International have direct claims against the Defendants, not derivative claims.

Two, SGO and Smartmatic International are entitled to presumed damages because the Defendants made defamatory *per se* statements "of and concerning" each of them. That means SGO and Smartmatic International are entitled to recover reputational damages separate and apart from any reputational damages recoverable by Smartmatic USA.

### C.    Defendants' remaining attacks lack legal and evidentiary support.

In three conclusory paragraphs, Defendants offer three "kitchen sink" arguments for summary judgment. (Def. Mem. at 37–38.) The arguments are undeveloped, made without evidentiary support and analysis, and are inconsistent with Minnesota law.

***Standing.*** Defendants seem to confuse Article III standing requirements with the requirements of personal jurisdiction over a defendant in federal court. (Def. Mem. at 34–

35.) To satisfy Article III standing, a plaintiff must only have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Finlay v. MyLife.com Inc.*, 525 F.Supp.3d 969, 976 (D. Minn. 2021) (internal citations and quotations omitted).

Defendants appear to take issue with the first prong, that Smartmatic suffered an injury-in-fact, but "[u]nder longstanding American law, a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021); *Gertz*, 418 U.S. at 349. Defendants published defamatory statements about Smartmatic to third parties. (Pls.' Mem. at 26–27, 37). Those statements were defamatory *per se* so reputational harm is presumed. *Supra* at II.B.1. And Smartmatic has introduced evidence showing reputational harm and economic loss. *Supra* at II.B.2-3. Smartmatic has standing.[11]

**Truth.** Defendants make a one sentence argument that they are entitled to summary judgment because the Defamatory Publications were true, citing to a handful of exhibits— most of which pertain to Smartmatic's (purported) lack of damages. (Def. Mem. at 38.) Smartmatic has already provide the Court with a voluminous record showing that Defendants statements and implications were false based on undisputed evidence. (Pls.' Mem. at 30–39.) Defendants' one sentence argument and random exhibits do not create a disputed issue of material fact as to falsity.

---

[11] There is no requirement that a plaintiff be injured or domiciled in the forum state to have Article III standing. Defendants cite no case for such a requirement.

*Opinion.* Defendants argue that the Defamatory Publications constitute hyperbolic opinions such that they are non-actionable. (Def. Mem. at 37–38.) Minnesota courts rely on the framework developed in *Janklow v. Newsweek, Inc*., 788 F.2d 1300 (8th Cir.1986), to distinguish between protected expressions of idea and actionable assertions of fact. *See Hunt v. University of Minn*., 465 N.W.2d 88, 93–94 (Minn.Ct.App.1991). Under *Janklow*, courts evaluate whether a statement is actionable using four factors: (1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary context in which the statement is made; (4) the statement's public context. *Janklow*, 788 F.2d at 1302–03.

Defendants do not engage with this analysis in the slightest, meaning they have waived their "opinion" argument. Defendants cannot expect this Court to hunt through the record and develop an argument that they themselves did not take the time to present. *See Ollila v. Astrue*, No. CIV 09-3394 JNE/AJB, 2011 WL 589037, at *11 (D. Minn. Jan. 13, 2011) (collecting cases "for the proposition that if a party fails to frame and develop an issue, the argument is waived.") It is also unfair to require Smartmatic to respond to an undeveloped argument where Defendants' contentions on why its statements should be considered non-actionable are unknown.

Nonetheless, to the extent the Court entertains the argument, and it should not, the Defendants' statements about Smartmatic were not expressions of ideas. They were demonstrably false assertions of fact. One, each of the defamatory statements made by Defendants is capable of being proven false as Smartmatic demonstrated in its opening briefing when discussing the evidence proving falsity. (Pls.' Mem. at 30–39). Two, in each

41

of the Defamatory Publications, Defendants presented their accusations about Smartmatic as being based on "evidence" and "facts" and "proof." (*See* Defamatory Publications Nos. 1-18.) Three, at his deposition, Lindell took the position that his accusations about Smartmatic were not opinions, but rather facts. (Ex. 1 at 335:7–9, 344:4–8). And, four, Defendants published their accusations against Smartmatic in forums and settings that were taking the accusations seriously. They were not being presented as comedy.

## III. Defendants present no legal or factual basis to grant summary judgment on Smartmatic's MDTPA claim.

Defendants present two misguided arguments on Smartmatic's claim for violation of the Minnesota Deceptive Trade Practices Act.

### A. Smartmatic has standing to pursue a MDTPA claim.

Defendants argue that Smartmatic does not have standing to pursue its MDTPA claim because Smartmatic is not a resident of Minnesota and does not claim business loss in Minnesota. (Def. Mem. at 35–36.) Not so.

First, Defendants are wrong on the facts. Under Minnesota law, Defendants' defamatory statements are presumed to harm Smartmatic's reputation (*supra* at II.B.1); and, further, Smartmatic has introduced evidence showing that Defendants' defamatory statements injured Smartmatic's reputation (*supra* at II.B.2). The presumed and actual injury to Smartmatic's reputation is nationwide, which includes Minnesota. Smartmatic's reputation was not somehow immune to injury within Minnesota. Smartmatic, therefore, has suffered losses in the State.

