# Exhibit 167

## Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF MINNESOTA
3
4    SMARTMATIC USA CORP.,
5    SMARTMATIC INTERNATIONAL
6    HOLDING B.V. and SCO
7    CORPORATION LIMITED,
8
9             Plaintiffs,
10
11   vs.              Case No. 0:22-cv-00098-WMW-JFD
12
13   MICHAEL J. LINDELL and MY
14   PILLOW, INC.,
15
16            Defendants.
17
18
19        VIDEOTAPED DEPOSITION OF BENJAMIN COTTON
20             THURSDAY, AUGUST 8, 2024
21                  9:35 a.m. PST
22
23
24
25
```

## Page 2

```
1         BE IT REMEMBERED THAT, the videotaped deposition of
2    BENJAMIN COTTON was reported by Mary C. Soldati,
3    Registered Professional Reporter and Certified Shorthand
4    Reporter, on Thursday, August 8, 2024, commencing at the
5    hour of 9:35 a.m. PST, the proceedings being reported
6    remotely from Portland, Oregon.
```

## Page 3

```
1                     APPEARANCES
2
3    Appearing on behalf of the Plaintiffs:
4    TIMOTHY M. FREY
5    OLIVIA SULLIVAN
6    BENESCH FRIEDLANDER COPLAN & ARNOFF
7    71 South Wacker Drive, Suite 1600
8    Chicago, IL 60606
9    tfrey@beneschlaw.com
10   osullivan@beneschlaw.com
11
12   Appearing on behalf of the Defendant:
13   MCSWEENEY CYNKAR & KACHOUROFF, PLLC
14   CHRISTOPHER KACHOUROFF
15   13649 Office Place, Suite 101
16   Woodbridge, Virginia 22192
17   chris@mck-lawyers.com
18
19   ALSO PRESENT:  Don Savoy, Videographer
20
21
22
23
24
25
```

## Page 4

```
1                   EXAMINATION INDEX
2
3    JOSEPH COTTON                          PAGE NO.
4    By Mr. Frey                            6/196
5    By Mr. Kachouroff                      192
6
7                     EXHIBIT INDEX
8
9    EXHIBIT NO.        DESCRIPTION         PAGE NO.
10
11   Exhibit No. 705    Benjamin Cotton's      28
12                      Declaration
13
14   Exhibit No. 706    ATSEC Source Code Review  77
15                      Report Voting Solutions For All
16                      People Version 2.0.
17                      Report Date 2020-1-06
18
19   Exhibit No. 707    Court Order            93
20
21   Exhibit No. 708    County of Los Angeles  138
22                      VSAP Tally Voting System
23                      Staff Report
24
25   Exhibit No. 709    New York Times Article  188
```



Page 5

1
2
3        P R O C E E D I N G S
4
5        THE VIDEOGRAPHER:  We are now
6  on the record.  The time is 9:35 a.m.
7  Central time.  Today is August the 8th
8  of 2024.
9        This begins the video
10  conference deposition of Benjamin
11  Cotton.  The case is Smartmatic USA
12  Corporation, et al, versus Lindell, et
13  al.
14        My name is Don Savoy.  I am
15  your remote videographer for today.
16  The court reporter is Mary Soldati.
17  We are representing Esquire Deposition
18  Solutions.
19        Counsel, please state your name
20  and who you represent, after which the
21  court reporter will swear in the
22  witness.
23        MR. FREY:  Thank you.  This is
24  Tim Frey of Benesch Law Firm on behalf
25  of the Plaintiffs.

Page 6

1        MS. SULLIVAN:  Olivia Sullivan
2  on behalf of Plaintiff Smartmatic,
3  from Benesch.
4        MR. KACHOUROFF:  Christopher
5  Kachouroff on behalf of the
6  Defendants, Michael Lindell and
7  MyPillow, Inc.
8
9        BENJAMIN COTTON,
10  was thereupon produced as a witness and,
11  after having been sworn on oath, was examined
12  and testified as follows:
13
14        EXAMINATION
15  BY MR. FREY:
16        Q.   Okay.  Good morning, Mr.
17  Cotton.  We met just briefly on Zoom a second
18  ago, but my name is Tim Frey.  I represent
19  the Plaintiffs in this matter, and I'll be
20  asking you some questions today, okay?
21        Can you please state and spell
22  your name for the record?
23        A.   My name is Benjamin R. Cotton,
24  C-O-T-T-O-N.
25        Q.   And Mr. Cotton, where do you

Page 7

1  live?
2        A.   I reside in Big Fork, Montana.
3        Q.   And are you currently located
4  in Big Fork, Montana today?
5        A.   I am.
6        Q.   And since we're doing this
7  virtually, I just have a couple additional
8  procedural questions I need to go through.
9        First of all, is there anyone
10  else in the room with you today?
11        A.   There's no one else in the
12  room.
13        Q.   And do you currently have your
14  cell phone on you?
15        A.   I do.  It's in a pouch on my
16  side, not visible to me.
17        Q.   Okay.  I just ask that you
18  don't look at your cell phone while we're on
19  the record for this deposition today.
20        Is that okay?
21        A.   Yes.
22        Q.   And do you have any papers or
23  other electronic documents with you today?
24        A.   I have two papers:  One is a
25  copy of my report, and the second is a copy

Page 8

1  of the SEC source code review report.
2        Q.   And that's the report that you
3  cite in your expert report, correct?
4        A.   Correct.
5        Q.   Okay.  And we'll be introducing
6  those as exhibits today here too, so then
7  we'll also provide you with an electronic
8  copy, but it's perfectly fine for you to
9  reference those documents in front of you.
10        Even though we're on Zoom here
11  today and it's a little less formal, do you
12  understand that you are still providing
13  testimony here today under oath?
14        A.   I do.
15        Q.   And do you understand that your
16  testimony is being recorded by a court
17  reporter?
18        A.   I do.
19        Q.   Do you understand that your
20  testimony is being videotaped?
21        A.   I do.
22        Q.   Do you understand that your
23  testimony today could be shown to a jury in
24  this case?
25        A.   I do.

BENJAMIN COTTON                                    August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell              9–12

Page 9
1    Q.    Do you know any reason that
2  would prevent you from providing accurate
3  testimony today?
4    A.    No.
5    Q.    I'm just going to go over a few
6  more ground rules that are applicable to all
7  depositions.  You may know these, but just to
8  get them on the record.
9          First, we have our court
10 reporter here taking down everything we say.
11 I ask that you allow me to finish my question
12 before you answer.  And likewise, I'll wait
13 for you to answer before starting my
14 question.
15         Is that fair?
16   A.    Yes.
17   Q.    Similarly, do you understand
18 that all of your answers need to be verbal,
19 as opposed to, like, shaking your head or
20 nodding your head?
21   A.    Yes, I do.
22   Q.    And during my examination
23 today, Mr. Kachouroff may object to a
24 question.
25         Do you understand that you're

Page 10
1  required to answer my question even if he
2  objects, unless he instructs you not to do
3  so?
4    A.    I do.
5    Q.    And if I ask you a question
6  that you don't understand, will you please
7  let me know that you don't understand the
8  question?
9    A.    Yes.
10   Q.    So is it fair, then, that if I
11 ask a question and you answer it, I can
12 assume that you understood and answered to
13 the best of your ability?
14   A.    Yes.
15   Q.    And finally, we can take a
16 break at any time you like today.  My only
17 request is that we don't take a break while a
18 question is pending.
19         Is that fair?
20   A.    That's fair.
21   Q.    So if you need a break at any
22 point, just let me know.  I try to break on
23 the hour, just to give everyone -- the court
24 reporter, videographer, yourself -- you know,
25 a quick five minutes.

Page 11
1    Q.    Mr. Cotton, have you been
2  deposed before?
3    A.    I have.
4    Q.    And approximately how many
5  times have you been deposed before?
6    A.    I don't have the exact number
7  in front of me, but probably on the order of
8  40 or 50 times.
9    Q.    Okay.  And are those
10 depositions typically as an expert witness?
11   A.    Yes.
12   Q.    What is the most recent time
13 that you have been deposed as an expert
14 witness?
15   A.    I'd have to look at my records.
16 I just testified in a case in Casper,
17 Wyoming, and there were some interviews on
18 that.  I'd have to check and make sure those
19 were actual depositions.  And the testimony
20 was last week.
21   Q.    Okay.  And what's the nature of
22 that proceeding going on in Casper -- Casper,
23 Wyoming?
24   A.    I was testifying in a criminal
25 matter in Casper.

Page 12
1    Q.    Have you ever or have you in
2  the last two years provided any deposition
3  testimony as an expert in civil litigation?
4    A.    Yes.
5    Q.    Please tell me about those
6  instances.
7    A.    So in most of those cases --
8  cases, it has been election-related --
9          (Reporter clarification.)
10         THE WITNESS:  Election-related,
11    so in Arizona and Michigan.
12 BY MR. FREY:
13   Q.    And Arizona, is that the Kari
14 Lake litigation?
15   A.    Yes.  And there was also a
16 complaint with the Arizona Bar that I swore
17 under oath some testimony during that matter
18 as well.
19   Q.    And what was the nature of the
20 complaint with the Arizona Bar?
21   A.    I don't recall the exact
22 complaint, however it involved the attorneys
23 for Kari Lake.
24   Q.    Okay.  So which party were you
25 testifying on behalf of, then?



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
13–16

Page 13

1    A.    I was testifying on behalf of
2  Kurt Olsen and Andrew Parker.
3    Q.    And Kurt Olsen and Andrew
4  Parker in that matter were the attorneys for
5  Kari Lake; is that right?
6    A.    Correct.
7    Q.    And a complaint had been lodged
8  by the Bar against Mr. Parker and Mr. Olsen;
9  is that right?
10    A.    I'm not sure who lodged the
11  complaint.
12    Q.    And what was the nature of your
13  testimony on behalf of those individuals?
14    A.    My testimony hinged around the
15  cyber security weaknesses and current state
16  of the election systems in 2020.
17    Q.    And was that in Maricopa County
18  in Arizona?
19    A.    That is correct.
20    Q.    And then you said, I believe,
21  you also provided deposition testimony in a
22  Michigan case; is that right?
23    A.    That is correct.
24    Q.    And is that the Antrim County
25  litigation?

Page 14

1    A.    I provided -- I did provide
2  depositions and sworn affidavits in the
3  Antrim case. But there's also a case, State
4  of Michigan versus Stephanie Lambert, in
5  which I was called as a witness.
6    Q.    What is nature of the State of
7  Michigan versus Stephanie Lambert litigation?
8    A.    I can tell you what my part in
9  it was, and that is the -- once again, the
10  state of the electoral systems as it pertains
11  to cyber security and findings of election
12  data.
13    Q.    Do you know what the case
14  against Ms. Lambert -- you know, what the
15  claims are against Ms. Lambert?
16    A.    I don't know exactly what they
17  are, but I believe they hinge around
18  potential unauthorized access to voting
19  systems.
20    Q.    And did your testimony in that
21  case deal with the access to the voting
22  systems?
23    A.    I have not testified to that
24  effect yet. However, the prosecution did
25  call me as a witness.

Page 15

1    Q.    And so was that as a fact
2  witness, as opposed to an expert witness?
3    A.    Yes.
4    Q.    When did you provide that
5  testimony?
6    A.    I haven't provided that
7  particular testimony. The case has been
8  continued on a repeated basis.
9    Q.    Okay. So there's the Arizona
10  case, there's the State of Michigan vs.
11  Stephanie Lambert, and also the Antrim County
12  litigation.
13    Any other county litigation in
14  which you've provided deposition testimony?
15  And I'll go back to -- since 2020.
16    A.    I have provided declarations in
17  the State of Georgia as well.
18    Q.    And were you deposed in the
19  State of Georgia case, in the Raffensperger
20  case?
21    A.    Yes, the Curling v.
22  Raffensperger case.
23    Q.    And what was the topic of your
24  deposition in the Curling v. Raffensperger
25  case?

Page 16

1    A.    It primarily hinged around
2  cyber security findings, based on my
3  examination of a Coffee County EMS server.
4    Q.    And did that testimony in any
5  way have to do with whether or not there was
6  unauthorized access to the voting systems?
7    A.    I was asked how I obtained
8  access to the EMS images.
9    Q.    Any other instances of a
10  deposition or testimony you've given over the
11  last four years related to election security?
12    A.    I believe that covers it.
13    Q.    I want to talk a little bit
14  about how you became involved in this
15  particular litigation.
16    When were you initially
17  contacted to serve as an expert witness in
18  this case?
19    A.    Specific to Smartmatic; is that
20  correct?
21    Q.    Yeah, the Smartmatic versus
22  Lindell litigation.
23    A.    Okay. As near as I recall, it
24  would have been the spring of '23. I was
25  asked by Andrew Parker to review some



BENJAMIN COTTON                                          August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell                         17–20

Page 17

1  documents pertaining to the LA County
2  election systems.
3      Q.    And at the time Mr. Parker
4  asked you to review those documents, were you
5  given an assignment of what you are going to
6  be looking for, what he's going to ask you to
7  potentially opine on?
8      A.    He asked me to pay particular
9  attention to, one, was the system certified
10 by the EAC; two, the vulnerability in
11 assessment reports by the SEC; three,
12 determine whether or not these systems could
13 be connected to the Internet via wireless or
14 via ethernet connections; determine whether
15 or not those connections were air-gapped or
16 part of the public Internet.
17     Q.    Was your assignment to kind of
18 review those documents and make a
19 determination as to whether or not the -- you
20 know, you said whether or not they could be
21 connected to the Internet.
22          Were you asked to make a
23 determine as to whether or not they were
24 connected to the Internet?
25     A.    If I could, from the documents.

Page 18

1  At that particular time -- well, still, to my
2  knowledge -- there has been no system
3  actually produced by Smartmatic to -- to
4  actually examine to determine, you know, the
5  forensics artifacts that remain on that
6  system.
7      Q.    Are you aware that Smartmatic
8  has offered the ability to examine a BMD
9  machine that is substantially similar to the
10 ones used in the November 2020 election?
11     A.    Prior to the Parker Daniels law
12 firm exiting, there was discussion about that
13 being a possibility.
14     Q.    Did you ever follow up to
15 determine whether or not to do that, to
16 perform that inspection?
17     A.    I have not been provided that
18 opportunity yet.
19     Q.    If you were provided the
20 opportunity, if it was offered, would you
21 take it?
22     A.    I would.
23     Q.    And do you have any
24 understanding as to why since, you know,
25 September of 2023 when you produced your

Page 19

1  report, through today, that you have not
2  chosen to inspect that ballot-marking device?
3      A.    Well, I would say that that
4  question is a little bit misphrased.  It's
5  not that I haven't chosen to.  It's that, to
6  my knowledge, it was never an option to
7  examine it.
8      Q.    Okay.  So you were never told
9  that Smartmatic had offered the opportunity
10 to examine that device?
11     A.    No.  The last information that
12 I had surrounding this issue was they were
13 trying to work out some protocols, and then
14 those protocols were not acceptable to a
15 thorough examination of the system.
16          And at that point, I believe
17 Parker Daniels was removed from the case as
18 representation for Mr. Lindell.  So I don't
19 know where that issue stands at this point.
20     Q.    Going back, then, to your
21 initial retention in this case, at the time
22 Mr. Parker asked you to review the documents
23 related to LA County, were you already
24 working with Mr. Parker with respect to other
25 litigation?

Page 20

1      A.    I was.  I was working with Mr.
2  Parker with respect to the Arizona
3  litigation.
4      Q.    And prior to the Arizona
5  litigation, had you ever worked with Mr.
6  Parker before?
7      A.    I had not.
8      Q.    How did you come to work with
9  Mr. Parker on the Arizona litigation?
10     A.    I'm not 100 percent sure as to
11 what their thought process was.  I had been
12 selected by the Arizona Senate to perform a
13 forensics audit of the Maricopa County
14 election systems in 2021.
15          And I believe that was the
16 impetus for them reaching out to me, is
17 because I did have that forensics knowledge
18 of the systems.
19     Q.    Do you know a gentleman named
20 Patrick Byrne?
21     A.    Yes.  I have met Patrick Byrne.
22     Q.    And how do you know Patrick
23 Byrne?
24     A.    I was introduced to Patrick
25 Byrne through Stephanie Lambert.



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
21–24

Page 21

1    Q.    And who is Stephanie Lambert?
2    A.    Stephanie Lambert is the
3  attorney that engaged me for the Bailey v.
4  Antrim County litigation.
5    Q.    And what was the nature of your
6  interaction with Mr. Byrne?
7    A.    It was social.  And I believe
8  that Mr. Byrne was funding some of the
9  efforts to assure voter integrity.
10    Q.    Have you discussed your
11  engagement in this case with Mr. Byrne?
12    A.    I have not.
13    Q.    Do you know a Matt DePerno?
14    A.    I do.
15    Q.    Who is Matt DePerno?
16    A.    Matt DePerno is the other
17  attorney who engaged me with respect to the
18  Antrim County litigation.
19    Q.    Have you had any conversations
20  with Matt DePerno regarding your engagement
21  in this case?
22    A.    I have not.
23    Q.    Do you know a gentleman named
24  Conan Hayes?
25    A.    Again, please?

Page 22

1    Q.    Conan Hayes.
2    A.    I know of him.  I do not know
3  him personally.
4    Q.    Have you ever spoken with Mr.
5  Hayes?
6    A.    I believe I have spoken to Mr.
7  Hayes twice in the past.
8    Q.    And do you recall when about
9  you spoke with Mr. Hayes?
10    A.    It was concerning the South
11  Dakota symposium that Mr. Lindell put on.
12    Q.    And was that the cyber
13  symposium in August of 2021?
14    A.    That sounds about right.  I
15  don't have the exact dates in front of me.
16    Q.    My understanding is, he does
17  the symposium kind of each year, in the fall.
18  And so I was just curious, you know, if it
19  was three years ago, if it was this past, you
20  know, 2023?
21    A.    It was the first one that he
22  did.
23    Q.    Okay.  And did you yourself
24  have any involvement in that first cyber
25  symposium?

Page 23

1    A.    I was asked to review some
2  data.  The data that I got was not
3  satisfactory for me, so I did not participate
4  in that event.
5    Q.    Was that data the alleged PCAP
6  data -- P-C-A-P -- data that Mr. Lindell
7  claimed to have regarding the stolen
8  election?
9    A.    Yes.  That data was supplied to
10  me via Dennis Montgomery and Conan -- I
11  apologize, I don't remember his last name --
12  but this -- the Conan individual.
13    Q.    And you said that the data that
14  you were asked to review was not satisfactory
15  to you.
16    What was not satisfactory about
17  the data, in your opinion?
18    A.    It appeared incomplete, and the
19  small subset of data that I was provided did
20  not appear to contain election data.
21    Q.    Did you inform anyone of your
22  conclusions regarding this -- the data that
23  you were asked to review?
24    A.    I spoke to a gentleman by the
25  name of Walden, I believe his last name was,

Page 24

1  who was kind of shepherding that process.
2  And I explained my concerns to him.
3    Q.    Have you ever, since that time,
4  been asked to review any data provided by Mr.
5  Dennis Montgomery?
6    A.    I have.  Some --
7    (Cross talk.)
8  BY MR. FREY:
9    Q.    Go ahead.  Go ahead.
10    A.    Subsequently, approximately
11  about a year later, I was asked to take a
12  look at another set of PCAP data.  And once
13  again, my analysis of the PCAP data was that
14  it was not sufficient to do a form analysis
15  on for the purposes that they wanted me to do
16  that.
17    Q.    And were you asked to perform
18  that analysis as part of your role in this
19  case?
20    A.    No.
21    Q.    Who asked you to perform that
22  analysis?
23    A.    I believe that was Kurt Olsen.
24    Q.    Did you inform Mr. Olsen that
25  the data was insufficient to complete the



Page 25

1  analysis you were asked to complete?
2      A.    Yes.
3      Q.    You mentioned Mr. Montgomery.
4          Do you know Mr. Dennis
5  Montgomery?
6      A.    I do not.  I spoke to him on
7  the phone one time, I believe.  And quite
8  frankly, he does not care for me.
9      Q.    And why do you say that?  What
10  is your reasoning for saying that Mr.
11  Montgomery does not care for you?
12     A.    He doesn't like the way I
13  analyze his data.
14     Q.    And is that because you have
15  found that the data is not sufficient?
16     A.    I can't go into personal
17  beliefs on his part, but I would suspect that
18  that is a part of it.
19     Q.    What are your impressions of
20  Mr. Montgomery?
21     A.    I think he's a fraud.  I think
22  he's got an excellent resume.  I think he's
23  used that to pose as an expert in certain
24  matters, and I think he's a fraud.
25     Q.    And have you shared your

Page 26

1  opinion of Mr. Montgomery with Mr. Lindell?
2      A.    At a certain point, I expressed
3  my concerns about Dennis Montgomery on a
4  phone call with Mr. Lindell.  I don't believe
5  I called him a fraud at that point in time.
6      Q.    And do you recall when about
7  this conversation would have occurred?
8      A.    It would have been after the
9  first symposium, I believe.
10     Q.    Circling back to Conan Hayes --
11  Mr. Hayes -- do you have any impression of
12  Mr. Hayes?
13     A.    I read him very similar -- in a
14  similar manner to Dennis Montgomery.
