# Exhibit 170

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF MINNESOTA
---oOo---

SMARTMATIC USA CORP., SMARTMATIC :
INTERNATIONAL HOLDING B.V., AND  :
SGO CORPORATION LIMITED,         :
                                 :
        Plaintiffs,     :
                        :
        vs.             : No.
                        : 22-cv-0098-WMW-JFD
MICHAEL J. LINDELL and MY        :
PILLOW, INC.,           :
                        :
                        :
        Defendants.     :
_____:

REMOTE VIDEO-RECORDED
DEPOSITION OF ROBERT ZEIDMAN
August 16, 2023

Job No. J10104683
Stenographically reported by:
LAURA AXELSEN
CA CSR NO. 6173
NV CCR 990
RMR, CCRR, CRR, CRC

---

Page 2

 1    IN THE UNITED STATES DISTRICT COURT
 2         FOR THE STATE OF MINNESOTA
 3              ---oOo---
 4    SMARTMATIC USA CORP., SMARTMATIC :
      INTERNATIONAL HOLDING B.V., AND  :
 5    SGO CORPORATION LIMITED,         :
                                       :
 6            Plaintiffs,     :
                              : No.
 7            vs.             : 22-cv-0098-WMW-JFD
 8    MICHAEL J. LINDELL and MY        :
      PILLOW, INC.,           :
 9                            :
                              :
10            Defendants.     :
      _____
11         BE IT REMEMBERED THAT, pursuant to Notice of
12    Subpoena and on Wednesday, August 16, 2023, at
13    10:00 a.m. thereof at 2300 W. Sahara Boulevard, Las
14    Vegas, Nevada, before me, LAURA AXELSEN, a Certified
15    Shorthand Reporter, personally appeared
16         ROBERT ZEIDMAN,
17    Called as a witness by the plaintiff.
18              ---oOo---
19
20
21
22
23
24
25

---

Page 3

 1              APPEARANCES
 2
 3    FOR THE PLAINTIFF:
 4
 5      BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP
 6      BY:  MAURA LEVINE-PATTON, ESQ.
 7      71 South Wacker Drive, Suite 1600
 8      Chicago, Illinois  60606
 9
10    FOR DEFENDANT MYPILLOW:
11
12      PARKER DANIELS KIBORT
13      BY:  ALEC BECK, ESQ.
14      888 Colwell Building
15      123 North Third Street
16      Minneapolis, Minnesota  55401
17
18         There also being present Timothy Frey, Esq.
19    and Andrew Jones, the videographer.
20
21              ---oOo---
22
23
24
25

---

Page 4

 1                   INDEX
 2
 3                         PAGE
 4    EXAMINATION BY MS. LEVINE-PATTON        7
 5    EXAMINATION BY MR. BECK               115
 6
 7              ---oOo---
 8
 9         INDEX OF EXHIBITS
10
11    EXHIBIT     DESCRIPTION          PAGE
12
13    Exhibit 314  Notice of Subpoena        12
14    Exhibit 315  Arbitration, January 17, 2023    13
15    Exhibit 316  Subpoena to Testify at a        14
16           Deposition in a Civil Action
17    Exhibit 317  Mr. Zeidman's curriculum vitae   15
18    Exhibit 318  First page Bates stamped        55
19           ZEIDMAN-SMT-LINDELL042603 (Full
20           file provided electronically.)
21    Exhibit 319  First page Bates stamped        61
22           ZEIDMAN-SMT-LINDELL042646 (Full
23           file provided electronically.)
24    Exhibit 320  First page Bates stamped        64
25           ZEIDMAN-SMT-LINDELL053965 (Full

---

                              1 (Pages 1 to 4)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                      August 16, 2023

---

Page 5

1          file provided electronically.)
2     Exhibit 321  First page Bates stamped          66
3          ZEIDMAN-SMT-LINDELL053987 (Full
4          file provided electronically.)
5     Exhibit 322  5.2 Open Capture Files, Chapter    69
6          5. File Input, Output, and
7          Printing
8     Exhibit 323  Bates stamped                      79
9          ZEIDMAN-SMT-LINDELL054199-068043
10    Exhibit 324  List of Other Files                89
11    Exhibit 325  Reasoned Decision and Final       111
12          Award
13
14                    ---oOo---
15
16
17
18
19
20
21
22
23
24
25

---

Page 6

1          VIDEOGRAPHER:  Good morning.  This is Disc
2     No. 1 to the video recorded deposition of Robert
3     Zeidman in the matter of Smartmatic U.S.A.
4     Corporation, et al. versus Michael J. Lindell, et
5     al.  Being heard before the United States District
6     Court District of Minnesota, Case No.
7     22-cv-0098-WMW-JFD.
8          This deposition is being held at 2300 West
9     Sahara Avenue in Las Vegas, Nevada, 89102, on
10    August 16th, 2023, at 10:01 a.m.  My name is
11    Andrew Jones.  I am the videographer.  The court
12    reporter is Laura Axelsen.
13         Counsel, will you please introduce
14    yourselves and affiliations and then the witness
15    will be sworn.
16         MS. LEVINE-PATTON:  Maura Levine-Patton on
17    behalf of plaintiffs.
18         MR. FREY:  Tim Frey on behalf of
19    plaintiffs.
20         MR. BECK:  Alec Beck for defendant
21    MyPillow.
22              ROBERT ZEIDMAN
23         having been duly sworn/affirmed
24             under penalty of perjury
25              testified as follows:

---

Page 7

1          EXAMINATION BY MS. LEVINE-PATTON
2          MS. LEVINE-PATTON:  Q. Good morning,
3     Mr. Zeidman.
4          A.  Good morning.
5          Q.  We met briefly earlier, but my name is
6     Maura Levin Patton.  I represent Smartmatic in
7     litigation that was filed against Mr. Lindell and
8     MyPillow.  I'm going to be asking you some questions
9     today regarding the data that Mr. Lindell provided
10    to you at the cyber symposium in connection with the
11    Prove Mike Wrong Challenge.  We understand that you
12    have a unique perspective on the data and the events
13    that ensued after the cyber symposium, and we're
14    just going to be just focusing on that.
15         Before we begin, can you state and spell
16    your name for the record?
17         A.  Robert Zeidman, R-o-b-e-r-t, Z, as in
18    zebra, e-i-d, as in David, m-a-n.
19         Q.  And where do you live, Mr. Zeidman?
20         A.  Las Vegas, Nevada.
21         Q.  So I understand that you've given
22    deposition testimony several times before today.
23    Given that you've served as an expert witness, can
24    you tell me approximately how many times you've been
25    deposed?

---

Page 8

1          A.  As an expert witness, I believe it's
2     around 65 or 70 times.  As a fact witness, probably
3     five, six times.
4          Q.  Okay.  Do you recall the first time you've
5     been deposed as a fact witness?
6          A.  I'm assuming when I was a plaintiff in a
7     case, my deposition is considered a fact witness
8     deposition.  Probably the first time was about 15
9     years ago, that I can recall.
10         Q.  And what case was that?
11         A.  I had a case against a contractor.  There
12    were two cases against contractors that worked on my
13    house.  One was the inspector for my house in
14    California.  I think that -- well, I think that was
15    the first -- I think that was the first time I was
16    deposed as a fact witness.
17         Q.  And then there were four other times that
18    you've been deposed as a fact witness?
19         A.  Roughly.
20         Q.  Were those also cases where you were the
21    plaintiff?
22         A.  Yes.
23         Q.  In matters -- what was the subject matter
24    of those cases?
25         A.  To the best I can recall, there was the

---

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                              August 16, 2023

---

**Page 9**

1  one against a home contractor -- well, sorry.  The
2  first one was against a home inspector when we
3  purchased our house.  The second time that I recall
4  was against a home contractor when we had our house
5  fixed.  Actually, there was a -- well, and then I
6  think maybe just three because the third one would
7  be in my case against Mr. Lindell and MyPillow.  I
8  was a plaintiff in a couple of other cases, but I
9  don't recall that there was a deposition.
10      Q.   Do you recall approximately how long ago
11  the contractor case was?
12      A.   That was about maybe 10 years ago.
13      Q.   And do you recall how long ago the
14  inspector case was?
15      A.   That was about 15 years ago.
16      Q.   And the Mr. Lindell case was relatively
17  recently?
18      A.   Yes.
19      Q.   Are there any other cases where you've
20  been deposed as a fact witness that you can recall?
21      A.   Again, I've been involved in -- I was a
22  plaintiff in at least two cases I recall.  Estate
23  matters.  I was a defendant in at least one business
24  case, but I don't believe that I was deposed in
25  those cases.  At least, I can't recall a deposition

---

**Page 10**

1  in those cases.
2      Q.   So although you've given deposition
3  testimony before, I'm going to refresh you on just
4  some of the rules and the protocols that we're going
5  to follow during this deposition.  First, I ask that
6  you allow me to finish my question before you
7  provide your answer, and I'll try my hardest not to
8  speak over you.
9          Do you agree to speak one at a time?
10      A.   Yes.
11      Q.   And then for Laura, the court reporter's
12  sake, all of your answers must be verbal as opposed
13  to nodding your head or saying hm-hmm.
14          Do you agree to provide verbal answers to
15  my questions?
16      A.   Yes.
17      Q.   If you do not understand a question, you
18  can ask me to clarify it.  Will you agree to do that
19  if you do not understand a question?
20      A.   Yes.
21      Q.   During my examination, counsel may object.
22  Unless you're instructed not to answer, you are
23  required to answer the question even after he
24  objects.
25          Do you agree to do that?

---

**Page 11**

1      A.   I do, but I'd like to say that I've been
2  in very few depositions, but occasionally
3  depositions where they delve into matters that are
4  outside -- in my understanding, outside the scope of
5  the matter at hand, and I'd like to reserve the
6  right to object to those and not answer those
7  myself.
8      Q.   Understood.  We can cross that bridge if
9  we come to it.
10          If you need a break at any time, just let
11  me know.  I only ask that you answer any questions
12  that are pending on the record before we take a
13  break.
14          Do you agree to do that?
15      A.   Yes.
16      Q.   Are you taking any medication today that
17  would prevent you from providing accurate testimony?
18      A.   No.
19      Q.   And do you know of any other reason that
20  would prevent you from providing accurate testimony?
21      A.   No.
22      Q.   Did you speak with anyone today, other
23  than an attorney that represents you, to prepare for
24  today's deposition?
25      A.   No.

---

**Page 12**

1      Q.   Did you review any documents on your own
2  to prepare for today's deposition?
3      A.   No.
4          MS. LEVINE-PATTON:  We're now going to
5  introduce what will be marked as Exhibit 314.
6          (EXHIBIT 314 WAS MARKED FOR
7          IDENTIFICATION.)
8          MS. LEVINE-PATTON:  Q.  This is your
9  notice of subpoena in this matter.  Do you recall
10  receiving this document?
11      A.   Yes, I do.
12      Q.   And when you received this, did you
13  understand that Smartmatic was requesting that you
14  produce documents in your possession, custody, or
15  control in connection with this litigation?
16      A.   Actually, I do recall receiving a
17  subpoena, but I only -- I think I only received one
18  page of the subpoena.  I don't recall getting the
19  pages which asked me to bring in documentation.
20      Q.   Were you represented by Cary Joshi in
21  connection with your correspondence with us?
22      A.   Yes.
23      Q.   And are you aware whether Ms. Joshi
24  accepted service of a document subpoena in this
25  matter?

---

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

---

Page 13

1    A.  That's my understanding.
2    Q.  And then in response to that subpoena,
3  you, via Ms. Joshi, produced a series of documents.
4       Do you know -- are you aware of that?
5    A.  I believe Ms. Joshi may have mentioned
6  that to me.  I just know she told me that I didn't
7  have to worry about bringing any documents.
8    Q.  Got it.  And you were aware that you were
9  also subpoenaed to sit for a deposition today?
10   A.  Yes.
11      MS. LEVINE-PATTON:  So now we're going to
12 show you what will be marked as Exhibit 315.
13      (EXHIBIT 315 WAS MARKED FOR
14      IDENTIFICATION.)
15      MS. LEVINE-PATTON:  Q.  This is a
16 transcript of the first day of your arbitration
17 against Mr. Lindell.  It includes your arbitration
18 testimony.  Are you aware that this was produced in
19 connection with your subpoena in this litigation,
20 the Smartmatic litigation?
21   A.  Well, I know that Ms. Joshi told me she
22 would produce whatever needed to be produced from
23 the litigation -- from my litigation.  And I
24 understand this is publicly available, this
25 transcript.

---

Page 14

1    Q.  And were you under oath when you testified
2  at the arbitration?
3    A.  Yes, I was.
4    Q.  You agreed to tell the truth to everything
5  that you were asked?
6    A.  Yes.
7       MS. LEVINE-PATTON:  We're now going to
8  enter Exhibit 316.
9       (EXHIBIT 316 WAS MARKED FOR
10      IDENTIFICATION.)
11      MS. LEVINE-PATTON:  Q.  This is your
12 updated deposition subpoena.  Have you ever seen
13 this document?
14   A.  When you asked me previously if I'd seen
15 the subpoena, this is the subpoena that I recall
16 receiving.
17   Q.  Got it.  And you're aware Ms. Joshi
18 accepted service on your behalf for this subpoena?
19   A.  Yes.
20   Q.  And this is a subpoena to sit for a
21 deposition today?
22   A.  Yes.
23   Q.  So you are present today pursuant to both
24 Exhibits 314 and Exhibits 316?
25   A.  Yes.

---

Page 15

1       MS. LEVINE-PATTON:  Okay.  We're now going
2  to enter what will be marked Exhibit 317.
3       (EXHIBIT 317 WAS MARKED FOR
4       IDENTIFICATION.)
5       MS. LEVINE-PATTON:  Q.  This is Bates
6  stamped Zeidman-Lindell 042569.  This is a copy of
7  your résumé, and this is 34 pages.  We don't have to
8  talk about the whole thing, but I just want to get a
9  sense of your expert credentials.
10      So we're first going to direct your
11 attention to page 24, where it says education.  You
12 attended undergraduate school at Cornell?
13   A.  That's correct.
14   Q.  You graduated in 1981?
15   A.  Yes.
16   Q.  Your degrees were in physics and
17 electrical engineering?
18   A.  Yes.
19   Q.  Was that a dual major?
20   A.  Dual degree.  Slightly different than a
21 dual major because I got a degree from two different
22 schools.
23   Q.  What was the other school?
24   A.  Well, so one was school of engineering.
25 One was school of arts and sciences.

---

Page 16

1    Q.  So you were in a Bachelor of Arts?
2    A.  And a Bachelor of Engineering.
3    Q.  Understood.  And then you attended a
4  graduate school program?
5    A.  Yes.
6    Q.  You earned your Master of Science in
7  electrical engineering?
8    A.  Yes.
9    Q.  And that was in 1982?
10   A.  Yes.
11   Q.  From Stanford University?
12   A.  Yes.
13   Q.  Did you take any classes regarding
14 computer science when you were in graduate school?
15   A.  Actually, I think I only took one class in
16 computer science in graduate school.  Technically --
17 well, I took classes in computer engineering and
18 electrical engineering, which in many schools is
19 combined with computer science.  But with regard to
20 software and programming, that was separate at
21 Stanford, and I think there was only one class that
22 I took in that field.
23   Q.  I'd like to look at your employment
24 history briefly.  This starts on page three of your
25 résumé with Signetics Corporation.

---

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.

