# Exhibit 172

## Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF MINNESOTA
3       -------------------------------
4    SMARTMATIC USA CORP., SMARTMATIC
     INTERNATIONAL HOLDING B.V., and
5    SGO CORPORATION LIMITED,
6              Plaintiffs,
7         vs.       CASE NO.  22-cv-0096-WMW-JFD
8    MICHAEL J. LINDELL and
     MY PILLOW, INC.,
9
              Defendants.
10      -------------------------------
11
12
13
14              VIDEO DEPOSITION OF
15             DOUGLAS GEAUWANNA FRANK
16
17
18                July 19, 2023
19                  9:33 a.m.
20
21             1600 Broadway, Suite 1600
22                Denver, Colorado
23
24
25             Michele Koss, RMR, RPR
```

## Page 2

```
1              APPEARANCES OF COUNSEL
2
     On Behalf of the Plaintiffs
3
         TIMOTHY FREY, ESQ.
4        MAURA LEVIN-PATTON, ESQ.
         BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
5        71 South Wacker Drive, Suite 1600
         Chicago, Illinois 60606
6        312.212.4949
         tfrey@beneschlaw.com
7        mlevine-patton@beneschlaw.com
8    On Behalf of the Defendants
9        NATHANIEL R. GREENE, ESQ.
         PARKER DANIELS KIBORT
10       888 Colwell Building
         123 North Third Street
11       Minneapolis, Minnesota 55401
         612.355.4100
12       greene@parkerdk.com
13   Also Present:  Clayton Bridges, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
                 INDEX OF EXAMINATION

3    WITNESS:  DOUGLAS GEAUWANNA FRANK
4    EXAMINATION                                       PAGE
5    By Mr. Frey                                          5
6               INDEX TO EXHIBIT
7    PLAINTIFFS'    DESCRIPTION                         PAGE
8    Exhibit 108 Notice of Subpoena                      13
9    Exhibit 109 Notice of Deposition                    13
10   Exhibit 110 Dr. Frank's resume                      35
11   Exhibit 111 PowerPoint presentation                156
12             Bates D_Frank00001 through 44
13   Exhibit 112 High Correlations Between Predicted    203
14             And Actual Ballots Do Not Imply Fraud
15   Exhibit 113 Analysis of the Dr. Douglas G. Frank   219
16             Voter Fraud Theory
17   Exhibit 114 Copy of 1099, Dr. Frank                237
18   Exhibit 115 Thread of emails, Bates Nos.           244
19             DEF017621.000000 through 2
20   Exhibit 116 Thread of emails, Bates Nos.           244
21             DEF121397.000000 through 6
22   Exhibit 117 Copy of Xcel file, Bates No.           258
23             D_Frank0000010
24   Exhibit 118 Copy of presentation                   273
25
```

## Page 4

```
1    PLAINTIFFS'    DESCRIPTION                         PAGE
2    Exhibit 119  Thumb drive with presentation         273
3    Exhibit 120  NewsRoom article December 22, 2021    281
4    Exhibit 121  Thread of emails, Bates Nos.          292
5             DEF017285000001 through 2
6    Exhibit 122  Telegram post                         299
7    Exhibit 123  Telegram post                         305
8    Exhibit 124  Prove Mike Wrong Challenge Official   308
9             Rules
10   Exhibit 125  Email to Dr. Frank from Mr. Ramsland  323
11             with attachments, Bates No.
12             D_Frank0000045.000001 through 46
13   Exhibit 126  Thread of emails, Bates Nos.          330
14             D_Frank0000022.000001
15        (Original exhibits included with original
16   transcript.)
17
18
19
20
21
22
23
24
25
```



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023

5—8

Page 5

1    VIDEO DEPOSITION OF DOUGLAS GEAUWANNA FRANK
2        July 19, 2023
3        THE VIDEOGRAPHER: This is tape number one
4    to the videotape deposition of Dr. Douglas Frank in the
5    matter of Smartmatic USA Corp. et al. vs. Lindell, et
6    al. being heard before the District Court for the
7    District of Minnesota, Case file 22-CV-00 98-WMWJ FDA.
8    This deposition is being held at 1600 Broadway, suite 16
9    hundred, Denver, Colorado. The date is July 19, 2023.
10   The time on the record is 9:33 a.m. My name is Clayton
11   Bridges. I am the videographer. The court reporter is
12   Michele Koss. Counsel, will you please introduce
13   yourselves and affiliations and the witness will be
14   sworn.
15       MR. FREY: Tim Frey as counsel for
16   Smartmatic.
17       MR. GREENE: Nate Greene as counsel for
18   Defendants.
19       MS. LEVINE-PATTON: Maura Levine-Patton also
20   here on behalf of Smartmatic.
21       DOUGLAS GEAUWANNA FRANK,
22   being first duly sworn in the above cause, was examined
23   and testified as follows:
24           EXAMINATION
25   BY MR. FREY:

Page 6

1    Q   Good morning, Dr. Frank.
2    A   Hi, Tim.
3    Q   I introduced myself before we went on the
4    record but, as you know, my name is Tim Frey. I am
5    counsel for Smartmatic.
6        I understand you are being represented here
7    by Mr. Greene, counsel for Mr. Lindell; is that correct?
8    A   Yes.
9    Q   I just want to go through a couple of
10   preliminary things that we do in every deposition. So I
11   know the court reporter asked you to state and spell
12   your name.
13       Could you please also state for the record
14   where you currently live?
15   A   Ohio.
16   Q   And what is your address?
17   A   7444 Misty Woods Court, Morrow, Ohio 45152.
18   Q   Have you been deposed before today,
19   Dr. Frank?
20   A   In this matter?
21   Q   In any case.
22   A   Yes.
23   Q   How many times?
24   A   Half a dozen.
25   Q   When was the first time you gave a

Page 7

1    deposition, if you recall?
2    A   I don't remember.
3    Q   Do you recall where the deposition took
4    place?
5    A   It was back in the eighties. I did a
6    deposition in a lawsuit I was an expert witness, and I
7    did another one, a couple of them in the nineties.
8    Some of my customers use my expert technologies in
9    their lawsuits. So I have to be deposed for their
10   cases, if that makes sense.
11   Q   Do you recall who the parties were in the
12   case in the eighties?
13   A   No.
14   Q   And you said that was about, you served as
15   an expert, correct?
16   A   Yes.
17   Q   And that was about one of your technologies,
18   or your expert technologies, correct?
19   A   Yes.
20   Q   What was the technology?
21   A   One is laser scanning and another one is
22   friction measurements.
23   Q   And then you said there were a couple of
24   depositions in the nineties as well, correct?
25   A   Just off the top of my head.

Page 8

1    Q   And those were also a similar situation, you
2    served as an expert?
3    A   Yes.
4    Q   Related --
5    A   I testified in court and related to it and
6    things like that.
7    Q   Do you recall where the trials took place?
8    A   I was not in the trials.
9    Q   So you did not testify at the trial?
10   A   I did testify at one trial in Cincinnati.
11   I think the Cincinnati courthouse.
12   Q   Do you remember the parties to that case?
13   A   One of the parties, I do not remember his
14   name, but the other one was Walgreens. The defendant
15   was Walgreens.
16   Q   Were you an expert on behalf of Walgreens?
17   A   No.
18   Q   On behalf of the plaintiff?
19   A   The plaintiff.
20   Q   Okay. Any other depositions that you recall
21   other than those ones in the eighties and nineties, to
22   the best of your recollection, where you served as an
23   expert?
24   A   Yes, I just did the one for the, recent one
25   for the arbitration for Mr. Lindell.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
9—12

Page 9

1    Q    That was for the -- related to the Zeidman
2  report?
3    A    Yes.
4    Q    Do you recall when that deposition took
5  place?
6    A    I can look it up.
7    Q    In the last six months or the last three
8  months?
9    A    This year.  Early this year.
10    Q    This past year, okay.
11        Where did that take place?
12    A    Minnesota.
13    Q    And you served as an expert for Mr. Lindell
14  in this arbitration; is that right?
15    A    I don't think that is right.  I don't know
16  if I was serving as an expert or whether I was just a
17  fact witness.
18        Does that make sense?
19    Q    Yes.  Okay.
20    A    That is a technical, legal thing and I am
21  not a lawyer.
22    Q    Were you retained or did you sign an expert
23  retention agreement to provide your testimony and
24  opinions in that case?
25    A    No, at least I do not remember doing it.

Page 10

1  Maybe I did.
2    Q    And were you compensated for the testimony
3  you gave in that case?
4    A    No.
5    Q    Okay.  So we have the cases kind of, I
6  guess, 30 to 40 years ago in the eighties and nineties
7  where you were an expert in cases related to your, the
8  technologies, your inventions?
9    A    Yes.
10    Q    And then we have the Zeidman arbitration in
11  which you were deposed.
12        Are there any other instances you recall
13  being deposed?
14    A    No.  No.
15    Q    So you might know some of this already from
16  your prior depositions, and you might have talked to
17  Mr. Greene about this, but I am just going to go over
18  some of the, kind of the rules and protocols that we
19  will use during the deposition.
20        Is that okay?
21    A    Sure.
22    Q    First I will ask that you agree to allow me
23  to finish my questions before you answer.
24        Is that fair?
25    A    Sure.

Page 11

1    Q    And, likewise, I will do my best to make
2  sure that you have finished your answer before I ask a
3  question, okay?  This way the court reporter, who is
4  taking everything down, can actually get what we are
5  saying and not have us talk over each other.  Fair?
6    A    Fair.
7    Q    I will do my best to talk slower for the
8  court reporter as well.
9        The other part of that is all of your
10  answers need to be verbal as opposed to like nodding
11  your head or shaking your head so that she can get it on
12  the record.
13        Is that fair?
14    A    Sure.
15    Q    Do you agree that if you do not understand
16  one of my questions, you will ask me to clarify it?
17    A    Sure.
18    Q    And so I will assume then, if you answer my
19  question, that you understood what I was asking.
20        Is that fair?
21    A    Sure.
22    Q    While I am asking you questions today,
23  Mr. Greene may object.  Unless Mr. Greene instructs you
24  not to answer, you are required to answer the question.
25        Do you understand that?

Page 12

1    A    Yes.
2    Q    If you need a break at any time, just let me
3  know.  The only thing I will ask is that if there is a
4  question pending, we don't break until after you answer
5  that question.  Fair?
6    A    Yes.
7    Q    Are you taking any medicine today that would
8  prevent you from providing accurate testimony?
9    A    No.
10    Q    Do you know of any reason that would prevent
11  you from providing accurate testimony today?
12    A    No.
13        MR. FREY:  Mr. Greene, I just want to ask on
14  the record if you will stipulate that any documents we
15  used that were produced by Mr. Lindell or MyPillow with
16  a DEF Bates stamp are authentic copies of that document?
17        MR. GREENE:  Yes.
18    Q    So, Dr. Frank, do you understand that you
19  are here today pursuant to a deposition subpoena issued
20  for your testimony by Smartmatic as it relates to the
21  lawsuit Smartmatic filed against Mr. Lindell and
22  MyPillow in the Federal District Court for the District
23  of Minnesota?
24    A    Yes.
25    Q    Okay.  Have you seen a copy of the subpoena



DOUGLAS GEAUWANNA FRANK                                    July 19, 2023
Smartmatic USA Corp. vs Michael J. Lindell                      13–16

Page 13

1  before?
2  A  Yes.
3      (Exhibit 108 was marked.)
4  Q  (BY MR. FREY)  Okay.  For the record, I am
5  handing you what will be marked as Exhibit 108.  This is
6  a copy of the notice of subpoena for documents and
7  deposition that was issued.
8      Have you seen this document before?
9  A  It looks familiar.
10  Q  Okay.  Do you recognize this document as the
11  subpoena for your testimony here today?
12  A  It looks familiar.
13  Q  Okay.  If you look at the bottom of the
14  paragraph on the first page, do you see that it states
15  that the date for deposition is a placeholder and
16  Plaintiffs will coordinate a mutually agreeable date,
17  time and location of the deposition.
18      Do you see that?
19  A  Yes.
20      (Exhibit 109 was marked.)
21  Q  (BY MR. FREY)  So now I am going to hand you
22  what will be marked as Exhibit 109.  This is the actual
23  notice of deposition for today.
24      Do you see that?
25  A  Yes.

Page 14

1  Q  Okay.  Do you recognize this document as the
2  scheduling notice that brought you here today?
3  A  Yes, sir.
4  Q  Okay.  Have you met with Mr. Greene before
5  today in order to prepare for today's deposition?
6  A  We had a phone call.
7  Q  When was that phone call?
8  A  Monday.
9      MR. FREY:  You cannot ask me the questions.
10  Answer to the best of your recollection.
11  A  I am not allowed to ask you questions.  I
12  think it was Monday.
13  Q  How long did you speak for?
14  A  About an hour.
15  Q  Did you review any documents during that
16  phone call?
17  A  No.
18  Q  Was anybody else present on that phone call?
19  A  I think senior -- another attorney was
20  present for a portion of it.  Maybe ten minutes.
21  Q  Do you know who that attorney was?
22  A  I want to say Abe, but I don't remember if
23  that is right.
24  Q  Abe Kaplan?
25  A  It sounds right.

Page 15

1  Q  Was anybody --
2  A  I would not swear on it, but I think that
3  is right.
4  Q  That is fair.
5      Was anybody else present for that phone
6  call?
7  A  No.
8  Q  Did you meet with anybody, other than
9  Mr. Greene and the other attorney on the call, likely
10  Mr. Kaplan, in order to prepare for your deposition
11  today?
12  A  No.
13  Q  Have you discussed this deposition today
14  with anybody other than Mr. Greene and the other
15  attorney who was on the phone call?
16  A  I have mentioned that I would have it
17  today.  I did not discuss, you know -- I might have
18  mentioned, you know, people say, where are you going?
19  I said, hey, I am going to be giving a deposition on
20  Wednesday for this lawsuit.  Oh, what lawsuit?  Which
21  one is Mike in?  This is the Smartmatic lawsuit.
22  Nothing more detailed than that.
23  Q  Okay.  Have you spoken with Mr. Lindell at
24  all about your deposition today?
25  A  No.  I take it back.  He called me about a

Page 16

1  week ago and said the lawyer is trying to get ahold of
2  you.  Call the lawyer.  So I guess that counts as me
3  speaking to him about this deposition.
4  Q  Was there anything else substantively that
5  you spoke about?
6  A  No, nothing substantive.  That is the right
7  word.  Just call the guy and get it set up.
8  Q  I have seen some public statements in which
9  you say that you are acting as an expert for
10  Mr. Lindell.
11      Are you acting as an expert for Mr. Lindell
12  in connection with this litigation?
13  A  No.  What do you mean by expert?  Am I
14  under contract?  No.  He calls me frequently for expert
15  advice.
16  Q  Do you intend to write an expert report in
17  connection with this litigation?
18  A  In connection with this litigation, I have
19  not been asked to.
20  Q  If you were asked to, would you?
21  A  Of course.
22  Q  But today no one has asked you to prepare an
23  expert report or serve as an expert witness --
24  A  To serve as an expert?  I am sorry.  Finish
25  it.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
17–20

Page 17

1    Q    As of today, no one has asked you to prepare
2    an expert report or serve as an expert witness in
3    connection with this litigation?
4    A    That's correct.
5    Q    I want to go back to Exhibit 108 which is
6    the document subpoena.
7         In addition to kind of asking you to come
8    give deposition testimony, did you understand that
9    Smartmatic also requested that you produce certain
10   documents?
11   A    Yes.
12   Q    Did you, in fact, produce documents in
13   response to the subpoena?
14   A    Yes.
15   Q    How did you go about collecting the
16   documents to produce in response to the subpoena?
17   A    I spent an entire afternoon at the
18   attorney's office in Minnesota, at LincolnPeter,
19   downloading all the emails that I could find related to
20   it and the documents requested as best I could
21   understand from the request.
22   Q    Did you run search terms or did you just go
23   through and look for documents?
24   A    I ran search terms.
25   Q    Do you recall any of the search terms?

Page 18

1    A    Yes.  For example, there were several names
2    that you wanted communications with.  So I searched all
3    of my email with those search terms.
4    Q    Did the attorneys for Mr. Lindell assist you
5    with coming up with those search terms?
6    A    No.
7    Q    Did they assist you in determining what was
8    relevant to the subpoena?
9    A    I asked some questions at one point, yes,
10   because I was trying to comply with the subpoena, but I
11   don't remember specifically.  It was a long time ago.
12   Q    It was.  Do you remember approximately how
13   long ago?
14   A    I want to say January, but do not hold me
15   to it.
16   Q    Okay.  I want to look just at a couple of
17   specific of the requests --
18   A    Sure.
19   Q    -- to understand the steps that you took to
20   produce documents.
21   A    Sure.
22   Q    And the documents that you produced.  So if
23   you turn to page 10, and this is like the little page
24   number 10.
25   A    Document requests.

Page 19

1    Q    Yes, document requests.  Exactly.
2         And so did you understand that these were
3    the categories of documents Smartmatic was asking you to
4    produce?
5    A    Yes.  Give me one second so I can get to
6    the right page.  Okay.
7    Q    Looking at request one, it asks for
8    documents and communications with or concerning
9    Smartmatic.
10        Do you see that?
11   A    Yes.
12   Q    And if you go back to page 2 to the
13   definitions section, at the very bottom documents is
14   defined as all written, printed, typed, recorded or
15   graphic data or matter of every kind and description and
16   all attachments and appendices thereto.  And then it
17   lists a whole bunch of things that it means, agreement,
18   contracts, correspondence, letters, messages, email,
19   records, reports.
20        Do you see that?
21   A    No.
22   Q    It is at the very bottom of page 2.
23   A    Okay.  I see it, documents, yes.
24   Q    And then it says, shall mean and include all
25   written, printed, typed, recorded or graphic data or

Page 20

1    matter of every kind and description.
2    A    Sure .
3    Q    It goes on from the second line from the
4    bottom, Documents shall include, without limitation, all
5    agreements, contracts, correspondence, letters,
6    telegrams, telexes, messages, email, memoranda, records,
7    reports, book, summaries, records of telephone
8    conversations or interviews, summaries of other records,
9    et cetera, et cetera.  Correct?  Do you see that?
10   A    Yes.
11   Q    Did you understand this to be the definition
12   of documents when you searched for items to production?
13   A    Yes.
14        MR. FREY:  Just real quick, I want to object
15   to the extent that this line of questioning is going to
16   exceed the objections that were originally raised by us
17   to the subpoena and the meetings that subsequently took
18   place after that.  I object related to that.
19        Go ahead.  You can answer the question.
20   Q    I understand.
21        When you were looking for documents
22   responsive to this request, request one for all
23   documents and communications concerning Smartmatic, what
24   sources of information did you review?
25   A    I know almost nothing about Smartmatic,



Page 21

1  knew almost nothing about Smartmatic at the time.
2      Q    So is it fair to say that when you went to
3  look for the documents, there were not any because you,
4  in fact, did not have any documents in your files
5  related to Smartmatic?
6      A    Right.
7      Q    When did you first become aware of the
8  company name Smartmatic?
9      A    I heard Mike mention it in some of his
10  documentaries, and I don't recall specifically if he
11  mentioned it in the ones that I was in.  That is when I
12  first became aware of the brand.
13      Q    So before you either were filming the
14  documentaries with Mr. Lindell or viewing the
15  documentaries that he published that you were not in,
16  you had not heard of Smartmatic before, correct?
17      A    Correct.
18      Q    Okay.  So at the time before you appeared on
19  Mr. Lindell's documentaries, you did not know who
20  Smartmatic was, correct?
21      A    Correct.
22      Q    Were you aware of -- strike that.
23          If you did not know who Smartmatic was, you
24  would not have known the role that Smartmatic played in
25  the November 2020 election, correct?

Page 22

1      A    Correct.
2      Q    Do you understand now that Smartmatic's
3  voting machines were only used in LA County?
4          MR. GREENE:  I object to the form.
5          Go ahead and answer.
6      A    I understand that now.
7      Q    (BY MR. FREY)  Okay.  And do you have any
8  reason to dispute that Smartmatic's voting machines were
9  only used in LA County?
10      A    No, I have no reason.
11      Q    Okay.  Do you also understand that the
12  machines provided by Smartmatic were what is known as a
13  ballot marking device?
14          MR. GREENE:  Objection.  Form.  Go ahead.
15      A    I might be aware of that because I read the
16  complaint.
17      Q    Before you read the complaint --
18      A    I had no idea.
19      Q    Okay.  So before you read -- I am just going
20  to reask it to get a clean record.
21          Before you read the complaint, you were not
22  aware that the machines Smartmatic provided were ballot
23  marking devices, correct?
24      A    Correct.
25          MR. GREENE:  Same objection.

Page 23

1      Q    Do you know what a ballot marking device is?
2      A    Yes.
3      Q    Explain to me your understanding of a ballot
4  marking device.
5      A    A ballot marking device is when a voter, or
6  they call them electors, can touch the screen and it
7  completes a ballot for them.
8      Q    It returns the ballot to the voter, correct?
9      A    Typically.
10      Q    And the ballot marking device does not
11  tabulate the votes, correct?
12          MR. GREENE:  Objection.  Form.
13      A    If you show me the source code, I could
14  answer that question.
15      Q    What would you need to see in the source
16  code?
17      A    Whether it is tabulating or not.
18      Q    Have you reviewed any of the VSAP LA County
19  materials about the way that their election was run?
20      A    Yes.
21      Q    And did you see that there was a separate
22  ballot marking device and then a tally machine that
23  would tally the votes?
24      A    Yes, I have seen that.  Yes.
25      Q    And so what is your understanding of how the

Page 24

1  ballot marking device could count the votes if there is
2  a separate machine designated to do that?
3      A    I am a computer programmer.  I can make a
4  computer do just about anything.  Unless I see the
5  source code, I don't know what is going on inside the
6  machine.
7          Purportedly the ballot marking device marks
8  a ballot and purportedly the tallying machine scans the
9  ballot and tallies.  I don't know what else they are
10  doing because I have not seen the source code, and I
11  would like forensic images and do the analysis and then
12  I would know what the machines are doing.
13      Q    And if the results generated by the tally
14  machine are the ones delivered to calculate the final
15  vote, would it matter if the ballot marking device even
16  counted the votes?
17      A    Yes, it would matter tremendously.
18      Q    How so?
19      A    Because the ballot marking devices
20  typically have modems in the screen which would be
21  capable of communicating with the outside world and
22  reporting the tallies in real time.  So that could
23  compromise the integrity of an election.
24      Q    Have you seen any evidence that the ballot
25  marking devices in LA County were communicating with the



Page 25

1  outside world reporting tallies in real time?
2      A   Yes.
3      Q   What is that evidence?
4      A   The information provided at the Cyber
5  symposium in August of 2021.
6      Q   Is that the -- and that information provided
7  at the cyber Symposium in August of 2021, is the PCAP
8  data; is that correct?
9      A   That is the casual reference.
10     Q   That is the casual reference?
11     A   Yes.
12     Q   If I say PCAP data, will you understand what
13  I am referring to?
14     A   Yes.
15     Q   And in that PCAP data presented in August of
16  2021, did you, yourself, see evidence of LA County
17  ballot marking devices reporting tallies in real time?
18     A   Not that specific.
19     Q   So not that specific.  What did you see in
20  that PCAP data related to LA County ballot marking
21  devices?
22     A   I don't know whether it was ballot marking
23  devices or the tallying machines or the EMS.  I don't
24  know the information that specifically.  I just know
25  that the reporting was compromised in real time.

Page 26

1      Q   We will come back -- let us come back to the
2  PCAP data later this afternoon.  For now I just was
3  trying to understand your knowledge and information
4  regarding Smartmatic and the role it played in the
5  election.
6          So aside from, one, hearing Mr. Lindell talk
7  about Smartmatic in his documentaries; and, two, data
8  related to LA County, not necessarily specific to
9  Smartmatic's machines but generally LA County and the
10  PCAP data, do you know of or are you aware of any other
11  information regarding Smartmatic?
12     A   Not off the top of my head.
13     Q   And would you, yourself, then have provided
14  Mr. Lindell any information regarding Smartmatic?
15     A   No.
16     Q   Okay.  Let's move to request number 6 and
17  that is on page 10.  And this request asks for documents
18  and communications with Lindell or MyPillow concerning
19  the Frank Appearances or any contemplated media or
20  documentaries appearances in connection with Lindell or
21  MyPillow.
22         Do you see that?
23     A   Yes.
24     Q   And then on page 4, Frank Appearances is
25  defined because this is a legal document so there is

Page 27

1  cross-references all over the place.
2          And that includes appearances on Absolute
3  Proof?
4      A   I was not in Absolute Proof.
5      Q   Okay.  Scientific Proof?
6      A   Of course.
7      Q   Absolute Interference?
8      A   Yes.
9      Q   And the cyber Symposium?
10     A   I was not in Absolutely 90 either.
11     Q   Of the appearances listed on page 4, you did
12  appear on Absolute Proof, correct?
13     A   No.
14     Q   I am sorry.  My fault.  You did not appear
15  on Absolute Proof.  You appeared on Scientific Proof,
16  correct?
17     A   Yes.
18     Q   You appeared on Absolute Interference?
19     A   Correct.
20     Q   And you appeared at the cyber Symposium in
21  August of 2021, correct?
22     A   Correct.
23     Q   Correct?
24     A   Yes.
25     Q   So do you understand that this request was

Page 28

1  for any communication with Mike Lindell or his company
2  related to those appearances?
3          MR. GREENE:  Same objection as prior
4  regarding the meeting and the previous objections to the
5  subpoena we discussed.
6      A   Yes.
7      Q   And did you review your files for any
8  documents or communications with Mike Lindell or
9  MyPillow regarding these?
10     A   I did.
11     Q   Which files did you review?
12     A   All my emails, all my texts, et cetera.  It
13  was very difficult however for me to review my texts
14  because my phone had been taken from me.
15     Q   When was your phone taken from you?
16     A   I think it was around October of last year.
17     Q   So October of 2022?
18     A   Yes.  That is a round number guess.  I can
19  go look it up, but it is something like that.
20     Q   And who is it that took your phone from you?
21     A   It is related to the lawsuit against Tina
22  Peters in Colorado and FBI met me at an airport.
23     Q   They took your physical phone?
24     A   Yes.
25     Q   And you have not been able to access it like



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
29–32

Page 29

1  via the Cloud or remotely or anything?
2      A  No, I do not use the Cloud.
3      Q  Did the FBI in Colorado take any other
4  devices from you?
5      A  No, just the phone.
6      Q  So when you were looking through your
7  communications and documents --
8      A  Yes.
9      Q  -- did you locate any communications with
10  Mr. Lindell or MyPillow regarding your appearance on
11  Scientific Proof?
12      A  I looked for communications with Kurt, his
13  attorney, who arranged for that, but I do not do emails
14  with Mike.  It is almost all by text or phone.  So
15  without my phone or my text, I have almost nothing I
16  can find.
17         So I did my best to find the communications
18  that I had with Kurt Olsen, I think it was the week
19  before we filmed Scientific Proof, where we arranged for
20  that meeting.  So I did my best to comply with the best
21  that I could find.
22      Q  Fair.
23         Same question.  Did you locate any documents
24  or communications with Mr. Lindell or MyPillow employees
25  regarding your appearance on Absolute Interference?

Page 30

1      A  Same answer.
2      Q  The same question with respect to Cyber
3  Symposium, did you locate any documents or
4  communications with Mr. Lindell or MyPillow employees
5  regarding your appearance at the Cyber Symposium in
6  August of 2021?
7      A  Yes, I did that search.
8      Q  And did you locate any documents or
9  communications?
10      A  Anything that I found I put on a drive and
11  gave to you guys.  So I do not remember now what I
12  found then.
13      Q  Is it fair to say if there are no documents
14  or communications in the documents that you produced to
15  us --
16      A  I could not find anything.
17      Q  -- that you could not find anything?
18      A  I spent a great amount of time looking.  I
19  gave it my best.  I gave it my best effort.
20      Q  And would it be fair to say that if you were
21  not able to find any of those, that is because that they
22  did not exist, that you did not have any written
23  communications regarding your appearances on Scientific
24  Proof and Absolute Interference or the Cyber Symposium?
25      A  With Mike Lindell or his employees?

Page 31

1      Q  Correct.
2      A  Correct.
3      Q  Okay.  And the communications I believe you
4  told me would have been with Kurt, Mr. Lindell's
5  attorney?
6      A  I spoke with Kurt Olsen for my original
7  meetings, and then after that occasionally I would get
8  phone calls from his assistants to schedule things, but
9  all of that is gone out of my reach.  Yes.
10      Q  Okay.
11      A  I guess that is my best answer, yes.
12      Q  I want to switch gears a little bit now.
13      A  Sure.
14      Q  And talk about your, kind of, educational
15  background, your experience.
16      A  Sure.
17      Q  So some of these are very basic, and they
18  are not meant to be offensive or anything like that.
19         Did you graduate from high school?
20      A  Yes.
21      Q  What year did you graduate high school?
22      A  '79, 1979.
23      Q  And did you go to college?
24      A  Yes.
25      Q  What college did you?

Page 32

1      A  Westmont College, Santa Barbara,
2  California.
3         MR. GREENE:  Give it a beat before you
4  answer.
5      A  Sorry.
6         MR. GREENE:  It is not for me.  The court
7  reporter is in arms reach of you and she will rip your
8  head off if you are not too careful.
9      A  Westmont College, Santa Barbara,
10  California.
11      Q  And did you graduate college?
12      A  Yes.
13      Q  What year did you graduate?
14      A  1983.
15      Q  And did you have a major in college?
16      A  Chemistry.
17      Q  Any majors other than chemistry?
18      A  Minor in music.
19      Q  So you have a major in chemistry and a minor
20  in music.
21         Any other degrees that you received from
22  Westmont --
23      A  Westmont College.  Sorry.
24         MR. GREENE:  Let him finish.  It is a
25  natural thing, but it is hard to do.



Page 33

1    A   Yes.  No other degrees from Westmont.
2    Q   And did you attend any school after
3 graduating college?
4    A   Yes.
5    Q   What school did you attend after graduating
6 college?
7    A   The University of California Santa Barbara.
8    Q   Did you receive a degree from the University
9 of California Santa Barbara?
10   A   I received a qualification for a Ph.D.
11   Q   Okay.  And what was the qualification for a
12 Ph.D., what field was that in?
13   A   Surface electrochemistry.
14   Q   And can you explain to me a little bit what
15 surface electrochemistry is?
16   A   It combines physics and chemistry to
17 analyze surface behaviors.  Most of the work that I do,
18 did involved immersing electrodes in liquids,
19 transferring them to vacuum systems and then analyzing
20 them with electron beams, massive amounts of
21 mathematics, calculations, simulations.
22   Q   So you got your qualification for a Ph.D.
23 from University of California Santa Barbara.
24       Do I understand correctly that you went on
25 and got your Ph.D. at another school?

Page 34

1    A   Yes.
2    Q   What school was that?
3    A   The University of Cincinnati.
4    Q   And was your specialty or your focus at the
5 University of Cincinnati surface electro analytical
6 chemistry?
7    A   Correct.
8    Q   Is that what you received your Ph.D. in?
9    A   Correct.
10   Q   Have you ever received a degree in computer
11 science?
12   A   No.
13   Q   Have you ever received a degree in
14 information technology?
15   A   No.
16   Q   Have you ever received a degree in cyber
17 security?
18   A   No.
19   Q   Have you ever received a degree in
20 mathematics?
21   A   No.
22   Q   Have you ever received a degree in
23 statistics?
24   A   No.
25   Q   Have you ever received a degree in election

Page 35

1 administration?
2    A   No.
3    Q   Now, I am going to hand you what will be
4 marked as Exhibit 111.
5       THE COURT REPORTER:  110.
6       MR. GREENE:  I was going to say that.
7       (Exhibit 110 was marked.)
8    Q   (BY MR. FREY)  I wrote it down wrong.  This
9 document I understand to be your resume which was filed
10 in the case of william Bailey vs. Antrim County held in
11 the Circuit Court of the County of Antrim.
12       Do you recognize this document?
13   A   Yes.
14   Q   And do you agree that this document is
15 indeed a copy of your resume which was filed in the case
16 of Bailey versus Antrim in the Circuit Court of the
17 County of Antrim?
18   A   I don't know how to answer that question.
19   Q   Was this --
20   A   I would have to go research it to find out
21 if this is what I submitted.
22   Q   Do you have any reason to think that this is
23 not what you submitted for that case?
24   A   No.
25   Q   Were you retained as an expert in that case?

Page 36

1    A   Retained meaning, was I paid?  No.
2    Q   You were not paid.  Were you asked to
3 provide expert opinion?
4    A   Yes.
5    Q   And was that related to the election data
6 associated with the 2020 election held in the state of
7 Michigan?
8    A   Yes.
9    Q   When were you retained or when were you
10 asked to serve as an expert in that litigation?
11   A   Oh, boy, I would have to go back and check
12 my records.  It was during the Bailey case.
13   Q   So necessarily after November 3, 2020,
14 correct?
15   A   After that, yes.
16   Q   And do you recall if it was before 2021,
17 before January of 2021?
18   A   I would have to consult my records.
19   Q   Okay.  Do you recall whether it was before
20 you appeared on Mr. Lindell's documentary Scientific
21 Proof?
22   A   It was not before.
23   Q   So it was after Scientific Proof?
24   A   Yes.
25   Q   Okay.  And who contacted you to provide



Page 37

1 testimony in the Antrim County litigation?
2     A   I do not recall who it was.  Should I
3 speculate two people?
4     Q   Please.
5     A   It was probably Kurt or Matt Deperno, I
6 believe.
7     Q   I understand Kurt Olsen is an attorney for
8 Mr. Lindell, correct?
9     A   Yes.
10    Q   And I believe Matt Deperno was the attorney
11 of record in the Antrim case, correct?
12    A   Correct.
13    Q   And based on your earlier answers, I am
14 going to assume, you might not recall, but nevertheless
15 I am going to ask, do you recall when they contacted to
16 you serve as an expert?
17    A   It was after the Scientific Proof for sure.
18    Q   Do you recall what they asked you to do?
19    A   Yes.
20    Q   What was that?
21    A   They asked me to analyze the registration
22 and voter rolls for, I want to say, six or seven
23 counties in Michigan.
24    Q   And did you tell them that you would be able
25 to do that?

Page 38

1     A   Yes.
2     Q   Was there anything else you discussed when
3 they asked you to do that analysis?
4     A   Sure.  There were long conversations on the
5 phone with Matt Deperno.
6     Q   How many conversations would you say that
7 you had?
8     A   Half a dozen.
9     Q   And what was the substance of those
10 conversations?
11    A   Discussing his case, discussing the kinds
12 of analyses that I could do for him and provide to him.
13    Q   And so your role in the Antrim County case
14 then was to analyze the voter rolls for these six or
15 seven counties in Michigan, correct, and provide your
16 opinions on what that data showed; that fair?
17    A   Fair.
18    Q   Okay.  So is there any reason why this
19 resume that you submitted in the Antrim County case
20 would leave out any information regarding your education
21 or experience that would be relevant to an analysis
22 regarding election data?
23    A   All of the work, almost all of the projects
24 that I do in my life involve large datasets, and I have
25 been writing computer programming since I was in high

Page 39

1 school.  So I take large datasets and I apply the
2 scientific method, and then I do mathematical modeling,
3 statistical modeling and produce results.  So I am a
4 natural at this.
5     Q   I appreciate that answer in context.  My
6 question was a little more specific.
7         Was there any reason that the resume you
8 submitted in Antrim County would have left out any
9 information regarding your education or experience
10 related to election technology?
11    A   I don't know how to answer that.  I cannot
12 think of any reason.
13        My understanding is when you are putting,
14 when you are in a legal case and you are, you are not
15 looking for a complete bio, you are not looking for a
16 complete vitae, you are just trying to provide the
17 relevant information concisely.
18        And so I am not even sure I am the one who
19 gave them this.  This looks more like a public kind of,
20 not necessarily a technical legal document.  Normally
21 when I would write this section for a technical legal
22 document it would not look like this.  But perhaps it
23 was done in haste and so I just sent in what I had.
24    Q   So is there -- if you and go ahead, and take
25 a second or a minute to review it, and then I would ask,

Page 40

1 what would it be that you would add to this to make it a
2 complete resume of your qualifications and experience
3 related to an analysis of election data?
4     A   Well, I have been teaching math classes to
5 advanced students for decades.  And as part of my
6 pedagogy I analyze election data with my students.  So
7 I am very familiar with polling.  I am very familiar
8 with election night reporting.  I am very familiar with
9 Secretary of State reporting.  I am familiar with the
10 data, the websites that provide all of that information
11 because I have been doing it for decades.
12        So if I were trying to establish myself as
13 an expert in analyzing election data, I would probably
14 have beefed that up in this.  My intent -- I would have
15 made that an emphasis, but I did not here.  So I don't
16 know why not.
17    Q   Okay.  So you would add in kind of the
18 experience that you have had in teaching these math
19 classes where you teach about analyzing election data;
20 fair?
21    A   Yes.
22    Q   Anything else?
23    A   Well, if this is a case on -- I have been
24 teaching statistics for decades as well and I teach
25 classes on that.  So I think those would be the things



DOUGLAS GEAUWANNA FRANK                                    July 19, 2023
Smartmatic USA Corp. vs Michael J. Lindell                    41—44

Page 41

1  that people would be looking for to evaluate whether or
2  not I was skilled at this.
3         The fact that Chemical Rubber Company, CRC,
4  everyone in science knows what I mean when I say this,
5  has featured a great deal of my statistical modeling in
6  their journals, it would be credentials enough in any
7  scientific community to say well, that guy really knows
8  his statistics.  And that guy really knows his
9  mathematics and his modeling.  He really knows electron
10  scattering and he really knows his physics.  That would
11  be sufficient.
12        So, you know, when you write a document like
13  this, you are trying to tailor it to the audience and
14  this, obviously, is not to a scientific audience.
15     Q   Okay.  Okay.  So I want to look at what is
16  here and talk about it a little bit.
17     A   Sure.
18     Q   First, it says, Dr. Frank has approximately
19  60 peer-reviewed scientific publications.
20     A   Yes.
21     Q   Including feature in cover articles in the
22  leading scientific journals in the world, e.g. Science
23  Nature, and I am going to --
24     A   Naturwissenschaften.
25     Q   Okay.  Is this a correct statement regarding

Page 42

1  your publishing history?
2     A   Yes.
3     Q   It goes on to state, During his graduate and
4  post-doctoral work, he discovered and developed a new
5  type of microscopy capable of producing
6  three-dimensional imaging of molecules resting on metal
7  surfaces.  This gave him international credibility in
8  the area of Low Energy Electron Diffraction, LEED, and
9  Auger electron --
10     A   Auger. (pronouncing)
11     Q   Auger, thank you.  Auger electron
12  spectroscopy and microscopy, and his work is prominently
13  featured in college textbooks and handbooks on the
14  subjects.
15        Do you see that?
16     A   Yes.
17     Q   Is that a correct statement?
18     A   Yes.
19     Q   So is it fair to say that your publications
20  have been focused on the areas of LEED and Auger
21  electron spectroscopy?
22     A   Yes, also electrochemistry.
23     Q   So LEED, Auger, electrochemistry, correct?
24     A   Correct.
25     Q   Have there been any other topics that your

Page 43

1  peer-reviewed scientific publications have been on?
2     A   No.
3     Q   Could you just tell me a little bit about
4  what Auger electron spectroscopy is?
5     A   Yes.  It is named for Pierre Auger who won
6  the Noble Prize in physics.  I believe it is 1923,
7  somewhere in that vicinity, he discovered a type of
8  electron that is emitted from an atom if you stimulate
9  it properly.
10        So it allows you to identify the identity of
11  the atom that the electron came from because it has
12  particular properties associated with its source.  Sort
13  of like the blue light from your coat tells me that your
14  coat has, it is absorbing the other colors.  So I know
15  something about the composition of your jacket.
16        Same way with Auger electrons.  I know the
17  composition of the atoms at a surface because of the
18  types of electrons that they are emitting.
19     Q   And how about low energy electron
20  diffraction?
21     A   Diffraction is an interference phenomenon
22  when waves interact with one another and it produces a
23  pattern which you can back-calculate to what the
24  structure must be if the structure is ordered.
25        In low energy electron diffraction, you are

Page 44

1  typically taking photographs of patterns.  In Auger
2  electron spectroscopy you are typically measuring large
3  amounts of data over time.  And I combined the two
4  measuring tens of millions of data points in a short
5  amount of time and then applied trans -- mathematical
6  transforms in order to produce three dimensional images
7  of molecules.  It was a surprise to everyone that I
8  could do that, including me, which is why it was a
9  discovery and which is why it made the cover of Science,
10  Nature and Naturwissenschaften.
11        The editor of Naturwissenschaften is the
12  head of the Noble Prize Committee.  He came and spent a
13  week in my laboratory with me and nominated me for a
14  Noble Prize in 1990 in chemistry.  So that tells you how
15  significant of a discovery that was.
16     Q   Thank you.  Thank you for that explanation.
17     A   Yes.
18     Q   So in any, in any sense were any of the kind
19  of peer-reviewed scientific publications on the topic or
20  having to do with computer science?
21     A   Oh, yes.
22     Q   How so?
23     A   I just described a massive amount of
24  mathematics that has to take place and computer science
25  required to accomplish that, that phenomenon to be able



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
45—48

Page 45

1  to measure it, process it, model it.
2       One of the reasons they put it on the cover
3  of the magazine is because my computer skills in those
4  days were more than what most people had, and I could
5  produce nice images and graphics before color graphics
6  were typically in journals.  And so to be able to
7  produce beautiful three-dimensional color graphical
8  images back in the days when most people were monochrome
9  was different, and my computer skills really shone then.
10  I was given super computer time as well.
11      Q   What is super computer time?
12      A   Back in the eighties your laptop did not do
13  very much.  And if you needed to do massive amounts of
14  calculations, you needed to have access to massive
15  computers and not everybody did.
16       And so the State of Ohio gave me access to
17  the state super computer to be able to do a lot of
18  calculations I needed to do.  Massive, massive
19  calculations.  Calculations that take days at a time and
20  take me months to write the software and the transforms
21  and things.  It is a great deal.  It is a massive amount
22  of mathematics and computer software.
23      Q   Okay.  Okay.  Same question, setting aside
24  computer science, mathematics, have any of your
25  peer-reviewed scientific publications been on the topics

Page 46

1  of elections?
2      A   No.
3      Q   Election technologies?
4      A   No.
5      Q   Electronic voting systems?
6      A   No.
7      Q   Cyber security?
8      A   No.
9      Q   Or information technology?
10      A   No.
11      Q   So I want to go back to the resume.  It goes
12  on to state, Dr. Frank left university academics in 1996
13  and began consulting, developing and manufacturing
14  surface analytical devices for national defense, DARPA,
15  that is in parens, and various industries, especially
16  the cleaning products industry and bowling ball
17  manufacturers were his custom electronics, software
18  inventions and products continued to be widely used as
19  industrial standards.  Much of his work is protected by
20  nondisclosure agreements.
21       Do you see that?
22      A   Yes.
23      Q   Is that a correct statement?
24      A   Yes.
25      Q   What type of electronics have you developed?

Page 47

1      A   Mostly process control, process monitoring
2  and control.
3      Q   And could you explain to me a little bit
4  more about what process monitoring and control is?
5      A   A manufacturer would come to me and say, we
6  need to control the quality of the product we are
7  making.  How do we do it?
8       I would say, well, I would make this
9  analytical device, design it, build it, build all the
10  electronics and all the data acquisition stuff so I know
11  what is happening in real time, and then I would design
12  the electronics and build the electronics that control
13  the motors, the processor, various things so that in
14  real time the products they would produce had quality
15  control to them.  That would be an example of an
16  application that I would do, and that is one type of
17  application.
18       Another application is product development.
19  If you were to visit leading laboratories in the world
20  in surface cleaners and waxes and polishes, for example,
21  Johnson Wax or Kiwi brands, you will find my machines in
22  their testing and development labs.
23       They all kind of follow the same strategy.
24  You have laser scanners.  You have electron scanners.
25  You have electronics measuring, monitoring things and

Page 48

1  then you have software that intelligently decides what
2  to do with all of that information to control or report
3  outputs.  Is Bounty the quicker picker upper?  I built
4  the machine that measures that.
5      Q   Okay.
6      A   If feminine products are performing
7  properly.  I built all the machines for
8  Proctor & Gamble for those types of things.
9       So it is all the way from electron
10  microscopes for military semi-conductor development, all
11  the way down to something as earthy as feminine hygiene.
12      Q   I got it.  So that kind of covered that
13  answer there.  I was going to break it down into parts,
14  but that is kind of the, that is the electronic software
15  inventions and products, that is kind of the description
16  of all of that?
17      A   Yes.  The thing that is -- I am sorry.
18      Q   Go ahead.
19      A   The thing that is in common is that they
20  all do lots of measurements, lots of data, lots of
21  statistical analysis, lots of software, lots of AI
22  during that software, lots of control outputs to
23  control and then also preparation of reports to enable
24  the engineers or product managers to know what is
25  happening.



Page 49

1    Q   Okay. Is it fair to say none of the
2  products that you just described relate to election
3  technology?
4    A   Correct.
5    Q   None of the products relate to cyber
6  security, correct?
7    A   When you say relate, you know, I didn't do
8  any papers on election stuff. I only worked with my
9  students and nothing peer reviewed, how about if I put
10  it that way.
11       I put stuff on social media on elections,
12  but never formally because that was not my field.
13  However, all the skills that you need to do elections
14  are easy compared to what I typically do.
15       So to be able to analyze the election data
16  to me is a straightforward, straightforward task
17  compared to what I usually have to deal with.
18    Q   I want to followup on one thing that you
19  just said.
20       You mentioned that you didn't do any
21  peer-reviewed writings on elections, but you put it out
22  kind of on social media?
23    A   Yes.
24    Q   When did you begin publishing on social
25  media regarding elections?

Page 50

1    A   I was one of the first 300 people on the
2  internet. I was in the first cyber net grant. So I
3  don't remember exactly when I started posting things,
4  but that was in early eighties.
5       But I have always been outspoken about my
6  thoughts on those issues. And so I would make election
7  predictions, and I would show how I came to those
8  conclusions based upon publicly available data.
9    Q   And before November of 2020 when you were
10  writing about elections, did you ever opine that an
11  election was rigged?
12    A   No.
13    Q   Did you ever opine that an election was
14  manipulated?
15    A   No.
16    Q   And did you ever look at the voter turnout
17  data to say that it was a predictable result of
18  population curves?
19    A   I was focused on the election outcomes.
20    Q   When you say focused on election outcomes --
21    A   Who would win. Sorry.
22    Q   Who would win.
23       You were just predicting who was going to
24  win kind of based on what? What were your predictions
25  based on?

Page 51

1    A   I typically use six or seven parameters
2  that I monitor. There would be cultural parameters.
3  There would be previous elections. There would be, for
4  previous election outputs there would be demographics.
5  There would be statistical things, cycles. One of my
6  favorites is FOIA transforms which are, which is a
7  mathematical tool to identify periodicities.
8    Q   Can you explain -- I am sorry -- like what
9  are periodicities?
10    A   Yes. A simple periodicity would be if you
11  look at the historic record of presidential elections
12  for example, it typically goes two Republicans, two
13  Democrats, two Republicans, two Democrats. There is
14  one exception to that until recently because two
15  Reagans and one Bush. There were three. But normally
16  it went two, two, two, two, two, two. So that is a
17  periodic phenomenon.
18       Well, there is a mathematical way to
19  characterize that. If you know the parameters that
20  characterize that, that is one of the parameters that
21  you would include in a model.
22       There are other things. Like there are
23  natural cultural shifts. Children rebel against their
24  parents, and then their children rebel against them so
25  they are back like the grandparents. So that is a

Page 52

1  natural cycle. That is about a 27-year cycle.
2       Mathematical tools allow you to extract
3  periodicities like that. When you study multiple
4  periodicities, you can combine them into a very
5  compelling statistical tool that allows you to make very
6  accurate predictions just from mathematics.
7    Q   And did you, did you make those predictions
8  with respect to every presidential election?
9    A   Since 1980.
10    Q   So since 1980 you looked at the six or seven
11  parameters?
12    A   Well, I would not say that I had all six or
13  seven at first. I grew and learned.
14    Q   And did you look at those six or seven
15  parameters in connection with this election?
16    A   Yes. In 2020 I think you mean by this
17  election?
18    Q   Yes. I am sorry?
19    A   I am helping you now.
20    Q   Yes, the November 2020 election. I
21  appreciate it because it will be clearer for my
22  question.
23       So you looked at those same parameters with
24  respect to this November 2020 election?
25    A   Yes. Yes.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
53—56

Page 53

1    Q    And have you published your findings on
2    those six or seven parameters?
3    A    On social media, yes.
4    Q    And what did those, what was your prediction
5    based on those six or seven parameters?
6    A    In 2016 my prediction was 2 to 1 Trump
7    would win.  In 2020 my prediction was 20 to 1 Trump
8    would win.
9    Q    We went on a little bit of a tangent there.
10   I want to get back to the resume.
11   A    That is a mathematical term.
12   Q    So the resume goes on to say that during the
13   nineties Dr. Frank helped to establish the Schilling
14   School for Gifted Children in Cincinnati.  Schilling is
15   a K to 12 school for extraordinarily gifted youngsters.
16   Dr. Frank continues to teach a couple of their most
17   advanced math and science classes each year and
18   continues to serve as the math and science department
19   chair.
20       Do you see that?
21   A    Yes.
22   Q    Is that a correct statement?
23   A    It may have been at the time this was
24   produced.
25   Q    Is it no longer correct?

Page 54

1    A    I am no longer affiliated with the school.
2    Q    Okay.
3    A    After I began this work, Dr. Schilling and
4    I had a talk.  She said, and she and I agreed, I needed
5    a one-year sabbatical, and then that basically turned
6    into an indefinite sabbatical since this problem has
7    experienced a great deal of mission creep.
8    Q    Do you intend to return to the Schilling
9    School after this?
10   A    I do not.
11   Q    Has that been your decision not to return?
12   A    Yes.
13   Q    When you were still teaching at Schilling, I
14   believe that you said that you taught a statistical
15   course?
16   A    Many.
17   Q    Many statistical courses.  And you taught
18   math courses, correct?
19   A    Yes.
20   Q    Did you teach any courses on election
21   technology?
22   A    No.
23   Q    Did you teach any courses on cyber security?
24   A    Yes.
25   Q    What courses did you teach on cyber

Page 55

1    security?
2    A    In my computer sciences classes.
3    Q    What did you teach about cyber security in
4    your computer science classes?
5    A    The first sentence I always told my
6    students is everything that you do on the internet is
7    not secure.  So do not think anything that you do on
8    the internet is secure.  And then I teach them how to
9    secure themselves as best as they are capable in lieu
10   of that and how to minimize the risk of cyber issues.
11       And then I would teach them also how to hack
12   each other so that they could learn better how to defend
13   themselves.  And my students have extremely high IQs.  A
14   fourth of them are autistic.  They are almost savants at
15   this.
16       And so if you have somebody who is good at
17   sword fighting, you need to find other sword fighters to
18   help them become better.  So nothing nefarious.  We like
19   to call it whitehead hackers.
20       You teach each other how to defend
21   yourselves by hacking each other.  That is a natural
22   tool and it exposes vulnerabilities and teaches you how
23   computers work.  It teaches you how the internet works.
24   It teaches you how networks work.
25       If you merely are a computer user, you will

Page 56

1    never learn those things.  But if you enter that realm
2    of programming and hacking, you suddenly learn how
3    everything works.  So I use it as a pedagogy to teach my
4    students computer science.
5    Q    And where did you learn what it is that you
6    are teaching about cyber security?  I ask that because
7    you did not study it is my understanding.
8        How did you educate yourself?
9    A    I did study it.  I took all kinds of
10   computer classes at Westmont.  I took Fortran 4,
11   Fortran 77, Pascal, computer architecture classes and I
12   have built computers my whole life as well.  I grew up
13   in the computer age.  So I can start from a piece of
14   paper and build you a complete computer.  I can design
15   the transistors.  I can design the circuits.  I can
16   design the logic.  And I can write all the operating
17   systems.  In the early days I wrote my own operating
18   system for PCs because I did not like DOS.  So I am
19   organically, but also in all of my scientific work.
20       When you are doing science, you cannot use
21   off-the-shelf components.  They are not sophisticated
22   enough.  You end up having to design and build your own.
23   That is what cutting-edge research is.
24   Q    Did you use any textbooks or source
25   materials to teach your students on cyber security?

DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
57—60

Page 57

1    A    No, mostly websites because they are
2  hacking communities and that is where the real
3  education is.
4    Q    Do you recall any of the websites that you
5  would use?
6    A    I would have to go research that.
7    Q    But maybe it would show up in your course
8  curriculum?
9    A    No, it would not be.
10    Q    Why not?
11    A    It is more dynamic than that.
12    Q    So perhaps notes prepared before class or
13  before the semester, that kind of place?
14    A    Teaching geniuses is different than
15  teaching a typical class.  You typically set, have a
16  project.  You say, here is the project we are going to
17  do and it will -- then you need to learn everything
18  that you need to learn along the way.
19    Q    Okay.  How is everyone doing?  We are about
20  an hour in.  I can go a little longer or we can take a
21  break?
22    A    I am good.
23        MR. GREENE:  I am okay if everyone else is.
24    Q    Okay.  We have been looking at this resume
25  from the Kate Bailey versus Antrim County, correct, and

Page 58

1  we talked about the fact that you were providing expert
2  opinion in that case, right?
3    A    Yes.  Yes.  Sure.
4    Q    Okay.  Were your opinions in that case
5  limited to your analysis of voter turnout and
6  registration data?
7    A    Yes.
8    Q    Did you present live testimony as part of
9  the Antrim --
10    A    No.
11    Q    I am just going to finish.
12        MR. GREENE:  Let him finish the question
13  first.
14    A    Sorry.
15        MR. GREENE:  It is okay.  It is easy to
16  forget.
17    Q    It will not be written down.  So it will be
18  unclear where I was going.
19    A    Forgive me, Michele.
20    Q    Did you provide live testimony as part of
21  the Antrim County litigation?
22    A    No.
23    Q    How did the Antrim County litigation
24  resolve?
25    A    My understanding is that the case was

Page 59

1  dismissed.
2    Q    Do you know whether the court made any
3  findings as to your testimony or opinions?
4    A    I don't know.
5    Q    Okay.  Have you been retained or served or
6  provided expert opinion in any other litigation related
7  to the 2020 election?
8    A    Yes.
9    Q    Okay.  How many times?
10    A    I think it is three times.
11    Q    Let's talk about the first.  What was the
12  first case, other than Antrim County, where you have
13  provided expert opinion?
14    A    But that was not served.  I was not
15  subpoenaed for that.  I mean, I understood your
16  question to be was I served.
17    Q    No.  Just have you been involved with other
18  litigation related to the 2020 election where you have
19  provided expert opinion or just provided opinion about
20  the analysis that you have done regarding voter data?
21    A    Yes.  Yes.  Dozens and dozens of
22  situations.
23    Q    I want to talk about those.
24        What is -- so dozens of situations.  So tell
25  me the first one that you recall doing.  What case was

Page 60

1  that?
2    A    So people call me to discuss their cases
3  and then they say, how can I prove this or how I can
4  prove that?
5        And then I will say, send me your voter
6  rolls and I will have a look and see what I can find.
7        And the first, the first opportunity I had
8  like that was in Pennsylvania.  I was asked by Members
9  of the House and the Senate to examine the voter rolls
10  for Pennsylvania, and I was part of a team of five or
11  six people.  We were auditing the election, and we found
12  a massive amount of fraud in Pennsylvania.
13    Q    And did that turn into any sort of
14  litigation such as this where there is, you know, a
15  formal complaint and legal pleadings, depositions, that
16  sort of thing?
17    A    My understanding is there were four
18  lawsuits filed to the Supreme Court from Montgomery
19  County which was my focus county, but those cases were
20  denied by the Supreme Court.
21    Q    And in the cases, the Montgomery County
22  cases, did you provide to the court any testimony or
23  opinion?
24    A    It never went to court.  The cases were
25  rejected.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
61—64

Page 61

1    Q    So they were dismissed on the pleadings
2  before?
3    A    Yes.
4    Q    So you did not -- there was no filing such
5  as there is in Antrim County where the attorney said,
6  Dr. Frank has analyzed the data and will testify X, Y,
7  Z; is that right?
8    A    I was consulting with the lawyers and they
9  were planning to have me testify.
10    Q    But it never got there?
11    A    But it never got there.
12    Q    Okay.  Okay.  After the Montgomery County
13  case -- let us set aside for a second places where you
14  just consult and nothing was filed or nothing got to the
15  point where you actually provided testimony -- have
16  there been any cases where you have provided testimony
17  either in a courtroom or, such as today, like a
18  deposition regarding your opinions on the voter data?
19    A    There are only a few because most of them
20  do not get that far.
21    Q    Let us talk about those few.
22    A    So you are only looking -- I am going to
23  ask you a question to clarify what you are asking me?
24    Q    Fair.
25    A    You are only interested in the ones where I

Page 62

1  have written something formally?
2    Q    That is where I am starting, yes.  I want to
3  know the ones where you have written something formally
4  or the attorneys have submitted something saying
5  Dr. Frank is going to provide this testimony.
6    A    So I am not sure I am going to be able to
7  answer this question just because it is such a huge
8  question because I spend every day of my life talking
9  to attorneys and legislatures and cases.  I consult and
10  coach them all of the time, and I am not sure I can --
11  we would be here for quite some time, days and days,
12  and I would have to pull of all of my records out.  I
13  am not even sure that I would remember every phone
14  call.
15        I am not sure how to answer your question,
16  if that makes sense.  I am not trying to be evasive.  I
17  am trying to answer your question.
18    Q    I am not asking about phone calls or
19  consulting or --
20    A    Yes.
21    Q    I think that you probably remember, if you
22  sat for a deposition before, right, you have not done
23  that you said?
24    A    Correct.
25    Q    Anything related to the 2020 other than the

Page 63

1  Zeidman arbitration.
2    A    Yes, and this one.
3    Q    And this one.  So this is the only election
4  related case?
5    A    Yes.
6    Q    Other than the Zeidman arbitration where you
7  have been called to be deposed?
8    A    Yes.  But, for example, yesterday I was on
9  the phone for two hours with an attorney from
10  Pennsylvania working on his case with him.
11        MR. GREENE:  Right.  I just want to clarify.
12    A    I do that all of the time.
13        MR. GREENE:  I think he is trying to
14  distinguish those and start with ones that are actually
15  in court now, at least first.  So that is what we are
16  trying to do, parse those.
17    Q    Right.  Thank you.
18    A    I am doing my best to answer you.
19    Q    I understand.  If you are not in the legal
20  field, you do not know necessarily the distinctions that
21  I am trying to draw here.
22    A    Right.
23    Q    So the first thing, as counsel said, is just
24  appeared at a deposition.  We said this case and the
25  Zeidman arbitration?

Page 64

1    A    Yes.
2    Q    Have you appeared in court to testify in any
3  case?
4    A    Does appearing before a committee of the
5  legislature under oath count?
6    Q    Not for this question.
7    A    No.
8    Q    Okay.  Have you appeared before a committee
9  of the legislature under oath to testify regarding --
10    A    Yes.
11    Q    -- regarding the November 2020 election?
12    A    Yes.
13    Q    Okay.  How many times?
14    A    Let me think it through here.  Publicly
15  under oath Kansas twice.  House and Senate.  Publicly.
16  Those are probably the only two times under oath, but I
17  have testified before legislatures and spoken at that
18  sort of thing but not like a formal proceeding.
19    Q    Okay.  We will talk about those state
20  legislatures visits and things like that later.
21        That is kind of when you go around and
22  present your data to a group of legislatures?
23    A    Yes.  Yes.
24    Q    So let us talk about the publicly Kansas
25  times.



Page 65

1        When was that?
2     A    Do you want me to look it up?
3     Q    Give me a ballpark.  Was it --
4     A    A year ago.
5     Q    Okay.  So we are looking at like summer of
6   2022?
7     A    Yes.  Yes.  It would be about then because
8   legislature Tadam Lee invited me to testify before
9   their formal committee.  And I presented my analysis
10  under oath for about 30 minutes, and that was
11  televised.  And then ten minutes into the question
12  period after that, she held up a report produced by the
13  Kansas State Legislature Research Department that
14  confirmed everything that I had just said for 30
15  minutes.  It was a powerful moment.
16    Q    Do you have a recollection of whether the
17  Kansas legislature changed their voting procedures
18  following your testimony?
19    A    No.  Instead they removed her from they
20  eliminated her district in the state of Kansas.
21    Q    And other than the legislature who held up
22  the report, were there any other legislatures who were,
23  to your knowledge, favoring changing the voting
24  processes in Kansas?
25    A    Yes.

Page 66

1     Q    How many?
2     A    Many in the committee.  There were three or
3   four out of the 12 and then there were other
4   legislatures in the legislature, maybe half a dozen,
5   that met privately with me that were trying to get
6   legislation passed.  It is an uphill battle.
7     Q    At the end of the day they did not do it?
8     A    They proposed legislation, but the
9   legislature did not pass it.
10    Q    The full body did not pass it?
11    A    Yes.
12    Q    So those are the -- that was you presented
13  to the House and the Senate in Kansas you said?
14    A    Yes, two separate occasions.
15    Q    Same substance of your testimony?
16    A    Similar.
17    Q    Okay.
18         And then we have, we have talked about the
19  formal testimony in court.
20         Have you written any expert reports that
21  have been filed in a case?  Do you know what that means?
22  Actually submitted, exchanged with adversary in
23  litigation regarding --
24    A    That would be Antrim.
25    Q    Other than Antrim, have you submitted any

Page 67

1   reports that were exchanged with an adversary in
2   litigation regarding the November 2020 election?
3     A    They didn't make it to that point, so no.
4     Q    So you were retained and consulted, but the
5   case did not get to the point where you would have been
6   disclosed in giving your opinions?
7     A    Right.  Right.  Exactly.  That happens a
8   lot.
9         MR. FREY:  Okay.  Let's take maybe a
10  five- or ten-minute break.
11        MR. GREENE:  Sure.
12        THE VIDEOGRAPHER:  The time is 10:51.  We
13  are now off the record.
14        (Recess was taken.)
15        THE VIDEOGRAPHER:  The time is 11:02 and we
16  are back on the record.
17    Q    Mr. Lindell (sic), we just took a quick
18  break.
19    A    Did you call me Mr. Lindell?
20    Q    I apologize.  Mr. Frank, we just took a
21  quick break.  And I understand that over the break you
22  may have recalled another case in which you served as an
23  expert?
24    A    Yes.
25    Q    What case was that?

Page 68

1     A    It is in Oregon.  It was last year, mid
2   year, Washington County, Oregon.
3     Q    Who were the parties in that case?
4     A    It was the state and the county were the
5   plaintiffs and it was against -- the name is escaping
6   me at the moment.  His first name was Tim, I think.  I
7   can go look it up.
8     Q    Who were you providing testimony on behalf
9   of?
10    A    The defendant.
11    Q    And what was the defendant being sued for?
12    A    Restraining order by the Secretary of State
13  and the county to restrain him from using the data that
14  the county clerk had given him.
15    Q    What was the subject matter of your
16  testimony in that case?
17    A    Why the data he was given is valuable for
18  citizens to have in order to evaluate the integrity of
19  elections.
20    Q    And what type of data was it?
21    A    It is a complete backup of their EMS.
22    Q    And how did that case resolve?
23    A    The judge ruled that the data had to remain
24  sealed; that if it became public, it could compromise
25  the integrity of the elections.  There were three,



Page 69

1  three reasons.  That was just one of the three.  There
2  was also a proprietary argument.  I don't recall the
3  third one off the top of my head.
4      Q    Was that a written opinion, do you know,
5  that the judge issued?
6      A    I am sure.
7      Q    Okay.  And do you know if in the judge's
8  ruling he --
9      A    She.
10     Q    She, I apologize.  If she evaluated your
11  testimony?
12     A    My testimony was read into the record by
13  the attorney.  When I took the stand, the prosecution
14  objected.
15     Q    So you did not actually testify live, it was
16  read in?
17     A    I did testify live but not completely.
18  Half of my testimony was read in by the attorney and
19  half of my testimony was live.
20     Q    When did that occur?
21     A    Mid year last year.
22     Q    Okay.
23     A    I want to say June.
24     Q    Okay.  And what attorneys were you working
25  with on that case?

Page 70

1      A    It was one attorney.  I have to look it up.
2      Q    It was not Mr. Olsen?
3      A    No.
4      Q    It was not Mr. Deperno?
5      A    No.
6      Q    How did you come to be involved in that
7  case?
8      A    Because I am well-known in election
9  integrity circles as an expert in analyzing the voter
10  rolls.  In fact, that is why this citizen asked for the
11  copy of the voter rolls in the first place.  And then I
12  was coaching him on that and then the Secretary of
13  State panicked when she learned that he had been given
14  an entire copy of EMS.
15     Q    So the defendant had reached out to you
16  directly to ask for your assistance?
17     A    Yes.
18     Q    Okay.  And when you say the judge ruled that
19  the data had to remain under seal, essentially she
20  granted the TRO; is that correct?
21     A    Yes.
22     Q    Any other cases that you recalled over the
23  break?
24     A    No, not over the break, but I do so much of
25  this that maybe I will remember something tomorrow.

Page 71

1  Sorry.
2      Q    And did you and Mr. Greene discuss any other
3  substance of your testimony over the break?
4      A    He just reminded me to let you finish your
5  sentences, which I have to remember, and not to
6  volunteer information, to answer your questions.
7      Q    Okay.  And I see that you are taking notes
8  there.
9          What kind of notes are you taking?
10     A    Just a reminder, reminding me that your
11  name is Nate and Maura and Tim and Michele and just a
12  reminder to myself that I am not a teacher today,
13  because I am not here to teach you.  I am here to
14  answer questions.  It is kind of coaching myself.  Is
15  that fair?
16     Q    Yes.  That is fair.
17          Okay.  So I want to move on and talk some
18  about kind of how you started to do this work following
19  the November 2020 election.
20     A    Yes.
21     Q    So, first, were you registered to vote in
22  the 2020 election?
23     A    Yes.
24     Q    In which state were you registered?
25     A    Ohio.

Page 72

1      Q    Did you vote in the 2020 election?
2      A    Yes.
3      Q    Okay.  Who did you vote for in the race for
4  president in the 2020 election?
5      A    Trump.
6      Q    Were you a registered Republican in 2020?
7      A    I believe so.  I am libertarian in
8  philosophy so sometimes I switch.  I am not certain.
9      Q    On November 4, 2020, so the day after the
10  election, did you believe that the November 30, 2020
11  election, the presidential election specifically, had
12  been manipulated?
13     A    I knew something was wrong.
14     Q    And why did you suspect that?
15     A    Because of my record predicting prior
16  elections.  For me to be that far off, something had to
17  be wrong.
18     Q    And that record you stated is the one where
19  you looked at various parameters?
20     A    And I successfully predicted every election
21  since 1980 presidentially.
22     Q    And you said that you published those
23  predictions on social media?
24     A    Yes.
25     Q    What social media account would you have



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
73–76

Page 73

1  published those on?
2      A    Facebook.
3      Q    So that would have started maybe in 2006,
4  correct?
5      A    No.  I was on earlier than that.  I was one
6  of the first people in time.
7      Q    I am trying to think back.  Facebook --
8      A    MySpace.
9      Q    Facebook was like 2003, I want to say
10  Facebook came out.
11          Does that seem fair?
12      A    Around there somewhere.
13      Q    So between the 1980s and 2003, where were
14  you publishing your predictions?
15      A    Message boards.
16      Q    Do you have any records of that?
17      A    I imagine we can go looking, but it would
18  be an adventure.
19      Q    When you say "message boards," what kind of
20  message boards would you post that on?
21      A    Blogs, discussions, forums, chats where
22  people would debate things.
23      Q    Do you have a record today of each of your
24  published predictions for every presidential election
25  since 1980?

Page 74

1      A    Not in one place.  I mean, we would have to
2  go compile it.  It would be an expedition.
3      Q    Okay.  Moving on, so on November 4 you said
4  that you knew that something was wrong because you had
5  typically predicted correctly and in this case you were
6  off, correct?
7      A    There were other symptoms too, but that was
8  just one of the symptoms.
9      Q    Okay.  What other symptoms?
10      A    The fact that the election stopped, it is a
11  huge symptom.
12      Q    Anything else?
13      A    The media reporting was strange and
14  suspicious, early calls, et cetera.
15      Q    Okay.  So the media reporting was strange
16  and suspicious because of early calls.
17          Anything else that you thought was strange
18  or suspicious about the media reporting?
19      A    Probably.  It was a long time ago.  I don't
20  know if I remember.  The red flags were screaming
21  something is wrong with this.  I need to look into
22  this.
23      Q    Do you know a woman by the name of Kathy
24  Barnette?
25      A    Yes.

Page 75

1      Q    Who is Kathy Barnette?
2      A    She was a candidate for the House of
3  Representatives in 2020 and she is the one who asked me
4  to look at her election for Montgomery County.  That
5  led to my interactions in cooperation with the team
6  that I mentioned earlier in Pennsylvania.
7      Q    So how did you first meet Kathy Barnette?
8      A    Because during the campaign she was
9  visiting my social media web pages to learn about COVID
10  and learn what the statistics were.  I was graphing
11  every county in the country at that time.  So any
12  politician could go look and see what the numbers
13  looked like for their county.  And so it was a campaign
14  year and people wanted to know where we stand.  What is
15  happening?  Where are we at in the epidemic?  I was
16  showing people their own data.  So that is how we
17  became acquainted.
18      Q    In the months leading up to the election,
19  you were doing kind of COVID data analysis and
20  presentations?
21      A    Yes.  Yes.
22      Q    Okay.  And when did you start compiling data
23  related to the COVID pandemic?
24      A    You are going to be surprised.  December of
25  2019.

Page 76

1      Q    Why did you start doing that?
2      A    Because one of my two students at Shilling
3  is an exchange student from China.  And when I told him
4  that that year in differential calculus we were going
5  to be modeling elections because we do that every four
6  years, but I also showed my students past epidemics we
7  modeled, including Ebola, SARS-CoV-1, and AIDS and
8  Sunspots and all the other types of modeling we had
9  done in the past, I said, this is an election year so
10  we are going to do elections, but here are some of the
11  other ones that past students have done.  He saw that
12  and he said, whoa, I want to do an epidemic.  Can we
13  please do an epidemic instead?  Why?  Because we are
14  having an epidemic back home.
15      Q    So you started that in 2019 with the student
16  modeling the COVID?
17      A    And then by January I had 5,000 people
18  following me on my Facebook page.  By March I had
19  25,000.  By the summer I had 150,000 people because, of
20  course, COVID was becoming an important discussion
21  topic in America, and I had all the graphs and I
22  already had all the infrastructure for showing people
23  the data.
24      Q    Okay.  And so before you started posting the
25  graphs about the COVID epidemic data, your social media



Page 77

1  following was significantly smaller; is that fair?
2      A   Oh, yes.
3      Q   Okay.  Like a couple hundred people?  A
4  thousand people?
5      A   A couple thousand.  Because of my bowling
6  industry products, I used social media to support my
7  customers around the world.
8      Q   Okay.  And then as a result of your COVID
9  modeling you said it grew to a couple hundred thousand?
10     A   150,000 hits per week.  Unique visitors per
11  week.  Facebook tracks that for you.  I had 150,000
12  unique visitors a week on Facebook.
13     Q   Okay.  And which Facebook page were you
14  posting these on?  Was it your personal page or was it
15  like a company page?
16     A   I set up special pages for COVID modeling.
17     Q   Okay.  What were those pages?
18     A   I think one of them was called Dr. Frank
19  Models.  And another one was called Follow the Data
20  with Dr. Frank.  Facebook took all of those down.
21     Q   That is what I was going to ask.  I was
22  going to ask if those are still up?
23     A   No.
24     Q   And were those the same pages you would
25  later use to put your election data modeling?

Page 78

1      A   No, because they were down.
2      Q   So when did the government or when did
3  Facebook, I apologize, when were those Facebook pages
4  taken down?
5      A   About a month before the election.
6      Q   Okay.  And you said Kathy Barnette was
7  someone who followed you on your Facebook pages or on
8  your Facebook page related to COVID modeling?
9      A   Correct.
10     Q   And did you actually meet her in connection
11  with that?
12     A   On podcasts.
13     Q   And then I understand that Ms. Barnette then
14  asked you to consult with her on issues related to her
15  election?
16     A   Correct.
17     Q   Okay.  And who initially contacted who as
18  related to that work?  Did she reach out to you or did
19  you reach out to her?
20     A   Her associate, Vico Bertogli.
21     Q   And when did Ms. Bertogli contact you?
22     A   Mr. Bertogli.
23     Q   Mr. Bertogli contact you?
24     A   Early December.
25     Q   And how did he contact you?

Page 79

1      A   I don't recall.
2      Q   You don't recall if it was phone or email?
3      A   Yes.
4      Q   Okay.  What did you discuss with
5  Mr. Bertogli when he contacted you?
6      A   B-e-r-t-o-g-l-i.  First name is V-i-c-o.
7  They were questioning the integrity of her race and
8  they said, would you please look at some data for us?
9  We have had some other statistician look at our data
10  and we don't understand his methodology, nor do we
11  understand his conclusions, and Kathy knows you from
12  your interactions during COVID and trusts you.  Would
13  you be willing to look at those data for us?
14         I said, of course.  So they sent me those
15  data and I immediately saw huge issues in the records
16  and agreed to help her out with that, to begin working
17  on that.
18     Q   Okay.  And during this first conversation
19  with Mr. Bertogli, was anyone else present?
20     A   I don't recall.  Probably Kathy.
21     Q   Was probably on the communication as well?
22     A   Probably.
23     Q   Okay.  And I believe that you said, so you
24  said okay, send me the data.  And then you saw huge
25  issues and so you agreed to help out with that?

Page 80

1      A   Yes.
2      Q   How long did it take between the time that
3  they sent you the data and you agreed to help?
4      A   Wow, the very same day, that afternoon.  It
5  was so obvious.  I called them right back and said, I
6  was expecting it to be a big, long job but immediately
7  there were anomalies everywhere.  I said, this is
8  serious.
9      Q   And had Mr. Bertogli or Ms. Barnette
10  indicated to you that they would like you to find
11  anomalies in the data?
12     A   No.  In fact, Vico and I had a really good
13  scientific discussion.  As soon as they started
14  explaining things, I said stop.  I do not want to hear
15  anything.  I do not want to be pre-biased in any way.
16  I am a scientist.  Just give me your data and let me
17  see what I can find myself.  I did not even want to
18  read the other statistician's report.  I want to have a
19  completely clean slate.  That is the scientific method.
20     Q   And at the time that Ms. Barnette's
21  assistant reached out to you, had you done any personal
22  investigation into the data behind the November 3, 2020
23  election?
24     A   No.
25     Q   So then you started your, started on this



Page 81

1  journey as a result of that phone call, correct?
2      A   Correct.
3      Q   Okay.  Before your conversation with
4  Mr. Bertolgi and Ms. Barnette asking you to assist, have
5  you ever studied voter registrations?
6      A   Not in this way.  I had in other ways.
7      Q   In what ways had you studied them?
8      A   You can download all sorts of information
9  from Secretary of State websites showing you
10  registration records, and I had not taken it down to
11  address level before.  I only looked at precinct level,
12  how many Republicans are registered and how many
13  Democrats are registered and tracking those trends.
14          Oh, gee, this precinct is becoming more
15  Republican.  This one is becoming more Democrat.  It
16  allows you to make better predictions in the aggregate,
17  but I had not gone down to the individual address level
18  before.
19          When they gave me a copy of the voter rolls
20  from Montgomery County, I could see every voter, what
21  their address was and their complete voter history.  And
22  I began analyzing that, but I had not gone to that deep
23  in the weeds as they say before.
24      Q   Okay.  The reason you had looked at the
25  precinct voter data before was just for your kind of

Page 82

1  curiosity to make your predictions with respect to the
2  elections?
3      A   To teach my students how to do this.  I
4  have a former student who predicted the mid-term 2018
5  amazingly accurately for the entire country.  He wrote
6  an AI program, which I coached him on and taught him
7  how to write the software that gathers the data from
8  all the websites and runs it through an AI program and
9  predicts the outcome.  This is what I do.  These are
10  amazing youngsters.
11      Q   So that was looking at voter registrations.
12  Similarly, before you started working with Ms. Barnette,
13  had you ever studied voter turnout?
14      A   Of course.
15      Q   And when had you done that?
16      A   Since the eighties.
17      Q   And why do you do that?
18      A   Well, because that is it how you make
19  better predictions.  You gather data on turnouts and
20  then you use those data to feed into your models to
21  make good predictions.
22      Q   And would you have written anything about
23  your analyses voter turnout or voter registration prior
24  to post November 2020?
25      A   I would not have, no.

Page 83

1      Q   Before your conversation with Ms. Barnette's
2  assistant and your work for Ms. Barnette, have you ever
3  studied election technologies?
4      A   I looked into the chad thing a little bit.
5      Q   What do you mean by the chad thing?
6      A   The hanging chad thing.
7      Q   The hanging chad thing, okay.
8      A   I looked into that a little bit.  And
9  because of my use of the internet for some years, I was
10  curious about the way state voter rolls were
11  maintained.  I ran into that decades ago and studied it
12  cursorily but not into the weeds.
13      Q   How did you -- you said that you ran into
14  that decades ago.
15          How did you run into that?
16      A   The Secretaries of State web pages are full
17  of all sorts of interesting data and interesting links.
18  So if you look behind the code, you know when most
19  people look at a website they see something and what
20  they do not realize is what they are seeing is being
21  produced by software.  And you can look at that
22  software.  And when you look at that software, you can
23  see where they are getting all of their data as well
24  which allows you to dig deeper into what is going on.
25  You are not merely seeing what they are presenting.

Page 84

1  You are also seeing where they got their data, how it
2  was processed and presented.  And that is part of, if
3  you want to have good models, you good need to have
4  good data.  So you need to get to the source not after
5  somebody else has worked it over.
6      Q   Why were you looking at the Secretary of
7  State web pages and looking behind the data at the
8  software?
9      A   Because I am teaching my students how to
10  model and I am curious myself, and it is a challenge.
11  I am a scientist.  What do scientists do?  You gather
12  data and make models and predictions.  That is what we
13  do.
14      Q   This was in connection with your teaching?
15      A   Also, I am a scientist.  I have fundamental
16  curiosity.  How predictable is the world?  If I can
17  predict every election, that is interesting.  Is that
18  because people are predictable?  Well, they are in the
19  aggregate.  There is a thing called Bayes theorem.  He
20  was one of my favorite theorems.  He was able to
21  predict population growth throughout Europe two or 300
22  years ago.  How did he do that?  Mathematics is very
23  powerful.  Mathematics is sort of my drive.
24  Mathematics and science are my driving principles.
25      Q   Okay.  So my original question was, had you



Page 85

1 studied election technologies? You said the hanging
2 chad thing?
3    A   Yes.
4    Q   You are talking about kind of looking behind
5 the Secretary of State website to understand data?
6    A   Yes.
7    Q   Do you characterize the data as election
8 technology?
9    A   Well, during elections data are reported to
10 news services, for example, and what you see when you
11 look at a web page when it is reporting election
12 results is typically not being managed by the state.
13 They have hired a third party firm such as the New York
14 Times Edison series or one of these groups that gather
15 the data, crunch it and feed it back to the state
16 during the elections.
17        I have looked into that extensively in the
18 past because if you are trying to predict elections, you
19 want to know where all of those data are coming from and
20 you like to see the source data. If you know people
21 turn out early in this precinct or if they turn out late
22 in this precinct. So, in that sense, yes, I have looked
23 into that technology quite a bit over the decades.
24    Q   Okay.
25    A   Especially since about 2000 when the

Page 86

1 internet became integrated into the elections.
2    Q   You predicted my next question.
3        When did you start looking at that?
4    A   Yes. Yes.
5    Q   Okay. Had you ever, before you began this
6 work with Ms. Barnett Barnette, had you ever studied
7 electronic voting machines?
8    A   No.
9    Q   Before your conversation with Ms. Barnett
10 Barnette and Ms. Barnett Barnette's assistant and the
11 work that you began performing for Ms. Barnett Barnette,
12 did you have any familiarity with Dominion voting
13 machines?
14    A   No.
15    Q   And I think you --
16    A   I voted on one.
17    Q   Okay. Me too, I believe. And I think that
18 we established earlier that before you started working
19 on this work for Ms. Barnett Barnette and before you
20 watched Mr. Lindell's documentaries, you did not have
21 any familiarity with Smartmatic either, correct?
22    A   Correct.
23    Q   Okay. So after Ms. Barnett Barnette's
24 assistant contacted you and shared the data and you
25 looked at it, what did you do next?

Page 87

1    A   Well, after I was shocked by what I found,
2 she set up Zoom calls for me and Vico and her and her
3 team with two legislatures, the head of the each of the
4 committees. There was a committee in the House and a
5 committee in the Senate. And I might confuse that, but
6 one of them was Russ Diamond. I think he was a Rep and
7 Frank Ryan who was the Senate. So there were
8 committees in the legislature that I began interacting
9 with because I found things and they were interested.
10        In the words of Russ Diamond, Dr. Frank, you
11 solved the crime of the century because I was able to
12 write FOIA transforms and recognize patterns that nobody
13 else had seen.
14    Q   And, well, the data you were looking at,
15 that data was provided to you by Ms. Barnett Barnette;
16 is that correct?
17    A   The county, the county will sell you a copy
18 of the voter rolls for 20 dollars and were
19 downloading those every week. And so I was given a
20 copy, I believe, by Vico. I said, hey, I want this.
21 He would download it and give to me.
22    Q   And that was the voter rolls. So that was
23 the actual, the actual ballots cast?
24    A   It would record every voter, every voter's
25 address, all the registration information, which

Page 88

1 elections they voted in the past, et cetera. Every
2 state is a little different. Some states separate what
3 they call the voter history from the registration
4 rolls. In Pennsylvania they are merged. So it is a
5 single file that contains who voted, as well as who is
6 registered.
7    Q   Okay. And that came through Mr.
8 Bertogli. from the county website that he got for 2020?
9    A   Yes. Yes.
10    Q   Okay. And then at some point Ms. Barnett
11 Barnette filed litigation, correct?
12    A   I don't know if she did or not. I think
13 she was working with the legislature. I am not sure
14 she did litigation.
15    Q   Okay. Aside from -- and I know that you
16 said that you met with the Senate and House Committees?
17    A   Yes.
18    Q   Did you do any -- did you provide any other
19 testimony in connection with Ms. Barnett Barnette's
20 challenge to her election results?
21    A   No, not formally.
22    Q   Did you provide any written declarations or
23 reports?
24    A   No.
25    Q   You said that you are not sure whether she



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
89–92

Page 89

1  filed litigation or tried to go through the legislature,
2  correct?
3      A    Late in February she called me and she
4  said, I give up.  They are not going to fix my
5  election.
6          So I am going to introduce you to Mike
7  Lindell.  So I interpret that as meaning she was not
8  filing a lawsuit.  She was trying to get the legislature
9  to address her concerns.
10     Q    Okay.  And she was unsuccessful in that?
11     A    Correct.
12     Q    Okay.  Beyond your data analysis, did you do
13  any other work for Ms. Barnett Barnette in connection
14  with her challenge to her election results?
15     A    For Ms. Barnett Barnette, no.
16     Q    Okay.
17     A    I don't think that is quite accurate.  So I
18  am a scientist and I design experiments.  I set up
19  controls.  So once I discovered the pattern that I was
20  finding in Pennsylvania, I started looking in other
21  states.
22          So I think it is incorrect to say that I did
23  not do other analysis, I did, of other states, multiple
24  other states.  Was that for her?  It is related because
25  I am doing an experiment.  I am trying to see if I can

Page 90

1  understand this pattern.  So I am trying to be accurate.
2      Q    Okay.  That is fair.
3          So the work that you did for Ms. Barnett
4  Barnette, I think that you said began in early December
5  is when she contacted you?
6      A    Yes.  Correct.
7      Q    And then after that time, I believe that you
8  just said that you started to look at other states,
9  correct?
10     A    Yes.
11     Q    When did you start to look at the other
12  states, in December?
13     A    In December as well.
14     Q    Did Ms. Barnett Barnette compensate you for
15  the work that you were doing for her?
16     A    She did.  I asked -- I was new to this.  I
17  did not know what I was getting into.  I asked her for
18  2,500 bucks for a week's of worth, which is a very
19  discounted price.  Later she paid me five out of the
20  goodness of her heart because she was grateful for all
21  the work that I had done.
22     Q    So she paid you $5,000 for the work that you
23  did on her behalf?
24     A    Yes.
25     Q    Okay.  Did you have any kind of written

Page 91

1  agreement regarding --
2      A    No.
3      Q    I believe I may have seen somewhere that you
4  also went out and knocked on doors for Ms. Barnett
5  Barnette; is that true?
6      A    I did not do it -- I am sorry.  I did not
7  do it myself.
8      Q    Okay.
9      A    I was proposing experiments.  I said to
10  Vico, this is what I think is going to happen based
11  upon the voter rolls analysis that I have done.  Put
12  together a team and go knock on doors and see if I am
13  right.
14          I predicted, based upon my models, that if
15  they were to knock on -- they gave me a list of 1,600
16  doors.  I said, based upon my analysis of these, if you
17  knock on these doors, you are going to find 30 percent
18  of the doors have a phantom voter there.
19          And when they did the experiment, it was
20  three days worth of canvassing, 100 people did it, they
21  found 32 percent.  So I knew I was onto something at
22  that point.
23     Q    Do you know how they selected the 1,600
24  doors?
25     A    I do not know.

Page 92

1      Q    Okay.  Do you know how they determined what
2  a phantom voter was, what their phantom definition was?
3      A    A phantom voter is someone who you have
4  counted a ballot from but they did not cast it.  They
5  could be dead.  They could be in another state or they
6  could just simply say I didn't vote and somebody voted
7  in my place.  That is a phantom voter.
8      Q    And so do you know whether they made the
9  determination that someone was actually a phantom voter
10  only if they spoke to someone who said that no, I did
11  not vote?
12          In other words, did they get confirmation
13  from the person that they themselves had not voted?
14     A    Everything was confirmed in person or we
15  didn't count it.
16     Q    So if someone did not open their doors --
17     A    They would not be included in the
18  statistics.
19     Q    Okay.  And of those 1,600 doors, do you know
20  how many people opened their doors?
21     A    I don't remember those statistics.
22     Q    Okay.  So then you said that at some point
23  in February I believe of 2021 Ms. Barnett Barnette told
24  you to stop, I am going to introduce you to Mike
25  Lindell; is that correct?



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
93—96

Page 93

1    A    Correct.

2    Q    And why did she introduce you to Mike
3    Lindell?

4    A    She was feeling bad.  I was feeling bad,
5    because we had exposed so much fraud in the state of
6    Pennsylvania and they were not going to fix it.  And so
7    she is like, I give up.  They are not going to fix
8    this, but I know you invested so much of your personal
9    time analyzing all of these other states.  I think
10   Mr. Lindell would be interested in your work.  This is
11   after Absolute Proof had come out, et cetera.

12           And so she -- I don't know how she made the
13   introduction, but she did and then I got the phone call
14   from Kurt Olsen asking me to present my work to several
15   attorneys.

16   Q    Okay.  So before Ms. Barnett Barnette said,
17   hey, I am going to introduce you to Mike Lindell, had
18   you heard of him before?

19   A    Of course.

20   Q    What did you know about him?

21   A    The MyPillow guy.  I had seen his
22   commercials for years.

23   Q    Did you know anything about him other than
24   he is the MyPillow guy?

25   A    No.  Well, not true because I had seen

Page 94

1    Absolute Proof.  I had seen the movie Absolute Proof.

2    Q    Prior to seeing Absolute Proof you knew him
3    as the MyPillow guy?

4    A    Correct.

5    Q    Did you have any opinions of Mr. Lindell
6    before Ms. Barnett Barnette said, I am going to put you
7    in contact with him?

8    A    Nothing substantial.

9    Q    And you said that you had been following at
10   least his first publication regarding the election which
11   was the Scientific Proof or Absolute Proof?  I get those
12   mixed up.  Absolute Proof you had watched before you met
13   him?

14   A    Correct.

15   Q    And you said that when Ms. Barnett Barnette
16   made the introduction, the first person who spoke with
17   you was Kurt; is that right?

18   A    Correct.

19   Q    How did Mr. Olsen contact you?

20   A    Phone.

21   Q    Okay.  Do you remember when, what the date
22   was?

23   A    It was either very late February or early
24   March.  It was the week before my filming of Scientific
25   Proof and I think that was early March.

Page 95

1    Q    And what did he say when he contacted you?

2    A    I don't remember, but it was something to
3    the effect of Kathy Barnette gave me your name.  You
4    have done a lot of work in Pennsylvania.  I would like
5    to -- I would like several attorneys to hear your work.
6    Let us schedule a Zoom.  I believe that Zoom was on a
7    Thursday afternoon.  It was supposed to be for one hour
8    I think or two hours and it turned into four hours.

9    Q    Okay.  So you have the initial phone call.
10   He says, Ms. Barnett Barnette talked about you.  I would
11   like you to meet with several other attorneys to
12   present, right?

13   A    Yes.

14   Q    What did you say to him?

15   A    Sure.  I would love to.

16   Q    Okay.  And on that initial phone call, did
17   Mr. Olsen ask you anything about your education and
18   experience?

19   A    I don't recall.

20   Q    Did he ask you any questions about the
21   substance of the analyses you had been performing?

22   A    I don't recall.

23   Q    When you had the Zoom meeting, the follow-up
24   Zoom meeting with the attorneys --

25   A    Yes.

Page 96

1    Q    -- did they ask you anything about your
2    education and experience?

3    A    I don't recall.

4    Q    Do you recall if they asked you anything
5    about the substance of your analysis?

6    A    Well, of course, it was four hours long.  I
7    gave my presentation, and then they asked questions for
8    a long time.  It was supposed to be short and it turned
9    out to be four hours, about 16 attorneys.

10   Q    Do you recall who any of those attorneys
11   were?

12   A    Yes.  Andy Howse was one of them.  Eric
13   Giuliani was one them.  Kurt Olsen was one them.

14   Q    Anybody else?

15   A    I do not recall the others.

16   Q    Okay.  Do you recall if Mr. Lindell was on
17   that Zoom meeting?

18   A    I am sure he wasn't.

19   Q    You are sure he was not?

20   A    I am sure he was not.

21   Q    Okay.  Do you know if any other MyPillow
22   employees, not attorneys, were on that phone call?

23   A    I don't.  I would not -- no, because
24   two-thirds of the people I did not even know who they
25   were.  I assumed they were legal aids and stuff.



Page 97

1    Q   Do you have a calendar invite or any kind of
2  record of an invite for that phone call or for that Zoom
3  call I should say?
4    A   Probably on my phone.
5    Q   The phone that the FBI took?
6    A   I looked for that actually because I knew
7  that is what you were asking for in the subpoena. I
8  could not find it. I mean, that is a fair request for
9  you to ask for that. I tried to find it.
10   Q   Thank you.
11       During that phone call or that zoom call,
12  excuse me, did they then request that you appear on the
13  documentaries?
14   A   The very next morning Kurt called me and
15  said, we want you in Memphis on Monday morning.
16   Q   Okay. And did he say what he wanted you to
17  talk about?
18   A   He wanted me to present my work, and Mike
19  wanted to film it. And originally the story was or the
20  plan was I mean to say that he was going to film for
21  about an hour and take 20 minutes, edit down to 20
22  minutes and insert that into his upcoming documentary
23  called Absolute Interference. That was the original
24  plan.
25   Q   Okay. And did you, in fact, then go to

Page 98

1  Memphis the next week to film the documentaries?
2    A   I did.
3    Q   Okay. And so you did appear on the
4  documentaries called Scientific Proof, Internationally
5  Renowned Physicist, Absolutely Proof 2020 Election was
6  the Biggest cyber Crime in World's History, correct?
7    A   I appeared in that movie.
8    Q   Okay. I am going to hand you what was
9  previously marked as Exhibit 30 which is a transcription
10  of that recording that Smartmatic attached as Exhibit 3
11  to its complaint in this lawsuit.
12       If you can take a minute to flip through it.
13  I do not expect you to read the whole thing.
14   A   It looks like it is.
15   Q   Does it seem as though it is a true and
16  correct transcription of the recording?
17   A   At first glance.
18       MR. GREENE: Objection to the extent that he
19  does not have time to read 74 pages in ten seconds, but
20  go ahead.
21   A   First glance.
22   Q   And this was --
23   A   May I keep this? Is this for me?
24   Q   We will discuss it off the record.
25       MR. GREENE: We will talk about that later.

Page 99

1    Q   It is attached to the complaint filed in the
2  case. If you go on Pacer or have your attorneys, you
3  can get it.
4    A   I wanted to make notes in it, and I wanted
5  to keep it if I make notes in it.
6       MR. FREY: Let us go off the record for a
7  second.
8       THE VIDEOGRAPHER: The time is 11:42. We
9  are off the record.
10      (Recess was taken.)
11      THE VIDEOGRAPHER: The time is 11:43 a.m.
12  We are on the record.
13   Q   Okay. Back on the record. Dr. Frank, we
14  were talking about the transcript of the Scientific
15  Proof recording, correct?
16   A   Yes.
17   Q   Okay. And do you recall when this, when
18  Scientific Proof was actually disseminated and published
19  to the public?
20   A   I believe it was March of 2021.
21   Q   Okay. And do you recall when you actually
22  taped Scientific Proof with Mr. Lindell?
23   A   It was on a Tuesday morning at about nine
24  o'clock. We were supposed to be there from 9 to 11 and
25  he ended up filming from like 10 to 1.

Page 100

1    Q   Okay. And when you were taping this with
2  Mr. Lindell, it sounds like you did have a discussion
3  for longer than the amount of content that was
4  published; is that correct?
5    A   Yes.
6    Q   Okay. Do you know how he edited it to
7  publish the portions that he did?
8    A   I had nothing to do with that.
9    Q   Have you watched the published version of
10  Scientific Proof?
11   A   Of course.
12   Q   Is there anything that you said in the
13  unpublished portion or the unpublished portion of the
14  taping that is different than what was published in the
15  documentaries?
16   A   Not to my knowledge.
17      MR. GREENE: I object to the form.
18   Q   Had you met Mr. Lindell before the taping of
19  Scientific Proof?
20   A   Sunday night at dinner.
21   Q   Okay. So Sunday night, and you were taped
22  on a Tuesday morning you said, correct?
23   A   Yes.
24   Q   So two nights before you went to dinner with
25  Mr. Lindell?



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
101—104

Page 101

1    A   With about 30 people.
2    Q   Okay.  And who were the other people at that
3  dinner?
4    A   Other people that were being taped, other
5  witnesses, security.
6    Q   Did you have any personal contact with
7  Mr. Lindell at that dinner?
8    A   Yes.  I sat right next to him.
9    Q   Okay.  And what did you and Mr. Lindell talk
10  about at that dinner on Sunday night before the filming?
11    A   Now I want to make a joke.  The question
12  is, what did Mr. Lindell talk about?  He basically told
13  us all stories from his past.  It was not a business
14  meeting.  It was a party.
15    Q   Did you and Mr. Lindell discuss at all the
16  substance of your analysis?
17    A   He knew nothing of it except he was told
18  that I had something he wanted to see or he should see.
19    Q   And about how long was the dinner, if you
20  recall?
21    A   Three hours.
22    Q   This was in Memphis you said, correct?
23    A   Yes.
24    Q   So before you taped Scientific Proof, is it
25  fair to say that you did not tell Mr. Lindell personally

Page 102

1  what you were going to say?
2    A   Correct.
3    Q   Okay.  When you taped Scientific Proof, who
4  else was present other than you and Mr. Lindell?
5    A   Brian Howse, his son Logan and someone was
6  there by streaming and it was Mary Fanning.
7    Q   And did Mr. Howse provide any direction or
8  guidance to you with respect to what you were presenting
9  in the taping of Scientific Proof?
10    A   No.
11    Q   And did Ms. Fanning provide any direction or
12  guidance to you in terms of the substance of what you
13  said on Scientific Proof?
14    A   No.
15    Q   You said it lasted about three hours, the
16  taping, correct?
17    A   Yes, more like three and a half.
18    Q   Okay.  And were there times during the
19  taping where you would go like off recording and just
20  have conversations or was the whole thing recorded?
21    A   I don't recall.  I think we took a break
22  about halfway through.  That is when I discovered that
23  Mary Fanning was there.  I didn't even know the first
24  half of the taping that she was streaming in.
25    Q   Were you in a recording studio?

Page 103

1    A   Yes.
2    Q   When you took breaks, did you and
3  Mr. Lindell talk at all about the substance of what was
4  being taped?
5    A   No.  We took breaks because he had to do
6  something.  So he would step out of the studio and I
7  would wait in studio for his return.
8    Q   And when you took the breaks, did you and
9  Mr. Howse talk at all about the substance of what you
10  were presenting during the taping of Scientific Proof?
11    A   No.
12    Q   And same question, when you took the breaks
13  after you realized Ms. Fanning was there on streaming,
14  did you and her have any conversations about the
15  substance of what you were taping on Scientific Proof?
16    A   I don't recall.  It was mostly nice to meet
17  you, kind of nice talk.  She talked a little bit about
18  Dennis Montgomery, but I didn't know -- she did not use
19  his name at that time.  I did not know who it was.
20        She said something to the order of, we sure
21  are glad to meet another physicist because we had
22  another physicist but you have credibility and you don't
23  have a history.  And so it is nice that we got to meet
24  you, something like that.
25    Q   Okay.

Page 104

1    A   I mean, I am a legitimate physicist.
2    Q   And was Ms. Fanning on video during the zoom
3  or was it just --
4    A   Audio only.
5    Q   Audio, okay.
6        I want to talk through some of the
7  statements in the transcript.  So if you can flip with
8  me to page 2 which is --
9    A   I am there.
10    Q   Okay.  And about midway down Mr. Lindell
11  welcomes you and he states, I mean, what you showed me
12  before, I want everyone to see in this hour.
13        Do you see that?  It is line 9 of page two.
14    A   Yes.
15    Q   Okay.  And is it the case that you had
16  actually shown Mr. Lindell your analysis before taping
17  this?
18    A   So what was supposed to happen was our time
19  was from 9 to 11.  He was late.  He showed up at 10:05.
20  He walks into the studio and he has never seen any of
21  my work before and he says, all right.  Let us get
22  going here.
23        And I said, what do you want me to do?
24        He says, just start.
25        What do you mean just start?  What do I -- I



DOUGLAS GEAUWANNA FRANK                                    July 19, 2023
Smartmatic USA Corp. vs Michael J. Lindell                 105—108

Page 105

1  have not even shown you any of my work yet. Where I do
2  start?
3        He said, whatever you have got, just show
4  me.
5        So the day before Monday when I had been
6  there with other people I had been working on a short
7  presentation for a private group of people in Ohio that
8  I was using as my soundingboard because my presentations
9  tend to be too technical. And so I was coming up with
10 the simple presentation that people could understand.
11       And so I just said, well, this is what I
12 got. This is what I was working on. So I just started
13 showing it to him. After five minutes he said, stop
14 everything. Delete the tapes. We are starting over.
15 We are going to do a whole documentary just on
16 Dr. Frank.
17       So that is what he means when he says, what
18 you showed me before. He is talking about literally
19 minutes before that I had just shown him.
20    Q   Okay. So you had shown him before, but five
21 minutes before?
22    A   Five minutes before.
23    Q   Okay. Okay. That was a portion of the
24 tape, right, that did not get published, that first five
25 minutes?

Page 106

1    A   It got all erased, yes.
2    Q   I want to followup on one thing you said.
3        You said that you had been working with this
4  private group of people in Ohio trying to make it --
5    A   Dumb.
6    Q   Who was in that group of people?
7    A   A bunch of super moms that I met during
8  COVID.
9    Q   Do you recall their names?
10   A   No.
11   Q   Okay. So let's go to the bottom of page 3
12 of the transcript. And here you state, I found with the
13 algorithms that control how many registrations and how
14 many ballots you need in every county to control an
15 election. That is what I figured out and it is
16 widespread. It is in every state that I have checked so
17 far and it is magnificent party per million detail. So
18 I know it is not an accident. It has to be done by an
19 algorithm.
20       Do you see that?
21   A   Yes.
22   Q   At that point in time of the taping in early
23 March of 2021, how many different states' data had you
24 analyzed?
25   A   Pennsylvania, Ohio, Florida, North

Page 107

1  Carolina, Colorado.
2    Q   And does that include states won by Former
3  President Trump?
4    A   Florida.
5    Q   Did you find it curious at all that you were
6  reaching the same conclusions in every state you
7  analyzed regardless of who won?
8    A   Very.
9    Q   And when you say "very," were you concerned
10 by that at all?
11   A   Yes.
12   Q   What was the reason for your concern?
13   A   Because I am a scientist and I am looking
14 for controls, and I am trying to find an election that
15 I cannot predict.
16   Q   And have you ever found a state election
17 that you were not able to predict?
18   A   State election?
19   Q   Not state election. A state in the 2020
20 presidential election that you were not able to predict.
21   A   We need to be more specific. What am I
22 predicting?
23   Q   Where you ran your analysis, your voter
24 analysis? And we will get into the substance of that --
25   A   Yes. Yes.

Page 108

1    Q   -- but the 6th degree polynomial --
2    A   That is one.
3    Q   -- analysis that you have done and you have
4  been unable to predict what the votes would be?
5    A   There are, because I do that at a county
6  level, I do not predict the state. I predict the
7  counties within a state. And in some cases I can
8  predict it down to the precinct level. So I have
9  done -- at that point I had not yet found a place. I
10 could not predict.
11   Q   And have you found a place since?
12   A   Since, yes.
13   Q   And what place is that?
14   A   For example, there is several counties in
15 Montana that I cannot predict, for example. There are
16 other types of data that I can tease out.
17       For example, I cannot predict who votes in
18 person or the rates of turnouts on people that vote in
19 person. But I can predict the total when you add the in
20 person with the mail in ballot, I can predict that
21 perfectly. I cannot predict who votes in person.
22   Q   Okay. So at that time there had not been a
23 state that you analyzed that you had not been able to
24 predict?
25   A   Correct.



Page 109

1    Q    And that was concerning to you because you
2    are trying to find a control that is something that is
3    not predictable, right?
4    A    Yes.  At that time I did not, I did not
5    appreciate yet, I mean, I am just going to confess, I
6    was thinking Republicans good, Democrats bad.  How come
7    I can predict all the Republican states?  I should not
8    be able to do that.
9    Q    And were you comfortable though providing
10   this analysis and this publication even though you were
11   not sure that it can make sense because you can predict
12   every state that you looked at, correct?
13   A    I am comfortable in the analysis.  The
14   analysis is, is anyone can reproduce it and there it
15   is.  And it is -- I use the phrase, that ain't natural,
16   buddy.  That cannot happen naturally.
17   Q    What made you comfortable saying that this
18   was evidence of fraud insofar as you did not have a
19   control that you could not predict at the time?
20   A    If I give you a die, a 20-sided die and I
21   have you roll it 83 times and you get a series of
22   numbers, and then you hand that die to this attorney
23   and he rolls it 83 times and he gets the same 83
24   numbers in the same order, you are going to be very
25   comfortable saying, that ain't natural, buddy.  There

Page 110

1    is something wrong.  This is something wrong here.  You
2    don't have to have a control in that case.  You already
3    know there is something wrong.
4         Now, what is wrong, we have to figure out,
5    and that's a more in-depth discussion.  But at least at
6    that point you can confidently say something is wrong
7    with that die.
8    Q    And you can confidently say there has to be
9    an algorithm controlling the election?
10   A    Yes, because it is the same, the 83 times
11   rolling the die is the same statistics as that.
12   Q    And it is not, it could not be that the
13   analysis is showing results that would just be normal
14   and expected and not fraudulent?
15   A    It could not be by any statistical valid
16   conclusion.  You walk into one county and you roll the
17   die 83 times and now every other county you walk into
18   it is the same 83 numbers.  That alone is highly
19   suspicious.
20        And then you walk to a different state and
21   the first county you come into you roll the die 83 times
22   and it is a new set of numbers, but it is the same in
23   every county in that state.
24        Then you go to another state and you roll
25   the die 83 times and it is a new set of 83 numbers that

Page 111

1    is the same in every county in that state.
2         That is highly suspicious and what it
3    suggests is that there is a central algorithm in each
4    state.
5    Q    And at that time you were not concerned that
6    there was no way to show what this algorithm, where it
7    came from or how it got in or how it would impact the
8    elections?
9         It is a purely theoretical analysis at that
10   point in time in your mind; is that fair?
11   A    No.  No, because using the same mathematics
12   I was able to predict the outcome of the canvassing
13   that they did on the ground.  And the simple
14   methodology of just walking into any state and
15   analyzing one county and then being able to predict all
16   the rest, very suspicious.
17   Q    So your analysis was not relying on anything
18   other than your own math?
19   A    Just the math.
20   Q    So I want to move a little further down on
21   page 4 of the transcript.  And Mr. Lindell says, it
22   starts at line 6, he says -- well, first, I guess at
23   line 4, he says, Right, it cannot be done by humans?
24   You say, it could not be done.
25        Mr. Lindell states, I want everybody to know

Page 112

1    that, but what you are going to see is impossible to be
2    done by humans; it had to be done by machines, i.e.
3    computers, and they had to be online?
4         You say, Absolutely, the whole time you have
5    to beforehand, during and after.
6         Do you see that?
7    A    Yes.
8    Q    And does this look like an accurate
9    transcription of what you would have said?  I am sorry.
10   You have to answer verbally.
11   A    I am sorry.  Yes.  I gave you the okay
12   sign.  My bad.
13   Q    Is it your position then in order for your
14   theory to work in practice all of the machines have to
15   be online?
16   A    I disagree with that question.  What do you
17   mean by theory?
18   Q    Your analysis, your 6th degree key, your
19   opinions that the election must have been rigged and
20   manipulated and you found the key to show how it was
21   done, that is reliance --
22   A    Did I say rigged and manipulated?  You said
23   that.  I didn't say that.
24   Q    So you are not of the opinion that the
25   election was manipulated?



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
113–116

Page 113

1    A    I said it could not have come out
2  naturally, what we are seeing.  That is what I said.
3    Q    Okay.  So you are not of the opinion that
4  the election was manipulated?
5    A    Oh, it was manipulated.  That is my
6  opinion, but that is not what that analysis.  I am
7  being careful.  I am a scientist.
8    Q    Okay.
9    A    This shows something unnatural is going on.
10    Q    Do you have a theory or do you have an
11  opinion about how the unnatural mathematical occurrences
12  that you have discovered would have been implemented
13  into the actual November 2020 election?
14    A    Certainly, which we proved extensively in
15  Pennsylvania with electronic logs and with paper
16  canvassing.  And basically what is happening is in real
17  time nefarious actors know the status of the election
18  and they stuff ballots to obtain the outcome they want.
19    Q    And for that to occur the machines have to
20  be online?
21    A    For it to occur in such a predictable way
22  you have to have what is called a feedback loop.  You
23  have to know where you stand in order to get it to come
24  out that way.
25    Q    So yes?

Page 114

1    A    Yes.
2    Q    Okay.  And this has to be, they have to be
3  online getting that feedback loop before the election,
4  correct?
5    A    Before, during and after.
6    Q    Before, during and after, right.
7         And for this to occur in the way that you
8  have seen and the data that you have analyzed for maybe
9  everywhere except a few counties in Montana, every
10  machine in every county in every state would have to be
11  online; is that right?
12    A    No.
13    Q    Okay.  How so is that wrong?
14    A    I am a scientist.  Every is too big of a
15  word.
16    Q    The majority?
17    A    We have to define what we mean by machines
18  too because when I give my presentations, I talk about
19  12 different machines.  There is EMS.  There is
20  scanners.  There is tabulators.  There is poll books.
21  There is check-in devices.  There is ballot marking
22  devices.  There are a dozen different systems that are
23  integrated in the election, and any one of them could
24  be online and it would not have to be just the
25  tabulator.  It would not have to be every one of those

Page 115

1  machines.  Any one could be online and that would
2  provide sufficient information.
3    Q    Any one machine in each precinct or any one
4  machine in each state?  What do you mean by any one
5  machine?
6    A    So, for example, right now states centrally
7  monitor and control their elections, voter rolls.  So
8  at a poll book, when you walk into the precinct to
9  vote, not all people do this, some use mail, if you
10  walk into a precinct to vote and you check in, that
11  poll book is online and it is recorded and within
12  minutes the entire state knows every person who has
13  voted.  That is a state network system.
14         Okay.  So that's information already you
15  have.  You don't necessarily know how that person voted
16  yet, but say that -- you say that you know that that
17  person is a Republican, then it is likely they are going
18  to vote for Trump and not Hillary or Biden.
19         So you can make a reasonable guess what the
20  tally was even at that point.  You would not have to
21  have the rest of the machines online.
22         However, we have since shown that many of
23  the machines have modems in them that are -- even the
24  scanners.  Like the Antrim Michigan case that you
25  brought up, the ES&S, DS200 has a telemodem in it.  It

Page 116

1  calls the cell tower.  So it can report in real time
2  what the tallies are.
3         So my point is, there are multiple leaks,
4  multiple locations where leaks could happen.  It does
5  not just have to be -- I am a computer guy.  I build all
6  kinds of computers.  To me they are machines.  People do
7  not always think of a computer as a machine.  I do.  So
8  it depends on what you mean by a machine.  So I think
9  that I tried to elaborate that to understand your
10  question a little bit.
11    Q    Sure.  So what I am trying to understand is
12  in your scenario that you gave me, the example, the poll
13  book is online?
14    A    Yes.
15    Q    And so therefore the nefarious actor can
16  know if a registered Republican came in, how they are
17  likely to vote?
18    A    Yes.
19    Q    Now, would the voting machine or the
20  tabulator or tally machine have to be online to know
21  what, to get that feedback and say, hey, I have to
22  change this, I have to put this extra vote in because
23  the Republican voter showed up to vote?
24    A    My experience has been that we have very
25  limited evidence in that category.  So I don't like to



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
117–120

Page 117

1  make conclusions in that category because I base my
2  opinions on evidence.
3        I think in the Antrim, Michigan case when
4  they did the recount, they showed that the machines
5  miscounted those ballots.  That is a fact.  That is
6  evidence.
7        But do I have evidence that the Antrim
8  machine was reporting tallying real time?  No, I don't
9  have that.
10        However, Mr. Lindell's PCAPs alluded to
11  that.  That is why I was so excited during scientific
12  Proof because at that point I am like, why can I predict
13  this everywhere?
14        And then Mr. Lindell says, guess what?  I
15  have recordings connecting all the elections in the
16  whole country.
17        Oh, that is how this could be.  Everything
18  is integrated.  Okay.  At that point I am still new.
19  Most of my work has been not in the machine, quote,
20  unquote side, but in the rolls side.  Machines seems to
21  be Mr. Lindell's primary.
22        So, for me, I was trying to explain, how
23  could this happen?  So I was designing experiments to
24  test that.  And the fact that the machines are online is
25  pretty helpful to my hypothesis at the time.

Page 118

1        Q    Okay.  And so the PCAP data is very
2  important to your analysis to show how it can be
3  implemented?
4        A    No.  No, I don't think it is very
5  important.  It is just at the time it was, oh, I see
6  how this could be.  If you follow my work today, that
7  is not -- I almost never discuss them.
8        Q    The PCAP data?
9        A    Right.  So they must not be very important
10  to me.
11        Q    So other than the PCAP data, do you have any
12  evidence that the poll books, the ballot marking
13  devices, the electronic voting machines, the tabulators
14  were actually online in any of the states that you have
15  analyzed?
16        A    Yes.
17        Q    What is that evidence?
18        A    This is touchy.  I will discuss two
19  publications.  Is that okay?  I don't know if I am
20  allowed to discuss some of the other because there is
21  whistleblower stuff.
22        Q    I can let you consult with your attorney and
23  then we can have a discussion about that, but I would
24  ask for all the information.
25        MR. GREENE:  Yes.  We can maybe go off the

Page 119

1  record first and we will chat.
2        MR. FREY:  Sure.
3        A    I made commitments to people.
4        THE VIDEOGRAPHER:  The time is 12:10 and we
5  are off the record.
6        (Recess was taken.)
7        THE VIDEOGRAPHER:  The time is 12:27 p.m.
8  We are on the record.
9        Q    Okay.  Mr. Frank, we went off the record
10  after I asked you about evidence that you have that
11  machines were online during the election.
12        I know you wanted to consult with your
13  attorney briefly just to make sure that it was okay to
14  answer those questions, and I believe you are prepared
15  to answer those questions now, correct?
16        A    Yes.
17        Q    Okay.  So I will repeat it for the record.
18        So I had asked, other than PCAP data, do you
19  have any evidence that the poll books, the ballot
20  marking devices, the electronic voting machines or the
21  tabulators were actually online in any of the states
22  that you have analyzed?
23        A    A certain -- let us separate that a little
24  bit.  Poll books everybody admits is online.  That is
25  an easy one to answer.

Page 120

1        The question that people argue about is
2  whether the scanners, like the DS200, and we have
3  evidence that they have modems but the question is, are
4  they online?  So everybody was asking that question.
5        My focus was on the poll books but people
6  were saying the machines are online, Dr. Frank.  Mike
7  Lindell says they are online.  We can prove that.  We
8  have ways of proving that.  One way is we can log into a
9  machine during an election.
10        So I introduced somebody to a local person
11  in Ohio.  And during Lake County's election he logged
12  into their machines and he could show that people were
13  playing solitaire.  The machines were connected.  The
14  machines were connected via Bluetooth.
15        Q    Let me stop you there for a second.
16        So this Lake County election in Ohio, when
17  was that election?
18        A    I think it was May.  I want to say May or
19  June of 2021.  I am not sure.
20        Q    It was not the November 2020 election?
21        A    No.  No, it was showing machines could go
22  online and were online during an election.
23        Q    He said that he logged into their machines
24  and he could see that people were playing solitaire and
25  the machines were connected?



Page 121

1    A   Yes.
2    Q   So he was he looking into just the poll
3    workers' computers?
4    A   The machines were connected via Bluetooth.
5    The scanning machines were connected via Bluetooth to
6    the EMS.  So he was able to get to all of it.
7    Q   So he was able to get into the EMS showing
8    the workers playing solitaire, correct?
9    A   Yes.
10   Q   And then he was able to get from there into
11   the scanners?
12   A   Yes.
13   Q   Okay.
14   A   And they were connected via Bluetooth.  So
15   that would be evidence not of the 2020 election, but
16   that would be evidence that the machines could go
17   online.
18       So you were asking me, do you have evidence
19   that the machines could go online during election?  Yes,
20   we do.
21       Now, if you watch the movie Absolute
22   Interference, Mike has recordings given to him by a
23   person interviewed on Absolute Interference who I have
24   personally spoken to and personally seen the recordings.
25   It is described in Absolute Interference.

Page 122

1        He is a person installing, a person
2    installing 5G in Georgia during the election.  He, when
3    he installs 5G, he looks and says, it is working
4    properly?  And he noticed all these communications
5    coming from the polling places.
6        So he said, that is not supposed to be
7    happening.  So he went to Micro Center and he bought, I
8    think it is five Raspberry Pis.  They are like miniature
9    computers the size of your phone.  He set up recording
10   devices and he recorded the runoffs.  So that is part of
11   the 2020 election.  He recorded in five precincts
12   actual, the elections actually taking, during the actual
13   election the machines, the voting machines, the things
14   people are putting ballots through actually reporting
15   tallies in real time.
16       I have seen that with my own eyes.  So I
17   know that is another piece of evidence that the machines
18   are online during the elections.  So that would be
19   another example.
20   Q   So let me talk to you a little bit about
21   that one.
22       Who is this person who was recorded on
23   Absolute Interference?
24   A   I don't recall his name, but I sat
25   across -- remember we were talking about Sunday night

Page 123

1    and the party.  Well, after we were goofing off for two
2    and a half hours, I separated from Mike and sat with
3    this kid for 30 minutes and we peaked out at a table
4    together with all of his equipment.  It was a lot of
5    fun, you know.
6    Q   This was in the Georgia runoff election that
7    he did this?
8    A   Yes.  He witnessed it in the 2020 general
9    and then he recorded it in the 2020.
10   Q   And then did he show anyone, other than you,
11   this recording?
12   A   Of course.
13   Q   Who else did he show it to?
14   A   Mike, several other technical people and
15   that is why Mike made a movie about it, Absolute
16   Interference.  It is like the last 20 minutes of
17   Absolute Interference.
18   Q   And does he still have these recordings?
19   A   I don't know.  I have not spoken to him
20   since.
21   Q   Do you know whether he has gone forward in
22   Georgia with these recordings?
23   A   I have no idea.
24   Q   Do you know whether a state attorney general
25   or a state prosecutor or a state legislature has ever

Page 124

1    done anything with these?
2    A   I am unaware.
3    Q   Back to the Ohio one.  Who was it that was
4    able to log into the machine?
5    A   Mr. Hayes.
6    Q   Conan?
7    A   Yes. C-o-n-a-n.
8    Q   Anything else?
9    A   I think that I answered your question.
10   Your question was, do I have evidence that the machines
11   can go online during the election?  I just gave you
12   three examples.
13   Q   I was asking if there are any more examples
14   that you have.
15   A   Another example is from Mr. Lindell' PCAPs
16   you can acquire the user names and passwords that were
17   being used during the 2020 election, and I have
18   presented those to multiple counties around the
19   country.  They come in and they say, how can we prove
20   our machines were online, Dr. Frank?  Well, here is the
21   log-in for your machine.
22       Where did you get that?  It comes from the
23   PCAPs I am told.  So that is evidence that their
24   machines were able to be online.
25   Q   You have not seen that yourself?



Page 125

1    A    Seen what?
2    Q    The evidence in the PCAPs.
3    A    I am not allowed to look at that, no.
4    Q    Why weren't you allowed to look at the
5    PCAPs?
6    A    My understanding is there are natural
7    security issues that require certain levels of
8    clearance which I do not have.
9    Q    Who made the determination that there are
10    national security issues with you looking at the PCAPs?
11    A    I don't know who made that determination.
12    Q    Who told you that determination, that there
13    were national security issues, that you were not allowed
14    to look at the PCAPs?
15    A    A couple of people.  I was at the -- it is
16    not directly told to me.  It is surrounding the cyber
17    Symposium.  It is why can't we just give them the
18    PCAPs?  Well, because they contain national security
19    information.
20        So what we have done is we put together a
21    team of people who have extracted some of it and cleaned
22    out the sensitive stuff and we are giving them that
23    remainder.  So that is my implication.  Nobody said to
24    me, you do not have a clearance.  You cannot see it.
25    They said to me, I have been in the discussion, this is

Page 126

1    why we are doing what we were doing.
2    Q    Who is leading that discussion?  Who is
3    telling you this is why we are doing what we are doing?
4    A    That would have been at the red team
5    meeting at the cyber Symposium.  That would have been
6    with Phil Waldron and several of the participants.
7    Q    So is it your understanding then that
8    Colonel Waldron and other people on the red team are the
9    ones making the determination that there is a national
10    security issue with them releasing this information to
11    you?
12    A    Yes.  He even spoke in public on Thursday
13    morning in front of the whole crowd.  He said, so this
14    is public, he said, we are going to be submitting this
15    as part of the cyber Security Act of 2015 which Obama
16    established by Executive Order which allows anybody to
17    put any type of data into evidence no matter how they
18    got it and what the sources were.  That is important
19    because you are in possession of classified information
20    and you do not want to be prosecuted.  So it allows you
21    to put data into evidence without being prosecuted.
22    Q    And is it your understanding then that
23    Colonel Waldron is the one who made the determination
24    about who could and could not see it?
25    A    I was not privy to those discussions.

Page 127

1    Q    And do you have any reason to believe that
2    the determination of who has the proper clearance to see
3    the actual PCAP data was made by an actual government
4    official?
5    A    My understanding is that people have
6    clearances and federal contracts which allow them to
7    have access.
8    Q    So is it your understanding everyone on the
9    red team has those clearances?
10    A    No, not everyone.
11    Q    Who on the red team do you understand to
12    have those clearances?
13    A    Colonel Waldron and Conan at least.  There
14    are probably more.  This is like a need to know thing,
15    so we are careful to not talk about stuff.
16    Q    So do you understand it is a need to know
17    thing as determined by Colonel Waldron I suppose?
18    A    It is just the way that we work.  We are
19    protecting each other.
20    Q    And, to your knowledge, who has actually
21    seen the full actual PCAP data not with information
22    removed from it?
23    A    I would have to speculate.
24    Q    Please do.
25    A    Well, I know several people that have

Page 128

1    worked on this data and prepared data for the cyber
2    Symposium, and I can say at least three people.
3    Q    Who are they?
4    A    That would be Conan, Josh and Phil Waldron
5    and Todd.
6    Q    Todd Sanders?
7    A    Yes, but I could be wrong.  Mike has made
8    it, many public statements saying that they had teams
9    of experts looking at the data.
10    Q    And do you know or are you aware of the
11    statements that Mr. Josh Merritt has made about the PCAP
12    data?
13    A    Probably not.  I mean, he made public
14    statements that were published in a newspaper while we
15    were at the Cyber Symposium.  I am aware of the Pete
16    Santilli interview that came afterward.  I am the one
17    that gave it to Mike, the interview.  So I am aware of
18    those things, but that is the extent.  That is the last
19    that I ever wanted to meet with the gentleman,
20    Mr. Merritt.
21    Q    Why is that?
22    A    Because we saw him as a trader.
23    Q    And that is because he went public saying
24    that what the PCAP data purports to be is not?
25    A    No.  No.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
129–132

Page 129

1  Q   So why did you see him as a trader?
2  A   He is a mole.  He was there to try to
3  undermine what Mike was doing.  He had spoken in
4  advance to newspapers and they had pre-written articles
5  which, when they published them on Wednesday, they were
6  wrong because they had been pre-written and we had
7  changed the format of the cyber Symposium, and they
8  matched the original format of the cyber Symposium so
9  we knew that he had been working in collusion earlier
10 with newspapers.  He confirmed much of that in his
11 interview with Pete Santilli.
12     Q   And the way that you know that he was a mole
13 giving prerecorded or pre-written interviews is because
14 of the content of the articles?
15     A   Yes.
16     Q   Any other reason?
17     A   I talked to the reporter.  I stood there
18 and talked to the reporter and I said, this is a really
19 poorly written article.  It is not even correct.  The
20 first paragraph had multiple errors in it.  I was like,
21 who told you this?  Who told you this?  Who told you
22 this?
23        Then he did not have to hide anything
24 because then the next paragraph, it says, in interviews
25 with Josh Merritt.  In other words, it is public.

Page 130

1  Q   Who was the reporter?
2  A   I don't recall.  You can look it up.  It is
3  a newspaper article.
4  Q   When did you speak with him?
5  A   Wednesday morning of the cyber Symposium I
6  was called off stage to speak with him.
7  Q   Was anyone else there?
8  A   Kurt and Phil Waldron.  The four of us
9  stood in a circle.  They were mostly listening to me
10 discussing it with, I think it was the Washington Post
11 or Washington Times.  I never remember.  It is one of
12 those.
13     Q   So, circling back, after you recorded
14 Scientific Proof --
15     A   Yes.
16     Q   -- you also recorded Absolute Interference,
17 correct?
18     A   No, it was in the same recording session.
19     Q   Okay.  That is what I wanted to clear up
20 today, because I have not been able to tell.
21        So the same day in that ten to one time
22 frame you recorded both of those segments?
23     A   Three and a half hours of film which was
24 edited down to one hour of Scientific Proof and another
25 30 minutes or so was put into Absolute Interference.

Page 131

1  Q   Okay.  And so then knowing that, that
2  alleviates some of my questions which are, who asked you
3  to appear?  What did you talk about?
4        Those are all the same, it is all the same
5  lead-up to the filming where you spoke with Mr. Olsen
6  and then you had the zoom meeting with the attorneys,
7  you had the dinner at which point you spoke with
8  Mr. Lindell but not about the content, and then you went
9  to film; that is the lead-up to both of those
10 recordings?
11     A   Correct.
12     Q   Okay.  All right.  So let's look briefly at
13 the transcript of that recording.
14     A   Interference?
15     Q   Interference, yes.  This was previously
16 marked as Exhibit 31.
17        MR. GREENE:  Thank you.
18     Q   If you can go to page 39.  At the top of 39
19 and you can -- first of all, let me just say this was
20 previously marked as Exhibit 31.  It is the transcript
21 of Absolute Interference that was attached to
22 Smartmatic's complaint in this matter.
23        Do you recognize this document?  Have you
24 seen this document before?
25     A   It looks familiar.

Page 132

1        MR. GREENE:  Again, same objection as the
2  prior transcript.  Go ahead.
3     Q   So on pages 38 and 39 of this transcript,
4  you are discussing phantom voters that you discovered.
5  And if you flip over then Mr. Lindell says, Right, so
6  they are using people that do not exist but they are
7  registering them to use for their algorithms in the
8  machine?
9        You respond, Exactly because, yeah, if you
10 think about it, after the election, what if the election
11 is challenged?  Somebody is going to count ballots.  You
12 better have registrations and you better have ballots.
13        Do you see that?
14     A   Yes.
15     Q   I am trying to understand your mechanism
16 here for how the registrations and the ballots get in.
17        And is it fair to say that what you are
18 saying here is not only do the voting machines register
19 these fake votes according to the algorithm, but that
20 the actual physical ballots also need to be delivered in
21 the event that there is a challenge to the election?
22     A   Yes.
23     Q   And so would the actual paper ballots then
24 need to be delivered to the election precincts?
25     A   The problem is you are generalizing and it




DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
133—136

Page 133

1  is not the same everywhere.  In Antrim, Michigan the
2  machines flipped ballots.
3      Q   So in Antrim, Michigan you are saying the
4  actual ballot was just printed by the machine and did
5  not need to be delivered?
6      A   The recount did not work.  The machine
7  screwed up the election.  That is provable.  It was
8  proven in court.  The recount showed the machine count
9  did not match the hand count.
10      Q   Right.  Before the hand count, they had
11  actual physical ballots?
12      A   It did not match the machines.
13      Q   So the actual physical ballots not in -- in
14  Michigan, the actual physical ballots you are saying
15  were the actual ballots that were voted on on that day
16  and the machine count was off?
17      A   And they proved that with the recount.
18      Q   I am not going to get -- I know there is a
19  whole history of the Antrim County litigation and they
20  did discover errors and they found it was a mistake.
21  You will probably dispute that.
22          Setting that aside, let us say there is an
23  election where the ballots are printed by a ballot
24  marking device and then they are tallied by the vote
25  tabulator.  So you have the tally of the machine and you

Page 134

1  have actual physical ballots, right?
2      A   Yes, but you are generalizing again.
3  Because, for example, in the Dr. Sheila case they
4  showed that every fourth image that the machine scanned
5  was a copy of a former image.  So the machine was doing
6  something separate.
7      Q   So the machines are doing something, in your
8  theory the machines are doing something per this
9  algorithm, correct?
10      A   No, it has nothing to do with my algorithm.
11  It has to do with the machine making copies, and that
12  was proven in court that that happened.  The Antrim,
13  Michigan thing had nothing to do with my algorithm.  It
14  had to do with the machines were incorrectly tallying
15  the ballots.
16      Q   So in Antrim, Michigan and in the Dr. Sheila
17  case the machines are incorrectly counting ballots and
18  it has nothing to do with your algorithm for 6th degree
19  polynomial?
20      A   I didn't prove whether it did or not.
21      Q   So how does your -- maybe just explain to me
22  how your 6th degree polynomial theory predicts the way
23  that the elections are going to come out and actually
24  makes that happen in practice?
25      A   So if I give you the die that has 20 sides

Page 135

1  on it, can I predict the 83 numbers you are going to
2  get?  No.  So we have to distinguish what you mean by
3  prediction.
4          However, if you go into one county and roll
5  it 83 times, now you have a set of numbers.  Using that
6  set of numbers, you can predict it in all the other
7  counties.
8          Do you understand that that is not a
9  prediction in the same way that most people think of a
10  prediction.  That is just me saying, look, it is the
11  same in all the counties.  How I do know?  I can predict
12  it now in all the other counties.  The point is it is
13  the same in all the counties.
14      Q   The way that your analysis comes out it has
15  the same numbers for all the counties in a state, right?
16      A   Yes.
17      Q   Okay.  What I am trying to understand is, in
18  your opinion, how is that actually implemented in the
19  election?
20      A   Yes, and there is more than one way.  It
21  could happen in a machine that the algorithm could
22  reside in the scanner.  The algorithm could reside in
23  the tabulator.  The algorithm could reside in the EMS.
24          The algorithm could -- there might not even
25  be an algorithm onboard anywhere.  It might just be

Page 136

1  someone act in and made it happen according to an
2  algorithm somewhere external.
3          The key element is not where does the
4  algorithm reside.  The key element is the fact that you
5  have connectivity.  So you have access to make sure that
6  things come out right.  There is no other way by natural
7  phenomenon it can work this way.  That is the point of
8  the statistics.  The statistics particulars make it
9  impossible.
10      Q   So the statistics show one thing and you are
11  saying the way that it actually happens could be --
12      A   A variety.
13      Q   -- a variety of different ways?
14      A   Yes.
15      Q   And you have no opinion on the way that
16  those are?
17      A   Yes, I have several -- we have proven
18  several of those.
19          For example, when the election turned off on
20  election night, suddenly around 150,000 new ballots got
21  added to the Michigan election.  And then, when we asked
22  the Secretary of State for the list of the names that
23  went with that, she did not provide them.  Okay.
24          Well, we would have gone and knocked on the
25  doors and proven that those were not real voters.  So



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
137–140

1    that is something that took place in the machines on
2    election night.
3         In Pennsylvania we proved in Montgomery
4    County alone 75,000 of the ballots that they tallied had
5    been stuffed. It was not the machines changing. It was
6    the machines informing how many ballots we needed. Oh,
7    we are behind. Better stuff more ballots.
8         Q    So that then every state to you or every
9    county or every precinct might accomplish this
10   differently and you have found several examples but they
11   could all do their own things? They could all implement
12   this in their own way?
13        A    Yes. Simple, simple ways. You know, when
14   the movie 2,000meals shows people stuffing ballots.
15   Well, where did they get those ballots? Who decided
16   which ballots to stuff for which names? Somebody on
17   the outside is deciding what is happening and they need
18   recognizance in order to know what to do.
19        It would be a mistake if Doug Frank had
20   already voted in the election for them to try to stuff
21   another ballot for Doug Frank because that ballot would
22   be rejected.
23        However, if they have access to the voter
24   rolls, they will know, hey, Doug Frank has not yet
25   voted. We will stuff a ballot for him.

1         Q    So is it your opinion then that there is
2    someone in each state who is deciding how they are going
3    to implement this process to use the key to make sure
4    the election comes out as they would like?
5         A    No. No. I could do the whole country
6    myself from my basement in Ohio. One person could do
7    it. That is the nice thing about computer programs,
8    they are very powerful. You have to plant them in the
9    right places.
10        Q    And you would say, okay, in Michigan, in
11   Antrim County do it X way and in Pennsylvania do it Y
12   way, in Florida do it Z way and they are all going to be
13   different ways, but I am going to decide for each place
14   in each county how I want do it; is that fair?
15        A    That is fair. And it makes sense too
16   because different places have different machines and
17   different infrastructure and different voter roll
18   controls, and it makes sense you would design a custom
19   strategy for each region depending on the vendor, the
20   election vendor.
21        For example, in California there are four
22   different vendors. Dominion, ESNS, Hart and Smartmatic.
23   Okay. Well, what if Smartmatic machines are different
24   than Dominion machines? Well, then you might need to
25   have a different strategy for those different counties.

1    So it is perfectly reasonable that you would do that.
2         Q    Okay. And would you -- so in Antrim County
3    there was a hand count that got the actual result,
4    right?
5         A    Yes.
6         Q    So would you expect if there were
7    manipulated ballots, fake ballots, whatever term you
8    want to use, in other states, that an audit of those
9    actual physical ballots to the machine tallies would
10   demonstrate that there was evidence of fraud?
11        A    I don't make that claim. The claim that I
12   make with my audiences I say, since we know this
13   happened here, here and here, and since you no longer
14   trust the machines, why don't we do a recount of the
15   ballots and find out?
16        However, most states will not let you do
17   that without court order and whatnot. So then the
18   people feel like, well, we are being blocked from being
19   able to verify our own election. So it is about trust.
20   It is not as much about whether there was fraud in your
21   election in particular. We want to trust our systems,
22   and they had not let us look so we don't trust them
23   anymore.
24        So that is typically my message. My message
25   is not you need to get a recount. That is not my

1    message. Listen to my talks. I have hundreds of them.
2    I discourage people from getting recounts.
3         Q    But what I am asking is, if there was an
4    audit comparing the physical ballots to the machine
5    count, there is a percentage audit of the ballots, would
6    you expect there to be discrepancies shown if the
7    machines in whatever manner are manipulating the ballots
8    according to the key to get the desired result?
9         A    That is too general of a statement for me.
10   In some cases I would expect there to be a discrepancy.
11   In most cases I would not, which is why I discourage
12   people from doing recounts.
13        Q    And why not?
14        A    Because I don't think that machine
15   manipulation is the primary mechanism of fraud. I
16   think ballot stuffing is the primary mechanism of the
17   fraud enabled by machine information.
18        Q    And by ballot stuffing you mean people
19   actually delivering fake ballots?
20        A    Hard copy ballots.
21        Q    Hard copy of fake ballots?
22        A    Yes.
23        Q    Okay.
24        A    Which we have evidence for.
25        Q    So, in your mind, that is more of the issue



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
141–144

Page 141

1  than the machines, is that hand stuffing of fake
2  ballots?
3      A    Well, that is sort of like you need the
4  intelligence.  The way they used to stuff elections is
5  they used to park people in the parking lot and
6  counting people going in and reporting back and saying,
7  hey, the turnout is good in precinct A.  We need more
8  voters.  They would go out and roundup voters or
9  ballots.
10          But now you don't have to do because the
11  machines are online and everything is being reported.
12  So now it is still ballot stuffing is the primary
13  mechanism, which is why, for example, in Pennsylvania
14  when they certified the election, they had seven 65,000
15  or so more ballots than they had voters.  Okay.  That is
16  it stuffing and which is why they catch a guy driving
17  200,000 ballots from New York to Pennsylvania, which is
18  why you have 2,000 mules people putting ballots in.
19  That it proveable and showable.  You know, when you do a
20  recount, it comes out right.  I always tell people, it
21  does not matter how many times you count the cash in the
22  register.  What matters is how many of the bills are
23  counterfeit.
24      Q    Okay.  And so you have given a few examples
25  of that, but your theory or your opinion is that is

Page 142

1  happening all over the country, in every state and we
2  just only found certain handful of instances of people
3  delivering fake ballots, having a truck, whatever it is
4  that you are claiming?
5      A    You say a few, but everywhere I go we find
6  it.
7      Q    And you have mentioned -- so you have
8  mentioned a guy driving 200 miles from New York to
9  Pennsylvania.  You mentioned in Pennsylvania when they
10  certified they had 765,000 or so more ballots.
11          What other evidence have you found?
12      A    So, for example, here is a really simple
13  one.  There are two ladies sitting at a computer in San
14  Joaquin County, California.  When we sorted the rolls
15  for them from oldest to youngest, only the people who
16  voted, and they are just looking up every one of them,
17  out of the first 2,700 people they looked up, 47 dead
18  people voted.
19      Q    Where was that at?
20      A    San Joaquin County, California where the
21  Lodi case is, where the sheriffs are hot on the trail
22  of a lot of election fraud.  Where they found him, the
23  city counsel member with 70 ballots on his table.  He
24  was stuffing his own election.
25      Q    And --

Page 143

1      A    So that is an example, a super simple
2  example.
3      Q    And your opinion is that these are all
4  coordinated though across the country by someone sitting
5  in a room?
6      A    No, that is not my opinion.  I said -- you
7  were asking, do you need someone in every state?  I
8  said no, I could do it myself from my basement in Ohio.
9  It does not take a massive conspiracy.
10      Q    But if implemented it might though, right?
11  You need the person driving the truck?  You need the
12  people delivering these fake ballots?
13      A    You need mules.
14      Q    Okay.  So when you, when Absolute
15  Interference was recorded, there is a number of speakers
16  in Absolute Interference, right, not just yourself?
17      A    Yes.
18      Q    Were you present with all of those people or
19  was it filmed in pieces and then kind of compiled
20  together?
21      A    When I went to Memphis, there were about 20
22  people there.  Ten of them were security and the other
23  ten were people being filmed, and those went into both
24  movies.  So some of them yes, and some of them no.
25          If you look, I think Absolute Interference,

Page 144

1  I do not know, it has been so long since I watched it,
2  but didn't it have General McInerney in it?
3      Q    Uh-huh.
4      A    He was there by zoom.  He was not in there
5  in person.  I did not get to meet with him in person.
6  Everybody who was there in studio, we were basically in
7  lockdown for about two and a half days.  Nobody could
8  go in or out.  They had armed men everywhere because
9  there were sensitive people there.
10      Q    Because I was just trying, I am just trying
11  to fully understand it basically.
12          When you said when you did the Scientific
13  Proof recording it was you, Brandon Howse and his son
14  and Mary Fanning and obviously Mr. Lindell.
15          And then for this Absolute Interference
16  there were more people present.  So were they in a
17  different room when you were taping Scientific Proof or
18  were these people all there as well?
19      A    So everybody was there -- I don't want to
20  say everybody in Absolute Interference because like
21  McInerney is an example.  Everybody who was live being
22  filmed was there for those two days, Monday and Tuesday
23  of that week, for filming.
24          And remember Mike's original intention was
25  to film Absolute Interference.  So he brought in



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
145–148

Page 145

1  everybody he was going to film live.  He just discovered
2  my work and said, let's do an extra one just with
3  Dr. Frank.  So he filmed with everybody, but then he
4  also released Scientific Proof next and then later.  So
5  everybody was there together.
6    Q    Okay.
7    A    Does make sense?
8    Q    That makes sense.  Not necessarily taping at
9  the same time?
10   A    No.  We had studio time.
11   Q    That is what I was trying to understand.
12        So you had different studio time for each
13  speaker?
14   A    Yes.  I was scheduled on Tuesday morning
15  from 9 to 11.  So then I had to wait and, during that
16  time I am waiting, I get to talk to all of these
17  people.
18   Q    Right.  That is when you are talking to them
19  outside the studio?
20   A    Yes.
21   Q    Okay.  Okay.  I believe so, Mike Flynn was
22  there for that?
23   A    Yes, he was.
24   Q    Did you know Mr. Flynn before you met him
25  there at Absolute Interference?

Page 146

1    A    No.
2    Q    Did you know what he was going to be
3  presenting on in the documentaries?
4    A    I didn't know what anybody was going to be
5  presenting.  I take it back.  Sunday night I met with
6  the young kid from Georgia and he showed me what he was
7  going to be talking about.  And then I was with Patrick
8  Colbeck and he told me what he was going to be showing
9  and some other people.  We talked.  So you are sitting
10 around for two days in a building, right.  You talk.
11   Q    Right.  Right.  And did you form any
12  opinions as to what Patrick Colbeck was going to talk
13  about when he told you about it?  Did you have any
14  reaction?
15   A    I didn't have any opinion, no.  I mean, he
16  is an honest guy.  He is a rocket scientist so we
17  connect on certain levels.
18   Q    I think the other person that you said was
19  the guy from Georgia I know you talked about?
20   A    Yes.
21   Q    We can circle back to it later.  Now I want
22  to talk about, we got into this a little earlier, but I
23  will tailor it, about the cyber Symposium?
24   A    Yes.
25   Q    So you attended the cyber Symposium in South

Page 147

1  Dakota in August of 2021, right?
2    A    Yes.
3    Q    And you attended all three days?
4    A    Yes.
5    Q    Okay.  Who asked you to attend the cyber
6  Symposium?
7    A    I don't remember the invitation but,
8  obviously, Mike wanted me there.  So he may have said,
9  he may have said to his assistant, call Dr. Frank and
10 invite him.  I don't remember who invited me.
11   Q    Do you remember when you were invited?
12   A    Several months in advance.
13   Q    Okay.  So you filmed Scientific Proof and
14  Absolute Interference in the beginning of March, and
15  then maybe a couple of months after that they said, hey,
16  will you come back to the cyber Symposium?
17   A    Yes.  Yes.
18   Q    And did they ask you to do anything specific
19  at the cyber Symposium?
20   A    Yes.
21   Q    What was that?
22   A    I gave a talk on the first day about an
23  hour long.  Also I was asked to be the glue between
24  highly technical talk and the general public, because I
25  understand both.

Page 148

1    Q    So you were kind of like the MC?
2    A    I was the MC.
3    Q    Okay.  Did you do any work before the cyber
4  Symposium to prepare separately than the analyses you
5  are running on the various states, which I am assuming
6  continued between March and August?
7    A    Yes.
8    Q    You continued to do that?
9        Did you select the states you were going to
10 look at on an ad hoc basis or how did you go about doing
11  that?
12   A    After Scientific Proof came out I was
13  deluged with requests for help around the country.
14  There was no way I could handle it all.  Each day I
15  would look at the stack what do I do now?  How do I
16  decide?  It seemed like whatever was the hottest thing
17  at the time and when they needed it the most, that is
18  what I jumped on next.
19   Q    It was kind of by request?
20   A    All by request, yes.
21   Q    You didn't say, hey, I want to look at the
22  state of Texas?
23   A    No.  All by request.
24   Q    Okay.  Okay.
25        Between the time of your filming of



Page 149

1  Scientific Proof and Absolute Interference and the cyber
2  Symposium, did you communicate with Mr. Lindell?
3      A   Sure.
4      Q   And how often would you communicate with
5  Mr. Lindell?
6      A   Very often.  Once or twice a week.  He
7  would call me and ask questions about states or he
8  would call and say, hey, would you look at that or
9  would you look at that?
10         I would look at different states and he
11  asked me to do work for -- he asked me to analyze
12  Georgia and he asked me to analyze Arizona.  I prepared
13  reports for those and put them up on my Rumble channel.
14  Also I gave them to, I did statistic analyses and gave
15  them to Kurt.
16     Q   So he would call you and say, hey --
17     A   You can look at this for me.
18     Q   Can you look at this state?  And you would
19  look at it and kind of deliver the results to Mr. Olsen?
20     A   Yes.
21     Q   Okay.  Anything else other than specific
22  kind of requests for work projects that he would give
23  you, anything else that you two would have discussed
24  between the cyber Symposium looking back to the filming
25  of Absolute Interference?

Page 150

1      A   Yes, because we were preparing for the
2  cyber Symposium.  And by the time the Cyber Symposium
3  had occurred, I was already working with dozens of
4  grassroots teams around the country.  They were all
5  looking forward to getting their slice of the PCAPs for
6  their county.
7          So I was writing software that enabled me to
8  quickly process the PCAP data I was given.  So I was
9  assuming, because that is what I was told, that I would
10  be given samples, cleaned versions of samples of PCAPs
11  that I could distribute.
12         So I was writing software because it was
13  going to be given to me in a format that most people
14  could not read.  I was writing software to convert it,
15  to translate it into English so they would be able to
16  read it.
17     Q   Okay.  And did you ever get those samples of
18  the PCAP data that you could convert?
19     A   I got samples ahead of the conference which
20  I based my software development on and Kurt provided
21  those to me.
22     Q   Did you then take those samples and deliver
23  them to the people who had been asking for them?
24     A   Those were my test samples.  Those were not
25  to be delivered to people.  I was expecting to go to

Page 151

1  the Cyber Symposium and then as the PCAP data was going
2  to be delivered, I had people from all over the country
3  there, I was going to be channeling data to them.  That
4  is why I needed software, because I was not going to be
5  able to do it myself.  It's too much.
6      Q   So you are working hard to get this software
7  ready?  You have a lot of people that are getting
8  excited to get this?
9      A   Exactly.
10     Q   Did you ever deliver it to them?
11     A   I was unable to deliver it to them.
12     Q   Why is that?
13     A   Because they were not given to me.  They
14  changed the strategy at the Cyber Symposium, what we
15  were going to do.  It changed from, it changed away
16  from the PCAP strategy and it moved towards the Tina
17  Peters strategy, the forensic images of her Dominion
18  machines.
19     Q   And do you know why the strategy changed?
20     A   Yes.  I was involved in all the debate and
21  discussion.
22     Q   And why did the strategy change?
23     A   We got a call from her on Monday saying
24  that it had been discovered that her, that she had
25  taken forensic images of the machines and she was being

Page 152

1  raided and all of that sort of thing.  So she was
2  wanting to come out and make it public.
3          So we stuck pretty close to the original
4  Tuesday schedule, but then that night she became public.
5  So then Wednesday, if you watch the Cyber Symposium, I
6  was on the MC most of the morning showing people the
7  forensic images before and after Dominion had come in
8  and reprogrammed their machines.  You could see that
9  they had deleted everything.  They had cleaned all the
10  old records off.  You could see the nature of the
11  previous image that they had been keeping for years and
12  years and years and years and now suddenly they delete
13  everything.  Why aren't they just doing an update?
14  Instead they did a complete purge.  So we showed that.
15  I explained that to people.
16     Q   So you had good information that you wanted
17  to share about this, but why was the decision made not
18  to deliver the PCAP data that all of these people had
19  been asking you for, that you were working hard to
20  develop software to deliver?  Why not do both?
21     A   Well, that was still the plan.  Even as of
22  Wednesday that was the plan.  But everybody was all hot
23  to trot about the forensic images.  So that was sort of
24  why that dominated Wednesday.
25         We were preparing to give, to distribute the



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
153–156

Page 153

1  PCAP data to the cyber experts who were there on
2  Thursday morning even though they were all obsessed with
3  the forensic images we were giving them.  We were still
4  going to get them.  The cyber people that were there
5  were mostly patriots wanting to help us.  They were busy
6  doing that.  But they still established another team for
7  which we were going to provide the PCAPs to.  So it was
8  less urgent for us to do that.  That is the first
9  reason.
10      The second reason is that on Wednesday might
11  Mike Lindell was assaulted and, when that happened,
12  Mr. Waldron called his sources.  And during that phone
13  call, I was in the room when that phone call happened,
14  he said that there were FBI warrants issued for our
15  arrest on Thursday morning for distributing classified
16  information.
17      Now, the plan was, we took the PCAP data and
18  cleaned out the sensitive information and gave the
19  remainder to the cyber experts.  That was the plan.
20      However, since we knew Josh Merritt was not
21  being truthful with us, we were concerned that he had
22  put sensitive data back into it or had not done his
23  portion of the cleaning that he was supposed to do.  And
24  so we were concerned that if we distributed the data on
25  Thursday morning, that we would all be guilty of

Page 154

1  distributing classified information.
2      Mr. Waldron referred to that as a poison
3  pill.  So we had been set up for a poison pill and the
4  FBI, they informed me that there were three FBI agents
5  on the floor the previous day that were ready to go.  We
6  decided if we, if we distributed that and the FBI
7  arrested everybody and took all the cyber guys'
8  computers, we would be really unpopular.
9      So we decided, and that is why on Thursday
10  morning, it is a public statement, he gave the
11  reasoning, he said, Phil Waldron got up and said, Mike
12  was assaulted last night and blah, blah, blah.  And we
13  are going to distribute -- we are going to submit them
14  in their original form to the cyber Security Act of
15  2015.
16      So that is kind of the overall logic why we
17  didn't do what we originally intended to do.  That was
18  public.  We made that public.
19      Q   And you said that you were in the room when
20  it was Mr. Olsen called and said the FBI informed --
21      A   Mr. Waldron.
22      Q   Okay.  I am sorry.
23      A   Yes.
24      Q   So you heard Mr. Waldron say that.  You did
25  not talk to the FBI?

Page 155

1      A   No, of course not.
2      Q   The FBI told Colonel Waldron?
3      A   I don't know who he talked to.  All I know
4  is that he said there are warrants out.  We are all
5  going to be arrested tomorrow morning.  We did not want
6  that.  So we did not do the thing that would cause the
7  arrest.
8      Q   I just want to understand.  Your source for
9  that information was Colonel Waldron?
10      A   Yes.
11      Q   Nothing else?
12      A   Correct.  I was in the room with him when
13  it happened.
14      Q   You were in the room when Colonel Waldron
15  shared that information?
16      A   When he made the phone call too.  It was
17  the red team room.  It was what we called the war room.
18  We managed the whole Cyber Symposium, about ten us of,
19  in the war room we called it.
20      Q   But that was the war room where Colonel
21  Waldron told you the FBI said this?
22      A   Yes.
23      Q   You were not in the room when the FBI said
24  to Colonel Waldron --
25      A   He was standing in the corner on the phone.

Page 156

1      Q   He was on the phone in the corner and you
2  heard his conversation?
3      A   Well, I was not eavesdropping.
4      Q   So you did not hear who was on the other end
5  of the line?
6      A   No.
7      Q   Okay.  Okay.
8      A   We were dealing with the fact that Mike had
9  just been assaulted.  That is what we were mostly
10  worried about.
11      Q   Sure.  Okay.  So you give a presentation on
12  the first day?
13      A   Yes.
14      Q   Of the Symposium?
15      A   Yes.
16      (Exhibit 111 was marked.)
17      Q   (BY MR. FREY)  I want to just to make the
18  record clear.  I want to hand you what will be marked as
19  Exhibit 111 which is a document you produced that has a
20  Bates stamp of DFrank_0001 or five zeros and a 1.
21      And do you recognize this document?
22      A   Yes.
23      Q   Okay.  And is this the PowerPoint
24  presentation that accompanied your speech on the first
25  day?



Page 157

1    A   I don't remember, but it looks like it.
2    Q   Okay.  I think the date is right?
3    A   It looks right to me.
4    Q   Okay.  Okay.  I just wanted to confirm that
5 that is how we found it.  It is the first three pages
6 and then it starts over again.
7    A   That is okay.  I remember, yes.  Maybe it
8 had something to do with the way I was presenting.  Go
9 ahead.
10   Q   This looks like the presentation that you
11 gave?
12   A   It does.
13   Q   Okay.  So you gave that presentation.  That
14 is where you kind of really laid out your 6th degree
15 polynomial, right, the analysis that you had been doing?
16   A   Yes.
17   Q   And then later that day you spoke on a panel
18 with Mr. Lindell, David Clemente, Patrick Colbeck; is
19 that correct?
20   A   Sounds right.
21   Q   Had you talked to the other panelists before
22 the panel about what you would be, what you each would
23 be saying in presenting that?
24   A   No.  Everything is kind of winging it.
25   Q   Okay.  Is the same thing true of the panel

Page 158

1 later that day where you spoke with Mr. Lindell and
2 Senator Sunny Barrelli?
3    A   Correct.
4    Q   Similarly, on day two of the panel or on day
5 two of the Symposium, you spoke on a panel with
6 Mr. Lindell, David Clements, Draza Smith and Seth
7 Cashel.
8        Do you recall that?
9    A   I do.
10   Q   And same question, had you guys talked
11 beforehand about what you would be discussing during the
12 panel?
13   A   No.
14   Q   Just kind of winging it?
15   A   Well, Mike might have a theme.  He might
16 say, we are going to discuss CBRs at this.  That would
17 be the extent.  So nothing substantial.  It is not like
18 we planned a strategy.
19   Q   And so by its nature then Mr. Lindell would
20 not have known beforehand what anyone was going to stay
21 during the panel, correct?
22   A   Yes, he would just get up and start asking
23 questions and he brought his experts with him.
24   Q   Okay.  Okay.
25        And same thing on day three, I believe you

Page 159

1 spoke in a panel with Colonel Waldron, Mark Cook and
2 Mr. Colbeck, correct?
3    A   It sounds familiar.
4    Q   Again --
5    A   Honestly, on all of that schedule stuff, I
6 don't know.  I am not testifying to it.  Do you
7 understand?
8    Q   I understand.
9    A   I am saying what you say sounds reasonable.
10 I would have to go check my schedule to confirm whether
11 it is right or wrong.  If you are establishing fact, I
12 would want to do that.  Round numbers, I was very
13 involved throughout and on multiple panels and in the
14 war room every night and planning the next day and that
15 sort of thing.
16   Q   Okay.  And then each of the panels were more
17 or less you knew the topic area but no pre-discussion of
18 what each person would say or how responses would be
19 given?
20   A   That's correct.
21   Q   Okay.  I am sorry.  We just covered some of
22 this earlier.  So I am just making sure that we are
23 efficient.
24        Why don't we take a quick like fill our
25 stomachs lunch break.  We can be quick about it.  Let us

Page 160

1 just go off the record.
2    A   Sure.
3        THE VIDEOGRAPHER:  The time is 1:13.  We are
4 off the record.
5        (Recess was taken.)
6        THE VIDEOGRAPHER:  The time is 1:48 p.m.  We
7 are on the record.
8    Q   Good afternoon, Dr. Frank.  I just want to
9 continue post lunch and talk a little bit more about
10 your 6th degree polynomial theory, okay?
11       So do I understand correctly that your
12 theory contains three sets of data?  For each state, on
13 a state basis there are three kind of datasets that you
14 input into your analysis; is that right?
15   A   If we are talking just about the 6th degree
16 polynomial?
17   Q   Yes.
18   A   All I do is get the voter rolls.
19   Q   Just the voter rolls?  So you don't take
20 population data?
21   A   That is not a 6th degree polynomial.
22   Q   Okay.  I am talking about your theory or
23 your graphs you have the blue line and black line and
24 red line.  What do you call that?  I do not want to call
25 it the wrong theory.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
161–164

Page 161

1    A    I don't know.  I do not call it a theory.
2   I say, here is your data.  Here is your population by
3   age.  Here who is registered by age.  Here is who voted
4   by age.
5    Q    Okay.  So there is three data points in the
6   data that you present?
7    A    Yes.
8    Q    The first is population data, right?
9    A    Yes.
10    Q    And is that taken, that is taken from the
11   2010 census; is that correct?
12    A    No, that is taken from the 2019 census.
13    Q    Okay.
14    A    What happens is the U.S. census does a
15   complete census every ten years.  Then in between they
16   do approximations of what they think it is.  And they
17   do that in five-year buckets and they check it by
18   county level.  I have checked that and they are pretty
19   good.  By coincidence, I have been using the census to
20   teach my kits statistic for decades.
21    Q    So has the 2020 census data come out yet?
22    A    Yes, but I have not used it yet.
23    Q    You still use the 2019 data?
24    A    For the 2020 election analysis, yes.  Yes.
25    Q    Okay.  And why would you use the 2020 census

Page 162

1   data for the 2020 election analysis?
2    A    It comes out a year later.
3    Q    You are still running analyses now, if I am
4   not mistaken, or maybe I am, but you are still looking
5   at state --
6    A    Yes.  But the -- I do use later census for
7   some of my other kind of graphs that I do, yes.  The
8   more current data, like when I compare the number of
9   people in the voter rolls with how many are in the
10   county, I use whatever the most current is.  But the
11   reason I stick with the 2019 stuff is because that was
12   the best available at the time.
13    Q    Okay.
14    A    So that is the best available data
15   describing what happened in that election.
16    Q    When did the 2020 census data come out?
17    A    It is like a year later.
18    Q    Sometime in 2021?
19    A    Yes.  It takes them a long time.  Even then
20   it is revised and smooshed and who knows.
21    Q    And is the 2019 census data broken down by
22   individual ages?
23    A    It is broken in five-year buckets.
24    Q    The second set of data is the voter
25   registration data, correct?

Page 163

1    A    Yes.
2    Q    Where does that data come from?
3    A    Secretary of State.
4    Q    Is that every state you can get that?
5    A    No.  Some states hide it.  In fact, after
6   the Antrim, Michigan case, the Secretary of State took
7   it down immediately so people could not request it
8   anymore because people were seeing, guess what, if you
9   have the rolls, you can do some fun stuff.  A bunch of
10   other states took it all down.
11          In Wisconsin it cost you about $30,000 to
12   get a copy of the rolls.  In Alabama Mike paid $30,000
13   to get a copy of the rolls.  Whereas in Ohio you can go
14   online right now and download it for free.  It varies.
15    Q    Okay.  And so in the states where it is more
16   difficult, you have to pay an exorbitant sum?
17    A    Yes.
18    Q    And I will not characterize it as
19   exorbitant.  A sum of money to get the data?
20    A    Yes.  It varies.  Some are $100 per county.
21   It depends.  State to state it varies.
22    Q    That data is more granular by age and
23   address and that kind of thing?
24    A    Oh, yes.  Yes.
25    Q    Okay.  The third set of data is the actual

Page 164

1   voter data from the election; is that right?
2    A    Well, like I said earlier, it depends state
3   to state.  For example, in Pennsylvania when you
4   download the file that they give you, it has already
5   merged the history with the rolls.  So, you know, it
6   will say John Smith, and it will show whether or not he
7   voted in each election.
8          If you go to Florida and download their
9   rolls, no, you download just the rolls and then you have
10   you download the voter history and then you have to do
11   the merge.
12    Q    Okay.  So it depends on state?
13    A    State to state.
14    Q    The actual kind of dataset that you are
15   looking at is the turnout, how many people turned out
16   and actually voted?
17    A    By age.
18    Q    By age?
19    A    Yes.
20    Q    Is that in five-year increments or is
21   that --
22    A    No, that is their birthday is in there.
23   Not all.  Some states just put the birth year.
24    Q    Okay.  And the voter data, the voter turnout
25   data, I know in Antrim County you used voter data from



Page 165

1  January of 2021?
2      A    That sounds right.
3      Q    In other states does that vary, the date of
4  it?
5      A    Yes, because for some states, Missouri,
6  their counties are not updated for six months after the
7  election.  So if you use the data right after the
8  election, it is incomplete and so your analyses are
9  marginal.  So sometimes I will wait until they have
10  kind of stabilized them and then I will use that data.
11     Q    Okay.  Okay.
12         So in the Antrim County case, you looked at
13  these three datasets and determined that the voter
14  registration so that is, I guess, the second of the
15  three we talked about?
16     A    The black curve.
17     Q    The black curve, was consistently near or
18  exceeding the population demographics?
19     A    Yes.
20     Q    And that's from bucket one of the census
21  data, right?
22     A    Yes.  Yes.  Yes.
23     Q    Okay.  And then you also determined, looking
24  at those three datasets, that you could predict ballot
25  turnout demographics with what you called remarkable

Page 167

1      A    That is the key.  I call that the
2  registration key.
3      Q    Okay.
4      A    There is another key.  I call it the
5  population key, but that is not a polynomial.
6      Q    So the registration key predicts turnout
7  from the registration data?
8      A    Yes.  If you know who is registered, you
9  can predict who is going to vote in every county.  No,
10  sorry. How many of every age is going to vote.
11     Q    You compare that, the actual turnout and
12  say, these are close?
13     A    Yes.
14     Q    I just want to make sure that I have it
15  right.
16     A    I use correlation coefficient so that
17  because, if you are a scientist, you can say those are
18  close.  Your idea of close and my idea of close is
19  different.  So you have to put a number on it.
20     Q    That is your R number?
21     A    That is the R.
22     Q    So your theory then is that this predicted
23  line that you have, the sixth polynomial line, right, is
24  what the key is that allows an algorithm to manipulate
25  the data and results of the election?

Page 166

1  precision, right?
2      A    Yes.
3      Q    And that's, you have developed then this
4  sixth-degree polynomial key that makes that prediction?
5      A    Yes.  Basically the key is just a
6  polynomial.  A polynomial is just a collection of
7  terms.  So it means many names, polynomial.  So it is
8  built right into Excel even.  If you have some wiggly
9  line on the screen and you want to fit an equation to
10  it, you use a polynomial.  So here is a wiggly line.
11  You put a six -- what is surprising is a sixth-order
12  polynomial always works.  That surprised me.  I would
13  not have expected that.  I would have expected there to
14  be other things that happen.
15         So I fit a sixth-order polynomial to it, and
16  that is sort of the equation that describes the 83
17  numbers and then I can predict all the other counties
18  with that.
19     Q    Then you say, look, my prediction based on
20  these, I guess, two sets of data, the population data
21  and the registration data --
22     A    No.  No.  The sixth-order polynomial is
23  what I am just predicting the voter turnout from the
24  registration.
25     Q    Okay.  It is just from the registration?

Page 168

1      A    I do not want to get too professorial.  I
2  don't like the word theory.  That means something
3  in science.  What I think we are trying to say is, what
4  are you doing?  Let me rephrase that.  Ask me again,
5  please.
6      Q    Sure.  So your opinion, I will not use the
7  word theory, so your opinion is that the sixth-degree
8  polynomial line --
9      A    Yes.
10     Q    -- is the key to the algorithm that is used
11  to fill the votes to make the election come out how
12  people want it to come out?
13     A    Now I remember.  So the way that I explain
14  this to people is, let us say you want to stuff
15  ballots.  You can't just stuff 1,000 60-year-old
16  ballots.  It would stick out and everybody would go,
17  that is suspicious.  So you have to pick who you are
18  going to stuff ballots for, and an algorithm controls
19  that.  You do not want any of your ages to be too good
20  of a turnout.  That would stand out.  So you have a
21  shape that you fill up to.
22     Q    Okay.
23     A    That shape is a sixth-order polynomial.
24     Q    And that sixth-order polynomial that you
25  found for the registration key you believe is consistent



Page 169

1  with the sixth-order polynomial that this algorithm used
2  to fill up the votes?
3      A   I cannot say that as a scientist.  As a
4  scientist I can just say the results fit a sixth-order
5  polynomial.  With that sixth-order polynomial I can
6  predict all the other counties.  That is suspicious.
7  That is all that I can say.  I cannot say that anybody
8  used it, but it is awfully suspicious that it fits
9  that.
10     Q   So is it not surprising to you then that you
11 have the ability to accurately predict the number of
12 people in an age group that will vote or who did vote
13 based on the number who were registered to vote?
14     A   What is surprising to me is that the
15 relative percentage are the same in every county even
16 though the counties are different.
17         For example, in this county you have got a
18 bunch of black people.  In this county you have a bunch
19 of Mexican people.  In this county you have a bunch of
20 white people, but they all vote with the same relative
21 propensity by age.  That is strange to me.  It should be
22 different.
23         I would expect, you know, Chinese people to
24 vote different than Mexican.  I would expect rural
25 people to vote different than urban and yet they are the

Page 170

1  same.  It is suspicious.
2      Q   Does each one of the counties you look at in
3  a given state exactly meet that mark or do they vary?
4      A   Exactly is why I have a number on it.  The
5  correlation coefficients are in the high .98, .99 area,
6  and that not, that ain't natural, buddy.  That is what
7  I say.
8      Q   Would you agree with me that a high
9  correlation does not equate to causation?
10     A   Of course not.  That is a statistical
11 fallacy.  I teach statistics classes.  I know that one.
12 No.  That is why I was careful to rephrase your
13 question a minute ago.  I am not saying anybody used
14 it.  I am saying it follows that, that smacks of
15 manipulation.
16     Q   All right.  So let us go back to the
17 Scientific Proof transcript, which was Exhibit 3.
18     A   Okay.
19     Q   Exhibit 3 to the Smartmatic complaint filed
20 in this case.  Exhibit 30 to this deposition.  So let's
21 go to page --
22     A   Scientific Proof or Absolute Interference?
23     Q   Scientific Proof.
24     A   Okay.  That way we don't have to worry
25 about the numbers.

Page 171

1      Q   So on page 3, line 21.
2      A   Page 3, line 21.  Dr. Douglas Frank, I got
3  it.
4      Q   That is where you say, I found where the
5  algorithms that control how many registrations and how
6  many ballots you need in every county to control the
7  election.
8          Did I read that correctly?
9      A   Yes.
10     Q   Then you say, That is when I figured out and
11 it is widespread.  It is every state that I checked so
12 far.  It is a magnificent part of the detail.  So I know
13 it is not an accident.  It has to be done by an
14 algorithm.
15         Did I read that right?
16     A   Yes.
17     Q   Okay.  So is your definition of an algorithm
18 here the polynomial?
19     A   No.
20     Q   What is your definition of an algorithm?
21     A   An algorithm is a set of steps by which you
22 accomplish something.  In programming we use that term.
23 You write a set of program lines and, when you are
24 done, that is an algorithm.
25     Q   So this is sort of what we were talking

Page 172

1  about earlier, but I just want to get a clear
2  understanding.
3          Is it your opinion that every single voting
4  machine has this algorithm embedded in it?
5      A   No, that is not my opinion.
6      Q   So where is the algorithm in your opinion?
7      A   We covered that earlier.  It could be
8  anywhere.  It could be on my computer in Ohio
9  controlling all the elections.  It could be on, it
10 could be in every machine.  I don't think that it is.
11 It could be anywhere.
12     Q   So that algorithm is what says how many, how
13 many votes you need to add in different places to get to
14 the result that you are intending?
15     A   Yes.  Yes.
16     Q   That could be one place or it could be all
17 over the place?
18     A   It could be anywhere.  I would concentrate
19 it at places where you had a bunch of ballots you could
20 fill out and a bunch of names that you could assign to
21 them.
22     Q   Places meaning precincts?
23     A   Well, not necessarily precincts because
24 when I first did this work I had the same question you
25 did.  How in the world could you implement something



Page 173

1  like this?
2          So I did some calculations and I came up
3  with the point of view or conclusion that we would need
4  at least six places in the country where we were
5  printing or collecting ballots to make this feasible.
6          And then the very next week I heard the news
7  report about it and one of them was New York.  The very
8  next week I heard about the guy driving ballots from New
9  York to Pennsylvania.  I am like, this is exactly what I
10 would have predicted I would have found.  Why would they
11 have to -- in other words, they don't have the print
12 shop in Pennsylvania.  It is somewhere else.  They are
13 distributing it from a central location.
14     Q   So the algorithm says, we need this many
15 extra ballots?
16     A   Yes.
17     Q   And then they are printed at one of these
18 print centers, correct?
19     A   Yes, or it could be harvested.
20     Q   What do you mean by harvested?
21     A   So if you -- in California, for example,
22 where Smartmatic is, every voter is mailed a ballot
23 except that about 30 percent of the people in the rolls
24 should not be in the rolls as the lawsuit with LA
25 proved.  They had to remove 1.2 million people from the

Page 174

1  rolls, okay.  Yet you are mailing a ballot to every one
2  of them.
3          So now imagine, just to make the numbers
4  easy, let us say we send 100 ballots out to 100 people.
5  70 of them go where you think they are going because 70
6  of the people are real.  But 30, where did they go?
7      Q   So by harvest you mean you fill out these
8  ballots and then you bring them in and put them in the
9  box?
10     A   Somebody collects those 30 and somebody
11 fills them out and somebody turns them in.
12     Q   Okay.  Okay.  And then so either by
13 harvesting or printing the ballots?
14     A   Yes.
15     Q   Then people take them to the places where
16 they are collecting the physical ballots?
17     A   Like drop boxes.
18     Q   And then they have them for the counts?
19     A   Right.  That is the smartest way to steal
20 an election because then the recount matches and you do
21 not need the machines to cheat.  You just need the
22 machines to report the tally so you know how much to
23 stuff.
24     Q   So the machines are just sending the
25 information to the algorithm about how many people have

Page 175

1  voted and how they voted?
2      A   And that is what we proved in Georgia.
3  That is what my friend, he just recorded it and I
4  looked at that.  All that was was, this voter voted.
5  This is what this tally is.  It was reporting -- it was
6  not saying now I want you to flip that ballot.  No.  It
7  was saying, tell me who has voted and tell me what the
8  tally is on each of the voting machines.  It was that
9  simple.
10     Q   Right.  Then it is sent to here and it goes
11 out to the printing centers or the people harvesting and
12 they know how many they need to get or how many they
13 need to print and then bring them to a drop box or --
14     A   Or mail them or whatever.
15     Q   Okay.  When you were coming up with your
16 implementation theory, how many people did you figure
17 would be required to kind of operationalize this?
18     A   I joke about it, but it is true.  I could
19 do it in Ohio all by myself.  I just need one printer
20 in the basement and I can do it.  You don't have to do
21 this real time.  You can have all the ballots printed
22 out ahead of time and filled out ahead of time.  You
23 already know what outcome you want.  You just have to
24 inflate the key appropriately.  It is the only
25 adjustable parameter in the whole thing.  You just say,

Page 176

1  turn up the turnout a little bit and it automatically
2  generates a whole another stack.  I could have the
3  whole thing filled out and prepared ahead of time.  You
4  have to know where you stand and drop off ballots.
5      Q   So you would not have to print or harvest
6  those ballots during the election?
7      A   No.  As soon as the ballot style is
8  finalized, which is typically six or eight weeks, nine
9  weeks, they have to have it done early because of their
10 mailing, as soon as it is standardized, then you can
11 start work.
12     Q   Okay.  So let's go to page 5, line 7.  You
13 are saying above that, just for context, you are saying,
14 computers are stupid.  They cannot do anything
15 themselves.  You have to tell them everything.  Once you
16 tell them to set up instructions, that is called an
17 algorithm.  It is just like a recipe.  A recipe is a set
18 of instructions.  The first thing you need to understand
19 about the way elections are managed is they have what
20 are called a registration database.  This is for every
21 precinct, every guy in the country, they have one of
22 these in each one.
23          Right?  Do you see that?
24     A   Yes.
25     Q   And then on line 12 you say, In most states



Page 177

1  you can download these for free, right?
2       A   And I would change that statement today
3  because I have now experienced more states and they are
4  not most states free.  But at that time most of the
5  states that I worked on were free.
6       Q   Okay.  Yes.
7           And so that is the data that you say is the
8  input for, one of the inputs for this algorithm that is
9  what they could have gotten for free before and now they
10  would have to pay for, correct?
11      A   Yes.
12      Q   Okay.  And then I just need to understand a
13  little bit better how the PCAP fits into it.
14          So on page 8, bottom of page 8, and then
15  under the top of page 9 you are talking about the work
16  that Mr. Lindell did on Absolute Proof, right?
17      A   Yes.
18      Q   Some forensic on the side, and that is what
19  Mr. Lindell says, that they found spy-ware and we have
20  all the IP addresses.  These are the computers.  We have
21  all of the text.
22          That is the kind of the forensic work that
23  Mr. Lindell showed you, right?
24      A   Yes.
25      Q   Okay.  So then at line 18 you say, Exactly I

Page 178

1  can see, but thing about it is you are showing the
2  incursions into the machines, but what do they do when
3  they are?  They have to know what to do.  That is what
4  the algorithm is telling them, what to do.  Right?
5       A   Yes.
6       Q   So is it your opinion then that the PCAP
7  data is showing these foreign incursions into the
8  electronic machines, into the actual electronic voting
9  machines?
10      A   So I have never with my own eyes seen the
11  PCAPs because I am not allowed.  But I have seen
12  excerpts, and clean excerpts and mostly what I see are
13  reports of who has voted and what tallies.  Patrick
14  Burn made a comment about that in January he made that
15  movie Rig.  I said.  I have looked at the PCAP data.
16  He says they are just a bunch of voter roll stuff.
17  That is right.  That is exactly what I am saying.  The
18  elections are being manipulated to the voter rolls.  So
19  I am not a bit surprised that that is what is in the
20  PCAPs.
21      Q   Okay.  So the incursions are not running the
22  algorithms?
23      A   Not necessarily.
24      Q   What are the incursions doing?
25      A   It might be doing a service request.  Tell

Page 179

1  me, what is the tally right now?
2       Q   Like just checking on where things are at?
3       A   It could be.  It could be, tell me who has
4  voted.  Tell me what the tally is.  Or it might say, we
5  are in trouble.  We need to do something.  Like that is
6  what happened in Michigan.  When the election turned
7  off, when it came back on, there were 150,000 new
8  voters that were suddenly added to the rolls.  That
9  could be something that the incursions were
10  accomplishing.
11      Q   Okay.  So then these incursions happen and
12  they check in.  That is what it sounds like.  The
13  incursions are checking in on what is going on and then
14  the algorithm would analyze the publicly available voter
15  data in the county, right?
16      A   Sure.
17      Q   And then it would tell whoever it was how
18  many ballots they needed to print or harvest?
19      A   Yes.
20      Q   And --
21      A   It is that simple.
22      Q   That is it?
23      A   I would like to say one thing about this.
24  I meant to mention it earlier too.  If you watch my
25  talks, I almost never talk about the PCAPs.  I almost

Page 180

1  never talk about the machines.  I almost never talk
2  about electronic interference because to me it does not
3  empower the people.  I am trying to help people know
4  what to do.
5           People do not trust machines.  So you do not
6  trust machines.  So what are you going to do?  Well, you
7  just run in there and say, I don't trust your machines.
8  They are going to laugh at you.
9           But if you come in and say, by the way, here
10  is voter fraud that we documented and the sheriff has
11  verified it is real and this is happening because
12  somebody knows who did not vote yet and somebody knows
13  who is a low propensity voter and somebody knows and
14  somebody knows, then you have evidence and that empowers
15  you.
16          So one of the things that you will notice
17  about me versus Mike is he is machines, machines,
18  machines, machines, machines, but those are the data he
19  has.
20          I am almost never machines.  I am almost
21  always voter rolls because those are the data I have and
22  that is what I can equip citizens with.
23          So that is why I think, you are trying to
24  say okay, Doug, explain how the PCAPs and the electronic
25  interference causes all of this stuff to happen.  And I

DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
181—184

Page 181

1  am sort of saying to you, I don't really focus on that.
2  That is not my lane.
3      I don't think that that is -- I have to
4  have, I would have to have recordings from every
5  machine. I would have to rip the cover off and look and
6  take the logs, which we have a few of those. We have
7  the Colorado. So that is why I am just, it helps you I
8  think to know that about me.
9      Q   Is it fair to say then, based on what you
10 just described to me, that Mr. Lindell really could not
11 rely on you to be saying anything about the machines or
12 what the machines did or the role the machines played?
13     A   No. No, that is not fair. My evidence --
14 we did this in the movie, remember. My evidence and
15 his meshed perfectly. I need, in order for the
16 algorithms to work, in order for the mathematical
17 algorithm to work, there has to be feedback. Feedback
18 means you have to have electronic feedback. He has the
19 electronic feedback. Guess what, it completes the
20 puzzle for me because I am sitting here scratching my
21 head, how would they know how many ballots to stuff?
22 Oh, Mike has got the evidence that that is how they
23 stuffed the ballots.
24     Q   Okay. So then if you didn't have that
25 evidence or if that evidence was not accurate, then you

Page 182

1  kind of be only halfway there and would not really have
2  an opinion on the election?
3      A   Well, I would still have all the
4  statistics. I would still say there is something not
5  working here because all of these statistics should not
6  work this well. So I still would have gone and found
7  fraud in counties, but I am not using machine evidence
8  to find fraud. I am using the voter rolls to find
9  fraud.
10     Q   So I think what you are saying, and correct
11 me if I am wrong, but you are staying Mr. Lindell can
12 rely on you for half of what, where it was filled to and
13 you can rely or you are relying on the evidence he found
14 for how that was then used, but he cannot really rely on
15 you to talk about the machines?
16     Like you saying the machines had to be on
17 online, that is just saying, well, for my statistics to
18 work and for this thing to be implemented, it must have
19 been, but not, you are not the source of the evidence
20 saying that they were?
21     A   I am the confirmatory, confirmatory
22 evidence.
23     Now, in the movie Scientific Proof Mike did
24 make a comment though -- maybe it was not that movie, it
25 was another one -- where he said in the early days, when

Page 183

1  he was looking at it himself, he noticed 30,000 people
2  who live in that state voted in this state. And he is
3  saying he knows 30,000 people did not commit fraud. It
4  is happening and he uses the word machines to mean a lot
5  things.
6      So I think he is including in that comment
7  the fact that the voter rolls are being used and the
8  machines are necessary to do that. So machines is a
9  very general term. I include the poll books as machines
10 and voter rolls as running in a computer. That is part
11 of the machine so.
12     Q   Okay. Okay.
13     A   I don't think it is fair to say that my
14 work does not support his work. It absolutely meshes.
15     Q   I meant that side of his work, it is not,
16 you are not the source, you are not the evidence --
17     A   Right.
18     Q   -- for what the machines did or did not
19 actually do?
20     A   Correct. I helped facilitate get the
21 forensic images because I understand the value of that,
22 but that is not what I analyze.
23     Q   And then if we flip over to the other one,
24 this one is Absolute Interference. I want to go to
25 pages 57 and 58.

Page 184

1      A   I am there.
2      Q   At the bottom you say, This is too
3  extensive. It could not be done by humans. It has to
4  be done by computers. I am imagining a room full of
5  computers somewhere that is connected to internet,
6  preparing, monitoring, controlling, cleaning up the mess
7  afterwards and you have to have each step and it could
8  not be humans.
9      Do you see that?
10     A   Yes.
11     Q   So I have asked you earlier today if you
12 have evidence in support of some of the things that you
13 said.
14     So I want to ask you this: Have you ever
15 seen any evidence that this roomful of computers, other
16 than that it is necessary for your theory, have you seen
17 evidence of a room of super computers somewhere running
18 these algorithms?
19     MR. GREENE: Objection. Misstates the
20 statement in the documentaries. Go ahead.
21     A   Have I seen it with my own eyes, no. Have
22 I spoken to people who have been in rooms where the
23 computers are there, yes.
24     Q   Who have you spoken to?
25     A   A federal agent. I don't recall his name



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
185–188

Page 185

1 because it was in a special circumstance. He described
2 the room where there was a computer at the end of a
3 line of tables with prefilled out ballots. The
4 computer was telling them how many out of each stack to
5 put in envelopes and take down to the NGO for stuffing.
6 And I was so excited when he said that because that is
7 exactly what I predicted was going on.
8      Q    You said that you do not recall the name of
9 this federal agent?
10     A    I don't know the name of that person, no.
11     Q    Was it a man or a woman?
12     A    Man.
13     Q    About how old?
14     A    40.
15     Q    Okay.  Blonde or brunette?
16     A    Brown hair.
17     Q    Brown hair.  Average height?  Tall or short?
18     A    I am watching him walk into the room right
19 now in my imagination.  He is 5'10.
20     Q    And when did you meet with this federal
21 agent?
22     A    About a year and a half ago.  I think it
23 was like January a year ago.
24     Q    You were saying it was a special
25 circumstance.

Page 186

1           What was that circumstance?
2      A    A Faraday room, Faraday cage.  We had to
3 turn in all of our cell phones and everything to go in
4 there.  There is no electronic communication in and
5 out.
6      Q    Why were you going into a Faraday cage?
7      A    Because we were doing planning and we
8 didn't want anybody to know what we were doing.
9      Q    Who else were you with?
10     A    Mark Cook, Todd Sanders, Russ Ramsland,
11 Eric Waldron, Colonel Waldron.
12     Q    And were all -- was Mr. Cook and
13 Mr. Sanders, Mr. Ramsland and Colonel Waldron all
14 present for this conversation?
15     A    Two days.
16     Q    This conversation now with the federal
17 agent?
18     A    Yes.
19     Q    Not the time that you were in the Faraday
20 room.
21     A    Yes.
22     Q    Why was the federal agent there?
23     A    We were reviewing strategies on how to
24 expose the fraud.
25     Q    So you were meeting with the federal agent

Page 187

1 to discuss strategies on how to expose the fraud?
2      A    Yes.
3      Q    Was he there as a representative of the
4 Federal Government or was he there on his own?
5      A    I don't know.
6      Q    Who invited him?
7      A    I don't know.
8      Q    How long did you meet with him?
9      A    Two hours.
10     Q    And did he stay for the duration of your
11 meetings?
12     A    No.
13     Q    So this federal agent appeared and told you
14 this information and then he left?
15     A    We had attorneys in there too.  I am trying
16 to remember who they were.  We were designing a
17 strategy.
18     Q    And you don't know why he was there?
19     A    I did not know why he was invited.  I know
20 he was there because he was telling us what we were
21 looking for.
22     Q    You don't know why he was there?  That is
23 why he was there, to tell you what you were looking for?
24     A    Yes.  I mean, we are traveling the country
25 trying to scrape up facts and evidence and I am part of

Page 188

1 that.
2      Q    Did he show you any credentials that he was
3 a federal agent?
4      A    I don't remember.
5      Q    Did he tell which agency he worked for?
6      A    No.  Justice Department is all that I
7 remember.
8      Q    Did he tell you where he worked?
9      A    No.
10     Q    Did he tell you where he saw this computer,
11 this room of computers?
12     A    I don't remember.
13     Q    All right.  Other than this person that you
14 spoke to about a year and a half ago, have you seen any
15 documentation, any other physical evidence about this
16 type of room with computers?
17     A    So the question is, you are asking me, if I
18 have this right, you are asking me have I seen any of
19 these rooms?  I am proposing or I had proposed the
20 idea, this is early in my thinking, somehow there has
21 to be places where this is organized.  How many would I
22 need?  Well, there has to be at least one computer
23 center where this is being integrated, and then we
24 would have to have five or six places around the
25 country where ballots were being harvested and printed



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
189–192

Page 189

1  or whatever, because there is lots of ways to do that.
2      I think that you are saying, have I ever
3  seen direct evidence of any of that myself with my own
4  eyes?  No.  But there is, there are reports.
5      For example, the newspaper report about the
6  guy driving ballots from New York to Pennsylvania.  Like
7  when I have sat with the federal agent who told me,
8  describing the whole thing, I could not believe what he
9  found.  That might have been a public story.  You might
10  want to search for it.  I think this was in a hotel
11  ballroom somewhere, if that is key words for you to
12  search for.
13      Q   It was not by the Faraday room, it was in a
14  hotel ballroom?
15      A   The computer, the set up I was describing?
16      Q   The set up.
17      A   Yes.  Yes.
18      Q   Okay.
19      A   But, in other words, I cannot be everywhere
20  and I am not going on knocking on doors trying to find
21  these things.  But when you have a hypothesis as a
22  scientist and then evidence comes from an independent
23  source confirming what you have hypothesized that
24  provides supporting evidence, that increases the
25  likelihood that you are on the right track.  A

Page 190

1  scientist has to always be willing to change his
2  opinion at the next piece of data that comes.  So you
3  are following the data is my motto.  Whatever the data
4  our telling me, that is where I am going.  Right now
5  the data is showing this, this and this.  So this is
6  what I am thinking right now.  Bring me something
7  different, I will change my theory.  Bring me data that
8  I am going the right way, okay, I must keep going the
9  right way.
10      Q   Circling back to the meeting with that
11  person in January of 2021 or 2022.
12      Was Mr. Lindell present for that?
13      A   No.  Sorry.  I have talked too fast.
14  Sorry, Michele.  I anticipated.  Just like you said, do
15  not do that.  Let him finish.
16      MR. GREENE:  Yes, let him finish.
17      Q   All right.  So just a little bit more on the
18  polynomial itself.  So back to Exhibit 3, Scientific
19  Proof.  You say, Yes, I just take the black curve and
20  multiply it by 86 percent that helps you to see those
21  little bumps and wiggles are just absolutely reproduced.
22  It is just the odds of that happening in one county are
23  ridiculously small.  But, guess what, they happen in
24  every county.
25      Did I read that right?

Page 191

1      MR. GREENE:  Which page?
2      Q   Page 12, starting on line 6.
3      That is what you were referring to in that
4  statement?  For the record, Dr. Frank is referring to
5  page 18 of Exhibit 111.
6      So that is the 86 percent in this
7  Pennsylvania district, correct?
8      A   Yes.
9      Q   How did you get to the 86 percent?
10      A   I multiplied, I multiplied by the
11  percentage that gave the best fit for that using
12  correlation coefficient.  I show that here.
13      Q   Let the record reflect Dr. Frank is
14  referring to page 19 of Exhibit 111.
15      So you are saying 86 percent was the number
16  that most matched, had the highest correlation with the
17  actual turnout?
18      A   Yes.  What I was saying is, if you multiply
19  the black curve, the registration distribution, by 86
20  percent, you get a remarkable fit to the voting.  That
21  is what I was saying.
22      That is not the key.  I was simply showing
23  how studying the alignment is, and I was taking people
24  through the intellectual process of thinking this out.
25  It is hard to throw the idea of sixth-order polynomial

Page 192

1  at people.  They do not understand it if you do that.
2      So you make it simple at first.  You say one
3  percentage.  Here you go, 86 percent.  Aren't you
4  surprised how well that fits?  Yes, you should be
5  surprised.  Okay.  Well, guess what, I am not limited to
6  one number.
7      Q   Right.  Is that because the numbers in the
8  18 to 40 year olds approximately do not really match up
9  that well with the 86 percent?
10      A   No, they don't.
11      Q   So that is why you needed to use a different
12  number for each age group?
13      A   The different number for each group matches
14  the sixth-order polynomial.
15      Q   That is the polynomial.  I got it.  Okay.
16  Okay.  So I can skip the next one then.
17      So on page 14, starting on line 7, I think
18  now you are talking about the polynomial.  You say, This
19  is the shape of that key.  This is the key that converts
20  registrations to ballots.  In other words, the
21  proportion of 20 year olds, to the proportion of 30 year
22  olds, to the proportion of 40.  When you look at that
23  curve, that is a really smooth curve.
24      A   That is what you are looking for?
25      Q   Yes.  I will just go on.  In fact,



Page 193

1  mathematicians recognize this. It is called the
2  sixth-order polynomial. A beautiful thing about a
3  sixth-order polynomial is you only need six numbers.
4  Now I don't need 82 numbers anymore. I just need six
5  numbers. And a turnout number, which would be the 7th
6  number, and I can predict every county in Ohio.
7       Is that correct? Did I read that correctly?
8    A  Yes.
9    Q  So breaking that down, the percentage, the
10 percentage from the polynomial is the key that converts
11 the registration into ballots; is that right?
12   A  Say that again.
13   Q  The percentage, the percent from your
14 polynomial for 20 years olds, 30 year olds, 40 year
15 olds, that is the key that converts the registrations
16 into ballots?
17   A  Right. The 86 percent has nothing to do
18 with it.
19   Q  It is not the 86 percent?
20   A  That was just an example to help people
21 see, gee, if you multiply this curve by a percentage,
22 you get awfully chose that curve. You notice that it
23 does not fit over here. It fits over here. What if we
24 use a different number for there than we use for here.
25 By the way, that fits a nice smooth curve. It is

Page 194

1  called a sixth-order polynomial.
2    Q  How did you determine the percentage for
3  each decade age group? How did you determine this is
4  the number for --
5    A  Oh, I was just using that as an example,
6  20, 30, 40. I am actually doing it for every age. 18,
7  19, 20, 21, 22. I show that in a different slide. I
8  do it for every age, 83 numbers. That is where we get
9  the 83 rolls of the die idea. I am trying to find that
10 for you. Yes, here it is. I give a diagram kind
11 illustrating that process.
12       MR. GREENE: Page 13 maybe.
13   A  Here.
14   Q  Let the record reflect we are looking at
15 page 34 of Exhibit 111.
16   A  You notice that I am showing that there is
17 a different percentage for every age. There is
18 actually 83 of those, but it would be a messy diagram.
19 So I did that just for illustration purposes. You need
20 a different proportion for every age. Together they
21 define the registration key. And then when you look at
22 the registration key, lo and behold, it is a smooth
23 sixth-order polynomial. Oh, that is interesting.
24   Q  So are you saying that, I am trying to get
25 how you get from 83 numbers for every age to the

Page 195

1  sixth-order polynomial which I understand there is six
2  inputs.
3       How do you get from the 83 to the six?
4    A  Good question. Now you have to have a math
5  answer. Let me make a really simple math answer. Let
6  us say that I say Y equals 2X. Okay. That describes a
7  line. I can put in any number I want for X, and you
8  can get a Y out of it. That is called a monomial. You
9  put in one number, you get this.
10       This equation describes all, the whole axis.
11 If I add a second one to X square, now it is a binomial.
12 Okay.
13       The sixth-order polynomial, we only need six
14 of these to describe that curve. Even though that curve
15 is composed of 83 ratios, just like this line is only,
16 it is just a line, but you can describe it with a simple
17 equation. This is just a curve, but you can describe it
18 with a simple equation. It just has six terms instead
19 of one.
20   Q  And that curve --
21   A  That is how you go from 83 to six.
22   Q  By the equation?
23   A  Yes. It is a simple equation.
24   Q  And how did you determine that it should be
25 a six-degree polynomial?

Page 196

1    A  Because a second-order polynomial does not
2  fit. A second-order polynomial is a line. It does not
3  look like a line, does it?
4       A third-order polynomial is a bravlet. It
5  does not fit, does it? So each order you increase, and
6  I do this in live. In the early days when I was focused
7  on the math, I am not so much focused on the math in my
8  presentations anymore, I used to bring up an Excel
9  spreadsheet and take the data and say, here is the
10 second order. Here is the third order and fourth order.
11 And you would notice, it would not fit. It would not
12 fit. And then suddenly the sixth order fits perfectly.
13 The fact that I can get a sixth-order polynomial to work
14 in every state was interesting in itself, especially
15 since it is the highest degree that Excel goes to.
16   Q  Okay. So you stopped at six?
17   A  Because it works.
18   Q  Because it fit what you were seeing?
19   A  Yes.
20   Q  So that is how you determined that was the
21 right one?
22   A  Yes.
23   Q  And you did not go seven or eight might have
24 worked better but Excel does not go there?
25   A  But I wrote it myself. I can write all of



Page 197

1    those equations myself and I did and explored it.  It
2    does not get any better.  It hits it at six and now you
3    are there.  You do not need it to be any better than
4    that.
5        Q    Okay.  Did you consider the age demographics
6    of registered voters and the votes cast by registered
7    voters both correlate to the age demographics of the
8    overall population?
9        A    For example, older people are more reliable
10   voters than younger voters.  So you are automatically
11   going to get a correlation coefficient around. 4., .5
12   without even trying just because older people tend to
13   vote better than younger people, but that may not be
14   true in every county.
15           For example, in a county that has a
16   university, there might be a different behavior of
17   younger people than in a county that does not have a
18   university, because the young people behave differently.
19   So, yes, I considered that.  And that is why it is so
20   important that it is not just one county.  It is every
21   county.
22       Q    Okay.  And I know that you mentioned earlier
23   today that you have done, you have looked at voter
24   turnout in the past as part of your election
25   prediction --

Page 198

1        A    Oh, yes.
2        Q    -- exercises, right?
3        A    Yes.
4        Q    Have you ever studied kind of like voter
5    demographics and what motivates people to vote and how
6    often people vote?  Have you done a study of the
7    research and literature on that?
8        A    Yes, quite a bit because when I do this
9    with my students, for example, I mentioned the project
10   that my senior student did one of my last years at
11   Schilling where he did that throughout the entire
12   country, and I helped him to write web bots they are
13   called.  They go and scrape all of that data so you can
14   start with a massive amount of data and run AI on it
15   and make predictions.  So absolutely I do that.
16       Q    Do you recall any of the studies or the
17   research or the literature that you read about voter
18   demographic and voter turnout?
19       A    There are many papers on it, yes.  A
20   specific one does not come to mind right now because
21   most of the time I am encouraging my students to do
22   this blind because I do not want them to be pre-biased
23   by any idea.  Oh, older people vote better than
24   younger.  I want them to discover that for themselves.
25           So I do not point them to the literature.

Page 199

1    First I point them to the data first, and they explore
2    the data themselves and learn from the data.
3        Q    Okay.  So you are more focused on the data,
4    analyzing the data yourself than about any kind of
5    research that has been done, you know, by people who
6    focus on this area of academia?
7        A    Yes.
8        Q    That is correct?
9        A    Yes.  Well, with my students that is what I
10   do, yes.  Yes.  Myself, I have read dozen of papers
11   over the years.  Academicians have studied that, yes.
12       Q    Do you recall any of the papers that you
13   have read?
14       A    I would have to go look it up, but I can
15   give you some of the conclusions that I have gleaned
16   over the years.  I mean, I have been studying it for
17   decades.
18       Q    But none come to mind right now?
19       A    For example, that especially comes up when
20   you are studying polls.  I studied polling extensively.
21   I even considered a career in working as a pollster
22   because that is a whole bunch of math and a whole bunch
23   of numbers.  And how do they reduce polling information
24   into statistics whereby they make election predictions,
25   that is what I have been doing for so many years.

Page 200

1           So I am very familiar with how they, for
2    example, if they need to know how many old people are
3    going to vote and how many young people they need to
4    have certain sampling rates because the demographics are
5    different.  They vote differently and in different
6    communities they vote.  I have read dozens of papers on
7    that.
8           If you even just read the methodology used
9    in the polling, when people read polls, they usually
10   just read the result of the poll.  They do not read all
11   the underlying.  I read all the underlying because I am
12   interested in that.
13       Q    Okay.  That is just something that you do as
14   kind for fun for your own edification, for your own
15   interest?
16       A    And for my students because, you know, I
17   try to be knowledgeable in what I am encouraging them
18   to do, yes.
19       Q    Okay.  Dr. Frank, I am sure you are aware
20   but I have to ask.  Are you aware that there are various
21   academics and others who have written articles,
22   published papers, news articles and things of that
23   nature discussing potential flaws in your polynomial --
24       A    Of course.
25       Q    -- analysis?



Page 201

1    A   Yes.
2    Q   Have you read those?
3    A   Yes.
4    Q   Do you know whether Mr. Lindell is aware of
5  the various academics and articles discussing the flaws?
6    A   Sure.  I know Mr. Lindell rather well.  I
7  doubt he has read a single one of them.  What has
8  probably happened is it has been brought to the
9  attention of his attorney who then calls me and says,
10  are you aware of this article?
11       And then I will say oh, no.  So I read a
12  copy of it.  Then he probably informs Mr. Lindell about
13  it, but Mr. Lindell himself probably did not read it.
14    Q   Have you ever talked to Mr. Lindell about
15  any of those articles?
16    A   Not at length, no.
17    Q   Not at length.  Briefly have you discussed
18  it then?
19    A   Yes, sure.
20    Q   How many times do you estimate?
21    A   Half a dozen times in the last couple of
22  years.
23    Q   Do you recall the first time?
24    A   After the Placer County thing, at the
25  moment of truth we discussed the Grimmer response.

Page 202

1    Q   What did Mr. Lindell say about the Grimmer
2  response?
3    A   He was not saying.  I was saying.  You
4  know, I am the teacher.  So he refers to me.
5    Q   So he asked you, what is your response?
6    A   What do you think of it?  I told him what I
7  thought of it.  That was that.
8    Q   Any other times that you recall?
9    A   Well, of course the Zeidman arbitration.
10  Zeidman's paper, I guess you can say it is a paper, he
11  discussed that at length.
12    Q   That is not really about your polynomial;
13  Mr. Zeidman's paper is more about the PCAP data, right?
14    A   Yes.
15    Q   I am focused right now on the polynomial.
16    A   Yes.  In particular there is one from
17  Stanford, Mr. Grimmer who often says -- well, he also
18  did a memo on my analysis of Placer County.  I have
19  written a formal response to that.
20    Q   So let's talk about, I think this is the
21  Grimmer one that you have in mind.
22    A   I believe there is two.  One is paper and
23  one is a memo.
24    Q   I got us all out of order.
25    A   That is all right.

Page 203

1       MR. GREENE:  It happens.  Do you want to go
2  off the record?
3       MR. FREY:  Yes, let us go off the record.
4       THE VIDEOGRAPHER:  The time is 2:41 p.m.
5  We are going off the record.
6       (Recess was taken.)
7       THE VIDEOGRAPHER:  The time is 2:42 p.m.
8  We are on the record.
9       (Exhibit 112 was marked.)
10    Q   (BY MR. FREY)  I apologize for that brief
11  recess there.  We found our exhibit.
12       So, Dr. Frank, we have handed you what is
13  marked as Exhibit 112 which is an article written by
14  Justin Grimmer and Matthew Tyler entitled, High
15  correlations between predicted and actual ballots do not
16  imply fraud.
17       Do you recognize this article?
18    A   Yes, sir.
19    Q   Is the article that we were just discussing
20  that you talked about with Mr. Lindell?
21    A   It is one of two, yes.
22    Q   And so are you familiar with Justin Grimmer?
23    A   Yes.
24    Q   Who is Mr. Grimmer?
25    A   He is a professor at Stanford, I think,

Page 204

1  Hoover Institute.
2    Q   Are you familiar with Matthew Tyler?
3    A   No.
4    Q   I want to talk a little bit about some of
5  the articles or some of the arguments put forth by
6  Mr. Grimmer and Mr. Tyler.
7       So, first, the author is describing a theory
8  at the very beginning as follows:  They say that your
9  theory is a strong correlation between the predicted
10  count of the votes from age groups.
11    A   Where are you reading?
12    Q   The very top line.  I just --
13    A   I am there.
14    Q   A strong correlation between the predicted
15  count of votes from age groups and actual count of the
16  votes across counties in swing states is evidence that a
17  key or algorithm was used to determine the vote before
18  the election.
19       Do you see that?
20    A   Yes.
21    Q   Is that a fair and accurate description of
22  your opinion?
23    A   I would never say that.  That is a
24  correlation versus causation argument.  I don't like
25  that kind of a statement.  I don't say it that way.  I



Page 205

1   am much more academic.

2          I would say, I have found one which is

3   suspicious which means I need to look into it some more.

4   That is what I would say.

5          Q    So you would not say that this was used to

6   determine; you would say that you found the correlation

7   which is suspicious?

8          A    Which means I would want to look into it

9   more carefully.

10         Q    Okay.  Okay.

11         A    I would never say it that way.  This is a

12  strongman.

13         Q    Because they go on to state that, in the

14  next sentence, that they will show that there is a high

15  correlation between predicted and actual ballots in all

16  states where there is adequate data to make an

17  assessment.

18         Do you see that in the next sentence there?

19         A    Yes.

20         Q    And if I understood your testimony earlier

21  today correctly, you would say, other than maybe a

22  couple of counties in Montana, you would agree with

23  their conclusion?

24         A    No, because they are based on a false

25  premise.  They are talking average turnout.  I am not.

Page 206

1   I am talking about turnout versus age.

2          Q    Where do you see that, them talking about

3   average turnout?

4          A    Average turnout rate correlation Figure 1

5   is the X axis.  Average ballot count correlation, I do

6   not do average ballot count correlation.  I do not do

7   that.  He is creating a strawman.  That is not what I

8   argue at all.

9          Q    So you would disagree that this high

10  correlation between predicted and actual ballots can be

11  found in all states?

12         A    I don't know.  I didn't analyze his -- I

13  would want to see his source data.

14         Q    I am saying, in your data, in your analysis,

15  every state you have looked at --

16         A    In every state that I have looked at, all I

17  have to do is look at one county, look at the ratio by

18  age between who is registered and who voted and that

19  relationship is maintained throughout the state.

20         Q    Okay.

21         A    That is not what he is saying.  He is

22  saying something else, and then he is arguing against

23  something that I did not say.  That is called a

24  strawman.

25         Q    So when he says, because the number of

Page 207

1   registrants appears in both terms of the correlation --

2          Q    Where are you reading now?

3          A    This is in the third sentence.

4          A    I got.

5          Q    There is nothing remarkable about

6   this correlation --

7          A    Yes.

8          Q    -- because the number of registrants appears

9   in both terms of the correlation.  Frank's correlation

10  is artificially inflated.

11         A    That is a misrepresentation again of what I

12  have said.  So, for example, I am not trying to say

13  that I am a prophet, that I can predict the outcome of

14  elections.  I am saying, if you allow me to look at one

15  county, I can predict all the others.  That is

16  surprising, okay.  It is not a prediction in the sense.

17         People say, if you can predict it, tell me

18  what is going to happen in the next election.  I don't

19  know what is going to happen in the next election.  Let

20  us do the next election.  I will measure one county and

21  we will see if it is in the same in all the other

22  counties.  The point is that it is the same.  That is

23  the point.

24         Q    The point is that the percentage of actual

25  turnout to registered voters for age ranges is the same

Page 208

1   across counties?

2          A    For every, yes.  That is what is the same.

3   That is, that is just a fact.  You can do the math and

4   there it is.

5          Q    So I want to look -- do you dispute the

6   correlation they are looking at?  Looking at page 3

7   under heading 4, right, they state, Your correlation

8   equation is core (actual counted ballots, predicted

9   counted ballots equals core) turnout, times number of

10  registrants, predicted turnout times number of

11  registrants.

12         Is that an accurate statement of your

13  correlation?

14         A    No, it is not.

15         Q    What is your actual correlation computation?

16         A    So people always ask me this.  When I

17  explain it, they say, it is that simple?  Yes.  It is

18  that simple.

19         Take the number of people who voted who are

20  18.  Take the number of people who are registered who

21  are 18.  Take the ratio.

22         Take the number of people who voted who are

23  19.  Take the number of people who are 19 and registered

24  and take the ratio.  Do that 83 times.  That is your

25  key.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
209–212

Page 209

1    Q    So it is number of people who voted at an
2    age over the number of people registered at an age?
3    A    It is that simple.
4    Q    83 times?  Where do you derive -- so is that
5    the number then on your plot in your polynomial, that
6    ratio?
7    A    Yes.
8    Q    And then your correlation, where do you, how
9    you do you get your correlation coefficient?
10    A    If I take the turnout in a county, the
11    total turnout and normalize the curve by that, you are
12    not allowed to create ballots or remove ballots, so we
13    know the curve looks like.  This let us make sure that
14    the total equals however many the turnout is,
15    superimpose that on the data and it fits.
16    Q    And the R number that you calculate is just
17    the difference between what?
18    A    It is called the Pearson's R.  It is a
19    correlation coefficient.  It is a statistical term
20    where you take the difference between every one of
21    those terms and do some fancy square roots and that is
22    about it.  It's built right into Excel.  It is called
23    the correlation coefficient.  It is a very powerful
24    technique.  You use R square to compare absolute fits.
25    I am not doing an absolute fit.  I am comparing the

Page 210

1    shape because I care about the relative turnout.
2    Q    And you are comparing the shape of your
3    predicted line to the shape of the actual line?
4    A    Yes.
5    Q    You are getting your predicted line by the
6    number of registrants is the registering key, correct?
7    A    I am taking the number of the
8    registrations, the registrations by each age and
9    multiplying it by the key, and that gives me who voted.
10    Q    And then you are saying that correlates
11    really well to the number of people registered?
12    A    No, it correlates really well to the number
13    of people who vote.
14    Q    Correct.  I misstated that.
15    So you are saying that then the predicted
16    line that you have which you derived from a percentage
17    of the registrations --
18    A    Yes.
19    Q    -- correlates very well to the number of
20    people who actually vote?
21    A    Yes.  So it is that simple.
22    Q    Okay.
23    A    He is saying, well, it correlates well
24    because you are self-correlating.  I am not.  I am
25    taking a ratio which matches all the other counties.

Page 211

1    Q    Is there like a particular county you pick
2    to start with?  How did you pick your --
3    A    Great question.  Sorry.  I interrupted you
4    again.
5    MR. GREENE:  Give him time.
6    A    I have debated this at length.  The point
7    is not that I can predict it.  The point is that they
8    are all the same.  So you can do it in a number of
9    ways.
10    You can pick one county and predict all
11    others, but that leaves you vulnerable because there
12    might be a little noise on one of the counties or one of
13    them might deviate a little bit.  So that would -- or I
14    can go through and pick the one that works the best and
15    then people can say, oh, well, you are cherrypicking.
16    So how do I know how to pick the one county?
17    So that would be -- so there is flaws with that
18    approach.
19    There is a flaw where I can say, well, I can
20    pick a big county, a medium county and a small county,
21    okay, and average them and use that as the key.  Well,
22    but then how did you pick those?  You are cherrypicking.
23    You are always vulnerable.
24    You can average all of them and then compare
25    it to all of them.  If I do that, they say you are just

Page 212

1    using the answer to get the answer.  Okay.
2    The point is not whether we are predicting
3    or not.  The point is that they are all the same.  How
4    do you want to show that is up to you.
5    I find that people seem to understand it
6    best if I say, I have a simple metaphor for this.
7    Imagine you have a bunch of jars on the wall and they
8    have ping-pong balls in it.  You start taking ping-pong
9    balls out of the first one and they all have a five on
10    it.  You can take the next one and they all have a seven
11    on it.  You take the ping-pongs out of the next one and
12    they all have nines on it.
13    Well, after awhile you got the idea that all
14    of the jars are sorted by number.  So after you pick a
15    number out of here, okay, you know that the rest is
16    going to be that way.  It is that simple.
17    Now, how do you want to prove that all of
18    them are nine?  Okay.  You can take them all out and
19    count them all and then say what the average is is nine.
20    Okay.  Let us compare nine to every one.
21    Okay.  That is sort of silly.  You can pick
22    three of them and average and say well, that is nine,
23    and they are all nine.
24    You can pick one and say they are all nine
25    and they are all nine.  The point is not how do you come



Page 213

1   up with that statistic.  The point is, they are all the
2   same.
3       Q    I understand.  But they are not actually
4   exactly the same?
5       A    They are within a percentage.
6       Q    Right.
7       A    That is why I use a 20 sided die.  The 20
8   sided die is 1/20th accuracy.
9       Q    So it is --
10      A    In my metaphor.
11      Q    In your metaphor --
12      A    I use a 20-sided die and that is really
13  actually conservative because it is usually way better
14  than that.
15      Q    In your metaphor you say I can roll the die
16  83 sometimes and I get the same number across each
17  county?
18      A    The same series of numbers, yes.
19      Q    It is not the exact same number, right?
20      A    It is different for every age.
21      Q    It is different for every age.  Even for
22  every county it is not exact same percentage?
23      A    It is within 1/20th.
24      Q    Within 1/20th?
25      A    So let us say your number is one to 20.  If

Page 214

1   it was a 16 or could have been a 17, or if it is 16, it
2   could have been a 15.  So it is within one.  That is
3   within 1/20.  That is a metaphor I use.
4        I actually think it is more accurate than
5   that, but a 20-sided die people play with Dungeons and
6   Dragons.  They have seen them.  It is not a scary thing.
7   It is a metaphor to explain.
8       Q    I appreciate that clarification because,
9   when I read your die analysis, I did not get that it was
10  same one way or the other that it was within a
11  percentage.  I thought that you were saying it is the
12  exact same as my prediction?
13      A    Yes.  Yes.  Well, exact -- nothing is exact
14  in statistics.  Everything is within a certain degree
15  of accuracy.
16      Q    Okay.  Okay.
17        So we talked about their correlation, and
18  your response to their correlation critique is that they
19  are just setting up a strawman theory?  They are not
20  accurate?
21      A    That is not what I actually say.  They are
22  arguing something against I do not actually say.
23      Q    You actually wrote a response to Mr. Grimmer
24  and Mr. Tyler?
25      A    Not to this one.  He wrote another memo

Page 215

1   about Placer County and I responded to that one and put
2   that out there somewhere.  It is on -- I gave copies to
3   Kurt and various people.
4       Q    Do you know where it was published?
5       A    It is not published.  It is just on social
6   media.
7       Q    It is on social media?
8       A    Yes.  So is his memo.  Was this published?
9   I do no know.  Or did he just put it out there.  A lot
10  of this stuff does not get peer reviewed and put out
11  anywhere.  It is just on social media.
12      Q    Do you know what social media channel you
13  published your response on?
14      A    You know what, I don't know if I even put
15  it on social media honestly.  I gave it to lots of
16  grassroots people who are saying, we need a response to
17  this.  I sent it to them.  I am not sure it is out
18  there.
19      Q    That just makes, frankly, me feel better
20  that we had not found it.
21      A    Yes.  Yes.  I sent it to a bunch of people
22  who are asking, how do we reply to Mr. Grimmer?  Here
23  is how you reply.
24        I have sat on it for a while because I like
25  peer review.  I like other people to read and critique

Page 216

1   me.  I also like whatever goes out in the public to be
2   carefully very accurate and that way it withstands the
3   test of time.
4       Q    Can I make a request of you and counsel, I
5   don't know if this is appropriate in this situation, can
6   I request that you produce us a copy of that response?
7       A    Any objection?
8        MR. GREENE:  Do you want to track it down
9   and send it to me.
10      A    I would be delighted, yes.
11      Q    Thank you.
12      A    It is not the same topic as this.
13      Q    It is on their other paper?
14      A    It is related to Placer County and the fact
15  that I could predict down to the precinct level what
16  was going on.
17        And, if you want, I can address what I
18  anticipate your questions to be from that so we don't
19  have to have another deposition or you can tell me to
20  shut up.
21        MR. GREENE:  Just send me what you wrote
22  previously.  Let's us do that and then we will cross any
23  other bridge after that.
24      A    Very good.
25      Q    Okay.  So you didn't respond to this one.



Page 217

1      Is there a reason you chose not to respond
2  to this one?
3      A   It is a strawman.  Okay.  So that is my
4  reply.  This is a strawman.  This is not what I say.
5  What do you mean that is not what you say?  What I am
6  going to do is turn into some kind of -- yes, it is a
7  waste of my time.  I have better things to do.
8      Q   I want to ask you one other thing about this
9  one and that is, it is at the very beginning, so at one
10 point in their paper on the bottom of page 1 they say
11 Frank never responded to our request for replication
12 code or data so we used his public description to
13 replicate his results.
14      Do you recall Mr. Grimmer or Mr. Tyler
15 requesting your code or data?
16      A   No, but there is not code.  You take the
17 ratio.
18      Q   So is that why you would not have provided
19 it to them?
20      A   Well, perhaps.  Data, I don't know what he
21 would be requesting.  I don't remember his request
22 honestly.
23      But a lot of times people come to me and
24 say, Dr. Frank, give us your software.  There is no
25 software to give.  Do the following steps.  Follow this

Page 218

1  algorithm.
2      Where do we get the data, Dr. Frank?  Talk
3  to your local clerk and get your own copy or talk to
4  Cause of America and they will give you a copy.  I mean,
5  I have hundreds of emails a day.  I don't have time to
6  coach every individual who wants help on this.
7      Q   Have you, setting aside Mr. Grimmer and
8  Mr. Tyler, have you provided your formulas or your
9  methods in like mathematical detail to anybody?
10      A   Yes.  Patrick Colbeck.  He put a chapter in
11 his book about it.  But at least a dozen people around
12 the country have duplicated what I have done.  To them
13 it is kind of like, we can do what Dr. Frank did and
14 they are proud of it.  Some of them are federal
15 officials and they do not want anybody to know who they
16 are so I do not give you their names.
17      But then some of them are normal citizens
18 who are proud that they can do that.  So a lot of people
19 have it.  I appreciate that because, not because I need
20 validation because it is pretty straightforward, but
21 then I make sure I did not make some silly mistake.  It
22 is like somebody else checked my work and that is great.
23      I got a group in Oregon that has validated
24 all my work there.  They are in a lawsuit there.  They
25 were using my work in a lawsuit there.  So they actually

Page 219

1  hired a statistician to duplicate my work.
2      In California there is a team in San
3  Bernardino County.  The team there, his name is Steve
4  Unfley, he is so proud that he has duplicated six of my
5  counties.  There are people all over the country that
6  have duplicated my work.
7      There is actually a published paper.  A guy
8  graduated from the University of Virginia and he asked
9  me to not to post my Florida results until he got his
10 paper published because he had already confirmed what I
11 found there and he wanted to be the first one to publish
12 on it.  And he submitted to the Secretary of State and
13 everything.  I don't remember his name, but we can
14 probably go look and find it.
15      But the point I am trying to make with this
16 is that the math I do is straightforward and anybody can
17 do it who has data skills, and so it is not a big deal.
18      Q   Okay.  Have you ever provided it to
19 Mr. Lindell your formulas and your underlying math?  Has
20 he ever asked for it?
21      A   No.  He has never asked for it.  It is
22 simple.  There is nothing to ask for.  Take the ratio.
23      (Exhibit 113 was marked.)
24      Q   (BY MR. FREY)  One more I want to look at.
25 We will mark what will be Exhibit 113 which is one

Page 220

1  additional article or publication that I wanted to
2  discuss with you.  This is -- Exhibit 113 will be a
3  document entitled, "Analysis of the Dr. Douglas G. Frank
4  Voter Fraud Theory,  Phantom Ballots and the Case of the
5  Polynomial Credit Line, written by John Henderson.
6      Have you seen this one before?
7      A   I don't recall it.
8      Q   Do you know who Mr. Henderson is?
9      A   No.
10      Q   So if you do not recall this article, is it
11 fair to say that you have not discussed this article
12 with Mr. Lindell?
13      A   I have not.
14      Q   I am not going to get to all of the details
15 of this one, but just a couple of questions.
16      If you turn to page 6, in the third full
17 paragraph under Section 4.1, Mr. Henderson writes, After
18 significant effort, I see no evidence that the Census
19 Bureau reports population for individual ages instead
20 using total population for age ranges which is what I
21 believe was used by Dr. Frank.
22      I believe that is consistent with what we
23 discussed earlier, that the 2019 census data is by
24 range, not by individual?
25      A   Five-year buckets.  Actually, I posted a



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

Page 221

1  video teaching people how to do it on my Rumble
2  channel.
3      Q   Okay.  So you would agree though that it is
4  data that has been worked with, it is not just raw data
5  from the census?
6      A   No, I would not agree with that.  It is
7  exactly consistent with what the census reports.
8      Q   How do you determine, say, the number of 23
9  year olds versus the number of 24 year olds?
10     A   So the census prints a graph every year for
11  the number of people by age.  There is a shape to it.
12  What they do, that shape does not change year to year.
13  The shape stays the same because people do not die in
14  uneven amounts.  It is statistical thing.  So that
15  shape gets promoted.  I have a picture of that in here.
16  This is completely the census doing this, not me.
17  Everything here I downloaded from the census.
18     Q   Just for the record, this is page 13 of
19  Exhibit 111?
20     A   Right.  Do you notice that this data they
21  give are for every year, every age?
22     Q   This is the 2010 census data, correct?
23     A   And 2011 and 2012 and 2013 and 2014.  This
24  is the seven years, eight years, sorry, eight years,
25  right, downloaded from the U.S. Census year by year,

Page 222

1  every age.
2      Q   And they do that graphically?
3      A   They do it digitally.
4      Q   I am sorry.  I thought earlier today that
5  you said that census gives the data by five-year age
6  ranges.  Now you are saying no, they give it for every
7  single age?
8      A   They don't update it perfectly by knocking
9  on every door every year.  They take the shape and then
10  they move it one year every year because the shape does
11  not change dramatically.  That is what I am
12  illustrating here.  Then they box it into five-year
13  increments.  But if you know there is source data which
14  they give you, then you can back calculate what it is
15  within a very reasonable percent.
16     Q   Okay.  That is because people do not die
17  on even --
18     A   You don't only use 50 year olds this year.
19  You are probably going to lose about the same amount of
20  50 year olds as 49 unless you have a disease that just
21  attacks 50-year-olds.  The shape does not change, it
22  shifts.  What happens is that people will begin to die.
23  It follows a pattern.  So the mathematics of this is
24  very straightforward, and they give that to you.
25     Q   What about the movement out, you look at a

Page 223

1  county level?  What about people leaving one county and
2  going to another.  I am from Chicago and we have a lot
3  of people leaving, right?
4      A   Right.  Yes.
5      Q   Is that accounted for i this movement from
6  your year to year?
7      A   They adjust it.  The census has a whole
8  bunch of guys who sit around and do this crunching all
9  of the time.  They say okay, what is the current
10  population according to the tax records of that city
11  right now.  Gee, that matches or changes or whatever.
12  Then they make adjustments.
13          I mean, they have people, that is all they
14  do They are actuaries.  They love doing this.  That is
15  their life.  And so understanding how their methodology
16  allows me to make really closest estimates.  They don't
17  even have to be perfect.  They have to be close to make
18  the argument that I am making.
19     Q   Okay.  So it does not have to be exact data;
20  it just has to be close data?
21     A   Close enough that you can make good claims.
22     Q   Okay.
23     A   Yes.
24     Q   Okay.
25     A   He says, There is no evidence that the

Page 224

1  census bureau reports population for individual ages.
2  Here it is.  He is wrong.
3      Q   They don't report it for individual ages
4  year over year; they move the graph from 2010?
5      A   The devil is in the details.
6      Q   Right.  Okay.  If you can go to page 13.  At
7  the very top under 4.5 he writes, We all know that
8  correlation does not equal causation, but did you know
9  that correlation as in Pearson's correlation coefficient
10  R value does not equal accuracy --
11     A   Correct, that would be R square.  I do not
12  use R for a reason.
13     Q   So you don't use the Pearson correlation?
14     A   I use R.
15     Q   You agree that that does not equal accuracy?
16     A   Correct.  Accuracy is something different.
17  You use R scare for accuracy.  You take the R value and
18  square it and that's -- yes, it is different.  It is a
19  different equation.  It is a different thing
20  altogether.
21          I am not trying to be accurate.  I am trying
22  to show that the shape is the same.  How do you show
23  this shape is the same?  You use a number that describes
24  shape.  That is why I chose correlation.
25     Q   Okay.  Okay.  If you can go to page 16.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
225–228

Page 225

1 About midway down Mr. Henderson walks through the three
2 curves or the three datasets that are input?
3     A   He says, Here is all we have shown or some
4 curves that match in shape.  He is acknowledging what I
5 just said.  Go ahead.
6     Q   First he says, you know, first what you show
7 is that citizens of a certain age exist.
8         Do you see that in his first bullet?
9     A   Yes.
10     Q   And do you agree that the blue line in your
11 charts, that is the population line?
12     A   Yes.
13     Q   Number of people who exist?
14     A   Yes.
15     Q   Second, some of those same citizens are
16 registered to vote?
17     A   Some of them, I agree.
18     Q   And that would be the black line, right?
19     A   Yup.
20     Q   That is the voter registrations?
21     A   And there is a problem there.  I am not
22 necessarily, I would not necessarily concede that
23 because in many cases the black line exceeds the blue
24 line, which means that some of the people in the rolls
25 are not some of the people in the blue.  Some of the

Page 226

1 people in the black are not the people in the blue.  I
2 think that is what his same italics are implying, and I
3 do not agree with that.
4     Q   Some voter rolls are out of date or not kept
5 up?
6     A   Exactly.  Yes.
7     Q   And then the third point is, some of those
8 same citizens vote and that is the voter turnout line,
9 that is the red line?
10     A   Yes.
11     Q   Okay.  And then Mr. Henderson poses a
12 question.  He says, how would it not be the case that
13 these curves match?  In other words, given some EG spike
14 of 73 year olds who exist in the population, why
15 wouldn't that spike in demographics show up in the
16 number of 73 years old who register or the number of 73
17 year olds who vote?  Do you see that?
18     A   I see it.
19     Q   What is your response to Mr. Henderson 's
20 question?
21     A   It is a simple response.  The percentage of
22 73 year olds who vote in one county is the same in
23 every other county in the state you think?  Why would
24 it necessarily be the same in every county?
25         Furthermore, let me make it worse than that.

Page 227

1 Why would the relative proportion of 73 year olds and 20
2 year olds be the same in every county?  Let me make it
3 worse than that.
4         Why would the relative percentage of 73 year
5 olds, 50 year olds, and 20 year olds be the same in
6 every county?  Why would all 83 of them be the same in
7 every county?
8     Q   And that is not the same percentage for
9 each, you are just saying that the --
10     A   Same relative percentage.
11     Q   Same relative percentage.  I got you.
12     A   That is what is mysterious.  So he is not
13 even really addressing the right question.  He is
14 looking at a single age.  It is not the fact that the
15 single age is what it is.  It is the fact that all 83
16 of them are.
17     Q   Okay.  Okay.  And then, finally, I want to
18 look at page 24.  I think it is the last page.  He poses
19 several kind of challenges here, I guess, that he
20 thinks, you know, might show that the correlations that
21 you see in the numbers of citizens registered voters and
22 actual voters is surprising or indicative of fraud.
23         And he says, first, you can do this by
24 showing that a state with a high plus R or high plus D
25 margin in the 2020 election, e.g., Wyoming, Idaho, Utah,

Page 228

1 California, Massachusetts, Vermont would there be no
2 incentive for ballot manipulation, does not have a
3 strong correlation between population registered voters
4 and votes across the age demographics.
5         Do you see that?
6     A   I see that.  That is a really poor comment.
7 I mean, if he was my student, he would get an F for
8 that comment.
9     Q   Why is that?
10     A   Why is he assuming there is no incentive
11 for ballot manipulation?  There is incentive in every
12 election in the country in the history of the world
13 there is incentive for ballot manipulation.
14     Q   And that incentive is?
15     A   Somebody wants to win.
16     Q   So you would have a reason to commit fraud
17 in every election because somebody wants to win?  That
18 is you what said, right?  Is that right?
19     A   Yes.  Yes.
20     Q   But where the case is that the democrat is
21 going to win this state based on, you know, the
22 percentage of Democratic voters --
23     A   Everybody makes that mistake.
24     Q   Why would you manipulate that?
25     A   They always look at the top.  They are all



Page 229

1  the school board races.  There is the mayor races.  The
2  one we proved in San Joaquin was the city counsel-man.
3  He was stuffing the ballots.
4       I hear the same broken record everywhere I
5  go in the country.  Dr. Frank, our county is a 70/30
6  conservative county but we just elected four out of four
7  liberal school board members.  How can that happen to
8  us?
9       Down ballot matters.  Kathy Barnette was a
10  down ballot.  Everybody thinks it is the top ballot.
11  No, the sheriff matters.  The county commissioners
12  matter.  There is incentive throughout the entire race
13  at multiple levels.  And especially in the small races
14  where the turnouts are low.  You only have to stuff a
15  few ballots to tip an election.  You might have 500 and
16  it might be close.  And you only take a few and you win
17  and you can buy them for nothing.  50 bucks a piece.
18  Why campaign?  You can buy them and stuff them?  That is
19  how you can hide in a basement and win the election.
20       Q   Buy the ballots for $50 a piece; is that
21  what you are saying?
22       A   Yes.
23       Q   For this down ballot kind of theory for
24  incentive, wouldn't that be individual scattered
25  incentives across the country for people who want to win

Page 230

1  their election?
2       A   That is an assumption you might make, but I
3  would not assume that.  I would assume, if I was
4  somebody trying to change the nature of the country, I
5  would start at the school boards or I would just quote
6  Sorrus who said in 2006 he was going to own every
7  Secretary of State in the country by 2020.
8       Q   So your thought then is that whoever is
9  deciding to use this algorithm to filter that line has
10  looked at the down state, down race ballots to the
11  school board level of every precinct across the country
12  and decided how they want them to come out?
13       A   That they could.
14       Q   Do you think -- for you saying that their
15  incentive is there so that is why the states where you
16  would not think it there would be an incentive show it
17  is because of the down ballot races and it is a
18  consistent algorithm that has to be one mastermind
19  deciding for every single election what they want,
20  right?
21       A   So the nice thing about math and computer
22  programming is once you come up with your formulas, you
23  don't have to think about every situation.  You can hit
24  a button and an AI goes and you can say, I want to have
25  this happen nationwide, and these are the kinds of

Page 231

1  races I want to affect and a computer program can do
2  that.  It does not take, you know, an army of people to
3  make that happen.  That is the power of computer
4  programming.
5       Q   So the computer program would say, okay, you
6  want someone with these characteristics on the local
7  school board and so we are going to make the ballots
8  come out this way?
9       A   Exactly.  You feed money in through the
10  NGOs which is what 2,000 meals proved is happening.
11  You feed money in so that there is an incentive for
12  local people, homeless people basically and NGOs who
13  want the money, and that is not just me saying that.
14  We have that informal testimony in Wisconsin.  That is
15  another one of my -- I forgot to mention it earlier.  I
16  testified under oath before the Wisconsin State
17  Legislature on December 8, 2021.  I don't remember them
18  all.  I do this so much.  Forgive me for forgetting
19  them.
20       We put into evidence that CTCL was pouring
21  tons of money into that state.  That is an example.  If
22  you pour tons of money in, then there are all of these
23  natural incentives that make things happen.  You don't
24  have to have a conspiracy.
25       What I mean to say is, you don't have to

Page 232

1  have millions of people or somebody in every county
2  cheating.  It sort of naturally takes care of itself.
3       Q   Okay.
4       A   That is why I reacted to that first
5  comment.  Did you want to go over more bullet points?
6       Q   I want to go just to the third one which you
7  suggest that these trends were not present in older data
8  when the use of machines and other fraud enabling
9  gadgetry did not exist, assuming 1998 is not officially
10  historic.
11       Do you see that?
12       A   Let us see here.  I have done that.  I did
13  that in Pennsylvania.  I showed data back to 2000.
14       Q   And that data showed that there was not,
15  that you could not predict every county by one county?
16       A   Well, that is not quite fair.  That is not
17  quite fair.  I showed that it was a different shape and
18  you can see the shape grow in this 2016 and 2020 that
19  was not present before that.  It was substantially
20  different, and I showed multiple years because the
21  challenge, people always say, well, show me an election
22  that does not have fraud in it?  How do you know it
23  does not have fraud in it?  How do you know?  So that
24  is not a good starting point, is it?  Or people will
25  say, you know, show us an election where there is no



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
233—236

Page 233

1  machine manipulation.
2      I will say, well, get me the data.  Okay.
3  Find the data.  Fat chance finding it.  It is really
4  tough to get a voter roll from 20 years ago because they
5  were not making backups.  They call it a living database
6  which is always migrating and changing.  They don't make
7  snapshots.
8      Now, since I have been doing this work a lot
9  of states have begun making snapshots of their data and
10  archiving it, and they were not before because it is
11  like, wait a minute, there is voter roll manipulation?
12  We should make snapshots.
13     Q    So is it that you could not do this because
14  the data does not exist?
15     A    Well, find it for me and I would be
16  delighted, but it is a lot of work just to find it.  I
17  tried in Ohio because I am from there and
18  unsuccessfully.  Working with local clerks is very
19  difficult.
20     Also, keep in mind not just finding it for
21  one county, you have to find it for the whole state
22  because you are comparing all the counties.  It is not a
23  trivial request.
24     Q    That analysis that you did do in
25  Pennsylvania, you said the shape started to change --

Page 234

1      A    Yes.
2      Q    -- in 2016.
3      Did you look at in 2016 that your numbers
4  from one country can predict the numbers across the
5  state?
6      A    I only had one county for every election
7  back in 1990 so I could not compare it to other
8  counties.  Does that make sense?  It is exactly
9  illustrating the point I am making right now.
10     Q    Which is the data is not there?
11     A    Yes.  How do you find the data?  Find me
12  the data and I would be delighted to, but nobody seems
13  to have it.  Especially the clerks, they do not like to
14  give it to you either.
15     Q    In your opinion then would you expect not to
16  find that one county can predict the other county as in
17  the 2016 election?
18     A    No, I would expect it to work in 2016.  One
19  of the advantages of looking at the historic records in
20  Pennsylvania, which I did, is I was able to look at
21  all, for all history, and I show this in my current
22  presentation, for all history I can show the voter
23  rolls for Montgomery County which I had all the way
24  back to 1900.  I could show there was funny business in
25  1996, an extra ten percent of people were added to the

Page 235

1  voter rolls that did not vote.  It is weird that you
2  inflate your voter rolls by ten percent and then years
3  after they phased them in gradually and that is
4  suspicious.
5      Q    So you are suspicious of the elections going
6  back to 1996?
7      A    Yes.  And I can, and maybe this is the
8  wrong time to discuss it, but I can give you a long
9  discussion where I have sat with senior officials in
10  states, for example, Missouri and they have explained
11  to me, yes, ballot stuffing has been going on here for
12  decades.
13     I can tell you a story about the 1950s and
14  when St. Louis was competing with these.  They were
15  committing, who can stuff more and the unions were
16  fighting.  I mean, ballot stuffing is as old as it gets.
17  It is an old mechanism.  Electronics has just made it
18  easier because now, you know, where you are standing and
19  you don't have to park somebody in the parking lot.
20     Q    Okay.  Let us change gears a little bit.  Is
21  everyone good?
22     So I want to talk about your income stream,
23  your payments from Mr. Lindell and others related to the
24  work that you are doing.
25     It is true at some point in time Mr. Lindell

Page 236

1  began to pay you for the work that you are performing
2  relating to election analysis?
3      A    I would want to define that more carefully.
4  When I first started working, remember when he first
5  invited me, I did not know what I was getting into.  I
6  never met the guy.  I was afraid of getting sued.  I
7  was afraid of all kinds of things.
8      So I wrote a one-page -- I don't know if I
9  sent it to you.  I tried to find it, if I did send it to
10  you, a one-page contract that I wanted with him where I
11  said, you know, if I am sued, you got to pay for my
12  attorneys.
13     And I proposed a rate per hour if I testify
14  and because I have done testimony before as an expert
15  witness.  I know what to expect.  $200 for my normal
16  hourly rate and $400 if I am in person or court or
17  whatever it was.  It was something like that.  I tried
18  to find that letter for you, unsuccessfully.  But maybe
19  I did find it.  I don't remember if I found it.
20     Q    I don't believe so.  We have not seen it?
21     A    Anyway, he sent me a retainer immediately
22  after that.  I think it was $30,000.  Okay.  He sent me
23  a retainer.  I never sent him a bill against that.  So
24  that, that is certainly -- I already mentioned the
25  situation with Kathy Barnette and she gave me the 5k.



Page 237

1    Q    Just pause for a second.
2    A    I am sorry. I am supposed to let you ask
3 the questions. Somebody coached me properly. I just
4 did not listen.
5        MR. GREENE: Let him ask the question and
6 then you answer.
7        (Exhibit 114 was marked.)
8    Q    (BY MR. FREY) So I am going to have the
9 court reporter mark as Exhibit 114 this document. This
10 document you did produce as D_Frank00157.
11    A    Yup. I provided that to you.
12    Q    Right. So this is, like an IRS filing for
13 nonemployee compensation, right?
14    A    Yes.
15    Q    Okay. And it shows Lindell Management, LLC
16 paid you $30,000 in nonemployee compensation in 2021,
17 right?
18    A    Right.
19    Q    And, in fact, you received that $30,000
20 payment in 2021?
21    A    I did.
22    Q    Did you receive it in a lump sum?
23    A    Yes.
24    Q    And you said that was very shortly after you
25 started kind of working with him in late February, early

Page 238

1 March of 2021?
2    A    Yes. Yes. It would have been about April.
3    Q    Okay.
4        THE COURT REPORTER: Can we go stop for a
5 second? My computer froze for some reason. If we can
6 go off the record.
7        MR. FREY: Yes. Let us go off the record.
8        THE VIDEOGRAPHER: The time is 3:26 p.m. We
9 are now off the record .
10        (Recess was taken.)
11        THE VIDEOGRAPHER: The time is 3:26 p.m. We
12 are back on the record.
13    Q    Dr. Frank, we just talked about the $30,000
14 payment you received from Lindell Management, LLC.
15        Did you receive any additional monetary
16 compensation in 2021 from Lindell Management, LLC?
17    A    Not that I recall.
18    Q    Did you ever receive any compensation that
19 was like actually on the paystub from MyPillow, Inc.?
20    A    No.
21    Q    Did you ever receive any compensation,
22 monetary compensation from Mr. Lindell directly, like
23 not through the Lindell Management, LLC?
24    A    He gave me a gift one time.
25    Q    What was that?

Page 239

1    A    When my YouTube channel got taken down, he
2 sent me some money for that. I don't remember how much
3 it was. It was more than $30,000. I think tens of
4 thousands because I was making three or $4,000 a month
5 on my YouTube channel and he felt bad that it got taken
6 down. He said here.
7    Q    More than $30,000 you think?
8    A    I think.
9    Q    More than $50,000?
10    A    No.
11    Q    Somewhere between 30 and 50?
12    A    Yes.
13    Q    And that was -- was that when your YouTube
14 channel got taken down -- I apologize. I don't know the
15 date of that, when was that?
16    A    Soon after he made the movie.
17    Q    Okay.
18    A    What he was doing he announced publicly to
19 everybody. He said, if you lose your channel because
20 of this, you know, I will pay you. He even said it in
21 public.
22        When it happened to me, he just did it. He
23 was doing that to a lot of people. It is a gift. It is
24 not really compensation. So that is why I did not like
25 the question. It is not really compensation. It is

Page 240

1 sort of like he is saying it is a gift. Let me help
2 you. That is different than compensation, I think.
3    Q    But it is however you want to define it.
4    A    Yes. Yes.
5    Q    It is money that Lindell provided to you?
6    A    Yes, he gave it to me, I think, friend to
7 friend.
8    Q    Okay.
9    A    It is a gift.
10    Q    Anything other than that one, let us call it
11 a gift, when your YouTube channel got taken down, any
12 other circumstances like that where Mr. Lindell gave you
13 money?
14    A    I never lie.
15    Q    That is good because you are under oath.
16    A    It is one of the big ten. I always tell my
17 sons, if you feel a lie about to form on your mouth,
18 stop moving it.
19        Yes, when we did the movie, we were in that
20 studio in Memphis, and the night after we finished all
21 the filming he sat down at the table and he signed one
22 of his books over to me and he gave me a check. I think
23 it was like 5,000 bucks or something like that. I was
24 not expecting that. That was right out of the blue. I
25 did not go there to get paid. I was not expecting to



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
241–244

Page 241

1  get paid. I had already got the thing in place.
2         So that was a gift from him and he said so.
3  He gave it to me. This is a gift.
4     Q   Okay.
5     A   If I give you a gift, that is not
6  necessarily compensation, but I understand you are
7  exploring that now so I am trying to honest.
8     Q   I appreciate that. Any other times where
9  Mr. Lindell gave you a gift of money?
10    A   Not that I can recall.
11    Q   What about nonmonetary compensation, did he
12  ever give you gifts, you know, items?
13    A   He gave me the book.
14    Q   The book. Anything else?
15    A   No. In fact, I paid for all of my pillows
16  and my own slippers and everything.
17    Q   Did he provide for your transportation when
18  you were doing work for him?
19    A   Yes. Like when you always do for speakers,
20  you compensate for travel expenses and he pays for the
21  hotel rooms for his speakers and things like that, yes.
22    Q   And is that when you came to appear on the
23  Cyber Symposium, Scientific Proof and also when you
24  travel around to different states?
25    A   When he sends me to events, yes. We have

Page 242

1  an event coming up and I am sure that he is going to
2  purchase a bank of hotel rooms. And I am sure that I
3  will be in one of them, but he has not promised that
4  yet. If I end up paying for myself, I will. Likely he
5  will be providing that.
6     Q   And aside from the travel compensation or
7  the travel facilitation with the transportation and the
8  hotel arrangements, is there any work that you do where
9  you get X amount of dollars to go do this?
10    A   No.
11    Q   Like $5,000 to go speak --
12    A   No. In fact, I make a big point of that in
13  public to separate me from a lot of people that are out
14  there. I say, I do not charge for any of the work that
15  I do, and they pass a hat to pay for my plane tickets.
16    Q   Did Mr. Lindell, when he gave you the
17  $30,000 retainer, did he specify like the work that he
18  wanted you to do under that retainer to kind of fulfill
19  your end of the engagement?
20    A   I negotiated that with Kurt, not with
21  Mr. Lindell and Kurt was assuming that I would be
22  analyzing states and testifying potentially in some of
23  the lawsuits. So I assumed that is what it was for. I
24  never sent him a bill, and I way exceeded the amount
25  that that would have covered in terms of my personal

Page 243

1  time.
2     Q   Have there been any, in 2022 or 2023, any
3  additional retainer payments related to the work that
4  you are doing?
5     A   No retainers, no.
6     Q   No lump sum payments?
7     A   He sent me some more last year.
8     Q   How much?
9     A   I did not ask for it.
10    Q   How much did he send you last year?
11    A   I hate these questions, but I have to
12  answer them. He sent me 100k last year.
13    Q   When was that?
14    A   June.
15    Q   And when he sent you the 100k --
16    A   That was the same as this.
17    Q   Okay. The same as this Lindell Management,
18  LLC?
19    A   Yes.
20    Q   At that time did you have a conversation
21  with him about the payment?
22    A   What happened is, when I did my taxes in
23  2021 and brought this out, I thought, that was nice
24  having help. So I called Mike and I said, hi, Mike.
25  Do you want to do that again this year? He said, yes.

Page 244

1  That was our conversation.
2         And then this June I got a big check and it
3  was for a lot more than that. I sent him a nice thank
4  you note. I said, I did not expect that. Thank you
5  very much.
6     Q   Okay. And so that was June of 2022, right?
7     A   Yes.
8     Q   And so now we are in July of 2023.
9         Has there been another payment like that?
10    A   No. Nothing. Zero.
11    Q   And he did not specify any particular work
12  that he wanted you to do to receive the payments you
13  said, right, it is just a general?
14    A   No. And the way that I have viewed it, and
15  I think that the way that he is viewing this enables me
16  to do what I am doing traveling the country and do
17  doing what I am doing. I have given up my job. I have
18  given up my income. So he is sort of covering for me,
19  yes.
20         (Exhibit 115 and Exhibit 116 were marked.)
21    Q   (BY MR. FREY) I want to look really quickly
22  at another exhibit.
23    A   Yes. This is when we were flying around
24  together.
25         MR. GREENE: Just one second. Wait until he



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
245–248

Page 245

1  asks you a question.
2        THE WITNESS:  I am sorry.
3      Q    And this is an email chain from mid
4  September 2021 with a Bates stamp DEF017621.00001.  I
5  will represent to you this was produced to us by counsel
6  from Mr. Lindell.
7      A    Sure.
8      Q    Do you recognize this email?
9      A    I have never seen it, but it looks like I
10  should have.
11      Q    You see that you were on it, correct?
12      A    Yes.  Because I see it there, yes.
13      Q    Okay.  And do you see that you, yourself, J.
14  Rosenthal and Mr. Lindell, right?
15      A    Who is that?
16      Q    That was going to be a question for you.  If
17  you know who --
18      A    I don't know who that is.
19      Q    -- if you know who Jeff Rosenthal is?
20      A    I don't know who that is.
21      Q    Do you see in the middle of the first page
22  there Mr. Rosenthal writes, Dr. Frank, below are the
23  communications that I am having with the NE SOS office.
24  I was told by Ben and in the SOS election office that
25  you were invited to Nebraska and turned down the

Page 246

1  invitation.  I have my doubts.
2        Do you see that?
3      A    Yes.
4      Q    Do you recall interactions with the Nebraska
5  Secretary of State's Office?
6      A    Absolutely.
7      Q    Do you recall the circumstance where they
8  reached out to you and you had not --
9      A    No.  In fact, I was there and I offered to
10  meet with them on multiple occasions and he would never
11  meet with me.  I was in person in the building knocking
12  on his door.
13      Q    But he was not taking the meeting, not the
14  other way around?
15      A    Wait a minute.  Is Rosenthal the deputy?
16  Is he the Deputy Secretary of State?
17      Q    I don't know.
18      A    Because I met with the Deputy Secretary of
19  State and I am wondering if that is him.
20      Q    No.  This email here --
21      A    I don't remember.  I don't know who it is.
22      Q    Okay.  That is fine.
23      A    I am sorry.  I tried to figure it out for
24  you but I --
25      Q    That is okay.  I just want to look at

Page 247

1  Mr. Lindell's email.
2      A    Right.
3      Q    Where he says, Hello, Jeff.  Dr. Frank is on
4  my payroll and he would not turn down any state.  He
5  goes on to talk about states that you have met and he
6  says, we would love to meet with Nebraska.
7        Do you see that?
8      A    Yes.
9      Q    Would you consider yourself "on
10  Mr. Lindell's payroll"?
11      A    Wow, no.  This even says nonemployee
12  compensation.  I have never considered myself on his
13  payroll.
14      Q    Okay.  So you do not consider yourself on
15  his payroll today?
16      A    No, absolutely not.
17      Q    Okay.  Would you have considered going
18  around to meet with Secretaries of State or legislatures
19  to be kind of a term of the payments you were receiving
20  from Mr. Lindell?
21      A    I never thought of it as payment for
22  services.  I always thought of it as him enabling me to
23  do the work that I do.  I think him saying Dr. Frank is
24  on my payroll is him just, I don't think that is
25  technically -- I would give him the benefit of the

Page 248

1  doubt because I have never been on his payroll.
2        So he probably just being sloppy in his
3  terminology.  He is probably saying, hey, I know him
4  well.  I have given him money.  He would not turn down
5  any state.
6      Q    That is how you interpret that?
7      A    That is my interpretation because,
8  obviously, I am not on his payroll.  If I was on his
9  payroll, you would have all my W-4 or W-2 forms which I
10  do not have.
11      Q    Okay.  Okay.  We will talk a little bit more
12  about other state visits here in a few minutes.  But my
13  understanding from you is that there is no kind of
14  written agreement or even solidified oral agreement that
15  I am going visit Wyoming, I am going to visit Nebraska,
16  I am going to visit Michigan and that is kind of why you
17  have given me these statements?
18      A    No connection.  I am a separate entity from
19  Mike Lindell.
20      Q    Okay.
21      A    I do everything that I do on my own.  Now,
22  that does not mean that I do not cooperate with him.
23  When he calls me and says, Doug, will you look at that
24  for me?  Absolutely.
25        If I ask him to do something, he would do



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
249–252

Page 249

1  something for me too.  In Southern California I asked
2  him to Zoom in and he does.  I did not pay him for that.
3  We are friends.
4      Q   Okay.  So aside from Mr. Lindell and Lindell
5  Management, have you received monetary compensation from
6  any other sources in connection with the election
7  analysis work you have been performing?
8      A   I got a donation from a church last year,
9  $5,000 a Southern California church.  They loved what I
10  was doing.  They gave me a donation.
11     Q   Any other sources?  I believe earlier you
12  said Kathy Barnette was $5,000?
13     A   Yes.  I asked for $2,500, and then later
14  she gave me $5,000 and said, well, we paid the other
15  analyst 5k so I felt like you did so much more than the
16  other, I felt like I had to give that to you.  I did
17  not ask for it.  I was volunteering.
18     Q   How about in connection with the Antrim
19  case, were you compensated for that?
20     A   Nothing.
21     Q   You mentioned the case in Oregon where they
22  used your --
23     A   Nothing.  They reimbursed me for my plane
24  tickets.
25     Q   No other sources of compensation in

Page 250

1  connection with the work that you did?
2      A   No.
3      Q   You said one donation from a Southern
4  California church?
5      A   Yes, 5k.  I had to put it on my taxes.
6      Q   Okay.  All right.  I want to look at one
7  other text chain that is kind of on this.  This is going
8  to be a Exhibit 16.  It is a string text messages with a
9  Bates label DEF121397.0001.  This was produced by
10  Mr. Lindell.
11         Do you see that document?
12     A   Yes.
13     Q   Do you see your name there at the top, Doug
14  frank?
15     A   I do.
16     Q   Okay.  Is that you?  Is that your phone
17  number?
18     A   Yes, it is.
19     Q   Do you recall -- this is from May 18, 2022,
20  so just over a year ago.
21         Do you recall communicating with a Keith
22  Center about Surry County, North Carolina?
23     A   I do.
24     Q   Who is Keith Center?
25     A   He is a local grassroots guy who is unhappy

Page 251

1  with his elections.
2      Q   How did you first come to know him, Keith
3  Center?
4      A   I don't remember, but I was invited to be a
5  speaker at one of their events and I met him there.
6      Q   Okay.  In this first chain here, the first
7  message on this chain, he says, Essentially that we had
8  a failed meeting with Surry County, North Carolina
9  commissioners.
10         Do you see that?
11     A   Yes.
12     Q   Can you guys look into this and help us
13  develop a plan of action to go forward.  Right?
14     A   I am reading that.
15     Q   Okay.  And you responded then about four
16  minutes later, you said, Sue them for their surety bonds
17  for starters.
18         Did I read that right?
19     A   Yes.
20     Q   And then a couple of texts later you say,
21  you put a link bondsforthewincom.
22         Do you see that?
23     A   Yes.
24     Q   What is bondsforthewin.com?
25     A   It is a website that teaches people how to

Page 252

1  sue their county officials for their surety bonds and
2  it had some degree of success around the country.  It
3  empowers citizens whose county officials are not
4  performing the way that they want.
5      Q   If you go to the next page, about four down,
6  you say, No money needed for suit.  Read the link I gave
7  you.  By the way, if you win, you get to keep the bond
8  money.
9          Do you see that?
10     A   Yes.
11     Q   Why did you tell Mr. Center that he got to
12  keep the bond money?
13     A   Because he is suing pro se a county
14  official.  If he wins the lawsuit, he gets the money
15  and they are typically $100,000 for a county clerk and
16  maybe ten or $20,000 for commissioners.
17     Q   So he would get the money from that?
18     A   Yes.  For a frivolous case it is not a
19  smart idea.  If you have a good case, sue them and get
20  the money.
21     Q   And then at 11:13 Mr. Center responds, he
22  says, If we get an event location, would you guys agree
23  to come and stoke the fire?
24         Do you see that?
25     A   Yes.



Page 253

1    Q    And you said, you know, we are in if
2    feasible. Work with Michelle on this, right?
3    A    Yes.
4    Q    Who is the "we"? Is that you and
5    Mr. Lindell?
6    A    No, I never commit Mike.
7    Q    Okay. So just other people on your team?
8    A    In the grassroots, yes.
9    Q    And who is Michelle?
10    A    Michelle is, was my planner for about --
11    she continues to be my planner.
12    Q    So she works for you?
13    A    She does not work. I do not pay her
14    anything. I offered to pay her and she said, if you
15    pay me, then I have to do what you say. So I am just
16    going to volunteer. She has been volunteering for me
17    since the beginning.
18    Q    So she is not associated with Mr. Lindell or
19    Lindell Management, she is more associated with you; is
20    that right?
21    A    She has been volunteering for me forever,
22    ever since the Cyber Symposium.
23    Q    Okay. If you go to the --
24    A    She got my hotel reservation last night
25    that I stayed in in Colorado Springs. She organized

Page 254

1    that for me. That tells you who she is.
2    Q    Okay. If you go to the fourth page that has
3    .004 in the corner. And at the bottom Mr. Center text
4    and says, Quick question. Can we have folk pay directly
5    the Lindell legal fund and it be designated for legal
6    bills related to CVR's in NC?
7        Do you see that at the top of that text?
8    A    I do.
9    Q    What are CVR's?
10    A    Cast vote records.
11    Q    And who would be -- why would they be making
12    payments to the Lindell legal fund?
13    A    I get this question all of the time.
14    People say, we want to support Mike but we want the
15    money to go to support our county. Can we designate
16    our donations so that they are used through the Lindell
17    legal fund here? We say no.
18    Q    Okay. So if people give to the Lindell
19    legal fund, it just kind of goes into the lawsuits
20    generally?
21    A    It gets disbursed as however they deem. I
22    have no idea.
23    Q    You anticipated my question.
24        Do you know how the Lindell legal fund is
25    being spent?

Page 255

1    A    No.
2    Q    So based on these payments and who they came
3    from, are you familiar with Lindell Management, Lindell
4    Management, LLC?
5    A    They are the ones who cut checks to me.
6    Q    What is -- do you have an understanding of
7    the purpose behind Lindell Management, LLC?
8    A    No.
9    Q    Do you know who the officers are?
10    A    No.
11    Q    Are you familiar with any Lindell Management
12    employees?
13    A    Maybe. Since I don't know what it is, I
14    might know some of the people.
15    Q    But you don't know anyone by, oh, they work
16    for Lindell Management, LLC?
17    A    No.
18    Q    Okay. You are familiar with an entity
19    called MyPillow?
20    A    Right.
21    Q    Do you work with any employees of MyPillow?
22    A    No.
23    Q    Are you familiar with an entity called
24    FrankSpeech?
25    A    Yes.

Page 256

1    Q    Have you ever been employed or received
2    compensation from FrankSpeech?
3    A    No.
4    Q    FrankSpeech is an internet based platform,
5    right?
6    A    Yes.
7    Q    Do you know when it was officially launched
8    for public viewing?
9    A    Yes, I was there.
10    Q    When was that?
11    A    I want to say, best memory, about April of
12    2021.
13    Q    Okay. And so you were there at the launch?
14    A    Yes.
15    Q    Tell me about that day. What was the
16    launch? Like who was there?
17    A    There were Ash and Holly and Sean and Conan
18    and Kurt and a bunch of grassroots people.
19    Q    I was going to stop you for a second.
20        Who is Ash?
21    A    Ash, at FrankSpeech they were launching
22    Cause of America. They were featuring Cause of
23    America. Ash was one of the officers, one of the
24    employees of Cause of America. I don't remember her
25    last name. I am sorry. Holly was one of them too.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
257—260

Page 257

1    Q    Both at Cause for America?
2    A    Yes, of America.
3    Q    Cause of America.  I apologize.
4         Sean you said?
5    A    Sean Smith.
6    Q    Sean Smith.  Okay.  And Kurt would be Kurt
7  Olsen?
8    A    Yes.
9    Q    And then you said a bunch of grassroots
10  people?
11    A    Well, I was characterizing that group.
12  There might have been, if I sat down and really thought
13  hard, I could probably remember more people.  The way
14  to find out is to look at the broadcast from that day
15  because Mike was trying to have a continuous stream of
16  guests, and you can see them one after another.
17    Q    Have you ever worked on any projects
18  specifically related to FrankSpeech?
19    A    I don't know what that means.
20    Q    So you probably appeared on FrankSpeech,
21  right?
22    A    Yes.
23    Q    Have you ever helped develop the
24  programming, who else will speak?
25    A    No.  I send them guests, yes.  I send them

Page 258

1  ideas.  I don't have any control.  I will say, hey,
2  here is a really good interview.  Brandon, Brandon
3  Howse let us say.  I will say, check out this person.
4  This is a great interview and I will make a
5  recommendation.
6    Q    Okay.  Okay.
7         Are you still good to keep going?
8    A    I am good.
9    MR. GREENE:  I am the wrong person to ask.
10  I am fine to keep going.
11         (Exhibit 117 was marked.)
12    Q    (BY MR. FREY)  I want to talk to you about a
13  couple of documents that were in your production that
14  you made to Smartmatic.  Both of these are a little
15  difficult in the sense that one is a big Excel file and
16  one is a video file.
17         So the first one which will be marked as
18  Exhibit 117 is a document that was produced with a Bates
19  Stamp D_10.0001.  We have a hard copy, right?
20    MR. GREENE:  Is this the Excel file?
21    Q    Yes.  So this was a large Xcel.  So we did
22  our best to print it to PDF.  But you see at the top
23  here it says Los Angeles, Registrants and the number of
24  voters?  Do you see that?
25    A    Yes.

Page 259

1    Q    Did you or do you recognize this?
2    A    Yes, I created it.
3    Q    Okay.  Next question was, did you create
4  this?  So thank you.
5         When did you create this document?
6    A    For the discovery.
7    Q    So you created this for the purposes of
8  discovery?
9    A    I made this document because you requested
10  it in the subpoena.
11    Q    We requested you to create a document?
12    A    No.  How do you describe this?  I was
13  supposed to provide -- I am trying to remember -- I am
14  shady on this.  I was supposed to provide the data
15  related to your county.
16    Q    Data that was already in your custody,
17  possession or control?
18    A    Right.  So I -- I mean, my computer is full
19  of data from other states.  So I pulled this out to
20  give you the part that was requested.
21    Q    So you already had data on your computer?
22    A    Yes.
23    Q    And then you went and found it when you got
24  our subpoena and said here is the --
25    A    Here is what you are asking for.

Page 260

1    Q    The LA county data.
2    A    I did my best to answer what you asked for.
3    Q    You did not actually go get this data?
4    A    I already had it.
5    Q    Okay.  That is what I was asking.
6         Why did you have this?  Like why had you
7  gone and got this data?
8    A    Because I am requested to help grassroots
9  teams all over country, including LA, and I have the
10  data for California and I had done every precinct in
11  California.  And so when I was asked about this, I
12  brought those data out and gave them to you.
13    Q    Okay.  Okay.  So the provisional Xcel
14  spreadsheet, there are tabs, there are different tabs at
15  the bottom?
16    A    Yes.
17    Q    The first tab, which is actually page 1 out
18  of 144 of this PDF, is labeled precincts.  So I want to
19  focus on that to start.
20         And at the far left column is the title
21  registrations.  Do you see that?
22    A    Yes.
23    Q    On page 1.  That number starts at 18?
24    A    Right.
25    Q    Do you know why the number started at 18?



Page 261

1    A    That is age.
2    Q    Okay.  And so then across the columns, I
3    guess you just have the number of registrations in each
4    precinct for each age level?
5    A    Acton has 64 18 year olds registered.  The
6    registrations are for these counties, and I could have
7    added age as a double header.  The problem with the
8    table is how do you put the label for that column and
9    the label for that column in the same cell.
10   Q    I am just trying to understand.
11   A    Yes.  Yes.
12   Q    So this is age and this is the number of
13   registrations per each, and then across the top those
14   are precincts?
15   A    Yes.
16   Q    Okay.  And you got this data from LA County;
17   that right?
18   A    No, I got it from the Secretary of State.
19   Q    And did the Secretary of State give it to
20   you in this format or did you input the values?
21   A    I wrote software that does this.
22   Q    Okay.  So you wrote software that takes from
23   the data that they provided?
24   A    That is a humongous set.  I want to know
25   how many there are of this.  The software goes through

Page 262

1    the big database and goes through it and counts them up
2    and puts them in.
3    Q    Okay.  Okay.
4         So then if we go to page 65.  I am sorry.
5    Back up one second.  It says ballots in the middle of
6    the page.
7    A    Yes.
8    Q    And so, and then again we have numbers 18
9    to --
10   A    It should be 110 or 120.
11   Q    Is that --
12   A    120.
13   Q    Is that the number of -- then you have the
14   precincts going across?
15   A    Yes.
16   Q    Is that the number of ballots cast in each
17   precinct by age?
18   A    Yes.
19   Q    And then, again, did you just take this data
20   from the Secretary of State website?
21   A    Yes.
22   Q    And have the software inputted?
23   A    Not the website.
24   Q    Or the Secretary of State's data?
25   A    Database that they gave me.

Page 263

1    Q    Okay.
2         If we go to page 145, we get to the next
3    what would be tab on the Xcel spreadsheet.  This tab is
4    called correlate turnout and party.
5    Do you see that at the bottom there?
6    A    Yes.
7    Q    Okay.  And then the precincts are listed
8    again on the left, right?
9    A    Yes.
10   Q    And then there is a bunch of columns over to
11   the right.
12        And so what are the first kind of three
13   columns under party affiliation register, what do those
14   show?
15   A    So the first precinct, Axton, has 3,098
16   Republicans who registered.  1,361 Democrats registered
17   and 1521 who are not specific for identification as
18   either Republican or Democrat as registered.  The next
19   three are how many of those Republics, Democrats or
20   nonaffiliated voted for Axton.
21   Q    The numbers at the top across the, above the
22   red text, above party affiliation registers, is that the
23   total?
24   A    For those columns, yes.
25   Q    Okay.  And then under percent turnout, did

Page 264

1    you run a calculation to get those numbers under R, D,
2    none and overall?
3    A    Those look to me like they are a
4    consequence of 757,191 divided by 970,519.
5    Q    And then going down by each precinct is just
6    taking that --
7    A    Those top numbers are separate from the
8    rest of the table.
9    Q    Those top numbers are, right?
10   A    Yes.
11   Q    And underneath the columns R, D and none?
12   A    Yes.
13   Q    The third set of R, D and none, I guess I
14   should say?
15   A    Yes.
16   Q    Starts with .86, .79, .73?
17   A    Yes.
18   Q    Those are the percentages of turnout by
19   Republicans, Democrats and unaffiliated for each
20   precinct?
21   A    Yes.
22   Q    And then overall would be the overall
23   turnout?
24   A    Yes.
25   Q    And then how about the next column to the



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
265–268

Page 265

1  right, the total registrants?
2      A   It looks to me like the sum of the first
3  three columns.
4      Q   I see.
5      A   And then because three, four, five, 58, 59,
6  it should be close. Yes, that is it.
7      Q   Okay. And then total ballots is probably
8  the sum of the next three columns?
9      A   Correct.
10      Q   And how about D/R?
11      A   Democrats over Republicans.
12      Q   Okay. And then --
13      A   So that would have been 1,361 divided by
14  3,098 and that looks just about right.
15      Q   U/ that would probably be unaffiliated over
16  Republicans?
17      A   Yes, that is about right. It is about 50
18  percent.
19      Q   One other question back on the registration
20  data. On page 65, if you go there, there is a lot of
21  zeros coming down for ages 100 to 119. In 120 there is
22  a bunch of numbers again.
23          Do you know what that might be?
24      A   Yes. If there is no birthday given or no
25  birth year given, I just accumulate them there. That

Page 266

1  way I don't lose my ability to reconcile the totals.
2  It also gives you an idea of what is going on in that
3  county and that is not -- this is an area that I
4  constantly complain to other people about. They will
5  say, we have 187people that are 120 years old in our
6  county. I am like, no. That is zero. January 1, 1900
7  is zero. So, guess what, anybody who has a zero for
8  their birthday is going to show up as 120 years old.
9  That means that they did not put in a birth date or
10  there is something defective about it or a lot of the
11  counties have witness protection programs to protect
12  wife abuse and things like that and they do not put in
13  the birth date. It basically give me an idea what that
14  is.
15      Q   Okay. I have, on page 147, starting with La
16  Mirada precinct, there is no data in the percent
17  turnout?
18      A   That is just a mistake.
19      Q   Okay.
20      A   Because you have a big county. This is my
21  exploration page. This is where I go looking for
22  stuff. All I would have needed to do is drag down and
23  I could have filled that out but I didn't which means
24  it tells you how useful this page was to me at the
25  time. Not very, because I would have discovered that I

Page 267

1  had left that out.
2      A   Right. Right. Okay. All right.
3          Then the last thing on these pages are on
4  pages 151 to 153?
5      A   Yes.
6      Q   These are three kind of graphs?
7      A   Yes.
8      Q   The first being Republican ballots versus
9  Republican registrants?
10      A   Yes.
11      Q   What is this graph showing?
12      A   The X axis shows the number of registered
13  Republicans -- I will back up. Every blue dot in the
14  graph represents one precinct.
15      Q   Okay. Every little blue dot.
16      A   Every blue dot is one precinct.
17      Q   Okay.
18      A   The X axis is how many people were
19  registered in that precinct. So, for example, the blue
20  dot in the upper-right corner looks like it has about
21  28,000 people registered who are Republicans in that
22  precinct. And then how many of those voted, it looks
23  like about 21,000 of them.
24      Q   Looking at the top blue dot all the way --
25      A   Yes.

Page 268

1      Q   -- to the right. You are saying it is
2  28,000. Then you have other bigger blue dots down on
3  the left?
4      A   They are all the same size. It is just
5  that sometimes there are some precincts that are all
6  lumped together. This is a raw form of this graph. I
7  probably would show this in public, but then I would
8  also zoom in so you can see the smaller because,
9  obviously, there is one outstanding precinct and it
10  dwarfs all the others. I would have changed the X axis
11  to zoom in. This is just my raw. I gave you my
12  worksheet.
13      Q   I was going to say, the next two, other
14  ballots versus other registrants and Democrats, it looks
15  like the same thing, right?
16      A   Yes.
17      Q   And did you do anything with this?
18          Has this been part of any your analyses to
19  date? You got all of the data here. You have these
20  graphs, but it sounds like, based on the fact that you
21  did not fill out the rest of some of these in registrant
22  or correlate it to turnout party, you did not zoom in on
23  the graphs?
24      A   At the time I made this I had not been in
25  LA yet.



Page 269

1    Q    Since the time that you made this?
2    A    At the time I made it.  So I didn't -- now,
3  I am going to qualify that.  I may be wrong.  I have
4  only recently been to LA County a couple of times, and
5  tend to spend my time where I am going.  So I analyze
6  data where I am going.  And I have since been to LA and
7  I would have fixed these graphs.
8    Q    Okay.  Have you used the updated version of
9  this externally at this point?
10   A    Only in public talks.
11   Q    In public talks, okay.
12        And are those talks that you have been
13 invited to by citizens?
14   A    Yes.
15   Q    Want citizen group is that?
16   A    Several.  When I first went to California
17 last year, it was New State California, and then we
18 parted ways.
19        And then it was Republican party.  The
20 California Republican Assembly.  G3 it is called.  Gods,
21 Guns and Government.  They are a conservative group.
22 People that are affiliated that have linked up
23 nationally with Cause of America have invited me in.
24   Q    And when you show this spreadsheet and these
25 graphs --

Page 270

1    A    Yes.
2    Q    -- what is your message?  What are
3  communicating about what these show?
4    A    Well, if I were talking about this today
5  with you, if I remember correctly, I would have to go
6  research to make sure that I am right, if I remember
7  right, when I zoom in on this so the X axis is expanded
8  so you can see all the rest of the precincts, LA
9  behaves very similarly to Placer County.  You can
10 predict very accurately, within, you know, close to the
11 line the number of Republicans who vote in every
12 precinct.  If you know how many are registered, you
13 know how many voted.  If you know how many Democrats
14 are registered, you know how many voted.  If you know
15 how many are registered otherwise, you know how many
16 voted.
17       Then I would show you another county where
18 it is not consistent and it is a scatter plot.  The dots
19 are all over the page.  So why are the Republicans and
20 Democrats in Los Angeles totally predictable, whereas in
21 other counties they are not?  That is a question.  That
22 is an observation.  Why is that the case?
23   Q    Have you, have you presented this data to
24 Mr. Lindell?
25   A    Not directly to him, but I brought it up at

Page 271

1  the Moment of Truth last year.  In fact, I featured my
2  California analysis, because I had just finished every
3  precinct in California and I focused mostly on Placer
4  County, but I believe I showed LA as a counter-example,
5  as an example within the presentation.  So you can
6  watch that and see if I did.  I believe that I did.
7    Q    I will request again of you and your
8  counsel, if you do have an updated version of this, that
9  you produce that to us.  The subpoena is kind of like an
10 ongoing, you know, request so to speak.  If you come
11 into possession of these documents, we still ask that
12 you produce them.
13   A    Yes.  That is tricky because they are
14 always changing.  It depends on what I am doing when.
15 So I don't know what state I am in, right.  I just gave
16 you what I had at the time.
17   Q    It looks like at the time this was
18 January 19, 2023 if you look at the graph?
19   A    I bet that is when I delivered my discovery
20 to you.  I mean my -- I bet that is because I date them
21 automatically so I know what I do when.
22   Q    So you compiled this or you got this from
23 your files then to produce it in discovery?
24   A    Yes.
25   Q    Since then have you done more with this?

Page 272

1    A    Well, I am not sure I did more.  Maybe.  I
2  don't know.  I would have to go look.  Since I have
3  spoken to LA, I bet you -- I do not always use these
4  graphs.  So I don't know if I did or not.  I cannot
5  answer unless I go check.
6    Q    I just make that request.
7        MR. GREENE:  I got it.
8    Q    Okay.
9    A    How about instead of, instead of giving you
10 the whole file so that you don't have to do this again,
11 I would just give you the three graphs that are
12 updated?
13   Q    Because the whole file or we can just get
14 the Excel.  I mean, if it is not in a deposition --
15       MR. GREENE:  You can probably just produce
16 the Excel file itself.
17   Q    This is just for purposes of having to talk
18 about it in the deposition.
19   A    This is an Excel file.
20       MR. GREENE:  Right.  We are saying it is
21 much easier to navigate on an Excel file.
22   Q    On a computer, right, not bounded by having
23 to hand you a paper document.
24   A    Okay.
25   Q    Okay.  The other file you produced in



Page 273

1  litigation that I want to talk about is a video file
2  that was in your production and it is a compilation of
3  slides. Here is a -- we will mark this as Exhibit 117.
4         MR. FREY: Let us go off the record for a
5  second.
6         THE VIDEOGRAPHER: The time is 4:13 p.m. We
7  are now off the record.
8         (Recess was taken.)
9         THE VIDEOGRAPHER: The time is 4:20 p. m. we
10 are on the record.
11        (Exhibit 118 and Exhibit 119 were marked.)
12    Q  (BY MR. FREY) Okay. Dr. Frank, we are back
13 on the record. We determined that we are on Exhibit
14 118. So we have marked Exhibit 118 as screenshots from
15 an MP4 file that you produced in your production with
16 Bates label DFrank158. Then we also have up on the
17 screen here for you that actual MP4 file.
18        Do you understand?
19    A  I understand.
20    Q  Okay. And if you take a second, we will
21 have you watch a bit of the MP4 and then flip through
22 the screenshots and just confirm to your satisfaction
23 that the screenshots are indeed what is in the MP4 file.
24        Is that okay?
25    A  Yes. I trust you.

Page 274

1     Q  For the record, we will do this.
2     A  I understand.
3     Q  I will let the record reflect that we are
4  playing the video, which is Exhibit 119.
5         (Video played.)
6     A  I am satisfied.
7     Q  So, Dr. Frank, you are satisfied that the
8  screenshots we printed as Exhibit 118 correspond to the
9  MP4 that you produced as Exhibit 119?
10    A  Sure.
11    Q  Great. So I want to talk to you a little
12 bit about these slides and how you compiled them.
13        So the cover slide or the cover page slide
14 says, Machine Slide for Smartmatic deposition. I
15 collected the slides I used in my presentation related
16 to, quote, machines.
17        Do you see that?
18    A  Yes.
19    Q  Did you write this?
20    A  Yes.
21    Q  Why did you A, compile the documents this
22 way and then B, write this?
23    A  Because I read the subpoena as I was
24 supposed to provide this stuff. And so I collected it
25 for you in one place. Click and drag, click and drag

Page 275

1  out of my hundreds and hundreds of presentations I
2  collected the slides related to machines. When I do a
3  PowerPoint, that is the title slide so I know what the
4  heck I am doing.
5     Q  Okay. So you went through all the various
6  presentations that you did and you collected everything
7  that you could find that related to machines and
8  compiled it here; fair?
9     A  Yes.
10    Q  Okay. And when you talk about your
11 presentations, are those the presentations you kind of
12 travel around and do around the country?
13    A  Yes.
14    Q  Like in front of state officials?
15    A  Yes.
16    Q  Okay. And I know there is probably a long
17 list, but do you recall which state officials you have
18 shown these slides to?
19    A  Hundreds.
20    Q  Let me ask it this way: How many state
21 legislatures would you think that you have met with out
22 of the 50?
23    A  Over 100.
24    Q  Over 100 different meetings?
25    A  Over 100 different legislatures. 46

Page 276

1  states.
2     Q  46 states, okay. What are the four states
3  that you have not been to?
4     A  Alaska, Hawaii, Arkansas, Mississippi.
5     Q  And so for the other 46 states you met with
6  some subset or the full group of state legislators or
7  legislatures?
8     A  I do not understand that question.
9     Q  I am just asking any other 46 states you met
10 with --
11    Other 46, the ones that I have met with?
12    Q  Yes.
13    A  Yes.
14    Q  You met with some set of state legislatures
15 in those states?
16    A  Yes.
17    Q  You have shown them these types of slides?
18    A  Yes.
19    Q  Okay. When you show the state
20 legislatures -- strike that.
21        Have you shown these presentations to anyone
22 other than to state legislatures?
23    A  Yes.
24    Q  Who else have you shown these presentations
25 to?



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
277—280

Page 277

1    A   County checks, county supervisors, county
2    commissioners, sheriffs, other elected officials,
3    mayors, sheriffs, grassroots teams.
4        Q   Okay.  And when you make these presentations
5    and you show these slides, do you specifically mention
6    Smartmatic during your presentations?
7        A   I never mentioned Smartmatic until I
8    received the subpoena and then I said, by the way, I am
9    in a lawsuit but I never call Smartmatic out in
10   particular and say they are the bad ones.
11       I do mention in my California presentations
12   and actually more recently I have included it where I
13   mention Smartmatic because I did a study of the state of
14   California and I show there are four different brands,
15   dominion, ES&S, Hart and Smartmatic.  And Smartmatic is
16   down here in LA.  I have a color graphic of the state.
17   I say that they have their own machine.  They have their
18   own, and it is the only one in the country.  I do not
19   call them in out in particular.  I call them out as
20   collectively, if that makes sense.
21       Q   And so let us just keep flipping through.
22   So this first slide, it says, selectioncode.com.  And
23   then underneath it says or onto the right it says, You
24   vote, and then a little caret, and they decide.
25       Did you create this graphic?

Page 278

1    A   No.  Well, yes and no.  I took this graphic
2    image and put the selectioncode.com on top of it for a
3    link to tell people to watch the movie.  I did not
4    create the bulk of it.
5        Q   The underlying --
6        A   Yes.
7        Q   That you just got from the trailer for the
8    movie?
9        A   Exactly.
10       Q   And when you show this slide, do you discuss
11   Smartmatic?
12       A   No.
13       Q   When you show this slide, do you discuss
14   other voting machines company?
15       A   I might mention every once in a while that
16   Tina Peters, who the movie is about, they use Dominion
17   machines and it is in Mesa County.  I will give you a
18   summary of what the movie is about.  So Dominion might
19   come up in that.
20       Q   Moving onto the next slide, it looks like
21   this is the Cyber Symposium poster.
22       Do you see that?
23       A   Correct.
24       Q   Did you create this poster?
25       A   I did not.

Page 279

1        Q   Okay.  Do you know who did?
2        A   No.
3        Q   When you are showing this slide, do you
4    discuss Smartmatic?
5        A   I don't think that I ever have, no.
6        Q   Looking at the third slide, and I recognize
7    from the video each of these things kind of comes up
8    individually and goes over the top of one another.
9        A   That is another reason to give you a video.
10       Q   So it says, and this is underneath the
11   Moment of Truth banner, what we just saw in the video,
12   it says, Trial of the Machines, Dr. Douglas Frank under
13   there.  Is that fair?
14       A   Yes.
15       Q   And then to help -- at the very bottom under
16   the Trial of the Machines Dr. Douglas Frank it says,
17   Help support this event and it says use P-R-O and it
18   will go on to promo code.
19       Do you recall this slide?
20       A   I do.
21       Q   It says, use promo code Truth45 at
22   MyPillow.com.
23       Does that sound right?
24       A   That sounds right.
25       Q   Okay.  And so were you, in making these

Page 280

1    presentations, kind of advertising for MyPillow?
2        A   No.  This was me telling people that I
3    participated in the Moment of Truth Summit.  Here is a
4    screen capture of part of it.
5        Q   Okay.  I see.  So Frankspeech.com published
6    this on FrankSpeech?
7        A   Yes.
8        Q   And they had this up there and you used this
9    slide to say, hey, I spoke at this?
10       A   Yes.  I participated in the trial of the
11   machines.  And since I was supposed to give you all of
12   my machine slides, that sounds like machines to me.
13       Q   Okay.  Do you discuss Smartmatic
14   specifically when you show this slide?
15       A   No.  Let me qualify that.  At the Moment of
16   Truth I did not mention Smartmatic at that time.  I did
17   not know that LA was Smartmatic.  I just knew it was a
18   different brand --
19       Q   Okay.
20       A   -- than the rest of the state at the time I
21   did this.  That shows you how little I pay attention to
22   machines.
23       Q   Okay.
24       To kind of expedite this, we watched all of
25   the slides or most of them.  You can flip through them



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
281–284

Page 281

1  here.
2      A    Yes.
3      Q    I believe you testified just a few minutes
4  ago that the way you discuss Smartmatic is really
5  limited to they are one of the machine companies used in
6  California, in LA County.  Hey, by the way, I am part of
7  the Smartmatic lawsuit.
8          Is that all that you say about Smartmatic
9  when you make these presentations and are associated
10  with these slides?
11      A    Yes.
12      Q    I want to talk about, more about the actual
13  visits to the state legislatures that you have been
14  doing.
15          So I am going show you a Washington Post
16  article and this will be Exhibit 120.
17          (Exhibit 120 was marked.)
18      Q    (BY MR. FREY)  Inside the nonstop pressure
19  campaign by Trump allies to get election officials to
20  revisit the 2020 vote.
21          Have you seen this article before?
22      A    Yes.
23      Q    And do you recall being contacted by the
24  author of this article?
25      A    Emma Brown, yes.

Page 282

1      Q    Do you recall talking to Emma Brown about
2  your state tours?
3      A    Yes.
4      Q    And you said that you have visited 46
5  states?
6      A    I have, yes.
7      Q    And you have spoken with state election
8  officials?
9      A    Quite a few.
10      Q    Secretaries of State?
11      A    Yes.
12      Q    You have spoken with some Attorney Generals?
13      A    Several.
14      Q    Multiple state Legislatures?
15      A    I would say as of now I have probably done
16  two dozen Secretaries of States.  Two dozen AGs.  Just
17  round numbers.  And hundreds of state legislatures.
18  Probably 100 clerks across the country, election
19  clerks.  They are called different things in different
20  states but.  You guys call them ROVs where you are.
21      Q    I did not know that.  Okay.
22          So Mr. Lindell has been with you to some of
23  these meetings, right?
24      A    Yes.
25      Q    Not all of them but some of them he also

Page 283

1  goes?
2      A    Let us say half.
3      Q    Okay.  Is he still accompanying you or has
4  that tapered off?
5      A    Well, we were doing that to get the Supreme
6  Court brief.  So for about three weeks straight he and
7  I flew around the country meeting with AGs, and
8  sometimes multiple in a single day, to get signatures
9  on the Supreme Court brief.
10      Q    When was that about?
11      A    Thanksgiving 2021.
12      Q    Okay.  I want to go to page 5 of the
13  article.  On the ninth paragraph down, which I will just
14  kind of show you.
15      A    He said --
16      Q    Yes.  It says, He said he has met personally
17  with numerous state officials.  "He" being you?
18      A    Yes.
19      Q    Including Missouri Secretary of State, Jay
20  Ashcroft.  On December 1 Frank wrote on telegram that he
21  had negotiated a deal in which Ashcroft agreed to take
22  up the cause if we brought him 100 phantom voters.
23  Ashcroft declined to comment, as did several other
24  Republican officials who Lindell or Frank said they
25  contacted.

Page 284

1          Did I read that correctly?
2      A    Yes.
3      Q    And so Mr. Lindell went to Missouri,
4  correct?
5      A    Multiple times.
6      Q    And you spoke with Missouri Secretary of
7  State Jay Ashcroft?
8      A    Yes.
9      Q    And Mr. Ashcroft is a Republican, correct?
10      A    I think so.
11      Q    Do you recall about when it was that you
12  spoke with Mr. Ashcroft?
13      A    It says on December 1.  I don't know what
14  year that is.  It was probably 2021 though.
15      Q    And did Missouri state officials or
16  Mr. Ashcroft agree that there was fraud in the 2020
17  election?
18      A    Not in public.
19      Q    Did they agree privately?
20      A    Yes.
21      Q    What did they say?
22      A    In private, not with Jay Ashcroft, with
23  Eric Smith, the Attorney General of the State of
24  Missouri, he said -- I was bringing up my laptop to
25  show him the fraud that we had already found.  He said



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
285–288

Page 285

1  that, okay, Dr. Frank, you don't need to do that.
2      I said, I need you to see it so that you
3  will sign on to this lawsuit we have going to the
4  Supreme Court.
5      He said, that is okay, quote, we already
6  know that we have tens of thousands of ballots being
7  stuffed in our elections, unquote.
8      Q    Did he then sign on to the petition?
9      A    No.
10     Q    Did he tell you what the evidence was that
11  they had tens of thousands of votes being stuffed in the
12  election?
13     A    I don't think that he had the evidence.  I
14  think his clerks told him that.  I met with his head
15  clerk the day before who explained tons of stuff.
16     Q    You met with -- when you met with the head
17  clerk, the head clerk was telling things to you?
18     A    Yes, in front of a state senator who was
19  escorting me around.
20     Q    Are you aware that Missouri state officials
21  stated publicly that there is no evidence of fraud?
22     A    They all say that.
23     Q    So you are aware?
24     A    Well, I am not aware of the specific time
25  that they said that.

Page 286

1      Q    Okay.  Do you know if Mr. Lindell is aware
2  that Missouri state officials stated publicly after you
3  all met that there was no evidence of election fraud?
4      A    I don't know.
5      Q    Have you spoken with Mr. Lindell about that?
6      A    No, not specifically for Missouri for
7  example.
8      Q    If you go to three paragraphs down, that
9  same page, it says, Alabama Secretary of State John
10  Merrill said in an interview that he met with Lindell
11  and Frank twice this fall and traveled to Trump's
12  private club in Florida this month to meet with the
13  former president.  Merrill describes the meeting as
14  cordial and said he is always willing to meet with
15  anyone, but he also said that the allegations of a
16  rigged election did not have merit.
17     Did I read that right?
18     A    Yes, sir.
19     Q    So you and Mr. Lindell also went to Alabama,
20  right?
21     A    Twice.
22     Q    You had two meetings with John Merrill?
23     A    Yes.
24     Q    And when were those meetings; do you recall?
25     A    About the same time frame because we were

Page 287

1  doing -- well, one of them was earlier when we were
2  collecting signatures.  So that would have been around
3  just before Thanksgiving 2021, and another one was
4  later, several months later, but I don't recall exactly
5  where.
6      Q    And did you know when you read this post
7  article then that Mr. Merrill told them that the
8  allegations of a rigged election did not have merit?
9      A    I read this article, yes.
10     Q    And do you know if Mr. Lindell read this
11  article and was aware of that?
12     A    I don't know.
13     Q    Did you bring it up to him?
14     A    No.  There are hundreds of these.  We do
15  not discuss them all.
16     Q    And then if you go down to the bottom of the
17  page, it says, Merrill said he personally knows a couple
18  of voters living at Big Oak Ranch whose names were
19  presented to him as evidence of fraud.
20     Did I read that correctly?
21     A    Yes.  I remember this meeting now.
22     Q    Did you present Big Oak Ranch as a facility
23  affected by the --
24     A    I did not.  Jay Valentine did who we fired.
25     Q    Who is Jay Valentine?

Page 288

1      A    He is someone who is trying to sell a
2  product to help people find fraud in multiple states.
3  It is kind of his own version of ERIC, E-R-I-C which is
4  a state-to-state comparison of voter roles service.  He
5  is going around the country trying to sell that.
6      He sold Mike Lindell on it.  Mike Lindell
7  retained him for a period of time.  I interviewed him.
8  The principle sounded good, but the guy cannot deliver
9  so we fired him.
10     Q    Okay.  That is because he would present
11  places such as Big Oak Ranch?
12     A    This is just one of dozens which is why we
13  got rid of the guy.
14     Q    Okay.  So on page 6, paragraph --
15     A    Frank acknowledged the meeting did not go
16  well.  Go ahead.  Sorry.
17     Q    On paragraph (sic) six on this next page, it
18  starts with, In Ohio.
19     A    Yes.
20     Q    In Ohio, Frank got an audience with LaRose's
21  staff after connecting with Joe Blystone, who is
22  challenging Governor Mike DeWine for the GOP nomination
23  in part on a platform claiming that fraud tainted the
24  state's election last year.
25     Did I read that correctly?



Page 289

1    A   Yes.

2    Q   Is Mr. LaRose a Republican?

3    A   I believe so.

4    Q   Do you recall threatening legal action
5    against Mr. LaRose's office if they didn't cooperate
6    with your requests?

7    A   No.  But I remember giving him the
8    opportunity to be a hero and expose fraud because, if
9    he does not, we will and we will make sure everyone
10   knows.

11       Okay.  So if you look at page 2 of the
12   article, paragraph three, there it says, In Ohio, Frank
13   met for more than two hours in May with the senior staff
14   of Ohio Secretary of State Frank LaRose presenting
15   unsubstantiated claims that voting machines are
16   connected to the internet and have been hacked,
17   according to a recording of the meeting obtained by the
18   Washington Post.  Frank warned that he planned to pursue
19   multiple legal actions around the country and said there
20   will be consequences if LaRose's office did not
21   cooperate.

22       So is that saying that you were saying we
23   are going to bring legal action, not necessarily against
24   Mr. LaRose?

25   A   I think that is a misrepresentation of what

Page 290

1    I, of the intention of my comments.

2    Q   So you disagree with that?

3    A   Yes.  I understand that the Secretary of
4    State recorded that meeting and gave a copy of the
5    meeting to the Washington Post.  So it is hard for me
6    to imagine that he misquoted me, but that is not a
7    quote.  So it is probably a misrepresentation.  That
8    does not sounds like me.

9    Q   Okay.

10   A   That is not what I say.  What I say is you
11   can either be a hero or we will expose you and
12   everybody will know.  That is what I do.

13       Subsequent to that, by the way, is when we
14   did the Lake County thing and proved their machines were
15   online.

16   Q   That is when you had or you talked to the
17   kid who went in and hacked into them?

18   A   Yes.

19   Q   Okay.

20   A   So, I mean, there is evidence right there.
21   And then Frank LaRose put out a note oh, we were
22   hacked, but nothing was changed.  Thank goodness.  That
23   was not the point.

24   Q   So, Dr. Frank, did you have the election
25   hacked in order to prove Mr. LaRose was wrong?

Page 291

1    A   I didn't have anything happened.  I
2    connected local citizens who wanted to know if their
3    machines could be hacked with somebody who knows how to
4    do that.  They had their own discussion and made their
5    own plans.

6    Q   Okay.

7    A   I was not actually expecting him to do
8    that.  I was expecting him to give the passwords.

9    Q   If you go to the back to page 6 and you look
10   at the last paragraph, and this is an interview of
11   Mr. LaRose, it says, In an interview in November LaRose
12   offered a blunt assessment of Frank's theories.  He
13   says, Almost nobody knows what a sixth-order polynomial
14   even is.  It has nothing to do with how elections are
15   run.

16       Do you see that?

17   A   Yes.

18   Q   He says, It sounds impressive but if you
19   have a preconceived sort of notion about what you want
20   to believe and somebody with a title tells you a bunch
21   of things, this is what conspiracy theories are based
22   on.

23       Did you read that as what he said?

24   A   That sounds like him.

25   Q   And that is after you met with him and

Page 292

1    presented your evidence?

2    A   I did not meet with him.

3    Q   You did not meet with Mr. LaRose?

4    A   No.  He did not show.

5    Q   So you met with his office but not with him?

6    A   (Witness shook head.)

7       (Exhibit 121 was marked.)

8    Q   (BY MR. FREY)  I want to look quickly at tab
9    nine.  This will be Exhibit 121.  This is a document
10   that was produced to us by Mr. Lindell with the Bates
11   stamp DEF017285.00001.  If you see, you are on the
12   bottom email here that was then forwarded to
13   ML@MyPillow.com.

14       Do you see that?

15   A   Yes.

16   Q   The email at the bottom is from Pamela Evans
17   to Doug@toolsforanalysis.com and
18   Drdouglasfrank@outlook.com, right?

19       Is doug@toolsforanalysis.com; is that you?

20   A   That is me.

21   Q   Okay.  And do you know Pamela Evans?

22   A   I don't recall her.

23   Q   Okay.  So you don't know if you would have
24   met Ms. Evans before she sent you this email on --

25   A   Probably not.



Page 293

1    Q   -- august 13?
2    A   She heard me at the Wellington where there
3    were 21,000 people.
4    Q   She is one of many people that you met and
5    she got your email address and reached out to you; fair?
6    A   Yes.
7    Q   Okay.  So if you look at the last paragraph
8    of the first page of the email here, she writes, I have
9    written to our governor, AG and Secretary of State in
10   January of 2021 and again this week asking for a full
11   forensic audit.  This week I had a breakthrough with the
12   SOS Office.  Dave Ward, Director of Constituents
13   Affairs, wrote me yesterday stating that they had met
14   with you a few months ago but you could not prove
15   election fraud but, if you had new information to share,
16   they would ask you to please come forward with it.
17       Do you see that?
18       MR. GREENE:  It goes on to the second page.
19   Q   It goes on to the second page.  I am sorry.
20   A   Okay.  I see that.
21   Q   So you have met with David Ward several
22   months before.
23       Do you recall meeting with David Ward in the
24   summer of 2021?
25   A   I think he was the one who was the Chief of

Page 294

1    Staff, I think, but I don't recall for sure.  I think
2    that is who he was.
3    Q   Were you aware then that Mr. Ward believed
4    you could not prove election fraud at that time?
5    A   Yes.  That was not the purpose of the
6    meeting.
7    Q   What was the purpose of the meeting?
8    A   To inform them that we were about to begin
9    an investigation in the state, and we were going to
10   uncover election fraud and they were going to have to
11   deal with it.
12   Q   Okay.  So when Ms. Evans wrote to you on
13   this August 13, 2021, did you have any new evidence of
14   voter fraud in Ohio to present to Mr. Ward or other
15   officials?
16   A   No.  My teams there -- my fraud teams
17   self-imploded.  It happens a lot.
18   Q   Despite kind of the, it seems like lack of
19   success that these meetings were having in getting the
20   state legislatures to do anything, you kept having these
21   meetings, right?
22   A   Yes.
23   Q   And you traveled, like you said, to 46 of
24   the 50 states, correct?
25   A   Yes.

Page 295

1    Q   Okay.  Have any of the states you visited
2    taken official action to reform their election
3    procedures?
4    A   Yes.
5    Q   How many?
6    A   Wyoming, South Dakota, Montana, Wisconsin,
7    California.  I think the question is too general
8    because I can go state to state and show you that we
9    have had official responses at city and county levels
10   all over the place and some state level as well.  I
11   mean the secretary -- the California legislature right
12   now is in panic mode trying to pass laws so that we
13   cannot flip more counties like we flipped Shasta.
14   Q   What do you mean by flipped Shasta?
15   A   Shasta is completely paper.  Paper poll
16   books, paper ballots, hand tally.
17   Q   When did Shasta County make the decision to
18   go paper?
19   A   January, February, March.  It was three
20   months' worth of decisions of this year.  January they
21   voted to not renew their Dominion contract.  A month
22   later they voted to not have machines at all.  A month
23   later they got rid of the electronic poll books.
24   Q   How did you learn of that decision?
25   A   I was involved in it.

Page 296

1    Q   So you were part of the meetings with the
2    legislature or the commissioners?
3    A   Yes.
4    Q   Okay.  And is that change being implemented
5    in the upcoming election?
6    A   Yes.
7    Q   In addition to Shasta County, you mentioned
8    Wyoming, correct?
9    A   Yes.  I met with the Secretary of State
10   there, Chuck Gray.
11   Q   And what action has Wyoming taken?
12   A   They have already begun taking actions to
13   clean up their elections.
14   Q   In what way?
15   A   Well, one of them is they do not have open
16   primary anymore.  Another is the way they perform their
17   audits.
18   Q   So they --
19   A   They have a limited session and they only
20   accomplish a couple things, but they are well on the
21   way.
22   Q   Okay.  And then you said South Dakota,
23   correct?
24   A   Yes.
25   Q   What is South Dakota?



Page 297
1      A   I met with several legislature there and we
2   almost swung the 2020 election.  Sorry, the 2022
3   election being completely paper for the whole state.
4   We were on the verge of that.  So even though we don't
5   always get the full 100 yards, we are making, we are
6   gaining ground in lots of places.
7      Q   Okay.  So you almost got it done in South
8   Dakota but did not quite get there?
9      A   Yes, for the whole state.
10     Q   How about Montana?
11     A   Montana already has a dozen counties that
12   do hand counting.
13     Q   Is that since the November '20 election or
14   they already had it?
15     A   Some of each.  There are more coming, and
16   that is what I work for.
17     Q   So some counties were already hand count and
18   more are going to be hand count?
19     A   Yes.  I am working with legislatures there
20   as well.  They just had a big summit in their
21   legislature.
22     Q   Wisconsin you mentioned?
23     A   Yes.
24     Q   What reforms have they taken?
25     A   Well, Janel Brandtjen, who is the head of

Page 298
1   the Election Committee for the Senate, had me in
2   testifying and we exposed tons of fraud there.  I met
3   privately with Secretary of State Robin -- I am sorry.
4   Speaker of the House Robin Vos and he walked out of
5   that meeting and said in front of ten television
6   cameras for the whole world to hear that there was
7   widespread fraud in the state of Wisconsin.
8      Q   Have they taken action?
9      A   They hired Judge Gableman to do all sorts
10   of fraud evaluation and whatnot.  And there are many
11   counties there that are getting out of electronic
12   voting.  They are moving to paper.  It is in their
13   state law.  They have a law that says 7,500 or less in
14   their county, they don't have to use the machines.
15     Q   Has that state law been put in place post
16   November 2020?
17     A   No, it was there already.  They didn't know
18   it was there.  Now that they know it is there, now
19   county by county they are making the decisions to opt
20   out.
21     Q   Okay.
22     A   But that is what I am there for.
23     Q   And that is what you are --
24     A   That is what I do.  I help counties and I
25   do it by helping them find real fraud and that empowers

Page 299
1   the citizens.  I don't expect change from the top down.
2   I am building change from the bottom up.
3         MR. FREY:  Okay.  All right.  Left us do a
4   quick break and then I have probably one more segment
5   and we will be done.
6         MR. GREENE:  Okay.
7         THE VIDEOGRAPHER:  The time is 4:53 and we
8   are off the record.
9         (Recess was taken.)
10        THE VIDEOGRAPHER:  The time is 5:04 p.m. and
11   we are on the record.
12     Q   Okay.  Dr. Frank, we are back from the
13   break.  I want to move on to talk about the Prove Mike
14   Wrong Contest.
15        You are aware of that contest, right?
16     A   Quite.
17        (Exhibit 122 was marked.)
18     Q   (BY MR. FREY)  The first thing that I handed
19   you was what we marked as Exhibit 122 which is a post
20   from the Telegram account Follow the Data with
21   Dr. Frank.
22        Do you see that?
23     A   Yes.
24     Q   It shows down in the bottom right that it
25   was posted on April 20, and I believe that is of this

Page 300
1   year?
2      A   Yes.
3      Q   Does that sound right to you?
4      A   Yes.
5      Q   Okay.  And you say here, At Mike Lindell
6   Cyber Symposium in August of 2021 he offered a $5
7   million challenge to dozens of cyber experts to prove
8   that the cyber evidence he provided unequivocally does
9   not, in all caps, reflect information related to the
10   November 2020 election.
11        Did I read that right?
12     A   Yes.
13     Q   You go on to say in the first paragraph that
14   you are intimately familiar with the details of the
15   event and the challenge, right?
16     A   Yes.
17     Q   Is that because you MC'd the Cyber Symposium
18   and kind of participated in the daily management?
19     A   Yes.  I also helped write the rules for the
20   contest.  I also served as a judge on the contest, and
21   then I also was in the arbitration.  So from beginning
22   to end I have been intimately involved in this.
23     Q   So you were a judge on the contest, right?
24     A   Yes.
25     Q   But you testified earlier that you are not a



Page 301

1 cyber security analyst, correct?
2    A    Correct.
3    Q    And you are not a computer scientist by
4 trade, right?
5    A    Every machine that I ever made is
6 controlled by computers that I wrote software and built
7 electronics for.  So I would disagree with that
8 comment.
9    Q    You don't have a computer science degree, do
10 you?
11    A    You don't need one to do what I do.
12    Q    You were on the panel with two other
13 individuals; is that right?  Or how many people served
14 on the judge panel?
15    A    Three.
16    Q    Three on the judge panel?
17    A    Tom Sanders, myself and Kurt Olsen.
18    Q    And Kurt Olsen is an attorney, right?
19    A    Correct.
20    Q    So he probably is not a cyber security
21 analyst, right?
22    A    Correct.
23    Q    He is also not, he is not a computer
24 scientist, correct?
25    A    Correct.

Page 302

1         MR. GREENE:  Objection.  If he knows.
2    Q    If you know.
3    A    He is not.
4    Q    And Todd Sanders was the third you said,
5 right?
6    A    Yes.
7    Q    Todd Sanders is someone who was on
8 Mr. Lindell's red team?
9    A    Yes.
10    Q    Were all the panelists closely affiliated
11 with Mr. Lindell?
12    A    We represented legal, technical and cyber.
13 That is why we chose those three.
14    Q    But your legal, technical and cyber for the
15 team that works closely with Mr. Lindell, right?
16    A    Yes.
17    Q    Probably all three of you receive or have
18 received payments from Mr. Lindell, right?
19    A    Well, we established that.
20    Q    As far as you know, if you know whether
21 Mr. Olsen or Mr. Sanders has received payments from
22 Mr. Lindell?
23    A    I have no idea.
24    Q    Okay.  And then you say in this post here
25 that unequivocally is a very high bar and the challenge

Page 303

1 was not to validate the data but instead to prove a
2 negative which is also a very high bar, all caps.
3         Did I read that right?
4    A    Yes.
5    Q    Did you talk at all with Mr. Lindell before
6 the challenge about whether it was even possible for
7 someone to win to meet this unequivocally high bar?
8    A    I did not speak with Mr. Lindell.  I spoke
9 with Kurt Olsen about it.
10    Q    What did you two discuss?
11    A    He asked me, he said, can anyone win this
12 challenge?  I said, it would be almost impossible.
13    Q    Because?
14    A    Because of time limitations.  You only have
15 three days.  So you would have to decrypt the data and
16 prove it was not related to the election.  How do you
17 prove it is not related to election when it is full of
18 election data?  You then have to prove it was
19 fraudulent or made up or something.  How are you going
20 to do that in three days?
21         So even if the data, even if I say worst
22 case, even if the data were not real, how would you
23 prove it in a mere three days?  And you would have to --
24 I mean it is 100 terabytes.  It is essentially an
25 impossible task.

Page 304

1    Q    So essentially impossible, you told
2 Mr. Olsen that?
3    A    We agreed, yes.
4    Q    You agreed that this is essentially an
5 impossible process?
6    A    Impossible is not a good word, but
7 extremely, extremely difficult.
8    Q    Because it is very difficult to, even in the
9 first instance, just to prove a negative, right?
10    A    Exactly.  That was my point.  Logically it
11 is a ridiculous -- and then I made a stupid -- I made a
12 silly example.  I said, prove that the blue shirt my
13 son is wearing is not related to the 2020 election.
14 How would you prove that?  He might have worn it on
15 that day, so that makes it related.  How would you
16 prove it was not related?  Proving a negative is a
17 logical difficulty.
18    Q    So there was really almost no scenario by
19 which someone could have won that challenge?
20    A    The only way they could have won that
21 challenge is if they had decrypted the data and had
22 been able to show it was made up in some way, that it
23 was not real data.  That would be the only way, and I
24 had never seen the PCAP data with my own eyes.  So I
25 left open that possibility.



Page 305

1    Q    Okay.  I want to look at another telegram
2  post --
3    A    Sure.
4    Q    -- of yours.  This will be marked as Exhibit
5  123.
6        (Exhibit 123 was marked.)
7    Q    (BY MR. FREY)  This was posted on Follow the
8  Data with Dr. Frank on January 23.
9        Do you see that?
10   A    Correct.
11   Q    Do you recognize this post?
12   A    I do.
13   Q    Okay.  One of the things that you write
14  here, and it is kind of hard to read, this little
15  printout.  I don't know if we can get it bigger.
16       MR. FREY:  Can we go off the record really
17  quick?
18       THE VIDEOGRAPHER:  The time is 5:11 p.m.  We
19  are off the record.
20       (Recess was taken.)
21       THE VIDEOGRAPHER:  The time is 5:12 p.m.  We
22  are on the record.
23   Q    Okay.  So in this post, Dr. Frank, you
24  start, Someone recently asked me whatever happened to
25  the PCAPs that Mike Lindell presented at the cyber

Page 306

1  symposium.
2        Do you see that?
3    A    Yes.
4    Q    So I prepared the summary diagram.  The
5  original PCAP files are protected for legal and national
6  security reasons, but information extracted from them
7  has been made public for some time.
8        Do you see that.
9    A    Yes.
10   Q    Okay.  And I know we talked earlier about
11  the kind of national security concerns and your
12  understanding of that.  And, correct me if I am wrong,
13  is that based on Colonel Waldron's conversation with an
14  FBI agent who said, you cannot disseminate this stuff?
15   A    No.  That was based upon months of my
16  interactions with Mike.  I was saying, give me the
17  PCAPs.  Give me the PCAPs so I can get ready.  I was
18  only given small samples, and that was explained to me
19  why.
20   Q    And that was Mr. Lindell was telling you?
21   A    No, Kurt Olsen was.
22   Q    Kurt Olsen was telling you the reason why?
23   A    I usually did not call Mike about those
24  issues.  Kurt Olsen is my contact.  He is a busy guy.
25   Q    And you -- do you know, did Mr. Olsen tell

Page 307

1  you kind of what national security branch was saying you
2  cannot release this data?
3    A    No.
4    Q    Did Mr. Olsen or Mr. Lindell tell you where
5  the original data came from?
6    A    Four sources.
7    Q    What were those sources?
8    A    I know Dennis Montgomery was 1/4.
9    Q    Okay.  Do you know what the other 3/4 were?
10   A    I could not say.  I would not know.  I,
11  mean I can guess, but I don't know.
12   Q    But no one has ever told you?
13   A    Not directly.  Not these are the sources.
14   Q    Okay.  And the portion that came from Dennis
15  Montgomery, what is your understanding of the portion of
16  it that he delivered?
17   A    I don't know which portion of the 100
18  terabytes he delivered.
19   Q    Okay.  And so did you ever sign an NDA or
20  anything in connection with your work on the election
21  analysis?
22   A    With whom?
23   Q    With Mr. Lindell?
24   A    No.
25   Q    With Mr. Montgomery?

Page 308

1    A    I never spoke to him.
2    Q    Okay.  With --
3    A    I am wrong.  I did speak to him.  I am
4  sorry.
5    Q    Anyone associated with the PCAP data review
6  and analysis were you asked to sign any kind of
7  nondisclosure agreement?
8    A    No.
9    Q    Who has asked that you sign a nondisclosure
10  agreement in connection with your election analysis, not
11  in your life?
12   A    Some states make you, if they give you the
13  data, there are limits and you are not allowed to give
14  the data to people that do marketing and things.
15   Q    I got it.  So that is like for voter
16  registration and voter rolls?
17   A    Right.  It is sensitive data.
18       (Exhibit 124 was marked.)
19   Q    (BY MR. FREY)  Okay.  So now I want to flip
20  to the actual report and your analysis of the Zeidman
21  report.  So this will be marked as Exhibit 124.  It is
22  produced with the Bates DEF120753.  It begins with, The
23  Prove Mike Wrong Challenge Official Rules, and then it
24  has a compilation of materials related to the contest.
25       Do you see that?



DOUGLAS GEAUWANNA FRANK                                July 19, 2023
Smartmatic USA Corp. vs Michael J. Lindell              309—312

Page 309

1      A   I see it, yes.
2      Q   If you go to page 5 of the report, it is
3   Review of Zeidman Report written by Douglas G. Frank.
4          Do you see that?
5      A   Yes.
6      Q   And did you write this review?
7      A   I did.
8      Q   Did you write it in October of 2021 for
9   Mr. Olsen?
10     A   I did.
11     Q   Okay.  And did you write this report as part
12   of the arbitration with Mr. Zeidman or before the
13   arbitration with Mr. Zeidman?
14     A   We met at the end of the Cyber Symposium as
15   a committee, reviewed the submissions and none of them
16   even came close.  So we said, no.
17          Then a month later or so Kurt called me and
18   said, hey, I need you to write a formal reply to the
19   Zeidman claim.  So I wrote this then.
20     Q   Okay.  Did Mr. Olsen tell you what he needed
21   the formal reply to say?
22     A   No.  He just told me to write it.  I agreed
23   and did it.
24     Q   Okay.  And it begins with this section after
25   your qualifications, it has a section called Prove a

Page 310

1   Negative, right?
2      A   Yes.
3      Q   Here you kind of talk about what we were
4   discussing with your Telegram post, that it is
5   exceedingly difficult to prove a negative, right?
6      A   Yes.  Yes.
7      Q   And you also write in here about how you
8   were yourself interested to see the PCAP data, right,
9   but the security and legal concerns have limited your
10   access?
11     A   Right.
12     Q   You do state that you have received, you
13   have seen enough of the extracted portions of the PCAP
14   data to convince you that it is at least related to the
15   November 2020 election?
16     A   Correct.
17     Q   Correct?
18     A   Correct.
19     Q   Okay.  So is it the case that you know the
20   PCAP data is something election related but you are not
21   sure what it is, you, yourself?
22     A   No, you can see what it is.  And during the
23   arbitration Todd Sanders right in front of the three
24   arbiters decrypted one of the files and showed them the
25   stuff right on the screen.  It is a bunch of voter

Page 311

1   data, a bunch of tallies, a bunch of results from
2   several counties during the election, even dated during
3   the election.  It is in English.
4      Q   Okay.  You saw it during the arbitration
5   panel?
6      A   As well, yes, I had seen it --
7      Q   You had seen it before?
8      A   I had seen the extracted portions as well
9   because I was on the red team at the Cyber Symposium.
10     Q   So you had seen certain extracted portions
11   --
12     A   Yes.
13     Q   -- during the Cyber Symposium?
14     A   That were cleaned already.
15     Q   That were cleaned?
16     A   Yes.  Yes.
17     Q   And what was cleaned out of, what needed to
18   be cleaned; do you know?
19     A   Well, there are like CISA, the Cyber
20   Infrastructure Security Agency, a lot of those networks
21   are being used to communicate this information around
22   the country and so those have passwords and those have
23   IP addresses.  That is secure information.  So that is
24   the sort of thing that is taken out.
25          Also, the user names and passwords, so if

Page 312

1   you think about it, every time an outside, every time an
2   outside event tries to log into a computer, it has to
3   have a user name and password.  Those are in every
4   single PCAP.  The PCAP tells you the source IP and user
5   name and password to get into the destination IP.  That
6   is why Conan was giving me all the user names and
7   passwords whenever I asked them for certain counties.  I
8   could go in and show them that.  They were like, how did
9   you get those?  My guy got them out of the PCAPs.
10     Q   So he would, Conan would show you certain
11   information from the PCAPs that you were not supposed to
12   see, but you were not allowed to see the rest of it?
13     A   I was allowed to see that.
14     Q   I am sorry.  I thought that you said user
15   names and passwords was the national security risk that
16   you were not allowed to see?
17     A   No, not for the secure networks.  For
18   counties.  I am sitting with the county officials.  He
19   says, prove to me I am online.  Here is your user name
20   and password.
21     Q   So when the PCAP data was scrubbed to take
22   out sensitive information, were the user name and
23   passwords of the counties left in?
24     A   What went to the public was scrubbed that
25   far.  All I did was ask, when I did not -- he did not



DOUGLAS GEAUWANNA FRANK                                July 19, 2023
Smartmatic USA Corp. vs Michael J. Lindell              313—316

Page 313

1  give me chunks of PCAPs and say get your own user names
2  and passwords.
3       I called him and said, I am going to be in
4  X, Y, Z County tomorrow and that commissioner wants
5  proof that his machines were online.  Give me the user
6  name and passwords.  He would give them to me and I
7  would go in and show them.  They would go, man, all the
8  employees, everything, everybody is hacked.  Yes,
9  exactly.  That is the point.
10     Q   Okay.
11     A   So that was -- that is not a national
12  security breach.  That is a specific official saying we
13  want to have specific information, and that is
14  different.
15     Q   Okay.  And is that information, that county
16  level information, was that left in the version that was
17  shown to people doing the Prove Mike Wrong Challenge,
18  those cyber security analysts like Mr. Zeidman could
19  they see that level of data?
20     A   I am not certain because I did not see it
21  all.
22     Q   Okay.  So I was thinking about this at one
23  of our breaks and trying to understand the difference
24  between what was publicly disseminated and what went to
25  the experts, The Prove Mike Wrong Challengers?

Page 314

1      A   Yes.  The challengers were given about, if
2  I remember right, I can be wrong, it is like seven
3  files the first day.  Five of the files were training
4  files to teach them how to work with the data we were
5  about to give them.
6       Two of the files were actual data files that
7  they had to decrypt and analyze, and Zeidman was unable
8  to decrypt them.  He even wrote in his claim he tried.
9  It was gibberish.  Then he wrote his claim.
10      How can you prove unequivocally at that time
11  data are not related to the election if you cannot
12  decrypt it?  That settles the claim.  It cannot be a
13  successful claim.  That is why we rejected his claim.
14     Q   I want to look at a little bit more above
15  your review.  And at paragraph 6 you say, The timestamps
16  in the original data are concentrated from November 2 to
17  6, 2020 and the IP addresses where the incursions took
18  place correspond to election offices.
19      Is that right?
20     A   Yes.
21     Q   Okay.  Have you seen those timestamps and IP
22  addresses yourself?
23     A   Yes, during the arbitration we showed that,
24  and Mike has published tons of those --
25     Q   And that is --

Page 315

1      A   In public.
2      Q   That is in the PCAP data that was delivered
3  to the public?
4      A   Yes, the IP addresses.
5      Q   In the Absolute Proof movie, the actual
6  video shows like a long series of numbers in a
7  hexadecimal format, right?
8      A   Right.
9      Q   And a hexadecimal format is not human
10  readable?
11     A   Yes.
12     Q   It has to be converted to text?
13     A   Yes.
14     Q   Have you then converted the data hexadecimal
15  format to text?
16     A   Which is what I explained to you earlier
17  today how I prepared all of my software ahead of time
18  so they can give me all of this hexadecimal stuff that
19  I could convert and give to my people in readable
20  stuff.
21     Q   Okay.  And then, so you are aware that when
22  it is converted to text it becomes, like you said, it is
23  a version of the Pennsylvania's voter file listing the
24  registered voters, right?
25     A   Yes.

Page 316

1      Q   Okay.  And that same data can be purchased
2  for $20?
3      A   No, it is not merely that.  It is also
4  communications from the IP address where it was
5  contacting.
6       It also includes, you know, voting tallies
7  as they were going and taking place.  It is also
8  including who has voted.  That is information that is
9  not information in the voter database.  That is -- that
10  is like the poll books updating or that sort of thing.
11  It is not the same thing as a voter database.
12     Q   You saw all those additional things in the
13  conversion?
14     A   I have seen those, yes, with my own eyes.
15     Q   Okay.  So I want to look at number, if you
16  go to the third page of your review or the second page
17  of your review.  I am sorry.  After number 23 to 32.
18     A   Yes.
19     Q   You say, Even if he is correct, Zeidman is
20  merely showing the formatting leftovers after sensitive
21  information was removed from the files.  This neither
22  proves or disproves anything.  Right?
23     A   The challenge was to disprove unequivocally
24  or prove unequivocally, yes.
25     Q   And the stuff that was sensitive information



Page 317

1  that was removed was the IP addresses and passwords and
2  security information?
3      A   IP addresses were in there still.  And I am
4  not sure, because I already answered that question, I
5  have not looked at everything they have given.  I just
6  looked at it decrypted and started scanning through it
7  and go, man, this is all this stuff related to the
8  election.
9      Q   Okay.  And then if you go to the third page
10 of your report, in the middle of the page under 36 to 37
11 you write, Zeidman admits that the data provided are
12 relevant to the election since he concedes that the
13 implied meanings of the file headers refer to the
14 November 2020 election.
15         Correct?
16     A   Yes.
17     Q   Okay.  Then you say, Once he has done this,
18 the balance of his discussion is irrelevant to his claim
19 of irrelevancy unless he is able to prove the data are
20 100 percent fraudulent, right?
21     A   Yes.
22     Q   So you are saying that Mr. Zeidman has
23 admitted that the file headers are related to the 2020
24 election?
25     A   Yes, in his claim.

Page 318

1      Q   Okay.  And so then the challenge is to prove
2  that everything is fraudulent?
3      A   That is his only choice at that point
4  because to prove it is not relevant, he has already
5  admitted it has got stuff about the 2020 election in
6  it.  Now he has to prove it is made up because
7  obviously it is relevant because it is referring to it.
8      Q   Okay.  That is about paragraph 36 and 37,
9  right?
10     A   Yes.
11     Q   All right.  So if we go to page 57 of this
12 compilation here, it says at the top files from day two.
13 And day two four more files were supplied and he lists
14 them, right?
15     A   Uh-huh.
16     Q   And then he says, The first file was simply
17 a spreadsheet and a comma separated values format.  I
18 have included a printout of the spreadsheet as Exhibit
19 G.
20     A   Yes.
21     Q   It contains names of cities in the United
22 States and numbers that are labeled latn and lngn where
23 n is a number, with no explanations.  Checking on line
24 the lat and lngn values are the latitude and longitude
25 of each city.

Page 319

1          Do you see that?
2      A   Yes.
3      Q   So where in these paragraphs does he talk
4  about the data being related to the November 2020
5  election?
6      A   I would not have said that unless he said
7  something.  What paragraph was it?  Something he said
8  made that happen.  He included a printout of the
9  spreadsheet as Exhibit G.  What is Exhibit G?  He
10 didn't.  If you look at Exhibit G, it has all the
11 headers.
12     Q   Okay.  What page is that?
13     A   He did not put it in here.  He did not put
14 the printout.  He says that he did, but he did not.
15 That is why we are confused.
16         MR. GREENE:  66 is the reference page.
17     A   Right.  That is why we are confused.  If
18 you show that file, it shows all the headers.  He said
19 it right there.
20     Q   He said in his report it is latn and lng
21 data, right, just a bunch of numbers from cities?
22     A   Those are two of the columns.  There are a
23 bunch of other columns too.  It is like his spreadsheet
24 with a bunch of columns.
25     Q   Okay.

Page 320

1      A   The lat and long, that is one of the big
2  arguments, how did the lat and lng get in there.  There
3  are no PCAPs.  We agreed, they were added later.
4      Q   So you are telling me now that if we look at
5  the full Exhibit G, there is going to be other headers
6  other than lat an lng?
7      A   That is what I am conceding based upon my
8  comment.  Why else would I say that?  I mean, why would
9  I lie?  It is right there.
10     Q   Okay.  But you don't know for sure that they
11 had that; you are saying, I would not have written this
12 unless there is some reason and this seems like a
13 plausible reason?
14     A   Let us go look at it.  We tried to look at
15 it and it is not there.  It is hard for us to make that
16 decision right now.  We would have to do more
17 investigations.
18     Q   Okay.  Are you aware that the arbitrators
19 arbiters found that Mr. Zeidman did deserve the $5
20 million award?
21     A   Yes.
22     Q   And are you aware that the arbitrators
23 determined Mr. Zeidman successfully challenged the PCAP
24 data?
25     A   Yes.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
321–324

Page 321

1    Q    Last thing I want to talk about today is
2    just some of the people that you have worked with and
3    been associated with over the last, I guess it is two
4    and a half years now.
5    A    Two and a half years.
6    Q    So first, we talked about her a little bit
7    today, but are you familiar with Mary Fanning?
8    A    Yes.
9    Q    And who is Ms. Fanning?
10    A    She is a podcaster, researcher, journalist
11    and she helped produce the first movie Scientific
12    Proof.
13    Q    I know that you told me that you spoke with
14    Ms. Fanning over streaming during Scientific Proof?
15    A    Yes.
16    Q    Have you ever met her in person?
17    A    No.
18    Q    Okay.  Before the election, before the
19    November 2020 election, did you know of Ms. Fanning?
20    A    No.
21    Q    Okay.  Before you met Mr. Lindell, did you
22    know of Ms. Fanning?
23    A    No.
24    Q    So did you first become familiar with her at
25    that Scientific Proof filming?

Page 322

1    A    The first movie, Absolute Proof, mentions
2    her and that is when I became first aware of her.
3    Q    Okay.  What do understand Ms. Fanning's
4    opinions to be regarding the November 3, 2020 election?
5    A    I think she agrees that it was rigged.
6    Q    Has she ever provided you with evidence
7    supporting her opinions regarding the election?
8    A    No.
9    Q    Have you ever discussed Ms. Fanning's
10    election theories with Mr. Lindell?
11    A    No.
12    Q    Have you ever discussed Ms. Fanning's
13    election theories with any other employees of Lindell
14    Management?
15    A    No.
16    Q    Does your sixth-degree polynomial analysis
17    or your beliefs or opinions about how it plays together
18    with the other aspects of the election rely at all upon
19    Ms. Fanning?
20    A    No.
21    Q    You are familiar with Russell Ramsland,
22    correct?
23    A    From Texas.
24    Q    And before the November 3, 2020 election,
25    did you know of Mr. Ramsland?

Page 323

1    A    No.
2    Q    Before you met Mr. Lindell, were you aware
3    of Mr. Ramsland?
4    A    No.
5    Q    When did you first become familiar with
6    Mr. Ramsland?
7    A    I was introduced to him, Kurt Olsen said,
8    please talk to this guy.  He has got some data from
9    Texas that I want you to look at.  So we had a call.
10    They sent me some data.  I did some work-ups and
11    provided it to them.
12    Q    And was that before or after you did the
13    taping of the first --
14    A    After.
15    Q    Have you discussed your, kind of, analysis
16    with Mr. Ramsland?
17    A    Yes.
18    (Exhibit 125 was marked.)
19    Q    (BY MR. FREY)  Okay.  Actually, I have one
20    document that I want to show you which is a document you
21    produced with a label DFrank_ 000045.
22    Do you recognize this document?
23    A    Yes.
24    Q    This is an email from Mr. Ramsland to you,
25    May 12, 2021, correct?

Page 324

1    A    Yes.
2    Q    Okay.  He says, Since we talked, we have
3    been gathering data for analysis in Texas.
4    Surprisingly, most of the data has been written over
5    already so we have had to source people who downloaded
6    it relatively contemporaneously with the election.
7    Do you see that?
8    A    Yes.
9    Q    So was Mr. Ramsland kind of taking what you
10    did and trying to apply it to the data in Texas?
11    A    Yes.
12    Q    Okay.  And was he doing this himself or did
13    he ask you to do it?
14    A    I helped them.
15    Q    Okay.
16    A    I also did some.
17    Q    You also did some of it?
18    A    Yes.  There was a lady there who called me.
19    Everybody thinks they are good at this stuff and think
20    they can do it themselves and they get stuck and they
21    call me and I help them.
22    Q    In the second-to-last paragraph here he
23    says, I took the turnout percentage from each county and
24    averaged them and then averaged all three of them to
25    arrive at an average turnout percentage rate page and



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
325–328

Page 325

1  then solved for the six part polynomial.  I believe that
2  is your methodology.
3      A    It is not.
4      Q    That is where I was going.  Is he correctly
5  describing your methodology?
6      A    No.
7      Q    And where did he go wrong?  What did he get
8  wrong here?
9      A    When you present work in public, you don't
10  give every detail because it is too much into the
11  weeds.  So you present work to public, to the public in
12  ways they can understand and get the idea of it.  And
13  so people listen to that and they think they
14  understand.  And so they launch into their own and they
15  get stuck, and then they call me.
16      Q    Okay.  Did you tell him, did you respond to
17  Mr. Ramsland and tell him that he had it wrong?
18      A    I am sure I did because I spoke with some
19  lady there that connected me with and they were able
20  to get it working.
21      Q    So when you spoke with -- you do not
22  remember the name the lady?
23      A    That is why I said some lady.
24      Q    Okay.  And did you then share, kind of, your
25  full methodology with Mr. Ramsland via that lady who

Page 326

1  worked for him?
2      A    Yes.
3      Q    I think that I asked you this earlier but
4  just in case.
5          Did Mr. Lindell ever ask you for your full
6  methodology?
7      A    No.
8      Q    And then the last thing he asks is that you
9  provide him the 2015 census data by age, by county.
10          Do you see that?
11      A    Yes.
12      Q    Did you provide that?
13      A    Once again, it shows he did not understand
14  my methodology.
15      Q    So you did not?
16      A    I didn't.
17      Q    Did you provide the 2019 data?
18      A    I suppose I did or maybe I gave him a link.
19  It was a phone call.  I probably said, here is the link
20  to go to the census.gov, and here is a video that you
21  can watch to tell you how to do it, because I prepared
22  a video on my Rumble channel to show people how to do
23  it.
24      Q    Okay.  So in this instance Mr. Ramsland is
25  trying to replicate your methodology and kind of do your

Page 327

1  work?
2      A    Yes.
3      Q    Do you understand what Mr. Ramsland's or do
4  you know what Mr. Ramsland's kind of independent
5  opinions or theories are about the election?
6      A    I have interacted with him a lot, and he
7  thinks that the rolls are being manipulated during the
8  election.
9      Q    Do you know if he has any other kind of
10  theories on how the election is being manipulated?
11      A    Not specifically.
12      Q    Okay.  Does Mr. Waldron's -- I am sorry.
13  Strike that.
14          Does Mr. Ramsland's theories as to the voter
15  rolls kind of rely upon the analysis that you are able
16  to provide?
17      A    No, he uses mostly electronic evidence.
18      Q    He is more on the electronics side?
19      A    Yes.
20      Q    And did he ever share evidence with you on
21  his kind of electronic side?
22      A    Yes.
23      Q    What evidence did he show?
24      A    He showed me -- I have listened to his
25  talks, for example, and he shows examples where the

Page 328

1  voter rolls are churning right during the election.
2  And you can download day-to-day and every day somebody
3  who voted the day before is now shown as not having
4  voted and showing how they had voted and who has voted
5  moves around.
6      Q    Did he tell you where he obtained that
7  evidence from?
8      A    Sure.
9      Q    Where?
10      A    The state website or county website, one of
11  the two.  It is available online.  So they are able to
12  download it legally every day.
13      Q    Okay.  And have you ever discussed
14  Mr. Ramsland's theories with Mr. Lindell?
15      A    No.
16      Q    And have you ever discussed Mr. Ramsland's
17  election theories with other employees of Lindell
18  Management?
19      A    No.
20      Q    All right.  You are familiar with Colonel
21  Waldron, correct?
22      A    Yes.
23      Q    Before the November 3, 2020 election, were
24  you familiar with Colonel Waldron?
25      A    No.



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
329–332

Page 329

1    Q    Did you know who he was?

2    A    No.

3    Q    Before you met Mr. Lindell, did you know who

4    Colonel Waldron was?

5    A    No.

6    Q    So did you first become familiar with

7    Colonel Waldron at that initial kind of dinner taping of

8    Scientific Proof?

9    A    I don't think he was there.  I don't think

10   I met him until the Cyber Symposium.

11   Q    Okay.  The first time you interacted with

12   Colonel Waldron would have been there?

13   A    I think that is right.

14   Q    Did you ever speak with him before that?

15   A    Not to my knowledge.

16   Q    Okay.  Do you understand what Colonel

17   Waldron's theories are on the November 2020 election?

18   A    No.  He did a movie called Your Wake Up

19   Call where he talks about things.

20   Q    But that is kind of what you know about

21   his --

22   A    That is what I know what he thinks.

23   Q    No private conversations behind the scenes?

24   A    No.  No.

25   Q    Okay.  Are you familiar, I believe that you

Page 330

1    said you are, with Dennis Montgomery?

2    A    Yes.

3    Q    And who is Dennis Montgomery?

4    A    So I might be confusing two people right

5    now.  There is another guy that I have done Zooms with.

6    I have never personally spoken to Dennis Montgomery,

7    not even on Zoom.  I just know about him.

8    Q    Okay.  What is it that you know about him?

9    A    All I know is that he was asked to look at

10   the data that Mike had early on.  According to Mary

11   Fanning, she told me this in our conversation when I

12   first met her at the taping, that he had looked at the

13   data and he said, wow, it would take a physicist to

14   figure this out.  Along came a physicist.  So that was

15   the a fun story to tell.  That he is a physicist as

16   well but kind of an unusual gentleman so he is not

17   somebody you put in front of a camera apparently.  They

18   were glad that a physicist came along who wears a bow

19   tie.

20   Q    Okay.  And before the November 2020

21   election, had you ever heard of Dennis Montgomery?

22   A    No.

23        (Exhibit 126 was marked.)

24   Q    (BY MR. FREY)  So there is -- sorry, one more

25   document actually which is a say document that you

Page 331

1    produced in response to the subpoena in this case.  It

2    will be Exhibit 126.  It has a Bates label DFrank00022.

3    It is a May 27, 28 email with you and Ms. Fanning.

4        Do you see that?

5    A    Yes.

6    Q    Do you recognize this document?

7    A    Yes.

8    Q    And Ms. Fanning says to you on May 27, if

9    you are going to be in Seattle, Washington, I would like

10   to set up a meeting between you and Dennis.  He would

11   like to meet with you and I am quite certain that the

12   two of you might find a couple areas of mutual interest

13   to discuss.

14        Do you see that?

15   A    Yes.  I do see that.

16   Q    Okay.  But you did not end up meeting with

17   Mr. Montgomery in Seattle?

18   A    I did not.

19   Q    Why not?

20   A    I don't know.  I remember, I remember

21   trying to meet with him but our schedules did not line

22   up for some reason.

23   Q    Okay.  And you said that you have never even

24   really spoke to him directly, right?

25   A    I don't believe that I have ever spoken to

Page 332

1    him.

2    Q    Okay.  Are you familiar with a theory of

3    election fraud that is called the hammer and scorecard?

4    A    Vaguely.

5    Q    What is your understanding of the hammer and

6    scorecard theory?

7    A    It is a software written by somebody, maybe

8    Dennis, in 2006 working for the NSA.  And apparently it

9    controls and regulates the way elections work.  I never

10   read it or looked into it.  It is part of my controls.

11   I try to stay completely objective, only letting data

12   tell me what to think, which is one of the reasons why

13   I do not listen a lot of other people.  I keep my mind

14   clean and focus on the data.

15   Q    Okay.  So you don't have any opinions about

16   the hammer and scorecard theory?

17   A    I have no informed opinions.

18   Q    What are your uninformed opinions?

19   A    Well, people I love and trust and respect

20   think it is real.  I reserve judgment until I have

21   looked at it myself.

22   Q    You know Kurt Olsen, correct?

23   A    Of course.

24   Q    Kurt Olsen is one of Mr. Lindell's

25   attorneys?



Page 333

1    A   Yes.
2    Q   Does Mr. Olsen serve in any other role other
3  than as an attorney for Mr. Lindell?
4    A   I don't know what you mean by that.
5    Q   Does Mr. Olsen publicly speak on or do
6  analysis of election fraud theories?
7    A   He wrote a whole Supreme Court brief which
8  involved a great deal of analysis.
9    Q   In that brief he is taking other people's
10  theories, right?
11   A   Yes.
12   Q   I was asking if you know if he has any of
13  his own --
14   A   Not to my knowledge, no.
15   Q   -- theories.  Okay.  Are you still in
16  contact with Mr. Olsen?
17   A   Oh, yes.
18   Q   For all of these people that we have talked
19  about, Mr. Ramsland, Colonel Waldron, Dennis Montgomery,
20  Mary Fanning, have you, does your analysis or are your
21  opinions about the 2020, November 2020 election in any
22  way relying upon evidence that they have provided you?
23   A   No.  I started completely independently in
24  Pennsylvania and came up with my own approaches.  It
25  was delightful to discover that somebody else had data

Page 334

1  which confirmed what was going on, but I do not rely on
2  it whatsoever, and that is one of the reasons why it is
3  like a parallel track.  I focus on one thing and Mike
4  focuses on something else.
5    Q   So you are focusing on data and Mr. Lindell
6  is focusing on the electronics?
7    A   Electronics, yes.
8    Q   And, to your knowledge, are any of -- strike
9  that.  Give me two minutes to talk with Maura.
10   A   Sure.
11   Q   And we might be done.
12   MR. GREENE:  Okay.
13   A   Do want me to walk out?  I am just asking
14  what you meant by I will give you two minutes.
15   MR. FREY:  Just give me two minutes to go
16  through this.
17   THE VIDEOGRAPHER:  The time is 5:49.  We are
18  off the record.
19   (Recess was taken.)
20   THE VIDEOGRAPHER:  The time is 5:50 p.m. We
21  are on the record.
22   Q   Okay.  Dr. Frank, thank you for coming here
23  today and answering my questions.  I have no further
24  questions at this time.
25   A   Thank you.

Page 335

1    MR. GREENE:  No questions.  We will, like I
2  said before, read and sign.
3    THE VIDEOGRAPHER:  This concludes tape
4  number one and the end of the videotape deposition of
5  Dr. Douglas Frank.  We are going off the video record on
6  July 19, 2023 at 5:51 p.m.
7    (The deposition concluded at 5:51 p.m.)

Page 336

1         C E R T I F I C A T E
2    I, MICHELE KOSS, a Shorthand Reporter and
3  notary public, within and for the State of Colorado, do
4  hereby certify:
5    That DOUGLAS GEAUWANNA FRANK, the witness whose
6  examination is hereinbefore set forth, was first duly
7  sworn by me and that this transcript of said testimony
8  is a true record of the testimony given by said witness.
9    I further certify that I am not related to any
10  of the parties to this action by blood or marriage, and
11  that I am in no way interested in the outcome of this
12  matter.
13    IN WITNESS WHEREOF,  I have hereunto set
14  my hand this 21st day of July, 2023.
15
16                   Michele Koss
          Michele Koss, RMR, RPR



DOUGLAS GEAUWANNA FRANK
Smartmatic USA Corp. vs Michael J. Lindell

July 19, 2023
337—339

**Page 337**

```
1              ESQUIRE ERRATA SHEET

2    Esquire Job ID: J9932058

3    Case Caption: Smartmatic USA Corp. vs. Lindell, et al.

4

5         DECLARATION UNDER PENALTY OF PERJURY

6

7         I declare under penalty of perjury that I have

8    read the entire transcript of my Deposition taken

9    in the above-captioned matter or the same

10   has been read to me and the same is true and

11   accurate, save and except for changes and/or

12   corrections, if any, as indicated by me on the

13   DEPOSITION ESQUIRE ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath. Signed on the _____ day of

16   _____, 2023.

17   _____

18   DOUGLAS GEAUWANNA FRANK

19

20

21

22

23

24

25
```

**Page 339**

```
1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25          DOUGLAS GEAUWANNA FRANK
```

**Page 338**

```
1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25          DOUGLAS GEAUWANNA FRANK
```

