# Exhibit 238

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD,
JAMES DAVID HOOPER, and
DAREN WADE RUBINGH,

                Plaintiffs,

v.

                                                    Civil Case No. 20-13134
                                                    Honorable Linda V. Parker

GRETCHEN WHITMER, in her official
capacity as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, and MICHIGAN
BOARD OF STATE CANVASSERS,

                Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY, and
ROBERT DAVIS,

                Intervenor-Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" (ECF NO. 7)

        The right to vote is among the most sacred rights of our democracy and, in

turn, uniquely defines us as Americans.  The struggle to achieve the right to vote is

1

one that has been both hard fought and cherished throughout our country's history. Local, state, and federal elections give voice to this right through the ballot. And elections that count each vote celebrate and secure this cherished right.

These principles are the bedrock of American democracy and are widely revered as being woven into the fabric of this country. In Michigan, more than 5.5 million citizens exercised the franchise either in person or by absentee ballot during the 2020 General Election. Those votes were counted and, as of November 23, 2020, certified by the Michigan Board of State Canvassers (also "State Board"). The Governor has sent the slate of Presidential Electors to the Archivist of the United States to confirm the votes for the successful candidate.

Against this backdrop, Plaintiffs filed this lawsuit, bringing forth claims of widespread voter irregularities and fraud in the processing and tabulation of votes and absentee ballots. They seek relief that is stunning in its scope and breathtaking in its reach. If granted, the relief would disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election. The Court declines to grant Plaintiffs this relief.

## I.    Background

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election ("2020 General Election"). (ECF

No. 36-4 at Pg ID 2622.)  Many of those votes were cast by absentee ballot.  This was due in part to the coronavirus pandemic and a ballot measure the Michigan voters passed in 2018 allowing for no-reason absentee voting.  When the polls closed and the votes were counted, Former Vice President Joseph R. Biden, Jr. had secured over 150,000 more votes than President Donald J. Trump in Michigan. (*Id.*)

Michigan law required the Michigan State Board of Canvassers to canvass results of the 2020 General Election by November 23, 2020.  Mich. Comp. Laws § 168.842.  The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices.  (ECF No. 36-5 at Pg ID 2624.)  That same day, Governor Gretchen Whitmer signed the Certificates of Ascertainment for the slate of electors for Vice President Biden and Senator Kamala D. Harris.  (ECF No. 36-6 at Pg ID 2627-29.)  Those certificates were transmitted to and received by the Archivist of the United States.  (*Id.*)

Federal law provides that if election results are contested in any state, and if the state, prior to election day, has enacted procedures to decide controversies or contests over electors and electoral votes, and if these procedures have been applied, and the decisions are made at least six days before the electors' meetings, then the decisions are considered conclusive and will apply in counting the electoral votes.  3 U.S.C. § 5.  This date (the "Safe Harbor" deadline) falls on

December 8, 2020.  Under the federal statutory timetable for presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which is December 14 this year.

Alleging widespread fraud in the distribution, collection, and counting of ballots in Michigan, as well as violations of state law as to certain election challengers and the manipulation of ballots through corrupt election machines and software, Plaintiffs filed the current lawsuit against Defendants at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving holiday.  (ECF No. 1.) Plaintiffs are registered Michigan voters and nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan.  (ECF No. 6 at Pg ID 882.)  They are suing Governor Whitmer and Secretary of State Jocelyn Benson in their official capacities, as well as the Michigan Board of State Canvassers.

On November 29, a Sunday, Plaintiffs filed a First Amended Complaint (ECF No. 6), "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof" (ECF No. 7), and Emergency Motion to Seal (ECF No. 8).  In their First Amended Complaint, Plaintiffs allege three claims pursuant to 42 U.S.C. § 1983: (Count I) violation of the Elections and Electors Clauses; (Count II) violation of the Fourteenth Amendment Equal Protection Clause; and, (Count III) denial of the Fourteenth

Amendment Due Process Clause.  (ECF No. 6.)  Plaintiffs also assert one count alleging violations of the Michigan Election Code.  (*Id*.)

By December 1, motions to intervene had been filed by the City of Detroit (ECF No. 15), Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14).  On that date, the Court entered a briefing schedule with respect to the motions.  Plaintiffs had not yet served Defendants with their pleading or emergency motions as of December 1.  Thus, on December 1, the Court also entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions.  Later the same day, after Plaintiffs filed certificates of service reflecting service of the summons and Amended Complaint on Defendants (ECF Nos. 21), the Court entered a briefing schedule with respect to Plaintiffs' emergency motions, requiring response briefs by 8:00 p.m. on December 2, and reply briefs by 8:00 p.m. on December 3 (ECF No. 24).

On December 2, the Court granted the motions to intervene.  (ECF No. 28.)  Response and reply briefs with respect to Plaintiffs' emergency motions were thereafter filed.  (ECF Nos. 29, 31, 32, 34, 35, 36, 37, 39, 49, 50.)  Amicus curiae Michigan State Conference NAACP subsequently moved and was granted leave to file a brief in support of Defendants' position.  (ECF Nos. 48, 55.)  Supplemental briefs also were filed by the parties.  (ECF Nos. 57, 58.)

