## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

SMARTMATIC USA CORP.,
SMARTMATIC
INTERNATIONAL HOLDING B.V. and
SGO CORPORATION LIMITED,

                Plaintiffs,                      Case No. 22-cv-00098-WMW-JFD

v.

MICHAEL J. LINDELL and MY PILLOW,
INC.,

                Defendants.

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Douglas G. Wardlow (MN Bar #339544)
Jeremiah D. Pilon (MN Bar #392825)
1550 Audubon Rd.
Chaska, MN 55318
Telephone: (952) 826-8658
doug@mypillow.com
jpilon@mypillow.com

**MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**
Christopher I. Kachouroff*
Robert J. Cynkar*
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com
rcynkar@mck-lawyers.com

ATTORNEYS FOR MY PILLOW, INC. AND
MICHAEL LINDELL
*Admitted *Pro Hac Vice*

# **<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT..................................................................................................4

ARGUMENT ...........................................................................................................................12

  I. Plaintiffs' Request for Summary Judgment on Their Claim for Defamation *Per Se*
    Must Be Denied.................................................................................................................12

    A. Plaintiffs have failed to show that specific statements of Lindell constituted
       actionable defamation. ...................................................................................................12

    B. As a matter of law, damages cannot be presumed without proof of actual malice
       for allegedly defamatory statements involving a matter of public concern. ..................15

  II. Plaintiffs' request for summary judgment on their claim that Lindell falsely "stated
    or implied that Smartmatic and its machines rigged the 2020 election" must be
    denied because the material facts are in dispute as to whether Lindell's statements
    are expressions of opinion or assertions of fact. ...............................................................16

    A. <u>The context of Lindell's statements indicate that they are opinions</u>.............................17

    B. <u>Undisputed material facts do not support a conclusion that Plaintiffs'</u>
       <u>characterizations of Lindell's statements or Lindell's statements themselves</u>
       <u>constitute factual statements that can be "false."</u>..........................................................19

       1. Smartmatic "rigged" the 2020 election by switching votes. ......................................25

       2. "Smartmatic machines were hacked to rig the 2020 election." ..................................27

       3. "Smartmatic machines were connected to the internet to allow for
          manipulation of the 2020 election." ...........................................................................29

       4. Smartmatic designed its machines to rig elections and they have been used to
          rig elections outside of the United States in the past. .................................................30

  III.   Smartmatic's Request for Summary Judgment on the "Of and Concerning"
    Element of Their Defamation Claim Must Be Denied Because the Material Facts
    Are in Dispute as to Whether Lindell's Statements Are Expressions of Opinion or
    Assertions of Fact.............................................................................................................32

  IV.   Plaintiffs' Request for Summary Judgment on Their Claim that MyPillow is
    Vicariously Liable for Lindell's Alleged Defamation Must Be Denied Because of
    Genuine Disputes of Material Fact Regarding the Key Elements of *Respondeat*
    *Superior* Liability. ...........................................................................................................33

  V. As a Matter of Law, Plaintiffs' Request for Summary Judgment on Their Claim
    Under the Minnesota Deceptive Trade Practices Act Must Be Denied Because
    They Do Not Have Standing to Bring a Claim Under That Act. .........................................36

CONCLUSION ............................................................................................................39

## PRELIMINARY STATEMENT

The animating flaw in Plaintiffs' arguments for partial summary judgment is that they transform Defendant Michael Lindell's broad and energetic criticism of the use of electronic voting machines – discussing various companies producing such machines – into a singular campaign to ruin their business. *See, e.g.,* Smartmatic Mem. at 1. Through a multiplicity of words that serves only to obscure the meaning of the speakers, amplified by extravagantly erroneous characterizations of what those words convey, Plaintiffs' Motion rests on factual claims that are highly disputed.[1] And far from establishing that Plaintiffs are entitled to judgment as a matter of law, the Motion invites the Court to evade the constitutional regime that protects even the "often vituperative, abusive, and inexact" expression of the "political arena." *Watts v. United States,* 394 U.S. 705, 708 (1969). That invitation should be declined.

A. Since *New York Times v. Sullivan,* 376 U.S. 254 (1964) and its progeny, courts must tread carefully adjudicating alleged defamation claims involving public figures or matters of public concern, both of which are involved in this case. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Meyers,* 461 U.S. 138, 145 (1983). Accordingly, our law is shaped by a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp

---

[1] As this Court noted in its ruling denying Defendants' Motion to Dismiss, the parties do not dispute that "the challenged statements were communicated to members of the public and entities other than Smartmatic." Order, at 8 (ECF. 52) While we do dispute where and to whom publication was made, we do not dispute that Lindell's statements were published.

attacks on government and public officials." *New York Times,* 376 U.S. at 270. Abusive and erroneous speech is tolerated because 'the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 503–04 (1984). Because "punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press, ... [t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340-41 (1974).

The regime protecting speech involving public figures and matters of public concern in the adjudication of alleged defamation essentially rests on two principles. First, expressions of opinion cannot give rise to actionable defamation. *Id.,* at 339-40 ("Under the First Amendment, there is no such thing as a false opinion. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas."); *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir. 1986) ("Opinion is absolutely protected under the First Amendment.").

An opinion is distinguished from a statement of fact through a four-part analysis. The first consideration is the precision and specificity of the statement, as a vague or indefinite statement whose meaning is a matter of subjective determination cannot qualify as a fact. *Id.,* at 1302. "Statements which are 'loosely definable' or 'variously interpretable' cannot in most contexts support an action for defamation." *Secrist v. Harkin,* 874 F.2d 1244, 1250 (8th Cir. 1989). As the Eighth Circuit explained:

The precision and specificity with which an assertion is made may reflect the extent to which it actually recites specific factual events. Specificity also goes to the singularity of a statement's meaning. Where a statement or phrase is susceptible of more than one meaning, we will not presume either that the phrase means what the plaintiff asserts it does or that it is factual where it can be understood as an opinion. . . . We do not recognize defamation by implication.

*Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1432 (8ᵗʰ Cir. 1989). *See also Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 868 (D. Minn. 2015) ("The purpose of the specificity requirement is to provide sufficient specificity for a court to evaluate whether a privilege applies, as well as to put defendants on notice of the scope of the defamation claim.").

The second, closely related consideration is whether the statement can plausibly be verified. *Id.*; *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990); *Beverly Hills Foodland, Inc. v. United Food & Com. Workers Union, Loc. 655*, 39 F.3d 191, 196 (8th Cir. 1994).

Assertions whose elements are unverifiable, including statements regarding motive, are "intrinsically unsuited" to serve as a basis for libel. . . . Where quantification for a general assertion is impossible, allowing any fact-finder to decide its truth or falsity invites the exercising of personal dispositions regarding the contents of the statement, its author, or its subject.

*Price,* 881 F.2d at 1432 (internal quotations omitted). Added to those considerations are the literary and public contexts in which the disputed statement is made. *Janklow,* 788 F.2d at 1302-1303.

Where core values of the first amendment are implicated, even some false statements of fact must be protected. [I]t cannot be avoided if the political arena is to remain as vigorous and as robust as the first amendment and the nature of our polity require. Statements made in the course of a political debate are also more likely to be understood as opinion.

*Price,* 881 F.2d at 1433 (internal quotation omitted).

As the Eighth Circuit summed up the delicate judicial enterprise at work at the intersection of the First Amendment and defamation law:

> Even when a statement is subject to verification, however, it may still be protected if it can best be understood from its language and context to represent the personal view of the author or speaker who made it. Thus we reject the suggestion . . . that any "question of fact" which can be decided by a jury can be actionable as defamation. Such a test ignores the underlying purposes of the fact/opinion distinction, and would lead to results that could not be reconciled with the developing case law in other circuits.

