# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

SMARTMATIC USA CORP.,
SMARTMATIC
INTERNATIONAL HOLDING B.V. and
SGO CORPORATION LIMITED,

                  Plaintiffs,                Case No. 22-cv-00098-WMW-JFD

v.

MICHAEL J. LINDELL and MY PILLOW,
INC.,

                  Defendants.

---

## DEFENDANTS' MICHAEL LINDELL AND MY PILLOWS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Douglas G. Wardlow (MN Bar #339544)
Jeremiah D. Pilon (MN Bar #392825)
1550 Audubon Rd.
Chaska, MN 55318
Telephone: (952) 826-8658
doug@mypillow.com
jpilon@mypillow.com

MCSWEENEY, CYNKAR & KACHOUROFF,
PLLC
Christopher I. Kachouroff*
Robert J. Cynkar*
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com
rcynkar@mck-lawyers.com

ATTORNEYS FOR MY PILLOW, INC. AND
MICHAEL LINDELL
*Admitted *Pro Hac Vice*

# **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ..................................................................................1

**ARGUMENT** ...........................................................................................................3

   I.   The First Amendment bars Plaintiffs' claims because Smartmatic is so inextricably intertwined with the government's elections operations that it cannot use civil claims to suppress criticism of those operations. ...................................3

  II.  There is no genuine issue of material fact that Lindell's *actual* statements were non-actionable opinions on matters of public concern. ...........................................7

 III.  Even if the Court found that some of Lindell's statements were factual assertions, there are no issues of *material* facts that Lindell acted with actual malice. .......................9

      A.  Plaintiffs cannot establish actual malice because Lindell relied on multiple sources and there are no "obvious" reasons to doubt those sources. ..........................13

      B.  Lindell's statements were not inherently implausible. ................................19

 IV.  Plaintiffs' lack standing under both the MDTPA and Common Law defamation. ............21

      A.  Plaintiffs' MDTPA standing argument fails to establish a genuine issue of material fact. ........................................................................................23

          1.   Presumed damages do not give Plaintiffs standing under the MDTPA absent a showing of actual malice by clear and convincing evidence. ................23

          2.   As a matter of law and fact, Plaintiffs cannot establish standing under the MDTPA because they have no damages in Minnesota nor any meaningful connection to Minnesota. ...........................................................24

      B.  The *Rouse* decision and 8th Circuit precedent definitively bar Plaintiffs' MDTPA claims. ..............................................................................25

      C.  Plaintiffs cannot establish standing for their Minnesota Common Law defamation claim ...............................................................................26

**CONCLUSION** ......................................................................................................**28**

# TABLE OF AUTHORITIES

**Cases**

*Barham v. Reliance Standard Life Ins. Co.*,
  441 F.3d 581(8th Cir. 2006) ..........................................................................8

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
  531 U.S. 288 (2001) ....................................................................................6

*Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155, (1967) .................................27

*Ferrari v. Best Buy Co.*,
  2015 WL 2242128 (D. Minn. May 12, 2015) ..............................................25

*Garrison v. Louisiana*,
  379 U.S. 64 (1964) ....................................................................................11

*Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*,
  2014 WL 943224 (D. Minn. Mar. 11, 2014) ...............................................26

*Lugar v. Edmondson Oil Co., Inc.*,
  457 U.S. 922 (1982) ....................................................................................4

*M.P. v. Hubbard Broad., Inc.*,
  216 F. Supp. 2d 933 (D. Minn. 2001)..........................................................22

*Maethner v. Someplace Safe, Inc.*,
  929 N.W.2d 868 (Minn. 2019) ....................................................................26

*Magee v. Trustees of the Hamline University, Minn.*,
  957 F.Supp.2d 1047 (2013) ..........................................................................4

*McGowen, Hurst, Clark & Smith, P.C. v. Commerce Bank*,
  11 F.4th 702 (8th Cir. 2021) .......................................................................23

*Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*, *Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*,
  20 F.2d 763 (8th Cir. 1927) ........................................................................26

*Odom v. Tripp*,
  575 F. Supp. 1491 (E.D. Mo. 1983) ..............................................................9

*Oien v. Home Depot U.S.A., Inc.*,
  69 F.4th 487 (8th Cir. 2023)..........................................................................2

*Richie v. Paramount Pictures Corp.*,
    544 N.W.2d 21 (Minn. 1996) ..................................................................27

*Rockwood Bank v. Gaia*,
    170 F.3d 833 (8th Cir. 1999) .................................................................18

*Rouse v. H.B. Fuller Co.*,
    694 F. Supp. 3d 1149 (D. Minn. 2023).................................................25

*S. Air Transp., Inc. v. Post-Newsweek Stations, Fla., Inc.*,
    568 So. 2d 927 (Fla. Dist. Ct. App. 1990)............................................18

*Sanzone v. Mercy Health*,
    954 F.3d 1031 (8th Cir. 2020) ...............................................................23

*Sidney M. v. Kijakazi*,
    630 F. Supp. 3d 1077 (N.D. Iowa 2022) ................................................8

*Sindi v. El-Moslimany*,
    896 F.3d 1 (1st Cir. 2018).......................................................................18

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ...............................................................................21

*Webb Golden Valley, LLC v. State*,
    865 N.W.2d 689 (Minn. 2015) ...............................................................23

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943) .................................................................................7

## PRELIMINARY STATEMENT

The frustrating thing about opinions is that people hold different, even sharply conflicting, opinions. But in a free society we protect – even guarantee – the right of the people to hold different opinions. The halls of Congress and our state legislatures are populated by elected representatives who give voice to markedly different views, all supported by evidence that has convinced them to adopt those views. Importantly, the people these elected officials represent have the right to offer their opinions to their representatives and to participate in the broader public debate over matters of public concern. This swirl of differing views is informed by evidence of all types – obviously conflicting – that purport to support these views.

The fact that one person is persuaded by certain evidence, but rejects other, competing evidence that may persuade someone else, is an inherent dynamic of opinions. The fact that people disagree, or that people weigh the credibility of evidence differently, does not undermine the genuineness of diverse opinions. Sadly, it is a mark of today's world that people often ascribe all manner of malevolence to those who disagree with them. Fortunately, the regime erected by the First Amendment stands as stalwart protection for the right of people to hold different opinions, and yes, even "the right to be wrong" in the face of the most hostile opposition.

