2015 WL 2242128
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

Rick FERRARI, on behalf of himself and all others
similarly situated, Plaintiffs,
v.
BEST BUY CO., INC., Defendants.

Civil No. 14–2956 (MJD/FLN).
|
Signed May 12, 2015.

**Attorneys and Law Firms**

Daniel Shulman and Richard Landon, Gray Plant & Mooty,
for Plaintiffs.

Elliot S. Kaplan, Stephen P. Safranski and Katherine S.
Barrett Wiik, Robins Kaplan LLP, for Defendant.

ORDER

MICHAEL J. DAVIS, Chief Judge.

**\*1** The above-entitled matter comes before the Court on the
parties' objections to the Report and Recommendation of
Magistrate Judge Franklin L. Noel dated March 18, 2015
recommending that the Court grant, in part, Defendant's
motion to dismiss.

Pursuant to statute, the Court has conducted a *de novo*
review of the record. 28 U.S.C. § 636(b)(1); Local Rule
72.2(b). Based on that review, the Court will adopt the
Report and Recommendation in its entirety.

IT IS HEREBY ORDERED:

1. To the extent Best Buy seeks to dismiss Plaintiff's
claims under the Minnesota Unfair Trade Practices Act,
the Minnesota Prevention of Consumer Fraud Act, and
the Minnesota Uniform Deceptive Trade Practices Act
(Plaintiff's First Cause of Action), the motion is

**GRANTED** and Plaintiff's claims are **DISMISSED
WITHOUT PREJUDICE** for lack of standing.

2. To the extent Best Buy seeks to dismiss all of Plaintiff's
claims for products he did not purchase and advertising
he did not see, the motion is **GRANTED** and Plaintiff's
claims are **DISMISSED WITHOUT PREJUDICE** for
lack of standing. Specifically, Plaintiff's claims are
limited to televisions with the model number NS–
65D260A13 and for advertising and marketing on the
television box itself.

3. To the extent Best Buy seeks to dismiss Plaintiff's claim
for injunctive relief, the motion is **DENIED.**

4. To the extent Best Buy seeks to dismiss Plaintiff's
claims for failure to adequately plead allegations of
fraud, the motion is **DENIED.**

5. To the extent Best Buy seeks to dismiss Plaintiff's
claims for failing to plausibly allege a price premium
injury, the motion is **DENIED.**

REPORT AND RECOMMENDATION

FRANKLIN L. NOEL, United States Magistrate Judge.

**THIS MATTER** came before the undersigned United States
Magistrate Judge on Defendants Best Buy Co., Inc., BestBuy
Stores, L .P., and Bestbuy.com, LLC's motion to dismiss
(ECF No. 16). This matter was referred to the undersigned
for Report and Recommendation pursuant to 28 U.S.C. § 636
and Local Rule 72.1. Order, ECF No. 30. For the reasons set
forth below, the Court recommends that Defendants' motion
to dismiss be **GRANTED in part** and **DENIED in part.**

I. FINDINGS OF FACT

A. Introduction
Plaintiff Rick Ferrari, a resident of Massachusetts, alleges
that Defendants Best Buy Co., Inc., BestBuy Stores, L.P.,
and Bestbuy.com, LLC (collectively, "Best Buy") are falsely

advertising and labeling certain Insignia-brand[1] LCD televisions as "LED TVs." First Am. Compl. ¶¶ 2–3, ECF No. 34. This, according to Plaintiff, allows Best Buy to sell its televisions at an "unjustified price premium," because consumers are misled into believing "they are purchasing a different, improved, and technologically advanced class or species of television." Pl.'s Mem. in Opp'n to Mot. to Dismiss 1, ECF No. 35; *see also* ECF No. 34 ¶ 4. Plaintiff alleges, on behalf of himself and all others similarly situated, that Best Buy's conduct violates both Minnesota and Massachusetts consumer protection statutes. ECF No. 35 at 1.

**B. History of television display technology**

**\*2** According to Plaintiff,[2] the picture on a television's display was originally created by using cathode ray tube ("CRT") technology. ECF No. 34 ¶ 20. To produce an image on a CRT television, a cathode generates electrons, which are then focused into a ray that travels through a vacuum glass tube and strikes a flat glass screen at the other end of the tube. *Id.* ¶ 21. This screen is coated with phosphor, which glows and generates an image when struck by the electron beam. *Id.*

Plaintiff states that in the early 2000s, television manufacturers began introducing flat panel, plasma display televisions to the mainstream consumer market. *Id.* ¶ 28. These televisions were thin and light enough to be mounted directly on a wall. *Id.* Plasma televisions use plasma displays, which are composed of millions of small pixels that contain electrically charged ionized gases, to generate the screen image. *Id.* ¶ 29. Each pixel is made up of three separate subpixel cells with different colored phosphors. *Id.* ¶ 30. When electricity is introduced to the plasma, the atoms become unstable and electrons and particles within the plasma begin to collide, releasing photons of ultraviolet energy. *Id.* All of the pixels acting together generate the screen image. *Id.* The pixels used in plasma displays do not require a separate light source; the image and all of the colors are generated by the interaction between the electrically charged ionized gases and the phosphor in the cells.

In the early to mid–2000s, television manufacturers began introducing flat panel, liquid crystal display ("LCD")

televisions to compete with plasma televisions. *Id.* ¶ 33. Like plasma televisions, LCD televisions are flat, reasonably light, and can be mounted on a wall. *Id.* However, LCD televisions utilize different display technology compared to plasma televisions; namely, LCD technology. *Id.* To form a liquid crystal display, a thin layer of a liquid crystalline substance is sandwiched between two substrates, which are sheets of glass or plastic to which a grid of electrodes have been applied. *Id.* ¶ 34. A vertical polarizing film is applied to the LCD's rear substrate, while patterned red, green, and blue color filters, as well as a horizontal polarizing film, are applied to the front substrate. *Id.* To generate the screen image, the liquid crystal display is lit by a separate light source because, unlike plasma displays, liquid crystals do not emit light themselves. *Id.*

An LCD television generates screen images by controlling the amount of light that passes through the liquid crystal display and strikes the color filters. *Id.* ¶ 35. Any white light source can be used to generate the screen image. *Id.* ¶ 36. Initially, all manufacturers of LCD televisions primarily used cold cathode fluorescent lights ("CCFLs") as the light source. *Id.* ¶ 37. Television manufacturers, however, continued to experiment with light sources other than CCFLs, including by using light emitting diodes ("LEDs") to light the liquid crystal display ("LED-lit LCD televisions"). *Id.* ¶ 38. However, according to Plaintiff, the introduction of a different light source did not change the manner in which the LCD panels and LCD televisions generated the screen image. *Id.*

**\*3** Best Buy introduced its first Insignia-brand LED-lit LCD television in 2009. *Id.* ¶ 39. As these LED-lit LCD televisions have become less expensive to manufacture, they have now emerged as the most popular flat-screen technology, almost completely displacing the previous generation of LCD televisions (i.e., CCFL-lit LCD televisions) within the United States. *Id.* ¶¶ 16, 39–40. Indeed, according to Plaintiff, Best Buy no longer sells Insignia televisions that use the older CCFL backlighting technology. *Id.* ¶ 50 n. 1.

More recently, television manufacturers have started producing televisions that use actual LED displays, rather than LCD displays. *Id.* ¶ 54. These LED displays are self-illuminating, require no independent light source, and do not

contain liquid crystal technology. *Id.* These televisions are known as organic LED televisions or "OLED TVs." While Best Buy does not sell an Insignia-brand OLED TV, other manufacturers sell OLED TVs at prices significantly higher than LED-lit LCD televisions. *Id.* ¶ 55 (referencing an LG 55″ OLED for $5,999.98 as compared to an Insignia 48″ LED-lit LCD TV for $399.99).

### C. Best Buy's marketing of LCD televisions

Plaintiff's Amended Complaint alleges that when LCD televisions were first introduced into the market, they were universally marketed by all television manufacturers as simply "LCD TVs," just as plasma display televisions had been advertised as "Plasma TVs." *Id.* ¶ 40. Television manufacturers did not, however, specify that these LCD televisions used CCFL backlighting or advertise them as "CCFL TVs." *Id.* After the development of LED backlighting technology for LCD televisions, many companies produced both CCFL-lit and LED-lit LCD televisions. *Id.* ¶ 42. Television manufacturers, including Best Buy, continued to market and advertise the LCD televisions with CCFL backlighting as "LCD TVs." The LCD televisions with LED backlighting, however, were initially marketed by these companies as "LED–LCD TVs" or "LED-backlit LCD TVs." *Id.* ¶¶ 40–43. Although many manufacturers trumpeted the alleged benefits of the LED backlighting, LED-lit LCD TVs did not sell well because they were priced higher than the CCFL-lit LCD TVs. *Id.* ¶ 42.

At some point, Plaintiff alleges that the majority of television manufacturers, including Best Buy, stopped using the descriptions "LED–LCD" or "LED-backlit" to describe their LCD televisions with LED backlighting. Instead, television manufacturers began marketing these televisions as simply "LED TVs." *Id.* ¶ 44. These marketing changes were made, according to Plaintiff, on Best Buy's website, product manuals, user guides, and product packaging. *Id.* For example, Plaintiff states that Best Buy's Insignia television cartons refer to the televisions as "LED TVs" but do not indicate that these televisions utilize LCD displays. *Id.* ¶ 45.

This marketing change, according to Plaintiff, had immediate and dramatic results. Specifically, before television manufacturers changed their marketing strategy, CCFL-lit LCD TVs accounted for over 97% of sales of televisions with LCD displays. *Id.* ¶ 46. Today, however, LED-lit LCD TVs are now the most popular flat-screen technology according to Plaintiffs. *Id.* Plaintiff also states that by marketing the LED-lit LCD TVs as simply an "LED TV," Best Buy was able to charge consumers a price premium for these televisions. *Id.* ¶ 59.

### D. The present litigation

**\*4** Plaintiff, a citizen of Massachusetts, purchased an Insignia-brand television (model number NS–65D260A13) for personal use on January 17, 2013 at a Best Buy store in Davners, Massachusetts. *Id.* ¶ 7. Plaintiff alleges that when he was considering purchasing this television, there were three flat panel television options advertised: "Plasma TVs," "LCD TVs," and "LED TVs." *Id.* Plaintiff claims that he chose an "LED TV" "because of and in reliance on Best Buy's marketing assertions on the carton containing the television that it was in fact an 'LED TV.' " *Id.*

Plaintiff alleges that he was misled into believing he was purchasing a television with an LED display instead of a television with a liquid crystal display like the television he actually received. *Id.* ¶ 60. Plaintiff claims that he had no knowledge that the television he purchased in fact had an LCD display, and he relied upon Best Buy's representations that the television he was purchasing had an LED display. *Id.* ¶¶ 60–61. According to Plaintiff, he would not have purchased, or he would have paid less for, his television had it not been advertised as an "LED TV." *Id.* ¶ 61.

Plaintiff's Amended Complaint asserts two causes of action. First, Plaintiff claims that Best Buy's advertising practices in calling an LED-lit LCD TV an "LED TV" violated Minnesota's Unfair Trade Practices Act (Minn.Stat. § 325D.9 *et seq.*), Minnesota's Prevention of Consumer Fraud Act ("CFA") (Minn.Stat. § 325F.68 *et seq.*), and Minnesota's Uniform Deceptive Trade Practices Act ("DTPA") (Minn.Stat. § 325D.43 *et seq.*). *Id.* ¶¶ 73–86. Second, Plaintiff claims that these advertising practices violated Massachusetts General Laws chapter 93A, sections 2 and 9. *Id.* ¶¶ 87–98.

Plaintiff purports to represent an alleged nationwide class defined as follows:

All persons who purchased, for personal use and not re-sale, within the United States within the four years (or other applicable statute of limitations period) preceding the filing of this Complaint up through any trial of this matter, an Insignia-brand LED-lit LCD television that is sold in a box that describes the television as an LED TV or LED HDTV or LED television.

*Id.* ¶ 63. Alternatively, or in addition, Plaintiff purports to represent an alleged subclass of Massachusetts residents:

All persons who purchased, for personal use and not re-sale, within the State of Massachusetts within the four years (or other applicable statute of limitations period) preceding the filing of this Complaint up through any trial of this matter, an Insignia-brand LED-lit LCD television that is sold in a box that describes the television as an LED TV or LED HDTV or LED television.

*Id.* ¶ 64. Neither of the proposed classes has been certified at this point.

Plaintiff seeks an injunction prohibiting Best Buy from advertising LED-lit LCD TVs as "LED TVs," "LED HDTVs," or "LED televisions." ECF No. 34 at 36. Plaintiff also seeks an order requiring Best Buy to (1) re-label or recall all new LED-lit LCD TVs that do not clearly state that the television is an LCD TV with LED backlighting, and (2) engage in a corrective advertising campaign that informs the public that "LED TVs" are actually LCD TVs with LED backlighting. *Id.* Finally, Plaintiff seeks monetary damages for the alleged price premium he was required to pay for the television. *Id.*

**E. Best Buy's Motion to Dismiss**

**\*5** Best Buy has now moved to dismiss Plaintiff's Amended Complaint. *See* Mot. to Dismiss, ECF No. 16. First, Best Buy argues that this Court does not have subject matter jurisdiction over certain claims made against Best Buy because Plaintiff lacks standing to (1) assert claims related to products he never purchased or advertising he never saw; (2) seek injunctive relief; and (3) assert Minnesota statutory claims. *See generally* Mem. in Supp. of Mot. to Dismiss, ECF No. 18. Additionally, Best Buy argues that (1) Plaintiff's

claims for fraud do not satisfy Rule 9(b)'s heightened pleading standard; (2) Plaintiff does not plausibly allege consumer fraud or a price premium injury; and (3) Plaintiff cannot seek damages under the DTPA because he has not properly invoked the private attorney general statute. *Id.* Plaintiff opposes this motion. *See generally* ECF No. 35. The Court addresses each of Best Buy's arguments below.

## II. STANDARD OF REVIEW

**A. Rule 12(b)(1) Motion to Dismiss**
The jurisdictional power of federal courts is defined by Article III of the Constitution. Because federal courts are not courts of general jurisdiction, the issue of subject matter jurisdiction may be raised at any time. *See* Fed.R.Civ.P. 12(b)(1); *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006) (stating that subject matter jurisdiction may never be forfeited or waived). Indeed, a federal court has a "special obligation" to satisfy itself of its own jurisdiction. *See Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986). If subject matter jurisdiction is lacking, the court must dismiss the action. *Kontrick v. Ryan,* 540 U.S. 443, 455 (2004).

A motion attacking the Court's subject matter jurisdiction is governed by Rule 12(b)(1) of the Federal Rules of Civil Procedure. A Rule 12(b)(1) motion to dismiss can either (1) attack the complaint's claim of jurisdiction on its face or (2) attack the factual basis for jurisdiction. *Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993). A facial challenge to subject-matter jurisdiction argues that factual allegations in a complaint—even if truthful—are insufficient to establish jurisdiction. *Carlson Holdings, Inc. v. NAFCO Ins. Co.,* 205 F.Supp.2d 1069, 1073 (D.Minn.2001). When analyzing a facial challenge to jurisdiction, the Court considers the pleadings alone. *Id.* In contrast, "[w]here a defendant mounts a 'factual attack' on the plaintiff's complaint, 'the court considers matters outside the pleadings and the non-moving party does not have the benefit of 12(b)(6) safeguards' in that the court may not presume the factual allegations in the plaintiff's complaint are true." *Rector v. State Farm Mut. Ins. Co.,* 392 F.Supp.2d 1069, 1071 (W.D.Mo.2005) (quoting

*Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990)).

