

**McSweeney Cynkar & Kachouroff, PLLC**
TRIAL & APPELLATE LAWYERS

**January 23, 2025**

**The Honorable Jeffrey M. Bryan**
**The United States District Court for the District of Minnesota**
**316 N. Robert Street**
**St. Paul, MN 55101**

> **Re:  Smartmatic., et al. v. Lindell, et al., Case No. 22-cv-00098-JMB-JFD;**
> **Defendants' Opposition and Response to "Plaintiffs' Motion to Exclude**
> **the Second and Supplemental Declarations of Benjamin Cotton"**

Dear Judge Bryan,

The Court should deny Plaintiffs' efforts to exclude the December Declarations of Benjamin Cotton because they are a result of the Plaintiffs' misrepresentations to the court and are otherwise substantially justified and harmless to Plaintiffs. This Court has "wide discretion" in fashioning appropriate sanctions under these Rules. *Rao v. St. Jude Med. S.C., Inc.,* 631 F. Supp. 3d 678, 719 (D. Minn. 2022); citing *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). Rules 16(f) and 37(c)(1) both provide that Courts should not award sanctions for an untimely disclosure where the conduct at issue was "substantially justified or is harmless," or where "other circumstances make an award of expenses unjust." *Rao v. St. Jude Med. S.C., Inc.,* 631 F. Supp. 3d 678, 719 (D. Minn. 2022); citing Fed. R. Civ. P. 16(f); 37(c)(1). Defendants were substantially justified in presenting Cotton's declarations based on Plaintiffs' prior misrepresentations and withholding of discoverable material subject to inspection by Cotton. It would be entirely unfair to exclude this testimony considering Plaintiffs' discovery violations and lack of candor.

## I.      Relevant Background.

On February 1, 2023, Lindell and My Pillow filed their First Motion to Compel seeking information and an inspection of an exemplar BMD machine and any hardware and software from their BMD machines contained in Lindell's Requests for Production (Rule 34) and inspection of an "exemplar" machine and hardware (Defs. RFP Nos. 1, 8, 10). ECF No. 73. Plaintiffs responded that they did not have *any* exemplar BMD machine for inspection as all were in the possession of Los Angeles County in their warehouse. ECF No. 89 at pp. 18-19. In the hearing to resolve this, Judge Docherty asked plaintiffs specifically what Smartmatic had in their possession or control that "could be responsive" to Lindell and My Pillow's requests to inspect an exemplar machine or hardware and

*Critical Thinking. Client Focus. A Will to Win.*

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC • 13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192 • WWW.MCK-LAWYERS.COM • 703-621-3300

**Page 2 of 11**
**January 23, 2025**

software from their BMD machines. *See* ECF No. 108 at 25:24 − 26:1, 28:15-17 (asking specifically whether all Smartmatic BMDs were in the possession of LA County). Plaintiffs stated that "all BMDs" were in L.A. County's possession and implied the only things that *could be* responsive to Lindell's requests were "spare parts" like "screws or plastic facing." *Id.* at 28:18-29:8. Based on these statements, Judge Docherty denied Lindell's First Motion to Compel any production or inspection of an exemplar machine or hardware, noting that Smartmatic could not produce what they do not have. *See* ECF No. 160 at pp. 15,16 & 19.

Without any method for Lindell's expert Ben Cotton to inspect any exemplar machine or hardware by Smartmatic, Cotton provided an expert report in September 2023. Cotton Report, Sept. 22, 2023, ECF No. 416-2. However, the same day, Plaintiffs provided their expert report by Dr. Sherman who stated that he inspected a substantially similar BMD machine (BMD150) provided by Smartmatic.[1] Sherman Report, Sept. 22, 2023, ¶25, note 2. After providing Sherman's report, Smartmatic only then offered Cotton an "external walkaround" of the "similar" machine Dr. Sherman had inspected. *See* ECF No. 416-5, Ex. 2, Loftus 10.2023 Letter. This timeframe was the *first time* Plaintiffs admitted that they *did* have an exemplar or similar BMD machine or hardware in their possession—information that they specifically (and presumably intentionally) withheld from Judge Docherty and Lindell in February 2023. *See e.g.* ECF No. 108 at pp. 25-27.

Cotton stated the inspection parameters would be insufficient to assess any forensic information or vulnerabilities and Plaintiffs never offered any internal forensic inspection of their similar BMD150 machine to Defendants.[2] *See* Attach. 1, Cotton Dep., at pp. 18-19. During his deposition, Ben Cotton testified to various ways the BMD machines with the specs provided by Smartmatic and in their user manual would be vulnerable to network breaches and could not be air gapped. *See id. e.g.* 43:11-23, p. 17 & 92.

---

[1] The exact BMD model used in the 2020 election was Smartmatic's BMD100 which plaintiffs contend they have no custody, possession or control over. The BMD150 was not used in the 2020 election, but Smartmatic notes that the machine and hardware are in their possession and is "substantially similar" to the BMD100 that was used in the 2020 election. During arguments on Lindell's First Motion to Compel (ECF Nos. 73 & 108), the Court gave Plaintiffs an opportunity to say where there was *anything* in their possession or control that could be produced for inspection (which necessarily would include a "substantially similar" BMD150 model), and Plaintiffs stated that "all BMDs" were in Los Angeles.

[2] *Id.*, footnote 1.

Critical Thinking. Client Focus. A Will to Win.

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC • 13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192 • WWW.MCK-LAWYERS.COM • 703-621-3300

Page 3 of 11
January 23, 2025

Cotton also testified specifically that, given the opportunity, he would be prepared to rebut Sherman's opinions regarding his "inspection" of the BMD150 and connection to the internet. *See* Defs. Attachment 1, Cotton Dep., at pp. 45 – 47.

In November 2024, Plaintiffs filed a motion to exclude Cotton's report and testimony, stating that the Defendants' "never requested to inspect their exemplar BMD150." *See* ECF No. 416-5, ¶¶7-8. In support of Plaintiff's summary judgment motion, Sherman filed a declaration stating that there was "no breach" on the BMD machines based, in part, on his "inspection" of Smartmatic's BMD150—the exemplar machine that Smartmatic concealed from and misled the Court and Defendants about in February 2023. *See* ECF No. 395-60 at ¶3.

To rebut Plaintiffs and Sherman's statements, Lindell and My Pillow filed two declarations from Cotton reiterating his original opinions and testimony criticizing Plaintiffs' insufficient inspection offering and discussing network vulnerabilities based on specs and user manuals relating to Plaintiffs' BMD machines. *See* ECF Nos. 464 and 481.

Now, Plaintiffs have filed a motion demanding this court exclude Cotton's December declarations. *See* ECF Nos. 488 & 493. Not only should the Court disregard or otherwise deny Plaintiffs motions (including their motion to exclude Cotton's testimony altogether), but the Court should dismiss this case entirely or alternatively issue adverse jury instructions because Plaintiffs intentionally misled Lindell and the Court about their possession of "substantially similar" hardware presumably to obstruct discovery, *exhaust Lindell's resources,* and conceal discoverable information. These obstructive and withholding tactics require, at a minimum, denial of Plaintiffs' motion to exclude Cotton's December 2024 declarations.

## II.    Cotton's December 2024 Declarations were substantially justified because of Smartmatic's prior obstructive and misleading disclosures and Dr. Sherman's additional information.

Lindell and My Pillow were substantially justified in introducing Cotton's December Declarations because Plaintiffs' obstructed inspection of material equipment by misleading the Court and Lindell and the Plaintiff's summary judgment motion introduced a new factual basis to support falsity. Plaintiffs cite *Meyer v. Currie Tech Corp* in asking this Court to exclude Cotton's declarations, but *Meyer* is distinguished from the facts here. 329 F.R.D. 228, 233 (D. Neb. 2018). In *Meyer,* the Court excluded the late submissions because the party offering the reports did not provide *any justification* for their disclosure. That is

Critical Thinking. Client Focus. A Will to Win.

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC  •  13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192  •  WWW.MCK-LAWYERS.COM  •  703-621-3300

not the case here, and Lindell and My Pillow are substantially justified in offering Cotton's declarations.

First, Cotton's December Declarations are substantially justified because Plaintiffs withheld and misrepresented the existence of their hardware and BMD150 machine to Lindell *and Judge Docherty* during the parties' hearing on Lindell's First Motion to Compel production and inspection of an exemplar machine and hardware in February 2023.[3] See ECF Nos. 73, 89, 108. Now, Plaintiffs contend that Cotton "should have" produced a rebuttal report to address Sherman's reliance on his BMD150 inspection. This is outrageous because such costly supplementation should never have been required had Plaintiffs not misled the Court in opposing Lindell's First Motion to Compel (ECF No. 73), only offering an inspection around the time they learned that Lindell's lead counsel was withdrawing from the case.[4]

Plaintiffs' efforts to exhaust Lindell's resources and engage in "gotcha" discovery tactics based on material misrepresentations and withholding is improper, sanctionable, and should doom Plaintiffs' case to dismissal. *See* Fed. R. Civ. P. 37(c)(1) and 37(b)(2)(A)(v). Essentially, Plaintiffs argue that Lindell should be denied any clarifying expert information from Cotton because Plaintiffs were "successful" in misleading Lindell and the Court about their possession of an exemplar machine until they filed their expert report. Indeed, Cotton's purported supplemental report regarding BMD150 would not have

---

[3] In Lindell and My Pillow's First Motion to Compel (ECF No. 73), Lindell sought to compel production and inspection of an "exemplar" BMD machine and hardware or software relating to his statements about Smartmatic's machines. Plaintiffs stated they had "no exemplar machine or hardware" in their possession, custody, or control" and the court (Judge Docherty) denied Lindell's motion in reliance on these statements. However, in Plaintiffs' motion to exclude Cotton's testimony and report (ECF No. 416), Plaintiffs' counsel asserted that they "offered" an exemplar machine for inspection, but that Defendants never requested to inspect that machine. *See* ECF No. 416-5. This is a misleading representation.

[4] ECF Nos. 89 & 108 are Plaintiffs' opposition to Defendants' RFPs seeking production and inspection of an exemplar voting machine and any hardware wherein Plaintiffs stated they had no such material in their possession nor anything substantially responsive to these requests. *See* ECF No. 416-5; *but see* ECF No. 108, at pp. 25-29. Plaintiffs contend that Defendants "never requested to inspect" any exemplar machine or hardware in their possession. This is inaccurate as it was requested in Defendants' RFPs 1, 8 & 10 at issue in Defendants' First Motion to Compel (ECF No. 73). Notably, Plaintiffs' "offer" for Cotton to inspect the BMD150 that Defendants' "did not respond to" occurred months after Defendants' First MTC, and around the time that Plaintiffs learned Lindell's lead counsel was withdrawing from this case. *See e.g.* ECF No. 225.

been required if plaintiffs had not concealed this machine from Lindell and the court in opposing Defendants' Requests for production and inspection in February 2023. *See* ECF No. 89, at pp. 18-19, ECF No. 108, at 25:24-26:1, 28:15-29:8..

Plaintiffs are demanding a highly prejudicial result—namely that, despite their withholding, misrepresentations, and nonuniform inspections; that not only should Lindell be deprived of clarifying declarations at summary judgment; but should also be deprived completely of his cyber security expertise. *See e.g.* Pls. Mot Exclude Cotton & ECF Nos. 488 & 493. Plaintiffs should not be rewarded for misleading the court about their possession of relevant equipment that Mr. Cotton could have inspected prior to his expert report.

Second, Lindell had the right to rebut Sherman's new information that was not otherwise included in his expert report. Plaintiffs assert that Dr. Sherman's declaration did not raise any new points from his expert report. But, Dr. Sherman's declaration made distinct points that were not contained in his expert report including (1) new details regarding alleged "post-tabulation audits" of 43 states, and (2) description of the 1% manual audit in LA County – a new distinct methodology to support his findings pertaining to Smartmatic's BMD machine. *See* Sherman Decl, ECF No. 395-60 ¶¶3, 11-13.

Lindell is entitled to rebut these distinct points with a declaration from Cotton, and the Court should not exclude this declaration. *See Rao v. St. Jude Med. S.C., Inc*., 631 F. Supp. 3d 678, 718–19 (D. Minn. 2022) (discussing that Rule 26(e) allows a party to submit a supplemental expert report when an expert becomes aware of new information that was unavailable at the time of initial report). Indeed, neither Lindell *nor Judge Docherty* was aware that Plaintiffs possessed any exemplar or similar hardware or machine for an inspection at the time of Cotton's original report. *See* ECF No. 89, 108; *but see* ECF No. 416-5.[5] At no point in this litigation, prior to summary judgment, have Plaintiffs stated they intended to rely on Dr. Sherman's assessment of their exemplar BMD150 to support any reliance on other state audits and the 1% manual audit in LA County.

Further, in discovery, Lindell requested *all facts* that Plaintiffs intended to rely on to support their contention that Lindell's statements about their machine network breach or inherent vulnerabilities were false. *See* Defs. Mot. Summ. Judg., Ex. D, ECF No. 439-4, at p. 9; *see also* Defs. Second Mot. to Compel, ECF No. 149. At no point in Plaintiffs' six supplemental interrogatory responses, nor at any point, did Plaintiffs state they would rely on Dr. Sherman's inspection of the BMD150 to prove falsity of Lindell's statements about

---

[5] *See id., footnote 2.*

Critical Thinking. Client Focus. A Will to Win.

