UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

|  |  |  |
|---|---|---|
| Smartmatic USA Corp., et al., | ) | File No. 0:22-cv-00098 |
|  | ) | (JMB/JFD) |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| Michael J. Lindell, et al., | ) | St. Paul, Minnesota |
|  | ) | **December 10, 2024** |
| Defendants. | ) | 11:00 a.m. |

_____

BEFORE THE HONORABLE JEFFREY M. BRYAN
UNITED STATES DISTRICT JUDGE

**MOTION HEARING**

**APPEARANCES**:

| | |
|---|---|
| For the Plaintiffs: | BENESCH FRIEDLANDER COPLAN & ARONOFF |
| | **Timothy M. Frey** |
| | 71 South Wacker Drive, Suite 1600 |
| | Chicago, Illinois 60606 |
| | |
| | ROBINS KAPLAN LLP |
| | **Christopher K. Larus** |
| | 800 LaSalle Avenue, Suite 2800 |
| | Minneapolis, Minnesota 55402-2015 |
| | |
| For the Defendants: | MCSWEENEY, CYNKAR & KACHOUROFF, PLLC |
| | **Christopher Kachouroff** |
| | 13649 Office Place, Suite 101 |
| | Woodbridge, Virginia 22192 |
| | |
| Court Reporter: | Nancy J. Meyer |
| | Registered Diplomate Reporter |
| | Certified Realtime Reporter |
| | Warren E. Burger Federal Building |
| | and United States Courthouse |
| | 316 North Robert Street |
| | St. Paul, Minnesota 55101 |

Proceedings reported by certified stenographer; transcript produced with computer technology.

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  Good morning.  Let's have appearances, beginning with plaintiffs, please.

MR. LARUS:  Good morning, Your Honor.  Christopher Larus, Robins Kaplan, on behalf of the plaintiff.

MR. FREY:  Good morning, Your Honor.  Tim Frey of Benesch Friedlander on behalf of the plaintiff.

THE COURT:  All right.  Good morning to you both.

MR. KACHOUROFF:  Good morning, Your Honor. Christopher Kachouroff for Michael Lindell and MyPillow, Inc.

THE COURT:  And good morning to you.

So we are here on a motion for contempt.  I have reviewed what the parties have submitted, as well as what I could of the history regarding these disputes, including the transcript from the hearing in front of Judge Docherty, the motions to compel, as well as the motions to show cause.

And I think I'm prepared to proceed, but I'd like to do it this way.  I think we should sequence the -- each side will get to argue, but I'd like those arguments to start with Interrogatory 15 and then address RFP 32 and move to RFP 30.  And I think there's some logic, in my head at least, about why I would go in that order, if it's not readily apparent.  And then we would -- you know, both sides

would argue, and I'll let the moving party have the last word.  Okay?

All right.  Who's arguing for plaintiffs this morning?

MR. FREY:  I am, Your Honor.

THE COURT:  All right.  Come up to the podium, Mr. Frey.  And you might have to adjust it.  You seem like a pretty tall person.  So there's a little button there to move it up or down.

MR. FREY:  Thank you, Your Honor.

Good morning, Your Honor.  Would you like me to just focus on Interrogatory 15 and then have Mr. Kachouroff speak?

THE COURT:  Let me just jump in; right?

MR. FREY:  Yeah.

THE COURT:  With Interrogatory 15, if I can cut to the chase, it seems -- and I understand with discovery it's an ongoing thing.  So things -- it's dynamic.  But it seems like as of the hearing -- or maybe even as of September 23rd when the motion papers and your declaration was filed, it seems like I can boil it down to whether or not Google Analytics data for www.michaeljlindell.com has been produced from defendants to plaintiffs.  And if the answer is yes, then I think we've pretty much dealt with that.

So let me start with that question.  Have you

received -- because the statement in the brief filed on September 23rd seems to suggest that even as of that date, because the data was only available to the site owner, Mr. Lindell, plaintiffs had not received it. Doesn't come out and say that, but that's what it suggests; that that's still outstanding.

MR. FREY: That's correct, Your Honor. It is still outstanding. And in July, shortly after the motion to show cause hearing, Mr. Kachouroff did provide plaintiffs with the screenshot of the Google Analytics data from Michael J. Lindell and inquired as to whether that is what we were looking for. We responded -- my colleague Ms. Loftus responded that we could not glean from the screenshot whether that was the full universe of data, but that, yes, we're looking for the Google Analytics data.

THE COURT: So let me ask this follow-up. On page 3, the bottom of page 3, of defendants' responsive brief filed on September 30th, quote, "Defendants did indeed extract all the data on this website from Google Analytics and gave it all to Plaintiffs." Is that a true statement or false statement?

MR. FREY: To my knowledge, Your Honor, that is a false statement.

THE COURT: Why do you say to your knowledge? I don't understand. Do you have it or not?

MR. FREY:  I do not have it.  I do not have it.

THE COURT:  Okay.  So that portion of it, "gave it all to Plaintiffs," you haven't received it?

MR. FREY:  Correct.  All we have received is this one screenshot, which would have data underlying it as demonstrated by the responses that FrankSpeech, a third party, made of this same type of data that had many more metrics associated with it than the single-page screenshot.

THE COURT:  And what besides that screenshot do you think you still need to have?  And let's be very specific.  And maybe as you're speaking, you know, I'll take close notes to know what it is that the expectation is here.

MR. FREY:  Certainly, Your Honor.  So what we expect there to be there is reflected in a separate production from FrankSpeech.  This would have tracked page views, data as to unique page views, data as to average time on page.

THE COURT:  Sorry.  Tracked page views.  Unique page views.

MR. FREY:  Average time on page.  Entrances, bounce rates, and exit percentage.

THE COURT:  And you're reading from something, I see.  What is it you're referencing when you're listing these types of data?

MR. FREY:  Yes, Your Honor.  I'm referencing

Exhibit B to our motion to compel, which is an email communication between my colleague Ms. Loftus and defense counsel.

THE COURT:  And in that email communication, what's the date?  And is it plaintiffs requesting this specific data from defendants?

MR. FREY:  That's correct, Your Honor.  It's dated July 29th, 2024.  This was filed in the motion to show cause hearing when Mr. Kachouroff provided a single-page screenshot and my colleague responded that we could not tell exactly what that screenshot entailed, but we are looking for the following data.  And then it listed those metrics I just spoke to.

THE COURT:  All right.  Anything else besides those four items?

MR. FREY:  I believe that there -- six items, Your Honor.  But, no, that is all.

THE COURT:  Oh, I see.  I combined the last three into one item.  So tracked page views, unique page views, average time on page, entrances, bounce rates, exit percentage.

MR. FREY:  Correct, Your Honor.

THE COURT:  Anything else you wanted to say on Interrogatory 15?

MR. FREY:  No, Your Honor.  You've read the

papers.  We think that it's fairly straightforward and should be able to be introduced.

THE COURT:  All right.  Then let's turn to RFP 32. And I wanted to start with that instead of RFP 30, and I want to treat it separately.  Even though, it seems to me, at one point there was information that would overlap or documents that would overlap.  I want to be clear today. With respect to RFP 32, which is tied to the audit -- and if I'm not mistaken, those audit years included 2020 and 2021, but not '22 or '23?

MR. FREY:  Correct, Your Honor.

THE COURT:  And I assume that's the reason why there isn't anything in the September 23rd brief addressing specifically RFP 32.  Is there still anything outstanding on RFP 32 that you didn't include in the brief?  Because I didn't see it addressed.

