UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

|                                 |                           |
|---------------------------------|---------------------------|
| Smartmatic USA Corp., et al.,  ) | File No. 0:22-cv-00098    |
|                                ) |         (JMB/JFD)         |
|                                ) |                           |
|                 Plaintiffs,    ) |                           |
|                                ) |                           |
| vs.                            ) |                           |
|                                ) |                           |
| Michael J. Lindell, et al.,    ) | St. Paul, Minnesota       |
|                                ) | **January 28, 2025**      |
|                 Defendants.    ) | 11:00 a.m.                |

_____


BEFORE THE HONORABLE JEFFREY M. BRYAN
UNITED STATES DISTRICT COURT JUDGE

**MOTION HEARING**

**APPEARANCES**:

For the Plaintiffs:      BENESCH FRIEDLANDER COPLAN & ARONOFF
                         **J. Erik Connolly**
                         **Timothy M. Frey**
                         **Julie Loftus**
                         71 South Wacker Drive, Suite 1600
                         Chicago, Illinois 60606

                         ROBINS KAPLAN LLP
                         **Christopher K. Larus**
                         800 LaSalle Avenue, Suite 2800
                         Minneapolis, Minnesota 55402-2015

For the Defendants:      MCSWEENEY, CYNKAR & KACHOUROFF, PLLC
                         **Christopher Kachouroff**
                         13649 Office Place, Suite 101
                         Woodbridge, Virginia 22192

                         DEMASTER LAW LLC
                         **Jennifer DeMaster**
                         361 Falls Road, Suite 610
                         Grafton, Wisconsin 53024


(appearances continued on next page)

**APPEARANCES** (continued):

For the Defendants:        **Douglas G. Wardlow**
(continued)                1550 Audubon Road
                           Chaska, Minnesota 55318

Court Reporter:            Nancy J. Meyer
                           Registered Diplomate Reporter
                           Certified Realtime Reporter
                           Warren E. Burger Federal Building
                           and United States Courthouse
                           316 North Robert Street
                           St. Paul, Minnesota 55101

Proceedings reported by certified stenographer; transcript produced with computer technology.

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  All right.  Good morning.  We're here on Case No. 22-98.

Why don't we start with appearances.  And if the attorneys would not just note their own appearances but also if there are people in the gallery here who either worked on the case or somewhat relevant, you can introduce them at this time.  We'll begin with plaintiffs.

MR. LARUS:  Good morning, Your Honor.  Chris Larus on behalf of Smartmatic plaintiffs.  With me today are Erik Connolly, Timothy Frey, Julie Lofthus, from the Benesch law firm.  Also in attendance is Colin Flannery, general counsel of Smartmatic.

THE COURT:  All right. Good morning to you-all.

MR. KACHOUROFF:  Good morning, Your Honor.  Chris Kachouroff for Mr. Lindell and MyPillow.  I also have with me my colleague Jennifer DeMaster and Doug Wardlow.  Today myself and Jen will be arguing.

THE COURT:  That does anticipate the next question I had -- or the next thing I was going to mention, which is at some point you would be handing over the podium to -- I think there are two attorneys on both sides.  And I'll leave that to you to decide how much time to devote and who's doing which portions of the argument today.

And we'll begin, as I think I indicated before the hearing, with plaintiffs, and then we'll move to defendants, and then we'll have plaintiffs with a brief rebuttal.

MR. KACHOUROFF: Your Honor, if I may, as a housekeeping matter, we also filed a motion for summary judgment. I just want to be clear. We would technically, under the way I've done things in the past in courts, we get a rebuttal to our motion as well. And I understand the Court has put the kibosh on that. So I just want to voice the understanding that we also have filed a motion and would like rebuttal time, if necessary. I don't know if it is necessary.

THE COURT: Yeah, I'm aware that you filed a motion; that I'm prepared to hear arguments about it today. I've reviewed the motion, as well as the sort of ancillary motions regarding motions to strike, other aspects -- so I'm aware of the full menu of motions that are pending before me today. And I've done it both ways where I've given both sides rebuttal arguments. As I sit here right now, I don't anticipate having defendants make a rebuttal argument.

MR. KACHOUROFF: Understood.

THE COURT: If there's something that comes up that -- for example, if plaintiffs say something on their rebuttal argument that's new or different or that you feel like you have to respond to it, you can renew that request.

But I really think this is an opportunity for the attorneys to highlight issues that they think are very important for me and not to rehash what's already been submitted in writing. And it's those written submissions, I think, that are the most important parts of these motions and less so what happens in the courtroom at oral argument.

MR. KACHOUROFF: Thank you, Your Honor.

THE COURT: All right. Mr. Connolly, Mr. Frey, who is going to begin?

MR. CONNOLLY: Your Honor, Erik Connolly. I'm going to begin with the summary judgment. I will pass it over to Mr. Frey, who will do a far better job on the motions to strike as well.

THE COURT: Whenever you're ready.

MR. CONNOLLY: Thank you very much.

Your Honor, from February 2021 forward, the defendants published and they stated three main messages in multiple publications. They repeatedly stated that the 2020 election had been stolen. Second, they repeatedly stated that machines stole the 2020 election by switching votes. And three, they repeatedly stated that Mr. Lindell had 100 percent proof and evidence to support the first two accusations.

At the summary judgment stage, Smartmatic came forward with the evidence to establish that that is

demonstrably, verifiably, undisputably false.  No evidence that the 2020 election was stolen.  No evidence of any votes being switched by Smartmatic machines or machines in general.

At that point, after Smartmatic submitted that evidence in its briefing to you, the burden has shifted over to the defendants to keep alive any issues for the jury. Once Smartmatic came forward with their evidence on an issue or on an element, the burden shifts over to the defendants, with contrary evidence, to come forward with something in the record, a record citation to you, to create a disputed issue of fact for the jury to decide.

That's where this motion is decided because that is where the defendants failed.  There are arguments that are made.  There are allegations.  But there's no evidence that's been put in the record for you by the defendant and critical elements; meaning under the summary judgment standard, you have to find in Smartmatic's favor to help us narrow the issues that the jury actually has to resolve in this case.

Julie, could you go to Slide 3 for a moment, please.

This is an illustration of how that burden-shifting comes into play with respect to our first count, the defamation count.  Several of these elements, the record only contains evidence supporting Smartmatic's position.

There are, therefore, no disputed facts on these elements for the jury to decide.  The Court has to find summary judgment for Smartmatic and these elements.  There's no fight over publication.

THE COURT:  So on this slide, where do you fit in, I would say, the bulk of defendants' argument when it comes to the elements of defamation under -- and they have a list of cases about when a defamation claim is actionable or not actionable.

And as I understand it, that requires a determination of whether a statement is one of fact or opinion, and there's some other context that goes into that.  But wouldn't that be a question of law?  And where do you fit that in to these -- the list of elements on this page, because it's not there?

MR. CONNOLLY:  Correct.  It does not belong there, actually.  The determination of whether or not a statement is actionable or not actionable is required to be determined by the Court -- never by a jury, but by the Court -- as a matter of law, and it has to do with the falsity element because --

THE COURT:  That's my understanding as well, is that it's sort of a threshold question under falsity.

MR. CONNOLLY:  Yep.

THE COURT:  And call it falsifiability or call it

fact versus opinion or subjective, whatever you want to do, I have a follow-up.  Does it matter in the Court's determination of that question of law if the speaker, himself or herself or themselves, says everything I'm about to tell you is a fact, not an opinion.

MR. CONNOLLY:  It does.

THE COURT:  And then it goes into something that future attorneys characterize as opinion, not actionable defamatory statement.

MR. CONNOLLY:  It does, Your Honor.  And the *Milkovich* decision, M-i-l-k-o-v-i-c-h, really sets the stage for the analysis that this Court has to do when they're making the determination of actionable versus nonactionable. And what *Milkovich* tells us is that your analysis is entirely hinged on determining whether or not the gist of the publications implies something that is sufficiently factual that it can be proven true or false.  That's the requirement for you.

As the Court is making that analysis and considering the context in which the statements are being made, one of the things the Court necessarily looks at is how was the assertions presented.  If you present them as being 100 percent true, 100 percent fact, based on an investigation, supported by evidence, that all is part of the context in which the statements are made that to a

reasonable listener or a reasonable reader would connotate that you are presenting factual assertions.

It so happens in this case we have two of the critical things that the Court would look at.

THE COURT: Can you just quickly -- is that from *Milkovich* itself, or are there other cases that -- that specifically address how factual the speaker presents this question that might still be opinion -- the speaker could be wrong. They could think it's a fact and, in fact, it's actually pure opinion. And is that from *Milkovich* that says the way it's presented matters, or is that some other case?

MR. CONNOLLY: Yes. I would look at three cases, Your Honor. I would start with *Milkovich* as the Supreme Court precedent. That really set the table. I would then look at the *Nunes* decision, N-u-n-e-s, and the *Toney* decision, T-o-n-e-y. Those are the ones I would take a look at to help understand the contextual framework that is typically used. A lot of courts --

THE COURT: You're saying that those cases specifically address whether the speaker said this is a hundred percent fact or not, and that's a factor in determining whether it actually is a fact?

MR. CONNOLLY: Those are the cases that tell you you look at the context in which the statements are made, and we don't have many cases where you have the speaker come

up and say:  This is 100 percent factual.  Believe me.  This is true.

But they tell you look at the context in the --

THE COURT:  Well, I know that.  I'm asking more specifically.

MR. CONNOLLY:  I don't have -- I don't think those specific cases have that type of declaration because it is a unique thing.

But when you look at the opinion analysis, your first threshold question, really, where under *Milkovich* you rise and fall, is are the assertions something that can be proven true or false.  And in this context, the gist of what is going on here, the gist of these statements is the election was stolen because votes were switched away from Trump.  Okay.  That either happened or it didn't happen.

It's a historical fact that either occurred or didn't occur, and it just happens it didn't occur.  That means it's not a nonactionable statement.  It's actionable.  Voting machines, including Smartmatic machines, were used to switch the votes.  Okay?  That either happened or it didn't happen.  It's demonstrably true or false.

THE COURT:  In your view, is your framing it -- and I don't necessarily agree that there's a burden-shifting that occurs.  I think it's possible for a plaintiff to come forward with insufficient evidence to -- on a factual

question, like reasonability or reasonableness of something. It's possible that I could have one-sided evidence presented and still think there are questions of fact remaining.

But putting that aside, there's a statement, for example, in the absolute proof documentary where a speaker is saying that voting machines used a prismatic scoring algorithm to change votes at a particular point -- at the transfer point, the point at which, quote, "the vote leaves the Secretary of State."

So are you saying that in order to survive this motion, defendants have to come forward with evidence that a Smartmatic machine in L.A. County used a prismatic scoring algorithm to switch the vote at the transfer point?

MR. CONNOLLY:  Yes.  Because what Smartmatic did on falsity -- and I want to go back to the opinion thing in a moment.  But what Smartmatic did in falsity is they presented evidence to you demonstrating Smartmatic machines were only used in L.A. County, Smartmatic only provided ballot-marking devices, Smartmatic only provided ballot-marking devices that were designed based upon the specifications from L.A. County.  Smartmatic voting machines were never connected to the internet.  Smartmatic voting machines never were hacked.  Smartmatic voting machines never switched any votes.  And all post-election audits confirm that.  That's our evidence.

We put that evidence out there, and that evidence undermines every statement that was made, but more critically, and we can't lose the forest through the trees here. More critically, it undermines the major messages, the gist of the publications. The Court's obligation isn't to parse every single statement that is made. What the Court does in its analysis is it comes away and says what is the main implications that are being conveyed by the publications. This is why the *Milkovich* decision talks about implication.

And when the Court does that analysis, it is attempting to decipher what are the main messages being conveyed here. There are a bunch of individual statements that are unquestionably factually inaccurate. Or more critically, for each of these publications, the overall message that is being conveyed were the two that I articulated at the beginning. And when you take away as a matter of law, which is the Court's province -- when you take away -- yes, that's the main message. Smartmatic has presented evidence showing that those main messages and the individual statements are false for all these reasons.

At that point, on the issue of falsity, the burden shifts over to the defendants to say, no, here is evidence establishing there's a dispute and those core facts. And that just didn't happen here.

And so when we're looking at the opinion analysis -- or I can see your focus is on that -- that's your obligation. It's going to be based upon the main messages that are being conveyed. And the first and foremost analysis for you is are the main messages demonstrably false or not demonstrably false. And in this case, every single one of them is demonstrably false.

Other courts have looked at that same question, and they've come out and concluded, yes, the allegations that were being made post-2020 about the voting machines, those aren't opinions. They're not protected as opinions. Those are demonstrably false assertions they're making.

Any more questions on that?

THE COURT: Go ahead.

MR. CONNOLLY: I don't know how I'm doing on my time. I need to save five for Mr. Frey here. This is how we break down the issues, and we spent some time already here on defamation. I want to talk for a moment about vicarious liability.

So could you go to Slide 12, please.

The other issue that summary judgment should be granted to Smartmatic on is on vicarious liability. This is not something that the jury should have to wrestle with. This is the evidence that Smartmatic put in on vicarious liability. And there was no response to that evidence

submitted by the defendants.  It's an astonishing admission in the evidentiary record that you've got in front of you. There's nothing that you can point to in the record on any of these points that would create a disputed issue of fact.

The most important one of these is the fourth one that we've identified, the participation of the MyPillow employees.  I'm just going to pause and talk about that one for a moment.  Because when you really think about it, the fact that the MyPillow employees were so intimately involved in the preparation, the publication, the dissemination of the defamatory publications is some of the best evidence that there should be vicarious liability and that Mr. Lindell was, in fact, acting in his capacity of a MyPillow executive, the MyPillow guy, during these defamatory publications.  It is undisputed -- "undisputed" -- about their participation.

Smartmatic put into the record for you evidence that they were involved in arranging for his appearances and the publications at issue.  They were involved in promoting the defamatory publications.  They were involved in disseminating the publications.  Some of the defamatory DVDs were stored at their main locker rooms.  They set up the websites and populated the websites with the defamatory publications.  And they generated and provided the promo codes that were used during them.

That was all the evidence that we put in on their participation. There's nothing on the other side of the ledger. It's blank. That means you have to find for us on vicarious liability.

The argument they make is, well, under the work space time requirement, he wasn't at a MyPillow facility when he was doing that. But that's irrelevant. The *Edgewater* case, which I know the Court is familiar with, is a perfect parallel to take a look at. That's the case where the employee was staying at the hotel. Two key factors in that. One was the employee was an executive. Two was he was a 24-hour guy. That was their phraseology for the employee.

Mr. Lindell, to his credit, he's a 24-hour guy. He is the MyPillow guy, and he is the executive of this company. If you draw the parallel to *Edgewater*, the one argument goes away.

But more importantly, the participation of the MyPillow employees demonstrates that this defamatory campaign was part of doing business. You cannot use MyPillow resources and the MyPillow employees to prepare, to disseminate, and to promote the defamatory publications, and then turn around and say I wasn't working and wearing my MyPillow hat.

THE COURT: You've now used your 15 minutes.

MR. CONNOLLY: And then I'm going to pass 5

minutes to Mr. Frey, if that's okay.

THE COURT:  Okay.  Instead of it being 15, 15, and 5, we'll go 20, 20, and 5.

MR. CONNOLLY:  Perfect.

THE COURT:  And we'll make sure both sides have that same amount of time for their argument.

Go ahead.

MR. CONNOLLY:  I appreciate it.

THE COURT:  I'm not going to tell defendants how to break that up.  They could flip it and spend 15 minutes on the motions to exclude the supplemental materials.  So they can decide how they want to do it.

MR. CONNOLLY:  Thank you.

THE COURT:  Mr. Frey.

MR. FREY:  Good morning, Judge.  I'll be fairly brief here.  As you've said, you've reviewed the submissions, and I won't rehash all of that.  But just very quickly, I'm going to talk about the motion to strike the second and supplemental declarations of Benjamin Cotton.

To frame the timeline here, initial expert reports in this case were due on December 22, 2023.  Rebuttal reports were due July 9th, 2024.  Mr. Cotton was deposed in August of 2024.  Fast-forward to summary judgment, and Mr. Cotton put in two declarations, including opinions that he had not previously stated.  Two of those were cited in the summary

judgment briefing; one being that the -- to try to provide evidence that Smartmatic machines somehow could tally votes because of a QR code; when in his deposition, Mr. Cotton didn't even know whether the BMDs printed paper ballots or not. That is not something he opined on. It's not an issue he looked at.

And then the second declaration being focused on, Smartmatic's role in administering the L.A. County election generally. Something, again, that is well outside of anything he previously had looked at or opined on.

So we moved, pursuant to Rule 37(c)(1), to exclude -- or to strike, you know, the Court considering these new declarations because according to the rule, you know, parties cannot create new evidence to support a motion if it was meant to be previously disclosed, which in this case those opinions should have been previously disclosed.

And the caveat is whether the failure was substantially justified or is harmless. The courts in this circuit have found that it's not harmless because it allows for the parties submitting the new evidence to fill in gaps and to change opinions without the opportunity for the opponent to really vet that and understand what their evidence will be.

So that's why we move to strike those declarations. We think they're improper and should have -- anything in

there should have been previously submitted by Mr. Cotton.

THE COURT:  Putting aside the -- what prejudice there might be, you know, in preparation, the attorney time -- putting that aside, if the Court does not agree with you and decides to include those in, let's call it, the evidentiary record, does that change, in your view, the outcome here on any of the issues that you've moved for summary judgment on or that defense has moved for summary judgment on?

MR. FREY:  No.  No, Judge, it does not.  With respect to the first declaration -- or the second declaration, December 13th, 2024, that mainly critiques what our expert has done in terms of looking at an exemplar BMD machine, not one used in L.A. County, and kind of examining that machine to see how it worked, how the securities were put in place.

You know, in the response brief from defendants, they misconstrue what Dr. Sherman was actually relying on in terms of that walk-around.  What -- that was one of eight bases for his opinion, and it was not the basis for his opinion that there was no outcome determinative of fraud in L.A. County.  He looked at all of the security protocols.  He looked at the audit that was done afterwards.  He looked at audits across the nation, none of which have anything to do with his inspection of the BMD machine.  And at best,

it -- there -- the Cotton declaration would show there are potential vulnerabilities, and that would just not rise to the level of proof that actual fraud, actual vote flipping, any actual malfeasance occurred. So that would -- that would not change the outcome there.

With respect to the second declaration, that is going to the issue of whether Smartmatic was a state actor for purposes of a First Amendment. And at best, what that would do would be to create an issue of fact. But I would submit that even if the Court considers what -- what Mr. Cotton says there, it does not put Smartmatic at the level of running the election as is required -- as would possibly be required to be a state actor. Although as we set forth in the briefs, the state actor doctrine is never used in this manner, as a matter of law.

The final point I'll make, Judge, is just on their response. Defendants did accuse Smartmatic of misleading this Court, misleading Mr. Lindell with respect to the BMD machine that Mr. Sherman did -- or Dr. Sherman did examine. We've set forth a request to put in a reply to address that point. But, briefly, I want to put on the record that Judge Docherty considered these same arguments over a year ago and found that there was no misrepresentations by Smartmatic; that Mr. Cotton could do the same thing Dr. Sherman did and that we should allow him time to do so.

We did just that.  The fact that he didn't take that opportunity is his prerogative, but Smartmatic in no way has misled the Court or defendants.

THE COURT:  Okay.  Thank you.

MR. FREY:  Thank you, Judge.

MR. KACHOUROFF:  Your Honor, I'll be addressing the issue of standing on behalf of the defendants. Ms. DeMaster will be handling all the First Amendment issues.

The absence of standing is fatal to this case.  This Court has no jurisdiction because standing is a jurisdictional prerequisite.  And once -- and for purposes of summary judgment, once standing is challenged, the Supreme Court has established the procedure.  The burden shifts to the plaintiffs to produce evidence of an injury in fact.  And that comes from the *Lujan v. Defenders of Wildlife* case; the famous case.  Plaintiffs have not met their burden.  They have failed to produce a single piece of evidence showing any injury in fact in Minnesota.

Turning to their own words, Interrogatory No. 20, which we propounded upon them, required them to specify and specifically list out places and states where they alleged harm.  And at first they named not only states, several states, they named foreign countries.  And even after several iterations, they amended their responses and

included other jurisdictions. But at no time did they ever list or identify Minnesota as one of them.

Your Honor, this is not an oversight. It's an admission. It's undisputed. And so the heart of the matter here is that plaintiffs have an inability to demonstrate standing under Minnesota law. And that is fatal.

First under the MDTPA, the Minnesota Deceptive Trade Practices Act, they have no damages. They claim nationwide damages, but they can't claim nationwide damages. This is Minnesota. The MDTPA does not have extraterritorial reach beyond the state borders. It was never intended to, and quite frankly, the *Rouse* decision slammed the door on this theory. And the *Rouse* decision was actually in this court not too long ago. I think Your Honor was tangentially involved with cleaning that -- or finishing that case up.

They fail to identify any economic harm or reputational injury specific to Minnesota. And this omission, quite frankly, Your Honor, underscores the speculative nature of their claim, and it violates the standing principles articulated in the *Webb Golden Valley* case, which requires demonstrable harm within the state. And let me be clear, plaintiffs are not Minnesotans. They've suffered no Minnesota harm; yet they insist that *Rouse* doesn't apply because this isn't a class action.

That distinction is without merit. *Rouse*'s core

holding is clear.  No Minnesota ties, no standing.  And, of course, we can't forget the *Ferrari* and the *Insulate SB* cases where this court rejected nearly identical attempts to highjack Minnesota law for out-of-state disputes.  Plaintiffs, quote, "nationwide," end quote, harm theory is a carbon copy of these failed arguments, and the Court should shut it down and shut it down now.

Smartmatic has never knocked on a door in Minnesota.  They have no certified products here that allow them to sell.  They have no government contracts, no government customers, no office space.  They are not registered with the Secretary of State to do business here in Minnesota.  They don't --

THE COURT REPORTER:  You need to slow down.  "They don't" --

MR. KACHOUROFF:  -- even have a business license.

And so what they're asking you to do, Your Honor, is to transform the MDTPA beyond its territorial limits, transform it into what we will call a nationwide sword, but the statute is not a tool for out-of-state plaintiffs to police speech they dislike.  The MDTPA protects Minnesotans, not the speculative global grievance that has been propounded by the plaintiffs.

And, finally, Your Honor, I'll wrap up with the issue of the defamation claim.  It fails for the same reasons and

more.  Reputational harm requires proof, not presumptions. Reputational harm to a business is different than reputational harm to you.  If I were to critique you as a judge, that's personal to you.  But for a business, reputational harm is economic loss.

If they have no business in Minnesota, there's no Minnesota reputation to harm.  And the Eighth Circuit in the *National Refining Company* case made this clear.  Corporate defamation requires economic injury, and they have none here.

Second, their actions -- or their statements today are so contradictory.  Before Michael Lindell even mentioned the name Smartmatic, the day before they filed a suit against Fox News in which I read what Mr. Connolly wrote in that case.  They claim the business was already virtually destroyed, end quote.  And now they blame Lindell for $125 million in damages.  Well, which is it?  You can't have it both ways.  And so this glaring inconsistency shows that their argument is simply not credible.  They have no damages, and no damages equals no standing.  And that's even under Minnesota defamation -- the Minnesota common law defamatory claims.

Smartmatic, as I said, has never operated here. They've never sold here.  And their expert report ignores Minnesota entirely.  That's fatal.  And if there's no trace

of harm, there's no standing to sue and, therefore, no jurisdiction. We're asking the Court -- before you get to anything else in this case, before you get to the first amendment claim, whether a statement's an opinion, whether it's not an opinion, whether the speaker says it's a fact, whether it really isn't a fact at all, you have to address the issue of standing; who has the power to decide the question of right or wrong.

And for that purpose, Judge, I would submit, respectfully, that they have failed to meet their burden under the Supreme Court's precedent establishing that they have to show injury here in Minnesota or some meaningful ties. They have no meaningful ties to Minnesota.

And with that, we would ask the Court to dismiss the entire case, grant summary judgment on the issue of standing, and dismiss the entire case. Thank you.

THE COURT: Do you have any response at all -- assuming I disagree and I think there's standing here, any response at all to their partial motion for summary judgment on falsity and everything but malice when it comes to defamatory elements?

MR. KACHOUROFF: My colleague is going to -- I would try to cabin my argument, Judge, just to -- just to standing.

THE COURT: Okay.

MR. KACHOUROFF: Believe me, it's tempting. I want to tell you, but I'll let my colleague do that.

THE COURT: I understand.

MS. DEMASTER: Thank you, Your Honor.

The First Amendment requires summary judgment in favor of the defendants in this case, not only to prevent a dangerous precedent, but to -- but to not encourage or invite this kind of suppression and chilling of speech in the future.

This is a dangerous precedent where government actors or their proxies, including private contractors acting as stalking horses, may suppress protected speech, specifically on matters of such grave public concern. Allowing this case to proceed, Your Honor, undermines the robust protections of the First Amendment. In support of that, *The New York Times v. Sullivan* started this off in 1964 where debate on public issues must remain uninhibited, robust, and wide open even if -- "even if" -- some of those statements have been erroneous.

In *Gertz v. Robert Welch* (1974), the First Amendment not only permits dismissal of this but actually requires protection of even some statements that might or might not be accurate, that might not be true. You see, the Court does not have to today -- under *Philadelphia Newspaper v. Hepps*, the Court does not have to determine the truth or the

falsity and in many cases need not -- specifically where the precedent that can be set is chilling and is extremely dangerous.

As far as government actors, because this is a stalking horse type of situation where the government can use proxies, government contractors who are engaging in very intertwined -- inextricably intertwined fundamental operations of government, not just the limited manner that the plaintiffs claim in manufacturing equipment and setting that off, but the setup, the teardown, the oversight.

In fact, less than one week ago, new case filings have come out from *Fox News v. Los Angeles County* talking about specifically how not only did Smartmatic oversee and conduct the maintenance of all facets of how these machines were used during Los Angeles County's --

THE COURT:  Before we get to that evidence -- and I'll let you do that in a minute -- I just -- I think the -- the thrust of the response on the state-actor issue is there's no case that allows it to be used in this way.  So that's where I would start.

What's your best case that allows this as a basis for granting summary judgment?  And if it's in the brief -- I mean, I've read it.  You can refer me to the page of the brief.  But if there's -- I just need to know how novel you think it is -- right? -- because their response sort of

portrays this as a pretty novel use of this doctrine.  And if you agree, that's helpful for me to know, you know, if I'm stepping into a space that is -- or there's few, if any, precedent.

MS. DEMASTER:  We don't agree, Your Honor, and I think, yes, it does establish a dangerous precedent because it allows that.  But I think there are a couple cases that are more on point.  I think *Manhattan* --

THE COURT REPORTER:  Hold on.  You need to slow down.  "I think Manhattan" --

MS. DEMASTER:  -- *Community Access v. Halleck* -- that's H-a-l-l -- I believe it's e-c-k -- it discusses three circumstances where a private entity can qualify as a state actor, and that includes the exclusive engaging in a traditionally exclusive public function, such as elections, operations under government control or authority, as well as joint action with the government, being an arm of the government.  They discuss those three circumstances.

As well as *Rosenblatt v. Baer*, which is 1966, the Supreme Court discussed how we must protect criticism of the government; especially when it entails those whose roles bear, quote, "significant importance on the functioning or public perception of government operations."

THE COURT:  So who was the state actor in that case?  Was that the plaintiff or the defendant?

MS. DEMASTER:  The state actor in *Rosenblatt,* Your Honor?

THE COURT:  No.  The *Manhattan Community Access* case first, and then we'll address -- did you say *Rosenblatt*?

MS. DEMASTER:  The state actor was the plaintiff, Your Honor.  The state actor.  And there was discussions because they were engaged, I believe, as the community access television.  And the court found that they still had some control.

But here we've seen throughout discovery that there is no control.  They go back and forth between confidentiality with Los Angeles County, but they still have some facet of the source code but can't provide other things.  And so there is this inextricably intertwined -- and I think that's the main argument that we make here is that -- especially for this in terms of the government agent, in part, because there's persuasive intertwinement, which brings us to *Brentwood Academy v. Tennessee,* which was in 2001.  And the term there used by the court was pervasive entwinement of government and the plaintiff.  Government policies are dictating conduct.

Here the plaintiffs have admitted that Los Angeles County told them how to make these, but the plaintiffs here are the ones that oversee this.  And they oversee this --

they bring in even other nations to review -- to review these machines, to review how the elections actually operate using these machines; meaning that three other countries, Dominican Republic, the country of Georgia, and Indonesia have all had more access to view exemplar machines or how these machines operate in Los Angeles County than this Court has and the defendants have and that any American citizen has.

THE COURT:  So going back to the -- so you've mentioned the *Manhattan Community Access* case.  Then you mentioned *Brentwood Academy v. Tennessee*.  Who's the state actor in *Brentwood Academy v. Tennessee*?  It sounds like Tennessee.

MS. DEMASTER:  Yes, it's -- the Tennessee -- I believe it was the Tennessee Secondary School of the Arts [sic].  And there it was technically a private company -- or private nonprofit corporation.  However, the court found that they were an arm of the state based on several factors; one of them is --

THE COURT:  Which part is the arm of the state?

MS. DEMASTER:  I apologize.  Here the arm of the state was -- it was the defendant here, who is Tennessee.

THE COURT:  And then --

MS. DEMASTER:  So they were arguing -- and they were arguing, Your Honor -- and you are correct.  They're

arguing that they were trying to bring a case that they were acting as an arm of the state in how they were setting out their decisions, violating rights under 42 U.S.C. --

THE COURT:  That seems like the more conventional way that the state actor doctrine is -- comes up -- right? -- is when somebody is sort of acting under the color of law and they're sued because there's some obligation that governments have that private actors don't.  And so you're impugning those obligations to private actors.  But that's pretty different than what we have here.  So is the *Manhattan* case more akin to this where we don't have that?  And if so, are there other cases like that?

MS. DEMASTER:  Correct, Your Honor.  *Halleck* is more -- or *Manhattan* is more akin to this.  And there have been others.  But to that point, we would say that, yes, even though this is not a case against a state actor acting as the government for 1983 purposes, our concern is the precedent that this could set because we do have somebody who's operating -- we have a plaintiff who's operating as, essentially, an arm of the government with the traditional public function and now trying to chill speech, not just --

And we heard -- we heard Mr. Connolly earlier talking about the employees.  So not only Mr. Lindell, but also his company, employees, others.  Where does the chilling of speech end?  And so we do believe that the precedent could

be dangerously set where they could continue to do this. And plus, not only that, but opening up for future litigation, being able to see that.

But the next point we wanted to truly get to was opinion. Because regardless of any of that -- regardless of any of this, every statement at issue here, every message that the plaintiffs have raised is classically consistent with opinions and not, in fact, assertions of fact.

THE COURT: So let me ask you some of the same questions.

MS. DEMASTER: Sure.

THE COURT: It's a question of law; right? And there are factors I look to to determine how factual or how opinion -- you agree with that?

MS. DEMASTER: Correct, Your Honor.

THE COURT: Okay. And then you agree that this is -- this sort of fits in the analysis as -- I would think of it as a threshold subpart to falsity. Or when you're listing the elements of defamation, I think it fits in best there as opposed to some overarching layer on top of; right? Or do you disagree? Where do you think it fits in?

MS. DEMASTER: No. This is absolutely -- this is a subpart. Before we even get to falsity, before we even get to malice, before any of that matters, you must determine whether these statements have the precision, are

precise enough, to not be considered classically consistent with opinion or --

THE COURT:  So let's take the example that I gave in opposing counsel's opening argument; that there's a statement in absolute proof where the person in -- in this documentary at this time is saying that voting machines used a prismatic scoring algorithm to change votes at the transfer point.  How is that opinion?

MS. DEMASTER:  There was -- there must have been one -- one expert, one person that came in that kind of made those and spoke to Mr. Lindell.  It was somebody that he had interviewed.  Within the context of changing votes, there was also --

THE COURT:  Let's use the factors that I'm supposed to use to determine if this is a fact or an opinion.

MS. DEMASTER:  Okay.

THE COURT:  The statement that the machine used a prismatic scoring algorithm, that part of the statement to me, at first blush, seems pretty factual.  Did it use this algorithm or not?  That seems like something we could determine as a factual matter.  The other portion of the statement, when that happened -- that it occurred at the transfer point -- that also seems like something we could determine as a factual matter.  And maybe as a factual

matter there's evidence of all of that, or maybe there's not. It's just kind of conspiracy theory mumbo jumbo. I don't know; right?

But that's the question to start with is using those factors, applying it to that specific statement, tell me why you think that is one -- because you said every statement's opinion. Let's look at that one.

MS. DEMASTER: Yes, Your Honor. And so to answer your question first, Your Honor, the -- the example that you're referring to from absolute proof, which is one of many -- at least a dozen different witnesses that came in, but that one example was not referring to Smartmatic. It was, actually, very clearly not referring to Smartmatic. And Smartmatic was not addressed in that facet. That would potentially be more consistent if they were talking -- if this person was talking about a specific date in time.

But what the plaintiffs have said and what they've continued even here in their -- their presentation to you today is four -- is four main messages that were conveyed by all the statements. And of those four main messages, not only in their submissions and evidence, but the statements and the messages that they state that Mr. Lindell made that they call defamatory are so imprecise, so vague, so consistent with opinion, including machines being online or machines being used to be online, that they can't even keep

them straight.

For example, in their summary judgment motion, one of the four messages is that the machines were used -- they were used by third parties. However, in their submissions here and some of their documents today, they argue that it was just that -- that all voting machines can be hacked.

But this goes down to *Campbell v. Citizens*. And one of the things that *Campbell v. Citizens for Honest Government*, back in 2001 in the Eighth Circuit, talked about and describes some of these vague and nonspecific accusations that are less likely to be actionable defamation. Claiming a product was used by others is one such example.

In fact, there had been cases where a plaintiff came in and they talked -- the statement was something about how their product was potentially used. But this goes to other third parties. So we're not just talking the vague and imprecise nature of the actual statement, whether a machine is rigged. And I believe there's --

THE COURT: No. But you -- let's -- I understand you're saying that statement itself doesn't explicitly refer at that moment to Smartmatic machines. But it's part of a documentary where you have repeated statements that lump all machines together; right?

So let's assume that I disagree with you that I can

sort of peel it off because it doesn't specifically say Smartmatic at every moment, and this is one of those moments.  Let's assume I disagree with that; that the overall context includes Smartmatic in this statement that machines used this scoring algorithm.  Why -- still you haven't explained why you think that's an opinion.

MS. DEMASTER:  Well, it's an opinion under law because he is addressing and, in fact, showing the public what the facts are that he is basing his conclusions on, and that's where courts have shown that -- some of that there.  So discussing the --

THE COURT:  I'm sorry.  I don't quite follow.  It's --

MS. DEMASTER:  It's Mr. Lindell's --

THE COURT REPORTER:  Hold on.

THE COURT:  I'll read back what you said because I don't quite follow.

MS. DEMASTER:  I apologize, Your Honor.

THE COURT:  "It's an opinion under law because he is addressing and, in fact, showing the public what the facts are."  I'm not sure I follow that logic.  So maybe there's a way you can explain that statement, why -- why that can't be proven one way or the other.

Shouldn't -- it sounds to me, at first blush, like you should be able to show what -- whether there was an

algorithm used in this machine.

MS. DEMASTER:  And --

THE COURT:  And maybe you're conceding that that statement itself is -- there's portions of it that you can show are true or false.  But the next question I had was where's the evidence that that statement was false?  Because I didn't see any reference to it.  In what I've reviewed of the evidentiary record, I don't see any evidence -- I'm sorry, that shows that statement was true; that a Smartmatic machine used a prismatic scoring algorithm at a transfer vote.

MS. DEMASTER:  Your Honor, the evidence that the plaintiffs had put forward is -- is no different than the evidence that defendants have put forward in terms of the statements and opinions of conclusions.  There has been no inspection regarding -- and this was even if that statement was in reference to Smartmatic, which it was not.

It is the plaintiffs' burden -- in fact, *Philadelphia Newspaper v. Hepps,* Mr. Connolly here had stated earlier to this Court that all they have to do is show falsity and then the burden is on us.  Well, that's inaccurate, Your Honor.  In fact, the Supreme Court has stated multiple times that it is the plaintiff's burden not only to prove falsity with evidence but to prove fault -- and that is actual malice -- before there can even be a consideration on defamation.

And the statements -- the only evidence plaintiffs have offered -- have offered at all and have been willing to offer throughout these proceedings is other statements, other opinions and a differing of opinions.  Statements by opinions by others that only go to conclusions of this.  Well, you say -- you say -- you say that votes were stolen or that votes were switched.  Well, we say they weren't.  Well, you say that the election was rigged.  Well, this guy says that it wasn't.  I can stamp audit on a piece of paper and show it to you.  That doesn't mean that I conducted an audit.

We have not been able to see that.  We haven't been able to inspect machines.  There hasn't been an exemplar.  We haven't been able to see any source code.  They haven't been able -- they haven't been willing to provide that, but nobody has seen that.  Nobody has come out at any point.  No matter which government official has said anything, there has been no evidence, no investigation, no audit, just mere media statements saying the --

THE COURT REPORTER:  Slow down.  "No audit, just" --

THE COURT:  Just media statements or something like that.

MS. DEMASTER:  Just media statements.  And just media reports about, say, Bill Barr, Chris Krebs saying

there's not enough evidence.  There's been no actual data, forensic analysis.  They haven't allowed that in this case, and it is the plaintiffs' burden to prove not just falsity, but to prove fault and actual malice.  And that's what the court has stated.  In fact, the Eighth Circuit (1987) --

THE COURT:  Your time's about up.  Why don't you take like a couple -- like another 20 seconds to wrap up.

MS. DEMASTER:  I'll wrap up very quickly, Your Honor.  I apologize.

And that's all that the defendants in this case -- the defendants have already argued for -- have already argued there is no actual malice and that plaintiffs cannot prove actual malice.  There is no reckless disregard. Reckless disregard is the objective standard.  They had to prove that Mr. Lindell believed his statements were false. He had a reasonable reliance.  And so we'd say that.

One last thing, just to wrap up with the last 10 seconds, regarding this -- the plaintiffs -- regarding the motions to exclude the Cotton declarations, these were -- just to address the point that the Court had already stated in the motion for reconsideration in April, which was Docket No. 266, we were addressing in our response, RFP No. 10, from the plaintiffs where the court, Judge Docherty, asked about, whether they had any material -- any hardware or software under RFP 10.  And they

said just some spare parts, screws, or plastic fittings. That's what we were concerned about. That was not raised in the motion for reconsideration. And we would say if they had an exemplar, similar BMD, that should have also been responsive to that. And that's all we said. And with that, Your Honor.

THE COURT: All right. We're going to take just a slight break before we have rebuttal argument.

(Recess taken from 11:56 a.m. to 12:01 p.m.)

THE COURT: Now we'll hear the rebuttal. Go ahead.

MR. CONNOLLY: Thank you, Your Honor. Erik Connolly on behalf of Smartmatic again.

Let me start with standing. Article III requires a plaintiff to have standing. In this case, because it is a defamation case, you look to primarily the reputational harm caused by the defamatory publications. You can get that guidance by reading almost any of the Supreme Court cases that talk about why defamation exists. You can look at the *Curtis Publishing* case; the *Gertz* case, G-e-r-t-z; the *Harte-Hanks* case, H-a-r-t-e-H-a-n-k-s; or the *Herbert v. Lando*, H-e-r-b-e-r-t.

You always look at reputational harm. In this case under Minnesota law, reputational harm versus injury provides the Article III standing, is presumed as a matter

of law because it's a per se defamation case. But beyond that, the record contains sufficient evidence of reputational injury.

I would refer the Court to the declarations of Jonah Berger, Kevin Keller, Tammy Patrick, as well as the deposition testimony that was admitted, including but not limited to Antonio Mugica, M-u-g-i-c-a. There's sufficient evidence of injury in this case. It's reputational injury. It's reputational injury that is infected, and anybody who hears these defamatory publications, that is why it is nationwide, why it is -- includes but is not limited to individuals within Minnesota.

The argument against standing that was presented by the defendants is inconsistent with Minnesota law. The Court only needs to look at the statute and the Minnesota Deceptive Trade Practices Act to know that the argument that the defendants are making regarding having to show an economic loss outside of a reputational harm is not, has never been a requirement. I refer the Court to the statute, which is 325D.45, which discusses the remedies for a violation of the Deceptive Trade Practices Act. And the subdivision 1 describing injunctive relief, which is what is being requested here, states the following, quote: "Proof of monetary damage, loss of profits, or intent to deceive is not required," end quote.

Smartmatic does not need to show monetary loss or loss of profits in order to get the injunctive relief under the Deceptive Trade Practices Act. Therefore, under no scenario can that be a standing threshold to have a claim under the act.

The cases that they cite to with respect to standing in general have a unique contour. They are all class action cases. The language is cited. It's the same language over and over again about what a named plaintiff must do in the scenario of an absent class. That is not what we're talking about here. We are seeking injunctive relief because we have a Minnesota individual citizen, we have a Minnesota corporate citizen disseminating from Minnesota the defamatory speech that they are attempting to enjoin. There's no statute that makes more sense to trigger and rely upon when seeking injunctive relief against a Minnesota plaintiff than the Minnesota Deceptive Trade Practices Act.

Let me talk about damages for a moment. There is no case in Minnesota or anywhere in the country that says that reputational harm does not exist for corporations in the context of a defamation case, nor is there a case in Minnesota or anywhere in the country that says in states where presumed damages are recognized for defamation per se it doesn't apply to corporations. That's not the law. It has never been the law.

If you look at the jury instruction in Minnesota for presumed damages -- it is Instruction 50.50 -- it makes no distinction between providing that instruction when it is a corporate plaintiff or providing that instruction when it is an individual plaintiff.  There's no distinction.  That's not how the law works in defamation, and it has never been the way.  Even if you look at the cases cited in that instruction, it has cases where it is an individual plaintiff and a corporate plaintiff.

The case they cite to to make up this rule that does not exist is the *Benzo* decision.  That's B-e-n-z-o.  *Benzo* actually says the opposite of what they just told you *Benzo* says.  *Benzo*, citation pincite for you is 771, describes per se defamation -- and that case was a libel per se -- against a corporation and simply stands for the proposition that when it is a corporate plaintiff bringing a defamation per se, you have to establish that it imputes to the corporation, quote, "fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product," end quote.  *Benzo* is an unremarkable decision that simply stands for the proposition that a corporate plaintiff has to establish the requirements for defamation per se before you get presumed damages.  And we've done that.

Quickly -- I won't spend time on the general immunity

argument; that there's some sort of immunity under First Amendment prosecution for this case. The Supreme Court has considered those arguments ad nauseam. The Supreme Court has always rejected it under the balancing between free speech and an individual's reputation. Those are the cases I cited to you previously. It's not an issue. It's never been an issue in any court.

On the state action doctrine -- I'll just do this very quickly, Your Honor, because I know I have my five minutes. The doctrine has never been used ever to bar a plaintiff from bringing a case, period. They do not cite one in their briefs. My colleague on the other side, I think, made a mistake when referencing the *Manhattan* decision. The *Manhattan Community Access* case, which is the Supreme Court case, the corporation Manhattan was the defendant in that case. It was not the plaintiff in that case. Obviously, the captions get flipped around a little bit when you go up on an appeal to the Supreme Court.

But if you read the synopsis even of that decision, it makes it very clear that it was individuals -- in that case television producers -- who were pursuing a 1983 claim against the corporation. The corporation was the defendant.

So there's been no case that has ever expanded the state action doctrine to bar a claim. Doesn't happen. It's not how it works.

THE COURT:  Okay.

MR. CONNOLLY:  That's all.

THE COURT:  Thank you.

MR. KACHOUROFF:  Can I have literally a minute?

THE COURT:  You can take some time.

MR. KACHOUROFF:  The notion that presumed damages are available in the absence of actual malice is not the law.  And the Court would be going over its skis to come up with some decision to say, well, we have presumed damages and we'll leave actual malice for trial.  That's not the standard.  It's a two-step.  Before you get to presumed damages, you have to show actual malice.  That's a protection of the First Amendment.  And there's no exception.

THE COURT:  The cases in your brief on this point, I can look to those to see the --

MR. KACHOUROFF:  You absolutely can.

THE COURT:  -- to see the sequence --

MR. KACHOUROFF:  I was going to --

THE COURT:  -- laid out in that manner?

MR. KACHOUROFF:  Right.  It's a one, two step; correct.

The second thing is that with respect to standing, there has been no pointing to any damage, any harm.  A business has no reputation other than its economic

reputation. And so the point that my counsel was trying to make, he was trying to treat a business the same as an individual. That simply isn't the law either. Reputational harm to a business is shown by economic loss in the community. And that's where you see it. It can take many forms: lost profits, loss of brand awareness, what have you. But the community is aware. Minnesota.

For those reasons, they still haven't established standing. Thank you.

THE COURT: All right. I want to thank the parties for their submissions and arguments today, and we will issue an order as soon as we can. Hope you-all have a nice day. Court stands in recess.

(Proceedings concluded at 12:10 p.m.)

CERTIFICATE OF COURT REPORTER


I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.

Dated this 10th day of February, 2025.


/s/ *Nancy J. Meyer*
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter