# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited, | Case No. 22-CV-00098 (JMB/JFD) |
| Plaintiffs, | |
| v. | **ORDER** |
| Michael J. Lindell and My Pillow, Inc., | |
| Defendants. | |

Christopher K. Larus and William E. Manske (*pro hac vice*), Thompson Hine LLP, Minneapolis, MN; Timothy M. Frey (*pro hac vice*), Christopher Letkewicz (*pro hac vice*), Joel Erik Connolly (*pro hac vice*), Julie Loftus (*pro hac vice*), Laura Seferian (*pro hac vice*), Maura Levine-Patton (*pro hac vice*), Nicole Wrigley (*pro hac vice*), Olivia Elizabeth Sullivan, Ronald S. Betman (*pro hac vice*), and William Edward Walsh (*pro hac vice*), Benesch Friedlander Coplan & Aronoff LLP, Chicago, IL; Alyssa A. Moscarino (*pro hac vice*), James Richard Bedell (*pro hac vice*), John W. Breig, Jr. (*pro hac vice*), and Michael J. Montgomery (*pro hac vice*), Benesch Friedlander Coplan & Aronoff, Cleveland, OH; Bruce R. Braun (*pro hac vice*), Sidley Austin LLP, Chicago, IL; Jamie Ward (*pro hac vice*), Jones Day, Chicago, IL; for Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited.

Jeremiah David Pilon, My Pillow, Chaska, MN; Christopher Kachouroff (*pro hac vice*), McSweeney, Cynkar & Kachouroff, PLLC, Woodbridge, VA; Robert J. Cynkar (*pro hac vice*), McSweeney, Cynkar & Kachouroff, PLLC, Oakton, VA; Jennifer DeMaster (*pro hac vice*), DeMaster Law LLC, Grafton, WI; for Defendants Michael J. Lindell and My Pillow, Inc.

This matter is before the Court on Plaintiffs Smartmatic USA Corp.'s, Smartmatic International Holding B.V.'s, and SGO Corporation Limited's (together, Smartmatic) and Defendants Michael J. Lindell's and My Pillow, Inc.'s (together, Defendants) cross

motions for summary judgment, motions to exclude expert testimony, and Smartmatic's motion to strike Defendants' letter brief to the Court. For the reasons explained below, the Court grants Smartmatic's motions to exclude Defendants' falsity expert (Doc. Nos. 414, 488), denies Defendants' motion to exclude two of Smartmatic's experts (Doc. Nos. 421 and 428), grants Smartmatic's motion for partial summary judgment (Doc. No. 388), denies Defendants' motion for summary judgment (Doc. No. 435), and denies the remaining motions (Doc. Nos. 398, 407, and 495).

STATEMENT OF UNDISPUTED FACTS

**A.    The 2020 Election in Los Angeles County, California**

This lawsuit relates to the reported results of the 2020 U.S. presidential election (2020 Election) between Democratic candidate Joe Biden and Republican incumbent President Donald Trump. More specifically, it relates to the reported election results in Los Angeles County, California.

In the 2020 Election, 17,501,380 votes were cast in California, or approximately 11% of the national total of votes cast (158,429,631). (Doc. No. 395-74 at 4, 8.) Statewide, Biden earned 63.5% of the popular vote (11,110,639 votes), and Trump earned 34.3% (6,006,518 votes). (*Id.* at 4.) Biden's margin of victory in California, therefore, was 5,104,121 votes. In Los Angeles County, Biden won 71.04% of the votes cast (3,028,885 votes), and Trump won 26.87% (1,145,530 votes), or a margin of 1,883,355 votes. (Doc.

No. 395-73 at 2; *see also* Doc. No. 395-74 at 2.)  Of the total 4,338,191 votes cast in Los Angeles County, only 913,765 were cast in person.  (Doc. No. 395-73 at 2.)[1]

Biden secured California's fifty-five Electoral College votes and won the 2020 Election with 306 Electoral College votes to Trump's 232 (and with 51.3% of the popular vote to Trump's 46.9% of the popular vote).  Fed. Elections Comm'n, *Federal Elections 2020: Election Results for the U.S. President, the U.S. Senate and the U.S. House of Representatives*, https://www.fec.gov/resources/cms-content/documents/federalelections2020.pdf, at 5, 7.[2] In the weeks and months after the 2020 Election, narratives that electronic voting machines manipulated votes in Biden's favor circulated in the media and on the internet.  Some of these narratives referenced Smartmatic.

Smartmatic is an election technology company that manufactures and provides election-related equipment and services to countries, states, and localities worldwide. (Doc. No. 395-2 ¶ 7.)  Prior to the 2020 Election, Smartmatic had processed more than 5 billion votes in more than 25 countries on five continents.  (*Id.* ¶ 8.)  For the 2020 Election, Smartmatic had only one customer in the United States: Los Angeles County, California. (*Id.* ¶ 11–12; Doc. No. 458-8 at 17).  Los Angeles County used Smartmatic's computer-based ballot marking devices (BMDs) at its in-person polls.  (Doc. No. 395-2 ¶¶ 11, 14.)

---

[1] Defendants do not dispute the reported results of the 2020 Election, the number of in-person votes cast in Los Angeles County, or the numerical totals reported in Doc. Nos. 395-73 and 395-74.

[2] Again, Defendants do not dispute that these are the reported results of the 2020 Election.

No other U.S. jurisdiction used Smartmatic's BMDs during the 2020 Election. (*Id.* ¶¶ 13–14.) On Smartmatic's BMDs, voters used a touchscreen to select their candidates. (*Id.* ¶ 11; Doc. No. 395-60 ¶ 4.) Afterward, the BMD printed a paper record of the voter's selections. (Doc. No. 395-2 ¶ 11; Doc. No. 395-60 ¶ 4.) After reviewing their selections on that paper record, the voter would then deposit it into a sealed case attached to the BMD. (Doc. No. 395-2 ¶ 11.) Thus, the Smartmatic BMDs used in Los Angeles County were used only with voters who were voting in-person. (*Id.*)[3] The record does not include a breakdown of how many of the 913,765 in-person ballots were cast for which candidate.

None of the Smartmatic BMDs used was connected to the internet. (Doc. No. 395-2 ¶ 12.)[4] None of the BMDs had wireless capability, and none of the BMDs' security measures indicated the occurrence of any breach or tampering. (Doc. No. 395-60 ¶ 8). None of the BMDs was used to directly count or tabulate ballots; Los Angeles County used a different system—one developed and provided to Los Angeles County by a nonparty—to count ballots. (Doc. No. 395-2 ¶ 12; Doc. No. 395-60 ¶¶ 4, 7.)[5]

### B.   Defendants Implicate Smartmatic in Election-Rigging Narratives

Lindell is a Minnesota resident and the founder and CEO of MyPillow, a Minnesota

---

[3] Defendants do not dispute that the BMDs in Los Angeles County were used in this manner for processing in-person votes. The record contains few, if any, facts concerning how mail-in ballots were processed, and the parties direct the Court to no record evidence indicating any Smartmatic machines were used in connection with mail-in ballots.

[4] Defendants direct the Court to no record evidence to the contrary.

[5] Defendants do not dispute that the Smartmatic BMDs did not directly count or tabulate ballots, and there is no evidence in the record presented that Smartmatic was involved with the nonparty who supplied the machines used to count and tabulate ballots.

company that manufactures and sells pillows, among other products. (Doc. No. 125 ¶¶ 14–15.) Lindell believed that the reported 2020 Election results were illegitimate. After the 2020 Election, Defendants sponsored a multi-city "March for Trump" bus tour. (Doc. No. 395-7 at 23.) During a December 2020 event on that tour, Lindell began claiming that electronic voting machines were used to affect the outcome of the 2020 Election. (*Id.*) Lindell was one of several persons and media outlets claiming that voting machines changed Trump votes to Biden votes. (Doc. Nos. 395-3, 395-4, 395-5.)

Smartmatic, among other election technology companies, brought defamation lawsuits against media outlets and individuals who espoused such messaging. *See* Summons & Complaint, *Smartmatic USA Corp. v. Fox Corp.*, No. 151136/2021, 2021 WL 454132 (N.Y. Sup. Ct. Feb. 4, 2021); *see also Coomer v. Lindell*, No. 22-CV-1129 (NYW/SBP), 2024 WL 3989524 (D. Colo. Aug. 29, 2024); *Smartmatic USA Corp. v. Powell*, No. 1:21-CV-2995 (CJN), 2023 WL 3619346 (D.D.C. May 24, 2023); *US Dominion, Inc. v. Herring Networks, Inc.*, 639 F. Supp. 3d 143 (D.D.C. 2022); *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42 (D.D.C. 2021).

From February 2021 to June 2021, despite knowing of the existence of some of these lawsuits, Lindell published four documentaries that included statements about electronic voting machines being used to change votes. (Doc. No. 395-36 ¶¶ 5–8.) Further, between February 2021 to August 2021, Lindell appeared on at least twelve podcast, radio, and television shows to promote his documentaries. (Doc. Nos. 395-39, 395-40, 395-41, 395-42, 395-43, 395-44, 395-45, 395-47, 395-48, 395-50, 395-51, 395-52.) Additionally, in August 2021, Lindell held a three-day in-person and live-streamed symposium on the

topic of how the 2020 Election had been stolen, in part, through the use of voting machines. (Doc. No. 395-36 ¶ 9.)

### C.    This Action

In January 2022, Smartmatic filed this action.  (Doc. No. 1.)  In its two-count Amended Complaint, Smartmatic alleges that Defendants made fifty-one false and defamatory statements that Smartmatic interfered with the results of the 2020 Election (Count I).  (Doc. No. 125 ¶¶ 366–79.)  Smartmatic also alleges that Defendants violated the Minnesota Deceptive Trade Practices Act (MDTPA), Minn. Stat. § 325D.44(8), by making false representations of fact about its business (Count II).  (*Id.* ¶¶ 380–87.)

#### 1.    Absolute Proof*: Statements 1–15*

In February 2021, Lindell released a documentary entitled *Absolute Proof: Exposing Election Fraud and the Theft of America by Enemies Foreign and Domestic* (*Absolute Proof*).  (Doc. No. 395-35; Doc. No. 395-36 ¶ 5.)  The documentary aired on the television news channel One America News Network (OANN) thirteen times in early February 2021. (Doc. No. 395-36 ¶ 5.)  It was also shown on other platforms, including Vimeo, Rumble, YouTube, The American Report, USAWatchdog.com, FrankSpeech.com, and MichaelJLindell.com.  (*Id.*)  Smartmatic alleges that, in *Absolute Proof*, Lindell made the following fifteen defamatory statements:

> GUEST 1: So a critical capability for any of this to happen are the inherent vulnerabilities that were built into ES&S [brand machines] and Dominion software, which . . . we've proven through . . . our work that this is all related directly back to . . . SGO Smartmatic software core.  And [Smartmatic] definitely had financial gains to [make] . . . based on some of the other investments that they've made. Especially . . . looking down

the road, if [the board of Smartmatic] make billions and billions of dollars . . . because they own . . . an air purification company.  So just think about it, if you get to pick an administration that is favorable to your company, say if [the administration] pas[sed] the Green New Deal, and you're going to make billions and billions of dollars off of government-mandated air purification systems and public buildings and apartment buildings and industrial complexes, you know, you would spend quite a bit of money on the frontside to make sure the election was done.

(Doc. No. 395-35 at 16:15–17:8 [hereinafter, "Statement 1"][6].)

LINDELL: Texas . . . denied these Dominion [machines] . . . so they must have looked at them and said there's something there we don't like, but then they . . . were okay with [Smartmatic and these other machines] . . . ?  What would be your opinion of why . . . they would deny one machine . . . because they're afraid of election fraud, and . . . accept[] [another]?

GUEST 2: I think that it sometimes has more to do with politics and influence, who gets through and who doesn't . . . for the machines.

(*Id.* at 20:1–11 [hereinafter, "Statement 2"].)

LINDELL: Okay, I want to ask you . . . when you say horrify, can you explain to everybody watching this right now . . . what horrified you, was [it] the fact [the machines] could go online?

GUEST 2: Well, there's no effective security at all for your votes.  Your votes are stored overseas . . . .

(*Id.* at 21:12–18 [hereinafter, "Statement 3"].)

LINDELL: [S]o both of [the issues we've talked about] involved the machines, everybody.  One [issue] we've talked

---

[6] The Court has numbered the statements in the order in which they appear in the publications.  As a result, some of the statements may be numbered differently from how Smartmatic numbered the statements in its briefing.

about in this show is here [in the U.S.]. But then the cyber [issue that] you just heard [about] from Russell . . . is all [an] attack by . . . other countries that hacked in which we're going to show you that proof now[.] . . . Russell doesn't even know that we have [proof] that's going to show who did it, the time they did it, the computer they did it off it, everything.

(*Id.* at 28:7–14 [hereinafter, "Statement 4"].)

LINDELL: Doesn't matter. Right. Somebody else picks our [elected officials] for [us] so why vote, right? I mean, that's the way . . . it would have been [if we had not found out that the machines go online] . . . . [A]nd . . . [as] you said earlier, it's not just Dominion, it's . . . all the machines that were used in this election. . . . [I]s that what you would say?

GUEST 2: Yes, that's absolutely a fair statement. And look, let me, let me tell you a little bit about that. You know, for these people that say [the machines are] not online, we have videos of workers with pollbooks, who are swiping left on their pollbook and bringing up Netflix and getting a movie and watching it on their pollbook. How does that happen if [the machines are] not connected to the internet?

(*Id.* at 28:20–29:8 [hereinafter, "Statement 5"].)

LINDELL: I know [the machines] were all online, but . . . is it illegal for them to be online?

GUEST 2: Well, it depends, [in] some places yes, [in] some places no. I mean, the assurance is that you can trust the voting system because they're not online, but they are most clearly online.

(*Id.* at 29:18–23 [hereinafter, "Statement 6"].)

LINDELL: Well, I just met [Guest 3] four weeks ago, and . . . he knows all about these machines . . . and we're going to hear some of the stuff that . . . absolutely validates this election fraud with these machines. . . .

GUEST 3: I found out that these electronic voting machines, remember, there's two ways you can vote. One is you vote,

you give a paper ballot, and the paper ballot is counted by human beings, two people, that's what occurred in Franklin County. But in those other counties, they take that paper ballot when you vote electronically—

LINDELL: Into a machine.

GUEST 3: It goes into a machine. And what happens in that machine? The paper ballot is converted to an image called a ballot image, no different than you taking . . . a picture with your iPhone. Now so what is actually counted? The paper ballot gets put aside, the machine, the electronic "AI" on the machine, actually tries to figure out where the circles are. And the machine is counting the ballot image. So . . . at that point I realized, oh my god, the ballot image is the ballot, the images are the ballot. . . .

GUEST 3: The other piece of the puzzle was, I found out that the voting machines, as early as 2002, have a feature in the[m] called a weighted race feature, where it's embedded into the system where you can multiply candidates votes by a percentage. All right, so what that means is you get 1,000 votes, I get 1,000 votes, I can multiply your votes by two, my votes by point five. And if . . . anyone doesn't believe this, go look up the deebot [sic] voting manual, go to page two dash 126 in the 2002 version [of the manual], and you'll see it in there.

LINDELL: [W]ere you able to prove that . . . your election was stole[n] by the machines? Did you mathematically . . . prove, did you prove 100% that this could only be recreated by a machine . . . , 60/40, that's it?

GUEST 3: So what we proved, Mike, was, first of all, we showed that the state had deleted the ballot images, which means that if they had the ballot image, they could have found the algorithm. . . .

LINDELL: This was a historical election fraud. This was coming from . . . these machines, of biblical proportions, of historical proportions. And now . . . it's all going to get exposed.

(*Id.* at 36:8–12, 39:24–40:16, 41:22–42:16, 46:5–8 [hereinafter "Statement 7"].)

> GUEST 4: [T]hey've already admitted to the fact that that [the] control center had computers that were connected to the internet. And we saw the actual cable routed from the wall . . . of the TCF center to the control center. And we have election officials that admitted that there were computers, in the control center that were connected to the Internet, and anybody . . . worth their salt in IT land understands that if one computer is connected to the internet, they're all connected to the internet. You may say that it's air-gapped, you may say you have a firewall. There are people that eat firewalls for breakfast.

> LINDELL: So what you're saying . . . [is that] if it's connected to the internet, somebody out there could have hacked in and . . . flip[ed] . . . the votes.

> GUEST 4: Yep. When . . . you've got the same devices that are supposed to be capturing that vote tally, connected to the internet, or frankly, even connected to a large local area network, and you can't witness that handoff of vote tallies, you don't have that seal. So you may be thinking you're passing that information from point A to point B. But there's nothing to prevent it from going to point C and the internet, it's called a man in the middle attack.

> LINDELL: Right. So . . . if [the machine is] . . . online . . . anybody could get in there and do that because they're intercepting that . . . . That's why . . . machines aren't supposed to be online in election[s], right?

> GUEST 4: Yes, it's called man in the middle.

(*Id.* at 49:20–50:24 [hereinafter, "Statement 8"].)

> LINDELL: Right [the votes] were just flipped. In order for [the votes] to be off, you [make] the conclusion [that] I would right now, 100%, how could [the votes] be off? [There] would be something wrong with what?

> GUEST 5: The machines.

LINDELL: The machines, the machines. And what we're showing here right now, what you're going to see, all [that] we've been talking about, this massive machine election fraud that went on, where countries hacked into our election. And nationwide, this is one little county in northern Michigan, and these machines would do it right down to the precinct. Okay, what you're gonna see, this is the example we have . . . that was hand counted. And . . . the rest of the country . . . didn't get to do that, they didn't have the luxury of being able to do that . . . . And so what I want to tell you all is this is the perfect example . . . [of] what went on with these machine[s].

(*Id.* at 57:15–58:8 [hereinafter, "Statement 9"].)

LINDELL: And [in Kearney Township, Michigan] 7,060 [votes] were flipped from Trump to Biden, is that correct?

GUEST 5: And what's more even, it's even more—

LINDELL: By machines right? It had to be done by the machines.

GUEST 5: Absolutely by machines.

(*Id.* at 59:8–14 [hereinafter, "Statement 10"].)

LINDELL: So everybody knows what you're going to see, when you see this spike [of votes for Biden], you're going to see a forensic footprint, how that happened[,] and who did it. China? Yes. If you're on the internet, the bottom line is you can . . . cheat, you can do all kinds of things. . . . [O]therwise[,] you can't explain any of these numbers. Right?

GUEST 5: That's correct. The machine results don't match up with the hand-tabulation.

(*Id.* at 70:23–71:7 [hereinafter, "Statement 11"].)

LINDELL: [T]he purpose of this whole show, obviously, is to show everyone in the world that these machines that this was the biggest fraud and the biggest crime I believe against humanity. It was a crime against humanity.

(*Id.* at 71:9–12 [hereinafter, "Statement 12"].)

> LINDELL: Could you guys all hear [that Michigan's Attorney General is calling for attorneys who file lawsuits in Michigan challenging the election results to be disbarred]? This is what we're up against, this Dominion, these machines [are] the biggest fraud in [the] election. They stole [the election]. But now the truth is all going to be revealed.

(*Id.* at 72:3–6 [hereinafter, "Statement 13"].)[7]

> GUEST 6: Now, red has been the most severe attacks [on our election system], those lines are all coming out of China. . . . Now, . . . the same exact type of information . . . was presented to . . . former FBI Director James Comey, by a whistleblower in 2015. They knew, in fact that our election machines were open for hacking, it's important to understand that there are prismatic scoring algorithms that they knew about that entered the election, and they steal the vote at the transfer points. So at the point where . . . the vote is leaving the Secretary of State's office and these machines, that is the point at which the vote is stolen at the transfer points.

(*Id.* at 81:10–22 [hereinafter, "Statement 14"].)

> LINDELL: And we've . . . just shown everybody in the world 100% evidence that this was an attack on our country and [that our country] is still under attack by China and other countries through . . . these machines used in our election.

(*Id.* at 86:22–87:1 [hereinafter, "Statement 15"].)

### 2. War Room *podcast appearance #1*

In February 2021, Lindell appeared on Steve Bannon's *War Room* podcast to promote *Absolute Proof*. (Doc. No. 395-39.) During this appearance, Lindell claimed that

---

[7] Smartmatic numbered this as "Statement 8."

*Absolute Proof* contains "hard evidence" and "facts" about election interference and that "[t]here's nothing subjective" about it.  (Doc. No. 395-39 at 5:21–22.)

### 3. *Real America with Dan Bell appearance: Statement 16*

In February 2021, Lindell appeared on *Real America with Dan Ball* on OANN to promote *Absolute Proof*, and during this appearance, Smartmatic alleges Lindell made the following defamatory statement:

> LINDELL: We have [cyber forensic footprints] from November 1 all the way through the election, and [they] show[] . . . a massive attack on our country by China and other countr[ies]. . . . .  It was all done through Dominion machines and . . . Smartmatic machines.

(Doc. No. 395-40 at 3:19–23 [hereinafter, "Statement 16"].)

### 4. *Screening and conversation about* Absolute Proof*: Statements 17– 19*

In February 2021, Lindell made his second appearance on OANN with Bannon during a live screening of *Absolute Proof*.  (Doc. No. 395-41.)  During the screening, Lindell and Bannon exchanged commentary, including the following statements Smartmatic allege to be defamatory:

> LINDELL: This was an attack on our country, these Dominion machines and Smartmatic, these machines . . . were the tools of this attack, and we will never have another fair election if we don't . . . stop that, so I will never back down. . . .

(*Id.* Vol. 1 at 10:1–6 [hereinafter, "Statement 17"].)

> LINDELL: ES[&]S, Smartmatic, and Dominion, you can interchange the names, they all are the same.  The cyber phonetics [sic] we show it goes through all these machine[s], they're all the same.  This is [my] whole point . . . .

13

(*Id.* Vol. 1 at 46:12–15 [hereinafter, "Statement 18"].)

> LINDELL: [A]s part of my due diligence, . . . I wanted to go back to where this all started. . . . [I]t all started in Venezuela with Smartmatic, not Dominion or the other [company], it was with Smartmatic.

(*Id.* Vol. 2 at 10:1–5 [hereinafter, "Statement 19"].)

### 5.    Pete Santilli Show *appearance: Statements 20–21*

In February 2021, Lindell appeared on the *Pete Santilli Show* to promote *Absolute Proof*, and during which Smartmatic alleges Lindell made the following defamatory statements:

> LINDELL: Smartmatic started machines in Venezuela, around 2001, 2002. . . . [T]hey . . . took down that country in two years. It was brought into the United States, they split with Dominion, ES[&]S and Smartmatic. . . . [A]ll they're built for is to steal elections. They've stolen [elections] in the United States . . . .

(Doc. No. 395-42 at 10:5–11 [hereinafter, "Statement 20"].)

> LINDELL: [W]hat everybody needs to know is that [the voting machine companies are] all . . . cousins. They're all split off from Smartmatic that started in 2001, or 2002. . . . . [E]very one of them is the same, they're interchangeable. And by the way, every state in the United States . . . had votes flip. It wasn't just those swing states . . . . [I]t didn't matter what machines you had, there was this whole thing, the cyber attack, which you can watch at *Absolute Proof*.

(*Id.* at 16:10–23 [hereinafter, "Statement 21"].)

### 6.    War Room *podcast appearance #2: Statement 22*

In March 2021, Lindell again appeared on Bannon's *War Room*, during which Smartmatic alleges that Lindell made the following defamatory statement:

> LINDELL: [F]oreign countries, like China, came in and
> attacked our country using these machines; Dominion,
> Smartmatic, ESNF, all these machines.

(Doc. No. 395-43 at 6:13–15 [hereinafter, "Statement 22"].)

### 7.    Eric Metaxas Radio Show *appearance: Statement 23*

In March 2021, Lindell appeared on the *Eric Metaxas Radio Show*, during which he

began to lay the groundwork for his next documentary, *Scientific Proof*.   Smartmatic

alleges that Lindell made the following defamatory statement:

> LINDELL: [W]e got whistleblowers you're gonna see.  We
> have people that worked on the inside . . . .  I spent millions of
> dollars . . . investigating Dominion, Smartmatic . . . the people
> behind these attacks, investigators . . . and cyber people that
> went over.  Got the IP[s], and the IDs of people in China . . . .

(Doc. No. 395-44 at 7:8–15 [hereinafter, "Statement 23"].)

### 8.    Indivisible with John Stubbins *appearance: Statement 24*

In April 2021, Lindell appeared on *Indivisible with John Stubbins*, during which

Smartmatic alleges that Lindell made the following defamatory statement:

> LINDELL: Just like going back to Venezuela.  They took
> Venezuela in two years with Smartmatic.  And, and it's this is
> their big plan.   This is a very conceived plan. And it's very
> organized, and very, you know, and they have all the marketing
> because they have all the evil media behind this.

(Doc. No. 395-45 at 21:9–14 [hereinafter, "Statement 24"].)

### 9.    Scientific Proof*: Statements 25–29*

In April 2021, Lindell released his second documentary, entitled *Scientific Proof:*

*Internationally Renowned Physicist Absolutely Proves 2020 Election Was Biggest Cyber-*

*Crime in World History* (*Scientific Proof*), which was shown on LindellTV.com and

Rumble.com.   (Doc. No. 395-46; Doc. No. 395-36 ¶ 6.)   Smartmatic alleges that in

*Scientific Proof*, Lindell made the following five defamatory statements:

> LINDELL:   Talking   about   *[A]bsolute   [P]roof*   that
> documentary we did, where we have the spyware and these
> American heroes that were . . . whistleblowers . . . that were
> there and . . . worked for the government . . . , that were there
> and they were taking . . . these cyber footprints the night of the
> election, actually, from November 1st to the 5th.  And we have
> all the IP addresses—
>
> GUEST: I know—
>
> LINDELL: —the IDs of the computers, we have all this of the
> attacks. . . .
>
> GUEST: Yes.  I was on the edge of my seat watching that
> [inaudible].
>
> LINDELL: I know.  You had no idea your work was done in
> you're going, wow, now you knew who did it right?
>
> GUEST: Exactly.  I can see.  But the thing about it is, you're
> showing the incursions into the machines but what do [the
> machines] do when they're there?  They have to know what to
> do. . . .  [T]he algorithm is telling them what to do.

(Doc. No. 395-46 at 9:2–22 [hereinafter, "Statement 25"].)

> LINDELL: [W]hat you're saying there, [Guest], that they've
> set this [algorithm] in the machine . . . beforehand . . . . to [see]
> who was gonna win . . . .
>
> GUEST: Yes.
>
> LINDELL: Okay.  These are the algorithms we've been telling
> you about.

(*Id.* at 14:19–15:4 [hereinafter, "Statement 26"].)

> LINDELL: I just want everyone to know . . . why we're
> showing other states and not just the swing state.  It was every

state, it happened in your state, happened in your state, happened in your state.  Texas, when they said, oh, we didn't use the Dominion machines.  Doesn't matter . . . the name of the machine doesn't matter.

GUEST: No.

LINDELL: Smartmatic, ES&S, don't matter.  Just in Dallas alone, there w[ere] . . . 57,000 votes flipped . . . , and I don't even know if that was before noon.

(*Id.* 26:16–27:2 [hereinafter, "Statement 27"].)

LINDELL:  100% it can only be done by machines.  I can't stress that enough.

GUEST: Absolutely.

LINDELL: And [the machines] all rhyme with Dominion, or Smartmatic, ES&S, all of them. . . .  [W]e have enough evidence that we're gonna dump for the next six weeks on the whole world and the country that by the time it gets to [the] Supreme Court . . . they're all nine going to go 9-0 yes, so our country's been attacked.  We have been attacked by foreign actors, starting with China, and with help of domestic actors here . . . .

(*Id.* at 29:1–17 [hereinafter, "Statement 28"].)

LINDELL: [L]et's open up the machines. Let's look at this and here's what you're gonna find, this was the biggest crime against [the] United States and the world in history.  I believe it's one of the biggest ever because it affects every single person on the planet.

(*Id.* at 57:24–58:4 [hereinafter, "Statement 29"].)

### *10.*   **USA Watchdog** *appearance: Statement 30*

In April 2021, Lindell appeared on internet news show *USA Watchdog*, during which Smartmatic alleges Lindell made the following defamatory statement:

> LINDELL: [Y]ou know what [Dominion] did to our country them and Smartmatic, let's not forget Smartmatic, they're like the mothership of this. . . . And for not only being involved in the biggest crime against our country, probably in history . . . .

(Doc. No. 395-47 at 30:20–24 [hereinafter, "Statement 30"].)

### 11.    **War Room** *podcast appearance #3: Statement 31*

In April 2021, Lindell made his third appearance on Bannon's *War Room*, during

which Smartmatic alleges Lindell made the following defamatory statement:

> LINDELL: We're going after [Dominion] in the biggest way possible, and . . . we're including Smartmatic because now we've tied the two together. They're the mothership, all of that[] [evidence is] gonna come out too . . . .  They're all tied together in this corruption and . . . the attack on our country, but this is why we're doing it.

(Doc. No. 395-48 at 3:18–23 [hereinafter, "Statement 31"].)

### 12.    **Absolute Interference***: Statements 32–39*

In April 2021, Lindell released his third documentary, entitled *Absolute Interference: The Sequel to* Absolute Proof *with New Evidence Foreign and Domestic Enemies Used Computers to Hack the 2020 Election* (*Absolute Interference*), which was shown on FrankSpeech.com and Rumble.com  (Doc. No. 395-49; Doc. No. 395-36 ¶ 7.) In it, Smartmatic alleges that Defendants published the following defamatory statements:

> GEN. FLYNN: Now we're into the 21st century, and we have these machines. . . .  [O]ne of the things that we do know for certain, is that the machines are connected to the internet. . . . The machines are not supposed to be connected to the internet. They're supposed to be free of the internet. . . .  [I]f it's connected to the internet, that means that anybody in any country [can interfere in our election process], and . . . we know China, we know Iran, we know Spain had something to do with it. We know Serbia, . . . we've had Italy come up,

we've had Germany come up.

(Doc. No. 395-49 at 2:10–22 [hereinafter, "Statement 32"].)

> LINDELL: The same thing, the same machines, the same attack, the same people, the same corruption that went on, the same crime against humanity was all, crossed all those states.

(*Id.* at 3:10–13 [hereinafter, "Statement 33"].)

> LINDELL: 100% impossible [for human interference], [it] had to be machines.
>
> GUEST: Yes.
>
> LINDELL: And the[] [machines] had to be online.
>
> GUEST: Constantly online.
>
> LINDELL: Constantly online, everybody. No way could you ever do that humanly, to make all of them exactly increase [by] the same percentage.
>
> GUEST: When I've shown this [to] other people they've said, well, gee, how could people do that? And I say—
>
> LINDELL: They can't, it has to be machines—
>
> GUEST: Has to be.
>
> LINDELL: And it rhymes with Dominion, and it rhymes with Smartmatic and ES&S, all these machines that were used out there cannot be done by humans and you have to have access before, during and after.

(*Id.* at 3:19–4:10 [hereinafter, "Statement 34"].)

> LINDELL: I have proof, 100% proof that our country was attacked by China, by communism coming in, this foreign interference to our elections, through the machines, Dominion, Smartmatic, ES&S, all of them.

(*Id.* at 6:15–18 [hereinafter, "Statement 35"].)

GEN. FLYNN: [O]ne of the things that we do know for certain is that the machines are connected to the internet. And most people . . . in this country, when you go in to vote, you're in fact, I believe everything that we discovered, none of those machines are supposed to be connected to the internet, none of them. You're supposed to go in, take your piece of paper, put it in there, you know, you vote, and it's counted. And it's . . . a legitimate, free, fair and transparent count. And what we've learned is that because [the machines are] connected to the internet, we have all these paths, these electronic pathways, or these electronic roads that lead from that machine where that individual voted, where a US citizen voted, and it goes back in through these IP addresses.

(*Id.* at 10:24–11:13 [hereinafter, "Statement 36"].)

GEN. FLYNN: China is clearly, I mean everything that we've learned about the ownership of some of these machines, some of these companies to . . . how they're actually operating inside of this country. And then all . . . that we've learned about cyber warfare and information warfare over the last couple of decades, particularly as it relates to China, the theft of various databases, and everything that we represent in our digital life, pretty much the Chinese have stolen that information. Now you take it to the elections . . ., and you look at the machinery that we are using in our election process, which, you know, I don't know how we are going to go forward as a nation and continue to use these machines, knowing that what we just went through was really a false election. It was a false election.

(*Id.* at 13:7–21 [hereinafter, "Statement 37"].)

LINDELL: And it's gonna come out. And this is all . . . just another way . . . to cheat with these machines.

GEN. FLYNN: Right.

LINDELL: There's actually four ways, maybe even more we don't know about, but these are all the online ways.

(*Id.* at 17:1–6 [hereinafter, "Statement 38"].)

LINDELL: [I]n Venezuela, . . . when it started in Venezuela, didn't they flip that country in two years, right?

GEN. FLYNN: Right so . . . what I learned, almost right after the election, when we started to really go, okay, wait a second, what happened and we started to talk about how the machines really were impacting [the election], as well as some of the other aspects of what was done, really from the fourth through the seventh of November. . . . [T]his issue of Venezuela came up and we had the opportunity to . . . get some feedback from one of the individuals who was in Venezuela at the time, who was working with . . . the Chavez government. And . . . they were able to take . . . these machines that they had in Venezuela at the time to basically ensure that . . . Chavez won the election and then subsequently down the road Maduro. So, . . . it was almost like the machinery was being tested, if you will, in another country to kind of get a sense of can you actually do this and to work for them.

(*Id.* at 27:1–18 [hereinafter, "Statement 39"].)

### 13.    War Room *podcast appearance #4: Statement 40*

In May 2021, Lindell again appeared on Bannon's *War Room* podcast, during which

Smartmatic alleges Lindell made the following defamatory statement:

LINDELL: Texas still had machines, all the machines are the same. They're all—you've got . . . your Dominion, and your mothership Smartmatic.

(Doc. No. 395-50 at 2:6–9 [hereinafter, "Statement 40"].)

### 14.    OANN Newsroom *appearance with Pearson Sharp: Statement 41*

In May 2021, Lindell appeared on *OANN Newsroom* with Pearson Sharp, during

which Smartmatic alleges that Lindell made the following defamatory statement:

LINDELL: Dominion, Smartmatic, . . . all of them are the same, ES&S [machines]. You just say Dominion, but it's all machines. China hacked into our election and flipped millions upon millions of votes.

(Doc. No. 395-51 at 4:13–15 [hereinafter, "Statement 41"].)

### 15.   War Room *podcast appearance #5: Statement 42*

In May 2021, Lindell also made his fifth appearance on Bannon's *War Room*. Smartmatic alleges that, during this appearance, Lindell made the following defamatory statement:

> LINDELL: I mean, this is what they do. Dominion, Smartmatic, all of them. . . . I think everybody knows now, this is the biggest cover-up that's probably in history for a crime.  It's so massive that they've covered this up with the machine, or all the stuff that they did with the machines.

(Doc. No. 395-52 at 5:8–17 [hereinafter, "Statement 42"].)

### 16.   Absolutely 9-0*: Statements 43–46*

In June 2021, Lindell released his fourth documentary entitled, *Absolutely 9-0*, which was published on FrankSpeech.com and broadcast on OANN.  (*See* Doc. No. 395-53; Doc. No. 395-36 ¶ 8.)  Smartmatic alleges that Defendants made the following four defamatory statements in this publication:

> LINDELL: [A]s you all know on January 9th I received evidence of a cyber attack orchestrated by China on our 2020 election.  I took that one piece of evidence and I just went all in.  This was something different, nobody had seen.  This was something that came through the machines, . . . the Smartmatic and other machines.  This was a cyber attack. . . .  And I hired experts to validate this, I hired, these guys are white hat hackers that work for the government.  But what I'm going to show you tonight is, you're going to all know now, why I have been 100% sure that when this gets before the Supreme Court, it's gonna be 9-0, 9-0 to pull this election down, and that this was 100% an attack by China on our country through these machines.

(Doc. No. 395-53 at 2:1–15 [hereinafter, "Statement 43"].)

> LINDELL: But I wanted to get on here and explain to everyone, this was an attack by China, on our country through these Dominion and these other machines, where . . . they just hacked in, a cyber attack hacked into our election and flipped it to . . . anyone that they wanted to win.

(*Id.* at 12:6–10 [hereinafter, "Statement 44"].)

> LINDELL: This is why, when we say that Donald Trump really won this election by like almost 80 million to 68 million for Biden, how can you switch tens of millions of votes? It had to be done with computers, it had to be done with the machines, through these Dominion [machines], and through all these machines, and China, China did it.

(*Id.* at 14:9–15 [hereinafter, "Statement 45"].)

> GUEST 1: I know America's voting machines are vulnerable, because my colleagues and I have hacked them repeatedly. We've created attacks that can spread from machine to machine like a computer virus and silently change election outcomes. And in every single case, we've found ways for attackers to sabotage machines and to steal votes.

> GUEST 2: Early voters in Georgia in 2018 saw machines deleting votes and switching them to other candidates.

> UNKNOWN SPEAKER: When you say hacked, what were they able to do once they gained access to the machines?

> GUEST 3: All sorts of things, they could manipulate the outcome of the vote, they could manipulate the tally. They could delete the tally. And they could compromise the vote in any number of ways.

(*Id.* at 17:5–19 [hereinafter, "Statement 46"].)

### 17.    *Cyber Symposium: Statements 47–50*

In August 2021, Lindell hosted a three-day Cyber Symposium event in South Dakota.  (Doc. No. 395-54; Doc. No. 395-55; Doc. No. 395-56; Doc. No. 395-36 ¶ 9.)  This event was broadcast to both a live audience and an audience viewing a livestream on FrankSpeech.com.  (Doc. No. 395-36 ¶ 9.)  Smartmatic alleges that, in this publication, Defendants made the following four defamatory statements:

> LINDELL: Venezuela is where the machine started. Smartmatic started in Venezuela. I got a whole big I've spent millions of dollars investigating this. They're built . . . as a tool to take countries.

(Doc. No. 395-54 at 12:6–9 [hereinafter, "Statement 47"].)

> GUEST 1: Some of the anomalies that we noticed in the 2020 general elections that five key states all stopped counting at a certain time in these key battleground states. These were all where the software Dominion machines, ES&S machines were used . . . the Smartmatic, the Gems software, so when the vote stopped counting, and this has been noted in other countries as well.

(Doc. No. 395-55 at 9:9–15 [hereinafter, "Statement 48"].)

> GUEST 2: This particular piece is actually talking about the . . . similarities in testing of the equipment, the hardware, between Smartmatic and Dominion Voting Systems. So they're using the same hardware, they just have a new badge put on it, one says Dominion Voting, and one says Smartmatic. . . . Yes, yeah. Made by the same supplier. Right.

(Doc. No. 395-56 at 4:9–20 [hereinafter, "Statement 49"].)

> GUEST 2: We were able to build an entire graph of the people that worked for ES&S, Hart, Dominion Voting Systems, Clear Ballot, Smartmatic, and they basically recycle people through the company.

(*Id.* at 5:18–21 [hereinafter, "Statement 50"].)

> **18.    *FrankSpeech.com Updates on the Smartmatic lawsuit and the cast-vote records: Statement 51***

In January 2023, Lindell hosted a program on FrankSpeech.com, where he discussed Smartmatic's filing of the instant lawsuit and continued to insist that Smartmatic played a prominent role in stealing the 2020 Election.  (Doc. No. 395-58.)  Smartmatic alleges that this publication contains the following defamatory statement:

> LINDELL: [L]et me tell you about Smartmatic . . . . in the 2020 election, do you think L.A. County was computer manipulated or not?
>
> GUEST: Oh, yeah, I'm sure it was.
>
> LINDELL: Would you bet everything you had on it?
>
> GUEST: Pretty much. Yep.
>
> LINDELL:· Then, you're like most people. Of course, it was. And now, we have the proof.

(*Id.* at 4:6–5:3 [hereinafter, "Statement 51"].)

## DISCUSSION

Smartmatic moves for partial summary judgment of certain elements of its two claims against Defendants (Doc. No. 388), and Defendants move for complete summary judgment in their favor of all claims (Doc. No. 435.)  The parties also move to exclude certain expert opinion evidence.  (Doc. Nos. 398, 407, 414, 421, 428, and 488.)  The Court first addresses the parties' motions to exclude expert testimony, concluding that the rules of evidence and procedure require exclusion of Defendants' falsity expert (Doc. Nos. 414 and 488), but they do not require exclusion of the two contested experts offered by Smartmatic (Doc. Nos. 421 and 428).  In addition, the Court denies Smartmatic's motion

to exclude two additional experts at this time as unnecessary to resolve the pending summary judgment motions, but the Court will permit Smartmatic to renew these arguments in pretrial motions in limine.  (Doc. Nos. 398 and 407).   Next, the Court addresses Smartmatic's motion for partial summary judgment, concluding that no genuine disputes of material fact remain concerning the elements of defamation addressed in that motion and that no genuine disputes of material fact remain concerning the elements of the MDTPA claim.  (Doc. No. 388.)[8]  Finally, the Court necessarily denies Defendants' motion for summary judgment.  (Doc. No. 435.)

## I.    MOTIONS REGARDING EXPERT OPINION EVIDENCE

### A.    Motion to Exclude Cotton's Initial Declaration (Doc. No. 414)

Defendants present the testimony of Benjamin Cotton concerning the element of falsity.[9]  In particular, Cotton made three separate declarations.  Smartmatic moves to exclude the first declaration under Federal Rule of Evidence 702.  (Doc. No. 414.)  In addition, Smartmatic argues that the Court should exclude the second and third declarations under Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1) because both were submitted after the close of discovery.  (Doc. No. 488.)  Smartmatic also moves to strike Defendants'

---

[8] Smartmatic does not request complete summary judgment on its defamation claim, and the Court agrees that the record contains genuine disputes of material fact concerning damages and malice. Similarly, Smartmatic requests summary judgment on its MDTPA claim to the extent that it seeks injunctive relief under this statute, and the Court agrees that the record contains genuine disputes of material fact concerning willfulness, as required for obtaining attorney fees and costs pursuant to this statute.

[9] As noted in Section II.A, below, to prevail on a claim of defamation, a plaintiff must prove (among other elements) that the allegedly defamatory statements were false. *Mudrich v. Wal-Mart Stores, Inc.*, 955 F. Supp. 2d 1001, 1010 (D. Minn. 2013)).

response opposing Smartmatic's motion to exclude the second and third Cotton Declarations.  (Doc. No. 495.)

Because the initial Cotton declaration does not satisfy Rule 702 and because Defendants did not comply with Rules 26 and 37 when submitting the second and third Cotton declarations, the Court grants Smartmatic's motions to exclude Cotton's expert reports and testimony.  In light of this decision, the Court also denies Smartmatic's motion to strike (Doc. No. 495) as moot.

Federal Rule of Evidence 702 provides that a witness may testify as an expert only if they are "qualified" by their "knowledge, skill, experience, training, or education," so long as their opinion, among other things, "will help the trier of fact to understand the evidence or to determine a fact in issue" and is "based on sufficient facts or data."  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the testimony bears the burden to establish, by a preponderance of the evidence, that the proposed witness is qualified and that the proposed opinion is reliable. *E.g.*, *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "[G]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."  *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100–01 (8th Cir. 2006) (citation omitted) (internal quotation marks omitted).  However, courts exclude expert opinion evidence when the proponent fails to show that the purported expert has necessary experience or education to provide an opinion.  *E.g.*, *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 893 (8th Cir. 2010) (affirming the exclusion of an ergonomist's opinion because he had "no training, education, or experience in the design of medical laboratories

or of monitor banks and radiation shield"); *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (affirming district court's exclusion of a police officer's expert opinion testimony because he had no "experience with civil rights violations or with strip searches" and "there was no evidence that Russo had any work experience pertinent to psychology"); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715–16 (8th Cir. 2001) (holding a district court abused its discretion in permitting a hydrologist to testify about safe warehousing practices, an area outside of his expertise); *Weisgram v. Marley Co.,* 169 F.3d 514, 520–21 (8th Cir. 1999) (affirming the exclusion of a metallurgist's design defect opinion because he had no personal experience and "no metallurgic reason for his conclusion"), *rev'd on other grounds*, 528 U.S. 440 (2000).

In addition, an expert witness's "testimony must rest on reliable principles and methods, but the 'relevant reliability concerns may focus upon personal knowledge or experience' rather than scientific foundations." *United States v. Holmes*, 751 F.3d 846, 850 (8th Cir. 2014) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). A non-scientific expert's experience can serve as a sufficient basis for their testimony. *Speed RMG Partners, LLC v. Arctic Cat Inc.*, No. 20-CV-609 (NEB/LIB), 2024 WL 4543340, at *13 (D. Minn. Oct. 17, 2024). An expert witness can also rely on hearsay evidence "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. However, expert evidence will not be admitted if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006).

The Court concludes that, for two separate and independent reasons, Rule 702 prohibits admission of Cotton's first declaration and anticipated testimony concerning the contents of this declaration. First, Cotton lacks the necessary experience to qualify as an expert who can opine regarding BMDs and administering voting systems. Cotton conceded during his deposition that none of his educational background or professional certifications pertained to voting systems, and prior to 2020, he admitted that he had no experience with voting technology. (Doc. No. 417 at 15.) Cotton also admitted that prior to November of 2020, he had never performed any work related to election systems, never designed a voting system, never published any papers concerning security of voting systems, never reviewed user manuals for electronic voting machines, never reviewed procedures related to use of an electronic voting machine, never reviewed certification tests or security vulnerability tests for electronic voting machines, and had no professional experience advising any clients regarding the security of electronic voting machines or the security of an election that used electronic voting machines. (*Id.* at 15–17.) In fact, the only training and experience that Cotton had prior to the 2020 Election related to computer operating systems generally, such as Linux, Unix, and Windows. (*Id.* at 14–15.) Cotton himself acknowledged that his expertise was limited to these operating systems and did not include the additional security components that are present in voting systems. (*Id.* at 18.) Given these concessions, Defendants have failed to establish by a preponderance of the evidence that Cotton has the necessary expertise to satisfy Rule 702 concerning voting systems, voting machines, or the general security—including cybersecurity—vulnerabilities of any voting system or the administration of an election.

Second, Cotton's opinion regarding the voting system used by Los Angeles County (including Smartmatic's BMDs) is unreliable and irrelevant because it is not based on any review of the BMDs used by Los Angeles County during the 2020 Election. Cotton opines that "it is a near certainty" that the voting system and BMDs used by Los Angeles County in the 2020 Election "would be vulnerable to unauthorized access and vote manipulation through technical processes." (Doc. No. 416-2 ¶ 22.)[10] Cotton acknowledges, however, that he had not analyzed the voting machines or voting system actually used in Los Angeles County during the 2020 Election,[11] and that he would need to examine a BMD to determine

---

[10] The Court observes that Defendants do not cite or otherwise rely on Cotton's declarations in support of their motion for summary judgment; Cotton's declarations are not attached to the declaration of counsel (*see* Doc. Nos. 438, 480), and Defendants cite only once to any of Cotton's declarations in their reply brief (Doc. No. 479 at 10). In their response to Smartmatic's motion for summary judgment (Doc. No. 459 at 21, 24, 25, and 31), however, Defendants do cite to Cotton's declarations, although, again, none of the three Cotton declarations is attached to Defendants' counsel's declaration (*see* Doc. No. 460). For this reason, the Court cites to Cotton's first declaration by reference to the exhibit attached to Smartmatic's memorandum in support of the motion to exclude Cotton's first declaration: Doc. No. 416-2. Cotton's second declaration is filed on CMECF, and the Court refers to it by reference to this entry (Doc. No. 464). Cotton's third declaration is also filed on CMECF, and although it is titled "Second Declaration of Benjamin Cotton in Support of [Defendants'] Motion for Summary Judgment," the Court refers to it as the third declaration and by reference to this entry (Doc. No. 481).

[11] The Court previously denied Defendants' motion to compel an inspection of the BMD machines used by Los Angeles County in the 2020 Election (Doc. No. 266), and Defendants have declined Smartmatic's invitation to inspect a similar BMD machine. (Doc. No. 416-5 ¶¶ 5–10; Doc. No. 494 at 2.) Much of Defendants' written submissions seek to relitigate the previous decisions. Parties, however, cannot challenge the decisions of Magistrate Judges through arguments made in response to a *Daubert* motion. Moreover, the Court has reviewed the pleadings (including multiple motions to compel and at least one request for reconsideration) and rulings of the Magistrate Judge concerning expert testimony, production of a BMD actually used during the 2020 election in Los Angeles

if his opinions and findings are "directly applicable to the Los Angeles County voting systems." (*Id.* ¶¶ 21–22.)[12] Thus, Cotton does not know whether or not his findings are applicable to the voting systems and BMDs that were actually used, and which are the subject of the allegedly defamatory statements in this case. Therefore, Cotton has no reliable basis on which to opine concerning the BMDs' vulnerability to vote manipulation, and his opinion is too speculative for Defendants to carry their burden as the proponent of this evidence.[13] Therefore, Cotton's initial declaration and any testimony that he might provide consistent with that declaration must be excluded under Rule 702.

**B.    Motion to Exclude Cotton's Second and Third Declarations (Doc. No. 488) and Motion to Strike (Doc. No. 495)**

Smartmatic also moves to exclude Cotton's second and third declarations, as well as the anticipated testimony consistent with these declarations, as untimely and prohibited by Federal Rules of Civil Procedure 26(a)(2) and 37(c)(1) because these additional declarations were submitted after the close of discovery. (Doc. No. 488.) The Court agrees and grants this motion.

---

County, and production of a similar (but different) BMD; the Court discerns no error by the Magistrate Judge in any of these decisions.

[12] Indeed, Cotton reiterates this refrain at least a dozen times throughout the sections of his report containing his opinions. (*See* Doc. No. 416-2, *in passim*.)

[13] The Court also observes that, as discussed in Section II.A.3, below, given the margin of victory in Los Angeles County and California (and the undisputed fact that Smartmatic BMDs were used to mark ballots submitted by only in-person voters), it is mathematically impossible for these BMDs to have changed the results of the 2020 Election in California. This conclusion renders irrelevant (and inadmissible) Cotton's conclusions in his initial declaration that these BMDs contained cybersecurity vulnerabilities.

First, for the reasons noted above, Cotton's expert opinions in these two declarations and their accompanying anticipated testimony are inadmissible under Federal Rule of Evidence 702. Cotton lacks the educational and professional experience necessary to be qualified under Rule 702. In addition, because Cotton himself acknowledged that he did not know if his findings were applicable to the BMDs used by Los Angeles County in the 2020 Election, his opinions are too speculative to satisfy Rule 702.[14]

Second, the Court also agrees that Cotton's second and third declarations violated the requirements of Federal Rules of Civil Procedure 26 and 37. Rule 26(a)(2) requires that parties seeking to introduce expert testimony must comply with scheduling orders issued by the court. *See, e.g.*, *Williams v. TESCO Servs., Inc.*, 719 F.3d 968, 976 (8th Cir. 2013) (excluding expert report submitted in support of a motion for summary judgment where it was untimely and altered the expert's opinion). In this case, the deadline for expert reports was September 22, 2023 (Doc. No. 168 at 3), and the deadline for rebuttal reports was July 9, 2024 (Doc. No. 280). Expert discovery closed on August 20, 2024. *Id.* The second declaration is dated December 12, 2024, and the third declaration is dated December 27, 2024. These declarations materially alter Cotton's opinion in several ways, but one substantial alteration is that unlike Cotton's first declaration, which merely suggested that cybersecurity vulnerabilities were present in Los Angeles County, the second declaration—for the first time—includes the theory that the BMDs switched Trump

---

[14] Again, the Court notes that the second and third declarations are rendered irrelevant based on the conclusion in Section II.A.3, below, that it would have been impossible for the BDMs in Los Angeles County to affect the outcome of the 2020 Election in California.

votes to Biden votes by including a manipulated QR code on the printed ballot that was later tabulated by other machines. (*Compare* Doc. No. 416-2 ¶¶ 21–22 *with* Doc. No. 464 ¶ 25.) Similarly, contrary to the first declaration, which included no discussion of Smartmatic's role in the 2020 Election, the third declaration—for the first time—includes the opinion that Smartmatic had a role in every function of the 2020 Election in Los Angeles County and that only Smartmatic personnel had access to and information regarding "maintenance, system support, [and] stand-by guidance." (*Compare* Doc. No. 416-2 *with* Doc. No. 481 ¶¶ 12–13.)[15]

For these reasons, the Court grants Smartmatic's motion to exclude Cotton's second and third declarations as well as any accompanying testimony.[16]

## C.    Defendants' Motion to Exclude Expert Opinion Evidence of Tammy Patrick (Doc. No. 421)

Patrick offers the following three opinions: (1) the 2020 Election results were legitimate and that it is implausible that Smartmatic interfered with its results (Doc. No. 458-6 at 14); (2) the technology developed by Smartmatic for use in Los Angeles County was a breakthrough in voting technology and positioned Smartmatic for success in the U.S. market (*id.* at 83); and (3) the allegedly defamatory statements impaired Smartmatic's ability to compete in the marketplace (*id.* at 92). Defendants move to exclude Patrick,

---

[15] This opinion also appears to be beyond the scope of Cotton's admitted area of expertise concerning security vulnerabilities of computer operating systems.

[16] As a result, the Court denies as moot Smartmatic's motion to strike Defendants' brief in opposition to the motion to exclude the second and third declarations. (Doc. No. 495.)

arguing that she is not qualified to offer her opinions and that her opinions are not relevant or reliable. (Doc No. 421.) Because Patrick has ample qualifications and provided reliable and relevant opinions, the Court denies Defendants' request.

First, the Court concludes that Patrick is qualified to offer her opinions given her educational and professional experience—including experience related to election administration, election regulation compliance, election cybersecurity, voting systems, and election audits. For instance, prior to 2020, Patrick published and presented on election administration and voting more than 30 separate times since 2010, including presenting to the Department of Homeland Security's (DHS) Cybersecurity and Infrastructure Security Agency (CISA) regarding election cybersecurity. (Doc. No. 458-6 at 13, 112–14.) She is also a member of the Election Center Security Task Force and the Advisory Board for the MIT Election Data and Science Lab. (*Id.* at 110.) Patrick has sat in the DHS Situation Room on federal election days to monitor cybersecurity. (Doc. No. 424-2 at 25.) She serves on the Election Center's committee on security and has testified before the United States House and Senate as well as the Maryland state legislature on election security and post-election audits. (Doc. No. 458-6 at 110–11.) She oversaw audits during her tenure as the Federal Compliance Officer for the Maricopa County Elections Department in Arizona. (*Id.* at 11.) Additionally, Patrick is also an expert in government procurement with respect to election technology given her experience as a Federal Compliance Officer and member of the Election Assistance Commission's working groups, which pull together various requests for proposals from jurisdictions across the country to assist with the procurement of election technology. (Doc. No. 424-2 at 6–7.) Patrick has received invitations from

34

several states to provide an expert consultation regarding their election technology. (*Id.* at 7.) Finally, Patrick previously served as Commissioner on the Presidential Commission on Election Administration, which assessed the nationwide purchasing of election technology. (*Id.* at 5.)

Second, each of Patrick's opinions is relevant. Patrick's first opinion on whether the 2020 Election results were legitimate and whether it is plausible that Smartmatic manipulated the 2020 Election results is at the heart of the falsity element of Smartmatic's defamation claim. Her remaining two opinions are also clearly relevant to damages and will help the trier of fact understand the impact, if any, that the allegedly defamatory statements had. Smartmatic has established the relevance of Patrick's three opinions.

Third, Patrick's opinions satisfy Rule 702's reliability requirements. Patrick's opinion on the legitimacy of the 2020 Election and Smartmatic's role in the 2020 Election is reliable because it is based on research of publicly available information regarding the 2020 Election, such as court documents and information from hundreds of election officials and government agencies nationwide that confirmed that the 2020 Election was secure, that voting machines were not used to change the outcome of the 2020 Election, and that the post-election audit results were accurate. (Doc. No. 424-2 at 26, 32; Doc. No. 458-6 at 35, 80–83.) Smartmatic contends that CISA uses these same facts and data to assess the security of the 2020 Election (Doc. No. 454 at 16–17), and Defendants do not contest that experts in this field would reasonably rely on these facts and research. Likewise, Patrick's opinions on Smartmatic's position in the election marketplace and the impact the defamatory statements likely had on Smartmatic's ability to compete in that marketplace

are also reliable.  As a non-scientific expert, Patrick's marketplace opinions are adequately grounded in her expertise on government procurement of election technology.

In sum, Smartmatic has established that Patrick has ample educational and professional experience to satisfy the qualification requirements of Rule 702 as it relates to each of her three opinions and that her testimony is both reliable and relevant.  Defendants' critiques may concern the weight of Patrick's anticipated testimony, but they do not call into question the admissibility of Patrick's expert opinion.

### D.    Defendants' Motion to Exclude Expert Opinion Evidence of Doug Bania (Doc. No. 428)

Bania offers opinions concerning the extent to which the allegedly defamatory statements were spread and the potential for Defendants to experience a financial benefit as a result of the allegedly defamatory statements.   (Doc. Nos. 431-1 and 431-2.) Defendants move to exclude this testimony under Rule 702.  (Doc. No. 428.)  The Court concludes that Bania is qualified and that his opinions are both relevant and reliable.

First, Bania has sufficient professional experience to qualify as a damages expert, including as it relates to analyzing and valuing intangible assets.  Bania has more than twenty years of experience in this regard and has conducted complex damages calculations in various contexts, including defamation, licensing, and intellectual property.  (Doc. No. 431-1 at 3.)  His expert witness history includes more than forty cases in the last ten years in which he provided opinions concerning defamation damages, brand valuation, website traffic and search engine optimization, right of publicity damages, reasonable royalty damages, or some combination of these areas of expertise.  (*Id.* at 24–32.)

Second, his opinions are highly relevant to the determination of malice and damages. The connection, if any, between Defendants' sales and the spread of the allegedly defamatory statements is probative of Defendants' state of mind, a necessary component of malice. In addition, the extent to which the allegedly defamatory statements spread clearly relates to damages in a defamation case.

Third, and finally, Bania's opinions are sufficiently reliable to satisfy Rule 702 admissibility requirements. Bania explains how the methodology used is based on well-established and widely accepted principles, and Defendants' argument cites to no legal authorities calling into question these methods or excluding expert opinion evidence on this basis. (*See* Doc. No. 430 at 3–4.) Instead, Defendants' purported methodological flaws more closely dispute the weight of the evidence, not its admissibility.

Smartmatic has easily carried its burden to establish Bania's qualifications and the reliability and relevance of his opinions. Thus, the Court denies Defendants' motion to exclude Bania's expert reports and accompanying anticipated expert testimony.

### E.    Motions to Exclude Expert Opinion Evidence of Robert Bowes (Doc. No. 398) and Peter Kent (Doc. No. 407)

Smartmatic moves to exclude Defendants' proffered experts Bowes and Kent, arguing that Federal Rule of Civil Procedure 26(a)(2)(B) precludes Bowes's rebuttal report and testimony and that Federal Rule of Evidence 702 precludes both Bowes and Kent from testifying as experts in this case. Because these proposed experts relate to damages, none of these motions impacts the Court's analysis of Smartmatic's motion for partial summary judgment. In addition, although Defendants' motion for summary judgment would relate

to damages evidence, as noted in Section III, below, the Court concludes that questions of fact preclude summary judgment in Defendants' favor concerning damages. The Court would reach this same conclusion whether or not the Court grants Smartmatic's motions to exclude Bowes's and Kent's opinion evidence—especially in light of the Court's decision to deny Defendants' motion to exclude expert opinion evidence of Bania, above. Therefore, the Court denies the motions at this time, but nothing in this order will preclude Smartmatic from renewing their objection to the admissibility of Bowes's and Kent's opinion evidence through a motion in limine prior to any trial in this matter.

## II.    SMARTMATIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Smartmatic moves for partial summary judgment in its favor of all elements of defamation except for the amount of damages and malice as well as summary judgment of their claim for injunctive relief under the MDTPA. (Doc. No. 388.) For the reasons below, the Court grants Smartmatic's motion.

As a threshold matter, the Court observes that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive the motion, the non-moving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (citation omitted) (internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) (internal quotation marks omitted). As is normally the case in a summary judgment motion, all justifiable inferences are to be drawn in the non-moving party's favor, *Anderson*, 477 U.S. at 255, meaning that the Court views the record in the light most favorable to the Defendants when considering Smartmatic's motion, and in the light most favorable to the Smartmatic when considering Defendants' motion. *See, e.g.*, *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

## A. Defamation

Smartmatic moves for partial summary judgment on its defamation claim. Defendants seek complete summary judgment in their favor on this claim.

To prevail on a typical claim of defamation, a party must establish the following elements: (1) the defendant made a defamatory statement to someone other than the plaintiff; (2) the statement is false; (3) the recipient of the false statement reasonably understands it to refer to the plaintiff; and (4) the statement tends to harm the plaintiff's reputation and to lower the plaintiff in the estimation of the community. *Larson v. Gannett Co.*, 940 N.W.2d 120, 130 (Minn. 2020) (citation omitted) (internal quotation marks omitted). When the statement at issue concerns "a person's business, trade, or professional conduct," it is defamation per se, which does not require proof of the fourth element; courts "presume harm to a plaintiff's reputation without requiring the plaintiff to prove actual damages." *Johnson v. Freborg*, 995 N.W.2d 374, 384 (Minn. 2023), *cert. denied*, 144 S. Ct. 819 (2024); *see also Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661

(Minn. 1987); *Bebo v. Delander*, 632 N.W.2d 732, 739 (Minn. Ct. App. 2001), *rev. denied*,

(Minn. Oct. 16, 2001). In addition, the allegedly defamatory statements are actionable only

if they "present or imply the existence of fact that can be proven true or false," *Schlieman*

*v. Gannett Minn. Broad., Inc.*, 637 N.W.2d 297, 308 (Minn. Ct. App. 2001) (citing

*Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18–20 (1990)), and because the statements at issue

here implicate a matter of public concern, Smartmatic cannot recover any presumed

damages unless it can establish that the statements were made with "actual malice,"

*Johnson*, 995 N.W.2d at 384 (citation omitted) (internal quotation marks omitted).

In this case, the parties do not contest the first element.[17] Likewise, there is no

dispute concerning the third element: the recipients of the statements at issue understood

that those statements actually concerned Smartmatic.[18] For the reasons noted below, the

---

[17] The Court acknowledges that Defendants do dispute the reach of the publications. (Doc. No. 459 at 4 n.1.) However, these arguments concern damages and are not included in Smartmatic's motion for partial summary judgment.

[18] Defendants include two paragraphs of argument under a heading that, on its face, seems to dispute the third, "of and concerning" element. (Doc. No. 459 at 32.) These two paragraphs, however, merely repeat Defendants' primary argument that the statements at issue are not actionable because they are opinions, not statements of fact. Defendants do not otherwise dispute that the statements at issue referred to and concerned Smartmatic, and the Court concludes that the statements were about Smartmatic. "A statement is 'of and concerning' the plaintiff if, when read in the context of the entire publication, it refers to the plaintiff," *Schlieman*, 637 N.W.2d at 306 (internal quotation marks omitted), or a recipient of the statement "by fair implication would understand the statement to be directed at the plaintiff," *Glenn v. Daddy Rocks, Inc.*, 171 F. Supp. 2d 943, 948 (D. Minn. 2001); *accord Dressel v. Shippman*, 58 N.W. 684, 684 (1894) (explaining that direct reference to the plaintiff is not "necessary where the libelous article contains reference to matters of description or to facts and circumstances from which others reading the article may know the plaintiff was intended"). Here, the statements explicitly refer to Smartmatic or, are such that a listener would, by fair implication, understand the statement to include Smartmatic.

Court concludes that, as a matter of law, the statements at issue are actionable. In addition, the Court concludes that the statements fall into one of the well-established categories of defamation per se, so the Court may presume the fourth element. Finally, the Court concludes that the record contains no genuine dispute of fact concerning the second and only remaining element: falsity. Therefore, the Court grants Smartmatic's motion for partial summary judgment, leaving the issue of actual malice[19] for trial.

### 1.    *Actionability*

Defendants argue that Smartmatic's defamation claim fails because the allegedly defamatory statements are not actionable. The Court disagrees. As a matter of law, the Court concludes that, based on the applicable factors, the statements are sufficiently factual in nature to give rise to Smartmatic's defamation claim.

As noted above, allegedly defamatory statements are actionable only if they "can be proven true or false." *Schlieman*, 637 N.W.2d at 308. Thus, a statement is sufficiently factual to be actionable "if it is plain that the speaker is . . . claiming to be in possession of 'objectively verifiable facts,'" and, by contrast, a statement is too opinion-like "if it is plain

---

[19] The parties do not dispute that the statements relate to matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (concluding that a statement relates to matters of public concern when the statement relates to "any matter of political, social, or other concern to the community," "a subject of legitimate news interest," or "a subject of general interest and of value and concern to the public" (citations omitted) (internal quotation marks omitted)). The parties also agree that as statements relating to matters of public concern, they are "conditionally privileged," *see Lewis v. Equitable Life Assurance Soc'y of the United States*, 389 N.W.2d 876, 889 (Minn. 1986), and Smartmatic must prove actual malice. Smartmatic's motion did not seek summary judgment on this point, acknowledging the genuine disputes of fact that remain regarding Defendants' state of mind and whether the statements were made with actual malice.

that the speaker is expressing a 'subjective view, an interpretation, a theory, conjecture, or surmise.'" *Id.* (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)). However, "statements couched as opinions may be [actionable] if they imply a defamatory factual basis." *E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 309 F. Supp. 3d 644, 674 (D. Minn. 2017) (applying Minnesota law). The Court decides, as a matter of law, whether allegedly defamatory statements are actionable. *See Zarling v. Abbott Lab'ys*, No. 21-CV-23 (MJD/JFD), 2023 WL 2652575, at *14 (D. Minn. Mar. 27, 2023).

When determining whether statements are "too opinion-like to be actionable," courts consider four factors: the "(1) specificity and precision of the statement; (2) verifiability; (3) literary and social context in which it was made[;] and (4) public context." *Id.* (quoting *McClure v. Am. Fam. Mut. Ins. Co.*, 223 F.3d 845, 853 (8th Cir. 2000) (applying Minnesota law) (internal quotation marks omitted)). Courts must "examine the statement in its totality and the context in which it was uttered or published" and "consider all of the words used, not merely a particular phrase or sentence." *E. Coast Test Prep*, 309 F. Supp. 3d at 674 (citation omitted) (internal quotation marks omitted); *see Schlieman*, 637 N.W.2d at 304 ("Context is critical to meaning because a false statement that is defamatory on its face may not be defamatory when read in context, and a statement that is not defamatory on its face may, in fact, be defamatory when read in context."). Based on these factors, the Court concludes that the statements at issue are actionable.

First, many the statements are made in the context of documentaries, or non-fiction films that purport to be true and based on facts. Indeed, titles of the first three documentaries reveal the factual nature of the material and statements contained in the

films: (1) *Absolute Proof: Exposing Election Fraud and the Theft of America by Enemies Foreign and Domestic*; (2) *Scientific Proof: Internationally Renowned Physicist Absolutely Proves 2020 Election Was Biggest Cyber-Crime in World History*; and (3) *Absolute Interference: The Sequel to* Absolute Proof *with New Evidence Foreign and Domestic Enemies Used Computers to Hack the 2020 Election.*  (Doc. No. 395-35; Doc. No. 395-46; Doc. No. 395-49.)  These titles all promote the idea that Lindell had not just proof of election interference—rather, he had "*absolute*" and "*scientific*" proof.   All four documentaries, in which thirty-two of the allegedly defamatory statements occurred, featured Lindell having discussions with purported "experts" who presented on and discussed such proof.  (Doc. No. 395-35; Doc. No. 395-46; Doc. No. 395-49; Doc. No. 395-53.)  Additionally, four of the statements were made during a symposium in which Lindell and others presented "evidence" of an election-interfering cyber-attack on voting machines.  (Doc. No. 395-54; Doc. No. 395-55; Doc. No. 395-56.)  Finally, the remaining fifteen statements were made during Lindell's appearances on programs to promote his documentaries and reveal the findings of his investigation into voting machines' impact on the 2020 Election.  (Doc. No. 395-40; Doc. No. 395-41; Doc. No. 395-42; Doc. No. 395-43; Doc. No. 395-44; Doc. No. 395-45; Doc. No. 395-47; Doc. No. 395-48; Doc. No. 395-50; Doc. No. 395-51; Doc. No. 395-52; Doc. No. 395-58.)  Thus, the Court rejects Defendants' argument that statements made purporting to be "absolute proof" or "scientific proof" are, instead, non-factual opinions or conjecture.

Second, the content of the statements themselves is factual in nature.  Statements 1–15, from *Absolute Proof*, can be proven true or false and are presented as objectively

verifiable or based on objectively verifiable facts.   For instance, Lindell claims to offer "cyber forensic experts" and "evidence" that "proves" that foreign countries used voting machines, including Smartmatic's machines, to steal the 2020 Election and that those machines are "made to steal elections."  (Doc. No. 395-35 at 3:5–10, 9:8–11, 28:9–29:3, 72:3–14, 75:9–13; 89:18–22.)   His guests also claim to possess "proof" that voting machines can be and were manipulated in the 2020 Election.  (*Id.* at 19:14–19, 24:2–12.) While many of the allegedly defamatory statements refer to voting machines in general, near the beginning of *Absolute Proof*, one of the guest speakers claims to have "proven" that "inherent vulnerabilities" were "built into" certain voting machine companies' software, and he directly ties these vulnerabilities to Smartmatic's software.  (Statement 1.)  The guest also claims that Smartmatic intentionally built these vulnerabilities into its software to ensure that the candidate from the administration most favorable to Smartmatic's interests would win the election.  (*Id.*)  Additionally, Lindell and his guest speakers assert that "all the [voting] machines that were used in th[e] election" were susceptible to foreign hacking and therefore vote-flipping because they were connected to the internet.  (Statements 5, 6, 8, 11.)  Lindell further claims that voting machines flipped votes from Trump to Biden on a nationwide basis.  (Statements 9, 12, 13, 15.)  Each of these statements is sufficiently factual to give rise to a defamation claim.

Likewise, Statements 16–24 are also factual in nature.  Lindell furthered these claims in the publications where he promoted *Absolute Proof*.  For instance, during his first appearance on the *War Room* podcast, Lindell referred to the statements in *Absolute Proof* as "hard evidence," "facts," and that "[t]here's nothing subjective" about it.  (Doc. No.

395-39 at 5:21–22.)  Similarly, during his February 2021 appearance on *Real America with Dan Bell* (Statement 16), Lindell claimed to be sharing "real evidence" and "100% proof" that foreign countries used Smartmatic machines to commit a "massive attack on our country."  (Statement 16; Doc. No. 395-40 at 5:15–17.)    During a February 2021 appearance on OANN (Statements 17–19), Lindell claimed to be sharing "100% fact" that Smartmatic's BMDs were tools used to "attack . . . our country."  (Doc. No. 395-41 Vol. 1 at 22:2–5; Statement 17.)  During a February 2021 appearance on the *Pete Santilli Show* (Statements 20–21), Lindell stated that Smartmatic machines were built to steal elections and that they have, in fact, stolen U.S. elections.  (Statement 20.)  He also claims to have "100%, not 99%, 100% evidence . . . of everything . . . Smartmatic did . . . ."  (Doc. No. 395-42 at 6:17–20.)  He also claims not just to be stating his opinion but to be stating "facts."  (*Id.* at 19:14–15.)  During his second appearance on the *War Room* podcast (Statement 22),[20]  Lindell stated that foreign countries used Smartmatic machines to "attack[] our country."  During his March 2021 appearance on the *Eric Metaxas Radio Show* (Statement 23), Lindell said that Smartmatic was "behind these attacks."  During his April 2021 appearance on *Indivisible with John Stubbins* (Statement 24), Lindell told the audience that Smartmatic machines have also been used to steal elections in Venezuela.

Statements 25–31, from *Scientific Proof* and publications shortly after its release, also satisfy this standard and are actionable.  For example, Lindell had a one-on-one

---

[20] Smartmatic does not identify allegedly defamatory statements in Lindell's first *War Room* appearance.

conversation with a guest speaker, who Lindell claimed to have identified a secret algorithm that allows voting machines, including Smartmatic BMDs, to steal elections. (*See* Doc. No. 395-46.)   Lindell represented that Smartmatic BMDs used a pre-programmed algorithm to flip votes in the 2020 Election.  (Statements 25, 26, 27, 28, 29.) After the release of *Scientific Proof*, Lindell appeared on *USA Watchdog* (Statement 30) and again on the *War Room* podcast (Statement 31).  In Statement 30, Lindell claimed that Smartmatic was not only involved in, but was the "mothership" of the alleged interference in the 2020 Election, which was "the biggest crime against our country, probably in history."  In Statement 31, Lindell reiterated that Smartmatic is the "mothership" behind the "corruption" and "attack on our country."  (Statement 31.)

The same is true for the statements made in *Absolute Interference* and subsequent media appearances (Statements 32–41).  Lindell featured several speakers who discussed "evidence" that voting machines, including Smartmatic's voting machines, were responsible for interfering with the 2020 Election.  (*See* Doc. No. 395-49.)  Lindell and his guests discussed how Smartmatic BMDs were able to interfere with the 2020 Election because they were connected to the internet.  (Statements 34, 36, 38.)  He also claimed to have "100% proof" that foreign entities used Smartmatic BMDs to "attack[]" the United States (i.e., interfere with the 2020 Election).  (Statement 35.)  After the release of *Absolute Interference*, Lindell again appeared on the *War Room* podcast (Statement 40), during which he discussed vote-flipping in the 2020 Election and that Smartmatic was the "mothership" behind it.  Lindell also appeared on *OANN Newsroom with Pearson Sharp* (Statement 41), during which Lindell claimed that it is the "absolute" truth that Smartmatic

machines "got hacked" and flipped votes, and he has "100% evidence" to prove it. (Doc. No. 395-51 at 4:10–20.) During another appearance on the *War Room* podcast (Statement 42), Lindell stated that Smartmatic specifically designs its machines to rig elections.

Statements 43–51 are also factual. For example, Lindell claimed to possess "evidence of a cyber attack orchestrated by China on our 2020 election," and that the cyber attack "came through" Smartmatic machines and "flipped" the election results. (Statements 43, 44, 45.) In the following months, Lindell hosted a Cyber Symposium. (Statements 47–50.) Lindell claimed that Smartmatic machines were "built . . . as a tool to take countries." (Statement 47.) His guests also stated that Smartmatic was involved in interfering with the 2020 Election because its machines or software were used in battleground states where voting anomalies supposedly occurred. (Statements 48, 49.) Finally, during a January 2023 program on FrankSpeech.com (Statement 51), Lindell claimed to have "proof" that Smartmatic BMDs manipulated the 2020 Election results in Los Angeles County.

Statements 1–51 present or imply the existence of objectively verifiable facts that can be proven true or false. Lindell was not purporting merely to express his opinion or surmise as to a subjective topic; rather, the premise of Lindell's documentaries and media appearances is that Lindell and his guests have uncovered objectively true facts and wish to share those facts with the audience. Thus, as a matter of law, each of Statements 1–51 is sufficiently factual as to give rise to a defamation action.[21]

---

[21] Defendants also argue that the statements are protected by absolute privilege because they are precluded by the state-action doctrine. (Doc. No. 436 at 15–21.) The Court

### 2.    *Defamation per se*

As noted above, the fourth element of defamation requires plaintiffs to establish that the defamatory statement harmed the plaintiff's reputation and lowered the plaintiff in the estimation of the community. *Larson*, 940 N.W.2d at 130. However, courts have also identified certain categories of defamatory statements that permit the presumption of "harm to a plaintiff's reputation without requiring the plaintiff to prove actual damages." *Johnson*, 995 N.W.2d at 384. The parties dispute whether the statements fall into one of these categories of statements that are defamatory per se.[22] The Court agrees with

---

disagrees for two reasons. First, Smartmatic's role in the 2020 Election does not make it a state actor. "[T]he fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor—unless the private entity is performing a traditional, exclusive public function." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 814 (2019) (citation omitted). Smartmatic has offered evidence that Los Angeles County contracted with Smartmatic during the 2020 Election to provide BMDs and administrative services in that county. (Doc. No. 457-1 ¶¶ 3–7.) It has also offered evidence that Los Angeles County "handled all aspects of running the vote centers, collecting ballots, and counting votes" and was "in full control of the voting equipment." (*Id.* ¶¶ 6–7.) Second, the state-action doctrine is traditionally used to hold private companies responsible for violations of constitutional rights when the company is acting in the traditional role of a government entity. *See Manhattan Cmty. Access Corp.*, 587 U.S. at 809. Here, instead of using the state-action doctrine to bring a lawsuit against a state actor, Defendants seek to preclude a private company from bringing a lawsuit. Defendants offer no legal authority to support extending the state-action doctrine in this manner, and absent some well-developed argument, the Court declines to do so.

[22] To the extent that portions of Defendants' written submissions can be construed as an argument that the Court cannot conclude that the statements are "defamatory per se" while reserving the issue of actual malice for trial, the Court disagrees. Defendants do not cite any binding legal authority to support such an argument, and whether a statement relates to a plaintiff's business, accuses the plaintiff of a crime, or otherwise falls within one of the categories of defamation per se, does not relate to the intent of speaker or whether the speaker acted with malice. This logical conclusion is also supported by examples from other courts who have made conclusions on whether a statement falls within one of the categories of defamation per se while also leaving for trial the issue of malice. *E.g.*,

Smartmatic and concludes that each of the statements falls within the categories of defamatory communications that require presumption of harm.

Statements are defamatory per se when they involve "false accusations of committing a crime" or "false statements about a [plaintiff's] business, trade, or professional conduct." *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. Ct. App. 2019) (citation omitted) (internal quotation marks omitted). Moreover, even when statements do not "carry upon their face a direct imputation of crime," courts have recognized such statements as defamatory per se so long as the statements "in their ordinary acceptance, would naturally and presumably be understood, in the connection and under the circumstances in which they [were] used, to impute a charge of a crime." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 158–59 (Minn. Ct. App. 2007) (citation omitted) (internal quotation marks omitted).

Each of the statements at issue is defamatory per se because each relates to Smartmatic's business, trade, or profession; accuses Smartmatic of committing a crime; or would be understood to impute a charge of crime. For example, in *Absolute Proof*, Lindell referenced "historical election fraud . . . coming from . . . these machines" (Statement 7), stated that "these machines . . . this was the biggest fraud and the biggest crime I believe against humanity" and "[i]t was a crime against humanity" (Statement 12), and that "these

---

*Zarling*, 2023 WL 2652575, at *14 (concluding challenged statements were defamatory per se and permitting plaintiff to "proceed to trial without consideration at [summary judgment] of whether he ha[d] presented proof of damages").

machines [are] the biggest fraud in [the] election" and the machines "stole" the election.[23]

(Statement 13.)  Lindell and a guest speaker also discussed that all of the machines that

were used in the 2020 Election were susceptible to hacking because they were online.

(Statements 3, 4, 5, 6.)   Lindell also states that foreign countries hacked into voting

machines across the country, which caused votes to flip and "massive machine election

fraud."  (Statements 9, 15.)  In Statements 16, 17, and 22, Lindell states that China, and

other countries, used Smartmatic machines to "attack" the United States.  In Statements 20

and 24, Lindell states that Smartmatic's machines are "built . . . to steal elections," "took

down [Venezuela] in two years," and have stolen elections in the United States.   In

Statement 23, Lindell imputes Smartmatic in "attacks" on the United States.  In Statements

25–29, Lindell and a guest speaker discuss how Smartmatic BMDs use an algorithm that

can be set before the election to control who wins the election, that Smartmatic BMDs were

used to flip votes, and that they were involved in committing "the biggest crime against

[the] United States and the world in history."   In his April 2021 appearances on *USA

Watchdog* and *War Room*, Lindell referred to Smartmatic as the "mothership" behind the

"attack" or "biggest crime" against the United States.  (Statements 30, 31.)  In *Absolute

Interference*, Lindell and his guest speaker discussed how Smartmatic's BMDs were used

---

[23] While some statements refer to voting machines in general, near the beginning of
*Absolute Proof*, one of the speakers claims to have "proven" that "inherent vulnerabilities"
were "built into" certain voting machine companies' software, and he directly ties these
vulnerabilities to Smartmatic's software.  (Statement 1.)  He also states that Smartmatic
intentionally built these vulnerabilities into its software to ensure victory for a presidential
administration favorable to Smartmatic's interests.   (*Id.*)   It is clear that the general
references to "machines" included those developed and marketed by Smartmatic.

to attack the United States and commit a "crime against humanity." (Statements 32, 33, 34, 35, 36, 37.)  Lindell and his guest speaker discussed how Smartmatic previously rigged an election in Venezuela, and that its machinery was being "tested" there to see if they could do the same in the United States.  (Statement 39.)  In his May 2021 *War Room* appearance, Lindell again referred to Smartmatic as the "mothership"—i.e., the mastermind behind voting machine interference in the 2020 Election.  (Statement 40.)  During a May 2021 *OANN Newsroom with Pearson Sharp* appearance, Lindell stated that China hacked Smartmatic's machines and flipped votes.  (Statement 41.)  In a May 2021 *War Room* appearance, Lindell stated that Smartmatic BMDs were used to rig and cover up election fraud.  (Statement 42.)  In *Absolutely 9-0*, Lindell stated that a cyberattack occurred during the 2020 Election through voting machines, including Smartmatic's, which flipped millions of votes.  (Statements 43, 44, 45.)  During the Cyber Symposium, Lindell said that Smartmatic machines were designed to "take countries."  (Statement 47.)  Finally, in his January 2023 update on FrankSpeech.com, Lindell unmistakably suggested that Smartmatic manipulated the election results in Los Angeles County.  (Statement 51.)

The Court is satisfied that all of the statements explicitly attack the integrity of Smartmatic's business and/or directly or impliedly accuse Smartmatic of criminal misdeeds.  Defendants have not cited any evidence to the contrary.  (*See* Doc. No. 459 at 12–15.)  Rather, Defendants merely reiterate their argument (which the Court has rejected in Section II.A.1, above) that the statements are too opinion-like and subjective to give rise to a defamation action.  (*Id.*)  When viewing the record and drawing all justifiable inferences in Defendants' favor, there is no genuine dispute as to whether these statements

are defamatory per se. They are, and the Court presumes that Smartmatic is entitled to damages for the reputational harm it has suffered.[24]

### 3. Falsity

The Court now to turns to the remaining contested aspect of Smartmatic's motion: the element of falsity. The Court concludes that, based on the record presented, no reasonable trier of fact could find that any of the statements at issue are true.

A defamatory statement "must present or imply a false fact." *Riverside Church v. City of St. Michael*, 205 F. Supp. 3d 1014, 1043 (D. Minn. 2016) (citing *Schlieman*, 637 N.W.2d at 308); *see also Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 394 (8th Cir. 1996) ("[I]mplications, like plain statements, may give rise to a defamation claim.").

Each of the actionable statements in this case conveys at least one of three overarching messages: (1) that Smartmatic machines stole the 2020 Election or otherwise manipulated ballots that changed the outcome of the 2020 Election;[25] (2) that Smartmatic

---

[24] To the extent that the Defendants separately argue Smartmatic lacks Article III standing because it has not experienced an injury in fact, the Court's conclusion that the statements are defamatory per se compels rejection of this argument. Reputational harm can be a concrete injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425, 432 (2021) (listing reputational harms as an example of the intangible harms that can also be concrete harms for purposes of standing).

[25] With regard to whether voting machines, in general, were used to steal the 2020 Election, the record evidence shows that none of post-election audits conducted in jurisdiction across the country identified any vote manipulation, vote switching, or vote flipping attributable to voting machines, much less to Smartmatic's BMDs. (Doc. No. 395-59 ¶¶ 5, 6; Doc. No. 395-60 ¶ 12.) Federal and state agencies have also confirmed the integrity of the 2020 Election. (Doc. No. 395-60 ¶¶ 12, 13; *see also* Doc. No. 395-61; Doc. No. 395-62; Doc. No. 395-75; Doc. No. 395-76; Doc. No. 395-77.)

BMDs were connected to the internet and, therefore, susceptible to hacking; and (3) that Smartmatic designed its machines to manipulate ballots and change election results. None of these messages can be true.

First, the record evidence shows that, given the margin of victory in Los Angeles County and California, it is mathematically impossible for these BMDs to have changed the results of the 2020 Election. The Court begins its analysis with the undisputed reported election results in California. Of the 17,501,380 votes cast in California, 11,110,639 were recorded as votes in favor of Biden and 6,006,518 in favor of Trump, for a margin of victory of 5,104,121 votes. (Doc. No. 395-74 at 4, 8.) In Los Angeles County, Biden won by a margin of 1,883,355 votes, earning 3,028,885 votes to Trump's 1,145,530. (Doc. No. 395-73 at 2; *see also* Doc. No. 395-74 at 2.) In addition, Defendants do not dispute the fact that Smartmatic BMDs were used to mark ballots submitted by only in-person voters in Los Angeles County, or the fact that only 913,765 voters cast their ballots in person in Los Angeles County. (Doc. No. 395-73 at 2.) Based on these undisputed facts, at most 913,765 votes could have been manipulated by Smartmatic BMDs—and that assumes 100% of the in-person voters in Los Angeles County intended to cast votes in favor of Trump, but all of these were instead recorded as votes for Biden. Even in that unlikely scenario, however, Biden still would have won a majority of votes in Los Angeles County, earning 2,115,120 (3,028,885 - 913,765) votes to Trump's 2,059,295 (1,145,530 + 913,765). More importantly, Biden would still have won a majority of votes statewide, earning 10,196,874 (11,110,639 - 913,765) votes to Trump's 6,920,283 (6,006518 + 913,765) votes. In short, Smartmatic BMDs processed what amounted to a small fraction of the votes that made up

Biden's wide margin of victory in California, and it was mathematically impossible for Smartmatic BMDs to have changed the outcome of the 2020 Election. No reasonable factfinder could disagree.

Second, the record evidence shows that Smartmatic BMDs were not connected to the internet during the 2020 Election. (Doc. No. 395-2 ¶ 12; Doc. No. 395-60 ¶ 8.) None of the BMDs had wireless capability, and none of the BMDs' security measures indicated the occurrence of any breach or tampering. (Doc. No. 365-60 ¶ 8). Moreover, there is no record evidence that the BMDs were hacked by foreign entities (Doc. No. 395-2 ¶ 18; Doc. No. 395-60 ¶ 9), and none of the BMDs was used to directly count or tabulate ballots; Los Angeles County used a system provided to Los Angeles County by a non-party to count ballots (Doc. No. 395-2 ¶ 12; Doc. No. 395-60 ¶¶ 4, 7). On this record, no reasonable trier of fact could conclude that any statement in the second category of statements was true.

Third and finally, there is simply no evidence in the record presented to support a finding that Smartmatic designed its BMDs to manipulate ballots or that Smartmatic machines have been used to manipulate ballots in other countries. To the contrary, the only evidence in the record concerning design shows that Smartmatic has not designed any of its election technology to manipulate ballots or steal elections. Instead, the machines are designed to enable election stakeholders to audit election results, and that the machines' design was subject to testing by five independent agencies, none of which identified any software designed to manipulate ballots or steal elections. (Doc. No. 395-2 ¶¶ 25, 29; Doc. No. 395-60 ¶¶ 5, 6; Doc. No. 395-79; Doc. No. 395-80; Doc. No. 395-81; Doc. No. 395-82; Doc. No. 395-83.) Likewise, the only evidence in the record before the Court

concerning Smartmatic's involvement in elections in other countries shows that Smartmatic has never stolen any election, and its technology has never been used to manipulate ballots. (Doc. No. 395-2 ¶¶ 30–31, 34.)[26]

In summary, the Court concludes that as a matter of law, the statements give rise to a defamation action and fall within one of the categories of defamation per se. The parties do not dispute the first or third elements of defamation, and the Court concludes that no reasonable juror could conclude that any of the statements was true. Therefore, the Court grants Smartmatic's motion for partial summary judgment on its defamation claim, leaving the issues of malice and damages for trial.

### 4.    *Vicarious liability*

Smartmatic seeks summary judgment against MyPillow under the theory that MyPillow is vicariously liable for Lindell's tortious conduct. The Court agrees.

Under the doctrine of respondeat superior, "an employer is vicariously liable for the torts of an employee committed within the course and scope of employment." *Rau v. Roberts*, 640 F.3d 324, 328 (8th Cir. 2011) (quoting *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 583 (Minn. 2008) (internal quotation marks omitted)). An employer may be held liable for the intentional torts of its employees when the tort is: (1) related to the employee's duties; and (2) occurs within work-related limits of time and space. *Id.* Under the first element, courts consider "whether the act was foreseeable." *Hagen v. Burmeister*

---

[26] In light of the Court's decision to grant Smartmatic's motion to exclude the expert opinion evidence of Cotton in Section I.A, above, the Court need not address how a reasonable trier of fact would evaluate his testimony for purposes of deciding Smartmatic's motion for partial summary judgment.

& *Assocs., Inc.*, 633 N.W.2d 497, 504 (Minn. 2001). "[A] plaintiff can raise a fact issue as to foreseeability by introducing evidence that the employer knew or had reason to know of the employee's misconduct." *Cruz v. TMI Hospitality, Inc.*, No. 14-CV-1128 (SRN/FLN), 2015 WL 5996383, at *18 (D. Minn. Oct. 14, 2015). Courts consider executives like Lindell "at work" whenever they act in furtherance of their responsibilities and their employer's objectives. *See, e.g.*, *Edgewater Motels, Inc. v. Gatzke*, 277 N.W.2d 11, 17 (Minn. 1979).

Here, Smartmatic offers undisputed evidence that MyPillow was aware of Lindell's conduct. The record evidence shows that Lindell, as the CEO of MyPillow, was aware of the tortious conduct, as he made the defamatory statements himself. Additionally, members of MyPillow's Board of Directors admitted that they were aware of Lindell's defamatory statements; board minutes reflect discussion of Lindell's election fraud claims and revenue splits with FrankSpeech—one of the primary methods of publication. (*See, e.g.*, Doc. No. 395-38 at 16, 32–33; Doc. No. 54–56; Doc. No. 396 at 13; Doc. No. 395-88; Doc. No. 396-4; Doc. No. 395-37 at 74.) Smartmatic also offers evidence that it was foreseeable that Lindell's conduct would be connected to MyPillow. For instance, the evidence shows that Lindell was MyPillow's primary spokesperson. (*See, e.g.*, Doc. No. 395-84 at 8; Doc. No. 395-1 at 117.) Further, in many of the publications, Lindell is introduced as the CEO and founder of MyPillow. (*See, e.g.*, Doc. No. 395-35; Doc. No. 395-40; Doc. No. 395-41; Doc. No. 395-42; Doc. No. 395-44; Doc. No. 395-45; Doc. No. 395-47; Doc. No. 395-51; Doc. No. 395-52.) Many of the publications also expressly include MyPillow advertisements or promotional codes. (*See, e.g.*, Doc. No. 395-42; Doc.

No. 395-44; Doc. No. 395-45; Doc. No. 395-47.) The use of promotional codes was a standard business practice for MyPillow. (*See, e.g.*, Doc. No. 395-66 at 6–7.)

Smartmatic offers additional evidence that Lindell used MyPillow employees and resources to publish his statements. For instance, MyPillow's Chief Technology Officer, who was also a Board Member, was involved in disseminating the publications. (*See, e.g.*, Doc. No. 396-1 at 54–56; Doc. No. 395-91.) Other MyPillow employees sent the publications to MyPillow partners and advertisers. (*See, e.g.*, Doc. No. 395-37 at 36–37; Doc. Nos. 395-95–105, 107–114, 116–117.) Other MyPillow employees sent promotional materials for the publications to its customers. (*See, e.g.*, Doc. No. 395-38 at 19; Doc. No. 395-118; Doc. No. 395-135.)

Lindell has not identified any record facts to rebut Smartmatic's evidence. (Doc. No. 459 at 33–36.) Therefore, the Court concludes that based on this record, there is only one finding that reasonable jurors could make: MyPillow is vicariously liable for Lindell's tortious conduct.

### B.    MDTPA Claim

Smartmatic also moves for partial summary judgment on its MDTPA claim. Defendants ask the Court to dismiss the MDTPA claim for lack of standing or, in the alternative, for lack of proof on the merits. In light of the decisions above regarding the elements of defamation and vicarious liability, the Court grants Smartmatic's motion.

An MDTPA claim has two elements: (1) the defendant "disparage[d] the [plaintiff's] goods, services, or business . . . by false or misleading representation of fact"; and (2) did so "in the course of [their] business, vocation, or occupation." Minn. Stat.

§ 325D.44, subd. 1(8).  To obtain injunctive relief on the claim, a plaintiff must show that it is "likely to be damaged by" the defendant's disparagement but need not prove "monetary damage, loss of profits, or intent to deceive."  Minn. Stat. § 325D.45, subd. 1. A plaintiff can seek these forms of relief "in addition to remedies otherwise available against the same conduct under the common law."  Minn. Stat. § 325D.45, subd. 3; *accord US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 65 (D.D.C. 2021).  Under the MDTPA, "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  Minn. Stat. § 325D.45, subd. 1.  A party seeking relief under the MDTPA must demonstrate a likelihood of future harm because the statute provides relief only "from future damage, not past damage."  *Gardner v. First Am. Title Ins. Co.*, 296 F.Supp.2d 1011, 1020 (D. Minn. 2003) (citation omitted) (internal quotation marks omitted), *cited in Knotts v. Nissan N. Am., Inc.*, 346 F. Supp. 3d 1310, 1327 (D. Minn. 2018).

Defendants contend that Smartmatic lacks standing to bring its MDTPA claim because the MDTPA "does not apply extraterritorially" and Smartmatic does not "reside in Minnesota," is not "registered to do business in Minnesota," has not "conducted any business in Minnesota," and has not alleged "injury in Minnesota."  (Doc. No. 459 at 36–37; Doc. No. 436 at 39.)  Defendants, however, do not support this assertion with a well-developed argument or binding legal authority.  Instead, Defendants rely exclusively on cases in which classes of out-of-state plaintiffs lacked standing to bring a nationwide class action under Minnesota statutes.  *See, e.g.*, *Rouse v. H.B. Fuller Co.*, 694 F. Supp. 3d 1149, 1154 (D. Minn. 2023); *Ferrari v. Best Buy Co.*, No. 14-CV-2956 (MJD/FLN), 2015 WL

2242128, at *1 (D. Minn. May 12, 2015); *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-CV-2644 (ADM/SER), 2014 WL 943224, at *11 (D. Minn. Mar. 11, 2014). No class allegations are before the Court in this case, however, and there is no dispute that Defendants are Minnesota residents, and that much of the pertinent conduct occurred and is likely to recur in Minnesota. Absent a well-developed argument concerning individual, as opposed to putative class or putative collective actions, the Court declines to rely on the authority cited by Defendants.

Turning next to the two elements of the MDTPA claim, the Court concludes that, for the same reasons explained above regarding the elements of defamation (Section II.A.1–3), no genuine issues of material fact remain as to whether the statements at issue in this case satisfy the first MDTPA element. Similarly, the Court concludes that, for the same reasons explained above regarding vicarious liability (Section II.A.4), no genuine issues of material fact remain as to whether the record establishes the second element.[27]

## III.    DEFENDANTS' MOTION FOR COMPLETE SUMMARY JUDGMENT

Defendants move for summary judgment of all claims. (Doc. No. 435.) Given the decision above to grant Smartmatic's motion for partial summary judgment (Section II),

---

[27] To obtain costs and attorney fees, a plaintiff must show that the defendant "willfully engaged in the trade practice knowing it to be deceptive." Minn. Stat. § 325D.45, subd. 2. For the same reasons that it does not seek summary judgment as to malice, Smartmatic does not seek summary judgment on this aspect of its MDTPA claim. In addition, Defendants make no argument that because the disparaging conduct relates to a matter of public concern, willfulness or malice is required in order for Smartmatic to obtain the permanent injunctive relief that it requests under its MDTPA claim. Absent any such argument, the Court declines to consider whether the record evidence establishes willfulness or malice at this time.

the Court necessarily denies Defendants' motion regarding those elements. In addition, in light of the decision above to deny Defendants' motion to exclude the expert opinion evidence of Bania (Section I.D), the Court also denies Defendants' motion for summary judgment on the issue of damages, concluding that questions of fact remain concerning the fact and expert evidence relating to damages. The Court need address only the remaining aspect of Defendants' motion: whether the record contains genuine disputes of material facts concerning malice. The Court concludes that it does and denies Defendants' motion.

To satisfy the actual-malice standard, a false publication must have been made with "knowledge that it was false" or with "reckless disregard of whether it was false." *Maethner*, 929 N.W.2d at 873 (citation omitted) (internal quotation marks omitted). To defame with reckless disregard, "the defendant must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of [the defendant's] publication." *Harte-Hanks Commc'ns Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (citations omitted) (internal quotation marks omitted). "[R]ecklessness may be found where there are obvious reasons to doubt the veracity" of the information. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). A defendant's publication of a statement after being informed of its falsity constitutes evidence of reckless disregard. *Nunes v. Lizza*, 12 F.4th 890, 900–01 (8th Cir. 2021).

In this case, Defendants argue that there is no evidence of malice because Lindell "believed that the statements were truthful, and that [he] continues to believe the statements were truthful." (Doc. No. 436 at 22, 23.) Specifically, he cites his unwavering belief, including his refusal to retract or correct statements and continued publication and

60

reiteration of the statements, as demonstrating that he harbors no subjective doubt about the statements. (*Id.* at 23–24; Doc. No. 439-15 at 6–11.) He also cites to the "experts" and "third-party sources" he relied on to form his belief as evidence that he "did not fabricate the basis for his statements, that the statements were not based entirely on an anonymous source, and that the statements are not inherently improbable." (*See, e.g.*, Doc. No. 439-11 at 7, 9–12; Doc. No. 438-6; Doc. No. 438-7; Doc. No. 439-12 at 1, 3–10, 15–16; Doc. No. 439-13 at 11, 13; Doc. No. 438-1; Doc. No. 438-2; Doc. No. 439-14 at 8–9, 11–16, 18–1933:8–34:9, 106:11–111:16, 148:25–149:20.) However, a defendant "cannot . . . automatically insure [sic] a favorable verdict by testifying that he published with a belief that the statements were true" or by professing "good faith." *St. Amant*, 390 U.S. at 732.

Smartmatic counters that its evidence raises a genuine dispute as to whether Defendants acted with reckless disregard for the truth. (Doc. No. 456 at 14–39.) First, Smartmatic offers evidence that Defendants lacked credible support for their accusations about Smartmatic because they were repeatedly told that there was no evidence to support them. (*See, e.g.*, Doc. No. 395-1 at 100, 103–05; Doc. No. 395-85 at 13–14; Doc. No. 457-115; Doc. No. 457-116; Doc. No. 457-117 at 6; Doc. No. 457-118; Doc. No. 457-119; Doc. No. 457-120; Doc. No. 457-121 at 2; Doc. No. 457-122 at 186; Doc. No. 457-173 at 3.) Second, Smartmatic offers evidence that Defendants were aware of numerous sources that contradicted their accusations. (*See, e.g.*, Doc. No. 395-1 at 102, 108.) For instance, Defendants were aware of other lawsuits, letters from Dominion, and investigations by federal agencies and officials and state governments that disavowed voting machine interference. (*See, e.g.*, Doc. No. 395-6; Doc. No. 395-8; Doc. No. 395-1 at 39–40, 42,

58–65; Doc. No. 395-58 at 2:9–16; Doc. No. 395-63; Doc. No. 457-7; Doc. No. 457-8; Doc. No. 457-9; Doc. No. 457-10.)  Third, Smartmatic offers evidence that Defendants had reason to doubt the veracity of statements made by guest speakers featured in their publications.  (*See, e.g.*, Doc. No. 457-33; Doc. No. 457-34; Doc. No. 457-35; Doc. No. 457-36 at 186; Doc. No. 457-43 at 27.)  Fourth, Smartmatic offers evidence that Defendants acted for an improper purpose.  For instance, Lindell admitted he included Smartmatic in his statements because he was angry with Smartmatic for suing a media company.  (Doc. No. 395-1 at 42.)  Additionally, Smartmatic cites to evidence indicating that Defendants tied the statements to promotions and advertisements for MyPillow.  (Doc. No. 395-42; Doc. No. 395-44; Doc. No. 395-45; Doc. No. 395-47.)  Fifth, Smartmatic offers evidence of Defendants' refusal to retract or correct their statements after being put on notice that the statements were false.  (*See, e.g.*, Doc. No. 395-1 at 86.)

Viewing the record in the light most favorable to Smartmatic, genuine fact disputes exist in the record as to whether the statements were made with knowledge that they were false or made with reckless disregard to their falsity.  Thus, the Court denies Defendants' motion on the issue of actual malice.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Plaintiffs' motions to exclude Defendants' expert, Benjamin Cotton (Doc. Nos. 414, 488) are GRANTED.

2.  Plaintiffs' motion to strike or for leave to file reply (Doc. No. 495) is DENIED as moot.

3.      Defendants' motion to exclude Plaintiffs' expert, Tammy Patrick (Doc. No. 421), is DENIED.

4.      Defendants' motion to exclude Plaintiffs' expert, Doug Bania (Doc. No. 428), is DENIED.

5.      Plaintiffs' motion to exclude Defendants' expert, Robert Bowes (Doc. No. 398), is DENIED WITHOUT PREJUDICE.

6.      Plaintiffs' motion to exclude Defendants' expert, Peter Kent (Doc. No. 407), is DENIED WITHOUT PREJUDICE.

7.      Plaintiffs' motion for partial summary judgment (Doc. No. 388) is GRANTED.

8.      On or before December 1, 2025, Plaintiffs shall file a proposed order requesting permanent injunctive relief.  Defendants may file objections to this request on or before December 31, 2025.

9.      Defendants' motion for summary judgment (Doc. No. 435) is DENIED.


Dated:  September 26, 2025                /s/ *Jeffrey M. Bryan*
                                              Judge Jeffrey M. Bryan
                                              United States District Court