## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SMARTMATIC USA CORP.,
SMARTMATIC
INTERNATIONAL HOLDING B.V., and
SGO CORPORATION LIMITED,

        Plaintiffs,

v.

MICHAEL J. LINDELL and MY
PILLOW, INC.,

        Defendants.

Case No.  22-cv-0098-JMB/JFD

**DEFENDANTS' OBJECTIONS
TO PLAINTIFFS' MOTION FOR
A PERMANENT INJUNCTION**

## INTRODUCTION

By order dated September 26, 2026, this Court granted, inter alia, Plaintiffs'

motion for partial summary judgment regarding the falsity of various statements made by

Defendants Michael J. Lindell ("Lindell") and My Pillow, Inc. ("My Pillow").  *See* Order

at 52-55 (Dkt. No. 522) ("Order").[1]  The Court further noted that Smartmatic had

acknowledged that there were material fact disputes as to whether Lindell made the

challenged statements with actual malice, thus presenting a jury question.  *See id.* at 41 &

---

[1] Although the challenged statements are all attributed in some fashion to Lindell himself,
the Court found that My Pillow, as Lindell's employer, was vicariously liable for all of
them.  Order at 55-57.  The Court noted, however, that "Lindell has not identified any
record facts to rebut Smartmatic's evidence" as to vicarious liability and thus 'there is
only one finding that reasonable jurors could make:  My Pillow is vicariously liable for
Lindell's tortious conduct."  *Id*. at 57.  There is, however, substantial evidence to the
contrary which unfortunately was not provided to the Court in response to Smartmatic's
motion for partial summary judgment.  *See* Declaration of Michael J. Lindell dated
December 29, 2025 ("Lindell Decl.") ¶ 2.

n.19.  The Court also invited Plaintiffs to submit a proposed order for a permanent injunction.  *See id*. at 63.

Plaintiffs' proposed order seeks broad injunctive relief prohibiting future publication of, or causing or assisting others to publish statements which fall into three categories of content, *see* Plaintiffs' 11/19/25 Proposed Order for Injunctive Relief at 2 (providing categories of statements to be enjoined)(Dkt. No. 525), as well as the fifty-one statements subject to the Court's Order.  *Id.*; *see id.* Appendix A (chart setting out the fifty-one specific statements on which Plaintiffs seek permanent injunctive relief).

Defendants, however, object to Plaintiffs' proposed order as well as to any grant of permanent injunctive relief.  *First*, there have been several developments since the Court's summary judgment order that significantly undermine the credibility of Plaintiffs' representations to this Court (in addition to the credibility of several of their top executives).  Those recent developments will also hamper Plaintiffs' ability to show irreparable harm (or even monetary damages) arising from any of the challenged statements.

*Second*, the law strongly disfavors enjoining allegedly defamatory future statements because of constitutional concerns, and in the extraordinary cases in which such injunctive relief is possibly warranted, a determination of the falsity of the statements, standing alone, is insufficient to prohibit such speech.

*Third*, there must also be, at a minimum, a determination of actual malice prior to issuing any such injunctive relief, and the Court has already ruled that actual malice is to be determined by a jury.

Given the foregoing, Defendants ask the Court to forego issuing a permanent injunction.

## FACTUAL BACKGROUND

There is evidence that has come to light after the Court's Order that calls into question Smartmatic's credibility and also provides support for the truthfulness of various statements challenged in this litigation.[2]  This evidence undercuts Plaintiffs' right to obtain permanent injunctive relief.

## I.    The Superseding Indictment Against Smartmatic.

After the Court issued its Order, the United States filed, on October 16, 2025, a Superseding Indictment in the Federal District Court in the Southern District of Florida against several persons allegedly affiliated with Smartmatic, including Juan Andres Donato Bautista ("Bautista"), Roger Alejandro Pinate Martinez ("Pinate"), Jorge Miguel Vasquez ("Vasquez"), and Elie Moreno ("Moreno").  Superseding Indictment at 1, *U.S. v. Bautista*, Case No. 24-20343-CR-WILLIAMS(s) (S.D. Fla. Oct. 16, 2025)(hereinafter "Superseding Indictment").

The United States also indicted, for the first time, "SGO Corporation Limited, a/k/a, 'Smartmatic.'"  *Id*. at 1.  The Superseding Indictment identifies "Smartmatic" as follows:

---

[2]  Defendants acknowledge the Court's ruling that the fifty-one challenged statements are false as a matter law based on the record before the Court at that point in time.  As set forth herein, there is evidence which postdates the Court's Order and provides additional support for the truthfulness of the challenged statements.

**SGO CORPORATION LIMITED, a/k/a, "Smartmatic," ("SGO"),**
headquartered in the United Kingdom, provided election voting machines
and related services. The **SGO** corporate structure included entities,
individually and collectively, commonly referred to as "Smartmatic,"
"SMMT," or "Smartmatic Group."  This included, among others: a wholly
owned subsidiary organized under the laws of The Netherlands
("Smartmatic International"); a wholly owned indirect subsidiary
incorporated in Delaware and registered in Florida, with an address in Boca
Raton, Florida ("SMMT USA")….

*Id*. ¶ 4 (emphasis in the original).

The other alleged co-conspirators are three executives of either Smartmatic or one
of its subsidiaries, as well as a former government official.[3]  *See id*. ¶¶ 3, 5-7; *see*
*generally id.*

Defendant Pinata is specifically alleged to be:

[A] citizen of Venezuela, was a co-founder, part owner, and executive of
Smartmatic.  Specifically, he was a director, stockholder, and Chief
Operating Officer of **SGO** and he received a salary from SMMT USA. He
also served on the board of directors of Smartmatic International.  **PINATE**
was a resident of Boca Raton, Florida, in the Southern District of Florida.

*Id*. ¶ 5 (emphasis in the original).

Defendant Morena is alleged to have been an executive of Smartmatic
International and a dual citizen of Venezuela and Israel.  *Id*. ¶ 7.

Vasquez, a United States citizen, was purportedly "an executive employed by
SMMT USA," *id*. ¶ 6, which is alleged to be "a wholly owned indirect subsidiary" of
Smartmatic."  *Id*. ¶ 4.

---

[3] The defendant government official, Juan Andres Donato Bautista, allegedly served as
the Chairman of the Commission on Elections of the Republic of the Philippines.
Superseding Indictment ¶¶ 2, 3.

A federal grand jury had returned the Superseding Indictment charging Smartmatic with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), *id*. Count 1; conspiracy to engage in money laundering, *id*. Count 3; and money laundering. *Id.* Counts 4-6. The Superseding Indictment alleges that Smartmatic conspired to, inter alia, create slush funds and hike costs on voting machines in order to pay bribes of more than $1 million to a former Philippine government official. *Id*. ¶¶ 5, 9; *see generally id*. The purported purpose of the conspiracy was to obtain contracts to lease (with options to purchase) Smartmatic's voting machines that were used in the 2016 Philippine national elections and to provide services related to the resulting election results. *Id.* ¶¶ 3, 16-21. Smartmatic allegedly obtained contracts valued in excess of $180 million as a result of the conspiracy, with that revenue flowing through a Smartmatic subsidiary to Smartmatic, where it was included on Smartmatic's financial statements. *Id.* ¶¶ 17, 19-22. If found guilty, Smartmatic may face fines of as much as $3 million, or, in the alternative, twice the value of the property involved in the challenged transactions and/or twice the amount of financial gain or loss. *See id*. at 33.

The Superseding Indictment charges Pinate and Vasquez (in addition to Smartmatic) with one count of conspiracy to violate the FCPA, *see id*. Count 1, and charges Pinate and Vasquez with a violation of the FCPA's anti-bribery provisions. *See id*. Count 2. Together with Smartmatic, Bautista, Pinate, Vasquez, and Moreno are all charged with one count of conspiracy to commit money laundering, *see id*. Count 3; as well as three separate counts of money laundering for their respective roles in the scheme. *See id*. Counts 4-6.

The factual allegations underlying the Superseding Indictment may be admitted, as discussed more fully below, to challenge Smartmatic's credibility. *See infra* (discussing admissibility of underlying factual allegations for certain purposes).

## II.    The Recent Sworn Confidential Statements of Two Witnesses.

There is additional factual information that was acquired after the Court's Order, which provides additional justification for denying the issuance of a permanent injunction. The Court noted in its Order that "the only evidence in the record concerning design shows that Smartmatic has not designed any of its election technology to manipulate ballots in other countries." *See* Order at 54. However, Defendants have now obtained the examination under oath of two confidential whistleblowers who testified in another federal district court case about Smartmatic's involvement in the manipulation of elections in another country, specifically Venezuela, the country in which two of the Defendants in the Superseding Indictment, including Smartmatic's former CEO, are alleged to be citizens. *See supra* (quoting same).

The transcripts of both whistleblowers' examinations were filed in the Federal District Court for the District of Colorado on October 1, 2025, after the Court's Order. *See* Declaration of Barbara P. Berens dated December 30, 2025 ("Berens Decl.") Ex. 1 (9/18/25 Transcript of Examination under Oath of Confidential Witness (hereinafter the "First Witness"), filed in *Peters v. Feyen*, Case No. 1:25-cv-00425-STV (D. Colo. Oct. 1, 2025))(hereinafter "*Peters*")(Dkt. No. 70-1 (Vol. 1) & Dkt. No. 70-2 (Vol. 2)); *see also id.* Ex. 2 (8/18/25 Transcript of Examination under Oath of Confidential Witness filed in *Peters* on Oct. 1, 2025 (Dkt. No. 76-1))(hereinafter the "Second Witness"). Defendants

6

anticipate that they will be able to produce both confidential witnesses (or another

witness) to affirm the substance of the confidential witnesses' sworn statements filed in

the *Peters* case as well as making those witnesses available for cross-examination. *See*

Lindell Decl. ¶ 3.

The First Witness had been the National Coordinator for voting machines and

national data in Venezuela from 2003 until 2016.[4]  Berens Decl. Ex. 1 (9/18/25 Tr. (Vol.

1) at 7-10).  In that role, he was "the person in charge of" creating and running all of the

situation or war rooms used during the Venezuelan elections.  *Id.* at 7-12.

When asked "What were you responsible for doing in Venezuelan elections

between 2003 and 2016?," *id.* at 9, the First Witness explained his role:

> I was responsible for configuring the voting equipment.  I was responsible
> for configuring the electoral manager system, responsible for the
> transmission systems, responsible for the electoral system audits, along with
> the Carter center and the European Union. On top of that, I was, after that
> responsible for the data centers, where we keep all the information of the
> voter records, biometric systems and the electoral systems before an election
> day.

*Id.* at 9-10.

The First Witness confirmed that Smartmatic systems were used in Venezuela

during the period of time he was National Coordinator:

> I have 20 years of experience in electoral systems.  This comes from
> Venezuela, from 2003 onward, where we received for the time and we
> configured the Smartmatic systems for the first time in Venezuela.  We
> configured the transmission systems and the tally systems.

---

[4] The First Witness agreed that he would be in physical danger if his true identity were to
become known.  Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 1) at 6).

*Id.* at 7.

The First Witness confirmed that Smartmatic was involved in the manipulation of elections through its products. For example, in response to the question "How much money per year did the Venezuelan government pay to Smartmatic after Smartmatic developed the software to rig Venezuelan elections?," the First Witness answered, "Well, is it [sic] varied by year. During the first year, Smartmatic received $140 million. That was in 2004." Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 2) at 14).

The First Witness also testified in detail about how elections in Venezuela had been fixed through the manipulation of Smartmatic voting machines and software. For example, "[i]n the case of 2004, one million fake voters were inputted into the system." Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 1) at 12). "In 2006, a tool was used," the SAES utility tool. *Id.* at 12-13. That tool was also used to manipulate the 2008 Venezuelan elections. *Id.* at 14 (testifying that "in the year 2008, the technology director for the National Electoral Council was in charge of transmitting the data from an entire state so that his relatives could win").

The First Witness described how the SAES utility tool in the Smartmatic system could be (and was) used to fix elections:

> This is supposed to be a tool that -- for its normal usage, it's supposed to allow you to test the integrity of the system. When it's misused, it can allow you to inject votes without people knowing you did so.

Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 1) at 15); *see id.* at 12-14; *see generally id.* He confirmed the tool had actually been used in Venezuela to fix elections and that he had seen how election results were altered:

8

**Q.**      Was SAES used in Venezuela to manipulate the outcome of elections?  So change the results?

**A.**      It was used by the technology directors. In this case, his name is Eduardo Hernandez.  Later on it was used by Delci's cousin, his name is Louis Campos Cabello.

**Q.**      And how did they use SAES to manipulate Venezuelan elections?

**A.**      By using a statistical system, knowing the electors behavior, without exceeding a maximum of 2 or 3 percent of vote manipulation, while at the same time taking over a large number of voting machines that you need in order to change the total amount of votes that you need to modify.

Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 1) at 13).

The First Witness also testified about Smartmatic's interconnection with the

Venezuelan government:

A.      [I]in Venezuela, Smartmatic worked hand-in-hand with the Venezuelan government.  And Jorge Rodriguez would collect bribes from Smartmatic.

Q.    And Jorge Rodriguez was part of the Venezuelan government?

A.    He's the current President of Congress in Venezuela.  We call it the National Assembly.  And his sister is the Vice President for the country. And it is Jorge Rodriguez who hired Smartmatic, or awarded the Smartmatic in 2003 in order for them to develop the electoral system for Venezuela.

Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 2) at 13).  In addition, the Venezuelan government

owned 28% of Smartmatic (based on publicly available information) as well as the source

code for the Smartmatic software, which the government stored in a central bank in

Caracas.  *Id.* at 14.

He further confirmed that the Smartmatic SAES utility tool was integrated into

Dominion voting machines via its acquisition of a company that it had acquired from

Smartmatic, Sequoia Voting Systems.  Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 1) at 16-17; *id*. at 21 (testifying that "the SAES election software from Smartmatic ended up being implemented in Sequoia and later on transferred to Dominion").

Finally, the First Witness confirmed that the voting system in the United States is vulnerable to manipulation:

> **Q.**    Sir, do you have personal knowledge, whether the election systems, in the United States, the voting systems, can be manipulated by foreign agents?
>
> **A.**    The electoral systems of the United States can be manipulated by foreign agents or third parties.

Berens Decl. Ex. 1 (9/18/25 Tr. (Vol. 1) at 6).

The Second Witness, who had been head of security for the President of Venezuela, Hugo Chavez Frias, for thirteen years, Berens Ex. 2 (8/18/25 Tr. at 10), also confirmed the manipulability of Smartmatic's voting machines and software as well as Smartmatic's participation in the fixing of an election in Venezuela.  *See generally id*. Among other things, the Second Witness testified that he was present at an initial meeting between Chavez, high ranking Smartmatic executives (specifically "the founders of the Smartmatic:  Pinate, Mugica, and Anzola") and representatives of Consejo Nacional Electoral ("CNE"), the latter of which was "the authority in charge of all of the elections in what is all of Venezuela."  *Id.* at 10-11.  He testified that:

> Yes, they had secret meetings.  And present there was President Chavez and Mr. Jorge Rodriguez, the president of the CNE, and the founders of the Smartmatic: Pinate, Mugica, and Anzola were there. Where initially, in that meeting, President Chavez ordered to create a software to -- to guarantee them to always win the elections, whichever elections there were always in Venezuela.  And there, he gave them, by word, a guarantee for the software financial of 100 -- of $100 million, but that that [sic] would increase as they

10

were developing the software.

*Id*. at 11.  The Second Witness explained that:

> Specifically in the meeting, Chavez would say that they had to guarantee,
> with the creation of the software, that all of -- that -- that in all of the
> elections that they were competing in, that they would always have the
> election result in their favor without anybody ever knowing.

*Id*. at 12.  He further testified that Chavez guaranteed the payment of $100 million to

"Jorge Pinate and Antonio Mugica," and that the Second Witness "was present when they

authorized the commencement of the payments to be made."  *Id*.  He stated that "either

Mugica or Pinate" would always attend the meetings with Chavez, *id*. at 15, and that he

was also present in 2002 or 2003 when there was:

> [A] demonstration of how the machine was going to work once they would
> select the vote.  And after that, how they were going to change the vote to the
> person that they wanted.  But the person that was doing the voting would not
> know that the vote was being changed through the software.

*Id*. at 15.  When asked, "Did you witness this vote manipulation?," the Second Witness

answered, "Yes, I was there looking."  *Id*.

He confirmed that vote manipulation had taken place in the 2013 presidential

election in Venezuela:

> And where I was really able to detect the -- and where I was able to detect
> where the software works to win the election was in 2013.  In the election to
> where is -- where the actual president, Nicolas Maduro was, and Capriles
> Radonski was the opponent.

*Id*. at 17.  He witnessed votes being added via the Smartmatic voting machines and

software to change the outcome of that 2013 election.  *Id*.  He stated that once the

Venezuelan political party in power "noticed that they were losing, they gave the order to

manipulate the votes."  He explained that:

> So I was in a room that was prepared with monitors with every state.  And --
> and there, I was able to see in real time how they were adding those votes in
> every state in Venezuela.

 *Id*. at 17.  He further confirmed that he saw them in real time "change it from the

opposing candidate to the candidate for the government, in state by state."  *Id*. at 18.  He

testified that the actual vote manipulation he observed in the 2013 election was done in

exactly the same way that he had witnessed votes being changed during the

demonstration in 2002 or 2003.  *Id*. at 19.

He also witnessed Smartmatic's participation in the 2013 election manipulation as

he was present when CNE's President, Jorge Rodriguez, and several others (including

Chavez's son-in-law), "had a conversation by telephone with Antonio Mugica and letting

them know that the election was being lost, and that they had to do a change that instant."

*Id*. at 22-23.

He also observed when Rodriguez and others called the presidential candidate,

Nicolas Maduro, to "let him know that they have the votes under control."  *Id*. at 23.  The

Second Witness further testified that he was present during the initial meetings between

Chavez and the Smartmatic representatives (Anzola, Mugica, and Pinate) in which

Chavez stated that Smartmatic software would someday be used to elect, among other

presidents of countries, the president of the United States.  *Id*. at 26-27.

Finally, the Second Witness provided testimony as to his observations about the

2020 presidential election in the United States:

> … In fact, in 2020, in the presidential elections with Trump and Biden, I was

paying attention to all of the information that all of the media was providing at that moment at the time. And I saw that almost the same thing happened with my experience in Venezuela with the manipulation of the votes, and I thought the same thing happened.

*Id*. at 34. In response to the question "Which election are you talking about?," the

Second Witness responded:

I was able to witness that without any doubt there was a manipulation of votes, and the same thing happened that they cut off -- that they cut off the internet. Then the internet came back on, and the next day, some other results -- different results were given. And I gave an affidavit of a sworn statement of everything that I had seen in the elections of 2020. But -- but during that time, [redaction] he made a comment during that time. He said that a member of the Hugo Chavez's cabinet gave some statements about the manipulation of the votes, [redaction]. And that was when, again, the agents from the DEA, they called me, and they were very mad, and they prohibited me from talking about the presidential election.

*Id*. at 34 (redactions in original).

Thus, the Second Witness's testimony regarding Smartmatic corroborates that of the First Witness.

The foregoing evidence calls into question Smartmatic's credibility regarding its claims about the alleged integrity of its voting machines and software, as well as its representations to this Court that it never had any involvement in the manipulation of elections. This evidence also supports the truthfulness of various statements challenged by Plaintiffs in this case. Finally, this evidence further undercuts the issuance of a permanent injunction.

## **LEGAL ARGUMENT**

### I.    **Legal Standard.**

In determining whether to grant a permanent injunction in cases which do not

implicate any First Amendment concerns, *see infra* (discussing same), the Eighth Circuit

has held that:

> The standard for issuing a preliminary or permanent injunction is essentially the same, **excepting one key difference.  A permanent injunction requires the moving party to show actual success on the merits, rather than the fair chance of prevailing on the merits required for a standard preliminary injunction**.

*Oglala Sioux Tribe v. C&W Enters.*, 542 F.3d 224, 229 (8th Cir. 2008)(Rosenbaum, J.,

sitting by designation)(emphasis added)(citations omitted).

If the movant has demonstrated actual success on the merits, the general rule

applicable to permanent injunctions requires the court to then consider:

> [T]he following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest.

*Id*. (citing *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds,* 530

F.3d 724, 729 n.3 (8th Cir. 2008)(en banc) and *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640

F.2d 109, 113 (8th Cir. 1981)(en banc)).  Here, there is no ruling that Plaintiffs have

succeeded on the merits of their claims because the Court has already determined that

several elements of their claims remain for trial.  And the Court's ruling on falsity fails to

qualify as success on the merits where a jury finding in Defendants' favor on either actual

malice and/or damages will defeat Plaintiffs' claims.  The Court should therefore deny

the motion for a permanent injunction for that reason alone.

## II.    Evidence Made Public After the Court's Order Calls into Question Plaintiffs' Credibility as Well as Their Ultimate Success on the Merits.

Defendants acknowledge that Plaintiffs' motion for a permanent injunction was in

response to the Court's express invitation that Plaintiffs bring such a motion.  But the

postdated evidence set forth in this memorandum clearly raises questions about Plaintiffs'

credibility, evidence that was not before the Court when ruling on Plaintiffs' motion for

partial summary judgment.  Defendants contend that this evidence substantially

undermines Plaintiffs' right to such injunctive relief, and thus ask the Court to deny the

motion.

> A.    _The Factual Allegations Underlying the Superseding Indictment May Be_
> _Admitted to Challenge Smartmatic's Truthfulness._

Courts generally allow admission of a party's prior dishonest conduct if that

conduct is relevant to that party's credibility:

> Federal Rule of Evidence 608(b) allows for specific instances of dishonest
> conduct to be "inquired into [on cross-examination] . . . if they are probative
> of the character for truthfulness or untruthfulness' of the witness.  Rule
> 608(b) operates in conjunction with Rule 403, meaning that as long as the
> conduct in question tends to show the witness's character for untruthfulness,
> said conduct may be raised on cross-examination subject to Rule 403's
> requisite balancing test.

_Ispot.Tv, Inc. v. Teyfukova_, Case No.: 2:21-cv-06815-MEMF-MAR, 2025 U.S. Dist.

LEXIS 234899, at *6-7 (C.D. Cal. Nov. 24, 2025)(citing _United States v. Olsen_, 704 F.3d

1172, 1184 n.4 (9th Cir. 2013) for the proposition that "Rule 608(b) of the Federal Rules

of Evidence authorizes courts to permit inquiry into specific instances of conduct during

cross-examination if they are probative of the character for untruthfulness of the

witness—subject, of course, to the balancing analysis of Rule 403.").

Although courts generally exclude the use of an indictment itself for purposes of

such impeachment because of the official governmental imprimatur an indictment may

hold, the facts underlying an indictment may, however, be used to challenge credibility:

> Unlike the indictment, the facts underlying the indictment may have
> significant probative value. Inquiry into the specific instances of conduct for
> securities fraud and tax evasion may bear directly on the credibility of Dr.
> Wallace and his character for truthfulness. Absent the perceived official
> sanction of a government indictment, the jury is less likely to be misled into
> believing that Dr. Wallace has in fact committed the acts. Moreover,
> extrinsic evidence of proof is barred by Rule 608(b), and thus there is little
> danger of undue delay or confusion of the issues. Any perceived prejudice
> or inference of use other than to attack the credibility of Dr. Wallace could
> be mitigated by a limiting instruction from the court. Plaintiffs' contention
> that there is no permissible evidentiary use of the specific acts underlying the
> indictment is not well-taken. The court therefore denies plaintiffs' motion in
> limine to exclude all reference to the facts related to the indictment.

*Baxter Health Care Corp. v. Spectramed, Inc.*, SA CV 89-131 AHS (RWRx), 1992 U.S.

Dist. LEXIS 19769, at *9-10 (C.D. Cal. Aug. 27, 1992).

Here, Plaintiffs have held themselves out to be reputable businesses and that their

representations about their voting machines and software are truthful. The facts

underlying the Superseding Indictment strongly undercut Plaintiffs' assertions regarding

both the integrity of their companies as well as the credibility and character for

truthfulness of individuals who founded those entities. *See supra* (detailing factual

allegations underlying Superseding Indictment that are relevant to Smartmatic's

credibility). Given that, Defendants contend that the facts underlying the Superseding

Indictment call into significant question Plaintiffs' credibility about the matters at issue in

this case and provide an additional reason to deny permanent injunctive relief. *Cf. United*

*States v. Girdner*, 773 F.2d 257, 260-61 (10th Cir. 1985)(upholding district court's ruling

permitting the cross-examination into defendant's involvement in a ballot fraud scheme

because such an inquiry was probative of the issue of defendant's truthfulness and stating

16

that Fed. R. Evid. 608(b)(1) permits a trial court to permit cross-examination "into the

prior conduct of a witness concerning his character for truthfulness").

      B.    *The Sworn Statements of the Two Anonymous Witnesses Undercut*
           *Smartmatic's Credibility and Argue Against a Permanent Injunction.*

The excerpts of the sworn statements of the two witnesses quoted above, which

postdate the Court's Order, clearly undermine Smartmatic's claims that it has never fixed

an election, that it is a truthful business, that its voting machines and software are not

susceptible to manipulation, and that the representations of the company, as well as its

high ranking executives, are credible.  As such, these sworn statements support the denial

of a permanent injunction which must, of necessity, rely on all of the representations that

Smartmatic has made to this Court in this proceeding.  Defendants thus ask the Court to

deny Plaintiffs' motion.  *Cf. United States v. Ojeda*, 23 F.3d 1473, 1477 (8th Cir. 1994)

(ruling that trial court properly permitted the cross-examination of a defendant regarding

his use of a different name as probative of his truthfulness because "[i]f a man would lie

about his name, a jury may reasonably infer that he would lie about other matters, even

on the witness stand")(citing *Lyda v. United States*, 321 F.2d 788, 793 (9th Cir. 1963)).

**III.    The Permanent Injunction Be Denied Because It Would Be an Impermissible**
       **Prior Restraint and Plaintiffs Have an Adequate Remedy at Law.**

      A.    *There Are no Extraordinary Circumstances to Justify the Requested*
           *Injunctive Relief.*

When evaluating a prior restraint of a party's challenged statements, "courts have

long held that equity will not enjoin a libel" absent exceptional or extraordinary

circumstances.  *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Rest. Emps. Int'l*

*Union*, 239 F.3d 172, 177 (2d Cir. 2001)(citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)); *accord A.M.P. v. Hubbard Broad. Inc*., 216 F. Supp. 2d 933, 934 (D. Minn. 2001)(Magnuson, J.)(when denying injunctive relief, noting that "[c]ourts take a dim view of the prior restraint of expression, and exceptions to the general rule against such prior restraints are recognized only in extraordinary circumstances").  As a result, courts recognize that the party seeking an injunction to prohibit future statements bears a heavy burden to justify such relief.  *See, e.g.*, *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971); *Erickson v. Sawyer*, 650 F. Supp. 3d 758, 770-71 (D. Minn. 2023) (Tostrud, J.)(citing with approval Eighth Circuit opinion which noted the "heavy burden" that must be met to obtain such injunctive relief).

One reason for imposing such a heavy burden is the constitutional concerns that are raised by such injunctive relief.  *See, e.g.*, *Organization for a Better Austin*, 402 U.S. at 419 (providing that "any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity")(quotation omitted).

Here, there are no extraordinary circumstances that would justify the issuance of the requested permanent injunction.  Courts have recognized that an injunction to prohibit speech is authorized only to protect an interest that is more fundamental than the First Amendment itself.  *See, e.g.*, *A.M.P.*, 216 F. Supp. 2d at 935.  For example, in *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)(per curiam), the Supreme Court concluded that alleged threats to national security did not justify an injunction to prevent the publication of a classified study regarding Viet Nam policy.  *See id*. at 718-19 (concurring opinion noting that the injunctive relief was not justified by government's arguments regarding

18

"national security" or the "guarding of military and diplomatic secrets"); *id*. at 723
(discussing and rejecting government's argument that it had "inherent powers to go into
court and obtain an injunction to protect the national interest, which in this case is alleged
to be national security").

The Supreme Court has further determined that the protection of personal privacy
and the prevention of criticism of a party's business interests fail to support the issuance
of an injunction to prohibit future statements. *Organization for a Better Austin*, 402 U.S.
at 419-20; *cf. A.M.P.*, 216 F. Supp. 2d at 935 (ruling that the prevention of emotional pain
and distress was insufficient to warrant the imposition of such injunctive relief).

Here, any alleged damage to Plaintiffs' reputation or business revenue fails to
justify the requested injunction. The *Erickson* case is instructive on this issue. In
*Erickson*, this Court refused to enjoin Erickson's "future defamatory" statements despite
the fact that Erickson had injured the counterclaimant's reputation by accusing him of
being "a pedophile, child rapist, kidnapper, fraudster, and serial killer." *Erickson*, 650 F.
Supp. 3d at 767, 770-71. The Court denied the injunction because, inter alia, it
constituted "a prior restraint, but Sawyer [the counterclaimant] has not explained why
this case poses such extraordinary circumstances to make a prior restraint justified or
workable." *Id.* at 770-71.

Plaintiffs also fail to demonstrate the existence of extraordinary circumstances,
and, as a result, the issuance of a permanent injunction is not warranted. *See, e.g.*, *Metro.
Opera Ass'n, Inc.*, 239 F.3d at 177-78 (2d Cir. 2001)(reversing grant of preliminary
injunction in private defamation action despite plaintiff's allegations that challenged

19

defamation was "harassing and threatening"); *id*. at 178 (ruling that preliminary injunction could not stand because it prohibited any statement that was, inter alia, "fraudulent" or defamatory").

    B.   *Courts Routinely Deny Injunctive Relief Because Allegedly Defamed Parties Are Found to Have an Adequate Remedy at Law*.

    In addition, courts routinely deny injunctions in defamation cases because the claimed injured party has an adequate legal remedy, that is, monetary damages for the alleged defamation. *See, e.g., Community for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987)(providing that "[t]he usual rule is that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages") (internal citation omitted). For example, in the *Erickson* case, this Court refused to issue an injunction to prohibit plaintiff Erickson's "future defamatory" statements not only because the injunction constituted an impermissible prior restraint, *see supra* (discussing same), but also because the defamation counterclaimant, who had been awarded compensatory and punitive damages, failed to show why those damages were not "an adequate remedy or deterrent against Erickson publishing future defamatory statements." *Erickson*, 650 F. Supp. 3d at 770.

    Here, Plaintiffs are seeking damages on their claims and thus also have an adequate remedy at law, providing another reason for denying a permanent injunction.[5]

---

[5] Given that Plaintiffs have an adequate remedy at law, they are unable to satisfy another factor in the general rule regarding whether to grant a permanent injunction, that is, irreparable harm. *See Oglala Sioux Tribe*, 542 F.3d at 229 (setting forth general rule for granting permanent injunctions); *see supra* (arguing that Plaintiffs are unable to satisfy the threshold factor for obtaining a permanent injunction, actual success on the merits).

*See* Erwin Chemerinsky, *Article: Injunctions In Defamation Cases*, 57 Syracuse L. Rev.

157, 166-68 (2007)(arguing that injunctions in defamation cases are unconstitutional

prior restraints that should never issue); *id*. at 168-70 (maintaining that monetary

damages are an adequate remedy in defamation cases).

       C.      *A Finding of Falsity Alone Fails to Support Permanent Injunctive Relief.*

The Court's ruling on falsity, standing alone, is insufficient to justify the grant of

any injunctive relief.  When considering alleged defamation statements, the Supreme

Court has instructed that "falsity alone may not suffice to bring the speech outside the

First Amendment; the statement must be a knowing and reckless falsehood."  *U.S. v.*

*Alvarez*, 567 U.S. 709, 719 (2012)(citing *N.Y. Times Co.*, 376 U.S. at 256).  Here, the

Court stated that the issue of actual malice must be tried.  *See* Order at 41 (ruling that

the "Court grants Smartmatic's motion for partial summary judgment, leaving the issue

of actual malice for trial")(footnote omitted).  The Court specifically noted that:

> … Smartmatic must prove actual malice.  Smartmatic's motion did not seek
> summary judgment on this point, acknowledging the genuine disputes of
> fact that remain regarding Defendants' state of mind and whether the
> statements were made with actual malice.

*Id*. at 41 n.19.  As a result, the grant of a permanent injunction should not issue solely on

a finding of falsity, particularly where there is evidence that postdates the Court's Order

and clearly undermines Plaintiffs' credibility and the truth of the representations they

have made to this Court.

21

**IV.**    **If the Court Issues an Injunction, Defendants Request a Stay Pending Appeal.**

      If the Court were to issue a permanent injunction, Defendants request that the imposition of that mandatory relief be stayed pending Defendants' appeal of the grant of an injunction. Federal Rule of Civil Procedure 62(d) permits the Court to issue such a stay. Furthermore, given the post-Order evidence, the First Amendment issues raised if the injunction were to issue, the absence of any monetary judgment, and the adequacy of Plaintiffs' remedy at law, Defendants ask the Court to forego the imposition of any bond for purposes of a stay pending appeal.

<strong>CONCLUSION</strong>

      Based on the foregoing, Defendants ask the Court to deny Plaintiffs' motion for a permanent injunction.

Dated: December 31, 2025

                                            **BERENS & MILLER, P.A.**

                                            s/Barbara Podlucky Berens
                                            Barbara Podlucky Berens (#209788)
                                            80 South Eighth Street
                                            3720 IDS Center
                                            Minneapolis, MN 55402
                                            (612) 349-6171
                                            bberens@berensmiller.com

                                            ***Attorneys for Defendants Michael J.***
                                            ***Lindell and My Pillow, Inc.***