Benesch

Timothy M. Frey
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Direct Dial: 312.624.6365
Fax: 312.767.9192
tfrey@beneschlaw.com

August 17, 2026

The Honorable Jeffrey M. Bryan
U.S. District Judge, District of Minnesota
316 N. Robert Street
St. Paul, MN 55101

**Re: *Smartmatic USA Corp., et al. v. Lindell, et al.*, Case No. 22-cv-00098-JMB-JFD; Plaintiffs' Opposition to Defendants' Request for Leave**

Dear Judge Bryan:

Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited ("Smartmatic") respectfully submit their opposition to Defendants' August 10, 2026 letter requesting leave to file a motion to reconsider ("Request for Leave") in the above-referenced case pursuant to Local Rule 7.1(j).

**Factual and Procedural Background.** On September 26, 2025, this Court granted Smartmatic's partial motion for summary judgment. (ECF No. 522.) Among other findings, the Court reasoned that "no reasonable trier of fact could find that any of the statements at issue are true," (*id.* at 52), including the following categories of actionable messages (*id.* at 52–53): (1) "that Smartmatic machines stole the 2020 Election or otherwise manipulated ballots that changed the outcome of the 2020 Election; (2) that Smartmatic BMDs were connected to the internet and, therefore, susceptible to hacking; and (3) that Smartmatic designed its machines to manipulate ballots and change election results." This Court determined that "it is mathematically impossible" for Smartmatic's machines to have changed the results of the 2020 Election in the only jurisdiction in which Smartmatic operated. (*Id.* at 53.) The Court concluded that "the record evidence shows that Smartmatic BMDs were not connected to the internet during the 2020 election." (*Id.* at 54.) Finally, the Court found that "there is simply no evidence in the record presented to support a finding that Smartmatic designed its BMDs to manipulate ballots or that Smartmatic machines have been used to manipulate ballots in other countries" (*id.*) and that "the only evidence in the record before the Court concerning Smartmatic's involvement in elections in other countries shows that Smartmatic has never stolen any election, and its technology has never been used to manipulate ballots." (*Id.* at 54–55.)

On July 16, 2026, the White House released several documents purportedly on the topic of election security. Among those was a document titled "Summary of Select Intelligence Reporting from 2004–2020 on Venezuela's Electronic Voting Manipulation Capabilities." (Attached hereto

as **Exhibit A**.[1]) The anonymously drafted document does not address any concerns related to the 2020 U.S. Presidential Election. (*See generally* **Exhibit A**.)

On August 10, 2026, Defendants filed their Request for Leave (ECF No. 535), claiming that the anonymous document "calls into question Plaintiffs' representations" and "raises red flags." As explained in further detail below, Defendants' Request for Leave does not, and cannot, tie any conclusion in the anonymous document to Smartmatic, and certainly cannot connect the document to the 2020 U.S. Presidential Election or actual rigging of an election.

**Reconsideration is Inappropriate.** Motions for reconsideration are "dimly viewed" in this District. *Ackerman v. PNC Bank,* No. 12-CV-42 (SRN/JSM), 2014 WL 4265826, at *2 (D. Minn. Aug. 29, 2014). They afford an opportunity for relief only in "extraordinary circumstances." *Dale & Selby Superette & Deli v. U.S. Dep't of Agric*., 838 F. Supp. 1346, 1348 (D. Minn. 1993). The purpose of motions for reconsideration is "to correct manifest errors of law or fact or to present newly discovered evidence." *Hagerman v. Yukon Energy Corp*., 839 F.2d 407, 414 (8th Cir. 1988) (citations and quotation marks omitted). A party cannot use a motion for reconsideration "as a vehicle to reargue the merits of the underlying Motion." *Fuller v. Hafoka*, No. 19-886 (PJS/BRT), 2020 WL 5350270, at *1 (D. Minn. Sep. 4, 2020).

**The Document Does Not Change the Court's Findings.** Even if the Court were to reconsider its summary judgment decision to include an analysis of the anonymous document (it should not), the document supports the Court's summary judgment findings. The document concludes that the intelligence community "did not definitively confirm that large-scale electronic fraud was successfully executed in specific Venezuelan elections," and that "reporting . . . provided concerning insight into alleged Venezuela government capabilities and intent, but came from limited sourcing." (**Exhibit A** at 1.) The report further claims that while the Venezuelan government had an interest in manipulating elections ("certain capabilities . . . were technically possible and operationally feasible . . ."), "this assessment focused on technical feasibility rather than confirmation that such features were actually implemented." (**Exhibit A** at 2.)

Most importantly, and in direct contrast to Defendants' allegation that Smartmatic participated in altering elections in Venezuela, the document notes that Smartmatic "ceased operations in Venezuela in 2018 after publicly accusing the Maduro regime of inflating voter turnout." (*Id.* at 3.) The document caveats that "neither Smartmatic nor the Venezuelan Government had the capability—that is, the level or control or access required[2]—to manipulate the outcome of an election outside of Venezuela," that "large-scale electronic fraud did not occur," and that other sources lacked "a definitive finding" due to "limited insight." (*Id.* at 4.)

The Court should not grant Defendants leave to re-litigate the issue of falsity.

---

[1] Defendants did not attach the actual document to their Request for Leave. The report is publicly available at https://www.whitehouse.gov/election-integrity/.

[2] Defendants claim that the document "reports that Venezuelan national elections were actually manipulated with 'Smartmatic's direct involvement.'" (ECF No. 535 at 2.) This is wrong. The document lists "***reporting*** that the Venezuela government manipulated Venezuela national elections with Smartmatic's direct involvement" in a list of "several factors" considered in a 2006 intelligence report—the same report that concluded that neither Venezuelan government nor Smartmatic has the capability to manipulate a foreign election. (**Exhibit A** at 3–4.)

Very truly yours,

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP

Timothy M. Frey

TMF:jml

# EXHIBIT A

APPROVED FOR PUBLIC RELEASE BY COUNSEL TO THE PRESIDENT WARRINGTON on 10 July 2026

Declassified by D/CIA Ratcliffe on 1 July 2026

[redacted]

CENTRAL INTELLIGENCE AGENCY

# CIA NOTE

# (U) Summary of Select Intelligence Reporting from 2004-2020 on Venezuela's Electronic Voting Manipulation Capabilities

*29 June 2026*

[redacted]

[redacted]

[redacted]

CENTRAL INTELLIGENCE AGENCY

**CIA** NOTE

*29 June 2026*

# (U) Summary of Select Intelligence Reporting from 2004-2020 on Venezuela's Electronic Voting Manipulation Capabilities

## (U) Summary

[redacted] Intelligence Community reporting from 2004-2020 documented persistent concerns about Venezuelan government manipulation of electronic voting systems and the potential national security implications for US election infrastructure. The intelligence established that Venezuelan government officials developed sustained interest and likely some capability in manipulating electronic voting systems, including Smartmatic technology, to influence electoral outcomes in Venezuela. The 2006 Intelligence Community assessment that Smartmatic's ties to Venezuela posed a national security threat was based on solid intelligence regarding Venezuelan government intent to influence US politics and evidence of Venezuelan manipulation of their own electoral systems. This assessment led to US government action forcing Smartmatic to divest its US operations in 2007. [redacted] reporting indicated that electronic voting systems contained vulnerabilities that could theoretically be exploited by sophisticated actors with insider access. However, while the intelligence validated significant concerns about foreign-linked voting technology vendors, it did not definitively confirm that large-scale electronic fraud was successfully executed in specific Venezuelan elections, with CIA's baseline assessments maintaining that other factors better explained electoral outcomes. The reporting on advanced techniques like [redacted] provided concerning insight into alleged Venezuelan government capabilities and intent, but came from limited sourcing.

(U) **Scope Note:** This summary focuses on what Intelligence Community reporting established regarding Venezuela's intent and capabilities to manipulate voting machines, both domestically and potentially in other countries. It is not a comprehensive re-assessment of all available intelligence on this topic, but rather a summary of key findings from select intelligence documents spanning 2004 to 2020.

## (U) Venezuela Government Interest in Election Manipulation

[redacted] intelligence sources between 2004 and 2020 reported that Venezuelan President Hugo Chavez and his successor Nicolas Maduro demonstrated sustained interest in manipulating electoral outcomes through electronic voting systems. In April 2004, intelligence reporting indicated Chavez stated his objective was to prevent the reelection of a sitting US president, suggesting intent to influence US domestic politics.[1] This finding was part of the basis for the Intelligence Community's 2006

[redacted] This product reflects a CIA perspective and was not coordinated within the Intelligence Community. It was produced under the auspices of Deputy Director of CIA for Analysis.

[redacted]

[redacted]

[redacted]

[redacted]

**CIA** NOTE

assessment that Smartmatic's acquisition of US voting systems company Sequoia posed a "moderate threat" to US national security.[2]

[redacted] Prior to Venezuela's 2012 presidential election, [redacted] reported that Chavez's intelligence services, including the General Directorate of Military Counterintelligence (DGCIM) and the Bolivarian Intelligence Service (SEBIN), worked with the National Electoral Council (CNE) and Smartmatic to develop plans to manipulate election results using preprogrammed voting machines. [redacted] reported that these plans called for deploying altered machines to approximately 300 voting centers in traditionally pro-Chavez areas to ensure victory by approximately 1.5 million votes.[3] Following the election, which Chavez won by approximately 1.6 million votes, sources reported that Chavez congratulated his team for successfully implementing the manipulation plan.[4]

[redacted] In September 2020, [redacted] reported that Venezuela [redacted] had developed detailed technical plans to manipulate the December 2020 National Assembly elections using what were [redacted] According to this reporting, the technique involved creating a second set of virtual machines that would replicate legitimate voting machine results, then substitute manipulated data while making votes appear to originate from legitimate machines. [redacted]

**(U) Technical Capabilities and Vulnerabilities**

[redacted] CIA analysts assessed in 2006 that certain capabilities [redacted] regarding electronic voting manipulation were technically possible and operationally feasible.[67] Specifically, [redacted] that voting machines in Venezuela had unspecified artificial intelligence components installed, were designed to alter vote tallies, could detect when they were being audited, and could provide printed receipts without registering, recording or transmitting those votes.[8] While CIA analysts judged these capabilities were theoretically achievable, this assessment focused on technical feasibility rather than confirmation that such features were actually implemented.

[redacted] A 2013 CIA alternative analysis, produced using the "Devil's Advocacy" methodology, outlined a plausible scenario for how large-scale electronic manipulation could have occurred in Venezuela's 2012 election without detection. This analysis noted that Venezuela's electronic voting system was vulnerable to insider access, the centralized nature of the CNE's control over voting technology, and gaps in opposition monitoring capabilities. The report assessed that if such manipulation occurred, "elections in Venezuela and other countries that are clients of the technology provider could be in doubt."[9] However, CIA's baseline assessment maintained that no large-scale electronic fraud occurred in 2012, based on pre-election polling data, absence of irregular voting patterns, and the opposition's concession.[10]

[redacted] Intelligence reporting consistently indicated that individuals with ties to Venezuelan intelligence services had access to election technology and voting systems. In 2012, sources reported that Chavez assigned an army communications specialist to the CNE to provide real-time access to election results.[11] Reporting from 2012 also indicated that the CNE Information Technology Director, described as a confidant of the head of military intelligence with expertise in voting technology, was responsible for designing protocols for auditing voting software.[12] These relationships provided potential pathways for manipulation of electronic voting systems.



[redacted]

[redacted]

# CIA NOTE

**(U) [redacted] Technique**

[redacted]) The September 2020 intelligence reporting on [redacted] plans provided the most detailed description of a specific technical approach to election manipulation, [redacted] technique was allegedly designed to:[13]

- [redacted] Replicate digital hash files sent to the central vote counting database;
- [redacted] Mimic real voting machines that favored the ruling party;
- [redacted] Overwrite hash files of voting machines that favored the opposition; and
- [redacted] Make altered votes appear to originate from legitimate voting machines.[14]

[redacted] this technique would, in theory, allow the Venezuelan government to monitor and adjust results in real-time during and after the election. The reporting indicated that virtual machine technology would be employed to accomplish this manipulation while evading detection through standard audit procedures.[15]

**(U) IC Assessments and Concerns**

[redacted] The 2006 National Security Threat Assessment produced by the National Intelligence Council evaluated Smartmatic's acquisition of Sequoia Voting Systems as a "moderate overall threat to US national security interests." This assessment was based on several factors:

- [redacted] Intelligence indicating Chavez's intent to influence US domestic politics and public opinion;
- [redacted] Reporting that the Venezuelan government manipulated Venezuelan national elections with Smartmatic's direct involvement;
- [redacted] intelligence that Smartmatic directors held credentials from Venezuelan intelligence services
- [redacted] Open source reporting of corrupt relationships between Smartmatic and Venezuelan government officials; and
- [redacted] Smartmatic's and Sequoia's reported contracts in approximately 400 US counties at the time.[16]

[redacted] The assessment concluded that Smartmatic's susceptibility to Venezuelan government manipulation makes the acquisition a potential instrument for Venezuelan officials seeking to undermine confidence in, or manipulate the electoral process in, the United States.[17] This finding led to pressure from the Committee on Foreign Investment in the United States (CFIUS) that resulted in Smartmatic divesting its ownership of Sequoia in 2007.

[redacted] In March 2018, Smartmatic ceased operations in Venezuela after publicly accusing the Maduro regime of inflating voter turnout by over one million votes in the August 2017 National Constituent Assembly election—figures that diverged from data recorded by Smartmatic's voting machines. This represented a break between Smartmatic and the Venezuelan government after years of the company providing electoral technology to Venezuela.[18]



[redacted]

[redacted]

# CIA NOTE

**(U) Limitations and Analytic Caveats**

[redacted] The intelligence reporting contains important limitations that must be considered when assessing what it establishes.

[redacted] First, the 2006 Intelligence Community assessment concluded that neither Smartmatic nor the Venezuelan Government had the capability—that is, the level of control or access required—to manipulate the outcome of an election outside of Venezuela in a predictable fashion. The Venezuelan Government's ability to manipulate the results of voting in Venezuela rested in part on its ability to control every stage of the electronic voting process, from initial acquisition of the machines to pre- and post-voting machine security, to programming, to storage of paper voting receipts, to control of the audit process. Neither the Venezuelan Government nor Smartmatic would have such a complete spectrum of access during an electoral process outside Venezuela.[19]

[redacted] Second, CIA's baseline assessment regarding Venezuela's 2012 election maintained that large-scale electronic fraud did not occur, despite [redacted] reporting of manipulation plans. This assessment was supported by pre-election polling showing Chavez ahead by approximately 10 percentage points, a 24% increase in government spending before the election, the opposition's concession of defeat, and CIA quantitative analysis showing no irregular voting patterns indicative of systematic manipulation.[20]

[redacted] Third, the 2013 Devil's Advocacy Report that outlined a plausible fraud scenario was explicitly an alternative analysis exercise rather than a definitive finding. The report acknowledged "conflicting [redacted] reporting" and "limited insight into key elements of the electronic voting system."[21]

[redacted] Fourth, the September 2020 reporting on [redacted] and judged the regime did not need to resort to gross fraud to win the December 2020 National Assembly elections, given that virtually the entire opposition boycotted and the regime had already co-opted opposition party leadership.[22]



[redacted]

[redacted]

# CIA NOTE

[redacted]



[redacted]