Second, Defendants are wrong on the law. Defendants' reliance on *Rouse v. H.B. Fuller Company* for the proposition that a plaintiff must be domiciled or injured in the forum state to pursue a claim for a state statutory violation is inapposite. That case (as well as the authorities cited therein) dealt with the distinct issue of whether named plaintiffs in a putative class action could assert claims against a defendant under Minnesota statutes. *See Rouse v. H.B. Fuller Co., et. al.*, 694 F.Supp.3d 1149, 1154 (D. Minn. 2023); *Ferrari v. Best Buy Co.*, 14-cv-2956 MJD/FLN, 2015 WL 2242128 at *1 (D. Minn. May 12, 2015); *Insulate SB, Inc. v. Advanced Finishing Sy., Inc.*, 13-cv-2655 (ADM/SER), 2014 WL 943224 at *1 (D. Minn. Mar. 11, 2014). The concern in those cases—where classes of out of state plaintiffs who had no connection to Minnesota sought to take advantage of Minnesota law—are fundamentally different than those here, where individual plaintiffs, injured nationwide, seek to hold a Minnesota company liable for conduct that disparages Smartmatic's goods, services, and business.

Moreover, in each case, the role of the court was to analyze the contacts each claim had with Minnesota to determine if plaintiffs had standing under Minnesota statutory law. Applying that analysis here, the record shows that the disparaging statements at issue:

- harmed Smartmatic's reputation in Minnesota (*supra* at II.B.2);

- were disseminated from Minnesota (Ex.32 at 69:1–70:12; Ex. 129 (showing that the defamatory statements were distributed from MyPillow's warehouse); Ex.62 at 209:5–219:6; Exs.85, 87 (MyPillow employees posted the Defamatory Publications on social media); Ex.31 at 140:1–142:2; Exs.89–106 (MyPillow employees sent links to the Defamatory Publications to advertisers from Minnesota);

- were spread with the intent of assisting the business of MyPillow, a Minnesota company (Pls.' Mem. at 20–22); and,

- included explicit references to and promotion of MyPillow, a Minnesota company (*id.*).

That means there are sufficient contacts between Smartmatic's MDTPA claim and Minnesota to satisfy the test even if it were applied (which it should not be).

**B.    Smartmatic's requested relief of a permanent injunction would not be an unconstitutional prior restraint on speech.**

Defendants argue that a permanent injunction should be denied as a matter of law because it would be an unconstitutional prior restraint and Smartmatic has not demonstrated sufficient evidence of extraordinary circumstances to warrant such an action. (Defs.' Mem. at 28–31.) This argument is both premature and suffers from Defendants' distorted view of this case as related only to whether Defendants can espouse opinions on the integrity of the 2020 U.S. election generally, as opposed to the actual issue of Defendants' defamation of the private company, Smartmatic.

The fundamental problem with Defendants' argument is that Smartmatic is seeking only to enjoin Defendants from publishing statements that the trier of fact would have found to be defamatory (and thus unprotected) regarding Smartmatic. When judicial orders are "'narrowly tailored, based upon a continuing course of repetitive speech and granted only after a final adjudication on the merits that the speech is unprotected,'" they do "not constitute unlawful prior restraints." *Minnesota Voters Alliance v. Ellison*, Case No 23-CV-2774(NEB/TNL), 2024 WL 4222829, at *6 (D. Minn. Sep. 17, 2024) (quoting *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993)). Accordingly, to the extent there is an ultimate determination in this case that Defendants are liable for publishing

defamatory content regarding Smartmatic, an injunction prohibiting such speech would not amount to an unlawful prior restraint.

## **CONCLUSION**

For these reasons, Smartmatic requests that the Court deny Defendants' motion for summary judgment.

Dated: December 13, 2024                    Respectfully submitted,

                                            /s/ *J. Erik Connolly*

                                            Christopher K. Larus
                                                Minnesota Bar No. 0226828
                                                CLarus@robinskaplan.com
                                            William E. Manske
                                                Minnesota Bar No. 0392348
                                                WManske@robinskaplan.com
                                            Emily J. Tremblay
                                                Minnesota Bar No. 0395003
                                                ETremblay@robinskaplan.com
                                            **ROBINS KAPLAN LLP**
                                            800 LaSalle Avenue, Suite 2800
                                            Minneapolis, MN 55402
                                            Telephone: (612) 349-8500

                                            J. Erik Connolly (admitted *pro hac vice*)
                                                EConnolly@beneschlaw.com
                                            Illinois ARDC No. 6269558
                                            Nicole E. Wrigley (admitted *pro hac vice*)
                                                NWrigley@beneschlaw.com
                                            Illinois ARDC No. 6278749
                                            Timothy M. Frey (admitted *pro hac vice*)
                                                TFrey@beneschlaw.com
                                            Illinois ARDC No. 6303335
                                            Julie M. Loftus (admitted *pro hac vice*)
                                                JLoftus@beneschlaw.com
                                            Illinois ARDC No. 6332174

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4949

James R. Bedell (admitted *pro hac vice*)
    JBedell@beneschlaw.com
Ohio Bar No. 97921
**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: (216) 363-4500

*Attorneys for the Plaintiffs*

46