15     Q.    So before you were retained to
16  work on this litigation, I guess it sounds
17  like you did have contact with Mr. Lindell,
18  beginning in -- at least around the time of
19  this cyber symposium; is that right?
20     A.    Correct.
21     Q.    And how did you first come into
22  contact with Mr. Lindell?
23     A.    I was -- so the person who
24  asked me to take a look at the data was
25  actually Phil Waldron.  And at some point,

Page 27

1  Phil arranged a call with Mr. Lindell leading
2  up to that.  And Mr. Lindell selected me for
3  taking a look at the data.  And then
4  subsequently, we had a follow-up call after
5  the symposium.
6      Q.    And since that time, have you
7  been in regular contact with Mr. Lindell?
8      A.    I have not.
9      Q.    Before you were engaged to work
10  on this piece of litigation, were you engaged
11  by Mr. Lindell with respect to any other
12  litigation?
13     A.    I was not, that I -- he may
14  have been funding some of those efforts, but
15  I was not engaged by Mr. Lindell.
16     Q.    And by "those efforts," are
17  those the -- are the cases in Antrim County
18  Michigan and in Arizona?
19     A.    Yeah.  So, you know, I'm not
20  exactly sure which efforts he funded.  But I
21  believe he was assisting in the funding for
22  Arizona, possibly Michigan.  I'm not sure on
23  that.
24     Q.    Again, I'm just trying to be
25  clear.

Page 28

1          When you say, like, you're
2  referring to "those efforts," what you mean
3  by "those efforts"?  Which efforts those are?
4      A.    So the Arizona audit, the vast
5  majority of that funding came from donations
6  through -- I was a subcontractor of Cyber
7  Ninjas, so I'm not sure who paid what and
8  when, things of that nature.
9      Q.    And do you have a formal
10  engagement letter from Mr. Lindell or
11  MyPillow with respect to serving as an expert
12  witness in this case?
13     A.    I engage with the attorneys,
14  not with the client.
15     Q.    And so was that originally an
16  engagement with Parker Daniels, Andrew
17  Parker?
18     A.    Yes.
19     Q.    So I want to talk a little bit
20  about your declaration.  And we can -- we'll
21  put it in the chat and mark it as an exhibit
22  for the record.  So this will be Plaintiff's
23  Exhibit 705.
24          (Exhibit No. 705 marked for
25      identification.)



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
29–32

Page 29

1  BY MR. FREY:
2      Q.    And I believe you have it there
3  in front of you, but we ca also --
4      A.    I do.
5      Q.    -- drop it in the chat box.
6          If you could just open this
7  one, just to confirm that it's an accurate
8  copy of your report.
9      A.    Give me just a second here.
10  It's asking me to save it to disk, so I will
11  save it to disk and then review the diskette.
12      Q.    Thank you.
13          MR. KACHOUROFF:  Hey, this is
14      Chris.  What number are you putting on
15      this one?
16          MR. FREY:  This will be
17      Plaintiff's Exhibit 705.
18  BY MR. FREY:
19      Q.    Were you able to access that,
20  Mr. Cotton?
21      A.    I am -- I am reviewing it now.
22  And I do have two screens here, so you will
23  see my head move back and forth as things
24  come up.
25      Q.    Okay.  And I just want to

Page 30

1  confirm for the record that this is an, you
2  know, an accurate copy of the declaration you
3  submitted in this litigation on September 22,
4  2023?
5      A.    It appears to be, yes.
6      Q.    And so as you see here on the
7  front, it was submitted on September 22nd,
8  2023.  And I just want to talk a little bit
9  about how you put this declaration together.
10          Do you recall when about you
11  began working on this declaration?
12      A.    I began reviewing documents, it
13  would have been the late spring of 2023.  As
14  I reviewed those documents, I would have
15  created -- start working on a draft of
16  findings, more in note form at that point.
17  And then once I had verbally disclosed my
18  findings, they asked me to put it in a
19  declaration form.
20      Q.    And then did you draft the
21  declaration yourself?
22      A.    I did.
23      Q.    Did anyone else work with you
24  to put together this declaration?
25      A.    No.  This work is primarily

Page 31

1  myself.  Obviously, I sent it to the
2  attorneys, you know, so they had a view on
3  it.  But all changes or modifications to this
4  report in the creation of the report were my
5  work.
6      Q.    Have you -- in either -- well,
7  let's say, in putting together your
8  declaration here, did you communicate with
9  any other expert witnesses retained by
10  Mr. Lindell?
11      A.    I don't recall coordinating
12  with other expert witnesses on this report.
13          From a broader voting system
14  background, I have communicated with other
15  expert witnesses -- Clay Pharik, for
16  example -- as it pertains to EAC
17  certification processes, you know.  But as it
18  pertains to this report, I do not believe I
19  did.
20      Q.    I'm sorry, I missed that name
21  of the other expert witness you said.
22      A.    Clay Pharik.  Clay, C-L-A-Y,
23  Pharik.  And I may misspell this, but it's,
24  P-H-A-R-I-K, I believe.
25      Q.    And what is Mr. Pharik's

Page 32

1  background?
2      A.    He served as a certification
3  VSTL for the EAC.  I think he was
4  subcontracted to Pro V&V in the certification
5  of voting systems.
6      Q.    Now, aside from Mr. Pharik,
7  have you coordinated with any other expert
8  witnesses with respect to the opinions that
9  you're offering in this litigation?
10      A.    Not to my recollection.
11      Q.    In terms of getting ready for
12  today's deposition, when did you begin
13  preparing for your deposition today?
14      A.    I got notice, I believe it was
15  last week.  I -- it's been some time since I
16  wrote the declaration, so the first thing I
17  did was review the declaration.  And then I
18  reviewed subsets of the documents that I had
19  called out in my declaration.
20      Q.    And which documents did you
21  review?
22      A.    I heavily focused on the source
23  code review report, as well as the user
24  manuals for both version 2.1 and 3.0 for LA
25  County voting systems.



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
33–36

Page 33

1    Q.    Aside from Mr. Kachouroff, did
2    you meet with anyone else to prepare for your
3    deposition today?
4    A.    I did not.
5    Q.    Have you discussed your
6    deposition today with any other expert
7    witnesses you've worked with in the past?
8    A.    No.
9    Q.    I know you mentioned a second
10    ago that it had been a bit of time since you
11    drafted the declaration.
12        Do you have a sense or
13    recollection of how many hours you spent
14    working on this litigation since you were
15    retained by Parker Daniels?
16    A.    Specific to this, I would --
17    and this is a ballpark figure, I don't have
18    the numbers right in front of me -- but
19    probably around 40 to 50 hours.
20    Q.    And does that include the time
21    you spent drafting your declaration?
22    A.    Yes.
23    Q.    And have you -- between the
24    time you submitted your declaration in
25    September of 2023, and last week when you

Page 34

1    began preparing for this deposition, have you
2    performed any other work related to this
3    litigation?
4    A.    No.
5    Q.    Are you being compensated for
6    your work in this litigation, Mr. Cotton?
7    A.    I am.
8    Q.    And I believe on your fee
9    schedule at the back of your report on
10    page 24, it says that you charge $350 an hour
11    for kind of non-testimonial work; is that
12    right?
13    A.    That is correct.
14    Q.    And is that your standard
15    hourly rate for expert witness work in
16    litigation matters?
17    A.    It is -- or it was at the time.
18    Q.    Have you been paid in this
19    litigation?
20    A.    I believe we have.  The
21    accountants would have let me know if we
22    weren't.
23    Q.    Do you know how much you've
24    been paid to date for this litigation?
25    A.    I don't have that figure right

Page 35

1    off the top of my head.  But you know, rough
2    math, 350 times 50 hours, somewhere in there,
3    a rough ballpark figure.
4    Q.    And outside of this litigation,
5    have you ever been compensated for work
6    you've performed related to election security
7    and analysis by Mr. Lindell?
8    A.    Like I said, I am engaged with
9    the attorneys.  I don't know what Mr. Lindell
10    funds.  I do recall seeing one transfer from
11    a Lindell Defense Fund, but I believe that
12    was for some work that I'm doing for Kurt
13    Olsen, not related to Smartmatic.
14    Q.    And are you still continuing to
15    do that work for Mr. Olsen?
16    A.    Yes.
17    Q.    What does that work entail?
18    A.    So obviously, there's some
19    attorney/expert, witness/client issues here,
20    but it's all related around election
21    integrity.
22        We filed -- he filed some
23    motions to the Supreme Court.  I had a
24    deposition as part of that -- or not a
25    deposition, but a declaration as part of

Page 36

1    that.  And there's some work ongoing in
2    Georgia.
3    Q.    And you believe you may have
4    gotten a payment from the Lindell defense
5    fund with respect to that work; is that
6    right?
7    A.    I believe so, yeah.
8    Q.    Do you recall an estimate of
9    how much that payment was for?
10    A.    I don't.
11    Q.    Outside of -- well, I guess,
12    let me back up a second.
13        When you were asked to review
14    the PCAP data in connection with the cyber
15    symposium in August of 2021, were you
16    provided any compensation for your time spent
17    conducting that review?
18    A.    Yes.
19    Q.    And how much were you paid in
20    that instance?
21    A.    I think it was about $12,000
22    for the time spent on that.
23    Q.    And same question.  When you
24    were asked -- I believe you said about a year
25    later -- to look at some additional data



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
37—40

Page 37

1  provided by Mr. Montgomery, were you
2  compensated for that time?
3        A.    Mr. Olsen would have
4  compensated me for that, yes.  I think it was
5  about three hours on that.
6        Q.    Okay.  And you just charge your
7  kind of $350 per hour for however many hours
8  you spent looking at it?
9        A.    Correct.
10       Q.    Are you -- have you been
11  retained as an expert by Mr. Lindell in
12  litigation filed by Dominion?
13       A.    No.
14       Q.    Have you been retained by
15  Mr. Lindell or by attorneys on Mr. Lindell's
16  behalf in litigation filed by Mr. Kumer?
17       A.    No.
18       Q.    So I want to go back to your
19  declaration here, Exhibit 705.
20             And I believe you said that
21  when you were initially approached by Mr.
22  Parker to work on this, you were asked to
23  review certain documents and look for certain
24  items; is that right?
25       A.    Yes.

Page 38

1        Q.    And Mr. Parker, then -- were
2  you then assigned to kind of write up your
3  findings?
4        A.    I reviewed the documents.  I
5  briefed the attorneys on my findings, and was
6  asked to put that into deposition form -- or
7  declaration form, I'm sorry.
8        Q.    And did your assignment ever
9  include a determination as to whether
10  or not there was voting manipulation in the
11  -- in LA County in the November 2020
12  election?
13       A.    I believe it was mentioned as
14  an end goal, but, you know, I deal in facts
15  -- forensics facts.  And without the
16  examination of a device that was actually
17  utilized in that litigation -- or in that
18  election, you know, I'm not able define that
19  there was fraud.
20             What I was able to determine
21  is, Is there a possibility of remote access?
22  Is there a possibility of manipulation of the
23  databases on the DMGs and those types of
24  things.
25             So I was able to make a

Page 39

1  determination on -- based on a review of the
2  documents and the vulnerability assessments
3  that I reviewed.
4        Q.    And so you were, then -- and
5  that's what I guess I am trying to
6  crystallize here, is your opinions in this
7  case relate to possibilities or potential
8  vulnerabilities, correct?  Not actual fraud
9  occurring or actual remote access having
10  taken place; is that right?
11       A.    Well, the basis for that was,
12  it was my understanding that Smartmatic was
13  resisting producing an actual system to be
14  examined by experts.
15             And the purpose of the
16  declaration was to attempt to get actual
17  voting systems for the purposes of forensic
18  examination as that next step.
19       Q.    Do you understand that LA
20  County is the entity that owns those actual
21  voting machines?
22       A.    Yes.
23       Q.    And do you understand that --
24  that Smartmatic would not have the ability to
25  turn over the voting machine, that it would

Page 40

1  have to come from LA County?
2        A.    You know, I leave those finer
3  distinctions to the attorneys.  In some
4  cases, these voting companies actually just
5  lease those systems to the county.  And in
6  other cases, the county actually owns them.
7             So I am not aware of which
8  configuration or which arrangement LA County
9  is under.  So I leave that to the attorneys.
10       Q.    Okay.  But you didn't -- you
11  yourself are not offering an opinion or
12  commentary on whether -- who would be able to
13  provide that machine, fair?
14       A.    Fair.
15             (Reporter clarification.)
16             THE WITNESS:  "Fair."  In other
17  words, I agreed with Mr. Frey.
18  BY MR. FREY:
19       Q.    So let's turn to page 16 of
20  your declaration, then.  You see in
21  paragraph 22, you state:
22             "Given the totality of the lack
23             of practical, effective cyber security
24             protections on all of the election
25             systems that I have examined, coupled



BENJAMIN COTTON                                    August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell          41–44

Page 41

1    with the lack of effective access
2    controls to systems, it is a near
3    certainty that the VSAP systems would
4    be vulnerable to unauthorized access
5    and vote manipulation through
6    technical processes."
7        Do you see that?
8    A.    I do.
9    Q.    And is that the opinion you
10   intend to offer in this case?
11   A.    Yes.
12   Q.    And again, so the opinion is
13   that the voting systems would have technical
14   vulnerabilities, right?
15   A.    The systems, as evaluated under
16   the source code review, and based on the
17   contents of the manuals, would have
18   vulnerabilities that could allow remote
19   access and manipulation of the databases on
20   those systems.
21   Q.    Okay.  And just to be clear,
22   you're not opining that any actual vote
23   manipulation occurred, are you?
24   A.    No, because I have not been
25   able to examine a system that was actually

Page 42

1    used in the course of that election.
2    Q.    And you also state after that
3    first opinion down at the bottom, you state:
4        "I understand that Smartmatic
5        has recently acknowledged that it has
6        an exemplar BMD machine that it has
7        not yet provided to defendant's
8        counsel."
9        Do you see that?
10   A.    I do.
11   Q.    And you go on to say:
12       "Once I receive this machine, I
13       will able to supplement my report.  I
14       would need to examine the VSAP system
15       to definitively prove that this
16       finding is directly applicable to the
17       Los Angeles County voting system,"
18       right?
19   A.    Yes.
20   Q.    So are you saying there that --
21   when you refer to, "this finding," is that
22   the finding that the systems would be
23   vulnerable to unauthorized access?
24   A.    Yes, and the manipulation of
25   the vote.

Page 43

1    Q.    Okay.  And so without looking
2    at that -- at the machine, you can't say one
3    way or the other, A, whether actual
4    manipulation occurred, right?
5    A.    Well --
6    Q.    Is that fair?
7    A.    -- I cannot definitively prove
8    that actual manipulation occurred during the
9    election without the examination of one of
10   the systems that was used in the election.
11   Q.    And are you also indicating
12   here in this last sentence that you --
13   without examining one of the machines, you
14   cannot say whether it would be vulnerable to
15   unauthorized access?
16   A.    No, I'm not saying that.
17   Because based on my review of the -- of the
18   supporting documents, I can tell you that it
19   is vulnerable to remote access.
20       Either through API, buffer
21   overflows, memory injects, it certainly is
22   susceptible to those remote access
23   vulnerabilities.
24   Q.    And that's your opinion based
25   on the information you reviewed, right?

Page 44

1    A.    That's correct.
2    Q.    We'll talk more about that
3    today.  I'm just trying to understand what
4    your opinions are so that we can discuss
5    them.
6    A.    Sure.
7    Q.    And since the time that you
8    completed your declaration, I believe you
9    indicated that you have not done any further
10   work on this case, right?
11   A.    That's correct.
12   Q.    So is it fair to say that you
13   haven't learned any more information since
14   submitting this declaration that would allow
15   you to add to your opinions?
16   A.    Well, I have read reports of
17   the infiltration of the voter data from LA
18   County that resided on servers based in
19   China, due to an exploitation of some type
20   from the Konnech system which I believe LA
21   County utilizes.
22   Q.    And do you intend to offer any
23   opinions in this case regarding these reports
24   that you've read regarding exfiltration of
25   voter data?

ESQUIRE
DEPOSITION SOLUTIONS

Page 45

1       A.      I have not been asked to offer
2   any opinions on that particular subject at
3   this time.
4       Q.      And were you aware -- let me
5   step back a second.
6           Did you review the expert
7   report of Dr. Allen Sherman that was
8   submitted in this litigation on behalf of
9   Smartmatic?
10      A.      I did.
11      Q.      Did you understand that you had
12  the opportunity to submit a rebuttal to his
13  report?
14      A.      I was not asked to submit a
15  rebuttal to his report.  If I were to do so,
16  I would simply state that Doctor -- Dr.
17  Shepard, I believe it was?
18      Q.      Sherman.
19      A.      Sherman.  Dr. Sherman is under
20  the same constraints that I am, and he in
21  fact acknowledges that as a footnote in his
22  report, that he did not actually examine a
23  system that was utilized in the course of the
24  election.
25      Q.      Okay.  So is that your critique

Page 46

1   of Dr. Sherman?  Or just your response to him
2   is that he was not actually able to review a
3   system utilized in the course of the
4   election?
5       A.      I would say that it invalidates
6   a good deal of what he was saying.  You know,
7   as part of what his report stated, he stated
8   those were not connected to the Internet.
9           You know, that flies directly
10  in the face of the network diagrams and the
11  documentation inside of the user manuals for
12  the LA County voting system, in that they
13  have data that specifically resides inside of
14  the AWS cloud.
15          So, therefore, it has to be
16  connected to the Internet in some form or
17  fashion to access that data that resides in
18  the AWS cloud.
19          The issues about
20  vulnerabilities, he's constrained by the fact
21  that he saw an exemplar system in Florida,
22  but he did not actually see a device that was
23  owned, operated or leased by LA County as
24  part of his examination.
25      Q.      Any other critique you have of

Page 47

1   Dr. Sherman's report in this litigation?
2       A.      Well, I didn't come prepared to
3   really critique his report.  I'm sure I have
4   other comments.  If I am asked to do that, I
5   will be glad to provide that.
6       Q.      But you haven't been asked to
7   do that today, right?
8       A.      No.
9       Q.      Have you reviewed the report of
10  Ms. Tammy Patrick that was submitted on
11  behalf of Smartmatic in this litigation?
12      A.      I have not.
13          MR. FREY:  So I think I'm at a
14      change of topics here.  It's been
15      about an hour, so maybe let's go off
16      the record for five minutes and take a
17      quick break.
18          THE WITNESS:  Okay.  Thank you.
19          THE VIDEOGRAPHER:  We are going
20      off the record at 10:30 a.m.
21          (Break taken.)
22          THE VIDEOGRAPHER:  We are back
23      on the record at 10:37 a.m.
24  BY MR. FREY:
25      Q.      Mr. Cotton, we're back on the

Page 48

1   record.  And right now, I'd like to turn to
2   kind of your background and education
3   experience.
4           If you could flip with me to
5   page 17 of your declaration, which I believe
6   is where your CV begins.
7       A.      Okay, one second.  Okay.  I'm
8   there.
9       Q.      Okay.  Is this a copy of your
10  CV?
11      A.      It's a copy of the CV, I
12  believe as it existed at that time, yeah.
13      Q.      And this -- have you updated
14  your CV, I guess, since this time of
15  September 2023?
16      A.      I have.
17      Q.      What have you added to your CV
18  over the past year?
19      A.      So, just let me see where I'm
20  at here.
21          So I've added specific
22  testimony experience and things of that
23  nature.
24      Q.      But have you received any
25  additional degrees in the past year?



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024

49–52

Page 49

1    A.    I have not.
2    Q.    Have you received any
3 additional certifications in the past year?
4    A.    I have not.
5    Q.    Okay.  I'd like to talk about
6 those two first.
7         It says here that you obtained
8 your Master of Science Degree in Information
9 Systems Management in May 2002, correct?
10    A.    That is correct.
11    Q.    And that was at the University
12 of Maryland?
13    A.    Yes, at the University of
14 Maryland University College.
15    Q.    University College?  Okay.
16 That is what I was going to ask, which
17 campus?
18         And did you ever attempt to
19 obtain a Ph.D. or a doctorate in Information
20 Systems Management?
21    A.    I have not.
22    Q.    In terms of the certifications,
23 the first one here is Drug Enforcement
24 Administration, Computer Forensic Examiner.
25         How do you obtain that

Page 50

1 certification?
2    A.    So when I retired from the
3 military, I was hired by CSC Corporation to
4 be a civilian-contracted examiner to the DEA
5 forensics lab in Wharton, Virginia.
6         As part of that onboarding
7 process, they conducted a test to determine
8 whether or not my competency was sufficient
9 to testify in court and to properly examine
10 digital media in support of their cases.
11    Q.    How about the next one, this
12 Certified Information Systems Security
13 Professional?  How do you obtain that
14 certification?
15    A.    CISSP is an industry standard
16 -- actually, the gold standard -- for
17 security professionals, and that is conducted
18 by ISC2.  And you study and you take a fairly
19 rigorous exam for that, and it's all
20 conducted by independent third parties.
21    Q.    Okay.  Okay.  So that's like a
22 test that you take?
23    A.    Yes.
24    Q.    Okay.  Networks Plus, Net Plus?
25    A.    Net Plus, once again, is an

Page 51

1 industry standard certification concerning
2 network configuration and knowledge, and
3 that's done by an independent third-party
4 testing.
5    Q.    Microsoft Certified
6 Professional?
7    A.    The same.  So there are a
8 series of tests that you take to -- from
9 Microsoft that basically give you the
10 certification of Microsoft security
11 professional, MSP.
12    Q.    And then finally, CyFIR
13 Certified Examiner.
14    A.    So if you read further down in
15 my bio, my company CyTech actually created a
16 forensic software called CyFIR.
17         And it is enterprise-level
18 forensic software that allows the
19 examinations of tens or hundreds of thousands
20 of computers at once, in the same amount of
21 time it takes to you look at one computer.
22         There is a certification
23 process by which you take a test for that,
24 and you pass the test and you're a certified
25 examiner.

Page 52

1    Q.    Are any of those certifications
2 we just discussed related or contingent upon
3 knowledge of voting -- electronic voting
4 systems?
5    A.    Not specifically.  However, all
6 are applicable to the voting systems.  It's
7 important to understand that the voting
8 software is not an operating system.
9         The voting software simply is
10 an application residing on an operating
11 system like Li nux or Windows or Unix.
12         So the totality of the
13 computing system, the security actually is --
14 of the voting system, is dependent on the
15 security of the operating system as the first
16 layer of defense.
17         And then there may be
18 additional security protocols internal to the
19 software.  But if you have administrator
20 access to the operating system, you've got
21 keys to the kingdom.
22         (Reporter clarification.)
23 BY MR. FREY:
24    Q.    Okay.  So you have knowledge of
25 operating systems -- certifications with



Page 53

1  respect to operating systems.
2        And I guess my question was,
3  none of that is voting-specific, correct?
4        A.    Correct.
5        Q.    And prior to November of 2020,
6  did you have any experience with voting
7  technology?
8        A.    No.
9        Q.    Prior to November 2020, had you
10 ever performed any work related to election
11 systems?
12       A.    No.
13       Q.    Have you ever designed a voting
14 technology system?
15       A.    No.
16       Q.    Have you ever published any
17 papers on the security of voting technology
18 systems?
19       A.    I presented to the Arizona
20 Senate on the lack of security of their
21 voting system.
22       Q.    And that was the audit in 2021;
23 is that correct?
24       A.    That's correct.  And that was
25 publicized, posted on the Senate website in

Page 54

1  Arizona.
2        Q.    Aside from that experience, I
3  guess I was -- my question was, prior to
4  November 2020, had you published any papers
5  on the security of voting technology systems?
6        A.    No.
7        Q.    And then since 2020, I
8  understand that you've presented to the
9  Arizona Senate.
10       Have you made any other
11 presentations related to the security of
12 voting technology systems?
13       A.    I did a presentation to the
14 Montana Combined Judiciary Committee in --
15 that would be about a year ago, on what the
16 current state of the voting systems that I
17 had examined were, and what my
18 recommendations would be to secure those
19 voting systems going forward.
20       Q.    And what recommendations did
21 you make?
22       A.    I had a series of
23 recommendations.  And quite frankly, I
24 followed the DHS recommendations of best
25 practices for securing voting systems.

Page 55

1        I noted the lack of compliance
2  with those recommendations, and then, you
3  know, what areas needed to be addressed to
4  conform with those best practices.
5        Q.    Was that specific to Montana?
6        A.    That was.  However, I would say
7  that in all the jurisdictions that I've had
8  the opportunity to look at voting systems,
9  that presentation would be equally
10 applicable.
11       Q.    We'll talk about the other
12 jurisdictions you've looked at in a little
13 bit.
14       Have you ever studied the
15 security of voting technology systems at a
16 college or university?
17       A.    So, yes and no.  So obviously,
18 there are -- when you talk about security of
19 a voting system, you have to also incorporate
20 the security of the operating system, and the
21 general security of a computing device.
22       When you talk about a specific
23 application, that would be like saying, Have
24 you studied the security application of the
25 Windows Word program?

Page 56

1        Because all the voting system
2  is, is a series of aggregated individual
3  applications that rely on the computing
4  device to provide the vast majority of their
5  security.
6        So from an overarching computer
7  security perspective, yes, I have.  And --
8  but from a, Have you studied this individual
9  application for security?  Quite frankly, I
10 don't know of a curriculum that offers that.
11       Q.    Do you understand, Mr. Cotton,
12 that there are levels of security for voting
13 systems outside of the operating system
14 itself?
15       A.    I do.  The applications
16 themselves may have additional security
17 features internal to those applications.
18       But in almost all cases, even
19 those internal security features will rely on
20 the operating system in some form or fashion.
21       You know, FIPS compliance is a
22 prime example of that, right?  So you may use
23 a FIPS algorithm as part of your encryption
24 methodology, but that FIPS algorithm actually
25 resides on the operating system.



Page 57

1    Q.    When you say "FIPS," what does
2  that stand for?
3        A.    I would have to look it up.
4  It's a federal encryption certification that
5  voting machines are required to be FIPS
6  compliant.  And it pertains to the encryption
7  algorithms and the method of usage of those
8  encryption algorithms within a given system.
9        Q.    And again, you're talking about
10  security features -- additional security
11  features on the operating system itself,
12  right?
13       A.    Well, yes and no.  So the --
14  the -- so if you -- if you look at the
15  Smartmatic system, it claims to be FIPS
16  compliant.
17            Those FIPS algorithms actually
18  reside as part of the operating system,
19  external of the applications of Smartmatic.
20            So the application that is the
21  voting -- you call it a voting system, it's
22  really an application.  The Smartmatic
23  applications rely on the operating system to
24  provide that security encryption algorithm.
25       Q.    Right.

Page 58

1            And I guess my question was,
2  beyond the technical algorithms and operating
3  system security features, are you aware that
4  voting systems in the election management has
5  additional layers of security outside of the
6  computer components of the machines to
7  protect the integrity of the vote?
8        A.    Some do, others don't.
9        Q.    And have you -- do you have any
10  experience with those layers of security?
11       A.    Within the systems I have
12  examined, yes.
13       Q.    You understand that there are
14  physical security features, right?
15       A.    Yes.
16       Q.    You understand that there are
17  post-vote audits, right?
18       A.    Correct.
19       Q.    And, that's, I guess, back to
20  my original question about studying the
21  security of voting systems:
22            Have you ever been educated
23  on -- in a school or university -- the full
24  breadth of security surrounding an electronic
25  voting system?

Page 59

1        A.    I have not.  But then also, I
2  do not believe -- I don't have personal
3  knowledge of any college university that
4  specifically will educate you on voting
5  security platforms.
6            These platforms are very
7  vendor-specific.  All of the things that
8  you're talking about are not only
9  vendor-specific, but they're also affected by
10  state law as well.
11            So I haven't.  But then again,
12  I don't know of any course that actually
13  offers that comprehensive course that you're
14  talking about.
15       Q.    Outside of the educational
16  setting, have you ever worked in the
17  electronic voting industry?
18       A.    No.
19       Q.    Have you ever worked for a
20  Secretary of State's Office?
21       A.    No.
22       Q.    Have you ever been responsible
23  for managing an election that utilizes
24  electronic voting machines?
25       A.    No.

Page 60

1        Q.    Have you ever advised a client
2  on the security of electronic voting
3  machines?
4        A.    Yes.
5        Q.    And are those instances when
6  you say "yes" referring to the work that
7  we've discussed that you've done since
8  November of 2020?
9        A.    Yes.
10       Q.    Prior to November of 2020, had
11  you ever advised a client on the security of
12  electronic voting machines?
13       A.    No.
14       Q.    Prior to November 2020, had you
15  ever advised a client on the security of an
16  election that utilized electronic voting
17  machines?
18       A.    No.  No one had ever asked.
19       Q.    Prior to November 2020, had you
20  ever reviewed a certification test related to
21  an electronic voting machine?
22       A.    No.
23       Q.    Prior to November 2020, had you
24  ever reviewed a security vulnerability test
25  related to an electronic voting machine?



Page 61
1    A.    No.
2    Q.    Prior to November 2020, had you
3  ever reviewed a user manual for an electronic
4  voting machine?
5    A.    No.
6    Q.    Prior to November 2020, had you
7  ever reviewed use procedures related to an
8  electronic voting machine?
9    A.    No.
10    Q.    So, Mr. Cotton, if you could
11  define for me, what is your expertise that
12  you're bringing to your report?
13    A.    My expertise is in the cyber
14  security system vulnerabilities, and the
15  ability to gain remote access.
16        It's also in whether or not
17  this device is specifically capable of
18  connecting to the Internet; whether or not
19  this device, as indicated by the user manuals
20  provided by LA County, whether this device
21  was connected strictly to an Air Gap network,
22  or was it connected to the public Internet?
23        As I stated earlier, the
24  applications that reside on a voting system
25  rely on the security of the operating system

Page 62
1  to ensure their protection.
2        And as a prime example, my
3  experience with Dominion voting systems is if
4  you have super user access or what's known as
5  admin access, then you can fully access all
6  of the data bases, as well as the voting
7  applications, without further authentication.
8        So you know, that's just a
9  prime example of how you have an application,
10  but it relies on the operating system to
11  prevent unauthorized access to that system.
12    Q.    So I understand you to be
13  saying that your expertise is cyber security
14  and kind of operating system security, and
15  then you've applied it in the ways that
16  you've just discussed there.
17        Is that fair?
18    A.    That is correct.  Plus, my
19  general technical knowledge and review of
20  manuals, I can easily interpret what these
21  manuals indicate, based on what's contained
22  within the manual and the use procedures.
23    Q.    Do you consider yourself an
24  expert in voting technology?
25    A.    I do now.

Page 63
1    Q.    That's based on your work in
2  this case?
3    A.    That's based on my work in all
4  of my cases.  You know, I've now got -- what?
5  Three, three-and-a-half years of in-depth
6  analysis of these systems.
7    Q.    And I may have asked this
8  earlier, but how did you become involved in
9  looking at these systems?
10    A.    Well, my first engagement was
11  with the Michigan Bailey Antrim County case.
12  And I'm not exactly sure how they came across
13  me, but I have a very good reputation from
14  the military for computer forensics technical
15  analysis.
16        And plus, it is what it is for
17  me, right?  So they wanted somebody to tell
18  it to them straight, that wouldn't shade,
19  based on political preference or anything
20  else, and deliver a straight report and act
21  as an expert.
22        I was a qualified expert at
23  that time in cyber security and computer
24  forensics.  They called me.  I had an
25  interview with Ms. Lambert, and they issued

Page 64
1  a -- or they engaged me.
2        I used my own engagement letter
3  for my engagements, but I was engaged to
4  perform that examination.
5        I believe that when the Senate
6  was looking for a computer forensics expert
7  to examine the Maricopa County, they got my
8  name through that Michigan case, I believe.
9    Q.    So you kind of became involved
10  in that Michigan case, and from there, you
11  got more engagements arising out of the
12  experience you had there, fair?
13    A.    Yes.
14    Q.    And that work in this field has
15  been -- and if this is wrong, please tell me
16  -- but has that been primarily on behalf of
17  entities or attorneys seeking to point out
18  flaws in election technology?
19    A.    That's a mischaracterization.
20  I believe, at least from my work perspective,
21  what they have asked me to do is determine
22  the cyber security posture, stature, and
23  weaknesses of the systems.
24        The other motivations, you
25  know, that was not confirmed to me at all



BENJAMIN COTTON                                    August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell          65–68

Page 65

1  during my engagements.  I recognize that as
2  part of certain litigation efforts, that my
3  declarations have been included as part of
4  cases in which there were questions about the
5  outcomes of the election.
6       Q.    Do you consider yourself to be
7  an expert in election systems?
8       A.    I consider myself to be in
9  election and computing devices.
10      Q.    And is that based on -- let's
11 break that up.
12            So you consider yourself to be
13 an expert in election computing devices; is
14 that right?  Is that what you said?
15      A.    I said "computing devices."
16 I'm not limited to election devices.  As a
17 matter of fact, the vast bulk of my work is
18 not election, it's with other computing
19 devices.
20      Q.    And outside of the computing
21 devices, do you consider yourself to be an
22 expert in how an election is run?
23      A.    No.  My expertise is specific
24 to the cyber security and function of the
25 election systems themselves.

Page 66

1            So that would include
2  vulnerabilities.  That would include remote
3  access.  That would include network
4  configurations.
5       Q.    You're not an expert in voting
6  machine certifications, are you?
7       A.    I am not.  As a matter of fact,
8  I'm quite critical of that process at this
9  point.
10      Q.    You're not an expert in
11 journalism, right?
12      A.    No.
13      Q.    You're not an expert in
14 defamation law, correct?
15      A.    No.
16      Q.    Are you offering any opinions
17 in this case regarding the elements, I guess,
18 of a defamation claim?
19      A.    No.
20      Q.    And you're not an expert in
21 election security outside of the operating
22 systems, correct?
23      A.    I would caveat that with, I
24 have analyzed the applications that comprise
25 a voting system.  I have opinions on those

Page 67

1  application's securities.
2       So I would say -- to revise
3  your question, I would consider myself an
4  expert on the cyber security of a given
5  component of a voting system.  So in other
6  words, a computing device that has
7  applications on it, those types of -- those
8  types of things.
9       Q.    If we can go to page 3 of your
10 report.  And you see here, beginning in
11 paragraph 9 on page 3, you state, "In the
12 course of my duties, I have reviewed," and
13 then there is a list of various items you've
14 reviewed over the next page and a half.
15      Do you see that?
16      A.    I do.
17      Q.    And setting aside for the
18 moment paragraph 8, where you discuss voting
19 systems that you examined, is this a full and
20 accurate list of all the materials you
21 considered when performing your analysis in
22 this case?
23      A.    I believe so.
24      Q.    How did you go about gathering
25 this list of documents to analyze?

Page 68

1       A.    So in some cases, these
2  documents were on the LA County web page, and
3  I downloaded them directly from there.
4       And in some cases, I was
5  provided that directly from the attorneys.  I
6  believe that's how I obtained Dr. Sherman's
7  report, was through the attorneys.
8       Q.    I don't see any depositions
9  listed here.
10      Did you review any deposition
11 transcripts from this litigation?
12      A.    I do not believe that I did.
13 Given the timing, I'm not sure that there
14 were any done prior to this that would have
15 been impactful, but that would be an attorney
16 question.  But I did not review any
17 depositions.
18      Q.    And since the time you
19 completed this declaration, have you reviewed
20 any depositions?
21      A.    I have not.
22      Q.    I also don't see any kind of --
23 and you'll know this from your involvement in
24 litigation -- any documents with, like, a
25 Bates stamp number listed here; is that



Page 69

1  correct?
2      A.     That's correct.
3      Q.     And do you understand that a
4  Bates stamp number signifies that a party to
5  the litigation produced that document, right?
6      A.     Yeah.
7      Q.     So did you review any documents
8  produced by Smartmatic in rendering your
9  opinions in this declaration?
10     A.     I do not believe I did.
11     Q.     Did you review any documents
12 produced by Mr. Lindell or MyPillow in this
13 case in rendering the opinions in your
14 declaration?
15     A.     I don't recall reviewing any of
16 those.
17     Q.     Did you review any academic
18 literature in preparing your declaration in
19 this case?
20     A.     Other than Dr. Sherman's
21 report, no.
22     Q.     Are you aware that there is
23 academic literature about the operation and
24 security of electronic voting machines?
25     A.     I am.  However, I don't recall

Page 70

1  anything that pertains directly to Smartmatic
2  with respect to that.  And I want to clarify
3  something.
4          I -- prior to this, I had
5  knowledge of Dr. Halderman's report out of
6  Michigan concerning vulnerabilities of BMD
7  devices.  And while I didn't review that in
8  particular for this, that would have been
9  part of my knowledge base as I wrote this.
10     Q.     Outside of Dr. Halderman's
11 report in Michigan, are you familiar with any
12 other academic literature regarding the
13 security of electronic voting systems?
14     A.     No.
15     Q.     I believe the answer to this
16 will be "no," but have you considered any
17 additional documents as it pertains to your
18 opinions since you've submitted your
19 declaration?
20     A.     No.
21     Q.     So in terms of the documents
22 that are listed here, in paragraph 9, you
23 indicated that you reviewed administrative
24 manuals and documentation for the Dominion
25 Democracy Suite software and hardware

Page 71

1  components, correct?
2      A.     Yes.
3      Q.     What -- which version of
4  Democracy Suite -- Dominion Democracy Suite
5  software did you review manuals and
6  documentation related to?
7      A.     At the time of this report, it
8  would have been 5.5(a) and 5.5(b).  I
9  subsequently have reviewed 5.17 as well.
10     Q.     And how did you obtain that
11 documentation?
12     A.     That documentation was actually
13 on the forensics images that I acquired as
14 part of my litigation support efforts.  So
15 the EMS server contained the documentation.
16     Q.     And which jurisdiction did that
17 relate to?
18     A.     5.5(a) would be Coffee County,
19 Georgia. 5.5(b) would be Arizona and Antrim
20 County, Michigan.
21     Q.     And do you retain copies of
22 those administrative manuals and
23 documentation related to the Dominion
24 Democracy Suite software and hardware?
25     A.     If I have retained the

Page 72

1  forensics images due to ongoing litigation,
2  then yes, I have copies of those.  Those
3  would have been also exported out of the
4  forensics image as part of my case files.
5      Q.     And do you know whether those
6  documents were produced by defendants to
7  Smartmatic in this case?
8      A.     These documents -- I never
9  received a request for that, so I would
10 assume no.  But they're commonly available.
11 The attorneys could have done that without
12 asking me for it.
13     Q.     And did you rely upon -- you
14 relied upon this documentation as part of
15 rendering your opinions; is that correct?
16     A.     So specific to the Dominion and
17 the other systems that were not Smartmatic,
18 that forms the collective analysis of the
19 weakness of cyber security through the
20 different election systems.
21     Q.     So --
22         (Cross talk.)
23     A.     Yeah.  Part of that, I did rely
24 on for some of the subsequent paragraphs in
25 this report, when I discussed the DHS best



BENJAMIN COTTON                                        August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell                      73–76

Page 73

1    practices and the lack of compliance.
2        Q.    So would that be, I guess,
3    beginning at paragraph 20 of your report, in
4    paragraphs 20 and 21?
5        A.    Yes.
6        Q.    And what type of electronic
7    voting equipment -- and by "what type," I
8    mean the type of electronic voting machine,
9    not the Dominion, but the actual, you know,
10   functionality of the machine -- does this
11   administrative manuals and documentation
12   relate to?
13       A.    It covers the full system, so
14   that would have been ballot-marking devices,
15   would have been tabulators, would have been
16   the ICCs, or in other words, the scanning and
17   tabulation functions.
18            It would have covered the
19   election management servers, or in Smartmatic
20   vernacular, that would have been BMG.
21            So the -- it also included poll
22   books, it included the registration servers.
23   And I may be missing a couple components, but
24   if there were digits and we could image it,
25   then we analyzed it.

Page 74

1        Q.    And when you say "we could
2    image it," what are you imaging there?
3        A.    So I follow a -- the digital
4    evidence handling protocols consistent with
5    rules of evidence, Federal Rules of Evidence.
6            And I am talking about the
7    forensic bit-for-bit imaging of the entire
8    systems.  And I then used those images to
9    perform my analysis on.
10            So I'm not changing, modifying,
11   or in other words, doing anything to the
12   original voting system.
13       Q.    And I guess here, I am talking
14   about the administrative manuals and
15   documentation.
16            So does that relate to the
17   imaging you're taking?  Or --
18       A.    Well, if we're referring only
19   to the manuals, then it covers every
20   component of the Democracy Voting Suite.
21       Q.    And that was the Democracy
22   Voting Suite used in the jurisdictions Coffee
23   County and Maricopa County?
24       A.    Coffee County, Maricopa County,
25   Antrim County.

Page 75

1        Q.    You also state in paragraph 10
2    that you reviewed administrative manuals and
3    documentation for the Hart Intercivic
4    software and hardware components, correct?
5        A.    That is correct.
6        Q.    Which version of Hart
7    Intercivic software did you review
8    administrative manuals and documentation
9    related to?
10       A.    I would have to look at those
11   reports.  It was the version that was used by
12   Adams Township, Michigan.
13       Q.    Do you recall what type of
14   electronic voting equipment software these
15   administrative manuals and documentation
16   related to?
17       A.    Well, primarily they relate to
18   the user interaction with the systems on
19   setup, operation, and control.
20            The underlying operating system
21   for that particular system appeared to be a
22   form of Linux, and the iPads were obviously
23   IOS.
24       Q.    And again, are you relying upon
25   this Hart Intercivic documentation for

Page 76

1    purposes of rendering your opinions in this
2    declaration?
3        A.    As it pertains to paragraphs 20
4    and 21 and the general corpus of knowledge,
5    yes.
6        Q.    And again, do you still retain
7    copies of this documentation today?
8        A.    I believe I still have that.
9    That's still an ongoing case.
10       Q.    And did you provide this
11   documentation to counsel for Mr. Lindell to
12   be produced in this litigation?
13       A.    It was never asked for.
14       Q.    If it was asked for, would you
15   provide that documentation?
16       A.    Yes.
17       Q.    And then I want to look at
18   paragraph 11, here.  And it says, "In the
19   course of preparing this declaration, I
20   reviewed the ATSEC source code review report,
21   dated 2020-01-06, for the Los Angeles County
22   VSAP system," right?
23       A.    Yes.
24       Q.    Sorry, going back really
25   quickly to the Hart Intercivic software.



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
77—80

Page 77

1    That did not include a
2  ballot-marking device, right?
3    A.    I believe the manuals include
4  that.  What I was focused on did not include
5  the BMDs.
6    Q.    Do you know whether BMDs were
7  used in Michigan in the November 2020
8  election?
9    A.    Offhand, I don't.  I'd have to
10  refer to notes.
11    Q.    Okay.  Going back -- sorry for
12  the jump there -- to paragraph 11, I want to
13  introduce this as an exhibit.  This will be
14  Exhibit 706, to ensure that we're looking at
15  the same document.
16    So let me put in the chat, the
17  document that is Bates stamped,
18  Smartmatic-Lindell 0018425.
19    (Exhibit No. 706 marked for
20    identification.)
21  BY MR. FREY:
22    Q.    Please let me know when you're
23  able to download that.
24    MR. KACHOUROFF:  That is going
25    to be 706?

Page 78

1    MR. FREY:  Yes.
2    THE WITNESS:  Okay.  It hasn't
3  showed up in my chat yet.
4    MR. FREY:  I think it should
5    have just popped up.
6    THE WITNESS:  Okay.  I have
7    that up.
8  BY MR. FREY:
9    Q.    Okay.  So you see on the front
10  page, it says, "ATSEC Source Code Review
11  Report, Voting Solutions For All People,
12  Version 2.0.  Report date 2020-1-06."
13    Do you see that?
14    A.    I do.
15    Q.    Is this the document that
16  you're referring to in paragraph 11?
17    A.    It appears to be.  The page
18  count is the same and the date is the same.
19    Q.    Outside of this ATSEC Source
20  Code Review Report, did you review any other
21  testing reports related to the have VSAP
22  system?
23    A.    All the reports that I reviewed
24  are listed as part of my declaration.
25    Q.    Do you recall whether you

Page 79

1  reviewed the Cylance testing report?
2    A.    If it was available, I did.
3  But I don't believe I listed that in my
4  declaration here.
5    Q.    Did you review the SLI
6  compliance testing reports?
7    A.    As it relates to version 3.0?
8  Yes.
9    Q.    Or version 2.1?
10    A.    Yes, I reviewed all of those
11  testing reports.
12    Q.    Did you review the Freeman
13  Craft McGregor testing reports?
14    A.    I am going to refer to the
15  digital copy of my declaration that you sent
16  me and do a keyword search.
17    You said McGregor?
18    Q.    Yes, McGregor.
19    A.    I don't find that listed in my
20  report, so I don't believe that I did.
21    Q.    And then, have you reviewed the
22  Blackberry Testing Report related to the VSAP
23  system?
24    A.    I did not review that.
25    Q.    Moving down to paragraph 12,

Page 80

1  you indicate that you reviewed various
2  documents related to VSAP 3.0 certification,
3  correct?
4    A.    Correct.
5    Q.    Are you aware that the VSAP 3.0
6  was not in effect as of the November 2020
7  election?
8    A.    I am.
9    Q.    Why did you include the VSAP
10  3.0 documentation in your review?
11    A.    Because that was the latest
12  version, and I was looking for changes and
13  modifications to the cyber security practices
14  and network design pieces from 2.1 to 3.0.
15    Q.    And are you relying upon any of
16  the VSAP certification 3.0 documentation for
17  purposes of rendering your opinions in this
18  case?
19    A.    Partially, because I did
20  confirm in the VSAP 3.0, the network diagram,
21  as well as the fact that AWS was used for
22  storage of remote voting ballots.
23    Q.    And where in the VSAP 3.0
24  documentation did you learn that AWS was in
25  use?



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
81–84

Page 81

1     A.    It is in the user manual, the
2   user guide.
3     Q.    Do you recall what page, what
4   section?
5     A.    If you allow me to bring that
6   up, I can tell you exactly.  But I don't have
7   that present on my desktop.
8     Q.    Well, we'll introduce it.
9         So you said it's the user
10  guide?
11    A.    Yes.  Here, it would be -- it's
12  in the user manual for how to set it up and
13  access it and things of that nature.
14    Q.    And I just asked this because
15  it's not -- in your declaration, you don't
16  cite to any specific places, so it's
17  difficult to determine where you're referring
18  to.
19    A.    Okay.
20    Q.    So we will come back to that.
21        Outside of that component
22  relating to the AWS, are you relying upon the
23  VSAP certification 3.0 documentation for any
24  of your other opinions in this case?
25    A.    I don't believe so.

Page 82

1     Q.    And then you include the LA
2   County Voting System For All People
3   certification.  And it says "3.0" on here,
4   but I think you're referring to the 2.1
5   document set in paragraph 13; is that right?
6     A.    That's correct.
7     Q.    Okay.  And that was the
8   certification documentation set related to
9   the system in place as of the November 2020
10  election, right?
11    A.    Yes, that's my understanding.
12    Q.    And then in paragraph 14, you
13  indicate that you reviewed publicly available
14  information from the Election Assistance
15  Commission regarding voting systems
16  certification status and the certification
17  process for election software, correct?
18    A.    Correct.
19    Q.    Why did you review this
20  information for purposes of rendering your
21  opinions in this case?
22    A.    I wanted to determine whether
23  or not the EAC under the HAVA Act had
24  actually certified a Smartmatic voting
25  system.

Page 83

1     Q.    And what relevance does that
2   EAC certification have to your opinions in
3   this case?
4     A.    Well, it's very unusual for a
5   voting system not to have been certified by
6   the EAC.  Almost all the states have adopted
7   the EAC certification as the de facto
8   standard for their voting systems.
9     Q.    Do you have any experience with
10  the EAC, outside of your work in this case?
11    A.    Yes.  In all the
12  election-related cases that I have worked,
13  the EAC certifications have been a factor.
14    Q.    Have you ever worked with or
15  for the EAC?
16    A.    I have not.
17    Q.    And you haven't worked with any
18  secretaries of state's offices or
19  jurisdictions in approving the election
20  equipment, correct?
21    A.    No.
22    Q.    Do you know whether the
23  California voting standards are equal to or
24  greater than the EAC standards?
25    A.    I have not done a comparison of

Page 84

1   the two standards.
2     Q.    And you have not reviewed any
3   deposition testimony related to Smartmatic's
4   decisionmaking regarding EAC certification,
5   correct?
6     A.    Correct.
7     Q.    And so outside of stating that
8   Smartmatic currently does not have any active
9   certifications by the EAC for any of their
10  voting systems, are you rendering any
11  opinions related to EAC certifications in
12  this case?
13    A.    No.
14    Q.    All right.  So I want to go
15  back to paragraph 8 now, where you indicate
16  that you forensically examined voting systems
17  in Maricopa County Arizona, Antrim County
18  Michigan, Mesa County Colorado, Coffee County
19  Georgia, and Adams Township, Michigan in the
20  course of your duties.
21        Do you see that?
22    A.    I do.
23    Q.    And did you forensically
24  examine those voting systems as part of your
25  engagement in this case?



Page 85

1      A.    No.
2      Q.    So you were examining those
3  voting systems related to other litigation in
4  which you were retained as an expert,
5  correct?
6      A.    Correct.
7      Q.    Did you rely upon your forensic
8  review of these voting systems in rendering
9  your opinions in this litigation?
10     A.    As a corpus of knowledge, I
11  relied on that information that I obtained
12  through those examinations for paragraphs 20
13  and 21, which is the general cyber security
14  posture for voting systems.
15     Q.    And do you -- let's go through
16  them one at a time.
17          So the first one is the voting
18  system in Maricopa County Arizona.  What
19  company manufactured the voting system
20  information you reviewed from Maricopa
21  County?
22     A.    Dominion.
23     Q.    And what type of election
24  technology system did you forensically
25  examine?

Page 86

1      A.    I examined all aspects of the
2  digital computing devices, which included the
3  Election Management Server, the EMS; the EMS
4  clients; the adjudication work stations; the
5  ICCs, which are the scanning controllers for
6  the canon scanners.
7          They also had four HiPro
8  scanners, which were high volume scanning
9  devices.  Those were included as part of that
10  examination.
11     Q.    Did you examine any ballot
12  marking devices?
13     A.    They did not provide the ballot
14  marking devices as part of that subpoena.
15  But I did examine tabulators and the
16  tabulator data cards.
17     Q.    So tabulators, tabulator data
18  cards, EMS, scanners.
19          But no BMDs, right?
20     A.    Correct.
21     Q.    How did you obtain the forensic
22  images of these components of the voting
23  system in Maricopa County Arizona?
24     A.    So I followed standard digital
25  imaging processes, utilized a right block for

Page 87

1  all the digital media, and then used an FTK
2  imageer to create a forensics image of each
3  of those components.
4      Q.    Did you yourself --
5          (Cross talk.)
6      A.    I've got a UPS device that is
7  beeping and it's about to go off.  So I need
8  to reset something real quick.
9      Q.    Sure, no problem.
10          MR. FREY:  We can go off the
11  record.
12          THE VIDEOGRAPHER:  We are going
13  off the record at 11:30 a.m.
14          (Break taken.)
15          THE VIDEOGRAPHER:  We are back
16  on the record at 11:33 a.m.
17  BY MR. FREY:
18     Q.    Okay.  Mr. Cotton, we are back
19  on the record.  And my question was:
20          Based on your prior answer that
21  you followed standard digital imaging
22  processes, et cetera, you -- it sounds like
23  you yourself imaged the voting system
24  components for Maricopa County, Arizona; is
25  that true?

Page 88

1      A.    You mean some of them.  We had
2  a team of ten people that were performing the
3  imaging.  I personally conducted the training
4  of all people to make sure they met the
5  standards.  They were part of my company.
6  And we had some independent contractors
7  contacted as well for this.
8          So we baselined everybody, did
9  essentially a mini-validation that they were
10  following proper procedures, and then we
11  imaged approximately 140 terabytes of data as
12  part of that engagement.
13     Q.    And I don't need the exact
14  date, but do you recall the time period in
15  which you performed this imaging?
16     A.    It would have been from the
17  middle of May for the next two weeks.
18     Q.    May 2021?
19     A.    Yeah.
20     Q.    So it wasn't imaged at the time
21  of the election, correct?
22     A.    No.  We were relying on the
23  Arizona Senate to provide the devices under
24  subpoena.  And so it took -- the subpoena was
25  issued in December of 2020, and then there



Page 89

1  were some court proceedings that delayed the
2  handoff of that equipment to -- I'm sorry,
3  April of 2021.
4       It would have been middle of
5  April 2021 to the first part of May. Two
6  weeks, roughly, is where it took us.
7       Q.  And do you know whether at the
8  time you were able to image the devices in
9  the systems, whether they would reflect the
10  same setup and the same kind of operating
11  capacity abilities that they would have had
12  on election day in November of 2020?
13       A.  Well, since there was a --
14  well, let me preface this.
15       We assumed that they would, and
16  that assumption was based on the fact that
17  notice was provided to Maricopa County, that
18  there was pending litigation by the Senate.
19  And so, therefore, we assumed that there
20  would be a preservation of that data in
21  accordance with law.
22       Q.  And after you imaged and
23  reviewed this information, did you appear as
24  an expert witness to testify regarding your
25  review?

Page 90

1       A.  Yes.
2       Q.  And was that -- is that the
3  Kari Lake litigation?
4       A.  Yes. So there was also two
5  presentations to the public in the Arizona
6  Senate previous to that litigation. I
7  believe that would have been July and
8  possibly the first part of September of 2021.
9       Q.  And you were retained by
10  attorneys representing Ms. Lake, correct?
11       A.  I was.
12       Q.  And isn't it true that that
13  litigation was dismissed by the Court?
14       A.  I believe it was, but then it
15  was subsequently appealed. I believe they're
16  still -- they are still in legal proceedings
17  over that matter, as I understand it.
18       Q.  And is that the case we talked
19  about earlier, wherein sanctions were awarded
20  against the attorneys for the client you were
21  retained by?
22       A.  Well, I can't speak as to
23  sanctions. However, there was a complaint at
24  the bar.
25       Q.  Are you aware of whether the

Page 91

1  Court in that case found that Rule 11
2  sanctions were appropriate against Ms. Lake's
3  attorneys?
4       A.  You'd have to ask the attorneys
5  on that. I didn't pay a lot of attention to
6  that.
7       Q.  And isn't it also true that
8  there was a special master appointed by the
9  Arizona State Senate in that litigation?
10       A.  There was.
11       Q.  And isn't it true that the
12  special master in that case disagreed with
13  your findings related to what the
14  forensically-imaged information showed?
15       A.  That is true, they disagreed
16  with our findings. However, their report was
17  fatally flawed.
18       Q.  Is that your opinion?
19       A.  Well, I think it would be any
20  honest examination of the facts opinion.
21  One, their scope was strictly limited to the
22  network aspects of the systems.
23       That was the reason they
24  appointed the special master, is they did not
25  want to produce the routers and network data

Page 92

1  to the auditors. So they appointed a special
2  master.
3       The -- in that report, they
4  stated that Maricopa County had informed them
5  that there were no managed switches that were
6  part of the voting system. And because of
7  that statement and a brief inspection of a
8  computer routing rack that was created after
9  the election, the special master said they
10  could not have been connected to the -- there
11  was no -- they stated that there was no
12  managed switch, so therefore, there was no
13  data, and that it was an Air Gapped system.
14       The problem with that is that
15  Pro V&V had been engaged in March of 2021 by
16  Maricopa County. And as part of their
17  examination for their audit, they listed a
18  managed switch. So it's clear that the
19  special master report did not have access to
20  the equipment and the configuration that
21  existed at the time of election, and at the
22  time of the Pro V&V audit.
23       Q.  The court found the special
24  master's findings to be dispositive, right?
25       A.  The Court certainly considered



Page 93

1  them.
2      Q.    Have you reviewed the United
3  States District Court for the District of
4  Arizona's December 1, 2022, order in the Lake
5  litigation?
6      A.    I have not.
7      Q.    I'll put up as an exhibit,
8  Exhibit 707.  This is the Court's order in
9  this case.
10          (Exhibit No. 707 marked for
11      identification.)
12          THE WITNESS:  Okay.  I have
13      that up.
14  BY MR. FREY:
15      Q.    Okay.  Do you see at the top,
16  there's the pacer identifier that says case
17  2:22-cv-00677, Document 106, filed December
18  1, 2022?
19      A.    I do.
20      Q.    And then it's an order from the
21  United States District Court from the
22  District of Arizona, right?
23      A.    Yes.
24      Q.    And looking at the first
25  paragraph there, the Court states:

Page 94

1          "At issue is the Federal Rule
2      of Civil Procedure 11 and 28 U.S.C.
3      section 1927, Motion for Sanctions
4      filed by Defendants."
5          Do you see that, in the opening
6      paragraph?
7      A.    Yes.
8      Q.    And then at the bottom of that
9  opening paragraph, the Court says, "For the
10  reasons set forth below, the Court grants
11  Maricopa County Defendants' motion," right?
12      A.    Yes.
13      Q.    So if you go down with me to
14  page 17, do you see there's a Section 5:
15  Allegations Regarding the Internet
16  Connectivity of Maricopa County's Election
17  Systems?
18          MR. KACHOUROFF:  What page are
19      you on, Tim?
20          MR. FREY:  Page 17.
21          THE WITNESS:  Yes.
22  BY MR. FREY:
23      Q.    Okay.  And then at the bottom
24  of -- the first paragraph there, kind of sets
25  out the dispute.

Page 95

1          And the Court states,
2  "Plaintiffs," -- which is Ms. Lake --
3  "responds that their allegations about the
4  Internet connectivity of Maricopa County
5  systems are well-founded."
6          It goes on to say:
7          "To support their argument,
8      plaintiffs cite to the testimony of
9      their expert, Benjamin Cotton, who
10      analyzed election systems provided by
11      Maricopa County during the Cyber
12      Ninjas' audit."
13          Do you see that?
14      A.    I do.
15      Q.    And is that the -- an analysis
16  of the images we have been discussing?
17      A.    Yes.
18      Q.    So the Court goes on to
19  describe your testimony:
20          "Mr. Cotton testified that he
21      saw actual evidence of remote log-ins
22      into Maricopa County's election
23      management server.  When asked whether
24      those were permissible or a security
25      breach, he responded, 'The

Page 96

1      attributable log-ins -- because I did
2      see some anonymous log-ins that I
3      could not trace back to an event.  The
4      ones that I saw came from the local
5      EMS subnet, if you will, the IP
6      address that -- for the voting
7      system.'"
8          Do you see that?
9      A.    I do.
10      Q.    And is that testimony that you
11  provided in that case?
12      A.    It is.
13      Q.    And if you go to the bottom of
14  that first paragraph, there is a discussion
15  where -- you give testimony that you couldn't
16  have access to the Internet, and provided
17  examples of breaches through other Air Gap
18  systems not used by Maricopa County.
19          Do you see that?
20      A.    Yes.
21      Q.    The Court then goes on, in the
22  next paragraph, to discuss the special master
23  designated by the Arizona State Senate to
24  examine the County's election network and
25  equipment.



Page 97

1           Do you see that?
2      A.   I do.
3      Q.   And the Court says that the
4  special master found, quote, "No evidence
5  that the routers, manage switches, or
6  electronic devices in Maricopa County's
7  Ballot Tabulations Center connected to the
8  public Internet," right?
9      A.   I see that.
10     Q.   And is this consistent with the
11  special master's testimony?
12     A.   That is.  However, what I would
13  like to point out here is that the special
14  master's examination of the current state of
15  the Maricopa County network was conducted
16  almost two and a half months after we imaged
17  the devices.
18          At no time did they request or
19  did they examine the forensics images that we
20  created that was the basis of my testimony.
21          So in other words, they wrote a
22  report without looking at those images.  They
23  wrote a report in which not all of the
24  evidence, as it existed at the time of the
25  election, existed.

Page 98

1          And they relied almost
2  exclusively on the Maricopa County officials'
3  assertion that it was an Air Gap network.
4          So this was his decision, but
5  quite frankly, I don't understand how you can
6  make this decision when they didn't look at
7  the evidence that we preserved.  And the
8  Senate had a copy of those images.
9          And that did not include all
10  the equipment that the Pro V&V audit report
11  validated was present at the time of the
12  election.
13          You know, I think we've all
14  been in cases where we believe the judge got
15  it wrong.  And in this case, he definitely
16  did.
17     Q.   As the Court then goes on to
18  state at the bottom of that page, it says:
19          "The special master's findings
20      are consistent with what the County
21      has long maintained and what previous
22      audits have likewise concluded."
23          Do you see that?
24     A.   I do.
25     Q.   And then the Court says:

Page 99

1          "Although the plaintiffs'
2  claims that Maricopa County's systems
3  can be or have been connected to the
4  Internet are in direct contradiction
5  to the County Defendant's evidence and
6  the special master's findings, the
7  Court will treat them as unpersuasive
8  arguments rather than as false
9  assertions of fact, allowing
10  plaintiffs the benefit of the doubt."
11         Do you see that?
12     A.   I think the keyword there is
13  they allowed the plaintiffs the benefit of
14  the doubt.  If you will review my report to
15  the Senate, I itemized specific instances in
16  which multiple connections were made external
17  to the Air Gap network by the EMS.
18     Q.   And you maintain control or
19  possession of the information that you
20  forensically reviewed in this case?
21     A.   So I returned to forensics
22  images to the Arizona State Senate.
23     Q.   Did you rely upon the forensic
24  images from the Maricopa County voting
25  systems in rendering your opinions in this

Page 100

1  case?
2      A.   From a corpus of knowledge as
3  it pertained to cyber security, yes, in
4  paragraphs 20 and 21.
5          There was no dispute that they
6  did not patch the systems, they had not
7  updated the antivirus, they allowed remote
8  access to the EMS, they had used the same
9  password for all user accounts on the system.
10  There's no dispute to that.
11     Q.   And I'm just trying to
12  understand that -- the extent to which you
13  relied upon that for rendering your opinions
14  in this litigation.
15          And that's in paragraphs 20 and
16  21, you said, correct?
17     A.   Well, specifically to the Air
18  Gap network, I relied on my personal
19  knowledge and the ability to easily bypass
20  Air Gap networks through various techniques.
21  I did not rely on this particular finding by
22  the judge as part of my report.
23     Q.   Okay.  I want to talk about the
24  next system that you forensically reviewed,
25  and that's Antrim County, Michigan, correct?

Page 101

1      A.    Correct.
2      Q.    And what company manufactured
3   the voting system information you reviewed
4   from Antrim County?
5      A.    Dominion.
6      Q.    And was that the Dominion
7   5.5(a), did you testify earlier?
8      A.    B.
9      Q.    5.5(b), okay.
10     A.    5.5(b) --
11     Q.    I'm sorry?
12     A.    5.5(a) is Georgia.
13     Q.    And what components of the
14  voting system did you forensically review in
15  Antrim County?
16     A.    So with Antrim County, I had
17  access to previously imaged -- to a
18  previously-imaged forensics image of the EMS
19  server, as well as the poll books and I
20  believe an ICC.
21     Q.    So no BMD, correct?
22     A.    And a BMD, yes.
23     Q.    There was a BMD?
24     A.    Yes.
25     Q.    And you don't recall one way or

Page 102

1   the other whether BMDs were used in Antrim
2   County in the 2020 election?
3      A.    I don't recall if this was one
4   that was actually used or one that they had
5   imaged.
6            I actually had imaged that one,
7   so I don't know if that one was actually used
8   in the election or not, so...
9      Q.    And it sounds like -- you said
10  you imaged one thing and then they had imaged
11  other things.
12           So who did the -- who obtained
13  the information that you reviewed --
14     A.    I'd have to look at the custody
15  documents for the exact person, but I believe
16  it was a member of an organization called
17  ASOC.
18     Q.    Is that Colonel Waldron's
19  organization?
20     A.    I believe so, yes.
21     Q.    Do you know the manner in which
22  they collected information?
23     A.    Based on the forensic images
24  that I got, it appeared to be created with
25  FTK Imager in conjunction with the use of a

Page 103

1   write block.
2      Q.    Are you confident that it
3   was --
4      A.    And it was --
5            (Cross talk.)
6            (Reporter clarification.)
7            THE WITNESS:  It was in the
8            N-case format.
9   BY MR. FREY:
10     Q.    Are you confident that it was
11  collected in the manner that would
12  demonstrate how it would have performed on
13  election day?
14     A.    I saw no indications that
15  anything was modified on it.  And within the
16  N-case forensics image format, it has a
17  self-validation/verification function.  And
18  the images -- the image is verified.
19     Q.    And did you appear as an expert
20  witness related to your review of the
21  information obtained from Antrim County?
22     A.    Specific to Antrim County, I
23  submitted an affidavit, but it did not reach
24  court so I did not testify.
25     Q.    That litigation was dismissed

Page 104

1   by the court, correct?
2      A.    Correct.
3      Q.    Do you retain control or
4   possession of the forensic images from Antrim
5   County?
6      A.    I returned those to the
7   attorney.
8      Q.    Did you review the forensic
9   images from Antrim County in the course of
10  drafting your declaration in this case?
11     A.    I reviewed the report at some
12  point prior to writing this, but once again,
13  that formed the -- kind of the corpus of
14  knowledge for paragraphs 20 and 21.
15     Q.    And in paragraphs 20 and 21,
16  you don't cite to any specific, you know,
17  findings or Antrim County specifically in
18  there, correct?
19     A.    No, but what I did find was
20  consistent among all of the Dominion systems,
21  was an -- I would call it a complete and
22  utter lack of cyber security practices.
23           The systems weren't patched,
24  the antivirus wasn't updated, there was no
25  mechanism to validate that only certified



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
105–108

Page 105

1 processes were being run, that only
2 authorized MAC addresses were communicating.
3       The user passwords had never
4 been changed since the date of the
5 installation of the software, and there was
6 repeated usage of the same password within
7 each jurisdiction for all user accounts. And
8 that had been across all Dominion.
9     Q.    And we just -- we don't -- to
10 your knowledge, defendants have not produced
11 any of the information you're relying on here
12 to plaintiffs in this case, right?
13     A.    No one has asked for it.
14     Q.    And if the request were made,
15 would you be able to provide the images you
16 reviewed from Antrim County?
17     A.    I would, but I would assume
18 that that would take a court order, because
19 one company is looking at another company's
20 proprietary data. But, yes, we would produce
21 that.
22     Q.    Moving on to Mesa County,
23 Colorado.
24       What voting system information
25 did you review from Mesa County, Colorado?

Page 106

1     A.    I reviewed an image of the
2 Dominion EMS.
3     Q.    So not a ballot-marking device,
4 correct?
5     A.    Correct.
6     Q.    And how did you obtain the
7 information or the image of the Dominion EMS
8 from Mesa County, Colorado?
9     A.    I was provided that by the
10 legal team that was defending -- I'm sorry, I
11 don't remember her name right now -- but the
12 County clerk and the election official for
13 Mesa County.
14     Q.    Is it Tina Peters?
15     A.    It is. Thank you.
16     Q.    Are you aware, then, that Ms.
17 Peters was indicted for copying this election
18 software from Mesa County Colorado without
19 authorization?
20       MR. KACHOUROFF: Objection.
21     (Inaudible) hypothetical.
22       Go ahead, you can answer the
23     question.
24       THE WITNESS: I knew she had
25     legal problems. I wasn't aware of

Page 107

1     exactly what she was charged with.
2 BY MR. FREY:
3     Q.    And you said you got the image
4 that you reviewed from her attorneys; is that
5 right?
6     A.    Yes.
7     Q.    And was that in connection with
8 the defense of her criminal case?
9     A.    That was my understanding, yes.
10     Q.    And what work did you do with
11 that image?
12     A.    I was asked to be a
13 non-testifying expert and review the findings
14 of another team's report.
15     Q.    Do you maintain control or
16 possession of the image of the Dominion EMS
17 from Mesa County, Colorado?
18     A.    I do not.
19     Q.    Are you relying upon your
20 review of the Dominion EMS from Mesa County,
21 Colorado in rendering your opinions in this
22 case?
23     A.    Only to the effect of the cyber
24 security implications for the election
25 systems as a whole.

Page 108

1     Q.    Okay. What voting system
2 information did you review from Coffee
3 County, Georgia?
4     A.    I was retained by Misty
5 Hampton's attorney to examine the EMS and one
6 ICC notebook as part of her defense for Misty
7 Hampton.
8     Q.    And was that -- excuse me.
9     (Discussion off the record.)
10 BY MR. FREY:
11     Q.    So you reviewed the EMS and an
12 ICC notebook.
13       Was that a Dominion system?
14     A.    That was, yes.
15     Q.    And again, that's -- you did
16 not review an image of a ballot-marking
17 device, correct?
18     A.    No.
19     Q.    And do you know how the image
20 that you reviewed of the EMS and ICC notebook
21 was obtained?
22     A.    Yes. I was provided that by --
23 or provided access to it by Stephanie
24 Lambert, who was the attorney for Misty
25 Hampton.



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
109—112

Page 109

1    Q.    Okay.  And was Ms. Lambert
2    representing Ms. Hampton against the charges
3    that she had illegally obtained this
4    information?
5    A.    I don't know exactly what Misty
6    Hampton's charges were, but there was the
7    possibility that she would be charged with
8    something.
9    Q.    And what was the purpose of
10   your review of the information?
11   A.    I think that gets a little bit
12   into the attorney-client work product piece
13   there, and they have not released that --
14   they have not given me authorization to
15   discuss that.
16         But I will tell you that for
17   the purposes of this declaration, I relied on
18   the general cyber security status indicative
19   on the EMS system.
20         So passwords, remote access,
21   system patches, failure to update the
22   antivirus, and Internet access.
23   Q.    And do you maintain control or
24   possession of the this EMS ICC notebook
25   images?

Page 110

1    A.    That's an ongoing case, so yes,
2    I still have a copy of those forensic images.
3    Q.    And you understand that if it's
4    an ongoing case, that it's not been made
5    available to Smartmatic in this action,
6    correct?
7    A.    I certainly have not provided
8    it to you.  I don't know if Ms. Lambert has
9    or not.
10   Q.    Again, I believe you said
11   you're relying on it to the extent of the
12   opinions you render in paragraphs 20 and 21?
13   A.    Correct.
14   Q.    And then the last one here,
15   Adams County, Michigan.
16   What voting system information
17   did you review from Adams County, Michigan?
18   A.    So that was the Hart
19   Intercivic.
20         (Reporter clarification.
21   BY MR. FREY:
22   Q.    What type of election
23   technology -- what were the components that
24   you reviewed from Adams County, Michigan?
25   A.    So I looked at the precinct

Page 111

1    iPad.  And I visually inspected that, I did
2    not image that device.
3         My purpose there was to
4    validate that the local election clerk had
5    that particular tablet secured behind a lock
6    and key and that it was functional.
7         I subsequently was provided
8    data specific to the databases and the
9    compilation of the votes from the EPB thumb
10   drive for analysis.
11   Q.    "EPB," what does EPB stand for?
12   A.    Or, I'm sorry -- EDP, Election
13   Database.
14   Q.    And how did you obtain -- or
15   who obtained the EDP thumb drive for
16   analysis?
17   A.    That would have been the
18   attorney, Ms. Lambert.
19   Q.    And do you know how she
20   collected it?
21   A.    I do not.
22   Q.    Are you aware that also
23   criminal charges were considered against the
24   Adams County clerk related to her disclosure
25   of this voting system information?

Page 112

1    A.    I am.
2    Q.    And that's the data you
3    obtained?
4    A.    Yes.  I would like to also
5    clarify that in my engagement letter, I have
6    a paragraph 10 that states -- it's an
7    indemnity clause in which the attorneys I
8    engage represent that all data that they
9    present to me for examination is legally and
10   lawfully obtained, and that they have a right
11   to authorize me to examine it.
12   Q.    So you're relying on the
13   attorneys there, correct?
14   A.    Correct.
15   Q.    And do you still maintain
16   control or possession of the EDP from Adams
17   County?
18   A.    I do.  It's an ongoing case.
19   Q.    Did you rely upon this
20   information from Adams County in rendering
21   your opinions in this case?
22   A.    No.
23   Q.    Okay.
24         MR. FREY:  Let's take another
25   break -- I'm at a good point -- and

BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
113–116

Page 113

1    use five minutes.
2        THE VIDEOGRAPHER:  Going off
3    the record at 12:06 p.m.
4        (Break taken.)
5        THE VIDEOGRAPHER:  We are back
6    on the record at 12:41 p.m.
7    BY MR. FREY:
8        Q.    All right.  Mr. Cotton, we're
9    back on the record.  I want to briefly talk
10   about the scope of your opinion in this case
11   again, and to confirm that -- are the
12   opinions you set forth here in your
13   declaration the opinions you intend to offer
14   at trial in this matter?
15       A.    Yes.
16       Q.    Are you planning to offer any
17   other opinions not identified in your
18   declaration?
19       A.    I haven't been asked any other
20   opinions at this point.  If I was asked, I
21   would write an addendum, should more
22   information become available.
23       Q.    Do you intend to perform any
24   additional analysis?
25       A.    No.

Page 114

1        Q.    Do you currently intend to
2    change any of the opinions set forth in your
3    declaration?
4        A.    No.
5        Q.    Are you offering any opinions
6    in this case on the truth of the statements
7    Mr. Lindell published regarding Smartmatic's
8    alleged role in the validity of the 2020 U.S.
9    election?
10       A.    No.
11       Q.    Are you aware of the statements
12   Mr. Lindell published regarding Smartmatic
13   and its alleged role in manipulating the 2020
14   U.S. election?
15       A.    I am not aware of specific
16   statements by Mr. Lindell.
17       Q.    Have you reviewed Smartmatic's
18   first amended complaint in this litigation?
19       A.    I don't believe I have.
20       Q.    Have you watched Mr. Lindell's
21   documentary, Absolute Proof?
22       A.    I have not.
23       Q.    Have you watched Mr. Lindell's
24   documentary, Absolute Interference?
25       A.    I have not.

Page 115

1        Q.    Have you watched Mr. Lindell's
2    documentary, Absolutely 9-0?
3        A.    I have not.
4        Q.    And have you watched Mr.
5    Lindell's documentary, Scientific Proof?
6        A.    I have not.
7        Q.    You did attend Mr. Lindell's
8    cyber symposium in August of 2021, correct?
9        A.    I went there.  The data that I
10   had been promised would be provided to me was
11   not provided, and so I did not stick around.
12   I was not actually part of the symposium.
13       Q.    And so is it your opinion,
14   then, that at least to your review or what
15   you have seen, the alleged PCAP data
16   demonstrating the November 2020 U.S. election
17   was manipulated is not evidence that the
18   election was manipulated?
19       A.    All I can respond to is the
20   data that was provided to me.  Whether or not
21   or that was the entire body of data that was
22   provided to the other 15 or 20 experts, I
23   cannot opine to.
24            But I can tell you that the
25   data that was provided to me was not

Page 116

1    sufficient for me to make an opinion on that.
2        Q.    And you're not intending to
3    offer any affirmative opinions in this case
4    regarding the validity of the alleged PCAP
5    data, right?
6        A.    That is not within the scope of
7    my declaration.
8        Q.    Are you aware of statements
9    published by Mr. Lindell and Dr. Frank
10   regarding a 6th degree polynomial algorithm
11   that was used to manipulate the November 2020
12   U.S. election?
13       A.    Only tangentially.  I remember
14   hearing something about it, and I don't even
15   remember where I heard about it.
16            But, you know, my area of
17   expertise is computer forensics, cyber
18   security.  So I don't know much about that.
19       Q.    So you're not going to offer
20   any opinions regarding that theory as an
21   expert in this case, correct?
22       A.    No.
23       Q.    Are you aware of claims made by
24   Mr. Lindell and others that cast vote records
25   indicate that the election in LA County was



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
117–120

Page 117

1  manipulated by Smartmatic?
2      A.    I am not.
3      Q.    So is it fair to say that you
4  will not be offering any opinions in this
5  case regarding what cast vote records may
6  indicate regarding the integrity of the 2020
7  election in LA County?
8      A.    That is not currently within
9  the scope of my engagement.
10      Q.    Are you familiar with the
11  Election's Infrastructure Government
12  Coordinating Council?
13      A.    Are you talking the DHS entity?
14      Q.    Yes.
15      A.    I am aware of it, yes.
16      Q.    Are you familiar with it at
17  all?
18      A.    To a high-level degree, nothing
19  in detail.
20      Q.    How about the Election
21  Infrastructure Sector Coordinating Executive
22  Committee?
23      A.    I'm aware that it exists.  I am
24  not a member of it.
25      Q.    Were you aware that on

Page 118

1  November 12, 2020, these two -- that the
2  EIGCC and the EISEC issued a report stating
3  that the November 3rd election was the most
4  secure in American history, and that there's
5  no evidence of any voting system lost -- any
6  voting system lost or deleted votes, changed
7  votes, or was in any way compromised?
8      A.    I am aware they issued that
9  report, yes.
10      Q.    Do you disagree with that
11  statement?
12      A.    I do disagree, to the extent of
13  my knowledge on the systems that I have
14  examined.
15           In the case of Arizona for
16  example, there were several hundred thousand
17  ballots deleted off of the EMS by the time
18  that we received that.  Some of those were
19  actually during the election time period.
20           So I would have to understand
21  better the full scope and the basis for their
22  statement before I could really opine on the
23  validity of it.
24           But I know from personal
25  experience, there do appear to be some

Page 119

1  incongruities with the forensics facts versus
2  the statement that was released.
3      Q.    And the basis for that is the
4  forensic work you did in Maricopa County,
5  Arizona; is that right?
6      A.    Maricopa, Antrim, and Georgia.
7  During the case of Antrim, there was clearly
8  votes that were flipped.  There's still some
9  debate a bit about why that happened, but the
10  clerk caught those.  So we do know that that
11  did occur, but that was corrected.
12           So, you know, there are some
13  inconsistencies with the absolute statement
14  on that report that they released.
15      Q.    Are you intending to offer
16  opinions in this case regarding the outcome
17  of elections in Michigan, Arizona, or
18  Georgia?
19      A.    That's not within the scope.
20  And I will tell you that my testimony will be
21  centered around forensics findings and
22  forensics evidence on the systems that I have
23  examined.
24      Q.    Are you aware of any evidence
25  of actual voter manipulation or actual vote

Page 120

1  manipulation occurring in LA County in the
2  November 2020 U.S. election?
3      A.    I have not been able to examine
4  the actual systems.  So once again, from a
5  forensics standpoint, I am not aware because
6  I have not been able to examine the actual
7  systems.
8      Q.    And I believe in preparing your
9  declaration, you reviewed a number of
10  documents related to the VSAP 2.1
11  certification, right?  Those are listed in
12  paragraph 14 of your -- or 13 of your report?
13      A.    That is correct.
14      Q.    And aside from reading these
15  documents and the version 3.0 certification
16  documents, what else did you do to
17  familiarize yourself will the LA County VSAP
18  initiative?
19      A.    I obviously read the web page
20  articles that they had.  Anything related to
21  VSAP, I reviewed those pages.  And I reviewed
22  the reports, I reviewed the source code
23  report and those items as listed in my
24  declaration.
25      Q.    What is your understanding of



Page 121

1  the components of the VSAP system used in
2  November 2020 that were manufactured or
3  designed by Smartmatic?
4      A.    Well, I looked at it from --
5  from a systematic hold perspective.  And so,
6  you know, there's various components.
7         My understanding is that
8  Smartmatic has a component within all of
9  those related systems.  My scope of this work
10  was not related specifically to Smartmatic,
11  it was to the VSAP system.
12      Q.    So in -- I guess, in performing
13  your work, you didn't worry so much about
14  whether it was a Smartmatic manufactured
15  component versus a component manufactured by
16  someone else?
17      A.    That's correct.
18      Q.    Okay.  In the course of your
19  analysis in this case, did you explicitly
20  analyze or consider the ballot marking
21  devices?
22      A.    Only to the extent that there
23  were reports or evaluations based on those
24  ballot marking devices.
25      Q.    What is your understanding of

Page 122

1  the functionality of a ballot-marking device?
2      A.    Well, a ballot-marking device
3  is a computing device that contains
4  vendor-specific application software that a
5  user either disabled or, in some
6  jurisdictions -- like in Georgia, for
7  example -- they do this for all voters.
8         But through the interaction of
9  the user and the application, they were able
10  to indicate on a stored ballot what their
11  voting preferences are, and then that vote is
12  tallied and recorded as part of the voting
13  process.
14         In some cases, they will
15  present a screen after the user has selected
16  the votes and the voter will confirm on the
17  screen; or in some cases, they actually print
18  something out and the voter supposedly looks
19  at that, validates it.
20         And then once they commit, then
21  that vote is considered closed and is then
22  counted as part of the election process.
23      Q.    Do you know in LA County,
24  whether the BMD printed out the ballot before
25  allowing the voter to cast their ballot?

Page 123

1      A.    I do not recall.  That would be
2  in the user's manual.
3      Q.    Do you know whether the ballot
4  marking devices used in LA County in
5  November 2020 tabulated votes?
6      A.    I believe those votes were
7  transmitted to a central tallying facility.
8  I believe that was called BMG.
9      Q.    Do you know whether the ballot
10  marking devices used in LA County in
11  November 2020 would store votes?
12      A.    It would obviously store those
13  votes prior in some medium, either in memory
14  or on thumb drive or removable media, until
15  those votes were transmitted to the central
16  counting facility.
17      Q.    Do you know whether the
18  ballot-marking devices used in LA County in
19  November 2020 generated a paper ballot?
20      A.    I do not know.
21      Q.    What is your understanding of
22  BMG system in LA County's VSAP initiative?
23      A.    So the BMG is basically a
24  manager for all of the ballot-marking
25  devices, and also contains some capacity or

Page 124

1  the function for a centralized repository for
2  the different voting tabulations.
3      Q.    When you say "a centralized
4  repository for the different voting
5  tabulations," could you explain what you mean
6  by that?
7      A.    Well, the votes can be
8  transmitted to that BMG and then aggregated
9  into a total.
10      Q.    What is the basis for your
11  understanding in that regard?
12      A.    My review of the user's manual.
13      Q.    It's your understanding there
14  that the BMG would take a record of an
15  electronic record of the vote from the
16  ballot-marking device?
17      A.    It can.  I haven't examined the
18  actual systems that were used in the
19  election, so I don't know what their
20  configuration was or how they functioned in
21  that particular election.
22      Q.    If the BMG did not create an
23  electronic record of a vote, would that
24  impact your opinions at all?
25      A.    No, because I'm approaching



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
125–128

Page 125

1  this from a cyber security perspective, can
2  you get remote access to an individual
3  component?
4        The ATSEC report evaluated all
5  of the different components, not just the
6  BMG. So it wouldn't change my opinions.
7        Q.    In forming your opinions in
8  this case with respect to the ability to
9  remote -- to gain remote access, have you
10  formed opinions or do you have opinions
11  regarding what could or could not be done
12  with that remote access?
13        A.    I have some opinions to that.
14  And obviously, as I get the opportunity to
15  examine these specific devices, I would form
16  more.
17        But based on the
18  vulnerabilities that are in the ATSEC report,
19  you have the ability to iterate the running
20  processes remotely.
21        You have the ability to inject
22  -- do memory injections on these devices.
23  You have the ability to perform buffer
24  overflows on these devices.
25        You have the ability to

Page 126

1  manipulate vulnerabilities, such that you
2  could overwrite specific files within these
3  end points.
4        And you have the ability to
5  escalate your user privileges if you do have
6  access to the systems.
7        Q.    I want to take those one at a
8  time.
9        So the first thing you said, I
10  believe, is the ability to iterate running
11  processes.
12        What do you mean by "iterate
13  running processes"?
14        A.    Well, there's no protection on
15  the ports, from what I can tell, on the
16  vulnerability listings to prevent the
17  interrogation of the devices.
18        And based on the return of the
19  -- it's called fingerprinting your ports,
20  okay?
21        So there's no protection that I
22  can see, either from a firewall or other
23  methodology, that would prevent the
24  fingerprinting of those ports so that you
25  understand what processes are running and

Page 127

1  communicating with those ports.
2        Q.    So if a port was fingerprinted,
3  I suppose, what would someone do with that?
4        A.    Just as one example, they run
5  SQLite databases.  SQLite databases could
6  communicate on port 1443 and 1445.
7        If you fingerprint a port, one,
8  you validate that they are running SQL; and
9  two, you know exactly which ports they are so
10  that you can then craft buffer overflows that
11  you may be able to get command line access
12  back into the SQL server for that port.
13        That's just one example of
14  that.
15        Q.    What do you mean by "a buffer
16  overflow"?
17        A.    So a buffer overflow is a
18  specific type of vulnerability in which you
19  send a specific formed packet to that device,
20  and that -- the packet instructions will
21  exceed the expected buffer length for a given
22  technology.
23        So SQL, for example:  It's
24  expecting a payload package with X-amount of
25  characters in it.  If you -- for a buffer

Page 128

1  overflow, what you can do is, once that
2  expected length of a packet is reached, you
3  can then insert commands and specific code
4  after that so that it is executed in memory.
5        And per the -- per the report,
6  they did not appear to have -- or those
7  systems were susceptible to buffer overflow
8  methodologies, and that's in the ATSEC
9  report.
10        Q.    So if the buffer overflow
11  methodology is used and a specific code is
12  put into a BMD, what impact, if any, would
13  that have?
14        A.    Well, it depends on what your
15  attacking and what the code is.  But
16  theoretically, you could change the contents
17  of the local database on the BMD.
18        You could change the CVR.  You
19  could change the ballot image that's
20  presented to the voter.
21        I mean, you know, it really
22  depends on what your objective is as an
23  intruder or a hacker at that particular
24  point, as to what you could do.
25        Q.    And do you agree that if the



Page 129

1  voter has an opportunity to look at the
2  ballot that they've marked with the BMD after
3  they've marked it, they would become aware of
4  any changes that were made to their vote?
5        A.    Yes and no.  They certainly
6  would reflect the changes that they'd made at
7  that point in time, but that vote is not
8  committed to the database or to the CVR at
9  that point.
10       It's only after they accept
11  the, you know, there's a check and balance
12  and you click "Continue" or something on
13  this, to -- to basically commit the vote.
14       And at that point, that would
15  be recorded in the CVR and that would also be
16  recorded as part of the count.
17       If there's a manipulation after
18  that individual reviewed the ballot selection
19  and before it was written to the CVR, they
20  would not know that.
21       Q.    And for purposes of what you
22  just discussed, is your assumption that the
23  ballot-marking device electronically stores
24  the cast vote record?
25       A.    Well, it certainly has that

Page 130

1  information in memory at the minimum until
2  the vote is committed.  And then it may
3  transmit that to another location or store it
4  locally, so...
5        Q.    Do you have any opinions with
6  respect to how an audit of paper ballots
7  against an electronic record could mitigate
8  potential risks?
9        A.    Well, I certainly have some
10  concepts that I would use if I were testing.
11  I don't know what LA County is actually
12  implementing on this.
13       But if you had an independent
14  program that scanned the retained ballot
15  images, and then you compared that against
16  the CVRs, that would give you a pretty good
17  indication if there were issues there with
18  the count.
19       Q.    For purposes of forming your
20  opinions in this case, did you review any
21  information or analyze any information with
22  respect to the audit procedures that the LA
23  County did use in November 2020?
24       A.    Only what was contained on the
25  websites, and I don't remember anything in

Page 131

1  detail on their website.
2        Q.    Going back to the components of
3  the VSAP program, what is your understanding
4  of the enterprise signing authority component
5  of the VSAP system?
6        A.    So the enterprise signing
7  authority would be the centralized crypto
8  repository that would digitally sign
9  individual items based on the cryptological
10  keys contained within that device.
11       Q.    And your knowledge regarding
12  the enterprise signing authority, does that
13  come from the documentation you reviewed?
14       A.    It does, and also basic
15  computer security knowledge.  That's not an
16  uncommon practice.
17       Q.    Do you have an understanding of
18  the cryptographic system that was employed by
19  the enterprise signing authority in the VSAP
20  system?
21       A.    I do not, because I have not
22  been able to examine the actual systems that
23  were used in the election.
24       Q.    Do you have an understanding as
25  to what the documentation and use procedures

Page 132

1  set forth regarding the cryptographic system
2  that would be employed by the enterprise
3  signing authority?
4        A.    I did review those as part of
5  the user manual and the setup procedures.  I
6  don't really recall those at this time.
7        I do recall that, based on the
8  ATSEC report, that they had a FIPS-compliant
9  algorithm.
10       But it could not be a
11  FIPS-certified system because that operating
12  system had not been tested in conjunction
13  with that algorithm.
14       Q.    What is your understanding of
15  the mechanism by which the enterprise signing
16  authority managed cryptographic keys related
17  to authorization?
18       A.    I don't recall the exact
19  procedures, but essentially they would import
20  a certificate, and that certificate was then
21  used as the basis for the signing authority.
22       Q.    And what is your understanding
23  of the mechanism by which the enterprise
24  signing authority managed authentication in
25  the VSAP system used in the November 2020



BENJAMIN COTTON                                          August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell                    133—136

Page 133

1  election?
2      A.    Once again, I haven't been able
3  to examine any of the systems, so I don't
4  know how they were configured and how they
5  actually operated.
6      Q.    Do you have any understanding
7  of the mechanism by which the enterprise
8  signing authority managed data integrity in
9  the November 2020 U.S. election?
10      A.    I remember that they would use
11  Shaw values, typically Shaw-1 values on
12  executables.  And they would use public
13  private keys on some of the authentication
14  mechanisms.
15      Q.    And you were able to learn that
16  information from the documentation
17  surrounding the VSAP system, correct?
18      A.    Yes.
19      Q.    And what is your understanding
20  of the trusted platform modules employed by
21  the VSAP system used in the November 2020
22  U.S. election?
23      A.    Well, as a -- by definition, a
24  trusted module is one that has been
25  authenticated, the hash values are listed

Page 134

1  with the group baseline.  And in some cases,
2  the MAC addresses are part of that trusted
3  system, so you wouldn't accept MAC addressed
4  or data from MAC addresses that year from
5  beyond a certain baseline.
6      But once again, I can't render
7  an opinion on that as it pertains the 2021
8  [sic] election, because I haven't been able
9  to examine the systems to determine whether
10  or not that was properly configured or not.
11      Q.    So you've been talking a lot
12  about the ATSEC report, and you have a few
13  points on that in paragraphs 15 and 16 of
14  your declaration, correct?
15      A.    Let me review here, real quick.
16      Q.    Okay.
17      A.    Yes.
18      Q.    Okay.  And so the ATSEC report,
19  which we marked as Exhibit 706 for the
20  record, the date of this is January 6, 2020,
21  correct?
22      A.    I believe so.
23      Q.    And the --
24      A.    Well, the ATSEC report that I
25  am looking at is January 6, 2020, yes.

Page 135

1      Q.    You understand -- or do you
2  understand that the election occurred on
3  November 3rd, 2020, correct?
4      A.    Correct.
5      Q.    And in your report, you
6  highlight a number of issues found by the
7  ATSEC report.
8      Are you aware of or did you
9  analyze whether any of these deficiencies
10  were corrected or ameliorated in advance of
11  the November 2020 election?
12      A.    I reviewed -- so, the bottom
13  line is, I reviewed the documentation to look
14  for any corrections, because that would have
15  required a recertification of the systems
16  themselves by the VSAP people.
17      And I did not see any
18  indication that they had performed a
19  recertification or had done additional
20  testing after they had modified or changed
21  the code.
22      Q.    Do you know what date the VSAP
23  system was certified?
24      A.    I would have to look.  I don't
25  recall that off the top of my head.

Page 136

1      Q.    Do you recall whether the VSAP
2  system was certified before or after
3  January 6, 2020?
4      A.    Well, it would have been
5  certified after, because they would have
6  relied on this ATSEC report as part of the
7  basis for that certification.
8      Q.    And do you recall one way or
9  another whether any additional testing was
10  performed on the VSAP system between the time
11  of issuance of the ATSEC report and the date
12  of the election?
13      A.    I don't recall seeing any in --
14  on the website for the County.
15      Q.    What is your understanding of
16  the purpose of security testing such as that
17  performed by ATSEC?
18      A.    Well, the basic code review is
19  to determine whether or not there are
20  vulnerabilities that exist in a given system
21  that would cause it to be vulnerable from
22  remote unauthorized use or access.
23      Q.    And do you understand that the
24  purpose of the testing is to identify
25  vulnerabilities so that they can be corrected



BENJAMIN COTTON                                          August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell                137–140

Page 137

1  to obtain certification?
2      A.    Well, the ATSEC report is
3  certainly used to identify vulnerabilities.
4  The follow-on remediation piece, that's
5  entirely up to the County, whether or not
6  they want to address those or try to use
7  compensating controls for those
8  vulnerabilities.
9      Q.    Did you review any
10 documentation from the County regarding how
11 they were addressing identifying
12 vulnerabilities?
13     A.    I don't recall reviewing a
14 document in which they addressed the
15 vulnerabilities.
16     Q.    And you did not review any
17 documents not listed in your report here, at
18 page --
19     A.    Well, I've indicated that I did
20 look at the websites for LA County, and I
21 didn't list every website and things.
22         But the documents listed in my
23 declaration are the primary basis for my
24 report.
25     Q.    So there's a -- Item 13-D in

Page 138

1  your report is, County of Los Angeles VSAP
2  2.1 Stat Report, a PDF, correct?
3      A.    Correct.
4      Q.    I'm going to put a document
5  into the chat, which will be Exhibit 707 --
6  709.
7         I apologize.  This will be 708.
8  The document for the record with Bates
9  identifier Smartmatic-Lindell 00017735.
10         (Exhibit No. 708 marked for
11         identification.)
12 BY MR. FREY:
13     Q.    Let me know when you have that,
14 Mr. Cotton.
15     A.    I have that.
16     Q.    All right.  Do you see that
17 this is a County of Los Angeles VSAP Tally
18 Voting System Staff Report, dated August 14,
19 2020?
20     A.    I do.
21     Q.    Did you -- is this the document
22 you reviewed in forming your opinions on the
23 case?
24     A.    Yes, this is the one that is
25 listed in my declaration.

Page 139

1      Q.    And if you go to the fifth page
2  of the document, do you see that it lists the
3  source code findings review and then the
4  staff analysis of that finding?
5      A.    Yeah.
6      Q.    And various of these indicate
7  that the finding was resolved, correct?
8      A.    Yes.
9      Q.    Walking through this
10 paragraph 15 of your report, in item C, you
11 say, "A static code analysis by ATSEC
12 revealed 14 low severity findings," correct?
13     A.    Yes.
14     Q.    Do you know whether or not
15 those findings are the ones that are resolved
16 here in --
17     A.    So here's what I will say, is
18 that some of those findings are addressed in
19 this.  However, if you look at the resolve,
20 they're actually not resolved.
21         So basically, they have
22 attempted to put in some compensating
23 controls to mitigate the effects of those
24 particular vulnerabilities.
25         Specific is the Air Gap system,

Page 140

1  and that's used on a number of these cases
2  that says, Well, we don't have to worry about
3  this because it's an Air Gap system.
4         Okay.  The challenge with that
5  is:  One, it doesn't address any insider
6  threat.  So if a user -- a malicious user has
7  authorized access to that Air Gap system,
8  then the vulnerability is still there, okay?
9         If someone penetrates that Air
10 Gap system through island-hopping or some
11 other mechanism, then that vulnerability is
12 still there.  So it's not resolved in the
13 formal sense of that word, as in it doesn't
14 exist anymore.
15         It still exists, but they have
16 attempted to put in a compensating control
17 for that.
18     Q.    And the control that is put in
19 is meant to protect the integrity of the
20 voting results in the election, right?
21     A.    It's an effort to protect the
22 system, yes.
23     Q.    And so, just so I understand
24 your opinions here, are you not concerned
25 about -- or are you not taking into account



Page 141

1  efforts that would protect the integrity of
2  the system if there is still a technical
3  vulnerability in the software?
4       A.    You know, I've been doing
5  incident response for a long time.  And I
6  have been dealing with hackers for a long
7  time.
8       And I have dealt in the U.S.
9  government on the classified side of programs
10  as a contractor.  And I know the techniques
11  and the methodologies by which you can bypass
12  these compensating controls.  So I recognize
13  the fact that they put a compensating control
14  in place.
15       But if, you know, there's this
16  little problem with people in the middle of
17  these things, right?  How do they implement
18  them?  How did they set that up?  How did
19  they configure these systems in conjunction
20  with the compensating controls to ensure that
21  they weren't exploited, right?
22       So you may have heard of
23  Stuxnet, that's a pretty famous open source
24  vulnerability that jumps Air Gap systems, and
25  it does it through devices.

Page 142

1       Another common methodology is
2  island-hopping, where someone -- either
3  witting or unwitting -- establishes a
4  connection on an Air Gap system through an
5  external wi-fi or other mechanism.
6       So there are multiple ways that
7  you could bypass these mechanisms.  I
8  recognize the fact that they are in place and
9  they're attempting to use that as a
10  compensating control.
11       But without actually examining
12  the system to determine whether or not those
13  controls were effective, is a different
14  matter entirely.
15       Q.    Moving on to paragraph 16 of
16  your report, you say:
17       "Based on my review of the
18       ATSEC source code review report, the
19       Smartmatic and VSAP devices have the
20       following interfaces that are used for
21       data transfer and communications with
22       other network devices."
23       And then you list A to K,
24  correct?
25       A.    Correct.

Page 143

1       Q.    And for each of these
2  interfaces, are you differentiating whether
3  it was on a Smartmatic device or a different
4  component of the VSAP system?
5       A.    So the VSAP system looked at
6  all components as a whole.  So I didn't
7  differentiate that Smartmatic has this
8  specific, you know, thing -- only Smartmatic,
9  et cetera.
10       Q.    Item D on your list says,
11  "Remote voting is provided by Amazon web
12  servers and is open to the public Internet."
13       What is the basis for your
14  statement there?
15       A.    Specifically, I believe it's
16  the -- within the report, as they're listing
17  the dependencies of these different
18  components, there's a specific listing in
19  there, both on the ATSEC report and this is
20  referenced also in the user guide for Amazon
21  web services.  And so it relies on Amazon web
22  services for its functionality.
23       Q.    And what is your understanding
24  as to how it relies on Amazon web services?
25       A.    My understanding is that it

Page 144

1  uses the S-3 buckets as a repository for
2  data.
3       Q.    And do you -- what is your
4  understanding of whether that -- Amazon web
5  service's use is implemented through a
6  Smartmatic-manufactured component of VSAP,
7  versus some other component of the VSAP
8  system?
9       A.    Well, just if you'd allow me to
10  look at the ATSEC, I'll tell you exactly
11  which component.  Just one minute.
12       So it's the ISB.
13       Q.    What page are you looking at?
14       A.    On the ATSEC, it's page 15.
15       Q.    Page 15 -- okay.  Next to ISB.
16       A.    Yeah.  "Amazon services is used
17  for cloud-based hosting and storage."
18       Q.    And is this statement here on
19  page 15, is that -- that the reference that
20  you are relying on for inclusion of this
21  Amazon web servers --
22       A.    That's also referred to in the
23  user guide, the user manual as well.
24       Q.    Did you say before that was the
25  user guide for 3.0?  Or for 2.1?



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
145–148

Page 145

1      A.    It exists in both.
2      Q.    And is that also -- is your
3   understanding that that's also related to
4   ISB?
5      A.    Well, in the user manual, it's
6   more related to the remote-voting function
7   rather than a specific device.
8            There's also indications, you
9   notice that it says "cloud-based hosting."
10  And there are some -- some references to
11  loading virtual hosts as part of their -- as
12  part of the ATSEC testing, and that came from
13  the Amazon web hosting functions.
14           So it's indeterminate as to how
15  many systems are up there, but there
16  certainly exists virtual systems in the
17  Amazon cloud hosting environment.
18     Q.    And your understanding is,
19  that's related to the ISB, correct?
20     A.    The ISB is where, in this
21  particular case, the hosting and storage is
22  correlated.
23           However, when you look at the
24  network diagram in the user guides, it does
25  not show an Air Gap from the ISB to the rest

Page 146

1   of the network.
2            And what's important to
3   understand from an access and a vulnerability
4   standpoint is that it just takes one access
5   point, and you can use that to leverage or
6   access the entire network.
7      Q.    What is your understanding of
8   what the ISB is?
9      A.    I don't recall at this point.
10  You know, my top level understanding is that
11  it's a remote voter function within the VSAP
12  system.
13     Q.    If I told you it stands for
14  Interactive Sample Ballot, does that help at
15  all?
16     A.    Well, yeah.  So, you know, they
17  would be presenting the ballot images and
18  things like that, as well as that remote
19  access voting piece.
20     Q.    And what's your understanding
21  of how the remote -- remote voting would work
22  in the VSAP initiative?
23     A.    Well, basically, somebody can
24  access through the Internet this function and
25  vote remotely, and that vote is recorded

Page 147

1   inside of the VSAP system.
2      Q.    And is your opinion that the
3   Amazon web servers, through the ISB, get an
4   access point, based on your understanding
5   that a person can access the Internet and
6   vote remotely?
7      A.    Yes.
8      Q.    Looking at this paragraph 16
9   again.  So -- and I'm just trying to
10  understand this here.  So it's -- it starts
11  by saying, you know, there's the following
12  interfaces used for data transfer, and it
13  lists USB ports, ethernet interfaces, network
14  switches, the election central and remote
15  voting sites used ethernet for open
16  connectivity, remote voting.
17           And then there's wireless and
18  Bluetooth capabilities that are reported to
19  be disabled, right?
20     A.    Yes.
21     Q.    And then, starting with G, is
22  this no longer a list of the interfaces, but
23  rather separate observations or opinions?
24     A.    So these are extracts from
25  various reports that were reported as part of

Page 148

1   the documentation that I reviewed.  So for
2   example, "J:  The VSAP code contains
3   hard-coded passwords in the code," that's out
4   of the ATSEC report.
5      Q.    That's J?  Okay.
6            Do you recall the source for
7   item G?
8      A.    I would have to look and see
9   where that came from, but it's from one of
10  the documents that I reviewed.
11     Q.    And how does that finding in
12  item G, how does that impact your opinions
13  here?  What's the relevance?
14     A.    So the relevance is, is that
15  even if I was able to examine one of the
16  these systems, that they are not logging the
17  proper elements that would be required to
18  prove whether or not there was an
19  unauthorized remote access.
20     Q.    And then in H, you say:
21           "The source code contains a
22           significant number of source code
23           files from third-party providers.
24           These third party source code files
25           are not part of the scope of



Page 149

1       evaluation and were not included in
2       the analysis."
3            Is that in reference to the
4       ATSEC analysis?  Or to your analysis?
5       A.    It is, it's ATSEC analysis.
6  That's one of their qualifying statements.
7  So what that means is, they have 17
8  vulnerabilities that they discovered.
9            They term those as "low-level
10 vulnerabilities," but they didn't do a full
11 analysis of all the vulnerabilities of the
12 third-party software packages that are
13 contained on these systems.
14           Now, I believe it's on --
15 within the ATSEC report, there are 30 pages
16 of CVE vulnerability reporting that are
17 primarily from third-party packages, but I
18 don't know that that's all of them.
19           And I believe that starts on
20 page 45, I think -- yeah, 45 to 75.
21      Q.    In 16(f), where you say:
22           "The devices have other
23      wireless and Bluetooth capabilities."
24           Do you know which devices are
25      reported to have wireless and

Page 150

1       Bluetooth capabilities?
2       A.    I would have to generate a list
3  for you on that.
4       Q.    And then in Item 16(k), it
5  states:
6           "No user lockout values are set
7      for invalid password attempts, thus
8      permitting unlimited password guesses,
9      and/or group crack" --
10          (Reporter clarification.)
11          MR. FREY:  I'm sorry.
12          "Cracking attempts."
13 BY MR. FREY:
14      Q.    Is that from the ATSEC report
15 as well?
16      A.    It is.
17      Q.    Do you see on page 81 of the
18 ATSEC report, and Item 12, no default values
19 are set for lockout policies or invalid
20 password attempts.  That's a description of
21 the finding, right?  Is that the finding that
22 you're discussing here?
23      A.    Yes.
24      Q.    And you see in the right-hand
25 column, it lists of "severity," and it says

Page 151

1  "non, produced from low due to response"?
2       A.    I see that.
3       Q.    And would that be another
4  instance where, in your opinion, there's
5  ameliorating or compensating component put
6  in, but the vulnerability still exists?
7       A.    Correct.  And I don't know what
8  that response is, so you know, I can't
9  address the effectiveness of it.
10      Q.    Well, if you look at the next
11 column to the left, it says "Developer
12 Response," right?
13      A.    Correct.
14      Q.    So I believe that's
15 providing --
16      A.    Oh, that's their response.  But
17 if you read that on the third bullet there,
18 the 723-F.F, it says:
19          "Shall allow the administrator
20      group to configure the lockout
21      policy."
22          This system was as configured,
23      supposedly, as it was going to be
24      deployed.  And that was not set.
25          So if the -- you know, like I

Page 152

1       said, from a response perspective, if
2       they said, Hey, we're going to fix it,
3       they would have noted that here to
4       reduce from "low" to "non."
5            But, you know, the devil is
6       always in the details in a lot of
7       these settings, and there are humans
8       involved, right?  So did they properly
9       configure it?  Did they properly
10      execute that?
11      Q.    Okay.  Moving on to
12 paragraph 19, state:  The SLA County --
13          (Reporter clarification.)
14 BY MR. FREY:
15      Q.    It says:
16          "The SLA County of Los Angeles'
17      VSAP Tally 2.1 software test report
18      for California that is posted on the
19      California Security of State's VSAP
20      web page as County of Los Angeles'
21      VSAP 2.1 consultant software report is
22      limited to the Tally 2.1 software and
23      does not address the Smartmatic BMD
24      testing or the testing of any other
25      VSAP component."



Page 153

1           Do you see that?
2    A.    Yes.
3    Q.    What's the relevance of that
4 statement?
5    A.    So they had this software
6 testing report up there but it was only a
7 sliver or small subcomponent of the actual
8 software system.
9          So while they have that up
10 there, just the tally software was addressed,
11 and any software that was contained on any of
12 the other components were not part of that
13 report.
14   Q.    Okay.  So in that particular
15 report, it was limited to the tally software?
16   A.    Correct.
17   Q.    And did you look at the --
18 listed in number I of your report, on 13-I --
19 the Consultant Security and
20 Telecommunications Testing Report?
21   A.    Yes.
22   Q.    And to the extent that that
23 included the BMD and other components, would
24 that ameliorate your concern in paragraph 19?
25   A.    Probably not.  If I recall that

Page 154

1 document -- and I don't have that in front of
2 me right now -- that was primarily concerned
3 with the network traffic from these devices.
4    Q.    Moving on to paragraphs 20 and
5 21, these are the paragraphs where you're
6 kind of relying on your work prior to this
7 litigation; is that right?
8    A.    Yeah.  So these two paragraphs
9 were designed to provide a kind of a
10 visualization of the state of insecurity for
11 the existing voting systems that I have had
12 the opportunity to analyze.
13          There's a misperception out
14 there that because the EAC in this case -- or
15 the certification body for those other
16 systems -- because those are certified, then
17 they are secure.
18          And that is a very drastic
19 misconception, because there are very serious
20 cyber security issues with those systems as
21 they exist.
22   Q.    Okay.  And again, so that's a
23 -- that's the voting systems you've analyzed
24 from Arizona, Michigan and Georgia, correct?
25   A.    That's correct.

Page 155

1    Q.    And that was the components of
2 the systems we discussed this morning?
3    A.    That's correct.
4    Q.    And is it correct that, I
5 believe for the Maricopa County system, you
6 had pretty much the whole system, right?
7    A.    Yes.
8    Q.    But the other four, you were
9 only looking at pieces of the whole election
10 system in those jurisdictions, right?
11   A.    That's correct.  In all of
12 those jurisdictions, I had what I call kind
13 of the brains of the system, which is the
14 election management system or the EMS.  And
15 then I had differing components that I was
16 able to analyze.
17   Q.    And you yourself collected the
18 Maricopa County system, but I believe other
19 individuals had imaged or collected the
20 systems in Antrim County, Michigan; Adams
21 County, Michigan; Coffee County, Georgia, and
22 the other Georgia system; is that right?
23   A.    Arizona, Michigan, Georgia,
24 yes.  Those were -- Arizona, I did the actual
25 collection or people under my direct

Page 156

1 supervision collected that, and the others
2 were provided to me in the form of forensics
3 images that had been collected by other
4 parties.
5    Q.    In at least three of those
6 instances, the person who had performed the
7 collection was at least alleged to have done
8 so without authorization, right?
9    A.    Well, people make a lot of
10 allegations.  As I looked at what I knew of
11 the chain of custody path, I felt confident
12 that in all cases, the local election
13 officials had authorized those collections,
14 and that the people were authorized to make
15 those collections.  In the case of Antrim
16 County --
17          (Cross talk.)
18          (Reporter clarification.)
19          THE WITNESS:  In the case of
20          Antrim County, they actually had a
21          court order to perform that imaging
22          process.
23 BY MR. FREY:
24   Q.    Right.  For Antrim County and
25 then in Maricopa County, you had the



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
157–160

Page 157

1    subpoena, correct?
2        A.    Correct.
3        Q.    So I am thinking about the
4    other three, was the focus of my question
5    there.
6        A.    Yeah, in the -- in those other
7    cases, there was implicit authorization by
8    the County clerks who were the election
9    officials for that collection or for that
10   imaging to occur.
11       Q.    And I guess my question is, the
12   person who did the collection was not you,
13   nor under your supervision in those three
14   instances, right?
15       A.    That is correct.
16       Q.    Okay.  So now looking at 20 in
17   particular, you discussed this CISA Best
18   Practices For Securing Election Systems,
19   dated November 2022, right?
20       A.    Correct.
21       Q.    And you last reviewed it
22   September 21st, which is the date before your
23   declaration.  And I'm assuming -- you checked
24   to make sure it didn't change and that it was
25   the same?

Page 158

1        A.    Correct.  Yes.  I do have
2    knowledge that that web link now is changed
3    to a different link, sometime after that
4    point in time.
5            But if you do a search for the
6    best practices for securing election systems,
7    you'll find the proper link.
8        Q.    And then you say that there is
9    recommendations in, it looks like A to H
10   areas, right?  So --
11       A.    Correct.
12       Q.    Okay.  And it looks like you
13   say what the area is, and then note whether
14   the systems you looked at were in compliance
15   or not in compliance?
16       A.    Yes.
17       Q.    Is that accurate?
18       A.    Yes.
19       Q.    Okay.  So the first software
20   and patch management, you say, the analyzed
21   election systems do not comply, right?
22       A.    Correct.
23       Q.    And what is the evidence that
24   they do not comply, I guess?
25       A.    So the evidence stems from the

Page 159

1    forensics images that are preserved.  For
2    example, in Arizona, the installation date
3    for the Dominion software on their systems
4    was, I believe the 6th of August of 2019.
5    From that day forward, there was not a single
6    system patch that was applied to that
7    computer or to those computers.
8            From that day forward, there
9    was not a single update to the antivirus
10   software definition.
11           The number of vulnerabilities
12   that were created between the time they
13   installed that software and the time that I
14   imaged that system was, well, roughly about a
15   million vulnerabilities a day were created.
16   So you can do the math.
17           We imaged those systems in
18   April of 2021, so you're talking 700 million
19   -- at least -- vulnerabilities that existed
20   out in the wild, that these systems would not
21   have prevented.
22       Q.    So you are looking at the
23   Arizona system there to say that they do not
24   comply.
25           Anything else?

Page 160

1        A.    Well, it's not only the Arizona
2    system.  It was every system that I could
3    get, that I actually physically analyzed a
4    forensics image on.  And it was the same
5    situation across the board.
6        Q.    And that was the five we've
7    talked about, right?  When we're talking
8    about the analyzed election systems, it's
9    those five jurisdictions from Arizona,
10   Michigan and Georgia, right?
11       A.    And Colorado, so the --
12       Q.    And Colorado, yeah.
13       A.    Yeah.  The one exception to
14   that in this case is, I didn't get a physical
15   image of the Adams County Township.  If you
16   remember, I stated my scope, and it was not
17   the actual physical examination of a
18   forensics image on that.
19       Q.    And for this definition of
20   analyzed election systems, that does not
21   include LA County, correct?
22       A.    That's correct.  As of yet, I
23   have not been able to analyze a single system
24   that was utilized in the 2020 election in LA
25   County.



Page 161
1    Q.    And that is the same for all of
2  A through H, correct?  That -- the analyzed
3  election systems you refer to in your report
4  do not include LA County?
5    A.    Yes.  Basically, this shows a
6  pattern within the voter jurisdictions -- the
7  voting jurisdictions -- of a lack of
8  attention to detail to cyber security.
9        I would welcome the opportunity
10 to examine an LA County system to see if that
11 pattern continues into LA County.
12   Q.    And so if we take out Adams
13 County or Adams Township, there are four
14 jurisdictions that you've reviewed, right?
15   A.    Correct.
16   Q.    Do you know how many voting
17 jurisdictions there are in the United States?
18   A.    I don't.  I'm obviously limited
19 by the opportunities that are presented to me
20 to look at.  I would love to look at every
21 single one.
22   Q.    Do you know -- do you have an
23 approximation of how many voting
24 jurisdictions there are in the United States?
25   A.    I don't.

Page 162
1    Q.    If it was over 10,000, would
2  that surprise you?
3    A.    No.
4    Q.    As a cyber security analyst and
5  a scientist, do you think that 4 out of over
6  10,000 is enough to make a determination as
7  to how the jurisdictions operate in
8  compliance with CISA recommendations as a
9  whole?
10   A.    I would say that if you're
11 provided the opportunity to look at 4, and
12 100 percent of your sampling is indicative of
13 a certain result, there is a high probability
14 that that result will continue on through
15 other jurisdictions.
16   Q.    And those four opportunities
17 were brought to you, correct?
18   A.    They were part of my
19 engagements as an expert witness, yes.
20   Q.    At trial in this matter, are
21 you intending to provide testimony with
22 examples as to how each of these four
23 analyzed election systems do not comply with
24 the various CISA recommendations?
25   A.    I am prepared to do so, if

Page 163
1  asked.
2    Q.    And so in that case, I have to
3  ask you for each one here so we can
4  understand what your testimony is going to be
5  -- because it's not listed in the report and
6  we don't have the system.  So I need to
7  understand, you know, the testimony you're
8  going to be providing.
9        So we'll move onto item B, log
10 management.  You say the analyzed election
11 systems do not comply with CISA
12 recommendations.
13       What is basis for that
14 statement?
15   A.    Well, there's two aspects to
16 that:  One, the CISA recommendation
17 recommends that you use an aggregated logging
18 source.  So in some technologies, it's called
19 a SEIM, S-E-I-M.
20       And basically, what that
21 prevents is the changing of logs by
22 intruders.  So logging itself is conducted,
23 both by the application and by the operating
24 system itself on these loading systems.
25       In the case of the analyzed

Page 164
1  systems, which we have discussed, the
2  voting -- or the operating system logs were
3  set to 20 megabytes of data retention.
4        Well, in a big county with lots
5  of activity, that is not enough space to
6  store all of the logs covering an election
7  time period from October through November,
8  right?
9        And so logs are overwritten,
10 logs are no longer there, and there is no
11 independent storage of those logs to preserve
12 that data.
13       And that is one of the CISA
14 recommendations, is that you have an
15 independent storage of those logs.  And that
16 could be part -- part of that Air Gap system,
17 but they want you to store those logs
18 independently from the systems that generate
19 them.
20       It's a common hacker tactic
21 that if you do get access to a system, you
22 know when you accessed it, you know when you
23 left it, and you can wipe and delete all
24 activities in those logs during those time
25 periods with a very simple power shelf



BENJAMIN COTTON                                              August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell                   165–168

Page 165

1   script.  And that's a common tactic,
2   technique, and procedure for hacking and
3   unauthorized activity.
4         So the CISA is recommending:
5   One, that you have larger log sizes; and two,
6   that those logs, as soon as they are created,
7   are then sent to an independent storage
8   device, separate from the device that created
9   them.
10        None of these systems had any
11  -- any independent storage device for
12  analysis or just storage, and they were all
13  set to 20 megabytes, which was not sufficient
14  to record the data for the election time
15  period.
16    Q.    And that was each of the four
17  jurisdictions where you had the full data?
18    A.    That's correct.
19    Q.    So network segmentation, you
20  note that the systems partially comply with
21  CISA recommendations.
22        Is -- what do you mean by,
23  "they partially comply"?
24    A.    So, in the four analyzed
25  systems, they did make an attempt to Air Gap

Page 166

1   the election network.  But the second part of
2   that is that you have to monitor those
3   networks to ensure that no unauthorized
4   device is present on the Air Gap system, and
5   none of those systems had any monitoring of
6   the network activity on those systems.
7     Q.    And how do you know that?
8     A.    From my analysis.  So they did
9   not -- in order to monitor that, they would
10  have either had to have:  A, an independent
11  device that was off of the one of the port
12  switches or resident inside of the network;
13  or they would have had to have had an onboard
14  PCAP collector like Wire Shark that would
15  capture that network traffic.
16        They did not have either of
17  those in any of those four networks.
18    Q.    And am I correct that in the
19  case of at least Maricopa County, the
20  opposing party to you in the litigation
21  disagreed with your findings, right? -- your
22  analysis?
23    A.    They disagreed with some of the
24  findings, but they did not disagree with that
25  finding.

Page 167

1     Q.    That particular one.
2         At a higher level, there has
3   been disagreement with what your analysis
4   showed from the entities that actually had
5   the opportunity to review the same data as
6   you, correct?
7     A.    Well, that's a misnomer.  They
8   didn't review the same data as I did.  They
9   didn't review the forensics images.
10        They did not review the same
11  devices that were present in the network at
12  the time that the election occurred.  So they
13  did not look at the same data that I did.
14    Q.    Did -- in the Coffee County,
15  Georgia data that you looked at, was there an
16  opposing party who also did a review?
17    A.    Not as of yet -- at least, I
18  haven't seen a report yet.
19    Q.    How about in Antrim County,
20  Michigan?
21    A.    J. Alex Halderman provided a
22  report, but that was more geared towards the
23  effects on the database and the election
24  definitions than the actual findings for
25  cyber security pieces.  In the Curling case,

Page 168

1   he essentially agrees with my findings on
2   cyber security.
3     Q.    And how about in Mesa County,
4   Colorado?  Is there another party who has
5   also had the opportunity to review and
6   analyze that data and offer an opinion
7   regarding what it shows?
8     A.    If there is, I have not seen
9   that.
10    Q.    The next note, on D, it says,
11  "Block suspicious activity.  The analyzed
12  systems do not comply."
13        Just at a high level, how do
14  the analyzed election systems not comply with
15  CISA recommendations?
16    A.    I'm trying to cut down my
17  verbiage, huh?  So basically, what we're
18  looking at here is, it's called an IDS,
19  Intrusion Detection System.  And that's a
20  specific form of technology.
21        It can be hardware, it could be
22  application-based -- so that if they see a
23  variance in user activity, for example, or a
24  different device coming -- requesting a
25  remote access, then it can actually block and



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
169–172

Page 169

1  isolate that activity.
2          From my analysis of all four of
3  these systems, there was no such IDS
4  technology present in the system, nor did any
5  of these jurisdictions report that there was.
6      Q.    The next one is "Credential
7  Management."
8          How did the analyzed election
9  systems not comply with CISA recommendations?
10     A.    So with the exception of one
11  account in Coffee County, all of the user
12  accounts on a given system for a given
13  jurisdiction shared the same password, okay?
14         Those passwords had not been
15  changed since the date that the Dominion
16  software was installed on those systems.
17         CISA recommendations and common
18  industry practices dictate that:  One, you
19  should change your password every 90 days;
20  two, you should never have a shared password
21  like that between accounts; and three, given
22  the generic nature of these accounts, there
23  should be some accountability and a log as to
24  what person was assigned which account at
25  what timeframe, okay?

Page 170

1          None of those -- none of those
2  items were present.  None of those items were
3  ever done.
4          And the fact that the passwords
5  had never been changed between multiple
6  election cycles with multiple different
7  election workers means that there's
8  essentially no accountability on the user
9  access into those systems.
10     Q.    And then the last one here:
11  "Baseline establishment for host and network
12  activity."
13         How did the analyzed election
14  systems not comply with CISA recommendations?
15     A.    Again, I'll use Arizona as a
16  prime example of this, but they were all
17  significantly or essentially the same.
18         So, the EAC publishes a scope
19  of conformance.  And within that scope of
20  conformance are all of the hash values of the
21  files for that certified election system.
22         So a software monitoring system
23  would take those hash values, that would
24  become a baseline.  And that capability would
25  monitor the execution of programs on the

Page 171

1  individual end points and flag or identify
2  if, at any time, a program was executed or
3  loaded into memory that was not part of that
4  scope of conformance.
5          So the same would apply for the
6  network, okay?  So once again, if you're
7  doing a network baseline monitoring, the
8  county knows every single MAC address for
9  every single system that is on that
10  particular network.
11         Those MAC addresses then become
12  the baseline for all of your network
13  communications.  If any device would come on
14  to that network that was not one of those MAC
15  addresses, then it would flag and alert, and
16  it would stop that activity.  In none of
17  those systems did any of that capability
18  exist.
19         And as a matter of fact,
20  specific to Arizona, there were over 1,400
21  executable files and device drivers that were
22  created or modified after the date that the
23  software was installed.  So it was clear that
24  there was no monitoring of that function.
25     Q.    Okay.  And again, that's your

Page 172

1  opinion based on your review of the system?
2      A.    I would say it's a present
3  fact.  But, yes -- yeah.
4      Q.    Okay.  And then for G:
5  Organization-wide IT guidance and policies,
6  and notice and consent banners for computer
7  systems.
8          You found for that the analyzed
9  selection systems did comply --
10     A.    Yes.
11     Q.    -- with those COSA
12  recommendations, correct?
13     A.    Yes.
14     Q.    All right.
15         MR. FREY:  Let's take a quick
16  five-minute break and we can go off
17  the record.
18         THE VIDEOGRAPHER:  We are going
19  off the record at 2:02 p.m.
20         (Break taken.)
21         THE VIDEOGRAPHER:  We are back
22  on the record at 2:09 p.m.
23  BY MR. FREY:
24     Q.    Great.
25         So we're back on record, Mr.



Page 173

1  Cotton, and we just talked through the
2  paragraph 21 or 20 of your report.
3          Looking now at paragraph 21, is
4  this actually -- do the subsections in here,
5  A to H, match up with the list that you put
6  in paragraph 20?
7      A.   They certainly address aspects
8  of the paragraph 20 subparagraphs, yes.
9      Q.   Okay. So in other words, like
10 21(a) matches up with the analyzed systems
11 not complying with software and patch
12 management --
13     A.   Correct --
14     Q.   -- and vis a vis --
15     A.   -- but you also have the -- you
16 know -- so we broke that down a little more
17 in detail, so -- you know, specific to
18 paragraphs A and B, those would pertain to
19 the patch management software updates.
20     Q.   Okay. The lead-in sentence
21 there, you say:
22          "I find the following specific
23      to the cyber security vulnerabilities
24      and weaknesses observed in the voting
25      systems of multiple vendors."

Page 174

1          When you say, "multiple
2      vendors" there, who are you referring
3      to?
4      A.   Well, primarily Dominion.
5      Q.   And similar to what we talked
6  about with paragraph 20, this would not
7  include Smartmatic; is that correct?
8      A.   That's correct. I have not had
9  the opportunity to physically examine a
10 Smartmatic system yet.
11     Q.   So I'm not going to go through
12 each and every one of these, but I want to
13 talk about 21(b), "Failure to patch and
14 maintain operating system security."
15          You note that, based on your
16 personal knowledge, "Companies that develop
17 operating system software such as Windows,
18 Linux, and Apple release software that
19 contains unknown remote access
20 vulnerabilities," right?
21     A.   Yes.
22     Q.   And then you talk specifically
23 about Microsoft, which was the developer of
24 the Windows family of software for the
25 Dominion voting systems, right?

Page 175

1      A.   Correct.
2      Q.   Do you know what the operating
3  system was for the Smartmatic machines on the
4  VSAP program?
5      A.   Based on what I could tell from
6  the reports and the vulnerability assessment,
7  within the VSAP program there are SUSE Linux,
8  there is Red Hat Linux.
9          Also, then they bought CentOS,
10 so those two are kind of synonymous. And
11 there's another variant of Linux in there as
12 well. Ubuntu is the other Linux variant
13 that's in the -- in this report.
14     Q.   Okay. And Ubuntu is a Linux
15 variant?
16     A.   Yes.
17     Q.   Looking at letter D on page 10,
18 you note that none of the jurisdictions you
19 reviewed had the capability to actively
20 monitor programs that were running on the
21 computers, monitor network activity, or had a
22 process to alert election officials if a
23 deviation from an approved baseline occurred,
24 right?
25     A.   That is correct. And I am

Page 176

1  speaking about, in terms of once the system
2  is booted up and running, at that point,
3  there was no alerting mechanism during the
4  operation or the execution of a vote time
5  period.
6      Q.   Are you --
7      A.   There are some of these systems
8  that attempt do a secure boot-load. I do
9  know that the VSAP is one of those, in which
10 it will look at the boot-loader through, I
11 believe they are using Grub2 to try to ensure
12 that what is being loaded is what's supposed
13 to be loaded.
14          However, I didn't see any
15 indication in the documentation that once
16 that is loaded, there were anything -- any
17 programs, any alerts that would identify a
18 rogue program, say that was injected through
19 memory, whether or not that would be
20 detected. I didn't see any alerting
21 mechanism for that.
22     Q.   Are you aware of network
23 monitoring that would be performed by various
24 government agencies and jurisdictions in the
25 course of the 2020 election?

BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
177–180

Page 177

1    A.    Well, if you have an Air Gap
2   system, then they wouldn't be monitoring that
3   Air Gap system because they can't connect to
4   it.
5         So I am aware of CISA's efforts
6   through the Albert sensors and things to
7   monitor activity within the election's
8   jurisdictions.
9         However, the Catch-22 is, if
10  it's truly Air Gapped -- because the Albert
11  sensors require Internet connection over
12  public Internet to report -- if it's truly
13  Air Gapped, then they can't monitor.  So --
14  but I am aware of some of those efforts.
15    Q.    And are you aware that in LA
16  County, they had the Elections Security
17  Operations Center set up to monitor the
18  security of the VSAP networks?
19    A.    Well, once again, then it
20  wasn't an Air Gap system.  Because the -- I'm
21  sure that the operation center was not
22  located in the voting center where these
23  systems were housed.
24    Q.    Did you, I guess, analyze the
25  role of the Election Security Operations

Page 178

1   Center in connection with your opinions in
2   this case?
3     A.    Well, I can't tell you or
4   detail the full scope of what they did.
5         But I can tell, just from a
6   technical means, that if they're trying to
7   monitor the network of an Air Gap system,
8   then by definition, they would have to have a
9   connection into the Air Gap system, which
10  would mean it's no longer Air Gapped.
11    Q.    Looking at 21(f), page 13, you
12  discuss network segmentation, correct?
13    A.    Yes.
14    Q.    And the idea here is that an
15  Air Gap can be overcome; is that right?
16    A.    Rather easily actually, yes.
17    Q.    And is the -- I guess, are you
18  aware of physical protections that were put
19  in place in LA County with respect to the
20  protection of the BMDs and access to those
21  machines?
22    A.    I am not aware of the physical
23  protections that were put in place.  But
24  without monitoring of that Air Gap system,
25  there's no assurance that there is actually

Page 179

1   integrity of that air gap.  So while you
2   might have a card swipe to get access into
3   the door, there's such a thing as insider
4   threat.
5         There's also typically seasonal
6   workers for these election events, and any
7   one of them could bring in a hockey puck or a
8   device, and bypass the Air Gap within a
9   matter of a couple of minutes.
10    Q.    And if the machines are not
11  connected to one another, would that attack
12  only impact one machine?  Or would it impact
13  more than that?
14    A.    So the bypassing of an Air
15  Gapped system would effect all systems that
16  are contained within the same network segment
17  that the device was implanted into.
18        So in the case of Maricopa
19  County, for example, they supposedly Air
20  Gapped all of their systems.  But all those
21  systems were on the same routing space within
22  that Air Gap system.
23        So in that case, if you
24  compromised one of those end points or the
25  router, then you would have compromised the

Page 180

1   entire Air Gap network.
2     Q.    And were you able to perform
3   this analysis as it relates to LA County?
4     A.    I have not been afforded that
5   opportunity yet.  I would welcome the
6   opportunity.
7     Q.    In the next, section G, you
8   discuss the BMG network is not truly air
9   gapped.
10        Do you see that?
11    A.    Yes.
12    Q.    And on the next -- or I guess
13  it's the fourth line, you discuss that remote
14  voting sites exist in the Amazon cloud,
15  right?
16    A.    Correct.
17    Q.    And is that based on the same
18  portion of the ATSEC report and the user
19  manual that you discussed earlier, where it
20  talks about the ISB being on the Amazon web
21  servers?
22    A.    Yes.  And in particular, in
23  this device.  So you've got ballot-marking
24  devices.  Those ballot-marking devices have
25  to obtain the actual ballot image from



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
181–184

Page 181

1  someplace, and that appears to be the IBG --
2  or the IPB, which is in the Amazon cloud.
3      Q.   That's your understanding of
4  it, correct?
5      A.   That's my understanding of it.
6  And then of course, the BMG is the manager
7  for all of the ballot-marking devices, so it
8  has to be connected to the ballot-marking
9  devices.
10     Q.   Are you familiar with the term
11  "software independence"?
12     A.   That can be used in a number of
13  different meanings.
14          If you could define that?
15     Q.   Sure.
16          In the context of voting
17  technology in particular, are you familiar
18  with the term "software independence" to mean
19  that the outcome of the election is
20  independent of how the software might
21  operate?
22     A.   I understand the term.
23  However, in practice, there is question to
24  that.
25          And so the software is

Page 182

1  primarily responsible for the presenting of
2  the ballot, the recording of the ballot, and
3  the counting of the ballot.
4          So then you're relying on
5  external audit mechanisms to attempt to
6  determine statistically whether or not the
7  election is valid.
8          However, those audits are based
9  on the actual retained printed ballot.  So
10  just as an example, if the -- if there was a
11  vulnerability that was introduced into the
12  system, that between the timeframe where the
13  voter approved his vote and the time that
14  that vote was actually recorded, if there was
15  a vulnerability that allowed the manipulation
16  of that vote record, then a limited-risk
17  audit would never catch it, because you're
18  looking at the modified ballots as the basis
19  of your limited risk audit.  I mean, that's
20  just an example.
21          So I understand the term.  The
22  true software independence, I believe, would
23  be only valid if there was absolute cyber
24  security assurance on the voting system.
25     Q.   And in the example you just

Page 183

1  gave there, you say "manipulation of the vote
2  record."
3          Are you talking about
4  manipulation of the paper ballot, itself?
5      A.   Well, a ballot-marking device
6  produces the ballot.  That becomes the paper
7  record.  So if there's a manipulation prior
8  to the production of that paper ballot, then
9  that's what I am referring to.
10     Q.   Okay.  And that would be before
11  the voter had the opportunity to look at
12  their ballot?
13     A.   No.  Typically -- well, it
14  depends on the system and how the -- how this
15  works.  But typically, there is a
16  verification splice screen that pops up, and
17  they look through the vote selections and
18  they say, Yeah, that's what I voted.  And
19  they press a button, and then that becomes
20  committed to paper.
21     Q.   And do you know whether the --
22  at least with respect to the VSAP system in
23  2020, whether the voter would then be able to
24  review that paper?
25     A.   I would have to review the

Page 184

1  procedures.  I am not familiar with that.
2      Q.   And we've talked some about
3  post-election audits, risk-limiting audits.
4          How familiar are you with the
5  different audits conducted following the
6  presidential election?
7      A.   Just a top level familiarity of
8  it.
9      Q.   Did you do any analysis of the
10  audits conducted in LA County on the
11  November 2020 election?
12     A.   I did not.
13     Q.   And so do your opinions in any
14  way take into account the post-election
15  audits that would occur after a presidential
16  election?
17     A.   Well, with the scope of my
18  report, there's no impact.  You know, the
19  audits have no impact as to the findings in
20  my report.
21     Q.   And that's because your report
22  is just identifying that vulnerabilities
23  exist -- or could exist in the software,
24  right?
25     A.   That's correct.  Yes, should I



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
185–188

Page 185

1  be provided with the opportunity to examine
2  an actual voting device, and I have findings
3  within that.
4          Then I obviously would take
5  into account any audits or risk-limiting
6  audits that occurred after the election.
7      Q.    And in terms of the procedural
8  safeguards of those audits being in place,
9  that doesn't impact your analysis?
10     A.    No.
11     Q.    Just a few more questions for
12  you.
13         In your opinion, Mr. Cotton,
14  was Joseph Biden legitimately elected
15  president of the United States in
16  November 2020?
17     A.    Congress certified him as the
18  president, and he is the President of the
19  United States.
20     Q.    In your opinion, was the 2020
21  presidential election a free and fair
22  election?
23     A.    I think that there are some
24  technical challenges that need to be
25  addressed.  I would love to see the Courts

Page 186

1  address those to restore confidence by the
2  voters in the election process.
3      Q.    Do you believe that vote
4  machines were used to rig the 2020
5  presidential election in favor of
6  President Biden over former President Trump?
7      A.    I have not been able to examine
8  enough evidence to really arrive at a
9  determination for that.  There are
10  significant discrepancies in Arizona that,
11  you know, should be addressed.  But Joe Biden
12  is our president.
13     Q.    Do you believe or are you aware
14  of any evidence that Smartmatic owns
15  Dominion?
16     A.    I'm not aware of any --
17  anything like that.
18     Q.    Do you believe or are you aware
19  of any evidence that Dominion is a front for
20  Smartmatic?
21     A.    I have not conducted any
22  analysis of the background of either company.
23     Q.    Do you believe that Smartmatic
24  rigged the 2020 presidential election for
25  President Biden over former President Trump?

Page 187

1      A.    I am a forensics examiner, I
2  deal with facts.  I haven't even had the
3  opportunity to look at a Smartmatic
4  ballot-marking device or any other device, so
5  I have no opinion on that.
6      Q.    Do you believe that Smartmatic
7  software or algorithms manipulated vote
8  counts in the 2020 presidential election?
9      A.    Once again, I haven't been able
10  to examine a Smartmatic, so I have no opinion
11  on that.
12         MR. FREY:  Give me three
13  minutes just to go back over my notes
14  and make sure I didn't miss anything.
15         THE VIDEOGRAPHER:  We are going
16  off the record at 2:29 p.m.
17         (Break taken.)
18         THE VIDEOGRAPHER:  We are back
19  on record at 2:31 p.m.
20  BY MR. FREY:
21     Q.    Mr. Cotton, in looking at my
22  notes, there's just one item you mentioned
23  earlier today that I wanted to address.  And
24  that is that you said you became aware
25  recently of a data from the LA County

Page 188

1  election going to China through this company,
2  Konnech.
3         Do you recall that?
4      A.    I do.
5      Q.    And when did you become aware
6  of that information?
7      A.    Approximately six months ago.
8      Q.    I'm going to introduce as
9  Exhibit 709, a New York Times article that I
10  believe might be the subject matter you're
11  referring to.
12         (Exhibit No. 709 marked for
13  identification.)
14  BY MR. FREY:
15     Q.    Whenever you get a chance, let
16  me know when you have that.
17     A.    I have it.
18     Q.    Do you see this is a New York
19  Times article, dated October 13, 2022,
20  titled, "Election Firm Knew Data Had Been
21  Sent to China, Prosecutors Say"?
22         Do you see that?
23     A.    Yes.
24     Q.    And you can take a second to
25  review this article if you want, but my



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
189–192

Page 189

1  question is:
2      Is this the kind of allegation
3  that you were referring to earlier in your
4  testimony?
5      A.    Yes.
6      Q.    So this says on page 2, it says
7  the company -- at the top of page 2, it says:
8          "When Eugene Yu's small
9       software company signed a contract to
10      help Los Angeles County organize poll
11      workers for the 2020 election, he
12      agreed to keep the worker's personal
13      data in the United States.
14          "But the company, Konnech,
15      transferred personal data on thousands
16      of the election workers to developers
17      in China."
18          Do you see that?
19      A.    I do.
20      Q.    So is the issue here that there
21  was personal information of poll workers from
22  LA County that ended up in China?
23      A.    So as it was -- as it was
24  brought to my attention, it was not just poll
25  workers.  It was also voter rolls.

Page 190

1      Q.    And what is your basis -- like,
2  did you review something that said voter
3  rolls?
4      A.    That was represented to me by
5  an attorney.
6      Q.    If you go down to the, I guess
7  it's the top of page 3, it says:
8          "Los Angeles prosecutors said
9       last week that none of Mr. Yu's or
10      Konnech's actions had altered election
11      results, and that they had seen no
12      evidence of identity theft."
13          Do you see that?
14      A.    I do.
15      Q.    And sitting here today, do you
16  have any reason to disagree with the
17  statements of the Los Angeles prosecutors?
18      A.    So once again, I'm really a
19  facts guy when it comes to forensics.  I
20  haven't had the opportunity to actually
21  review the specific data.
22          I will tell you that, you know,
23  if we took everything that the press reported
24  at face value, I'd probably be locked up in
25  bars for nefarious actions on the -- on

Page 191

1  things which I have never, ever committed.
2  So you know, I have a healthy skepticism on
3  certain reported items until I actually see
4  the data.
5      Q.    And do you have an intention to
6  look at any underlying data or form any
7  opinions for this case related to this
8  Konnech activity?
9      A.    No. The only reason it even
10  came up was the form of your question.
11      Q.    Well, thank you, Mr. Cotton,
12  for your time today.
13          MR. FREY:  I am going to close
14      the deposition for today, but I'll
15      reserve the right to -- if you are
16      able to -- if you do the forensic or
17      the inspection of the BMD that Dr.
18      Sherman reviewed or if you are able to
19      produce any of the underlying
20      information related to the machines
21      that you've looked at, to call you
22      back.
23          But as of right now, I have no
24      further questions.
25          MR. KACHOUROFF:  I have a few

Page 192

1  follow-ups.
2          MR. FREY:  Okay.
3          MR. KACHOUROFF:  I'll be brief.
4      Let me make sure my camera is on.
5
6          EXAMINATION
7  BY MR. KACHOUROFF:
8      Q.    So you talked about the cyber
9  symposium in October of 2021, and you stated
10  that you were -- if I remember your
11  testimony, there were 15 to 20 experts that
12  Mike Lindell had hired?
13      A.    Yes. I don't remember the
14  exact number, but there was a whole -- there
15  was a bunch.
16      Q.    And you were waiting on data,
17  and you only received partial data?
18      A.    That's correct.  I was promised
19  additional data, and they did not produce
20  that in time for the symposium.  So I did not
21  stick around.
22      Q.    So you left before that data
23  came around?
24      A.    I don't know if the data ever
25  came around.  I didn't receive it.  I left



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
193–196

Page 193

1 before the symposium started.
2      Q.    Do you -- in your discussions
3 with Mike, did you ever tell him that Dennis
4 Montgomery was a fraud?
5      A.    Not at that particular time.  I
6 grew to those conclusions over time, after
7 some repeated attempts to look at the data
8 and specific data to Arizona.  I was using
9 that as kind of my test sample, if you will.
10           Because I had so much data from
11 Arizona, I could look at MAC addresses and
12 things like that, and I eventually came to
13 the conclusion that he was a fraud after the
14 symposium.
15      Q.    But that's not something you
16 ever explicitly told to Mike?
17      A.    No.
18      Q.    The Konnech breach that we just
19 talked about, that's a total breach versus a
20 hack.
21           Is there a difference between
22 the two?  Is one worse than the other?
23      A.    So a "total breach" means
24 there's simply no limit to the amount of data
25 that was exfiltrated.

Page 194

1           A hack, typically you could put
2 a scoping around the impacts of what was
3 accessed, what was exfiltrated and that
4 nature.
5           A total breach is, you know,
6 just that; they have the keys to the kingdom
7 and they got everything.
8      Q.    I want to talk about your past
9 experience.  I don't know if this was
10 covered.
11           Do you sit on any boards, by
12 the way, that are relevant to your
13 experience?
14      A.    I do.  I sit on the BYU Cyber
15 Security Advisory Board for the Cyber
16 Security Program.
17      Q.    What does "BYU" stand for?
18      A.    Brigham Young University.
19      Q.    And in 2015, I believe you were
20 in Manassas, Virginia?
21      A.    That is correct.
22      Q.    Did you -- when you were
23 demonstrating a product -- you were engaged
24 in government contracting; were you not?
25      A.    Yes, I was engaged in

Page 195

1 government contracting from, essentially
2 April of 2003 up until the present time.
3      Q.    In 2015, you were demonstrating
4 a project to the -- or a product, one of your
5 software products, to the U.S. Office of
6 Personnel Management.
7           Do you recall that?
8      A.    I do.
9      Q.    And during your demonstration,
10 can you describe what you found at the Office
11 of Personnel Management?
12      A.    So I found a breach by Chinese
13 government into the Office of Personnel
14 Management's servers that ultimately is
15 estimated as the largest single breach in the
16 history of the U.S. government.
17      Q.    And then finally, the special
18 master's report.  You were talking about how
19 the special master got it wrong.
20           Why didn't you file a rebuttal
21 or file some sort of response to that?
22      A.    So by contract, I was a
23 subcontractor to Cyber Ninjas.  Cyber Ninjas
24 was contracted to the Arizona Senate.
25           There was a clause in the

Page 196

1 contract that gave the Arizona Senate full
2 editorial rights on any responses, reports,
3 et cetera, et cetera, et cetera, and they
4 choose not to include that data in their
5 response.
6      Q.    So you actually did write a
7 response, but it wasn't sent to the special
8 master?
9      A.    Correct.
10           MR. KACHOUROFF:  I have nothing
11      further, Tim.
12           MR. FREY:  Okay.  Just one
13      follow-up, Mr. Cotton.
14
15           FURTHER EXAMINATION
16 BY MR. FREY:
17      Q.    You were talking about the
18 Office of Personnel Management breach, and
19 that breach was discovered, correct?
20      A.    Correct.
21      Q.    And that discovery was
22 publicized, right?
23      A.    There was a lot of publicity
24 about that.  There was also confusion and
25 cover-up, and I believe I participated in



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
197–200

Page 197

1  three hearings before congress on that.
2      And the OPM CIO -- finally, on
3  the last public hearing before her
4  resignation -- admitted that, yes, CyTech did
5  discover the breach.
6      Q.    And that breach didn't relate
7  to an election, right?
8      A.    It did not.  But you have to
9  understand, the breaches all hinge around
10  unauthorized access, right?
11      So the fact that it's an
12  election system, quite frankly -- and to all
13  of my election security experts -- it doesn't
14  really make a difference, if you can get
15  access at root-level to the underlying
16  operating system.  You've -- you will suffer
17  a breach on that system.
18      Q.    You could suffer a breach,
19  right?
20      A.    I would -- I would say
21  99 percent probability that you would suffer
22  a breach on that system.
23      Q.    Oh, I understand.
24      You said, "If you get access to
25  the root level," then you would suffer one?

Page 198

1      A.    Correct.
2      Q.    Okay.  Oh, with respect to that
3  OPM breach, did you discover that?  Or how
4  did that -- who made the discovery?
5      A.    I discovered it, actually.  We
6  had -- they were interested in buying the
7  software, so we had come down to do a proof
8  of concept.  Came down, I had one of the
9  cyber servers as part of that proof of
10  concept.
11      Being a government entity,
12  there was a huge administration debt on this,
13  so I had to get approved, they had to approve
14  the server, and things like that.  So we got
15  the server in place that evening, I believe
16  that was the 14th.
17      And then on the 15th, I came
18  back -- I had to leave because the person
19  escorting me was going to miss their bus.
20      And so we turned on the
21  monitoring functions.  I came back the
22  following day, and I discovered a piece of
23  malware disguising itself as MacAfee
24  Antivirus on one the SQL servers that we were
25  installed on.

Page 199

1      Q.    Are you aware that, at least
2  Representative Elijah Cummings reported to
3  the House Permanent Select Committee on
4  Intelligence that the contracted engineer,
5  Brandon Salisbury, discovered the breach?
6      A.    I'm aware that Mr. Cummings
7  stated a lot of things.  And ultimately, his
8  aide was instrumental in getting my server
9  back, even though they have accused me of not
10  even participating in the investigation.
11      So the server remained inside
12  of OPM all the way up through the public
13  hearings, and I didn't get that back until
14  later.
15      When I did get it back, they
16  had destroyed or attempted to destroy all the
17  data that was contained on it, but I
18  recovered that.
19      If you would like to review the
20  last public hearing concerning the OPM breach
21  prior to the CIO resigning, that large binder
22  sitting on the desk of the chairman is all
23  the recovered data and artifacts from that
24  server that they returned to me.
25      And she did admit that -- well,

Page 200

1  she caveated.  She said I had discovered it,
2  but they had already found it.  But you know,
3  that atmosphere and the activities when I was
4  in there did not indicate that they were
5  under active breach until after I disclosed
6  it.
7      Q.    Do you recall giving an
8  interview to Fed Scoop in May of 2016?
9      A.    I don't.
10      Q.    Do you recall telling Fed Scoop
11  that your company never claimed to have
12  discovered the hack?
13      A.    What I will tell you is that I
14  discovered the hack.  We never made any
15  public announcements of being the company
16  that discovered it.
17      We were contacted by the Wall
18  Street Journal.  How they knew, I don't know.
19  And I declined to comment to the Wall Street
20  Journal.
21      MR. FREY:  No further questions
22  from me.
23      MR. KACHOUROFF:  Nothing
24  further.
25      THE VIDEOGRAPHER:  Before we go

BENJAMIN COTTON                                      August 08, 2024
Smartmatic USA Corp vs Michael J. Lindell              201–202

Page 201

1  off the record, Mr. Kachouroff, would
2  you like to order a copy of this video
3  today?
4       MR. KACHOUROFF:  Yes, please.
5       THE VIDEOGRAPHER:  This
6  concludes the video deposition of
7  Benjamin Cotton.  We're going off the
8  record at 2:46 central time.
9       (Whereupon, the deposition
10  concluded at 12:38 p.m. PST)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 202

1               CERTIFICATE
2
3       I, Mary C. Soldati, Registered Professional
4  reporter, Oregon and Washington Certified Shorthand
5  Reporter, hereby certify that at said time and place, I
6  reported in stenotype all testimony adduced and other
7  oral proceedings had in the foregoing matter; that
8  thereafter my notes were transcribed through
9  computer-aided transcription by me to the best of my
10  ability; and that the foregoing pages constitute a full,
11  true and accurate record of all such testimony adduced
12  and oral proceedings had, and of the whole thereof.
13      In witness whereof, I have hereunto set my hand
14  this 9th day of August, 2024.
15
16
17  Mary C. Soldati, RPR
18  CSR-WA No. 3406
19  Expires April 20, 2025
20  CSR-OR No. 19-0457
21  Expires September 30, 2025
22
23
24
25