August 16, 2023

Page 17

```
 1    A.  Yes.
 2    Q.  Was that your first employment following
 3  graduate school?
 4    A.  Yes.
 5    Q.  And then it looks like you were an
 6  engineer at several companies in the 1980s; is that
 7  right?
 8    A.  That's correct.
 9    Q.  What type of engineering were you
10  performing?
11    A.  At Signetics, I was designing integrated
12  circuits or computer chips.  At ROLM Corporation, I
13  was, again, designing computer chips, but also
14  writing what's called firmware, which is low level
15  software.  At American Supercomputers I was, again,
16  designing computer chips, but also I wrote a
17  what's -- I wrote software to do what's called a
18  behavioral simulator of circuits of computer chips.
19  At Telestream, I was designing chips and systems,
20  physical systems circuit boards.
21        Then at Stanford, I had a consulting job
22  at Stanford University working on a -- what's called
23  a neurological network memory.  I was basically
24  supervising the design of circuit boards, you know,
25  and the 1980s was -- included I think where I was
```

Page 18

```
 1  consulting at ICO Systems where I was designing
 2  systems -- communication systems.
 3    Q.  Were these --
 4    A.  And I should say and controller embedded
 5  systems and communication systems.
 6    Q.  And were these all technology companies?
 7    A.  Yes.
 8    Q.  It says that in -- from 1982 to 1988 you
 9  worked at eVault Remote Backup Service.  You were
10  the founder and the president.  What is eVault
11  Remote Backup Service?
12    A.  E-Vault was a -- the very first remote
13  back-up service, which would allow customers using a
14  modem over the phone lines to automatically back up
15  their critical files to a server that I maintained,
16  and I wrote that entire system, the software for
17  that system myself, and maintained the company.
18    Q.  So that was computer software that you
19  wrote?
20    A.  Yes.
21    Q.  And then it looks like in the 1990s you
22  were a consultant for several large and well-known
23  companies that include Cisco systems?
24    A.  Yes.
25    Q.  Hitachi?
```

Page 19

```
 1    A.  Yes.
 2    Q.  Apple?
 3    A.  Yes.
 4    Q.  And in the early 2000s you then founded
 5  Zeidman Technologies?
 6    A.  Yes.
 7    Q.  What does Zeidman Technologies do?
 8    A.  Zeidman Technologies officially closed
 9  this year, but it had a technology for -- it was
10  software that automatically generated other
11  software, specifically what's called a realtime
12  operating system.  So a user could specify some
13  parameters within other code and this tool would go
14  through other code, find those parameters, and
15  rewrite the code to create a system that could
16  operate on its own.  That's simplification.  I don't
17  think you want the details of it.
18    Q.  It sounds complicated.  So you developed
19  the software tools for that project?
20    A.  Yes, I -- I developed the concept.  I
21  filed the patents.  I wrote the prototype myself,
22  and then I hired people to turn the prototype into a
23  commercial product.
24    Q.  So you're also the company founder and
25  president of Software Analysis and Forensic
```

Page 20

```
 1  Engineering Corporation.  What is that company?
 2    A.  So that company provides software
 3  forensics tools, specifically the main product is
 4  called CodeSuite.  CodeSuite is used typically in
 5  intellectual property disputes, software
 6  intellectual property disputes, to compare a
 7  software from two different parties to determine if
 8  one was copied from another.
 9    Q.  So you wrote computer software in that
10  capacity -- in that role as well?
11    A.  Yes.  I wrote the initial tool and
12  continued to develop it over the past 20 years or
13  so.  I brought some people on to -- at various
14  phases to add features or maintain the tool, but at
15  this point, I'm the one who maintains it.
16    Q.  Mr. Zeidman, approximately how many times
17  have you written computer software?
18    A.  Really hard to say.  I started writing
19  software about 50 years ago when I was in middle
20  school, and the reason I never took many classes --
21  I think I've taken two computer science classes.  By
22  the time I got to college, I'd already written a
23  full operating system that won a national award, and
24  I thought I didn't need to take any more classes in
25  computer science.
```

5 (Pages 17 to 20)

ROBERT ZEIDMAN                                        August 16, 2023
SMARTMATIC, ET AL. V. LINDELL, ET AL.

---

Page 21

1    Q.  Wow.  Did you earn any patents?
2    A.  I currently have 28 patents, 28 issued
3  patents.  I think 27 of them are software patents or
4  have some software aspect to them.
5    Q.  Have you ever heard the term Internet
6  packet data?
7    A.  Yes.
8    Q.  What is your definition of the term
9  Internet packet data?
10    A.  Well, packet data are small chunks of data
11  that are used to efficiently send information over a
12  network.  Internet packet data would be specifically
13  packet data that travels the Internet as opposed to,
14  for example, a company's local network.
15    Q.  Have you ever worked with Internet packet
16  data through your employment experience?
17    A.  Many times, yes.
18    Q.  In what position?  In what employment
19  positions or what companies?
20    A.  Let's see.  It think first was at David
21  Systems, which is at the bottom of page two.  So at
22  David Systems, their key technology was sending
23  packets -- network packets over a phone system.  So
24  they had designed a phone system, so let's say they
25  were called PBXs, private branch exchanges, but they

---

Page 22

1  were systems that a company could have to control
2  the input and output to all of the extensions within
3  the -- within a building or within a company.
4    And David Systems had figured out how to
5  send ethernet data, which is the most common
6  networking -- type of network -- the most common
7  type of network.  They figured out how to put -- to
8  send ethernet packets over these phone systems.  So
9  they had developed that, but I was called in as a
10  consultant because they had a big project to design
11  a system for Alcatel in France.  And Alcatel had
12  certain requirements, and the company was going
13  through certain changes.  So they brought me in to
14  design some chips and to supervise the project.  So
15  that was David Systems.
16    With my remote back-up company, eVault, I
17  had to have some understanding -- let me take that
18  back.  Actually, that worked over a phone system.
19  The later systems worked over networks, but that
20  worked over a phone system.  It wasn't really
21  involve packets.  It was a similar kind of
22  technology, but I shouldn't call it packets.
23    But Wireless Access, I was a consultant on
24  a chip that had to connect to a network and send
25  packets.  Adaptive Video was a network-based

---

Page 23

1  imaging -- medical imaging system, and, in fact, I
2  designed the hardware, but I eventually got involved
3  in the software, which connected over the network.
4  And then of course Cisco Systems is where I got most
5  of my experience where I actually designed
6  simulators for switches, hubs, and routers.  These
7  are devices that send packets.  They control packet
8  switching.
9    So in other words, if -- you know, if
10  you're on your computer and you're sending something
11  to someone else on their computer, it goes through
12  switches and hubs and routers throughout the world.
13  Cisco, at the time, was the largest seller of these
14  kinds of devices, and I worked on the Catalyst --
15  well, okay.  Let me take that back.
16    This was pre-Catalyst.  The reason I know
17  that, Catalyst was their most successful product
18  during the '90s.  If you go -- oh, it doesn't have
19  it here because I don't have all my consulting work
20  here.  Because I worked for a company called
21  Crescendo Systems.
22    The founders of David Systems -- as I
23  mentioned, David Systems was going through some
24  changes when they hired me.  The engineering team
25  had quit, which is why they brought me on to finish

---

Page 24

1  this project, but the engineering team -- I got to
2  know them before they quit, and they started
3  Crescendo Systems, and Crescendo Systems was
4  building a high speed router.  They brought me on as
5  a consultant on a small side project they had, which
6  was a multi-port router, which became the reason
7  that Cisco bought them, and that became the Catalyst
8  router.
9    And, again, as I said, the Catalyst was
10  Cisco's most successful product.  So, interestingly,
11  at Crescendo I worked on what became Cisco's most
12  successful product.
13    Q.  Is it safe to say that you'd recognize
14  Internet packet data if you saw it?
15    A.  Yes, I've had to understand it very much
16  to simulate it, to build hardware, to deal with it.
17  I actually haven't gone over all the projects I
18  worked on, but that was a major part of my work was
19  hardware and software for understanding packets.
20    In fact, one -- just one other thing I'll
21  mention is at Zeidman Technologies, which you
22  mentioned, I had software that I patented called
23  Molasses.  Molasses was a fully -- full software
24  solution to -- there was a problem -- again, I don't
25  need to go into the details unless you want to hear

---

6 (Pages 21 to 24)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                      August 16, 2023

---

Page 25

1    it, but there was a problem in a particular
2    industry, the electronic design automation industry,
3    and everyone thought that you had to have a hardware
4    solution, a very, very expensive hardware solution
5    to this problem about slowing down network traffic.
6            But I actually realized you could do it
7    with a simple personal computer and software, and I
8    wrote the software and sold the product to several
9    different companies over a seven-year period and got
10   one patent in the technology, and I believe six,
11   seven, or eight other patents that were
12   continuations or continuations in part of that
13   technology.  And that required me to understand the
14   packet data because I had to take in packets, my
15   software had to take in packets, actually modify
16   them on the fly, and then send them out again.
17       Q.  Have you ever heard the phrase advanced
18   packet sniffing?
19       A.  Well, I know packet sniffing.
20       Q.  What is your definition of packet
21   sniffing?
22       A.  So packet sniffing is basically recording
23   packets on a network.  My Molasses technology that I
24   patented actually modified the packets on the fly.
25   So in other words, packet sniffing is typically

---

Page 26

1    recording packets, but my software could take in a
2    packet, modify it, make it look like it came from
3    somewhere else, and then send it on its way.
4        Q.  So your résumé shows that one of your
5    current positions is at Zeidman Consulting where
6    you're the founder and president.  What does Zeidman
7    Consulting do?
8        A.  Zeidman Consulting started out being me
9    designing hardware and software on a contract basis
10   for various companies.  It's now mostly litigation
11   support, doing forensics.  So taking apart or
12   reverse engineering hardware and software to
13   determine whether any IP infringement occurred and
14   then writing a report and testifying in court.  And
15   I have -- I've trained people to do that, and I
16   subcontract out work as needed.
17       Q.  Approximately, how many employees do you
18   have?
19       A.  I currently have two, me and my wife, but
20   I have a network of consultants.  I'd say there are
21   three -- there are -- well, there are about five or
22   six that I use on a regular basis, and I've trained
23   close to 60 people in my methods and tools.
24       Q.  So do you consult on IP infringement that
25   has to do with forensic computing?

---

Page 27

1        A.  Well, I wouldn't -- the technique is
2    forensics.  You know, we work on computing.  We work
3    on hardware and software.  A lot of what we do is
4    looking at software.  So I would call -- the
5    forensics is the examination and presentation in
6    court, but we look at all kinds of machines in
7    various industries and various technologies.
8        Q.  Got it.  It looks like you've done a fair
9    amount of litigation consulting from your résumé.
10   Approximately, how many times have you been hired as
11   an expert witness in legal matters?
12       A.  As a -- well, I'll say as a consultant to
13   legal matters, I've been hired just over 260 times.
14   As a testifying expert, probably roughly 200 times.
15   The first few -- the first -- probably the first 20
16   or 30 times I was just consulting on a team of
17   people, not testifying.
18       Q.  And approximately how many expert reports
19   have you written?
20       A.  Over 200.
21       Q.  And do you work on software copyright
22   cases?
23       A.  Yes.
24       Q.  And software trade secret cases?
25       A.  Yes.

---

Page 28

1        Q.  And patent cases as well?
2        A.  Yes, software and hardware.
3        Q.  What subject matter have you been
4    qualified as an expert in?
5        A.  Let me put it this way.  There's --
6        MR. BECK:  I'll object to the form of
7    question with respect to being qualified as an
8    expert.  Go ahead, please.
9        THE WITNESS:  So the technologies I've
10   testified on range from medical equipment to
11   breathalyzers, to networking equipment to game --
12   gaming software.  There's -- there's no kind of
13   hardware or software that I've ever been excluded
14   from working on.  Mainly because the technology --
15   at the very basic level, the technology is the same.
16   It's mostly the use of the technology that differs
17   from machine to machine.
18       MS. LEVINE-PATTON:  Q.  Have you been
19   qualified as an expert in federal court before?
20       A.  Yes.
21       Q.  Approximately, how many times?
22       A.  I would say at least a hundred times.  I
23   don't know how many more than that.
24       Q.  Have you been qualified as an expert in
25   state court?

---

7 (Pages 25 to 28)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                August 16, 2023

Page 29

1    A.  Yes.
2    Q.  Approximately, how many times?
3    A.  I would say at least 50 times.
4    Q.  Have you been qualified as an expert by
5    the International Trade Commission?
6    A.  Yes.
7    Q.  And have you been hired by both plaintiffs
8    and defendants?
9    A.  Yes.
10   Q.  Have you ever -- have you been hired by
11   different law firms?
12   A.  Yes, many different law firms.
13   Q.  Is that all over the country?
14   A.  All over the world.
15   Q.  Have you ever analyzed computer files as
16   an expert witness before?
17   A.  Yes.
18   Q.  Approximately how many times?
19   A.  Probably 260 times.
20   Q.  I'm going to talk about -- I'd like to
21   talk about some of the awards that you've earned.
22   It looks like you've earned multiple awards as an
23   outstanding engineer for forensic software analysis.
24   Who gave you this award?
25   A.  That was the IEEE, the Institute of

Page 30

1    Electrical and Electronics Engineers.
2    Q.  How do you earn that?
3    A.  Not quite sure.  It's -- somebody
4    recommends you based on your work, and then it goes
5    to a committee and the committee reviews -- I assume
6    they review my work or my credentials.  It's not --
7    I'm not aware that they publicly go through the
8    process, and then I'm notified that I was given an
9    award.
10   Q.  When you say somebody recommends you, it's
11   peers in your field?
12   A.  Yes.
13   Q.  You were also given awards for cybernetics
14   and informatics; is that right?
15   A.  If you show me the page of my C.V. --
16   Q.  Yeah, I'm sorry.
17   A.  I just want to remember which one in
18   particular.
19   Q.  I'm on page 21 of your C.V.
20   A.  And which number is that?
21   Q.  I'm looking at number six, Session's Best
22   Paper Award.
23   A.  Okay.  Okay.  That was a conference.  The
24   conference -- it was a worldwide conference on
25   systemic cybernetics and informatics.  I don't

Page 31

1    remember -- I just remember that I submitted a
2    paper.  The paper was accepted.  I gave a talk at a
3    conference somewhere in the world.  I'd have to go
4    back -- it might have been India, and then the
5    attendees of the conference would vote on the best
6    paper and mine was voted best paper.
7    Q.  And what is cybernetics and informatics,
8    just generally?
9    A.  Generally, it refers to computer
10   information and computer manipulation of
11   information.
12   Q.  You've also been awarded for software
13   development; is that true?
14   A.  I think -- there was the Jolt Reader's
15   Choice Award for a book I wrote from software
16   development magazine, if that's what you're
17   referring to, or I received two Jolt awards.
18   Q.  And what are Jolt awards?
19   A.  Jolt was a magazine that doesn't exist
20   anymore, unfortunately, but it was a -- it came
21   from -- there was a super caffeinated cola called
22   Jolt, but this was put out by software development
23   magazine.  They produced awards for books and
24   software and anything having to do with software
25   development.  I don't recall.  I think they had a

Page 32

1    panel of judges who would judge different products,
2    and so I received an award -- two awards for two
3    books that I wrote on software.  One was really on
4    hardware development, and one was for my book on
5    software forensics.
6    Q.  Do you know how you earned this award?
7    A.  All I recall is that I think there was a
8    panel of esteemed judges.  I don't know who they
9    were, and they would go over all the entries and
10   decide which ones deserved awards.
11   Q.  I'm now on page 23 of your résumé.  You
12   have a list of special knowledge and skills at the
13   bottom of the page.  It shows that you've listed
14   software code analysis and synthesis.  What does
15   synthesis mean in this context?
16   A.  Synthesis means taking a description and
17   automatically generating software code from it.  So
18   you mentioned we discussed Zeidman Technologies.  I
19   had a tool called SythOS, which had -- there was a
20   family of seven patents that I filed, and it was a
21   product that I sold through Zeidman Technologies,
22   and that would automatically generate software code
23   based on specifications.
24   Q.  You've also listed that you have skills in
25   various computer architectures.  What does it mean

8 (Pages 29 to 32)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                          August 16, 2023

Page 33

1   to be an expert in computer architecture?
2       A.  So different computer processors are
3   designed in different ways is the simplest way to
4   say it, and the processors that I've listed there
5   are all processors that I've either developed
6   software for -- let me say that these days, when you
7   develop software, the architecture of a processor is
8   typically hidden from the software developer, but
9   30, 40, 50 years ago you had to write software that
10  specifically -- to a specific computer architecture.
11      In other words, you would have to
12  understand the features of the processor in order to
13  write software for it, and so these are processors
14  that I all wrote software for or -- and also --
15  also, in many cases, interfaced these processors to
16  hardware in which case you need to know the
17  architecture, and by architecture I mean the
18  internal features, the internal workings of them.
19      Q.  On the next page, it shows that you are an
20  expert in networking protocols.  What does that
21  mean?
22      A.  Well, we discussed packets.
23      Q.  Uh-huh.
24      A.  As far as I recall, every networking
25  protocol uses some kind of packet, but the packets

Page 34

1   are -- have different formats.  The most common one
2   now though is what's called the ethernet packet.
3   The Internet works on ethernet packets.  Although
4   you can -- a gateway is a device -- for example, I
5   mentioned I worked on gateways.  They will transform
6   packets from one format to another.  But
7   basically -- and different networks transmit the
8   packets in different ways.
9       But I'm familiar with these -- I'm
10  particularly familiar with ethernet, which is by far
11  the most common system for transmitting packet data
12  on a network.  But I'm also familiar with -- I was
13  familiar with ATM.  ATM, in the '90s, was going to
14  be the next -- was going to replace ethernet.  A lot
15  of companies were certain it was going to replace
16  ethernet, but, like Betamax, was expected to replace
17  VHS tapes.  It never happened.  ATM never replaced
18  ethernet.
19      MR. BECK:  That analogy might be lost on
20  these two.
21      THE WITNESS:  That's true.  I realize
22  that.  I don't know.  As soon as it came out, I
23  realized not everyone might understand that.
24      MS. LEVINE-PATTON:  Q.  So you're also an
25  expert in several software programming languages; is

Page 35

1   that true?
2       A.  Yes.
3       Q.  And you're an expert in several operating
4   systems?
5       A.  Yes.
6       Q.  Okay.  I'm going to move on to your
7   scholarship, which starts at page 24.  It looks like
8   here you've got 11 books and 108 papers or
9   presentations.  Is that up-to-date?
10      A.  No, there have been a few more.  Actually
11  gave two presentations at the Star Trek convention
12  here in Las Vegas on intellectual property, but --
13  and there might be -- there might be some others
14  missing, but this is fairly up-to-date, I think.
15      Q.  And then if we look at page 31, it shows
16  that you are the named inventor of 26 patents.  I
17  think earlier you mentioned 29.  So is that missing
18  a few patents?
19      A.  Right.  It's now at 29.
20      Q.  And 28 of those patents are in computer
21  software?
22      A.  Yes, they were involved.  They involve
23  computer software.
24      Q.  We're going to switch gears a little bit.
25  So you're familiar Mr. Mike Lindell?

Page 36

1       A.  Yes.
2       Q.  How did you first come to know of
3   Mr. Lindell?
4       A.  I'm sure it was for his commercials for
5   MyPillow.
6       Q.  And have you ever spoken with Mike
7   Lindell?
8       A.  I don't think I've ever spoken directly
9   with him.
10      Q.  We're going to talk about your experience
11  at the cyber symposium, which was hosted by Mike
12  Lindell in August of 2021.  When did you first hear
13  about the cyber symposium?
14      A.  I think it was probably around June of
15  2021.
16      Q.  And how did you hear about it in June?
17      A.  All that I can recall is that some podcast
18  or news report mentions something about it.  It
19  might have been on the Jamie Glazov podcast.
20      Q.  Who is Jamie Glazov?
21      A.  Jamie Glazov is a person who has a
22  podcast.  He interviews people.  Among others, he
23  does -- he had done a number of interviews with Mike
24  Lindell.  Jamie Glazov actually invited me on his
25  podcast about -- about 10 years ago when I written a

9 (Pages 33 to 36)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

Page 37

1   book, a novel, that interested him.  So we had a
2   podcast with two other people, who -- one was a
3   friend of mine.  One has become a friend of mine.
4       Q.  So Mr. Glazov was talking about the cyber
5   symposium on his podcast and that's how you first
6   heard about it; is that right?
7       A.  I know that I heard about it on his
8   podcast.  I can't say for sure that's the first
9   place I heard about it.
10      Q.  And did you attend the cyber symposium?
11      A.  Yes.
12      Q.  Was that from August 10 through August 12,
13  2021?
14      A.  Yes.
15      Q.  Did you attend all three days?
16      A.  Yes.
17      Q.  How did you come to attend the cyber
18  symposium?
19      A.  Friends of mine told me that I should go.
20  And after a while they convinced me that it would be
21  an interesting experience, and I e-mailed Jamie
22  Glazov and said can you get me invited, because I
23  understood you had to be invited, and he wrote back
24  that -- well, actually I received something from
25  what -- I think was Lindell Management or one of

Page 38

1   Mr. Lindell's companies saying that I had been
2   invited, and it had a room reservation for me.
3       Q.  What information did you need to supply in
4   order to be invited to attend?
5       A.  I don't remember supplying anything.  I'd
6   heard that you needed to be qualified to be a cyber
7   expert.  In other words, to be a cyber expert,
8   allegedly, there was some kind of qualification
9   requirement.  I don't know if -- you know, if -- if
10  my name was put through some kind of process or not.
11  People know my reputation.  My friends know my
12  reputation.  I think Jamie Glazov knows it.
13      So I don't know if there really was a
14  qualification process, but it's also possible that
15  they just knew me and decided that I met the
16  qualifications.
17      Q.  And were you given cyber security
18  credentials when you came to the cyber symposium?
19      A.  Yes.
20      Q.  Did you bring your own computer to the
21  cyber symposium?
22      A.  Yes.
23      Q.  Did you bring any other technical
24  equipment with you?
25      A.  I think just my computer and some flash

Page 39

1   drives.
2       Q.  And what was the first thing you did when
3   you arrived at the cyber symposium?
4       A.  I checked in.  I was given a hot pink dot
5   that -- for my badge.  I was given a badge and a hot
6   pink dot to put on the badge to show that I was a
7   cyber expert, and then I was directed to a room that
8   had a guard who checked for the dot on my badge and
9   then let me in.
10      Q.  So when you first heard of the cyber
11  symposium, is that the same time that you learned
12  about the Prove Mike Wrong Challenge?
13      A.  I would say in January of 2021, I had
14  heard that Mr. Lindell claimed he had proof of voter
15  hacking.  The -- when I heard notice of the
16  symposium, I also heard Mr. Lindell talk about the
17  five-million-dollar challenge.  I don't think I had
18  heard a name for it, but I just heard there was a
19  five-million-dollar challenge, and it was when I got
20  to the symposium that I was handed a form to sign
21  which said these are the rules of the Prove Mike
22  Wrong Challenge.
23      Q.  And what did you think the purpose of the
24  Prove Mike Wrong Challenge was?
25      A.  Well, initially, before I got the

Page 40

1   paperwork, I thought if you could prove that the
2   votes or the voting machines were not hacked and the
3   vote was not corrupted in the 2020 -- November 2020
4   presidential election that you would win five
5   million dollars.  When I received the agreement to
6   sign, the restrictions were much narrower or the,
7   let's say, the goal of the prize was much narrower.
8   And that was to simply prove that the data had no
9   relation to the 2020 election.
10      Q.  Did you enter the Prove Mike Wrong
11  Challenge?
12      A.  I did because I was told that I couldn't
13  see the data without signing the forms.
14      Q.  And when you entered the challenge, did
15  you believe you would be able to succeed?
16      A.  No.
17      Q.  Why is that?
18      A.  Because three days is not enough time to
19  examine data, typically.  It could be a very
20  complicated process.  Sometimes there's a team of us
21  working for weeks.  Sometimes even months.  I also
22  thought that Mr. Lindell -- my understanding is that
23  his own team had already validated the data, and
24  also because the challenge was not to show whether
25  or not hacking had occurred, but whether the data

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                              August 16, 2023

---

Page 41

1  was related to the election, I assumed from the
2  start the data was related to the election.
3      Q.  You said Mr. Lindell's own team.  Did you
4  know who was on that team?
5      A.  No.
6      Q.  Did you ever learn who was on that team?
7      A.  I did.
8      Q.  And who was that?
9      A.  Well, there was Josh Merritt, Doug Frank,
10 Todd Sanders.  It's a little unclear.  During my
11 arbitration against Mr. Lindell, it was never clear
12 who else was on that team.  There was Kurt Olsen,
13 Phil Waldren.  I can't remember his real name.
14 Somebody who goes by Code Monkey Z -- Watkins.  I
15 can't remember his first name.  Watkins.
16     All of these peoples' names were
17 mentioned, and also Dennis Montgomery, Conan Hayes,
18 but it was never clear and still not clear to me
19 today which of these people had allegedly vetted the
20 data to show hacking.
21     Q.  So when did you first receive the rules to
22 the Prove Mike Wrong Challenge?
23     A.  When I entered the symposium.
24     Q.  And did you sign the rules at that time?
25     A.  Yes.

---

Page 42

1      Q.  Okay.  We're going to show you what's been
2  previously marked as Exhibit 124.  Do you recognize
3  these first couple of pages?
4      A.  Yes, these look to be the Prove Mike --
5  Prove Mike Wrong official rules.
6      Q.  And what was your understanding of the
7  rules when you signed them?
8      A.  My understanding was that I couldn't see
9  the data without signing.  Although, to be fair, I
10 would have signed anyway.  There was nothing in the
11 rules that seemed objectionable to me, and that I --
12 to win contest, I needed to prove that the data was
13 not -- the data Mr. Lindell supplied was not related
14 to the 2020 election.
15     Q.  And were you aware that Lindell Management
16 LLC was the entity sponsoring and administering the
17 challenge?
18     A.  Yes, it says so in the very first
19 paragraph.
20     Q.  Had you ever heard of Lindell Management
21 LLC before?
22     A.  No.
23     Q.  Have you ever spoken with anyone at
24 Lindell Management LLC before?
25     A.  No.

---

Page 43

1      Q.  So you told me a couple minutes ago that
2  after you signed rules and you got the pink dot on
3  your badge, you went to a room with other experts.
4  How many other cyber security experts were there on
5  the first day?
6      A.  I was told there were two rooms.  I was
7  directed to one of them, and in that room there were
8  about 12 to 15 experts.  I assumed there were 12 to
9  15 in the other room, but I don't really know.
10     Q.  Did you recognize any of the experts that
11 were in your room?
12     A.  No, but I -- that didn't surprise me.
13 There's a lot of people who do this work.
14     Q.  Did you say anything to the other people
15 in your room on that first day?
16     A.  I -- we all introduced each other.  We
17 shared information about where to download
18 Mr. Lindell's data.  Yeah, there was a lot of
19 ongoing discussion.
20     Q.  So did you receive data to review on that
21 first day of the cyber symposium?
22     A.  Yes.
23     Q.  How were you given access to that data?
24     A.  As I recall, there was a whiteboard with a
25 URL for reaching a site on the local network at the

---

Page 44

1  building where we could download the files.
2      Q.  Did anyone talk to you about how to access
3  the files?
4      A.  I know that people from -- from
5  Mr. Lindell's red team -- they called themselves the
6  red team -- would come in.  I found that out, I
7  think, during the symposium.  Would come in -- I
8  didn't really know who they were, but somebody would
9  come in and say here's how you access the files or I
10 understand you're having problems accessing the
11 files.  Here's what you need to do.  They would come
12 in and say something like that and leave.
13     Q.  Do you recall any of the specific people
14 on the red team who would come in and talk to you?
15     A.  The only one I know specifically was Josh
16 Merritt.  That's because later I find out it was him
17 because of some things he told us.
18     Q.  Had you met Josh Merritt before the cyber
19 symposium?
20     A.  No.
21     Q.  Do you recall what Mr. Merritt told you
22 about the data you were receiving on the first day?
23     A.  What Mr. Merritt told us?
24     Q.  Uh-huh.
25     A.  Well, at first he came in and gave us, as

---

11 (Pages 41 to 44)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

Page 45

1  I recall -- well, someone came in and gave us
2  information about how to download it. I can't say
3  whether that was him or not. I was sitting at a
4  desk and somebody would walk in, say something, and
5  leave. But at one point he did -- and I'll quote
6  him. At one point later in the day he said this is
7  all bullshit. The data is all bullshit.
8      Q. And that was on the first day of the cyber
9  symposium?
10     A. I believe so.
11     Q. Do you recall which files you were
12 reviewing when he said that?
13     A. Those were what I call the day one files.
14 I think there were seven of them. It's in my
15 report.
16     Q. Yep, I'd like to talk about your report
17 next. So if you actually flip to page 42 of
18 Exhibit 124, is this your expert report?
19     A. Yes, it is. It looks to be.
20     Q. Before I forget to go back, I'd like to
21 ask you one more question about the red team. Did
22 anyone else other than Josh Merritt talk to you
23 about what the data was supposed to be?
24     A. I had read reports that one of the other
25 people that came in -- that someone else came in

Page 46

1  possibly -- well, it's possible that Phil Waldren
2  came in, but I don't know for sure. Again, I was
3  focused on the data, and I had my back to the door.
4  Someone would come in and make a statement or two
5  and then leave. So I really didn't get a chance to
6  see who was making the statement, and I didn't know
7  who was who at that point.
8      Q. What did the other people say who came
9  into the room at various points throughout the day?
10     A. I don't have any recollection of anything
11 specific. Most of them were just telling us how to
12 download the files. I know that we all had
13 questions once we downloaded the files. The main
14 question was where are the PCAP files, and I think
15 occasionally someone would come in and make a
16 statement, but I don't remember. At some point, I
17 realized we had not received PCAP files.
18     Q. Was it a consensus among the group of
19 cyber experts that there were no PCAP files?
20     MR. BECK: Object to the form.
21     THE WITNESS: Yes.
22     MS. LEVINE-PATTON: Q. Uhm --
23     A. Let me -- there were people who spent all
24 three days looking -- we received some very large
25 binary files, and there were people who spent I

Page 47

1  think all three days trying to understand whether
2  these were PCAP files, but by day one I was
3  convinced they were not PCAP files. So I think
4  everyone knew we had not received PCAP files, but
5  some people believed that some of the larger files
6  might be some kind of modified PCAP files in a
7  format we weren't aware of.
8      So everyone knew that we did not get PCAP
9  files, but that some people felt that they might
10 still be with -- somehow encoded within the files we
11 had received.
12     Q. And why were people expecting or why were
13 you expecting to see PCAP files?
14     A. Well, I was not expecting particularly --
15 particularly to see PCAP files. I know that
16 Mr. Lindell had a number of statements about
17 having the PCAP files. My feeling is the other
18 people at the symposium were -- ranged from I.T.
19 people with little experience in forensics to cyber
20 security people. Some -- you know, at least one or
21 two or three very experienced cyber security people,
22 but I think I was the only, what I would call,
23 forensics person.
24     And cyber security people tend to be given
25 a certain type of data and ask to figure out what's

Page 48

1  in that data. As a forensics examiner, I never know
2  what I'm being given. So I don't assume that I'm
3  getting any particular format, even if party to a
4  litigation says it's in a particular format.
5      And so I think that made my analysis
6  somewhat unique in that I just didn't -- once I
7  determined these were not PCAP files, I started
8  using other tools to figure out what they actually
9  were.
10     Q. And did you eventually draft an expert
11 report?
12     A. Yes.
13     Q. Why did you draft the report?
14     A. I realized that I knew what the day one
15 files were. I knew they were not PCAP files or
16 related to the November 2020 election. So I
17 typically write a report. I have a template that I
18 use. I went to my hotel, wrote up all my results,
19 registered this with the copyright office, and was
20 prepared to bring it in the next day.
21     Q. Did you draft this report on the first day
22 of the cyber symposium?
23     A. Yes.
24     Q. After looking at the files from day one?
25     A. Well, let me -- let me say not this

12 (Pages 45 to 48)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

---

Page 49

1  particular report that you have here.  Because we
2  were given more files on day two, and so then I
3  realized that I needed to examine those files, and
4  so the report you have here is what I eventually
5  filed on day three where each day I added more to
6  it.
7        Q.  I'd like to direct your attention to page
8  51.  This is where you wrote files from day one.  Do
9  you see that?
10       A.  Yes.
11       Q.  Is this the list of seven files that you
12  viewed on the first day?
13       A.  Yes.
14       Q.  Did you expect to receive more than seven
15  files on the first day?
16       A.  No, I think it surprised everyone, all the
17  cyber experts.
18       Q.  Why were you surprised?
19       A.  On day one, nobody said anything about
20  other files.  On day one, we were told here are the
21  files.  You can download them from this location,
22  and so there was no expectation we would receive
23  additional files.
24       Q.  And who communicated that to you?
25       A.  The red team members.  Maybe was Josh

---

Page 50

1  Merritt, maybe was Phil Waldren.  I just don't
2  remember.
3        Q.  I'd like to direct your attention to
4  Paragraph 20.  It says that you were instructed to
5  examine files in the folder pod_DIST.  How did you
6  get to that folder?
7        A.  So you can see there a network locations
8  //USAserver01/cyber.  We were given the -- we were
9  connected to the local network, and that's just a
10  URL.  It's just a location on the network.  If you
11  point your browser to it, then you'll see a folder
12  called pod_DIST.
13       Q.  It looks like the first file listed in
14  your report is file CExtract.mp4.  Did you open that
15  file?
16       A.  Yes.
17       Q.  How did you open that file?
18       A.  It's an MPEG file, so that means it's a
19  video.  If you double click on it in Windows, which
20  is the machine I have, it will come up with a
21  standard media player and start playing it.  It's a
22  video file.
23       Q.  And what was that a video of?
24       A.  Well, it was -- you know, I can tell you
25  what I eventually learned it was of or what I

---

Page 51

1  eventually understood it to be of.  Because some
2  details didn't become clearer until the arbitration,
3  but it was someone manipulating -- using a
4  development environment, a software development
5  environment -- let me back up.
6        It's a screenshot of a mouse being
7  manipulated using a development -- software
8  development environment, and obviously someone on
9  the computer typing some information onto some
10  screens.  It didn't have sound.  It lasted I think a
11  minute and 20 seconds, and later on, if you zoomed
12  in on it -- and we also I think heard some testimony
13  at the arbitration.  It was a Microsoft visual
14  studio development system, which is probably the
15  most common development system.  It showed a tiny
16  bit of source code for some program.
17       But there was no explanation.  You
18  couldn't gather any understanding of what the video
19  was about from looking at it.
20       Q.  Was there any indication of where the
21  video came from?
22       A.  No.
23       Q.  Was this first file related to the 2020
24  U.S. election?
25       A.  No.

---

Page 52

1        Q.  Was there any data in this first file
2  indicating that voting machines were online during
3  the 2020 U.S. election?
4        A.  No.
5        Q.  Was there any data in this first file
6  indicating that voting machines changed votes during
7  the 2020 U.S. election?
8        A.  No.
9        Q.  Was there any data in this first file
10  indicating that voting machines were hacked during
11  the 2020 U.S. election?
12       A.  No.
13       Q.  Was there any data in this first file
14  pertaining to Smartmatic?
15       A.  No.
16       Q.  Was there any data in the first file
17  indicating that the 2020 U.S. election was stolen?
18       A.  No.
19       Q.  I'd like to talk about the next file
20  listed as number two in your report.  It was called
21  Election Process Taxonomy.PDF.  Did you open that
22  file?
23       A.  Yes, that's a standard PDF of a diagram of
24  some voting system.
25       Q.  And how did you open the file?

---

13 (Pages 49 to 52)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

---

Page 53

1      A.  Again, clicking on it brought up the
2  default application Adobe Acrobat.
3      Q.  What specifically was in the second file?
4      A.  As I recall, there were two diagrams, I
5  believe.  Each one showed some kind of voting system
6  at a very high level.  It might have shown voting
7  machines connected to -- I just don't recall.  It
8  might have mentioned voting machines, but it was
9  just a generic block diagram of how voting occurred
10  in some system.
11      Q.  Was the second file related, in your
12  opinion, to the 2020 U.S. election?
13      A.  No.
14      Q.  Was there any data in that second file
15  indicating that voting machines were online during
16  the 2020 U.S. election?
17      A.  I don't recall.
18      Q.  Do you have any reason to believe that the
19  second file showed that voting machines were online
20  during the 2020 U.S. election?
21      A.  I don't recall if it showed some kind of
22  connection in the diagram, but to me, it was just a
23  diagram with no -- it was a generic diagram with no
24  specific relationship to the November 2020 election.
25      Q.  Did the second file have evidence proving

Page 54

1  that voting machines changed votes during the 2020
2  U.S. election?
3      A.  No.
4      Q.  Did the second file have evidence proving
5  that voting machines were hacked during the 2020
6  U.S. election?
7      A.  No.
8      Q.  Did the second file have evidence
9  pertaining to Smartmatic?
10      A.  I don't believe so.
11      Q.  Did the second file have evidence
12  indicating that the 2020 U.S. election was stolen?
13      A.  No.
14      Q.  I'd like to talk about the third file that
15  you have in your report, which is called Chinese
16  Source IP Hex.txt.
17          Did you open this file?
18      A.  Yes, I did.
19      Q.  How did you open it?
20      A.  Well, I explained it in my report.  It's a
21  text file, so initially I opened it with standard
22  text editor on my computer.
23      Q.  And what did you find in the third file?
24      A.  This was ASCII representation of text,
25  which means text that had been -- sorry.  I said

Page 55

1  that wrong.  ASCII representations of hex numbers.
2  Hex are base 16 numbers that are used by computers,
3  but these weren't actual numbers.  They were letters
4  designed for a human to read them as hex numbers.
5      Q.  You refer to hex code in your report.  Is
6  that the same hex that you're talking about right
7  now?
8      A.  I believe so, yes.
9      MS. LEVINE-PATTON:  Okay.  We're now going
10  to introduce what will be marked as Exhibit 318.
11  This is Bates stamped Zeidman SMT Lindell 042603.
12          (EXHIBIT 318 WAS MARKED FOR
13          IDENTIFICATION.)
14      MS. LEVINE-PATTON:  Q.  So what I've shown
15  you is the first 10 pages printed of Exhibit 318.
16  This is a voluminous file with thousands of pages,
17  and the actual Exhibit 318 is on a computer that is
18  in front of you there.  Would you look at that file?
19      A.  Okay.  Just a minute.
20      MR. BECK:  Maura, can we take a couple of
21  minutes just to fill up my coffee?
22      MS. LEVINE-PATTON:  Sure.
23      VIDEOGRAPHER:  We are off the record.
24  11:06 a.m.
25          (The deposition was in recess from 11:05

Page 56

1  to 11:16.)
2      VIDEOGRAPHER:  We're back on the record at
3  11:17 a.m.
4      MS. LEVINE-PATTON:  Q.  Mr. Zeidman, we
5  just introduced Exhibit 318.  Do you recognize this
6  document?
7      A.  Yes.  So if you take the file Chinese
8  Source IP Hex.txt and translate the ASCII
9  representation of hex to actual hex and then bring
10  it up, that file in a word processor, this
11  Exhibit 318 that you've shown me is what you'll see.
12      Q.  So you mentioned ASCII.  Is that
13  A-S-C-I-I?
14      A.  Yes.
15      Q.  What is that?
16      A.  It's just a standard way of representing
17  numbers and letters and characters for a computer.
18      Q.  And you write in Paragraph 26 of your
19  report that you used a program called hex to bin
20  that you created in order to convert ASCII
21  represented text to binary.
22      A.  Yes.
23      Q.  Is that the process that you used?
24      A.  I did.  People pointed out that there are
25  other tools available, that are easily available

14 (Pages 53 to 56)

ROBERT ZEIDMAN                                              August 16, 2023
SMARTMATIC, ET AL. V. LINDELL, ET AL.

Page 57

1   online, but this was a tool I created many years ago
2   to do the same thing.
3       Q.   And you converted the file to binary code?
4       A.   Yes.
5       Q.   And when you converted the file to binary,
6   did you discover it was an RTF file?
7       A.   Yes, rich text format.
8       Q.   And were you able to open it at that
9   point --
10      A.   Yes.
11      Q.   -- using --
12      A.   With Microsoft Word.
13      Q.   What did you see when you opened the RTF
14  file in Microsoft word?
15      A.   I -- I saw what's shown to me in
16  Exhibit 318, at least this is the first few pages of
17  it.
18      Q.   Did it look to you to be IP addresses?
19      A.   Yes, there were two columns, the left most
20  column looks -- is formatted like IP addresses.
21      Q.   Were you able to determine if the left
22  column actually contained IP addresses?
23      A.   Technically, there's nothing I'm aware of
24  to determine that.  IP addresses are simply four
25  numbers from one to three digits each, and they can

Page 58

1   be IP addresses.  They're assigned -- well, it's
2   complicated how they're assigned, but they can be
3   assigned to a device.  There are some restrictions
4   on what kind of IP address numbers are assigned, but
5   just glancing at it, they look like all legitimate
6   IP addresses.
7       Q.   Was there a header on this file?
8       A.   No, I don't believe so.
9       Q.   Was there any other distinguishing
10  information in the file?
11      A.   Let me clarify that the actual file -- and
12  I have some information.  Technically, there was a
13  header that I show on Paragraph 24, but it is a
14  header that indicates that this is an RTF file.  So
15  if you look at the RTF file, you'll see lots and
16  lots and lots of commands about how to format the
17  file.  Things like, you know, which things are in a
18  row, which things are in a column, which are bold,
19  which are certain fonts, which font sizes to use.
20  But it's all word processing information.
21      Q.   Was this third file packet or PCAP data?
22      A.   No, it wasn't.
23      Q.   How did you know that this file did not
24  contain packet or PCAP data?
25      A.   Packet data would include much more

Page 59

1   information.  It would have, not just one IP
2   address, it would have a source IP address, which is
3   where the packet originated, a destination IP
4   address, which is where it was intended to go.  It
5   would have information about the size of the packet.
6   I don't recall offhand.  I used to know what went
7   into a packet, but it would have much more
8   information than this.
9       Q.   And in your opinion, is there evidence
10  that this file was related to the 2020 U.S.
11  election?
12      A.   There was nothing in here that I -- I
13  determined that nothing in here was related to the
14  2020 election.
15      Q.   Was --
16      A.   Also, if I can clarify, I used to know --
17  I should say I used to know -- I used to have
18  memorized what was in a packet.  I can certainly
19  look it up, but when I wrote software and hardware
20  for manipulating packets, I could tell you, off the
21  top of my head, other than source IP, destination
22  IP, and packet length -- oh, and a checksum at the
23  end of the packet.  And a payload.  But there might
24  be more specific information I'm not recalling.
25      Q.   But you didn't see any of that information

Page 60

1   in this Chinese source IP hex file?
2       A.   That's correct.
3       Q.   Was there evidence that this file -- in
4   this file that voting machines were online during
5   the 2020 U.S. election?
6       A.   No.
7       Q.   Was there evidence in this third file
8   indicating that voting machines changed votes during
9   the 2020 U.S. election?
10      A.   No.
11      Q.   Was there evidence in this third file
12  indicating that voting machines were hacked during
13  the 2020 U.S. election?
14      A.   No.
15      Q.   Was there evidence in this file pertaining
16  to Smartmatic?
17      A.   No.
18      Q.   And was there evidence in this file
19  indicating that the 2020 U.S. election was stolen?
20      A.   No.
21      Q.   I'd like to talk now about the fourth file
22  in your report, which is on page 53 of the
23  Exhibit 124.  The fourth file was called Final
24  Reult_2020_hex.txt; is that right?
25      A.   Yes.

15  (Pages 57 to 60)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

Page 61

1    Q.  And did you open this file?
2    A.  Yes.
3    Q.  How did you open it?
4    A.  I went through the same process as the
5    file for -- the file Chinese Source IP Hex.txt by
6    translating it from hex to binary -- actually, ASCII
7    representation of hex to binary and then opening up
8    in Microsoft Word.
9        MS. LEVINE-PATTON:  I'm now entering what
10   is marked as Exhibit 319.  This has a Bates number
11   Zeidman SMT Lindell 042646.
12       (EXHIBIT 319 WAS MARKED FOR
13       IDENTIFICATION.)
14       MS. LEVINE-PATTON:  Q. So, again, this is
15   the first 10 pages of that document printed.  The
16   file itself is on the flash drive in front of you.
17   A.  Did you want me to check it, to open the
18   flash drive?
19   Q.  Yes, please.  The Bates number on the file
20   is 042646.
21   A.  Okay.  I have it open.
22   Q.  Is this the fourth file that you reviewed
23   at the cyber symposium?
24   A.  It looks to be, yes.
25   Q.  Can you tell what was in this file?

Page 62

1    A.  Well, what was in this file appear to be a
2    random set of characters, numbers, symbols, but the
3    thing that I discovered, going through the process
4    that I described, is that this was all perfectly
5    formatted RTF.  In other words, sometimes you can
6    open a file that looks like this because the word
7    processor doesn't understand it, but this was
8    actually a perfectly readable RTF file.  The word
9    processor perfectly understood it to be these --
10   what appear to be a random set of characters and
11   symbols.
12   Q.  Do you recall if this file was about
13   30 megabytes?
14   A.  That sounds about right.
15   Q.  And was there evidence that this fourth
16   file was related to the 2020 U.S. election?
17   A.  No.
18   Q.  You say that it was random characters and
19   numbers.  In your report, you refer to it as
20   gibberish.
21   A.  Uh-huh.
22   Q.  How do you know that this document was
23   just not translated properly?
24   A.  Well, it was Microsoft Word, and I did
25   some testing, but I know this from years of

Page 63

1    experience.  If it can't understand a file, it will
2    give a message at the very beginning asking how do
3    you want this file translated because it doesn't
4    understand.  I've seen that a lot of times.  This
5    file, it opened up perfectly, and there were no
6    error message or warnings or questions about how to
7    translate it.  So it -- and I also looked at the
8    underlying code and saw that everything was
9    perfectly described in RTF commands.
10   Q.  Was there any evidence in this fourth file
11   indicating that voting machines were online during
12   the 2020 U.S. election?
13   A.  No.
14   Q.  Was there any data in this fourth file
15   indicating that the voting machines changed votes
16   during the 2020 U.S. election?
17   A.  No.
18   Q.  Was there any evidence in this fourth file
19   indicating that voting machines were hacked during
20   the 2020 U.S. election?
21   A.  No.
22   Q.  Was there any data at all in this fourth
23   file pertaining to Smartmatic?
24   A.  No.
25   Q.  Was there any data in this fourth file

Page 64

1    indicating that the 2020 U.S. election was stolen?
2    A.  No.
3    Q.  And did this fourth file contain PCAP
4    data?
5    A.  No.
6    Q.  Now, we're going to talk about the fifth
7    file, which is called target_machineID_hex.txt.
8       Did you open this file?
9    A.  Yes, using the same process that I
10   described for the other two files.
11       MS. LEVINE-PATTON:  We're now entering
12   what will be marked as Exhibit 320 with the Bates
13   stamp Zeidman SMT Lindell 053965.
14       (EXHIBIT 320 WAS MARKED FOR
15       IDENTIFICATION.)
16       THE WITNESS:  I just lost the folder.
17   Thank you.
18       MS. LEVINE-PATTON:  Q. We have the first
19   10 pages printed for you and the full file on the
20   computer in front of you.  Could you please open
21   that file and look at it?
22   A.  Yes, I just did.
23   Q.  Do you recognize this document?
24   A.  Yes, this is the -- this is the result of
25   putting Target Machine I.D. Hex.txt through the same

16  (Pages 61 to 64)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

---

Page 65

1    transformation process for -- as I did for the other
2    two files and opening it up in Microsoft Word.
3        Q.   And is this fifth file also in gibberish?
4        A.   Yes.
5        Q.   And seeing as it's in gibberish, how do
6    you know that you translated it correctly?
7        A.   In the same way I described before.  There
8    were no -- well, I looked at the code.  The code
9    appeared to be correct for RTF, the underlying RTF
10   commands, and Microsoft Word did not give me error
11   messages or warnings when trying to open it.
12       Q.   Was this 5th file related, in your
13   opinion, to the 2020 election?
14       A.   No.
15       Q.   Was there evidence in this fifth file
16   indicating that voting machines were online during
17   the 2020 U.S. election?
18       A.   No.
19       Q.   Was there evidence in this fifth file
20   indicating that voting machines changed votes during
21   the 2020 U.S. election?
22       A.   No.
23       Q.   Was there evidence in this fifth file
24   indicating that voting machines were hacked during
25   the 2020 election?

---

Page 66

1        A.   No.
2        Q.   Was there any evidence in this file
3    pertaining to Smartmatic?
4        A.   No.
5        Q.   Was there any evidence in this file
6    indicating that the 2020 U.S. election was stolen?
7        A.   No.
8        Q.   And did this fifth file contain PCAP or
9    packet data?
10       A.   No.
11           MS. LEVINE-PATTON:  We're now going to
12   talk about the sixth file, which is on page 54 of
13   your report labeled targets_hex.txt.  We're
14   introducing what will be marked as Exhibit 321 with
15   the Bates stamp Zeidman SMT Lindell 053987.
16           (EXHIBIT 321 WAS MARKED FOR
17           IDENTIFICATION.)
18           MR. BECK:  321?
19           MS. LEVINE-PATTON:  Q.  Yes.
20       Do you have Exhibit 321 open on the
21   computer in front of you?
22       A.   Yes.
23       Q.   Do you recognize this document?
24       A.   Yes, this is the -- again, going through
25   the same translation process for the other hex text

---

Page 67

1    files, this is what appears in Microsoft Word when
2    you do a transformation on targets hex.txt.
3        Q.   And did you use the same process for the
4    sixth file that you did for the fifth and the fourth
5    file?
6        A.   Yes.
7        Q.   And did gibberish -- is this file in
8    gibberish?
9        A.   Yes, it's what I have termed gibberish.
10       Q.   Seeing as it's gibberish, do you know you
11   translated it correctly based on the process you
12   described for me from the fifth file and the fourth
13   file?
14       A.   Yes, as with those files, I looked at the
15   codes, the RTF codes.  They all seemed to be
16   correct.  Of course, I can't look at all of them,
17   but Microsoft Word didn't give me error messages or
18   warnings when opening it.
19       Q.   In your expert opinion, was the sixth file
20   related to the 2020 U.S. election?
21       A.   No.
22       Q.   Was there any evidence that the sixth file
23   indicated that voting machines were online during
24   the 2020 U.S. election?
25       A.   No.

---

Page 68

1        Q.   Was there any evidence in the sixth file
2    indicating that voting machines changed votes during
3    the 2020 U.S. election?
4        A.   No.
5        Q.   Was there any evidence in the sixth file
6    indicating that voting machines were hacked during
7    the 2020 U.S. election?
8        A.   No.
9        Q.   Was there any evidence in the sixth file
10   pertaining to Smartmatic?
11       A.   No.
12       Q.   Was there any evidence in the sixth file
13   indicating that the 2020 U.S. election was stolen?
14       A.   No.
15       Q.   Did the sixth file even contain any packet
16   data?
17       A.   No.
18       Q.   I'd like to talk about the seventh file.
19   Which is also on page 54 of your report.  This file
20   was called RNX-000001.bin.  Is that right?
21       A.   That's correct.
22       Q.   Mr. Zeidman, what is a bin file?
23       A.   Well, a bin file is typically a binary
24   file.  Now, technically every file on a computer is
25   a binary file.  But bin typically indicates that

---

17 (Pages 65 to 68)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

---

Page 69

1  it's a file with ones and zeros that are just meant
2  for a computer, that are not meant for a human being
3  to understand.
4        Q.  So how did you first -- did you attempt to
5  open this file?
6        A.  I used a number of different tools.  I
7  discuss here Wireshark.  This seemed to be the
8  candidate that everyone -- all of the cyber experts
9  agreed if there were packet captures, PCAPs, that
10  this would be it, but those would typically not have
11  the extension bin, B-I-N.  But I put it through
12  Wireshark, which is a program for analyzing PCAPs.
13       And, actually, initially it was taking a
14  really long time.  So I found a utility online to
15  divide it up into much smaller packets -- much
16  smaller -- sorry -- chunks and put each chunk -- put
17  a couple of chunks through Wireshark, and Wireshark
18  gave an error message, said there's no PCAP data in
19  this file.
20       MS. LEVINE-PATTON:  We're now going to
21  introduce what will be marked as Exhibit 322.
22       (EXHIBIT 322 WAS MARKED FOR
23       IDENTIFICATION.)
24       MS. LEVINE-PATTON:  Q.  This has the Bates
25  stamp Zeidman SMT Lindell 054195.  And this was

---

Page 70

1  attached to your expert report as Exhibit F.
2        A.  Okay.
3        Q.  Do you recognize this?
4        A.  Vaguely.  This appears to be the
5  instructions for using Wireshark to open PCAP files.
6        Q.  And what happened when you attempted to
7  open the RNX bin file with Wireshark?
8        A.  So on page 12 of my report, Paragraph 34,
9  I show a screenshot of an error message that I
10  received.  To be clear, I also tried legitimate PCAP
11  files that I found online and Wireshark did open
12  them.  I also divided those Wireshark -- sorry --
13  those PCAP files into smaller pieces, smaller
14  chunks, and Wireshark was also able to open those
15  smaller chunks, just in case my effort to divide up
16  the file had somehow made the file unreadable.
17       But also, as I discussed in arbitration
18  and perhaps not as much detail in my report, I used
19  other tools, including my own tools, to determine
20  whether there was some other kind of data in this
21  file other than PCAP data, and I couldn't find
22  anything.
23       Q.  And when you received this error message
24  from Wireshark, what did that mean to you as a cyber
25  security expert?

---

Page 71

1        A.  It told me that these are not PCAP files
2  in any known format, by the way.  As I mentioned,
3  they're -- Wireshark can analyze 37 different PCAP
4  formats.  I think these are all of the known PCAP
5  formats, to my -- to my knowledge, these are all the
6  known PCAP formats.
7        Q.  And did you also try to change the
8  extension on this file?
9        A.  Yes, but Wireshark still couldn't read it.
10       Q.  You tried to change the extension to dot
11  PCAP?
12       A.  Yes.
13       Q.  Were you ever able to get this file open?
14       A.  I was able to open it in a text editor.
15  And what I found is that the binary files that I've
16  worked with and that I'm aware of will typically
17  have a header that says what -- that will describe
18  the data in the file and how it was generated so
19  that if a human does try to read the file, it will
20  give some basic information about the file.  I
21  didn't find that.
22       I also have some tools that will search
23  for text within a file, and I was surprised that I
24  couldn't find any text.  Even in a binary file,
25  typically there will be something like a message to

---

Page 72

1  a user.  So, for example, if it's an application
2  that you're running on the computer, there will be a
3  list of messages saying please press this button or,
4  you know, error.  You did the wrong thing.  You
5  know, user errors.  And there was none of that.  So
6  it surprised me that I couldn't find any text
7  whatsoever in the file.
8        Q.  In your expert opinion, did this file
9  contain packet data?
10       A.  No, it didn't.
11       Q.  Was there evidence that this file was
12  related to the 2020 U.S. election?
13       A.  No.
14       Q.  Was there evidence that the seventh file
15  indicated that voting machines were online during
16  the 2020 U.S. election?
17       A.  No.
18       Q.  Was there evidence that the seventh file
19  showed that voting machines changed votes during the
20  2020 U.S. election?
21       A.  No.
22       Q.  Was there evidence in the seventh file
23  indicating that voting machines were hacked during
24  the 2020 U.S. election?
25       A.  No.

---

18  (Pages 69 to 72)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                              August 16, 2023

Page 73

1     Q.  Was there any data in the seventh file
2  pertaining to Smartmatic?
3     A.  No.
4     Q.  Was there any data in the seventh file
5  indicating that the U.S. election in 2020 was
6  stolen?
7     A.  No.
8     Q.  Were you given any other information to
9  analyze on day one of the cyber symposium?
10     A.  No.
11     Q.  Did you ever determine where the files
12  came from that you saw on day one?
13     A.  Well, I eventually determined that they
14  were given to Mr. Lindell by a man named Dennis
15  Montgomery.
16     Q.  How did you learn that?
17     A.  Mr. Lindell discussed that in his
18  deposition and at the hearing.
19     Q.  His deposition in your arbitration?
20     A.  Yes.
21     Q.  Do you know if these were the files
22  Mr. Montgomery gave to Mr. Lindell unedited?
23     A.  I've heard testimony about various
24  manipulations that were done.  I have no firsthand
25  knowledge of -- I have no firsthand knowledge of how

Page 74

1  Mr. Lindell received these files, only what was
2  testified to at my arbitration.
3     Q.  Do you have any opinions about how the
4  files you saw on day one were created?
5     A.  Well, I do.
6     Q.  What are those opinions?
7     A.  Well, I can tell you that the hex files
8  appear to have been created probably by a program
9  that put out these gibberish characters or these
10  table of numbers into a word processor.  I say that
11  because everything seems to be random, and I doubt
12  that someone would spend days typing thousands of
13  pages into a word processor.  So I'm assuming that
14  it was done automatically.  But then the simple
15  transformation that I undid, that simple
16  transformation was performed to make it look like
17  something different.  That's for the text files.
18     I do have some information, if you want me
19  to talk about it, that I learned in my arbitration
20  about the bin file.
21     Q.  Yes, please.
22     A.  Okay.  It came out in my arbitration that
23  there is a program, which I did receive on day
24  three -- sorry -- day two in the other files called
25  C Extract.  C Extract will extract a spreadsheet

Page 75

1  from the binary files.  Well, let me correct that.
2  In theory, C Extract will extract a spreadsheet,
3  which is one of the files I was given on day two.
4     However, what came out in testimony and
5  with my experimentation, at some point during the
6  arbitration, the C Extract program I was given had
7  security measures in it that would not allow it to
8  work.  However, I was able to take some time and
9  defeat the security mechanisms because they were
10  very, very simple and run the program, and as some
11  of Mr. Lindell's experts opined at the hearing, it
12  did not produce the spreadsheet that I was given.
13  It actually produced something similar, but without
14  the headers, in the spreadsheet.  Those headers were
15  put in manually.
16     Q.  Are you referring to the spreadsheet
17  mx000123.csv?
18     A.  Yes.
19     Q.  Who told you to use the C Extract program?
20     A.  That -- I was told at the arbitration that
21  I was expected to use it.  It was among the 509
22  other files that I received on day two, which
23  eventually the cyber experts were told were not part
24  of the challenge and were not supposed to be given
25  to us, but at my arbitration I was told that I

Page 76

1  should have used the program.  However, the program
2  had a security measure that made it impossible to
3  run or at the very least dangerous to run, which
4  Mr. Lindell's own expert witness testified to at
5  his -- at the hearing.
6     Q.  Going back to day one, did you have any
7  thoughts or opinions about how the seven files you
8  viewed were named?
9     A.  Well, my only opinion was -- I didn't want
10  to draw any conclusions, but final reult was spelled
11  wrong.  It seemed to me to be sloppy, but not
12  necessarily an indication of anything, and there was
13  an issue with RNX that came up later.  I think we
14  might get to it on the day two files.  The names of
15  the files seemed to imply some kind of Chinese
16  hacking, but I had no reason to question them until
17  I did my analysis.
18     Q.  And how long did it take for you to
19  determine that none of the seven files had evidence
20  relating to the 2020 U.S. election?
21     A.  I recall it was roughly three hours.
22     Q.  What did you do for the rest of the day?
23     A.  I went back to my hotel and wrote up my
24  expert report.
25     Q.  Did you speak with anyone else that day?

19  (Pages 73 to 76)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

Page 77

1      A.  My wife.
2      Q.  Did you watch any of the cyber symposium
3   stage programming on day one?
4      A.  I did.  I went back and forth between the
5   cyber room where the cyber experts were working and
6   the stage where the symposium was being given.
7      Q.  Do you recall any of the programming you
8   saw on day one?
9      A.  Yes.
10      Q.  What programming was that?
11      A.  Well, day one was mostly Mr. Lindell on
12   stage for the entire time discussing Chinese hacking
13   of our voting machines.  We gave the pledge of
14   allegiance.  We sang God bless America or Star
15   Spangled Banner several times.  I don't remember
16   anything specific beyond that.
17      Q.  So what happened when you arrived for day
18   two of the cyber symposium?
19      A.  That's when I got into the cyber room and
20   a people were still working and said we've been
21   given more files to analyze.
22      Q.  Are those the same people that were in the
23   room with you on day one?
24      A.  Yes.
25      Q.  They were other cyber experts?

Page 78

1      A.  Yes, I should say that these were the
2   people who were considered cyber experts.  And I
3   just want to be clear, I have no dispute with any of
4   those people or I'm not questioning anything about
5   them, but I did know there was a varying degree of
6   expertise.  Some people were simply I.T. people who
7   said they knew nothing about cyber security or
8   forensics.  And there were some people there who
9   were expert cyber security analysts.
10      Q.  And you were all given cyber security
11   credentials at the cyber symposium?
12      A.  Yes.
13      Q.  Were you given more files on the day two
14   of the cyber symposium?
15      A.  Yes, the four files listed in Paragraph 36
16   of my report.
17      Q.  Did anyone from the red team tell you
18   anything about these four files before you reviewed
19   them?
20      A.  Not that I recall, and I think it was on
21   day one that Josh Merritt made his comment, but it
22   may have been on day two.
23      Q.  I'm now looking at the -- at day two in
24   your expert report, and I'd like to talk about the
25   first file, which is mx000123.csv.  Is this the

Page 79

1   Excel file that we were talking about a few minutes
2   ago?
3      A.  Yes, but to be clear, just as a
4   technicality, it's not really an Excel file.  It's a
5   generic spreadsheet that can be -- it's a very, very
6   simple format.  It's very easy to generate.  I know
7   that because my tools generate these files, but they
8   can be read by any spreadsheet program.
9      MS. LEVINE-PATTON:  Thank you.  That's
10   helpful.  We're now entering what will be marked as
11   Exhibit 323.
12      (EXHIBIT 323 WAS MARKED FOR
13      IDENTIFICATION.)
14      MS. LEVINE-PATTON:  Q.  This is Bates
15   stamped Zeidman SMT Lindell 054199.  Are you able to
16   open that on the computer?
17      A.  Yes.
18      Q.  So I'll represent to you that what we
19   printed as Exhibit 323 is the first 10 pages of the
20   file and then select pages of an almost 18,000-page
21   document showing the first columns -- the first page
22   of the column of the spreadsheet.  Does that make
23   sense?
24      A.  I believe so, yes.  It's hard to get this
25   all printed on a few pages.

Page 80

1      Q.  Exactly.  How did you open this file at
2   the cyber symposium?
3      A.  Well, a CSV is known as a comma separated
4   values spreadsheet.  As I mentioned, any spreadsheet
5   program will open it, so I used Microsoft Excel to
6   open it.
7      Q.  And what -- what did you see when you
8   opened the file?
9      A.  A very large spreadsheet, very wide and
10   very long, with columns with what I later realized
11   were latitude and longitude of cities, the city
12   name, the state, the country, various information in
13   columns, in many different columns.
14      Q.  Paragraph 38 of your report says that the
15   files included columns labeled source IP, target IP,
16   and source location.  What did that mean to you?
17      A.  Well, I was guessing.  Source IP is
18   typically the name in a packet from where -- the IP
19   address of the computer where the packet originated
20   from.  Target IP has no meaning that I'm aware of in
21   a packet and source location has no meaning in a
22   packet.  There is destination IP, and I, at some
23   point, thought maybe someone had renamed target --
24   renamed destination IP to target IP.  Although,
25   there would be no real reason for doing that.

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

Page 81

1    Q.  Are source IP, target IP, and source
2  location items you would expect to see in a packet
3  capture?
4        A.  I would expect to see source IP.  Not
5  target IP, but something called destination IP.
6  Source location is not something.  There's one thing
7  that you should know about a packet is only basic
8  information is available -- is visible to packet
9  capture.  And that's the source of the packet, the
10  destination of the packet, but any other information
11  would be encrypted inside what's called the payload
12  of the packet, and so I wouldn't expect to see any
13  of that.
14        And if the packet is created correctly,
15  decrypting that information from a payload would be
16  a nearly impossible task.  I won't say completely
17  impossible.  If someone had massive super computers
18  or some kind of -- there are ways of doing it by
19  hacking into other systems or having a massive
20  supercomputer.  In theory, it's possible.
21        But also what's in the packet header is
22  not just encrypted, but it's another format.  It's
23  not a packet format.  It's not a -- it's not the
24  basic packet format.  In fact, I think it can be in
25  any format.  So what you would find in the packet is

Page 82

1  source IP, destination IP, length of packet, which
2  is interesting none of -- none of these, the
3  spreadsheet or anything that anyone explained, had
4  length of the packet.
5        You also have a checksum at the end, which
6  is a way of confirming that the packet was not
7  corrupted.  Packets get corrupted during
8  transmission.  That happens frequently.  So there is
9  what's called an error checking code at the end,
10  which determine whether the packet was corrupted or
11  not.
12     Q.  So is it fair to say there are items that
13  you would expect to be in this file if it were
14  indeed a PCAP that you did not find?
15     A.  That's correct, and the other information
16  in here is something that I would definitely never
17  find in a PCAP.
18     Q.  So I'd like you to turn to the last page
19  of the printed document, which is Zeidman SMT
20  Lindell 068043.  There are candidate names Biden
21  one, Trump one, Biden two, Trump two, on the top
22  column.
23        Would you expect to see candidate names in
24  PCAP data?
25     A.  No.

Page 83

1     Q.  Why not?
2     A.  They have nothing to do with a packet.
3  Again, there might be information inside the header
4  that would need to be de-coded or decrypted.  Any
5  kind of information can be inside the packet header,
6  but the packet itself wouldn't have that information
7  in it.
8     Q.  Was there any explanation given to you as
9  to where this file came from?
10     A.  During arbitration, there were various
11  explanations given.  These were allegedly captured
12  by Dennis Montgomery using his alleged Hammer and --
13     Q.  Scorecard?
14     A.  Scorecard, thank you.  Hammer Scorecard
15  hardware and software to capture packets in
16  realtime.  Then there were further explanations that
17  these -- well, that the data in the binary files
18  that we discussed, the one we discussed so far, I
19  think, had this data encrypted, encoded, decrypted,
20  decoded, cyphers added, cyphers removed.  The
21  explanations varied depending on who was giving the
22  explanation.
23     Q.  Did you find that explanation to be
24  credible?
25     A.  Not at all.

Page 84

1     Q.  Why not?
2     A.  A lot of reasons.  One very simple reason
3  is that -- one consistent explanation is that the
4  binary files were compressed.  However, this file
5  that I was told came from the binary files, this is
6  about 24 megabytes of data, and the binary file was
7  about 24 gigabytes of data.  Compression makes
8  things smaller, not bigger.  And this made it --
9  let's see if I get it right -- I think a thousand
10  times larger.  So that's not compression.
11     Q.  Was there any evidence that this file was
12  related to the 2020 election?
13     A.  Not in my opinion, no.
14     Q.  Was there any evidence that this was PCAP
15  data?
16     A.  No.
17     Q.  Was there any evidence that this file from
18  day two indicated that voting machines were online
19  during the 2020 U.S. election?
20     A.  No.
21     Q.  Was there any evidence from this first
22  file of day two indicating that voting machines
23  changed votes during the 2020 U.S. election?
24     A.  No, if I could just say some of
25  Mr. Lindell's people claimed that Trump one, Biden

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                August 16, 2023

Page 85

1   one, Trump two, Biden two, was evidence that votes
2   were changed, but I disproved that.  The arbitrators
3   agreed with me in my hearing that this did not
4   comprise evidence that votes were changed.
5       Q.  Was there evidence that this first file
6   from day two shows that voting machines were hacked
7   during the 2020 election?
8       A.  No.
9       Q.  And was there evidence that this first
10  file from day two had anything to do with
11  Smartmatic?
12      A.  No.
13      Q.  I'd like to talk about the second file you
14  were given on day two.  This was called summary.rtf.
15      A.  Yes.
16      Q.  Did you open this file?
17      A.  Yes, that was a -- I opened in it
18  Microsoft Word.  It was a rich text format document.
19      Q.  What was in the file?
20      A.  So that's what was shown at the top of
21  page 14 of my report was just some -- a list of
22  three files, what looked like a creation date, a
23  modified date, and a last access date, and then a
24  paragraph discussing C Extract, the file -- the
25  program that allegedly created the spreadsheet from

Page 86

1   the binary data, and then the name of the
2   spreadsheet.
3       Q.  In your opinion, was this second file PCAP
4   data?
5       A.  No.
6       Q.  Was this second file related to the 2020
7   U.S. election?
8       A.  No, it has a date in there for the 2020
9   election, but that doesn't say to me that it's
10  related in any way.
11      Q.  Was there evidence that the second file
12  indicated voting machines were online during the
13  2020 U.S. election?
14      A.  No.
15      Q.  Was there evidence in this second file
16  from day two indicating that voting machines changed
17  votes during the 2020 U.S. election?
18      A.  No.
19      Q.  Was there evidence in the second file from
20  day two indicating that voting machines were hacked
21  during the 2020 U.S. election?
22      A.  No.
23      Q.  Was there any data in the second file from
24  day two pertaining to Smartmatic?
25      A.  No.

Page 87

1       Q.  Was there any data in the second file from
2   day two indicating that the 2020 U.S. election was
3   stolen?
4       A.  No.
5       Q.  I'd like to talk about the last file you
6   looked at on day two.  This was called
7   rnx-000002.bin.
8           Did you open this file?
9       A.  So there were two files, also dash -- also
10  three dot bin, and that's listed there.  They were
11  both binary files like the first one I was given on
12  day one.  I, again, attempted to use Wireshark to
13  open it.  I also used my other tools to look for
14  text within there.  These seemed to be very similar
15  to the first binary file, and I couldn't find any
16  useful information in it.
17      Q.  When you say these, are you referring to
18  the RNX two bin and the RNX three bin file together?
19      A.  Well, I analyzed them separately.  I put
20  them together -- I described them together here only
21  because I did the same things to both of them that I
22  did to the one dot bin file and got the same results
23  that these were not PCAP files or anything related
24  to the 2020 election.
25      Q.  So you tried to use Wireshark to open

Page 88

1   them?
2       A.  Yes.
3       Q.  And you received the same error message we
4   talked about earlier?
5       A.  Yes.
6       Q.  Did you find any evidence that these two
7   files were related to the 2020 U.S. election?
8       A.  No.
9       Q.  Did you find any evidence that these two
10  files indicated that voting machines were online
11  during the 2020 U.S. election?
12      A.  No.
13      Q.  Did you find any evidence indicating that
14  voting machines changed votes during the 2020 U.S.
15  election?
16      A.  No.
17      Q.  Did you find any evidence in these two
18  files indicating that voting machines were hacked
19  during the 2020 U.S. election?
20      A.  No.
21      Q.  Was there any data in both of these files
22  from day two pertaining to Smartmatic?
23      A.  No.
24      Q.  Was there any data in both of these files
25  from day two indicating that the 2020 U.S. election

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

Page 89

1  had been stolen?
2       A.  No.
3       Q.  Your report said you were also given some
4  other files on a hard drive.  Do you remember
5  receiving these files?
6       A.  Yes.
7           MS. LEVINE-PATTON:  We're going to
8  introduce what will be marked as Exhibit 324.
9           (EXHIBIT 324 WAS MARKED FOR
10          IDENTIFICATION.)
11          MS. LEVINE-PATTON:  Q. This document is
12  Bates stamped Zeidman SMT Lindell 071504, and this
13  was attached to your expert report as Exhibit H.
14          Do you recognize this?
15      A.  Yes.
16      Q.  Is this a complete list of the other files
17  you looked at during the cyber symposium?
18      A.  I believe it was.  I believe it is.
19      Q.  At any point, did you open these files?
20      A.  I don't recall.  I probably opened --
21  well, I know that I have recently opened the PCAP
22  files in Wireshark.  I don't recall if I did that at
23  the symposium.
24      Q.  Are the PCAP files the first 11 that we
25  see listed here?

Page 90

1       A.  The ones ending in PCAP NG, which is at
2  least files one, five, six, seven, eight, nine, 10,
3  and 11.
4       Q.  And what did you find when you opened
5  those?
6       A.  They opened in Wireshark easily, and
7  Wireshark gave me information like source address
8  and destination -- sorry -- source IP and
9  destination IP.
10      Q.  Was there any evidence in those files
11  indicating that they were related to the 2020 U.S.
12  election?
13      A.  Not that I recall, but -- so I did my
14  analysis at the symposium.  I just happened to open
15  them recently.
16      Q.  Uh-huh.
17      A.  And I didn't really look at the data, just
18  looked to see whether Wireshark had opened them.  I
19  don't recall if I did that at the symposium, but
20  what I did determine is all of these files, with
21  maybe a few exceptions, all of them were modified
22  within a week before the symposium, which meant that
23  they couldn't at least legitimately represent data
24  from the 2020 election, which had occurred nine
25  months, 10 months earlier.

Page 91

1       Q.  So based on that finding, was there
2  evidence in these PCAP files indicating that voting
3  machines were online during the 2020 election?
4       A.  I would say I didn't look at a lot of
5  these files, and I may have looked at some of them.
6  I just know that from their modification date they
7  couldn't reflect -- they couldn't legitimately
8  reflect anything about the 2020 election.
9       Q.  Do you recall seeing evidence in any of
10  these other files indicating that voting machines
11  were hacked during the 2020 U.S. election?
12      A.  No, I didn't.
13      Q.  Do you believe that any of these other
14  files prove the 2020 U.S. election was stolen?
15      A.  I don't believe so.
16      Q.  Were you given any other information to
17  analyze on day two of the cyber symposium?
18      A.  I believe that was all the -- all the
19  files that I've listed, including this list.
20      Q.  And did you ever determine where the files
21  you saw on day two came from?
22      A.  Well, from -- what -- what came from
23  testimony at my arbitration hearing and depositions,
24  the first four files, again, came from Dennis
25  Montgomery.  That's my understanding -- and/or Conan

Page 92

1  Hayes.  It appears that Mr. Montgomery gave the
2  files to Mr. Lindell, who used Conan Hayes to review
3  them.  The other files, those 509 files, were given
4  out by Josh Merritt, and we were told emphatically
5  at the arbitration that Josh Merritt was not
6  associated or was not -- was no longer associated
7  with the challenge and that he should not have given
8  these out and we were to ignore these files.
9       Q.  At what point were you told to ignore
10  Mr. Merritt?
11      A.  I remember it distinctly at my
12  arbitration.  At the symposium, I don't recall.  I
13  don't remember getting that message.  There was some
14  discussion among cyber experts that these were not
15  part of the challenge, as I recall, but I don't
16  remember hearing that directly from Lindell's
17  people.
18      Q.  The top of page 52 of Exhibit 124, which
19  is page eight of your report, you say that some
20  files were represented to you by Joshua Merritt and
21  Colonel Phil Waldren as excerpts of packet data and
22  hex format.  Is that the first time that you met
23  Joshua Merritt?
24      A.  Yes.
25      Q.  And is this on or around the time that

23  (Pages 89 to 92)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                              August 16, 2023

---

Page 93

1   Joshua Merritt told you that all of the files were
2   bullshit?
3       A.  Yes, somewhere around that time.  Again, I
4   can't -- I believe it was day one, but it could have
5   been day two.
6       Q.  Do you recall anything else about that
7   comment or the context surrounding it?
8       A.  I just remember I was surprised to hear
9   that.  I think a lot of the people -- the cyber
10  experts in the room were surprised.  We -- we didn't
11  get an explanation of what that meant.  But by that
12  time, it was -- we had already begun analyzing the
13  files and were asking where are the PCAPs.  These
14  are not PCAPs.
15          Again, everyone was focused on PCAPs.  I
16  wasn't necessarily focused on PCAPs, but a lot of
17  people were frustrated, and I just remember that
18  people were surprised to hear him say that.
19      Q.  How long did it take for you to determine
20  on day two that none of the files contained
21  information relating to the 2020 U.S. election?
22      A.  Well, I would say that the four files that
23  I've labeled day two files, which, as I understand
24  now, were part of the challenge.  Probably took me a
25  half hour because I used all the techniques I had

Page 94

1   done on the other files, the similar files, on day
2   one.  Other than a spreadsheet, which I just opened
3   in Microsoft Excel, and saw that there was nothing
4   in there that was PCAP data, and I recognized things
5   that could not have been captured from PCAP data.
6       Q.  Uhm, no, go ahead.
7       A.  With the 509 other files, I didn't
8   discover -- I didn't have an opinion about that
9   until day three.  Because it took me most of the day
10  to just get a copy of these files, and realized 24
11  hours was not going to be enough time to analyze
12  them, but then again, on day three, I saw that most
13  of them were modified within a week.  So from my
14  point of view, they could not legitimately represent
15  data about the November 2020 election if they had
16  been modified just a week ago.
17      Q.  What did you do for the rest of the day
18  after you spent only 30 minutes determining these
19  files were not real?
20      A.  So on day two, I don't remember the exact
21  sequence, but I did go out and get a larger hard
22  drive, and then one person at the symposium was
23  copying the data for these 509 files.  They required
24  a larger hard drive than I had, and I think they
25  took about an hour for each copy, maybe a half hour,

Page 95

1   and there was a line of people.  So I went out and
2   got hard drive, put it in the queue, and then went
3   and listened to the talks at the symposium.
4       Q.  Do you recall any of the talks that you
5   heard specifically on day two?
6       A.  Yeah, I do -- I think it was day two.
7   Because I also heard talks on day three.  Actually,
8   yeah, I don't remember which run, day two and day
9   three.  I remember Ron Watkins, who is Code Monkey
10  Z, gave a talk remotely.  And I will say to his
11  credit, he mostly said that he couldn't analyze any
12  of the data that they were showing him because he
13  needed to have the computer in front of him.
14          I think there were people on stage at the
15  symposium who were showing, allegedly, disc images
16  from voting machines or some computer disc images.
17  And they were saying they had found evidence of
18  hacking because certain files were missing from the
19  system, and Mr. Watkins would say, well, there are
20  reasons that could happen.  I would have to have the
21  computer in front of me to determine what happened,
22  but the people on the stage, and I don't recall who,
23  were saying, see, we found hacking, and -- but the
24  expert on stage remotely was not really saying that.
25      Q.  What were your impressions of the

Page 96

1   programming at the cyber symposium?
2       A.  I think that, at least on some of the
3   time, Mr. Lindell did most of the speaking.  Even
4   when there were alleged experts on the symposium up
5   on the stage, and he would talk over them.  He would
6   show data streaming by at a rate that nobody could
7   discern, and so it was completely meaningless.  Most
8   of the experts complained about that because we
9   wanted to see the actual data, and we were told to
10  look at this movie, which had data streaming in the
11  background like something from the matrix.
12          There were numbers shown, and even
13  Mr. Lindell claimed that the numbers on the screen
14  weren't correct, that -- that there were numbers
15  that were shown -- that allegedly the number of
16  votes in various counties that were switched from
17  Trump to Biden, and Mr. Lindell would mysteriously
18  say those aren't even the right numbers.  It was
19  worse than that.
20          There were a lot of people up on the stage
21  at the symposium.  Some of whom did not claim to be
22  experts.  I think there were a group of mothers who
23  had apparently lost children in wars or were in
24  support of President Trump or ex-President Trump.  I
25  didn't understand why they were there.  They were

24  (Pages 93 to 96)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                              August 16, 2023

Page 97

1   not experts in cyber security or computers, and then
2   there were people who alleged to be experts in
3   computers, in cyber security who I could tell, from
4   what they discussed on stage, they misused terms,
5   and I came to the conclusion that they didn't really
6   understand what they were talking about.
7       Q.  Do you recall who any of those alleged
8   experts were?
9       A.  I don't recall who specifically said what.
10  I know that Doug Frank was one of the people.  Phil
11  Waldren.  There were some others whose names I just
12  don't recall.
13      Q.  Have you ever met a Todd Sanders?
14      A.  Yes, I have.
15      Q.  Did you ever speak with him?
16      A.  I spoke with him briefly during my
17  arbitration.  He was deposed, and then he testified,
18  but we also actually spoke casually during breaks,
19  and we were staying at the same hotel during the
20  arbitration, so we spoke a few times.
21      Q.  Do you recall if Mr. Sanders was one of
22  the alleged experts you saw at the cyber symposium?
23      A.  Not that I recall.
24      Q.  Have you ever heard of a Shawn Smith?
25      A.  That name came up, I think, at the

Page 98

1   hearing, but I don't know who that is.
2       Q.  And have you ever met Dennis Montgomery?
3       A.  No.
4       Q.  Have you ever met Colonel Waldren?
5       A.  I think he came into the cyber room to
6   make some of the announcements, but I didn't talk to
7   him, and I can't -- what I recall is somebody would
8   come in, make an announcement, something like we're
9   getting you the files or, you know, there's a reason
10  you can't -- we can't give you the files, and then
11  walk out.  And somebody would say that was Phil
12  Waldren, but I just -- I didn't talk to him, and I
13  can't even confirm that that was him.
14      Q.  Do you recall if Phil Waldren was one of
15  the alleged cyber security experts that you saw
16  speak at the cyber symposium?
17      A.  I'm almost certain that he was one of the
18  people who spoke at the symposium.  One thing that
19  was difficult about the symposium -- well, two
20  things.  One, I was focused on the data, so I would
21  walk back, but also interesting thing is that
22  Mr. Lindell would bring speakers up to the stage
23  without introducing them, and I had to do some
24  sleuthing to find out who these people were.
25          I did find that on the -- on a streaming

Page 99

1   platform -- I found out sometime later, maybe day
2   two or three, that if you go to the streaming
3   platform, it was being streamed live, and there it
4   would have subtitles showing who was speaking.  But
5   most of the time he would just say we've got a
6   panel.  I'm going to let them speak.  Nobody
7   introduced anyone.  So I was never really sure who
8   was speaking, and there was no written agenda.
9          One of the things that frustrated me, at
10  my hearing, an agenda -- at my arbitration hearing,
11  an agenda showed up that was turned over in
12  discovery, but every day we got a sheet paper that
13  told when breakfast was -- I think it said
14  breakfast, lunch, and dinner, and in between it said
15  speakers to be announced.
16      Q.  Have you ever met Conan Hayes?
17      A.  No.
18      Q.  Had you -- did you see Conan Hayes speak
19  at the cyber symposium?
20      A.  I don't think so, but, again, because
21  speakers weren't announced, I never knew who was
22  speaking.
23      Q.  Do you know anything about Conan Hayes
24  other than what you told me as it relates to the
25  Dennis Montgomery files?

Page 100

1       A.  I know a little bit about him.  So I
2   know -- I've written some articles, and I've been
3   doing research for my hearing and since my hearing
4   about the people involved.  So I do know something
5   about Conan Hayes.  I didn't know at the time,
6   though.
7       Q.  And what is your understanding now of
8   Conan Hayes?
9       A.  My understanding from my research and from
10  testimony at my hearing is that he started a -- a
11  chain of stores for surfers.  I think was fashion
12  for surfers.  I've looked into his background, could
13  find no evidence of any computer background
14  whatsoever, either experience or education, but I do
15  understand that Mr. Lindell, for some reason, has
16  relied on him to -- to take images of discs from
17  computers involved in -- with voting and also to vet
18  the data coming from Dennis Montgomery.
19      Q.  During your time at the cyber symposium,
20  did you talk to any other cyber security experts who
21  you knew by name?
22      A.  Yes, I knew them -- I found out their
23  names at the conference.  I talked with Bill
24  Alderson.
25      Q.  Anyone else?

25 (Pages 97 to 100)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

---

Page 101

1    A. I talked with Doug Gould, who became
2  Mr. Lindell's expert at my arbitration.
3    Q. Uh-huh.
4    A. I talked briefly with a gentleman whose
5  name I'm going to get wrong. Mr. Lindell always
6  gets it wrong. Harri --
7    Q. Hursti?
8    A. Hursti. Yes. Thank you. Harri Hursti.
9  I talked briefly with him. There were others I
10  talked to, but I don't recall their names.
11    Q. Do you recall your conversation with Bill
12  Anderson?
13    A. Yes.
14    Q. What did you talk about?
15    A. Well, we had mutual friends back in
16  California. He had worked for a company run by two
17  people who were very successful and are now
18  philanthropists. I know them both, one very well.
19  But also we talked about packets and networking, and
20  I'm sure you know that he has also claimed that the
21  data that Mike Lindell presented was bogus, that was
22  not related to the November 2020 election.
23    MR. BECK: Counsel, are we talking about
24  Anderson or Alderson?
25    THE WITNESS: Alderson, Bill Alderson.

---

Page 102

1    MR. BECK: Okay. There's a mistake then.
2    MS. LEVINE-PATTON: Q. Did Mr. Alderson
3  ever express to you that he believed the cyber
4  security data was illegitimate?
5    A. He said something about that.
6    MR. BECK: Objection; calls for hearsay.
7    THE WITNESS: He said something to that
8  effect. We've -- I should say we've talked since
9  the cyber symposium, and I know that he -- he's
10  given interviews where he said that the data -- the
11  word I've used is bogus. That the data presented by
12  Mr. Lindell at the symposium was bogus, not packet
13  data, and not related to the November 2020 election.
14    MS. LEVINE-PATTON: Q. Do you recall your
15  conversation with Doug Gould?
16    A. Yes. I had a conversation with him,
17  several at the symposium, and actually a few
18  informal conversations during the -- my arbitration.
19    Q. And what do you recall from those
20  conversations?
21    A. Well, Mr. Gould was sitting next to me at
22  the cyber symposium. I asked him where I could get
23  a copy of Wireshark. One thing I will say I was
24  unaware of is that I was used to using a tool
25  called -- I think it was EtherPeek, which was a tool

---

Page 103

1  for examining packets. What I didn't know was
2  EtherPeek, p-e-e-k -- I believe that's the name of
3  the tool -- later became named Wireshark. And so I
4  wasn't familiar with the name Wireshark. So I said,
5  well, where can I get this tool, and he told me
6  where I could download it.
7    We talked a bit about our backgrounds.
8  And then at the hearing we ran into each other a few
9  times at breakfast, and he said that he'd like to
10  get to know me better when this whole thing is over.
11    MS. LEVINE-PATTON: Q. Do you recall any
12  conversations with Harri Hursti?
13    A. Just a very brief one. I believe it was
14  Harri that I had talked to on day three. We had
15  given a note -- the cyber experts who remained on
16  day three, there were about maybe 20 left, 15 to 20.
17  We all gathered in one room, and we decided to give
18  a note to Mr. Lindell saying that we didn't
19  understand the data he had given us, and we didn't
20  have any PCAPs and that we'd like to get them or
21  discuss them with him.
22    It was a long discussion that day about --
23  everyone remaining said that there was no PCAP data
24  and nothing related to the 2020 election. But some
25  people thought that maybe Mr. Lindell wasn't aware

---

Page 104

1  of that or that he wasn't giving us the right data
2  for some reason that -- that we wanted him -- we
3  wanted him to understand the situation. Maybe he --
4  the thought was maybe he didn't understand the
5  situation. He's not a technical guy, so maybe he
6  thought we were given the right data and we weren't,
7  or maybe he could explain to us why we weren't given
8  the right data.
9    There were rumors of national security
10  concerns and hacking concerns. So we wrote up a
11  note, and we gave it to Doug Gould to give to
12  Mr. Lindell. And as I was leaving the symposium on
13  day three, I saw Harri Hursti, and I asked him -- I
14  believe it was him. I know I talked to Harri
15  Hursti, and I believe this is what we discussed. I
16  said, What happened to the note that Doug Gould was
17  to give to Lindell? And he said, Gould went to
18  Lindell. Lindell invited him up on stage to speak,
19  and Mr. Gould said that the experts were all
20  examining the data and we would need a few more
21  weeks at least to understand the data.
22    So Harri and I were both surprised, but
23  the symposium was ending and we just kind of
24  shrugged our shoulders and said that's that.
25    Q. Do you have any personal knowledge of

---

26 (Pages 101 to 104)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                          August 16, 2023

| Page 105 | Page 106 |
|---|---|

**Page 105**

1  whether anyone told Mr. Lindell that the cyber
2  security experts did not believe his data was real?
3      A.  Well, I know Josh Merritt said that he
4  didn't believe they were real.  From what I
5  understand, Josh told Mr. Lindell that the cyber
6  experts were upset -- well, I know, this from Josh
7  Merritt's testimony at my hearing and my discussions
8  with him.  He told Mr. Lindell the cyber experts
9  were really upset because they expected PCAP data
10  and they're not getting them.
11      But you probably know that Mr. Lindell
12  fired Josh Merritt and did some other things to hurt
13  his reputation, and -- but then we sent Doug Gould
14  with the note.  I don't know if Doug Gould ever
15  presented that note to Mr. Lindell, but I assume he
16  did.  Did that answer your question?
17      Q.  Yeah, what else did you do, if anything,
18  on the third day of the cyber symposium?
19      A.  Uhm, most of the day I spent listening,
20  eating the food, and listening to the talks.  I
21  actually -- during the symposium, I met the editor
22  of the Iowa Standard, a newspaper.  And we discussed
23  what was happening.  We discussed the fact that the
24  experts were frustrated by not finding anything.  I
25  know that he interviewed me for an article that

**Page 106**

1  appeared.
2      I also met some government
3  representatives.  I think a state senator from
4  Missouri and some other people.  We discussed
5  politics and culture, and I didn't -- I didn't do
6  much of anything thinking that the -- you know, I
7  lost the challenge because of these 509 files.  It
8  was only late in the day that I realized that
9  because of the modification dates, because the files
10  had been modified so recently, that I could use that
11  to determine they were not related to the November
12  2020 election.
13      By the way, if I could say that the
14  note -- I may have a copy of what was in the note
15  that we -- I don't have it on me, but a copy of the
16  note that we gave to Doug Gould to give to
17  Mr. Lindell.
18      Q.  We may ask your counsel to give that note
19  to us.
20      A.  I don't know if they have it.  I had -- I
21  had made extensive notes during the symposium, and I
22  believe I copied down -- well, I think I was the one
23  who wrote the note initially, and so I think I have
24  it on a -- like in a Word document, but then we
25  either printed it out or somebody handwrote it and

| Page 107 | Page 108 |
|---|---|

**Page 107**

1  gave it to Mr. Mr. Lindell.  So I didn't give it to
2  him, but I think I crafted the wording with
3  everyone's input.  We were all there saying what
4  should we put in this note.
5      Q.  Got it.  Did you eventually submit your
6  expert report about the files that you reviewed at
7  the cyber symposium to Lindell Management?
8      A.  Yes, at the very end of the symposium.
9      Q.  And did you ever hear from anyone about
10  your report?
11      A.  Not until I started an arbitration against
12  Mr. Lindell.
13      Q.  And when did you start an arbitration
14  against Mr. Lindell?
15      A.  I believe that was in October of 2021.
16      Q.  And why did you do that?
17      A.  I felt that I had won the challenge, and
18  the rules said that they -- that Lindell Management
19  would determine a winner within two hours of the
20  symposium ending, and I waited about two weeks and
21  didn't hear anything.
22      Q.  Are you aware that Dr. Douglas Frank, who
23  you mentioned earlier, wrote a report about your
24  expert report?
25      A.  Yes.

**Page 108**

1      Q.  I'd like you to turn to page 71 of
2  Exhibit 124, which is in front of you.  Have you
3  seen this before?
4      A.  Yes, this was given to me after I filed
5  the arbitration.  In fact, it's dated
6  October 10th, which I believe was within a few
7  days after I filed the arbitration.
8      Q.  Okay.  This is titled Review of Zeidman
9  Report written on October 10, 2021.  Have you
10  personally reviewed Dr. Frank's qualifications?
11      A.  Yes.
12      Q.  And do you think he's qualified to rebut
13  your expert report?
14      A.  No.
15      Q.  Why not?
16      A.  I've looked into his background, and I had
17  difficulty finding any scientific or engineering
18  work he'd done.  Eventually, he turned over a list
19  of papers, maybe a dozen papers, that he had written
20  or co-written.  I was able to verify at least some
21  of them by finding them online.  But they were
22  written something like 30 or more years ago, and
23  they are in the area of physics.  I have a degree in
24  physics.  I understand physics better than most
25  people.

27 (Pages 105 to 108)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

---

Page 109

1     I don't dispute his qualifications as a
2  physicist, but I know that the -- skills to
3  examine computer software and packet data and
4  network equipment is completely different, and I
5  couldn't find anything of that nature in his
6  background or experience or education.  Actually, I
7  have to say, as I recall, I never found anything
8  about his education.  So I'm not sure even what his
9  education is.
10     Q.  Dr. Frank writes about a canary trap in
11 his review of your report.  Do you know what a
12 canary trap is?
13     A.  Yes.
14     Q.  What is that?
15     A.  A canary trap is used to isolate a leak of
16 sensitive information, and the way it's done is
17 different parties are given different information,
18 all of which is fake because you know that that
19 information is going to be leaked.  So if you -- you
20 know, however many parties you have, they all get
21 somewhat different information.  It may not be
22 completely different, but there's at least one fact
23 that is different among all the parties, and then
24 when the information leaks, you look at that one
25 fact that was unique and that tells you who among

---

Page 110

1  the suspects leaked the data.
2     Q.  Did you believe that any of the files that
3  you viewed at the cyber symposium were canary traps?
4     A.  No, it makes no sense because every single
5  expert got the same copy.  We made each other's
6  copies.  So you could not use a canary trap to track
7  any leaks, and also we were told that this was
8  legitimate data and the canary trap doesn't give out
9  legitimate data.  It gives out fake data because you
10 know it's going to be leaked.
11     Q.  Who told you that you were being given
12 legitimate data?
13     A.  Well, I can say that we were never told
14 otherwise until I filed my arbitration.
15     MS. LEVINE-PATTON:  I'd like to take a
16 break.
17     VIDEOGRAPHER:  We are off the record.
18 12:32 p.m.
19     (The deposition was in recess from 12:32
20     to 1:10.)
21     VIDEOGRAPHER:  We are back on the record.
22 1:10 p.m.
23     MS. LEVINE-PATTON:  Mr. Zeidman, we're now
24 introducing what's going to be marked as
25 Exhibit 325.

---

Page 111

1     (EXHIBIT 325 WAS MARKED FOR
2     IDENTIFICATION.)
3     MS. LEVINE-PATTON:  Q.  This is the final
4  arbitration award in your case against Mike Lindell.
5  Have you seen this before?
6     A.  Yes, I have.
7     Q.  I'd like you to go to page six of this
8  document.  The first paragraph says, "Thus, the
9  rules provided that to win the contest, a
10 participant must prove that the data Lindell
11 provides and represents reflects information from
12 the November 2020 election unequivocally does not
13 reflect information related to the November 2020
14 election."
15     Do you see that?
16     A.  Yes.
17     Q.  Did you prove that the data unequivocally
18 did not reflect information related to the 2020
19 election?
20     A.  Yes, I did.
21     Q.  Please look at page 15 of this document.
22 In the middle of the page it says analysis of the
23 data.  Are you aware that the arbitrators went
24 through each of the files that you and I discussed
25 earlier and found that you met the requirement of

---

Page 112

1  winning the Prove the Mike -- Prove Mike Wrong
2  Challenge?
3     A.  Yes, they went through each of the 11
4  files, not the 509 other files.
5     Q.  And are you aware that the arbitrators
6  found that none of the 11 files you reviewed were
7  related to the November 2020 election?
8     A.  Yes, I am.
9     Q.  I'd like to go to the last page of this
10 document.  No. 1 says, "Robert Zeidman's claim
11 against Lindell Management LLC for breach of
12 contract is granted.  Accordingly, within 30 days of
13 issuance of this award, Lindell Management LLC shall
14 pay $5 million to Robert Zeidman."
15     Do you see that?
16     A.  Yes.
17     Q.  And this is dated April 19, 2023; is that
18 correct?
19     A.  Yes.
20     Q.  Did Mr. Lindell pay you $5 million?
21     A.  No.
22     Q.  Do you know why not?
23     A.  I know that he has filed an appeal of this
24 arbitration award.
25     Q.  Have you done anything further to collect

---

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                     August 16, 2023

---

**Page 113**

1   your $5 million reward?
2       A.  My lawyers have filed a motion to enforce
3   the award and to have Mr. Lindell's appeal
4   dismissed.
5       Q.  Do you consider yourself politically
6   active?
7       A.  Yes.
8       Q.  Do you consider yourself politically
9   conservative?
10      A.  Yes.
11      Q.  If the election were stolen in the way
12  that Mr. Lindell has claimed through electronic
13  voting machines, do you think that would have been
14  detected?
15      MR. BECK:  Object to the form.
16      THE WITNESS:  I think, and I've written
17  about this, that most likely it would have been
18  detected, yes.
19      MS. LEVINE-PATTON:  Q.  Why?
20      A.  Because there are a number of factors.
21  It's very hard to hide this kind of thing.  If it
22  was done purposely within a voting machine, for
23  example, that would require everyone who worked on
24  the development of the software to be quiet about
25  what had happened.

---

**Page 114**

1       Also, if the machines were transmitting
2   over the Internet -- I've compared this to the
3   discovery of the Stuxnet virus, which was a computer
4   virus that was released some years ago in Iran.  I
5   don't know if you want me to go into the details,
6   but I've written about this.  That it was the most
7   sophisticated malware computer virus ever devised,
8   probably was devised as a joint effort between the
9   United States and Israel.  It was located in one of
10  the least accessible parts of the Internet that's
11  within the country of Iran that controls its data
12  going in and out, and yet within a matter of months
13  it was detected, isolated, and analyzed.
14      And so I've stated that if such
15  communications or hacking were taking place in the
16  United States, one of the most -- well, probably the
17  most open society in the world, the most Internet
18  connected society, the most tech savvy society, that
19  it definitely would have been detected by now.
20      When -- I can say that I thought that
21  perhaps Mr. Lindell or his team had actually
22  detected it.  So I thought if it occurred, then --
23  and somebody would have detected it, maybe
24  Mr. Lindell had that proof, but I've determined that
25  he didn't.

---

**Page 115**

1       MS. LEVINE-PATTON:  I don't have any
2   further questions.
3       EXAMINATION BY MR. BECK
4       MR. BECK:  Q.  Mr. Zeidman, I want to
5   clear up a few things, and we meet again.  It's good
6   to see you.
7       You said earlier that you did not know who
8   the experts were who had validated Mr. Lindell's
9   data.  Do you remember saying that?
10      A.  When I first learned of the data, yes.
11      Q.  Great.  But you did walk through a few
12  names.  I'm going to get into those.  As a
13  preliminary matter, though, is it your understanding
14  that Mr. Lindell believed he had validated the data?
15      MS. LEVINE-PATTON:  Objection;
16  speculation.
17      THE WITNESS:  That was my understanding
18  from his statements.
19      MR. BECK:  Q.  Okay.  And, in fact, you
20  saw Mr. Lindell testify at your arbitration hearing;
21  is that right?
22      A.  Correct.
23      Q.  He's hard to miss.
24      A.  Yes.
25      Q.  You would agree.  He stated in there that

---

**Page 116**

1   he absolutely believed that the data showed fraud;
2   is that right?
3       A.  That's what he stated, yes.
4       Q.  Yeah, in fact, his exact words were I
5   don't need to prove it's true.  I know it's true.
6   Do you remember him saying that?
7       A.  That sounds familiar, but I can't say for
8   sure.
9       Q.  Okay.  You mentioned Dennis Montgomery.
10  Now, without getting into the background of
11  Mr. Montgomery, let me ask do you know what Dennis
12  Montgomery told Mike Lindell about the data in
13  question?
14      A.  Not specifically, no.
15      Q.  Do you know whether or not Mr. Montgomery
16  told Mr. Lindell that the data were, in fact,
17  accurate?
18      A.  I believe that's what Mr. Lindell
19  testified.  So that's my understanding.
20      Q.  You have no reason to think that's not
21  true?
22      A.  No.  I don't have any firsthand knowledge
23  either way.
24      Q.  You testified earlier in response to
25  counsel's questions about some of the qualifications

---

**29 (Pages 113 to 116)**

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                                    August 16, 2023

---

**Page 117**

1  of the people involved here.  Let me ask
2  specifically about Mr. Montgomery.  Do you have any
3  reason to think that he is not qualified to evaluate
4  the data in question?
5      A.  Well, I've read about Mr. Montgomery, and
6  I have concerns about his ability to analyze data.
7      Q.  Are those concerns based on his personal
8  background or his actual technical expertise or some
9  combination thereof?
10     A.  I'd say combination.  I haven't been able
11 to track down his technical background other than
12 reports from him directly.
13     Q.  Okay.  So the answer really is I don't
14 know, correct?
15     A.  I'd say that's correct.
16     Q.  All right.  Now, regarding Conan Hayes,
17 you did testify about him a bit.  First off, do you
18 know if Conan Hayes validated the data in question?
19     A.  I believe there was testimony from
20 Mr. Lindell and perhaps others at my arbitration
21 that Conan Hayes validated the data.
22     Q.  And what did -- if you know, what did
23 Conan Hayes tell Mike Lindell about the data?
24     A.  I don't know specifically.
25     Q.  Okay.  So if I were to tell you that Conan

---

**Page 118**

1  Hayes told Mike Lindell the data are accurate, would
2  you have any reason or ability to dispute that?
3      MS. LEVINE-PATTON:  Objection; hearsay.
4      THE WITNESS:  No, I don't.
5      MR. BECK:  Q.  Okay.  You said you
6  researched Conan Hayes's background.  Does that mean
7  internet research, that sort of thing?
8      A.  It was Internet research, but also there
9  was -- I had discussions with people who had some
10 knowledge of Conan Hayes.  I don't recall if they
11 had direct contact with him.
12     Q.  Well, your testimony this morning, and I
13 was writing this down as it came through on the
14 realtime, said you could find no evidence of any
15 computer background whatsoever.  That was the quote.
16     Do you remember saying that?
17     A.  Yes.
18     Q.  Okay.  This may be splitting a hair here,
19 but I'm just going to ask you do you know -- do you
20 find any evidence that he does not have computer
21 background?
22     A.  No.
23     Q.  Okay.  Are you aware of the validation
24 work that he did, if any, on this data that we're
25 talking about?

---

**Page 119**

1      A.  The only knowledge I have is from
2  testimony from Mr. Lindell and perhaps others at my
3  arbitration.
4      Q.  All right.  Same question about Phil
5  Waldren.  I think we're calling him Colonel Waldren.
6  What did he tell Mike Lindell, if you know, about
7  the data in question?
8      MS. LEVINE-PATTON:  Objection; hearsay.
9      THE WITNESS:  I don't know.
10     MR. BECK:  Q.  Okay.  Do you know if
11 Mr. or Colonel Waldren told Mr. Lindell that the
12 data were, in fact, accurate?
13     A.  I -- again, only from testimony.  I think
14 Mr. Lindell may have testified about that or others,
15 but I don't know directly.
16     Q.  You don't have any direct knowledge?
17     A.  That's correct.
18     Q.  Okay.  So if Mike Lindell said -- let's
19 just assume that Phil Waldren told him the data were
20 accurate, you'd have no ability to dispute that,
21 correct?
22     MS. LEVINE-PATTON:  Object to form.
23     THE WITNESS:  I can't dispute that, no.
24 Not directly.
25     MR. BECK:  Q.  You testified -- and,

---

**Page 120**

1  again, I wrote this down regarding Dennis
2  Montgomery.  I have no firsthand knowledge of how
3  Mr. Lindell received these files, close quote.
4      Do you remember saying that?
5      A.  I believe so, yes.
6      Q.  Okay.  And by these files, I think we're
7  referring to the data that we're talking about in
8  the cyber symposium challenge.  So do you have any
9  firsthand knowledge, direct knowledge of the origins
10 of the data that Mr. Montgomery gave to Mr. Lindell?
11     A.  No.
12     Q.  Okay.  You testified -- and this is,
13 again, a quote.  Maybe he -- meaning Mike Lindell,
14 Maybe he thought we were given the right data, close
15 quote.  Remember saying that?
16     A.  I said that was a general thought among
17 some of the cyber experts.
18     Q.  Well, it was a general thought because he
19 was saying it over and over again, correct?
20     A.  Could you repeat what the quote was?
21     Q.  Maybe he thought we were given the right
22 data.
23     A.  Oh, because he was saying over and over
24 again that we were given the right data?
25     Q.  Yes.

---

30 (Pages 117 to 120)

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                        August 16, 2023

---

Page 121

1       A.  Uhm, he was definitely saying that, but we
2  didn't know what he believed.
3       Q.  Do you have any reason to think that he
4  did not believe that the data were accurate?
5       MS. LEVINE-PATTON:  Objection;
6  speculation.
7       THE WITNESS:  Well, I don't know except
8  that so many people were telling him at that point
9  that I would think he would heed their remarks.
10      MR. BECK:  Q.  Who exactly told him
11  something to the contrary?
12      A.  Well, I know that Josh Merritt told him.
13      Q.  Okay.  Anyone else?
14      A.  Well, Doug Gould was supposed to give this
15  note that represented a consensus of the experts.  I
16  don't know if Mr. Lindell received that note.
17      Q.  You testified earlier that he did not
18  receive that note, didn't you?
19      A.  I don't know.  I asked Harri Hursti
20  whether Doug Gould gave him that note and he didn't
21  know.
22      Q.  Okay.  So when you say that Mr. Lindell
23  should have known because people are telling him, we
24  have that note, which may or may not have been
25  delivered, and we have Josh Merritt.  Anybody else?

---

Page 122

1       A.  Well, I know that -- my understanding is
2  that Josh relayed the information from the cyber
3  experts to Mr. Lindell.  Again, I heard this from
4  Josh.  I don't know firsthand, but we were all
5  complaining that we hadn't gotten the PCAP data or
6  data that we expected.
7       Q.  I understand.  I understand.  Now, just to
8  revisit what you just said.  You know that
9  Mr. Lindell was told something because Josh Merritt
10  said it; is that right?  So this is secondhand?
11      A.  Right.  Although, I do know from the
12  arbitration that he heard all the testimony from me,
13  from Josh Merritt, and received my report and heard
14  about the complaints, at least from me, from the
15  cyber experts.
16      Q.  But the arbitration hearing was this year,
17  correct?
18      A.  Yes.
19      Q.  It was.
20      A.  Yes.
21      Q.  It was January of this year?
22      A.  Right.
23      Q.  All right.  So that's well after the cyber
24  symposium.  Agreed?
25      A.  That's correct.

---

Page 123

1       Q.  Okay.  And well after the statements that
2  are the basis of this lawsuit, correct?
3       A.  I don't know what this lawsuit covers,
4  what time period it covers.
5       MR. BECK:  Okay.  That's all I have.
6  Thank you.
7       MS. LEVINE-PATTON:  I don't have anything
8  further.
9       VIDEOGRAPHER:  This concludes today's
10  deposition of Robert Zeidman.  We are off the record
11  at 1:24 p.m.
12      THE REPORTER:  Did you want to order a
13  copy of transcript?
14      MR. BECK:  We do.
15      (The deposition was concluded at 1:24
16  p.m.)
17
18          ---oOo---
19
20
21
22
23
24
25

---

Page 124

1  STATE OF_____)
                          ) ss.
2  COUNTY OF_____)
3
4      I, the undersigned, declare under penalty
5  Of perjury that I have read the foregoing
6  transcript, and I have made any corrections,
7  additions or deletions that I was desirous of
8  making; that the foregoing is a true and correct
9  transcript of my testimony contained therein.
10     EXECUTED this _____ day of _____,
11  _____, at _____, _____.
12     (City)        (State)
13
14
15
16
17
                          _____
                          ROBERT ZEIDMAN
18
19
20
21
22
23
24
25

---

800.211.DEPO (3376)
EsquireSolutions.com

ROBERT ZEIDMAN
SMARTMATIC, ET AL. V. LINDELL, ET AL.                    August 16, 2023

Page 125

```
 1              CERTIFICATE
 2
 3      I, the undersigned, a Certified Shorthand
 4   Reporter, State of California, hereby certify that
 5   the witness in the foregoing deposition was by me
 6   first duly sworn to testify to the truth, the whole
 7   truth, and nothing but the truth in the
 8   within-entitled cause; that said deposition was
 9   taken remotely; that the testimony of the said
10   witness was reported by me, a disinterested person,
11   and was thereafter transcribed under my direction
12   into typewriting; that the foregoing is a full,
13   complete, and true record of said testimony; and
14   that the witness was given an opportunity to read it
15   and, if necessary, correct said deposition and to
16   subscribe the same.
17      I further certify that I am not of counsel
18   or attorney for either or any of the parties in the
19   foregoing deposition and caption named, nor in any
20   way interested in the outcome of the cause named in
21   said caption.
22      Executed this 17th day of August, 2023.
23
24
25          LAURA AXELSEN, C.S.R. 6173
```

800.211.DEPO (3376)
EsquireSolutions.com