In light of the limited time allotted for the Court to resolve Plaintiffs' emergency motion for injunctive relief—which Plaintiffs assert "must be granted in advance of December 8, 2020" (ECF No. 7 at Pg ID 1846)—the Court has disposed of oral argument with respect to their motion pursuant to Eastern District of Michigan Local Rule 7.1(f).[1]

## II.    Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). The plaintiff bears the burden of demonstrating entitlement to preliminary injunctive relief. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Such relief will only be granted where "the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to

---

[1] "'[W]here material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction sought, district courts generally need not hold an evidentiary hearing.'" *Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 Fed. Appx. 489, 496-97 (6th Cir. 2018) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 553 (6th Cir. 2007)) (citation omitted).

support or oppose a motion for a preliminary injunction."  11A Mary Kay Kane,

Fed. Prac. & Proc.  § 2949 (3d ed.).

Four factors are relevant in deciding whether to grant preliminary injunctive

relief: "'(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury absent the injunction; (3)

whether the injunction would cause substantial harm to others; and (4) whether the

public interest would be served by the issuance of an injunction.'"  *Daunt v.*

*Benson*, 956 F.3d 396, 406 (6th Cir. 2020) (quoting *Bays v. City of Fairborn*, 668

F.3d 814, 818-19 (6th Cir. 2012)).  "At the preliminary injunction stage, 'a plaintiff

must show more than a mere possibility of success,' but need not 'prove his case in

full.'"  *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012)

(quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511

F.3d 535, 543 (6th Cir. 2007)).  Yet, "the proof required for the plaintiff to obtain a

preliminary injunction is much more stringent than the proof required to survive a

summary judgment motion …."  *Leary*, 228 F.3d at 739.

## III.  Discussion

The Court begins by discussing those questions that go to matters of subject

matter jurisdiction or which counsel against reaching the merits of Plaintiffs'

claims.  While the Court finds that any of these issues, alone, indicate that

Plaintiffs' motion should be denied, it addresses each to be thorough.

## A. Eleventh Amendment Immunity

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. This immunity extends to suits brought by citizens against their own states. *See, e.g., Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020) (citing *Hans v. Louisiana*, 134 U.S. 1, 18-19 (1890)). It also extends to suits against state agencies or departments, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (citations omitted), and "suit[s] against state officials when 'the state is the real, substantial party in interest[,]'" *id.* at 101 (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

A suit against a State, a state agency or its department, or a state official is in fact a suit against the State and is barred "regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100-02 (citations omitted). "'The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *Id.* at 101 n.11 (quoting *Dugan v. Rank*, 372 U.S. 609, 620 (1963)) (internal quotation marks omitted).

Eleventh Amendment immunity is subject to three exceptions: (1) congressional abrogation; (2) waiver by the State; and (3) "a suit against a state official seeking prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted). Congress did not abrogate the States' sovereign immunity when it enacted 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). "The State of Michigan has not consented to being sued in civil rights actions in the federal courts." *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) (citing *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986)). The Eleventh Amendment therefore bars Plaintiffs' claims against the Michigan Board of State Canvassers. *See McLeod v. Kelly*, 7 N.W.2d 240, 242 (Mich. 1942) ("The board of State canvassers is a State agency …"); *see also Deleeuw v. State Bd. of Canvassers*, 688 N.W.2d 847, 850 (Mich. Ct. App. 2004). Plaintiffs' claims are barred against Governor Whitmer and Secretary Benson unless the third exception applies.

The third exception arises from the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123 (1908). But as the Supreme Court has advised:

> To interpret *Young* to permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle … that Eleventh Amendment immunity represents a real

9

> limitation on a federal court's federal-question
> jurisdiction. The real interests served by the Eleventh
> Amendment are not to be sacrificed to elementary
> mechanics of captions and pleading. Application of the
> *Young* exception must reflect a proper understanding of
> its role in our federal system and respect for state courts
> instead of a reflexive reliance on an obvious fiction.

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997). Further, "the

theory of *Young* has not been provided an expansive interpretation." *Pennhurst

State Sch. & Hosp.*, 465 U.S. at 102. "'In determining whether the doctrine of *Ex

parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct

a straightforward inquiry into whether [the] complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective.'" *Verizon

Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (quoting *Coeur d'Alene

Tribe of Idaho*, 521 U.S. 296 (O'Connor, J., concurring)).

Ex parte Young* does not apply, however, to *state law* claims against state

officials, regardless of the relief sought. *Pennhurst State Sch. & Hosp.*, 465 U.S. at

106 ("A federal court's grant of relief against state officials on the basis of state

law, whether prospective or retroactive, does not vindicate the supreme authority

of federal law. On the contrary, it is difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform

their conduct to state law."); *see also In re Ohio Execution Protocol Litig.*, 709 F.

App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law

10

in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief."). Unquestionably, Plaintiffs' state law claims against Defendants are barred by Eleventh Amendment immunity.

The Court then turns its attention to Plaintiffs' § 1983 claims against Defendants. Defendants and Intervenor DNC/MDP contend that these claims are not in fact federal claims as they are premised entirely on alleged violations of *state* law. (ECF No. 31 at Pg ID 2185 ("Here, each count of Plaintiffs' complaint—even Counts I, II, and III, which claim to raise violations of federal law—is predicated on the election being conducted contrary to Michigan law."); ECF No. 36 at Pg ID 2494 ("While some of [Plaintiffs'] allegations concern fantastical conspiracy theories that belong more appropriately in the fact-free outer reaches of the Internet[,] … what Plaintiffs assert at bottom are violations of the Michigan Election Code.") Defendants also argue that even if properly stated as federal causes of action, "it is far from clear whether Plaintiffs' requested injunction is actually prospective in nature, as opposed to retroactive." (ECF No. 31 at Pg ID 2186.)

The latter argument convinces this Court that *Ex parte Young* does not apply. As set forth earlier, "'[i]n order to fall with the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law.'"

11

*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (quoting *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013)). Unlike *Russell*, which Plaintiffs cite in their reply brief, this is not a case where a plaintiff is seeking to enjoin the continuing enforcement of a statute that is allegedly unconstitutional. *See id.* at 1044, 1047 (plaintiff claimed that Kentucky law creating a 300-foot no-political-speech buffer zone around polling location violated his free-speech rights). Instead, Plaintiffs are seeking to undo what has already occurred, as their requested relief reflects.[2] (*See* ECF No. 7 at Pg ID 1847; *see also* ECF No. 6 at Pg 955-56.)

Before this lawsuit was filed, the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist. (ECF Nos. 31-4, 31-5.) There is no continuing violation to enjoin. *See Rios v. Blackwell*, 433 F. Supp. 2d 848 (N.D. Ohio Feb. 7, 2006); *see also King Lincoln Bronzeville Neighborhood Ass'n v. Husted*, No. 2:06-cv-00745, 2012 WL 395030, at *4-5 (S.D. Ohio Feb. 7, 2012); *cf. League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008) (finding that the plaintiff's claims fell within the *Ex parte Young* doctrine

---

[2] To the extent Plaintiffs ask the Court to certify the results in favor of President Donald J. Trump, such relief is beyond its powers.

where it alleged that the problems that plagued the election "are chronic and will continue absent injunctive relief").

For these reasons, the Court concludes that the Eleventh Amendment bars Plaintiffs' claims against Defendants.

## B.    Mootness

This case represents well the phrase: "this ship has sailed."  The time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court.  For those reasons, this matter is moot.

"'Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies.'"  *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)).  A case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410 (1980) (internal quotation marks and citation omitted).  Stated differently, a case is moot where the court lacks "the ability to give meaningful relief[.]"  *Sullivan v. Benningfield*, 920 F.3d 401, 410 (6th Cir. 2019).  This lawsuit was moot well before it was filed on November 25.

In their prayer for relief, Plaintiffs ask the Court to: (a) order Defendants to decertify the results of the election; (b) enjoin Secretary Benson and Governor

Whitmer from transmitting the certified election results to the Electoral College;
(c) order Defendants "to transmit certified election results that state that President
Donald Trump is the winner of the election"; (d) impound all voting machines and
software in Michigan for expert inspection; (e) order that no votes received or
tabulated by machines not certified as required by federal and state law be counted;
and, (f) enter a declaratory judgment that mail-in and absentee ballot fraud must be
remedied with a manual recount or statistically valid sampling.[3]  (ECF No. 6 at Pg
ID 955-56, ¶ 233.)  What relief the Court could grant Plaintiffs is no longer
available.

Before this lawsuit was filed, all 83 counties in Michigan had finished
canvassing their results for all elections and reported their results for state office
races to the Secretary of State and the Michigan Board of State Canvassers in
accordance with Michigan law.  *See* Mich. Comp. Laws § 168.843.  The State
Board had certified the results of the 2020 General Election and Governor
Whitmer had submitted the slate of Presidential Electors to the Archivists.  (ECF

---

[3] Plaintiffs also seek an order requiring the impoundment of all voting machines
and software in Michigan for expert inspection and the production of security
camera footage from the TCF Center for November 3 and 4.  (ECF No. 6 at Pg ID
956, ¶ 233.)  This requested relief is not meaningful, however, where the remaining
requests are no longer available.  In other words, the evidence Plaintiffs seek to
gather by inspecting voting machines and software and security camera footage
only would be useful if an avenue remained open for them to challenge the election
results.

No. 31-4 at Pg ID 2257-58; ECF No. 31-5 at Pg ID 2260-63.) The time for requesting a special election based on mechanical errors or malfunctions in voting machines had expired. *See* Mich. Comp. Laws §§ 168.831, 168.832 (petitions for special election based on a defect or mechanical malfunction must be filed "no later than 10 days after the date of the election"). And so had the time for requesting a recount for the office of President. *See* Mich. Comp. Laws § 168.879.

The Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so. Plaintiffs did not avail themselves of the remedies established by the Michigan legislature. The deadline for them to do so has passed. Any avenue for this Court to provide meaningful relief has been foreclosed. As the Eleventh Circuit Court of Appeals recently observed in one of the many other post-election lawsuits brought to specifically overturn the results of the 2020 presidential election:

> "We cannot turn back the clock and create a world in which" the 2020 election results are not certified. *Fleming v. Gutierrez*, 785 F.3d 442, 445 (10th Cir. 2015). And it is not possible for us to delay certification nor meaningful to order a new recount when the results are already final and certified.

*Wood v. Raffensperger*, -- F.3d -- , 2020 WL 7094866 (11th Cir. Dec. 5, 2020). And as one Justice of the Supreme Court of Pennsylvania advised in another 2020 post-election lawsuit: "there is no basis in law by which the courts may grant Petitioners' request to ignore the results of an election and recommit the choice to

15

the General Assembly to substitute its preferred slate of electors for the one chosen by a majority of Pennsylvania's voters." *Kelly v. Commonwealth*, No. 68 MAP 2020, 2020 WL 7018314, at *3 (Pa. Nov. 28, 2020) (Wecht, J., concurring); *see also Wood v. Raffensperger*, No. 1:20-cv-04651, 2020 WL 6817513, at *13 (N.D. Ga. Nov. 20, 2020) (concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways").

In short, Plaintiffs' requested relief concerning the 2020 General Election is moot.

## C.    Laches

Defendants argue that Plaintiffs are unlikely to succeed on the merits because they waited too long to knock on the Court's door. (ECF No. 31 at Pg ID 2175-79; ECF No. 39 at Pg ID 2844.) The Court agrees.

The doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941); *see also United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008) ("A constitutional claim can become time-barred just as any other claim can."). An action may be barred by the doctrine of laches if: (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant is prejudiced by this delay. *Brown-Graves Co. v. Central States, Se. and Sw. Areas Pension Fund*,

16

206 F.3d 680, 684 (6th Cir. 2000); *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d

634, 639 n.6 (6th Cir. 2009) ("Laches arises from an extended failure to exercise a

right to the detriment of another party."). Courts apply laches in election cases.

*Detroit Unity Fund v. Whitmer*, 819 F. App'x 421, 422 (6th Cir. 2020) (holding

that the district court did not err in finding plaintiff's claims regarding deadline for

local ballot initiatives "barred by laches, considering the unreasonable delay on the

part of [p]laintiffs and the consequent prejudice to [d]efendants"). *Cf. Benisek v.*

*Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary

injunction must generally show reasonable diligence. That is as true in election law

cases as elsewhere.").

First, Plaintiffs showed no diligence in asserting the claims at bar. They

filed the instant action on November 25—more than 21 days after the 2020

General Election—and served it on Defendants some five days later on December

1. (ECF Nos. 1, 21.) If Plaintiffs had legitimate claims regarding whether the

treatment of election challengers complied with state law, they could have brought

their claims well in advance of or on Election Day—but they did not. Michigan's

83 Boards of County Canvassers finished canvassing by no later than November

17 and, on November 23, both the Michigan Board of State Canvassers and

Governor Whitmer certified the election results. Mich. Comp. Laws §§ 168.822,

168.842.0. If Plaintiffs had legitimate claims regarding the manner by which

ballots were processed and tabulated on or after Election Day, they could have

brought the instant action on Election Day or during the weeks of canvassing that

followed—yet they did not.  Plaintiffs base the claims related to election machines

and software on "expert and fact witness" reports discussing "glitches" and other

alleged vulnerabilities that occurred as far back as 2010.  (*See e.g.,* ECF No. 6 at

Pg ID 927-933, ¶¶ 157(C)-(E), (G), 158, 160, 167.)  If Plaintiffs had legitimate

concerns about the election machines and software, they could have filed this

lawsuit well before the 2020 General Election—yet they sat back and did nothing.

Plaintiffs proffer no persuasive explanation as to why they waited so long to

file this suit.  Plaintiffs concede that they "would have preferred to file sooner, but

[] needed some time to gather statements from dozens of fact witnesses, retain and

engage expert witnesses, and gather other data supporting their Complaint."  (ECF

No. 49 at Pg ID 3081.)  But according to Plaintiffs themselves, "[m]anipulation of

votes was apparent *shortly after the polls closed on November 3, 2020*."  (ECF No.

7 at Pg ID 1837 (emphasis added).)  Indeed, where there is no reasonable

explanation, there can be no true justification.  *See Crookston v. Johnson*, 841 F.3d

396, 398 (6th Cir. 2016) (identifying the "first and most essential" reason to issue a

stay of an election-related injunction is plaintiff offering "no reasonable

explanation for waiting so long to file this action").  Defendants satisfy the first

element of their laches defense.

Second, Plaintiffs' delay prejudices Defendants. *See Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the candidate's claim to be a serious candidate who has received a serious injury becomes less credible by his having slept on his rights.") This is especially so considering that Plaintiffs' claims for relief are not merely last-minute—they are after the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the results were certified. The rationale for interposing the doctrine of laches is now at its peak. *See McDonald v. Cnty. of San Diego*, 124 F. App'x 588 (9th Cir. 2005) (citing *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988)); *Soules*, 849 F.2d at 1180 (quoting *Hendon v. N.C. State Bd. Of Elections*, 710 F.2d 177, 182 (4th Cir. 1983)) (applying doctrine of laches in post-election lawsuit because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action").

Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes. The Court concludes that Plaintiffs' delay results in their claims being barred by laches.

19

## D. Abstention

As outlined in several filings, when the present lawsuit was filed on November 25, 2020, there already were multiple lawsuits pending in Michigan state courts raising the same or similar claims alleged in Plaintiffs' Amended Complaint. (*See, e.g.*, ECF No. 31 at Pg ID 2193-98 (summarizing five state court lawsuits challenging President Trump's defeat in Michigan's November 3, 2020 General Election).) Defendants and the City of Detroit urge the Court to abstain from deciding Plaintiffs' claims in deference to those proceedings under various abstention doctrines. (*Id.* at Pg ID 2191-2203; ECF No. 39 at Pg ID 2840-44.) Defendants rely on the abstention doctrine outlined by the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). The City of Detroit relies on the abstention doctrines outlined in *Colorado River*, as well as those set forth in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500-01 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). The City of Detroit maintains that abstention is particularly appropriate when resolving election disputes in light of the autonomy provided to state courts to initially settle such disputes.

The abstention doctrine identified in *Colorado River* permits a federal court to abstain from exercising jurisdiction over a matter in deference to parallel state-court proceedings. *Colorado River*, 424 U.S. at 813, 817. The exception is found

warranted "by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (quoting *Colorado River*, 424 U.S. at 817). The Sixth Circuit has identified two prerequisites for abstention under this doctrine. *Romine v. Compuserve Corp.*, 160 F.3d 337, 339-40 (6th Cir. 1998).

First, the court must determine that the concurrent state and federal actions are parallel. *Id*. at 339. Second, the court must consider the factors outlined by the Supreme Court in *Colorado River* and subsequent cases:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; … (4) the order in which jurisdiction was obtained; … (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*Romine*, 160 F.3d at 340-41 (internal citations omitted). "These factors, however, do not comprise a mechanical checklist. Rather, they require 'a careful balancing of the important factors as they apply in a give[n] case' depending on the particular facts at hand." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983)).

As summarized in Defendants' response brief and reflected in their exhibits (*see* ECF No. 31 at Pg ID 2193-97; *see also* ECF Nos. 31-7, 31-9, 31-11, 31-12,

31-14), the allegations and claims in the state court proceedings and the pending matter are, at the very least, substantially similar, *Romine*, 160 F.3d at 340 ("Exact parallelism is not required; it is enough if the two proceedings are substantially similar." (internal quotation marks and citation omitted)).  A careful balancing of the factors set forth by the Supreme Court counsel in favor of deferring to the concurrent jurisdiction of the state courts.

The first and second factor weigh against abstention.  *Id.* (indicating that the weight is against abstention where no property is at issue and neither forum is more or less convenient).  While the Supreme Court has stated that "'the presence of federal law issues must always be a major consideration weighing against surrender of federal jurisdiction in deference to state proceedings[,]'" *id*. at 342 (quoting *Moses H. Cone*, 460 U.S. at 26), this "'factor has less significance where the federal courts' jurisdiction to enforce the statutory rights in question is concurrent with that of the state courts.'"[4]  *Id.* (quoting *Moses H. Cone*, 460 U.S. at 25).  Moreover, the Michigan Election Code seems to dominate even Plaintiffs' federal claims.  Further, the remaining factors favor abstention.

"Piecemeal litigation occurs when different courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting

---

[4] State courts have concurrent jurisdiction over § 1983 actions.  *Felder v. Casey*, 487 U.S. 131, 139 (1988).

results." *Id.* at 341. The parallel proceedings are premised on similar factual allegations and many of the same federal and state claims. The state court proceedings were filed well before the present matter and at least three of those matters are far more advanced than this case. Lastly, as Congress conferred concurrent jurisdiction on state courts to adjudicate § 1983 claims, *Felder v. Casey*, 487 U.S. 131, 139 (1988), "[t]here can be no legitimate contention that the [Michigan] state courts are incapable of safeguarding [the rights protected under this statute]," *Romine*, 160 F.3d at 342.

For these reasons, abstention is appropriate under the *Colorado River* doctrine. The Court finds it unnecessary to decide whether abstention is appropriate under other doctrines.

### E.     Standing

Under Article III of the United States Constitution, federal courts can resolve only "cases" and "controversies." U.S. Const. art. III § 2. The case-or-controversy requirement is satisfied only where a plaintiff has standing to bring suit. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). Each plaintiff must demonstrate standing for each claim he seeks to press.[5]

---

[5] Plaintiffs assert a due process claim in their Amended Complaint and twice state in their motion for injunctive relief that Defendants violated their due process rights. (*See* ECF No. 7 at Pg ID 1840, 1844.) Plaintiffs do not pair either statement with anything the Court could construe as a developed argument. (*Id.*) The Court finds it unnecessary, therefore, to further discuss the due process claim.

23

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted) ("[A]

plaintiff must demonstrate standing separately for each form of relief sought.").

To establish standing, a plaintiff must show that:  (1) he has suffered an injury in

fact that is "concrete and particularized" and "actual or imminent"; (2) the injury is

"fairly . . . trace[able] to the challenged action of the defendant"; and (3) it is

"likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)

(internal quotation marks and citations omitted).

### 1. Equal Protection Claim

Plaintiffs allege that Defendants engaged in "several schemes" to, among

other things, "destroy," "discard," and "switch" votes for President Trump, thereby

"devalu[ing] Republican votes" and "diluting" the influence of their individual

votes.  (ECF No. 49 at Pg ID 3079.)  Plaintiffs contend that "the vote dilution

resulting from this systemic and illegal conduct did not affect all Michigan voters

equally; it had the intent and effect of inflating the number of votes for Democratic

candidates and reducing the number of votes for President Trump and Republican

candidates."  (ECF No. 49 at Pg ID 3079.)  Even assuming that Plaintiffs establish

---

*McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a
perfunctory manner, unaccompanied by some effort at developed argumentation,
are deemed waived.").

injury-in-fact and causation under this theory,[6] their constitutional claim cannot stand because Plaintiffs fall flat when attempting to clear the hurdle of redressability.

Plaintiffs fail to establish that the alleged injury of vote-dilution can be redressed by a favorable decision from this Court. Plaintiffs ask this Court to de-certify the results of the 2020 General Election in Michigan. But an order de-certifying the votes of approximately 2.8 million people would not reverse the dilution of Plaintiffs' vote. To be sure, standing is not "dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934 (citing *Cuno*, 547 U.S. at 353); *Cuno*, 547 U.S. at 353 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Plaintiffs' alleged injury does not entitle them to seek their requested remedy because the harm of having one's vote invalidated or diluted is not remedied by denying millions of others *their* right to vote. Accordingly, Plaintiffs have failed to show that their injury can be redressed by the relief they seek and thus possess no standing to pursue their equal protection claim.

---

[6] To be clear, the Court does not find that Plaintiffs satisfy the first two elements of the standing inquiry.

### 2. Elections Clause & Electors Clause Claims

The provision of the United States Constitution known as the Elections Clause states in part: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]"  U.S. Const. art. I, § 4, cl. 1.  "The Elections Clause effectively gives state governments the 'default' authority to regulate the mechanics of federal elections, *Foster v. Love*, 522 U.S. 67, 69, 118 S. Ct. 464, 139 L.Ed.2d 369 (1997), with Congress retaining 'exclusive control' to 'make or alter' any state's regulations, *Colegrove v. Green*, 328 U.S. 549, 554, 66 S. Ct. 1198, 90 L.Ed. 1432 (1946)."  *Bognet*, 2020 WL 6686120, *1.  The "Electors Clause" of the Constitution states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors …."  U.S. Const. art. II, § 1, cl. 2.

Plaintiffs argue that, as "nominees of the Republican Party to be Presidential Electors on behalf of the State of Michigan, they have standing to allege violations of the Elections Clause and Electors Clause because "a vote for President Trump and Vice-President Pence in Michigan … is a vote for each Republican elector[], and … illegal conduct aimed at harming candidates for President similarly injures Presidential Electors."  (ECF No. 7 at Pg ID 1837-38; ECF No. 49 at Pg ID 3076-78.)

But where, as here, the only injury Plaintiffs have alleged is that the

Elections Clause has not been followed, the United States Supreme Court has made

clear that "[the] injury is precisely the kind of undifferentiated, generalized

grievance about the conduct of government that [courts] have refused to

countenance."[7] *Lance v. Coffman*, 549 U.S. 437, 442 (2007).  Because Plaintiffs

"assert no particularized stake in the litigation," Plaintiffs fail to establish injury-

in-fact and thus standing to bring their Elections Clause and Electors Clause

claims.  *Id.*; *see also Johnson v. Bredesen*, 356 F. App'x 781, 784 (6th Cir. 2009)

(citing *Lance*, 549 U.S. at 441-42) (affirming district court's conclusion that

citizens did not allege injury-in-fact to support standing for claim that the state of

Tennessee violated constitutional law).

---

[7] Although separate constitutional provisions, the Electors Clause and Elections
Clause share "considerable similarity," *Ariz. State Leg. v. Ariz. Indep. Redistricting
Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting), and Plaintiffs do
not at all distinguish the two clauses in their motion for injunctive relief or reply
brief (ECF No. 7; ECF No. 49 at Pg ID 3076-78).  *See also Bognet v. Sec'y
Commonwealth of Pa.*, No. 20-3214, 2020 WL 6686120, at *7 (3d Cir. Nov. 13,
2020) (applying same test for standing under both Elections Clause and Electors
Clause); *Wood*, 2020 WL 6817513, at *1 (same); *Foster*, 522 U.S. at 69
(characterizing Electors Clause as Elections Clauses' "counterpart for the
Executive Branch"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05
(1995) (noting that state's "duty" under Elections Clause "parallels the duty"
described by Electors Clause).

This is so because the Elections Clause grants rights to "the Legislature" of "each State." U.S. Const. art. I, § 4, cl. 1. The Supreme Court interprets the words "the Legislature," as used in that clause, to mean the lawmaking bodies of a state. *Ariz. State Legislature*, 135 S.Ct. at 2673. The Elections Clause, therefore, grants rights to state legislatures and to other entities to which a State may delegate lawmaking authority. *See id.* at 2668. Plaintiffs' Elections Clause claims thus belong, if to anyone, Michigan's state legislature. *Bognet v. Secy. Commonwealth of Pa.*, -- F.3d. --, 2020 WL 6686120, *7 (3d Cir. Nov. 13, 2020). Plaintiffs here are six presidential elector nominees; they are not a part of Michigan's lawmaking bodies nor do they have a relationship to them.

To support their contention that they have standing, Plaintiffs point to *Carson v. Simon*, 78 F.3d 1051 (8th Cir. 2020), a decision finding that electors had standing to bring challenges under the Electors Clause. (ECF No. 7 at Pg ID 1839 (citing *Carson*, 978 F.3d at 1057).) In that case, which was based on the specific content and contours of Minnesota state law, the Eighth Circuit Court of Appeals concluded that because "the plain text of Minnesota law treats prospective electors as candidates," it too would treat presidential elector nominees as candidates. *Carson*, 78 F.3d at 1057. This Court, however, is as unconvinced about the majority's holding in *Carson* as the dissent:

> I am not convinced the Electors have Article III standing
> to assert claims under the Electors Clause. Although

28

> Minnesota law at times refers to them as "candidates,"
> *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are
> not candidates for public office as that term is commonly
> understood. Whether they ultimately assume the office
> of elector depends entirely on the outcome of the state
> popular vote for president. *Id.* § 208.04 subdiv. 1 ("[A]
> vote cast for the party candidates for president and vice
> president shall be deemed a vote for that party's
> electors."). They are not presented to and chosen by the
> voting public for their office, but instead automatically
> assume that office based on the public's selection of
> entirely different individuals.

78 F.3d at 1063 (Kelly, J., dissenting).[8]

Plaintiffs contend that the Michigan Election Code and relevant Minnesota

law are similar. (See ECF No. 49 at Pg ID 3076-78.) Even if the Court were to

---

[8] In addition, at least one Circuit Court, the Third Circuit Court of Appeals, has distinguished *Carson*'s holding, noting:

> Our conclusion departs from the recent decision of an
> Eighth Circuit panel which, over a dissent, concluded
> that candidates for the position of presidential elector had
> standing under *Bond* to challenge a Minnesota state-court
> consent decree that effectively extended the receipt
> deadline for mailed ballots. . . . The *Carson* court appears
> to have cited language from *Bond* without considering
> the context—specifically, the Tenth Amendment and the
> reserved police powers—in which the U.S. Supreme
> Court employed that language. There is no precedent for
> expanding *Bond* beyond this context, and the *Carson*
> court cited none.

*Bognet*, 2020 WL 6686120, at *8 n.6.

29

agree, it finds that Plaintiffs lack standing to sue under the Elections and Electors Clauses.

**F.     The Merits of the Request for Injunctive Relief**

**1.     Likelihood of Success on the Merits**

The Court may deny Plaintiffs' motion for injunctive relief for the reasons discussed above.  Nevertheless, the Court will proceed to analyze the merits of their claims.

**a.     Violation of the Elections & Electors Clauses**

Plaintiffs allege that Defendants violated the Elections Clause and Electors Clause by deviating from the requirements of the Michigan Election Code.  (*See, e.g.,* ECF No. 6 at Pg ID 884-85, ¶¶ 36-40, 177-81, 937-38.)  Even assuming Defendants did not follow the Michigan Election Code, Plaintiffs do not explain how or why such violations of state election procedures automatically amount to violations of the clauses.  In other words, it appears that Plaintiffs' claims are in fact state law claims disguised as federal claims.

A review of Supreme Court cases interpreting these clauses supports this conclusion.  In *Cook v. Gralike*, the Supreme Court struck down a Missouri law that required election officials to print warnings on the ballot next to the name of any congressional candidate who refused to support term limits after concluding that such a statute constituted a "'regulation' of congressional elections," as used in

30

the Elections Clause.  531 U.S. 510, 525-26 (2001) (quoting U.S. Const. art. I, § 4, cl. 1).  In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court upheld an Arizona law that transferred redistricting power from the state legislature to an independent commission after concluding that "the Legislature," as used in the Elections Clause, includes any official body with authority to make laws for the state.  576 U.S. 787, 824 (2015). In each of these cases, federal courts measured enacted state election laws against the federal mandates established in the clauses—they did not measure *violations* of enacted state elections law against those federal mandates.

By asking the Court to find that they have made out claims under the clauses due to alleged violations of the Michigan Election Code, Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review.  Plaintiffs cite to no case— and this Court found none—supporting such an expansive approach.

### b.  Violation of the Equal Protection Clause

Most election laws will "impose some burden upon individual voters." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  But "[o]ur Constitution leaves no room for classification of people in a way that unnecessarily abridges this right [to vote]."  *Reynolds v. Sims*, 377 U.S. 533, 559 (1964) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964)).  Voting rights can be impermissibly burdened "by a

31

debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* (quoting *Reynolds*, 377 U.S. at 555).

Plaintiffs attempt to establish an Equal Protection claim based on the theory that Defendants engaged in "several schemes" to, among other things, "destroy," "discard," and "switch" votes for President Trump, thereby "devalu[ing] Republican votes" and "diluting" the influence of their individual votes. (ECF No. 49 at Pg ID 3079.)

But, to be perfectly clear, Plaintiffs' equal protection claim is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden. For example, the closest Plaintiffs get to alleging that physical ballots were altered in such a way is the following statement in an election challenger's sworn affidavit: "I believe some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates."[9] (ECF No. 6 at Pg ID 902 ¶ 91 (citing Aff. Articia

---

[9] Plaintiffs allege in several portions of the Amended Complaint that election officials improperly tallied, counted, or marked ballots. But some of these allegations equivocate with words such as "believe" and "may" and none of these allegations identify which presidential candidate the ballots were allegedly altered to favor. (*See, e.g.,* ECF No. 6 at Pg ID 902, ¶ 91 (citing Aff. Articia Bomer, ECF No. 6-3 at Pg ID 1008-10 ("I *believe* some of these ballots *may* not have been properly counted." (emphasis added))); Pg ID 902-03, ¶ 92 (citing Tyson Aff. ¶ 17) ("At least one challenger observed poll workers adding marks to a ballot where there was no mark for any candidate.").

Bomer, ECF No. 6-3 at Pg ID 1008-1010).)  But of course, "[a] belief is not

evidence" and falls far short of what is required to obtain any relief, much less the

extraordinary relief Plaintiffs request.  *United States v. O'Connor*, No. 96-2992,

1997 WL 413594, at *1 (7th Cir. 1997); *see Brown v. City of Franklin*, 430 F.

App'x 382, 387 (6th Cir. 2011) ("Brown just submits his belief that Fox's

'protection' statement actually meant "protection from retaliation. . . . An

unsubstantiated belief is not evidence of pretext."); *Booker v. City of St. Louis*, 309

F.3d 464, 467 (8th Cir. 2002) ("Booker's "belief" that he was singled out for

testing is not evidence that he was.").[10]  The closest Plaintiffs get to alleging that

election machines and software changed votes for President Trump to Vice

---

[10] As stated by the Circuit Court for the District of Columbia Circuit:

> The statement is that the complainant believes and
> expects to prove some things. Now his belief and
> expectation may be in good faith; but it has been
> repeatedly held that suspicion is not proof; and it is
> equally true that belief and expectation to prove cannot
> be accepted as a substitute for fact.  The complainant
> carefully refrains from stating that he has any
> information upon which to found his belief or to justify
> his expectation; and evidently he has no such
> information.  But belief, without an allegation of fact
> either upon personal knowledge or upon information
> reasonably sufficient upon which to base the belief,
> cannot justify the extraordinary remedy of injunction.

*Magruder v. Schley*, 18 App. D.C. 288, 292, 1901 WL 19131, at *2 (D.C. Cir.
1901).

President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible*. (*See e.g.,* ECF No. 6 at ¶¶ 7-11, 17, 125, 129, 138-43, 147-48, 155-58, 160-63, 167, 171.) And Plaintiffs do not at all explain how the question of whether the treatment of election challengers complied with state law bears on the validity of votes, or otherwise establishes an equal protection claim.

With nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails.[11] *See Wood*, 2020 WL 7094866 (quoting *Bognet*, 2020 WL 6686120, at *12) ("'[N]o single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'").

---

[11] "[T]he Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity. That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at *11.

### 2. Irreparable Harm & Harm to Others

Because "a finding that there is simply no likelihood of success on the merits is usually fatal[,]" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997), the Court will not discuss the remaining preliminary injunction factors extensively.

As discussed, Plaintiffs fail to show that a favorable decision from the Court would redress their alleged injury. Moreover, granting Plaintiffs' injunctive relief would greatly harm the public interest. As Defendants aptly describe, Plaintiffs' requested injunction would "upend the statutory process for election certification and the selection of Presidential Electors. Moreover, it w[ould] disenfranchise millions of Michigan voters in favor [of] the preferences of a handful of people who [are] disappointed with the official results." (ECF No. 31 at Pg ID 2227.)

In short, none of the remaining factors weigh in favor of granting Plaintiffs' request for an injunction.

### IV. Conclusion

For these reasons, the Court finds that Plaintiffs are far from likely to succeed in this matter. In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court— and more about the impact of their allegations on People's faith in the democratic

process and their trust in our government. Plaintiffs ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters. This, the Court cannot, and will not, do.

The People have spoken.

The Court, therefore, **DENIES** Plaintiffs' "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" (ECF No. 7.)

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 7, 2020