*Id.*

Consistent with this perspective, courts rigorously scrutinize an allegedly defamatory statement, "examining each statement for a precise core meaning for which a consensus of understanding exists." *Id.,* at 1432 (internal quotation omitted). Under this analysis, a newsletter calling plaintiffs "scabs" and "traitors" in the climate of a labor strike was not actionable defamation and implied no specific criminal conduct, *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264 (1974); describing a developer's negotiating position as "blackmail" was "rhetorical hyperbole," *Greenbelt Cooperative Publishing Assn. v. Bresler,* 398 U.S. 6, 14 (1970); the word "scam," used to describe a time-share condominium development, did not have a sufficiently precise meaning to maintain a defamation action, *McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987); calling someone a "fascist" had an indefinite meaning and therefore was an opinion, *Buckley v. Littell,* 539 F.2d 882 (2d Cir. 1976); the claims  that a defendant "blocked" the plaintiff and "wouldn't allow [him] to retreat" were "objectively unverifiable and thus unactionable opinions," *Sandmann v. New York Times Co.*, 617 F. Supp.3d 683, 691 (E.D. Ky. 2022); and the term "incompetent" applied to a judge was too vague to support a defamation claim, *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 366 N.E. d 1299,

1303 (N.Y. 1977). Thus "broad brush-stroked references to unethical conduct, even using terms normally understood to impute specific criminal acts, may be understood by the reasonable viewer as opinion." *Lauderback v. Am. Broad. Companies, Inc.*, 741 F.2d 193, 197 (8th Cir. 1984).

Under the second principle, even untrue defamatory remarks concerning public figures and matters of public concern are considered conditionally privileged, the condition being that the speaker has not acted with actual malice. *Nelson v. Lake Elmo Bank,* 74 F.4th 932, 941-42 (8th Cir. 2023). Actual malice, which a plaintiff must prove by clear and convincing evidence – or "convincing clarity," *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 270 (1971) – means "that the defendant made a false remark with a high degree of awareness of probable falsity, or that the defendant entertained serious doubts as to the truth of his publication." *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001). In practice, this is a "daunting" standard. *Id.,* at 569. Notwithstanding Plaintiffs' efforts to suggest a profit motive lay behind Lindell's statements, *see* Pl. Mem. at 1, 22-24, 42-44, "[e]vidence of a defendant's ill will, desire to injure, or political or profit motive does not suffice." *Id.* (citing *Garrison v. Louisiana,* 379 U.S. 64, 78–79 (1964); *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 665-67 (1989). Indeed, the allegedly defamatory statements at issue in *New York Times* were published as part of a paid advertisement. 376 U.S. at 265-66.

As the *Garrison* Court elaborated:

> Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.

*Garrison,* 379 U.S. at 215.

B. Importantly, the public context in which Lindell voiced his opposition to electronic voting machines was a continuing national discussion questioning the integrity of electronic voting systems. As early as September 2005, the Government Accountability Office published a report which concluded that all electronic voting systems had inherent security problems that "could allow unauthorized personnel to disrupt elections or modify data and programs that are critical to the accuracy of the voting process." GAO, *Federal Efforts to Improve Security and Reliability of Electronic Voting Systems are Under Way, but Key Activities Need to Be Completed,* GAO-05-956, at 26 (Sept. 21, 2005).

In 2018, the National Academy of Sciences, in a "Consensus Study Report," [2] recounted the scope of the risks of manipulation of election computer systems:

• "Election tallies and reporting may . . . be affected by malicious actors." The National Academies of Sciences, Engineering, and Medicine, Securing the Vote: Protecting American Democracy, at 9 (2018), *available at* https://nap.nationalacademies.org/catalog/25120?securing-the-vote-protecting-american-democracy.

• "Malware--malicious software that includes worms, spyware, viruses, Trojan horses, and ransomware--is perhaps the greatest threat to electronic voting." *Id.,* at 86.

• "Malware can be introduced at any point in the electronic path of a vote--from software behind the vote-casting interface to the software tabulating votes--to prevent a voter's vote from being recorded as intended." *Id.,* at 86-87.

• "Malware can also be used to disrupt auditing software." *Id.,* at 87.

• "Election administrators face a daunting task in responding to cyber threats, as cybersecurity is a concern with all computer systems." *Id.,* at 88.

---

[2]  This Consensus Study Report was a joint effort of the Committee on the Future of Voting: Accessible, Reliable, Verifiable Technology (co-chaired by Lee Bollinger, President of Columbia University, and Michael McRobbie (President of Indiana University), the Committee on Science, Technology, and Law (co-chaired by David Baltimore, President emeritus of the California Institute of Technology, and Judge David Tatel, U.S. Court of Appeals for the District of Columbia), and the Computer Science and Telecommunications Board (chaired by Farnam Jahanian of Carnegie Mellon University).

• "[T]here is no realistic mechanism to fully secure vote casting and tabulation computer systems from cyber threats." *Id.,* at 91.

That same year, in a live demonstration at Massachusetts Institute of Technology, J. Alex Halderman, professor of computer science and engineering at the University of Michigan, used an electronic voting machine programmed with "malicious vote-stealing software" to alter the results of a mock election. Charlotte Jee, *How to hack an election-and what states should do to prevent fake votes*, MIT TECHNOLOGY REVIEW (Sept. 13, 2018).

In 2019, HBO released a documentary, *Kill Chain: The Cyber War on America's Elections*, focusing on the security vulnerabilities of electronic voting machines in which a number of cybersecurity experts warned that these machines were susceptible to hacking. As one of those experts, Harri Hursti, put it, "I keep hearing that the system is un-hackable. Wrong. Always." *Id.,* at 1:55. Another expert, Sandy Clark, a security researcher at the University of Pennsylvania, pointed out, "We call them voting machines but they are nothing more than obsolete computers." *Id.,* at 2:10.

Political leaders were vocal about their concerns over the integrity of electronic voting machines. Then-Senator Kamala Harris told her colleagues in a 2018 hearing, "I actually held a demonstration for my colleagues here at the Capitol where we brought folks who, before our eyes, hacked election machines." *Election Security*, *Hearing Before S. Judiciary Comm.*, 115th Cong. (2018) (statement of Sen. Kamala Harris (D-CA)). As Vice President, she actually agreed with Lindell: "As it turns out, for all that technology has brought us, good and bad, the best way to conduct secure elections? Paper ballots. Cause, the way I kind of like to say it, half joking, is 'Russia can't hack a piece of paper.'" John Bowden, *Harris on election security: 'Russia can't*

*hack a piece of paper'*, THE HILL (Feb. 19, 2019, 11:07 AM),
https://thehill.com/policy/cybersecurity/430565-harris-calls-for-paper-ballots-in-elections-russia-cant-hack-a-piece-of.

Also in 2019, Sen. Amy Klobuchar (D-MN), along with several of her Democratic
colleagues, observed:

> Election security experts have noted for years that our nation's election systems and
> infrastructure are under serious threat . . . researchers recently uncovered previously
> undisclosed vulnerabilities . . .  these problems threaten the integrity of our elections
> and demonstrate the importance of election systems that are strong, durable, and not
> vulnerable to attack.

Letter from Sens. Amy Klobuchar (D-MN), Elizabeth Warren (D-MA), Ron Wyden (D- OR) and
Rep. Mark Pocan (D-WI) to Michael McCarthy, Chairman, McCarthy Grp. (Dec. 6, 2019).

The vulnerability of electronic voting systems to hacking has been the subject of litigation.
In one of the most thorough judicial analyses of the issue, in *Curling v. Raffensperger*, U.S. District
Judge Amy Totenberg received testimony from several leading cyber experts on the vulnerabilities
of Dominion computer election equipment.  In her October 11, 2020, opinion, Judge Totenberg
stated that

> [a] broad consensus now exists among the nation's cybersecurity experts
> recognizing the capacity for the unobserved injection of malware into computer
> systems to circumvent and access key codes and hash values to generate fraudulent
> codes and data.

493 F.Supp.3d 1264, 1280 (N.D.Ga. 2020).  Her opinion went on to conclude that "[t]he Plaintiffs'
national cybersecurity experts convincingly present evidence that this is not a question of 'might
this actually happen?'-- but 'when it will happen." *Id.,* at 1342.

It is Lindell's participation in this important national conversation, unabashedly offering his opinions in response to what he sees as a foundational threat to American democracy, that Plaintiffs wrongly seek to punish as defamation.

## ARGUMENT

### I. Plaintiffs' Request for Summary Judgment on Their Claim for Defamation *Per Se* Must Be Denied.

#### A. Plaintiffs have failed to show that specific statements of Lindell constituted actionable defamation.

Plaintiffs seek summary judgment on their claim that Lindell's statements constitute defamation *per se.* But "defamation *per se*" simply means a case of actionable defamation in which damages are presumed. M. Steenson, *Presumed Damages in Defamation Law,* WM. MITCHELL L.REV. 1492, 1505-1506 (2014). The plaintiff must establish a case of actionable defamation, whether or not damages are presumed. Actionable defamation, with respect to statements concerning public figures and matters of public concern as we have in this case, requires that the allegedly defamatory statements not be expressions of opinion nor made with actual malice, as we have discussed above. *See, e.g., Compuware Corp. v. Moody's Inv'rs Servs.*, 499 F.3d 520, 529 (6th Cir. 2007) ("[A] viable defamation claim exists only where a reasonable factfinder could conclude that the challenged statement connotes actual, objectively verifiable facts."); *Franzwa v. City of Hackensack*, 567 F. Supp. 2d 1097, 1112 n. 7 (D. Minn. 2008) ("[E]ven if a statement is defamatory *per se,* the plaintiff still must establish that there was publication of a false statement to a third party to succeed in a defamation action. . . . Moreover,

the requirement that actual malice be shown in defamation cases involving public officials applies even to statements that would be defamatory *per se.*").

Here, Plaintiffs expressly refrain from adducing evidence showing that what they identify as Lindell's allegedly defamatory statements were uttered with actual malice, claiming they will prove actual malice at trial. Pl. Mem. 25. This, they cannot do *and* seek summary judgment for defamation *per se.* Interestingly, Plaintiffs seem to give the game away at the end of their brief, when they state what issues will be left for trial if they prevail on their partial summary judgment motion. Those are "(1) Lindell's actual malice and willful violation of the MDTPA and (2) Smartmatic's damages." Pl. Mem. at 47. By omitting trial of actual malice on their defamation claim, Plaintiffs implicitly acknowledge that their request for summary judgment on their defamation *per se* claim would completely adjudicate in their favor liability for their defamation claim against Lindell, without ever having to establish any actual malice on the part of Lindell. Again, this, they cannot do.

To establish that undisputed material facts legally entitle them to summary judgment for any form of defamation, Plaintiffs must first adduce undisputed evidence that the Lindell statements of which they complain were uttered with actual malice. Not having done that, Plaintiffs' claim for summary judgment for defamation *per se* must be denied.

Indeed, summary judgment on Plaintiffs' defamation claim could not succeed because the material facts concerning the essential element of actual malice are vigorously disputed. As we discuss in more detail below, both the literary context – Lindell's words themselves – and the public context – the political debate over the use of computerized voting – show Lindell's statements to be his opinions, advanced in political discourse, of the vulnerabilities of

computerized voting to manipulation by foreign adversaries. In addition, even assuming for the sake of argument only that Lindell's statements were factual assertions, Plaintiffs have failed to offer any evidence that Lindell harbored subjective doubt about their truth.  This is fatal to Plaintiffs' defamation claim and requires summary judgment in Defendants' favor.  *See*, *e.g.*, *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968) (to establish actual malice, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication").

Lindell's criticism is directed at the use of computers to record and tabulate votes, which Lindell believes are susceptible to inaccuracy and manipulation, and not because of some antagonism to the computer companies themselves. As this exchange from his deposition illustrates, Lindell has been animated by his view that computers should not be used to record and tabulate votes in elections, not by antagonism to Smartmatic, much less by the actual malice required to support Plaintiffs' defamation claim:

Q. Mr. Lindell, are you looking to put Smartmatic out of business?

A. Am I looking to put them out of business?

Q. Yes.

A. That's not my goal. My goal is -- I don't care what you guys do.· I don't even care what your other businesses are.· *I'm telling you no machine company should be used*. And just like I agree with the Democrats, Amy Klobuchar and Kamala Harris and everybody on [the documentary movie] Kill Chain and the Democrats, all the Democrat politicians, *they want these machines gone in our elections*. *Gone*.

So whatever you do -- Smartmatic does with their other businesses, which I've read -- I'm been hearing about a lot of -- hearing about a lot of corruption coming out of Florida and stuff that you guys did, the Philippines and all these other countries, but we'll see what happens there, you know. *I just don't think you should have any kind of election ever done with a computer*.

14

. . .

Q. And let me ask it again. Do you want to put Smartmatic out of business, sir?

A. I just – I gave you my answer.

Q. Is the answer yes?

A. *I don't – Smartmatic can do anything but be involved in elections*.

Q. Okay.

A. *Be involved in anything. Go – go make – blenders. I don't know. Do whatever you want to do, but don't use them in elections*.

Q. And, sir, you don't care about putting employees that work at Smartmatic out of jobs, do you?

A. You know, I feel bad for them that they're working for a company that has these devices that are used to corrupt -- corrupt these -- the elections.

Ex. 1, Pl. Mtn Partial SJ, Lindell Depo. Tr. 471:8-22, 25, 472:1-21, and 472:24-25 to 473:1 (emphasis added).

### B. As a matter of law, damages cannot be presumed without proof of actual malice for allegedly defamatory statements involving a matter of public concern.

In addition, under well-established First Amendment jurisprudence, presumed damages are unavailable absent proof of actual malice when the allegedly defamatory statements at issue involve matters of public concern. Courts recognize the need to balance the reputational interests implicated by defamation law against the vital need to protect freedom of speech on matters of public concern. *See Maethner v. Someplace Safe, Inc.,* 929 N.W.2d 868, 875 ("[C]ourts cannot offer recourse for injury to reputation at the cost of chilling speech on matters of public concern . . . which is entitled to special protection."). To achieve this balance, courts developed the following, unequivocal rule: "a private plaintiff may not recover presumed damages for

defamatory statements involving a matter of public concern unless the plaintiff can establish actual malice." *Id.* at 878-79; *accord Connick,* 461 U.S. at 145; *Jadwin v. Minneapolis Star and Tribune Co.,* 367 N.W.2d 476, 488 (Minn.,1985) ("We are limited under the Federal Constitution . . .against imposing a strict liability standard and *against allowing presumed* or punitive damages absent proof of actual malice.") (emphasis added); *Tholen v. Assist America, Inc.,* 528 F.Supp.3d 1017, 1024–25 (D. Minn. 2021) ("[T]o strike a legal balance between reputational rights and free speech protections on matters of public concern, a private plaintiff may not recover presumed damages absent a showing of actual malice.").

In this case, there is no dispute that the speech in question directly addresses what is undeniably a matter of public concern: the integrity and security of elections. To overcome the heightened First Amendment protection afforded statements on matters of public concern, Plaintiffs must prove actual malice *before* the statements may be considered defamation *per se*. Plaintiffs do not even attempt to establish actual malice. For this independently sufficient reason, Plaintiffs' request for summary judgment on their claim for defamation *per se* must be denied.

## II. Plaintiffs' request for summary judgment on their claim that Lindell falsely "stated or implied that Smartmatic and its machines rigged the 2020 election" must be denied because the material facts are in dispute as to whether Lindell's statements are expressions of opinion or assertions of fact.

It is elementary that when ruling on a summary judgment motion, the Court must view all the evidence in the record in the light most favorable to the non-moving part and resolve all factual disputes in the non-moving party's favor. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). A corollary of this principle in the defamation context is "[w]here a statement or phrase is susceptible of more than one meaning, [the Court] will not presume either that the phrase

means what the plaintiff asserts it does or that it is factual where it can be understood as an opinion." *Price,* 881 F.2d at 1432. Read with these principles in mind, Plaintiffs' arguments for summary judgment on the alleged falsity of Lindell's statements, which rest on their characterizations of his "message," do not establish that undisputed evidence proves these statements are factual, and not opinions, much less prove that they are false.

A. The context of Lindell's statements indicate that they are opinions.

All the statements alleged by Plaintiffs to be part of what they call Lindell's "disinformation" campaign were undeniably made in the context of discussions of an important matter of public interest – the integrity of the mechanisms by which the votes of citizens are counted. The Supreme Court has pointed out that "loose language or undefined slogans are part of the conventional give and take in our economic and political controversies," and such expression is not understood to be a falsification of facts. *Austin,* 418 U.S. at 284. *See also Price,* 881 F.2d at 1433 ("Statements made in the course of a political debate are … more likely to be understood as opinion."). All of the statements of which Plaintiffs complain were made either in documentaries addressing the issue of election integrity, Pl. Mem. at 8-10, 13-15, 16-17, 18-19, during interviews on public affairs podcasts or radio shows, *id.,* at 10-13, 15-16, 17-18, 20, or during a "Cyber Symposium" hosted by Lindell on the subject. *Id.,* at 19-20.

Notably, the documentaries and the Symposium were venues in which Lindell presented experts and other knowledgeable people to offer their insights into the issue. For example, in his lead-off documentary, *Absolute Proof*, Lindell brought on nearly a dozen third party experts, each of whom provides him with information and their opinions, in which Lindell bases *his* opinion. *See* Defs. Exs. 9, 29.

Even Plaintiffs acknowledge Lindell's pattern of putting forward informed people to discuss election integrity. Plaintiffs concede that *Absolute Proof* consisted of "speakers" and experts that Lindell heard from on which he based his opinions about voting machines and foreign hacking in general. *See* Pl. Mem., at 9 – 10. They go on to observe, "[s]imilar to *Absolute Proof, Absolute Interference* is a two-hour documentary featuring several speakers discussing 'evidence' that voting machines, including Smartmatic voting machines, were responsible for rigging the 2020 election." *Id.,* at 16.

While Plaintiffs clearly have disdain for this discussion, they still describe Lindell offering the public an array of views from people involved in the subject from which they can draw their own conclusions. From any fair observation of these documentaries, it is unmistakable that Lindell invites his viewers to form their own opinions based on the information he presents from experts with not only technical expertise but often hands-on knowledge drawn from cybersecurity investigations in which they participated. Lindell believes the U.S. government has failed to take steps to ensure election integrity, and hopes that citizens, informed by these documentaries, will share his concern and speak out in favor of election integrity reform. *See* Defs. Ex. 29, at 85:20-24; 89:22-23; and 34:23 – 35:11.

Importantly, even by Plaintiffs' description, the focus was on the vulnerabilities of voting machines – the public interest at stake – with Smartmatic being only one of the producers of those machines, hardly a diatribe aimed at Smartmatic. This approach – offering listeners or viewers information upon which they can agree or disagree with Lindell – is well-recognized as expression not equivalent to a statement of fact. *Beverly Hills Foodland*, 39 F.3d at 195 (A statement "is not a false 'statement of fact' [because it] invites readers to make his or her own inquiry and assess

the facts for him or her self."); *Salmon v. Lang*, 57 F.4th 296, 323 (1st Cir. 2022) ("Where, as here, 'the speaker outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the [listener] free to draw his own conclusions,' a claim of defamation cannot survive.").

Moreover, some courts have dismissed defamation claims about statements on matters of public concern where the speaker assessed facts presented by another in which they based their comments. *See e.g. Sandmann v. WP Co. LLC,* 401 F. Supp. 3d 781, 792 (E.D. Ky. 2019) ("[p]ure opinion . . . occurs where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is based") (internal citations omitted); see also *Nunes v. Lizza*, 486 F.Supp.3d 1267 (2020) (statements are non-actionable opinions if they do not imply the existence of *undisclosed* defamatory facts).  Here, Lindell expressly states that everything he believes is based on the information being shown to the public through these third-party experts and reports. Lindell repeatedly says and shows this in all three of his documentaries, each of which include multiple speakers and third-party information streams. With these attributes, the message from Lindell that he was expressing his opinion based on the information he disclosed could not be clearer.

B. Undisputed material facts do not support a conclusion that Plaintiffs' characterizations of Lindell's statements or Lindell's statements themselves constitute factual statements that can be "false."

Plaintiffs' arguments for their claim that Lindell's allegedly defamatory speech constituted false statements of fact cannot pass muster under the required close examination of the allegedly defamatory language for "a precise core meaning for which a consensus of understanding exists,"

*Price,* 881 F.2d at 1432, and for its ability to be plausibly verified. At the very least, the proposition that Lindell's statements are statements of fact is vigorously disputed.

Plaintiffs present 18 allegedly defamatory publications that include 54 purported statements by Lindell.[3] Pl. Mem. at 8-20. Plaintiffs do not proceed to a close examination of the statements in those publication, as would be expected, but instead tell this Court that the 18 publications *all boil down* to four "messages" about Smartmatic. *Id.,* at 7-8. It is their formulation of Lindell's "messages" that is the focus of Plaintiffs' arguments. Such self-serving recasting of a defamation defendant's speech is obviously wildly afield from the close scrutiny of that defendant's actual words that the law requires.

Moreover, Plaintiffs' distillation of Lindell's statements employs vague or imprecise words, not susceptible to being proven true or false – notably "rigging the election" – that the cases teach cannot be the basis for a defamation claim. Neither Lindell, nor any third party associated with Lindell, uses the term "rigged," "rig" or any variation of the term in any of the statements Plaintiffs' raise. *See* Pls. App. A – D; Br. pp. 8 – 20. What defamatory meaning Plaintiffs impute to Lindell through the use of "rigged" is far from clear. Do Plaintiffs contend that Lindell is claiming that Smartmatic is uniquely responsible for engineering in some way the results of the 2020 election? That portrayal cannot credibly stand in the face of Lindell's many statements that the main culprits of what he believes to be the 2020 election fraud were China,

---

[3] Plaintiffs assert Lindell made 54 separate statements from which those 18 allegedly defamatory publications are drawn. Pls. Mem., Appendices A – D. BRIEF PAGES. In Plaintiffs' Appendices A – D, they list the 54 statements (many of which are not spoken by Lindell nor defamatory), assigning each of them one of the "18 publication" slots. *Id.* The "four overall" messages that Plaintiffs ascribe to the 18 publications and 54 statements, addressed in this section, are the "main messages" Plaintiffs claim the 18 publications and 54 statements conveyed, which Defendants argue here are inaccurate representations.

foreign hackers, the "deep state," U.S. government officials and the media, social media companies, unknown election workers, and several other "enemies"—none of which include Smartmatic. Pl. Mtn Partial SJ, Exs. 9 (video) and 29 (transcript).

As a practical matter, if the thrust of Plaintiffs' use of "rigging" was to suggest that Lindell was accusing Smartmatic of being an architect of election fraud, that notion is inconsistent with the fact that computer operating systems inevitably have vulnerabilities that allow for remote access by unauthorized parties. Cotton Dec. ¶ 24. With that understanding, Smartmatic could have been a victim, not a perpetrator, of election fraud.

Compounding the unreliability is the fact that Plaintiffs rely on objectionable hearsay to claim, among many things,  that the November 2020 election was safe, secure from foreign interference, not stolen, free from fraud, and properly audited constitutes inadmissible hearsay under FED. R. EVID. 802. At bottom, statements by the media, by former Attorney General William Barr, former CISA Director Chris Krebs, organization like the U.N. or the Carter Center, and even public election officials claiming that there was no fraud in the November 2020 election, that it was secure, that their self-conducted election audits demonstrated the integrity of the November 2020 election are not admissible in this summary judgment hearing or at trial.[4]

All this is exacerbated by the fact that Plaintiffs' distillation of Lindell's statements is often misleading or outright wrong. For example, Plaintiffs assert that in *Absolute Proof* Smartmatic was "introduced as the primary villain behind machines being used to rig the election by switching votes." Pl. Mem. at 9. The notion that Lindell was somehow fixated on Smartmatic is a fanciful

---

[4] We object to this hearsay.

misrepresentation of not only *Absolute Proof,* but of Lindell's other documentaries and other statements concerning election integrity. Lindell repeatedly identified the main "culprits" in his documentaries and other statements as being China, other foreign entities, known and unknown hackers, and U.S. government officials, including (but not limited to) these statements:

- "Now you've all seen absolute proof of the biggest cyber-attack in history. We right now, it's a takeover of our country, we all see it happening. And now you see the proof of where it came from what happened." Pl. Ex. 29, 89:18 – 23.

- foreign adversaries stole the US election in an "act of war." *Id.* 80:3

- "Hello everyone I'm Mike Lindell and as you all know on January 9th I received evidence of a cyber attack orchestrated by China on our 2020 election." *Id.* at pp. 18 – 19 (publication 16).

Another example of Plaintiffs' misrepresentation of facts is seen in their description of Publication 18. Pl. Mem. at 20. Lindell has never said, implied, or inferred that Smartmatic's BMD machines in L.A. County "played a prominent role in rigging the 2020 presidential election." *Id.* Rather, Lindell refers to L.A. County's entire voting system and believes that L.A. County's cast vote record shows "deviations" that could only be explained by computer manipulation. *See, e.g.,* Lindell Tr. 198:2-8 and 267:1-8. This is because the cast vote record is a database of how voters voted and in what order the votes were cast. L.A. County's cast vote record showed a deviation because the ordering was incorrect. Lindell also was asked who the head of the conspiracy was and he replied "CCP, the globalists, the deep state and the uniparty." Lindell Tr. 269:5-6 He then blamed Republicans. Lindell Tr. 269:9-25.

Knowing this, Plaintiffs still claim that Lindell said Smartmatic's L.A. County BMD machines rigged the 2020 election by offering, for example, the following statement he made in 2023:

> Mr. Lindell: "Let me tell you about Smartmatic . . . in the 2020 election, do you think L.A. County was computer-manipulated or not? . . . Of course it was! And now we have the proof."

*See* Pls. Appends. A – D, at p. 19 (Pls. Statement 54, Publication 18). What Plaintiffs have done with this example is particularly egregious because they omit several minutes between the ellipses. When one views the complete quote in its true context, it is not even close to the insinuation Smartmatic tries to draw. First, Lindell mentioned Smartmatic as the company that sued him. After several minutes, he made generalized comments about computer manipulation in LA County from what he found in the cast vote record. At the time Lindell made his statement, L.A. County was found to have suffered a complete breach of its election network in November of 2020 where sensitive voter and election worker data was found residing on Chinese Communist Party servers.

The breach was established via public record in the criminal indictment of the actual voting machine company in L.A. County, Konnech.[5] The indictment over the breach into L.A. County's voting system came in October 2022—*four months before* Lindell made this statement in January 2023. *See id.* By the time the conversation turned a corner to general voting machine manipulation, Lindell did not reference Smartmatic as the source or cause of any "computer manipulation." The convenient ellipses imposed by Plaintiffs to support their motion excluded several sentences that showed this comment was not a continuation of statements about Smartmatic.

At the beginning, Lindell was upset that Smartmatic sued him simply because he exercised his First Amendment rights to raise concerns about U.S. election integrity and all voting machines' ability to connect to the internet—something numerous persons from both sides of the aisle have

---

[5] October 4, 2022, Press Release, LA County District Attorney Office, https://da.lacounty.gov/media/news/head-election-worker-management-company-arrested-connection-theft-personal-data.

done for over a decade, as we have discussed above. At one point, Lindell is talking about this lawsuit being filed in bad faith, and in the next (several minutes later), he is addressing L.A. County's computer manipulation without any statement that Smartmatic was responsible or engaged in the L.A. County network breach.

At the same time, Smartmatic's statement that "Smartmatic and its technology were no involved in counting or tabulating votes," Pl. Mem. at32, is not true. Smartmatic and its technology were, in fact, involved in the counting and tabulating of votes in Los Angeles County. Smartmatic's BMD system encodes the voter's choice in a QR code that is printed on the voter's ballot. Cotton Decl. ¶ 25. The QR code is not human readable—it requires technology to be read. *Id.* The tabulation system cannot count or tabulate votes without the ability to read the QR codes generated by the Smartmatic BMD system.

At bottom, many of the discussions cited in Plaintiffs' 18 allegedly defamatory publications do not include any reference to Smartmatic, but rather address unknown third parties from China, the "deep state" or other nefarious actors unaffiliated with Smartmatic. Pl. Mem. at 8-20. The overarching message that comes through in these publications is Lindell's opposition to the use of *all* electronic voting machines in U.S. elections.

The failure of Plaintiffs to ground their argument in Lindell's actual words – substituting their own preferred formulation of his "messages" – is a sufficient reason for this Court to deny Plaintiffs' motion for summary judgment on the falsity issue. However, below we examine each of the four Lindell messages as crafted by Plaintiffs to underscore the conclusion that the material facts concerning whether Lindell's speech amounted to false statements of fact or his opinion are intensely disputed.

*1. Smartmatic "rigged" the 2020 election by switching votes.*

Lindell has never stated nor implied that Smartmatic *or any voting machine* "rigged" the election or "switched votes" in the 2020 election. To support their position here, Plaintiffs raise purported publications 1, 9, 13, 14, and 16 from their list of 18 alleged defamatory publications. Publication 1 does not include statements about Smartmatic switching votes, but rather, *third party* Russell Ramsland is the first to raise Smartmatic in discussing how ES&S and Dominion's software "relates back" to the original Smartmatic core software. The second part is Lindell asking Ramsland about his "opinion" as to why governments would deny or accept certain voting machines, and he lists the names that included Smartmatic as one company that makes voting machines. *See* Pls. Mem. at pp. 8-9. Publication 9 is information Lindell learned from Ramsland about Dallas County in another discussion with Dr. Frank (another third-party expert). *Id.* at pp. 13 – 15. Dr. Frank says there must be an algorithm in voting software. Lindell then says people should be able to look inside the machines.[6] *Id.* In publications 13 and 14, Lindell opines that all companies who make electronic voting machines are the "same" in a similar manner that many would opine all fast-food chains or gas stations are the same. *Id.* at 17 – 18. These publications contain no precise information about Smartmatic – just distinguishing them from other companies as all the same who manufacture electronic voting machines with network capabilities. *Id.*; see also Pls. Exs. 24 & 25. Publication 16 mentions only that a foreign cyber-attack from China likely hacked into elections to switch votes. This does not reference Smartmatic and is otherwise too imprecise to be a factual assertion about Smartmatic.

---

[6] Notably, Plaintiffs have never allowed any examination of their machines actually used in L.A., internal specification analysis, nor any source code in discovery in this matter. Without such a forensic examination, Plaintiffs' claims that their machines could not have been hacked as Lindell claims are effectively unsubstantiated. *See* Cotton Dec. ¶ 13-23.

Here, the entire context of the "switching votes" conversations specifically concern (1) two particular locations using Dominion and ES&S machines, and (2) discussions from experts regarding data streams going to foreign countries through *County* access to election data via the adjudication process. None of these conversations accuse or implies that *Smartmatic* is switching votes. Rather the factual bases for Lindell's opinions here comes largely from two third-parties in *Absolute Proof*—Attorney Matthew DePerno and Russell Ramsland. In DePerno's Antrim County, Michigan case (Dominion), he *filed and introduced* proof from a hand recount that, during 2020 election, Biden obtained roughly 1,000 more votes than those actually cast, and 3,200 votes were not counted altogether. *See* Pl. Mot. Partial Summ. Judg. Ex. 29, Transcript of *Absolute Proof,* 54:23 – 68:16, at ECF No. 395-35 at pp. 55 - 69 (Starting at approx. 1:08:00 into documentary). DePerno continued saying that an expert report publicly filed in his Michigan case contained an opinion that the Antrim County 2020 results should *not* have been certified because of these hand count discrepancies. *Id.*; (also from video at 1:22:02 – 1:22:40).

In Texas (ES&S), Ramsland stated that Texas authorities and his cyber security experts found proof that *unknown third parties* were getting into machines on election night because the ES&S machines in Dallas had a high adjudication rate setting ballots aside. Ramsland told Lindell how he tried to present this data to CISA (Chris Krebs) but CISA refused to investigate and did not follow up with him. *Id.* at 11:8-16; 17:22 – 36:3. (In video of *Absolute Proof,* at approx. 00:24:50 minutes in). In the election process, "adjudication" occurs when a machine is unable to read a ballot and then sets the ballot aside for another unnamed election worker or third party to "determine the voter's intent." *Id.* Thus evidence of a high adjudication rate suggests abuse of the adjudication process by unnamed or unknown third parties—none of which is defamatory or

harmful to Dominion or ES&S, let alone Smartmatic. *Id.* Accordingly, these statements, in the accurate context, contain numerous ambiguous terms as to how adjudication or "vote switching" is accomplished that does not include machines or machine companies doing the "switching" but rather others who gained access through particular County logins or networks. *See id.* at 32:9 – 33:21. At bottom, this illustrates that "vote switching" can be accomplished in different ways, not all of which involve some inherent error in the operation of the voting machines.

### 2.   *"Smartmatic machines were hacked to rig the 2020 election."*

Plaintiffs essentially claim that Lindell contends that Smartmatic somehow participated in the hacking of the 2020 election. Pl. Mem. at 31-34. But Lindell has never stated or implied that Smartmatic machines (or any voting machines) "hacked" the 2020 election. Lindell expressly stated that China and other foreign entities "hacked" or "breached" voting systems. *See e.g.* Pl. Mem. at 18-19 (discussing "a cyber attack orchestrated by China on our election"). Lindell made numerous statements about other foreign countries like China hacking the elections, for example:

- "Hello everyone I'm Mike Lindell and as you all know on January 9th I received evidence of a cyber attack orchestrated by China on our 2020 election." *Id.* at pp. 18 – 19 (publication 16).

- foreign adversaries stole the US election in an "act of war." *Id.* 80:3

- [F]oreign countries, like China, came in and attacked our country using these machines. Pls. Br. at 10 (publication 2).

- "[f]oreign counties, like China, came in and attacked our country using these machines. *Id.* at p. 12 (publication 6).

Lindell also published the underlying facts for these statements when he published his discussion with Mary Fanning, an investigatory researcher, who presented cyber security data logs and videos showing bidirectional streams of data specifically going to *U.S. County networks*, as

opposed to the computer systems of individual companies, to or from foreign countries, including China, during the 2020 election. *See* Pls. Ex. 29 at 75:14 – 84:5.

Next, Lindell's use of the terms "using" or "through" the machines is far too imprecise to be an assertion of fact. Every single computer (not only voting machines) that has internet connectivity capability is susceptible to hacking. Personal computers, phones, and even other household devices can all be victims of foreign hacking.

The public knows that a ransomware attack on a business or even hack into a personal home computer system is certainly not blamed on the business or home, and certainly not blamed on the computer or device manufacturers. No one blames Dell computers for a ransomware attack on a business that uses Dell computers. Similarly, here, Lindell's statements about hacking, in no way, accuse Smartmatic of "hacking" but rather specifically addresses foreign interference from China and other countries—who "used" the machine, just as hackers might "use" computers of businesses or homes to hack. All of these statements are not defamatory and the phrase "used the machines" can have multiple meanings, including that voting machines were victims of hacking. This is consistent with Lindell's overall message that he never targeted Smartmatic specifically, but rather, his opinion is that there should not be electronic voting machines in elections because of the potential for hacking. This is a clear opinion, and certainly not defamatory.

At no point does Lindell state nor imply that Smartmatic "hacked" machines, nor that Smartmatic helped China hack into voting machines during the election. Rather, Lindell's statements clearly show that the network access all voting machines companies admit they have [Cite?] create intrinsic vulnerabilities that could be susceptible to hacking, especially if election workers fail to properly secure their election system. *See e.g.* Sam Tabachnik, *Denver DA launches*

28

*investigation into voter system passwords breach by secretary of state's office,* (Nov. 11, 2024), at

https://www.denverpost.com/2024/11/11/denver-district-attorney-investigation-passwords-leak-jena-griswold-election/. As we discussed above, Lindell clearly testified that his concerns about

using electronic voting machines were driven by his recognition of the variety of ways the

integrity of a voting system could be compromised—with no intent to target Smartmatic or its

business.

> 3.  *"Smartmatic machines were connected to the internet to allow for manipulation of the 2020 election."*

Similarly, Plaintiffs' assertion that Lindell's statements sent a message that Smartmatic's

machines were connected to the internet to allow for manipulation fails because Lindell's related

statements lack precision and specificity for a factual assertion. Further, even if Lindell said

machines were connected to the internet, that is not defamatory. To support their supposition that

Lindell conveyed this message, Plaintiffs point to Publications 2, 3, 4, 10, 12 and 18 – none of

which contain the specificity or precise enough terms to support Plaintiffs' theory as a matter of

law. In publications 2 through 4, Lindell simply reiterates what he heard from the experts in

*Absolute Proof* that China and other countries instituted massive "cyber-attacks" on the U.S.

election in 2020 "through" machines. Pl. Mem. at 10 – 11. Lindell similarly notes that the

machines were "tools" of the enemy cyber-attacks from China and others. *Id.* Lindell does not

define what the term "tool" means in this context nor does he detail how this "tool" was used.

Similarly, Publications 8 and 10 are too imprecise to render these statements assertions of fact

where Lindell discusses "the biggest crime in our country" and that there was foreign interference

in the 2020 election "through" the machines. Pl. Mem. at 15 – 17. All of these unverifiable elements within alleged assertions are "intrinsically unsuited" to be a basis for defamation. *Price,* 881 F.2d at 1432. In *Price,* the Eighth Circuit underscored the importance of the precision requirement:

> Where quantification for a general assertion is impossible, allowing any fact-finder to decide its truth or falsity invites the exercising of personal dispositions regarding "the contents of the statement, its author, or its subject."
>
> Specificity and verifiability thus function as limits on majoritarian bias and government intervention. By examining each statement for "a precise core of meaning for which a consensus of understanding exists," … we hope to avoid both liability conditioned on public sentiment, and putting judges and juries in the role of declaring what the "truth" is about disputed social issues.

*Id.* at 1432 (8th Cir. 1989).

Like *Price,* Plaintiffs here not only misconstrued Lindell's statements, but fashioned their own messaging as to advance their favored portrayal of Lindell's statements about Smartmatic being "used" by the culprits or the culprits acting "through" the machines. Pl. Mem. at 15-17. Again, the actual culprits Lindell refers to (China, foreign actors) could have breached, and according to third party experts did breach, County networks, logins, and other non-Smartmatic machines, each of which were "tools" or "used" for attacks Lindell expressed concern about.

> 4. *Smartmatic designed its machines to rig elections and they have been used to rig elections outside of the United States in the past.*

As discussed above, "rig" is not a term that Lindell used in any statement involved in this case, and the term itself is far too imprecise and vague to be considered a factual statement that can give rise to an actionable defamation claim. So, too, the word "design" is vague in this context.

As we pointed out above, computer operating systems inevitably have vulnerabilities to remote access by unauthorized parties without those vulnerabilities being intentionally included in those systems for the purpose of allowing such unauthorized access. Cotton Dec. ¶ 24.

Lindell's opinion about Smartmatic's operation in Venezuela was based on information he received from former government intelligence officials and public government reports regarding Smartmatic's early days in Venezuela, Smartmatic's own admissions about collusion with government officials, and public records that their software licensing was sold to Dominion. *See, e.g.*, Ex. C, July 6, 2010 Letter from Obama Lawyer John Bonifaz to NIST at 2 and 7 ("Dominion, Now the Largest or Second Largest Voting System Company, Is Foreign Controlled and Depends Upon Secret Source Code Created and Owned by Smartmatic, a Foreign Controlled Company With Ties to The Venezuelan Government Led by Hugo Chavez.") and Ex. D, June 12, 2008 Smartmatic Report by Obama Lawyer, John Bonifaz on behalf of Voter Action.

Nevertheless, Plaintiffs claim that the following Lindell statement in Publication No. 17 is defamatory:

> Venezuela is where the machine started. Smartmatic started in Venezuela. I got a whole big I've spent millions of dollars investigating this. They're built to take they're built as a tool to take countries.

Here again, Lindell does not use the terms "rig" or "rigged." The first sentence, "Venezuela is where the machine started," appears factually accurate, as Smartmatic is commonly understood to have originated in Venezuela. However, the final statement—"They're built as a tool to take countries"—is imprecise in its meaning. Does "they're" refer to Smartmatic? To its machines? And what does "a tool to take countries" signify? The word "take" itself is vague, lacking any clear or nefarious implication.

Plaintiffs' attempt to extrapolate defamatory meaning from such indeterminate language fails under scrutiny. A defamation claim cannot stand on vague or ambiguous language that is neither explicitly stated nor reasonably attributable to the defendant. The Plaintiffs' reliance on language that Lindell never used underscores the fundamental weakness of their case.

### III. Smartmatic's Request for Summary Judgment on the "Of and Concerning" Element of Their Defamation Claim Must Be Denied Because the Material Facts Are in Dispute as to Whether Lindell's Statements Are Expressions of Opinion or Assertions of Fact.

As Plaintiffs frame it, they must "prove that defendant (1) published a statement of fact; (2) of and concerning [them]; (3) which was false; and (4) damaged [their] reputation in the community." Pl. Mem. at 25. As discussed above, whether Lindell's statements are opinions or assertions of fact is disputed. Accordingly, the "of-and-concerning" element – which is premised on a statement of *fact* concerning Plaintiffs -- in this case is not susceptible to resolution on summary judgment because there is a genuine dispute of material fact about whether all the statements identified by Plaintiffs are truly statements of fact.

Moreover, as we also pointed out above, in their compilations of allegedly defamatory statements by Lindell, Plaintiffs include statements that do not mention Smartmatic or could not fairly be called discussions "of and concerning" Smartmatic. For this additional reason, Plaintiffs' sweeping claim for summary judgment on the of-and-concerning element should be denied.

**IV. Plaintiffs' Request for Summary Judgment on Their Claim that MyPillow is Vicariously Liable for Lindell's Alleged Defamation Must Be Denied Because of Genuine Disputes of Material Fact Regarding the Key Elements of *Respondeat Superior* Liability.**

Smartmatic is not entitled to a summary-judgment ruling that MyPillow is vicariously liable for the allegedly defamatory statements made by Lindell. Genuine disputes of material fact exist with respect to the key elements necessary to establish *respondeat superior* liability.

The liability of an employer under the doctrine of *respondeat superior* is "imposed based on a policy choice that liability for acts committed within the scope of employment ought to be allocated to employers as a cost of doing business." *Hagen v. Burmeister & Assocs., Inc.*, 633 N.W.2d 497, 504 (Minn. 2001). To find that an employee's acts are committed within the scope of employment, there must be a connection between the employee's duties and the tort at issue. The Minnesota Supreme Court has held that, with respect to intentional torts, *respondeat superior* liability exists if (1) the source of the tort is related to the duties of the employee, and (2) the tort occurs within work-related limits of time and place." Frieler v. Carlson Mktg. Grp., Inc., 751 N.W.2d 558, 583 (Minn. 2008) (internal quotation marks and brackets omitted) (citing *Lange v. Nat'l Biscuit Co.,* 211 N.W.2d 783, 786 (Minn. 1973)). *Respondeat superior* liability will not be found unless the "employee's acts were foreseeable, related to, and connected with acts otherwise within the scope of … employment." *Fahrendorff ex. Rel Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 911 (Minn. 1999). The question of whether an employee's acts are foreseeable, related to and connected with acts otherwise within the scope of employment is a question of fact for the jury. *See*, *e.g.*, *Marston v. Minneapolis Clinic of Psychiatry and Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn. 1982) (holding that question of whether sexual acts committed by

psychologist during patient's therapy sessions were within scope of employment was question of fact; rejecting argument that court should determine that the acts were within the scope of employment as a matter of law).

Smartmatic tries to skirt the requirement that the intentional tort be related to and connected with acts within the scope of employment, arguing that it is enough that the tortious conduct was "reasonably foreseeable." Smartmatic Br. at 42. But that is not the law in Minnesota.  To establish *respondeat superior* liability, the tortious act in question must have been foreseeable, and the act must also be "related to and connected with acts otherwise with the scope of employment." *Fahrendorff*, 597 N.W.2d at 911; *Marston*, 329 N.W.2d at 311. Put another way, in addition to the requirement of foreseeability, the source of the tort must relate to the duties of the employee. *Frieler*, 751 N.W.2d at 583.  While the fact that an employee's tortious act was *not* foreseeable to the employer is sufficient to *prevent* a determination that the act was related to the employee's duties, the fact that an act was foreseeable is not alone sufficient to establish vicarious liability, even when the act occurred within work-related limits of time and place.  *See P.L. v. Aubert*, 545 N.W.2d 666, 668 (Minn. 1996) (holding that sexual contact by teacher toward student could not be considered an "indivisible" act directly related to teaching duties, and thus liability of school could not be imputed, even though committed within work related time and place; stating that the holding "do[es] not change the test set out in *Marston* and *Lange*").

*Lange v. National Biscuit Company*, the principal Minnesota case on the question of imposing *respondeat superior* liability on an employer for the intentional tort of an employee, explains the requirements this way:

> [T]he master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act.'

211 N.W.2d 783, 785–86 (Minn. 1973) (quoting *Gulf, C. & S.F. Ry. Co. v. Cobb*, 45 S.W.2d 323, 326 (Tex. Civ. App.1931)). In *Lange,* the Minnesota Supreme Court held that the employer was liable for an assault committed by an employee because "the source of the attack [was] related to the duties of the employee and the assault occur[red] within work-related limits of time and place." *Id.* The Court reasoned that the assault was related to the employee's duties because "the precipitating cause of the initial argument" leading to the assault "concerned the employee's conduct of his work," and "the employee was motivated to become argumentative in furtherance of his employer's business." The argument that led to the assault was imputable to the employer because it concerned the employee's duties and was motivated to further the employer's business. *See id.* Thus, the assault itself was an act so connected with and immediately growing out of an act imputable to the employer that both acts—the argument and the assault—were treated as one indivisible tort for purposes of employer liability. *See id.*

Plaintiffs' argument, which focuses entirely on foreseeability, ignores the gravamen of any valid claim for respondeat superior liability: the relationship between the tortious conduct and the employee's duties. Plaintiffs point to no evidence that would establish that Lindell's allegedly defamatory statements are "connected with and immediately grow[] out of another act . . . imputable to" MyPillow. *Lange*, 211 N.W.2d at 785. No evidence suggests that Lindell's duties as MyPillow's CEO had anything to do with making statements about voting machines or voting-machine companies. And Plaintiffs do not even try to argue that any of Lindell's statements were

precipitated by some other act falling within Lindell's duties as MyPillow's CEO or done in furtherance of MyPillow's business. Consequently, there is no basis to conclude that "source of the tort is related to the duties of the employee." *Frieler*, 751 N.W.2d at 583.

At the very least, then, the evidence presents a genuine dispute of material fact as to whether Lindell's statements were related to and connected with his duties as MyPillow's CEO. In addition, a second question of material fact exists with respect to whether the alleged tortious acts occurred within work-related limits of time and place. Indeed, Plaintiffs point to no evidence whatsoever that would establish that Lindell made the alleged defamatory statements while on MyPillow premises or during working hours. For these reasons, Plaintiffs are not entitled to summary judgment on the question of *respondeat superior* liability. Whether MyPillow is vicariously liable for the allegedly defamatory statements of Lindell is a fact-intensive determination that should be left to the jury.

### V. As a Matter of Law, Plaintiffs' Request for Summary Judgment on Their Claim Under the Minnesota Deceptive Trade Practices Act Must Be Denied Because They Do Not Have Standing to Bring a Claim Under That Act.

As a matter of law, the Minnesota Deceptive Trade Practices Act (the "MDTPA") does not apply extraterritorially. *Rouse v. H.B. Fuller Company, et al.*, 694 F.Supp.3d 1149 (2023). In *Rouse* this Court held that plaintiffs lacked standing to bring a claim under MDTPA explaining:

> "[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *Ferrari v. Best Buy Co.*, 14-cv-2956 MJD/FLN, 2015 WL 2242128 at *9 (D. Minn. May 12, 2015) (*quoting Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 13-cv-2644 (ADM/SER), 2014 WL 943224, *11 (D. Minn. Mar. 11, 2014)). "In general, there is a presumption against the extraterritorial application of a state's statutes." *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 961-62 (D. Minn. 2020).

> For these Minnesota statutes [i.e., MDTPA] to apply extraterritorially, the Minnesota legislature must have intended for them to do so. *See id.*

*Id.* at 1156-57. Indeed, Minnesota courts have indicated that out of state companies can only enforce claims under Minnesota laws if they have a sufficient connection to business dealings in Minnesota. *Cambria Co., LLC v. M&M Creative Laminants, Inc.,* 11 N.W.3d 318, 325 (Minn. 2024) (noting sufficient connections for Minnesota law application where out of state company had business agreements drafted in Minnesota for eight years and had Minnesota choice of law provisions in their contracts).

Here, none of the Plaintiffs reside in Minnesota. None of the Plaintiffs are registered to do business in Minnesota. None of the Plaintiffs have conducted any business in Minnesota. None of the Plaintiffs allege, nor can they allege, any injury in Minnesota. Plaintiffs have tried (unsuccessfully) to penetrate the U.S. government election market over the last seven years. Long before any statements by Michael Lindell were made, Plaintiffs did not win a single award in the U.S. for the sale of any election product they sell. Plaintiffs' target audience consists solely of state government procurement boards because Plaintiffs are engaged in government contracting, specifically for the sale of voting machine equipment worldwide.

The *only* "business" Plaintiffs have is a single service contract with Los Angeles County to build a system that was designed by a third party—a system that is wholly owned by Los Angeles County.  To date, Plaintiffs do not have a single certified voting product to sell in the United States—let alone Minnesota. Plaintiffs do not have a single voting machine product that has been certified by the U.S. Election Assistance Commission (EAC) or eligible for sale in any U.S. state or territory—including Minnesota. See Def. Mtn to Exclude Patrick, Ex. C, Shelly Depo

Tr. at 34:15-21; 58:13-17; 74:5-7; 77:3-24; 81:15-25 to 82:1-24; 87:17-20; 97:2-4; 113:24 to 114:1-10 ("same problem . . . Smartmatic didn't have a completed certified product to offer to customers"); 133:13-24; 140:1-12; and 161:19-23; 163:18-24 (working for two years with no product to sell); 326:22-24 thru 327:1-19 (terminated because vocal about lack of certified product) and Ex. D, Smith Depo Tr. 65:13-24 to 66: 1-6 ("until we are certified we cannot consummate a sale.") Indeed, Plaintiffs have no business presence in Minnesota and *have explicitly excluded Minnesota* as a jurisdiction in which they suffered alleged damages. *See* Ex. E, Pls. 6th Suppl Discovery Response to Interrogatory 20.  As a result, Plaintiff has no established business, no reputation, and no proven ability to secure government contracts in Minnesota or any other U.S. state.

It is not surprising, then, that Plaintiffs have not adduced any undisputed evidence that they have suffered any harm to their business in Minnesota. Plaintiffs have no lost profits, nor have they sustained any reputational injuries resulting from any conduct by Defendants.

Under the MDTPA, Plaintiffs had the burden of proving that Lindell and My Pillow disparaged and injured their business in Minnesota by misleading factual representations or engaged in conduct that creates a likelihood of confusion about their business. Minn. Stat. § 325D.44, subd. 1 (1998); see *United Wild Rice, Inc., v. Nelson,* 313 N.W.2d 628, 635 (Minn.1982). Plaintiffs failed to establish that any statements by Lindell, regardless of their veracity, injured their business in Minnesota because Plaintiffs have never done business in Minnesota. For these reasons, the Court should deny Plaintiffs' Motion for Summary Judgment on their MDTPA claim.

## CONCLUSION

Michael Lindell and My Pillow, Inc. move this Court to deny Plaintiffs' Motion for Partial Summary Judgment.

Dated: December 13, 2024.

Respectfully Submitted,

McSWEENEY, CYNKAR & KACHOUROFF, PLLC

By /s/ Christopher I. Kachouroff
Christopher I. Kachouroff* (Bar No. 44216)
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com


Douglas G. Wardlow (MN Bar #339544)
Jeremiah D. Pilon (MN Bar #392825)
1550 Audubon Rd.
Chaska, MN 55318
Telephone: (952) 826-8658
doug@mypillow.com
jpilon@mypillow.com

ATTORNEY FOR MY PILLOW, INC. AND
MICHAEL LINDELL

*Admitted *Pro Hac Vice*