These constitutional protections insulate the expression of opinions on matters of public concern from legal penalty. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 4-8 ("Defs. Opp."). Further, even an expression of fact concerning a public figure or matter of public concern is not actionable unless it is false and uttered with actual malice – that is, with knowledge of its falsity or reckless disregard of whether the

statement was false. *See, id.,* at 8. "Actual malice" is a precise legal concept that does not mean ill will, hostility, or self-interest. *Id.*

The fundamental task before this Court is to adjudicate whether a genuine dispute of material fact prevents summary judgment on the issues raised by the parties. What facts are "material" is determined by the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Oien v. Home Depot U.S.A., Inc.*, 69 F.4th 487, 490 (8th Cir. 2023). In this case, it is on this question of materiality that the constitutional bounds that protect speech must be brought to bear, and which expose the animating flaw in Plaintiffs' arguments.

At bottom, Plaintiffs' Opposition relies on facts that are legally immaterial to Defendants' Motion for Summary Judgment—even assuming Plaintiffs' purported facts are true. Thus Plaintiffs' extended discussion of sources supposedly contradicting Lindell's opinions or otherwise claiming that he was "on notice" that he was wrong, *see* Smartmatic's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, at 8-26 ("Pls. Opp."), is immaterial to the attributes that establish Lindell's speech as an expression of opinion that cannot be the basis for actionable defamation. Defs. Opp., at 16-32. While Plaintiffs engage in a tendentious disdain for the credibility of the sources on which Lindell relied, *see, e,g,.* Pls. Opp. at 8, that is to be expected in a clash of opinions. Such a self-serving characterization of Lindell's sources, especially given the context of public discussion over the integrity of computerized voting, *see* Defs. Opp. at 9-12, hardly constitutes evidence that Lindell's expression was not a constitutionally protected opinion.

The proposition that Lindell's expression was constitutionally protected opinion also informs any analysis of whether he spoke with actual malice. Plaintiffs again rely on claims that

certain sources contradicted Lindell's opinions or otherwise put him "on notice" that he was wrong as evidence of Lindell's actual malice. Pls. Opp. at 8-26. But in the face of sources that Lindell believed to be credible – which he had every right to do – there is no evidence in the record that remotely suggests that Lindell ever had serious doubts about the truth of his opinion about the vulnerabilities of computerized voting. And, again, his concern over those vulnerabilities was hardly idiosyncratic, but was shared by many other public figures. *See* Defs. Opp. at 9-12.

In sum, the record contains no evidence that creates a dispute of material facts that defeats their motion for summary judgment. Specifically, the record holds no evidence establishing material facts that dispute that

- Plaintiffs are so inextricably intertwined with a government activity that they cannot bring defamation claims based on criticisms of that activity;

- Lindell's *actual statements* (not Plaintiffs' ascribed narratives) were opinions that cannot support a claim for defamation;

- Lindell did not act with actual malice; and

- Plaintiffs suffered no injury resulting from Lindell's alleged statements, and so they do not have standing to bring this action.

## ARGUMENT

**I.    The First Amendment bars Plaintiffs' claims because Smartmatic is so inextricably intertwined with the government's elections operations that it cannot use civil claims to suppress criticism of those operations.**

Plaintiffs cannot bring a defamation claim to punish criticism of the government's elections operations because they are so intimately involved in those operations. *See* Memorandum in Support of Defendants Michael Lindell's and My Pillow's Motion for Summary Judgment, at 12 – 18 (Defs. S.J. Br."). When the government handles all aspects of balloting and tabulation, any person may criticize the administration of elections with impunity. The same would be true were

the government to create and operate its own electronic voting systems. That the government utilizes a private entity to design and implement electronic voting systems should not open the door to defamation liability for critics of electronic voting technology.

The proposition that a private company can be so involved in a governmental activity as to act under color of law and assume the attributes of the government is far from a novelty in our jurisprudence. *See e.g. Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922 (1982) (private parties acted under color of law for conspiring with government official in scheme to defraud); *Magee v. Trustees of the Hamline University, Minn.,* 957 F.Supp.2d 1047 (2013) (acting as government under color of law where private actor is willful participant in joint activity with the state or its agents).

Plaintiffs contend that what it calls the "state-action doctrine" can only be used to hold a private entity responsible for violations of constitutional rights and cannot be used to preclude a private company from bringing a lawsuit. Pl. Opp. at 5. But this dodges Lindell's argument. Smartmatic does not sell paper clips to the government. Smartmatic's product is election equipment that deals with counting votes.[1] The operation of elections is traditionally an exclusive public function. *See Manhattan Comm. Access Corp. v. Halleck*, 587 U.S. 802, 814-15 (2019). Smartmatic's machinery must pass state certifications – that is, must be designed to the requirements of Smartmatic's government-customers – for Smartmatic even to be eligible to bid on a contract to run an election. Defs. Br. Supp. Mot. Summ. Judg. ¶¶ 5 – 32. Thus, Smartmatic's

---

[1] Smartmatic LA County Deploying VSAP Model, *at* https://www.smartmatic.com/us/case-studies/los-angeles-county-building-deploying-vsap-a-model-for-21st-century-elections/

product, and the services it provides to run that product, are inherently intertwined with, and in a real sense indistinguishable from, the governmental activity of running elections.

Lindell's essential point is that a government choosing to use such machines to run elections is making a critical mistake because of their inherent vulnerabilities to manipulation. Thus the government's choice to use such machines *because of* the attributes of those machines is the target of Lindell's criticism. In such a posture, a defamation suit attacking the criticism of Plaintiffs' machines is effectively striking a blow in defense of the government's choice to use them. Under the First Amendment, just as the government could not bring such a lawsuit itself, *see New York Times v. Sullivan,* 376 U.S. 254, 291 (1964) (observing that no court "of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence.") (internal quotations omitted), so Plaintiffs cannot employ a defamation suit that has the effect of intimidating and silencing those who would criticize how governments run elections.

Plaintiffs further argue that Smartmatic does not qualify as a state actor because Los Angeles County, not Smartmatic, was in full control of election equipment and the operation of vote centers, election security, ballot transportation and tabulation, and auditing of results.  Pl. Opp. at 4. Los Angeles County was not, however, in full control of ballot creation, ballot marking, or ballot tabulation. The creation and the marking of ballots was handled entirely by the election equipment designed, manufactured, and supported by Smartmatic.[2] Moreover, Smartmatic and its technology were involved in the counting and tabulating of votes in Los Angeles County. *Id.*

---

[2] *Supra note 1.*

Smartmatic's BMD system encodes the voter's choice in a QR code that is printed on the voter's ballot. First Cotton Decl. ¶ 25. The QR code is not human readable—it requires technology to be read. *Id.* The tabulation system cannot count or tabulate votes without the ability to read the QR codes generated by the Smartmatic BMD system. Despite the tame role claimed by Smartmatic in Los Angeles County (Pl. Op, Ex.2 Affidavit of Mugica), Smartmatic was far more involved in the L.A County 2020 election than just supplying BMDs. They were directly responsible for managing critical aspects of the LA. County election. Second Cotton Decl. dated 12/27/24. These facts, taken together, show that Smartmatic is more than a mere government contractor. Rather, Smartmatic is inextricably involved the traditionally exclusive public function of operating elections, and so in that role is indistinguishable from the government. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001); *Halleck*, 587 U.S. at 810.

Put another way, if Plaintiffs do have a right to bring this lawsuit, how would citizens who want to oppose the government's use of computerized election machinery go about that without exposing themselves to defamation litigation by those who make and operate that machinery? At bottom, allowing a government contractor in the unique posture of Plaintiffs to bring a defamation suit for criticism of the governmental activity in which they are so intimately involved empowers that contractor to be a stalking horse for the government to suppress that criticism. Such a result is at war with the bedrock First Amendment principles that permits even robust speech to ensure the accountability of the government.

## II. There is no genuine issue of material fact that Lindell's *actual* statements were non-actionable opinions on matters of public concern.

There is no genuine issue of material fact that Lindell's *actual statements* (not Plaintiffs' ascribed narratives) were opinions. Even if Court found that Plaintiffs could raise these claims as an arm of the government, their fictious ascribed narratives about Lindell's statements are inaccurate, grossly exaggerated, and, thus, there is no material fact issue that Lindell's statements were non-actionable opinions. *See* Defs. S.J. Br. at 29 – 31, 37 – 38; Defs. Opp. at 17 – 19. Lindell has never used the term "rigged" (or any variation thereof) and did not engage in the "disinformation campaign" narrative about Plaintiffs that they attempt to convince the Court of with their numerous exhibits and misrepresentations of context about Lindell's speech. *Id.* With this case, Plaintiffs ask this Court to overturn over 70 years of precedent and "prescribe what shall be orthodox in politics…forc[ing] citizen Michael Lindell to "confess by word" that he has no concerns about electronic voting machines, the 2020 general election, or network infiltration into U.S. elections. See *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943).

Removing the "weeds" from Plaintiffs' unnecessarily complex "rebuttal" is the fundamental fact that Lindell's actual, published statements were opinions about electronic voting machines and concerns regarding network vulnerabilities mainly in 2021—during nationwide intense public debate surrounding the 2020 general election. This is not defamatory nor a basis to sustain this case beyond summary judgment, and Plaintiffs ascribed "narratives" to Lindell's general statements fail to show there is any issue of material fact that Lindell's statements constituted more than opinions on matters of public concern. *See* Defs. S.J. Br. at 29 – 31, 37 – 38; Defs. Opp. at 17 – 19. Plaintiffs' assertion that Defendants "waived" their "opinion" argument

fails because Defendants sufficiently raised this argument both in their Motion for Summary judgment and their response to Defendants' motion for partial summary judgment. *See id.* Arguments are only waived where *the record* shows that a party has failed to develop any argument on an issue. Plaintiffs' assertions here mischaracterize the legal standard and the case record, and thus, should be disregarded. Further, even if the Court believed that Defendants' "opinion" argument was not "fully developed" in their initial brief, the Court is not precluded from considering a supplemented Reply argument. See *Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir. 2006). This is even more permitted where the Defendants have fully addressed and briefed the same issue in other briefing before the Court. See e.g. *Frank v. Winter*, 528 N.W.2d 910, 913 (Minn. Ct. App. 1995) (holding the trial court may address issues not fully developed in an initial brief if the consideration could potentially end the litigation); *Sidney M. v. Kijakazi*, 630 F. Supp. 3d 1077, 1096 (N.D. Iowa 2022) (considering an issue on the merits because the parties had briefed the issue on the record).

However, here, Lindell and My Pillow not only addressed the opinion argument in their initial brief but expounded substantially on that in their Briefing on the Defendants' motion for partial summary judgment. *See* Defs. Br. Opposition to Pls. Mot. Partial Summ. Judg. at pp. 16 – 33 (detailing Plaintiffs' factual misrepresentations and Lindell's statements of opinion in accurate context). The Plaintiffs refusal to analyze, address, nor rebut Lindell's opinion arguments concedes that Lindell's actual statements—not the fictional manifestations Plaintiffs ascribed to Lindell—were, indeed, opinions on matters of public concern. Thus, Lindell and My Pillow are entitled to Summary Judgment on all claims because Lindell's *actual* statements, in context, were non-actionable opinions. *See id.*

### III.    Even if the Court found that some of Lindell's statements were factual assertions, there are no issues of *material* facts that Lindell acted with actual malice.

There are no *material* facts at issue that Lindell acted with actual malice, certainly none that justify expending further resources litigating this matter or having a jury seated merely for Plaintiffs to try and conjure any evidence of "actual malice" by Lindell.  Although Plaintiffs raise "facts" that they alleged put Lindell on "notice" of false statements, this is a distraction from Defendants' argument that Plaintiffs failed to raise a single legitimate *material* fact issue that Lindell acted with any actual malice—because none exists. *See* Defs. S.J. Br. at 19 – 28.  For summary judgment, facts are "material" if they constitute a legal defense, their "existence or nonexistence might affect the result of an action, or when the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." *Odom v. Tripp*, 575 F. Supp. 1491, 1492 (E.D. Mo. 1983) (citations omitted). "Where the determinative facts are …clearly established by the record so that one of the parties is shown to be entitled to judgment as a matter of law, it is the duty of the Court to grant summary judgment accordingly; this notwithstanding that there may be a dispute as to immaterial points." *Id.*

Here, Plaintiffs' argument rests on a fundamental misunderstanding of the proper legal standard because if the proper standard were applied, no reasonable juror could conclude that Lindell made the statements at issue with actual malice. Plaintiffs assert that they may rely on circumstantial evidence to prove actual malice. Pl. Opp. at 7. Attempting to demonstrate the ways in which circumstantial evidence may be used to establish actual malice, Plaintiffs quote a portion of the following footnote from *Herbert v. Lando*:

The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration. The plaintiff may show that the defendant had drawn a pistol at the time he uttered the words complained of; that defendant had tried to kiss and embrace plaintiff just prior to the defamatory publication; or that defendant had failed to make a proper investigation before publication of the statement in question. On cross-examination the defendant may be questioned as to his intent in making the publication.

441 U.S. 153, 164 n. 12 (1979) (*quoting* 50 Am. Jur.2d Libel and Slander § 455 (1970)).

But Plaintiffs' reliance on this footnote is inappropriate, because they take the passage out of its proper context. The *Herbert* Court in the above-quoted footnote was not explaining how actual malice in the First Amendment sense, as required by *New York Times* and its progeny in cases involving public figures, may be shown. Rather, the *Herbert* Court was discussing the common-law privilege, developed "long before *New York Times* was decided, that "protect[s] a publisher from liability for libel unless the publication was made with malice." *Id.* at 163. The text relied upon by Plaintiffs is a quote from *American Jurisprudence* used by the *Herbert* Court to show how the old, common-law privilege of malice could be established. *See id.* at 163-164 and n. 12. It is inapposite to a determination of actual malice under *New York Times*.

By focusing on the *Herbert* footnote regarding common-law malice, Plaintiffs mistakenly direct the actual-malice inquiry toward factors that have no bearing on the *New York Times* actual-malice standard, such as ill will toward the defendant, hostility, and motive. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 n. 7 (1989) ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will."). Under *New York*

*Times* and its progeny, the "actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks*, 491 U.S. at 666. Instead, actual malice focuses entirely on the defendant's state of mind concerning the truth or falsity of the statement. The "reckless disregard for the truth" required by the actual-malice standard, *id.*, can only be established if there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Under this subjective standard, Plaintiffs must put forward sufficient evidence to show that "defendant actually had a 'high degree of awareness of … probable falsity.'" *Harte-Hanks*, 491 U.S. at 688 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964)). Consequently, circumstantial evidence may not be considered unless it is probative of whether Lindell actually entertained serious doubts as to the truth of his statements or had a high degree of awareness of probable falsity.

Given the requirement to show that the defendant entertained subjective, serious doubts about the truth of his statements, a "failure to investigate alone does not support a finding of actual malice." *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 570 (8th Cir. 2001). This is true even if "a reasonably prudent man … would have investigated before publishing." *Id.* And while the Supreme Court has held that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports," *St. Amant,* 390 U.S. at 732, the governing subjective standard must still be met. That is, the reasons to doubt the veracity of the informant must be so obvious that they permit the conclusion that the defendant must have entertained serious doubts about the truth of the statement. Keeping the subjective standard in mind, it also follows that an obviously doubtful source is not *alone* sufficient to

establish reckless disregard for truth or falsity. Not only must there be obvious reasons to doubt the source, but also the source must be the defendant's sole source for the information in question.

Plaintiffs here may not merely point to what they believe are indications that Lindell's sources lack credibility and claim that constitutes evidence of actual malice. Nor may Plaintiffs rely on the existence of conflicting information as a basis to establish actual malice. *See Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 478 (8th Cir. 1987) ("A publisher's failure accurately to guess which of two conflicting accounts a jury might later believe does not demonstrate actual malice…To find liability in these circumstances would undermine the purpose for which the Supreme Court in New York Times adopted the actual malice requirement – to prevent the self-censorship that may arise if a critic of official conduct were compelled to guarantee the actual truth of all factual assertions on pain of a libel judgment.").

Plaintiffs assert that they have accumulated extensive circumstantial evidence showing that Lindell acted with reckless disregard for whether his statements were false or not. But this is not the correct legal standard. Plaintiffs were required to provide evidence showing that Lindell "in fact entertained serious doubts" about the truth of his statements. *St. Amant*, at 731 (1968). Not only is there no evidence that Lindell ever doubted the truth of his opinions about voting machines or the 2020 election, but the conclusory statements raised by "state and federal" officials that Plaintiffs rely on do not include a single page, document or record of any supporting "investigation" or audit they refer to. *Not one.*

Plaintiffs cannot ask this Court to expend significant resources, jury time and costs simply to "see whether they can find actual malice." Plaintiffs have not presented evidence of a single

*material* fact that establishes that Lindell acted with actual malice so as to create a dispute of material fact sufficient to require a trial of this case.

### A. Plaintiffs cannot establish actual malice because Lindell relied on multiple sources and there are no "obvious" reasons to doubt those sources.

Plaintiffs claim that Lindell has no "credible source" that supports the statements at issue. Def. Opp. at 8. This claim is not true. Lindell (publicly) relied on multiple independent sources. Importantly, Plaintiffs' judgments about the credibility of Lindell's sources are completely irrelevant. It is Plaintiffs' burden to show actual malice by establishing that Lindell harbored subjective, serious doubts about the truth of his statements. As discussed above, the only way for Plaintiffs to meet that burden by means of questioning the credibility of Lindell's sources is to demonstrate that there were "obvious reasons" to doubt *each* of Lindell's sources. Here, Lindell did not rely on one source – Lindell had over 10 sources that he introduced and broadcasted in conjunction with his alleged statements. *See e.g.* Pls. Exs. 9, 29 to Pls. Mot. for Partial Summ. Judgment; *see also* Decl. Lindell ¶¶ 2 – 7. Each separate expert unknowingly supported statements, data, and opinion by others. *Id.* Smartmatic's assertions that the sources are not credible do not amount to "obvious" reasons that are sufficient to show that Lindell entertained serious doubts about the truth of his statements.

That Lindell did not credit information provided by Smartmatic and Dominion does not constitute a basis for establishing actual malice. Plaintiffs spend a significant portion of their opposition brief arguing that Lindell knew that his statements about voting machines and Smartmatic were false because Lindell was allegedly put on notice about the supposed "truth" concerning those matters in various ways. Pl. Opp. at 10-21. This argument fails for two reasons.

13

First, in all cases, Smartmatic is claiming that Lindell was made aware of the supposed "truth" by virtue of allegations in a complaint by Smartmatic or Dominion, or in a letter from a defamation plaintiff (Dominion). That is, the information was part and parcel of denials made by defamation plaintiffs. But Lindell need not believe or credit the denials of Smartmatic and Dominion, no matter how vehement. See *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021).

Second, as discussed herein above and in Defendants' opening brief, Lindell had received contrary information from multiple, independent sources—and there were no obvious reasons to doubt the veracity of any of those sources, let alone all of them. *See* Def. Br. Supp. at 22 – 27; *see also* Pls. Exs. 9, 29 to Pls. Mot. for Partial Summ. Judgment. The reckless disregard for truth or falsity required by the actual malice standard cannot be established by showing that Lindell opted to believe information from one set of sources as opposed to contrary information from another set of sources. *See Speer*, 828 F.2d at 478.

Moreover, because Lindell relied on multiple, independent sources to make the allegedly defamatory statements, and because there is no evidence of any obvious reasons for Lindell to doubt the veracity of any of his multiple sources (let alone all of them), no reasonable juror could conclude that Lindell purposefully avoided the supposed "truth" by failing to credit the allegations made and information provided by Smartmatic and Dominion.

**Dennis Montgomery.** Plaintiffs assert that Lindell was warned about the credibility of Dennis Montgomery. Pl. Opp. at 22 – 24. But one individual's generalized opinion is not the kind of material fact that proves Lindell harbored subjective doubts about the truth of his statements. More importantly, Dominion's "warning" about Montgomery's credibility was self-serving,

14

amounting to nothing more than an extension of Dominion's denials that its voting machines were vulnerable to hacking. Such denials cannot form the basis for establishing actual malice. *See Tah*, at 242 (publisher "need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharges that, in themselves they hardly alert the conscientious reporter to the likelihood of error."). Dominion's opinion about Montgomery's credibility does not amount to the kind of "obvious reason" that the *St. Amant* Court stated (in dicta) might be sufficient to establish that Lindell harbored subjective doubt about the truth of his statements. If a public-figure-defamation plaintiff could manufacture subjective doubts by informing the defendant that one of his multiple sources lacked credibility, that would eviscerate the actual malice requirement and undermine its purpose: preventing the suppression of speech on matters of public concern.

Plaintiffs further argue that Montgomery admits that he did not have any evidence "implicating Smartmatic in rigging the 2020 election." Pl. Opp. at 24. This argument fails because Lindell never claimed that Smartmatic itself rigged the 2020 election and because the admission from Montgomery that he had no evidence implicating Smartmatic came during his deposition— long after he made statements that Lindell relied on. Defs. Opp. to Pls. Mot. Partial Summ Judg., at 25 – 32. Montgomery's admission during his deposition is not relevant to Lindell's statements, let alone whether Lindell harbored subjective, serious doubts about the truth of his statements when they were made.

**Dr. Douglas Frank.** Plaintiffs likewise adduce no evidence creating a material fact issue that Lindell had any obvious reason to doubt the veracity of information from Dr. Douglas Frank. Plaintiffs assert that Dr. Frank is unqualified, despite the fact that he has a science-related Ph.D.

15

as well as approximately 60 peer-reviewed scientific publications.  Def. Opp. Br. at p. 24; *but see* Kachouroff Decl., Ex. N, 33:8-34:9, 41:15-42:2. Lindell frequently asked Dr. Frank to analyze election data, Lindell Decl. ¶ 2, and given Dr. Frank's extensive scientific training and credentials, Lindell had no obvious reason to doubt the analyses that Dr. Frank performed.

Plaintiffs also assert that Dr. Frank's theory that an algorithm had been used to manipulate the results in all Presidential elections over the last 20 years was inherently improbable.  Pl. Opp. at 24-25. But none of Lindell's allegedly defamatory statements invoke Dr. Frank's theory that all Presidential elections over the last 20 years have been manipulated by an algorithm.  Lindell relied on Dr. Frank to review election data, and he also relied on Dr. Frank—in addition to others—for information about voting machines in general and to conclude that there had been manipulation of votes in the 2020 Presidential election. Lindell Aff. ¶¶ 2, 5, 6. Whether it is inherently implausible that an algorithm was used in 20 years' worth of Presidential elections has no bearing on whether Lindell harbored subjective, serious doubts about the truth of his statements concerning voting machines and election fraud in the 2020 Presidential election.

Again, Plaintiffs' argument that Lindell never "vetted" Dr. Frank strays from the governing standard: Actual malice cannot be established based on a failure to investigate information or sources.  *See*, *e.g.*, *St. Amant*, 390 U.S. at 731, 733; *Harte-Hanks*, 491 U.S. at 588; *Campbell*, 255 F.3d at 570. Lindell had no duty to investigate Dr. Frank's credibility, and in light of Dr. Frank's extensive scientific background, there was no obvious reason to doubt the veracity of Dr. Frank's information.

Plaintiffs have pointed to no obvious reasons to doubt the veracity of Dr. Frank's information that would permit a conclusion that Lindell harbored subjective, serious doubts about

16

the truth of the allegedly defamatory statements at issue. On the contrary, Lindell's reliance on Dr. Frank's information, in light of Dr. Frank's scientific pedigree and education, demonstrates that Lindell did not make the statements at issue with reckless disregard for their truth or falsity.

**Gen. Michael Flynn.** Similarly, Plaintiffs' arguments that there were obvious reasons to doubt the veracity of Gen. Michael Flynn have no merit. Plaintiffs contend that Gen. Flynn had no background with voting security or systems, that he had been convicted for lying to Congress, and that he had been banned from Twitter due to statements he made on the platform. Pl. Opp. at 25-26. But Gen. Flynn's pleading guilty to lying to the F.B.I. about conversations with the Russian Ambassador does not speak to Gen. Flynn's credibility with respect to information he provided Lindell on the subject of voting machines and election fraud. Being banned from Twitter or lacking certain credentials doesn't provide an obvious reason to doubt his veracity—that just means a Twitter employee believed the user violated usage terms. There is no evidence that Lindell knew about any of these things prior to making the allegedly defamatory statements.

Plaintiffs claim that Defendants have not identified any evidence received by Lindell supporting anything Lindell said but Lindell clearly argued that in his opening brief. *See* Def. Opening Br. at 24-25. Next, Gen. Flynn's refusal to answer questions at a deposition held long after Lindell made the allegedly defamatory statements is not evidence about what Lindell knew or believed when he made the statements. Moreover, that a source does not provide corroborating evidence to support the information that the source passes along does not constitute a reason to doubt the veracity of the source, let alone an "obvious reason." The First Amendment does not require a certain quantum of corroborating evidence from a source without which the source is deemed obviously questionable. Gen. Flynn served in multiple administrations and as the

Intelligence Director under the Obama Administration, having held a successful and highly decorated U.S. military career globally prior to that. His background and experiences within the U.S. government, across the globe, are certainly bases to trust the veracity of his information.

Finally, Plaintiffs cite three cases to support their general argument that an alleged lack of so-called "credible support" for Lindell's statements is sufficient to establish reckless disregard for the truth. *See* Pl. Opp. at 10. But in each of the cases, multiple other factors, not present in the instant matter, drove the finding of actual malice, such as evidence of fabrication of facts and blatantly obvious reasons to doubt the veracity of a single source. None of the cited cases stands for the proposition that actual malice can be established by questioning the credibility of a defamation defendant's sources. *See Sindi v. El-Moslimany*, 896 F.3d 1, 16 (1st Cir. 2018) (finding actual malice when, among other things, evidence showed that defendant fabricated material facts); *Rockwood Bank v. Gaia*, 170 F.3d 833, 841 (8th Cir. 1999) (finding actual malice when bank president made statements to bank examiners alleging poor performance of executive vice president in spite of executive vice president's assertions of excellent job performance backed with empirical data); *S. Air Transp., Inc. v. Post-Newsweek Stations, Fla., Inc.*, 568 So. 2d 927, 928 (Fla. Dist. Ct. App. 1990) (in case where defendants aired investigative television news show accusing plaintiff of drug trafficking while engaged in covert arms shipments to Nicaraguan Contras, finding actual malice when, among other things, the report was based on single informant, and the informant "had an extensive drug trafficking background and a motive to lie in order to obtain immunity therefor").

B.  <u>Lindell's statements were not inherently implausible.</u>

Plaintiffs further argue that a jury could conclude that Lindell acted with actual malice because his statements were inherently implausible. Pl. Opp. at 30-32. *See St. Amant*, 390 U.S. at 732 (stating that "professions of good faith" would be unlikely to be persuasive when "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation"). But statements about the vulnerability of electronic voting computer systems to manipulation and hacking have been put into circulation by many sources that cannot be labeled as "reckless." As pointed out in Defendants' opening brief, support for Lindell's statements can be found in the opinions of United States District Judge Amy Totenberg in *Curling v. Raffensperger,* who received testimony from several leading cyber experts. In her October 11, 2020, opinion, Judge Totenberg wrote about the risks posed by Dominion's BMD voting system in Georgia, stating that the "stealth vote alteration or operational risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited." *Curling v. Raffensperger*, 493 F. Supp. 3d at 1341 (N.D. Ga. 2020). Judge Totenberg further observed that "[t]he Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually happen?'---but 'when it will happen.'" *Id.,* at 1342. In light of the *Curling* opinion as well as the other highly credible sources cited in Defendants' opening brief, *see* Def. Opening Br. at 26-28, Lindell's statements are not inherently implausible.

Plaintiffs further assert that Lindell's statements are inherently implausible in light of the fact that Smartmatic's technology was only used in Los Angeles County during the 2020 election, and Smartmatic's technology created an auditable paper trail.  Pl. Opp. at 31. But these assertions

have nothing to do with Lindell's actual statements.  Lindell did not state that Smartmatic machines in particular were used to rig the 2020 Presidential election. Rather, Lindell's statements voiced his concerns that voting machines in general were vulnerable to hacking and that they were hacked to allow manipulation of votes in the 2020 Presidential election. Plaintiffs' argument merely sets up and attacks a straw man. *See* Defs. Br. Opp. to Pls. Mot. Partial Summ. Judg., at 19 – 32.

\*    \*    \*

Plaintiffs do not contest one of the central facts in this case: that Lindell has repeatedly stated and testified that he believed and still believes his statements to be true. *See* Pl. Opp. at 29. It is true that mere "[p]rofessions of good faith will be unlikely to prove persuasive" when "a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call[,]" when "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation," or when there "are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732. But that is not the case here. Lindell's repeated assertions that he believes in the truth of his statements are much more than mere professions of good faith. As discussed herein above, Lindell's statements were not the product of his imagination, nor were they based solely on an unverified anonymous source.  On the contrary, Lindell's statements were based on dozens of independent sources beyond just those raise in Defendants' brief—but rather those shown by *Plaintiffs' proffered videos from Lindell. See e.g.* Pls. Exs. to Pls. Mot. Summ. Judg. 9, 29. Plaintiffs have failed to point to any obvious reasons to doubt the veracity of those sources. Lindell was under no legal obligation to credit Smartmatic's or Dominion's denials or any of the contrary

20

information they provided, especially given Lindell's reliance on multiple sources. Nor can Lindell be required to accept Plaintiffs' assessments of his sources' credibility. And, particularly in light of the Georgia District Court's holding in *Curling*, Lindell's statements are not inherently improbable.

The protection of the First Amendment reaches is maximum where, as here, the speech at issue constitutes discussion of issues of great public concern. *See*, *e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Few if any issues of public concern have greater significance than the means by which the elective franchise is administered. Accordingly, Plaintiffs bear a particularly heavy burden to establish actual malice by clear and convincing evidence. Plaintiffs have put forward no evidence—let alone clear and convincing evidence—that would permit the conclusion that Lindell had serious, subjective doubts about the truth of his statements. Consequently, Plaintiffs cannot establish actual malice, and the First Amendment requires the dismissal of Plaintiffs' defamation claim.

### IV. Plaintiffs' lack standing under both the MDTPA and Common Law defamation.

Plaintiffs assert that they suffered reputational injuries from Lindell's statements nationwide—despite previously excluding states (including Minnesota) from their list of injuries. *See* Defs. Ex. D in Supp. Defs. Mot. Summ. Judg., at pp. 26 – 31. However, nearly all of the alleged "reputational injuries" Plaintiffs list occurred before Lindell's first statement at issue here.. Second Decl. Kachouroff in Supp. Defs. Mot. Summ. Judg., Ex. P, Smartmatic Fox News Complaint at pp. 220 – 239 ("Fox Compl.").

In Plaintiffs' Fox Complaint, *before* Lindell ever made a single statement at issue in this case, Smartmatic publicly stated that the value of Smartmatic's intellectual property and tangible

assets "has been nearly destroyed… leaving little value beyond liquidation value of [Plaintiffs']

tangible assets." *See* Ex. P, Fox Compl. ¶ 518. Despite Plaintiffs' knowing admission that they had

veritably no value and had already suffered catastrophic and business-ending losses (not remotely

attributed to *Lindell's* statements), Plaintiffs claim the exact same value of monetary damages on

Lindell that they claimed they had *already suffered prior to Lindell's first statement.*

| **Plaintiffs' Fox News Complaint filed one-day before Lindell's first statement at issue here (2.4.2021).** | **Plaintiffs' damages claimed solely against Michael Lindell and My Pillow (statements made 2.5.2021) here (6th Supplemental Interrogatory dated June 3, 2024).** |
|---|---|
| "Based on [Plaintiffs Smartmatic, SGO Corporation] adjusted forecasts and projections [through 2025], due to [Defendants Fox Corporation, Fox News Network LLC, Lou Dobbs, Maria Bartiromo, Jeanine Pirro, Rudolph Giuliani, Sidney Powell]s' defamation and disparagement, solely for election-related sales, Smartmatic's election business will suffer between $500 million and $690 million in lost profits, based on (i) a forecasted loss of not less than $500 million in profits from base contracts and (ii) lost profits from potential upselling and other upside opportunities, in an estimated amount of not less than $190 million." Defs. Ex. D, Fox Compl. ¶501. | "Assuming Smartmatic maintained a 21.3% market share in 2021–2025, Smartmatic would have earned, but for the disinformation campaign that [Lindell and My Pillow] participated in, approximately $652.1 million in revenue from 2021–2025 ($101.3 million in 2021, $115.8 million in 2022, $130.4 million in 2023, $145 million in 2024, $159.6 million in 2025)." Defs. Ex. D, Pls. 6th Supp Resp. to Defs. Discovery Reqs., 4th Supp Resp to ROG 20, at p. 33. |

Plaintiffs cannot use this Court as their "back up plan" in case the Fox Complaint does not

pan out in their favor. *See* Ex. P, Fox Compl. at pp. 220 – 239; *see also* Decl. Kachouroff, Defs.

Appendix 1.

For the same reasons, no jury could find that Plaintiffs will suffer imminent and irreparable

harm without a permanent injunction (prior restraint) because there are *no damages* nor injuries

relating to Lindell and My Pillow that are separate and distinct from those Plaintiffs raised before

Lindell's first statement at issue. *See id.; see also M.P. v. Hubbard Broad., Inc.*, 216 F. Supp. 2d

933, 934 (D. Minn. 2001) (requiring a showing of "extraordinary circumstances" to issue permanent injunction for unconstitutional prior restraint). There are no extraordinary circumstances because the damages allege they suffered from Lindell and MyPillow, they published were already incurred before Lindell made any statement about them.

A. Plaintiffs' MDTPA standing argument fails to establish a genuine issue of material fact.

Plaintiffs assertion of standing based on alleged "nationwide" reputational damage "which includes Minnesota" (Smartmatic Opp. at 42) fundamentally misapprehends the legal requirements for standing under both the Minnesota Deceptive Trade Practices Act ("MDTPA") and Minnesota Common Law Defamation. The existence of Plaintiffs' Article III standing is a jurisdictional prerequisite. *See Sanzone v. Mercy Health*, 954 F.3d 1031, 1046 (8th Cir. 2020). In diversity cases, a plaintiff must not only "meet[ ] the 'case or controversy' requirements of [A]rticle III of the Constitution [but] also [must have] standing to sue under the relevant state law." *McGowen, Hurst, Clark & Smith, P.C. v. Commerce Bank*, 11 F.4th 702, 708 (8th Cir. 2021) (citation omitted). Minnesota law governs this dispute.

Under Minnesota law, each of the Plaintiffs must establish standing in one of two ways: when "(1) the party has suffered an injury-in-fact, or (2) the party is the beneficiary of a legislative enactment granting standing." *Webb Golden Valley, LLC v. State*, 865 N.W.2d 689, 693 (Minn. 2015).

  *1. Presumed damages do not give Plaintiffs standing under the MDTPA absent a showing of actual malice by clear and convincing evidence.*

Plaintiffs improperly ground their claim to standing under the MDTPA on the proposition that they are entitled to presumed damages without showing actual malice. Smartmatic Opp. at

42. There is no authority for presumed damages under the MDTPA statute and Plaintiffs cannot elevate the MDTPA over the Constitution. Plaintiffs' MDTPA claim relies on the same defamation allegations to penalize statements that "disparage Smartmatic's goods, services, and business by false and misleading representations of fact." Suppl. Compl at ¶¶372-74.

Nothing in the MDTPA creates a special arena insulated from the protections of the First Amendment. There is no dispute in this case that Smartmatic is a public figure and that Lindell's speech was directed to matters of public concern. As we have explained, in such a context, damages cannot be presumed to penalize an individual for that speech absent a showing of malice. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 12-16; see also, *New York Times*, at 278–80.

The U.S. Supreme Court has explicitly held that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, at 254. Without evidence of actual malice, Plaintiffs' "substantive evidentiary burden" requires they demonstrate standing by showing actual harm—they cannot rely on presumed damages.

> 2. *As a matter of law and fact, Plaintiffs cannot establish standing under the MDTPA because they have no damages in Minnesota nor any meaningful connection to Minnesota.*

Plaintiffs' claim of "nationwide harm" directly contradicts their own detailed responses to Interrogatory No. 20, which required identification of specific jurisdictions where economic loss occurred. *See* Defs. Ex. D at pp. 26 - 30. Plaintiffs enumerated several states and numerous foreign countries, but Minnesota is conspicuously not among them. *Id.* Plaintiffs thus admit they have no economic loss in Minnesota and thus no harm to reputation.

Plaintiffs have no meaningful connection to Minnesota that could establish standing:

- They have no certified election system that can be sold in Minnesota
- They have offered no evidence that shows they have lost government contracts or customers in Minnesota
- They do not have and have never had a business presence or actual business activity in Minnesota
- They cannot demonstrate any *actual* economic loss and thus no reputational harm in Minnesota

*See* Defs. Mem. In Supp. of Defs. Mot. Summ. Judg. ¶¶ 10 – 32.

### B. The *Rouse* decision and 8th Circuit precedent definitively bar Plaintiffs' MDTPA claims.

This Court's recent decision in *Rouse v. H.B. Fuller Co.*, 694 F. Supp. 3d 1149 (D. Minn. 2023), directly addresses and forecloses Plaintiffs' standing argument. *Rouse* established two crucial principles:

1. Standing under Minnesota law requires either specific, tangible harm or domicile within Minnesota.

2. The MDTPA does not apply extraterritorially.

*Rouse*, 694 F.Supp.3d at 1156–57 ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.")

Plaintiffs' attempt to distinguish *Rouse* as applicable only to class actions fails. The Court's reasoning in *Rouse* focuses on the fundamental requirement that *plaintiffs* demonstrate meaningful connections to Minnesota when asserting statutory claims. The Court specifically rejected standing for out-of-state plaintiffs who could not demonstrate harm directly traceable to Minnesota.

This interpretation is supported by two cases. First, *Ferrari v. Best Buy Co.*, rejected MDTPA claims by out-of-state plaintiffs attempting to rely on nationwide conduct. 2015 WL

2242128 (D. Minn. May 12, 2015). The court ruled that plaintiffs could not bootstrap standing under Minnesota law based on conduct with attenuated or indirect effects in the forum state. Second, in *Insulate SB, Inc. v. Advanced Finishing Systems, Inc*., the court clarified that standing requires not only harm tied to Minnesota but also harm that directly implicates the plaintiff's ability to compete or operate *within the state*. 2014 WL 943224 (D. Minn. Mar. 11, 2014).

Here, Smartmatic is neither domiciled in Minnesota nor conducting *any* business operations within this state. Plaintiffs are out-of-state entities who are not licensed to do business in Minnesota, have no certified election product to sell to the governments of this state, have never tried to sell a service or a product in Minnesota, and they have alleged no economic loss in Minnesota. And, Plaintiffs' speculative claim of presumed reputational harm "nationwide, including Minnesota" is precisely the type of speculative injury disallowed under the MDTPA.

### C. Plaintiffs cannot establish standing for their Minnesota Common Law defamation claim

Minnesota's standing requirements for common law defamation claims are equally stringent. For their business, Plaintiffs must establish standing by showing that the alleged defamation "harmed the plaintiff's reputation in the community." *Maethner v. Someplace Safe, Inc*., 929 N.W.2d 868, 873 (Minn., 2019). Plaintiffs' argument that "reputational harm" is presumed and that they have "introduced evidence showing reputational harm and economic loss" mischaracterizes the role of reputation in defamation law. Smartmatic Opp. at 47.

The Eighth Circuit articulated this crucial distinction in *Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*, *Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763, 766 (8th Cir. 1927), explaining that while the basic principles of libel law apply to both corporations and individuals, their

application differs significantly. As the court noted, corporations lack the personal reputation that individuals possess, and therefore corporate defamation claims must specifically demonstrate harm to the corporation's property, credit, or business. *Id.* Where a business is concerned, reputational harm *is* economic loss. They are not separate categories.

As with their MDTPA claim, Plaintiffs have not established an economic injury-in-fact in any Minnesota community that is directly traceable to Defendants. Yet Plaintiffs seek *per se* damages without proof of actual malice. Pls. Opp. at 39-40. But Plaintiffs cannot ignore the prerequisite of proving malice that must precede any presumption of damages. *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155, (1967); *New York Times*, at 278–80.

For purposes of standing under Minnesota's common law defamation involving public figures and matters of public concern, the Minnesota Supreme Court has required a showing of actual malice by "clear and convincing" evidence in order to survive summary judgment. *See Richie v. Paramount Pictures Corp*., 544 N.W.2d 21, 26 (Minn., 1996) (absent actual malice, "there must be a genuine issue of material fact as to whether [plaintiffs] *suffered actual harm*; damages cannot be presumed." *Id.*).

Plaintiffs' credibility is severely undermined by their prior litigation position: The day before Lindell first mentioned Smartmatic, Plaintiffs filed suit against Fox News Corporation claiming their business was already "virtually destroyed" and worth only "liquidation of tangible assets." *See* Ex. P, Fox Compl. ¶¶517-519. Plaintiffs' suit amounts to suing Lindell for kicking their already dead horse. Nothing in Plaintiffs' expert report or any other traces *any damage* to Minnesota because, in fact, the damages Plaintiffs claim they suffered here were already done prior to Lindell's first statement.

Plaintiffs' complete lack of business presence in Minnesota at any time, coupled with their failure to demonstrate specific harm within the state, precludes standing under both Minnesota's MDTPA and common law defamation claims.

## CONCLUSION

For the foregoing reasons and those in Defendants opening brief, Michael Lindell and My Pillow respectfully request this Court enter summary judgment dismissing all claims with prejudice.

Dated: December 27, 2024.

Respectfully Submitted,

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC

By */s/ Christopher I. Kachouroff*
Christopher I. Kachouroff* (Bar No. 44216)
Robert J. Cynkar* (Bar No. 23349)
13649 Office Place, Suite 101
Woodbridge, Virginia 22192
Telephone: (703) 621-3300
chris@mck-lawyers.com


Douglas G. Wardlow (MN Bar #339544)
Jeremiah D. Pilon (MN Bar #392825)
1550 Audubon Rd.
Chaska, MN 55318
Telephone: (952) 826-8658
doug@mypillow.com
jpilon@mypillow.com

ATTORNEY FOR MY PILLOW, INC. AND
MICHAEL LINDELL

*Admitted *Pro Hac Vice*