**B. Rule 12(b)(6) Motion to Dismiss**

In analyzing the adequacy of a complaint under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those facts. *See Turner v. Holbrook,* 278 F.3d 754, 757 (8th Cir.2002). For the purpose of a motion to dismiss, facts in the complaint are assumed to be true. *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 738 (8th Cir.2002). Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions that are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. *See Neitzke v. Williams,* 490 U.S. 319, 326–27 (1989).

**\*6** To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and may not merely state legal conclusions. *Springdale Educ. Ass'n v. Springdale Sch. Dist.,* 133 F.3d 649, 651 (8th Cir.1998). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A pleading must contain enough facts to state a claim for relief that is "plausible on its face," and a claim has facial plausibility only when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 570; *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but it calls for more than a sheer possibility that a defendant has acted unlawfully. *Iqbal,* 556 U.S. at 678.

## III. LEGAL ANALYSIS

**A. Subject Matter Jurisdiction**

**1. Standing to assert claims for products which Plaintiff did not purchase and advertising which Plaintiff did not see.**

Best Buy first argues that this Court does not have subject matter jurisdiction over Plaintiff's claims relating to products he did not purchase and advertising he did not see or rely on. ECF No. 18 at 9. Specifically, although Plaintiff alleges that he only purchased a single model of Insignia television (model NS–65D206A13), his Complaint challenges the marketing of *all* Insignia LED televisions, including models that he never saw or purchased. *Id.* Similarly, Best Buy argues that although Plaintiff alleges that he only relied on Best Buy's marketing assertions on the carton of the television that he purchased, *see* ECF No. 34 ¶¶ 7, 61, Plaintiff purports to challenge advertising statements in a variety of marketing materials that he did not see, including Best Buy's website and online videos, product manuals, newspaper and magazine advertisements, and point-of-sale display materials. ECF No. 34 ¶¶ 44–51. According to Best Buy, Article III of the U.S. Constitution does not allow Plaintiff to assert claims based on products he never purchased and advertisements that he never saw or relied upon. ECF No. 18 at 9.

In response, Plaintiff claims that the different models of Insignia televisions are not different products, but essentially different sizes of the same product. ECF No. 35 at 7. Additionally, Plaintiff asserts that purchasers in false advertising cases have standing to represent other purchasers of similar or related protects who were victimized by the same false advertising and labeling. *Id.*

"A plaintiff has the burden of establishing subject matter jurisdiction, for which standing is a prerequisite." *Jones v. Gale,* 470 F.3d 1261, 1265 (8th Cir.2006). As explained by the Eighth Circuit:

> To establish standing, a plaintiff is required to show that he or she had "suffered an injury in fact, meaning that the injury is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Second, the injury must be traceable to the defendant's challenged action. Third, it must be "likely" rather than "speculative" that a favorable decision will redress the injury.

**\*7** *Id.* (quoting *S.D. Farm Bureau, Inc. v. Hazeltin,* 340 F.3d 583, 591 (8th Cir.2003)).

Best Buy relies on *Chin v. General Mills, Inc.,* No. 12–2150 (MJD/TNL), 2013 WL 2420455 (D. Minn. June 3, 2013), to

support its claim that Plaintiff lacks standing to assert claims for products he never purchased or advertising he never saw or relied on. ECF No. 18 at 11. In *Chin*, the plaintiffs filed a putative class action against General Mills claiming that although General Mills marketed its Nature Valley granola bars as "100% natural," these products were not "natural" because they contained high fructose corn syrup, high maltose corn syrup, and Maltodextrin. 2013 WL 2420455, at *1. The complaint alleged, among other things, that this marketing practice violated Minnesota's consumer protection laws, New York's unfair and deceptive business practices law, New York's false advertising law, and New Jersey's consumer fraud act. *Id.* at *2. Plaintiffs sought to represent a class of "all persons in the United States who ... purchased Nature Valley products that contained high fructose corn syrup or high maltose corn syrup or Maltodextrin and were packaged, labeled, marketed, or advertised as being '100% Natural.' " *Id.*

General Mills produced, marketed, and sold the following Nature Valley products: "Protein Chewy Bars," "Chewy Trail Mix Granola Bars," "Yogurt Chewy Granola Bars," "Sweet & Salty Nut Granola Bars," and "Granola Thins." *Id.* at *1. General Mills filed a motion to dismiss for lack of standing, arguing that the court did not have subject matter jurisdiction over claims relating to Nature Valley products the plaintiffs did not purchase. *Id.* Specifically, General Mills maintained that the plaintiffs lacked Article III standing to seek relief for the alleged false representations made on "Protein Chewy Bars" and "Yogurt Chewy Granola Bars" because nowhere in the complaint had the plaintiffs alleged that they ever purchased these products. *Id.* at *3. Finding that none of the named plaintiffs purchased the "Protein Chewy Bars" or "Yogurt Chewy Granola Bars," the court agreed with General Mills and held that plaintiffs lacked standing to assert claims relating to these two types of Nature Valley granola bars. *Id.* In doing so, the court stated, "The named plaintiffs in a class action may not rely on injuries that the putative class may have suffered, but instead must allege that they personally have been injured." *Id.* (citing *Lewis v. Casey,* 518 U.S. 343, 357 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.");

*Thunander v. Uponor, Inc.,* 887 F.Supp.2d 850, 863 (D.Minn.2012) ("A class representative must have standing to assert claims on his or her own behalf in order to have standing to assert claims as a class representative.")).Therefore, the court dismissed all counts of the plaintiffs' complaint to the extent the plaintiffs sought relief relating to "Protein Chewy Bars" and "Yogurt Chewy Granola Bars." *Id.* at *4.

**\*8** The Court finds *Chin* directly applicable to the present case. Here, Plaintiff seeks to represent a nationwide class defined as "all persons who purchased, for personal use and not for re-sale, ... an Insignia-brand LED-lit LCD television that is sold in a box that describes the television as an LED TV or LED HDTV or LED television." ECF No. 43 ¶ 63. In other words, Plaintiff seeks to challenge Best Buy's marketing practice on *all* Insignia-brand LED-lit LCD televisions, even though Plaintiff admits that he only purchased one single model of television.

Plaintiff argues that *Chin* is distinguishable from the present case because different models of a television are not separate products, but "basically different sizes of the same product." ECF No. 35. The Court disagrees. Specifications other than simply screen size differ between television models. For example, LED-lit LCD televisions have many specifications that vary from model to model, such as screen resolution (e.g., 720p or 1080p), refresh rate (e.g., 60hz or 120hz), contrast ratio, whether a television can connect to the internet (i.e., a "Smart TV"), or whether the television offers three-dimensional support (i.e., a "3D TV"). Indeed, Plaintiff acknowledges in his Amended Complaint that televisions have a "plethora" of output specifications (e.g., contrast, refresh rate, color space). ECF No. 34 ¶ 58. Therefore, this Court finds that there are many more distinguishing characteristics between models of televisions than simply size as Plaintiff claims.

Plaintiff additionally argues that unlike *Chin,* the alleged claims of misrepresentation and false advertising applies to the "essential nature and identity" of a television, rather than to some "peripheral aspect" of the product. ECF No. 35. However, the Court finds no real distinction between marketing an LED-lit LCD television as an "LED TV" and marketing a granola bar that contains high fructose corn syrup as a "100% Natural" granola bar. Both representations

affect what type of product the consumer believes he or she is purchasing; namely, the type of television or the type of granola bar. Thus, Plaintiff's attempt to distinguish *Chin* is misplaced.

Finally, Plaintiff cites multiple cases for the proposition that a class representative has standing to assert claims on behalf of the class as a whole when "there is sufficient similarity between the products purchased and not purchased." *See, e.g., Astiana v. Dreyer's Grand Ice Cream, Inc.,* No. C–11–2910, 2012 WL 2990766, at *11 (N.D.Cal. July 20, 2012); *see also* ECF No. 35 at 7–9 (citing cases). However, Plaintiff has not directed this Court to any applicable case law from either the Eighth Circuit or the District of Minnesota supporting his contention. Indeed, most of the cases cited by Plaintiff are from various federal district courts throughout California or New York. *See* ECF No. 35 at 8–9 (citing, among other cases, *Bruno v. Quten Research Inst.,* 280 F .R.D. 524 (C.D.Cal.2011); *Miller v. Ghirardelli Chocolate Co.,* 912 F.Supp.2d 861 (N.D.Cal.2012); *In re Frito–Lay N. Am. All Natural Litig.,* No. 12–md–2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013)). And, as recent as 2012, at least one federal district court in California has admitted that courts have diverged on the question of whether a named plaintiff has standing to sue on behalf of purchasers of a product that he or she did not actually purchase. *See Donohue v. Apple, Inc.,* 871 F.Supp.2d 913, 921–22 (N.D.Cal.2012). Additionally, there are numerous other courts that have decided this issue consistent with the *Chin* decision. *See, e.g., Carrea v. Dreyer's Grand Ice Cream, Inc.,* No. C–10–1044, 2011 WL 159380 (N.D.Cal. Jan. 10, 2011) (dismissing claims for products the plaintiff did not purchase for lack of standing); *Johns v. Bayer Corp.,* No. 09–cv–1935, 2010 WL 476688 (S.D.Cal. Feb. 9, 2010) (holding that the plaintiff "cannot expand the scope of his claims to include a product he did not purchase or advertisements relating to a product that he did not rely upon"); *Henry v. Perdue Farms, Inc.,* No. 11–888, 2011 WL 6002463 (D.N.J. Nov. 20, 2011) (dismissing claims with prejudice as to products that named plaintiff did not purchase); *Lieberman v. Johnson & Johnson Consumer Co.,* 865 F.Supp.2d 529 (D.N.J.2011) (same).

**\*9** Although this Court acknowledges the diverging case law from courts around the country as to the issue of whether Plaintiff has standing to assert claims for products he did not in fact purchase, the Court finds no reason to divert from this

District's reasoning in *Chin.* Accordingly, the Court concludes that Plaintiff lacks standing to assert claims on behalf of the class for televisions that he did not purchase or advertising that he did not see or rely upon. *See also Powers v. Ohio,* 499 U.S. 400, 410 (1991) ("In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."). Therefore, the Court recommends that Best Buy's motion to dismiss be granted to the extent Counts I or II seek relief relating to products Plaintiff never purchased or advertising that Plaintiff never saw or relied upon. Specifically, Plaintiff's claims should be limited to Insignia-brand televisions with the model number NS–65D260A13 and for advertising and marketing on the television box itself.

### 2. Standing to assert Minnesota statutory claims

Best Buy next argues that Plaintiff does not have standing to assert claims under Minnesota's Unfair Trade Practices Act, Prevention of Consumer Fraud Act, and Uniform Deceptive Trade Practices Act because Plaintiff did not suffer an injury in Minnesota. ECF No. 18 at 14–15. Conversely, Plaintiff maintains that he does have standing to assert claims under Minnesota state law because "Plaintiff has without question sustained an injury in fact caused by Best Buy's violation of the Minnesota statutes, which is redressable under those statutes." ECF No. 35 at 20. Plaintiff argues that the issue of whether he can assert claims under Minnesota state law is not one of standing, but whether the application of Minnesota law to claims against Best Buy on purchases that occurred outside Minnesota would violate the Due Process Clause of the U.S. Constitution. *Id.* at 21.

"[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *Insulate SB, Inc. v. Advanced Finishing Sys ., Inc.,* No. 13–2644 (ADM/SER), 2014 WL 943224, *11 (D.Minn. Mar. 11, 2014); *see also Zaycer v. Sturm Foods, Inc.,* 896 F.Supp.2d 399, 409 (D.Md.2012) (finding that plaintiff lacked standing to assert claims under the laws of states other than Maryland where plaintiff was neither harmed by the product nor purchased the product in any state other than Maryland); *In re Graphics Processing Units Antitrust Litig.,* 527 F.Supp.2d 1011, 1027 (N.D .Cal.2007); *In re Checking Account Overdraft Litig.,* 694

F.Supp.2d 1302, 1325 (S.D.Fla.2010); *In re Packaged Ice Antitrust Litig .,* 779 F.Supp.2d 642, 657 (E.D.Mich.2011); *Smith v. Lawyers Title Ins. Corp.,* No. 07–12124, 2009 WL 514210, *3 (E.D.Mich. Mar. 2, 2009); *McGuire v. BMW of N. Am., LLC,* No. 13–7356, 2014 WL 2566132, *6 (D.N.J. June 6, 2014); *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 156–58 (E.D.Pa.2009).

**\*10** Here, Plaintiff is a resident of Massachusetts, he purchased the product at issue at a Best Buy store in Massachusetts, and he supposedly relied on advertisements only in Massachusetts. ECF No. 34 ¶ 7. Plaintiff does not allege anywhere in his Amended Complaint that he suffered any injury in Minnesota. Accordingly, the Court concludes that lacks standing to bring his claims under Minnesota's consumer protection statutes. *See Jones,* 470 F.3d at 1265 (requiring that plaintiff suffer an injury in fact to have Article III standing). Thus, the Court recommends that Best Buy's motion to dismiss should be granted to the extent Plaintiff asserts claims under Minnesota's consumer protection statutes (Count I).

### 3. Standing to assert claims for injunctive relief

Next, Best Buy contends that Plaintiff lacks standing to assert his claim for injunctive relief. ECF No. 18 at 12–14. Specifically, Best Buy argues that because Plaintiff is now fully aware of what Best Buy intends the term "LED TV" to mean, there is no future harm to Plaintiff that would be obviated by the requested injunction. *Id.* at 12. Conversely, Plaintiff states that simply because he now knows that the existing television he purchased is, in actuality, an LCD television, that does not mean that he will be able to determine in the future whether Insignia televisions sold as "LED TVs" are truly LED televisions or merely LED-lit LCD televisions. ECF No. 35 at 10. In other words, Plaintiff argues that "[i]f Best Buy is not enjoined from misrepresenting its televisions in the future, then Plaintiff and the Class cannot expect to get truthful answers from Best Buy to any inquiries they make about the nature of the televisions." *Id.; see also* ECF No. 34 ¶ 60 ("Plaintiff and the other members of the Class also face threatened harm or injury in the future if Best Buy is not enjoined from continuing to misrepresent Insignia LED-backlit LCD TVs as LED TVs, because Plaintiff and the other members of the Class lack the knowledge and expertise to determine from

designations on the box whether the television inside is really an LED TV or merely an LED-backlit LCD TV, or for that matter from looking at the television itself.").

Massachusetts General Laws chapter 93A[3] explicitly allows for both the recovery of monetary damages and equitable relief. *Mass. Gen. Laws ch. 93A § 9(3)* ("In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper."). After reviewing the arguments of both parties, the Court concludes that it is premature to dismiss Plaintiff's claim for injunctive relief at this time. Plaintiff should be allowed to conduct discovery to attempt to uncover evidence showing that he may be harmed in the future by Best Buy's alleged misrepresentations. *See Gardner v. Fist Am. Title Ins. Co .,* 296 F.Supp.2d 1011, 1020 (D.Minn.2003) ("Plaintiffs must advance *record evidence* sufficient to support an inference of future harm to Plaintiffs." (emphasis in original)). Although Best Buy has cited some case law in support of its position that an injunction is not appropriate, the Court finds such cases distinguishable as they were decided at the summary judgment stage and were based on the fact that the plaintiff could not present any evidence to show he would be harmed in the future. *See, e.g., Damon v. Groteboer,* 937 F.Supp.2d 1048 (D.Minn.2013) (finding injunction not appropriate because plaintiffs did not present any "evidence that they face[d] any risk of future harm to themselves"); *Buetow v. A.L.S. Enters., Inc.,* 713 F.Supp.2d 832, 843 (D.Minn.2010) (granting summary judgment on plaintiffs' claim for injunctive relief as "there [was] no evidence indicating a risk of future harm to Plaintiffs"), *rev'd on other grounds by* 888 F.Supp.2d 956 (8th Cir.2012). Although Best Buy may have an argument that Plaintiff's claim for injunctive relief should be dismissed at the summary judgment stage if Plaintiff is unable to present any evidence that he will be harmed in the future, the Court concludes that Plaintiff has alleged sufficient facts to survive a motion to dismiss at this stage of the litigation.

**\*11** Additionally, at least one court has addressed this identical issue and denied the defendant's motion to dismiss for lack of standing. In *Pierce–Nunes v. Toshiba America Information Systems, Inc.,* No. 14–cv–7242, Dkt. No. 70 (C.D.Cal. Jan. 8, 2015), a plaintiff filed suit alleging the same basic allegations in the present case; namely, that the defendant falsely marketed and advertised its LED-lit LCD

televisions as "LED TVs." The defendant, Toshiba, brought a motion to dismiss the plaintiff's claim for injunctive relief for lack of standing, arguing that the plaintiff would not be deceived by Toshiba's marketing in the future. Like the present case, the plaintiff argued that the harm she faced was the lack of assurance that she could shop in the future without needing to second guess Toshiba's representations. The court held that the fact plaintiff discovered the deception does not render the advertising any more truthful, and found that the plaintiff could not rely on Toshiba's representations with any confidence. *Id.* at 4. Thus, the court found that plaintiff had alleged a sufficient threat of imminent injury to establish Article III standing. *Id.*

Based on the foregoing, the Court determines that it is premature to dismiss Plaintiff's claim for injunctive relief at the motion to dismiss stage, before any fact discovery has begun. Accordingly, to the extent Best Buy seeks to dismiss Plaintiff's claim for injunctive relief, the Court recommends that the motion be denied.

## B. Sufficiency of First Amended Complaint Under Rule 9 of the Federal Rules of Civil Procedure

Best Buy next argues that because Plaintiff's claims are grounded in fraud, they must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. ECF No. 18 at 16. According to Best Buy, Plaintiff's Amended Complaint fails to meet this standard. ECF No. 44 at 9–11. Contrastingly, Plaintiff argues that its Amended Complaint sufficiently complies with Rule 9(b). ECF No. 35 at 25.

Rule 9(b) states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." A pleading which alleges fraud or mistake must identify "who, what, where, when and how." *Bank of Montreal v. Avalon Capital Grp., Inc.,* 743 F.Supp.2d 1021, 1028 (D.Minn.2010) (citing *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 550 (8th Cir.1997)). "The purpose of Rule 9(b) is to provide the defendant with notice of and a meaningful opportunity to respond specifically to charges of fraudulent conduct by apprising the defendant of the claims against it and the facts upon which the claims are based." *In re Hardieplank Fiber Cement Siding Litig.,* No. 12–md–2359, 2013 WL 3717743, at *6 (D.Minn. July 15, 2013) (citing *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.,* 61

F.3d 639, 644 (8th Cir.1995)). The Court finds that this heightened pleading standard applies to Plaintiff's remaining claim under Massachusetts law. *See Hallal v. Vicis Capital Master Fund Ltd.,* No. 12–10166, 2013 WL 1192384, *14–15 (D.Mass. Feb. 25, 2013)* (applying Rule 9(b) to Mass. Gen. Laws ch. 93A).

**\*12** Plaintiff's Amended Complaint alleges: (1) Plaintiff purchased an Insignia-brand television (model number NS–65D260A13) at a Best Buy store in Danvers, Massachusetts, on January 17, 2013 (¶ 7); (2) when deciding which television to purchase, Plaintiff considered televisions advertised as "Plasma TVs," "LCD TVs," and "LED TVs" (¶ 7); (3) Plaintiff selected an " 'LED TV' model because of and in reliance on Best Buy's marketing assertions on the carton containing the television that it was an 'LED TV' " (¶ 7); (4) Plaintiff had no knowledge that the television he purchased was in fact an LCD TV (¶ 60); (5) Plaintiff relied upon Best Buy's representations on the television's carton that the television he purchased was an LED TV (¶ 61); and (6) Plaintiff lacked the knowledge and expertise to determine from designations on the box whether the television was really an LED TV or merely an LED-lit LCD TV (¶ 60). The Court finds that these allegations in Plaintiff's First Amended Complaint are not merely conclusory—rather, the allegations provide Best Buy with sufficient information as to the fraudulent conduct alleged by Plaintiff. *See Commercial Prop. Invs., Inc.,* 61 F.3d at 644 ("Because one of the main purposes of [Rule 9(b) ] is to facilitate a defendant's ability to respond to and to prepare a defense to charges of fraud, conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."). Plaintiff's Amended Complaint adequately informs Best Buy of what product Plaintiff purchased, where the product was purchased, what Plaintiff believed he was purchasing, and how Plaintiff was allegedly deceived by Best Buy's advertising. Accordingly, the Court concludes that Plaintiff's First Amended Complaint meets the heightened pleading requirement of Rule 9(b).

Therefore, to the extent Best Buy seeks to dismiss Plaintiff's First Amended Complaint for failure to satisfy Rule 9(b), the Court recommends that Best Buy's motion should be denied.

## C. Plausible Allegations of Fraud

Best Buy next argues that Plaintiff's causes of action should be dismissed under *Twombly* and *Iqbal* because "there are no plausible allegations that the 'LED TV' classification is likely to deceive a substantial portion of reasonable customers." ECF No. 18 at 18. Specifically, Best Buy claims that it is undisputed that LED-lit LCD televisions use LED technology, and that Plaintiff has failed to allege any facts that support his conclusion that consumers who purchased an "LED TV" actually believed they were purchasing something other than an LCD television with LED backlighting. *Id.* at 18–19.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a "short plain statement of the claim showing that the pleader is entitled to relief." Rule 8 does not require "detailed factual allegations," but a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*13** Massachusetts General Laws chapter 93A § 2[4] states, "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws. ch. 93A, § 2(a) (2014). Section 9 of chapter 93A permits any consumer injured by a violation of § 2 to bring a civil action for damages and for injunctive relief. *Id.* § 9(1) ("Any person ... who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two ... may bring an action in the superior court ... for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."). The Supreme Judicial Court of Massachusetts has stated that "an advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." *Aspinall v. Philip Morris Cos.,* 813 N.E.2d 476, 488 (Mass.2004). Similarly, the Massachusetts Civil Jury Instruction Guides indicate that the phrase "unfair

or deceptive" is "broad and flexible." 2 Mass. Superior Ct. Civ. Prac. Jury Inst. § 16.4.1 (citing *Commonwealth v. DeCotis,* 316 N.E.2d 748, 754 (Mass.1974)). Additionally, the guides state that "[a] 'deceptive' act or practice is simply one that has the capacity to deceive. An act or practice is deceptive if it could reasonably cause a person to act differently from the way [he/she] would act if [he/she] knew the truth about the matter." *Id.* § 16.4.2 (citing *Sargent v. Koulisas,* 560 N.E.2d 569, 571 (Mass.App.Ct.1990)). Thus, in order to survive a motion to dismiss, Plaintiff's Amended Complaint must plausibly allege that Best Buy's advertising and labeling was either unfair or deceptive.

Plaintiff alleges in his First Amended Complaint that the television Plaintiff purchased, which was manufactured and marketed by Best Buy, was falsely advertised as an "LED TV." ECF No. 34 ¶ 7. However, according to Plaintiff, these televisions were not in fact "LED TVs," but were "LCD TVs that use light emitting diodes (LEDs) instead of cold cathode fluorescent lights (CCFLs) to light the liquid crystal display (LCD) panel." *Id.* ¶ 3. As stated above, Plaintiff claims that when LCD televisions were first introduced, they used CCFL backlighting and were advertised simply as "LCD TVs," not "CCFL TVs." *Id.* ¶ 40. Additionally, when Best Buy introduced its first LCD television with LED backlighting, it advertised this as an "LED–LCD TV." *Id.* ¶ 41. This initial advertising of LED-lit LCD televisions, according to Plaintiff, was not deceptive because "no effort was made to conceal that these televisions utilized liquid crystal displays." *Id.* ¶ 43. However, due to low sales, Plaintiff alleges that Best Buy changed its marketing strategy and began advertising its LCD televisions with LED backlighting as simply an "LED TV." *Id.* ¶ 44. The cartons containing the televisions, however, did not indicate that the televisions still in fact had an LCD screen. *Id.* ¶ 45. According to Plaintiff, advertising a television as an "LCD TV" accurately describes the applicable display technology, while advertising an LCD television as an "LED TV" misleadingly identifies only the light source, thus falsely implying that LED, not LCD, is the display technology. *Id.* ¶ 50. Therefore, Plaintiff claims that "Best Buy's failure to disclose that its references to LED refer to the light source that illuminates the LCD panel, instead of the display technology itself, and its nondisclosure and concealment that each of the televisions is otherwise functionally identical to televisions that are advertised and

sold as 'LCD TVs,' were at all times knowing, intentional, and intended to mislead consumers." *Id.* ¶ 4.

**\*14** Best Buy argues that these allegations do not plausibly allege that its "LED TV" advertising would tend to deceive reasonable consumers. ECF No. 44 at 11. Additionally, Best Buy argues that although Plaintiff claims that the term "LED TV" implies to reasonable consumers that LED, not LCD, is the display technology, "Plaintiff has yet to plausibly support this claim." *Id.* at 12. Specifically, Best Buy states that Plaintiff "does not identify any contextual statements on the packaging or otherwise indicating that the term 'LED' refers to the composition of the screen and not the backlighting ... technology used to illuminate the display." *Id.* Additionally, Best Buy argues that Plaintiff's interpretation of the term "LED TV" is directly contradicted by both the television's product manual and the product web page, which both indicate that the display of an "LED TV" is an LCD panel. ECF No. 18 at 21–22.

The Court concludes that Plaintiff's Amended Complaint alleges a plausible claim that Best Buy's advertising and marketing violated Massachusetts law sufficient to survive a motion to dismiss. Accepting Plaintiff's allegations as true, Best Buy first produced an Insignia-brand television with an LCD display and CCFL backlighting and marketed it as an "LCD TV." Best Buy then produced an Insignia-brand television with an LCD display and LED backlighting and marketed it as an "LED–LCD TV." When that marketing was unsuccessful, Best Buy began advertising the same television with an LCD display and LED backlighting as an "LED TV." However, according to Plaintiff, the boxes containing the "LED TVs" did not indicate that the televisions contained therein still used a liquid crystal display. The Court finds that based on these allegations, it is plausible that Best Buy's marketing and advertising strategy had the capacity to cause a person to act differently from the way he or she otherwise would have acted. *See Aspinall,* 813 N.E.2d at 488 (stating that "an advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted."). Although Best Buy argues that no reasonable consumer could have been misled by it referring to an LED-lit LCD television as simply an "LED TV,"[5] the reasonableness of what consumers understand "LED TV" to mean is not for this Court to determine at this stage. Instead,

the Court simply considers the allegations in the Complaint to determine whether the plaintiff has plausibly alleged a claim for relief.

Therefore, to the extent Best Buy's motion seeks to dismiss Plaintiff's Complaint for failure to meet *Twombly* 's plausibility standard, the Court recommends that the motion be denied.

### F. "Price premium" injury

Finally, Best Buy argues that "Plaintiff's claims for damages should also be dismissed because he has not plausibly alleged any injury that was caused by the alleged misrepresentation." ECF No. 18 at 23. Specifically, Best Buy maintains that although Plaintiff states he and others were required to pay a "price premium" for the LED-lit LCD televisions they purchased based on the fact they were advertised as an "LED TV," Plaintiff has not offered any facts to support this claim. *Id.* at 24. The Court disagrees.

**\*15** Plaintiff's First Amended Complaint contains the following allegations of a "price premium" injury:

- "Best Buy's deceptive marketing practices have allowed it to charge a premium for the Insignia LED-lit LCD TVs that it has misrepresented as LED TVs. At all times, Best Buy's Insignia brand LED-lit LCD TVs have been priced higher than its otherwise comparable CCFL-lit LCD TVs." ECF No. 34 ¶ 59.

- "Plaintiff would not have purchased or would have paid less for his television had the television not been falsely and deceptively advertised or had he known the truth." *Id.* ¶ 61.

- "In the absence of Best Buy's deceptive advertising, Plaintiff and other consumers would instead have purchased a comparable model CCFL LCD TV from Best Buy or another manufacturer at a lower price, or would have paid less for the falsely marketed and advertised 'LED TV' Insignia brand models that they purchased from Best Buy." *Id.* ¶ 52

- "Best Buy has falsely advertised the televisions to increase sales and profits. Best Buy would not have been able to charge the premium it has charged for its

Insignia brad 'LED TVs' if it had accurately advertised them as LCD TVs or LED-lit LCD TVs." *Id.* ¶ 53.

- "Best Buy has used and continues to use this deception ... to charge a premium for such televisions that Plaintiff and other consumers would not have paid had the televisions been accurately labeled and described." *Id.* ¶ 5

- "Best Buy has perpetrated a massive consumer fraud upon thousands of unsuspecting purchasers, each of whom paid an unsupported premium for a deceptively labeled 'LED TV,' and on whose behalf Plaintiff brings this action to recover such premium and for other appropriate relief." *Id.* ¶ 6.

The Massachusetts Supreme Judicial Court discussed the appropriate measure for damages in claims arising under Massachusetts General Laws chapter 93A in *Aspinall v. Philip Morris Cos.,* 813 N.E.2d 476, 490–91 (Mass.2004). In *Aspinall,* the plaintiffs brought suit under chapter 93A, alleging that the defendant mislead the public into believing that their product, Marlboro Lights, would deliver lower levels of tar and nicotine compared to other cigarettes. *Id.* at 479. As to damages, the plaintiffs alleged that "as a result of the defendants' deceptive advertising, all consumers of Marlboro Lights in Massachusetts paid more for the cigarettes than they would have otherwise paid." *Id.* at 490. The plaintiffs expected to offer proof at trial that the amount that all purchasers of Marlboro Lights paid for the cigarettes exceeded their true market value (i.e ., what purchasers would have paid had they known the truth). *Id.* Thus, the plaintiffs argued that "the correct model for measuring actual damages is the difference between the price paid by the consumers and the true market value of the 'misrepresent[ed]' cigarettes they actually received." *Id.* The Massachusetts Supreme Judicial Court agreed that these "benefit of the bargain" damages, if proved with reasonable certainty, would be appropriate in that case. *Id.* Additionally, the court acknowledged that even if plaintiffs were unsuccessful in their attempt to prove actual damages, they would still be entitled to recover statutory damages. *Id.* at 490–91 (citing Mass. Gen. Laws ch. 93A § 9(3) ("[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater....")).

**\*16** The Court finds that the damages alleged by Plaintiff in the present case are essentially the same as those alleged in *Aspinall* . Plaintiff's First Amended Complaint makes clear that as a result of Best Buy's alleged deceptive advertising, Plaintiff claims he paid more for his television than he otherwise would have paid. Thus, Plaintiff seeks to receive the difference between the price consumers paid for the alleged falsely advertised televisions and the true market value of the television he actually received.

Best Buy argues that Plaintiff cannot plausibly support his price premium injury claim because Plaintiff makes no allegations that either (1) the Insignia-brand televisions with the "LED TV" labeling were priced any higher than comparable LED-lit LCD televisions that did not have the accused deceptive labeling or (2) that Best Buy's switch from the "accurate" "LED-lit LCD TV" labeling to "LED TV" labeling inflated the prices being charged for those products. ECF No. 18 at 25. In other words, Best Buy claims that Plaintiff cannot plausibly allege any injury because the price Best Buy charged for its LED-lit LCD televisions was the same both prior to and after it began its allegedly deceptive marketing practice. *Id.* Additionally, Best Buy contends that Plaintiff's price premium injury compares apples to oranges; namely, it compares the prices of LED-lit LCD televisions with CCFL-lit LCD televisions. *Id.* These products, however, are different according to Best Buy, and thus the difference in price between the two products has nothing to do with the complained of "LED TV" marketing. *Id.*

What Best Buy fails to realize, however, is that Plaintiff's argument is not simply that Best Buy was able to charge a higher price for its televisions after it began its allegedly deceptive advertising and marketing, but rather that this deceptive advertising allowed Best Buy to convince the general public that these LED-lit LCD televisions had a higher market value than they really did. Indeed, Plaintiff explicitly contends in his Amended Complaint that "[t]here is nothing about LED-lit LCD TVs that renders them inherently superior (or inferior) to CCFL-lit LCD TVs." ECF No. 34 ¶ 58. Plaintiff specifically alleges that although Best Buy was unable to sell very many LED-lit LCD televisions prior to the allegedly deceptive advertising and marketing, Best Buy's sales of these televisions dramatically increased after Best Buy began its allegedly deceptive marketing. *Id.* ¶¶ 43–46. In other words, although the price for the Insignia-

Ferrari v. Best Buy Co., Inc., Not Reported in F.Supp.3d (2015)

brand LED-lit LCD televisions may not have increased after the allegedly deceptive marketing began, Plaintiff contends its market value was something below the price Best Buy was charging to begin with. According to Plaintiff, the deceptive advertising allowed Best Buy to begin selling a multitude of LED-lit LCD televisions at a price higher than it would have been able to had it not engaged in the allegedly deceptive marketing. Under Chapter 93A, if Plaintiff's allegations prove to be true, Plaintiff is entitled to recover the difference between the price he paid and the true market value of the television.

**\*17** The Court finds that Plaintiff's Amended Complaint adequately alleges a price premium injury; specifically, that he paid more for the television than it was actually worth. Whether Plaintiff will ultimately be successful in proving actual damages, however, is a matter for the fact finder, not the Court at the motion to dismiss stage. Accordingly, to the extent Best Buy seeks to dismiss Plaintiff's Amended Complaint for failing to state an injury that was caused by Best Buy's alleged misrepresentations, the Court recommends that the motion should be denied.[6]

### IV. RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Best Buy's motion to dismiss (ECF No. 16) be **GRANTED in part** and **DENIED in part** as follows:

1. To the extent Best Buy seeks to dismiss Plaintiff's claims under the Minnesota Unfair Trade Practices Act, the Minnesota Prevention of Consumer Fraud Act, and the Minnesota Uniform Deceptive Trade Practices Act (Plaintiff's First Cause of Action), the motion should be **GRANTED** and Plaintiff's claims be **DISMISSED WITHOUT PREJUDICE** for lack of standing.

2. To the extent Best Buy seeks to dismiss all of Plaintiff's claims for products he did not purchase and advertising he did not see, the motion should be **GRANTED** and Plaintiff's claims be **DISMISSED WITHOUT PREJUDICE** for lack of standing. Specifically, Plaintiff's claims should be limited

to televisions with the model number NS–65D260A13 and for advertising and marketing on the television box itself.

3. To the extent Best Buy seeks to dismiss Plaintiff's claim for injunctive relief, the motion should be **DENIED.**

4. To the extent Best Buy seeks to dismiss Plaintiff's claims for failure to adequately plead allegations of fraud, the motion should be **DENIED.**

5. To the extent Best Buy seeks to dismiss Plaintiff's claims for failing to plausibly allege a price premium injury, the motion should be **DENIED.**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 2242128

Ferrari v. Best Buy Co., Inc., Not Reported in F.Supp.3d (2015)

---

### Footnotes

1    "Insignia" is Best Buy's in-house brand of electronics.

2    This section pertaining to the history of television display technology is derived from the information provided by Plaintiff's Amended Complaint. The Court includes this information for purposes of deciding Best Buy's motion to dismiss, but makes no findings as to the scientific accuracy of the technology described by Plaintiff.

3    Because the Court has determined that Plaintiff does not have standing to assert his claims under Minnesota law, the Court declines to address Best Buy's arguments regarding standing to assert a claim for injunctive relief under Minnesota law.

4    The Court only addresses Plaintiff's claims under Massachusetts law as it previously concluded that Plaintiff's claims under Minnesota law should be dismissed.

5    The main basis for Best Buy's claim that no reasonable consumer could have understood an "LED TV" to mean a television with an LED display (rather than a liquid crystal display) is because the television's product manual and an online video on the television's web page specifically stated that the display was LCD. ECF No. 18 at 21. However, these advertising forms are not at issue because Plaintiff did not allege that he ever saw or relied on those advertisements. Because claims based on advertisements Plaintiff did not see were dismissed in Part A of this Report and Recommendation, the Court only considers advertisements Plaintiff actually saw or relied upon; namely, those advertisements on the television's carton. Nothing on the television's carton indicated that the display was LCD.

6    Although Best Buy also makes an argument in its briefing that Plaintiff's Minnesota DTPA claim should be dismissed because Plaintiff did not properly invoke the private attorney general statute, *see* ECF No. 18 at 33, this Court declines to address the argument as the Court has recommended dismissing all of Plaintiff's Minnesota statutory claims for lack of standing.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 943224

United States District Court, D. Minnesota.

INSULATE SB, INC., Plaintiff,

v.

ADVANCED FINISHING SYSTEMS, INC.; Airtech Spray Systems; Barnhardt Manufacturing Company; C.H. Reed, Inc.; C.J. Spray Inc.; Coast Industrial Systems, Inc.; Coatings Holdings, Ltd.; Demilec (USA), LLC; Dove Equipment Co., Inc.; Endisys Fluid Delivery Systems; Golden State Paint Corporation; Graco, Inc.; Graco Minnesota, Inc.; Jack De Mita; Intech Equipment & Supply, LLC; Marco Group International, Inc. (Marco); MCC Equipment & Service Center; Specialty Products, Inc.; Spray Foam Nation (registered under Energy Independence Inc.); Spray Foam Systems, LLC; Spray–Quip, Inc.; and Ultimate Linings, Ltd., Defendants.

Civil No. 13–2664 ADM/SER.
|
Signed March 11, 2014.

**Attorneys and Law Firms**

Christopher A. Nedeau, Esq., Veronica L. Harris, Esq., and Natasha Saggar Sheth, Esq., Nossaman LLP, San Francisco, CA, and Richard A. Lockridge, Esq., Karen H. Riebel, Esq., and Eric N. Linsk, Esq., Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, on behalf of Plaintiff Insulate SB, Inc.

Stephen P. Safranski, Esq., Anne M. Lockner, Esq., Kellie Lerner, Esq., George D. Carroll, Esq., and Mahesha P. Subbaraman, Esq., Robins Kaplan, Miller & Ciresi, LLP, Minneapolis, MN, on behalf of Defendants Graco Inc., and Graco Minnesota Inc.

Lewis A. Remele, Jr., Esq., and Christopher R. Morris, Esq., Bassford Remele P.A., Minneapolis, MN, on behalf of Defendants Advanced Finishing Systems, Inc.; Airtech Spray Systems; C.H. Reed, Inc.; C.J. Spray Inc.; Coast Industrial Systems, Inc.; Coatings Holdings, Ltd.; Demilec (USA), LLC; Engineered Distribution Specialties, LLC (identified in the Complaint as Endisys Fluid Delivery Systems); Golden State Paint Corp.; Intech Equipment & Supply, LLC; Marco Group International, Inc.; MCC Equipment & Service Center; Specialty Products, Inc.; Spray Foam Systems, LLC; Spray–Quip, Inc.; and Ultimate Linings, Ltd.

Elizabeth M. Sorenson Brotten, Esq., Foley & Mansfield, PLLP, Minneapolis, MN; and Jeanne Welch Sopher, Esq., and Kevin M. Ward, Esq., Rawle & Henderson LLP, Pittsburgh, PA, on behalf of Defendant Barnhardt Manufacturing Company.

Barry A. O'Neil, Esq., Lommen, Abdo, Cole, King & Stageberg, PA, Minneapolis, MN; and L. Pahl Zinn, Esq., Dickinson Wright PLLC, Detroit, MI, on behalf of Defendant Spray Foam Nation.

**MEMORANDUM OPINION AND ORDER**

ANN D. MONTGOMERY, District Judge.

# I. INTRODUCTION

**\*1** On December 17, 2013, the undersigned United States District Judge heard oral argument on Defendants Graco, Inc. and Graco Minnesota, Inc.'s (collectively "Graco") Motion to Dismiss [Docket No. 211] and Motion to Stay Discovery [Docket No. 232], Distributor Defendants' Motions to Dismiss [Docket Nos. 224 and 241],[1] and Plaintiff Insulate SB, Inc.'s ("Insulate") Motion for Expedited Discovery [Docket No. 254]. For the reasons set forth below, Graco and the Distributor Defendants' motions to dismiss are granted and the parties' discovery motions are denied as moot.

# II. BACKGROUND[2]

This is a putative antitrust class action against Graco, a manufacturer of fast-set equipment used to install foam insulation, and against dozens of Graco's alleged distributors (the "Distributor Defendants").[3] Insulate alleges Graco

acquired two of its closest competitors in the fast-set equipment market to gain significant market share and eliminate competition, which allowed Graco to raise the prices of its fast-set equipment products and reduce product options after the acquisitions. Compl. [Docket No. 1] ¶¶ 156, 160–61. Insulate also alleges Graco and the Distributor Defendants conspired with each other to exclude new entrants into the fast-set equipment market by entering into exclusivity agreements, boycotting competing products, vertically fixing prices, and controlling geographic distribution areas. *Id.* ¶¶ 9–10, 95–96, 104–05, 110–12, 171. Claiming violations of federal and state antitrust laws and state consumer protection statutes, Insulate seeks damages and injunctive relief on behalf of end users who purchased fast-set equipment from Graco or one of its Distributors during the Class Period.[4] *Id.* ¶¶ 1, 187, 198–283.

## A. The Parties

Graco is incorporated in Minnesota and manufactures fast-set equipment. *Id.* ¶¶ 4, 38. Fast-set equipment includes spray guns, heated hoses, and other components, and is used primarily by contractors to install spray foam insulation in residential and commercial buildings. *Id.* ¶¶ 4, 56–58. The sale of fast-set equipment to end users occurs almost exclusively through specialized distributors who act as intermediaries between the manufacturer and contractors. *Id.* ¶ 63. The Distributor Defendants sold fast-set equipment during the Class Period. *Id.* ¶¶ 21–37, 39–52. Insulate is a fast-set contractor incorporated in California. *Id.* ¶ 20. Insulate purchased fast-set equipment from Distributor Defendant Intech Equipment & Supply, LLC, an Arizona corporation. *Id.* ¶¶ 20, 41. Insulate alleges it was force to pay higher prices as a result of the Defendants' conduct. *Id.* ¶ 20.

## B. Graco's 2005 and 2008 Acquisitions of Fast–Set Equipment Manufacturers

In February of 2005, Graco purchased Gusmer Corporation ("Gusmer"), the world's largest manufacturer of fast-set equipment, from PMC Global, Inc. ("PMC") for $65 million. *Id.* ¶¶ 148–49. Following the acquisition, Graco closed Gusmer's fast-set equipment manufacturing facilities. *Id.* ¶ 151. Graco's acquisition of Gusmer caused the Gusmer line of products to become obsolete. *Id.* ¶ 160. "This forced

buyers, many begrudgingly, to switch to the more expensive corresponding Graco models." *Id.* ¶ 161.

**\*2** In February of 2008, Graco purchased GlasCraft, the only other competing manufacturer of fast-set equipment, for $35 million. *Id* . ¶¶ 152, 155. Following the GlasCraft acquisition, Graco closed GlasCraft's fast-set equipment manufacturing facilities. *Id.* ¶ 151.

## C. Defendants' Alleged Conspiracies to Boycott and Exclude Competition

The Complaint alleges "[u]pon information and belief" that after acquiring Gusmer in 2005, Graco agreed with each of its Distributors to exclude new entrants from the fast-set equipment market. *Id.* ¶ 104. The Complaint further alleges that, "[u]pon information and belief, the Distributors collectively agreed to and conspire [sic] with one another to exclude new entrants" from the fast-set equipment market. *Id.* ¶ 105. This allegation is based on the theory that "[t]he Distributors were economically motivated to join and enforce the conspiracy to exclude new entrants in the [fast-set equipment] market, because the conspiracy enabled Distributors to: charge Contractors anticompetitive prices for fast-set equipment, and control geographic distribution areas and exclude new distributors from such areas, who might be willing to sell new entrants' products." *Id.* ¶ 112.

## D. PMC and Former Gusmer Employees' 2007 Reentry Into Market; Graco's Reaffirmation of Boycott

In 2007, former owners and employees of Gusmer, operating through PMC, Garraf Maquinaria S.A. ("Garraf"), and Gama Machinery USA, Inc. ("Gama") sought to reenter the fast-set equipment market. *Id.* ¶ 99. Graco allegedly viewed Gama and PMC as a threat to its monopoly power in the fast-set equipment market, and sought the advice of unidentified "key Distributors" to determine "how best to reinforce the Distributors' individual and collective agreements" to exclude new entrants from the market. *Id.* ¶ 102, 114. Following this alleged consultation, Graco sent a letter to Distributors in October 2007 (the "October 2007 Letter"). The Complaint avers the October 2007 Letter was a reminder to Distributors of the consequences that would befall them if they did not continue to abide by their exclusivity

agreements with Graco. *Id.* ¶ 115. The October 2007 Letter stated in relevant part:

> It is our opinion that taking on an additional competitive product line may significantly reduce the "best efforts" of a Graco distributor to sell our Graco and Gusmer product lines. Graco realizes that a business owner must make independent decisions regarding product lines competitive to Graco and Gusmer product offerings. Graco makes similar independent business decisions regarding the addition of new distributors in a given geographic area.

> Should a distributor add a competitive product line, it will result in an immediate review of our business relationship and may impact access to specific products, changes in addendum status or possible elimination of our distributor agreement. If you are considering adding a Graco or Gusmer competitive equipment offering to your business, we ask that you give careful thought prior to making your final decision.

> **\*3** This position has been adopted by us unilaterally.

*Id.; Graco Inc. v. PMC Global, Inc.,* Civ. No. 08–1304 (D.N.J.) at Gama Countercl. [D.N.J. Docket No. 23] Ex. 2.

### E. Graco's 2008 Litigation with PMC, Garaf, and Gama

In March of 2008, Graco filed a federal lawsuit in New Jersey against PMC, Garraf, and Gama alleging theft of trade secrets and breach of contract. *Id.* ¶ 101, *Graco Inc. v. PMC Global, Inc .,* Civ. No. 08–1304 (D.N.J.) at Compl. ("Graco Compl.") [D.N.J. Docket No. 1]. Graco alleged that PMC and the former Gusmer employees working with PMC unfairly exploited Graco intellectual property and goodwill that had been sold to Graco. Graco Compl. ¶¶ 47, 58–86. On June 30, 2008, Gama responded to Graco's Complaint and asserted antitrust counterclaims (the "Gama Counterclaim") against Graco. Gama alleged a scheme by Graco to exclude competition in the fast-set market, and also accused Graco of exclusive dealing, monopolization, and conspiracy to monopolize. Gama Countercl. ¶¶ 1, 3. Gama attached the October 2007 Letter as an exhibit to its publicly-filed Counterclaim. *Id.* Ex. 2.

### F. FTC's 2013 Complaint, Consent Decree, and Order

After the litigation in New Jersey began, the Federal Trade Commission ("FTC") initiated an investigation of Graco's alleged anticompetitive conduct. *See Matter of Graco, Inc.,* http://www.ftc.gov/os/caselist/1010215/index.shtm. On April 17, 2013, the FTC filed a complaint against Graco, alleging Graco violated antitrust laws by acquiring Gusmer and GlasCraft, raising prices for fast-set equipment products, reducing product options, and raising barriers to market entry for manufacturers seeking to compete with Graco. Compl. ¶ 6. On the same day the FTC filed the complaint against Graco, the FTC entered into a Consent Agreement with Graco. *Id.* ¶ 8. The FTC also issued a Decision and Order ("FTC Order") that remains effective until April 17, 2023 and requires Graco "to cease and desist from inviting, entering into, and implementing exclusivity policies with its distributors." *Id* .

Simultaneously, Graco entered into a settlement agreement to resolve the litigation with PMC, Gama and others. *Matter of Graco,* http://www.ftc.gov/ sites/default/files/documents/cases/2013/04/130418gracodo. pdf at 5. The settlement was incorporated into the FTC Order and requires PMC to purchase licenses from Graco for PMC's use of the Gusmer intellectual property that Graco acquired in 2005. *Id.* at 4, App. C.

Insulate alleges it did not discover Graco and the Distributor Defendants' anticompetetive and conspiratorial conduct until the FTC filed its complaint against Graco in April 2013. Compl. ¶ 176.

### G. Insulate's June 2013 Complaint Against Graco and Distributors

On June 14, 2013, Insulate filed this antitrust lawsuit against Graco and 32 of its alleged distributors. The Complaint alleges Graco and the Distributor Defendants violated Section 1 of the Sherman Act by entering into a vertical retail price-fixing and market allocation conspiracy (Count I) and by using exclusionary contracts and other conduct to eliminate and bar new market entrants (Count II). The Complaint also alleges Graco violated Section 2 of the Sherman Act by monopolizing the fast-set equipment market (Count III), and that all Defendants violated this provision by conspiring to acquire, maintain, and enhance Graco's

monopoly power (Count IV). The Complaint further alleges all Defendants violated Section 3 of the Clayton Act by using exclusionary contracts to substantially lessen competition (Count V), and that Graco violated Section 7 of the Clayton Act by unlawfully acquiring Gusmer and GlasCraft (Count VI). Finally, the Complaint asserts claims against all Defendants under 22 state antitrust laws and Puerto Rico's antitrust law (Count VII), and under 11 state consumer protection laws (Count VIII). Insulate seeks damages, treble damages, and injunctive relief. The requested injunctive relief proposes: (1) prohibiting Defendants from continuing to exclusively deal with one another; (2) requiring Distributors to sell 25% non-Graco fast-set equipment; and (3) divesting Graco of its fast-set equipment business.

**\*4** Graco and the Distributor Defendants move for dismissal of the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Graco also moves to stay discovery, and Insulate moves to expedite discovery.

### III. DISCUSSION

#### A. Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure states that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The court construes the pleadings in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm, 15 F.3d at 112.

Working in combination with Rule 8, Rule 12 requires the plaintiff's factual allegations to "raise a right to relief above the speculative level," and push claims "across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). In other words, the complaint must establish more than a "sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). However, a court "must not presume the truth of legal conclusions couched as factual allegations," and should

"dismiss complaints based on 'labels and conclusions, and a formulaic recitation of the elements of a cause of action.' " Hager v. Ark. Dept. of Health, 735 F.3d 1009, 1013 (8th Cir.2013) (quoting, in part, Twombly, 550 U.S. at 555); see also Retro TV Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 769 (8th Cir.2012) ("Conclusory statements and naked assertion[s] devoid of further factual enhancement are insufficient.") (quotations and alterations omitted).

In ruling on a motion to dismiss, a district court "generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999) (internal quotations and citations omitted); see also Stahl v. U.S. Dep't of Agric., 327 F.3d 697, 700 (8th Cir.2003) (stating a court may consider public records and matters referenced in the complaint in ruling on a motion to dismiss).

#### B. Federal Anti-trust Claims

##### 1. Statute of Limitations

Graco and the Distributor Defendants seek dismissal of the federal antitrust claims, arguing inter alia that the claims for damages under the Sherman Act and Clayton Act are time-barred. "Federal antitrust causes of action are governed by a four-year limitations period." Varner v. Peterson Farms, 371 F.3d 1011, 1019 (8th Cir.2004) (citing 15 U.S.C. § 15b). "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).

**\*5** Defendants argue the acts that allegedly injured Insulate's business—thereby causing Insulate's claims to accrue and the limitations period to commence—were committed before June 14, 2009, which is four years before Insulate's filing of the Complaint on June 14, 2013. Specifically, Defendants' entry into vertical price-fixing and market allocation conspiracies, as alleged in Count I, began "at least as early as 2005." Compl. ¶ 199. Defendants' entry into exclusionary contracts or agreements, as alleged in Counts II, and V, occurred sometime prior to October of 2007, because Graco's

alleged purpose in sending the October 2007 Letter was to "remind" Distributors of the consequences of not abiding by the agreements. Compl. ¶ 115. Graco's monopolization of the fast-set equipment market, as alleged in Count III, occurred when Graco acquired Gusmer and GlasCraft in 2005 and 2008, respectively. *Id.* ¶¶ 148–56. The conspiracy among all Defendants to maintain Graco's monopoly power, as alleged in Count IV, began before Gama attempted to reenter the fast-set equipment market in 2007. *Id.* ¶ 223. Defendants thus contend the limitations period has expired and the claims must be dismissed.

Insulate argues the federal anti-trust claims are not time-barred because (1) the limitations period was tolled under the fraudulent concealment doctrine, and (2) the limitations period was restarted under the continuing violations doctrine.

### a. Fraudulent Concealment

The fraudulent concealment doctrine applies if a plaintiff proves that (1) a defendant concealed the plaintiff's cause of action, (2) the plaintiff failed to discover the action, and (3) the plaintiff exercised due diligence in attempting to discover the claim. *In re Milk Prods. Antitrust Litig.,* 84 F.Supp.2d 1016, 1022 (D.Minn.1997). If these elements are met, "the limitation period begins to run from the time that the plaintiff, by the exercise of reasonable diligence, discovers or should have discovered his cause of action." *In re Bulk Popcorn Antitrust Litig.,* No. 3–89–0710, 1990 WL 123753, at *5 (D. Minn. June 19, 1990). Insulate argues Defendants prevented it from learning of the antitrust conspiracy until the FTC filed its litigation in April of 2013, and so the limitations period did not begin to run until that time.

Assuming without deciding that the first two elements of the fraudulent concealment doctrine are met, Insulate cannot prove that it exercised diligence in attempting to discover the antitrust conspiracy. A plaintiff who becomes aware of facts and activities that would "create notice and excite attention" requires inquiry on the part of the plaintiff. *Milk Prods.,* 84 F.Supp.2d at 1024. When prices are raised and competition is substantially eliminated, "[t]his fact alone would seem to excite attention and thus put [a] Plaintiff [ ] on inquiry notice." *Id.* Here, Insulate was aware of facts sufficient to excite its attention and put it on notice of its potential antitrust claims. After Graco acquired Gusmer in 2005,

Gusmer products became obsolete, prices for fast-set equipment increased, and choices for fast-set equipment declined. These facts would have drawn Insulate's attention when it became forced to "begrudgingly" switch to more expensive fast-set equipment models. Compl. ¶ 161; *see also In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1171 (8th Cir.1979) ("Those who have learned of facts calculated to excite inquiry must inquire.") (quotations omitted).

**\*6** Moreover, just as the FTC litigation put Insulate on notice of its claims in April 2013, the New Jersey litigation should have put Insulate on notice of its claims when Gama filed its Counterclaim against Graco in June of 2008. "The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice" if the litigation uncovers information that would tend to verify a plaintiff's allegations or suspicions. *Beef Indus.,* 600 F.2d at 1171. The circumstances of the New Jersey litigation sufficed to give Insulate notice of its claims back in June 2008, because the October 2007 Letter on which Insulate heavily relies to support its present claims was attached as an exhibit to Gama's publicly-filed Counterclaim. Thus, the New Jersey litigation that occurred five years before this case was filed uncovered information that would tend to verify Insulate's allegations or suspicions.

For these reasons, Insulate did not exercise due diligence in attempting to discover its antitrust claims, and the doctrine of fraudulent concealment does not apply.

### b. Continuing Violation Doctrine

Insulate next argues the federal antitrust claims are not time-barred because the statute of limitations was restarted by the continuing violation doctrine. The continuing violation doctrine provides that each overt act that is part of a violation and that injures the plaintiff starts the statutory period running again. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189 (1997). An overt act is required to restart the statute of limitations, and the limitations period runs from the date of the last overt act. *Varner,* 371 F.3d at 1019.

The elements of an overt act are: (1) a "new and independent act that is not merely a reaffirmation of a previous act," and (2) the infliction of new and accumulating injury on the plaintiff. *Id.* To qualify as a continuing violation, the new

overt act "must be more than the unabated inertial consequences of the initial violation." *Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.,* 392 F.3d 265, 269 (8th Cir.2004). Additionally, "acts that simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations." *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1052 (8th Cir.2000) (quotation omitted).

Insulate contends that Defendants' continued adherence to the conspiracy to boycott constituted continuing violations. However, if there was a conspiracy, Defendants' continued compliance would have simply reflected the unabated inertial consequences of the Defendants' alleged agreements to exclude new entrants in the fast-set equipment market. These agreements are alleged to have been reached at least as early as 2007, and Insulate has not alleged that new acts were required to maintain the unlawful arrangements. Indeed, according to the Complaint, "the threat of loss of a distributorship [was] sufficient to hold the conspiracy together." Compl. ¶ 168; *see also id.* ¶ 241 (alleging Graco's status as the sole supplier of fast-set equipment has enabled Graco "to prevent its distributors from withdrawing from the conspiracy").

**\*7** Insulate contends a February 2012 letter from Graco to Distributors "reminding them" they were not to carry the Gama product line was an overt act in furtherance of the conspiracy that started the limitations period running anew. However, the first element of an overt act expressly states that a "reaffirmation of a previous act" cannot constitute an overt act. The February 2012 letter merely reflected and reaffirmed the alleged prior agreement to eliminate new entrants such as Gama from the fast-set equipment market, and therefore did not restart the limitations period.[5]

Insulate further argues that Defendants committed an overt act each time a supra-competitive price was changed in furtherance of the price-fixing conspiracy. The analysis of whether sales at supra-competitive prices constitute a continuing violation differs depending on whether the claim is brought under the Clayton Act or the Sherman Act. With respect to a claim under Section 7 of the Clayton Act, which forbids acquisitions that substantially lessen competition or tend to create a monopoly, the Eighth Circuit has held that

post-merger sales at higher prices are not continuing violations because "such acts [are] not undertaken to further an illegal policy of merger or to maintain the merger." *Midwestern Mach.,* 392 F.3d at 271 (holding increased hub premiums charged post-merger were "not continuing violations of the Clayton Act sufficient to restart the statute of limitations"); *see also Concord Boat,* 207 F.3d at 1052 (refusing to apply continuing violation doctrine where defendant's conduct was an "unabated inertial consequence" of the initial acquisition).

With regard to the Sherman Act, the Eighth Circuit has observed that an "antitrust continuing violation occurs in a price-fixing conspiracy, actionable under Section 1 of the Sherman Act ... when conspirators continue to meet to fine-tune their cartel agreement. These meetings are overt acts that begin a new statute of limitations because they serve to further the objectives of the conspiracy." *Midwestern Mach.,* 392 F.3d at 269 (internal citation omitted). The Complaint does not include any factual allegation that the Distributor Defendants met or communicated for the purpose of "fine-tuning" or furthering the objectives of their alleged price-fixing conspiracy. Although the Complaint alleges that unidentified "key Distributors, as well as other FSE Distributors, know and communicate with each other at industry conferences and otherwise," *id.* ¶ 108, no information is provided about the conferences, who attended them, or what was discussed.

Additionally, a customer's injury resulting from a price-fixing agreement occurs when the defendants begin to charge supra-competitive prices. *In re Wholesale Grocery Prods. Antitrust Litig.,* 722 F.Supp.2d 1079, 1088–89 (D.Minn.2010). "Once customers have reason to know of the violation and their damages are sufficiently ascertainable to justify an antitrust action, the statute begins to run against them." II Phillip Areeda & Herbert Hovencamp, *Antitrust Law* ¶ 320c4 (3d ed.2007). Where a defendant's continued sales under an anticompetitive arrangement merely enforces the initial, unabated arrangement, the sales do not constitute a continuing violation. *Compare Varner,* 371 F.3d at 1020 (holding continued sales under alleged anti-competitive contracts did not restart limitations period because plaintiffs "failed to allege any new overt acts, other than enforcement of the initial contracts," that would toll the statute of limitations) *with Lomar Wholesale Grocery, Inc. v. Dieter's*

*Gourmet Foods, Inc.,* 824 F.2d 582, 588 (8th Cir.1987) (discussing Third Circuit's opinion in *Hanover Shoe, Inc. v. United Mach. Corp.,* 377 F.2d 776, 794 (3d Cir.1967), *rev'd in part,* 392 U.S. 481 (1968), and noting that defendant's conduct in *Hanover* went beyond mere continuation of lease-only policy because defendant entered into new leases when old machinery was no longer working and actively collected rentals from coerced lessees). The Complaint does not allege facts suggesting the initial price-fixing agreement was abated or that new acts beyond the initial price-fixing were required to perpetuate the agreement. Therefore, as with the alleged boycott conspiracy, the alleged price-fixing conspiracy does not constitute a continuing violation, and Insulate's federal antitrust claims are time-barred.

### 2. Failure to State Claims

**\*8** Even if the claims alleging price-fixing, market allocation, and exclusionary agreements in Counts I—V were to survive the statute of limitations challenge, the claims must nevertheless be dismissed because the Complaint fails to allege sufficient facts to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. The claim of a "vertical retail price-fixing agreement and conspiracy," alleged in Count I, rests on the conclusory statement that "Graco with each of the Distributors individually and collectively agreed to vertically fix the price of fast-set equipment," Compl. ¶ 171, and on the naked assertion that "[t]he Distributors were economically motivated to join and enforce the conspiracy to exclude new entrants in the FSE market, because the conspiracy enabled Distributors to: charge Contractors anticompetitive prices for fast-set equipment, and control geographic distribution areas and exclude new distributors from such areas, who might be willing to sell new entrants' products." *Id.* ¶ 112. The Complaint has no factual allegations identifying which Distributors charged anticompetitive prices and which Distributors controlled which geographic areas, much less conduct or communications suggesting concerted or conspiratorial action by Distributor Defendants. Thus, the bare allegations of a price-fixing conspiracy are too vague to put the Defendants on notice of the factual grounds for this claim. *See Milk Prods.,* 84 F.Supp.2d at 1020 (dismissing price-fixing claim based on vague allegations that defendant engaged in illegal pricing discussions with other defendants and unnamed co-conspirators by phone and in person,

illegally allocated customers, and illegally enforced compliance with conspiracy).

The claim that Defendants conspired to eliminate new entrants to the fast-set equipment market through the use of exclusionary contracts, as alleged in Counts II, IV, and V, also fails to state a plausible claim for relief. An exclusionary practice is not an exclusionary contract or conspiracy if the practice is "merely a unilateral or independent decision." *Quality Mercury, Inc. v. Ford Motor Co.,* 542 F.2d 466, 469 (8th Cir.1976). Here, the Complaint fails to allege facts showing more than unilateral action by Graco. Although the Complaint conclusorily alleges the Distributor Defendants conspired with Graco and each other by entering into exclusivity arrangements with Graco, the October 2007 Letter referenced in the Complaint explicitly stated that Graco had "unilaterally adopted" its exclusivity policy, and that each Distributor "must make independent decisions regarding product lines competitive to Graco and Gusmer product offerings." Additionally, given Graco's ultimatum, "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway." *Twombly,* 550 U.S. at 566. Indeed, the Complaint as much as acknowledges that each of the Distributor Defendants had an independent and individual self-interest in acquiescing to Graco's demands for exclusivity: "Incumbent distributors cannot afford to take on a new competitive product line, if they risk the loss of access to Graco's products, and new entrants cannot compensate the distributors to make such a switch." Compl. ¶ 113. The Complaint specifically recounts an instance in which a Distributor acquiesced to Graco's exclusivity policy because acquiescence was "a better decision for [the Distributor's] business." *Id.* ¶ 128. The Complaint also states that Graco's "agree[ment]" with Defendant Distributors "reduced Distributors' willingness and *ability* to carry the products of new entrants." *Id.* ¶ 95. In other words, Distributor Defendants could not carry new entrants' products even if they wanted to.

**\*9** In sum, Insulate's claims for damages under the federal antitrust laws accrued more than four years ago, and the fraudulent concealment and continuing violation doctrines do not apply to prevent the claims from being time-barred. Therefore, the claims for damages in Counts I–V are dismissed based on the statute of limitations. Additionally, to the extent they are not time-barred, the claims involving

price-fixing, market allocation, and exclusivity conspiracies and agreements in Counts I–V are dismissed based on Insulate's failure to allege sufficient facts to push the claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

### 3. Injunctive Relief

Insulate also requests injunctive relief on its federal antitrust claims. Insulate seeks an order prohibiting Graco and Distributors from continuing to deal exclusively with one another, requiring Distributors to sell 25% non-Graco fast-set equipment, and divesting Graco of its fast-set business.

Each of the three requested equitable remedies fails as a matter of law. First, Insulate's request to prohibit Graco and Distributors from continuing to deal exclusively with one another lacks merit because it duplicates the FTC Order prohibiting Graco from continuing its exclusive-dealing practices. Second, the request for a sales quota is not a reasonable remedy because "[c]ourts are ill suited to act as central planners, identifying the proper price, quantity, and other terms of dealing. No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.,* 555 U.S. 438, 452–53 (2009) (quotations and internal citations omitted).

Third, equitable principles bar the claim for divestiture. Divestiture is the "most drastic" of antitrust remedies. *Ginsburg v. InBev NV/SA,* 623 F.3d 1229, 1234 (8th Cir.2010). "Never has a federal court ordered divestiture at the request of a private party who was neither a customer nor a competitor of the merging parties." *Id.* In determining whether to impose the extreme remedy of divestiture, courts balance the potential benefit to the plaintiff against the hardship caused by forced divestiture. *Id.* at 1235. For example, in *Ginsburg,* the Eighth Circuit determined divestiture was barred as a matter of law because the challenged acquisition had occurred nearly two years earlier, and the assets and operations of the merged corporations had already been combined. *Id.* at 1235–36. The Eighth Circuit ruled that the obvious hardship that would result from a court decree splitting up the merged entities outweighed the potential benefits end users would gain from divestiture. *Id.* Similarly here, the potential benefit to end-users of fast-set equipment would be outweighed by the hardship that would result from divesting Graco of its fast-set equipment business. Graco's acquisition occurred over five years ago, and divestiture would impose obvious hardship on Graco employees and Distributors. Therefore, Insulate's claims for equitable relief in Counts I–VI are dismissed.

### C. State Law Claims

**\*10** Defendants argue that Insulate lacks standing to assert claims for alleged violations of state, other than California, antitrust and consumer-protection laws, because Insulate does not reside in those states and has not alleged suffering injury in those states. Insulate responds that the standing issue is premature because no class has yet been certified. Insulate argues class-certification issues must be decided before consideration of Article III standing.

"It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing." *In re Magnesium Oxide Antitrust Litig.,* Civ. No. 10–5943(DRD), 2011 WL 5008090, at \*7 (D.N.J. Oct. 20, 2011) (citing *Lewis v. Casey,* 518 U.S. 343, 357 (1996). However, courts differ over the question of

> whether, pre-class certification, named plaintiffs are required to establish standing for each and every claim set forth in a class action complaint, or whether it is sufficient to establish standing for a single claim because a court will determine if the named plaintiffs have standing to represent the unnamed class members seeking redress under the balance of asserted claims during the class certification process pursuant to Federal Rule of Civil Procedure 23.

*Magnesium Oxide,* 2011 WL 5008090, at \*8; *see also In re Packaged Ice Antitrust Litig.,* 779 F.Supp.2d 642, 654–58 (E.D.Mich.2011) (noting federal court split and surveying cases); *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.,* Civ. No. 12–169, 2013 WL 5503308, at \*11 (D.N.J. Oct. 2, 2013) (same).

The split among courts stems from the two Supreme Court cases of *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999).

Both cases concern global settlements of class actions, address the standing of absent class members (rather than named plaintiffs), and involve situations in which the court was simultaneously presented with class certification issues and Article III issues. *Magnesium Oxide,* 2011 WL 5008090, at *9–10; *In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143, 153–55 (E.D.Pa. July 30, 2009). In each case, the Supreme Court resolved class certification issues prior to resolving Article III standing, because the class certification issues were dispositive in those cases and thus were 'logically antecedent to the existence of Article III issues....' " *Ductile Iron,* 2013 WL 5503308, at *12 (quoting *Amchem,* 521 U.S. at 591–92).

Some courts interpret *Amchem* and Ortiz as requiring a court to defer Article III standing issues until after class certification. *See In re Grand Theft Auto Video Game Consumer Litig.,* No. 06–1739, 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006); *In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002).

Other courts read *Amchem* and Ortiz more narrowly, interpreting the cases to

> stand [only] for the proposition that, in cases where a court is presented with class certification and Article III standing issues *simultaneously,* and the class certification issues are dispositive in that they pertain to statutory standing—i.e. whether a statute authorizes a given party to sue in the first place, the certification issues are 'logically antecedent' to the standing issues and the court may therefore elect to address the certification issues first in the interest of judicial restraint.

**\*11** *Ductile Iron,* 2013 WL 5503308, at *12 (quoting *Magnesium Oxide,* 2011 WL 5008090, at *10) (alteration in original). Courts adopting this more limited interpretation require a named plaintiff to establish standing for each claim set forth in a class action when the issue is presented prior to class certification. *See, e.g., Ductile Iron,* 2013 WL 5503308, at *11 ("[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury."); *In re Graphics Processing Units Antitrust Litig.,* 527 F.Supp.2d 1011, 1026–27 (N.D.Cal.2007) (stating "standing can be addressed before

class certification" and dismissing claims under antitrust laws of states in which no named plaintiff resided; *cf. Chin v. Gen. Mills, Inc.,* Civil No. 12–2150 (MJD/TNL), 2013 WL 2420455, *3 (D. Minn. June 3, 2013) (granting Rule 12 motion to dismiss certain claims in a putative class action and noting that "other courts routinely dismiss claims in consumer class actions that attempt to seek relief relating to products that the named plaintiffs have not purchased").[6] Were a named plaintiff not required to establish Article III standing for each class action presented, "named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, [would be allowed] to embark on lengthy class discovery with respect to injuries in potentially every state in the Union." *Wellbutrin,* 260 F.R.D. at 155. This Court finds this reasoning persuasive and dismisses those claims for which Insulate cannot establish Article III standing.

"[N]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury." *Ductile Iron,* 2013 WL 5503308, at *11. Insulate is a resident of California, and has not alleged that it suffered injury in any other state. Additionally, Insulate has not identified any specific state in which wrongful conduct occurred that may be causally connected to Insulate's injury. Thus, Insulate lacks standing to assert any of the state law claims alleged in Counts VII and VIII of the Complaint with the possible exception of the California antitrust claim, Cal. Bus. & Prof.Code §§ 16700 *et seq.,* alleged in Count VII, and the claim that Defendants violated California's prohibition against unfair competition or unfair or deceptive acts or practices under Cal. Bus. Prof.Code §§ 17200 *et seq.,* alleged in Count VIII.

Furthermore, California's antitrust statute is subject to a four-year statute of limitations. Cal. Bus. & Prof.Code § 16750.1 ("Any civil action to enforce any cause of action for a violation of this chapter shall be commenced within four years after the cause of action accrued."). Thus, this claim is time-barred for the same reasons as the federal antitrust claims. *See Oliver v. 3D–3C, LLC,* No. C 11–01260 JSW, 2012 WL 1835740, at *3 (N.D.Cal. May 21, 2012) (finding plaintiff's antitrust claims under California law fell "outside the statute of limitations period for all of the same reasons applicable to its federal antitrust claims"). Therefore, Count VII is dismissed in its entirety.

**\*12** The claim in Count VIII for violation of the California Business and Professions Code § 17200 must also be dismissed. "An action based on Section 17200 'borrows' violations of other laws and treats them as unlawful practices." *Id.,* at \*4. Insulate has failed to adequately allege a violation under any other law, and thus has also failed to state a claim under § 17200. *See id.* ("Because the Court has concluded that Plaintiffs have failed to state a claim under any independent law, the Court similarly finds that Plaintiffs have failed to state a claim under Section 17200 for unlawful business practices and dismisses the claim."). Therefore, Count VIII is dismissed in its entirety.

Because Insulate has failed to allege any plausible claims for relief, this lawsuit is dismissed as to all Defendants.[7]

**D. Discovery Motions**

The parties' discovery motions are rendered moot by the dismissal of all claims in this action. Therefore, the discovery motions are denied.

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

  1. Defendants Graco, Inc. and Graco Minnesota, Inc.'s Motion to Dismiss [Docket No. 211 ] is **GRANTED;**

  2. Distributor Defendants' Motion to Dismiss [Docket No. 224] is **GRANTED;**

  3. Defendant Spray Foam Nation's Motion to Dismiss [Docket No. 241] is **GRANTED;**

  4. Defendant Graco, Inc. and Graco Minnesota, Inc.'s Motion to Stay Discovery [Docket No. 232] is **DENIED;** and

  5. Plaintiff Insulate SB, Inc.'s Motion for Expedited Discovery [Docket No. 254] is **DENIED.**

  6. All claims in Plaintiff Insulate SB, Inc.'s Complaint are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 943224, 2014-1 Trade Cases P 78,705

## Footnotes

1    The "Distributor Defendants" are all of the named defendants except Graco, Inc. and Graco Minnesota, Inc. The Distributor Defendants joining in the Motions to Dismiss are: Advanced Finishing Systems, Inc.; Airtech Spray Systems; Barnhardt Manufacturing Company; C.H. Reed, Inc.; C.J. Spray Inc.; Coast Industrial Systems, Inc.; Coatings Holdings, Ltd.; Demilec (USA), LLC; Engineered Distribution Specialties, LLC (incorrectly identified in the Complaint as Endisys Fluid Delivery Systems); Golden State Paint Corp.; Intech Equipment & Supply, LLC; Marco Group International, Inc.; MCC Equipment & Service Center; Specialty Products, Inc.; Spray Foam Nation (registered under Energy Independence Inc.); Spray Foam Systems, LLC; Spray–Quip, Inc.; and Ultimate Linings, Ltd.

2    In considering the Motions to Dismiss, the Court takes the facts alleged in the Complaint to be true. *See Hamm v. Groose,* 15 F.3d 110, 112 (8th Cir.1994).

3    Insulate initially named thirty-three distributors as defendants, but voluntarily dismissed twelve of them shortly after this case was transferred from Pennsylvania to Minnesota. *See* Notices of Voluntary Dismissal [Docket Nos. 200–210, 218].

4    The Class Period runs from "February 1, 2005, until the effects of the anticompetitive conduct end." *Id.* ¶ 187.

5    Insulate also argues that Graco instructed pro se Defendant Distributor Jack De Mita in August 2009 that he was not to support sub-distributors that also distributed the Gama product line, and that this communication by Graco was an overt act that started the limitations period anew. Pl.'s Mem. Opp. Graco Mot. Dism. [Docket No. 249] at 12. However, the August 2009 communication, which is neither mentioned in nor embraced by the pleadings, is a matter outside the record here and may not be properly considered by the Court. Moreover, even if this communication were considered, it is also a reflection and reaffirmation of the alleged prior refusal to deal.

6    The parties have not cited, nor has this Court located, any Eighth Circuit Court of Appeals decision on this issue.

7    Distributor Defendants Dove Equipment Co. and Jack De Mita did not file a motion to dismiss or join in the motions to dismiss by the other Distributor Defendants. However, the Complaint does not allege any basis to differentiate the claims asserted against them from the motion to dismiss of the other Defendants. Therefore, the claims against these additional Defendants are also dismissed based on Insulate's failure to allege plausible claims for relief.

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

797 F.3d 538
United States Court of Appeals, Eighth Circuit.

INSULATE SB, INC., Plaintiff–Appellant

v.

ADVANCED FINISHING SYSTEMS, INC.; Airtech
Spray Systems; Barnhardt Manufacturing Company;
C.H. Reed, Inc.; C.J. Spray; Coast Industrial Systems,
Inc.; Coatings Holdings, Ltd.; Demilec (USA), LLC;
Dove Equipment Co., Inc.; Endisys Fluid Delivery
Systems; Golden State Paint Corporation; Graco Inc.;
Graco Minnesota Inc.; Jack DeMita, in his individual
capacity; Intech Equipment & Supply, LLC; Marco
Group International, Inc.; MCC Equipment & Service
Center; Specialty Products, Inc.; Spray Foam Nation,
(registered under Energy Independence Inc.); Spray
Foam Systems, LLC; Spray–Quip, Inc.; Ultimate
Linings, Ltd., Defendants–Appellees.

No. 14–2561
|
Submitted: May 12, 2015.
|
Filed: Aug. 13, 2015.
|
Rehearing and Rehearing En Banc Denied Sept. 25,
2015.

**Synopsis**
**Background:** Purchaser of fast-set foam spray equipment
brought putative class action against manufacturer, its
subsidiary, and numerous distributors, alleging conspiracy in
restraint of trade, conspiracy to acquire monopoly power, use
of exclusionary contracts to lessen competition, and
violations state consumer protection laws. Defendants moved
to dismiss. The United States District Court for the District
of Minnesota, Ann D. Montgomery, J., 2014 WL 3573662,
granted the motion. Purchaser appealed.

**Holdings:** The Court of Appeals, Riley, Chief Judge, held
that:

[1] purchaser possessed antitrust standing;

[2] manufacturer did not enter into exclusive dealing contracts
with distributors;

[3] purchaser failed to allege exclusivity agreement; and

[4] purchaser failed to state claim for violation of California
unfair competition law.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss;
Motion to Dismiss for Failure to State a Claim.

West Headnotes (17)

[1]    **Antitrust and Trade Regulation**━Injury to
       Business or Property

       To bring a federal antitrust claim, a private
       plaintiff must demonstrate that he has suffered an
       antitrust injury as a result of the alleged conduct
       of the defendants. Sherman Act, § 1 et seq., 15
       U.S.C.A. § 1 et seq.

       6 Cases that cite this headnote

[2]    **Antitrust and Trade Regulation**━Injury to
       Business or Property

       An "antitrust injury," required for standing to
       bring an antitrust claim, is an injury of the type
       the antitrust laws were intended to prevent that
       flows from that which makes defendants' acts
       unlawful. Sherman Act, § 1 et seq., 15 U.S.C.A.
       § 1 et seq.

       7 Cases that cite this headnote

[3]    **Antitrust and Trade Regulation**━Indirect
       purchasers

       Purchaser of fast-set spray foam equipment
       possessed antitrust standing to bring conspiracy
       in restraint of trade claim against manufacturer
       and distributors of equipment under Sherman

Act, notwithstanding that it was an indirect purchaser, where it alleged that the manufacturer entered into a conspiracy with the distributors that were the direct purchasers. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

6 Cases that cite this headnote

[4]   **Evidence**🔑Particular Cases
**Evidence**🔑As establishing truth of facts or matters noticed in general

Court would take judicial notice of existence of prior claims against fast-set spray foam equipment manufacturer for violation of antitrust laws in subsequent unrelated antitrust action under Sherman Act by equipment purchaser; however, court would take notice only as to basic facts involved in the prior action, and not take notice as an indication that manufacturer actually engaged in anticompetitive conduct.

10 Cases that cite this headnote

[5]   **Antitrust and Trade Regulation**🔑Cartels, Combinations, Contracts, and Conspiracies in General
**Antitrust and Trade Regulation**🔑Cartels, Combinations, Contracts, and Conspiracies

To satisfy the concerted action requirement of claims under the Sherman Act for conspiracy in restraint of trade, or to acquire monopoly power, the plaintiff must demonstrate that the defendants shared a unity of purpose or a common design and understanding, or a meeting of the minds. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

10 Cases that cite this headnote

[6]   **Antitrust and Trade Regulation**🔑Cartels, Combinations, Contracts, and Conspiracies in General
**Antitrust and Trade Regulation**🔑Cartels, Combinations, Contracts, and Conspiracies

Pleading only parallel conduct or other conduct merely consistent with an agreement is not sufficient to show a conspiracy in restraint of trade or to acquire monopoly power under the

Sherman Act. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

3 Cases that cite this headnote

[7]   **Antitrust and Trade Regulation**🔑
Manufacturers
**Antitrust and Trade Regulation**🔑
Manufacturers

Fast-set spray foam equipment manufacturer did not enter into exclusive dealing contracts with distributors, as required element of equipment purchaser's claims for conspiracy in restraint of trade and conspiracy to acquire monopoly power under the Sherman Act; unilateral terms in letter sent by manufacturer, including that it would not supply distributors who carried competitors' products, without more, did not convert pre-existing distributor relationships into contracts for exclusive dealing. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

[8]   **Antitrust and Trade Regulation**🔑Conspiracy or combination

Purchaser of fast-set spray foam equipment failed to allege a concerted action between equipment manufacturer and distributors by entry into exclusivity agreements, and thus failed to state a claim for conspiracy in restraint of trade or conspiracy to acquire monopoly power that would violate the Sherman Act. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

4 Cases that cite this headnote

[9]   **Antitrust and Trade Regulation**🔑
Manufacturers

The federal antitrust laws do not restrict the long recognized right of a manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

1 Case that cites this headnote

Insulate SB, Inc. v. Advanced Finishing Systems, Inc., 797 F.3d 538 (2015)

2015-2 Trade Cases P 79,262

[10]    **Antitrust and Trade Regulation**⚖️
**Manufacturers**

For purposes of a Sherman Act claim, a manufacturer generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

2 Cases that cite this headnote

[11]    **Antitrust and Trade Regulation**⚖️
**Manufacturers**

Under the Sherman Act, a manufacturer can announce its policy in advance and refuse to deal with those who fail to comply; and a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination. Sherman Act, §§ 1, 2, 15 U.S.C.A. §§ 1, 2.

1 Case that cites this headnote

[12]    **Antitrust and Trade Regulation**⚖️Construction

Minnesota antitrust law is generally interpreted consistently with federal antitrust law. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.; M.S.A. § 325D.49 et seq.

1 Case that cites this headnote

[13]    **Antitrust and Trade Regulation**⚖️Indirect purchasers

Purchaser of fast-set spray foam equipment lacked standing to bring antitrust conspiracy claim against manufacturer and one of its distributors, where purchaser did not purchase equipment from that particular distributor. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

2 Cases that cite this headnote

[14]    **Courts**⚖️Construction of federal Constitution, statutes, and treaties

Federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.; West's Ann.Cal.Bus. & Prof.Code § 16700 et seq.

[15]    **Antitrust and Trade Regulation**⚖️
**Manufacturers, distributors, wholesalers, and retailers in general**

Fast-set spray foam equipment purchaser failed to allege conduct by manufacturer that was unlawful or unfair, and thus failed to state claim against manufacturer under California's unfair competition law. West's Ann.Cal.Bus. & Prof.Code § 17200 et seq.

[16]    **Antitrust and Trade Regulation**⚖️In general; unfairness

California's unfair competition law prohibits unfair competition, including unlawful, unfair, and fraudulent business acts. West's Ann.Cal.Bus. & Prof.Code § 17200.

[17]    **Antitrust and Trade Regulation**⚖️Businesses in General; Competitors and Competition

In the antitrust context, the word "unfair" in the California unfair competition law means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. West's Ann.Cal.Bus. & Prof.Code § 17200.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*540** Joshua P. Davis, argued, San Francisco, CA, (Richard Allen Lockridge, Karen Riebel, Kate M. Baxter–Kauf, Minneapolis, MN, Joseph R. Saveri, Ryan McEwan, John F. McLean, Patrick M. Ryan, Sean R. McTigue, San Francisco, CA, on the brief), for Plaintiff–Appellant.

Stephen Paul Safranski, argued, Minneapolis, MN, (Anne Michele Lockner, George Donald Carroll, Thomas Berndt, Christopher R. Morris, Kay Nord Hunt, Lewis Albert Remele, Jr., Minneapolis, MN, Kellie C. Lerner, New York,

N.Y., Jeanne Welch Sopher, Pittsburgh, PA, on the brief), for Defendants–Appellees.

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

**Opinion**

RILEY, Chief Judge.

Insulate SB, Inc., a purchaser of fast-set spray foam equipment (FSE), filed this antitrust class action alleging FSE manufacturer Graco Inc. and its subsidiary Graco Minnesota Inc. (Graco) and a number of FSE distributors (Distributors) (collectively, appellees) conspired to restrain trade in violation of federal antitrust law, *see* 15 U.S.C. § 1, *et seq.,* and numerous state antitrust and consumer protection laws. Insulate claims these conspiracies kept Graco's competitors out of the market, allowing Graco and the Distributors to charge artificially high prices. The district **\*541** court[1] dismissed the action on the pleadings, and with appellate jurisdiction under 28 U.S.C. § 1291, we affirm.

# I. BACKGROUND[2]

Graco manufactures FSE and sells it to distributors, who then resell on the open market to consumers like Insulate. Because there is no direct market for FSE, distributors are key to its sale. Insulate purchased FSE from defendant distributor Intech Equipment & Supply, L.L.C. and claims Graco's anticompetitive practices forced it to pay an artificially high price. In 2005, Graco purchased a competing FSE manufacturer, Gusmer Corp., thus achieving a 65% share of the North American FSE market, and in 2008, Graco purchased competitor GlasCraft, Inc., raising its market share "to above 90%."

Insulate alleges at some point "Graco agreed with its Distributors individually and collectively to enter into exclusive dealing arrangements for the purpose of keeping new and potential entrants out of the FSE market." Insulate further alleges "key Distributors" assisted Graco in advancing its anticompetitive scheme. In October 2007, Graco sent a letter to its distributors citing the "best efforts" clause in its distributor agreements and expressing its preference that distributors refrain from adding non-Graco products. The letter stated:

It is our opinion that taking on an additional competitive product line may significantly reduce the "best efforts" of a Graco distributor to sell our Graco and Gusmer product lines. Graco realizes that a business owner must make independent decisions regarding product lines competitive to Graco and Gusmer product offerings....

Should a distributor add a competitive product line, it will result in an immediate review of our business relationship and may impact access to specific products, changes in addendum status or possible elimination of our distributor agreement....

This position has been adopted by us unilaterally.

Insulate contends these distributor agreements kept potential competitor Gama Machinery USA, Inc. from entering the FSE market. In January 2009, Foampak, Inc.—a Graco distributor not named as a defendant—considered carrying Gama products but chose not to after Graco executives met with Foampak's president and threatened to end its distributorship. "Considering it a better decision for its business, Foampak acquiesced." In February 2012, Graco sent a letter to its distributors "reminding" them to not carry Gama products. Insulate alleges exclusive dealing agreements allowed Distributors to "charge Contractors anticompetitive prices for [FSE] and control geographic distribution areas and exclude new distributors from such areas."

In March 2008, Graco sued Gama alleging, among other things, theft of trade secrets, and Gama counterclaimed alleging, among other things, Graco had unilaterally monopolized the FSE market in violation of Sherman Act Section 2, 15 U.S.C. § 2.

In 2013, the United States Federal Trade Commission (FTC) also drafted a complaint against Graco accusing Graco of unlawfully acquiring its competitors in violation **\*542** of Clayton Act Section 7, *id.* § 18. Graco and the FTC entered a consent agreement which confirmed Graco would not engage in any practice "that has the purpose or effect of achieving Exclusivity with any Distributor." The consent agreement did "not constitute an admission by [Graco] that the law ha[d] been violated," and Graco emphasizes "the FTC did not allege" that Graco's activities were unlawful.

On June 14, 2013, after learning of the FTC complaint, Insulate filed the instant suit. Insulate claimed Graco and a collection of FSE distributors, through "agreements in restraint of trade," conspired to reduce competition in violation of the Sherman Act, the Clayton Act, and numerous states' antitrust and consumer protection laws. The district court granted the appellees' motions to dismiss, finding (1) Insulate's federal claims were barred by the statute of limitations; (2) Insulate had failed to state a claim on its federal causes of action; (3) Insulate, as a California resident, could not bring state law claims for states other than California; and (4) Insulate had not met the California antitrust statute of limitations and failed to state a claim under California's Unfair Competition Law.[3] Insulate appeals.

## II. DISCUSSION

### A. Federal Antitrust Claims

#### 1. Federal Antitrust Standing

[1] [2] "[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *cf. NicSand, Inc. v. 3M Co.,* 507 F.3d 442, 449 (6th Cir.2007) (en banc) (describing the doctrine of antitrust standing as more rigorous than Article III standing and explaining courts "must[ ] reject claims under [Federal Rule of Civil Procedure] 12(b)(6) when antitrust standing is missing"). To bring a federal antitrust claim, "a private plaintiff must demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants." *In re Canadian Import Antitrust Litig.,* 470 F.3d 785, 791 (8th Cir.2006). An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent ... that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). "[T]he Supreme Court [has] held that a remote or 'indirect' purchaser was not a person injured" under federal antitrust law. *In re Midwest Milk Monopolization Litig.,* 730 F.2d 528,

529 (8th Cir.1984) (citing *Ill. Brick Co. v. Illinois,* 431 U.S. 720, 735, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)).

[3] The appellees claim Insulate, as an indirect purchaser of FSE, lacks standing to bring its antitrust claims. Our court has suggested that indirect purchasers may bring an antitrust claim if they allege the direct purchasers are "party to the antitrust violation" and join the direct purchasers as defendants. *Campos v. Ticketmaster Corp.,* 140 F.3d 1166, 1170–71 & nn. 3–4 (8th Cir.1998). We now hold as much. Because Insulate's complaint alleges conspiracies between Graco and the Distributors and names the Distributors as defendants, Insulate has adequately established it has antitrust standing.

#### 2. Failure to State a Claim

The presence of antitrust standing does not answer the distinct question whether **\*543** Insulate has sufficiently stated a claim under Federal Rule of Civil Procedure 12(b)(6). *Cf. Hutterville Hutterian Brethren, Inc. v. Sveen,* 776 F.3d 547, 554 (8th Cir.2015).

[4] "We review *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(6)." *Retro Television Network, Inc. v. Luken Commc'ns, LLC,* 696 F.3d 766, 768 (8th Cir.2012).[4] "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal marks omitted).

Given "the unusually high cost of discovery in antitrust cases," *id.* at 558, 127 S.Ct. 1955, "the limited 'success of judicial supervision in checking discovery abuse[,]' and 'the threat [that] discovery expense will push cost-conscious defendants to settle even anemic cases ...,' the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage," *NicSand,* 507 F.3d at 450 (second alteration in original) (quotation omitted) (quoting *Twombly,* 550 U.S. at 559, 127 S.Ct. 1955). *Cf. In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 625–26 (7th Cir.2010) ( "When a district court by misapplying the *Twombly* standard allows a complex case of extremely

dubious merit to proceed, it bids fair to immerse the parties in the discovery swamp ... and by doing so create irrevocable as well as unjustifiable harm to the defendant.").

[5] [6] On appeal, Insulate challenges the dismissal of three federal antitrust claims: (1) conspiracy to restrain trade through the use of exclusionary agreements in violation of Sherman Act Section 1; (2) "attempt and conspiracy to" "acquire, maintain, and enhance Graco's monopoly power" in violation of Sherman Act Section 2; and (3) "use of exclusionary contracts to substantially lessen competition" in violation of Clayton Act Section 3.⁵ As relevant to this case, the critical element of each claim is concerted action—i.e., the existence of a contract or conspiracy. *See* 15 U.S.C. §§ 1, 2, 14. "[T]o satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a 'unity of purpose or a common design and understanding, or a meeting of the minds.' " *Impro Prods., Inc. v. Herrick,* 715 F.2d 1267, 1273 (8th Cir.1983) (quoting **\*544** *Am. Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)). Pleading only "parallel conduct" or other conduct "merely *consistent with* [an] agreement" is not sufficient to show a conspiracy. *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955 (emphasis added).

Insulate can satisfy the concerted action requirement by showing "two or more persons entered into either an express or implied agreement." *Impro,* 715 F.2d at 1273 (discussing Sherman Act claims); *see also* In re Wholesale Grocery Prods. Antitrust Litig., 752 F.3d 728, 734 (8th Cir.2014); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 392 (7th Cir.1984) ("In order to prevail on its [Clayton Act] section 3 claim, [the plaintiff] will have to show ... that there was an agreement, though not necessarily an explicit agreement."). Insulate claims to have pled the existence of both express anticompetitive contracts and implied exclusivity agreements. After a thorough review of the complaint, we conclude Insulate has not pled "enough factual matter (taken as true) to suggest that an agreement was made," *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955.

### a. Written Exclusivity Agreements

[7] Insulate, quoting *Insignia Systems, Inc. v. News America Marketing In–Store, Inc.,* 661 F.Supp.2d 1039, 1062

(D.Minn.2009), argues the "Appellees entered into written exclusive dealing contracts" that are " 'sufficient to establish a contract or conspiracy for the purposes of ... exclusive dealing claims.' " (Alteration in original). The complaint does not support this argument. Insulate appears to rely on Graco's 2007 letter as evidence of these "written exclusive dealing contracts." Because the complaint does not allege the Distributors signed any agreement consenting to the letter's terms or otherwise expressly agreed to its terms, there was no " 'meeting of the minds,' " *Impro,* 715 F.2d at 1273 (quoting *Am. Tobacco,* 328 U.S. at 810, 66 S.Ct. 1125), so the letter alone cannot constitute a written exclusive-dealing contract.

Insulate additionally suggests Graco and the Distributors' preexisting distributorship contracts are express contracts not to compete because, in its 2007 letter, Graco referenced the contracts' "best efforts clause." Graco's unilateral announcement of its decision not to supply distributors who also sell competing products did not transform a prior innocuous distributor agreement into a contract for exclusive dealing. *See, e.g.,* United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919) (determining a manufacturer's later request that its products not be sold below certain prices did not transform preexisting sales agreements between the manufacturer and its distributors into agreements not to compete); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1058 (8th Cir.2000) (explaining, although defendant's discount program may have created "de facto exclusive dealing arrangements," the discount agreements themselves "were not exclusive contracts").

Even though the complaint contains several conclusory references to a contract, the alleged facts do not suggest Graco entered into explicit exclusivity agreements with any of the Distributors. *See* Twombly, 550 U.S. at 555, 127 S.Ct. 1955 ("[A] plaintiff's obligation to provide the grounds of its entitlement to relief requires more than labels and conclusions." (internal marks omitted)).

### b. Implied Agreements

[8] Insulate, pointing to Graco's 2007 and 2012 letters and some distributors' resulting compliance, proposes the

"Appellees' conduct provides ... circumstantial **\*545** evidence of anticompetitive agreements."₅ However, in both the 2007 and 2012 letters, Graco simply stated its policy of not selling to distributors who also sold competitors' products.

[9] [10] [11] The federal antitrust laws "do[ ] not restrict the long recognized right of [a] manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *Colgate,* 250 U.S. at 307, 39 S.Ct. 465. Under the "*Colgate* doctrine," "[a] manufacturer ... generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761–63, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (citing *Colgate,* 250 U.S. at 307, 39 S.Ct. 465); *accord Corner Pocket of Sioux Falls, Inc. v. Video Lottery Techs., Inc.,* 123 F.3d 1107, 1111–12 (8th Cir.1997). Indeed, a "manufacturer can announce its [policy] in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination." *Monsanto,* 465 U.S. at 761, 104 S.Ct. 1464.

To allege the existence of a conspiracy adequately, Insulate must present something beyond the mere fact that Graco stated its policy and the Distributors complied. In *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Supreme Court explained that plaintiffs can prove concerted action by showing a manufacturer took some action "beyond mere announcement of his policy and the simple refusal to deal[ and] employ[ed] other means which effect adherence to his" policies. *Id.* at 44, 80 S.Ct. 503; *see, e.g., Monsanto,* 465 U.S. at 765, 104 S.Ct. 1464 (holding defendant's attempts to force its distributors to comply with its resale price policy went beyond the *Colgate* doctrine's limits); *Parke, Davis,* 362 U.S. at 33–36, 45, 80 S.Ct. 503 (deciding a company that policed the implementation of its resale price policy and individually met with each of its wholesalers and retailers to ensure compliance exceeded *Colgate* ). Yet *Colgate* protects a manufacturer who communicates a policy and then terminates distribution agreements with those who violate that policy. *See Colgate,* 250 U.S. at 307, 39 S.Ct. 465;

*Roland,* 749 F.2d at 393 ("The mere announcement of [an exclusive-dealing] policy, and the carrying out of it by canceling [a] noncomplying dealer, would not establish an agreement."); *see also, e.g., Lovett v. Gen. Motors Corp.,* 998 F.2d 575, 577, 579 (8th Cir.1993) (explaining the plaintiff's evidence that a manufacturer decreased its supply to a noncompliant distributor and told the distributor to "reconsider" its noncompliant activities was not sufficient to support the jury's finding of a conspiracy and reversing the district court's denial of judgment as a matter of law to the manufacturer).

Attempting to distinguish *Colgate,* Insulate maintains the appellees took actions to enforce their agreements that went " 'beyond [the] mere refusal to deal,' " quoting *Parke, Davis,* 362 U.S. at 44, 80 S.Ct. 503. But the complaint does not describe any conduct suggesting an agreement between Graco and the Distributors. While **\*546** the complaint makes some vague references to concerted action among "key Distributors," Insulate does not provide any factual allegations beyond the bare conclusion that there was a conspiracy. The complaint does not allege when the agreements occurred or even identify which of the distributors named as defendants—if any—are among the "key Distributors" who were party to the agreements. Without some supporting factual allegations, these conclusions are insufficient. *See Twombly,* 550 U.S. at 557, 127 S.Ct. 1955 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."); *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50–51 (2d Cir.2007) (per curiam) (dismissing plaintiff's complaint because the complaint generally recounted antitrust violations "without any specification of any particular activities by any particular defendant; it is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever" (quotation and marks omitted)); *accord Twombly,* 550 U.S. at 565 n. 10, 127 S.Ct. 1955 (doubting whether a complaint "mention[ing] no specific time, place, or person involved in the alleged conspiracies" would adequately state a claim).

The only allegations in the complaint that come close to suggesting a conspiracy are those concerning Foampak. The complaint avers Graco, after learning Foampak was considering taking on a competitive product line, flew two "top executives" to Foampak's headquarters to meet with

Foampak executives. At this meeting, Graco threatened to end Foampak's distributorship, so Foampak chose not to carry a competitive product. Insulate compares Graco's actions here to similar behavior in *Monsanto,* which the Supreme Court found exceeded the *Colgate* doctrine's limits. *See Monsanto,* 465 U.S. at 765, 104 S.Ct. 1464 (explaining Monsanto's multiple attempts to force distributor compliance with its resale price policy by threatening termination and "complain[ing] to [a] distributor's parent company" were sufficient to support the jury's finding of an agreement).

Assuming Insulate's complaint sufficiently alleges an agreement between Foampak and Graco, Insulate cannot challenge this conspiracy because it has not named Foampak as a defendant. *See Campos,* 140 F.3d at 1170–71 & nn. 3–4. The complaint does allege Foampak had "communications with fellow Distributors," broadly implying these other distributors may have been part of the alleged Graco–Foampak conspiracy. But again Insulate does not identify any other distributor by name, suggest when these communications occurred, or provide any other specific factual allegation that would create an inference that an agreement was made.[7]

Ultimately, Insulate's complaint fails sufficiently to allege concerted action. The complaint repeatedly asserts Graco and an unnamed set of distributors generally conspired to restrain trade, but these assertions are not enough. "[A] naked assertion of conspiracy ... gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and **\*547** plausibility of entitlement to relief." *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955 (internal marks omitted). Insulate has not provided the "factual enhancement" necessary to move its complaint forward.

### B. State Law Claim

#### 1. Minnesota Antitrust Claim

[12]  [13]  Insulate appeals the dismissal of its claim under the Minnesota Antitrust Law of 1971, Minn.Stat. § 325D.49 *et seq.,* contending the district court erroneously concluded Insulate, as a non-citizen of Minnesota, could not bring this claim. Assuming without deciding Insulate can bring a claim

under Minnesota antitrust law, we affirm the dismissal because Insulate failed to state its claim adequately. *See Phipps v. FDIC,* 417 F.3d 1006, 1010 (8th Cir.2005) ("We may affirm the district court's dismissal on any basis supported by the record."). Because "Minnesota antitrust law is generally interpreted consistently with federal antitrust law," *Lorix v. Crompton Corp.,* 736 N.W.2d 619, 626 (Minn.2007) (en banc), and Insulate agrees our analysis of its federal claims also applies to its Minnesota claim, Insulate's Minnesota antitrust claim also must be dismissed for failure to state a claim.[8]

#### 2. California Claims

Insulate appeals the dismissal of its California antitrust and unfair competition claims.

[14]  As with its Minnesota claim, Insulate has failed to state a claim under California's Cartwright Antitrust Act, Cal. Bus. & Prof.Code § 16700 *et seq.* "A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." *Marin Cnty. Bd. of Realtors, Inc. v. Palsson,* 16 Cal.3d 920, 130 Cal.Rptr. 1, 549 P.2d 833, 835 (1976) (in bank); *see also Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.,* 4 Cal.3d 842, 94 Cal.Rptr. 785, 484 P.2d 953, 959 (1971) (in bank) ("[F]ederal decisions interpreting section 3 [of the Clayton Act] are applicable to section 16727 [of the Cartwright Act]."). Because Insulate has not sufficiently pled a claim under federal antitrust law, Insulate also has not stated a claim under the Cartwright Act. *See, e.g., nSight, Inc. v. PeopleSoft, Inc.,* 296 Fed.Appx. 555, 557 n. 3 (9th Cir.2008) (unpublished memorandum) ("nSight's monopolization and attempted monopolization claims under the Cartwright Act fail for the same reasons as its [Sherman Act] Section 2 claim.").

[15]  [16]  Insulate similarly has failed to state a claim under California's Unfair Competition Law (UCL), Cal. Bus. & Prof.Code § 17200 *et seq.* The UCL "prohibits unfair competition, including unlawful, unfair, and fraudulent business acts." **\*548** *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937, 943

(2003). The district court found Insulate failed to state a claim under the UCL's unlawful prong because Insulate did not allege a violation of the antitrust laws. Insulate now claims the appellees engaged in both unlawful and unfair business practices.

As discussed above, Insulate has not sufficiently pled the appellees violated any antitrust law and thus has no claim under the UCL's unlawful prong. *See Davis v. HSBC Bank Nev., N.A.,* 691 F.3d 1152, 1168, 1171 (9th Cir.2012) (explaining "[t]o be 'unlawful' under the UCL, the [defendant's] advertisements must violate another 'borrowed' law" and affirming the dismissal of the plaintiff's UCL claim because he failed to plead adequately a violation of California's False Advertising Law (quoting *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 539–40 (1999))).

[17] Insulate also failed to plead a violation of the UCL's unfair prong. In the antitrust context, "the word 'unfair' ... means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel–Tech,* 83 Cal.Rptr.2d 548, 973 P.2d at 544. Here, Insulate has only pled actions consistent with Graco's "right to deal, or refuse to deal, with whomever it likes," *Monsanto,* 465 U.S. at 761, 104 S.Ct. 1464, which is not unfair conduct. *See Orchard Supply Hardware LLC v. Home Depot USA, Inc.,* 967 F.Supp.2d 1347, 1364 (N.D.Cal.2013) ("[A]cts permissible under antitrust laws 'cannot be deemed unfair under the unfair competition law,' at least not where a plaintiff alleges that the acts are unfair for the same reason it argues that they violate antitrust law." (quoting *Chavez v. Whirlpool Corp.,* 93 Cal.App.4th 363, 113 Cal.Rptr.2d 175, 184 (2001))).

## III. CONCLUSION

While "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, [it is] quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly,* 550 U.S. at 558, 127 S.Ct. 1955 (internal citation omitted). Insulate has not pled sufficient facts to allow its case to proceed to discovery. We affirm the dismissal of Insulate's claims.

**All Citations**

797 F.3d 538, 2015-2 Trade Cases P 79,262

---

### Footnotes

[1]    The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

[2]    Because this case was disposed on a motion to dismiss, we state the well-pled facts as alleged in the complaint. *See Zayed v. Assoc. Bank, N.A.,* 779 F.3d 727, 730 (8th Cir.2015).

[3]    The district court also denied Insulate's request for injunctive relief on its federal antitrust claims. We do not reach the district court's statute of limitations decisions.

[4]    On appeal, Insulate asks this court to take judicial notice of a number of documents concerning the FTC and Gama actions—including the FTC complaint and related documents, the district court's order denying summary judgment to Graco in the Gama suit, and a transcript of a deposition taken in the Gama suit*-that Insulate believes are "supportive of the plausibility of [its] claims." Federal Rule of Evidence 201(b) allows this court to take judicial notice of public documents for the purpose of noting undisputed adjudicative facts, but judicial notice is inappropriate to the extent Insulate offers these documents for the "truth of the matters within them and inferences to be drawn from them—matters which [Graco] disputes." *Kushner v. Beverly Enters.,* 317 F.3d 820, 832 (8th Cir.2003). We thus grant Insulate's motion for judicial notice of these documents to the extent we note the existence of and basic facts surrounding these actions, but we decline to consider the documents as evidence Graco actually engaged in any anticompetitive conduct alleged therein.
Insulate's motion to supplement the record is denied.

[5]    Insulate also brought a price-fixing claim against all defendants and monopolization and unlawful acquisition claims solely against Graco but has expressly abandoned these claims on appeal.

[6]    Insulate's complaint states the appellees entered into both an overarching hub-and-spoke conspiracy and multiple small conspiracies between Graco and each of its distributors. The parties dispute whether Insulate adequately alleged a hub-and-spoke conspiracy. Because we conclude Insulate's complaint does not sufficiently allege any conspiracy—whether widespread or on an individual basis—we do not reach this issue.

[7]    Insulate additionally references Graco's dealings with the FTC, suggesting we should infer Graco's wrongdoing from the FTC's investigation and consent agreement. The FTC's complaint, however, alleged Graco unlawfully acquired competitors under Clayton Act Section 7, conduct not relevant to the conspiracy claims alleged here. Further, the FTC consent agreement explicitly stated Graco had made no admission of guilt. We thus decline to presume Graco violated federal antitrust laws based on the mere existence of this settlement of a different antitrust dispute.

[8]    Minnesota law differs from federal law in one material respect: Minnesota allows indirect purchasers to sue manufacturers for antitrust violations. *See Lorix,* 736 N.W.2d at 626–27. Minnesota still imposes some "prudential limits" on antitrust plaintiffs, including a showing of proximate cause. *Id.* at 631. Assuming Insulate has alleged an anticompetitive agreement between Graco and Foampak, Insulate still lacks standing under Minnesota law to challenge this agreement because it only purchased FSE from Intech and has not pled any injury traceable to a Graco–Foampak conspiracy. To the extent Insulate alleges in its brief a Minnesota monopolization claim against Graco individually, there is nothing in the pleadings or record mentioning this claim, and we will not consider that claim for the first time on appeal. *See Horras v. Am. Capital Strategies, Ltd.,* 729 F.3d 798, 803 n. 3 (8th Cir.2013).

---

**Insulate SB, Inc. v. Advanced Finishing Systems, Inc., 797 F.3d 538 (2015)**

2015-2 Trade Cases P 79,262

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   11