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC  •  13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192  •  WWW.MCK-LAWYERS.COM  703-621-3300

network vulnerabilities on their machines. *Id.* Accordingly, Defendants' introduction of the December 2024 declarations by Cotton (ECF Nos. 464 and 481) was substantially justified based on Plaintiff's new information and their prior misrepresentations that precluded Defendants' expert from inspecting the exemplar machine and hardware in Smartmatic's possession.

### III.    Even if the Court held that Cotton's December Declarations were improper, permitting Cottons' December Declarations are harmless to Plaintiffs.

Even if the court found that Cotton's December declarations were not substantially justified, his testimony there is harmless because he does not alter from his original opinions or methodology, maintains his testimony from his deposition, and responds to new information from Plaintiffs summary judgment filings. This court has permitted supplemental reports even a year after the discovery deadline *if there is no prejudice to Plaintiffs*. *Rao v. St. Jude Med. S.C., Inc*., 631 F. Supp. 3d 678, 719 (D. Minn. 2022) (noting that *even if* 3rd and 4th supplemental reports were not proper, there was no prejudice plaintiffs would suffer). Defendants' assertion that they will have to "re-depose" Cotton because of the December declarations is meritless because nearly all of Cotton's statements were reiterated or otherwise testified to in his original report and deposition.

Most of Cotton's statements in his December Declarations clarified and reiterated his original opinions and testimony, were already known by Plaintiffs, and therefore, do not prejudice plaintiffs nor require another deposition of Cotton. Plaintiffs are incorrect that Cotton's December declarations are an "unfair surprise" because Cotton did not alter or give any testimony that Plaintiffs were previously unaware of. This distinguishes this issue from *Williams v. TESCO Servs., Inc.* cited by Plaintiffs. 719 F.3d 968 (8th Cir. 2013). In *Williams,* the court excluded a supplemental report because it "altered" the expert's opinion. *Id.* Here, however, Cotton's declarations did not alter his opinion but doubled down on his original statements *and deposition testimony.* Indeed, Cotton's declarations clarified and reiterated many points made in his original declaration report *and* from his deposition testimony shown, in part, in the tables below.

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC • 13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192 • WWW.MCK-LAWYERS.COM • 703-621-3300

### TABLE 1
### (SEPT. 2023 REPORT COMPARISON TO DEC. DECLS. COTTON)

| Cotton Original Report Sept. 2023 | Decl. 1 (ECF No. 464) | Decl. 2 (ECF No. 481) |
|---|---|---|
| **Cotton Subject: Cybersecurity vulnerabilities in Voting Systems** | | |
| Page 5, ¶ 18: Over 290 vulnerabilities in the VSAP system, including USB ports and hardcoded passwords.<br><br>Page 6-7, ¶ 20-21: Failures in log management, cryptographic compliance, and antivirus updating. | Page 3, ¶ 8-9: Concerns about insufficient forensic access to voting systems, preventing full analysis of vulnerabilities. | Page 4, ¶ 7: Discussion about cybersecurity risks due to lack of proper testing and forensic examination of Smartmatic systems. |
| **Cotton Subject: Inadequate Testing and Oversight** | | |
| Page 7, ¶ 21: Describes failures to update antivirus definitions and patch operating systems across systems.<br><br>Page 13, ¶ f: Discusses weaknesses in air-gapped systems. | Page 4, ¶ 14: Notes the lack of adequate forensic inspection, particularly regarding critical components like Wi-Fi modems. | Page 5, ¶ 17: Highlights the use of a mismatched model (BMD150 instead of BMD100) for inspection, questioning testing adequacy. |
| **Cotton Subject: Questionable Audit Trails and Log Management** | | |
| Page 10, ¶ e: Lack of centralized log management and its impact on cybersecurity detection and audits. | Page 5, ¶ 19: Insufficient log retention and preservation to meet cybersecurity standards. | Page 6, ¶ 22: Raises concerns about Smartmatic's lack of proper forensic preservation for effective audit trails. |
| **Cotton Subject: Physical Security and Inspection Restrictions** | | |
| Page 5, ¶ 16(k): No lockout mechanisms for failed password attempts. | Page 4, ¶ 16: Prevented physical inspection of critical components (e.g., Wi-Fi modems) due to restrictions by Smartmatic. | Page 5, ¶ 18: Criticizes the use of the BMD150 model, which was not used in the actual election, for inspection purposes. |

Critical Thinking. Client Focus. A Will to Win.

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC  •  13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192  •  WWW.MCK-LAWYERS.COM  •  703-621-3300

| Cotton Subject: Claims of Vote Manipulation and Errors | | |
|---|---|---|
| Page 8-9, ¶ 26(a)-(c): References incidents of vote flipping and misallocation in Antrim County, Michigan, and DeKalb County, Georgia. | | Page 9, ¶ 26(c): Highlights how such errors and misconfigurations align with broader systemic concerns in voting systems. |
| Lack of Transparency and Comprehensive Access | | |
| Page 6, ¶ 20(b): Criticizes Smartmatic for not producing systems for full forensic examination. | Page 4, ¶ 16: Notes restrictions imposed by Smartmatic that prevent meaningful analysis. | Page 7, ¶ 21: Discusses the impossibility of making cybersecurity determinations without proper forensic access. |

## TABLE 2
## (AUG. 2024 DEPOSITION TESTIMONY COMPARISON TO DEC. DECLS. COTTON)

| Cotton Deposition Aug. 2024 | Decl. 1 (ECF No. 464) | Decl. 2 (ECF No. 481) |
|---|---|---|
| Criticism and rebuttal topics from Cotton regarding Dr. Sherman's report or methodology of network security. Insufficiency of October 2023 inspection protocol for the BMD150 (external permission for Cotton after original September report completed). Insufficiency of reliance on external sources. *See* Attach. 1, Cotton Dep. at pp. 45-47, 17:8-21:6, ant p. 184 (re: opinion on external reliance) | Insufficient Forensic Imaging, Incorrect model for inspection, physical restraints on inspection (no forensic or internal inspection), Sherman's reliance on "manuals" or external statements regarding other audits criticism. ECF No. 464 at p. 4, ¶¶15-18; p. 5 ¶¶17 & 19. | Direct Criticism of Dr. Alan Sherman's Inspection Methods: Highlights flaws in Dr. Sherman's methodology, particularly any reliance on external physical examination of BMDs that Cotton was offered which Cotton states are inadequate for assessing breaches or vulnerabilities. ECF No. 481 at p. 6, ¶22. |

Critical Thinking. Client Focus. A Will to Win.

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC  •  13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192  •  WWW.MCK-LAWYERS.COM  •  703-621-3300

| | | |
|---|---|---|
| | | |
| Information regarding network vulnerabilities learned in Antrim County, Michigan and other counties with similar software. *See e.g. id.* at pp. 100-104, 155-168. | | Flipping of Votes in Specific Elections: Detailed examples of vote flipping in counties w/ similar machines: DeKalb, Williamson, Antrim (2020-2022) supported by root-cause analyses and misconfigurations. *Id.* at p. 9, ¶¶26(a)-(c). |
| Deposition testimony and opinion regarding Smartmatic and other voting machine Network vulnerabilities from BMD and VSAP systems. *Id.* at 100:3-104:8, 105:12-111:15, 112:16-117:10, 114:9-115:22, 118:5-121:14.<br><br>Information regarding original report discussion of vulnerabilities to unauthorized access, vote manipulation based on evaluations of system manuals and source code from similar machines and the possibility of remote access of databases. *Id.* at 16:19-17:22 & 39:8-41:6, 88:4-91:6, 123:22-126:1, 138:5-141:20. | | Vulnerability concerns regarding software and chain of custody concerns: Raises the possibility of memory scraping malware being injected into BMDs to manipulate memory (noting another example of a QR code) and Plaintiffs failure to prove or establish secure chain of custody for BMDs. *Id.* at p. 8, ¶¶25 and v. |

Clearly, Plaintiffs are incorrect that they must now conduct another deposition of Cotton based on his December declarations because Cotton testified to nearly everything

*Critical Thinking. Client Focus. A Will to Win.*

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC • 13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192 • WWW.MCK-LAWYERS.COM • 703-621-3300

raised in his December declarations and has otherwise already provided consistent and clarifying information in his original analysis and testimonies that does not prejudice Plaintiffs.

Further, Plaintiffs make *two false assertions* in their letter to the Court when they stated that Cotton's original report never referenced (1) cyber security vulnerabilities of their BMD machines nor (2) Cotton's work in Antrim County, Michigan. These statements are inaccurate. Here, Cotton testified and opined originally that the BMD machines had inherent cyber security vulnerabilities in his deposition and throughout his original report. *See e.g.* Cotton Report, ECF No. 416-2, at pp. 5-7, 10, 13; *see also* Cotton Dep. 181:25 – 182:24 (discussing vulnerabilities in ballot marking devices through configuration of software). Further, Cotton's original report discussed the Antrim County, Michigan situation, among other specific examples. *Id.* at pp. 8-9, ¶ 26(a)-(c). In his deposition, Plaintiffs' counsel specifically deposed Cotton about Antrim County, Michigan and had sufficient opportunities to seek this information. *See* Attach. 1, Cotton Dep. at pp. 155 – 168. These are inaccurate statements that doom Plaintiffs' motion and entitle Defendants to attorney fees and costs for having to respond to this. Unlike Lindell, plaintiffs have had the exact same legal counsel throughout this litigation. There is no excuse to misrepresent facts unless Plaintiffs hope to "pull one over" on Lindell's new legal counsel in hopes they will not be discovered.

Alternatively, if the Court disregards any portion of Cotton's December 2024 Declarations (ECF Nos. 464 and 481) for purposes of summary judgment, the Court should also disregard all facts offered by Plaintiffs to prove falsity of Lindell's claims relating to their machine network security or hacking in fairness. It would be very prejudicial to deny Lindell any rebuttal at summary judgment where the Plaintiffs rely on facts that were withheld, misrepresented to the court, and otherwise never supplemented as far as their factual reliance. If the Court finds that any portion of Cotton's December declarations should be disregarded for purposes of summary judgment, Lindell and My Pillow request that the Court similarly disregard all facts and information offered by Plaintiffs about the security of their BMD machines to prove the falsity of Lindell's statements.

Finally, Defendants are entitled to dismissal of this matter entirely or striking Plaintiffs' pleadings or evidence relating to security of their BMD machines under Rule 37(c)(1) and 37(b)(2)(A)(v) because of Plaintiffs' material misrepresentations to this Court specifically in light of their intent to deprive the Defendants of expert testimony that relates to their prior withholding and misstatements. Plaintiffs bear the burden of proving falsity regarding network vulnerabilities of their BMD machines, and by inaccurately saying they had no possession of any exemplar machine or hardware, while providing their exemplar

*Critical Thinking. Client Focus. A Will to Win.*

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC • 13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192 • WWW.MCK-LAWYERS.COM • 703-621-3300

**Page 11 of 11**
**January 23, 2025**

---

machine to *their* expert for inspection and then demanding exclusion of any responsive information, Plaintiffs' bad faith, dilatory tactics, and lack of candor to the Court cannot go unaddressed. Defendants are also entitled to any attorney fees and costs for responding to this motion and any other incurred costs that the Court deems appropriate.

Sincerely,

**Christopher I. Kachouroff, Esq. (No. 44216)**

**Jennifer T. DeMaster (No. 1124201)**
*Of Counsel*

Critical Thinking. Client Focus. A Will to Win.

MCSWEENEY, CYNKAR & KACHOUROFF, PLLC • 13649 OFFICE PLACE, SUITE 101, WOODBRIDGE, VA 22192 • WWW.MCK-LAWYERS.COM • 703-621-3300

# ATTACHMENT 1

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF MINNESOTA
3
4   SMARTMATIC USA CORP.,
5   SMARTMATIC INTERNATIONAL
6   HOLDING B.V. and SCO
7   CORPORATION LIMITED,
8
9              Plaintiffs,
10
11  vs.               Case No. 0:22-cv-00098-WMW-JFD
12
13  MICHAEL J. LINDELL and MY
14  PILLOW, INC.,
15
16             Defendants.
17
18
19      VIDEOTAPED DEPOSITION OF BENJAMIN COTTON
20             THURSDAY, AUGUST 8, 2024
21                 9:35 a.m. PST
22
23
24
25
```

**Page 2**

```
1   BE IT REMEMBERED THAT, the videotaped deposition of
2   BENJAMIN COTTON was reported by Mary C. Soldati,
3   Registered Professional Reporter and Certified Shorthand
4   Reporter, on Thursday, August 8, 2024, commencing at the
5   hour of 9:35 a.m. PST, the proceedings being reported
6   remotely from Portland, Oregon.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                         APPEARANCES
2
3   Appearing on behalf of the Plaintiffs:
4   TIMOTHY M. FREY
5   OLIVIA SULLIVAN
6   BENESCH FRIEDLANDER COPLAN & ARNOFF
7   71 South Wacker Drive, Suite 1600
8   Chicago, IL 60606
9   tfrey@beneschlaw.com
10  osullivan@beneschlaw.com
11
12  Appearing on behalf of the Defendant:
13  MCSWEENEY CYNKAR & KACHOUROFF, PLLC
14  CHRISTOPHER KACHOUROFF
15  13649 Office Place, Suite 101
16  Woodbridge, Virginia 22192
17  chris@mck-lawyers.com
18
19  ALSO PRESENT:  Don Savoy, Videographer
20
21
22
23
24
25
```

**Page 4**

```
1                      EXAMINATION INDEX
2
3   JOSEPH COTTON                              PAGE NO.
4   By Mr. Frey                                 6/196
5   By Mr. Kachouroff                            192
6
7                       EXHIBIT INDEX
8
9   EXHIBIT NO.        DESCRIPTION           PAGE NO.
10
11  Exhibit No. 705    Benjamin Cotton's        28
12                     Declaration
13
14  Exhibit No. 706    ATSEC Source Code Review  77
15                     Report Voting Solutions For All
16                     People Version 2.0.
17                     Report Date 2020-1-06
18
19  Exhibit No. 707    Court Order               93
20
21  Exhibit No. 708    County of Los Angeles    138
22                     VSAP Tally Voting System
23                     Staff Report
24
25  Exhibit No. 709    New York Times Article   188
```



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024

13–16

Page 13

1    A.    I was testifying on behalf of
2  Kurt Olsen and Andrew Parker.
3    Q.    And Kurt Olsen and Andrew
4  Parker in that matter were the attorneys for
5  Kari Lake; is that right?
6    A.    Correct.
7    Q.    And a complaint had been lodged
8  by the Bar against Mr. Parker and Mr. Olsen;
9  is that right?
10    A.    I'm not sure who lodged the
11  complaint.
12    Q.    And what was the nature of your
13  testimony on behalf of those individuals?
14    A.    My testimony hinged around the
15  cyber security weaknesses and current state
16  of the election systems in 2020.
17    Q.    And was that in Maricopa County
18  in Arizona?
19    A.    That is correct.
20    Q.    And then you said, I believe,
21  you also provided deposition testimony in a
22  Michigan case; is that right?
23    A.    That is correct.
24    Q.    And is that the Antrim County
25  litigation?

Page 14

1    A.    I provided -- I did provide
2  depositions and sworn affidavits in the
3  Antrim case. But there's also a case, State
4  of Michigan versus Stephanie Lambert, in
5  which I was called as a witness.
6    Q.    What is nature of the State of
7  Michigan versus Stephanie Lambert litigation?
8    A.    I can tell you what my part in
9  it was, and that is the -- once again, the
10  state of the electoral systems as it pertains
11  to cyber security and findings of election
12  data.
13    Q.    Do you know what the case
14  against Ms. Lambert -- you know, what the
15  claims are against Ms. Lambert?
16    A.    I don't know exactly what they
17  are, but I believe they hinge around
18  potential unauthorized access to voting
19  systems.
20    Q.    And did your testimony in that
21  case deal with the access to the voting
22  systems?
23    A.    I have not testified to that
24  effect yet. However, the prosecution did
25  call me as a witness.

Page 15

1    Q.    And so was that as a fact
2  witness, as opposed to an expert witness?
3    A.    Yes.
4    Q.    When did you provide that
5  testimony?
6    A.    I haven't provided that
7  particular testimony. The case has been
8  continued on a repeated basis.
9    Q.    Okay. So there's the Arizona
10  case, there's the State of Michigan vs.
11  Stephanie Lambert, and also the Antrim County
12  litigation.
13        Any other county litigation in
14  which you've provided deposition testimony?
15  And I'll go back to -- since 2020.
16    A.    I have provided declarations in
17  the State of Georgia as well.
18    Q.    And were you deposed in the
19  State of Georgia case, in the Raffensperger
20  case?
21    A.    Yes, the Curling v.
22  Raffensperger case.
23    Q.    And what was the topic of your
24  deposition in the Curling v. Raffensperger
25  case?

Page 16

1    A.    It primarily hinged around
2  cyber security findings, based on my
3  examination of a Coffee County EMS server.
4    Q.    And did that testimony in any
5  way have to do with whether or not there was
6  unauthorized access to the voting systems?
7    A.    I was asked how I obtained
8  access to the EMS images.
9    Q.    Any other instances of a
10  deposition or testimony you've given over the
11  last four years related to election security?
12    A.    I believe that covers it.
13    Q.    I want to talk a little bit
14  about how you became involved in this
15  particular litigation.
16        When were you initially
17  contacted to serve as an expert witness in
18  this case?
19    A.    Specific to Smartmatic; is that
20  correct?
21    Q.    Yeah, the Smartmatic versus
22  Lindell litigation.
23    A.    Okay. As near as I recall, it
24  would have been the spring of '23. I was
25  asked by Andrew Parker to review some



Page 17

1  documents pertaining to the LA County
2  election systems.
3      Q.    And at the time Mr. Parker
4  asked you to review those documents, were you
5  given an assignment of what you are going to
6  be looking for, what he's going to ask you to
7  potentially opine on?
8      A.    He asked me to pay particular
9  attention to, one, was the system certified
10 by the EAC; two, the vulnerability in
11 assessment reports by the SEC; three,
12 determine whether or not these systems could
13 be connected to the Internet via wireless or
14 via ethernet connections; determine whether
15 or not those connections were air-gapped or
16 part of the public Internet.
17     Q.    Was your assignment to kind of
18 review those documents and make a
19 determination as to whether or not the -- you
20 know, you said whether or not they could be
21 connected to the Internet.
22         Were you asked to make a
23 determine as to whether or not they were
24 connected to the Internet?
25     A.    If I could, from the documents.

Page 18

1  At that particular time -- well, still, to my
2  knowledge -- there has been no system
3  actually produced by Smartmatic to -- to
4  actually examine to determine, you know, the
5  forensics artifacts that remain on that
6  system.
7      Q.    Are you aware that Smartmatic
8  has offered the ability to examine a BMD
9  machine that is substantially similar to the
10 ones used in the November 2020 election?
11     A.    Prior to the Parker Daniels law
12 firm exiting, there was discussion about that
13 being a possibility.
14     Q.    Did you ever follow up to
15 determine whether or not to do that, to
16 perform that inspection?
17     A.    I have not been provided that
18 opportunity yet.
19     Q.    If you were provided the
20 opportunity, if it was offered, would you
21 take it?
22     A.    I would.
23     Q.    And do you have any
24 understanding as to why since, you know,
25 September of 2023 when you produced your

Page 19

1  report, through today, that you have not
2  chosen to inspect that ballot-marking device?
3      A.    Well, I would say that that
4  question is a little bit misphrased.  It's
5  not that I haven't chosen to.  It's that, to
6  my knowledge, it was never an option to
7  examine it.
8      Q.    Okay.  So you were never told
9  that Smartmatic had offered the opportunity
10 to examine that device?
11     A.    No.  The last information that
12 I had surrounding this issue was they were
13 trying to work out some protocols, and then
14 those protocols were not acceptable to a
15 thorough examination of the system.
16         And at that point, I believe
17 Parker Daniels was removed from the case as
18 representation for Mr. Lindell.  So I don't
19 know where that issue stands at this point.
20     Q.    Going back, then, to your
21 initial retention in this case, at the time
22 Mr. Parker asked you to review the documents
23 related to LA County, were you already
24 working with Mr. Parker with respect to other
25 litigation?

Page 20

1      A.    I was.  I was working with Mr.
2  Parker with respect to the Arizona
3  litigation.
4      Q.    And prior to the Arizona
5  litigation, had you ever worked with Mr.
6  Parker before?
7      A.    I had not.
8      Q.    How did you come to work with
9  Mr. Parker on the Arizona litigation?
10     A.    I'm not 100 percent sure as to
11 what their thought process was.  I had been
12 selected by the Arizona Senate to perform a
13 forensics audit of the Maricopa County
14 election systems in 2021.
15         And I believe that was the
16 impetus for them reaching out to me, is
17 because I did have that forensics knowledge
18 of the systems.
19     Q.    Do you know a gentleman named
20 Patrick Byrne?
21     A.    Yes.  I have met Patrick Byrne.
22     Q.    And how do you know Patrick
23 Byrne?
24     A.    I was introduced to Patrick
25 Byrne through Stephanie Lambert.



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
21–24

Page 21

1    Q.    And who is Stephanie Lambert?
2    A.    Stephanie Lambert is the
3    attorney that engaged me for the Bailey v.
4    Antrim County litigation.
5    Q.    And what was the nature of your
6    interaction with Mr. Byrne?
7    A.    It was social.  And I believe
8    that Mr. Byrne was funding some of the
9    efforts to assure voter integrity.
10    Q.    Have you discussed your
11    engagement in this case with Mr. Byrne?
12    A.    I have not.
13    Q.    Do you know a Matt DePerno?
14    A.    I do.
15    Q.    Who is Matt DePerno?
16    A.    Matt DePerno is the other
17    attorney who engaged me with respect to the
18    Antrim County litigation.
19    Q.    Have you had any conversations
20    with Matt DePerno regarding your engagement
21    in this case?
22    A.    I have not.
23    Q.    Do you know a gentleman named
24    Conan Hayes?
25    A.    Again, please?

Page 22

1    Q.    Conan Hayes.
2    A.    I know of him.  I do not know
3    him personally.
4    Q.    Have you ever spoken with Mr.
5    Hayes?
6    A.    I believe I have spoken to Mr.
7    Hayes twice in the past.
8    Q.    And do you recall when about
9    you spoke with Mr. Hayes?
10    A.    It was concerning the South
11    Dakota symposium that Mr. Lindell put on.
12    Q.    And was that the cyber
13    symposium in August of 2021?
14    A.    That sounds about right.  I
15    don't have the exact dates in front of me.
16    Q.    My understanding is, he does
17    the symposium kind of each year, in the fall.
18    And so I was just curious, you know, if it
19    was three years ago, if it was this past, you
20    know, 2023?
21    A.    It was the first one that he
22    did.
23    Q.    Okay.  And did you yourself
24    have any involvement in that first cyber
25    symposium?

Page 23

1    A.    I was asked to review some
2    data.  The data that I got was not
3    satisfactory for me, so I did not participate
4    in that event.
5    Q.    Was that data the alleged PCAP
6    data -- P-C-A-P -- data that Mr. Lindell
7    claimed to have regarding the stolen
8    election?
9    A.    Yes.  That data was supplied to
10    me via Dennis Montgomery and Conan -- I
11    apologize, I don't remember his last name --
12    but this -- the Conan individual.
13    Q.    And you said that the data that
14    you were asked to review was not satisfactory
15    to you.
16    What was not satisfactory about
17    the data, in your opinion?
18    A.    It appeared incomplete, and the
19    small subset of data that I was provided did
20    not appear to contain election data.
21    Q.    Did you inform anyone of your
22    conclusions regarding this -- the data that
23    you were asked to review?
24    A.    I spoke to a gentleman by the
25    name of Walden, I believe his last name was,

Page 24

1    who was kind of shepherding that process.
2    And I explained my concerns to him.
3    Q.    Have you ever, since that time,
4    been asked to review any data provided by Mr.
5    Dennis Montgomery?
6    A.    I have.  Some --
7    (Cross talk.)
8    BY MR. FREY:
9    Q.    Go ahead.  Go ahead.
10    A.    Subsequently, approximately
11    about a year later, I was asked to take a
12    look at another set of PCAP data.  And once
13    again, my analysis of the PCAP data was that
14    it was not sufficient to do a form analysis
15    on for the purposes that they wanted me to do
16    that.
17    Q.    And were you asked to perform
18    that analysis as part of your role in this
19    case?
20    A.    No.
21    Q.    Who asked you to perform that
22    analysis?
23    A.    I believe that was Kurt Olsen.
24    Q.    Did you inform Mr. Olsen that
25    the data was insufficient to complete the



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
37–40

Page 37

1  provided by Mr. Montgomery, were you
2  compensated for that time?
3      A.   Mr. Olsen would have
4  compensated me for that, yes.  I think it was
5  about three hours on that.
6      Q.   Okay.  And you just charge your
7  kind of $350 per hour for however many hours
8  you spent looking at it?
9      A.   Correct.
10      Q.   Are you -- have you been
11  retained as an expert by Mr. Lindell in
12  litigation filed by Dominion?
13      A.   No.
14      Q.   Have you been retained by
15  Mr. Lindell or by attorneys on Mr. Lindell's
16  behalf in litigation filed by Mr. Kumer?
17      A.   No.
18      Q.   So I want to go back to your
19  declaration here, Exhibit 705.
20          And I believe you said that
21  when you were initially approached by Mr.
22  Parker to work on this, you were asked to
23  review certain documents and look for certain
24  items; is that right?
25      A.   Yes.

Page 38

1      Q.   And Mr. Parker, then -- were
2  you then assigned to kind of write up your
3  findings?
4      A.   I reviewed the documents.  I
5  briefed the attorneys on my findings, and was
6  asked to put that into deposition form -- or
7  declaration form, I'm sorry.
8      Q.   And did your assignment ever
9  include making a determination as to whether
10  or not there was voting manipulation in the
11  -- in LA County in the November 2020
12  election?
13      A.   I believe it was mentioned as
14  an end goal, but, you know, I deal in facts
15  -- forensics facts.  And without the
16  examination of a device that was actually
17  utilized in that litigation -- or in that
18  election, you know, I'm not able define that
19  there was fraud.
20          What I was able to determine
21  is, Is there a possibility of remote access?
22  Is there a possibility of manipulation of the
23  databases on the DMGs and those types of
24  things.
25          So I was able to make a

Page 39

1  determination on -- based on a review of the
2  documents and the vulnerability assessments
3  that I reviewed.
4      Q.   And so you were, then -- and
5  that's what I guess I am trying to
6  crystallize here, is your opinions in this
7  case relate to possibilities or potential
8  vulnerabilities, correct?  Not actual fraud
9  occurring or actual remote access having
10  taken place; is that right?
11      A.   Well, the basis for that was,
12  it was my understanding that Smartmatic was
13  resisting producing an actual system to be
14  examined by experts.
15          And the purpose of the
16  declaration was to attempt to get actual
17  voting systems for the purposes of forensic
18  examination as that next step.
19      Q.   Do you understand that LA
20  County is the entity that owns those actual
21  voting machines?
22      A.   Yes.
23      Q.   And do you understand that --
24  that Smartmatic would not have the ability to
25  turn over the voting machine, that it would

Page 40

1  have to come from LA County?
2      A.   You know, I leave those finer
3  distinctions to the attorneys.  In some
4  cases, these voting companies actually just
5  lease those systems to the county.  And in
6  other cases, the county actually owns them.
7          So I am not aware of which
8  configuration or which arrangement LA County
9  is under.  So I leave that to the attorneys.
10      Q.   Okay.  But you didn't -- you
11  yourself are not offering an opinion or
12  commentary on whether -- who would be able to
13  provide that machine, fair?
14      A.   Fair.
15          (Reporter clarification.)
16          THE WITNESS:  "Fair."  In other
17  words, I agreed with Mr. Frey.
18  BY MR. FREY:
19      Q.   So let's turn to page 16 of
20  your declaration, then.  You see in
21  paragraph 22, you state:
22          "Given the totality of the lack
23          of practical, effective cyber security
24          protections on all of the election
25          systems that I have examined, coupled



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
41–44

Page 41

1    with the lack of effective access
2    controls to systems, it is a near
3    certainty that the VSAP systems would
4    be vulnerable to unauthorized access
5    and vote manipulation through
6    technical processes."
7        Do you see that?
8    A.    I do.
9    Q.    And is that the opinion you
10   intend to offer in this case?
11   A.    Yes.
12   Q.    And again, so the opinion is
13   that the voting systems would have technical
14   vulnerabilities, right?
15   A.    The systems, as evaluated under
16   the source code review, and based on the
17   contents of the manuals, would have
18   vulnerabilities that could allow remote
19   access and manipulation of the databases on
20   those systems.
21   Q.    Okay.  And just to be clear,
22   you're not opining that any actual vote
23   manipulation occurred, are you?
24   A.    No, because I have not been
25   able to examine a system that was actually

Page 42

1    used in the course of that election.
2    Q.    And you also state after that
3    first opinion down at the bottom, you state:
4        "I understand that Smartmatic
5        has recently acknowledged that it has
6        an exemplar BMD machine that it has
7        not yet provided to defendant's
8        counsel."
9        Do you see that?
10   A.    I do.
11   Q.    And you go on to say:
12       "Once I receive this machine, I
13       will able to supplement my report.  I
14       would need to examine the VSAP system
15       to definitively prove that this
16       finding is directly applicable to the
17       Los Angeles County voting system,"
18       right?
19   A.    Yes.
20   Q.    So are you saying there that --
21   when you refer to, "this finding," is that
22   the finding that the systems would be
23   vulnerable to unauthorized access?
24   A.    Yes, and the manipulation of
25   the vote.

Page 43

1    Q.    Okay.  And so without looking
2    at that -- at the machine, you can't say one
3    way or the other, A, whether actual
4    manipulation occurred, right?
5    A.    Well --
6    Q.    Is that fair?
7    A.    -- I cannot definitively prove
8    that actual manipulation occurred during the
9    election without the examination of one of
10   the systems that was used in the election.
11   Q.    And are you also indicating
12   here in this last sentence that you --
13   without examining one of the machines, you
14   cannot say whether it would be vulnerable to
15   unauthorized access?
16   A.    No, I'm not saying that.
17   Because based on my review of the -- of the
18   supporting documents, I can tell you that it
19   is vulnerable to remote access.
20       Either through API, buffer
21   overflows, memory injects, it certainly is
22   susceptible to those remote access
23   vulnerabilities.
24   Q.    And that's your opinion based
25   on the information you reviewed, right?

Page 44

1    A.    That's correct.
2    Q.    We'll talk more about that
3    today.  I'm just trying to understand what
4    your opinions are so that we can discuss
5    them.
6    A.    Sure.
7    Q.    And since the time that you
8    completed your declaration, I believe you
9    indicated that you have not done any further
10   work on this case, right?
11   A.    That's correct.
12   Q.    So is it fair to say that you
13   haven't learned any more information since
14   submitting this declaration that would allow
15   you to add to your opinions?
16   A.    Well, I have read reports of
17   the infiltration of the voter data from LA
18   County that resided on servers based in
19   China, due to an exploitation of some type
20   from the Konnech system which I believe LA
21   County utilizes.
22   Q.    And do you intend to offer any
23   opinions in this case regarding these reports
24   that you've read regarding exfiltration of
25   voter data?



Page 45

1    A.    I have not been asked to offer
2  any opinions on that particular subject at
3  this time.
4    Q.    And were you aware -- let me
5  step back a second.
6        Did you review the expert
7  report of Dr. Allen Sherman that was
8  submitted in this litigation on behalf of
9  Smartmatic?
10    A.    I did.
11    Q.    Did you understand that you had
12  the opportunity to submit a rebuttal to his
13  report?
14    A.    I was not asked to submit a
15  rebuttal to his report.  If I were to do so,
16  I would simply state that Doctor -- Dr.
17  Shepard, I believe it was?
18    Q.    Sherman.
19    A.    Sherman.  Dr. Sherman is under
20  the same constraints that I am, and he in
21  fact acknowledges that as a footnote in his
22  report, that he did not actually examine a
23  system that was utilized in the course of the
24  election.
25    Q.    Okay.  So is that your critique

Page 46

1  of Dr. Sherman?  Or just your response to him
2  is that he was not actually able to review a
3  system utilized in the course of the
4  election?
5    A.    I would say that it invalidates
6  a good deal of what he was saying.  You know,
7  as part of what his report stated, he stated
8  those were not connected to the Internet.
9        You know, that flies directly
10  in the face of the network diagrams and the
11  documentation inside of the user manuals for
12  the LA County voting system, in that they
13  have data that specifically resides inside of
14  the AWS cloud.
15        So, therefore, it has to be
16  connected to the Internet in some form or
17  fashion to access that data that resides in
18  the AWS cloud.
19        The issues about
20  vulnerabilities, he's constrained by the fact
21  that he saw an exemplar system in Florida,
22  but he did not actually see a device that was
23  owned, operated or leased by LA County as
24  part of his examination.
25    Q.    Any other critique you have of

Page 47

1  Dr. Sherman's report in this litigation?
2    A.    Well, I didn't come prepared to
3  really critique his report.  I'm sure I have
4  other comments.  If I am asked to do that, I
5  will be glad to provide that.
6    Q.    But you haven't been asked to
7  do that today, right?
8    A.    No.
9    Q.    Have you reviewed the report of
10  Ms. Tammy Patrick that was submitted on
11  behalf of Smartmatic in this litigation?
12    A.    I have not.
13        MR. FREY:  So I think I'm at a
14      change of topics here.  It's been
15      about an hour, so maybe let's go off
16      the record for five minutes and take a
17      quick break.
18        THE WITNESS:  Okay.  Thank you.
19        THE VIDEOGRAPHER:  We are going
20      off the record at 10:30 a.m.
21        (Break taken.)
22        THE VIDEOGRAPHER:  We are back
23      on the record at 10:37 a.m.
24  BY MR. FREY:
25    Q.    Mr. Cotton, we're back on the

Page 48

1  record.  And right now, I'd like to turn to
2  kind of your background and education
3  experience.
4        If you could flip with me to
5  page 17 of your declaration, which I believe
6  is where your CV begins.
7    A.    Okay, one second.  Okay.  I'm
8  there.
9    Q.    Okay.  Is this a copy of your
10  CV?
11    A.    It's a copy of the CV, I
12  believe as it existed at that time, yeah.
13    Q.    And this -- have you updated
14  your CV, I guess, since this time of
15  September 2023?
16    A.    I have.
17    Q.    What have you added to your CV
18  over the past year?
19    A.    So, just let me see where I'm
20  at here.
21        So I've added specific
22  testimony experience and things of that
23  nature.
24    Q.    But have you received any
25  additional degrees in the past year?



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
85–88

Page 85

1    A.    No.

2    Q.    So you were examining those
3    voting systems related to other litigation in
4    which you were retained as an expert,
5    correct?

6    A.    Correct.

7    Q.    Did you rely upon your forensic
8    review of these voting systems in rendering
9    your opinions in this litigation?

10    A.    As a corpus of knowledge, I
11    relied on that information that I obtained
12    through those examinations for paragraphs 20
13    and 21, which is the general cyber security
14    posture for voting systems.

15    Q.    And do you -- let's go through
16    them one at a time.

17    So the first one is the voting
18    system in Maricopa County Arizona.  What
19    company manufactured the voting system
20    information you reviewed from Maricopa
21    County?

22    A.    Dominion.

23    Q.    And what type of election
24    technology system did you forensically
25    examine?

Page 86

1    A.    I examined all aspects of the
2    digital computing devices, which included the
3    Election Management Server, the EMS; the EMS
4    clients; the adjudication work stations; the
5    ICCs, which are the scanning controllers for
6    the canon scanners.

7    They also had four HiPro
8    scanners, which were high volume scanning
9    devices.  Those were included as part of that
10    examination.

11    Q.    Did you examine any ballot
12    marking devices?

13    A.    They did not provide the ballot
14    marking devices as part of that subpoena.
15    But I did examine tabulators and the
16    tabulator data cards.

17    Q.    So tabulators, tabulator data
18    cards, EMS, scanners.

19    But no BMDs, right?

20    A.    Correct.

21    Q.    How did you obtain the forensic
22    images of these components of the voting
23    system in Maricopa County Arizona?

24    A.    So I followed standard digital
25    imaging processes, utilized a right block for

Page 87

1    all the digital media, and then used an FTK
2    imageer to create a forensics image of each
3    of those components.

4    Q.    Did you yourself --

5    (Cross talk.)

6    A.    I've got a UPS device that is
7    beeping and it's about to go off.  So I need
8    to reset something real quick.

9    Q.    Sure, no problem.

10    MR. FREY:  We can go off the
11    record.

12    THE VIDEOGRAPHER:  We are going
13    off the record at 11:30 a.m.

14    (Break taken.)

15    THE VIDEOGRAPHER:  We are back
16    on the record at 11:33 a.m.

17    BY MR. FREY:

18    Q.    Okay.  Mr. Cotton, we are back
19    on the record.  And my question was:

20    Based on your prior answer that
21    you followed standard digital imaging
22    processes, et cetera, you -- it sounds like
23    you yourself imaged the voting system
24    components for Maricopa County, Arizona; is
25    that true?

Page 88

1    A.    You mean some of them.  We had
2    a team of ten people that were performing the
3    imaging.  I personally conducted the training
4    of all people to make sure they met the
5    standards.  They were part of my company.
6    And we had some independent contractors
7    contacted as well for this.

8    So we baselined everybody, did
9    essentially a mini-validation that they were
10    following proper procedures, and then we
11    imaged approximately 140 terabytes of data as
12    part of that engagement.

13    Q.    And I don't need the exact
14    date, but do you recall the time period in
15    which you performed this imaging?

16    A.    It would have been from the
17    middle of May for the next two weeks.

18    Q.    May 2021?

19    A.    Yeah.

20    Q.    So it wasn't imaged at the time
21    of the election, correct?

22    A.    No.  We were relying on the
23    Arizona Senate to provide the devices under
24    subpoena.  And so it took -- the subpoena was
25    issued in December of 2020, and then there



Page 89
1  were some court proceedings that delayed the
2  handoff of that equipment to -- I'm sorry,
3  April of 2021.
4          It would have been middle of
5  April 2021 to the first part of May.  Two
6  weeks, roughly, is where it took us.
7      Q.    And do you know whether at the
8  time you were able to image the devices in
9  the systems, whether they would reflect the
10  same setup and the same kind of operating
11  capacity abilities that they would have had
12  on election day in November of 2020?
13      A.    Well, since there was a --
14  well, let me preface this.
15          We assumed that they would, and
16  that assumption was based on the fact that
17  notice was provided to Maricopa County, that
18  there was pending litigation by the Senate.
19  And so, therefore, we assumed that there
20  would be a preservation of that data in
21  accordance with law.
22      Q.    And after you imaged and
23  reviewed this information, did you appear as
24  an expert witness to testify regarding your
25  review?

Page 90
1      A.    Yes.
2      Q.    And was that -- is that the
3  Kari Lake litigation?
4      A.    Yes.  So there was also two
5  presentations to the public in the Arizona
6  Senate previous to that litigation.  I
7  believe that would have been July and
8  possibly the first part of September of 2021.
9      Q.    And you were retained by
10  attorneys representing Ms. Lake, correct?
11      A.    I was.
12      Q.    And isn't it true that that
13  litigation was dismissed by the Court?
14      A.    I believe it was, but then it
15  was subsequently appealed.  I believe they're
16  still -- they are still in legal proceedings
17  over that matter, as I understand it.
18      Q.    And is that the case we talked
19  about earlier, wherein sanctions were awarded
20  against the attorneys for the client you were
21  retained by?
22      A.    Well, I can't speak as to
23  sanctions.  However, there was a complaint at
24  the bar.
25      Q.    Are you aware of whether the

Page 91
1  Court in that case found that Rule 11
2  sanctions were appropriate against Ms. Lake's
3  attorneys?
4      A.    You'd have to ask the attorneys
5  on that.  I didn't pay a lot of attention to
6  that.
7      Q.    And isn't it also true that
8  there was a special master appointed by the
9  Arizona State Senate in that litigation?
10      A.    There was.
11      Q.    And isn't it true that the
12  special master in that case disagreed with
13  your findings related to what the
14  forensically-imaged information showed?
15      A.    That is true, they disagreed
16  with our findings.  However, their report was
17  fatally flawed.
18      Q.    Is that your opinion?
19      A.    Well, I think it would be any
20  honest examination of the facts opinion.
21  One, their scope was strictly limited to the
22  network aspects of the systems.
23          That was the reason they
24  appointed the special master, is they did not
25  want to produce the routers and network data

Page 92
1  to the auditors.  So they appointed a special
2  master.
3          The -- in that report, they
4  stated that Maricopa County had informed them
5  that there were no managed switches that were
6  part of the voting system.  And because of
7  that statement and a brief inspection of a
8  computer routing rack that was created after
9  the election, the special master said they
10  could not have been connected to the -- there
11  was no -- they stated that there was no
12  managed switch, so therefore, there was no
13  data, and that it was an Air Gapped system.
14          The problem with that is that
15  Pro V&V had been engaged in March of 2021 by
16  Maricopa County.  And as part of their
17  examination for their audit, they listed a
18  managed switch.  So it's clear that the
19  special master report did not have access to
20  the equipment and the configuration that
21  existed at the time of election, and at the
22  time of the Pro V&V audit.
23      Q.    The court found the special
24  master's findings to be dispositive, right?
25      A.    The Court certainly considered



Page 97

1         Do you see that?
2    A.    I do.
3    Q.    And the Court says that the
4    special master found, quote, "No evidence
5    that the routers, manage switches, or
6    electronic devices in Maricopa County's
7    Ballot Tabulations Center connected to the
8    public Internet," right?
9    A.    I see that.
10   Q.    And is this consistent with the
11   special master's testimony?
12   A.    That is.  However, what I would
13   like to point out here is that the special
14   master's examination of the current state of
15   the Maricopa County network was conducted
16   almost two and a half months after we imaged
17   the devices.
18        At no time did they request or
19   did they examine the forensics images that we
20   created that was the basis of my testimony.
21        So in other words, they wrote a
22   report without looking at the evidence.  They
23   wrote a report in which not all of the
24   evidence, as it existed at the time of the
25   election, existed.

Page 98

1         And they relied almost
2    exclusively on the Maricopa County officials'
3    assertion that it was an Air Gap network.
4         So this was his decision, but
5    quite frankly, I don't understand how you can
6    make this decision when they didn't look at
7    the evidence that we preserved.  And the
8    Senate had a copy of those images.
9         And that did not include all
10   the equipment that the Pro V&V audit report
11   validated was present at the time of the
12   election.
13        You know, I think we've all
14   been in cases where we believe the judge got
15   it wrong.  And in this case, he definitely
16   did.
17   Q.    As the Court then goes on to
18   state at the bottom of that page, it says:
19        "The special master's findings
20        are consistent with what the County
21        has long maintained and what previous
22        audits have likewise concluded."
23        Do you see that?
24   A.    I do.
25   Q.    And then the Court says:

Page 99

1         "Although the plaintiffs'
2    claims that Maricopa County's systems
3    can be or have been connected to the
4    Internet are in direct contradiction
5    to the County Defendant's evidence and
6    the special master's findings, the
7    Court will treat them as unpersuasive
8    arguments rather than as false
9    assertions of fact, allowing
10   plaintiffs the benefit of the doubt."
11        Do you see that?
12   A.    I think the keyword there is
13   they allowed the plaintiffs the benefit of
14   the doubt.  If you will review my report to
15   the Senate, I itemized specific instances in
16   which multiple connections were made external
17   to the Air Gap network by the EMS.
18   Q.    And you maintain control or
19   possession of the information that you
20   forensically reviewed in this case?
21   A.    So I returned to forensics
22   images to the Arizona State Senate.
23   Q.    Did you rely upon the forensic
24   images from the Maricopa County voting
25   systems in rendering your opinions in this

Page 100

1    case?
2    A.    From a corpus of knowledge as
3    it pertained to cyber security, yes, in
4    paragraphs 20 and 21.
5         There was no dispute that they
6    did not patch the systems, they had not
7    updated the antivirus, they allowed remote
8    access to the EMS, they had used the same
9    password for all user accounts on the system.
10   There's no dispute to that.
11   Q.    And I'm just trying to
12   understand that -- the extent to which you
13   relied upon that for rendering your opinions
14   in this litigation.
15        And that's in paragraphs 20 and
16   21, you said, correct?
17   A.    Well, specifically to the Air
18   Gap network, I relied on my personal
19   knowledge and the ability to easily bypass
20   Air Gap networks through various techniques.
21   I did not rely on this particular finding by
22   the judge as part of my report.
23   Q.    Okay.  I want to talk about the
24   next system that you forensically reviewed,
25   and that's Antrim County, Michigan, correct?



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
101–104

Page 101

1    A.    Correct.
2    Q.    And what company manufactured
3  the voting system information you reviewed
4  from Antrim County?
5    A.    Dominion.
6    Q.    And was that the Dominion
7  5.5(a), did you testify earlier?
8    A.    B.
9    Q.    5.5(b), okay.
10    A.    5.5(b) --
11    Q.    I'm sorry?
12    A.    5.5(a) is Georgia.
13    Q.    And what components of the
14  voting system did you forensically review in
15  Antrim County?
16    A.    So with Antrim County, I had
17  access to previously imaged -- to a
18  previously-imaged forensics image of the EMS
19  server, as well as the poll books and I
20  believe an ICC.
21    Q.    So no BMD, correct?
22    A.    And a BMD, yes.
23    Q.    There was a BMD?
24    A.    Yes.
25    Q.    And you don't recall one way or

Page 102

1  the other whether BMDs were used in Antrim
2  County in the 2020 election?
3    A.    I don't recall if this was one
4  that was actually used or one that they had
5  imaged.
6        I actually had imaged that one,
7  so I don't know if that one was actually used
8  in the election or not, so...
9    Q.    And it sounds like -- you said
10  you imaged one thing and then they had imaged
11  other things.
12        So who did the -- who obtained
13  the information that you reviewed --
14    A.    I'd have to look at the custody
15  documents for the exact person, but I believe
16  it was a member of an organization called
17  ASOC.
18    Q.    Is that Colonel Waldron's
19  organization?
20    A.    I believe so, yes.
21    Q.    Do you know the manner in which
22  they collected information?
23    A.    Based on the forensic images
24  that I got, it appeared to be created with
25  FTK Imager in conjunction with the use of a

Page 103

1  write block.
2    Q.    Are you confident that it
3  was --
4    A.    And it was --
5        (Cross talk.)
6        (Reporter clarification.)
7        THE WITNESS:  It was in the
8        N-case format.
9  BY MR. FREY:
10    Q.    Are you confident that it was
11  collected in the manner that would
12  demonstrate how it would have performed on
13  election day?
14    A.    I saw no indications that
15  anything was modified on it.  And within the
16  N-case forensics image format, it has a
17  self-validation/verification function.  And
18  the images -- the image is verified.
19    Q.    And did you appear as an expert
20  witness related to your review of the
21  information obtained from Antrim County?
22    A.    Specific to Antrim County, I
23  submitted an affidavit, but it did not reach
24  court so I did not testify.
25    Q.    That litigation was dismissed

Page 104

1  by the court, correct?
2    A.    Correct.
3    Q.    Do you retain control or
4  possession of the forensic images from Antrim
5  County?
6    A.    I returned those to the
7  attorney.
8    Q.    Did you review the forensic
9  images from Antrim County in the course of
10  drafting your declaration in this case?
11    A.    I reviewed the report at some
12  point prior to writing this, but once again,
13  that formed the -- kind of the corpus of
14  knowledge for paragraphs 20 and 21.
15    Q.    And in paragraphs 20 and 21,
16  you don't cite to any specific, you know,
17  findings or Antrim County specifically in
18  there, correct?
19    A.    No, but what I did find was
20  consistent among all of the Dominion systems,
21  was an -- I would call it a complete and
22  utter lack of cyber security issues.
23        The systems weren't patched,
24  the antivirus wasn't updated, there was no
25  mechanism to validate that only certified



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
105–108

Page 105

1  processes were being run, that only
2  authorized MAC addresses were communicating.
3      The user passwords had never
4  been changed since the date of the
5  installation of the software, and there was
6  repeated usage of the same password within
7  each jurisdiction for all user accounts.  And
8  that had been across all Dominion.
9      Q.    And we just -- we don't -- to
10  your knowledge, defendants have not produced
11  any of the information you're relying on here
12  to plaintiffs in this case, right?
13      A.    No one has asked for it.
14      Q.    And if the request were made,
15  would you be able to provide the images you
16  reviewed from Antrim County?
17      A.    I would, but I would assume
18  that that would take a court order, because
19  one company is looking at another company's
20  proprietary data.  But, yes, we would produce
21  that.
22      Q.    Moving on to Mesa County,
23  Colorado.
24      What voting system information
25  did you review from Mesa County, Colorado?

Page 106

1      A.    I reviewed an image of the
2  Dominion EMS.
3      Q.    So not a ballot-marking device,
4  correct?
5      A.    Correct.
6      Q.    And how did you obtain the
7  information or the image of the Dominion EMS
8  from Mesa County, Colorado?
9      A.    I was provided that by the
10  legal team that was defending -- I'm sorry, I
11  don't remember her name right now -- but the
12  County clerk and the election official for
13  Mesa County.
14      Q.    Is it Tina Peters?
15      A.    It is.  Thank you.
16      Q.    Are you aware, then, that Ms.
17  Peters was indicted for copying this election
18  software from Mesa County Colorado without
19  authorization?
20      MR. KACHOUROFF:  Objection.
21      (Inaudible) hypothetical.
22      Go ahead, you can answer the
23  question.
24      THE WITNESS:  I knew she had
25  legal problems.  I wasn't aware of

Page 107

1  exactly what she was charged with.
2  BY MR. FREY:
3      Q.    And you said you got the image
4  that you reviewed from her attorneys; is that
5  right?
6      A.    Yes.
7      Q.    And was that in connection with
8  the defense of her criminal case?
9      A.    That was my understanding, yes.
10      Q.    And what work did you do with
11  that image?
12      A.    I was asked to be a
13  non-testifying expert and review the findings
14  of another team's report.
15      Q.    Do you maintain control or
16  possession of the image of the Dominion EMS
17  from Mesa County, Colorado?
18      A.    I do not.
19      Q.    Are you relying upon your
20  review of the Dominion EMS from Mesa County,
21  Colorado in rendering your opinions in this
22  case?
23      A.    Only to the effect of the cyber
24  security implications for the election
25  systems as a whole.

Page 108

1      Q.    Okay.  What voting system
2  information did you review from Coffee
3  County, Georgia?
4      A.    I was retained by Misty
5  Hampton's attorney to examine the EMS and one
6  ICC notebook as part of her defense for Misty
7  Hampton.
8      Q.    And was that -- excuse me.
9      (Discussion off the record.)
10  BY MR. FREY:
11      Q.    So you reviewed the EMS and an
12  ICC notebook.
13      Was that a Dominion system?
14      A.    That was, yes.
15      Q.    And again, that's -- you did
16  not review an image of a ballot-marking
17  device, correct?
18      A.    No.
19      Q.    And do you know how the image
20  that you reviewed of the EMS and ICC notebook
21  was obtained?
22      A.    Yes.  I was provided that by --
23  or provided access to it by Stephanie
24  Lambert, who was the attorney for Misty
25  Hampton.



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
109–112

Page 109

1    Q.    Okay.  And was Ms. Lambert
2    representing Ms. Hampton against the charges
3    that she had illegally obtained this
4    information?
5    A.    I don't know exactly what Misty
6    Hampton's charges were, but there was the
7    possibility that she would be charged with
8    something.
9    Q.    And what was the purpose of
10   your review of the information?
11   A.    I think that gets a little bit
12   into the attorney-client work product piece
13   there, and they have not released that --
14   they have not given me authorization to
15   discuss that.
16          But I will tell you that for
17   the purposes of this declaration, I relied on
18   the general cyber security status indicative
19   on the EMS system.
20          So passwords, remote access,
21   system patches, failure to update the
22   antivirus, and Internet access.
23   Q.    And do you maintain control or
24   possession of the this EMS ICC notebook
25   images?

Page 110

1    A.    That's an ongoing case, so yes,
2    I still have a copy of those forensic images.
3    Q.    And you understand that if it's
4    an ongoing case, that it's not been made
5    available to Smartmatic in this action,
6    correct?
7    A.    I certainly have not provided
8    it to you.  I don't know if Ms. Lambert has
9    or not.
10   Q.    Again, I believe you said
11   you're relying on it to the extent of the
12   opinions you render in paragraphs 20 and 21?
13   A.    Correct.
14   Q.    And then the last one here,
15   Adams County, Michigan.
16          What voting system information
17   did you review from Adams County, Michigan?
18   A.    So that was the Hart
19   Intercivic.
20          (Reporter clarification.
21   BY MR. FREY:
22   Q.    What type of election
23   technology -- what were the components that
24   you reviewed from Adams County, Michigan?
25   A.    So I looked at the precinct

Page 111

1    iPad.  And I visually inspected that, I did
2    not image that device.
3          My purpose there was to
4    validate that the local election clerk had
5    that particular tablet secured behind a lock
6    and key and that it was functional.
7          I subsequently was provided
8    data specific to the databases and the
9    compilation of the votes from the EPB thumb
10   drive for analysis.
11   Q.    "EPB," what does EPB stand for?
12   A.    Or, I'm sorry -- EDP, Election
13   Database.
14   Q.    And how did you obtain -- or
15   who obtained the EDP thumb drive for
16   analysis?
17   A.    That would have been the
18   attorney, Ms. Lambert.
19   Q.    And do you know how she
20   collected it?
21   A.    I do not.
22   Q.    Are you aware that also
23   criminal charges were considered against the
24   Adams County clerk related to her disclosure
25   of this voting system information?

Page 112

1    A.    I am.
2    Q.    And that's the data you
3    obtained?
4    A.    Yes.  I would like to also
5    clarify that in my engagement letter, I have
6    a paragraph 10 that states -- it's an
7    indemnity clause in which the attorneys I
8    engage represent that all data that they
9    present to me for examination is legally and
10   lawfully obtained, and that they have a right
11   to authorize me to examine it.
12   Q.    So you're relying on the
13   attorneys there, correct?
14   A.    Correct.
15   Q.    And do you still maintain
16   control or possession of the EDP from Adams
17   County?
18   A.    I do.  It's an ongoing case.
19   Q.    Did you rely upon this
20   information from Adams County in rendering
21   your opinions in this case?
22   A.    No.
23   Q.    Okay.
24          MR. FREY:  Let's take another
25   break -- I'm at a good point -- and



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
113–116

Page 113

1    use five minutes.
2        THE VIDEOGRAPHER:  Going off
3    the record at 12:06 p.m.
4        (Break taken.)
5        THE VIDEOGRAPHER:  We are back
6    on the record at 12:41 p.m.
7    BY MR. FREY:
8        Q.    All right.  Mr. Cotton, we're
9    back on the record.  I want to briefly talk
10   about the scope of your opinion in this case
11   again, and to confirm that -- are the
12   opinions you set forth here in your
13   declaration the opinions you intend to offer
14   at trial in this matter?
15       A.    Yes.
16       Q.    Are you planning to offer any
17   other opinions not identified in your
18   declaration?
19       A.    I haven't been asked any other
20   opinions at this point.  If I was asked, I
21   would write an addendum, should more
22   information become available.
23       Q.    Do you intend to perform any
24   additional analysis?
25       A.    No.

Page 114

1        Q.    Do you currently intend to
2    change any of the opinions set forth in your
3    declaration?
4        A.    No.
5        Q.    Are you offering any opinions
6    in this case on the truth of the statements
7    Mr. Lindell published regarding Smartmatic's
8    alleged role in the validity of the 2020 U.S.
9    election?
10       A.    No.
11       Q.    Are you aware of the statements
12   Mr. Lindell published regarding Smartmatic
13   and its alleged role in manipulating the 2020
14   U.S. election?
15       A.    I am not aware of specific
16   statements by Mr. Lindell.
17       Q.    Have you reviewed Smartmatic's
18   first amended complaint in this litigation?
19       A.    I don't believe I have.
20       Q.    Have you watched Mr. Lindell's
21   documentary, Absolute Proof?
22       A.    I have not.
23       Q.    Have you watched Mr. Lindell's
24   documentary, Absolute Interference?
25       A.    I have not.

Page 115

1        Q.    Have you watched Mr. Lindell's
2    documentary, Absolutely 9-0?
3        A.    I have not.
4        Q.    And have you watched Mr.
5    Lindell's documentary, Scientific Proof?
6        A.    I have not.
7        Q.    You did attend Mr. Lindell's
8    cyber symposium in August of 2021, correct?
9        A.    I went there.  The data that I
10   had been promised would be provided to me was
11   not provided, and so I did not stick around.
12   I was not actually part of the symposium.
13       Q.    And so is it your opinion,
14   then, that at least to your review or what
15   you have seen, the alleged PCAP data
16   demonstrating the November 2020 U.S. election
17   was manipulated is not evidence that the
18   election was manipulated?
19       A.    All I can respond to is the
20   data that was provided to me.  Whether or not
21   or that was the entire body of data that was
22   provided to the other 15 or 20 experts, I
23   cannot opine on.
24            But I can tell you that the
25   data that was provided to me was not

Page 116

1    sufficient for me to make an opinion on that.
2        Q.    And you're not intending to
3    offer any affirmative opinions in this case
4    regarding the validity of the alleged PCAP
5    data, right?
6        A.    That is not within the scope of
7    my declaration.
8        Q.    Are you aware of statements
9    published by Mr. Lindell and Dr. Frank
10   regarding a 6th degree polynomial algorithm
11   that was used to manipulate the November 2020
12   U.S. election?
13       A.    Only tangentially.  I remember
14   hearing something about it, and I don't even
15   remember where I heard about it.
16            But, you know, my area of
17   expertise is computer forensics, cyber
18   security.  So I don't know much about that.
19       Q.    So you're not going to offer
20   any opinions regarding that theory as an
21   expert in this case, correct?
22       A.    No.
23       Q.    Are you aware of claims made by
24   Mr. Lindell and others that cast vote records
25   indicate that the election in LA County was



Page 117

1   manipulated by Smartmatic?
2       A.    I am not.
3       Q.    So is it fair to say that you
4   will not be offering any opinions in this
5   case regarding what cast vote records may
6   indicate regarding the integrity of the 2020
7   election in LA County?
8       A.    That is not currently within
9   the scope of my engagement.
10      Q.    Are you familiar with the
11  Election's Infrastructure Government
12  Coordinating Council?
13      A.    Are you talking the DHS entity?
14      Q.    Yes.
15      A.    I am aware of it, yes.
16      Q.    Are you familiar with it at
17  all?
18      A.    To a high-level degree, nothing
19  in detail.
20      Q.    How about the Election
21  Infrastructure Sector Coordinating Executive
22  Committee?
23      A.    I'm aware that it exists.  I am
24  not a member of it.
25      Q.    Were you aware that on

Page 118

1   November 12, 2020, these two -- that the
2   EIGCC and the EISEC issued a report stating
3   that the November 3rd election was the most
4   secure in American history, and that there's
5   no evidence of any voting system lost -- any
6   voting system lost or deleted votes, changed
7   votes, or was in any way compromised?
8       A.    I am aware they issued that
9   report, yes.
10      Q.    Do you disagree with that
11  statement?
12      A.    I do disagree, to the extent of
13  my knowledge on the systems that I have
14  examined.
15            In the case of Arizona for
16  example, there were several hundred thousand
17  ballots deleted off of the EMS by the time
18  that we received that.  Some of those were
19  actually during the election time period.
20            So I would have to understand
21  better the full scope and the basis for their
22  statement before I could really opine on the
23  validity of it.
24            But I know from personal
25  experience, there do appear to be some

Page 119

1   incongruities with the forensics facts versus
2   the statement that was released.
3       Q.    And the basis for that is the
4   forensic work you did in Maricopa County,
5   Arizona; is that right?
6       A.    Maricopa, Antrim, and Georgia.
7   During the case of Antrim, there was clearly
8   votes that were flipped.  There's still some
9   debate a bit about why that happened, but the
10  clerk caught those.  So we do know that that
11  did occur, but that was corrected.
12            So, you know, there are some
13  inconsistencies with the absolute statement
14  on that report that they released.
15      Q.    Are you intending to offer
16  opinions in this case regarding the outcome
17  of elections in Michigan, Arizona, or
18  Georgia?
19      A.    That's not within the scope.
20  And I will tell you that my testimony will be
21  centered around forensics findings and
22  forensics evidence on the systems that I have
23  examined.
24      Q.    Are you aware of any evidence
25  of actual voter manipulation or actual vote

Page 120

1   manipulation occurring in LA County in the
2   November 2020 U.S. election?
3       A.    I have not been able to examine
4   the actual systems.  So once again, from a
5   forensics standpoint, I am not aware because
6   I have not been able to examine the actual
7   systems.
8       Q.    And I believe in preparing your
9   declaration, you reviewed a number of
10  documents related to the VSAP 2.1
11  certification, right?  Those are listed in
12  paragraph 14 of your -- or 13 of your report?
13      A.    That is correct.
14      Q.    And aside from reading these
15  documents and the version 3.0 certification
16  documents, what else did you do to
17  familiarize yourself will the LA County VSAP
18  initiative?
19      A.    I obviously read the web page
20  articles that they had.  Anything related to
21  VSAP, I reviewed those pages.  And I reviewed
22  the reports, I reviewed the source code
23  report and those items as listed in my
24  declaration.
25      Q.    What is your understanding of



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
121-124

Page 121

1  the components of the VSAP system used in
2  November 2020 that were manufactured or
3  designed by Smartmatic?
4      A.   Well, I looked at it from --
5  from a systematic hold perspective.  And so,
6  you know, there's various components.
7          My understanding is that
8  Smartmatic has a component within all of
9  those related systems.  My scope of this work
10  was not related specifically to Smartmatic,
11  it was to the VSAP system.
12      Q.   So in -- I guess, in performing
13  your work, you didn't worry so much about
14  whether it was a Smartmatic manufactured
15  component versus a component manufactured by
16  someone else?
17      A.   That's correct.
18      Q.   Okay.  In the course of your
19  analysis in this case, did you explicitly
20  analyze or consider the ballot marking
21  devices?
22      A.   Only to the extent that there
23  were reports or evaluations based on those
24  ballot marking devices.
25      Q.   What is your understanding of

Page 122

1  the functionality of a ballot-marking device?
2      A.   Well, a ballot-marking device
3  is a computing device that contains
4  vendor-specific application software that a
5  user either disabled or, in some
6  jurisdictions -- like in Georgia, for
7  example -- they do this for all voters.
8          But through the interaction of
9  the user and the application, they were able
10  to indicate on a stored ballot what their
11  voting preferences are, and then that vote is
12  tallied and recorded as part of the voting
13  process.
14          In some cases, they will
15  present a screen after the user has selected
16  the votes and the voter will confirm on the
17  screen; or in some cases, they actually print
18  something out and the voter supposedly looks
19  at that, validates it.
20          And then once they commit, then
21  that vote is considered closed and is then
22  counted as part of the election process.
23      Q.   Do you know in LA County,
24  whether the BMD printed out the ballot before
25  allowing the voter to cast their ballot?

Page 123

1      A.   I do not recall.  That would be
2  in the user's manual.
3      Q.   Do you know whether the ballot
4  marking devices used in LA County in
5  November 2020 tabulated votes?
6      A.   I believe those votes were
7  transmitted to a central tallying facility.
8  I believe that was called BMG.
9      Q.   Do you know whether the ballot
10  marking devices used in LA County in
11  November 2020 would store votes?
12      A.   It would obviously store those
13  votes prior in some medium, either in memory
14  or on thumb drive or removable media, until
15  those votes were transmitted to the central
16  counting facility.
17      Q.   Do you know whether the
18  ballot-marking devices used in LA County in
19  November 2020 generated a paper ballot?
20      A.   I do not know.
21      Q.   What is your understanding of
22  BMG system in LA County's VSAP initiative?
23      A.   So the BMG is basically a
24  manager for all of the ballot-marking
25  devices, and also contains some capacity or

Page 124

1  the function for a centralized repository for
2  the different voting tabulations.
3      Q.   When you say "a centralized
4  repository for the different voting
5  tabulations," could you explain what you mean
6  by that?
7      A.   Well, the votes can be
8  transmitted to that BMG and then aggregated
9  into a total.
10      Q.   What is the basis for your
11  understanding in that regard?
12      A.   My review of the user's manual.
13      Q.   It's your understanding there
14  that the BMG would take a record of an
15  electronic record of the vote from the
16  ballot-marking device?
17      A.   It can.  I haven't examined the
18  actual systems that were used in the
19  election, so I don't know what their
20  configuration was or how they functioned in
21  that particular election.
22      Q.   If the BMG did not create an
23  electronic record of a vote, would that
24  impact your opinions at all?
25      A.   No, because I'm approaching



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
125–128

Page 125

1  this from a cyber security perspective, can
2  you get remote access to an individual
3  component?
4        The ATSEC report evaluated all
5  of the different components, not just the
6  BMG. So it wouldn't change my opinions.
7     Q.    In forming your opinions in
8  this case with respect to the ability to
9  remote -- to gain remote access, have you
10 formed opinions or do you have opinions
11 regarding what could or could not be done
12 with that remote access?
13    A.    I have some opinions to that.
14 And obviously, as I get the opportunity to
15 examine these specific devices, I would form
16 more.
17        But based on the
18 vulnerabilities that are in the ATSEC report,
19 you have the ability to iterate the running
20 processes remotely.
21        You have the ability to inject
22 -- do memory injections on these devices.
23 You have the ability to perform buffer
24 overflows on these devices.
25        You have the ability to

Page 126

1  manipulate vulnerabilities, such that you
2  could overwrite specific files within these
3  end points.
4        And you have the ability to
5  escalate your user privileges if you do have
6  access to the systems.
7     Q.    I want to take those one at a
8  time.
9        So the first thing you said, I
10 believe, is the ability to iterate running
11 processes.
12        What do you mean by "iterate
13 running processes"?
14    A.    Well, there's no protection on
15 the ports, from what I can tell, on the
16 vulnerability listings to prevent the
17 interrogation of the devices.
18        And based on the return of the
19 -- it's called fingerprinting your ports,
20 okay?
21        So there's no protection that I
22 can see, either from a firewall or other
23 methodology, that would prevent the
24 fingerprinting of those ports so that you
25 understand what processes are running and

Page 127

1  communicating with those ports.
2     Q.    So if a port was fingerprinted,
3  I suppose, what would someone do with that?
4     A.    Just as one example, they run
5  SQLite databases.  SQLite databases could
6  communicate on port 1443 and 1445.
7        If you fingerprint a port, one,
8  you validate that they are running SQL; and
9  two, you know exactly which ports they are so
10 that you can then craft buffer overflows that
11 you may be able to get command line access
12 back into the SQL server for that port.
13        That's just one example of
14 that.
15    Q.    What do you mean by "a buffer
16 overflow"?
17    A.    So a buffer overflow is a
18 specific type of vulnerability in which you
19 send a specific formed packet to that device,
20 and that -- the packet instructions will
21 exceed the expected buffer length for a given
22 technology.
23        So SQL, for example:  It's
24 expecting a payload package with X-amount of
25 characters in it.  If you -- for a buffer

Page 128

1  overflow, what you can do is, once that
2  expected length of a packet is reached, you
3  can then insert commands and specific code
4  after that so that it is executed in memory.
5        And per the -- per the report,
6  they did not appear to have -- or those
7  systems were susceptible to buffer overflow
8  methodologies, and that's in the ATSEC
9  report.
10    Q.    So if the buffer overflow
11 methodology is used and a specific code is
12 put into a BMD, what impact, if any, would
13 that have?
14    A.    Well, it depends on what your
15 attacking and what the code is.  But
16 theoretically, you could change the contents
17 of the local database on the BMD.
18        You could change the CVR.  You
19 could change the ballot image that's
20 presented to the voter.
21        I mean, you know, it really
22 depends on what your objective is as an
23 intruder or a hacker at that particular
24 point, as to what you could do.
25    Q.    And do you agree that if the



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
137–140

Page 137

1  to obtain certification?
2      A.    Well, the ATSEC report is
3  certainly used to identify vulnerabilities.
4  The follow-on remediation piece, that's
5  entirely up to the County, whether or not
6  they want to address those or try to use
7  compensating controls for those
8  vulnerabilities.
9      Q.    Did you review any
10  documentation from the County regarding how
11  they were addressing identifying
12  vulnerabilities?
13      A.    I don't recall reviewing a
14  document in which they addressed the
15  vulnerabilities.
16      Q.    And you did not review any
17  documents not listed in your report here, at
18  page --
19      A.    Well, I've indicated that I did
20  look at the websites for LA County, and I
21  didn't list every website and things.
22      But the documents listed in my
23  declaration are the primary basis for my
24  report.
25      Q.    So there's a -- Item 13-D in

Page 138

1  your report is, County of Los Angeles VSAP
2  2.1 Stat Report, a PDF, correct?
3      A.    Correct.
4      Q.    I'm going to put a document
5  into the chat, which will be Exhibit 707 --
6  709.
7      I apologize.  This will be 708.
8  The document for the record with Bates
9  identifier Smartmatic-Lindell 00017735.
10      (Exhibit No. 708 marked for
11      identification.)
12  BY MR. FREY:
13      Q.    Let me know when you have that,
14  Mr. Cotton.
15      A.    I have that.
16      Q.    All right.  Do you see that
17  this is a County of Los Angeles VSAP Tally
18  Voting System Staff Report, dated August 14,
19  2020?
20      A.    I do.
21      Q.    Did you -- is this the document
22  you reviewed in forming your opinions on the
23  case?
24      A.    Yes, this is the one that is
25  listed in my declaration.

Page 139

1      Q.    And if you go to the fifth page
2  of the document, do you see that it lists the
3  source code findings review and then the
4  staff analysis of that finding?
5      A.    Yeah.
6      Q.    And various of these indicate
7  that the finding was resolved, correct?
8      A.    Yes.
9      Q.    Walking through this
10  paragraph 15 of your report, in item C, you
11  say, "A static code analysis by ATSEC
12  revealed 14 low severity findings," correct?
13      A.    Yes.
14      Q.    Do you know whether or not
15  those findings are the ones that are resolved
16  here in --
17      A.    So here's what I will say, is
18  that some of those findings are addressed in
19  this.  However, if you look at the resolve,
20  they're actually not resolved.
21      So basically, they have
22  attempted to put in some compensating
23  controls to mitigate the effects of those
24  particular vulnerabilities.
25      Specific is the Air Gap system,

Page 140

1  and that's used on a number of these cases
2  that says, Well, we don't have to worry about
3  this because it's an Air Gap system.
4      Okay.  The challenge with that
5  is:  One, it doesn't address any insider
6  threat.  So if a user -- a malicious user has
7  authorized access to that Air Gap system,
8  then the vulnerability is still there, okay?
9      If someone penetrates that Air
10  Gap system through island-hopping or some
11  other mechanism, then that vulnerability is
12  still there.  So it's not resolved in the
13  formal sense of that word, as in it doesn't
14  exist anymore.
15      It still exists, but they have
16  attempted to put in a compensating control
17  for that.
18      Q.    And the control that is put in
19  is meant to protect the integrity of the
20  voting results in the election, right?
21      A.    It's an effort to protect the
22  system, yes.
23      Q.    And so, just so I understand
24  your opinions here, are you not concerned
25  about -- or are you not taking into account



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
141–144

Page 141

1   efforts that would protect the integrity of
2   the system if there is still a technical
3   vulnerability in the software?
4        A.   You know, I've been doing
5   incident response for a long time.  And I
6   have been dealing with hackers for a long
7   time.
8            And I have dealt in the U.S.
9   government on the classified side of programs
10  as a contractor.  And I know the techniques
11  and the methodologies by which you can bypass
12  these compensating controls.  So I recognize
13  the fact that they put a compensating control
14  in place.
15           But if, you know, there's this
16  little problem with people in the middle of
17  these things, right?  How do they implement
18  them?  How did they set that up?  How did
19  they configure these systems in conjunction
20  with the compensating controls to ensure that
21  they weren't exploited, right?
22           So you may have heard of
23  Stuxnet, that's a pretty famous open source
24  vulnerability that jumps Air Gap systems, and
25  it does it through devices.

Page 142

1            Another common methodology is
2   island-hopping, where someone -- either
3   witting or unwitting -- establishes a
4   connection on an Air Gap system through an
5   external wi-fi or other mechanism.
6            So there are multiple ways that
7   you could bypass these mechanisms.  I
8   recognize the fact that they are in place and
9   they're attempting to use that as a
10  compensating control.
11           But without actually examining
12  the system to determine whether or not those
13  controls were effective, is a different
14  matter entirely.
15       Q.   Moving on to paragraph 16 of
16  your report, you say:
17           "Based on my review of the
18       ATSEC source code review report, the
19       Smartmatic and VSAP devices have the
20       following interfaces that are used for
21       data transfer and communications with
22       other network devices."
23           And then you list A to K,
24  correct?
25       A.   Correct.

Page 143

1        Q.   And for each of these
2   interfaces, are you differentiating whether
3   it was on a Smartmatic device or a different
4   component of the VSAP system?
5        A.   So the VSAP system looked at
6   all components as a whole.  So I didn't
7   differentiate that Smartmatic has this
8   specific, you know, thing -- only Smartmatic,
9   et cetera.
10       Q.   Item D on your list says,
11  "Remote voting is provided by Amazon web
12  servers and is open to the public Internet."
13           What is the basis for your
14  statement there?
15       A.   Specifically, I believe it's
16  the -- within the report, as they're listing
17  the dependencies of these different
18  components, there's a specific listing in
19  there, both on the ATSEC report and this is
20  referenced also in the user guide for Amazon
21  web services.  And so it relies on Amazon web
22  services for its functionality.
23       Q.   And what is your understanding
24  as to how it relies on Amazon web services?
25       A.   My understanding is that it

Page 144

1   uses the S-3 buckets as a repository for
2   data.
3        Q.   And do you -- what is your
4   understanding of whether that -- Amazon web
5   service's use is implemented through a
6   Smartmatic-manufactured component of VSAP,
7   versus some other component of the VSAP
8   system?
9        A.   Well, just if you'd allow me to
10  look at the ATSEC, I'll tell you exactly
11  which component.  Just one minute.
12           So it's the ISB.
13       Q.   What page are you looking at?
14       A.   On the ATSEC, it's page 15.
15       Q.   Page 15 -- okay.  Next to ISB.
16       A.   Yeah.  "Amazon services is used
17  for cloud-based hosting and storage."
18       Q.   And is this statement here on
19  page 15, is that -- that the reference that
20  you are relying on for inclusion of this
21  Amazon web servers --
22       A.   That's also referred to in the
23  user guide, the user manual as well.
24       Q.   Did you say before that was the
25  user guide for 3.0?  Or for 2.1?



Page 153

1              Do you see that?
2      A.    Yes.
3      Q.    What's the relevance of that
4  statement?
5      A.    So they had this software
6  testing report up there but it was only a
7  sliver or small subcomponent of the actual
8  software system.
9            So while they have that up
10  there, just the tally software was addressed,
11  and any software that was contained on any of
12  the other components were not part of that
13  report.
14     Q.    Okay.  So in that particular
15  report, it was limited to the tally software?
16     A.    Correct.
17     Q.    And did you look at the --
18  listed in number I of your report, on 13-I --
19  the Consultant Security and
20  Telecommunications Testing Report?
21     A.    Yes.
22     Q.    And to the extent that that
23  included the BMD and other components, would
24  that ameliorate your concern in paragraph 19?
25     A.    Probably not.  If I recall that

Page 154

1  document -- and I don't have that in front of
2  me right now -- that was primarily concerned
3  with the network traffic from these devices.
4      Q.    Moving on to paragraphs 20 and
5  21, these are the paragraphs where you're
6  kind of relying on your work prior to this
7  litigation; is that right?
8      A.    Yeah.  So these two paragraphs
9  were designed to provide a kind of a
10  visualization of the state of insecurity for
11  the existing voting systems that I have had
12  the opportunity to analyze.
13            There's a misperception out
14  there that because the EAC in this case -- or
15  the certification body for those other
16  systems -- because those are certified, then
17  they are secure.
18            And that is a very drastic
19  misconception, because there are very serious
20  cyber security issues with those systems as
21  they exist.
22     Q.    Okay.  And again, so that's a
23  -- that's the voting systems you've analyzed
24  from Arizona, Michigan and Georgia, correct?
25     A.    That's correct.

Page 155

1      Q.    And that was the components of
2  the systems we discussed this morning?
3      A.    That's correct.
4      Q.    And is it correct that, I
5  believe for the Maricopa County system, you
6  had pretty much the whole system, right?
7      A.    Yes.
8      Q.    But the other four, you were
9  only looking at pieces of the whole election
10  system in those jurisdictions, right?
11     A.    That's correct.  In all of
12  those jurisdictions, I had what I call kind
13  of the brains of the system, which is the
14  election management system or the EMS.  And
15  then I had differing components that I was
16  able to analyze.
17     Q.    And you yourself collected the
18  Maricopa County system, but I believe other
19  individuals had imaged or collected the
20  systems in Antrim County, Michigan; Adams
21  County, Michigan; Coffee County, Georgia, and
22  the other Georgia system; is that right?
23     A.    Arizona, Michigan, Georgia,
24  yes.  Those were -- Arizona, I did the actual
25  collection or people under my direct

Page 156

1  supervision collected that, and the others
2  were provided to me in the form of forensics
3  images that had been collected by other
4  parties.
5      Q.    In at least three of those
6  instances, the person who had performed the
7  collection was at least alleged to have done
8  so without authorization, right?
9      A.    Well, people make a lot of
10  allegations.  As I looked at what I knew of
11  the chain of custody path, I felt confident
12  that in all cases, the local election
13  officials had authorized those collections,
14  and that the people were authorized to make
15  those collections.  In the case of Antrim
16  County --
17            (Cross talk.)
18            (Reporter clarification.)
19            THE WITNESS:  In the case of
20       Antrim County, they actually had a
21       court order to perform that imaging
22       process.
23  BY MR. FREY:
24     Q.    Right.  For Antrim County and
25  then in Maricopa County, you had the



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
157–160

Page 157

1  subpoena, correct?
2      A.    Correct.
3      Q.    So I am thinking about the
4  other three, was the focus of my question
5  there.
6      A.    Yeah, in the -- in those other
7  cases, there was implicit authorization by
8  the County clerks who were the election
9  officials for that collection or for that
10  imaging to occur.
11      Q.    And I guess my question is, the
12  person who did the collection was not you,
13  nor under your supervision in those three
14  instances, right?
15      A.    That is correct.
16      Q.    Okay.  So now looking at 20 in
17  particular, you discussed this CISA Best
18  Practices For Securing Election Systems,
19  dated November 2022, right?
20      A.    Correct.
21      Q.    And you last reviewed it
22  September 21st, which is the date before your
23  declaration.  And I'm assuming -- you checked
24  to make sure it didn't change and that it was
25  the same?

Page 158

1      A.    Correct.  Yes.  I do have
2  knowledge that that web link now is changed
3  to a different link, sometime after that
4  point in time.
5          But if you do a search for the
6  best practices for securing election systems,
7  you'll find the proper link.
8      Q.    And then you say that there is
9  recommendations in, it looks like A to H
10  areas, right?  So --
11      A.    Correct.
12      Q.    Okay.  And it looks like you
13  say what the area is, and then note whether
14  the systems you looked at were in compliance
15  or not in compliance?
16      A.    Yes.
17      Q.    Is that accurate?
18      A.    Yes.
19      Q.    Okay.  So the first software
20  and patch management, you say, the analyzed
21  election systems do not comply, right?
22      A.    Correct.
23      Q.    And what is the evidence that
24  they do not comply, I guess?
25      A.    So the evidence stems from the

Page 159

1  forensics images that are preserved.  For
2  example, in Arizona, the installation date
3  for the Dominion software on their systems
4  was, I believe the 6th of August of 2019.
5  From that day forward, there was not a single
6  system patch that was applied to that
7  computer or to those computers.
8          From that day forward, there
9  was not a single update to the antivirus
10  software definition.
11          The number of vulnerabilities
12  that were created between the time they
13  installed that software and the time that I
14  imaged that system was, well, roughly about a
15  million vulnerabilities a day were created.
16  So you can do the math.
17          We imaged those systems in
18  April of 2021, so you're talking 700 million
19  -- at least -- vulnerabilities that existed
20  out in the wild, that these systems would not
21  have prevented.
22      Q.    So you are looking at the
23  Arizona system there to say that they do not
24  comply.
25          Anything else?

Page 160

1      A.    Well, it's not only the Arizona
2  system.  It was every system that I could
3  get, that I actually physically analyzed a
4  forensics image on.  And it was the same
5  situation across the board.
6      Q.    And that was the five we've
7  talked about, right?  When we're talking
8  about the analyzed election systems, it's
9  those five jurisdictions from Arizona,
10  Michigan and Georgia, right?
11      A.    And Colorado, so the --
12      Q.    And Colorado, yeah.
13      A.    Yeah.  The one exception to
14  that in this case is, I didn't get a physical
15  image of the Adams County Township.  If you
16  remember, I stated my scope, and it was not
17  the actual physical examination of a
18  forensics image on that.
19      Q.    And for this definition of
20  analyzed election systems, that does not
21  include LA County, correct?
22      A.    That's correct.  As of yet, I
23  have not been able to analyze a single system
24  that was utilized in the 2020 election in LA
25  County.



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
161–164

Page 161

1    Q.    And that is the same for all of
2  A through H, correct?  That -- the analyzed
3  election systems you refer to in your report
4  do not include LA County?
5    A.    Yes.  Basically, this shows a
6  pattern within the voter jurisdictions -- the
7  voting jurisdictions -- of a lack of
8  attention to detail to cyber security.
9        I would welcome the opportunity
10  to examine an LA County system to see if that
11  pattern continues into LA County.
12    Q.    And so if we take out Adams
13  County or Adams Township, there are four
14  jurisdictions that you've reviewed, right?
15    A.    Correct.
16    Q.    Do you know how many voting
17  jurisdictions there are in the United States?
18    A.    I don't.  I'm obviously limited
19  by the opportunities that are presented to me
20  to look at.  I would love to look at every
21  single one.
22    Q.    Do you know -- do you have an
23  approximation of how many voting
24  jurisdictions there are in the United States?
25    A.    I don't.

Page 162

1    Q.    If it was over 10,000, would
2  that surprise you?
3    A.    No.
4    Q.    As a cyber security analyst and
5  a scientist, do you think that 4 out of over
6  10,000 is enough to make a determination as
7  to how the jurisdictions operate in
8  compliance with CISA recommendations as a
9  whole?
10    A.    I would say that if you're
11  provided the opportunity to look at 4, and
12  100 percent of your sampling is indicative of
13  a certain result, there is a high probability
14  that that result will continue on through
15  other jurisdictions.
16    Q.    And those four opportunities
17  were brought to you, correct?
18    A.    They were part of my
19  engagements as an expert witness, yes.
20    Q.    At trial in this matter, are
21  you intending to provide testimony with
22  examples as to how each of these four
23  analyzed election systems do not comply with
24  the various CISA recommendations?
25    A.    I am prepared to do so, if

Page 163

1  asked.
2    Q.    And so in that case, I have to
3  ask you for each one here so we can
4  understand what your testimony is going to be
5  -- because it's not listed in the report and
6  we don't have the system.  So I need to
7  understand, you know, the testimony you're
8  going to be providing.
9        So we'll move onto item B, log
10  management.  You say the analyzed election
11  systems do not comply with CISA
12  recommendations.
13        What is basis for that
14  statement?
15    A.    Well, there's two aspects to
16  that:  One, the CISA recommendation
17  recommends that you use an aggregated logging
18  source.  So in some technologies, it's called
19  a SEIM, S-E-I-M.
20        And basically, what that
21  prevents is the changing of logs by
22  intruders.  So logging itself is conducted,
23  both by the application and by the operating
24  system itself on these loading systems.
25        In the case of the analyzed

Page 164

1  systems, which we have discussed, the
2  voting -- or the operating system logs were
3  set to 20 megabytes of data retention.
4        Well, in a big county with lots
5  of activity, that is not enough space to
6  store all of the logs covering an election
7  time period from October through November,
8  right?
9        And so logs are overwritten,
10  logs are no longer there, and there is no
11  independent storage of those logs to preserve
12  that data.
13        And that is one of the CISA
14  recommendations, is that you have an
15  independent storage of those logs.  And that
16  could be part -- part of that Air Gap system,
17  but they want you to store those logs
18  independently from the systems that generate
19  them.
20        It's a common hacker tactic
21  that if you do get access to a system, you
22  know when you accessed it, you know when you
23  left it, and you can wipe and delete all
24  activities in those logs during those time
25  periods with a very simple power shelf



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
165–168

Page 165

1   script.  And that's a common tactic,
2   technique, and procedure for hacking and
3   unauthorized activity.
4           So the CISA is recommending:
5   One, that you have larger log sizes; and two,
6   that those logs, as soon as they are created,
7   are then sent to an independent storage
8   device, separate from the device that created
9   them.
10          None of these systems had any
11  -- any independent storage device for
12  analysis or just storage, and they were all
13  set to 20 megabytes, which was not sufficient
14  to record the data for the election time
15  period.
16      Q.    And that was each of the four
17  jurisdictions where you had the full data?
18      A.    That's correct.
19      Q.    So network segmentation, you
20  note that the systems partially comply with
21  CISA recommendations.
22          Is -- what do you mean by,
23  "they partially comply"?
24      A.    So, in the four analyzed
25  systems, they did make an attempt to Air Gap

Page 166

1   the election network.  But the second part of
2   that is that you have to monitor those
3   networks to ensure that no unauthorized
4   device is present on the Air Gap system, and
5   none of those systems had any monitoring of
6   the network activity on those systems.
7       Q.    And how do you know that?
8       A.    From my analysis.  So they did
9   not -- in order to monitor that, they would
10  have either had to have:  A, an independent
11  device that was off of the one of the port
12  switches or resident inside of the network;
13  or they would have had to have had an onboard
14  PCAP collector like Wire Shark that would
15  capture that network traffic.
16          They did not have either of
17  those in any of those four networks.
18      Q.    And am I correct that in the
19  case of at least Maricopa County, the
20  opposing party to you in the litigation
21  disagreed with your findings, right? -- your
22  analysis?
23      A.    They disagreed with some of the
24  findings, but they did not disagree with that
25  finding.

Page 167

1       Q.    That particular one.
2           At a higher level, there has
3   been disagreement with what your analysis
4   showed from the entities that actually had
5   the opportunity to review the same data as
6   you, correct?
7       A.    Well, that's a misnomer.  They
8   didn't review the same data as I did.  They
9   didn't review the forensics images.
10          They did not review the same
11  devices that were present in the network at
12  the time that the election occurred.  So they
13  did not look at the same data that I did.
14      Q.    Did -- in the Coffee County,
15  Georgia data that you looked at, was there an
16  opposing party who also did a review?
17      A.    Not as of yet -- at least, I
18  haven't seen a report yet.
19      Q.    How about in Antrim County,
20  Michigan?
21      A.    J. Alex Halderman provided a
22  report, but that was more geared towards the
23  effects on the database and the election
24  definitions than the actual findings for
25  cyber security pieces.  In the Curling case,

Page 168

1   he essentially agrees with my findings on
2   cyber security.
3       Q.    And how about in Mesa County,
4   Colorado?  Is there another party who has
5   also had the opportunity to review and
6   analyze that data and offer an opinion
7   regarding what it shows?
8       A.    If there is, I have not seen
9   that.
10      Q.    The next note, on D, it says,
11  "Block suspicious activity.  The analyzed
12  systems do not comply."
13          Just at a high level, how do
14  the analyzed election systems not comply with
15  CISA recommendations?
16      A.    I'm trying to cut down my
17  verbiage, huh?  So basically, what we're
18  looking at here is, it's called an IDS,
19  Intrusion Detection System.  And that's a
20  specific form of technology.
21          It can be hardware, it could be
22  application-based -- so that if they see a
23  variance in user activity, for example, or a
24  different device coming -- requesting a
25  remote access, then it can actually block and



BENJAMIN COTTON
Smartmatic USA Corp vs Michael J. Lindell

August 08, 2024
181–184

Page 181

1  someplace, and that appears to be the IBG --
2  or the IPB, which is in the Amazon cloud.
3      Q.   That's your understanding of
4  it, correct?
5      A.   That's my understanding of it.
6  And then of course, the BMG is the manager
7  for all of the ballot-marking devices, so it
8  has to be connected to the ballot-marking
9  devices.
10     Q.   Are you familiar with the term
11  "software independence"?
12     A.   That can be used in a number of
13  different meanings.
14          If you could define that?
15     Q.   Sure.
16          In the context of voting
17  technology in particular, are you familiar
18  with the term "software independence" to mean
19  that the outcome of the election is
20  independent of how the software might
21  operate?
22     A.   I understand the term.
23  However, in practice, there is question to
24  that.
25          And so the software is

Page 182

1  primarily responsible for the presenting of
2  the ballot, the recording of the ballot, and
3  the counting of the ballot.
4          So then you're relying on
5  external audit mechanisms to attempt to
6  determine statistically whether or not the
7  election is valid.
8          However, those audits are based
9  on the actual retained printed ballot.  So
10  just as an example, if the -- if there was a
11  vulnerability that was introduced into the
12  system, that between the timeframe where the
13  voter approved his vote and the time that
14  that vote was actually recorded, if there was
15  a vulnerability that allowed the manipulation
16  of that vote record, then a limited-risk
17  audit would never catch it, because you're
18  looking at the modified ballots as the basis
19  of your limited risk audit.  I mean, that's
20  just an example.
21          So I understand the term.  The
22  true software independence, I believe, would
23  be only valid if there was absolute cyber
24  security assurance on the voting system.
25     Q.   And in the example you just

Page 183

1  gave there, you say "manipulation of the vote
2  record."
3          Are you talking about
4  manipulation of the paper ballot, itself?
5      A.   Well, a ballot-marking device
6  produces the ballot.  That becomes the paper
7  record.  So if there's a manipulation prior
8  to the production of that paper ballot, then
9  that's what I am referring to.
10     Q.   Okay.  And that would be before
11  the voter had the opportunity to look at
12  their ballot?
13     A.   No.  Typically -- well, it
14  depends on the system and how the -- how this
15  works.  But typically, there is a
16  verification splice screen that pops up, and
17  they look through the vote selections and
18  they say, Yeah, that's what I voted.  And
19  they press a button, and then that becomes
20  committed to paper.
21     Q.   And do you know whether the --
22  at least with respect to the VSAP system in
23  2020, whether the voter would then be able to
24  review that paper?
25     A.   I would have to review the

Page 184

1  procedures.  I am not familiar with that.
2      Q.   And we've talked some about
3  post-election audits, risk-limiting audits.
4          How familiar are you with the
5  different audits conducted following the
6  presidential election?
7      A.   Just a top level familiarity of
8  it.
9      Q.   Did you do any analysis of the
10  audits conducted in LA County on the
11  November 2020 election?
12     A.   I did not.
13     Q.   And so do your opinions in any
14  way take into account the post-election
15  audits that would occur after a presidential
16  election?
17     A.   Well, with the scope of my
18  report, there's no impact.  You know, the
19  audits have no impact as to the findings in
20  my report.
21     Q.   And that's because your report
22  is just identifying that vulnerabilities
23  exist -- or could exist in the software,
24  right?
25     A.   That's correct.  Yes, should I