MR. FREY:  No, Your Honor.  So, again, following the motion to show cause hearing, plaintiffs [sic] did produce additional documentation related to the audit, which we do not have any identified gaps, save for one spreadsheet that was referenced in one of Mr. Lindell's responses to the audit.  But it -- it would not be a sufficient reason for us to bring this motion to you today.

Now, I will say, the only other thing that we don't have -- and I don't know if this exists or not -- is any

documentation regarding whether the audit was closed, whether the lien was satisfied or, you know, the current status of that audit.

THE COURT: Whether the audit was closed, whether the lien has been satisfied, and current status?

MR. FREY: Correct, Your Honor.

THE COURT: All right. Well, let's put that aside. And if there is some outstanding request between the parties for any or all of those three things, I think that should be a separate motion to compel going forward and not wrapped into this process, just to keep it clear.

Then the question I have regards the remedy. If somebody doesn't disclose something and -- doesn't disclose and then you get to this point where you have a motion to show cause and then -- let's say, for example, it was disclosed this morning. At what point is that still proper for the Court to "grant" -- and I put that in quotes -- a motion which has now become moot and for purposes of fashioning a remedy?

MR. FREY: Yes, Your Honor.

THE COURT: Do you include the attorney's fees spent to -- up until the time you received this information, or does the Court characterize it differently in terms of, well, this is part of the process of clarifying and objections and ruling on that and if you received what you

wanted, then you don't get a remedy when it comes to contempt?

MR. FREY:  Your Honor, I would proffer that the fees spent in these additional motions necessary to get that information would still be appropriate.  Because in the ordinary course of discovery, you know, Judge Docherty rules on a motion to compel and orders defendants to produce documentation.  And let's say they then -- after that order, they produce it.  Okay.  That is ordinary course.  There's no contempt.  There's no sanctions.

If the parties -- the plaintiffs have to take the additional step to file subsequent motion to show cause and then a motion for contempt in order to spur compliance --

THE COURT:  So the motion to compel, ordinary.  Motion to show cause at that point going forward, regardless of the outcome, I am, in a sense, if I agree with you, granting the motion for contempt and, as a consequence, ordering fees from the -- from and including fees incurred for the motion to compel forward?

MR. FREY:  Yes, Your Honor.  Because the law for a motion for contempt -- or to hold someone in contempt would be that there's a valid order that existed, the party had knowledge of that order, and the party disobeyed that order.  So until the motion to compel is granted, there's no order existing compelling that.  There's a discovery dispute about

whether or not the party's going to produce it.

But then, Judge Docherty says, you're compelled to produce this. So now there's a valid order and they know it exists. So then the disobeying of that order by not producing it, requiring opposing party to take extra steps, I would submit to Your Honor that that is correct; that that would be a sanctionable -- or subject to the contempt relief.

THE COURT: Would the Court be granting contempt? Like, is that part of it, or is it really just more the attorney's fees as a result? I mean, you got what you needed so they're not in contempt as of this morning.

MR. FREY: Certainly, Your Honor. If it was the case that -- that we got what we needed this morning, but I just want to make sure that Your Honor is not under the impression that we got what we needed this morning.

THE COURT: No, I understand that. I didn't mean to suggest that. I'm saying as of this moment, you're standing here in front of me, there's nothing outstanding for RFP 32, even though there was this extra process that you had to take and it cost money and incurred fees for it.

I understand there being a way to get attorney's fees for that, but is the Court actually holding defendants in contempt for that if as of this moment you've received what you wanted?

MR. FREY: Your Honor, not with -- I would submit not with respect to the RFP 32 for which there is compliance. I would submit that the contempt is a -- it's meant to encourage the contemner's compliance with the Court's order. And so, therefore, once the contemner has complied with the Court's order, they would no longer be in contempt.

THE COURT: All right. Let's move then to RFP 30, if there's nothing else to say on 32.

MR. FREY: Yes, Your Honor. So RFP 30 sought documents sufficient to show Mr. Lindell's financial condition from 2020 to present, including but not limited to annual financial reports and tax returns.

As Your Honor may have seen in the filings and record that you reviewed, Mr. Lindell has complied with respect to tax years 2020 and 2021. However, nothing has been produced with respect to tax years 2022 and 2023. The court, Judge Docherty --

THE COURT: Let me be very specific. When you say nothing, I understand there's sort of this ongoing objection to the return itself; that that can't be produced because it doesn't yet exist. But that's not the only thing requested in RFP 30. There are other things requested, and that was sort of the bulk of the hearing and much of it overlapped with 32, so I'm glad we have separated those out.

But the 5,000 pages that defendants say they have produced, did that include the tax returns for '22 and '23?

MR. FREY:  No.  There have not been tax returns for 2022 and '23 produced, Your Honor.

THE COURT:  And, you know, sorry if this feels like a deposition now.  You're not under oath here.  You're just an officer of the court, but I do have some follow-ups along the same lines about what that did and did not include.  So those 5,000 pages, I would not have expected them to include the actual returns given the arguments made.  What about annual financial reports for '22 or '23?

MR. FREY:  No, Your Honor.  And if I could -- I could quickly jump in and say I -- I've double- and triple-checked, and I do not know what those 5,000 pages are referring to in terms of anything from 2022 and 2023 related to --

THE COURT:  Do you know the -- like, you could -- the Bates numbers, do you know you've identified the 5,000 that defendants are referring to, or you don't even know that?

MR. FREY:  I do not know what 5,000 -- what the Bates numbers are that are being referred to in that statement.  I know that we have received productions of MyPillow financial information and Lindell Management financial information, and we have also received personal

financial information for 2020 and 2021, which includes the tax returns and underlying documents.

THE COURT:  Well, let me -- I think it's a little surprising, to be honest, that you don't know what Bates numbers they're referred to.  It seems like that should be something that in the correspondence back and forth defendants would have provided and repeated so that you know exactly what it is they're pointing to.  But we'll get to that, I think, during defendants' argument.

But as you stand here, have you received any documents that include annual financial reports for any of those four years?

MR. FREY:  For 2020 and 2021, Your Honor.

THE COURT:  What about -- I think at the hearing there was a list of related tax forms that would fall under the term underlying tax documents, including W-2s, W-4s, 1099s, K-1s.  Have you received any of those tax forms or -- let's start with that.  Any of those tax forms for tax years '21 and 2020?

MR. FREY:  Yes, Your Honor.

THE COURT:  What about '22 and '23?

MR. FREY:  No, Your Honor.

THE COURT:  And I know that there was some discussion at the hearing specifically concerning K-1s.  Mr. Kachouroff said, by the way, K-1s are tax returns.  And

that stuck out just because I'm not a tax attorney, but that did seem inconsistent with what I understood a K-1 to be.

So is that a true statement or not; that a K-1 is a tax return as opposed to something generated by some corporate entity that then the person who is filing a personal income tax return has to attach?

MR. FREY:  So my understanding, Your Honor -- and I'm not a tax attorney either -- is that a K-1 is what, like, an S corp or partnership will generate to show money paid to individuals and that those then feed into the tax return of that individual.

THE COURT:  But it is not a tax return itself?

MR. FREY:  That is my understanding, Your Honor.

THE COURT:  What about the more open-ended phrase in the request for production, any other documents sufficient to show financial condition?  That's a pretty broad phrase, admittedly.  I didn't see any discussion about a specific objection to the word "sufficient to show," so we're putting all that aside.  I would assume a document that would show assets and liabilities for any of the years covered, that would be something that would show someone's financial condition.

So do you have anything in the neighborhood that could be characterized -- have you received anything that could be characterized as an assets and liabilities sheet,

balance sheet, or anything like that?

MR. FREY:  Not for Mr. Lindell personally.  Again, we've received that for MyPillow and Lindell Management, but not for Mr. Lindell.

THE COURT:  So what, if anything, do you think you've received that's responsive to RFP 30 with respect to Mr. Lindell personally?

MR. FREY:  We believe that we've received the tax returns for 2020 and 2021, and then those underlying documents as well for 2020 and 2021.  So bank statements, K-1s, 1099s, things of that nature.  We are -- plaintiffs are not disputing that defendants have met -- you know, complied with the order as it relates to tax years 2020 and 2021.

THE COURT:  Okay.  Anything else I need to know about RFP 30 or your argument on that?

MR. FREY:  No, Your Honor.

THE COURT:  Okay.  Thank you.  Anything further -- you'll get the last word, but anything further before we turn to defendants?

MR. FREY:  I don't believe so, Your Honor.  We appreciate your time today and recognize this is a bit of an unusual motion, and we appreciate the Court taking the time to hear us.

THE COURT:  Okay.  Thank you.

Mr. Kachouroff, why don't you approach, and you can begin whenever you're ready.

MR. KACHOUROFF:  Well, I can begin or you can ask me questions.  I don't know what the Court's proclivity is.

THE COURT:  Well, why don't we start with -- in the same order as before.

MR. KACHOUROFF:  Sure.

THE COURT:  Because I think there's some logic to it.  Starting with Interrogatory 15 --

MR. KACHOUROFF:  Since we're going to be a little bit green eyeshade -- my opponents are -- they did not object to the Court's ruling below on Item No. 15.  So, technically -- and I'm prepared to address 15 --

THE COURT REPORTER:  You need to slow down.

MR. KACHOUROFF:  I'm sorry, ma'am.  I speak fast. I'm sorry.

THE COURT:  All right.  Why don't you explain why -- this theory, that this has been waived.  Is it because there was a voluntary agreement to provide it and technically denied as moot at one point?

MR. KACHOUROFF:  Correct, Your Honor.  And I only --

THE COURT:  And since then -- I mean, it's included in Judge Docherty's orders since then.  It was something --

MR. KACHOUROFF:  I'm sorry.  Which order was it? I don't have the --

THE COURT:  The dispute over page views and video viewership is an issue that was addressed at the hearing in June.

MR. KACHOUROFF:  It was addressed --

THE COURT:  It was addressed in the facts certified to this Court for purposes of today.  So it seems like -- yes, I guess you could characterize the history of it as such that there was a voluntary agreement and based on that agreement, the motion to compel was denied.  And to bring that issue back to the Court, technically you'd need a new motion to compel to enforce this voluntary agreement. That was the reason why it was denied as moot at one point. And then you'd come back after that, et cetera; right?

But at the same time, if there was a motion to compel this specific thing and there was an agreement to provide it, that didn't happen, and then that became the subject, the entire thing.  Not just the failure to comply with the voluntary agreement in the summer of '23, but the entire thing was wrapped up in a motion to show cause in '24 and part of the magistrate judge's certification of facts, how could it have been waived?

MR. KACHOUROFF:  The ruling is waived.  And I would submit, Your Honor, that we look at jurisdictional

questions seriously. And I'm expecting the Court to want to hear this. I'm pointing out that this was not objected to.

THE COURT: Did you say that to Judge Docherty at the hearing?

MR. KACHOUROFF: That it was waived?

THE COURT: Yes. That technically that issue was not before Judge Docherty at the hearing in 2024.

MR. KACHOUROFF: No, because he denied it as moot. Now, if he goes ahead and puts it in his --

THE COURT: At the hearing in 2024 --

MR. KACHOUROFF: Right.

THE COURT: -- did you say that this issue of viewership has been waived?

MR. KACHOUROFF: No, Your Honor. I wasn't appealing it. They were the ones who were appealing. I objected to Request 30 and 32.

If you'll note my objection on -- when I objected to the lower court's order, my understanding of how the magistrate's orders are appealed are that the parties have to lodge objections to the order. My objections were to 30 and 32 and nothing else. If the plaintiffs at that time wanted to object to the denial of the Request No. 15 as moot, they could have done so.

Now, as I said to the Court, I am prepared to address it today head-on.

THE COURT:  Well, I mean, you should because it's in the certification of facts.  It is part of what was granted as far as the motion to show cause.  So if you thought that that was waived, then I think it's incumbent on you to say so when you're either before the magistrate judge at the motion to show cause hearing or after he issues the order to show cause to say, well, Judge, look, either reconsider it, or you say it to me that everything on pages 4 and 5 and 6 and 7 and part of 8 is technically not before the Court; right?

The entire order itself is like ten pages, so 40 percent of it or so is made up of something addressing Interrogatory 15.  And if you thought that was technically not before the Court and not subject to this order to show cause, I would expect you to say that.

MR. KACHOUROFF:  I am saying it now.  Now, if you're saying I said it too late, okay.  I got -- I hear what you're saying.  But all the court did below was to recite facts.  It didn't change the ruling that it gave, which it denied it as moot.  So with that said, I'll go ahead and address --

THE COURT:  Why was it moot?  What mooted it?

MR. KACHOUROFF:  Because we had already produced to them, which they don't accept and they reject outright, that photocopy of the screenshot that we pulled up.  And I

can address that directly.

THE COURT: Okay. So the statement in the brief to this Court -- this is bottom of page 3, "Defendants did indeed extract all the data on this website from Google Analytics and gave it all to Plaintiffs."

MR. KACHOUROFF: That's correct.

THE COURT: And you said that's a correct statement because of the screenshot, or is there some additional data that was extracted from the website?

MR. KACHOUROFF: To get to the heart of the matter --

THE COURT: I want you to answer the question, please.

MR. KACHOUROFF: I'm answering it.

THE COURT: Did you -- when you say that's a correct statement, "Defendants did indeed extract all the data on this website from Google Analytics and gave it all to Plaintiffs," does that statement only refer to the screenshot or does it refer to some other additional data?

MR. KACHOUROFF: It only refers to the screenshot because that's the only data that is available. And that's the heart of the problem. They believe there's skulduggery going on; that there's something more to this -- because there was other websites that Mr. Lindell used. He had other accounts and he produced more.

THE COURT:  What did you --

MR. KACHOUROFF:  This one didn't have it.

THE COURT:  What did you take a screenshot of it?

MR. KACHOUROFF:  When you got on to the account, you take a screenshot of it, and I produced the hits.  And we're talking -- in the universe of hits, they've received data with millions of hits.  They're complaining now about 30,000 hits.

So at the end of the day, I produced for them what I could find on that website, what I could pull up, and what reports I could run.  I was not able to run all the other reports that they talked about.  I told them that.  They didn't believe me.  They thought I was lying.  I have no reason to lie about 30,000 or -- whatever it is, 40,000 hits.  They already have a million of them.  I don't care about the thirty of forty thousand.  It's not a big deal to me, but they seem to think there's some skulduggery going on with -- with this earlier website that -- this pilot website he started with his program.

THE COURT:  Again, you took a screenshot of something; right?

MR. KACHOUROFF:  Correct.  The Google Analytics page.

THE COURT:  Okay.  And then you just sent the image you had taken?

MR. KACHOUROFF:  Yes, I did.  I said, "This is all I could produce."

THE COURT:  Do you see a distinction between sending an image and extracting data?

MR. KACHOUROFF:  I extracted data and I took a copy of the -- judge, before you say that --

THE COURT:  There's a distinction to be made between those two.

MR. KACHOUROFF:  I --

THE COURT:  I think that you should at least acknowledge that distinction as part of, you know, your attempt to make a credible argument today.  If what you did was take a screenshot and send an image, I think that's pretty different than extracting data.

MR. KACHOUROFF:  I extracted data and took a screenshot of the data I extracted.  I have no ability to take the data that I extracted with a report and bring it down into an Excel spreadsheet or anything else.  If I could have done so, I would.

I explained all of this, by the way, to my colleagues.  It's not like I'm trying to hide it.  I'm not trying to make a credible argument.  I'm trying to make a truthful argument.  What I have and produced is all I can get.  So whether you call it extracted or I took a screenshot of the extracted data, if you think I misspoke,

I'll accept that, Judge.  Fine.  I don't -- I understand what you're saying.

If I had to go back, maybe I would say, look, this is the report I ran and this is the data that the report extracted.  Here's a copy of the report.  But I wasn't that detailed.  I just said, "This is what I extracted and this is all I can get."  They don't buy it.  There's no other evidence that isn't true, and that's what the Court has before it on Interrogatory No. 15.

THE COURT:  Okay.  And then can you tell when the screenshot was sent, that image?

MR. KACHOUROFF:  Well, I don't think it's in dispute that it was sent.

THE COURT:  I said when.  Do you know when?  You can take your time to try and recreate the timeline.  I just wanted to try and figure out the date that it was sent.

MR. KACHOUROFF:  It was sent to my colleague on July 23rd, 2024.

THE COURT:  When was it sent -- you mean your colleague, meaning plaintiffs' counsel?

MR. KACHOUROFF:  Correct.

THE COURT:  All right.  July 23rd?

MR. KACHOUROFF:  Correct.

THE COURT:  Okay.  Thank you.

MR. KACHOUROFF:  Since that time we have had a

disagreement about what it means and what it doesn't mean.

Your Honor, may I approach the Court?  I can show on my cellphone my image I sent to them, if you want to see it.

THE COURT:  Just a second.

All right.  So I'm looking at what was attached to Mr. Frey's declaration, Exhibit B.  It includes an email dated July 23rd to Ms. Loftus, L-o-f-t-u-s, from yourself saying, "Is this what you wanted?  If so, I'll PDF it and bate stamp it."  And then in response, there's sort of an email with the bullets -- each of the six things that Mr. Frey just mentioned this morning, saying, "It is difficult to tell exactly what you are proposing from this one screenshot.  We are looking for the following."  And then they have the six things.  And they say, "These . . . were all represented in FrankSpeech's metrics production . . . looking for the same, but for michaeljlindell.com."

So what was the follow-up from your end to that?  It doesn't exist; I have none; I've extracted the data; you've got it or --

MR. KACHOUROFF:  Allow me to tell you what I did. I went right to the IT guy because I'm not an IT guy.  I said, "Can you extract this data?  This is what they're looking for."  He said, "I can't do that."  And I said, "Why?"

"Because that account doesn't allow for it.  The FrankSpeech account is different.  We have more robust capabilities in that account.  We don't have it on this one."  And I said, "You can't get any of it?"

THE COURT REPORTER:  Hold on.  Slow down.

MR. KACHOUROFF:  I'm sorry.

THE COURT REPORTER:  I said, "You can't get any of it?"

MR. KACHOUROFF:  And he said, "No, I can't."  I said, "All right.  Well, very good.  I will tell the other side that this is all we have."

They rejected that.  They said, "No.  There's more." There is not more, Judge.  That's my point.

THE COURT:  All right.  Anything else on Interrogatory 15?

MR. KACHOUROFF:  Judge, just that I don't have the ability to comply with a request that I can't get.  If the Court's going to order to me to get something that I can't turn over, I don't -- I don't have the ability -- I never had the ability to comply with that order.  My client didn't, rather.

I'm not eager to have a discovery fight.  We're going to end up having -- we're going to be up here a couple of times on the other discovery fights now.  There's an MO to what the plaintiffs do in this case.  But I'm not interested

in discovery fights.  I want to turn over everything we have.  My clients' instructions to me were give them whatever they want; let's just get to trial.

So with respect to No. 15, I'm perfectly willing -- if the Court believes we have the ability to turn it over, we will turn it over.  I'm telling you I don't have the ability to comply with any order turning it over.  That's what I have.

THE COURT:  It may be that there's some additional information that they need to be convinced that the screenshot is all there is.  Frankly, I'd be surprised if that's -- if that's true, but, again, I'm not an IT guy; right?

MR. KACHOUROFF:  Right.

THE COURT:  I'm looking at the drop-down menu. And it seems like there's other things that you could select in that drop-down menu reflected in that one image.  But, again, this seems to me -- we're not going to get to the bottom of it right here, but this could be the kind of thing where, in addition to talking to your IT guy, that's something that you let plaintiffs' counsel depose or you talk to Google directly and see what it is that Google can do.  And I don't know if you've done those things, but that to me -- yeah.

MR. KACHOUROFF:  You want me to go to Google and

ask Google for production that's not in my possession?

THE COURT:  Well, who owns that website?

MR. KACHOUROFF:  It's not a website.  It's --
Google Analytics is a tool --

THE COURT:  Who owns michaeljlindell.com?

MR. KACHOUROFF:  Michael Lindell does.

THE COURT:  Okay.  So if only the site owner can access this information from Google, then maybe there's a way to get data.  I don't know.  Again, I'm not an IT guy either.  But I'm saying that there may be some additional steps that you have to go through.  And, you know, I think it's a bit premature to say this is MO for opposing counsel.

MR. KACHOUROFF:  Oh, this isn't the half of it.  But the point is, Judge, I am required to turn over according to the rules what's in my position.  You're asking me now to make the extra step and go to Google.  And if that was such an import- -- if the 30,000 hits that are on here are so important to them, they could have filed a subpoena for that.

Fact discovery is closed.  They pushed to close fact discovery.  We're now in the phase of summary judgment, and here we are arguing about 35,000 [sic] hits on a website.  If you think that we care about the 35,000 hits when we've already turned over millions of FrankSpeech -- I mean, this is de minimis at best.  So I'm not sure really what the

issue here is other than to harass Mr. Lindell and force us into court during the very time I should be writing my responses -- or my opposition to their summary judgment motion.

THE COURT:  Well, they're here too.  So it's taking their time as well.

MR. KACHOUROFF:  But they -- under Rule 26, our resources are not like theirs.  Reid Hoffman invested $16 million into Smartmatic for litigation.  We don't have the war chest behind us.  They've assigned six or seven attorneys.  It's just me and half of another attorney at some time.

THE COURT:  All right.  Well, let's move to RFP 32.

MR. KACHOUROFF:  So they have the tax returns from 2022.  I'm positive I sent Mr. Lindell's.  2023 is not done yet.  He's still working on it.

THE COURT:  I think that's more 30.  Let's just focus on 32, which is tied to the audit and --

MR. KACHOUROFF:  They asked me for all -- I thought it was moot.  But they asked for all paperwork related to the audit.  I sent them.

THE COURT:  I think if we're following up on the conversation I had with opposing counsel earlier, I think for me, it's less about what hasn't been provided and

more about the remedy for when it was provided and what the Court -- there's two parts; right?

One is a finding of contempt, and the other is the actual remedy of attorney's fees. And opposing counsel is explaining to the Court that from the moment of the order to show cause forward, even if at some point after that the information is provided, there's still as a sanction permissible -- as a permissible sanction, fees that can be awarded.

MR. KACHOUROFF: Sure.

THE COURT: Even though he's saying that I wouldn't find defendants in contempt because it was ultimately, as he sits here today, provided. So I guess I'm looking for a response from you to that. Maybe you agree. Maybe it's a partial agreement. Partial disagreement. I don't know.

MR. KACHOUROFF: I don't think that you can award fees without a finding of contempt. I mean, there has to be some finding that we're derelict. Now, down below, in front of Judge Dougherty [sic], I was given time to produce these things. And I produced what I had. And the only response back -- and I put a notice of compliance in the court record.

And the next thing I know is I get a bare-bones response from them that says you didn't comply. Didn't tell

me how.  And then Judge Dougherty [sic] files his, well, you're in contempt.

Well, how am I supposed to comply with something like that?  I did the best that I could to put forward all the evidence that I had in my possession.  Now I don't know what I'm supposed to produce.  That's the problem I have with these orders.

THE COURT:  Okay.  Well, RFP 32, I think, specifically -- the only thing outstanding as of today -- and I tried to make this clear.  So I'll make it clear to you as well.  The information about whether the audit has been closed, whether the lien has been satisfied, or any other information about the current status, that is all, in my view, something that would have to be the subject of a new motion to compel, not -- so in a sense, everything that has been produced as of now, I think, satisfies RFP 32.

And then the only question is what will you do with fees that were incurred to bring the motion to show cause and to prepare for that on that point.  That's the only issue that I think is -- is left to decide, and it sounds like your position is without an order finding defendants in contempt on that request for production, there is no sanction?

MR. KACHOUROFF:  Correct.

THE COURT:  Okay.  Let's move to RFP 30.

MR. KACHOUROFF:  May I address one thing, Your Honor?

THE COURT:  Yeah.

MR. KACHOUROFF:  Whether the audit is closed, whether the lien has been satisfied, and what the current status is is not a new motion to compel.  It's a phone call to your opposing counsel, "Hey, Chris, what's the status of this?"

"Sure.  What do you want to know?"

"Is the audit closed?"

"No."

"Has the lien been satisfied?"

"No."

"Is the current status still ongoing?"

"The 2023 returns, not done yet."

That's not what they want.  They want to go into court.  They generate their own fees.  That's what they're doing instead of making a simple phone call.  So that's all I will say about 32.

THE COURT:  Okay.  On RFP 30, I think the obvious question is what Bates numbers are you referring to when you say there are 5,000 pages that have been provided?  And then what is included in those 5,000 pages and what isn't is the next part of this.  But let's start with do you have those Bates numbers handy?

MR. KACHOUROFF:  If you'll permit me time to search my phone, I'll find them.

THE COURT:  Yeah.  Go ahead.

MR. KACHOUROFF:  Your Honor, while I'm waiting for this to pull up, I emailed my tech guy.  I'm going to point something out to the Court.  I told you about our resources.  And under Rule 26, that's what the Court will consider.

My colleagues know I also was out for about eight weeks because of shoulder reconstruction.  So that was after these hearings.  That's in the August and September time frame.  So part -- there's not been a delay on my part.  I want the Court to understand.  I'm not intentionally obfuscating here.

THE COURT:  And if you need to make a phone call, that's fine.  We can take a short break.

MR. KACHOUROFF:  Yeah, if I could do a phone call, that'd be great.

THE COURT:  All right.  Let's do that.

MR. KACHOUROFF:  Thank you, Judge.

(Recess taken from 11:45 a.m. to 11:53 a.m.)

THE COURT:  All right.  Let's go back on the record.

Go ahead.

MR. KACHOUROFF:  The Bates range -- I don't have the exact 5,000 pages.  I can only give the Court the total

number of Bates that we've turned over to them, which is 16,510 pages.  And it begins MCK-00001 through MCK-16510.

I want to say something briefly about Interrogatory No. 30, even defendants are confused about what Interrogatory No. 30 requests.  It asks for documents sufficient to show his financial condition.  What I deem sufficient might be different than what they deem sufficient, what might be deemed different than what you deem sufficient.

THE COURT:  Was there an objection at the time that you received the request for production that it was vague or overbroad because of the word sufficient?

MR. KACHOUROFF:  No, because I thought that when you saw tax returns, any reasonable person would think, they're the tax returns, there's what the guy owns and doesn't own, that should be sufficient.

THE COURT:  Okay.  So no objection --

MR. KACHOUROFF:  No.

THE COURT:  -- to the word sufficient as including documents beyond tax returns and being overbroad?

MR. KACHOUROFF:  I don't think that it is overbroad.  I think the question for the Court is if you know what the word sufficiently -- sufficient to show a financial status and it's other than what we've just talked about, what is that?

THE COURT: Okay. Let's turn to tax returns, as well as the other specific things listed. Annual financial reports and underlying tax documents. The other side is saying that they have nothing related to 2022 and 2023.

MR. KACHOUROFF: For -- okay. Let's make a distinction because my colleague just pointed out to me that I was conflating Lindell. When I say "Lindell," it's hard. Sometimes when I say "Lindell," I'm meaning MyPillow as well.

THE COURT: Right, right, right. Because any -- he's pretty closely connected to the companies; right?

MR. KACHOUROFF: He owns them; right? I mean, he's the owner.

THE COURT: And sort of the public face and --

MR. KACHOUROFF: Sure. Sure.

THE COURT: So we're talking about Mr. Lindell's individual income tax returns; is that right?

MR. KACHOUROFF: Right now we'll talk about his individual income tax returns. I -- I will get -- I thought for certain that I had sent 2022 over. Mr. Frey says that -- he just said to me now, I don't think I got it. I will check. I'm just going to go ahead and set up a new set of Bates right now, as soon as I get out of the courtroom, and I'll have it sent over.

2023 is not done.

I distinctly remember sending it over to them, but I don't care. I don't want to fight about it. I just want them to have it.

THE COURT: No, I think it matters --

MR. KACHOUROFF: It does matter.

THE COURT: -- for purposes of today's hearing, if you're conceding it was never sent or you're saying it was and, therefore, you're not in contempt.

MR. KACHOUROFF: I believe it was sent. Now, I'm not the one with the burden of proof going forward on this matter. So let me say that. But secondly, if for some reason it wasn't sent, it was inadvertent. But, again, that's a phone call, not --

THE COURT: There's a whole motion about it. And, you know, at the time of the hearing, that would have been the time to say it's --

MR. KACHOUROFF: At the time of the hearing it wasn't done. The 2022s were not done until, I want to say, late October, long after the hearing. The 2023s are not done. So this is -- we're talking about a continuing duty that I have as counsel, officer of the court, to update them on all the statuses of the discovery. And they have the like and reciprocal duty.

THE COURT: So at the time of the hearing, there's some back-and-forth with Judge Docherty about waiting for

completion or not.  And at one point you said, "I'll personally go to the accountant's office myself.  I will secure the file and the documents in there.  I don't see why they can't have them."

MR. KACHOUROFF:  That's part of the 5,000.

THE COURT:  Okay.  So you're saying that --

MR. KACHOUROFF:  I turned those over.  Everything that was in the accountant's possession was turned over to them, regardless of how small, regardless of what it was.

THE COURT:  All right.  So at what point did you turn over these 5,000 pages?

MR. KACHOUROFF:  It would have been --

I don't know if you recall the exact day.

THE COURT:  Let's just go off the record for a minute.

(Off the record.)

THE COURT:  All right.  Let's go back on the record.

Go ahead.

MR. KACHOUROFF:  Just a couple things.  So my colleague and I were discussing there's a difference between Lindell individually and the business.  So even with my colleagues and some of the emails that I have going back and forth with them, they conflate -- and there is some spillover between 30 and 32 and, quite frankly, other RFPs

as well.  And so it gets confusing as to what's been produced and what's not.  So I want the Court to understand, I've produced -- what did we say?  August -- August 7th or thereabouts.

THE COURT:  This year?

MR. KACHOUROFF:  Of this year.  I brought up to speed MyPillow.  Lindell, no.  I was under the assumption that Lindell -- what was sufficient to show Lindell's financial condition was the tax returns that he was working on because that shows a man's wealth, whatever he owes to the IRS and what he pays.

My colleague just mentioned to me about FrankSpeech, which is a platform that Mr. Lindell uses to espouse his views.  And that went public this year.  I didn't think about that.  That would be part of the ongoing duty, not subject to this motion per se.

But that's where I can sit down -- and I have a standing order from my client:  Whatever they want, make it available to them.  He has nothing to hide.

And so there's a possibility that I can work that out with them, to sit down, and say, look, if you want to come to the office regularly, like the IRS auditors do, get an office and sit down and starting asking for information, my client will give it.

I'm sorry.  I'll slow down.

So that's number one.

But I just want to give the Court a flavor for RFP No. 30.  Ms. Loftus, my colleague, said defendants were ordered to --

THE COURT REPORTER:  Slow down.  ". . . defendants were ordered to" --

MR. KACHOUROFF:  My colleague said defendants were ordered to produce documents sufficient to show Mr. Lindell's financial condition.  They have produced only some of his tax returns but have not produced any other accounting documents or the tax returns for 2022 or 2023.

So, Your Honor, in my mind, when they're talking about documents sufficient, I'm talking about -- I'm responding to Ms. Loftus about what they wanted, which appears to me to be the tax returns for him personally.

THE COURT:  Okay.  Let's just start with tax returns, because that's something specifically identified in the RFP that we're talking about.

MR. KACHOUROFF:  Correct.

THE COURT:  In your brief to the Court, you're saying that there were 5,000 pages that were provided.  Now you're saying that was in August of this year, so after the hearing in front of Judge Docherty.

MR. KACHOUROFF:  I don't remember whether it was 5,000 pages or 10,000 pages or 1,000 pages.

THE COURT:  Your brief says 5,000.

MR. KACHOUROFF:  If my brief said it, then I looked at it at that time, it would have been 5,000.

THE COURT:  Okay.  It's not clear to plaintiffs what 5,000 -- what set of documents you're referring to, what pages those are.

MR. KACHOUROFF:  Ah.

THE COURT:  But the brief says 5,000.  And so now I'm specifically asking, in your view, the thing that you provided that you talk about in your brief that it's 5,000 pages, does that include tax returns for 2022?

MR. KACHOUROFF:  For MyPillow, yes.

THE COURT:  Okay.

MR. KACHOUROFF:  For Lindell, no.  Lindell's aren't done yet.  Back up.  Strike that.

Lindell's 2023's are not done yet.  That's what I believe I owe them.  Mr. Frey said to me now he doesn't believe he has 2022.  I will go back and check.  If he doesn't have it, I will get it to him immediately.

THE COURT:  All right.  And then as it relates to 2023, again, I go back to that discussion in front of Judge Docherty where you said that you would go to the accountant's office personally and get the information for the two tax years at that time, not just one, that had not yet been completed and produce it.

MR. KACHOUROFF:  Plus all the IRS documentation for the audits.  And I did.  All that was produced.  I did what I said I was going to do.

THE COURT:  All right.  So then let's -- in addition to tax returns, it says, for lack of a better word, the kind of tax forms that you file in conjunction with the tax returns or information that you need to file those things, including K-1s.

MR. KACHOUROFF:  Right.  I -- to the extent a K-1 is a return -- maybe it's not a tax return -- but it's a return on what -- it shows what the business distributed to --

THE COURT:  All the gain of return --

MR. KACHOUROFF:  Gain, loss --

THE COURT:  -- distributions?

MR. KACHOUROFF:  Distributions, that sort of thing.

THE COURT:  Okay.

MR. KACHOUROFF:  So to the extent I said K-1 tax return, I would agree; that would be an error.  It should be K-1 return or just a K-1 form.

THE COURT:  Okay.  So the underlying tax forms, they have -- you know, there's the specific universe of forms that we all know.

MR. KACHOUROFF:  Right.  Right.

THE COURT:  Have those been provided for tax year 2022?

MR. KACHOUROFF:  For Lindell or for MyPillow?

THE COURT:  For Lindell.

MR. KACHOUROFF:  No, not yet.  As far as I know, those have not been compiled yet.  And as far as I know, they're still working through the audit process, doing --

THE COURT:  The audit process for which year?

MR. KACHOUROFF:  2021, 2022, and maybe -- I'll have to check again to see if they're opening up to 2023. As the audit progresses, it opens up years.  So when we spoke the first time --

THE COURT:  As of the hearing, it seemed, in July in front of Judge Docherty, the audit was specific to 2020, 2021.

MR. KACHOUROFF:  Correct.

THE COURT:  And then the problem with 2022 and 2023 at that time was that those years -- the tax returns themselves haven't been completed.  Not an audit --

MR. KACHOUROFF:  Correct.

THE COURT:  -- isn't completed, but that the tax returns --

MR. KACHOUROFF:  Correct.

THE COURT:  -- aren't completed.  And so the question is for 2023, still not yet completed?

MR. KACHOUROFF:  For Lindell personally, no.

THE COURT:  And the underlying documents related to Lindell's personal 2023 tax return, those have not been produced yet either?

MR. KACHOUROFF:  I maintain that they have been.

THE COURT:  The K-1 that would relate to 2023, personal income tax for Lindell, has been produced?

MR. KACHOUROFF:  Because if the tax return for the corporation was done, that means the K-1 is done.  That means the K-1 was produced, so if --

THE COURT:  Well, I don't know if that means it was produced.  You're saying it means it was produced.  But that seems to be the dispute here, whether it was produced or not.  I think they have been under the impression all along that the corporation generating those documents has done what it's supposed to do in a timely manner and it just hadn't been provided to them, which is why we're here. Underlying tax documents that the preparer is not responsible to generate, I think those are the kinds of things that they have been asking for all along.

MR. KACHOUROFF:  They've gotten everything we have in our possession.  That's the point.  And when you say, well, the K-1s are his, yes, but they're also corporate -- part of the corporate documents and records.  And so that would have been turned over with the corporate production.

Now, Mr. Lindell himself does not have any individual financial statement.

THE COURT:  All right.  So you're saying 2023 K-1s have been turned over?

MR. KACHOUROFF:  I don't know the answer to that and I'll go check because I don't want to make a misstatement to the Court.

THE COURT:  I think we should check.  Let's go off the record and you can check.  Because that's the heart of this, what has and hasn't been produced.  And it's one thing to say you didn't produce any because it doesn't exist, which is sort of the position in the July hearing in front of Judge Docherty.  And that's why you said at the time, I'll go myself personally and get the stuff.

MR. KACHOUROFF:  Which I did.

THE COURT:  Right.  So now the question is what was that stuff that was produced and was it sufficient?  They're saying it wasn't.

MR. KACHOUROFF:  At the time -- let's -- because you're expanding now the scope of my production, so --

THE COURT:  I'm not expanding the scope of your production, sir.  I'm saying I don't know --

MR. KACHOUROFF:  2022 --

THE COURT:  -- what you produced and --

MR. KACHOUROFF:  2022 --

THE COURT REPORTER:  You have to let him finish.  Say that again.

MR. KACHOUROFF:  I'm sorry.

THE COURT:  Go ahead.

MR. KACHOUROFF:  2022 and 2023 were not at issue during the hearing below because they didn't exist.  I've been producing that after the fact pursuant to my -- my duties under the -- under Rule 26 to supplement and to provide those things.

THE COURT:  They were at issue at the July hearing, sir.  That's part of the facts that were certified to me; that was the discussion that you had with Judge Docherty specific about 2022 and 2023.  It was briefed by both sides.  So they were at issue.  The question now --

MR. KACHOUROFF:  The tax returns --

THE COURT:  -- is what has been produced and what hasn't.  They're still of the opinion that none of the Lindell 2022 or 2023 tax returns, underlying tax documents, and then this catchall, which there may be some dispute about what is and isn't -- what does and doesn't fall under this catchall phrase of other documents sufficient to show; right?

So those are the three things.  And I guess annual financial reports is another one.  And they're sitting here today at this stage, none of that has been produced for

Lindell of 2022 and 2023.  You're at least conceding that the tax return itself for 2023 has not been produced because it wasn't prepared yet.  That's consistent with what you said in July and throughout this process in response to that.  It's the other piece of it that I'm not certain of. So we need to take a break --

MR. KACHOUROFF:  I don't know where we're miscommunicating, but I turned over -- I went to the accountant and I said, "Give me all the documents that you have in your possession for 2020, 2021, 2022."  And whatever 2023 he had, would have all been put together -- actually --

THE COURT:  Did you review them?

MR. KACHOUROFF:  Say again?

THE COURT:  Did you review them?

MR. KACHOUROFF:  I looked at them, yes.

THE COURT:  Okay.  So do you recall seeing a K-1 for 2023?

MR. KACHOUROFF:  It's not possible for me to remember that because I have terabytes of data that I have.

THE COURT:  That's fair.  It's a lot.

MR. KACHOUROFF:  My mind is dumping stuff.

THE COURT:  So, to the best of your knowledge or recollection, K-1s for 2023; other tax -- other underlying documents that are needed for the tax return for 2022, which is now done; and 2023, you think those have been produced?

MR. KACHOUROFF: Subsequent to the hearing and the 5,000 pages, yes. When I went to the accountant and got -- I thought -- the 5,000 pages, in my mind, is what the accountant turned over.

THE COURT: Okay.

MR. KACHOUROFF: Since then I believe I've produced the 2023 taxes --

THE COURT: '22.

MR. KACHOUROFF: -- for MyPillow.

THE COURT: 2023 for MyPillow and 2022 for Mr. Lindell?

MR. KACHOUROFF: Right. I'm going to go check to make sure that if for some reason the 2022 taxes for Lindell, which would have been October -- I know I got them at the end of October. Because I had told Tim that I was expecting them to be done September 23rd. And I hounded the accountant to get them done. I'll check on that.

THE COURT: Okay. Let's go off the record, and you can take a second to double-check what you can.

(Off the record.)

THE COURT: Let's go back on the record.

MR. KACHOUROFF: It would have been the end of July where I sent MyPillow's 2022 and 2023 financial statements to my colleagues. And that would have been part of the big production.

THE COURT:  All right.  Anything further you'd like to say on RFP 30?

MR. KACHOUROFF:  Yes, Your Honor.  My colleagues and I have had email communications back and forth where my understanding to satisfy No. 30 was going to be just the tax returns for Lindell because that would have been documents sufficient to show his financial condition.  I just talked to my colleague just now, and he mentioned my client's ownership in FrankSpeech.  He also mentioned a couple of other companies that my client had owned in the past.  I know one of them.  It was Blixwear (phonetic).  It's absolutely worthless.  There's no paper.  No tax returns.  He'd set up a company, but there's nothing to it so it doesn't cross my mind to turn that over.  Glad to turn over whatever documents I have on Blixwear, which I know is nothing.  It's a zero entity, if it is an entity at all.

But that's stuff that I would have to work out with him.  I don't think doing that here is going to be as helpful as having Mr. Frey come back to the MyPillow office's here while we're both here.  He's in Chicago.  I'm in Virginia and sometimes Florida.  We are here.  We can go to MyPillow offices, and I can start getting for him what he needs right away.

THE COURT:  Okay.  Thank you.

Mr. Frey.  Whenever you're ready, sir.

MR. FREY:  Thank you, Your Honor.

Just a few points that I'd like to make.  One is just an overarching point.  Mr. Kachouroff intimated or said that, you know, Smartmatic is interested in just pursuing these discovery motions to harass or -- that's our MO is to bring these things.  And I want to assure the Court that is farthest from the case.  We do not want to be here on these discovery motions.

We just are looking to have, one, Judge Docherty's orders complied with and, two, you know, obtain the discovery that we sought, much of this back in 2022, 2023.  And we just -- we cannot wait an indefinite amount of time to get the things that are ordered to be produced.  That's why we're here today, and that's why if we're back, we'll be back.  Because we just -- we've tried to be patient and allow Mr. Lindell, Mr. Kachouroff time to make these productions and comply with the orders.  But at some point, we need to move forward and have these things complied with.

With respect to some of the specifics that you discussed with defense counsel on Interrogatory 15, I'd submit to the Court that Docket No. 281, which was the Exhibit A attached to defendants' opposition to the motion to show cause, is the Google Analytics from FrankSpeech.  That is the type of data that we believe --

THE COURT:  Right.  You have an expectation now

based on that of what data is out there.  And I'm assuming that in your meet-and-confers and other discussions with opposing counsel, this isn't the first time you've heard him say, well, michaeljlindell.com is different because it's not as widespread and so the analytics might be different.

Is today the first time you're hearing that they don't have the same -- that that expectation you have from what's attached to Exhibit A is not something that you should expect to have from michaeljlindell.com --

MR. FREY:  So what we have heard back after we sent that email explaining what it was we wanted is nothing, Your Honor.

THE COURT:  No response to that email at all?

MR. FREY:  Correct.  And so -- and as Your Honor pointed out, the screenshot in an email is different than a -- even just a downloaded production of the actual document.  What we could see in that screenshot doesn't tell us what else is on the page, if that's the whole page, if there's, you know, things you can click into.  It was just a small screenshot embedded in an email.  It was not --

THE COURT:  What did you think the purpose of showing you the screenshot was?

MR. FREY:  To ask if that is the type of page that we're looking for.

THE COURT:  And that's exactly the -- explicitly

what accompanied the screenshot.  Is this the kind of thing you want; right?  I mean, I can look at it too in that exhibit that I have in front of me so I'm seeing it.  That is how it was discussed.

Although there is a statement there that if so, I can PDF and Bates-stamp it.  So it's sort of a little of both.  Like, this -- what additional information -- or how would you get the additional information that you think you -- that you want from the Google Analytics web page, for lack of a better term?  Is that a subpoena to Google?  Is that a deposition of the IT guy that Mr. Kachouroff is talking about?

MR. FREY:  Perhaps, Your Honor.  I mean, frankly, this Google Analytics for michaeljlindell.com is within his custody or control.  So we should not have to subpoena Google to get it, but perhaps a deposition to understand or just the full -- a full production of whatever it is that --

THE COURT:  Right.  But he's saying he can't do it.  He's saying that is -- that one page, that image, is all there is.  And so I would assume that at that point, either he's mistaken or there's somebody with knowledge about how to access the data that you could get that would confirm that's all there is --

MR. FREY:  Correct.

THE COURT:  -- that one screenshot.

MR. FREY:  Perhaps a declaration or an affidavit or -- of some sort of formal response would -- would quell our --

THE COURT:  Or it just creates more questions. That's the problem with doing that.  We're here now at this stage of it, and it's a little hard to back -- back up the bus and start doing fact discovery from IT people about what is accessible when here we are now.

What about the other -- this sort of meta-argument on whether or not you have to be found in contempt before the Court can order attorney's fees related to something that was produced after a motion to show cause hearing?

MR. FREY:  So, Your Honor, I respectfully submit that there should be a finding of contempt as to the other issues, 15 and 30.  With respect to 32, to the extent that the motion to show cause was required for that particular issue and he has since complied, that still should be recoverable; because, otherwise --

THE COURT:  Right.  No, I think it should -- I don't think he's saying it shouldn't.  What he's saying is the only way it can be recoverable is if there's also a finding of contempt.

MR. FREY:  Correct, Your Honor.  And I can submit a supplemental --

THE COURT:  Well, before we go --

MR. FREY:  I don't have the law at my fingertips. I can tell you what my --

THE COURT:  Before we get to that, let's see what your response is on 30.  We have a more detailed statement today, perhaps, than you've had before about what is and isn't in this 5,000 dollar pages -- or 5,000 pages and where you can find them, so.

MR. FREY:  So, Your Honor, respectfully, the -- I believe the 5,000 pages that Mr. Kachouroff is referring to was likely a production he made at the end of July, which was the MyPillow financial production for 2022.  That production does not contain any information related to Mr. Lindell's personal finances.

I will agree with you and defendant that there is overlap to the extent that MyPillow and Mr. Lindell share a lot in common, and Mr. Lindell owns MyPillow, is the face of MyPillow.  But that is not Lindell's personal information. There are not bank statements from Mr. Lindell in there. There are not other K-1s related to Mr. Lindell in there. There is nothing related to anything other than MyPillow as part of that production.

I would also state that we did not receive the 2022 tax returns for Mr. Lindell.  And to the extent that Mr. Kachouroff says that, well, 2023 hasn't been compiled yet, the underlying information has not been compiled yet,

so, therefore, we don't have it, there's also this discovery request for information that would go to show the finances he's been ordered to comply with.  So whether or not the accountants have done the tax returns yet, if those documents exist, which come from other places -- bank statements don't even need to be compiled.  They just need to be collected and produced.  There are many things that even if the 2023 returns are not done yet could and should have been produced in accordance with Judge Docherty's order.

THE COURT:  So as you sit here today, I'll ask again, the income tax returns for Mr. Lindell personally, 2022, have they been produced or not?

MR. FREY:  No, Your Honor.

THE COURT:  2023, have they been produced or not?

MR. FREY:  No, Your Honor.

THE COURT:  Underlying tax documents, that includes tax forms, include some things that aren't specific tax forms for Mr. Lindell personally, have they been produced for 2022?

MR. FREY:  No, Your Honor.

THE COURT:  And 2023?

MR. FREY:  No, Your Honor.

Let me just -- for 2022, I'll just caveat that to say in the MyPillow financial production, there were K-1s for

everyone who's part of MyPillow.  So there would be one piece of Mr. Lindell's that would have been included in that, but that would be all.

THE COURT:  Now, there's a lot of information in your declaration and exhibits.  If you can, where is the best place for the Court to look to see the statement that we've looked at everything that was produced in August post-hearing and none of that includes Mr. Lindell's personal tax returns, underlying tax documents, or other information sufficient to show his financial condition?

MR. FREY:  So in my declaration submitted, Document 380, attached to the motion to compel, it says, "As of today, September 23, 2024, Smartmatic has not received Mike Lindell's tax returns for the years 2022 and 2023." And paragraph 6, "As of today, September 23, 2024, Smartmatic has not received the documents underlying Mike Lindell's personal tax years for the years 2022 and 2023."

THE COURT:  Okay.  That's the tax returns.  What about the other -- you said bank statement.  I'm thinking underlying tax documents as well.  Annual reports, that's not usually something a person does, but there may be some specific annual financial reports that you think would pertain to Mr. Lindell personally that have or haven't been produced.  And where would I look to find the statement that they have not been?

MR. FREY:  Your Honor, I apologize if I conflated those.  So there's two paragraphs in my declaration.  Paragraph 5 says we don't have the tax returns.  Paragraph 6 says we do not have the documents underlying tax returns.

THE COURT:  Bank statements, is there a specific reference to those?

MR. FREY:  It does not specifically reference.

THE COURT:  Does it specifically reference the catchall, documents sufficient to show?

MR. FREY:  No, Your Honor.  It says "The documents underlying Mike Lindell's personal tax returns."  That's what my declaration attached to this motion for contempt states.

THE COURT:  And you also said at the outset that you weren't sure what 5,000 pages was being referred to.  Do you think it's at all possible that in the Bates numbers that you were given during Mr. Kachouroff's argument that if you were to go back and look at those, that answer would change?

MR. FREY:  No, Your Honor.  Mr. Kachouroff cited the -- just the Bates range of all the productions that have been made since he has become counsel.  That's just all of his productions.  And I do not believe it is in that 16,000 pages.

While we were on one of the breaks, I checked with my

colleague, who said that the MyPillow financial production, which was done, had 4,022 pages in it. So perhaps that is what Mr. Kachouroff was referring to. We don't know. But that was my best assumption that could be made. And that, again, does not include Mr. Lindell's personal financial information.

And for the record, Your Honor, in that communication where Mr. Kachouroff produced that, we said to him, just to be clear, these documents relate to MyPillow; it does not satisfy Mr. Lindell's burden to produce documents sufficient to show his financial information for 2022 and 2023. Mr. Kachouroff said that's crystal clear.

THE COURT: Okay. Where is the best place to look, if anywhere, to see a statement that there was no response to the email? I think it was the 29th. And I could be wrong. Whatever. The email relating to Interrogatory No. 15.

MR. FREY: Let me check, Your Honor.

MR. KACHOUROFF: Your Honor, may I talk to my colleague real quick?

MR. FREY: Your Honor, I do not. I do not have a declaration to that effect in the record that's been filed.

THE COURT: Okay. Anything else you'd like to say at this point?

Why don't we do this. We'll go off the record.

We'll give you a chance to talk one more time with Mr. Kachouroff, and then I'll let you have the last word about what the next steps should be.

MR. KACHOUROFF:  Thank you, Judge.

THE COURT:  Off the record.

(Off the record.)

THE COURT:  All right.  Go ahead.

MR. FREY:  Thank you, Your Honor.

In speaking with Mr. Kachouroff, he believes he did respond to Ms. Loftus's email that's Exhibit B.  I have not seen any response.  Certainly, if there was a response, it was not anything of substance nor would it have been production of the document.

And then other than that, Your Honor, I would just say thank you for your time.  Smartmatic continues to respectfully request a finding of contempt and the fees awarded for the two motions that have been filed to get us to today.

THE COURT:  All right.  Thank you.

And I know maybe this doesn't need to be said, but I'll say it anyway.  It's not necessary.  But it does appear there's additional discovery disputes.  So I would just encourage the parties to do -- as Mr. Kachouroff said today, you know, phone calls and do what you can to get the information that you need short of following this procedure

another time.  You know, let's -- let's try and be efficient where we can and focus on the issues that really are going to decide this case; right?

All right.  Well, thank you-all for your submissions and for your time this morning.

The matter is now under advisement.  The Court stands in recess.

(Proceedings were concluded at 12:37 p.m.)

CERTIFICATE OF COURT REPORTER


I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.


Dated this 11th day of February, 2025.


/s/ *Nancy J. Meyer*
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter